DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Timothy Graulich, Esq.
Joanna McDonald, Esq.

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 15** |
| **Andrade Gutierrez Engenharia S.A., et al.**[1] | **Case No. 26-12355 ( )** |
| **Debtors in a Foreign Proceeding** | **(Joint Administration Pending)** |

**DECLARATION OF GUSTAVO COUTINHO IN SUPPORT OF THE MOTION FOR (I) RECOGNITION OF FOREIGN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, (III) RECOGNITION AND ENFORCEMENT OF BRAZILIAN CONFIRMATION ORDER AND RELATED EJ PLANS AND (IV) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE AND ADDITIONAL FIRST DAY FILINGS**

I, Gustavo Braga Mercher Coutinho (the "Foreign Representative"), pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America as follows:

1. I am over the age of 18 and, if called upon, could testify to all matters set forth in this statement, except for those portions specified as being otherwise.

[1] The debtors in these chapter 15 cases (the "Chapter 15 Cases"), along with each Debtor's tax identification or corporate registry number, are: Andrade Gutierrez Engenharia S.A. (Brazil – No. 17.262.213/0001-94) ("AGE"), Andrade Gutierrez Construções e Serviços S.A. (Brazil – No. 39.469.291/0001-05) ("AGCS"), Andrade Gutierrez Investimentos em Engenharia S.A. (Brazil – No. 17.027.611/0001-26) ("AGIE"), Andrade Gutierrez International S.A. (Brazil – No. 20.253.172/0001-84) ("AGINT"), Zagope SGPS S.A. (Portugal – No. 507403177) ("Zagope"), and INZAG Germany GmbH (Germany – No. HRB 32335) ("INZAG").

2. I am making this Declaration in accordance with section 1515 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3. I am a Director at Andrade Gutierrez International S.A. ("AGINT") and an Officer of Andrade Gutierrez Investimentos em Engenharia S.A. ("AGIE"), the direct or indirect parent of Andrade Gutierrez Engenharia S.A. ("AGE") and Zagope Sgps, S.A. ("Zagope"), and affiliate of Andrade Gutierrez Construções e Serviços S.A. ("AGCS") and INZAG Germany GmbH ("INZAG"). As set forth below, I have also been appointed the foreign representative for the purposes of the Chapter 15 Cases, which are filed by AGE and its affiliated debtors, AGCS, AGIE, AGINT, INZAG and Zagope (collectively, the "Debtors") in respect of the *recuperação extrajudicial* proceeding (the "Brazilian EJ Proceeding") of the Debtors in the 1st Commercial Court of the District of Belo Horizonte (the "Brazilian Court") pursuant to Federal Law 11.101 of February 9, 2005 (as amended from time to time, the "Brazilian Bankruptcy Law") of the laws of the Federative Republic of Brazil ("Brazil"), filed before the Brazilian Court on May 19, 2026 (the "EJ Petition Date"). The Debtors, along with other related entities and affiliates (collectively, the "AG Group"), are part of a larger Brazilian corporate group.

4. I submit this declaration (the "Declaration") in support of the (a) *Official Form 401 Petitions* (collectively, the "Petitions"), (b) *Motion for (I) Recognition of Foreign Proceeding, (II) Recognition of Foreign Representative, (III) Recognition and Enforcement of Brazilian Confirmation Order and Related EJ Plans and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Motion"),[2] (c) *Motion Pursuant to Fed. R. Bank. 2002 and 9007 Requesting Entry of an Order Scheduling Recognition Hearing and Specifying Form and Manner*

[2] Capitalized terms not defined herein have the meaning ascribed to such terms in the Motion.

*of Service of Notice* (the "Scheduling Motion") and (d) *Motion for an Order Directing the Joint Administration of Andrade Gutierrez Engenharia S.A. and its Debtor Affiliates Pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rule 1015(b)* (the "Joint Administration Motion" and, together with the Petitions, the Motion and the Scheduling Motion, the "First Day Filings"), filed contemporaneously herewith.

5. I make this declaration on the basis of documentation I have reviewed and facts known to me through my work as a Director of AGINT and Officer of AGIE and in my capacity as foreign representative of the Debtors. Where relevant information has been provided to me by others, the information is true to the best of my knowledge and belief. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## BACKGROUND

### A. General Background and History

#### *i. Overview*

6. The Debtors are part of the engineering and civil construction division of the AG Group, a business conglomerate founded in September 1948. The AG Group has nearly 80 years of history in Brazil's heavy construction sector and is responsible for some of the most important projects in the country's history. For example, the AG Group was involved in the construction of the country's first subway line (in São Paulo, SP) and in the development of major Brazilian highways (the Anhanguera-Bandeirantes highway complex and the Presidente Castelo Branco Highway).

7. In total, the AG Group has delivered more than 1,000 projects across various segments of the infrastructure market, with a presence throughout its history in more than 40 countries in Africa, Central America, North America, South America, Asia, and Europe. Currently,

the AG Group employs more than 16,000 people in Brazil and around the world (of whom more than 9,000 are direct employees of the Debtors).

8. Adm. São Miguel S.A., Adm. Santo Estevão S.A., and Adm. Sant'Ana Ltda. (collectively, the "Shareholder Entities")—control the AG Group. Each of the Shareholder Entities is a Brazilian entity, and the Shareholder Entities make strategic decisions on behalf of each of the Debtors from the Group's offices in Brazil.

9. The AG Group's operational and economic activities are concentrated in Brazil, and its history designing and constructing Brazil's infrastructure runs deep. For example, the AG Group has (a) either led or participated in the largest hydroelectrical projects in Brazil's history, (b) been actively involved in the construction of Brazil's highway infrastructure, as stated above, (c) built four stadiums for the Brazil 2014 World Cup and the Olympic Park for the Brazil 2016 Olympic and Paralympic Games, and (d) built numerous refineries and other energy-related infrastructure in Brazil. The AG Group, overseen by corporate management in Brazil, has similarly continued to be involved in significant construction and engineering projects more recently as well.

10. As of the commencement of the Chapter 15 Cases, approximately US$554.6 million of the Debtors'[3] funded indebtedness is denominated in U.S. dollars and governed by New York law instruments. As further described herein, these instruments include notes issued by AGINT under those certain indenture agreements entered into in 2022 as part of the consummation of the 2022 EJ Plans (as defined and further discussed below): the indenture with respect to the notes due (a) 2029 (the "2029 Indenture") and (b) 2040 (the "2040 Indenture," and, together with the 2029 Indenture, the "Indentures"). The 2029 Indenture is attached hereto as Exhibit A. The

[3] INZAG and Zagope provide a limited guarantee for the Debtors' funded indebtedness.

2040 Indenture is attached hereto as Exhibit B. In addition to the Notes (as defined below), certain unsecured claims owed by Debtors AGE and AGCS are also being restructured pursuant to the Brazilian EJ Proceeding.

### *ii. The AG Group's Corporate Structure and Offices*

11. The AG Group's operational and economic activities are concentrated in Brazil. The AG Group's corporate structure reflects its history of financings, expansions, strategic investments, and acquisitions, as well as its corporate strategy of allocating specific operations to different corporate entities. The chart below shows, in relevant part, a summary of the AG Group's corporate structure as it pertains to the Debtors and certain of their related affiliates.[4]




12. As shown above, the AG Group, which includes all of the Debtors, has operational activities concentrated in Brazil and is subject to Brazilian laws and regulations. Since the Debtors' founding or its merging with the AG Group, as applicable, they have exclusively or primarily

[4] A description of the remaining minority ownership interests is set forth in the Bankruptcy Disclosures filed contemporaneously herewith.

operated in Brazil, existed primarily to fund operations taking place in Brazil and/or existed to support the operations of the Brazilian economic group. Indeed, the AG Group's primary operational activities are in Brazil, including its central operational management center, located in Belo Horizonte, Minas Gerais, Brazil (the "Belo Horizonte Office").

***iii. Chapter 15 Debtors***

13. AGE. AGE is a corporation organized under the laws of Brazil with its registered office in Belo Horizonte, Brazil. AGE is a privately held company and a subsidiary of AGIE. As noted above, AGE is an important holding and operational company of the AG Group, and with and through its subsidiaries leads many of the company's construction and engineering projects. AGE is a guarantor of the Notes. AGE does not have a board of directors, but all of AGE's executive officers are based in Brazil and all decisions are made in Brazil. Furthermore, a significant majority of its operating contracts are governed by Brazilian law. AGE employs approximately 1,290 employees, all in Brazil, and files its taxes in Brazil.

14. AGCS. AGCS is an entity organized under the laws of Brazil with its registered office in Belo Horizonte, Brazil. AGCS is one of the operational entities of the AG Group that is engaged in, among other things, (a) development of real estate projects, (b) construction in the areas of tourism, leisure, services, housing, and hotel projects, (c) renting properties, (d) engineering projects and services in all areas of its operations, and (e) operation and execution of public works. AGCS is owned by non-debtor Andrade Gutierrez Construções S.A., which holds 99.7% of its shares. AGCS is a guarantor of the 2029 Notes (as defined below). AGCS does not have a board of directors, but all of its officers are based in Brazil and are citizens of Brazil. Moreover, all decisions are made in Brazil. AGCS employs approximately 370 employees, all in Brazil, and files its taxes in Brazil.

15. AGIE. AGIE is an entity organized under the laws of Brazil with its registered office in Belo Horizonte, Brazil. AGIE is controlled directly by Andrade Gutierrez S.A. ("AGSA"), which owns 100% of its shares. AGIE's assets consist primarily of its equity interest in AGE. AGIE is also a guarantor of the 2029 Notes. AGIE does not have a board of directors, but its two officers (Renato Torres de Faria and I) are located in Brazil and are citizens of Brazil. AGIE does not have any employees.

16. AGINT. AGINT is an entity organized under the laws of Grand Duchy of Luxembourg with its registered office in Luxembourg, Luxembourg. AGINT is a pure finance subsidiary and is operated for the sole purpose of issuing funded indebtedness, such as the Notes, to fund, among other things, the Brazilian operations of the AG Group. AGINT is wholly owned by AGSA and is the issuer for the Notes. AGINT is managed by its board of directors. AGINT has three board members—Gustavo Benchimol, Sandra Sequeira, and I. Of the three of us, two are Brazilian citizens who work and reside in Brazil. AGINT's board meetings are held by video conference as permitted by local legislation with Brazilian directors generally participating from Brazil. AGINT does not have any employees.

17. Zagope. Zagope is an entity organized under the laws of Portugal with its registered office in Oeiras, Portugal. Zagope is owned 53.53% by AGE and 46.47% by AGIE. Its primary purpose is to hold equity participation in companies of the AG Group in certain jurisdictions outside of Brazil. Zagope is managed by its board of directors. Zagope is a guarantor under the 2029 Notes, alongside Debtor INZAG and the three Debtors organized under Brazilian law. Zagope has three board members–Margarida Eva Ferreira Damião Ferreira Fernandes Lobo, Ricardo de Oliveira Lopes de Sá, and André Giudice De Oliveira—two of whom are Brazilian

citizens who work and reside in Portugal. Its board meetings are held in Portugal. Zagope does not have any employees.

18. INZAG. INZAG is an entity organized under the laws of Germany with its headquarters in Wiesbaden, Germany. It is an operating company involved in the European and African markets, with all of its relevant corporate, strategic and operational decisions made in Brazil by the shareholders and its representatives. INZAG is part of the Brazilian economic group and became guarantor under the 2029 Notes pursuant to the 2022 EJ Proceeding, alongside Debtor Zagope and the three Debtors organized under Brazilian law.

**B. The Debtors' Capital Structure**

19. The Debtors' outstanding funded indebtedness consists of approximately (a) US$ 489,201,296.43 in aggregate amount of 9.000%/10.500% senior secured PIK toggle notes due 2029 issued by AGINT and guaranteed by AGE, AGIE, AGCS, Zagope, and INZAG pursuant to the terms and conditions of the 2029 Indenture (the "2029 Notes") and (b) US$ 65,464,463.81 in aggregate amount of 1.000% PIK toggle notes due 2040 issued by AGINT and guaranteed by AGE pursuant to the terms and conditions of the 2040 Indenture (the "2040 Notes" and, together with the 2029 Notes, the "Notes" and, holders of the Notes, the "Noteholders"). In addition to the indebtedness arising from the Notes (as defined below), Debtors AGE and AGCS also owe certain unsecured debts, in the approximate amounts of US$116.7 million and US$37.3 million, respectively, that are also being restructured pursuant to the Brazilian EJ Proceeding. Certain of the Debtors are also party to ordinary course working capital and equipment leasing arrangements, which are not subject to the Brazilian EJ Proceeding or the EJ Plans (as defined below).

## C. Events Precipitating Commencement of the Brazilian EJ Proceeding

### *i. The 2022 Restructuring and the Notes*

20. The Notes are a byproduct of the AG Group's previous exchange offers and debt issuances, including a restructuring pursuant to a previous Brazilian proceeding.[5] Specifically, in 2022, in view of certain macroeconomic adversities faced between 2015 and 2022, AGE, AGCS, AGIE, AGINT, and Zagope (collectively, the "2022 EJ Debtors")[6] filed a *recuperação extrajudicial* proceeding (the "2022 EJ Proceeding") in the 1st Corporate Court of the Judicial Venue of Belo Horizonte (the "2022 Brazilian Court") with the aim of restructuring the then-outstanding 2021 Notes and 2024 Notes.[7] On November 29, 2022, the 2022 Brazilian Court confirmed the extrajudicial restructuring plan (the "2022 EJ Plan") through which the 2021 Notes and 2024 Notes were cancelled and replaced by the 2029 Notes and the 2040 Notes, respectively. The 2022 EJ Debtors also commenced chapter 15 cases in this Court (the "2022 Chapter 15 Cases" and together with the 2022 EJ Proceedings, the "2022 Restructuring"), by which they obtained recognition of the 2022 EJ Proceeding as a foreign main proceeding of each of the 2022 EJ Debtors and enforcement of the 2022 EJ Plan. At issuance, the principal balance of the 2029 Notes and the 2040 Notes were approximately US$391,426,721 and US$63,288,319 respectively.

21. The Indentures for the Notes include terms and provisions that provide notice to the Debtors' creditors that restructuring of the Debtors' obligations could take place in Brazil, and that the Debtors are subject to the laws and regulations of Brazil. First, the Notes themselves were

[5] For further detail regarding the history of the 2022 EJ Proceeding, please see Decl. of Gustavo Coutinho in Supp. of the Mot. for (I) Recognition of Foreign Proceeding, (II) Recognition of Foreign Representative, & (III) Related Relief Under Chapter 15 of the Bankr. Code & Additional First Day Filings, *In re Andrade Gutierrez Engenharia S.A.*, No. 22-11425 (MG) at 18–25 (Bankr. S.D.N.Y., Oct. 31, 2022) (ECF No. 5).

[6] With the exception of INZAG, all of the 2022 Debtors are Debtors.

[7] The "2021 Notes" refers to the 11.00% senior secured PIK toggle notes due 2021 and the "2024 Notes" refers to the of 9.50% senior secured notes due 2024, each of which were issued by AGINT and guaranteed by AGE, AGIE, AGCS, and Zagope.

issued pursuant to the terms of a Brazilian proceeding – the 2022 EJ Proceeding. Moreover, as described below, the Debtors have historically and continue to hold themselves out to be part of a Brazilian economic group in official corporate communications and press releases.

22. For example, the Indentures make repeated reference to Brazilian rules, regulations, currency, institutions, and other Brazilian legal concepts. The Indentures' definitions are also filled with examples of Brazilian elements, including in the definitions of "Business Day," "Cash Equivalents," "Central Bank," and "Hedging Obligations." The Indentures provide that the "Collateral will be governed by, and construed in accordance, with the laws of Brazil."[8] The Indentures' definition of "Bankruptcy Law" includes both the Brazilian Bankruptcy Law and the Bankruptcy Code and specifically contemplates the filing of a *recuperação extrajudicial*.[9] The notice address for the Debtors that is included in the Indentures is also in Brazil.[10]

23. Finally, there have been numerous public communications in Brazil in connection with the Notes. For example, beginning May 20, 2026, both Brazilian and international media outlets reported on the commencement of the Brazilian EJ Proceeding. In addition, the Debtors created a SharePoint drive, as set forth in Section 8.3. of the EJ Plan, on which the main documents relating to the Brazilian EJ Proceeding were uploaded (the "Company Sharepoint"). Similarly, beginning on June 8, 2026, the Debtors sent letters informing all affected creditors of the filing of the Brazilian EJ proceeding, the main terms of the EJ Plans, and the applicable deadline for filing objections against the EJ Plans, which are attached hereto as Exhibits I and J.

[8] 2029 Indenture at 4-5, 10; 2040 Indenture at 2-3, 5.

[9] 2029 Indenture at 3-4; 2040 Indenture at 2.

[10] 2029 Indenture at 102; 2040 Indenture at 55.

### *ii. Events Following the 2022 Restructuring*

24. The 2022 Restructuring resolved defaults on billions of reais of financial debt and provided the AG Group with much-needed liquidity. However, the 2022 Restructuring, while successful, were not sufficient. New adversities arose which negatively impacted the Debtors' ability to pay the debts sought to be restructured in the Brazilian EJ Proceeding.

25. First, due to external factors, approximately 47% of the Debtors' project portfolio was halted or postponed as of December 2024, which negatively affected their cash flow. For example, major projects developed by INZAG in Ghana were suspended because the State of Ghana defaulted on its domestic debt securities. In addition, and also as of December 2024, a construction project in the Dominican Republic which accounted for 32% of the Debtors' portfolio was postponed by an order of the Dominican Republic itself. A rise in exchange rate pressure magnified these adversities in 2024, when the dollar sharply appreciated. This led to a default in December 2024 on an interest payment for the 2029 Notes. Simultaneously a rise in domestic interest rates substantially increased the cost of local currency debt.[11]

26. The challenging macro and microeconomic scenario negatively impacted the Debtors' ability to pay and led the Debtors to suffer significant losses between 2022 and 2025. This in turn led to defaults on the 2029 Notes (under which all Debtors are obligors) and on other local-currency denominated debts owed by the EJ Plan 1 Debtors.

### *iii. Negotiation of the Restructuring*

27. Against this backdrop, since December 2024, with the assistance of their advisors, Davis Polk & Wardwell LLP ("Davis Polk"), as counsel under New York law, and Mattar —

[11] For example, at the time the 2022 Extrajudicial Reorganization was filed, the Banco Central do Brasil projected a SELIC rate (a benchmark interest rate for the Brazilian economy) of 7.75% at the end of 2025, whereas the rate actually observed in December 2025 reached 15.00%.

Sociedade de Advogados ("Brazilian Counsel"), as counsel under the laws of Brazil, the Debtors have taken steps to negotiate a restructuring of their liabilities. Those negotiations ultimately led to the current restructuring, as further described below, which is supported by a creditor holding between 70% and 80% of the claims against each Debtor that are impaired by the EJ Plans.[12]

## D. The Brazilian EJ Proceeding and Brazilian Reorganization Plan

### *i. Overview of Restructuring and Brazilian EJ Proceeding*

28. The commencement of the Brazilian EJ Proceeding and the Chapter 15 Cases were duly authorized by each of the Debtors pursuant to applicable corporate laws on (a) May 8, 2026, by the board of directors of AGINT, (b) May 14, 2026, by the shareholders of AGE, (c) May 14, 2026, by the shareholders of AGCS, (d) May 14, 2026 by the shareholders of AGIE, (e) May 7, 2026, by the shareholders of Zagope, and (f) May 7, 2026, by the shareholders of INZAG (the resolutions in (a)-(f), the "Authorizing Resolutions"). The Authorizing Resolutions are attached hereto as Exhibit C. The Debtors submitted the EJ Plans to the Brazilian Court on May 19, 2026. A copy of EJ Plan 1 (in both Portuguese and a certified translation in English) is attached hereto as Exhibit D ("EJ Plan 1"). A copy of EJ Plan 2 (in both Portuguese and a certified translation in English) is attached hereto as Exhibit E ("EJ Plan 2," and together with EJ Plan 1, the "EJ Plans").

29. The Debtors are the issuer and guarantors of the 2029 Notes, and AGINT and AGE are the issuer and guarantor, respectively, of the 2040 Notes. EJ Plan 1 restructures claims against the Brazilian Debtors AGE, AGCS and AGIE (collectively the "EJ Plan 1 Debtors") under the Notes, as well as certain unsecured claims against EJ Plan 1 Debtors AGE and AGCS that are not owed to current suppliers, including an arbitration award and claims under a confidential

[12] In summary, the EJ Plans were approved, as applicable, by creditor holding more than (i) 71.3% of claims owed by AGE, (ii) 79.2% of claims owed by AGIE, (iii) 73.5% of claims owed by AGCS, (iv) 77.1% of claims owed by AGINT, (v) 79.2% of claims owed by Zagope, and (vi) 79.2% of claims owed by INZAG.

settlement agreement. EJ Plan 2 solely restructures claims against the non-Brazilian debtors AGINT (Luxembourg), Zagope (Portugal) and INZAG (Germany) (the "EJ Plan 2 Debtors") under the Notes. The terms of the EJ Plans are described in more detail below.

30. On May 28, 2026 the Brazilian Court entered an order that, among other things, confirmed acceptance of the filing of the Brazilian EJ Proceeding, ratified the preliminary automatic 180-day stay of all collection proceedings commenced by creditors subject to the Brazilian EJ Proceeding,[13] including holders of Notes, against the Debtors, and ordered the publication of a public notice informing affected creditors of the filing of the Brazilian EJ Proceeding and the deadline to submit objections to the EJ Plans (the "Initial Court Order"), which was later set for July 3, 2026. A copy of the Initial Court Order and a certified English translation thereof are attached hereto as Exhibit F.

31. On June 3rd, 2026, the public notice (*edital*) (the "Public Notice") of the Brazilian EJ Proceeding to affected creditors was published in the Brazilian Court's official judicial gazette. A copy of the Public Notice and a certified English translation thereof are attached hereto as Exhibit G. On June 3, 2026, the Debtors published the Public Notice in a local wide-circulation newspaper (*Diário do Comércio*), in both digital and printed editions (the "Published Public Notice"). A copy of the Published Public Notice and a certified translation thereof are attached hereto as Exhibit H. Between June 8, 2026 and June 10, 2026, the Debtors sent a notice, as required

[13] As explained in the *Declaration of Eduardo Augusto Mattar in Support of the Motion For (I) Recognition Of Foreign Proceeding, (II) Recognition of Foreign Representative, (III) Recognition and Enforcement of Brazilian Confirmation Order and Related EJ Plans and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code and Additional First Day Filings* ("Foreign Law Declaration"), recent modifications to the Brazilian Bankruptcy Law provide for a 180-day stay of all actions and enforcement proceedings against the debtor related to claims being restructured pursuant to the EJ plan—irrespective of whether such claims are held by creditors that executed the EJ plan. However, in order to receive the benefit of this stay, the debtor must demonstrate, *prima facie*, that creditor(s) representing at least one-third (1/3) of the total amount of impaired claims being restructured consented to, and executed, the EJ plan. In other words, obtaining the stay only depends on the Brazilian EJ Court verifying that the debtor has sufficient (i.e., 1/3) creditor support for their proposed EJ plan. Foreign Law Decl. ¶ 19.

pursuant to Brazilian Bankruptcy Law, to the 2029 Indenture trustee and the 2040 Indenture trustee (the "EJ Plan 1 Notice" and the "EJ Plan 2 Notice" respectively and, together, the "Brazilian Law Notices") for distribution to the Noteholders, as well as to other affected creditors, for each of the EJ Plans. Copies of each of the Brazilian Law Notices are attached hereto as Exhibits I and J, respectively.

32. As stated in the Foreign Law Declaration filed contemporaneously herewith, the objection deadline passed following July 3, 2026, and all objections have been overruled. Foreign Law Decl. ¶ 48. In light of the broad support for the EJ Plans, the Brazilian Court entered an order (the "Brazilian Confirmation Order") confirming the EJ Plans on September 17, 2026.[14] *Id.* The Brazilian Confirmation Order and a certified English translation thereof are attached hereto as Exhibit K.

### *ii. The Terms of the Restructuring*

33. On September 30, 2026, the Debtors launched an election process (the "Election") through The Depository Trust's ("DTC") automated-tender option program ("ATOP"). Pursuant to the Election, Noteholders will have the opportunity to choose from 3 different payment options under the EJ Plans (each, an "Option"): Option A, Option B, and Option C. Each Option under EJ Plan 1 has the same economic terms as the corresponding Option under EJ Plan 2. As further

[14] On September 29, 2026, a creditor of the Debtors' filed a motion for clarification with respect to the Brazilian Confirmation Order, which is pending before the Brazilian Court. As such, the deadline to appeal to Brazilian Confirmation Order in the Brazilian Court will be set for 15 days from the date that the motion for clarification is decided.

detailed below, as consideration for their claims, Noteholders shall receive consideration corresponding to the Option selected in the form of notes.

34. The below chart highlights the Election options available to Noteholders and high-level corresponding treatment under the EJ Plans, which is further detailed below and in the EJ Plans:

| **Election Option** | **Principal** | **Interest[15]** | **Maturity** | **Optional Redemption** |
|---|---|---|---|---|
| Option A | 36% of the subject claim | 6.00% per annum | December 28, 2040 | N/A |
| Option B | 100% of the subject claim | 1.00% per annum | December 28, 2070 | Yes – optional redemption at 90% discount |
| Option C | C-A: 31% of the subject claim | 6.00% per annum | December 28, 2040 | N/A |
| | C-B: 69% of the subject claim | 1.00% per annum | December 28, 2070 | Yes – optional redemption at 90% discount |

35. Creditors who elect option A (the "Option A Creditors" and the claims held by the Option A Creditors, the "Option A Claims") are entitled to receive as consideration (the "Option A Consideration") the equivalent of 36% of the amount of the subject claim, and the remaining 64% shall be discharged. Option A Claims held by Noteholders shall receive their Option A Consideration in the form of new notes (the "New Notes A") issued by AGINT and guaranteed by Debtors AGE, AGIE and AGCS and non-Debtors Andrade Gutierrez Participações S.A. ("AGPAR") and AGSA. The principal amount of the Option A Claims that are denominated in USD (including the New Notes A) shall accrue interest at a rate of 6.00% per annum. Interest

[15] Interest rates listed in the chart apply to USD denominated claims, including the Notes. Option A Claims and 31% of Option C Claims denominated in Brazilian reais accrue interest annually at the daily average interest rate for one-day interbank loans in Brazil ("DI Rate"). Option B Claims and 69% of Option C Claims denominated in Brazilian reais accrue interest annually at 2%.

accrued from the date of the Brazilian Confirmation Order to December 28, 2030 shall be capitalized into principal. Interest accrued from December 28, 2030 to December 28, 2040 shall be paid in cash on a semiannual basis on June 28 and December 28, as applicable, with the first payment being due June 28, 2031. The principal amount of the Option A Claims shall be paid in six annual installments beginning December 28, 2035, with a maturity date of December 28, 2040. The Notes will be secured by a fiduciary lien, governed by Brazilian law, on the shares issued by AGE and a first lien pledge, governed by German law, on the shares issued by INZAG.

36. Creditors who elect option B (the "Option B Creditors" and the claims held by the Option B Creditors, the "Option B Claims") are entitled to receive as consideration (the "Option B Consideration") the equivalent of 100% of the amount of the subject claim. Option B Claims held by Noteholders shall receive their Option B Consideration in the form of new notes (the "New Notes B") issued by AGINT and guaranteed by Debtors AGE, AGIE, AGCS and non-Debtor AGPAR. The principal amount of the Option B Claims that are denominated in USD (including the New Notes B) shall accrue interest at a rate of 1.00% per annum. The principal amount of the Option B Consideration shall be paid in one single installment due on the maturity date: December 28, 2070. The Option B Claims may be redeemed in advance, partially or in full, at the sole discretion of AGINT, AGE, AGCS, AGIE, AGSA and/or AGPAR at any time from January 1, 2035 until June 28, 2070. The Option B Claims may be redeemed with a discount equivalent to 90% of the subject Option B Claim. The Notes will be secured by a fiduciary lien, governed by Brazilian law, and granted on a conditional basis, over the shares issued by AGE and a second lien pledge, governed by German law, on the shares issued by INZAG.

37. Creditors who elect option C (the "Option C Creditors" and the claims held by the Option C Creditors, the "Option C Claims") are entitled to receive as consideration 31% of

the amount of their subject claims in the form of Option A Consideration and 69% of their subject claims in the form of Option B consideration.

38. On September 30, 2026, Epiq Corporate Restructuring, LLC, in its capacity as the Debtors' information agent (the "Information Agent") sent election notices (the "Noteholder Election Notice") and election forms (the "Noteholder Election Form") to the Noteholders through the banks and brokerage firms holding Notes through DTC or such firm's nominee representative, with sufficient copies and instructions to forward such documents to the Noteholders. Copies of the Noteholder Election Notice and the Noteholder Election Form are attached hereto as Exhibit L and Exhibit M respectively. On the same day, the Debtors posted the Noteholder Election Notice and the Noteholder Election Form on https://dm.epiq11.com/andrade (the "Case Website"). The Election is currently ongoing, and is scheduled to expire on October 30, 2026.

39. The EJ Plans are a significant step towards restructuring the Notes and providing the Debtors with an optimal competitive platform for their businesses. A Brazilian *recuperação extrajudicial*, like a prepackaged case under U.S. Bankruptcy Law, allows for an expeditious and cost-effective reorganization process that will maximize the Debtors' going concern value, and consummation of the EJ Plans offers the Debtors and their creditors a clear path to revitalized companies, well-positioned to preserve and build their businesses.

40. To further the implementation of the EJ Plans, the Debtors have determined that the Chapter 15 Cases are necessary to avoid potentially irreparable harm to the Debtors' creditors and businesses and to facilitate the Brazilian EJ Proceeding by ensuring that creditors cannot attempt to circumvent the Brazilian EJ Proceeding by taking action against the Debtors in the United States.

41. Pursuant to the Authorizing Resolutions, I have been, among other things, (a) appointed to act as the foreign representative of the Brazilian EJ Proceeding for purposes of these Chapter 15 Cases and (b) authorized to commence these Chapter 15 Cases. A true and correct copy of the Authorizing Resolutions is attached hereto as Exhibit C.

**E. Connections to the United States and this District**

42. The Debtors have property in the United States, including in this jurisdiction. Among other things, the Debtors have bank accounts held by AGINT, AGIE, AGCS and AGE located in Manhattan, New York (the "U.S. Bank Accounts") through which the Debtors periodically receive payments in the ordinary course of business. Each of the Debtors also has an interest in cash paid to Davis Polk for the benefit of each Debtor as retainer for Davis Polk & Wardwell LLP's services in connection with the Brazilian EJ Proceeding and the Chapter 15 Cases, in a bank account located in Manhattan, New York. Additionally, the Indentures are governed by New York law and contain provisions submitting the parties to the jurisdiction of New York state and federal courts.

43. Moreover, each of the Indentures contains a governing law clause selecting New York as the governing law, and the issuers and guarantors of the Notes expressly consented to New York jurisdiction and venue in the respective Indentures.

44. In addition, AGCS is part of an incorporated consortium constituted in Brazil for the sole purpose of designing, procuring, and constructing a liquefied natural gas terminal in Brazil. As is the case with the Indentures, the contract governing such project (the "Operating Contract") is governed in accordance with New York Law.

**REQUESTS FOR RECOGNITION AND RELATED RELIEF**

45. In connection with filing the Chapter 15 Cases, by and through my counsel, I have submitted the First Day Filings. In addition to the facts set forth above, factual bases for relief

under these motions is set forth below. I believe, after consultation with counsel, that the relief requested by each of the First Day Filings is necessary to maximize value for all of the Debtors' creditors through the Brazilian EJ Proceeding and to properly administer the Chapter 15 Cases.

***i. Joint Administration Motion***

46. Concurrently herewith, by and through my counsel, I have filed the Joint Administration Motion seeking entry of an order directing joint administration of the Chapter 15 Cases for procedural purposes only, and providing that parties-in-interest shall use a consolidated caption to indicate that any pleading filed relates to the jointly administered Chapter 15 Cases.

47. I believe that joint administration of the Chapter 15 Cases is warranted because the Debtors' financial affairs and business operations are closely related and because it will ease the administrative burden of the Chapter 15 Cases on the Court and interested parties and minimize confusion for affected creditors. I can confirm that the various notices, motions, orders, and other pleadings in the Chapter 15 Cases will affect all of the Debtors. I believe that the failure to jointly administer the Chapter 15 Cases would result in numerous duplicative pleadings filed for each issue and served upon separate service lists for six affiliated Debtors. I also believe that such duplication of substantially identical documents would be wasteful and would unnecessarily burden the Clerk of the Court (the "Clerk").

48. Moreover, I have been advised that joint administration will permit the Clerk to use a single docket for all of the Debtors' cases and to combine notices to creditors and other parties-in-interest, which will be both efficient and economic by reducing the overall costs of service. I have further been advised that joint administration will protect parties-in-interest by ensuring that they will be apprised of the various matters before the Court and minimize confusion from multiple notices that appear duplicative. I believe that the proposed caption set forth in the Joint Administration Motion should be approved as the modified caption for the Chapter 15 Cases.

49. I believe that the rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of the Chapter 15 Cases inasmuch as the relief sought in the Joint Administration Motion is purely procedural and not intended to affect substantive rights. I have been advised that each creditor and party-in-interest will maintain whatever rights it has against the particular Debtor against which it allegedly has a claim or right. I have also been told by my counsel that the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration. I have also been informed by my counsel that all creditors are likely to benefit from the Chapter 15 Cases being jointly administered because there would be reduced costs associated with the resulting streamlined services of process. Finally, I have been advised that if the requested relief is granted, the Court and the Clerk will be relieved of the burden of entering duplicative orders and keeping duplicative files, and supervision of the administrative aspects of the Chapter 15 Cases by the Office of the United States Trustee for Region 2 will be simplified. Therefore, I believe that the relief requested in the Joint Administration Motion is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties-in-interest.

***ii. Scheduling Motion***

50. Concurrently herewith, by and through my counsel, I have also filed the Scheduling Motion seeking the entry of an order approving, among other things, (a) the form and manner of service of notice (the "Recognition Hearing Notice"), of (i) the filing of the Debtors' Petitions and certain related pleadings, including the Motion, (ii) the deadline to object to the Court's entry of a final order (the "Proposed Order") granting the final relief sought in the Motion (the "Recognition Objection Deadline"), and (iii) the hearing for the Court to consider the Petitions and the relief requested in the Motion (the "Recognition Hearing"), (b) the form and manner of service of notice (the "Hearing Notice") of the Petitions, the Motion, the Recognition Objection Deadline, and the

Recognition Hearing, (c) the form and manner of service of the Recognition Hearing Notice on any party that files a notice of appearance in the Chapter 15 Cases, (d) the form and manner of service on the master service list of any pleadings or papers that I file through my counsel in the Chapter 15 Cases, and (e) granting certain related relief.

51. I can attest that the Debtors have many creditors, potential creditors, and other parties-in-interest that received actual notice or notice by publication of the Brazilian EJ Proceeding and many of whom may need to be provided with notice of the Proposed Order, the Recognition Objection Deadline, the Recognition Hearing, or other papers filed in the Chapter 15 Cases. Under the facts and circumstances of the Chapter 15 Cases, I submit that service of the Recognition Hearing Notice, service of the Hearing Notice, and service of other papers in the manner proposed in the Scheduling Motion will provide parties-in-interest due and sufficient notice of the relief requested in the Motion, the associated objection deadline, hearing dates, and of any other papers that may be filed in the Chapter 15 Cases.

52. Furthermore, I believe that the Recognition Hearing Notice provide multiple efficient ways for any party receiving such notice to obtain copies of pleadings filed in the Chapter 15 Cases, as it provides website addresses that can be used to obtain critical documents including the Motion and the Proposed Order. Additionally, I believe that service by the Debtors of all pleadings that they file in the Chapter 15 Cases by electronic mail to the extent email addresses are available, and otherwise by overnight mail or United States mail, first-class postage prepaid on the Notice Parties (as defined in the Scheduling Motion) is an efficient and effective way to provide notice to such key parties in the Chapter 15 Cases. At the same time, I believe that such proposed procedures will not overburden the Debtors with the significant costs associated with copying and

mailing all the various documents filed in the Chapter 15 Cases to the entire matrix of putative creditors and other parties.

53. Therefore, I believe that the relief requested in the Scheduling Motion is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties-in-interest.

***iii. Motion for Recognition***

54. Concurrently herewith, by and through my counsel, I have filed the Motion seeking entry of an order that, among other things:

(a) grants the petitions in the Chapter 15 Cases, including the Motion, and recognizes the Brazilian EJ Proceeding as a foreign main proceeding (or, in the alternative, as a foreign nonmain proceeding) pursuant to section 1517 of the Bankruptcy Code;

(b) recognizes me as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code, in respect of the Brazilian EJ Proceeding;

(c) recognizing and enforcing the EJ Plans in the United States and giving full force and effect, and granting comity in the United States, to the Brazilian Confirmation Order;

(d) entrusts me with the administration and realization of all assets of the Debtors within the territorial jurisdiction of the United States; and

(e) grants such other and further relief as the Court deems just and proper.

55. As detailed more fully in the Motion, I believe that there are persuasive reasons for recognition of the Brazilian EJ Proceeding as a foreign main proceeding (or, in the alternative, as a foreign nonmain proceeding), including that, pragmatically, Brazil is the sole jurisdiction in which the Debtors' businesses can be comprehensively and efficiently restructured given that, as described above, the Debtors are part of Brazilian economic group with deep current and historical connections and interests to and in Brazil. I have been advised by my counsel that the Brazilian

EJ Proceeding is a "foreign proceeding" and that I am a proper "foreign representative," as those terms are defined in the Bankruptcy Code. I have been further advised that the Chapter 15 Cases were duly and properly commenced by filing the Petitions accompanied by all fees, documents, and information required by the Bankruptcy Code and the Bankruptcy Rules, including (a) corporate ownership statements, (b) a list containing (i) the names and addresses of all persons or bodies authorized to administer the Foreign Proceeding of the Debtors and (ii) all parties to litigation pending in the United States in which the Debtors are a party at the time of filing of the Petitions (none) and (iii) all entities against whom provisional relief is being sought (none), (c) a statement identifying all foreign proceedings with respect to the Debtors that are known to me, and (d) copies of the Initial Court Order and the Authorizing Resolutions.

56. My counsel has also advised me that the bankruptcy stay is one of the most fundamental protections provided by the Bankruptcy Code. I have been advised that it halts, among other things, all collection efforts, harassment, and foreclosure actions against debtors and provides them with the necessary breathing room to step back from and attempt to resolve the financial pressures that caused a bankruptcy filing.

57. I believe that the Debtors may suffer irreparable harm if a stay of actions by creditors in the United States is not granted by the Court. Any such actions would cause significant disruption to the Debtors and their management during the implementation of the EJ Plans. Preventing actions that could disrupt the Brazilian EJ Proceeding or threaten the Debtors' foreign estates is necessary to ensure the success of the Brazilian EJ Proceeding, which the Debtors anticipate will result in their successful reorganization and a fair distribution to creditors.

58. I also believe that the Debtors' creditors and other stakeholders will suffer little, if any, harm as a result of the requested relief as it will merely preserve the status quo. I am advised

by counsel that, to the extent that any creditor wished to voice objections to the EJ Plans or the confirmation thereof, such objections could have been brought before the Brazilian Court. Foreign Law Decl. ¶ 23. In fact, two creditors brought objections before the Brazilian Court: One argued, *inter alia*, that its claims should not be pooled together with the claims held by the creditor supporting the EJ Plans. The other objecting creditor argued that the Debtors failed to submit certain documents in the dockets of Brazilian EJ Proceeding. Both objections were overruled by the Brazilian Court and the EJ Plans were subsequently confirmed. Therefore, the Debtors' creditors will not be adversely affected by a stay in the United States.

59. Additionally, I believe that it is critical that I be entrusted with the Debtors' assets located in the United States, because this will help ensure that the Debtors, through me, retain access to their property in the United States and are able to use such property as necessary in the ongoing operation of their businesses, in order to protect and maximize value for the benefit of all stakeholders, and in order to protect the Debtors' property from any maneuvers by creditors to seize assets. If I am not entrusted with the Debtors' assets located in the United States, I may not be able to assure that such assets are utilized to protect the Debtors' businesses in a manner consistent with the EJ Plan.

60. Finally, as described in the Motion, and as discussed with counsel, I understand and believe that recognizing the Brazilian EJ Proceeding and granting the relief requested therein is consistent with the purpose of chapter 15 of the Bankruptcy Code and the public policy of the United States. Therefore, I believe that the relief requested is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties-in-interest. Therefore, I have directed our United States counsel, Davis Polk & Wardwell LLP, to (a) commence the Chapter 15 Cases, (b) seek recognition of the Brazilian EJ Proceeding as a "foreign main

proceeding" or, in the alternative, a "foreign nonmain proceeding" and (c) enforce the EJ Plans under chapter 15 of the Bankruptcy Code.

## CONCLUSION

61. Based on the foregoing, I believe that the relief being requested at the outset of the Chapter 15 Cases is well-justified, necessary under the circumstances, in the best interests of the Debtors and their creditors, and should be granted.

[*Remainder of page intentionally left blank; signature page follows*]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is, to the best of my knowledge, information and belief, complete, true and correct.

Executed on this 30 day of September, 2026
in São Paulo, Brazil.

/s/ *Gustavo Braga Mercher Coutinho* _
Gustavo Braga Mercher Coutinho

# Exhibit A

## 2029 Indenture

**ANDRADE GUTIERREZ INTERNATIONAL S.A.,**
**as Issuer**

**ANDRADE GUTIERREZ ENGENHARIA S.A.,**
**ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A.,**
**AG CONSTRUÇÕES E SERVIÇOS S.A.,**
**ZAGOPE SGPS, S.A., and**
**INZAG GERMANY GMBH,**
**as Guarantors**

**WILMINGTON SAVINGS FUND SOCIETY, FSB, as Trustee, Registrar, Transfer Agent and Paying Agent**

**and**

**TMF GROUP NEW YORK, LLC,**
**as Collateral Agent**

---

# INDENTURE

**Dated as of December 21, 2022**

---

**9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029**

# TABLE OF CONTENTS

PAGE

## ARTICLE 1

### DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01. *Definitions* ....................1
Section 1.02. *Incorporation by Reference of Trust Indenture Act* ....................26
Section 1.03. *Rules of Construction* ....................26

## ARTICLE 2

### THE SECURITIES

Section 2.01. *Form and Dating; Payment* ....................28
Section 2.02. *Execution and Authentication; Additional Securities* ....................29
Section 2.03. *Registrar, Paying Agents and Transfer Agents* ....................30
Section 2.04. *Paying Agent to Hold Money in Trust* ....................31
Section 2.05. *Securityholder Lists* ....................31
Section 2.06. *Transfer and Exchange* ....................32
Section 2.07. *Replacement Securities* ....................33
Section 2.08. *Outstanding Securities* ....................33
Section 2.09. *Temporary Securities* ....................34
Section 2.10. *Cancellation* ....................34
Section 2.11. *CUSIP Numbers, Common Codes and ISINs* ....................34

## ARTICLE 3

### REDEMPTION

Section 3.01. *Notices to Trustee* ....................35
Section 3.02. *Notice of Redemption* ....................35
Section 3.03. *Effect of Notice of Redemption* ....................36
Section 3.04. *Optional Redemption* ....................36
Section 3.05. *Asset Sales Redemption; TEN Permitted Financing Redemption* ....................36
Section 3.06. *Optional Redemption for Equity Offerings* ....................37
Section 3.07. *Tax Redemption* ....................37
Section 3.08. *Mandatory Cash Sweep Redemption* ....................38
Section 3.09. *Deposit of Redemption or Purchase Price* ....................39
Section 3.10. *Open Market Purchases* ....................39

## ARTICLE 4

### COVENANTS

Section 4.01. *Performance of Obligations under the Securities* ....................39

Section 4.02. *Reports* .....40
Section 4.03. *Limitation on Indebtedness* .....42
Section 4.04. *Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries* .....45
Section 4.05. *Limitation on Transactions with Affiliates* .....47
Section 4.06. *Limitations with respect to the Issuer* .....48
Section 4.07. *Repurchases at the Option of the Holders Upon Change of Control* .....49
Section 4.08. *Limitation on Liens* .....51
Section 4.09. *Limitation on Sale and Leaseback Transactions* .....51
Section 4.10. *Maintenance of Corporate Existence* .....51
Section 4.11. *Maintenance of Properties* .....51
Section 4.12. *Compliance with Applicable Laws* .....52
Section 4.13. *Maintenance of Governmental Approvals* .....52
Section 4.14. *Payment of Taxes and Other Claims* .....52
Section 4.15. *Appointment of the Trustee or Collateral Agent* .....52
Section 4.16. *Maintenance of Books and Records* .....52
Section 4.17. *Listing of Securities* .....52
Section 4.18. *Additional Amounts* .....53
Section 4.19. *Ranking* .....55
Section 4.20. *Further Actions* .....55
Section 4.21. *Substitution of the Issuer* .....55
Section 4.22. *Limitation on Asset Sales* .....57
Section 4.23. *Restricted Payments* .....58
Section 4.24. *Permitted Business* .....62

ARTICLE 5

CONSOLIDATION, MERGER, CONVEYANCE, SALE OR LEASE

Section 5.01. *Consolidation, Merger, Conveyance, Sale or Lease* .....62

ARTICLE 6

DEFAULTS AND REMEDIES

Section 6.01. *Events of Default* .....64
Section 6.02. *Notice of Default; Acceleration* .....66
Section 6.03. *Control by Majority* .....67
Section 6.04. *Limitation on Suits; Rights of Holders to Receive Payments* .....68
Section 6.05. *Other Remedies* .....68
Section 6.06. *Collection Suit by Trustee* .....69
Section 6.07. *Trustee or Collateral Agent May File Proofs of Claim* .....69
Section 6.08. *Priorities* .....69
Section 6.09. *Undertaking for Costs* .....69
Section 6.10. *Waiver of Stay or Extension Laws* .....70

## ARTICLE 7

### TRUSTEE

Section 7.01. *Duties of Trustee* ....70
Section 7.02. *Rights of Trustee* ....71
Section 7.03. *Individual Rights of Trustee* ....73
Section 7.04. *Trustee's Disclaimer* ....73
Section 7.05. *Notice of Defaults* ....73
Section 7.06. *Compensation and Indemnity* ....74
Section 7.07. *Replacement of Trustee* ....75
Section 7.08. *Successor Trustee by Merger* ....76
Section 7.09. *Eligibility; Disqualification* ....76
Section 7.10. *Preferential Collection of Claims Against Issuer* ....76
Section 7.11. *Appointment of Co-Trustee* ....77

## ARTICLE 8

### DISCHARGE OF INDENTURE; DEFEASANCE

Section 8.01. *Satisfaction and Discharge of Liability on Securities* ....78
Section 8.02. *Application of Trust Money* ....78
Section 8.03. *Repayment to Issuer* ....79
Section 8.04. *Reinstatement* ....79
Section 8.05. *Defeasance* ....79
Section 8.06. *Indemnity for U.S. Government Obligations* ....80

## ARTICLE 9

### AMENDMENTS

Section 9.01. *Without Consent of Holders* ....80
Section 9.02. *With Consent of Holders* ....81
Section 9.03. *Revocation and Effect of Consents and Waivers* ....82
Section 9.04. *Notation on or Exchange of Securities* ....83
Section 9.05. *Trustee to Sign Amendments* ....83

## ARTICLE 10

### GUARANTEES

Section 10.01. *Guarantees* ....83
Section 10.02. *Guarantees Unconditional* ....84
Section 10.03. *Discharge and Reinstatement; Guarantor Releases* ....84
Section 10.04. *Waiver by the Guarantors* ....85
Section 10.05. *Subrogation and Contribution* ....85
Section 10.06. *Stay of Acceleration* ....86

Section 10.07. *Execution and Delivery of Guarantees* ....86
Section 10.08. *Purpose of Guarantees* ....86
Section 10.09. *Limitations of obligations of Inzag* ....86
Section 10.10. *Additional Guarantees* ....90

ARTICLE 11

COLLATERAL

Section 11.01. *Security Interest* ....91
Section 11.02. *Further Assurances* ....91
Section 11.03. *Impairment of Security Interest* ....92
Section 11.04. *Maintenance of Collateral* ....92
Section 11.05. *Release of Liens in Respect of Securities* ....93
Section 11.06. *Collateral Agent* ....93
Section 11.07. *Parallel Debt* ....97
Section 11.08. *Trustee* ....99

ARTICLE 12

RESIGNATION AND REMOVAL OF A COLLATERAL AGENT

Section 12.01. *Resignation or Removal of Collateral Agent* ....100
Section 12.02. *Appointment of Successor Collateral Agent* ....100
Section 12.03. *Succession* ....101
Section 12.04. *Merger, Conversion or Consolidation of Collateral Agent* ....101

ARTICLE 13

MISCELLANEOUS

Section 13.01. *Notices* ....102
Section 13.02. *Communication by Holders with Other Holders* ....104
Section 13.03. *Certificate and Opinion as to Conditions Precedent* ....104
Section 13.04. *Statements Required in Certificate or Opinion* ....104
Section 13.05. *Rules by Trustee, Paying Agents and Registrar* ....104
Section 13.06. *Legal Holidays* ....105
Section 13.07. *Governing Law* ....105
Section 13.08. *Successors* ....105
Section 13.09. *Multiple Originals* ....105
Section 13.10. *Table of Contents; Headings* ....105
Section 13.11. *Consent to Jurisdiction; Appointment of Agent to Accept Service of Process; Currency Indemnity* ....105
Section 13.12. *Waiver of Jury Trial* ....107
Section 13.13. *Severability* ....107
Section 13.14. *Regarding the Paying Agent* ....107
Section 13.15. *U.S.A. Patriot Act* ....108

<u>SCHEDULES, APPENDIX AND EXHIBITS</u>:

Appendix A: QIB/Accredited Investor/Regulation S Appendix

Schedule A: Required Affiliate Transactions

| | |
|---|---|
| Exhibit 1 to QIB/Accredited Investor/Regulation S Appendix | Form of Security |
| Exhibit 2 to QIB/Accredited Investor/Regulation S Appendix | Form of Notation of Guarantee |
| Exhibit 3 to QIB/Accredited Investor/Regulation S Appendix | Form of Regulation S Transfer Certificate |
| Exhibit 4 to QIB/Accredited Investor/Regulation S Appendix | Form of Restricted Securities Legend Transfer Certificate |
| Appendix B | Form of Beneficial Ownership Certificate |

INDENTURE dated as of December 21, 2022 among Andrade Gutierrez International S.A. (the "**Issuer**"), a public limited liability company (*société anonyme*) incorporated in the Grand Duchy of Luxembourg, with registered office at 12C, rue Guillaume Kroll, L-1882 Luxembourg and registered with the Luxembourg Register of Commerce and Companies under number B-176492, Andrade Gutierrez Engenharia S.A. (the "**Company**"), a corporation (*sociedade por ações*) incorporated in the Federative Republic of Brazil, AG Construções e Serviços S.A. ("**AGCS**"), a corporation (*sociedade por açõe*s) incorporated in Brazil, Andrade Gutierrez Investimentos em Engenharia S.A. ("**AGIE**"), a corporation (*sociedade por ações*) incorporated in Brazil, Zagope SGPS, S.A. ("**Zagope**"), a corporation (*sociedade anônima*) incorporated in Portugal, INZAG Germany GmbH, a limited liability company incorporated in Germany ("**Inzag**"), as guarantors (collectively, and together with the Company, the "**Guarantors**"), Wilmington Savings Fund Society, FSB, a national banking association, as trustee (the "**Trustee**"), registrar, transfer agent and paying agent, and TMF Group New York, LLC, as collateral agent (the "**Collateral Agent**").

Each party agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the Holders (as defined herein) of the Securities (as defined herein):

## ARTICLE 1

### Definitions and Incorporation by Reference

Section 1.01. *Definitions.*

"**Additional Amounts**" has the meaning set forth in Section 4.18 hereof.

"**Additional Securities**" means the 9.000%/10.500% Senior Secured PIK Toggle Notes due 2029 of the Issuer (other than the Initial Securities) issued in accordance with Section 2.02 hereof.

"**Affiliate Transaction**" has the meaning set forth in Section 4.05 hereof.

"**Affiliates**" of any specified Person means any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control," when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**AGC**" means Andrade Gutierrez Concessões S.A.

"**AGCS**" means AG Construções e Serviços S.A., a corporation (*sociedade por ações*) incorporated and existing under the laws of Brazil, enrolled at the National Taxpayers Registration (CNPJ/ME) under No. 39.469.291/0001-05.

"**AGE Collateral**" means the fiduciary sale (*alienação fiduciária*) of all AGE Shares held by AGIE and any and all economic rights related thereto that secures the Securities pursuant to the AGE Collateral Agreement.

"**AGE Collateral Agent"** means TMF Brasil Administração e Gestão de Ativos Ltda., as a sub-agent of the Collateral Agent.

"**AGE Collateral Agreement**" means the collateral agreement with respect to the AGE Collateral, to be entered into on the Issue Date by and among the Issuer, AGIE, the Company, and the AGE Collateral Agent, for the benefit of the Holders of the Securities.

"**AGE Shares**" means all of the outstanding common shares of the Company, owned by AGIE, currently representing 99.9% of the Company's Capital Stock, and currently amounting to 2,631,715,936 outstanding commons shares of the Company.

"**Agent**" means each of the Paying Agent, the Transfer Agent, the Registrar, any co-registrar, each Collateral Agent, and any other agent appointed pursuant to this Indenture.

"**AGIE**" means Andrade Gutierrez Investimentos em Engenharia S.A., a corporation (*sociedade por ações*) incorporated and existing under the laws of Brazil, enrolled at the National Taxpayers Registration (CNPJ/ME) under No. 17.027.611/0001-26.

"**AGPAR**" means Andrade Gutierrez Participações S.A., a corporation (*sociedade por ações*) incorporated and existing under the laws of Brazil enrolled at the National Taxpayers Registration (CNPJ/ME) under No. 04.031.960/0001-70.

"**AGSA**" means Andrade Gutierrez S.A., a corporation (*sociedade por ações*) incorporated and existing under the laws of Brazil, enrolled at the National Taxpayers Registration (CNPJ/ME) under No. 17.262.197/0001-30.

"**Appendix**" has the meaning set forth in Section 2.01 hereof.

"**Asset Sale**" means

(1) any sale, disposition, issuance, conveyance, transfer, lease (other than operating leases entered into in the ordinary course of business), assignment or other transfer (each, a "**disposition**"), by the Issuer, the Company or any Restricted Subsidiary of:

(a) any Capital Stock of any Restricted Subsidiary; or

(b) any property or assets (other than cash, Cash Equivalents or Capital Stock) of the Issuer, the Company or any Restricted Subsidiary not in the ordinary course of business,

(2) any receipt by the Company or any Restricted Subsidiary of Net Insurance/Condemnation Proceeds.

Notwithstanding the foregoing, the following shall not be deemed to be Asset Sales:

(1) the disposition of all or substantially all of the assets of the Issuer, the Company and the Restricted Subsidiaries as permitted under this Indenture or any disposition which constitutes a Change of Control;

(2) any transaction or series of related transactions involving assets with a Fair Market Value not in excess of US$15,000,000;

(3) the sale, lease, sublease, license, sublicense, consignment, conveyance or other disposition of real property, capital assets or equipment, inventory, indefeasible right of uses, accounts receivable or other assets in the ordinary course of business;

(4) the making of a Restricted Payment permitted under Section 4.23 hereof and any Permitted Investment;

(5) a disposition by the Issuer, the Company or a Restricted Subsidiary to the Issuer, the Company or another Restricted Subsidiary, including a Person that is or will become a Restricted Subsidiary immediately after the disposition;

(6) the sale or disposition of cash or Cash Equivalents;

(7) dispositions of receivables and related assets in the ordinary course of business or interests in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings (including pursuant to any Bankruptcy Law) and exclusive of factoring or similar arrangements;

(8) any issuance of Disqualified Stock otherwise permitted under Section 4.03 of this Indenture;

(9) the settlement, compromise, release, dismissal or abandonment of any action or claims against any Person; and

(10) dispositions in connection with a Permitted Lien.

"**Attributable Debt**" in respect of a Sale and Leaseback Transaction means, as at the time of determination, the present value (discounted at the interest rate implicit in the Sale and Lease-Back Transaction) of the total obligations of the lessee for rental payments during the remaining term of the lease included in such Sale and Lease-Back Transaction (including any period for which such lease has been extended), determined in accordance with IFRS.

"**Bankruptcy Custodian**" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

"**Bankruptcy Law**" means any bankruptcy, insolvency, reorganization or similar laws for the relief of debtors or any debt relief or debt restructuring law worldwide, including, without limitation, Brazilian Federal Law No. 11.101/2005, as amended from time to time, articles 437 to 592 of the Luxembourg Commercial Code, the relevant provisions of the Law dated 10 August 1915, as amended, on commercial companies, the relevant provisions of the Civil Code, other proceedings listed at Article 13, items 2 to 11, 13 of the Luxembourg Act dated December 19,

2002, as amended, on the Register of Commerce and Companies, Regulation (EU) No. 2015/848 of 20 May 2015 on insolvency proceedings (or any similar Luxembourg law) or any similar foreign law, as applicable, for the relief of debtors and the U.S. Bankruptcy Code. Furthermore, and for the avoidance of doubt, any scheme of arrangement or *recuperação extrajudicial* or *judicial* shall be deemed to have occurred under a Bankruptcy Law for all purposes herein.

"**Beneficial Owner**" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act. The terms "Beneficially Owns" and "Beneficially Owned" have corresponding meanings.

"**Board of Directors**" means, with respect to any Person, the board of directors of such Person or any committee thereof duly authorized to act on behalf of the board of directors of such Person, or similar governing body of such Person, including any managing partner or similar entity of such Person.

"**Brazil**" means The Federative Republic of Brazil and any branch of power, ministry, department, authority or statutory corporation or other entity (including a trust) owned or controlled directly or indirectly by it or any of the foregoing or created by law as a public entity.

"**Business Day**" means each day that is not a Saturday, Sunday or other day on which banking institutions in New York City, New York, Wilmington, Delaware or São Paulo, Brazil are authorized or required by law to close.

"**Capital Expenditures**" means, for any Person, the aggregate amount of all expenditures of such Person for fixed or capital assets made during such period which, in accordance with IFRS, would be classified as capital expenditures.

"**Capital Stock**" of any Person means any and all quotas, shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such Person, including any Preferred Stock and partnership interests, but excluding any debt securities convertible into such equity.

"**Capitalized Lease Obligation**" means an obligation that is required to be classified and accounted for as a capitalized lease for financial reporting purposes and the amount of Indebtedness represented by such obligation shall be the capitalized amount of such obligation; and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty.

"**Cash Equivalents**" means, at any time, any of the following:

(1) *Reais*, U.S. dollars or money in other currencies received in the ordinary course of business;

(2) direct obligations of, or unconditionally guaranteed by any country or a state thereof (or any agency or political subdivision thereof, to the extent such obligations are supported by the full faith and credit of the government of such country or a state thereof) where the Company or any Subsidiary has operations;

(3) commercial paper maturing no more than one year from the date of purchase thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's;

(4) demand deposits, certificates of deposit, time deposits or bankers' acceptances maturing within one year from the date of acquisition thereof issued by (a) any bank organized under the laws of the United States of America or any state thereof or the District of Columbia, (b) any member State of the European Union, (c) any U.S. branch of a non-U.S. bank having at the date of acquisition thereof combined capital and surplus of not less than US$250,000,000, (d) with respect to Cash Equivalents made by any Person whose principal place of business is in a jurisdiction other than the United States or such member state of the European Union, a bank operating in such other jurisdiction that either (i) has a long-term local currency rating of A1 or higher from Moody's, A or higher from S&P or A or higher from Fitch, or (ii) is ranked (by any applicable governmental regulatory authority or by any reputable, non-governmental ranking organization) as one of the top three banks in such jurisdiction (ranked by total assets), or (e) any bank to the extent the Company or any of its Subsidiaries maintains any deposits with such bank in the ordinary course of business, so long as no such deposit is outstanding for longer than 14 days; or

(5) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (1) above entered into with any bank meeting the qualifications specified in clause (4) above; and investments in money market funds which invest substantially all of their assets in securities of the types described in clauses (1) through (4) above.

"**Central Bank**" means the Brazilian Central Bank (*Banco Central do Brasil*).

"**Change of Control**" means:

(1) the acquisition (other than by way of merger, consolidation or amalgamation), in one or a series of related transactions, of all or substantially all of the assets (including properties) of the Company and its Subsidiaries taken as a whole or the Issuer by any "person" (as that term is used in Section 13(d) of the Exchange Act), other than one or more Permitted Holders;

(2) the adoption of a plan relating to the liquidation or dissolution of the Issuer or the Company; *provided, however*, that this clause shall not be applicable to (a) a Restricted Subsidiary consolidating with, merging into or transferring all or part of its properties and assets to the Company or (b) the Company merging with a Restricted Subsidiary of the Company solely for the purpose and with the sole effect of reincorporating the Company in another jurisdiction;

(3) the consummation of any transaction (including, without limitation, any merger, consolidation or amalgamation), the result of which is that any "person" (as defined above), other than one or more Permitted Holders, becomes the Beneficial

Owner, directly or indirectly, of more than 50% of the Voting Stock of the Issuer or the Company, measured by voting power rather than number of shares; or

(4) the Issuer and/or the Company merges, consolidates or amalgamates with or into any Person, or any Person merges, consolidates or amalgamates with or into the Company, in any such event pursuant to a transaction in which any of the outstanding Voting Stock of the Company or such other Person is converted into or exchanged for cash, securities or other property, other than any such transaction where the Voting Stock of the Company outstanding immediately prior to such transaction is converted into or exchanged for Voting Stock (other than Disqualified Stock) of the surviving or transferee Person constituting a majority of the outstanding shares of such Voting Stock of such surviving or transferee Person (immediately after giving effect to such issuance).

"**Change of Control Offer**" has the meaning set forth in Section 4.07 hereof.

"**Change of Control Payment**" has the meaning set forth in Section 4.07 hereof.

"**Change of Control Payment Date**" has the meaning set forth in Section 4.07

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collateral**" means the AGE Collateral and the Inzag Collateral.

"**Collateral Agent**" has the meaning set forth in the introductory paragraph.

"**Collateral Agents**" means the Collateral Agent and each of its appointed sub-agents, including the AGE Collateral Agent and the Inzag Collateral Agent. For the avoidance of doubt, when reference is made herein to the Collateral Agent, such reference, to the extent applicable, shall be deemed to include the AGE Collateral Agent and the Inzag Collateral Agent.

"**Collateral Agreements**" means the AGE Collateral Agreement and the Inzag Collateral Agreement.

"**Collateral Providers**" means AGIE and IZG Invest Unipessoal LDA.

"**Company**" or "**AGE**" means Andrade Gutierrez Engenharia S.A., a corporation (*sociedade por ações*) incorporated and existing under the laws of Brazil and enrolled at the National Taxpayers Registration (CNPJ/ME) under No. 17.262.213/0001-94, and its successors, excluding its Subsidiaries.

"**Consolidated EBITDA**" means, for any period, the amount equal to the sum of Consolidated Net Income for such period *plus*, to the extent deducted in calculating such Consolidated Net Income:

(1) consolidated financial expenses, net for such period;

(2) consolidated income tax and social contribution for such period;

(3) consolidated depreciation and amortization for such period;

(4) any restructuring charges or reserves, including any one-time costs Incurred in connection with acquisitions after the Issue Date and costs related to the closure and/or consolidation of facilities, and any other non-recurring charges for such period; and

(5) any non-cash charges of the Company and the consolidated Restricted Subsidiaries (excluding any such non-cash charge to the extent that it represents an accrual of or reserve for cash expenditures in any future period),

in each case calculated in conformity with IFRS. Notwithstanding the foregoing, any of the items described in clauses (1) through (5) above of any consolidated Restricted Subsidiary of the Company will be added to Consolidated Net Income to compute Consolidated EBITDA only to the extent (and in the same proportion) that the net income (loss) of such Subsidiary was included in calculating Consolidated Net Income in such period.

"**Consolidated Net Income**" means, for any period, the aggregate net income (or loss) of the Company and the Restricted Subsidiaries for such period determined on a consolidated basis in conformity with IFRS.

"**Consolidated Net Leverage Ratio**" means, on any date (the "**transaction date**"), the ratio of:

(1) the aggregate amount of Consolidated Net Indebtedness at that time to

(2) Consolidated EBITDA for the four fiscal quarters immediately prior to the transaction date for which financial statements have been delivered to the Trustee (the "**reference period**").

In making the foregoing calculation,

(a) *pro forma* effect will be given to (i) any Indebtedness Incurred (and the application of proceeds thereof) during or after the reference period to the extent the Indebtedness is outstanding or is to be Incurred on the transaction date as if the Indebtedness had been Incurred on the first day of the reference period and (ii) any Indebtedness repaid during or after the reference period as if the Indebtedness had been repaid on the first day of the reference period; and

(b) *pro forma* effect will be given to:

(A) the acquisition or disposition of companies, divisions or lines of businesses by the Company and the Restricted Subsidiaries, including any acquisition or disposition of a company, division or line of business since the beginning of the reference period by a

Person that became a Restricted Subsidiary after the beginning of the reference period, and

(B) the discontinuation of any discontinued operations that have occurred since the beginning of the reference period as if such events had occurred, and, in the case of any disposition, the proceeds thereof applied, on the first day of the reference period.

To the extent that *pro forma* effect is to be given to the calculation of the Consolidated Net Leverage Ratio, such *pro forma* calculation will be (i) based upon the most recent four full fiscal quarters for which the relevant financial information is available and (ii) determined in good faith by the chief financial officer, the treasurer or another accounting officer of the Company.

"**Consolidated Net Indebtedness**" means, as of any date of determination, the aggregate amount of Indebtedness of the Company and its Subsidiaries less the sum of (without duplication) consolidated cash and Temporary Cash Investments and consolidated marketable securities (except for any Capital Stock in any Person) in all cases determined in accordance with IFRS and as set forth in the most recent consolidated balance sheet of the Company. For the avoidance of doubt, "Consolidated Net Indebtedness" shall include Indebtedness represented by the Securities and the Guarantees (without duplication).

"**Corporate Trust Office**" means the designated office of the Trustee at which at any particular time its corporate trust business shall be administered (which office as of the date of this Indenture is located at 500 Delaware Avenue, Wilmington, DE 19801, Attn.: WSFS Institutional Services).

"**Default**" means any event which is an Event of Default or which, after notice or passage of time or both, would be an Event of Default.

"**Depositary**" means, with respect to the Securities issuable or issued in whole or in part in the form of one or more Global Securities, the Person designated in Section 2.03 hereof as Depositary by the Issuer pursuant to this Indenture, until a successor shall have been appointed and become such and, thereafter, "**Depositary**" shall mean or include such Person.

"**Disqualified Stock**" means, with respect to any Person, any Capital Stock that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable) or upon the happening of any event:

(1) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise;

(2) is convertible or exchangeable for Indebtedness or Disqualified Stock; or

(3) is redeemable at the option of the holder thereof, in whole or in part,

in each case on or prior to the 91st day after the Stated Maturity of the Securities; *provided*, *however*, that any Capital Stock that would not constitute Disqualified Stock

but for provisions thereof giving holders thereof the right to require such Person to repurchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the 91st day after the Stated Maturity of the Securities shall not constitute Disqualified Stock if the "asset sale" or "change of control" provisions applicable to such Capital Stock are not more favorable to the holders of such Capital Stock than the comparable provisions of this Indenture.

"**DTC**" means The Depository Trust Company.

"**Equity Offering**" means a public or private offering or sale by the Company of its Capital Stock or options, warrants or rights with respect to its Capital Stock, for cash to any Person (other than an Affiliate of the Company); *provided* that the cash proceeds are contributed to the Issuer.

"**Event of Default**" has the meaning set forth in Section 6.01 hereof.

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended.

"**Fair Market Value**" of any property, asset, share of Capital Stock, other security, Investment or other item means, on any date, the fair market value of such property, asset, share of Capital Stock, other security, Investment or other item on that date as determined in good faith by the management of the Issuer or the Company, as applicable.

"**Fitch**" means Fitch Ratings Ltd. and its successors.

"**Global Securities**" means any Securities issued in fully registered book-entry form to the Depositary (or its nominee), for the Beneficial Owners thereof, which shall be substantially in the form set forth in Exhibit 1 to the Appendix attached hereto.

"**Good Faith Contest**" means the contest of liability for taxes or other claims described in Section 4.14 hereof if such liability is diligently contested in good faith by appropriate proceedings timely instituted and adequate provisions are established if required by and in accordance with IFRS or other generally accepted accounting principles, as applicable.

"**guarantee**" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness or other obligation of any other Person and any obligation, direct or indirect, contingent or otherwise, of any Person:

(1) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation of such other Person (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise); or

(2) entered into for purposes of assuring in any other manner the obligee of such Indebtedness or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided*, *however*, that the term "guarantee" shall not include endorsements for collection or deposit in the ordinary

course of business. The term "**guarantee**" used as a verb has a correlative meaning. The term "**guarantor**" shall mean any Person guaranteeing any obligation.

"**Guarantees**" means the Guarantees pursuant to the provisions of Article 10 hereto granted by the Guarantors in favor of the Trustee and the Securityholders.

"**Guarantors**" means each of the Company, AGCS, AGIE, Zagope and Inzag and any other Person that provides a Guarantee in accordance with Article 10.

"**Hedging Obligations**" of any Person means the obligations of such Person under any agreement relating to any swap, option, forward sale, forward purchase, index transaction, cap transaction, floor transaction, collar transaction or any other similar transaction, in each case, for purposes of hedging or capping against Brazilian inflation, interest rates, currency or commodities price fluctuations.

"**Holder**" or "**Securityholder**" means the Person in whose name a Security is registered on the Securities Register.

"**IFRS**" means International Financial Reporting Standards as issued by the International Accounting Standards Board, as in effect from time to time.

"**Incur**" means issue, assume, guarantee, incur or otherwise become liable for Indebtedness or Capital Stock; *provided*, *however*, that any Indebtedness or Capital Stock of a Person existing at the time such Person is merged or consolidated with the Company or becomes a Subsidiary of the Company (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time of such merger or consolidation or at the time it becomes a Subsidiary of the Company. The terms "**Incurrence**," "**Incurred**" and "**Incurring**" shall have a correlative meaning to the foregoing. Neither the accretion of principal of a non-interest bearing or other discount security nor the capitalization of interest on Indebtedness shall be deemed the Incurrence of Indebtedness.

"**Indebtedness**" means, with respect to any Person on any date of determination (without duplication):

(1) the principal in respect of indebtedness of such Person for borrowed money;

(2) the principal and premium, if any, in respect of obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3) all obligations of such Person to pay the deferred and unpaid purchase price of property or services (except trade payables and contingent obligations to pay earn-outs), which purchase price is due more than six months after the date of placing such property in service or taking delivery and title thereto or the completion of such services;

(4) all reimbursement obligations of such Person in respect of the face amount of letters of credit or other similar instruments (the amount of such obligations being

equal at any time to the aggregate then undrawn and unexpired amount of such letters of credit or other instruments plus the aggregate amount of drawings thereunder that have not been reimbursed), other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (1) through (3) above) entered into in the ordinary course of business of such Person, such as import tax credits and import transactions, to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the third Business Day following receipt by such Person of a demand for reimbursement following payment on the letter of credit;

(5) the redemption, repayment or other repurchase amount of such Person with respect to any Disqualified Stock of such Person or any Preferred Stock of a Restricted Subsidiary of the Company, but excluding, in each case, any accrued dividends (the amount of such obligation to be equal at any time to the maximum fixed involuntary redemption, repayment or repurchase price for such Capital Stock, or if less (or if such Capital Stock has no such fixed price), to the involuntary redemption, repayment or repurchase price therefor calculated in accordance with the terms thereof as if then redeemed, repaid or repurchased, and if such price is based upon or measured by the Fair Market Value of such Capital Stock, such Fair Market Value shall be as determined in good faith by the Board of Directors or other governing body of the issuer of such Capital Stock);

(6) all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; *provided*, *however*, that the amount of Indebtedness of such Person shall be the lesser of:

(a) the Fair Market Value of such asset at such date of determination;

and

(b) the amount of such Indebtedness of such other Persons;

(7) to the extent not otherwise included in this definition, all Hedging Obligations of such Person;

(8) all Capitalized Lease Obligations of such Person; and

(9) all obligations of the type referred to in clauses (1) through (8) above of other Persons that is guaranteed by such Person to the extent so guaranteed;

if and to the extent any of the preceding items (other than letters of credit, Hedging Obligations and obligations under clauses (6) and (9) above) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with IFRS. Notwithstanding anything to the contrary contained herein, Indebtedness shall not include any advances by customers in connection with construction.

"**Indenture**" means this Indenture, as amended or supplemented from time to time.

"**Initial Lien**" has the meaning set forth in Section 4.08 hereof.

"**Initial Securities**" means US$391,426,721 in aggregate principal amount of 9.000%/10.500% Senior Secured PIK Toggle Notes due 2029 of the Issuer issued under this Indenture on the Issue Date and any replacement Securities issued therefor in accordance with this Indenture.

"**Interest Payment Date**" means: (i) the Issue Date, with interest computed for the period from and including the Issue Date to and including December 28, 2022 (it being understood that such interest payment is being distributed as PIK Interest and is made in advance for interest that would otherwise be paid on December 28, 2022 if December 28, 2022 were an Interest Payment Date, it being further understood that such interest shall be payable to Holders to which the Securities are issued on the Issue Date, notwithstanding any provision of the Indenture or the Securities regarding payment of interest to Holders of record as of any Record Date); (ii) March 28, June 28, September 28 and December 28 of 2023, commencing on March 28, 2023 through and including December 28, 2023 (it being understood that interest payable on March 28, 2023 shall be calculated from and excluding December 28, 2022); and (ii) June 28 and December 28 of each year, commencing on June 28, 2024.

"**Investment**" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the form of advances, loans or other extensions of credit including by way of guarantee or similar arrangements (other than advances), to customers or suppliers, in the ordinary course of business and consistent with past practice, that are recorded as accounts receivable, prepaid expenses or deposits on the balance sheet of a lender) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), Capital Expenditures, or the Incurrence of a guarantee of any obligation of, or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by, such other Persons and all other items that are or would be classified as investments on a balance sheet prepared on the basis of IFRS. If the Issuer, the Company or any Restricted Subsidiary issues, sells or otherwise disposes of any Capital Stock of a Person that is a Restricted Subsidiary such that, after giving effect thereto, such Person is no longer a Restricted Subsidiary, any Investment by the Issuer or any Restricted Subsidiary in such Person remaining after giving effect thereto shall be deemed to be a new Investment at such time.

For purposes of the definition of "**Unrestricted Subsidiary**":

(1) "**Investment**" shall include the portion (proportionate to the Company's or a Restricted Subsidiary's equity interest in a Restricted Subsidiary to be designated as an Unrestricted Subsidiary) of the Fair Market Value of the net assets of such Restricted Subsidiary of the Company or a Restricted Subsidiary at the time that such Restricted Subsidiary is designated an Unrestricted Subsidiary; *provided*, *however*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Company shall be deemed to continue to have a permanent "**Investment**" in an Unrestricted Subsidiary in an amount (if positive) equal to (a) the Company's "**Investment**" in such Subsidiary at the time of such redesignation *less* (b) the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets (as determined by

the Company) of such Subsidiary at the time that such Subsidiary is so re-designated a Restricted Subsidiary; and

(2) any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer.

"**Inzag**" means INZAG Germany GmbH, a limited liability company incorporated in Germany.

"**Inzag Collateral**" means all of the Inzag Shares held by IZG Invest Unipessoal LDA and any and all ancillary rights related thereto that secures the Securities pursuant to the Inzag Collateral Agreement.

"**Inzag Collateral Agent**" means TMF Trustee Services GmbH, as a sub-agent of the Collateral Agent.

"**Inzag Collateral Agreement**" means the share pledge agreement with respect to the Inzag Collateral, to be entered into on or about the Issue Date by and among IZG Invest Unipessoal LDA, Inzag, and the Inzag Collateral Agent, providing for pledges over the Inzag Collateral and all the ancillary rights thereto for the benefit of the Holders of the Securities.

"**Inzag Shares**" means all of the present and future shares of Inzag, held or to be held by IZG Invest Unipessoal LDA, currently representing 100% of Inzag's Capital Stock, and currently amounting to 2,500,000 shares of Inzag.

"**Issue Date**" means December 21, 2022.

"**Issuer**" means Andrade Gutierrez International S.A. and its successors, excluding its Subsidiaries.

"**Issuer Substitution Documents**" has the meaning set forth in Section 4.21 hereof.

"**Lien**" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any *alienação fiduciária*, *cessão fiduciária*, *hipoteca*, *penhor e anticrese*, conditional sale or other title retention agreement or lease in the nature thereof).

"**Material Adverse Effect**" means a material adverse effect on (a) the business, financial condition or results of operations of the Company and its Subsidiaries taken as a whole, or (b) the ability of either the Issuer or the Company to perform any of their respective obligations under this Indenture.

"**Maturity Date**" means December 28, 2029.

"**Moody's**" means Moody's Investors Service, Inc. and its successors.

"**Net Available Cash**" from an Asset Sale means cash payments received (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise and Net Proceeds from the sale or other disposition of any

securities received as consideration, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring Person of Indebtedness or other obligations relating to the properties or assets that are the subject of such Asset Sale or received in any other non-cash form) therefrom, in each case net of:

(1) all legal, accounting, investment banking, title and recording tax expenses, commissions and other fees and expenses Incurred, and all taxes paid, reasonably estimated to be actually payable or accrued as a liability under IFRS (including, for the avoidance of doubt, any income, withholding and other taxes payable as a result of the distribution of such proceeds to the Company and after taking into account any available tax credits or deductions and any tax sharing agreements), as a consequence of such Asset Sale;

(2) all payments made on any Indebtedness which is secured by any assets subject to such Asset Sale, in accordance with the terms of any Lien upon such assets, or which by applicable law be repaid out of the proceeds from such Asset Sale;

(3) all distributions and other payments required to be made to minority interest holders in Subsidiaries or joint ventures as a result of such Asset Sale;

(4) the deduction of appropriate amounts required to be provided by the seller as a reserve, on the basis of IFRS, against any liabilities associated with the assets disposed of in such Asset Sale and retained by the Company or any Restricted Subsidiary after such Asset Sale; and

(5) any funded escrow established pursuant to the documents evidencing such sale or disposition to secure any indemnification obligation or adjustments to the purchase price associated with any such Asset Sale.

"**Net Insurance/Condemnation Proceeds**" means the aggregate cash proceeds received by the Issuer, the Company or any of its Restricted Subsidiaries (a) under any casualty insurance policy in respect of a covered loss thereunder or (b) as a result of the taking of any assets of the Issuer, the Company or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking (any event of the type referenced in clauses (a) and (b) above being referred to as a "**Casualty Event**"), net of, without duplication:

(1) the actual and reasonable costs Incurred by the Issuer, the Company or any of its Subsidiaries in connection with the adjustment or settlement of any claims of the Issuer, the Company or such Subsidiary in respect thereof;

(2) the direct costs Incurred in connection with any sale of such assets as referred to in clause (b) of this definition, including, without limitation, legal, accounting and investment banking fees, and sales commissions, and any relocation expenses Incurred as a result of such asset sale;

(3) taxes paid or payable as a result of any sale of such assets as referred to in clause (b) of this definition, in each case, after taking into account any available tax

credits or deductions and any tax sharing arrangements Incurred in connection with any sale of such assets;

(4) amounts required to be applied to the repayment of Indebtedness secured by a Lien on the properties or assets that were the subject of such Casualty Event; and

(5) any reserve for adjustment in respect of the sale price of such properties or assets as referred to in clause (b) of this definition, established in accordance with IFRS.

"**Net Proceeds**" with respect to (i) any issuance or sale of Capital Stock or sale or other disposition of any Investment, means the cash proceeds of such issuance or sale net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, listing fees, discounts or commissions and brokerage, consultant and other fees and expenses actually Incurred in connection with such issuance or sale and net of taxes paid or payable in connection with such issuance, sale or disposition (after taking into account any available tax credit or deductions and any tax sharing arrangements); and (ii) any Incurrence of Indebtedness means the cash proceeds of such Indebtedness net of attorneys' fees, accountants' fees, listing fees, discounts or commissions and brokerage, consultant and other fees and expenses actually Incurred in connection with such Indebtedness and net of taxes paid or payable in connection with such Indebtedness (after taking into account any available tax credit or deductions and any tax sharing arrangements).

"**Notation of Guarantee**" means a notation of the Guarantors' Guarantees substantially in the form of Exhibit 2 to the Appendix.

"**Officer**" means (i) with respect to the Issuer, any director or authorized representative of the Issuer and (ii) with respect to the Company, any Guarantor or any Restricted Subsidiary, any authorized representative of the Company, any Guarantor or any Restricted Subsidiary including any President, Vice President, Executive Officer, Financial Officer or General Counsel of the Company, any Guarantor or any Restricted Subsidiary, as the case may be.

"**Officer's Certificate**" means, with respect to any Person, a certificate signed by, in the case of the Issuer or the Company, any Officer thereof, and, in the case of any other Person, any of the chief executive officer, the chief operating officer, the chief financial officer, the chief accounting officer, the treasurer, a director, the general counsel or any vice president (or any equivalent of the foregoing) of such Person.

"**Opinion of Counsel**" means a written opinion from legal counsel who may be an employee of or counsel to the Company, which opinion shall be reasonably satisfactory to the Trustee.

"**Option A Securities**" means the PIK Toggle Notes Due 2040 issued by the Issuer on the Issue Date.

"**Parallel Debt**" means the obligations of the Issuer, the Company, each Guarantor and each Collateral Provider under Section 11.08.

"**Paying Agent**" means any Person authorized by the Issuer or the Company to pay the principal of (and premium, if any), interest or any other amounts owing with respect to any Security; *provided* that the Trustee shall initially be appointed as the Paying Agent.

"**Payment Default**" has the meaning set forth in Section 6.01(e)(i) hereof.

"**Permitted Business**" means any business or activity of the Company or any of its Subsidiaries currently conducted as of the Issue Date, or any business or activity that is a reasonable extension, development or expansion thereof, or is complementary thereto, as determined in good faith by the Company.

"**Permitted Financial Institution**" means any first tier financial institution, or any of their respective Affiliates.

"**Permitted Holders**" means (1) Andrade Gutierrez S.A. or any of its Affiliates; and (2) any Person the Voting Stock of which (or in the case of a trust, the beneficial interests in which) is owned more than 50% by Andrade Gutierrez S.A.

"**Permitted Indebtedness**" has the meaning set forth in Section 4.03(b) hereof.

"**Permitted Investment**" means:

(1) Investments in the Issuer, the Company or a Restricted Subsidiary;

(2) Investments by the Company or any Restricted Subsidiary in any Person that is, or that result in any Person becoming, immediately after such Investment, a Restricted Subsidiary or constituting a merger or consolidation of such Person into the Company or with or into a Restricted Subsidiary;

(3) Investments in cash and Cash Equivalents;

(4) any Investment existing on, or made pursuant to written agreements existing on, the Issue Date and any extension, modification or renewal of such Investments *provided* that the amount of any such Investment may not be increased except (a) as required by the terms of such Investment as in existence on the Issue Date or (b) as otherwise permitted under this Indenture;

(5) Investments permitted pursuant to clause (i), (ii), (iii) or (iv) of Section 4.05 hereof.

(6) any Investments received in compromise or resolution of (a) obligations of Persons that were Incurred in the ordinary course of business of the Company or any of its Restricted Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any Persons (under any Bankruptcy Law); or (b) litigation, arbitration or other disputes;

(7) Investments by the Company or its Restricted Subsidiaries as a result of non-cash consideration permitted to be received in connection with an Asset Sale made in compliance with Section 4.22 hereof.

(8) Investments made with or in exchange for the issuance of Capital Stock (other than Disqualified Stock) of the Company;

(9) Investments in receivables owing to the Company or any Restricted Subsidiary created or acquired in the ordinary course of business and consistent with past practice;

(10) loans and advances to officers, directors and employees made in the ordinary course of business of the Company or any Restricted Subsidiary of the Company in an aggregate principal amount not to exceed US$1,000,000 at any one time outstanding;

(11) any Investment acquired from a Person which is merged with or into the Company or any Restricted Subsidiary, or any Investment of any Person existing at the time such Person becomes a Restricted Subsidiary and, in either such case, is not created as a result of or in connection with or in anticipation of any such transaction;

(12) Investments made in contemplation of bidding for or complying with engineering, procurement and construction contracts in the ordinary course, in the aggregate not to exceed US$30,000,000;

(13) Investments made with or in exchange for the issuance of Capital Stock (other than Disqualified Capital Stock) of the Company;

(14) additional Investments, taken together with all other Investments made pursuant to this clause (14) that are at that time outstanding, in the aggregate not to exceed US$20,000,000; *provided* that any Investments made pursuant to this clause (14) (other than with respect to a designation of an Unrestricted Subsidiary) must be made in the form of cash or Cash Equivalents; and

(15) any Investment in a Similar Business having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (15) that are at that time outstanding, not to exceed US$20,000,000.

"**Permitted Liens**" means:

(1) (a) Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to the Issuer, the Company or another Restricted Subsidiary permitted to be Incurred in accordance with Section 4.03 hereof, (b) Liens in favor of the Issuer or (c) in the case of Indebtedness of the Company, Liens in favor of the Company;

(2) Liens on any property or assets acquired from a Person which is merged with or into the Company or any Restricted Subsidiary, or any Liens on the property or assets of any Person or other entity existing at the time such Person or other entity

becomes a Restricted Subsidiary and, in either such case, is not created as a result of or in connection with or in anticipation of any such transaction; *provided* that such Liens may not extend to any other property owned by the Company or any Restricted Subsidiary;

(3) any Lien on any property or assets existing at the time of acquisition thereof and which is not created as a result of or in connection with or in anticipation of such acquisition; *provided* that such Liens may not extend to any other property owned by the Company or any Restricted Subsidiary;

(4) Liens for taxes, assessments, governmental charges, levies or claims which are not yet due or thereafter can be paid without penalty or are being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with IFRS;

(5) pledges or deposits in connection with workers' compensation laws, unemployment insurance laws or similar legislation, any deposit to secure appeal bonds in proceedings being contested in good faith to which the Company or any Restricted Subsidiary is a party, good-faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which the Company or any Restricted Subsidiary is a party or deposits for the payment of rent, in each case made in the ordinary course of business;

(6) any Lien in favor of issuers of surety or performance bonds or similar bonds or letters of credit issued pursuant to the request of and for the account of the Issuer, the Company or any Restricted Subsidiary in the ordinary course of business;

(7) (a) except in respect of Inzag, Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens and other similar Liens, on the property or assets of the Company or any Restricted Subsidiary arising in the ordinary course of business and securing payment obligations that are not yet due or are being contested in good faith by appropriate proceedings, and (b) solely in respect of Inzag, any Lien arising by operation of law in the ordinary course of business;

(8) easements, rights of way, restrictions, defects or irregularities in title and other similar charges or encumbrances not interfering in any material respect with the business of the Company or any Restricted Subsidiary, and any leases and subleases of real property that do not interfere with the ordinary conduct of the business of the Company or any Restricted Subsidiary, and which are made on customary and usual terms applicable to similar properties;

(9) Liens arising (a) solely by virtue of any statutory or common law provision relating to bankers' liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a creditor depository institution; *provided*, *however*, that such deposit account is not a dedicated cash collateral account and is not intended by the Company or any Restricted Subsidiary to provide collateral to such depository institution, (b) by virtue of any rights of set-off of any Person with respect to any deposit account of the Company or any Restricted Subsidiary arising in the

ordinary course of business, and (c) solely in respect of Inzag, any Lien arising under the general terms and conditions of banks or *Sparkassen* (*Allgemeine Geschäftsbedingungen der Banken oder Sparkassen*);

(10) solely in respect of Inzag, any Lien arising under any (extended) retention of title ((*verlängerter*) *Eigentumsvorbehalt*), hire purchase or conditional sale arrangement or arrangements having similar effect in respect of goods supplied to the Company or any Restricted Subsidiary in the ordinary course of trading and on the supplier's standard or usual terms and not arising as a result of any default or omission by the Company or any Restricted Subsidiary;

(11) solely in respect of Inzag, any Lien created for purposes of insolvency protection under section 8a German Part Time Retirement Act (*Altersteilzeitgesetz*) and section 7e of the German Social Security Code IV (*SGB IV*) or any similar provisions (introduced to render insolvency protection) or successor provisions and any Lien created in relation to pension liabilities;

(13) judgment Liens not giving rise to an Event of Default so long as such Lien is bonded in accordance with applicable law and any appropriate legal proceedings which may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(14) Liens granted to secure borrowing from, directly or indirectly, (a) *Banco Nacional de Desenvolvimento Econômico e Social—BNDES* (including loans from *Financiadora de Estudos e Projetos—FINEP*) or any other Brazilian governmental development bank or credit agency (including, without limitation, *Caixa Econômica Federal* in respect of any funding provided in connection with *Financiamento à Infraestrutura e ao Saneamento (FINISA)*), or (b) any international or multilateral development bank, government-sponsored agency, export-import bank or official export-import credit insurer;

(15) Liens on property or assets (including Capital Stock) of any Person that secure Indebtedness Incurred for the purpose of financing all or any part of the purchase price or cost of construction or improvement of such property or assets; *provided* that: (a) the aggregate principal amount of Indebtedness secured by such Liens is otherwise permitted to be Incurred in accordance with Section 4.03 hereof and does not exceed the cost of the assets or property so acquired or constructed; and (b) such Liens are created within 365 days of construction or acquisition of such assets or property and do not encumber any other assets or property of the Company or any Restricted Subsidiary other than such assets or property and assets affixed or appurtenant thereto; and *provided, further*, that to the extent that the property or assets acquired is Capital Stock, the Lien also may encumber other property or assets of the Person acquired;

(16) Liens in existence on the Issue Date;

(17) Liens securing the Securities and the Guarantees;

(18) any Lien securing Hedging Obligations so long as such Hedging Obligations are entered into for bona fide, nonspeculative purposes;

(19) any Lien on inventory or short-term receivables and related assets of any Person securing the obligations of such Person under any lines of credit or working capital facility or in connection with any structured export or import financing or other trade transaction; *provided* that the aggregate amount of receivables securing Indebtedness shall not exceed at any one time outstanding US$40,000,000;

(20) Liens on the Capital Stock of any Unrestricted Subsidiary;

(21) Liens securing Indebtedness Incurred by a Subsidiary that was an Unrestricted Subsidiary at the time of such Incurrence and the granting of such Liens that continue to exist after the date that the Issuer or the Company redesignates such Subsidiary as a Restricted Subsidiary;

(22) any extension, renewal or replacement (or successive extensions, renewals or replacements), in whole or in part, of any Lien referred to in clauses (2), (3), (15), (16), (17) or (21) above or (26) below; *provided* that the principal amount of Indebtedness secured by any such extension, renewal or replacement shall not exceed the principal amount of Indebtedness so secured at the time it was initially Incurred (plus premiums, interest and reasonable expenses Incurred in connection therewith), and that such extension, renewal or replacement Lien shall be limited to all or part of the property which secured the Lien extended, renewed or replaced (plus improvements on or additions to such property);

(23) any Liens imposed in connection with the leniency and other agreements that were entered into by the Issuer, the Company or their Affiliates with any Brazil or foreign governmental authorities or may be entered into with any Brazil or foreign governmental authorities, including, without limitation, with the Federal Prosecution Office of Brazil (*Ministério Público Federal*, or the MPF), and the Brazilian Antitrust Authority (*Conselho Administrativo de Defesa Econômica* – CADE), as well as in connection with any future agreements, investigations, probes or proceedings related thereto;

(24) Liens securing TEN Permitted Financing;

(25) other than Liens on the Collateral, Liens in favor of any creditor of new Indebtedness to be Incurred by the Company and/or the Issuer in order to prepay and/or refinance the Company's, the Issuer's or their respective Subsidiaries' Indebtedness; and

(26) Liens securing Indebtedness in an aggregate principal amount not to exceed US$25,000,000 at any one time outstanding.

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"**PIK Interest**" has the meaning set forth for such term in Section 2.01.

"**PIK Notice**" has the meaning set forth for such term in Section 2.01.

"**Preferred Stock**" as applied to the Capital Stock of any Person, means Capital Stock of any class or classes (however designated) that is preferred as to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Capital Stock of any other class of such Person.

"**Process Agent**" has the meaning set forth in Section 13.11(b) hereof.

"**Protected Purchaser**" means a purchaser of a Security, or of an interest therein, who (1) gives value, (2) does not have notice of any adverse claim to the Security, and (3) obtains control of the Security.

"**Purchase Money Indebtedness**" means Indebtedness:

(1) consisting of the deferred purchase price of an asset, conditional sale obligations, obligations under any title retention agreement and other purchase money obligations; or

(2) Incurred to finance all or any part of the purchase price, or other cost of construction or improvement, of any property; *provided*, *however*, that the aggregate principal amount of such Indebtedness does not exceed the lesser of the Fair Market Value of such asset or property or such purchase price or cost, including any Refinancing of such Indebtedness that does not increase the aggregate principal amount (or accreted amount, if less) thereof as of the date of Refinancing.

"**Qualified Capital Stock**" means any Capital Stock that is not Disqualified Stock and any warrants, rights or options to purchase or acquire Capital Stock that is not Disqualified Stock or that are not convertible into or exchangeable into Disqualified Stock.

"***Reais***" or "**R$**" means the lawful currency of Brazil.

"**Record Date**" means: (1) each March 15, June 15, September 15 and December 12 of each year (whether or not a Business Day), commencing on March 15, 2023 through and including December 28, 2023; and (2) each June 15 and December 12 of each year (whether or not a Business Day), commencing on June 15, 2024.

"**Refinance**" means, in respect of any Indebtedness, to refinance, extend (including pursuant to any defeasance or discharge mechanism), renew, refund, repay, replace, prepay, redeem, defease or retire, or to issue other Indebtedness in exchange or replacement for, such Indebtedness. "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

"**Refinancing Indebtedness**" means Indebtedness that is Incurred to Refinance any Indebtedness of the Issuer, the Company or any Restricted Subsidiary existing on the Issue Date or Incurred in compliance with this Indenture (including Indebtedness that Refinances Refinancing Indebtedness); *provided*, *however*, that:

(1) the Refinancing Indebtedness has a Stated Maturity no earlier than the Stated Maturity of the Indebtedness being Refinanced and such Refinancing Indebtedness has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is Incurred which is not less than the remaining Weighted Average Life to Maturity of the Indebtedness refunded or Refinanced;

(2) such Refinancing Indebtedness is Incurred in an aggregate principal amount (or if issued with original issue discount, an aggregate issue price) that is equal to or less than the aggregate principal amount (or if issued with original issue discount, the aggregate accreted value) then outstanding of the Indebtedness being Refinanced (plus premiums, interest and reasonable expenses Incurred in connection therewith);

(3) if the Indebtedness being Refinanced is Subordinated Obligations, such Refinancing Indebtedness is subordinated in right of payment to the Securities at least to the same extent as the Indebtedness being Refinanced;

(4) in no event may Indebtedness of the Issuer or the Company be Refinanced pursuant to this definition by means of any Indebtedness of any Subsidiary of the Company; and

*provided*, *further*, that Refinancing Indebtedness shall not include Indebtedness of the Issuer or the Company or a Restricted Subsidiary that Refinances Indebtedness of an Unrestricted Subsidiary.

"**Registrar**" means an office or agency, authorized by the Issuer or the Company, where Securities may be presented for registration of transfer or for exchange; *provided* that the Trustee shall initially be appointed as the Registrar.

"**Relevant Date**" has the meaning set forth in Section 4.18 hereof.

"**Relevant Jurisdiction**" has the meaning set forth in Section 4.18 hereof.

"**Required Holders**" means, in respect of any request by the Trustee for direction, the Holders of a majority in principal amount of the outstanding Securities as of the date one (1) Business Day prior to such request.

"**Restricted Investment**" means any Investment other than a Permitted Investment.

"**Restricted Payment**" has the meaning set forth in Section 4.23 hereof.

"**Restricted Subsidiary**" means any Subsidiary of the Company and any Subsidiary of such Subsidiary other than an Unrestricted Subsidiary; *provided* that for purposes of Article 4 of this Indenture, Inzag shall be deemed to be a Restricted Subsidiary.

"**Sale and Leaseback Transaction**" means any arrangement with any Person (other than the Company or a Restricted Subsidiary), or to which any such Person is a party, providing for the leasing to the Company or a Restricted Subsidiary of any property or assets which property or assets have been or are to be sold or transferred by the Company or such Restricted Subsidiary

to such Person or to any other Person (other than the Company or a Restricted Subsidiary) to which funds have been or are to be advanced by such Person on the security of the leased property or assets.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Secured Party**" means, individually, and "**Secured Parties**" means, collectively, the Holders and all other Persons to whom amounts are payable by the Issuer, the Company, any Guarantor, or any Collateral Provider under this Indenture, the Securities, the Guarantees or under any Collateral Agreements (including, without limitation, the Trustee and any Agent).

"**Securities**" means, collectively, the Initial Securities and any Additional Securities issued pursuant to this Indenture. For the avoidance of doubt, references to the "Securities" shall include any increase in the principal amount of outstanding Securities as a result of payment of PIK Interest.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended.

"**Securities Register**" has the meaning set forth in Section 2.03 hereof.

"**Significant Subsidiary**" means any Restricted Subsidiary of the Company which at the time of determination either (1) had assets which, based on the consolidated balance sheet of the Company for the fiscal quarter most recently ended for which internal financial statements are available, constituted at least 10% of the Company's total assets on a consolidated basis as of such date or (2) had revenues for the 12-month period which, based on the consolidated income statements of the Company for the fiscal quarter most recently ended for which internal financial statements are available, constituted at least 10% of the Company's total revenues on a consolidated basis for such period, in each case, (1) measured in accordance with IFRS and (2) on a *pro forma* basis to give effect to any acquisition or disposition of companies, divisions, lines of businesses or operations by the Company and the Restricted Subsidiaries subsequent to such date (or the beginning of such period, as applicable) and on or prior to the date of determination.

"**Similar Business**" means any business conducted or proposed to be conducted by the Company or the Restricted Subsidiaries on the Issue Date or any business that is similar, reasonably related, complementary, incidental or ancillary thereto, or is a reasonable extension, development or expansion thereof.

"**Stated Maturity**" means, with respect to any Indebtedness, the date specified in such Indebtedness as the fixed date on which the final payment of principal of such Indebtedness is due and payable, including, with respect to any principal amount which is then due and payable pursuant to any mandatory redemption provision, the date specified for the payment thereof (but excluding any provision providing for the repurchase of any such Indebtedness upon the happening of any contingency unless such contingency has occurred).

"**Subordinated Obligation**" means any Indebtedness that is subordinate or junior in right of payment to the Securities and the Guarantees pursuant to a written agreement.

"**Subsidiary**" means, with respect to any Person (the "**parent**") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which more than 50% of the outstanding Voting Stock is owned, directly or indirectly, by such Person and one or more Subsidiaries of such Person (or a combination thereof).

"**Substituted Debtor**" has the meaning set forth in Section 4.21 hereof.

"**Successor Company**" has the meaning set forth in Section 5.01(b) hereof.

"**Successor Guarantor**" has the meaning set forth in Section 5.01(c)(i) hereof.

"**Successor Issuer**" has the meaning set forth in Section 5.01 hereof.

"**Temporary Cash Investments**" means any of the following:

(1) *Reais*, U.S. dollars or money in other currencies that are readily convertible into U.S. dollars received in the ordinary course of business;

(2) any investment in direct obligations of Brazil, the United States or any agency thereof or obligations guaranteed by Brazil, the United States or any agency thereof;

(3) investments in time deposit accounts, certificates of deposit and money market deposits issued by a bank or trust company that is organized under the laws of the United States, any state thereof, Brazil or any foreign country recognized by the United States having capital, surplus and undivided profits aggregating in excess of US$500,000,000 (or the foreign currency equivalent thereof) and whose long term debt is rated "A" (or such similar equivalent rating, including similar equivalent ratings in foreign countries) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act);

(4) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (2) above entered into with a bank meeting the qualifications described in clause (3) above;

(5) investments in commercial paper maturing not more than 90 days after the date of acquisition issued by a corporation (other than an Affiliate of the Company) organized and in existence under the laws of the United States, Brazil or any other foreign country recognized by the United States with a rating at the time as of which any investment therein is made of "P 1" (or higher) according to Moody's or "A 1" (or higher) according to S&P (or such similar equivalent rating, including similar equivalent ratings in foreign countries);

(6) investments in securities with maturities of 12 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of

the United States, or by any political subdivision or taxing authority thereof, and rated at least "A" by S&P or "A" by Moody's (or such similar equivalent rating);

(7) certificates of deposit, banker's acceptances and time deposits issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any Brazilian or United States office of any Permitted Financial Institution; and

(8) investments in money market funds substantially all the assets of which are comprised of investments of the types described in clauses (1) through (7) above.

"**TIA**" means the Trust Indenture Act of 1939 as in force at the date as of which this Indenture was executed; *provided, however*, that in the event the Trust Indenture Act of 1939 is amended after such date, "**TIA**" means, to the extent required by any such amendment, the Trust Indenture Act of 1939 as so amended.

"**Transfer Agent**" means any Person authorized by the Issuer or the Company at whose office or agency Securities may be presented or surrendered for transfer or for the exchange; *provided* that the Trustee shall initially be appointed as the Transfer Agent.

"**Trustee**" means the party named as such in this Indenture until a successor replaces it and, thereafter, means the successor.

"**Trust Officer**" means, when used with respect to the Trustee or the Collateral Agent, any officer within the corporate trust department of the Trustee or the Collateral Agent, as applicable, having direct responsibility for the administration of this Indenture and to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject.

"**United States**" means the United States of America.

"**Unrestricted Cash**" means the sum of the aggregate amount of cash and Cash Equivalents held by Inzag and its Subsidiaries and the Company and its Subsidiaries that (1) would not appear as "restricted" on the consolidated balance sheet of Inzag or the Company, as applicable, contained in its respective audited annual consolidated financial statements (including the notes thereto) prepared in accordance with IFRS, or (2) are restricted in favor of the Securities.

"**Unrestricted Subsidiary**" means:

(1) any Subsidiary of the Company that is designated as an Unrestricted Subsidiary by the Company in compliance with the terms of this Indenture; and

(2) any Subsidiary of an Unrestricted Subsidiary.

The Company may designate any Subsidiary of the Company (including any newly acquired or newly formed Subsidiary or a Person becoming a Subsidiary through merger, consolidation or other business combination transaction, or Investment therein), to be an Unrestricted Subsidiary only if:

(1) such Subsidiary or any of its Subsidiaries does not own any Capital Stock or Indebtedness of, or own or hold any Lien on any property of, the Issuer, the Company or any other Subsidiary of the Issuer or the Company which is not a Subsidiary of the Subsidiary to be so designated or otherwise an Unrestricted Subsidiary; and

(2) such designation and the Investment of the Company in such Subsidiary complies with Section 4.23 hereof.

As of the Issue Date, all of the Company's Subsidiaries are Restricted Subsidiaries.

"**U.S. Bankruptcy Code**" means the United States Bankruptcy Reform Act of 1978, as amended, and codified as 11 U.S.C. §§ 101 et seq.

"**U.S. dollar**" or "**US$**" means the lawful currency of the United States.

"**U.S. Government Obligations**" means direct obligations (or certificates representing an ownership interest in such obligations) of the United States (including any agency or instrumentality thereof) for the payment of which the full faith and credit of the United States is pledged and that are not callable or redeemable at the issuer's option.

"**Voting Stock**" of a Person means all classes of Capital Stock or other interests (including partnership interests) of such Person then outstanding that are entitled (without regard to the occurrence of any contingency) to vote in the election of the directors of such Person, but excluding such classes of Capital Stock or other interests that are entitled, as a group in a separate cast, to appoint one director of such Person as representative of the minority shareholders.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years (calculated to the nearest one-twelfth) obtained by dividing:

(1) the then outstanding aggregate principal amount or liquidation preference, as the case may be, of such Indebtedness into

(2) the sum of the products obtained by multiplying:

(a) the amount of each then remaining installment, sinking fund, serial maturity or other required payment of principal or liquidation preference, as the case may be, including payment at final maturity, in respect thereof, by

(b) the number of years (calculated to the nearest one-twelfth) which shall elapse between such date and the making of such payment.

"**Wholly-Owned Subsidiary**" means any Restricted Subsidiary of a Person of which at least 95% of the outstanding Capital Stock or other ownership interests (other than directors' qualifying shares) of such entity shall at the time be owned by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

"**Zagope**" means Zagope SGPS, S.A., a corporation (*sociedade anônima*) incorporated under the laws of the Portugal.

"**Zagope Guarantee Limit**" has the meaning set forth in Section 2.01 hereof.

Section 1.02. *Incorporation by Reference of Trust Indenture Act*. The following TIA terms have the following meanings:

"**indenture securities**" means the Securities and the Guarantees; and

"**obligor**" on the indenture securities means the Issuer, the Guarantors and any other obligor on the indenture securities.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule have the meanings assigned to them by such definitions to the extent such terms are not defined herein.

Section 1.03. *Rules of Construction*. Unless the context otherwise requires:

(a) a term has the meaning assigned to it;

(b) (i) all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with IFRS, (ii) except as otherwise herein expressly provided, the term IFRS, with respect to any computation required or permitted hereunder, shall mean IFRS as of the date of such computation, and (iii) except as otherwise herein expressly provided, all ratios and computations based on IFRS contained in this Indenture should be computed in conformity with IFRS;

(c) "or" is not exclusive;

(d) "including" and "includes" means including and includes without limitation;

(e) words in the singular include the plural and words in the plural include the singular;

(f) unsecured Indebtedness shall not be deemed to be subordinate or junior to secured Indebtedness merely by virtue of its nature as unsecured Indebtedness;

(g) the principal amount of any non-interest bearing or other discount security at any date shall be the principal amount thereof that would be shown on a balance sheet of the Company dated such date prepared in accordance with IFRS;

(h) the principal amount of any Preferred Stock shall be (a) the maximum liquidation value of such Preferred Stock or (b) the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock, whichever is greater;

(i) references to "principal amount" of Securities include any increase in the principal amount of outstanding Securities as a result of the payment of PIK Interest;

(j) all references to the date the Securities were originally issued shall refer to the Issue Date;

(k) unless context requires otherwise, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Indenture shall refer to this Indenture as a whole and not to any particular provision of this Indenture;

(l) unless otherwise stated, any agreement, contract or document defined or referred to herein shall mean such agreement, contract or document and all schedules, exhibits and attachments thereto as in effect as of the date hereof, as the same may thereafter be amended, supplemented or otherwise modified from time to time; and

(m) all references in this Indenture and the Securities to principal, interest or any other amount payable under, or with respect to the Securities or the Guarantees, as applicable, shall be deemed also to refer to any Additional Amounts which may be payable as set forth in this Indenture or in the Securities, unless the context otherwise requires, and express mention of the payment of Additional Amounts in any provision hereof or thereof shall not be construed, without more, as excluding reference to Additional Amounts in those provisions hereof or thereof where such express mention is not made.

# ARTICLE 2

## THE SECURITIES

Section 2.01. *Form and Dating; Payment*. Provisions relating to the Securities are set forth in the QIB/Accredited Investor/Regulation S Appendix attached hereto (the "**Appendix**") which is hereby incorporated in, and expressly made part of, this Indenture. The Securities and the Trustee's certificate of authentication shall be substantially in the form of Exhibit 1 to the Appendix which is hereby incorporated in, and expressly made a part of, this Indenture. The Securities may have notations, legends or endorsements required by law, stock exchange rule, agreements to which the Issuer and Guarantors are subject, if any, or usage (*provided* that any such notation, legend or endorsement is in a form acceptable to the Issuer and the Company). Each Security shall be dated the date of its authentication. The Securities shall be issued in minimum denominations of US$1.00 and integral multiples of US$1.00 in excess thereof in the form of one or more Global Securities. The Securities shall be fully and unconditionally guaranteed by the Guarantors in accordance with Article 10, except that (x) Zagope's Guarantee shall guarantee the Issuer's obligations pursuant to the Securities only up to US$50,000,000 (the "**Zagope Guarantee Limit**") and (y) any guarantee granted by any German GmbH Guarantor or any German Guarantor organized under the laws of the Federal Republic of Germany as a limited liability partnership (*GmbH & Co. KG*) with a GmbH as sole general partner shall be subject to the limitations pursuant to Section 10.10 of this Indenture. The terms of the Securities set forth in the Appendix and Exhibit 1 to the Appendix are part of the terms of this Indenture.

(a) The Issuer shall pay interest on the Securities on each Interest Payment Date in accordance with this Indenture and the Securities in cash at the rate of 9.000% per annum. Notwithstanding the foregoing, the Issuer may, at its sole option, elect to pay the following interest by capitalizing accrued and unpaid interest on the applicable Interest Payment Date and

adding the same to the principal amount of the Securities then outstanding (each, a "**PIK Interest**"): (i) from and including the Issue Date, to and including the Interest Payment Date on December 28, 2022, PIK Interest at the rate of 10.500% per annum; and (ii) from and excluding the Interest Payment Date on December 28, 2022 to and including the Interest Payment Date on December 28, 2023, PIK Interest at the rate of 5.500% per annum for each Interest Payment Date during such second interest payment period, with the remaining interest on the Securities payable in cash at the rate of 5.000% per annum. Following an increase in the principal amount of the outstanding Securities as a result of a payment of PIK Interest on the applicable Interest Payment Date, the Securities will bear interest on such increased principal amount from and after such applicable Interest Payment Date, and the principal amount of the Securities at any time and after such date will include all interest which has been capitalized thereon. Interest on the Securities on each subsequent Interest Payment Date from and excluding December 28, 2023 shall be payable solely in cash. For the avoidance of doubt, if the Issuer does not elect to pay PIK Interest, the Issuer shall pay interest on the Securities at the rate of 9.000% per annum.

(b) In the event the Issuer elects to pay PIK Interest for the applicable interest payment period as set forth in the Securities, no later than 15 days prior to the applicable Interest Payment Date, the Issuer shall deliver to the Trustee and the Paying Agents a notice executed by one of its Officers (i) stating that the Issuer has elected to pay PIK Interest on the applicable Interest Payment Date, (ii) setting forth the total amount of interest due and payable on the applicable Interest Payment Date, (iii) setting forth the amount of PIK Interest to be paid on the applicable Interest Payment Date and (iv) directing the Trustee to increase the aggregate principal amount of the outstanding Securities as of the applicable Interest Payment Date in an amount equal to the PIK Interest payable on such date (a "**PIK Notice**"), which PIK Notice the Trustee and the Paying Agents shall be entitled to conclusively rely upon. The Trustee shall promptly deliver a copy of the PIK Notice to the Holders of the Securities. In the event the Trustee does not receive the PIK Notice from the Issuer in accordance with the preceding sentence, interest on the Securities for the applicable interest payment period shall automatically be payable in cash as set forth in the Securities.

Section 2.02. *Execution and Authentication; Additional Securities*.

(a) An Officer of the Issuer shall sign the Securities for the Issuer, and an Officer of each Guarantor shall sign this Indenture and the Notation of the Guarantees. Each such signature may be by manual or facsimile signature of such Officer.

(b) If an Officer whose signature is on a Security (or this Indenture or the Notation of Guarantee) no longer holds that office at the time the Trustee authenticates the Security, the Security and the Notation of Guarantee shall be valid nevertheless.

(c) A Security shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Security. The signature shall be conclusive evidence that the Security has been authenticated under this Indenture.

(d) On the Issue Date, the Trustee, upon receipt of a written order from the Issuer, shall authenticate and deliver the Initial Securities and, at any time and from time to time thereafter, the Trustee shall, upon receipt of a written order from the Issuer, authenticate and

deliver Additional Securities for original issue (or shall increase the principal amount of Securities as a result of a payment of PIK Interest), in each case upon a written order of the Issuer signed by an Officer of the Issuer. Such written order shall specify the aggregate principal amount of the Securities to be authenticated and the date on which the original issue of Securities is to be authenticated. PIK Interest on the Securities represented by one or more Global Securities is payable by increasing the principal amount of such Global Security as of the Record Date for the initial Interest Payment Date by an amount equal to the PIK Interest for the initial Interest Payment Date, rounded up to the nearest US$1.00, as set forth in the applicable PIK Notice, to the credit of the Holders on such record date, pro rata in accordance with their interests or, if applicable, otherwise in accordance with the procedures of the Depositary. On the initial Interest Payment Date, the Trustee and the Registrar shall adjust their respective books and records with respect to such Security to reflect the payment of such PIK Interest.

(e) The Trustee may appoint an authenticating agent reasonably acceptable to the Issuer to authenticate the Securities. Unless limited by the terms of such appointment, an authenticating agent may authenticate Securities whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as any Registrar, Paying Agent, Transfer Agent or agent for service of notices and demands.

(f) Subject to the Issuer's compliance with Section 4.03 hereof, the Issuer may, without the consent of the Holders of the Securities, issue Additional Securities from time to time having terms and conditions set forth in Exhibit 1 to the Appendix that are substantially identical to those of the Initial Securities (except for issue date, issue price and the date from which interest will accrue and, if applicable, the initial Interest Payment Date); *provided* that the Issuer shall have delivered to the Trustee (i) an Officer's Certificate (which satisfies Section 13.04 hereof) certifying that the issuance of such Additional Securities does not contravene any provision of Section 4.03 hereof and any other information the Issuer may determine to include or the Trustee may reasonably request, and (ii) an Opinion of Counsel (subject to customary qualifications) that (A) the form and terms of such Additional Securities have been established in conformity with the provisions of this Indenture and (B) such Additional Securities, when authenticated and delivered by the Trustee and issued by the Company in the manner and subject to any conditions specified in such Opinion of Counsel, will constitute valid and legally binding obligations of the Company and (in a separate Opinion of Counsel if necessary) the Guarantors, enforceable in accordance with their terms, subject to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting the enforcement of creditors' rights and to general equity principles, and in accordance with Section 13.03 hereof. Such Additional Securities may be issued in one or more series and with the same or different CUSIP numbers, ISINs and/or Common Codes. The Initial Securities and the Additional Securities, if any, will be treated as a single class for all purposes under this Indenture, including waivers, amendments, redemptions and offers to purchase; *provided*, *however*, that if the Additional Securities are not fungible with the Initial Securities for U.S. federal income tax purposes, such Additional Securities will have a separate CUSIP number, ISIN and Common Code. Holders of Additional Securities will vote together with Holders of Securities issued on the Issue Date as one class under this Indenture, subject to Section 2.08 hereof.

Section 2.03. *Registrar, Paying Agents and Transfer Agents*. The Issuer shall ensure the maintenance of the Registrar, the Paying Agent and the Transfer Agent. The Registrar shall keep a register of the Securities and of their transfer and exchange (the "**Securities Register**").

The Issuer may have one or more co-registrars and one or more additional Paying Agent and/or Transfer Agent. The term "Paying Agent" includes any additional paying agent, the term "Registrar" includes any additional Registrar or co-registrar and the term "Transfer Agent" includes the Trustee and any additional transfer agents.

The Issuer shall enter into an appropriate agency agreement with any Registrar, Paying Agent, Transfer Agent or co-registrar not a party to this Indenture. Such agreement shall implement the provisions of this Indenture that relate to such agent. The Issuer shall notify the Trustee in writing of the name and address of any such agent. If the Issuer fails to maintain a Registrar, Paying Agent or Transfer Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.06 hereof. The Issuer, the Company or any Restricted Subsidiary may act as Paying Agent, Registrar, co-registrar or Transfer Agent.

The Issuer initially appoints (a) the Trustee as Registrar, Transfer Agent and Paying Agent in connection with the Securities, and (b) DTC as Depositary with respect to the Securities.

Section 2.04. *Paying Agent to Hold Money in Trust*. By 12:00 noon (New York City time), no later than one Business Day prior to each Interest Payment Date, redemption date, purchase date, Change of Control Payment Date or Maturity Date on any Securities, the Issuer shall deposit with a Paying Agent in immediately available funds a sum sufficient to pay such principal and interest when so becoming due on any such Interest Payment Date, redemption date, purchase date, Change of Control Payment Date or Maturity Date on any Securities. The Issuer shall require each Paying Agent (other than the Trustee) to agree in writing that (a) such Paying Agent shall hold in trust, for the benefit of Holders or the Trustee, all money held by such Paying Agent for the payment of principal and interest on the Securities, (b) such Paying Agent shall give the Trustee written notice of any failure by the Issuer (or by any other obligor on the Securities) to make any payment of the principal of or interest on any Securities, as the case may be (including Additional Amounts) and any other payments to be made by or on behalf of the Issuer under this Indenture or the Securities when the same shall be due and payable and (c) that such Paying Agent will pay any such sums so held in trust by it to the Trustee upon the Trustee's written request at any time during the continuance of the failure referred to in the preceding clause (b). The Paying Agent in New York shall arrange with all other Paying Agents for the payment, from funds furnished by the Issuer to the Paying Agent pursuant to this Indenture, of the principal, premium and interest (including Additional Amounts, if any) on the Securities.

The Paying Agent will hold in trust, for the benefit of the Holders or the Trustee, all money held by such Paying Agent for the payment of principal, premium or interest on the Securities. The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by it. Upon complying with this Section 2.04, the Paying Agent shall have no further liability for the money delivered to the Trustee.

The receipt by the Paying Agent or the Trustee from the Issuer of each payment of principal, interest and/or other amounts due in respect of the Securities in accordance with this Indenture and on the date on which such amount of principal, interest and/or other amounts are then due, shall satisfy the obligations of the Issuer herein and under the Securities to make such payment to the Holders on the due date thereof; *provided* that the Trustee or such Paying Agent, as applicable, is not prohibited from paying such money to the Holders in accordance with this Indenture.

So long as any of the Securities remain outstanding, the Issuer shall maintain one or more agents in New York City to whom the Securities may be presented for payment.

Each of the Issuer and the Guarantors, jointly and severally, agrees to indemnify the Holders and the Trustee (which for purposes of this Section 2.04 shall be deemed to include its directors, officers, agents and employees) against any failure on the part of the Paying Agent to pay, in accordance with the terms hereof, any sum due in respect of the Securities on the applicable payment date.

Section 2.05. *Securityholder Lists*. The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Securityholders. If the Trustee is not the Registrar, the Issuer shall furnish to the Trustee, in writing at least two Business Days before each Interest Payment Date and at such other times as the Trustee may reasonably request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Securityholders.

Section 2.06. *Transfer and Exchange*. The Securities shall be issued in registered form and shall be transferable only as provided in the Appendix to this Indenture. The Issuer may require payment of a sum sufficient to pay all taxes, assessments or other governmental charges in connection with any transfer or exchange pursuant to the terms of this Indenture (other than any such transfer taxes, assessments or similar governmental charge payable upon exchange or transfer pursuant to Section 4.07, Section 4.22 and Section 9.04 hereof). The Issuer shall not be required to make and the Registrar need not register transfers or exchanges of Securities selected and delivered for redemption or any Securities for a period of 15 days before an Interest Payment Date.

Subject to the rights of the relevant Holders as of a Record Date to receive interest as of the related Interest Payment Date, prior to the due presentation for registration of transfer of any Security, the Issuer, the Trustee, any Paying Agent, the Registrar, any Transfer Agent or any co-registrar may conclusively deem and treat the Person in whose name a Security is registered as the absolute owner of such Security for the purpose of receiving payment of principal of and interest (and Additional Amounts, if any) on such Security and for all other purposes whatsoever, whether or not presentation of such Security is overdue, and none of the Issuer, the Trustee, any Paying Agent, any Transfer Agent, the Registrar or any co-registrar shall be liable for or affected by notice to the contrary.

All Securities issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Securities surrendered upon such transfer or exchange.

None of the Trustee, the Registrar, the Paying Agent, or any Transfer Agent shall have any obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Security (including any transfers between or among participants in the Depositary or Beneficial Owners of interests in any Global Securities) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

None of the Trustee or any Paying Agent, Registrar or Transfer Agent shall have any responsibility or obligation to any Beneficial Owner of an interest in a Global Security, a member of, or a participant in, the Depositary or any other Person with respect to the accuracy of the records of the Depositary or its nominee or of any participant or member thereof, with respect to any ownership interest in the Securities or with respect to the delivery to any participant, member, Beneficial Owner or other Person (other than the Depositary) of any notice (including any notice of redemption) or the payment of any amount or delivery of any Securities (or other security or property) under or with respect to such Securities. All notices and communications to be given to the Holders and all payments to be made to Holders in respect of the Securities shall be given or made only to or upon the order of the registered Holders (which shall be the Depositary or its nominee in the case of a Global Security). The rights of Beneficial Owners in any Global Security shall be exercised only through the Depositary subject to the applicable rules and procedures of the Depositary. Each of the Trustee, any Paying Agent, the Registrar and any Transfer Agent may conclusively rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its members, participants and any Beneficial Owners.

Section 2.07. *Replacement Securities*. If (a) any mutilated Security is surrendered to the Issuer, a Registrar, any Transfer Agent or the Trustee, or (b) the Issuer, a Registrar, the Transfer Agent and the Trustee receive evidence to their satisfaction of the destruction, loss or theft of any Security, and, unless otherwise agreed by the Issuer, the Registrar, the Transfer Agent and the Trustee, there is delivered to the Issuer, the Registrar, the Transfer Agent and the Trustee such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Issuer, the Registrar, the Transfer Agent or the Trustee that such Security has been acquired by a Protected Purchaser, the Issuer shall execute and the Trustee, upon receipt of a written order from the Issuer, shall authenticate and deliver, in exchange for any such mutilated Security or in lieu of any such destroyed, lost or stolen Security, a new Security of like tenor and principal amount, bearing a number not contemporaneously outstanding.

In case any such mutilated, destroyed, lost or stolen Security has become due and payable, or has been called for redemption by the Issuer pursuant to Article 3 of this Indenture, the Issuer in its discretion may, instead of issuing a new Security, pay or redeem such Security, as the case may be.

Upon the issuance of any new Security under this Section 2.07, the Issuer may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expense (including the fees and expenses (including, without

limitation, attorneys' fees and expenses) of the Trustee, the Registrar or any Transfer Agent) in connection therewith.

Every replacement Security is an additional obligation of the Issuer.

The provisions of this Section 2.07 are exclusive and, to the extent lawful, shall preclude all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities.

Section 2.08. *Outstanding Securities*. Securities outstanding at any time are all Securities authenticated by the Trustee except for those canceled by it pursuant to Section 2.10 hereof, those delivered to the Trustee for cancellation or surrendered for transfer or exchange and those described in this Section 2.08 as not outstanding. Except as set forth below, a Security does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Security.

If a Security is replaced pursuant to Section 2.07 hereof, it ceases to be outstanding unless the Trustee and the Issuer receive proof satisfactory to each of them that the replaced Security is held by a Protected Purchaser.

If any Paying Agent segregates and holds in trust, in accordance with this Indenture, on a redemption date or the Maturity Date money sufficient to pay all principal, premium, interest and Additional Amounts (if any) payable on that date with respect to the Securities (or portions thereof) to be redeemed or maturing, as the case may be, and such Paying Agent is not prohibited from paying such amounts to the Holders in accordance with this Indenture, then on and after that date, such Securities (or portions thereof) shall cease to be outstanding and interest on them shall cease to accrue.

In determining whether the Holders of the required principal amount of outstanding Securities have concurred in any direction, waiver or consent, Securities owned by the Issuer, the Company or by any Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with the Issuer or the Company shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Securities which a Trust Officer of the Trustee actually knows are so owned shall be so disregarded. Also, subject to the foregoing, only Securities outstanding at the time shall be considered in any such determination.

Section 2.09. *Temporary Securities*. Until definitive Securities are ready for delivery, the Issuer may prepare and execute and the Trustee shall, upon receipt of a written order from the Issuer, authenticate temporary Securities. Temporary Securities shall be substantially in the form of definitive Securities but may have variations that the Issuer considers appropriate for temporary Securities. Without unreasonable delay, the Issuer shall prepare and execute and the Trustee shall, upon receipt of a written order from the Issuer, authenticate definitive Securities and deliver them in exchange for temporary Securities.

Section 2.10. *Cancellation*. The Issuer at its option at any time may deliver Securities to the Trustee for cancellation. The Registrar, the Transfer Agent and the Paying Agent shall forward to the Trustee any Securities surrendered to any of them for registration of transfer, exchange or payment. The Trustee and no one else shall cancel and dispose of (subject to the

record retention requirements of the Exchange Act) all Securities surrendered for registration of transfer, exchange, payment or cancellation in accordance with its then customary procedures for the disposition of canceled securities and, upon the written request of the Issuer, deliver a certificate of such disposition to the Issuer unless the Issuer directs the Trustee in writing to deliver canceled Securities to the Issuer. The Issuer may not issue new Securities to replace Securities it has redeemed, paid or delivered to the Trustee for cancellation.

Section 2.11. *CUSIP Numbers, Common Codes and ISINs*. The Issuer in issuing the Securities may use "**CUSIP**" numbers, "**ISINs**" and "**Common Codes**" (if then generally in use) or similar numbers and, if so, the Trustee shall use CUSIP numbers, ISINs, Common Codes or similar numbers in notices of redemption as a convenience to Holders; *provided*, *however*, that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Securities or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Securities, and any such redemption shall not be affected by any defect in or omission of such numbers. The Issuer shall promptly notify the Trustee, in writing, of any change in any "**CUSIP**" numbers. "**ISINs**" or "**Common Codes.**"

## ARTICLE 3

## REDEMPTION

Section 3.01. *Notices to Trustee*. If the Issuer elects to or is required to redeem the Securities pursuant to Sections 3.04, 3.05, 3.06, 3.07, 3.08 or 4.07 hereof, it shall notify the Trustee in writing of the redemption date and the principal amount of Securities to be redeemed, as hereinafter provided.

The Issuer shall give each notice to the Trustee provided for in this Section 3.01 at least 30 days but not more than 60 days before the redemption date (unless a shorter period shall be acceptable to the Trustee). In the case of a redemption under Sections 3.04, 3.05, 3.06, 3.07, 3.08 or 4.07 hereof, such notice shall be accompanied by an Officer's Certificate and an Opinion of Counsel from the Issuer to the effect that such redemption will comply with the conditions set forth in this Article 3 of this Indenture.

Section 3.02. *Notice of Redemption*. At least 30 days but not more than 60 days before a date for redemption of Securities, the Issuer shall give a notice of redemption to each Holder of a Security to be redeemed in accordance with Section 13.01 hereof.

The notice shall identify the Securities to be redeemed and shall state:

(a) the redemption date;

(b) the redemption price;

(c) that, unless the Issuer or the Company defaults in making such redemption payment, interest on Securities called for redemption ceases to accrue on and after the redemption date;

(d) the paragraph of the Securities pursuant to which the Securities called for redemption are being redeemed;

(e) the "**CUSIP**" number, "**ISIN**" or "**Common Code,**" if any;

(f) that no representation is made as to the correctness or accuracy of the CUSIP number, ISIN or Common Code, if any, listed in such notice or printed on the Securities; and

(g) that the Securities called for redemption must be surrendered to the Paying Agent to collect the redemption price.

If any Security is to be redeemed in part only, the notice of redemption that relates to that Security shall state the portion of the principal amount thereof to be redeemed. The Issuer shall issue a new Security in a principal amount equal to the unredeemed portion of the original Security (if any) in the name of the Holder upon cancellation of the original Security (or appropriate adjustments to the amount and beneficial interests in a Global Security shall be made, as appropriate).

In the event that less than all of the Securities are to be redeemed at any time, selection of Securities for redemption shall be made (a) in compliance with the requirements of the principal national securities exchange, if any, on which Securities are listed and any applicable depository procedures, (b) by lot or such other similar method in accordance with the applicable procedures of the Depositary (if the Securities are Global Securities) or (c) if there are no such requirements of such exchange or the Securities are not then listed on a national securities exchange or the Depositary's procedures do not apply, on a pro rata basis or by such other method the Trustee deems fair and reasonable. No Securities of a principal amount of US$1.00 or less may be redeemed in part, and if Securities are redeemed in part, the remaining outstanding amount must be at least equal to US$1.00 and be an integral multiple of US$1.00 in excess thereof.

At the Issuer's written request, delivered at least 5 days prior to the date such notice of redemption is to be given to the Holder(s) (unless a shorter period shall be acceptable to the Trustee), the Trustee shall give the notice of redemption in the Issuer's name and at the Issuer's expense. In such event, the Issuer shall provide the Trustee with the form of notice of redemption required by this Section 3.02.

Section 3.03. *Effect of Notice of Redemption*. Once notice of redemption is given, Securities called for redemption become irrevocably due and payable on the redemption date and at the redemption price stated in the notice and from and after such redemption date, the Securities called for redemption shall cease to bear interest (unless the Issuer and the Company default in the making of such redemption price). Upon surrender to a Paying Agent, such Securities shall be paid at the redemption price stated in the notice, plus accrued and unpaid interest to, but not including, the redemption date (subject to the right of Holders of record on the relevant Record Date to receive interest due on the related Interest Payment Date). Failure to give notice or any defect in the notice to any Holder shall not affect the validity of the notice to any other Holder.

Section 3.04. *Optional Redemption*. The Issuer may, at its option, redeem the Securities in whole at any time or in part from time to time at the redemption price of 100.000% (expressed

as a percentage of principal amount of the Securities to be redeemed), plus any accrued and unpaid interest on the Securities (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date) and Additional Amounts, if any, to (but excluding) the date of redemption.

Section 3.05. *Asset Sales Redemption; TEN Permitted Financing Redemption*. In connection with any Asset Sale pursuant to Section 4.22 of this Indenture, or in connection with any TEN Permitted Financing pursuant to Section 4.03(b)(xii), the Issuer shall provide the Trustee, within 60 days following the consummation of such Asset Sale or TEN Permitted Financing, as applicable, with a notice pursuant to Section 3.02 of this Indenture to redeem the Securities in an aggregate principal amount to be determined by the Issuer. If the Issuer has elected to apply:

(a) only an amount equal to 50.000% of the Net Available Cash from such Asset Sale or Net Proceeds from a TEN Permitted Financing, as the case may be, to redeem the Securities, the redemption price shall be equal to 100.000% (expressed as a percentage of principal amount of the Securities to be redeemed), *plus* accrued and unpaid interest on the Securities (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date) and Additional Amounts, if any, to (but excluding) the date of redemption; or

(b) an amount in excess of 50.000% of the Net Available Cash from such Asset Sale to redeem the Securities, the redemption price shall be equal to the ratio (expressed as a percentage of principal amount of the Securities to be redeemed) that results from dividing (i) (x) 100.000% times an amount equal to 50.000% of the Net Available Cash from such Asset Sale, *plus* (y) 85.000% times the amount in excess of 50.000% of the Net Available Cash from such Asset Sale that the Issuer elects to apply to redeem the Securities, by (ii) the Net Available Cash form such Asset Sale, *plus* accrued and unpaid interest on the Securities (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date) and Additional Amounts, if any, to (but excluding) the date of redemption.

In addition to the information required by such Section 3.02, the notice of redemption to be provided to the Trustee shall be certified by the Company's chief financial officer and shall (i) in the case of (ii) above, provide the Company's calculations to determine the redemption price, and (ii) confirm that such redemption complies with the terms of this Indenture.

Section 3.06. *Optional Redemption for Equity Offerings*. Prior to December 21, 2024, the Issuer may, at its option, on any one or more occasions redeem up to 40.000% of the aggregate principal amount of the outstanding Securities (calculated after giving effect to any issuance of Additional Securities) with the aggregate Net Proceeds of one or more Equity Offerings, at a redemption price equal to 100.000 % of the principal amount thereof, *plus* any accrued and unpaid interest on the Securities (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date) and Additional Amounts, if any, to (but excluding) the date of redemption; *provided* that:

(a) after giving effect to any such redemption at least 60% of the original aggregate principal amount of the Securities (calculated after giving effect to any issuance of Additional Securities) remains outstanding after each such redemption; and

(b) such redemption occurs within 90 days after the closing of such Equity Offering.

Section 3.07. *Tax Redemption*. The Issuer may redeem the Securities, in whole but not in part, at a redemption price equal to 100.000% of the principal amount thereof, plus accrued and unpaid interest on the Securities (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date) and Additional Amounts, if any, to (but excluding) the redemption date, if as a result of:

(a) any amendment to, or change in, the laws or treaties (or any regulations or rulings promulgated thereunder) of a Relevant Jurisdiction; or

(b) any amendment to or change in an official interpretation or application regarding such laws, treaties, regulations or rulings (including a determination by a court of competent jurisdiction),

which amendment or change becomes effective on or after the Issue Date (or, in the case of a jurisdiction that becomes a Relevant Jurisdiction after the Issue Date, on or after the date such jurisdiction becomes a Relevant Jurisdiction), (x) the Issuer has become or would become obligated to pay, on the next date on which any amount would be payable with respect to the Securities, any Additional Amounts and (y) the Issuer determines in good faith that such obligation cannot be avoided by the use of reasonable measures available to the Issuer (including making payment through a Paying Agent located in another jurisdiction, to the extent such measure would be a reasonable measure in light of the circumstances); *provided* that:

(i) no notice of redemption pursuant to this Section 3.07 may be given earlier than 60 days prior to the earliest date on which the Issuer would be obligated to pay such Additional Amounts were a payment in respect of the Securities then due and payable, and

(ii) at the time such notice is given, such obligation to pay such Additional Amounts remains in effect.

Immediately prior to the delivery of any notice of redemption to the Holders pursuant to this provision, the Issuer shall deliver to the Trustee:

(A) an Officer's Certificate (1) stating that the Issuer is entitled to effect such redemption, (2) setting forth a statement of facts showing that the conditions precedent to the right of the Issuer to so redeem have occurred, and (3) stating that all governmental approvals, if any, necessary to effect such redemption have been obtained and are in full force and effect; and

(B) an opinion of recognized counsel in the Relevant Jurisdiction to the effect that (1) the Issuer has or will become obligated to pay such Additional Amounts as a result of such amendment or change and (2) all governmental

approvals, if any, necessary to effect such redemption have been obtained and are in full force and effect.

Any notice of redemption pursuant to this Section 3.07 shall be irrevocable.

Section 3.08. *Mandatory Cash Sweep Redemption*. Within 60 days following the date of publication of the audited annual consolidated financial statements (including the notes thereto) of the Company, which shall be prepared in accordance with IFRS and presented in the English language, together with a report thereon by the Company's certified independent public accountants, the Issuer shall apply or cause to be applied an amount equal to the U.S. dollar equivalent of the amount of Unrestricted Cash on the balance sheet of the Company and Inzag, as applicable (without double counting), as of the end of the fiscal year in excess of R$350 million to redeem the Securities pursuant to this Section 3.08 and Article 1 hereof at a redemption price equal to 100.000% of the aggregate principal amount of the Securities being redeemed, plus any accrued and unpaid interest on the Securities (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date) and Additional Amounts, if any, to (but excluding) the date of redemption. The Issuer shall provide Trustee and each Holder of a Security to be redeemed with a notice pursuant to Section 3.02 of this Indenture, certified by the Company's chief financial officer, which, in addition to the information required by such Section 3.02, shall (a) provide the Company's calculations to determine the amount of Unrestricted Cash applied in such redemption, and (b) confirm that such redemption complies with the terms of this Indenture.

Section 3.09. *Deposit of Redemption or Purchase Price*.

(a) Unless otherwise indicated herein, at or before the close of business one Business Day prior to the redemption date or purchase date, the Issuer shall deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption or purchase price, plus accrued interest and premium, if any, on all Securities to be redeemed or purchased on that date. Upon written request of the Issuer, the Trustee or the Paying Agent shall promptly return to the Issuer, after the applicable redemption date, any money deposited with the Trustee or the Paying Agent by the Issuer in excess of the amounts necessary to pay the redemption or purchase price of; and accrued interest on, all Securities to be redeemed or purchased.

(b) If the Issuer complies with the provisions of the preceding paragraph, on and after the redemption or purchase date, interest shall cease to accrue on the Securities or the portions of Securities called for redemption or purchase. If a Security is redeemed or purchased on or after a Record Date but on or prior to the related Interest Payment Date, then any accrued and unpaid interest shall be paid to the Person in whose name such Security was registered at the close of business on such Record Date. If any Security called for redemption or purchase is not so paid upon surrender for redemption or purchase because of the failure of the Issuer to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the redemption or purchase date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Securities and in Section 4.01 hereof.

Section 3.10. *Open Market Purchases*. The Issuer, the Company or any of their Affiliates may at any time purchase Securities at any price or prices in the open market or otherwise. All Securities which are purchased or otherwise acquired by the Issuer, the Company or any of their respective Affiliates shall be delivered to the Trustee for cancellation.

## ARTICLE 4

## COVENANTS

Section 4.01. *Performance of Obligations under the Securities*. The Issuer shall duly and punctually pay the principal of and premium, if any, and interest and Additional Amounts, if any, on the Securities in accordance with the terms of the Securities and this Indenture. Each Guarantor shall duly and punctually pay any amounts owed by it under its Guarantee in accordance with the terms of the Guarantees, the Securities and this Indenture. The principal and interest shall be considered paid on each of the dates due if on such date (a) there has been irrevocably deposited with the Trustee or the Paying Agent in accordance with this Indenture money sufficient to pay all principal and interest then due; *provided* that the Paying Agent is not prohibited from paying such money to the Holders in accordance with this Indenture or (b) in the case of payment of PIK Interest, and subject to the limitations set forth in the Securities, the Issuer has delivered to the Trustee the documentation necessary to increase the principal balance of the Global Securities to pay PIK Interest.

Any amounts that are payable on the Securities which are not punctually paid or duly provided for (including, without limitation, the principal of, or interest or premium, if any, on the Securities, the redemption price of any Securities to be redeemed, or the purchase price for any Securities to be repurchased in connection with a Change of Control Offer) shall accrue interest at the rate of 2.00% per annum in addition to the stated interest rate per annum payable in cash to, but excluding, the date such amounts shall have been paid by or on behalf of the Issuer to the extent lawful.

Section 4.02. *Reports*. So long as any Securities are outstanding, the Company shall provide the Trustee and the Holders:

(a) within 120 days following the end of each fiscal year (ending on December 31) of the Company, the audited annual consolidated financial statements (including the notes thereto) of the Company prepared in accordance with IFRS and presented in the English language and a report thereon by the Company's certified independent public accountants, with an accompanying certification from the Company that shall include detailed information on any use of the Cash Allowance provided in Section 4.23(e)(ii)(E)(8) hereof, including amounts delivered to AGPAR and AGSA, as applicable;

(b) within 75 days following the end of the first three fiscal quarters of each fiscal year (ending on December 31) of the Company beginning with the second full quarter ending after the Issue Date, unaudited quarterly consolidated financial statements (including the notes thereto) of the Company, prepared in accordance with IFRS and presented in the English language; and

(c) at any time that (i) any of the Company's Subsidiaries are Unrestricted Subsidiaries and (ii) such Unrestricted Subsidiaries, either taken together or individually, constitute a Significant Subsidiary, then the quarterly and annual reports required by this Section 4.02 shall include (A) in the case of subclause (a), a list of such Restricted Subsidiaries and (B) in the case of subclause (ii), a reasonably detailed presentation, either on the face of the financial statements or in the footnotes thereto, of the financial condition and results of operations of the Company and its Restricted Subsidiaries separate from the financial condition and results of operations of the Unrestricted Subsidiaries of the Company, in each case, which shall include a reasonably detailed presentation of financial information relating to the Company and its Subsidiaries, on a consolidated basis.

Delivery of such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt of such shall not constitute actual or constructive notice of any information contained therein or determinable from information contained therein, including the Issuer's, the Company's or any other Person's compliance with any covenant hereunder or under any Collateral Agreements (as to which the Trustee is entitled to rely exclusively on Officers' Certificates).

In addition, the Issuer shall furnish to the Holders and to prospective investors, upon request of such Holders or investors, any information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act so long as the Securities are not freely tradable under the Securities Act.

Notwithstanding the foregoing, if the Company makes available the reports described in the first paragraph of this Section 4.02 on the Company's website and notifies the Trustee in writing thereof, it shall be deemed to have satisfied the reporting requirements set forth in such applicable clause as of the date of such notice. The Trustee shall have no obligation to determine if and when the Company's information is available on the Company's website.

In the event that any direct or indirect parent company of the Company provides a Guarantee, the Company may satisfy its obligations under this Section 4.02 to provide consolidated financial information of the Company by furnishing consolidated and/or combined financial information relating to such parent; *provided* that such parent is not engaged in any business in any material respect other than such activities as are incidental to its ownership, directly or indirectly, of the Capital Stock of the Company and/or any Restricted Subsidiary.

So long as any Securities are outstanding:

(i) the Company shall, within three Business Days after furnishing to the Trustee the reports required by this Section 4.02, issue a press release which includes reasonably detailed information regarding the financial condition of the Company;

(ii) in the event that the Issuer, the Company or any of their Affiliates purchases Securities in the open market or otherwise and cancels such Securities, the Company shall issue a press release within 10 Business Days after the end of the month reporting the number of such Securities it has repurchased and cancelled; and

(iii) the Company shall also promptly, after furnishing to the Trustee the reports required by this Section 4.02, hold a conference call in English to discuss such reports and the results of operations for the relevant reporting period.

(iv) Any Person who seeks to participate in any conference calls required by this Section 4.02(c)(iv) may be required to provide its email address, employer name and other information reasonable requested by the Issuer or the Company and represent to the Issuer and the Company (to each of the Issuer's and the Company's reasonable good-faith satisfaction) that:

(A) it is a Holder or a Beneficial Owner of the Securities, a bona fide prospective investor in the Securities, a bona fide market maker in the Securities or a bona fide securities analyst providing an analysis of investment in the Securities;

(B) it will not use the information in violation of applicable securities laws or regulations; and

(C) it will keep such provided information confidential and will not communicate the information to any Person.

(v) Neither the Trustee nor any Agent shall be obligated to attend any such conference call. Any and all documentation and/or other information requested of any Person by the Issuer and/or the Company pursuant to this Section 4.02 shall be delivered by or on behalf of such Person directly to the Issuer and/or the Company, as applicable, and, in no circumstances shall the Trustee or any Agent be obligated to request, deliver, provide or otherwise facilitate the transmission of any such documentation and/or information or confirm the accuracy thereof.

Section 4.03. *Limitation on Indebtedness*.

(a) The Issuer, Inzag and the Company shall not, and the Company shall not permit any Restricted Subsidiary to, Incur any Indebtedness; *provided*, *however*, that the Company and the Restricted Subsidiary may Incur Indebtedness if on the date thereof and after giving effect thereto on a *pro forma* basis:

(i) the Consolidated Net Leverage Ratio for the Company and the Restricted Subsidiaries is less than 2.00 to 1.00; and

(ii) no Default or Event of Default shall have occurred or be continuing or would occur as a consequence of Incurring the Indebtedness or entering into the transactions relating to such Incurrence.

(b) Notwithstanding (a) above, the Issuer, the Company or any Restricted Subsidiary may Incur the following Indebtedness ("**Permitted Indebtedness**"):

(i) Indebtedness of the Issuer owing to the Company or a Restricted Subsidiary; *provided* that (A) any such Indebtedness owing to a Restricted Subsidiary

which is not a Guarantor shall be unsecured and subordinated in right of payment to the Issuer's obligations with respect to the Securities and (B) any subsequent issuance or transfer of any Capital Stock or any other event that results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Issuer, the Company or another Restricted Subsidiary) shall be deemed, in each case, to be an Incurrence of such Indebtedness or an issuance not permitted by this clause;

(ii) Indebtedness of the Company or a Restricted Subsidiary owing to the Issuer, the Company or another Restricted Subsidiary; *provided* that (A) if a Guarantor Incurs such Indebtedness, owing to a Restricted Subsidiary which is not a Guarantor, such Indebtedness is unsecured and subordinated in right of payment to the Guarantee of such Guarantor and (B) any subsequent issuance or transfer of any Capital Stock or any other event that results in any Restricted Subsidiary lending such Indebtedness ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Issuer, Company or another Restricted Subsidiary) shall be deemed, in each case, to be an Incurrence of such Indebtedness, not permitted by this clause;

(iii) Indebtedness:

(A) represented by the Securities (including any increase in the principal amount of the Securities as a result of a payment of PIK Interest) and the Guarantees, in each case, outstanding on the Issue Date;

(B) outstanding on the Issue Date (other than as described in clause (i) above);

(C) consisting of Refinancing Indebtedness Incurred in respect of any Indebtedness described in this clause (b)(iii); or

(D) consisting of guarantees of any Indebtedness permitted under this Indenture; *provided* that if any such guarantee is of Subordinated Obligations, then the guarantee of such Subordinated Obligations shall be subordinated to the Securities or the Guarantees, as applicable;

(iv) Indebtedness represented by Capitalized Lease Obligations or Purchase Money Indebtedness, and Refinancing Indebtedness in respect thereof, in an aggregate outstanding principal amount which, when taken together with the principal amount of all other Indebtedness Incurred pursuant to this clause (iv) and then outstanding, does not exceed US$20,000,000;

(v) Hedging Obligations of the Company, the Issuer or any Restricted Subsidiary (entered into for nonspeculative purposes) in the ordinary course of business;

(vi) Indebtedness arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, or guarantees or letters of credit, advance bonds, retention bonds, judicial bonds, surety bonds, performance bonds or similar bonds securing any obligations of the Company or any Restricted Subsidiary

pursuant to such agreements, in any case Incurred in connection with the disposition of any business, assets or Subsidiary (other than guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition), so long as the amount does not exceed the gross proceeds (including noncash proceeds) actually received by the Company or any Restricted Subsidiary thereof in connection with such disposition;

(vii) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided*, *however*, that such Indebtedness is extinguished within five Business Days of its Incurrence;

(viii) Indebtedness to the extent that the Net Proceeds thereof are promptly deposited to defease or to satisfy and discharge the Securities in accordance with this Indenture;

(ix) Indebtedness in respect of bankers' acceptances, deposits, promissory notes, letters of credit, self-insurance obligations, completion guarantees, performance, surety, appeal or similar bonds and guarantees provided by the Company or any Restricted Subsidiary in the ordinary course of its business or Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims;

(x) Indebtedness consisting of (A) the financing of insurance premiums or (B) take or pay obligations contained in supply agreements in the ordinary course of business;

(xi) Indebtedness Incurred in an Affiliate Transaction that is permitted by Section 4.05 hereof solely for the purpose of repaying or refinancing the Securities or any amounts due thereunder;

(xii) Indebtedness Incurred in connection with any pledge, hypothecation, or any other transfer, as applicable, by the Issuer, of the Capital Stock of TEN and/or the assets thereof ("**TEN Permitted Financing**") *provided* that the aggregate amount of such Indebtedness shall be limited to the Fair Market Value of TEN and/or the assets thereof; and *provided*, *further* that at least 50% (and, at the Company's option, up to 100%) of the Net Proceeds from such TEN Permitted Financing shall be used to redeem the Securities in accordance with Section 3.05 of this Indenture; and

(xiii) in addition to the items referred to in clauses (i) through (xii) of Section 4.03(b) hereof, Indebtedness in an aggregate outstanding principal amount which, when taken together with the principal amount of all other Indebtedness Incurred pursuant to this Section 4.03(b)(xiii) and then outstanding, will not exceed US$10,000,000 at any time outstanding.

Notwithstanding any other provision of this covenant, neither the Issuer, the Company nor any Restricted Subsidiary shall, with respect to any outstanding Indebtedness Incurred, be deemed to be in violation of this covenant solely as a result of fluctuations in the exchange rates of currencies.

For purposes of determining compliance with this covenant: (i) in the event that an item of Indebtedness meets the criteria of more than one of the categories of Permitted Indebtedness described in Section 4.03(b)(i) through (xii) hereof or is entitled to be Incurred pursuant to Section 4.03(a) hereof, the Issuer or the Company, in its sole discretion, may classify, and from time to time may reclassify, such item of Indebtedness in any manner that complies with this covenant; and (ii) Indebtedness permitted by this Section 4.03 (including pursuant to Section 4.03(a) hereof), need not be permitted solely by reference to one provision permitting the Incurrence of such Indebtedness but may be permitted in part by one such provision and in part by one or more other provisions of this covenant permitting the Incurrence of such Indebtedness.

For purposes of determining compliance with any U.S. dollar-denominated restriction on the Incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate determined on the date of Incurrence, in the case of term Indebtedness, or first committed, in the case of revolving credit Indebtedness. The principal amount of any Indebtedness Incurred to Refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being Refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such Refinancing Indebtedness is denominated calculated based on the relevant currency exchange rates as calculated in the first sentence of this paragraph.

The accrual of interest, the accretion or amortization of original issue discount, the payment of regularly scheduled interest in the form of additional Indebtedness of the same instrument shall not be deemed to be an Incurrence of Indebtedness for purposes of this covenant.

If at any time an Unrestricted Subsidiary becomes a Restricted Subsidiary, any Indebtedness of such Subsidiary shall be deemed to be Incurred by a Restricted Subsidiary as of such date (and, if such Indebtedness is not permitted to be Incurred as of such date under this Section 4.03, the Issuer shall be in default of this Section 4.03).

Section 4.04. *Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries*. Inzag and the Company shall not, and the Company shall not permit any Restricted Subsidiary to, directly or indirectly, create or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to:

(a) pay dividends or make any other distributions on the Capital Stock of the Restricted Subsidiary owned by the Issuer or the Company to the Issuer or the Company, as applicable, or any Restricted Subsidiary;

(b) pay any Indebtedness owed to the Issuer, the Company or any Restricted Subsidiary;

(c) make loans or advances to the Issuer, the Company or any Restricted Subsidiary; or

(d) sell, lease or transfer any of its properties or assets to the Issuer, the Company or any Restricted Subsidiary.

However, the preceding restrictions shall not apply to encumbrances or restrictions:

(i) existing under or by reason of applicable law or applicable governmental rule, regulation or order;

(ii) existing with respect to any Person, or on any property or assets acquired from a Person which is acquired by or merged with or into the Company or any Restricted Subsidiary, or by reason of any Liens on the property or assets, or relating to the Indebtedness, of any Person or other entity existing at the time such Person or other entity becomes a Restricted Subsidiary, or restriction relating to Indebtedness of any such Person and, in any such case, is not created as a result of or in connection with or in anticipation of any such transaction; *provided* that such Liens and any extensions, renewals, replacements or refinancing thereof may not extend to any other property owned by the Company or any Restricted Subsidiary; and *provided, further*, that the encumbrances and restrictions in the extension, renewal, replacement or refinancing are, taken as a whole, no less favorable in any material respect to the Holders than the encumbrances or restrictions being extended, renewed, replaced or Refinanced;

(iii) on any property or assets existing at the time of acquisition thereof and which are not created as a result of or in connection with or in anticipation of such acquisition; *provided* that such encumbrances and restrictions and any extensions, renewals, replacements or refinancing thereof may not extend to any other property owned by the Company or any Restricted Subsidiary; and *provided*, *further*, that the encumbrances and restrictions in the extension, renewal, replacement or refinancing are, taken as a whole, no less favorable in any material respect to the Holders than the encumbrances or restrictions being extended, renewed, replaced or Refinanced;

(iv) in the case of clause (d) above:

(A) that exist by virtue of any transfer of, agreement to transfer, option or right with respect to, or Lien on, any property or assets of the Issuer, the Company or any Restricted Subsidiary not otherwise prohibited by this Indenture;

(B) that restrict in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a lease, license or similar contract, or the assignment or transfer of any such lease, license or other contract or contractual right;

(C) contained in mortgages, pledges or other security agreements permitted under this Indenture securing Indebtedness of the Issuer, the Company or any Restricted Subsidiary to the extent such encumbrances or restrictions restrict the transfer of the property subject to such mortgages, pledges or other security agreements;

(D) imposed by Purchase Money Indebtedness for property acquired in the ordinary course of business or by Capitalized Lease Obligations permitted

under this Indenture on the property so acquired, but only to the extent that such encumbrances or restrictions restrict the transfer of the property; or

(E) arising or agreed to in the ordinary course of business, not relating to Indebtedness, and that do not, individually or in the aggregate, detract from the value of the property or assets of the Issuer, the Company or any Restricted Subsidiary in any manner material to the Issuer, the Company and the Restricted Subsidiaries;

(v) imposed by the standard loan documentation in connection with loans from (i) *Banco Nacional de Desenvolvimento Econômico e Social*—BNDES (including loans from *Financiadora de Estudos e Projetos—FINEP*) or any other Brazilian governmental development bank or credit agency (including, without limitation, *Caixa Econômica Federal* in respect of any funding provided in connection with *Financiamento à Infraestrutura e ao Saneamento* (*FINISA*)), or (ii) any international or multilateral development bank, government sponsored agency, export-import bank or official export-import credit insurer;

(vi) imposed by any agreement governing Indebtedness of any Restricted Subsidiary that is permitted to be Incurred under Section 4.03 hereof; *provided* that the encumbrance or restriction, taken as a whole, is not materially more restrictive than comparable financings and will not materially affect the Issuer's or the Guarantors' ability to pay interest, premium, if any, or principal, when due, on the Securities;

(vii) existing by reason of Liens that secure Indebtedness otherwise permitted to be Incurred under Section 4.08 hereof and that limit the right of the debtor to dispose of the assets subject to such Liens;

(viii) imposed with respect of a Restricted Subsidiary pursuant to an agreement entered into for the sale or disposition of all or substantially all the Capital Stock or assets of such Restricted Subsidiary pending the closing of such sale or disposition;

(ix) with respect to a Restricted Subsidiary and imposed pursuant to a customary provision in a joint venture or other similar agreement with respect to such Restricted Subsidiary that was entered into in the ordinary course of business;

(x) required pursuant to this Indenture; or

(xi) existing on the Issue Date and any amendments, extensions, renewals, replacements or refinancing thereof; *provided* that the encumbrances and restrictions in the extension, renewal, replacement or refinancing are, taken as a whole, not materially less favorable to the Holders than the encumbrances or restrictions being extended, renewed, replaced or Refinanced.

Section 4.05. *Limitation on Transactions with Affiliates*. The Issuer, Inzag and the Company shall not, and the Company shall not permit any Restricted Subsidiary to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract,

agreement, understanding, loan, advance or guarantee involving an aggregate amount in excess of US$2,000,000 (or the equivalent in other currencies) with, or for the benefit of, any Affiliate (each, an "**Affiliate Transaction**"), unless:

(a) the Affiliate Transaction is on terms that are no less favorable to the Issuer, the Company or the relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Issuer, the Company or such Restricted Subsidiary with an unrelated Person (as determined in good faith by a responsible financial or accounting officer of the Issuer); and

(b) with respect to an Affiliate Transaction with an aggregate amount in excess of US$5,000,000, the Issuer or the Company, as applicable, delivers to the Trustee a resolution of the Board of Directors of the Issuer or the Company, as applicable, set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with this Section 4.05 and that such Affiliate Transaction has been approved by all members of the Board of Directors of the Issuer or the Company, as applicable.

The following items shall not be deemed to be Affiliate Transactions and, therefore, shall not be subject to the provisions of the prior paragraph:

(i) Affiliate Transactions with or among the Issuer, Inzag or the Company and any Restricted Subsidiary or between or among Restricted Subsidiaries (including Inzag);

(ii) the payment of reasonable and customary regular fees to directors of the Company;

(iii) transactions or payments (including loans and advances) pursuant to any employee, officer or director compensation or benefit plans, customary indemnifications or arrangements entered into in the ordinary course of business;

(iv) Affiliate Transactions undertaken pursuant to (A) the contractual obligations or rights in existence on the Issue Date set forth in Schedule A hereto, (B) any contractual obligation of any Restricted Subsidiary or any Person that is merged into the Company or any Restricted Subsidiary on the date such Person becomes a Restricted Subsidiary or is merged into the Company or any Restricted Subsidiary and (C) any amendment or replacement agreement to the obligations and rights described in clauses (A) and (B), so long as such amendment or replacement agreement is not more disadvantageous to the Holders in any material respect, taken as a whole, than the original agreement;

(v) transactions with customers, clients, distributors, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and on market terms;

(vi) any Restricted Payments made in compliance with Section 4.23 hereof and Permitted Investments;

(vii) any Sale and Lease-Back Transaction permitted by Section 4.09 hereof if such transaction is on market terms; and

(viii) Affiliate Transactions entered into solely for the purpose of repaying or refinancing the Securities or any amounts due thereunder.

Section 4.06. *Limitations with respect to the Issuer*. The Issuer shall not, except as otherwise specifically permitted by this Indenture, so long as any of the Securities are outstanding:

(a) engage in any business or enter into, or be party to, any transaction or agreement, except (i) the issuance, sale, payment on, redemption, repurchase, exchange or defeasance of the Securities and activities incidentally related thereto, (ii) enter into Affiliate Transactions, (iii) enter into Hedging Obligations not for speculative purposes, (iv) as required by law, (v) in order to maintain its existence as a public limited liability company and (vi) as otherwise required by this Indenture;

(b) Incur any Indebtedness other than (i) the Securities, and (ii) any other Indebtedness which is *pari passu* with or subordinated to the Securities, so long as such Indebtedness is permitted to be Incurred under Section 4.03 hereof;

(c) redeem any of its shares of Capital Stock;

(d) acquire or own any Subsidiary or Person or other assets or properties, except (i) an interest in Hedging Obligations relating to its Indebtedness and instruments evidencing interests in the foregoing, (ii) cash and Cash Equivalents, (iii) any assets related to Affiliate debt transactions, including any Indebtedness, (iv) the Securities and other Indebtedness and (v) other non-material assets and properties;

(e) Incur or suffer to exist any Lien upon any of its properties or assets;

(f) voluntarily liquidate, wind up or dissolve, unless the Company fully and unconditionally assumes all of the obligations of the Issuer, including under this Indenture and the Securities;

(g) consolidate, amalgamate or merge with another Person other than the Company or a Wholly-Owned Subsidiary of the Company, where the Company or such Wholly-Owned Subsidiary of the Company assumes all of the obligations of the Issuer, including under this Indenture and the Securities in accordance with Article 5; or

(h) amend, supplement, waive or otherwise modify specified provisions of the documents relating to the Issuer's rights or benefits under its organizational documents without the written consent of the Holders of a majority in aggregate principal amount of the Securities then outstanding if such amendment, supplement, waiver or modification would materially adversely affect the rights of the Holders.

Section 4.07. *Repurchases at the Option of the Holders Upon Change of Control*. If a Change of Control occurs, each Holder shall have the right to require the Issuer to repurchase all

or any part (in integral multiples of US$1.00 in excess of US$1.00) of that Holder's Securities pursuant to a Change of Control Offer on the terms set forth in this Indenture. No such purchase in part shall reduce the outstanding principal amount of the Securities held by any Holder to below US$1.00. In the Change of Control Offer, the Issuer shall offer a "**Change of Control Payment**" in U.S. dollars equal to 100.000% of the aggregate principal amount of Securities repurchased plus accrued and unpaid interest and Additional Amounts, if any, on the Securities repurchased, to (but excluding) the Change of Control Payment Date (subject to the right of the Holders of record on the relevant Record Date to receive interest and Additional Amounts, if any, on the relevant Interest Payment Date).

No later than 30 days following a Change of Control, the Issuer shall make a "**Change of Control Offer**" by notice to each Holder in accordance with the provision set out under Section 13.01 hereof (with a copy to the Trustee), describing the transaction or transactions that constitute the Change of Control and offering to repurchase Securities on the date specified in the notice (the "**Change of Control Payment Date**"), which date shall be no earlier than 15 days and no later than 60 days from the date such notice is given, pursuant to the procedures required by this Indenture and described in such notice.

The Issuer shall comply, to the extent applicable, with the requirements of Section 14(e)-1 of the Exchange Act and any other applicable securities laws or regulations in connection with the repurchase of Securities pursuant to this covenant. To the extent that the provisions of any applicable securities laws or regulations conflict with provisions of this covenant, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this covenant by virtue of its compliance with such securities laws or regulations.

Upon receipt of the Change of Control Payment in accordance with this Indenture, the Paying Agent shall promptly deliver to each Holder properly tendered the Change of Control Payment for such Securities. The Issuer shall publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

The provisions described above that require the Issuer to make a Change of Control Offer following a Change of Control shall be applicable whether or not any other provisions of this Indenture are applicable. Except as described above with respect to a Change of Control, this Indenture does not contain provisions that permit the Holders to require that the Issuer repurchase or redeem the Securities in the event of a takeover, recapitalization or similar transaction.

The Issuer shall not be required to make a Change of Control Offer if (a) a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements, set forth in this Indenture, that are applicable to a Change of Control Offer made by the Issuer and such third party purchases all Securities properly tendered and not withdrawn under the Change of Control Offer or (b) notice of redemption for all outstanding Securities has been given pursuant to this Indenture as described in Article 3, unless and until there is a default in payment of the applicable redemption price. Notwithstanding anything to the contrary contained herein, the Issuer may make an offer to purchase in advance of a Change of

Control and conditioned upon the consummation of such Change of Control, if a definitive agreement is in place for the Change of Control at the time the offer to purchase is made.

In the event that the Holders of not less than 90% of the aggregate principal amount of the outstanding Securities accept a Change of Control Offer and the Issuer or a third party purchases all the Securities held by such Holders, the Issuer shall have the right, on not less than 30 nor more than 60 days' prior notice, given not more than 30 days following the Change of Control Payment Date, to redeem all of the Securities that remain outstanding following such purchase at the purchase price equal to the Change of Control Payment plus, to the extent not included in the Change of Control Payment, accrued and unpaid interest and Additional Amounts, if any, on the Securities that remain outstanding, to, but excluding, the date of redemption.

The Guarantors, other than Zagope, agree to obtain all necessary consents and approvals from the Central Bank for any remittance of funds outside of Brazil prior to making any payment pursuant to a Change of Control Offer, if necessary.

Section 4.08. *Limitation on Liens*. The Issuer, Inzag and the Company shall not, and the Company shall not, permit any Restricted Subsidiary to issue or assume any Indebtedness secured by a Lien (other than Permitted Liens) (the "**Initial Lien**") on any of its property or assets (including Capital Stock of any other Person) unless contemporaneously therewith effective provision is made to secure the Indebtedness due under this Indenture and the Securities or, in respect of Liens on any Restricted Subsidiary's property or assets, any Guarantee of such Restricted Subsidiary, equally and ratably with (or on a senior basis to, in the case of Subordinated Obligations) such obligation for so long as such obligation is so secured by such Initial Lien. Any such Lien thereby created in favor of the Securities or the Guarantees (which, for the avoidance of doubt, do not include Liens on the Collateral) shall be automatically and unconditionally released and discharged upon (a) the release and discharge of the Initial Lien to which it relates or (b) any sale, exchange or transfer to any Person (other than the Company and any Restricted Subsidiary) of the property or assets secured by such Initial Lien, or of all of the Capital Stock held by the Company or any Restricted Subsidiary in, or all or substantially all the assets of, any Restricted Subsidiary creating such Initial Lien.

Section 4.09. *Limitation on Sale and Leaseback Transactions*. The Issuer, Inzag and the Company shall not, and the Company shall not permit any Restricted Subsidiary to, enter into any Sale and Leaseback Transaction; *provided, however*, that the Company or any Restricted Subsidiary may enter into a Sale and Leaseback Transaction if:

(a) the Company or such Restricted Subsidiary, as applicable, would have been entitled pursuant to Section 4.08 hereof to Incur a Lien to secure Indebtedness in a principal amount equal to or exceeding the Attributable Debt in respect of such Sale and Leaseback Transaction;

(b) the gross cash proceeds and/or Fair Market Value of any property received in connection with such Sale and Leaseback Transaction are at least equal to the Fair Market Value, as set forth in an Officer's Certificate delivered to the Trustee, of the property that is the subject of such transaction; and

(c) such Sale and Leaseback Transaction is entered into in the ordinary course of business.

Section 4.10. *Maintenance of Corporate Existence*. Subject to Article 5 hereof, each of the Issuer and the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence and shall use its reasonable efforts to do or cause to be done all things necessary to preserve and keep in full force and effect its rights (charter and statutory) and franchises; *provided*, *however*, that the Issuer and the Company shall not be required to preserve any such right or franchise if the failure to do so does not, and would not reasonably be expected to, have a Material Adverse Effect.

Section 4.11. *Maintenance of Properties*. The Company shall cause all properties used or useful in the conduct of its business to be maintained and kept in good condition, repair and working order and supplied with all necessary equipment and shall cause to be made all necessary repairs, renewals and replacements, thereof, all as in the judgment of the Company may be necessary so that the business carried on in connection therewith may be properly conducted at all times; *provided*, *however*, that nothing in this Section 4.11 shall prevent the Company from discontinuing the operation or maintenance of any of such properties or the supply of equipment if such discontinuance is, in the judgment of the Company, desirable in the conduct of its business or would not reasonably be expected to have a Material Adverse Effect.

Section 4.12. *Compliance with Applicable Laws*. The Issuer and the Company shall comply with all laws, rules, regulations and orders of any governmental authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 4.13. *Maintenance of Governmental Approvals*. The Issuer and the Company shall maintain and renew all permits, licenses, authorizations, approvals, and consents held by the Issuer, Inzag and the Company and required for the Issuer or the Company to conduct their respective businesses or to perform their obligations under this Indenture, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect. If any permit, license, authorization, approval or consent not held by the Issuer or the Company is or becomes required for the Issuer or the Company to conduct its business or to perform any of its obligations under this Indenture, the Securities or the Guarantees, the Issuer or the Company shall promptly take all reasonable steps within its power to obtain such permit, license, authorization, approval or consent and shall notify the Trustee in writing that such steps have been taken, unless the failure to hold such permit, license, authorization, approval, or consent would not be reasonably likely to have a Material Adverse Effect.

Section 4.14. *Payment of Taxes and Other Claims*. Each of the Issuer and the Company shall pay and discharge (a) all taxes, assessments and governmental charges or levies imposed upon it, or upon its income or profits, or upon any of its properties before they shall become delinquent and (b) all lawful claims (including claims for labor, materials and supplies) which, if unpaid, would reasonably be expected to give rise to a Lien upon any of its properties, unless in each of clause (a) and clause (b), such taxes, assessments, governmental charges or levies or

lawful claims are then the subject of a Good Faith Contest or except where nonpayment thereof would not have a Material Adverse Effect.

Section 4.15. *Appointment of the Trustee or Collateral Agent*. The Issuer or the Company, whenever necessary to avoid or fill a vacancy in the office of Trustee or the Collateral Agent, shall promptly appoint in the manner provided in Section 7.07 hereof or Article 12, respectively, a successor Trustee or Collateral Agent, as applicable, so that there shall at all times be a Trustee with respect to the Securities and a Collateral Agent with respect to the Collateral.

Section 4.16. *Maintenance of Books and Records*. The Company shall keep proper books of record and account in which full, true and correct entries shall be made of all dealings and transactions in relation to its and its Subsidiaries' business and activities.

Section 4.17. *Listing of Securities*. The Issuer and the Company shall each use commercially reasonable efforts to obtain and maintain the listing of the Securities on any of the Luxembourg Stock Exchange, the Singapore Stock Exchange or the Irish Stock Exchange (each a "**Designated Exchange**") and to make the Securities eligible for trading on the relevant list of platform of such exchange as soon as practicable but in no event later than three months from the Issue Date; *provided* that if, as a result of applicable rules and regulations relating to such listing on a Designated Exchange, the Issuer or the Company could be required to publish financial information either more regularly than the Issuer or the Company otherwise would be required to or according to accounting principles which are materially different from the accounting principles which the Issuer or the Company would otherwise use to prepare its published financial information, the Company may delist the Securities from the applicable Designated Exchange, and retire them from trading or seek an alternate admission to listing, trading and/or quotation for the Securities on a different section of any Designated Exchange, or by such other listing authority, stock exchange and/or quotation system inside or outside the European Union as the Issuer may decide. Except for the initial listing of the Securities in the applicable Designated Exchange, the Issuer shall notify the Trustee in writing upon the listing or de-listing of the Securities from any securities exchange.

Section 4.18. *Additional Amounts*. All payments of principal and interest by or on behalf of the Issuer or the Guarantors in respect of the Securities shall be made without withholding or deduction for or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed by or within the Grand Duchy of Luxembourg, Brazil or any other jurisdiction in which the Issuer or the Guarantors or any Substituted Debtor or Successor Issuer or Successor Company is organized or resident for tax purposes or maintains a permanent establishment, or from or through which such payments are made or by any political subdivision thereof or any authority therein or thereof having power to tax (each a "**Relevant Jurisdiction**"), unless such withholding or deduction is required by law. In the event of any such withholding or deduction, the Issuer or the Guarantors (in the case of payments made by the Guarantors) shall pay to Holders of the Securities in U.S. dollars such additional amounts ("**Additional Amounts**") as will result in the payment to such Holders of the U.S. dollar amount that would otherwise have been receivable by such Holders in the absence of such withholding or deduction, except that no such Additional Amounts shall be payable:

(a) in respect of any tax that would not have been imposed but for the existence of any present or former connection, including a permanent establishment, between the Holder or Beneficial Owner of the Security (or, if the Holder or Beneficial Owner is an estate, nominee, trust, partnership or corporation, between a fiduciary, settlor, beneficiary, member or shareholder of, or possessor of power over, the Holder or Beneficial Owner) and the Relevant Jurisdiction other than the mere receipt of payment on the Security or the mere holding or ownership of such Security or beneficial interest therein or exercise or enforcement of rights thereunder;

(b) in respect of any tax that would not have been so withheld or deducted if the Security had been presented for payment within 30 days after the Relevant Date (except to the extent that the Holder of the Securities would have been entitled to Additional Amounts had the Security been presented for payment on the last day of such 30-day period);

(c) in respect of any tax that would not have been so withheld or deducted but for the failure by the Holder or the Beneficial Owner of the Security to (i) make a declaration of non-residence, or any other claim or filing for exemption, to which it is entitled or (ii) comply with any certification, identification, information, documentation or other reporting requirement concerning its nationality, residence, identity or connection with the Relevant Jurisdiction; provided that, in the case of any such requirement that is not in effect under the laws of the Relevant Jurisdiction on the Issue Date, compliance is not materially more onerous in form, procedure or substance than the information or other reporting requirements under U.S. federal income tax law, regulation and administrative practice (such as completing Internal Revenue Service Forms W-8 or W-9);

(d) in respect of any estate, inheritance, gift, value added, sales, use, excise, transfer, personal property or similar taxes, duties, assessments or other governmental charges;

(e) in respect of any tax, assessment or other government charge payable other than by withholding or deduction;

(f) in respect of any payment to a Holder of a Security that is a fiduciary or partnership or any Person other than the sole Beneficial Owner of such payment or Security, to the extent that a beneficiary or settlor with respect to such fiduciary, a member of such partnership or the Beneficial Owner of such payment or Security would not have been entitled to the Additional Amounts had such beneficiary, settlor, member or Beneficial Owner been the actual Holder of such Security;

(g) in respect of any withholding or deduction imposed in connection with a Security presented for payment by or on behalf of a Holder or Beneficial Owner that could have avoided such withholding or deduction by presenting the relevant Security (where presentation is required) to another Paying Agent;

(h) in respect of any tax, assessment or other governmental charge imposed pursuant to sections 1471 through 1474 of the Code, any regulations thereunder or official interpretations thereof, any intergovernmental agreement between the United States and another jurisdiction facilitating the implementation thereof (or any fiscal or regulatory legislation, rules or practices

implementing such an intergovernmental agreement), or any agreement entered into pursuant to section 1471(b)(1) of the Code;

(i) in respect of any withholding or deduction imposed on a payment to a Luxembourg resident individual beneficial owner that is required to be made pursuant to the law of December 23, 2005 introducing a 20% withholding tax on certain payments of interest; or

(j) in respect of any combination of (a) through (i) above.

"**Relevant Date**" means, with respect to any payment due under the Securities, whichever is the later of (x) the date on which such payment first becomes due and (y) if the full amount payable has not been received in New York City, New York by the Trustee on or prior to such due date, the date on which, the full amount having been so received, notice to that effect shall have been given to the Holders in accordance with this Indenture.

At least 30 days prior to the first Interest Payment Date (and at least 30 days prior to each succeeding Interest Payment Date if there has been any change with respect to the matters set forth in the below-mentioned Officer's Certificate), the Issuer or the Guarantors, as the case may be, shall furnish to the Trustee and each Paying Agent an Officer's Certificate instructing the Trustee and each such Paying Agent whether payments of principal of or interest on the Securities due on such Interest Payment Date shall be without deduction or withholding for or on account of any tax. If any such deduction or withholding shall be required, such Officer's Certificate shall specify the amount, if any, required to be withheld on such payment to Holders of the Securities and certify that the Issuer or the Guarantors, as the case may be, shall pay such withholding or deduction to the relevant taxing authority.

The Issuer or the Guarantors, as the case may be, shall furnish to the Trustee the official receipts (or a certified copy of the official receipts) evidencing payment of any taxes deducted or withheld from payments on the Securities. Copies of such receipts shall be made available to Holders of the Securities upon written request.

The Issuer or the Guarantors shall promptly pay when due and indemnify the Holder for any present or future stamp, issue, registration, court or documentary taxes or any other excise or property taxes, charges or similar levies that arise in any jurisdiction from the execution, delivery, issuance or registration of each Security or any other document or instrument referred to herein or therein, excluding any such taxes, charges or similar levies imposed by any jurisdiction other than a Relevant Jurisdiction and except, in certain cases, for taxes, charges or similar levies resulting from certain registration of transfer or exchange of Securities, unless such registration is not necessary to maintain, preserve, establish, enforce, perfect or protect the rights of the Holders, the Trustee or the Collateral Agent.

Section 4.19. *Ranking*. The Issuer and the Company shall ensure that the Securities will be senior to all of the Issuer's existing and future unsecured and unsubordinated obligations, to the extent of the value of the Collateral, and senior to all of the Issuer's existing and future subordinated obligations, and the Guarantees will be senior to all of the Guarantors' existing and future unsecured and unsubordinated obligations, to the extent of the value of the Collateral, and

senior to all of the Guarantors' existing and future subordinated obligations (subject, in the case of Zagope, to the Zagope Guarantee Limit).

Section 4.20. *Further Actions*. Upon the request of the Trustee or the Collateral Agent, each of the Issuer, Inzag and the Guarantors shall execute such further documents and do all acts and things as may be reasonably necessary in order to give effect to this Indenture, the Securities, the Guarantees and the Collateral Agreements.

Section 4.21. *Substitution of the Issuer*. The Issuer may, without the consent of any Securityholder, be substituted by (x) the Company or (y) any Wholly-Owned Subsidiary of the Company as principal debtor in respect of the Securities (in that capacity, the "**Substituted Debtor**"); *provided* that the following conditions are satisfied:

(a) such documents shall be executed by the Substituted Debtor, the Issuer, the Company and the Trustee as may be necessary to give full effect to the substitution, including a supplemental indenture under which (i) the Substituted Debtor assumes all of the Issuer's obligations under this Indenture and the Securities, and (ii) the Guarantors (other than the Company, if the Company is the Substituted Debtor) confirm that the Guarantees remain in full force and effect and apply to the obligations of the Substituted Debtor, and the covenants, Events of Default and other obligations other than the Substituted Debtor's payment obligations continue to apply to the Company and its current and future Restricted Subsidiaries in respect of the Securities to the same extent such provisions applied prior to such substitution as if no such substitution had occurred, it being the intent that the rights of the Holders in respect of the Securities be unaffected by the substitution (the "**Issuer Substitution Documents**");

(b) if the Substituted Debtor is organized in a jurisdiction other than the Grand Duchy of Luxembourg, the Issuer Substitution Documents shall contain covenants (i) to ensure that each Securityholder has the benefit of a covenant in terms corresponding to the obligations of the Issuer in respect of the payment of Additional Amounts, and (ii) to indemnify and hold harmless each Holder and Beneficial Owner of the Securities against all taxes or duties which arise by reason of a law or regulation in effect or contemplated on the effective date of the substitution, which may be Incurred or levied against such Holder or Beneficial Owner of the Securities as a result of the substitution and which would not have been so Incurred or levied had the substitution not been made;

(c) any credit rating assigned to the Securities shall not be downgraded when the Substituted Debtor replaces and substitutes the Issuer in respect of the Securities; *provided* that, any such downgrade in credit rating is in whole or in part in connection with such substitution;

(d) the Substituted Debtor shall have delivered, or caused the delivery, to the Trustee of opinions from counsel in the jurisdiction of organization of the Substituted Debtor as to the due authorization, execution and delivery of the Issuer Substitution Documents by the Substituted Debtor and the United States as to the validity, legally binding effect and enforceability of the Issuer Substitution Documents, as well as an Officer's Certificate as to compliance with the provisions described under this Section 4.20;

(e) the Substituted Debtor shall have appointed a process agent in the Borough of Manhattan in The City of New York to receive service of process on its behalf in relation to any legal action or proceedings arising out of or in connection with the Securities, this Indenture and the Issuer Substitution Documents;

(f) no Event of Default has occurred and is continuing; and

(g) the substitution shall comply with all applicable requirements under the laws of the jurisdiction of organization of the Substituted Debtor and New York.

Upon the execution of the Issuer Substitution Documents and the Issuer's delivery of an Officer's Certificate confirming compliance with the other conditions in this Indenture related to the substitution, the Substituted Debtor shall be deemed to be named in the Securities and this Indenture as the principal debtor in place of the Issuer and the Issuer shall be automatically released from all of its obligations under the Securities and this Indenture, including, without limitation, compliance with the covenants set forth in Section 4.06 hereof. For the avoidance of doubt, the Substituted Debtor shall assume all of the Issuer's obligations under this Indenture and the Securities, including compliance with the covenants set forth in Section 4.06 hereof.

Not later than 10 Business Days after the execution of the Issuer Substitution Documents and compliance with the other conditions in this Indenture, the Substituted Debtor shall give notice thereof to the Holders in accordance with the provisions of this Indenture.

Section 4.22. *Limitation on Asset Sales*.

(a) The Issuer, Inzag and the Company shall not, and the Company shall not permit any Restricted Subsidiary to, make any Asset Sale unless:

(i) the Issuer, the Company or such Restricted Subsidiary, as the case may be, receives consideration (including by way of relief from, or by any other Person assuming responsibility for, any liabilities, contingent or otherwise) at least equal to the Fair Market Value (such Fair Market Value to be determined on the date of contractually agreeing to such Asset Sale), as determined in good faith by the Company, of the assets subject to such Asset Sale;

(ii) in any such Asset Sale, or series of related Asset Sales, at least 75.000% of the consideration from such Asset Sale is in the form of cash or Cash Equivalents;

(iii) the Issuer, the Company or such Restricted Subsidiary, as the case may be, shall apply an amount equal to 50.000% of the Net Available Cash from such Asset Sale to redeem the Securities in accordance with Section 3.05 of this Indenture; and

(iv) either:

(A) to redeem additional Securities in an amount in excess of 50.000% of the Net Available Cash from such Asset Sale pursuant to Section 3.05 of this Indenture; or

(B) to prepay, repay or purchase any Indebtedness of the Company or any Restricted Subsidiary (in each case, other than Indebtedness owed to the Issuer or the Company); *provided*, *however*, that, in connection with any prepayment, repayment or purchase of Indebtedness pursuant to this clause, the Issuer or the Company shall retire such Indebtedness and shall cause the related commitment (if any) to be reduced in an amount equal to the principal amount so prepaid, repaid or purchased; or

(C) to pay general operating expenses or Capital Expenditures of the Company or to purchase or to enter into a binding contract to purchase assets to be used by the Issuer, the Company or any Restricted Subsidiary in a Permitted Business.

Notwithstanding the foregoing, neither the Issuer, the Company nor any Restricted Subsidiary shall be required to redeem the Securities in connection with an Asset Sale unless the Net Available Cash from such Asset Sale exceeds US$25,000,000.

(b) For the purposes of Section 4.22(a)(i) hereof, the following shall be deemed to be cash:

(i) the assumption by the transferee of Indebtedness or other liabilities contingent or otherwise of the Issuer, the Company or a Restricted Subsidiary (other than subordinated indebtedness of the Issuer or a Guarantor) and the release of the Issuer, the Company or such Restricted Subsidiary from all liability on such Indebtedness or other liability in connection with such Asset Sale;

(ii) securities, notes or other obligations received by the Issuer, the Company or any Restricted Subsidiary from the transferee that are converted by the Issuer or such Restricted Subsidiary into cash or Cash Equivalents within 90 days following the closing of such Asset Sale; and

(iii) Indebtedness of any Restricted Subsidiary that is no longer a Restricted Subsidiary as a result of such Asset Sale, to the extent that the Issuer, the Company and each other Restricted Subsidiary are released from any guarantee of payment of such Indebtedness in connection with such Asset Sale.

(c) Under the Collateral Agreements, the Collateral Providers shall not be permitted to sell, convey, lease or otherwise transfer any of the Collateral other than as permitted by this Indenture or by the Collateral Agreements.

Section 4.23. *Restricted Payments*. Inzag and the Company shall not, and the Company shall not permit any of its Restricted Subsidiaries to, directly or indirectly, take any of the actions described in clauses (a) through (e) of this Section 4.23 (each, a "**Restricted Payment**"):

(a) declare or pay any dividend or make any distribution or return of capital on or in respect of shares of Capital Stock of the Issuer, the Company or any Restricted Subsidiary to holders of such Capital Stock; *provided, however*, that a Restricted Subsidiary may declare or

pay dividends, distributions or returns of capital to the holders of its equity interests on a pro rata basis;

(b) purchase, redeem or otherwise acquire or retire for value any Capital Stock of the Issuer or the Company, except for Capital Stock held by the Issuer, the Company or a Restricted Subsidiary or for a purchase, redemption, retirement or other acquisition for value that would constitute a Permitted Investment;

(c) make any payment on, purchase, defease, redeem, prepay, decrease or otherwise acquire or retire for value any Indebtedness owed to any Affiliate of the Company (other than a Restricted Subsidiary), other than as permitted pursuant to this Indenture including, without limitation, in connection with any Permitted Indebtedness incurred pursuant to Section 4.03(b)(xi) of this Indenture;

(d) make any principal payment on, purchase, defease, redeem, prepay, decrease or otherwise acquire or retire for value prior to any scheduled final maturity, scheduled repayment or scheduled sinking fund payment, as the case may be, any Subordinated Obligations of the Issuer, the Company or any Restricted Subsidiary except (i) a repayment, redemption, repurchase, defeasance or acquisition or retirement in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case, due within one year of the date of such repurchase, defeasance or acquisition or retirement and (ii) Subordinated Obligations permitted to be Incurred under clauses (a)(i)(x) and (a)(ii)(x) of the definition of "Permitted Indebtedness"; or

(e) make any Restricted Investment;

if at the time the Company or such Restricted Subsidiary makes such Restricted Payment:

(i) an Event of Default will have occurred and be continuing; or

(ii) the aggregate amount of such Restricted Payment and all other Restricted Payments declared or made subsequent to the Issue Date would exceed the sum of, without duplication:

(A) the aggregate Net Proceeds, and the Fair Market Value of any property, received by the Company or any Restricted Subsidiary from the issue or sale of its Capital Stock (other than Disqualified Stock) or other capital contributions subsequent to the Issue Date (other than net cash proceeds received from an issuance or sale of such Capital Stock to a Restricted Subsidiary or the Company); *plus*

(B) if the Company or any Restricted Subsidiary makes an Investment in a Person that, as a result of or in connection with such Investment, becomes a Restricted Subsidiary, an amount equal to the Company's or such Restricted Subsidiary's existing Investment in such Person; provided that any amount added pursuant to this clause (ii) shall not exceed the amount of such Investment previously made and treated as a Restricted Payment; *plus*

(C) the amount by which Indebtedness of the Company or any Restricted Subsidiary is reduced on the Company's balance sheet or the balance sheet of any Restricted Subsidiary, in each case, upon the conversion or exchange (other than for Indebtedness held by the Company or any Restricted Subsidiary) subsequent to the issue date of any such Indebtedness convertible or exchangeable for Capital Stock (other than Disqualified Stock) of the Company (less the amount of any cash or the Fair Market Value of other property distributed by the Company or any Restricted Subsidiary upon such conversion or exchange); *plus*

(D) the amount equal to the net reduction of Investments (other than Permitted Investments) made by the Company or any Restricted Subsidiary in any Person resulting from (1) repurchases or redemptions of such Investment by such Person, proceeds realized upon the sale of such Investment, repayments of loans or advances or other transfers of assets (including by way of dividend or distribution) by such Person to the Company or any Restricted Subsidiary or (2) the redesignation of Unrestricted Subsidiaries as Restricted Subsidiaries (valued in each case as provided in the definition of Investment) not to exceed, in the case of any Unrestricted Subsidiary, the amount of Investments previously made by the Company or any Restricted Subsidiary in such Unrestricted Subsidiary; *provided* that any amount added pursuant to this clause (D) shall not exceed the amount of such Investment previously made and treated as a Restricted Payment; *plus*

(E) 100% of any dividends or distributions received by the Company or any of its Restricted Subsidiaries from an Unrestricted Subsidiary.

Notwithstanding the preceding paragraph, this Section 4.23 does not prohibit:

(1) any Restricted Payment either (aa) in exchange for Qualified Capital Stock of the Company or (bb) through the application of the Net Proceeds received by the Company from (I) a substantially concurrent sale of Qualified Capital Stock of the Company or (II) a contribution to the Capital Stock of the Company not representing an interest in Disqualified Stock, in each case, not received from a Restricted Subsidiary;

(2) the voluntary prepayment, purchase, defeasance, redemption or other acquisition or retirement for value of any Subordinated Obligations solely in exchange for, or through the application of Net Proceeds of a substantially concurrent sale, other than to a Restricted Subsidiary, of Refinancing Indebtedness for such Subordinated Obligations;

(3) dividends paid within 60 days of the declaration if at such date of declaration such dividend would have complied with Section 4.23(a); *provided*, *however*, that the payment or declaration, but not both the payment and the declaration, of such dividend will be included in the

calculation of the amount of Restricted Payments pursuant to clause (ii) above;

(4) the declaration or payment of the minimum legally required dividends, pursuant to Brazilian law; *provided*, *however*, that such payment shall be included in the calculation of the amount of Restricted Payments pursuant to clause (b) above;

(5) payments made by the Issuer, the Company, or in the form of dividends or otherwise to the Company's parent companies, for purposes of payment of fines or penalties relating to the leniency and other agreements that were entered into by the Company or AGIE with any Brazil or foreign governmental authorities or may be entered into with any Brazil or foreign governmental authorities, including without limitation with the Federal Prosecution Office of Brazil (*Ministério Público Federal*, or the MPF), and the Brazilian Antitrust Authority (*Conselho Administrativo de Defesa Econômica—CADE*), along with legal and other expenses incurred or that may be incurred in connection with, or as a result of, such leniency and other agreements, as well as under any future agreements, investigations, probes or proceedings related thereto;

(6) so long as no Default or Event of Default has occurred and is continuing, loans or advances to employees or directors of the Company or any Subsidiary of the Company the proceeds of which are used to purchase Capital Stock of the Company or any Restricted Subsidiary, in an aggregate amount not in excess of US$1,000,000 at any one time outstanding; *provided*, *however*, that such payment shall be included in the calculation of the amount of Restricted Payments pursuant to clause (ii) above;

(7) Restricted Payments made to an Affiliate if such transaction is permitted by Section 4.05 hereof solely for the purpose of repaying or refinancing the Securities or any amounts due thereunder;

(8) so long as no Default or Event of Default has occurred and is continuing, payments by the Company to AGPAR and/or AGSA in the form of dividends, distribution, repayments of loans or advances or other transfers of assets, creation of new intercompany loans or otherwise, for the payment of AGPAR's or AGSA's obligations and in the following amounts (the "**Cash Allowance**"): (aa) from and excluding the Issue Date, to and including December 28, 2024, R$800,000,000 in aggregate during the period, *provided that*, if, on or prior to December 28, 2024, AGE or the Issuer has repurchased, redeemed or repaid at least R$100,000,000 in principal amount of the Securities up until December 28, 2023, then the Cash Allowance for this period shall be increased to R$860,000,000; (bb) from and excluding December 28, 2024 to and including December 28, 2027, R$220,000,000 per year during the period; and (cc) from and

excluding December 28, 2027 to and including December 28, 2029, R$80,000,000 per year during the period; *provided* that, any unused Cash Allowance at the end of a given year shall not be added to the amount available in subsequent years; *provided*, *further* that, as a condition precedent to the release of the funds to AGPAR and/or AGSA, as applicable, such payments shall be approved by the Company's Board of Directors and prior to any such payments, the Company shall deliver to the Trustee an Officer's Certificate each stating that such payment complies with this Indenture, specifying the nature and amount of the AGPAR or AGSA obligation being repaid, certifying that the funds will be used by AGPAR or AGSA to repay such obligation, and that all conditions precedent in this Indenture relating to such payment have been complied with; and

(9) any Restricted Payment from Inzag to the Company or any Restricted Subsidiary.

The amount of any Restricted Payments not in cash shall be the Fair Market Value on the date of such Restricted Payment of the property, assets or securities proposed to be paid, transferred or issued by the Issuer, the Company or the relevant Restricted Subsidiary, as the case may be, pursuant to such Restricted Payment.

Section 4.24. *Permitted Business.* The Company and its Restricted Subsidiaries shall not engage in any business or activity that is not a Permitted Business or any business or activity that is a reasonable extension, development or expansion thereof, or is complementary thereto, as determined in good faith by the Company; and the Company shall use reasonable commercial efforts to prevent any Affiliate of the Company that is not a Restricted Subsidiary from, directly or indirectly, developing or starting to develop a Similar Business.

## ARTICLE 5

## CONSOLIDATION, MERGER, CONVEYANCE, SALE OR LEASE

Section 5.01. *Consolidation, Merger, Conveyance, Sale or Lease.*

(a) The Issuer shall not, directly or indirectly consolidate, amalgamate or merge with or into another Person unless:

(i) the resulting Person, surviving Person or transferee (if not the Issuer) is the Company or a Wholly-Owned Subsidiary of the Company (the "**Successor Issuer**");

(ii) the Successor Issuer expressly assumes all the obligations of the Issuer under this Indenture and the Securities pursuant to a supplemental indenture and the Collateral Agreements by amendments or supplements thereto; *provided*, *however* that Section 4.06 hereof shall not apply to the Company if the Company is the Successor Issuer;

(iii) immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing; and

(iv) the Issuer shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each to the effect that (A) such consolidation, merger or transfer and any supplemental indenture and any other amendments or supplements to the Collateral Agreements comply with this Indenture and the Collateral Agreements, (B) that such supplemental indenture is the legal, valid and binding obligation of such Successor Issuer, and (C) that all conditions precedent relating to such consolidation, merger or transfer have been satisfied.

(b) The Company shall not, directly or indirectly, consolidate with or merge into another Person or convey, transfer or lease all or substantially all of its assets (determined on a consolidated basis) to any Person unless:

(i) the Company has not previously expressly assumed all the obligations of the Issuer under this Indenture and the Securities and becomes the Successor Issuer as described in Section 5.01(a)(i) hereof;

(ii) the Company is (A) the continuing Person or (B) the resulting, continuing, surviving, transferee, assignee or otherwise successor Person, if not the Company (the "**Successor Company**") is organized and existing under the laws of Luxembourg, Brazil or any political subdivision thereof, the United States, any state thereof or the District of Columbia or any other country member of the Organization for Economic Cooperation and Development ("**OECD**") and expressly assumes by supplemental indenture, executed and delivered to the Trustee, in a form satisfactory to the Trustee, all of the obligations of the Company under this Indenture, the Securities and its Guarantee;

(iii) immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing;

(iv) immediately after giving effect to such transaction, either (A) the Company or (B)the Successor Company, as applicable, would be able to Incur at least an additional US$1.00 of Indebtedness pursuant to Section 4.03(a) hereof; or

(v) the Consolidated Net Leverage Ratio of the Company and the Restricted Subsidiaries would not be higher than it was immediately prior to giving effect to such transaction; and

(vi) the Company has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that (A) such consolidation, merger, conveyance, transfer or lease and, if a supplemental indenture is required in connection with such transaction, such supplemental indenture comply with this Indenture, (B) that all conditions precedent herein relating to such transaction and the execution of the supplemental indenture, if any, have been complied with and (C) that such supplemental indenture is the legal, valid and binding obligation of such Successor Company;

(vii) except that this provision shall not apply to any consolidation or merger of the Company with the Issuer, which shall be governed by Section 5.01 hereof nor to any consolidation, amalgamation or merger of AGPAR or its assets or any part thereof (including AGPAR Subsidiaries) with or into the Company or any Restricted Subsidiary.

(c) Except as permitted under Section 5.01 hereof, the Company shall not permit any other Guarantor to, directly or indirectly, consolidate with or merge into another Person (other than the Company or another Guarantor) or convey, transfer or lease all or substantially all of its assets (determined on a consolidated basis) to any Person (other than to the Company or another Guarantor) unless:

(i) the Guarantor is the continuing Person or the resulting, surviving or transferee Person (if not the Guarantor, the "**Successor Guarantor**") is a Person organized and existing under the laws of Luxembourg, Brazil or any political subdivision thereof, the United States, any state thereof or the District of Columbia or any other country member of the OECD and expressly assumes by supplemental indenture, executed and delivered to the Trustee, in a form satisfactory to the Trustee, all of the obligations of such Guarantor under this Indenture and its Guarantee;

(ii) immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing; and

(iii) the Company has delivered to the Trustee an Officer's Certificate and an opinion of counsel, each stating that (A) such consolidation, merger, conveyance, transfer or lease and, if a supplemental indenture is required in connection with such transaction, such supplemental indenture comply with this Indenture, (B) that all conditions precedent in this Indenture relating to such transaction and the execution of the supplemental indenture, if any, have been complied with and (C) that such supplemental indenture is the legal, valid and binding obligation of such Successor Guarantor.

Notwithstanding the foregoing, (a) any Guarantor may consolidate or otherwise combine with, merge into or transfer all or part of its properties and assets to the Company or another Guarantor, and (b) any Restricted Subsidiary may consolidate or otherwise combine with, merge into or transfer all or part of its properties and assets to any other Restricted Subsidiary, so long as the entity that is the result of such consolidation, combination or merger or the recipient of the transfer is a Guarantor or expressly assumes by supplemental indenture, executed and delivered to the Trustee, in a form satisfactory to the Trustee, all of the obligations of a Guarantor under this Indenture and provides a Guarantee, so long as immediately after giving effect to such transaction, (1) no Default or Event of Default shall have occurred and be continuing, (2) either (x) the Company would be able to Incur at least an additional US$1.00 of Indebtedness pursuant to Section 4.03(a) hereof or (y) the Consolidated Net Leverage Ratio of the Company and the Restricted Subsidiaries would not be higher than it was immediately prior to giving effect to such transaction and (C) such Guarantor has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, conveyance, transfer or lease and, if a supplemental indenture is required in connection with such transaction, such supplemental indenture comply with this Indenture and that all conditions precedent in this

Indenture relating to such transaction and the execution of the supplemental indenture, if any, have been complied with.

## ARTICLE 6

### DEFAULTS AND REMEDIES

Section 6.01. *Events of Default*. An "**Event of Default**" is defined in this Indenture as a:

(a) default for a period of 30 consecutive days in payment of any interest or Additional Amounts on the Securities when the same becomes due and payable, *provided* that such period may be extended by written consent of the Holders of at least 66.66% in aggregate principal amount of then outstanding Securities;

(b) default in payment of principal of or premium, if any, on the Securities when the same becomes due and payable (without necessity of acceleration), upon optional redemption, upon required purchase, upon declaration of acceleration or otherwise;

(c) failure by the Issuer or the Company to comply with Article 5 or Section 4.23(8);

(d) default in the performance, or breach, of any other covenant or obligation of the Issuer, the Guarantors or any Restricted Subsidiary in this Indenture and continuance of such default or breach for a period of 30 consecutive days after written notice specifying such default or breach is given to the Company by the Trustee or to the Company and the Trustee by the Holders of at least 25% in aggregate principal amount of then outstanding Securities;

(e) default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness by the Company or any Restricted Subsidiary (or the payment of which is guaranteed by the Company or any Restricted Subsidiary) whether such Indebtedness or guarantee now exists, or is created after the Issue Date, if that default:

(i) is caused by a failure to pay principal of or interest or premium (or Additional Amounts) on such Indebtedness within any applicable grace period (a "**Payment Default**"); or

(ii) effectively results in the acceleration of such Indebtedness prior to its Stated Maturity,

and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a Payment Default or the maturity of which has been so accelerated, aggregates US$30,000,000 (or its equivalent in other currencies at the time of determination) or more;

(f) any final judgment or order for the payment of money in excess of US$35,000,000 (or its equivalent in other currencies at the time of determination) is rendered

against the Company, AGPAR or any Significant Subsidiary and such judgment or order is not paid (whether in full or if there is a failure to pay installments in accordance with the terms of the judgment aggregating in excess of US$35,000,000) or otherwise discharged and remains unstayed for a period of 30 days after such judgment becomes final and non-appealable;

(g) any involuntary case, petition, claim or other proceeding is commenced or filed against AGIE, AGPAR, the Issuer, the Company or any Significant Subsidiary under any Bankruptcy Law or any other bankruptcy, insolvency, *falência, recuperação judicial* or *extrajudicial*, or other similar law now or hereafter in effect, including, but not limited to, any proceeding seeking the appointment of a trustee, receiver, *administrador judicial*, liquidator, administrator, custodian, assignee, sequestrator or other similar official of it or any substantial part of its assets, or the liquidation of AGIE, AGPAR, the Issuer, the Company or any Significant Subsidiary, and such involuntary case or other proceeding remains undismissed and unstayed for a period of 60 days, or a non-appealable final order for relief is entered against AGIE, AGPAR, the Issuer, the Company or any Significant Subsidiary under any relevant Bankruptcy Law as now or hereafter in effect;

(h) AGIE, AGPAR, the Issuer, the Company or any Significant Subsidiary: (i) files a petition or claim and/or commences a voluntary case or other proceeding seeking to be adjudicated bankrupt or insolvent or seeking liquidation, reorganization, *falência, recuperação judicial* or *extrajudicial* or other relief under any applicable Bankruptcy Law or any other bankruptcy, insolvency or other similar law now or hereafter in effect; (ii) consents to the institution of bankruptcy, insolvency, liquidation or scheme proceedings against it (including entry of an order against it in an involuntary case), or the filing by it (or against it) of a petition or answer or consent or any other document seeking reorganization or relief under any Bankruptcy Law; (iii) consents to the appointment of or taking possession by a receiver, *administrador judicial*, liquidator, administrator, assignee, custodian, trustee, sequestrator or similar official of AGIE, AGPAR, the Issuer, the Company or any Significant Subsidiary or for all or substantially all of the assets of AGIE, AGPAR, the Issuer, the Company or any such Significant Subsidiary; (iv) effects any general assignment for the benefit of creditors; or (v) generally is not paying its debts as they become due;

(i) any Guarantee by a Guarantor ceases to be in full force and effect, other than in accordance with the terms of this Indenture, or any Guarantor denies or disaffirms its obligations under its Guarantee;

(j) all or substantially all of the assets and revenues of the Issuer, the Company and the Restricted Subsidiaries, taken as a whole, is condemned, seized or otherwise appropriated by any Person acting under the authority of any national, regional or local government or the Issuer, the Company or any Significant Subsidiary is prevented by any such Person for a period of 60 consecutive days or longer from exercising normal control over all or substantially all of the assets and revenues of the Issuer, the Company and the Restricted Subsidiaries, taken as a whole;

(k) failure by the Issuer, the Company, AGIE or AGPAR, as applicable, to perfect the fiduciary sale (*alienação fiduciária*) of the AGE Collateral and the pledge of the Inzag Collateral as a first priority security interest in favor of the Collateral Agent for the benefit of the Holders within 90 days from the Issue Date;

(l) except as expressly permitted by this Indenture and the Collateral Agreements, any of the Collateral Agreements shall for any reason not be, or cease to be, in full force and effect, or, after becoming effective, fails to provide the Collateral Agent with the Liens purported to be created thereby, and such default continues for 30 days or the Issuer, the Company, any Restricted Subsidiary AGIE, or AGPAR shall so assert, or any security interest created, or purported to be created, by any of the Collateral Agreements shall cease to be enforceable; and

(m) any Affiliate of the Company (other than Inzag) that is not a Restricted Subsidiary, directly or indirectly, develops a Similar Business and such event is not remedied within 60 days from the date that the Company or Inzag becomes aware of the development of such Similar Business by such Affiliate.

Section 6.02. *Notice of Default; Acceleration*. The Issuer or the Company, as applicable, shall deliver to the Trustee and the Collateral Agent, within 10 Business Days after obtaining actual knowledge thereof, written notice of any Default or Event of Default that has occurred and is still continuing, its status and what action the applicable Person is taking or proposing to take in respect thereof. If an Event of Default (other than an Event of Default specified in Section 6.01(g) or (h) hereof) shall have happened and be continuing, either the Trustee or the Holders of at least 25% in aggregate principal amount of the outstanding Securities, by written notice to the Company (and to the Trustee and the Collateral Agent if notice is given by the Holders), may declare the principal amount of (and interest on) all the Securities to be due and payable immediately. If an Event of Default specified in Section 6.01(g) or (h) hereof occurs and is continuing, the principal amount of all the Securities shall be immediately due and payable without notice or any other act on the part of the Trustee or any Securityholder. In this case, the Issuer and the Guarantors, other than Zagope, shall comply with any and all then applicable regulations of the Central Bank for remittance of funds outside of Brazil. However, if the applicable Person cures all Defaults (except the nonpayment of principal of and accrued and unpaid interest or premium (and Additional Amounts) which shall have become due by acceleration) and the Company pays or irrevocably deposits with the Trustee a sum sufficient to pay (a) all overdue interest on the outstanding Securities, (b) all unpaid principal of the Securities that has become due otherwise than by such declaration of acceleration, (c) interest on such overdue interest (including any Additional Amounts) as provided herein and (d) all sums paid or advanced by the Trustee and any Agent hereunder and the compensation, expenses, disbursements and advances of the Trustee, the Agents and their agents and counsel Incurred in connection with such Event of Default, a declaration of acceleration may be rescinded and annulled by the Holders of not less than a majority in aggregate principal amount of the outstanding Securities. In addition, past Defaults with respect to the Securities may be waived by the Holders of not less than a majority in aggregate principal amount of the outstanding Securities except (i) a Default in the payment of principal of (or premium, if any) or interest or premium (and Additional Amounts), if any, on any Security or (ii) in respect of a provision of this Indenture which cannot be amended without the consent of the Holder of each outstanding Security affected thereby.

Section 6.03. *Control by Majority*. The Trustee and the Collateral Agent shall be under no obligation to exercise any of its respective rights or powers under this Indenture at the request or direction of any of the Holders, unless such Holders shall have offered to the Trustee or the Collateral Agent security or indemnity reasonably satisfactory to the Trustee or the Collateral

Agent, as applicable. Subject to such provision for indemnification, the Holders of a majority in principal amount of the outstanding Securities shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or the Collateral Agent, as applicable, or exercising any trust or power conferred on the Trustee or the Collateral Agent, as applicable, with respect to the Securities (or with respect to the Collateral Agent, the Collateral; provided that the Holders may not direct the Collateral Agent to take any action with respect to the AGE Collateral and the Inzag Collateral except and to the extent there are amounts due and payable under the Securities); and *provided further*, *however*, that the Trustee or the Collateral Agent, as applicable, shall have the right to decline to follow any such direction if the action so directed conflicts with any law or the provisions of this Indenture (or with respect to the Collateral Agent, the Collateral Agreements), if the Trustee or the Collateral Agent, as applicable, shall determine that such action would be prejudicial to Securityholders not taking part in such direction (*provided* that the Trustee or the Collateral Agent, as applicable, shall have no duty to ascertain whether such actions would be prejudicial to any Holder) or if either of the Trustee or the Collateral Agent, as applicable, determines in good faith that such action would involve the Trustee or the Collateral Agent, as applicable, in personal liability. In the event the Trustee receives inconsistent or conflicting requests and indemnity from two or more groups of Holders of the Notes, each representing less than a majority in aggregate principal amount of the Securities outstanding, the Trustee, may refrain from acting on such direction or requests, and shall Incur no liability to any Person for so refraining.

Section 6.04. *Limitation on Suits; Rights of Holders to Receive Payments*. No Holder shall have any right to institute any proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy thereunder, unless:

(a) such Holder has previously given written notice to the Trustee of a continuing Event of Default with respect to the Securities;

(b) the Holders of not less than 25% in aggregate principal amount of the outstanding Securities shall have made written request to the Trustee to institute proceedings in respect of such Event of Default in its own name as Trustee thereunder;

(c) such Holder or Holders have offered to the Trustee indemnity or security reasonably satisfactory to the Trustee against the costs, expenses (including, without limitation, attorneys' fees and expenses) and liabilities to be Incurred in compliance with such request;

(d) the Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(e) no direction inconsistent with such written request has been given to the Trustee during such 60-day period by the Holders of a majority in aggregate principal amount of the outstanding Securities;

it being understood and intended that no one or more of such Holders shall have any right in any manner whatsoever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other of such Holders, or to obtain or to seek to obtain

priority or preference over any other of such Holders or to enforce any right under this Indenture, except in the manner therein provided and for the equal and ratable benefit of all such Holders, it being expressly understood and agreed that the Trustee shall not have an affirmative obligation to ascertain whether such action is prejudicial.

Notwithstanding any other provision of this Indenture, the Holder of any Security shall have the right, which is absolute and unconditional, to receive payment of the principal of (and premium, if any) and interest (and Additional Amounts), if any, on such Security and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

Section 6.05. *Other Remedies*. If an Event of Default occurs and is continuing, the Trustee and the Collateral Agent (solely with respect to its interests in the Collateral) may pursue any available remedy to collect the payment of principal of or interest on the Securities or to enforce the performance of any provision of the Securities or this Indenture or the Collateral Agreements.

The Trustee may maintain a proceeding even if it does not possess any of the Securities or does not produce any of them in the proceeding. A delay or omission by the Trustee or the Collateral Agent or any Securityholder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. No remedy is exclusive of any other remedy. All available remedies are cumulative.

Section 6.06. *Collection Suit by Trustee*. If an Event of Default specified in Section 6.01(a) or (b) hereof occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer or the Company for the whole amount then due and owing (together with interest on any unpaid interest to the extent lawful) and the amounts provided for in Section 7.06 hereof.

Section 6.07. *Trustee or Collateral Agent May File Proofs of Claim*. The Trustee or the Collateral Agent, as applicable, may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee or the Collateral Agent, as applicable, and the Securityholders allowed in any judicial proceedings relative to the Issuer, any Guarantor, their creditors or their property and any Bankruptcy Custodian in any such judicial proceeding is hereby authorized by each Holder to make payments to the Trustee or the Collateral Agent, as applicable, and, in the event that the Trustee or the Collateral Agent, as applicable, shall consent to the making of such payments directly to the Holders, to pay to the Trustee or the Collateral Agent, as applicable, any amount due it for the reasonable compensation, expenses (including, without limitation, attorneys' fees and expenses), disbursements and advances of the Trustee or the Collateral Agent, as applicable, its agents and its counsel, and any other amounts due the Trustee or the Collateral Agent, as applicable, under Section 7.06 hereof.

Section 6.08. *Priorities*. If the Trustee collects any money or property pursuant to this Article 6 or any proceeds are delivered to the Trustee by the Collateral Agent, it shall pay out the money or property in the following order:

FIRST: to the Trustee and the Agents appointed hereunder for amounts due under Section 7.06 hereof;

SECOND: to Securityholders for amounts due and unpaid on the Securities for principal and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Securities for principal and interest, respectively; and

THIRD: to the Issuer.

The Trustee may fix a record date and payment date for any payment to Securityholders pursuant to this Section 6.08 and shall promptly notify the Issuer thereof. At least fifteen (15) days before such record date, the Issuer shall give to each Securityholder and the Trustee a notice that states the record date, the payment date and amount to be paid.

Section 6.09. *Undertaking for Costs*. In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.09 does not apply to a suit by the Trustee, a suit by a Holder pursuant to this Section 6.09 or a suit by Holders of more than 10% in aggregate principal amount of the outstanding Securities.

Section 6.10. *Waiver of Stay or Extension Laws*. Neither the Issuer nor the Company (to the extent it may lawfully do so) shall at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and each of the Issuer and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

## ARTICLE 7

## TRUSTEE

Section 7.01. *Duties of Trustee*.

(a) Except during the continuance of an Event of Default:

(i) the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii) in the absence of negligence or willful misconduct on its part, as determined by a court of competent jurisdiction in a final, non-appealable order, the

Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. Notwithstanding the foregoing, the Trustee shall examine such certificates and opinions to determine whether or not they conform, on their faces, to the requirements of this Indenture (but need not, and is under no obligation to, confirm or investigate the accuracy of mathematical calculations or other facts stated therein or the validity, accuracy, enforceability or sufficiency of any attachments thereto or documents referenced therein).

(b) Following the occurrence and continuance of an Event of Default, the Trustee shall exercise such of the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs.

(c) The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable order, except that:

(i) this Section 7.01(c) does not limit the effect of Section 7.01(a) hereof;

(ii) the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(iii) the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.03 hereof.

(d) The Trustee shall not be liable for interest on or the investment of any money received or held by it except as the Trustee may agree in writing with the Issuer or the Company.

(e) Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(f) No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise Incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(g) Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 7.01.

Section 7.02. *Rights of Trustee.*

(a) The Trustee may conclusively rely on any document believed by it to be genuine and to have been signed or presented by the proper Person or Persons. The Trustee need not investigate any fact or matter stated in the document but may, in its discretion, make such further inquiry or investigation into such facts or matters as it may see fit and, if the Trustee shall

determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer and the Company, personally or by agent or attorney at the sole cost of the Issuer and the Company and shall Incur no liability or additional liability of any kind by reason of such inquiry or investigation.

(b) Before the Trustee acts or refrains from acting, it may require an Officer's Certificate and/or an Opinion of Counsel. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officer's Certificate or Opinion of Counsel.

(c) The Trustee may act through agents and attorneys and shall not be charged with the supervision of such agents or attorneys, and shall not be responsible for the acts, omissions, misconduct or negligence of any agent appointed with due care.

(d) The Trustee shall not be liable for any action it takes or omits to take in good faith which it reasonably believes to be authorized or within its rights or powers.

(e) The Trustee may consult with counsel of its own selection, the costs and expenses of which shall be borne by the Issuer, and the advice or opinion of counsel of such counsel with respect to legal matters relating to this Indenture and the Securities shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or such opinion of such counsel.

(f) In no event shall the Trustee be responsible or liable for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(g) The Trustee shall not be deemed to have notice of any Default or Event of Default (other than a payment default of principal, premium or interest) unless a Trust Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Securities and this Indenture.

(h) The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each Paying Agent, the Registrar, each Transfer Agent, the Collateral Agent and each other agent, custodian and other Person employed to act hereunder.

(i) The Trustee may request that the Issuer or any Guarantor deliver an Officer's Certificate setting forth the names of individuals and/or titles of Officers authorized at such time to take specified actions pursuant to this Indenture.

(j) In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, pandemics, epidemics, recognized public emergencies, quarantine restrictions, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions,

loss or malfunctions of utilities, communications or computer (software and hardware) services, use or infiltration of the Trustee's technological infrastructure exceeding authorized access; it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

(k) Any request, direction, order or demand of the Issuer or the Company shall be sufficiently evidenced by an Officer's Certificate of the Issuer or the Company, as applicable (unless other evidence in respect thereof be herein specifically prescribed), and any resolution of the Board of Directors of the Issuer or the Company, as applicable, shall be evidenced by copies thereof certified by the Secretary or an Assistant Secretary (or equivalent Officer) of the Issuer or the Company, as applicable.

(l) The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Indenture at the request, order or direction of any of the Holders pursuant to the provisions of this Indenture, unless such Holders shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses (including, without limitation, attorneys' fees and expenses) and liabilities that might be Incurred thereby.

(m) The permissive rights of the Trustee enumerated herein shall not be construed as duties of the Trustee.

(n) The Trustee shall not have any liability or responsibility with respect to, or obligation or duty to monitor, confirm, determine or inquire as to the Company's, the Issuer's, any Guarantor's or any Subsidiary's compliance with any covenant under this Indenture (other than payment of the Securities).

(o) To the extent that any consent or instruction from the Holders is required under this Indenture or otherwise with respect to the Collateral and/or the Collateral Agreements, the Trustee, the Paying Agent, the Registrar and the Transfer Agent shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to solicit such consent or instructions. Without limiting the generality of the foregoing, and notwithstanding anything contained herein to the contrary, nothing contained in this Indenture or the Collateral Agreements, as the case may be, shall require the Trustee, in acting under the Collateral Agreements, to exercise any discretionary acts, and any provisions of this Indenture or the Collateral Agreements, as the case may be, that authorize or permit the Trustee to approve, consent to, disapprove, request, determine, waive, act or decline to act, in its discretion under the Collateral Agreements, shall be subject to the Trustee receiving written direction from the Holders of the Securities to take such action or to exercise such rights.

(p) None of the Trustee, any Paying Agent, the Registrar or any Transfer Agent shall at any time be under any duty or responsibility to the Issuer, the Guarantors, any Holders or any other Person to calculate any principal, interest (including, without limitation, PIK Interest), Additional Amounts, premium or any other amount payable in respect of the Securities whether at Stated Maturity, acceleration, redemption, prepayment or otherwise. Each of the Trustee, the Paying Agent, the Registrar and the Transfer Agent may conclusively rely on the calculations

and determinations of the Issuer in respect of any such amount payable with respect to the Securities.

Section 7.03. *Individual Rights of Trustee*. The Trustee in its individual or any other capacity may become the owner or pledgee of Securities and may otherwise deal with the Issuer, the Company or their Affiliates with the same rights it would have if it were not Trustee. Any Collateral Agent, Paying Agent, Registrar, co-registrar or Transfer Agent may do the same with like rights. However, the Trustee must comply with Sections 7.09 and 7.10 hereof.

Section 7.04. *Trustee's Disclaimer*. The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture, the Guarantees or the Securities, it shall not be accountable for the Issuer's use of the proceeds from the Securities, and it shall not be responsible for any statement of the Issuer or the Company or any other Person in this Indenture, or in any other document issued in connection with the sale of the Securities or in the Securities other than the Trustee's certificate of authentication.

Section 7.05. *Notice of Defaults*. If a Default or Event of Default occurs and is continuing and if it is actually known to a Trust Officer in accordance with Section 7.02(g) hereof, the Trustee shall give to each Securityholder notice of the Default within 10 days after such Trust Officer has actual knowledge thereof. Except in the case of a Default or Event of Default in payment of principal of, or interest or premium (and Additional Amounts), if any, on any Security (including payments pursuant to the mandatory redemption provisions of, or interest, if any, on the Securities), the Trustee may withhold the notice if and so long as the Trustee determines in good faith that withholding the notice is in the interests of Securityholders. The Trustee shall not be charged with knowledge of any Default or Event of Default other than a Default under Section 6.01(a) or 6.01(b) hereof unless a Trust Officer in the Corporate Trust Office of the Trustee shall have received written notice thereof from the Issuer, the Company or a Securityholder, expressly referencing this Indenture and the Securities or as otherwise provided in Section 7.02(g) hereof.

Section 7.06. *Compensation and Indemnity*. The Issuer and each Guarantor jointly and severally agree to pay to each of the Trustee, the Collateral Agent, the Paying Agent, the Registrar and the Transfer Agent from time to time such compensation for its services hereunder as the parties may from time to time agree in writing. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. Except as otherwise expressly provided herein, the Issuer and each Guarantor jointly and severally agree to reimburse each of the Trustee, the Collateral Agent, the Paying Agent, the Registrar and the Transfer Agent upon its request for all reasonable expenses (including, without limitation, attorneys' fees and expenses), disbursements and advances Incurred or made by it in accordance with any provision of this Indenture (including the compensation and the expenses and disbursements of its agents and counsel), except any such expense, disbursement or advance as may be attributable to its own willful misconduct or negligence, as determined by a court of competent jurisdiction in a final, non-appealable order. Each of the Issuer and the Guarantors, jointly and severally, shall indemnify each of the Trustee or any predecessor Trustee (which for purposes of this Section 7.06 shall be deemed to include its directors, officers, agents and employees), the Collateral Agent, the Paying Agent, the Registrar, the Transfer Agent, and to hold each of them harmless for, from and against any and all loss, liability damage, cost, claim or expense (including taxes

(other than taxes based upon, measured by or determined by the income of the Trustee) and reasonable and documented attorneys' fees and expenses) Incurred by it in connection with the administration of this trust, the performance of its duties hereunder and/or the exercise of its rights hereunder, including the reasonable costs and expenses of defending itself against any claim (whether asserted by the Issuer, any Guarantor, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section 7.06, except to the extent that such loss, damage, claim, liability or expense is due to its own willful misconduct or negligence as determined in a final judgment of a court of competent jurisdiction. The Trustee, the Paying Agent, the Registrar or the Transfer Agent, as applicable, shall notify the Issuer and the Company promptly of any claim for which it may seek indemnity. Failure by the Trustee, any Paying Agent, the Registrar or any Transfer Agent to so notify the Issuer and the Guarantors shall not relieve the Issuer and the Guarantors of their obligations hereunder. The Issuer and the Guarantors shall defend the claim and each of the Trustee, any Paying Agent, the Collateral Agent, the Registrar or any Transfer Agent may have separate counsel and the Issuer and the Guarantors shall pay the reasonable and documented fees and expenses of such counsel; provided that any of the Trustee, the Paying Agent, the Collateral Agent, the Registrar or the Transfer Agent may only employ separate counsel at the expense of the Issuer and the Company if any of the Trustee, the Paying Agent, Collateral Agent, the Registrar or the Transfer Agent, as applicable, in its sole judgment, determines (a) a conflict of interest or the potential for a conflict of interest exists by reason of common representation, or (b) there are legal defenses available to it that are different from or are in addition to those available to the Issuer and/or any Guarantors or (c) if all parties commonly represented do not agree as to the action (or inaction) of counsel. The Issuer and the Guarantors need not pay for any settlement made without its consent, which consent shall not be unreasonably withheld.

To secure the Issuer's and the Guarantors' obligations in this Section 7.06, the Trustee shall have a Lien prior to the Securities on all money or property held or collected by the Trustee or the Paying Agent other than money or property held in trust to pay principal of and interest and Additional Amounts, if any, on particular Securities.

The Issuer and the Guarantors agree to pay by wire transfer the fees and expenses (including, without limitation, attorneys' fees and expenses) of each of the Trustee, the Collateral Agent, each Paying Agent, the Registrar and the Transfer Agent and their respective counsel in connection with the negotiation, execution and delivery of this Indenture within three Business Days of receipt of invoices for such fees and expenses.

The Issuer's and the Guarantors' payment obligations pursuant to this Section 7.06 shall survive the discharge of this Indenture, final payment on the Securities and resignation or removal of the Trustee, any Paying Agent, the Registrar or any Transfer Agent. When the Trustee Incurs expenses (including, without limitation, attorneys' fees and expenses) after the occurrence of an Event of Default specified in Section 6.01(g) or (h) hereof with respect to the Issuer or the Guarantors, the expenses are intended to constitute expenses of administration under the U.S. Bankruptcy Code and any other Bankruptcy Law.

Section 7.07. *Replacement of Trustee*. The Trustee may resign at any time by so notifying the Issuer. The Holders of a majority in principal amount of the outstanding Securities

may remove the Trustee by so notifying the Trustee and may appoint a successor Trustee. The Issuer shall remove the Trustee if:

(a) the Trustee fails to comply with Section 7.09 hereof;

(b) the Trustee is adjudged bankrupt or insolvent;

(c) a receiver or other public officer takes charge of the Trustee or its property; or

(d) the Trustee otherwise becomes incapable of acting.

Furthermore, so long as no Event of Default has occurred and is continuing, the Issuer may, in its discretion, remove the Trustee at any time.

If the Trustee resigns or is removed by the Issuer or by the Holders of a majority in aggregate principal amount of the Securities and the Issuer or such Holders do not reasonably promptly appoint a successor Trustee, or if a vacancy exists in the office of Trustee for any reason (the Trustee in such event being referred to herein as the "**retiring Trustee**"), the Issuer shall promptly appoint a successor Trustee; *provided* that such successor Trustee complies, at the time of such appointment, with Section 7.09 hereof.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer. Thereupon, the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall give a notice of its succession to Securityholders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the Lien provided for in Section 7.06 hereof.

If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Issuer or the Holders of 10% in aggregate principal amount of the outstanding Securities may, at the expense of the Company, petition any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee fails to comply with Section 7.09 hereof, any Securityholder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of another successor Trustee.

Notwithstanding the replacement of the Trustee pursuant to this Section 7.07, the Issuer's and the Guarantors' obligations under Section 7.06 hereof shall continue for the benefit of the retiring Trustee.

Section 7.08. *Successor Trustee by Merger.* If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another entity, the resulting, surviving or transferee entity without any further act shall be the successor Trustee.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture any of the Securities shall have

been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Securities so authenticated; and in case at that time any of the Securities shall not have been authenticated, any successor to the Trustee by merger, conversion or consolidation may authenticate such Securities either in the name of any predecessor hereunder or in the name of the successor to the Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Securities or in this Indenture provided that the certificate of the Trustee shall have.

Section 7.09. *Eligibility; Disqualification*. The Trustee shall at all times satisfy the requirements of TIA § 310(a). The Trustee shall have a combined capital and surplus of at least US$50,000,000 as set forth in its most recent published annual report of condition. The Trustee shall comply with TIA § 310(b); *provided*, *however*, that there shall be excluded from the operation of TIA § 310(b)(1) any indenture or indentures under which other securities or certificates of interest or participation in other securities of the Issuer are outstanding if the requirements for such exclusion set forth in TIA § 310(b)(1) are met.

Section 7.10. *Preferential Collection of Claims Against Issuer*. The Trustee shall comply with TIA § 311(a), excluding any creditor relationship listed in TIA § 311(b). A Trustee who has resigned or been removed shall be subject to TIA § 311(a) to the extent indicated.

Section 7.11. *Appointment of Co-Trustee*. Notwithstanding any other provisions of this Indenture, the Trustee shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, and to vest in such Person or Persons, in such capacity and for the benefit of the Securityholders, subject to the other provisions of this Section 7.11, such powers, duties, obligations and rights as the Trustee may consider necessary or desirable. No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 7.09 hereof and no notice to Holders of the appointment of any co-trustee or separate trustee shall be required under Section 7.07 hereof.

(a) Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i) all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the written direction of the Trustee;

(ii) no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

(iii) the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(b) Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article 7. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection or rights (including the rights to compensation, reimbursement and indemnification hereunder) to, the Trustee. Every such instrument shall be filed with the Trustee.

(c) Any separate trustee or co-trustee may at any time constitute the Trustee, its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

## ARTICLE 8

### DISCHARGE OF INDENTURE; DEFEASANCE

Section 8.01. *Satisfaction and Discharge of Liability on Securities*. This Indenture shall be discharged and shall cease to be of further effect as to all Securities issued hereunder, and the Collateral shall be released in accordance with Section 11.05 hereof, when:

(a) all Securities that have been authenticated, except lost, stolen or destroyed Securities that have been replaced or paid and Securities for whose payment money has been deposited in trust and thereafter repaid to the Issuer, have been delivered to the Trustee for cancellation; or all Securities that have not been delivered to the Trustee for cancellation (i) have become due and payable, (ii) will become due and payable within one year of their Stated Maturity or (iii) are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of a redemption by the Trustee and, in each case, the Issuer, any Guarantor or any Restricted Subsidiary has irrevocably deposited or caused to be deposited with the Trustee as funds in trust solely for the benefit of the Holders, cash in U.S. dollars in amounts as will be sufficient to pay and discharge the entire Indebtedness on the Securities not delivered to the Trustee for cancellation for principal, premium and Additional Amounts, if any, and accrued interest to the date of maturity or redemption;

(b) no Default or Event of Default has occurred and is continuing on the date of the deposit or will occur as a result of the deposit and the deposit will not result in a breach or violation of, or constitute a default under, any other material instrument to which the Issuer or the Company is a party or by which the Issuer or the Company is bound;

(c) the Issuer, the Guarantors or any Restricted Subsidiary has paid or caused to be paid all other sums payable by the Issuer or the Guarantors under this Indenture; and

(d) the Issuer has delivered irrevocable instructions to the Trustee under this Indenture to apply the deposited money toward the payment of the Securities at maturity or the redemption date, as the case may be.

In addition, the Issuer must deliver an Officer's Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent relating to satisfaction and discharge have been satisfied.

Notwithstanding this Section 8.01, this Article 8 and the Issuer's and the Guarantors' obligations in Sections 2.03, 2.04, 2.06, 2.07, 7.06 and 7.07 hereof shall survive until the Securities have been paid in full. Thereafter, Section 8.03 hereof and the Issuer's and the Guarantors' obligations in Sections 7.06 and 8.04 hereof shall survive.

Section 8.02. *Application of Trust Money*. The Trustee shall hold in trust U.S. dollars or U.S. Government Obligations deposited with it pursuant to this Article 8. It shall apply the deposited money and the U.S. dollars from U.S. Government Obligations through the Paying Agent and in accordance with this Indenture to the payment of principal of and interest and Additional Amounts, if any, on the Securities.

Section 8.03. *Repayment to Issuer*. The Trustee and the Paying Agent shall promptly turn over to the Issuer or the Company upon written request any excess money or securities held by them at any time.

Subject to any applicable abandoned property law, the Trustee and the Paying Agent shall pay to the Issuer or the Company upon written request any money held by them for the payment of principal and interest and Additional Amounts, if any, that remains unclaimed for two years, and, thereafter, Securityholders entitled to the money must look only to the Issuer and not to the Trustee or any Paying Agent for payment as general creditors.

Section 8.04. *Reinstatement*. If the Trustee or any Paying Agent is unable to apply any U.S. dollars or U.S. Government Obligations in accordance with this Article 8 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's obligations under this Indenture and the Securities shall be revived and reinstated as though no deposit had occurred pursuant to this Article 8 until such time as the Trustee or such Paying Agent is permitted to apply all such U.S. dollars or U.S. Government Obligations in accordance with this Article 8; *provided*, *however*, that, if the Issuer has made any payment of interest or Additional Amounts, if any, on or principal of any Securities because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Securities to receive such payment from the U.S. dollars held by the Trustee or such Paying Agent.

Section 8.05. *Defeasance*. The Issuer, the Guarantors and the Restricted Subsidiaries may, at the Issuer's option, at any time elect to have either Section 8.05(a) or Section 8.05(b) hereof applied to this Indenture, all outstanding Securities and the Guarantees upon compliance with the conditions set forth in this Section 8.05:

(a) Upon the Issuer's election of the "legal defeasance" option applicable to this Section 8.05(a), and subject to the satisfaction of the conditions set forth in Section 8.05(c) hereof, the Issuer and the Guarantors, as applicable, shall be discharged from any and all obligations in respect of this Indenture, the Securities, the Guarantees and the Collateral Agent may release the Collateral in accordance with Section 11.05 hereof (except in each case for certain obligations, including to register the transfer or exchange of Securities, replace stolen, lost or mutilated Securities, maintain paying agencies and hold moneys for payment in trust and the rights, protections, immunities and indemnities of the Trustee and the obligations of the Issuer and the Guarantors with respect thereto). Subject to compliance with this Section 8.05, the Issuer may exercise its option under this Section 8.05(a) notwithstanding the prior exercise of its option under Section 8.05(b) hereof. If the Issuer exercises the "**legal defeasance**" option, any payment on the Securities may not be accelerated due to an Event of Default with respect thereto.

(b) Upon the Issuer's election of the "**covenant defeasance**" option applicable to this Section 8.05(b), and subject to the satisfaction of the conditions set forth in Section 8.05(c) hereof, the Issuer and the Guarantors, as applicable, need not comply with the covenants set forth in Sections 4.02, 4.03, 4.04, 4.05, 4.06, 4.07, 4.08, 4.09, 4.10, 4.11, 4.12, 4.13, 4.14, 4.16, 4.17, 4.18, 4.19, 4.20, 4.22 and 4.23, and Sections 6.01(c), (d), (e), (f), (g) (solely with respect to any Significant Subsidiary, (h) (solely with respect to any Significant Subsidiary), (i) and (j) hereof shall no longer constitute Events of Default.

(c) In order to exercise the options set forth in Section 8.05(a) or Section 8.05(b) hereof the Issuer must irrevocably deposit with the Trustee, in trust, (i) money, (ii) U.S. Government Obligations which through the payment of interest and principal in respect thereof in accordance with their terms will provide money in an amount or (iii) a combination thereof, in each case, in such amounts, as shall be, in the opinion of an internationally recognized firm of independent accountants delivered to the Trustee, sufficient to pay and discharge the principal of each installment of principal and interest, if any, and Additional Amounts, if any, on the outstanding Securities to, but excluding, the dates such payments are due, in accordance with the terms of this Indenture and of the Securities. The defeasance options set forth in Section 8.05(a) or Section 8.05(b) hereof shall become effective only if the Issuer delivers to the Trustee: (A) an opinion of recognized U.S. counsel independent of the Issuer to the effect that the Holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such deposit, defeasance and discharge described in Section 8.05(a) hereof or Section 8.05(b) hereof, as applicable, and shall be subject to U.S. federal income tax on the same amounts and in the same manner and at the same times as if such deposit, defeasance and discharge had not occurred, which in the case of Section 8.05(a) hereof must be based on a change in law or a ruling by the U.S. Internal Revenue Service; and (B) an Opinion of Counsel and an Officer's Certificate as to compliance with all conditions precedent provided for in this Indenture relating to the defeasance of the Securities.

Section 8.06. *Indemnity for U.S. Government Obligations*. The Company or the Guarantors shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the U.S. Government Obligations deposited pursuant to this Article 8 or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of outstanding Securities.

# ARTICLE 9

## AMENDMENTS

Section 9.01. *Without Consent of Holders*. Notwithstanding Section 9.02 hereof, the Issuer, the Guarantors, the Trustee and the Collateral Agent may amend this Indenture, the Guarantees or the Securities without notice to or consent of any Securityholder:

(a) to cure any ambiguity, omission, defect or inconsistency;

(b) provide for the assumption by a Successor Issuer, Successor Company, Successor Guarantor or a Substituted Debtor of the obligations of the Issuer, the Company or a Guarantor, as applicable, under this Indenture, the Guarantees and/or the Securities;

(c) to add additional Guarantees with respect to the Securities;

(d) add additional security with respect to the Securities;

(e) to add to the covenants of the Issuer, the Guarantors or the Restricted Subsidiaries for the benefit of the Holders or to surrender any right or power herein conferred upon the Issuer, the Company or the Restricted Subsidiaries;

(f) to make any change that does not adversely affect the rights of any Securityholder in any material respect; and

(g) to provide for the appointment of a successor Trustee with respect to the Securities; *provided* that the successor Trustee is otherwise qualified and eligible to act as such under the terms of this Indenture.

The relevant parties to the Collateral Agreements may amend the Collateral Agreements without notice to or consent of any Holder to provide for the succession of any parties to the Collateral Agreements (and other amendments that are administrative or ministerial in nature) in connection with an amendment, renewal, extension, substitution, refinancing, restructuring, replacement, supplementing or other modification from time to time of any agreement that is not prohibited by the Collateral Agreements or this Indenture.

After an amendment under this Section 9.01 becomes effective, the Issuer shall give to Securityholders a notice briefly describing such amendment. The failure to give such notice to all Securityholders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.01.

Section 9.02. *With Consent of Holders*. The Issuer, the Guarantors, the Trustee and the Collateral Agent may amend this Indenture or the rights of the Holders (or waive any Default other than a Default in the payment of principal of, premium, accrued plus unpaid interest or Additional Amounts, if any, on the Securities) without notice to any Securityholder but with the written consent of the Holders of at least a majority in aggregate in principal amount of the

outstanding Securities. However, without the consent of the Holder of each outstanding Security affected thereby, an amendment or waiver may not:

(a) change the Stated Maturity upon which the principal of or the interest on any Security is due and payable;

(b) reduce the principal amount of the Security;

(c) reduce the rate of interest on the Security (including Additional Amounts) or any premium payable upon the redemption thereof;

(d) change any place of payment in which any Security or any premium or the interest thereon is payable;

(e) change the currency in which any Security or any premium or the interest thereon is payable;

(f) impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity of the Security (or, in the case of redemption, on or after any redemption date);

(g) reduce the percentages of principal amount of the outstanding Securities, whose Holders' consent is required for any amendment, supplement or waiver of any provision of this Indenture;

(h) waive a Default or Event of Default in the payment of principal of, premium, if any, or interest on the Securities (except (i) a rescission of acceleration of the Securities by the Holders of at least a majority in aggregate principal amount of the then outstanding Securities with respect to a non-payment Default and a waiver of the payment Default that resulted from such acceleration and (ii) that this provision shall not affect Holders' right to extend the period set forth in Section 6.01(a) of this Indenture by written consent of the Holders of at least 66.66% in aggregate principal amount of the outstanding Securities);

(i) make any change in this Section 9.02;

(j) amend or modify any payment provision of the Guarantees that would adversely affect the Securityholders or release the Guarantees;

(k) modify the obligations of the Company to make a Change of Control Offer upon a Change of Control if such modification was done after the occurrence of such Change of Control; or

(l) modify or change any provision of this Indenture affecting the ranking of the Securities or the Guarantees in a manner adverse to the Securityholders.

Notwithstanding anything herein to the contrary, without the consent of the Holders of at least 75% in principal amount of the Securities then outstanding, no amendment, supplement or

waiver may release all or substantially all of the Collateral other than in accordance with the express terms of this Indenture and the Collateral Agreements.

It shall not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent approves the substance thereof.

After an amendment under this Section 9.02 becomes effective, the Issuer shall give to Securityholders a notice briefly describing such amendment. The failure to give such notice to all Securityholders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.02.

Section 9.03. *Revocation and Effect of Consents and Waivers*.

(a) A consent to an amendment or a waiver by a Holder of a Security shall bind the Holder and every subsequent Holder of that Security or portion of the Security that evidences the same debt as the consenting Holder's Security, even if notation of the consent or waiver is not made on the Security. However, any such Holder or subsequent Holder may revoke the consent or waiver as to such Holder's Security or portion of the Security if the Trustee receives the notice of revocation before the date the amendment or waiver becomes effective. After an amendment or waiver becomes effective, it shall bind every Securityholder. An amendment or waiver becomes effective upon the execution of such amendment or waiver by the Trustee.

(b) The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the Securityholders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture. If a record date is fixed, then notwithstanding Section 9.01(a) hereof, those Persons who were Securityholders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be Holders after such record date. No such consent shall be valid or effective for more than 120 days after such record date.

(c) Notwithstanding any other provision of this Indenture or the Securities, any waiver or consent that may be delivered by a Holder of the Securities pursuant to this Article 9 may be delivered by a Beneficial Owner of the Securities. Such Beneficial Owner of the Securities shall be able to prove its holdings of the Securities by executing a certificate in the form of Appendix B hereto or any other form reasonably established by the Company.

Section 9.04. *Notation on or Exchange of Securities*. If an amendment changes the terms of a Security, the Trustee may require the Holder of that Security to deliver it to the Trustee. The Trustee may place an appropriate notation on that Security regarding the changed terms and return it to the Holder. Alternatively, if the Issuer or the Trustee so determines, the Issuer in exchange for that Security shall issue and the Trustee shall, upon receipt of a written order of the Issuer, authenticate a new Security that reflects the changed terms. Failure to make the appropriate notation or to issue a new Security shall not affect the validity of such amendment.

Section 9.05. *Trustee to Sign Amendments*. The Trustee shall sign any amendment authorized pursuant to this Article 9 if, in the reasonable discretion of the Trustee, the amendment does not adversely affect the rights, duties, liabilities or immunities of the Trustee. If the Trustee, in its reasonable discretion, determines that any such amendment adversely affects the rights, duties, liabilities or immunities of the Trustee, the Trustee may but need not sign it. In signing such amendment the Trustee shall receive indemnity reasonably satisfactory to it and to receive, and (subject to Section 7.01 hereof) shall be fully protected in relying upon, in addition to the documents required by Section 13.03 hereof, an Officer's Certificate and an Opinion of Counsel of the Issuer or the Company each stating that such amendment is authorized or permitted by this Indenture, and that the conditions precedent relating to such amendment have been satisfied.

## ARTICLE 10

## GUARANTEES

Section 10.01. *Guarantees*. Subject to the provisions of this Article 10, each Guarantor hereby irrevocably and unconditionally Guarantees to each Securityholder and to the Trustee, on an unsecured basis, the full, due and punctual payment (whether at the Maturity Date, upon redemption, purchase pursuant to an offer to purchase or acceleration or otherwise) of the principal (and premium, if any), interest, Additional Amounts and all other amounts payable by the Issuer under this Indenture and the Securities as they come due, except that Zagope Guarantees the Issuer's obligations pursuant to the Securities only up to the Zagope Guarantee Limit. Upon failure by the Issuer to pay punctually any such amount, the Guarantors shall forthwith pay the amount not so paid at the place and time and in the manner specified in this Indenture. Notwithstanding anything to the contrary in this Indenture and/or the Securities, any reference to the Guarantee of Zagope shall be deemed to be limited to the extent of, and subject to, the Zagope Guarantee Limit. The Guarantees constitute a direct, general and unconditional obligation of each Guarantor which shall at all times rank at least *pari passu* with all other present and future senior unsecured obligations of each Guarantor, except for such obligations as may be preferred by mandatory provisions of law.

Section 10.02. *Guarantees Unconditional*. The obligations of each Guarantor under the Guarantees are unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a) any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Issuer under this Indenture, the Securities or any Collateral Agreements, by operation of law or otherwise;

(b) any modification or amendment of or supplement to this Indenture (other than this Article 10), the Securities or any Collateral Agreements;

(c) any change in the corporate existence, structure or ownership of the Issuer, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Issuer or its assets or any resulting release or discharge of any obligation of the Issuer contained in this Indenture, the Securities or any Collateral Agreements;

(d) the existence of any claim, set-off or other rights which the Guarantors may have at any time against the Issuer, the Trustee or any other Person, whether in connection with this Indenture or any unrelated transactions; *provided* that nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim;

(e) any invalidity or unenforceability relating to or against the Issuer for any reason of this Indenture, the Securities or any Collateral Agreements, or any provision of applicable law or regulation purporting to prohibit the payment by the Issuer of the principal of or interest on any Security or any other amount payable by the Issuer under this Indenture;

(f) any other act or omission to act or delay of any kind by the Issuer, the Trustee or any other Person or any other circumstance whatsoever which might, but for the provisions of this Section 10.02, constitute a legal or equitable discharge of or defense to the Guarantors' obligations hereunder; or

(g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms of this Indenture.

Section 10.03. *Discharge and Reinstatement; Guarantor Releases*.

(a) The Guarantors' obligations hereunder shall remain in full force and effect until the principal of, premium, if any, and interest on the Securities and all other amounts payable by the Issuer under this Indenture have been paid in full. If at any time any payment of the principal of, premium, if any, or interest on any Security or any other amount payable by the Issuer under this Indenture is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Issuer or otherwise, the Guarantors' obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

(b) Each of Zagope, Inzag and AGCS shall be released from its obligations under its Guarantee:

(i) upon a sale or disposition (including by way of consolidation or merger) of all or a portion of the Capital Stock of such Guarantor following which the Guarantor is no longer a Subsidiary of the Company;

(ii) upon a sale or disposition (including by way of consolidation or merger) of all or substantially all of the assets of such Guarantor to a Person that is not the Company or a Restricted Subsidiary;

(iii) upon defeasance or discharge of the Securities in accordance with Sections 8.01 and 8.05 hereof; or

(iv) upon the designation of such Guarantor as an Unrestricted Subsidiary;

*provided* that the transaction is carried out pursuant to, and in accordance with, all other applicable provisions of this Indenture, as evidenced by an Officer's Certificate of the Issuer or the Company delivered to the Trustee.

Section 10.04. *Waiver by the Guarantors*.

(a) Each Guarantor unconditionally and irrevocably waives acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the Issuer or any other Person. The Guarantees constitute a guarantee of payment and not of collection.

(b) Each Guarantor unconditionally and irrevocably waives any and all rights provided under the relevant applicable law of Brazil on prior demand and protest, as well as any and all rights it may have under Articles 333, sole paragraph, 364, 366, 821, 822, 827, 829, 830, 834, 835, 837, 838 and 839 of the Brazilian Civil Code, and Article 794, first paragraph of the Brazilian Code of Civil Procedure.

Section 10.05. *Subrogation and Contribution*. Upon making any payment with respect to any obligation of the Issuer under this Article 10, the Guarantors shall be subrogated to the rights of the payee against the Issuer with respect to such obligation; *provided*, *however*, that the Guarantors shall not be entitled to enforce, or to receive any payments arising out of or based upon, such right of subrogation until the principal of (and premium, if any) interest, and Additional Amounts on all Securities and all other amounts due and owing under this Indenture shall have been paid in full.

Section 10.06. *Stay of Acceleration*. If acceleration of the time for payment of any amount payable by the Issuer under this Indenture or the Securities is stayed upon the insolvency, bankruptcy or reorganization of the Issuer, all such amounts otherwise subject to acceleration under the terms of this Indenture are nonetheless payable by the Guarantors forthwith on demand by the Trustee.

Section 10.07. *Execution and Delivery of Guarantees*. The execution by each Guarantor of this Indenture or a supplemental indenture hereto evidences the Guarantee of each such Guarantor, whether or not the Person signing as an Officer of such Guarantor still holds that office at the time of authentication of any Security. In addition, each Guarantor shall execute a Notation of Guarantee in accordance with Section 2.02 hereof; *provided*, *however*, that each Guarantor agrees that its Guarantee shall remain in full force and effect notwithstanding any failure to endorse on each Security a Notation of Guarantee. The delivery of any Security by the Trustee after authentication constitutes due delivery of the Guarantee set forth in this Indenture on behalf of each Guarantor.

Section 10.08. *Purpose of Guarantees*. Each Guarantor hereby acknowledges that the purpose and intent of each Guarantor in executing this Indenture and providing the Guarantee is to give effect to the agreement of such Guarantor to guarantee the payment of any such amounts due by the Issuer under the Securities and this Indenture, whether such amounts are in respect of principal, interest or any other amounts (including Additional Amounts). Therefore, each Guarantor agrees that if the Issuer shall fail to pay in full when due (whether at Stated Maturity,

by acceleration or otherwise) any principal (and premium, if any), interest or any other amounts (including Additional Amounts) with respect to this Indenture and the Securities, each Guarantor shall promptly pay the same, without any demand or notice whatsoever. The Trustee shall promptly deposit in the account designated by the Trustee to receive payments from the Issuer with respect to the Securities for further payment to the Holders any funds it receives from the Guarantors under or pursuant to the Guarantees in respect of the Securities.

Section 10.09. *Limitations of obligations of Inzag*. Subject to the provisions of this Section 10.09 and notwithstanding anything to the contrary in this Indenture, any liability under this Indenture of any Guarantor which is organized under the laws of the Federal Republic of Germany in the form of a limited liability company (*GmbH*) (a "**German GmbH Guarantor**"), shall be enforceable (if and to the extent the respective German GmbH Guarantor guarantees liabilities, or assumes joint and several liability, for any obligations of its direct or indirect shareholder(s) or any of their affiliates (other than Subsidiaries of that German GmbH Guarantor)), only up to an amount equal to the higher of:

(a) The aggregate of:

(i) any proceeds of the Securities which have been directly or indirectly made available to such German GmbH Guarantor and which have not yet been repaid by that German GmbH Guarantor as of the date on which a payment demand is made pursuant to this Indenture (the "**Demand Date**"); and

(ii) the amount of the net assets (*Reinvermögen*) of that German GmbH Guarantor as shown in a balance sheet drawn up (*Stichtagsbilanz*) as of the end of the Demand Date (the "**Available Net Assets**"); and

(b) the amount enforceable by operation of clause (ii) of Section 10.09(c).

When used in this Section 10.09, net assets (*Reinvermögen*) of a German GmbH Guarantor shall be calculated in accordance with the German Commercial Code (*Handelsgesetzbuch*) (taking into account applicable case law on the calculation of net assets pursuant to Sections 30 and 31 of the German Limited Liability Company Act (*GmbH-Gesetz,* or "**GmbHG**") and accounting practices consistent with those applied in the preparation of the latest annual unconsolidated financial statements for that German Guarantor (except to the extent otherwise required by a change in law relating to the accounting principles or accounting practices) as the sum of the balance sheet positions shown under Section 266 (2) (A), (B), (C), (D) and (E) of the German Commercial Code (*HGB*), less the aggregate of (i) the amounts shown under balance sheet positions pursuant to Section 266 (3) (A) I, IV (to the extent losses are carried forward) and V (to the extent there is an annual loss), (B), (C), (D) and (E) of the German Commercial Code (but disregarding, for the avoidance of doubt, any liabilities which are subordinated to any indebtedness outstanding under this Indenture (including indebtedness in respect of guarantees for Indebtedness which is so subordinated) pursuant to Section 39 para. 1 no. 5 or para. 2 of the German Insolvency Code), and (ii) any amounts that are not available for distribution pursuant to Section 253(6), 268 (8) and/or Section 272(5) of the German Commercial Code.

Further, any increases of the registered capital (*Stammkapital*) of the German GmbH Guarantor effected after the Issue Date without the prior written consent of the Trustee (acting at the direction of the Required Holders) and any Indebtedness incurred in violation of this Indenture shall be disregarded.

(c) The German GmbH Guarantor shall, if:

(i) it has received a demand for payment under this Indenture; and

(ii) enforcement of the relevant Guarantee against the German GmbH Guarantor would be restricted under this Section 10.09,

realize, within a period of three months after the Demand Date, to the extent legally permitted, any and all of its assets which have a fair market value which is materially higher than their respective book value (or if there is no book value allocated to this asset), if such realization is commercially justifiable with respect to the cost and efforts involved and, to the extent that any asset is essential for its business, shall only realize such asset if such realization does not affect the ability of such German GmbH Guarantor to use that asset, or the relevant part of its business can be carried on from other sources without use of such asset. After the expiry of such three month period the German GmbH Guarantor shall, within three Business Days, notify the Trustee of the amount of the proceeds from the sale and submit an accompanying statement to the Trustee stating the amount of the (revised) Available Net Assets of such German GmbH Guarantor, recalculated to take into account such proceeds. Such recalculation shall, upon the Trustee's request, acting at the direction of the Required Holders, (such request to be delivered not later than 20 Business Days after receipt by the Trustee of such recalculation), be confirmed by the German GmbH Guarantor's auditor or an auditor of international standing and repute within a period of 30 Business Days following the respective request; it being understood that the Trustee shall not be responsible for the selection of any such auditor.

(d) The parties agree that:

(i) a demand for payment made may, subject to the preconditions and terms of this Section 10.09, be delivered for any amount due and payable under the guaranteed obligations (the "**Demand Amount**"), *provided* that the enforcement will be subject to the terms and limitations pursuant to this Section 10.09;

(ii) the Demand Amount may be enforced against the German GmbH Guarantor unless the German GmbH Guarantor notifies the Trustee upon receiving such payment demand within a period of 15 Business Days that the Demand Amount exceeds the Available Net Assets together with reasonably detailed calculations of such excess (the "**Management Determination**") (the Available Net Assets, upon request by the Trustee, acting at the direction of the Required Holders, (such request to be delivered not later than 20 Business Days after receipt by the Trustee of the Management Determination) to be confirmed by such German GmbH Guarantor's auditor or an auditor of international standing and repute within a period of further 30 Business Days following the respective request it being understood that the Trustee shall not be responsible for the selection of any such auditor) (the "**Auditor's Determination**"); the

Auditors Determination shall (1) certify the accuracy of the relevant German GmbH Guarantor's balance sheet or interim balance sheet used for the calculation; and (B) include calculations as to the amount which may be enforced hereunder. The costs related to the Auditor's Determination shall be borne by the Issuer or the relevant German GmbH Guarantor and the Auditor's Determination shall be conclusive and binding on all parties as to the matters to which it relates. To the extent no Auditor's Determination is requested in the time period set forth above, the Management Determination shall be conclusive and binding on all parties as to the matters to which it relates;

(iii) irrespective of any notice given in accordance with clause (ii) of this Section 10.09(d), the German GmbH Guarantor will in any case immediately pay to the Trustee for distribution to the Holders of the Securities an amount equal to the aggregate of:

(A) any proceeds of the Securities which have been directly or indirectly made available to such German GmbH Guarantor and which have not yet been repaid by that German GmbH Guarantor as of the Demand Date, and

(B) if a Management Determination or Auditor's Determination was provided timely, an amount equal to the Available Net Assets as determined by the Management Determination or Auditor's Determination shall be paid by the applicable German GmbH Guarantor to the Trustee for distribution to the Holders of the Securities within five Business Days after delivery of such Management Determination or Auditor's Determination. If and to the extent the Available Net Assets as determined by the Auditors Determination are lower than the amount enforced in accordance with the Management Determination, the Trustee shall without undue delay (*ohne schuldhaftes Zögern*) repay to the applicable German GmbH Guarantor upon written demand of such German GmbH Guarantor any amount (if and to the extent already received by the Trustee) equal to the difference between the amount received by the Trustee and the amount payable resulting from the Auditor's Determination; *provided* that the demand for repayment is made within three months of delivery of the Auditor's Determination (*Auschlussfrist*). The Trustee shall withhold any amount received pursuant to an enforcement of this Guarantee until either (i) final determination of the amount of the Available Net Assets pursuant to the Auditor's Determination or (ii) the date on which the Trustee's right to request an Auditor's Determination expires pursuant to Section 10.09(c) or 10.09(d)(ii), as applicable;

(iv) any additional payment pursuant to Section 10.09(c) shall be made by the German GmbH Guarantor to the Trustee for distribution to the Holders of the Securities within five Business Days after expiry of the three-month period set forth in Section 10.09(c) or, if the Trustee has requested a confirmation of the recalculation of the Available Net Assets pursuant to Section 10.09(c), within five Business Days after expiry of the period of further 30 Business Days referred to in the last sentence of Section 10.09(c). Should the statement on the recalculated Available Net Assets pursuant to Section 10.09(c) or, as the case may be, the confirmation of such recalculation by its auditors, not be provided to the Trustee within the time periods set forth in Section

10.09(c), the German GmbH Guarantor shall pay to the Trustee for distribution to the Holders of the Securities an amount equal to the net proceeds from the sale of the assets pursuant to Section 10.09(c) within five Business Days after expiry of the relevant time period referred to in Section 10.09(c);

(e) The restrictions pursuant to Section 10.09(a) above shall not apply:

(i) when, at a Demand Date the restrictions under this Section 10.09Section 10.09(a) are due to a change of the applicable laws, the interpretation thereof or otherwise, not required to protect the managing directors of the relevant German GmbH Guarantor or of any of its direct or indirect shareholders from the risk of personal liability;

(ii) if the applicable German GmbH Guarantor (as dominated entity) is subject to a domination and/or profit and loss pooling agreement (*Beherrschungs-und/oder Gewinnabführungsvertrag*) (within the meaning of Section 291 of the German Stock Corporation Act (*Aktiengesetz*)) on the Demand Date, unless according to a final (*rechtskräftig*) court judgement obtained by or in relation to the relevant German GmbH Guarantor the existence of a domination and/or profit and loss pooling agreement alone is not sufficient to disapply section 30 sentence 1 *GmbHG* and payment under the Guarantee would result in a breach of section 30 sentence 1 *GmbHG* and result in personal or criminal liability of the managing directors of the German GmbH Guarantor (or payment under the Guarantee would otherwise result in a personal or criminal liability of the managing directors of the German GmbH Guarantor); each of the Secured Parties agrees that if such court proceedings to obtain a final judgment in that respect has been initiated (*anhängig*) by the German GmbH Guarantor no later than 30 Business Days after the Demand Date (and does not terminate such proceedings itself), they will only enforce the Guarantee subject to the limitations set out in this Section 10.09 until such proceedings have been settled by a final court judgment on the merit (*Begründetheit*), *provided* that if a judgement is rendered which is not based on the merit the limitations set out in this Section 10.09 shall only continue to be applicable if the German GmbH Guarantor initiates new court proceedings within 30 Business Days of such judgment. A precedent decision of the Federal Supreme Court (*Bundesgerichtshof*) ruling on whether or not the existence of a domination and/or profit and loss pooling agreement alone is sufficient to disapply section 30 sentence 1 GmbHG shall be deemed as sufficient evidence as between the parties in respect of that question;

(iii) if and to the extent the applicable German GmbH Guarantor holds on the Demand Date a fully recoverable indemnity or claim for refund (*vollwertiger Gegenleistungs-oder Rückgewähranspruch*) (within the meaning of Section 30 (1) sentence 2 of the German Limited Liability Companies Act (*Gesetz betreffend die Gesellschaften mit beschränkter Haftung*) against its shareholder covering at least the relevant amount paid under the guarantee; or

(iv) if the applicable German GmbH Guarantor has not delivered a Management Determination or, if applicable, Auditors Determination to the Trustee within the time periods set forth in Section 10.09(d)(ii).

(f) Notwithstanding delivery of a Management Determination or Auditors Determination, the Trustee or the Secured Parties shall be entitled to enforce the Guarantee from time to time in accordance with, and subject to the restrictions in, the preceding paragraphs; *provided* that, unless otherwise agreed by that German GmbH Guarantor, no more than two Auditors Determinations may be requested in relation to any German GmbH Guarantor in any financial year of that German GmbH Guarantor.

(g) Clauses (a) through (e) of this Section 10.09 shall apply *mutatis mutandis* to a Guarantor organized under the laws of the Federal Republic of Germany as a limited liability partnership (*GmbH & Co. KG*) with a GmbH as its sole general partner, provided that in such case and for the purpose of this Section 10.09 only, any reference to such German Guarantor's net assets (*Reinvermögen*) shall be deemed to be a reference to the net assets (*Reinvermögen*) of the German Guarantor and its general partner (*Komplementär*) on a *pro forma* consolidated basis.

Section 10.10. *Additional Guarantees*. Any Person that becomes a Guarantor pursuant to this Indenture shall:

(a) execute and deliver to the Trustee a supplemental indenture and a Notation of Guarantee pursuant to which such Person shall, subject to applicable legal limitations, provide a Guarantee and unconditionally guarantee all of the Issuer’s Obligations under the Securities and this Indenture; and

(b) deliver to the Trustee one or more Opinions of Counsel that such supplemental indenture (and Guarantee therein) and Notation of Guarantee have been duly authorized, executed and delivered by such new Guarantor and constitutes a valid and legally binding obligation of such new Guarantor in accordance with its terms.

## ARTICLE 11

## COLLATERAL

Section 11.01. *Security Interest*. The due and punctual payment of the principal of, premium (if any), and interest on, the Securities when and as the same shall be due and payable, whether on an Interest Payment Date, at maturity, by acceleration, repurchase, redemption or otherwise, and interest on the overdue principal of, premium (if any), and interest on, the Securities and the payment and performance of all other obligations of the Issuer and the Guarantors, according to the terms hereunder and the Guarantees, are secured by the Collateral as provided herein and in the Collateral Agreements. Each Holder, by its acceptance of any Securities, consents and agrees to the terms of the Collateral Agreements (including, in each case, without limitation, the provisions providing for foreclosure and release of Collateral), as the same may be in effect or may be amended from time to time in accordance with their terms, and to the appointment of (a) Wilmington Savings Fund Society, FSB as Trustee under this Indenture and (b) TMF New York, LLC as Collateral Agent. Each Holder directs each Collateral Agent to enter into the respective Collateral Agreement as a Collateral Agent for the Secured Parties, and to perform its obligations and exercise its rights thereunder in accordance therewith. The Issuer, the Company, the Collateral Providers and the Guarantors consent and agree to be bound by the

terms of the respective Collateral Agreements, as the same may be in effect from time to time, and agree to perform their respective obligations thereunder in accordance therewith. The Issuer and the Guarantors shall deliver to the Trustee copies of all documents delivered to the respective Collateral Agent pursuant to the respective Collateral Agreement, and shall do or cause to be done all such acts and things as may be required by the provisions of the respective Collateral Agreement to assure and confirm to such Collateral Agent the security interest in the Collateral contemplated by the respective Collateral Agreement or any part thereof, as from time to time constituted, so as to render the same available for the security and benefit of the Secured Parties. The Issuer and the Guarantors hereby agree that each Collateral Agent shall hold the respective Collateral in trust for the benefit of all Secured Parties, in each case pursuant to and in accordance with this Indenture and the respective Collateral Agreement.

Section 11.02. *Further Assurances*.

(a) The Issuer and the Guarantors shall do or cause to be done all acts and things that may be required by applicable law to assure and confirm that the Collateral Agents hold, for the benefit of the Secured Parties, duly created and enforceable and perfected Liens upon all or a portion of the Collateral (including any property or assets that are acquired or otherwise become, or are required by this Indenture or any Collateral Agreements to become, Collateral after the Issue Date), in each case, as contemplated by, and with the Lien priority required under, the respective Collateral Agreements. Such security interests and Liens shall be created under the Collateral Agreements and other security agreements and other instruments and documents in form and substance reasonably necessary to grant a security interest and Lien to the respective Collateral Agent for the benefit of the Secured Parties to secure obligations of the Issuer under this Indenture, the Securities and the Collateral Agreements.

(b) The Issuer and any applicable Guarantor shall promptly execute, acknowledge and deliver such Collateral Agreements, instruments, certificates, notices and other documents, and take such other actions as shall be reasonably required by applicable law, to create, perfect, protect, assure or enforce the Liens and benefits intended to be conferred, in each case as contemplated by this Indenture or Collateral Agreements for the benefit of the Secured Parties.

(c) In addition, the Issuer and such Guarantor shall:

(i) enter into the Collateral Agreements and any amendments or supplements to the Collateral Agreements necessary in order to cause each Collateral Agent (for the benefit of the Secured Parties) to have valid and perfected Liens on the applicable Collateral;

(ii) do, execute, acknowledge, deliver, record, file and register, as applicable, any and all acts, deeds, conveyances, security agreements, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as may be required by applicable law so that each Collateral Agent (for the benefit of the Secured Parties) shall have valid and perfected first Liens on the applicable Collateral; and

(iii) take such further action and execute and deliver such other documents specified in this Indenture or the Collateral Agreements or as otherwise may be required by applicable law to give effect to the foregoing.

Section 11.03. *Impairment of Security Interest*. Neither the Issuer nor any Restricted Subsidiaries nor Guarantor shall (a) take or omit to take any action which would materially adversely affect or impair the Liens in favor of any Collateral Agent for the benefit of the Secured Parties with respect to the Collateral, or enter into any agreement that requires the proceeds received from any sale of Collateral to be applied to repay, redeem, defease or otherwise acquire or retire any Indebtedness of any Person in a manner that conflicts with this Indenture, the Securities, the Guarantees or the Collateral Agreements, if applicable. Each of the Issuer and each Guarantor shall, at their sole cost and expense, execute and deliver all such agreements and instruments as required by applicable law to more fully or accurately describe the assets and property intended to be Collateral or the obligations intended to be secured by the Collateral Agreements.

Section 11.04. *Maintenance of Collateral*. Each of the Issuer and the Guarantors shall maintain the Collateral in good, safe and insurable operating order, condition and repair (ordinary wear and tear excepted) and do all other acts as may be reasonably necessary or appropriate to maintain and preserve the Collateral; *provided* that the foregoing requirement shall not prevent any of the Issuer or any of the Company's Subsidiaries from discontinuing the use, operation or maintenance of Collateral or disposing of Collateral, if such discontinuance or disposal (1) is, in the judgment of the applicable Person, desirable in the conduct of the business of the applicable Collateral Provider or the Issuer and the Guarantors taken as a whole and (2) is otherwise in compliance with the provisions of this Indenture and the Collateral Agreements, including, in the case of a disposal, Section 4.22 hereof. Each of the Issuer and the Guarantors shall pay all taxes, and maintain in full force and effect all material permits and insurance in amounts that insure against such losses and risks as are reasonable for the type and size of the business conducted by the Issuer and the Guarantors, if any. No Collateral Agent shall any obligation whatsoever to the Trustee, any of the Holders or any other Person to assure that the Issuer and the Guarantors comply with their obligations under this Section 11.04 or any other provision of this Indenture.

Section 11.05. *Release of Liens in Respect of Securities*.

(a) The Liens on the Collateral that secure the Securities will be released upon the occurrence of any of the following, subject to the terms of this Indenture and the Collateral Agreements:

(i) legal defeasance in accordance with this Indenture;

(ii) the satisfaction and discharge of this Indenture as set forth in Article 8 hereof;

(iii) in whole or in part, with the consent of the Holders of at least 75% in principal amount of the Securities then outstanding in accordance with Section 9.02 hereof; and

(iv) the disposition of assets permitted under Section 4.22 hereof or under the terms of the respective Collateral Agreement.

(b) Each Collateral Agent shall execute, upon request and at the Issuer's expense, any documents, instruments, agreements or filings reasonably requested by the Issuer to evidence such release of such Collateral, in each case, without representation, warranty or recourse; *provided* that if any Collateral Agent is required to execute any such documents, instruments, agreements or filings, such Collateral Agent shall be fully protected in relying upon an Officer's Certificate and an Opinion of Counsel of the Issuer or the Company in connection with any such release stating that all conditions precedent to such release in this Indenture and the applicable Collateral Agreement have been complied with.

Section 11.06. *Collateral Agent.*

(a) Without limiting or affecting Clause 11.07, the Collateral Agent shall hold (directly or through co-trustees or sub-agents), and is directed by each Holder to so hold, and shall be entitled to enforce, on behalf of the Holders, all Liens on the Collateral created by the respective Collateral Agreement for their benefit and the benefit of the other Secured Parties. Neither the Issuer nor any of its Affiliates may serve as Collateral Agent.

(b) The rights and powers granted to the Collateral Agent by the Secured Parties have been granted in order to, among other things, perfect its Lien in the Collateral and to otherwise act as their agent with respect to the matters contemplated hereby and the Collateral Agreements. Each Collateral Agent from time to time shall exercise such rights and powers as contemplated by and subject to the terms and conditions of this Indenture and the respective Collateral Agreement, and all of the rights, protections, immunities and indemnities applicable to such Collateral Agent set forth in this Indenture shall apply to such Collateral Agent acting pursuant to the respective Collateral Agreement. The Collateral Agent shall take instructions and directions from the Trustee (acting solely pursuant to the written instructions of the Holders of a majority (or such greater percentage as shall be required by this Indenture) in aggregate principal amount of the outstanding Securities) pursuant to, and solely to the extent set forth in, this Indenture and the respective Collateral Agreement, and no implied duties and covenants shall be deemed to arise against such Collateral Agent. The AGE Collateral Agent, the Inzag Collateral Agent and any other sub-agent of the Collateral Agent may seek direction from, and shall only be obligated to act only upon the direction of, the Collateral Agent.

(c) Each Collateral Agent in its individual capacity shall not be answerable or accountable under any circumstances, except to the extent Incurred as a result of its own willful misconduct or gross negligence (as determined by a court of competent jurisdiction pursuant to a non-appealable final order or judgment) and such Collateral Agent shall not be liable for any action or inaction of the Issuer, the Guarantors, the Collateral Providers or any other parties to the respective Collateral Agreement. No Collateral Agent shall have any fiduciary duties or other implied duties, regardless of whether an Event of Default has occurred and is continuing, nor shall it have responsibilities or obligations other than those expressly assumed by it in this Indenture and the respective Collateral Agreement. No Collateral Agent shall be required to take any action that is contrary to applicable law or any provision of this Indenture or the respective Collateral Agreement or, that otherwise subjects it to liability.

(d) The powers conferred on each Collateral Agent under this Indenture with respect to the Collateral are to secure the payment and performance of the Obligations of the Issuer and the Guarantors under this Indenture and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it under this Indenture and/or the Collateral Agreements, no Collateral Agent shall have any duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not any Secured Party has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve or perfect rights against any parties or any other rights pertaining to any such Collateral; *provided* that, if a Collateral Agent receives any written notices with respect to the Collateral, it shall promptly transmit such notices to the Trustee. No Collateral Agent shall have any duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Issuer, the Guarantors or the Collateral Providers.

(e) It is expressly understood and agreed by all Secured Parties (and, with respect to any Holder of a Security, by holding such Security such Holder shall be deemed to have agreed) that the Collateral Agent shall not be responsible to any Secured Party for any recital, statement, representation, or warranty (whether written or oral) made by any Person other than such Collateral Agent (without limiting the responsibility, obligations, duties or liabilities of the Person acting as Collateral Agent in another capacity under this Indenture or any Collateral Agreements) in or in connection with this Indenture or the Collateral Agreements or any certificate or other document referred to or provided for in, or received by any of them under, this Indenture or the Collateral Agreements, or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of this Indenture or the Collateral Agreements, or any other document referred to or provided for therein or for any failure by the Issuer, any Guarantor, any Collateral Provider or any other Person to perform any of its obligations thereunder.

(f) No Collateral Agent makes and shall not be deemed to have made any representation or warranty as to the validity, legality or enforceability of this Indenture, the respective Collateral Agreement or any other document or instrument or as to the correctness of any statement contained in any thereof, or as to the validity or sufficiency of any of the pledge and security interests granted pursuant to any Collateral Agreements.

(g) No Collateral Agent shall Incur any liability to anyone as a result of acting upon any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, bond or other document or paper believed by it to be genuine and believed by it to be signed by the proper party or parties, other than by gross negligence, willful misconduct or bad faith on its part (as determined by a court of competent jurisdiction pursuant to a non-appealable final order or judgment). Each Collateral Agent may accept a copy of a resolution of the board or other governing body of any party to this Indenture or the Collateral Agreements, certified by the Secretary or an Assistant Secretary thereof or other duly authorized Person of such party as duly adopted and in full force and effect, as conclusive evidence that such resolution has been duly adopted by said board or other governing body and that the same is in full force and effect. As to any fact or matter the manner of ascertainment of which is not specifically described in this Indenture or the Collateral Agreements, each Collateral Agent shall be entitled to receive and may for all purposes hereof conclusively rely on, and shall be fully protected in acting or

refraining from acting upon, a certificate, signed by an officer of any duly authorized Person, as to such fact or matter, and such certificate shall constitute full protection to such Collateral Agent for any action taken or omitted to be taken by it in good faith in reliance thereon. Each Collateral Agent shall assume, and shall be fully protected in assuming, that each other party to this Indenture and the respective Collateral Agreement is authorized by its constitutional documents to enter into this Indenture and to take all action permitted to be taken by it pursuant to the provisions of this Indenture, and shall not have any duty to inquire into the authorization of such party with respect thereto.

(h) Each Collateral Agent may execute any of the powers hereunder or perform any duties under this Indenture either directly or by or through agents or sub-agents, including financial advisors, separate trustees or attorneys or a custodian or nominee, and such Collateral Agent shall not be responsible for any misconduct or negligence on the part of, or for the supervision of, any such agent, sub-agent, attorney, custodian or nominee appointed with due care by it hereunder. The rights, privileges, protections, immunities and benefits given to each Collateral Agent, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, each agent, sub-agent or custodian and other Person employed by it to act hereunder. The parties hereto, the Holders and the other Secured Parties agree that the Collateral Agent shall appoint its affiliates to act as the AGE Collateral Agent and the Inzag Collateral Agent, in each case, as sub-agents of the Collateral Agent.

(i) Each Collateral Agent may consult with counsel, independent accountants and other experts, and any opinion of counsel or any advice of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it under this Indenture in good faith and in accordance with such advice or opinion.

(j) No Collateral Agent shall be under any obligation to exercise any of the rights or powers vested in it by this Indenture or the respective Collateral Agreement, or to institute, conduct or defend any litigation under this Indenture or the Collateral Agreements or in relation hereto or thereto, at the request, order or direction of any of the Secured Parties, pursuant to the provisions of this Indenture or the Collateral Agreements, unless such Secured Party shall have offered to such Collateral Agent security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities which may be Incurred therein or thereby. No Collateral Agent shall have any duty or responsibility in the event of any default by the Issuer and/or any Guarantor and/or any Collateral Provider or any action or inaction by the Issuer and/or any Guarantor and/or any Collateral Provider in the performance of any of its obligations under this Indenture, the Securities and/or the other Collateral Agreement, as the case may be, and/or any other agreement pertaining to any or all of the foregoing, including but not limited to, any duty or responsibility to initiate or attempt to initiate any proceeding at law or otherwise against the Issuer and/or any Guarantor and/or any Collateral Provider or to make any demand of any kind or nature upon the Issuer and/or any Guarantor and/or any Collateral Provider.

(k) No Collateral Agent shall be required to expend or risk its own funds or otherwise Incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, and none of the provisions contained in this Indenture or the respective Collateral Agreement shall in any event require such Collateral Agent to perform, or

be responsible or liable for the manner of performance of, any obligations of the Issuer, the Guarantors, the Collateral Providers or any other Person under the Collateral Agreements.

(l) When any Collateral Agent Incurs out-of-pocket expenses or renders services in connection with an exercise of remedies upon the occurrence of an Event of Default, such out-of-pocket expenses (including the fees and expenses of its counsel) and the compensation for such services are intended to constitute expenses of administration under any Bankruptcy Law or law relating to creditors' rights generally. No Collateral Agent shall be charged with knowledge of any event or information including, but not limited to, an Event of Default unless a Trust Officer of such Collateral Agent obtains actual knowledge of such event or information in the course of performing its obligations hereunder or such Collateral Agent receives written notice of such event or information from any of the Secured Parties, the Issuer, or any Guarantor.

(m) No Collateral Agent shall be liable for any action it takes or omits to take, in good faith which it reasonably believes to be authorized or within its rights or powers; *provided*, *however*, that such Collateral Agent's conduct does not constitute willful misconduct or gross negligence.

(n) Any discretionary power or permissive right of any Collateral Agent shall not be deemed to be, or otherwise construed as, an obligation.

(o) No Collateral Agent shall have any duty to monitor the Collateral (including the validity and perfection of the Lien provided pursuant to any Collateral Agreements in respect of such Collateral), or the performance of the Issuer, any Guarantor, any Collateral Provider or any other party to the Collateral Agreements. No Collateral Agent shall have any liability in connection with compliance by the Issuer, any Guarantor, or any Collateral Provider with statutory or regulatory requirements related to the Collateral. No Collateral Agent shall make or be deemed to have made any representations or warranties with respect to the Collateral or the validity or sufficiency of any assignment or other disposition of the Collateral.

(p) In no event shall any Collateral Agent be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit), even if any Collateral Agent shall have been advised of the likelihood of such loss or damage and regardless of the form of action. In no event shall any Collateral Agent Incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of such Collateral Agent (including any act or provision of any present or future law or regulation or governmental authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, or the unavailability of the Brazilian Central Bank wire or facsimile or other wire or communication facility).

(q) No Collateral Agent shall be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or otherwise, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Issuer to the Collateral, for insuring the Collateral or for payment of taxes, charges, assessment or liens upon the Collateral or otherwise as to the maintenance of the Collateral. No Collateral

Agent shall have any responsibility for recording, filing, rerecording or refiling any financing statement, continuation statement, documents, instrument or other notice in any public office at any time or times or to otherwise take any action to perfect or maintain the perfection of any security interest granted to such Collateral Agent or for otherwise taking any action under or pursuant to the Collateral Agreements. No Collateral Agent shall be required to make any determination (i) with respect to the Collateral or (ii) as to what rights the Holders may have under this Indenture, the Collateral Agreements or any other document in respect of the Collateral.

(r) In each case that any Collateral Agent may, or is required hereunder or under the Collateral Agreements to take any action, including to make any determination, exercise of discretion or judgment, to give consents, to exercise rights, powers or remedies, to release or sell Collateral or otherwise to act hereunder or under the Collateral Agreements, such Collateral Agent may seek direction from the Trustee (who shall only deliver instructions upon receipt of written direction from the Holders of the requisite aggregate principal amount of outstanding Securities). No Collateral Agent shall be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction from the Trustee (acting solely pursuant to the written instructions of the Holders holding the requisite aggregate principal amount of outstanding Securities). If any Collateral Agent shall request direction from the Trustee with respect to any action, such Collateral Agent shall be entitled to refrain from such action unless and until such Collateral Agent shall have received direction from the Trustee, and such Collateral Agent shall not Incur liability to any Person by reason of so refraining.

Section 11.07. *Parallel Debt*.

(a) Notwithstanding any other provision of this Indenture, the Issuer, the Company, each Guarantor and each Collateral Provider hereby irrevocably and unconditionally undertakes to pay to each Collateral Agent, as creditor in its own right and not as representative of the Secured Parties, sums equal to and in the currency of each and any amount payable by the Issuer, the Company, any Guarantor or any Collateral Provider to any of the other Secured Parties under this Indenture, the Securities, the Guarantees or under any Collateral Agreement as and when that amount falls due for payment or would have fallen due but for any discharge resulting from failure of another Secured Party to take appropriate steps, in insolvency proceedings affecting the Issuer, the Company, a Guarantor or a Collateral Provider, to preserve its entitlement to be paid that amount.

(b) Each Collateral Agent shall have its own independent right to demand payment of the amounts payable by the Issuer, the Company, any Guarantor or any Collateral Provider under this Section 11.07, irrespective of any discharge of the Issuer's, the Company's, such Guarantor's or such Collateral Provider's obligation to pay those amounts to the other Secured Parties resulting from failure by them to take appropriate steps, in insolvency proceedings affecting the Issuer, the Company, a Guarantor or a Collateral Provider, to preserve their entitlement to be paid those amounts.

(c) Any amount due and payable by the Issuer, the Company, a Guarantor or a Collateral Provider to any Collateral Agent under this Section 11.07 shall be decreased to the extent that the other Secured Parties have received (and are able to retain) payment in full of the

corresponding amount under the other provisions of this Indenture, the Securities, the Guarantees or under any Collateral Agreement and any amount due and payable by the Issuer, the Company, a Guarantor or a Collateral Provider to the other Secured Parties under those provisions shall be decreased to the extent that such Collateral Agent has received (and is able to retain) payment in full of the corresponding amount under this Section 11.07.

(d) For the purposes of this Section 11.07, each Collateral Agent acts in its own name and not as a trustee, and its claims in respect of the Parallel Debt shall not be held on trust but owed to it as an individual creditor. The Collateral granted under the Collateral Agreements to each Collateral Agent to secure the Parallel Debt is granted to such Collateral Agent in its capacity as creditor of the Parallel Debt and shall not be held on trust.

(e) The rights of the Secured Parties to receive payment of amounts payable by the Issuer, the Company, a Guarantor or a Collateral Provider under this Indenture, the Securities, the Guarantees or under any Collateral Agreement are several and are separate and independent from, and without prejudice to, the rights of each Collateral Agent to receive payment under this Section 11.07. The Issuer's, the Company's, each Guarantor's and each Collateral Provider's parallel obligation under this Section 11.07 towards each Collateral Agent constitutes a single and separate obligation from any other debt of the Issuer, the Company, each Guarantor and each Collateral Provider under this Indenture, the Securities, the Guarantees or under any Collateral Agreement.

(f) Without limiting or affecting any Collateral Agent's rights against the Issuer, the Company, a Guarantor or a Collateral Provider (whether under this Section 11.07 or under any other provision of this Indenture), the Issuer, the Company, each Guarantor and each Collateral Provider acknowledges that:

(i) nothing in this Section 11.07 shall impose any obligation on any Collateral Agent to advance any sum to the Issuer, the Company, a Guarantor or a Collateral Provider or otherwise under this Indenture, the Securities, the Guarantees or under any Collateral Agreement; and

(ii) for the purpose of any vote taken under this Indenture, no Collateral Agent shall be regarded as having any participation or commitment.

Section 11.08. *Trustee.*

(a) Neither the Trustee or any Agent nor any of their respective officers, directors, employees, attorneys or agents shall have any duty with respect to, or be responsible or liable for (i) the existence, genuineness, value or protection of any Collateral, for the legality, enforceability, effectiveness or sufficiency of the Collateral Agreements or any other document or security instrument, for the creation, validity, perfection, priority, sufficiency, protection or enforcement of any Liens or any other security interest in the Collateral or any defect or deficiency as to any such matters; (ii) any recording, filing, or depositing of this Indenture, the Collateral Agreements or any other agreement or instrument; (iii) monitoring or filing any financing statement, amendments to financing statements, continuation statement or any other document or instrument evidencing a security interest, the maintenance of any such recording,

filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, or otherwise creating or monitoring the perfection, continuation of perfection or the sufficiency or validity of any security interest in or related to the Collateral; (iv) the acquisition or maintenance of any insurance; (v) the validity of the title of the Company or the Guarantors or any Collateral Provider to the Collateral; (vi) the payment or discharge of any tax, assessment, or other governmental charge or any Lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Collateral; or (vii) making any investigation into (A) the performance or observance by the Company, the Issuer, any Guarantor, any Collateral Provider or any other Person of any of the covenants, agreements or other terms or conditions set forth in this Indenture, the Securities, the Guarantees, the Collateral Agreements or in any related document, (B) the satisfaction of any condition set forth in this Indenture, the Securities, the Guarantees, the Collateral Agreements or in any related document.

(b) The Trustee shall not have any duty or responsibility in the event of any default by any Collateral Agent or any action or inaction by any Collateral Agent in the performance of any of its obligations under this Indenture, the Securities and/or the Collateral Agreements, as the case may be, and/or any other agreement pertaining to any or all of the foregoing, included but not limited to any duty or responsibility to initiate or attempt to initiate any proceeding at law or otherwise against any Collateral Agent or to make any demand of any kind or nature upon any Collateral Agent. The Issuer, the Guarantors, the Collateral Providers and each Collateral Agent hereby acknowledge and agree that the Trustee is not a party to the Collateral Agreements or any related document and the Trustee has no independent knowledge of, and is not required to have any independent knowledge of, the terms or provisions of any such agreements or documents. The Trustee shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or otherwise, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Collateral Providers, for insuring the Collateral or for payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Trustee shall have no responsibility for recording, filing, re-recording or re-filing any financing statement, amendments to financing statements, continuation statement, document, instrument or other notice in any public office at any time or times or to otherwise take any action to perfect or maintain the perfection of any security interest granted to the Collateral Agent or for otherwise taking any action under or pursuant to the Collateral Agreements. The Trustee shall not be required to make any determination (i) with respect to the Collateral, the Collateral Agreements, or (ii) as to what rights the Holders may have under this Indenture, the Securities, the Guarantees, the Collateral Agreements or any other document in respect of the Collateral and the Trustee's sole obligation in respect of the Collateral shall be limited to delivery of instructions to a Collateral Agent upon written request of the Holders of the requisite percentage of outstanding Securities as required by this Indenture. Except for delivery of instructions in accordance with the foregoing sentence, the Trustee shall not be required to take any action outside the United States or take any action under any agreement forming part of, or constituting the Collateral, it being understood that the Trustee is authorized to receive any funds for the benefit of the Trustee and the Holders distributed under the Collateral Agreements and to make further distributions of such funds according to the provisions of this Indenture.

# ARTICLE 12

## RESIGNATION AND REMOVAL OF A COLLATERAL AGENT

Section 12.01. *Resignation or Removal of Collateral Agent.* Subject to the appointment of a successor Collateral Agent as provided in Section 12.02 hereof and the acceptance of such appointment by the successor Collateral Agent:

(a) the Collateral Agent may resign at any time by giving not less than 30 days' notice of resignation to the Trustee, the Issuer and the Company; and

(b) the Collateral Agent may be removed at any time, with or without cause, at the written direction of the Trustee (acting at the direction of Holders holding a majority in aggregate principal amount of the Securities then outstanding).

Section 12.02. *Appointment of Successor Collateral Agent.* Upon any such resignation or removal, a successor Collateral Agent may be appointed at the written direction of the Holders of a majority in aggregate principal amount of the Securities then outstanding. If no such successor Collateral Agent has been so appointed and accepted such appointment within 30 days after the predecessor Collateral Agent gave notice of resignation or was removed, the retiring Collateral Agent may (at the expense of the Issuer), at its option, appoint a successor Collateral Agent, as applicable, or petition a court of competent jurisdiction for appointment of a successor Collateral Agent, which must be a bank or trust company:

(a) authorized to exercise corporate trust powers;

(b) having a combined capital and surplus of at least US$50,000,000;

(c) maintaining an office in Brazil; and

The Collateral Agent shall fulfill its obligations hereunder until a successor Collateral Agent meeting the requirements of this Section 12.02 has accepted its appointment as Collateral Agent and the provisions of Section 12.03 hereof have been satisfied.

Notwithstanding the foregoing and Section 12.01 hereof, if a successor Collateral Agent has not been appointed within 120 days after the date of its notice of resignation, the Collateral Agent may apply to a court of competent jurisdiction for the appointment of a successor Collateral Agent or for other appropriate relief, and thereafter be relieved of all further duties and obligations as Collateral Agent hereunder and under the respective Collateral Agreement. The costs and expenses (including reasonable attorneys' fees and expenses) Incurred by such Collateral Agent in connection with such proceeding shall be paid by, and be deemed an obligation of the Issuer.

Section 12.03. *Succession.* When the Person so appointed as successor Collateral Agent accepts such appointment:

(a) such Person shall succeed to and become vested with all the rights, powers, privileges and duties of the predecessor Collateral Agent, and the predecessor Collateral Agent shall be discharged from its duties and obligations hereunder; and

(b) the predecessor Collateral Agent shall (at the expense of the Company) promptly transfer all Liens and Collateral within its possession or control to the possession or control of the successor Collateral Agent and shall execute instruments and assignments as may be necessary or desirable or reasonably requested by the successor Collateral Agent to transfer to the successor Collateral Agent all Liens, interests, rights, powers and remedies of the predecessor Collateral Agent in respect of the Collateral Agreements.

Section 12.04. *Merger, Conversion or Consolidation of Collateral Agent*. Any Person into which a Collateral Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which such Collateral Agent shall be a party, or any Person succeeding to the business of such Collateral Agent shall be the successor of such Collateral Agent pursuant to Section 12.02 hereof; *provided* that (a) without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto, except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding, such Person satisfies the eligibility requirements specified in clauses (a) through (c) of Section 12.02 hereof and Section 12.02(b) prior to any such merger, conversion or consolidation, such Collateral Agent shall have notified the Company, the Issuer and the Trustee.

## ARTICLE 13

## MISCELLANEOUS

Section 13.01. *Notices.* Any notice or communication to the Issuer, the Guarantors, the Trustee, the Paying Agent, the Registrar, the Transfer Agent or any Collateral Agent shall be in writing in the English language or a translation, and delivered in person, sent by fax or other electronic method, overnight courier or mailed by first-class mail addressed as follows:

if to the Issuer or the Company:

Andrade Gutierrez Engenharia S.A.
Rua do Passeio, 38, 14th floor - Centro
Rio de Janeiro, RJ, 20021-290
Brazil
Att: Gustavo Braga Mercher Coutinho

with copies to:

Andrade Gutierrez International S.A.
12C, rue Guillaume Kroll,

L-1882
Luxembourg
Att: Gustavo Braga Mercher Coutinho

and copies to:

Davis Polk & Wardwell LLP
Av. Presidente Juscelino Kubitschek, 2041
Torre E - CJ 17A, São Paulo, SP 04543-011
Attn: Manuel Garciadiaz
E-mail: manuel.garciadiaz@davispolk.com

if to the Trustee, Paying Agent, Transfer Agent and Registrar:

Wilmington Savings Fund Society, FSB
500 Delaware Avenue
Wilmington, DE 19801

Attn: WSFS Institutional Services

if to the Collateral Agent:

TMF Group New York, LLC
48 Wall Street, 27th Floor
New York, New York 10005
E-mail Al.Fioravanti@tmf-group.com; april.grosso@tmfgroup.com;
david.johnson@tmf-group.com

(a) The Trustee may accept and act upon instructions or directions pursuant to this Indenture sent by unsecured e-mail, fax transmission or other similar unsecured electronic methods. If any Person elects to give the Trustee e-mail or fax instructions (or instructions by a similar electronic method) and the Trustee in its discretion elects to act upon such instructions, the Trustee's understanding of such instructions shall be deemed controlling. The Trustee shall not be liable for any losses, costs or expenses (including, without limitation, attorneys' fees and expenses) arising directly or indirectly from the Trustee's reliance upon and compliance with such instructions notwithstanding such instructions conflict or are inconsistent with a subsequent written instruction. The Person providing electronic instructions agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Trustee, including without limitation the risk of the Trustee acting on unauthorized instructions, and the risk or interception and misuse by third parties.

(b) The Trustee may rely conclusively upon and comply with instructions or directions sent via unsecured fax or email transmission and the Trustee shall not be liable for any loss, liability or expense (including, without limitation, attorneys' fees and expenses) of any kind Incurred by the Issuer, the Guarantors, the Holders or any other Person, due to the Trustee's reliance upon and compliance with instructions or directions given by unsecured fax transmission or e-mail or other electronic transmission.

(c) The Issuer, the Guarantors, the Trustee the Paying Agent, the Registrar, the Transfer Agent or the Collateral Agents by notice to the other may designate additional or different addresses for subsequent notices or communications.

(d) Notwithstanding anything to the contrary contained herein, as long as the Securities are in the form of Global Securities, notice to the Holders may be made electronically in accordance with procedures of the Depositary. Any notice or communication mailed to a Securityholder of a non-Global Security shall be mailed to the Securityholder at the Securityholder's address as it appears on the Securities Register. Any such notice shall be deemed to have been given to a Holder upon the mailing by first class mail, postage prepaid, of such notice to such Holder at its registered addresses as recorded in the Securities Register not later than the latest date, and not earlier than the earliest date, prescribed in this Indenture for the giving of such notice. If a notice or communication is given in the manner provided above, it is duly given, whether or not the addressee receives it.

(e) Failure to give a notice or communication to a Securityholder or any defect in a notice or communication to a Securityholder shall not affect the sufficiency of such notice or communication with respect to other Securityholders.

Section 13.02. *Communication by Holders with Other Holders*. Securityholders may communicate pursuant to TIA § 312(b) with other Securityholders with respect to their rights under this Indenture or the Securities. The Issuer, the Company, the Trustee, the Registrar and anyone else shall have the protection of TIA § 312(c).

Section 13.03. *Certificate and Opinion as to Conditions Precedent*. Upon any request or application by the Issuer or any Guarantor to the Trustee to take or refrain from taking any action under this Indenture, the Issuer or such Guarantor, as the case may be, shall furnish to the Trustee:

(a) an Officer's Certificate in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to taking the proposed action or to refraining from taking the proposed action have been complied with; and

(b) an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

Section 13.04. *Statements Required in Certificate or Opinion*. Each Officer's Certificate or Opinion of Counsel, as the case may be, with respect to compliance with a covenant or condition provided for in this Indenture shall include substantially:

(a) a statement that the individual making such Officer's Certificate or Opinion of Counsel, as the case may be, has read such covenant or condition;

(b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such Officer's Certificate or Opinion of Counsel, as the case may be, are based;

(c) a statement that, in the opinion of such individual, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d) a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with.

Section 13.05. *Rules by Trustee, Paying Agents and Registrar*. The Trustee may make reasonable rules for action by or a meeting of Securityholders. The Registrar, the Transfer Agent and the Paying Agent may make reasonable rules for their functions.

Section 13.06. *Legal Holidays*. If any payment date is not a Business Day, payment shall be made on the next succeeding Business Day, and no interest shall accrue for the intervening period. If a regular Record Date is not a Business Day, the Record Date shall not be affected.

Section 13.07. *Governing Law*. This Indenture, the Securities and the Guarantees shall be construed in accordance with, and this Indenture, the Securities, the Guarantees and all matters arising out of or relating in any way whatsoever to this Indenture, the Securities or the Guarantees (whether in contract, tort or otherwise) shall be governed by, the laws of the state of New York. The Collateral shall be governed by, and construed in accordance, with the laws of Brazil. For the purposes of paragraph 2 of Article 9 of Brazilian decree-law no. 4,657, of September 4, 1942, Wilmington Savings Fund Society, FSB is the proponent of this Indenture. The provisions of articles 470-1 to 470-19 of the Luxembourg law of 10 August 1915 on commercial companies, as amended, are excluded with respect to the Securities.

Section 13.08. *Successors*. All agreements of the Issuer and the Guarantors in this Indenture and the Securities shall bind their successors. All agreements of the Trustee in this Indenture shall bind its successors.

Section 13.09. *Multiple Originals*. The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement. One signed copy is enough to prove this Indenture.

Section 13.10. *Table of Contents; Headings*. The table of contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

Section 13.11. *Consent to Jurisdiction; Appointment of Agent to Accept Service of Process; Currency Indemnity*.

(a) Each of The Issuer and the Guarantors each irrevocably consents and agrees, for the benefit of the Holders from time to time of the Securities, the Trustee, the Paying Agent, the Registrar, and the Transfer Agent, that any legal action, suit or proceeding against it with respect to its obligations, liabilities or any other matter arising out of or in connection with this Indenture, the Securities or the Guarantees (whether in contract, tort or otherwise) may be brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and hereby irrevocably consents and submits

to the nonexclusive jurisdiction of each such court in personam, generally and unconditionally with respect to any action, suit or proceeding for itself and in respect of its properties, assets and revenues.

(b) The Issuer and the Guarantors have validly and effectively appointed CCS Global Solutions, Inc. (together with any of its successors and assigns, the "**Process Agent**"), with offices on the date hereof at 99 Washington Avenue, Suite 805A, Albany, New York 12210, as its authorized agent upon which process may be served in any action, suit or proceeding referred to in Section 13.11(a) hereof. If for any reason such agent hereunder shall cease to be available to act as such, each of the Issuer and the Guarantors agrees to designate a new agent in the Borough of Manhattan, New York City, New York on the terms and for the purposes of this Section 13.11 reasonably satisfactory to the Trustee. Each of the Issuer and the Guarantors further hereby irrevocably consents and agrees to the service of any and all legal process, summons, notices and documents in any such action, suit or proceeding against the Issuer or the Guarantors by serving a copy thereof upon the Process Agent (whether or not the appointment of such agent shall for any reason prove to be ineffective or such agent shall accept or acknowledge such service) or by mailing copies thereof by registered or certified air mail, postage prepaid, to each of the Issuer and the Guarantors at its address specified in or designated in Section 13.01 hereof. Each of the Issuer and the Guarantors agrees that the failure of any such designee, appointee and agent to give any notice of such service to it shall not impair or affect in any way the validity of such service or any judgment rendered in any action or proceeding based thereon. Nothing herein shall in any way be deemed to limit the ability of the Holders, the Trustee, the Paying Agent, the Registrar, and the Transfer Agent to serve any such legal process, summons, notices and documents in any other manner permitted by applicable law or to obtain jurisdiction over the Issuer and the Guarantors or bring actions, suits or proceedings against the Issuer or any Guarantor in such other jurisdictions, and in such manner, as may be permitted by applicable law. Each of the Issuer and the Guarantors irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings arising out of or in connection with this Indenture, the Securities or the Guarantees brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

If for the purpose of obtaining judgment in any court it is necessary to convert a sum due under this Indenture, the Securities or the Guarantees to a Holder or the Trustee from U.S. dollars into another currency, each of the Issuer and the Guarantors agrees, and each Holder by holding such Security and the Trustee by execution of this Indenture shall be deemed to have agreed, to the fullest extent that each of the Issuer, the Guarantors, the Trustee and the Holders may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures such payee could purchase U.S. dollars with such other currency in New York City, New York on the day two Business Days preceding the day on which final judgment is given.

The obligation of each of the Issuer and the Guarantors in respect of any sum payable by it to any payee shall, notwithstanding any judgment in a currency (the "**judgment currency**")

other than U.S. dollars, be discharged only to the extent that on the Business Day following receipt by such payee of any sum adjudged to be so due in the judgment currency, such payee may, in accordance with normal banking procedures, purchase U.S. dollars with the judgment currency; if the amount of U.S. dollars so purchased is less than the sum originally due to such payee in the judgment currency (determined in the manner set forth in the preceding paragraph), each of the Issuer and the Guarantors agrees, as a separate obligation and notwithstanding any such judgment, to indemnify such payee against such loss, and if the amount of the U.S. dollars so purchased exceeds the sum originally due to such payee, such payee agrees to remit to the Issuer or any Guarantor, as applicable, such excess; *provided* that such payee shall have no obligation to remit any such excess as long as the Issuer or the Guarantors shall have failed to pay such payee any obligations due and payable under this Indenture or any Security, in which case such excess may be applied to such obligations of the Issuer or the Guarantors under this Indenture or such Security or any Guarantee in accordance with the terms thereof.

(c) The provisions of this Section 13.11 shall survive any termination of this Indenture, in whole or in part.

Section 13.12. *Waiver of Jury Trial*. EACH OF THE ISSUER, THE GUARANTORS, THE COLLATERAL AGENT AND THE TRUSTEE (SOLELY IN ITS CAPACITY AS TRUSTEE, WHICH, FOR THE AVOIDANCE OF DOUBT, SHALL NOT IN ANY WAY AFFECT ANY RIGHT OF ANY HOLDER) HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE SECURITIES, THE GUARANTEES, THE COLLATERAL OR THE TRANSACTION CONTEMPLATED HEREBY.

Section 13.13. *Severability*. In case any provision in this Indenture or in the Securities shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 13.14. *Regarding the Paying Agent*.

(a) Each payment in full of principal, redemption amount, Additional Amounts, interest or any other amounts payable under this Indenture in respect of any Securities or the Guarantees made by or on behalf of the Issuer or the Guarantors to or to the order of any Paying Agent in the manner provided herein or in the Securities on the date due shall be valid and effective to satisfy and discharge the obligation of the Issuer to make payment of principal, redemption amount, Additional Amounts interest or any other amounts payable under this Indenture and the Securities on such date; *provided*, *however*, that the liability of any Paying Agent hereunder shall not exceed any amounts paid to it by the Issuer or the Guarantors, or otherwise held by it, on behalf of the Holders hereunder; and *provided*, *further*, that, in the event that there is a default by the Paying Agent in any payment of principal, redemption amount, Additional Amounts, interest or any other amounts payable in respect of any Security in accordance with the terms hereof, the Issuer and/or the Guarantors shall pay on demand such further amounts as will result in the receipt by the Holders of such amounts as would have been received by them had no such default occurred.

(b) Each of the Issuer and the Guarantors, jointly and severally, undertakes to indemnify the Paying Agent and its Affiliates against all losses, liabilities and expenses (including, without limitation, attorneys' fees and expenses), including any and all tax liabilities (other than taxes based upon, measured by or determined by the income of the Paying Agent or its Affiliates), which, for the avoidance of doubt, shall include Brazilian taxes and associated penalties, costs, claims, actions, damages, expenses or demands which any of them may Incur or which may be made against any of them as a result of or in connection with the appointment of or the exercise of the powers and duties by any Paying Agent or its Affiliates under this Indenture except as may result from its own negligence, or willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable order.

(c) Each of the Issuer and the Guarantors acknowledges that the Paying Agent make no representations as to the interpretation or characterization of the transactions herein undertaken for tax or any other purpose, in any jurisdiction.

(d) The Issuer agrees to pay any and all stamp and other documentary taxes or duties which may be payable in connection with the execution, delivery, performance and enforcement of this Indenture, the Securities and/or any Guarantee by the Paying Agent.

Section 13.15. *U.S.A. Patriot Act*. The parties hereto acknowledge that in order to help the United States government fight the funding of terrorism and money laundering activities, federal regulations that became effective on October 1, 2003 (Section 326 of the U.S.A. Patriot Act) require all financial institutions to obtain, verify, record and update information that identifies each Person establishing a relationship or opening an account. The parties to this Indenture agree that they will provide to the Trustee such information as it may request, from time to time, in order for the Trustee to satisfy the requirements of the U.S.A. Patriot Act, including but not limited to the name, address, tax identification number and other information that will allow it to identify the individual or entity who is establishing the relationship or opening the account and may also ask for formation documents, such as articles of incorporation or other identifying documents, to be provided.

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

**ANDRADE GUTIERREZ INTERNATIONAL S.A.**

By: ______________________________
Name: Gustavo Braga Mercher Coutinho
Title: Director

By: ______________________________
Name: Gustavo Benchimol
Title: Director

**ANDRADE GUTIERREZ ENGENHARIA S.A. as Guarantor**

By: ______________________________
Name: Gustavo Braga Mercher Coutinho
Title: Chief Financial Officer

By: ______________________________
Name: Fernando Leyser
Title: Director

**ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A. as Guarantor**

By: ______________________________
Name: Gustavo Braga Mercher Coutinho
Title: Officer

By: ______________________________
Name: Ricardo Sena
Title: Officer

**AG CONSTRUÇÕES E SERVIÇOS S.A., as Guarantor**

By: ______________________________
Name: Cristiano Pimentel Cavalcanti Vieira
Title: Director

By: ______________________________
Name: José Eduardo Kauark Leite
Title: Director

**ZAGOPE SGPS, S.A., as Guarantor**

By: ______________________________
Name: Margarida Damião
Title: Director

By: ______________________________
Name: André Giudice
Title: Director

**INZAG GERMANY GMBH, as Guarantor**

By: ______________________________
Name: André Giudice
Title: Director

By: ______________________________
Name: Achim Becker
Title: Director

**WILMINGTON SAVINGS FUND SOCIETY, FSB,** as Trustee, Registrar, Transfer Agent and Paying Agent

By: /s/ John McNichol
Name: John McNichol
Title: Assistant Vice President

**TMF GROUP NEW YORK, LLC, as Collateral Agent**

By: ______________________________
Name: Albert Fioravanti
Title: Managing Director

QIB/ACCREDITED INVESTOR/REGULATION S APPENDIX

## PROVISIONS RELATING TO THE SECURITIES

1. Definitions.

For the purposes of this Appendix the following terms shall have the meanings indicated below. Other terms used in this Appendix and not defined herein shall have the meanings assigned to them in the Indenture.

"**Accredited Investor**" means an "**accredited investor**" within the meaning of Rule 501(a) of Regulation D under the Securities Act.

"**Accredited Investor Global Security**" means a single, permanent Global Security in definitive, fully registered book-entry form sold to Accredited Investors.

"**Certificated Securities**" has the meaning set forth in Section 2.1(g) of this Appendix.

"**Clearstream**" means Clearstream Banking, société anonyme, Luxembourg.
"**Distribution Compliance Period**" means, in respect of any Regulation S Global Securities, the 40 consecutive days beginning on and including the later of (a) the day on which any Securities represented thereby are offered to Persons other than distributors (as defined in Regulation S under the Securities Act) pursuant to Regulation S and (b) the issue date for such Securities, as notified by the Issuer to the Trustee in writing.

"**Euroclear**" means Euroclear Bank, S.A./N.V.

"**Non-U.S. Person**" has the meaning given to it in Regulation S.

"**QIB**" means a "**qualified institutional buyer**" as defined in Rule 144A under the Securities Act.

"**Regulation S Global Security**" means a single, permanent Global Security in definitive, fully registered book-entry form sold outside of the United States in reliance on Regulation S.

"**Regulation S Legend**" means the Regulation S Legend set forth in Exhibit 1 to this Appendix.

"**Restricted Global Security**" means a single, permanent Global Security in definitive, fully registered form without interest coupon, constituting a Restricted Security.

"**Restricted Securities Legend**" means the Restricted Securities Legend set forth in Exhibit 1 to this Appendix.

"**Restricted Security**" means a Security that constitutes a "**restricted security**" within the meaning of Rule 144(a)(3) under the Securities Act; *provided*, *however*, that the Trustee shall

be entitled to request and conclusively rely on an Opinion of Counsel with respect to whether any Security constitutes a Restricted Security.

"**Securities Custodian**" means the custodian with respect to a Global Security, or any successor Person thereto and shall initially be the Trustee.

2. The Securities.

2.1. Form and Registration.

(a) Form and Registration. The certificates representing the Securities shall be issued in fully registered form without interest coupons. Each Global Security shall be subject to certain restrictions on transfer, set forth in Section 2.3 and 2.4 of this Appendix.

(b) Regulation S Global Security. Securities offered and sold in reliance on Regulation S under the Securities Act shall initially be represented by one or more Regulation S Global Securities, which shall bear the Regulation S Legend and shall be deposited with the Trustee as Securities Custodian for, and registered in the name of Cede and Co., as nominee of DTC.

(c) Accredited Investor Global Security. Securities sold to Accredited Investors in reliance on Section 4(a)(2) under the Securities Act shall be represented by one or more Accredited Investor Global Securities, which shall bear the Restricted Securities Legend and shall be deposited with the Trustee as Securities Custodian for, and registered in the name of a nominee of, DTC.

(d) Restricted Global Security. Securities sold in reliance on Rule 144A under the Securities Act shall be represented by one or more Restricted Global Securities, which shall bear the Restricted Securities Legend and shall be deposited with the Trustee as Securities Custodian for, and registered in the name of Cede and Co. as nominee of DTC.

(e) Ownership. Ownership of beneficial interests in a Global Security shall be limited to Persons who have accounts with DTC ("**participants**"), or Persons who hold interests through participants in DTC, including Euroclear and Clearstream. Ownership of beneficial interests in a Global Security shall be shown on, and the transfer of that ownership shall be effected only through, records maintained by DTC or its nominee (with respect to interests of participants) and the records of participants (with respect to interests of Persons other than participants). QIBs and Accredited Investors may hold their interests in a Restricted Global Security, or an Accredited Investor Global Security, as applicable, directly through DTC, if they are participants in such system, or indirectly through organizations which are participants in such system.

Non-U.S. Persons may hold their interests in a Regulation S Global Security, directly through Euroclear or Clearstream as indirect participants in DTC, if they are participants in such systems, or indirectly through organizations that are participants in such systems.

So long as DTC or its nominee is the registered owner or Holder of a Global Security, DTC or such nominee, as the case may be, shall be considered the sole owner or Holder of the Securities represented by such Global Security for all purposes under the Indenture. No Beneficial Owner of an interest in a Global Security shall be able to transfer that interest except in accordance with DTC's applicable procedures, in addition to those provided for under the Indenture. Payments made with respect to a Global Security shall be made to DTC or its nominee, as the registered owner thereof. None of the Issuer, the Company, the Trustee or any Paying Agent, the Registrar or any Transfer Agent shall have any responsibility or Incur any liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Global Security or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

The Issuer and the Company expect that DTC or its nominee, upon receipt of any payment in respect of a Global Security, shall credit participants' accounts with payments in amounts proportionate to their respective beneficial interests in such Global Security as shown on its records. The Issuer and the Company also expect that payments by participants to owners of beneficial interests in such Global Security held through such participants shall be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for such customers. Such payments shall be the responsibility of such participants.

(f) Limitation on Obligations. Although DTC, Euroclear and Clearstream are expected to follow the procedures set forth in this Appendix and the Indenture in order to facilitate transfers of interests in a Global Security among participants of DTC, Euroclear and Clearstream, as the case may be, they are under no obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time. None of the Issuer, the Company, the Trustee, any Paying Agent, the Registrar or any Transfer Agent shall have any responsibility or Incur any liability for the performance by DTC, Euroclear or Clearstream or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

(g) Successors; Certificated Securities. If (i) DTC or any successor to DTC is at any time unwilling or unable to continue as a Depositary for the Global Securities and the Issuer fails to appoint a successor Depositary within 90 days, or (ii) any amounts due under the Indenture, the Securities or the Guarantees has become immediately due and payable in accordance with Article 6 of the Indenture after an Event of Default has occurred and is continuing, the Issuer shall issue certificated non-global Securities ("**Certificated Securities**") which may bear the Restricted Securities Legend or Regulation S Legend, as applicable, set to all Beneficial Owners, in exchange for their beneficial interests in Global Securities.

Holders of an interest in a Global Security may receive Certificated Securities, in accordance with DTC's rules and procedures in addition to those provided for under the Indenture; *provided*, *however*, that if the Issuer is issuing Certificated Securities pursuant to Section 2.1(g)(ii) of this Appendix, the Issuer shall only be required to issue Certificated Securities to the Beneficial Owners of the Securities who request Certificated Securities.

(h) Certificated Securities. Except as provided in this Section 2.1, owners of beneficial interests in Global Securities shall not be entitled to receive physical delivery of Certificated Securities. The registered Holder of a Global Security shall be entitled to grant proxies and otherwise authorize any Person, including DTC and Persons that may hold interests through DTC to take any action which a Holder is entitled to take under the Indenture or the Securities. In the event of transfer of a Global Security to the Beneficial Owners thereof in the form of Certificated Securities, the Issuer shall promptly make available to the Trustee a reasonable supply of Certificated Securities in definitive, fully registered form without interest coupons.

2.2. Global Securities.

(a) Any Global Security (i) shall represent, and shall be denominated in an aggregate amount equal to the aggregate principal amount of, all of the outstanding Securities of such series to be represented by such Global Security, (ii) shall be registered in the name of Cede and Co. as nominee of DTC, (iii) shall be delivered by the Securities Custodian to DTC or pursuant to DTC's instruction and (iv) shall bear a legend substantially to the following effect:

THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY. THIS SECURITY IS EXCHANGEABLE FOR SECURITIES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS SECURITY (OTHER THAN A TRANSFER OF THIS SECURITY AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY) MAY BE REGISTERED EXCEPT IN LIMITED CIRCUMSTANCES.

UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY DEFINITIVE SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER

NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Transfers between participants in DTC shall be effected in accordance with DTC's procedures, and shall be settled in same-day funds. Transfers between participants in Euroclear and Clearstream shall be effected in accordance with their respective rules and operating procedures. Transactions settled through DTC, Euroclear and Clearstream shall settle on a T+2 basis.

The Issuer and the Company expect that DTC shall take any action permitted to be taken by a Holder (including the presentation of Securities for exchange) only at the direction of one or more participants to whose account the interest in a Global Security is credited and only in respect of such portion of the securities as to which such participant or participants has or have given such direction.

Subject to compliance with the transfer restrictions applicable to the Global Securities, cross-market transfers between the participants in DTC, on the one hand, and Euroclear or Clearstream participants, on the other hand, shall be effected through DTC in accordance with DTC's rules on behalf of each of Euroclear or Clearstream by its common depositary; however, such cross market transactions shall require delivery of instructions to Euroclear or Clearstream by the counterparty in such system in accordance with the rules and procedures and within the established deadlines (Brussels, Belgium time) of such system.

Euroclear or Clearstream shall, if the transaction meets its settlement requirements, deliver instructions to its common depositary to take action to effect final settlement on its behalf by delivering or receiving interests in the Global Securities in DTC, and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to DTC. Euroclear participants and Clearstream participants may not deliver instructions directly to the common depositaries for Euroclear or Clearstream.

Because of time zone differences, the securities account of a Euroclear or Clearstream participant purchasing an interest in a Global Security from a participant in DTC shall be credited, and any such crediting shall be reported to the relevant Euroclear or Clearstream participant, during the securities settlement processing day (which must be a business day for Euroclear and Clearstream) immediately following the settlement date of DTC. Cash received in Euroclear or Clearstream as a result of sales of interests in a Global Security by or through a Euroclear or Clearstream participant to a participant in DTC shall be received with value on the settlement date of DTC but shall be available in the relevant Euroclear or Clearstream cash account only as of the business day for Euroclear or Clearstream following DTC's settlement date.

(b) In connection with any transfer or exchange of a portion of the beneficial interest in any Global Security to Beneficial Owners pursuant to Section

2.1(g) of this Appendix the Registrar shall (if one or more Certificated Securities are to be issued) reflect on its books and records the date and a decrease in the principal amount of the Global Security in an amount equal to the principal amount of the beneficial interest in the Global Security to be transferred, and the Issuer shall execute, and the Trustee shall, upon receipt of a written order from the Issuer, authenticate and deliver, one or more Certificated Securities of like tenor and principal amount of authorized denominations.

(c) Any beneficial interest in one of the Global Securities that is transferred to a Person who takes delivery in the form of an interest in the other corresponding Global Security shall, upon transfer, cease to be an interest in such Global Security and become an interest in the other corresponding Global Security and, accordingly, shall thereafter be subject to all transfer restrictions, if any, and other procedures applicable to beneficial interest in such other corresponding Global Security for as long as it remains such an interest.

(d) In connection with the transfer of Global Securities as an entirety to Beneficial Owners pursuant to Section 2.1(g) of this Appendix, the Global Securities shall be deemed to be surrendered to the Trustee for cancellation, and the Issuer shall execute, and the Trustee shall, upon receipt of a written order from the Issuer, authenticate and deliver, to each Beneficial Owner identified by DTC, in exchange for its beneficial interest in the Global Securities, an equal aggregate principal amount at maturity of Certificated Securities of authorized denominations.

(e) Any Certificated Security constituting a Restricted Security delivered in exchange for an interest in a Global Security pursuant to this Section 2.2 of this Appendix shall bear the applicable Restricted Securities Legend set forth in Exhibit 1 to this Appendix.

(f) The registered Holder of any Global Security may grant proxies and otherwise authorize any Person, including participants in DTC and Persons that may hold interests through participants in DTC to take any action which a Holder is entitled to take under the Indenture or the Securities.

2.3. Special Transfer Provisions.

The following provisions shall apply with respect to the Securities:

(a) *Transfers to Non-U.S. Persons*. The following provisions shall apply with respect to the registration of any proposed transfer of a Security to any Non-U.S. Person:

(i) the Registrar shall register the transfer of any Security, whether or not such Security bears the Restricted Securities Legend, if the

proposed transferor has delivered to the Registrar a certificate substantially in the form of Exhibit 3 to this Appendix;

(ii) if the proposed transferee is a participant in DTC and the Securities to be transferred consist of Certificated Securities which after transfer are to be evidenced by an interest in a Regulation S Global Security, upon receipt by the Registrar of (A) written instructions given in accordance with DTC's and the Registrar's procedures and (B) the certificate required by Section 2.3(a)(i) of this Appendix, the Registrar shall register the transfer and reflect on its books and records the date and an increase in the principal amount of the Regulation S Global Security in an amount equal to the principal amount of Certificated Securities to be transferred, and the Trustee shall cancel the Certificated Securities so transferred;

(iii) if the proposed transferor is a participant in DTC seeking to transfer an interest in a Global Security which after transfer is to be evidenced by an interest in a Regulation S Global Security, upon receipt by the Registrar of (A) written instructions given in accordance with DTC's and the Registrar's procedures and (B) the certificate required by Section 2.3(a)(i) of this Appendix, the Registrar shall register the transfer and reflect on its books and records the date and (x) a decrease in the principal amount of the Global Security from which such interests are to be transferred in an amount equal to the principal amount of the Securities to be transferred and (y) an increase in the principal amount of the Regulation S Global Security in an amount equal to the principal amount of the interest in the Global Security to be transferred.

(b) *Transfers to QIBs or Accredited Investors*. The following provisions shall apply with respect to the registration of any proposed transfer of a Security to a QIB or an Accredited Investor:

(i) the Registrar shall register the transfer of any Security occurring prior to the Distribution Compliance Period if the proposed transferor has delivered to the Registrar a certificate substantially in the form set forth in Exhibit 4 to this Appendix, in which case any such Security shall be evidenced, after such transfer, by an interest in a Restricted Global Security or an Accredited Investor Global Security, as applicable;

(ii) if the proposed transferee is a participant in DTC and the Securities to be transferred consist of Certificated Securities, upon receipt by the Registrar of (A) instructions given in accordance with DTC's and the Registrar's procedures, and (B) the certificate, if any, required by Section 2.3(b)(i) of this Appendix, the Registrar shall register the transfer and reflect on its books and records the date

and an increase in the principal amount of the Restricted Global Security or the Accredited Investor Global Security, as applicable, in an amount equal to the principal amount of the Certificated Securities, to be transferred, and the Trustee shall cancel the Certificated Securities so transferred;

(iii) if the proposed transferor is a participant in DTC seeking to transfer an interest in a Global Security which after transfer is to be evidenced by an interest in a Restricted Global Security or an Accredited Investor Global Security, as applicable, upon receipt by the Registrar of (A) written instructions given in accordance with DTC's and the Registrar's procedures, and (B) the certificate, if any, required by Section 2.3(b)(i) of this Appendix, the Registrar shall register the transfer and reflect on its books and records the date and a decrease in the principal amount of the Global Security from which interests are to be transferred in an amount equal to the principal amount of the Securities to be transferred and an increase in the principal amount of the Restricted Global Security or the Accredited Investor Global Security, as applicable, in an amount equal to the principal amount of the interest in the Global Security to be transferred.

(c) *Restricted Securities Legend and Regulation S Legend.* Upon the registration of transfer, exchange or replacement of Securities not bearing the Restricted Securities Legend or the Regulation S Legend, as applicable, the Registrar shall deliver Securities that do not bear the Restricted Securities Legend or the Regulation S Legend, as applicable. Upon the registration of transfer, exchange or replacement of Securities bearing the Restricted Securities Legend or the Regulation S Legend, as applicable, the Registrar shall deliver only Securities that bear the Restricted Securities Legend or the Regulation S Legend, as applicable, unless the Registrar has received an Opinion of Counsel reasonably satisfactory to the Issuer, to the effect that neither such Restricted Securities Legend or the Regulation S Legend, as applicable, nor the related restrictions on transfer are required in order to maintain compliance with the provisions of the Securities Act or such Security has been sold pursuant to an effective registration statement under the Securities Act.

(d) *Securities Purchased by the Issuer.* In order to insure the availability of Rule 144(k) under the Securities Act, all Securities which are purchased or otherwise acquired by the Issuer or the Company or any of their Affiliates may not be resold or otherwise transferred.

(e) *Other Transfers.* If a Holder proposes to transfer a Security constituting a Restricted Security pursuant to any exemption from the registration requirements of the Securities Act other than as provided for by

Section 2.3(a) of this Appendix, the Registrar shall only register such transfer or exchange if such transferor delivers an Opinion of Counsel reasonably satisfactory to the Issuer, that such transfer is in compliance with the Securities Act and the terms of the Indenture; *provided*, *however*, that the Issuer may, based upon the opinion of its counsel, instruct the Registrar not to register such transfer in any case where the proposed transferee is not a QIB, an Accredited Investor or a Non-U.S. Person.

(f) *General*. By its acceptance of any Security (or any beneficial interest in any Global Security) bearing the Restricted Securities Legend or the Regulation S Legend, each Holder of such a Security or holder of such beneficial interest acknowledges the restrictions on transfer of such Security set forth in the Indenture, this Appendix, and in the Restricted Securities Legend or the Regulation S Legend, as applicable, and agrees that it will transfer such Security only as provided in this Appendix, the Indenture and in the Restricted Securities Legend or the Regulation S Legend, as applicable. The Registrar shall not register a transfer of any Security unless such transfer complies with the restrictions on transfer of such Security set forth in the Indenture and this Appendix.

The Registrar shall retain copies of all letters, notices and other written communications received pursuant to this Section 2.3 in accordance with its standard retention policies. The Issuer shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable prior written notice to the Registrar.

2.4. Cancellation or Adjustment of Global Security.

At such time as all beneficial interests in a Global Security have either been exchanged for Certificated Securities, redeemed, purchased or canceled, such Global Security shall be returned to DTC for cancellation or retained and canceled by the Trustee. At any time prior to such cancellation, if any beneficial interest in a Global Security is exchanged for certificated Securities, redeemed, purchased or canceled, the principal amount of Securities represented by such Global Security shall be reduced and an adjustment shall be made on the books and records of the Trustee (if it is then the Securities Custodian for such Global Security) with respect to such Global Security, by the Trustee or the Securities Custodian, to reflect such reduction.

EXHIBIT 1
to
QIB/ACCREDITED INVESTOR/REGULATION S APPENDIX

[FORM OF FACE OF SECURITY]

[Global Securities Legend]

THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY. THIS SECURITY IS EXCHANGEABLE FOR SECURITIES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS SECURITY (OTHER THAN A TRANSFER OF THIS SECURITY AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY) MAY BE REGISTERED EXCEPT IN LIMITED CIRCUMSTANCES.

UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY DEFINITIVE SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS SECURITY WAS ISSUED WITH ORIGINAL ISSUE DISCOUNT ("**OID**") FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. UPON REQUEST, THE ISSUER SHALL PROMPTLY MAKE AVAILABLE TO A HOLDER OF THIS SECURITY (1) THE ISSUE PRICE AND ISSUE DATE OF THE SECURITY, (2) THE AMOUNT OF OID ON THE SECURITY, AND (3) THE ORIGINAL YIELD TO MATURITY OF THE SECURITY. SUCH REQUEST SHOULD BE SENT TO THE ISSUER AT ANDRADE GUTIERREZ ENGENHARIA S.A., RUA DO PASSEIO, 38, 14TH FLOOR – CENTRO, RIO DE JANEIRO, RJ, 20021-290, BRAZIL, ATT: GUSTAVO BRAGA MERCHER COUTINHO.

[Restricted Securities Legend]

THIS SECURITY (AND RELATED GUARANTEE) HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**") AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE, BY

ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN. THE ACQUIRER

(1) REPRESENTS THAT

(A) IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS A "**QUALIFIED INSTITUTIONAL BUYER**" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) OR AN "**ACCREDITED INVESTOR**" (WITHIN THE MEANING OF RULE 501(A) OF REGULATION D UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT; OR

(B) IT IS NOT A U.S. PERSON (WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT) AND

(2) AGREES FOR THE BENEFIT OF THE ISSUER THAT IT SHALL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN, EXCEPT IN ACCORDANCE WITH THE SECURITIES ACT AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ONLY

(A) TO THE ISSUER;

(B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT;

(C) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT OR AN ACCREDITED INVESTOR IN COMPLIANCE WITH RULE 501(A) OF REGULATION D UNDER THE SECURITIES ACT;

(D) IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 OF REGULATION S UNDER THE SECURITIES ACT; OR

(E) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH (2)(E) ABOVE, THE ISSUER RESERVES THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY RULE 144 EXEMPTION FROM THE REGISTRATION

REQUIREMENTS OF THE SECURITIES ACT. THIS LEGEND MAY ONLY BE REMOVED WITH CONSENT OF THE ISSUER.

BY ITS PURCHASE AND HOLDING OF THIS SECURITY (OR ANY INTEREST HEREIN), THE PURCHASER OR HOLDER SHALL BE DEEMED TO HAVE REPRESENTED AND AGREED THAT EITHER (1) NO ASSETS OF AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN THE U.S. EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("**ERISA**")) SUBJECT TO TITLE I OF ERISA, A PLAN TO WHICH SECTION 4975 OF THE U.S. INTERNAL REVENUE CODE OF 1986, AS AMENDED ("**THE CODE**"), APPLIES, OR, AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE THE ASSETS OF ANY SUCH PLAN, OR A NON-U.S. PLAN, GOVERNMENTAL PLAN, CHURCH PLAN, OR OTHER PLAN HAVE BEEN USED TO ACQUIRE THIS SECURITY OR ANY INTEREST HEREIN, OR (2) THE ACQUISITION, HOLDING AND DISPOSITION OF THIS SECURITY, OR ANY INTEREST HEREIN, SHALL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE, (OR, IN THE CASE OF A GOVERNMENTAL PLAN, CHURCH PLAN, NON-U.S. OR OTHER PLAN, A VIOLATION OF ANY FEDERAL, NON-U.S., STATE OR LOCAL LAWS, REGULATIONS OR RULES THAT ARE SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE).

[Regulation S Legend]

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION, AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO OR FOR THE ACCOUNT OR BENEFIT OF U.S. PERSONS EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF, THE HOLDER (1) REPRESENTS THAT IT IS NOT A U.S. PERSON, IS NOT ACQUIRING THIS SECURITY FOR THE ACCOUNT OR BENEFIT OF A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION, (2) BY ITS ACCEPTANCE HEREOF, AGREES TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY ONLY (A) TO THE ISSUER OR ANY AFFILIATE THEREOF, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A, TO A PERSON IT REASONABLY BELIEVES IS A "**QUALIFIED INSTITUTIONAL BUYER**" AS DEFINED IN RULE 144A PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (D) PURSUANT TO OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES IN COMPLIANCE WITH RULE 903 OR 904 UNDER REGULATION S UNDER THE SECURITIES ACT, (E) TO AN "**ACCREDITED INVESTOR**" WITHIN THE MEANING OF RULE 501(A) OF REGULATION D UNDER THE SECURITIES ACT ACQUIRING THE SECURITIES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF SUCH AN ACCREDITED INVESTOR,

OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, IN EACH CASE IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND (3) AGREES THAT IT SHALL DELIVER TO EACH PERSON TO WHOM THIS SECURITY IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS RESTRICTIVE LEGEND. THIS LEGEND SHALL BE REMOVED AFTER 40 CONSECUTIVE DAYS BEGINNING ON AND INCLUDING THE LATER OF (A) THE DAY ON WHICH THE SECURITIES ARE OFFERED TO PERSONS OTHER THAN DISTRIBUTORS (AS DEFINED IN REGULATION S) AND (B) THE DATE OF THE CLOSING OF THE ORIGINAL OFFERING. AS USED HEREIN, THE TERMS "**OFFSHORE TRANSACTION,**" "**UNITED STATES**" AND "**U.S. PERSON**" HAVE THE MEANINGS GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT. THIS LEGEND OR ANY PORTION HEREOF MAY BE REMOVED FROM THIS SECURITY SOLELY IN THE DISCRETION AND AT THE DIRECTION OF ANDRADE GUTIERREZ INTERNATIONAL S.A. OR CONSTRUTORA ANDRADE GUTIERREZ S.A.

BY ITS PURCHASE AND HOLDING OF THIS SECURITY (OR ANY INTEREST HEREIN), THE PURCHASER OR HOLDER SHALL BE DEEMED TO HAVE REPRESENTED AND AGREED THAT EITHER (I) NO ASSETS OF AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN THE U.S. EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("**ERISA**")) SUBJECT TO TITLE I OF ERISA, A PLAN TO WHICH SECTION 4975 OF THE U.S. INTERNAL REVENUE CODE OF 1986, AS AMENDED ("**THE CODE**"), APPLIES, OR, AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE THE ASSETS OF ANY SUCH PLAN, OR A NON-U.S. PLAN, GOVERNMENTAL PLAN, CHURCH PLAN, OR OTHER PLAN HAVE BEEN USED TO ACQUIRE THIS SECURITY OR ANY INTEREST HEREIN, OR (II) THE ACQUISITION, HOLDING AND DISPOSITION OF THIS SECURITY, OR ANY INTEREST HEREIN, SHALL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE, (OR, IN THE CASE OF A GOVERNMENTAL PLAN, CHURCH PLAN, NON-U.S. OR OTHER PLAN, A VIOLATION OF ANY FEDERAL, NON-U.S., STATE OR LOCAL LAWS, REGULATIONS OR RULES THAT ARE SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE).

No. [S][R]

US$ __________
(Comprising:(1) an initial aggregate principal amount on the Issue Date of US$[●] plus (2) the initial PIK Interest payment being made on the Issue Date in the amount of US$[●] for the period from and including December 21, 2022 to and including December 28, 2022)

ANDRADE GUTIERREZ INTERNATIONAL S.A.

9.000%/10.500% Senior Secured PIK Toggle Notes due 2029

CUSIP No. [Reg. S: L01795 AG5] [144A: 03439T AH4]
ISIN [Reg. S: USL01795AG50] [144A: US03439TAH41]

Andrade Gutierrez International S.A., public limited liability company (*société anonyme*) incorporated in the Grand Duchy of Luxembourg, with registered office at 12C, rue Guillaume Kroll, L-1882 Luxembourg and registered with the Luxembourg Register of Commerce and Companies under number B176492, promises to pay to Cede & Co., or its registered assigns, the principal sum in U.S. dollars listed on the Schedule of Increases or Decreases in Global Security attached hereto on December 28, 2029.

Interest Payment Dates: (i) the Issue Date, with interest computed for the period from and including the Issue Date to and including December 28, 2022 (it being understood that such interest payment is being distributed as PIK Interest and is made in advance for interest that would otherwise be paid on December 28, 2022 if December 28, 2022 were an Interest Payment Date, it being further understood that such interest shall be payable to Holders to which the Securities are issued on the Issue Date, notwithstanding any provision of the Indenture or the Securities regarding payment of interest to Holders of record as of any Record Date); (ii) March 28, June 28, September 28 and December 28 of 2023, commencing on March 28, 2023 through and including December 28, 2023 (it being understood that interest payable on March 28, 2023 shall be calculated from and excluding December 28, 2022); and (ii) June 28 and December 28 of each year, commencing on June 28, 2024.

Record Dates: March 15, June 15, September 15 and December 12.

Additional provisions of this Security are set forth on the other side of this Security.

IN WITNESS WHEREOF, the Issuer has caused this instrument to be duly executed.

**ANDRADE GUTIERREZ INTERNATIONAL S.A.**

By: ______________________________
Name:
Title:

By: ______________________________

Title:

TRUSTEE'S CERTIFICATE OF
AUTHENTICATION

**Wilmington Savings Fund Society, FSB**
as Trustee, certifies that this is
one of the Securities referred
to in the Indenture.

By:

___________________________________
Authorized Signatory

Dated: ________________, 2022

[FORM OF REVERSE SIDE OF SECURITY]

**9.000%/10.500% Senior Secured PIK Toggle Notes due 2029**

1. *Interest*

Andrade Gutierrez International S.A., public limited liability company (*société anonyme*) incorporated in the Grand Duchy of Luxembourg, with registered office at 12C, rue Guillaume Kroll, L-1882 Luxembourg and registered with the Luxembourg Register of Commerce and Companies under number B-176492, (such company, and its successors and assigns under the Indenture hereinafter referred to as the "**Issuer**"), promises to pay interest on the principal amount of this Security at the rate per annum shown above.

The Issuer shall pay interest to a Paying Agent, which shall in turn distribute the interest in accordance with the Indenture: (a) on the Issue Date, computed for the period from and including the Issue Date to and including December 28, 2022 (it being understood that such interest payment is being distributed as PIK Interest and is made in advance for interest that would otherwise be paid on December 28, 2022 if December 28, 2022 were an Interest Payment Date, it being further understood that such interest shall be payable to Holders to which the Securities are issued on the Issue Date, notwithstanding any provision of the Indenture or the Securities regarding payment of interest to Holders of record as of any Record Date); (b) quarterly on March 28, June 28, September 28 and December 28 of 2023, commencing on March 28, 2023 through and including December 28, 2023 (it being understood that interest payable on March 28, 2023 shall be calculated from and excluding December 28, 2022); and (b) semi-annually June 28 and December 28 of each year, commencing on June 28, 2024. Interest on the Securities shall be computed on the basis of a 360-day year of twelve 30-day months. The Securities shall bear interest at the rate per annum of 9.000%/10.500% from December 21, 2022, the date of issuance, or from the most recent Interest Payment Date to which interest has been paid or provided for (except for the Interest Payment Date on March 28, 2023, which shall bear interest from and excluding December 28, 2022, as set forth above), to the Maturity Date (or earlier redemption or prepayment date), which interest shall be paid entirely in cash, subject to the following paragraph.

The Issuer shall pay interest on the Securities on each Interest Payment Date in accordance with the Indenture and this Security in cash at the rate of 9.000% per annum. For each of the interest payment periods specified below, the Issuer may, at its sole option, elect to pay the following interest by capitalizing accrued and unpaid interest on the applicable Interest Payment Date and adding the same to the principal amount of the Securities then outstanding (each, a "**PIK Interest**"): (a) from and including the date of issuance, to and including December 28, 2022, PIK Interest at the rate of 10.500% per annum for each Interest Payment Date during such first interest payment period; and (b) from and excluding December 28, 2022 to and including December 28, 2023, PIK Interest at the rate of 5.500% per annum for each Interest Payment Date during such second interest payment period, with the remaining interest payable on the Securities at the rate of 5.000% per annum for such second interest payment period to be paid in cash. Following an increase in the principal amount of the outstanding Securities as a result of a payment of PIK Interest on the applicable Interest Payment Date, the Securities will bear interest on such increased principal amount from and after such applicable Interest Payment

Date, and the principal amount of the Securities at any time and after such date will include all interest which has been capitalized thereon. Interest on the Securities on each subsequent Interest Payment Date from and excluding December 28, 2023 shall be payable solely in cash. For the avoidance of doubt, if the Issuer does not elect to pay PIK Interest, the Issuer shall pay cash interest on the Securities at the rate of 9.000% per annum. In the event the Issuer elects to pay PIK Interest for the applicable interest payment period after the Issue Date, no later than fifteen 15 days prior to the applicable Interest Payment Date, the Issuer shall deliver to the Trustee and the Paying Agents a notice executed by one of its Officers (i) stating that the Issuer has elected to pay PIK Interest on the applicable Interest Payment Date, (ii) setting forth the total amount of interest due and payable on the applicable Interest Payment Date, (iii) setting forth the amount of PIK Interest to be paid on the applicable Interest Payment Date and (iv) directing the Trustee to increase the aggregate principal amount of the outstanding Securities as of the applicable Interest Payment Date in an amount equal to the PIK Interest payable on such date (a "**PIK Notice**"), which PIK Notice the Trustee and the Paying Agents shall be entitled to conclusively rely upon. The Trustee shall promptly deliver a copy of the PIK Notice to the Holders of the Securities. In the event the Trustee does not receive the PIK Notice from the Issuer in accordance with the preceding sentence, interest on the Securities for the applicable interest payment period shall automatically be payable without the PIK Interest as set forth above.

The Securities shall bear interest on overdue principal, premium, if any, and interest at the rate equal to 2.00% *per annum* in excess of 9.000%/10.500% to the extent lawful.

2. *Method of Payment*

Except as otherwise provided in Section 1 in the event the Issuer elects to pay PIK Interest in lieu of cash on any Interest Payment Date, the Issuer shall pay interest on the Securities to the Persons who are registered Holders at the close of business on March 15, June 15, September 15 or December 12 (each a "**Record Date**" whether or not such date is a Business Day) next preceding the Interest Payment Date even if Securities are canceled after the Record Date and on or before the Interest Payment Date. Holders must surrender Securities to a Paying Agent to collect principal payments. The Issuer shall pay principal, premium, interest and Additional Amounts, if any, in money of the United States that at the time of payment is legal tender for payment of public and private debts. Payments in respect of the Securities represented by a Global Security (including principal, premium, interest and Additional Amounts, if any) shall be made by wire transfer of immediately available funds to the accounts specified by the Depositary. The Issuer shall make all payments in respect of a Certificated Security (including principal, premium, interest and Additional Amounts, if any) at the office or agency of the Paying Agent or the Trustee, unless the Issuer elects to make such payments by mailing a check to the registered address of, or by wire transfer to, a Holder thereof; *provided*, *however*, that payments on a Certificated Security will only be made by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such Holder elects payment by wire transfer by giving written notice to the Trustee or the Paying Agent to such effect designating such account no later than 30 days immediately preceding the relevant due date for payment (or such other date as the Trustee may accept in its discretion). If the Issuer elects to make payments directly to the Holders, payment shall be made by wire transfer or in the form of a check mailed to the address of each such Holder as it appears on the register maintained by the Registrar and Paying Agent. However, the final payment on any Certificated Security shall be made only upon

presentation and surrender of such Security at the offices of the Paying Agent on the relevant payment date.

If any payment date (including any redemption date) falls on a day which is not a Business Day, any payment of interest and principal with respect to the Securities shall be made on the next succeeding Business Day with the same force and effect as if made on the due date, and no interest on such payment shall accrue from and after such due date.

3. *Registrar, Paying Agent and Transfer Agent*

Initially, Wilmington Savings Fund Society, FSB will act as Paying Agent, Registrar and Transfer Agent. The Issuer may appoint and change any Paying Agent, Registrar, Transfer Agent or co-registrar without notice. The Issuer, the Company or any Restricted Subsidiary may act as Paying Agent, Registrar, co-registrar or Transfer Agent.

4. *Indenture*

The Issuer issued the Securities under an Indenture dated as of December 21, 2022 (the "**Indenture**"), among the Issuer, Andrade Gutierrez Engenharia S.A. (the "**Company**"), Andrade Gutierrez Investimentos em Engenharia S.A., AG Construções e Serviços S.A., Zagope SGPS, S.A., and INZAG Germany GmbH (collectively, and together with the Company, the "**Guarantors**"), Wilmington Savings Fund Society, FSB as Trustee, Registrar, Paying Agent and Transfer Agent, and TMF Group New York, LLC, as Collateral Agent. Capitalized terms used and not defined herein shall have the same meanings ascribed to such terms in the Indenture.

The Securities are general obligations of the Issuer. The Securities issued on the Issue Date and Securities issued in exchange therefor shall be treated as a single class for all purposes under the Indenture. The Indenture contains covenants that, among other things, limit the ability of the Company and its Subsidiaries to Incur additional Indebtedness; pay dividends or make distributions on, redeem or repurchase Capital Stock; make investments; engage in transactions with Affiliates; create Liens on assets; transfer or sell assets; restrict dividends or other payments of Subsidiaries; consolidate, merge or transfer all or substantially all of its assets and the assets of its Subsidiaries; and engage in sales and leaseback transactions. These covenants are subject to important exceptions and qualifications.

To the extent of any conflict between the terms of the Securities and the Indenture, the applicable terms of the Indenture shall govern.

5. *Optional Redemption*

The Issuer may, at its option, redeem the Securities in whole at any time or in part from time to time at the redemption price of 100.000% (expressed as a percentage of principal amount of the Securities to be redeemed), plus any accrued and unpaid interest on the Securities (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date) and Additional Amounts, if any, to (but excluding) the date of redemption.

6. *Asset Sales Redemption; TEN Permitted Financing Redemption*

In connection with any Asset Sale pursuant to Section 4.22 of the Indenture, or in connection with any TEN Permitted Financing pursuant to Section 4.03(b)(xii) of the Indenture, the Issuer shall provide the Trustee, within 60 days following the consummation of such Asset Sale or TEN Permitted Financing, as applicable, with a notice pursuant to Section 3.02 of the Indenture to redeem the Securities in an aggregate principal amount to be determined by the Issuer. If the Issuer has elected to apply:

(a) only an amount equal to 50.000% of the Net Available Cash from such Asset Sale or Net Proceeds from a TEN Permitted Financing, as the case may be, to redeem the Securities, the redemption price shall be equal to 100.000% (expressed as a percentage of principal amount of the Securities to be redeemed), *plus* accrued and unpaid interest on the Securities (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date) and Additional Amounts, if any, to (but excluding) the date of redemption; or

(b) an amount in excess of 50.000% of the Net Available Cash from such Asset Sale to redeem the Securities, the redemption price shall be equal to the ratio (expressed as a percentage of principal amount of the Securities to be redeemed) that results from dividing (i) (x) 100.000% times an amount equal to 50.000% of the Net Available Cash from such Asset Sale, *plus* (y) 85.000% times the amount in excess of 50.000% of the Net Available Cash from such Asset Sale that the Issuer elects to apply to redeem the Securities, by (ii) the Net Available Cash form such Asset Sale, plus accrued and unpaid interest on the Securities (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date) and Additional Amounts, if any, to (but excluding) the date of redemption.

7. *Optional Redemption for Equity Offerings*

Prior to December 21, 2024, the Issuer may, at its option, on any one or more occasions redeem up to 40.000% of the aggregate principal amount of the Securities (calculated after giving effect to any issuance of Additional Securities) with the aggregate Net Proceeds of one or more Equity Offerings, at a redemption price equal to 100.000% of the principal amount thereof, plus any accrued and unpaid interest on the Securities (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date) and Additional Amounts, if any, to (but excluding) the date of redemption; *provided* that: (a) after giving effect to any such redemption at least 60.000% of the original aggregate principal amount of the Securities (calculated after giving effect to any issuance of Additional Securities) remains outstanding after each such redemption; and (b) such redemption occurs within 90 days after the closing of such Equity Offering.

8. *Tax Redemption*

The Issuer may redeem the Securities, in whole but not in part, at a redemption price equal to 100.000% of the principal amount thereof, plus accrued and unpaid interest on the Securities (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date) and Additional Amounts, if any, to (but excluding) the redemption date, if as a result of:

(a) any amendment to, or change in, the laws or treaties (or any regulations or rulings promulgated thereunder) of a Relevant Jurisdiction; or

(b) any amendment to or change in an official interpretation or application regarding such laws, treaties, regulations or rulings (including a determination by a court of competent jurisdiction),

which amendment or change becomes effective on or after the Issue Date (or, in the case of a jurisdiction that becomes a Relevant Jurisdiction after the Issue Date, on or after the date such jurisdiction becomes a Relevant Jurisdiction), (i) the Issuer has become or would become obligated to pay, on the next date on which any amount would be payable with respect to the Securities, any Additional Amounts and (ii) the Issuer determines in good faith that such obligation cannot be avoided by the use of reasonable measures available to the Issuer (including making payment through a paying agent located in another jurisdiction, to the extent such measure would be a reasonable measure in light of the circumstances); *provided* that:

(c) no notice of redemption pursuant to this provision may be given earlier than 60 days prior to the earliest date on which the Issuer would be obligated to pay such Additional Amounts were a payment in respect of the Securities then due and payable, and

(d) at the time such notice is given, such obligation to pay such Additional Amounts remains in effect.

Immediately prior to the delivery of any notice of redemption to the Holders pursuant to this provision, the Issuer shall deliver to the Trustee:

(e) an Officer's Certificate (A) stating that the Issuer is entitled to effect such redemption, (B) setting forth a statement of facts showing that the conditions precedent relating to the right of the Issuer to so redeem have occurred, and (C) stating that all governmental approvals, if any, necessary to effect such redemption have been obtained and are in full force and effect; and

(f) an opinion of recognized counsel in the Relevant Jurisdiction to the effect that (A) the Issuer has or will become obligated to pay such Additional Amounts as a result of such amendment or change and (B) all governmental approvals, if any, necessary to effect such redemption have been obtained and are in full force and effect.

Any notice of redemption pursuant to this Article 7 shall be irrevocable.

9. *Mandatory Cash Sweep Redemption*

Within 60 days following the date of publication of the audited annual consolidated financial statements (including the notes thereto) of the Company, which shall be prepared in accordance with IFRS and presented in the English language, together with a report thereon by the Company's certified independent public accountants, the Issuer shall apply or cause to be applied an amount equal to the U.S. dollar equivalent of the amount of Unrestricted Cash on the

balance sheet of the Company as of the end of the fiscal year in excess of R$350 million to redeem the Securities pursuant to this Section 3.08 and Article 1 hereof at a redemption price equal to 100.000% of the aggregate principal amount of the Securities being redeemed, plus any accrued and unpaid interest on the Securities (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date) and Additional Amounts, if any, to (but excluding) the date of redemption. The Issuer shall provide Trustee and each Holder of a Security to be redeemed with a notice pursuant to Section 3.02 of this Indenture, certified by the Company's chief financial officer, which, in addition to the information required by such Section 3.02, shall (i) provide the Company's calculations to determine the amount of Unrestricted Cash applied in such redemption, and (ii) confirm that such redemption complies with the terms of this Indenture.

10. *Put Provisions*

Upon a Change of Control, any Holder shall have the right to cause the Issuer to repurchase all or any part (in integral multiples of US$1.00 in excess of US$1.00) of the Securities of such Holder at a repurchase price equal to 100.000% of the aggregate principal amount of the Securities to be repurchased plus accrued and unpaid interest and Additional Amounts, if any, to the date of repurchase, as provided in, and subject to the terms of, the Indenture. No such purchase shall reduce the outstanding principal amount of the Securities held by any Holder to less than US$1.00.

11. *Guarantees; Collateral*

The payment by the Issuer of the principal of, and premium (if any) and interest on, the Securities shall be fully and unconditionally Guaranteed on a joint and several basis by the Guarantors (subject, in the case of Zagope, to the Zagope Guarantee Limit), to the extent set forth in the Indenture. The due and punctual payment of the principal of, premium (if any), and interest on, the Securities and the payment and performance of all other obligations of the Issuer and the Guarantors, according to the terms hereunder and under the Indenture, the Guarantees and under the Collateral Agreements, are secured as provided in the Indenture and in the Collateral Agreements.

12. *Denominations; Transfer; Exchange*

The Securities shall be issued in registered form in minimum denominations of US$1.00 and any integral multiple of US$1.00 in excess thereof and shall be issued as one or more Global Securities. A Holder may transfer or exchange Securities in accordance with the Indenture. The Securities may be transferred, combined or divided without payment of any charge other than taxes or other governmental charges. The Registrar may require a Holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes and fees required by law or permitted by the Indenture. The Registrar need not register the transfer of or exchange any Securities selected for redemption for fifteen (15) days before an Interest Payment Date.

13. *Persons Deemed Owners*

The registered Holder of this Security may be treated as the owner of it for all purposes; *provided* that payments of interest shall be made to the Person in whose name a Security is registered at the close of business on the applicable Record Date.

14. *Unclaimed Money*

If money for the payment of principal, premium or interest or Additional Amounts, if any, remains unclaimed for two years, the Trustee or the relevant Paying Agent shall pay the money back to the Issuer or the Company at their written request unless an applicable abandoned property law designates another Person. After any such payment, Holders entitled to the money must look only to the Issuer and not to the Trustee for payment.

15. *Discharge; Defeasance*

Subject to certain conditions set forth in Article 8 in the Indenture, the Issuer shall be entitled to terminate some or all of its obligations under the Securities and the Indenture if the Issuer deposits with the Trustee cash and/or U.S. Government Obligations for the payment of principal and interest on the Securities upon redemption or maturity, as the case may be.

16. *Amendment, Waiver*

Subject to certain exceptions set forth in the Indenture, (a) the Indenture and the Securities may be amended without notice to any Holder but with the written consent of the Holders of at least a majority in aggregate principal amount of the outstanding Securities and (b) any default or noncompliance with any provision may be waived with the written consent of the Holders of a majority in aggregate principal amount of the outstanding Securities.

Subject to certain exceptions set forth in the Indenture, without the consent of any Securityholder, the Issuer, the Guarantors, the Trustee and the Collateral Agent may amend the Indenture, the Guarantees or the Securities to cure any ambiguity, omission, defect or inconsistency, or to provide for the assumption by a Successor Issuer, Successor Company or a Substituted Debtor of the obligations of the Issuer, the Company or a Guarantor, as applicable, under the Indenture, the Securities and/or the Guarantees; or to add additional Guarantees with respect to the Securities; or to add additional security with respect to the Securities; or to add to the covenants of the Issuer, the Company or the Restricted Subsidiaries for the benefit of the Holders or surrender rights or powers conferred upon the Issuer, the Company or the Restricted Subsidiaries; or to make any change that does not adversely affect the rights of the Holders in any material respect; or to provide for the appointment of a successor Trustee with respect to the Securities; provided that the successor Trustee is otherwise qualified and eligible to act as such under the term of the Indenture.

17. *Defaults and Remedies*

Under the Indenture, Events of Default include: (a) default for 30 days in payment of any interest or Additional Amounts on the Securities; (b) default in payment of principal of or premium, if any, on the Securities, upon optional redemption, upon required purchase, upon declaration of acceleration, or otherwise; (c) failure by the Issuer or the Company to comply with Article 5 or Section 4.23(8) of the Indenture; (d) default in the performance, or breach, of any

other covenant or obligation of the Issuer, the Guarantors or any Restricted Subsidiary in this Indenture and continuance of such default or breach for a period of 30 consecutive days after written notice specifying such default or breach is given to the Company by the Trustee or to the Company and the Trustee by the Holders of at least 25% in aggregate principal amount of then outstanding Securities; (f) any final judgment or order for the payment of money in excess of US$35,000,000 (or its equivalent in other currencies at the time of determination) is rendered against the Company, AGPAR or any Significant Subsidiary and such judgment or order is not paid (whether in full or if there is a failure to pay installments in accordance with the terms of the judgment aggregating in excess of US$35,000,000) or otherwise discharged and remains unstayed for a period of 30 days after such judgment becomes final and non-appealable; (g) events of bankruptcy or insolvency with respect to the Issuer, the Company, AGIE, AGPAR or any Significant Subsidiary; (h) any Guarantee of the Guarantors ceases to be in full force and effect, other than in accordance with the terms of the Indenture, or the Guarantors deny or disaffirm its obligations under the Securities; (i) all or substantially all of the assets and revenues of the Issuer, the Company and the Restricted Subsidiaries, taken as a whole, is condemned, seized or otherwise appropriated by any Person acting under the authority of any national, regional or local government or the Issuer, the Company or any Significant Subsidiary is prevented by any such Person for a period of 60 consecutive days or longer from exercising normal control over all or substantially all of the assets and revenues of the Issuer, the Company and the Restricted Subsidiaries, taken as a whole; (j) failure by the Issuer, the Company, AGIE or AGPAR, as applicable, to perfect the fiduciary sale (*alienação fiduciária*) of the AGE Collateral and the pledge of the Inzag Collateral as a first priority security interest in favor of the Collateral Agent for the benefit of the Holders within 90 days from the Issue Date; (k) except as expressly permitted by the Indenture and the Collateral Agreements, any of the Collateral Agreements shall for any reason cease to be in full force and effect or, after becoming effective, fails to provide the Collateral Agent with the Liens purported to be created thereby, and such default continues for 30 days or the Issuer, the Company, any Restricted Subsidiary, AGIE or AGPAR shall so assert, or any security interest created, or purported to be created, by any of the Collateral Agreements shall cease to be enforceable; or (l) any Affiliate of the Company (other than Inzag) that is not a Restricted Subsidiary, directly or indirectly, develops a Similar Business and such event is not remedied within 60 days from the date that the Company or Inzag becomes aware of the development of such Similar Business by such Affiliate.

If an Event of Default (other than an Event of Default specified in Section 6.01(g) or (h) of the Indenture) occurs and is continuing, either the Trustee or the Holders of at least 25% in aggregate principal amount of the outstanding Securities, by written notice to the Company (and to the Trustee if notice is given by the Holders), may declare all the Securities to be due and payable immediately. Certain events of bankruptcy or insolvency are Events of Default which will result in the Securities being due and payable immediately upon the occurrence of such Events of Default.

Securityholders may not enforce this Indenture or the Securities except as provided in this Indenture. Each of the Trustee and the Collateral Agent may refuse to enforce this Indenture or the Securities unless it receives indemnity or security reasonably satisfactory to it. Subject to certain limitations, Holders of a majority in aggregate principal amount of the outstanding Securities may direct the Trustee in its exercise of any trust or power. The Trustee may withhold

from Securityholders notice of any continuing Default (except a Default in payment of principal or interest) if it determines that withholding notice is in the interests of the Holders.

18. *Trustee Dealings with the Issuer and the Company*

Subject to certain limitations imposed by the TIA, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Securities and may otherwise deal with and collect obligations owed to it by the Issuer, the Guarantors or their Affiliates and may otherwise deal with the Issuer, the Guarantors or their Affiliates with the same rights it would have if it were not Trustee.

19. *No Recourse Against Others*

A director, officer, employee or shareholder, as such, of the Issuer, the Guarantors, AGPAR, and a director, officer or employee of any Subsidiary of the Company, shall not have any liability for any obligations of the Issuer, the Guarantors, and AGPAR or any Subsidiary of the Issuer, the Guarantors, or AGPAR under the Securities or the Indenture or the Guarantees or for any claim based on, in respect of or by reason of such obligations or their creation. By accepting any Security, each Securityholder thereof waives and releases all such liability. The waiver and release are part of the consideration for the issue of the Securities.

20. *Authentication*

This Security shall not be valid until an authorized signatory of the Trustee (or an authenticating agent) manually signs the certificate of authentication on the other side of this Security.

21. *Abbreviations*

Customary abbreviations may be used in the name of a Securityholder or an assignee, such as TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (= custodian), and U/G/M/A (= Uniform Gift to Minors Act).

22. *CUSIP Numbers, Common Codes and ISINs*

Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP numbers, Common Codes or ISINs to be printed on the Securities and has directed the Trustee to use CUSIP numbers, Common Codes or ISINs in notices of redemption as a convenience to Securityholders. No representation is made as to the accuracy of such numbers either as printed on the Securities or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

23. *Governing Law; Consent to Jurisdiction and Service of Process*

THIS SECURITY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

The provisions of articles 470-1 to 470-19 of the Luxembourg law of 10 August 1915 on commercial companies, as amended, are excluded with respect to the Securities.

Each of the Issuer and the Guarantors has consented to the non-exclusive jurisdiction of the courts of the State of New York and the United States courts located in the Borough of Manhattan, New York City, New York with respect to any action that may be brought in connection with the Indenture, the Securities or the Guarantees (whether in contract, tort or otherwise) and has irrevocably appointed CCS Global Solutions, Inc. as agent for service of process.

The Issuer shall furnish to any Securityholder upon written request and without charge to the Securityholder a copy of the Indenture which has in it the text of this Security in larger type. Requests may be made to:

Andrade Gutierrez Engenharia S.A.
Rua do Passeio, 38, 14th floor - Centro
Rio de Janeiro, RJ, 20021-290
Brazil
Att: Gustavo Braga Mercher Coutinho

with copies to:

Andrade Gutierrez International S.A.
12C, rue Guillaume Kroll,
L-1882
Luxembourg
Att: Gustavo Braga Mercher Coutinho

**[FORM OF] ASSIGNMENT FORM**

To assign this Security, fill in the form below:

I or we assign and transfer this Security to

____________________________________________________________

(Insert assignee’s soc. sec. or tax I.D. no.)

______________________________________________

______________________________________________

______________________________________________

______________________________________________

(Print or type assignee’s name, address and zip code)

and irrevocably appoint

______________________________________________

Agent, to transfer this Security on the books of the Issuer. (The agent may substitute another to act for him or her.)

Your Signature:

Date: ____________________ _____________________________________

(Sign exactly as your name appears on the other side of this Security)

*Signature guaranteed by:

By: __________________________________

* The signature must be guaranteed by an institution which is a member of one of the following recognized signature guaranty programs: (i) the Securities Transfer Agent Medallion Program (STAMP); (ii) the New York Stock Exchange Medallion Program (MSP); (iii) the Stock Exchange Medallion Program (SEMP); or (iv) such other guaranty program acceptable to the Trustee.

[TO BE ATTACHED TO GLOBAL SECURITIES] SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY

The initial principal amount of this Global Security is US$[ ]. The following increases or decreases in this Global Security have been made:

| Date of Increase or Decrease | Amount of decrease in principal amount of this Global Security | Amount of increase in principal amount of this Global Security | Principal amount of this Global Security following such decrease or increase | Signature of authorized officer of Trustee or Securities Custodian |
|---|---|---|---|---|

## [FORM OF] OPTION OF SECURITYHOLDER TO ELECT PURCHASE

If you elect to have this Security purchased by the Issuer pursuant to Section 4.07 or Section 4.22 of the Indenture, check the box below:

☐

If you elect to have only part of this Security purchased by the Issuer pursuant to Sections 4.07 or 4.22 of the Indenture, state the amount (in minimum denominations of US$1.00 and integral multiples of US$1.00 in excess thereof) you elect to have purchased:

US$ ________________________

Dated:

Your Name:

____________________________________
(Print your name exactly as it appears on the face of this Security)

Your Signature:

_________________________________
(Sign exactly your name appears on the face of this Security)

Signature Guarantee:

_____________________________

Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

EXHIBIT 2
to
QIB/ACCREDITED INVESTOR/REGULATION S APPENDIX

FORM OF NOTATION OF GUARANTEE

For value received, Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Investimentos em Engenharia S.A., AG Construções e Serviços S.A., Zagope SGPS, S.A. and INZAG Germany GmbH (collectively, together with any of their respective successor Persons under the Indenture, the "**Guarantors**") have unconditionally guaranteed (except, in the case of Zagope SGPS, S.A., up to the Zagope Guarantee Limit), to the extent set forth in the Indenture and subject to the provisions of the Indenture dated as of December 21, 2022 (as amended from time to time, the "**Indenture**"), among the Andrade Gutierrez International S.A. (the "**Issuer**"), the Guarantors, Wilmington Savings Fund Society, FSB, as Trustee, Registrar, Transfer Agent and Paying Agent and TMF Group New York, LLC, as Collateral Agent, the full and punctual payment (whether upon redemption, acceleration, or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Security, and the full and punctual payment of all other amounts payable by the Issuer under the Indenture. The obligations of the Guarantors to the Securityholders and to the Trustee pursuant to the Guarantees and the Indenture are expressly set forth in Article 10 of the Indenture and reference is hereby made to the Indenture for the precise terms of the Guarantees. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Indenture.

IN WITNESS WHEREOF, the Guarantors have caused this notation of guaranty to be duly executed.

**ANDRADE GUTIERREZ ENGENHARIA S.A.**
**as Guarantor**

By: ______________________________
Name:
Title:

By: ______________________________
Name:
Title:

**ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A. as Guarantor**

By: ______________________________
Name:
Title:

By: ______________________________
Name:
Title:

**AG CONSTRUÇÕES E SERVIÇOS S.A., as Guarantor**

By: ______________________________
Name:
Title:

By: ______________________________
Name:
Title:

**ZAGOPE SGPS, S.A., as Guarantor**

By: ______________________________
Name:
Title:

By: ______________________________
Name:
Title:

**INZAG Germany GmbH, as Guarantor**

By: ______________________________
Name:
Title:

By: ______________________________
Name:
Title:

EXHIBIT 3
to
REGULATION S APPENDIX

FORM OF CERTIFICATE TO BE DELIVERED
IN CONNECTION WITH TRANSFERS
PURSUANT TO REGULATION S

[Date]

Andrade Gutierrez International S.A.
12C, rue Guillaume Kroll,
L-1882
Luxembourg
Att: Gustavo Braga Mercher Coutinho

Wilmington Savings Fund Society, FSB
500 Delaware Avenue
Wilmington, DE 19801
Attn: WSFS Institutional Services

Re: Andrade Gutierrez International S.A. (the "**Issuer**")
9.000%/10.500% Senior Secured PIK Toggle Notes due 2029
CUSIP No. [03439T AH4] [ ]
ISIN: [USL01795AG50] [ ]

Ladies and Gentlemen:

Reference is hereby made to the Indenture (the "**Indenture**") dated as of December 21, 2022 by and among Andrade Gutierrez International S.A., as the issuer (the "**Issuer**"), Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Investimentos em Engenharia S.A., AG Construções e Serviços S.A., Zagope SGPS, S.A., INZAG Germany GmbH, Wilmington Savings Fund Society, FSS, as Trustee, Registrar, Transfer Agent and Paying Agent, and TMF Group New York, LLC, as Collateral Agent. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Indenture.

This letter relates to US$ aggregate principal amount of the Issuer's 9.000%/10.500% Senior Secured PIK Toggle Notes due 2029 (the "**Securities**") which are held in the form of a beneficial interest in the [Restricted Global Security][Accredited Investor Global Security] (CUSIP: No.: [03439T AH4] [ ]; ISIN: [US03439TAH41] [ ]);) with the Depositary in the name of the undersigned.

The undersigned has requested transfer of such Securities to a Person who will take delivery thereof in the form of a beneficial interest in the Regulation S Global Security (CUSIP No.: L01795 AG5; ISIN: USL01795AG50;). In connection with such transfer, the undersigned confirms that such transfer has been effected pursuant to and in accordance with

Regulation S under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), and, accordingly, the undersigned represents that:

(1) the offer of the Securities was not made to a Person in the United States;

(2) either (a) at the time the buy offer was originated, the transferee was outside the United States or the undersigned and any Person acting on the undersigned's behalf reasonably believed that the transferee was outside the United States, or (b) the transaction was executed in, on or through the facilities of a designated off shore securities market and neither the undersigned nor any Person acting on the undersigned's behalf knows that the transaction has been pre-arranged with a buyer in the United States;

(3) no directed selling efforts have been made in the United States in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S, as applicable;

(4) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act;

(5) the undersigned has advised the transferee of the transfer restrictions applicable to the Securities;

(6) if the circumstances set forth in Rule 904(c) under the Securities Act are applicable, the undersigned has complied with the additional conditions therein, including (if applicable) sending a confirmation or other notice stating that the Securities may be offered and sold during the restricted period specified in Rule 903(c)(2) or (3), as applicable, in accordance with the provisions of Regulation S; pursuant to registration of the Securities under the Securities Act; or pursuant to an available exemption from the registration requirements under the Securities Act; and

(7) if the sale is made during a restricted period and the provisions of Rule 903(c)(3) are applicable thereto, the undersigned confirms that such sale has been made in accordance with such provisions.

You and the Issuer are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.

Very truly yours,

[Name of Transferor]

By: ________________________________
Authorized Signature

Signature Guarantee*: ____________________

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

EXHIBIT 4
to
QIB/ACCREDITED INVESTOR/REGULATION S APPENDIX

FORM OF TRANSFER CERTIFICATE FOR
TRANSFER OF RESTRICTED GLOBAL SECURITY
BEARING A RESTRICTED SECURITIES LEGEND

[Date]

Andrade Gutierrez International S.A.
12C, rue Guillaume Kroll,
L-1882
Luxembourg
Att: Gustavo Braga Mercher Coutinho

Wilmington Savings Fund Society, FSB
500 Delaware Avenue
Wilmington, DE 19801
Attn: WSFS Institutional Services

Re: Andrade Gutierrez International S.A.
9.000%/10.500% Senior Secured PIK Toggle Notes due 2029
CUSIP No. L01795 AG5
ISIN: USL01795AG50

Ladies and Gentlemen:

Reference is hereby made to the Indenture (the "**Indenture**") dated as of December 21, 2022 by and among Andrade Gutierrez International S.A., as the issuer (the "**Issuer**"), Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Investimentos em Engenharia S.A., AG Construções e Serviços S.A., Zagope SGPS, S.A., INZAG Germany GmbH, Wilmington Savings Fund Society, FSB, as trustee, registrar, transfer agent and paying agent, and TMF Group New York, LLC, as Collateral Agent. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Indenture.

This letter relates to US$ aggregate principal amount of the Issuer's 9.000%/10.500% Senior Secured PIK Toggle Notes due 2029 (the "**Securities**") which are held in the form of a beneficial interest in the Regulation S Global Security (CUSIP No. L01795 AG5; ISIN: USL01795AG50) with the Depositary in the name of the undersigned.

The undersigned has requested transfer of such Securities to a Person who will take delivery thereof in the form of a beneficial interest in the [Restricted Global Security][Accredited Investor Global Security] (CUSIP No. [03439T AH4][ ]; ISIN: [US03439TAH41][ ]). In connection with such transfer, the undersigned does hereby confirm that such transfer has been effected in accordance with the transfer restrictions set forth in the Indenture and on the

Securities and pursuant to and in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended, and accordingly, the undersigned represents that:

1. the Securities are being transferred to a transferee that the undersigned reasonably believes is purchasing the Securities for its own account or one or more accounts with respect to which the transferee exercises sole investment discretion; and

2. the undersigned (a) reasonably believes that the transferee and any such account is a qualified institutional buyer or an accredited investor purchasing this security for its own account or for the account of one or more qualified institutional buyers or accredited investors, as applicable, (b) agrees to offer, sell or otherwise transfer the Securities, prior to the date, or the resale restriction termination date, which is one year after the later of the Issue Date and the last date on which the Issuer or any affiliate of the Issuer was the owner of the Securities (or any predecessor of the Securities), only (i) to the Issuer or any Affiliate thereof, (ii) pursuant to a registration statement that has been declared effective under the Securities Act, (iii) for so long as the Securities are eligible for resale pursuant to Rule 144A, to a Person it reasonably believes is a "**qualified institutional buyer**" purchasing for its own account or for the account of a qualified institutional buyer to whom notice is given that the transfer is being made in reliance on Rule 144A, (iv) pursuant to offers and sales that occur outside the United States in compliance with Rule 903 or 904 under Regulation S under the Securities Act, (v) to an "**accredited investor**" within the meaning of Rule 501(a) of Regulation D under the Securities Act, and (vi) pursuant to another available exemption from the registration requirements of the Securities Act, in each case in accordance with all applicable securities laws of the states of the United States or any other applicable jurisdiction; and (c) agrees that it will deliver to each Person to whom the Securities are being transferred a notice substantially to the effect of this paragraph.

[NAME OF TRANSFEROR]

By: ________________________________
Name:
Title:

Dated: _______________________

Signature Guarantee*: _________________

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

APPENDIX B

FORM OF CERTIFICATION OF BENEFICIAL OWNERSHIP
EXECUTION BY NOMINEE, ADVISOR OR AGENT

Record Date: [●]

The undersigned signatory hereby represents and warrants to the Trustee as of both the date of the signature below and the date of delivery hereof to the Trustee that (i) [the person identified as nominee, advisor or other authorized agent ("**Agent**") is the Agent for the Beneficial Owner identified below with respect to] or [the undersigned is the Beneficial Owner of] the indenture securities identified below (the "**Notes**"), (ii) as of the Record Date the Beneficial Owner owned the Notes; (iii) [the Agent has the power and authority to execute and deliver this Certification to the Trustee on behalf of such Beneficial Owner, (iv) the undersigned is duly authorized to sign and deliver this Certification to the Trustee so as to bind the Agent, and (v)] the Trustee may conclusively rely upon this Certification.

**ISIN Number of Notes**: ____________________
Current Principal Amount of Notes Beneficially Owned on Record Date: ____________
DTC Participant through whom Notes are held: ____________________
DTC Participant No.: ____________________

**Name of Agent**: ____________________
Address: ____________________
Contact Person Name: ____________________
Phone: ____________; Fax: ___________; E-mail: ____________________
Name of entity (if any) required to act on behalf of Agent: ____________________
Capacity of such entity: ____________________

**Signature**: ____________________
Name: ____________________
Title: ____________________
Date:
____________________
____________________

Signature Guarantee*:

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

**OR**

_____________*OF*_________________)
) *SS*:

____________*OF*________________)

On , 20 , before me, Notary Public, personally appeared , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that, by his/her/their signature(s), bound the entity on whose behalf such person(s) executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

______________________________
Notary Public

# **Exhibit B**

# **2040 Indenture**

**ANDRADE GUTIERREZ INTERNATIONAL S.A.,**
**as Issuer**

**ANDRADE GUTIERREZ ENGENHARIA S.A.,**
**as Guarantor, and**

**WILMINGTON SAVINGS FUND SOCIETY, FSB, as Trustee, Registrar, Transfer Agent**
**and Paying Agent**

**and**

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.,**
**as Collateral Agent**

---

# INDENTURE

**Dated as of December 21, 2022**

---

**1.000% PIK TOGGLE NOTES DUE 2040**

# TABLE OF CONTENTS

PAGE

ARTICLE 1
DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01 Definitions....1
SECTION 1.02 Incorporation by Reference of Trust Indenture Act....11
SECTION 1.03 Rules of Construction....12

ARTICLE 2
THE SECURITIES

SECTION 2.01 Form and Dating....13
SECTION 2.02 Execution and Authentication; Additional Securities....14
SECTION 2.03 Registrar, Paying Agents and Transfer Agents....15
SECTION 2.04 Paying Agent To Hold Money in Trust....16
SECTION 2.05 Securityholder Lists....16
SECTION 2.06 Transfer and Exchange....17
SECTION 2.07 Replacement Securities....18
SECTION 2.08 Outstanding Securities....18
SECTION 2.09 Temporary Securities....19
SECTION 2.10 Cancellation....19
SECTION 2.11 CUSIP Numbers, Common Codes and ISINs....19

ARTICLE 3
REDEMPTION

SECTION 3.01 Notices to Trustee....19
SECTION 3.02 Notice of Redemption....20
SECTION 3.03 Effect of Notice of Redemption....21
SECTION 3.04 Optional Redemption....21
SECTION 3.05 Optional Redemption for Equity Offerings....21
SECTION 3.06 Tax Redemption....21
SECTION 3.07 Deposit of Redemption or Purchase Price....22
SECTION 3.08 Open Market Purchases....23

ARTICLE 4
COVENANTS

SECTION 4.01 Performance of Obligations Under the Securities....23
SECTION 4.02 Maintenance of Corporate Existence....23
SECTION 4.03 Appointment of the Trustee or the Collateral Agent....23
SECTION 4.04 Ranking....24
SECTION 4.05 Further Actions....24
SECTION 4.06 Substitution of the Issuer....24

ARTICLE 5
CONSOLIDATION, MERGER, CONVEYANCE, SALE OR LEASE

SECTION 5.01 Consolidation, Merger, Conveyance, Sale or Lease ..........25

ARTICLE 6
DEFAULTS AND REMEDIES

SECTION 6.01 Events of Default ..........26
SECTION 6.02 Notice of Default; Acceleration ..........27
SECTION 6.03 Control by Majority ..........27
SECTION 6.04 Limitation on Suits; Rights of Holders to Receive Payments ..........28
SECTION 6.05 Other Remedies ..........29
SECTION 6.06 Collection Suit by Trustee ..........29
SECTION 6.07 Trustee or Collateral Agent May File Proofs of Claim ..........29
SECTION 6.08 Priorities ..........29
SECTION 6.09 Undertaking for Costs ..........30
SECTION 6.10 Waiver of Stay or Extension Laws ..........30

ARTICLE 7
TRUSTEE

SECTION 7.01 Duties of Trustee ..........30
SECTION 7.02 Rights of Trustee ..........31
SECTION 7.03 Individual Rights of Trustee ..........33
SECTION 7.04 Trustee’s Disclaimer ..........33
SECTION 7.05 Notice of Defaults ..........33
SECTION 7.06 Compensation and Indemnity ..........34
SECTION 7.07 Replacement of Trustee ..........35
SECTION 7.08 Successor Trustee by Merger ..........36
SECTION 7.09 Eligibility; Disqualification ..........36
SECTION 7.10 Preferential Collection of Claims Against Issuer ..........37
SECTION 7.11 Appointment of Co-Trustee ..........37

ARTICLE 8
DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 8.01 Satisfaction and Discharge of Liability on Securities ..........38
SECTION 8.02 Application of Trust Money ..........39
SECTION 8.03 Repayment to Issuer ..........39
SECTION 8.04 Reinstatement ..........39
SECTION 8.05 Defeasance ..........39
SECTION 8.06 Indemnity for U.S. Government Obligations ..........40

ARTICLE 9
AMENDMENTS

SECTION 9.01 Without Consent of Holders ..........40

SECTION 9.02 With Consent of Holders....41
SECTION 9.03 Revocation and Effect of Consents and Waivers....42
SECTION 9.04 Notation on or Exchange of Securities....43
SECTION 9.05 Trustee to Sign Amendments....43

ARTICLE 10
GUARANTEE

SECTION 10.01 Guarantee....43
SECTION 10.02 Guarantee Unconditional....44
SECTION 10.03 Discharge and Reinstatement; Guarantor Release....44
SECTION 10.04 Waiver by the Guarantor....45
SECTION 10.05 Subrogation and Contribution....45
SECTION 10.06 Stay of Acceleration....45
SECTION 10.07 Execution and Delivery of Guarantee....46
SECTION 10.08 Purpose of Guarantee....46

ARTICLE 11
COLLATERAL

SECTION 11.01 Security Interest....46
SECTION 11.02 The Conditional AGE Collateral....47
SECTION 11.03 Further Assurances....47
SECTION 11.04 Release of Liens in Respect of Securities....48
SECTION 11.05 Collateral Agent....48
SECTION 11.06 Trustee....52

ARTICLE 12
RESIGNATION AND REMOVAL OF A COLLATERAL AGENT

SECTION 12.01 Resignation or Removal of Collateral Agent....54
SECTION 12.02 Appointment of Successor Collateral Agent....54
SECTION 12.03 Succession....55
SECTION 12.04 Merger, Conversion or Consolidation of Collateral Agent....55

ARTICLE 13
MISCELLANEOUS

SECTION 13.01 Notices....55
SECTION 13.02 Communication by Holders with Other Holders....57
SECTION 13.03 Certificate and Opinion as to Conditions Precedent....57
SECTION 13.04 Statements Required in Certificate or Opinion....57
SECTION 13.05 Rules by Trustee, Paying Agents and Registrar....58
SECTION 13.06 Legal Holidays....58
SECTION 13.07 Governing Law....58
SECTION 13.08 Successors....58
SECTION 13.09 Multiple Originals....58
SECTION 13.10 Table of Contents; Headings....58

SECTION 13.11 Consent to Jurisdiction; Appointment of Agent to Accept Service of Process; Currency Indemnity ....58
SECTION 13.12 Waiver of Jury Trial ....60
SECTION 13.13 Severability ....60
SECTION 13.14 Regarding the Paying Agent ....60
SECTION 13.15 U.S.A. Patriot Act ....61

SCHEDULES, APPENDIX AND EXHIBITS:

QIB/Accredited Investor/Regulation S Appendix

| | |
|---|---|
| Exhibit 1 to QIB/Accredited Investor/Regulation S Appendix | Form of Security |
| Exhibit 2 to QIB/Accredited Investor/Regulation S Appendix | Form of Notation of Guarantee |
| Exhibit 3 to QIB/Accredited Investor/Regulation S Appendix | Form of Regulation S Transfer Certificate |
| Exhibit 4 to QIB/Accredited Investor/Regulation S Appendix | Form of Restricted Securities Legend Transfer Certificate |

INDENTURE dated as of December 21, 2022 among Andrade Gutierrez International S.A. (the "Issuer"), a public limited liability company (*société anonyme*) incorporated in the Grand Duchy of Luxembourg, with registered office at 12C, rue Guillaume Kroll, L-1882 Luxembourg and registered with the Luxembourg Register of Commerce and Companies under number B-176492, Andrade Gutierrez Engenharia S.A., a corporation (*sociedade por ações*) incorporated in the Federative Republic of Brazil, as guarantor (the "Guarantor," or the "Company"), and Wilmington Savings Fund Society, FSB, a national banking association, as trustee (the "Trustee"), registrar, transfer agent and paying agent, and TMF Brasil Administração e Gestão de Ativos Ltda., as collateral agent (the "Collateral Agent").

Each party agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the Holders (as defined herein) of the Securities (as defined herein):

## ARTICLE 1

## DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01 Definitions.

"Additional Securities" means the 1.000% PIK Toggle Notes due 2040 of the Issuer (other than the Initial Securities) issued in accordance with Section 2.02 hereof.

"Affiliates" of any specified Person means any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control," when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Conditional AGE Collateral" has the meaning set forth in Section 11.02 hereof.

"AGE Shares" means all of the outstanding common shares of the Company, owned by AGIE, currently representing 99.9% of the Company's Capital Stock, and currently amounting to 2,631,715,936 outstanding commons shares of the Company.

"Agent" means each of the Paying Agent, the Transfer Agent, the Registrar, any co-registrar, the Collateral Agent and any other agent appointed pursuant to this Indenture.

"AGIE" means Andrade Gutierrez Investimentos em Engenharia S.A., a corporation (*sociedade por ações*) incorporated and existing under the laws of Brazil, enrolled at the National Taxpayers Registration (CNPJ/ME) under No. 17.027.611/0001-26.

"AGPAR" means Andrade Gutierrez Participações S.A., a corporation (*sociedade por ações*) incorporated and existing under the laws of Brazil enrolled at the National Taxpayers Registration (CNPJ/ME) under No. 04.031.960/0001-70.

"Appendix" has the meaning set forth in Section 2.01 hereof.

"Bankruptcy Custodian" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

"Bankruptcy Law" means any bankruptcy, insolvency, reorganization or similar laws for the relief of debtors or any debt relief or debt restructuring law worldwide, including, without limitation, Brazilian Federal Law No. 11.101/2005, as amended from time to time, articles 437 to 592 of the Luxembourg Commercial Code, the relevant provisions of the Law dated 10 August 1915, as amended, on commercial companies, the relevant provisions of the Civil Code, other proceedings listed at Article 13, items 2 to 11, 13 of the Luxembourg Act dated December 19, 2002, as amended, on the Register of Commerce and Companies, Regulation (EU) No. 2015/848 of 20 May 2015 on insolvency proceedings (or any similar Luxembourg law) or any similar foreign law, as applicable, for the relief of debtors and the U.S. Bankruptcy Code. Furthermore, and for the avoidance of doubt, any scheme of arrangement or *recuperação extrajudicial* or *judicial* shall be deemed to have occurred under a Bankruptcy Law for all purposes herein.

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act. The terms "Beneficially Owns" and "Beneficially Owned" have corresponding meanings.

"Board of Directors" means, with respect to any Person, the board of directors of such Person or any committee thereof duly authorized to act on behalf of the board of directors of such Person, or similar governing body of such Person, including any managing partner or similar entity of such Person.

"Brazil" means The Federative Republic of Brazil and any branch of power, ministry, department, authority or statutory corporation or other entity (including a trust) owned or controlled directly or indirectly by it or any of the foregoing or created by law as a public entity.

"Business Day" means each day that is not a Saturday, Sunday or other day on which banking institutions in New York City, New York; Wilmington, Delaware or São Paulo, Brazil are authorized or required by law to close.

"Capital Expenditures" means, for any Person, the aggregate amount of all expenditures of such Person for fixed or capital assets made during such period which, in accordance with IFRS, would be classified as capital expenditures.

"Capital Stock" of any Person means any and all quotas, shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such Person, including any Preferred Stock and partnership interests, but excluding any debt securities convertible into such equity.

"Capitalized Lease Obligation" means an obligation that is required to be classified and accounted for as a capitalized lease for financial reporting purposes and the amount of Indebtedness represented by such obligation shall be the capitalized amount of such obligation; and the Stated Maturity thereof shall be the date of the last payment of rent or any

other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty.

"Central Bank" means the Brazilian Central Bank (*Banco Central do Brasil*).

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Collateral" means the Conditional AGE Collateral.

"Collateral Agent" means TMF Brasil Administração e Gestão de Ativos Ltda.

"Collateral Agreement" means the collateral agreement to be entered into on the Issue Date by and among the Issuer, AGIE, the Company, and the Collateral Agent, for the benefit of the Holders of the Securities.

"Collateral Provider" means AGIE.

"Company" or "AGE" means Andrade Gutierrez Engenharia S.A., a corporation (*sociedade por ações*) incorporated and existing under the laws of Brazil and enrolled at the National Taxpayers Registration (CNPJ/ME) under No. 17.262.213/0001-94, and its successors, excluding its Subsidiaries.

"Corporate Trust Office" means the designated office of the Trustee at which at any particular time its corporate trust business shall be administered (which office as of the date of this Indenture is located at 500 Delaware Avenue, Wilmington, DE 19801, Attn: WSFS Institutional Services).

"Default" means any event which is an Event of Default or which, after notice or passage of time or both, would be an Event of Default.

"Depositary" means, with respect to the Securities issuable or issued in whole or in part in the form of one or more Global Securities, the Person designated in Section 2.03 hereof as Depositary by the Issuer pursuant to this Indenture, until a successor shall have been appointed and become such and, thereafter, "Depositary" shall mean or include such Person.

"Disqualified Stock" means, with respect to any Person, any Capital Stock that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable) or upon the happening of any event:

(1) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise;

(2) is convertible or exchangeable for Indebtedness or Disqualified Stock; or

(3) is redeemable at the option of the holder thereof, in whole or in part,

in each case on or prior to the 91st day after the Stated Maturity of the Securities; *provided, however*, that any Capital Stock that would not constitute Disqualified Stock

but for provisions thereof giving holders thereof the right to require such Person to repurchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the 91st day after the Stated Maturity of the Securities shall not constitute Disqualified Stock if the "asset sale" or "change of control" provisions applicable to such Capital Stock are not more favorable to the holders of such Capital Stock than the comparable provisions of this Indenture.

"DTC" means The Depository Trust Company.

"Equity Offering" means a public or private offering or sale by the Issuer or the Company of its Capital Stock or options, warrants or rights with respect to its Capital Stock, for cash to any Person (other than an Affiliate of the Company); *provided* that the cash proceeds are contributed to the Issuer.

"Event of Default" has the meaning set forth in Section 6.01 hereof.

"Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended.

"Fair Market Value" of any property, asset, share of Capital Stock, other security, Investment or other item means, on any date, the fair market value of such property, asset, share of Capital Stock, other security, Investment or other item on that date as determined in good faith by the management of the Issuer.

"Global Securities" means any Securities issued in fully registered book-entry form to the Depositary (or its nominee), for the Beneficial Owners thereof, which shall be substantially in the form set forth in Exhibit 1 to the Appendix attached hereto.

"Guarantee" (1) the Guarantee pursuant to the provisions of Article 10 hereto granted by the Guarantor in favor of the Trustee and the Securityholders; and (2) any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness or other obligation of any other Person and any obligation, direct or indirect, contingent or otherwise, of any Person:

(a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation of such other Person (whether arising by virtue of partnership arrangements, or by agreement to keep well, to purchase assets, goods, securities or services, to take or pay, or to maintain financial statement conditions or otherwise); or

(b) entered into for purposes of assuring in any other manner the obligee of such Indebtedness or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided, however*, that the term "guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The term "guarantee" used as a verb has a correlative meaning. The term "guarantor" shall mean any Person guaranteeing any obligation.

"Guarantor" means AGE and any other Person that provides a Guarantee in accordance with Article 10.

"Hedging Obligations" of any Person means the obligations of such Person under any agreement relating to any swap, option, forward sale, forward purchase, index transaction, cap transaction, floor transaction, collar transaction or any other similar transaction, in each case, for purposes of hedging or capping against Brazilian inflation, interest rates, currency or commodities price fluctuations.

"Holder" or "Securityholder" means the Person in whose name a Security is registered on the Securities Register.

"IFRS" means International Financial Reporting Standards as issued by the International Accounting Standards Board, as in effect from time to time.

"Incur" means issue, assume, guarantee, incur or otherwise become liable for Indebtedness or Capital Stock; *provided, however*, that any Indebtedness or Capital Stock of a Person existing at the time such Person is merged or consolidated with the Company or becomes a Subsidiary of the Company (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time of such merger or consolidation or at the time it becomes a Subsidiary of the Company. The terms "Incurrence," "Incurred" and "Incurring" shall have a correlative meaning to the foregoing. Neither the accretion of principal of a non-interest bearing or other discount security nor the capitalization of interest on Indebtedness shall be deemed the Incurrence of Indebtedness.

"Indebtedness" means, with respect to any Person on any date of determination (without duplication):

(1) the principal in respect of indebtedness of such Person for borrowed money;

(2) the principal and premium, if any, in respect of obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3) all obligations of such Person to pay the deferred and unpaid purchase price of property or services (except trade payables and contingent obligations to pay earn-outs), which purchase price is due more than six months after the date of placing such property in service or taking delivery and title thereto or the completion of such services;

(4) all reimbursement obligations of such Person in respect of the face amount of letters of credit or other similar instruments (the amount of such obligations being equal at any time to the aggregate then undrawn and unexpired amount of such letters of credit or other instruments plus the aggregate amount of drawings thereunder that have not been reimbursed), other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (1) through (3) above) entered into in the ordinary course of business of such Person, such as import tax credits and import transactions, to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the third Business Day following receipt by such Person of a demand for reimbursement following payment on the letter of credit;

(5) the redemption, repayment or other repurchase amount of such Person with respect to any Disqualified Stock of such Person or any Preferred Stock of a Restricted Subsidiary, but excluding, in each case, any accrued dividends (the amount of such obligation to be equal at any time to the maximum fixed involuntary redemption, repayment or repurchase price for such Capital Stock, or if less (or if such Capital Stock has no such fixed price), to the involuntary redemption, repayment or repurchase price therefor calculated in accordance with the terms thereof as if then redeemed, repaid or repurchased, and if such price is based upon or measured by the Fair Market Value of such Capital Stock, such Fair Market Value shall be as determined in good faith by the Board of Directors or other governing body of the issuer of such Capital Stock);

(6) all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; *provided*, *however*, that the amount of Indebtedness of such Person shall be the lesser of:

(a) the Fair Market Value of such asset at such date of determination;

and

(b) the amount of such Indebtedness of such other Persons;

(7) to the extent not otherwise included in this definition, all Hedging Obligations of such Person;

(8) all Capitalized Lease Obligations of such Person; and

(9) all obligations of the type referred to in clauses (1) through (8) above of other Persons that is guaranteed by such Person to the extent so guaranteed;

if and to the extent any of the preceding items (other than letters of credit, Hedging Obligations and obligations under clauses (6) and (9) above) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with IFRS. Notwithstanding anything to the contrary contained herein, Indebtedness shall not include any advances by customers in connection with construction.

"Indenture" means this Indenture, as amended or supplemented from time to time.

"Initial Securities" means US$63,288,319 in aggregate principal amount of 1.000% PIK Toggle Notes due 2040 of the Issuer issued under this Indenture on the Issue Date and any replacement Securities issued therefor in accordance with this Indenture.

"Interest Payment Date" means (i) the Issue Date, with interest computed for the period from and including the Issue Date to and including December 28, 2022 (it being understood that such interest payment is being distributed as PIK Interest and is made in advance for interest that would otherwise be paid on December 28, 2022 if December 28, 2022 were an Interest Payment Date, it being further understood that such interest shall be payable to Holders to which the Securities are issued on the Issue Date, notwithstanding any provision of the Indenture or the Securities regarding payment of interest to Holders of record as of any Record

Date) and (ii) June 28 and December 28 of each year after 2022, commencing on June 28, 2023 (it being understood that interest payable on June 28, 2023 shall be calculated from and excluding December 28, 2022).

"Investment" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the form of advances, loans or other extensions of credit including by way of guarantee or similar arrangements, (other than advances to customers or suppliers, in the ordinary course of business and consistent with past practice, that are recorded as accounts receivable, prepaid expenses or deposits on the balance sheet of a lender) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), Capital Expenditures, or the incurrence of a guarantee of any obligation of, or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by, such other Persons and all other items that are or would be classified as investments on a balance sheet prepared on the basis of IFRS. If the Issuer or any Restricted Subsidiary issues, sells or otherwise disposes of any Capital Stock of a Person that is a Restricted Subsidiary such that, after giving effect thereto, such Person is no longer a Restricted Subsidiary, any Investment by the Issuer or any Restricted Subsidiary in such Person remaining after giving effect thereto shall be deemed to be a new Investment at such time.

For purposes of the definition of "Unrestricted Subsidiary:"

(1) "Investment" shall include the portion (proportionate to a Restricted Subsidiary's equity interest in a Restricted Subsidiary to be designated as an Unrestricted Subsidiary) of the Fair Market Value of the net assets of such Restricted Subsidiary or a Restricted Subsidiary at the time that such Restricted Subsidiary is designated an Unrestricted Subsidiary; *provided, however*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Issuer shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to (a) the Company's "Investment" in such Subsidiary at the time of such redesignation *less* (b) the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets (as determined by the Issuer) of such Subsidiary at the time that such Subsidiary is so re-designated a Restricted Subsidiary; and

(2) any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer.

"Issue Date" means December 21, 2022.

"Issuer" means Andrade Gutierrez International S.A. and its successors, excluding its Subsidiaries.

"Issuer Substitution Documents" has the meaning set forth in Section 4.06(2)(a) hereof.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any *alienação fiduciária, cessão fiduciária, hipoteca, penhor e anticrese*, conditional sale or other title retention agreement or lease in the nature thereof).

"Material Adverse Effect" means a material adverse effect on (1) the business, financial condition or results of operations of the Company and its Subsidiaries taken as a whole, or (2) the ability of the Issuer to perform any of its obligations under this Indenture.

"Maturity Date" means December 28, 2040.

"Net Proceeds" with respect to any issuance or sale of Capital Stock or sale or other disposition of any Investment, means the cash proceeds of such issuance or sale net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, listing fees, discounts or commissions and brokerage, consultant and other fees and expenses actually Incurred in connection with such issuance or sale and net of taxes paid or payable in connection with such issuance, sale or disposition (after taking into account any available tax credit or deductions and any tax sharing arrangements).

"Notation of Guarantee" means a notation of the Guarantor's Guarantee substantially in the form of Exhibit 2 to the Appendix.

"Officer" means (1) with respect to the Issuer, any director or authorized representative of the Issuer and (2) with respect to any Restricted Subsidiary, any authorized representative of any Restricted Subsidiary including any president, vice president, executive officer, financial officer or general counsel of any Restricted Subsidiary.

"Officer's Certificate" means, with respect to any Person, a certificate signed by, in the case of the Issuer, any Officer thereof, and, in the case of any other Person, any of the chief executive officer, the chief operating officer, the chief financial officer, the chief accounting officer, the treasurer, a director, the general counsel or any vice president (or any equivalent of the foregoing) of such Person.

"Opinion of Counsel" means a written opinion from legal counsel who may be an employee of or counsel to the Company or the Issuer, which opinion shall be reasonably satisfactory to the Trustee.

"Option B Securities" means the 9.000%/10.500% Senior Secured PIK Toggle Notes due 2029 to be issued by the Issuer on the Issue Date.

"Paying Agent" means any Person authorized by the Issuer to pay the principal of (and premium, if any), interest or any other amounts owing with respect to any Security; *provided* that the Trustee shall initially be appointed as the Paying Agent.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"PIK Interest" has the meaning set forth for such term in Section 2.01(1).

"PIK Notice" has the meaning set forth for such term in Section 2.01(2).

"Preferred Stock" as applied to the Capital Stock of any Person, means Capital Stock of any class or classes (however designated) that is preferred as to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Capital Stock of any other class of such Person.

"Process Agent" has the meaning set forth in Section 13.11(2) hereof.

"Protected Purchaser" means a purchaser of a Security, or of an interest therein, who (1) gives value, (2) does not have notice of any adverse claim to the Security, and (3) obtains control of the Security.

"Record Date" means each June 15 and December 12 of each year (whether or not a Business Day), commencing on June 15, 2023.

"Registrar" means an office or agency, authorized by the Issuer, where Securities may be presented for registration of transfer or for exchange; *provided* that the Trustee shall initially be appointed as the Registrar.

"Relevant Jurisdiction" means the Grand Duchy of Luxembourg, Brazil or any other jurisdiction in which the Issuer or any Substituted Debtor or Successor Issuer or Successor Company is organized or resident for tax purposes or maintains a permanent establishment, or from or through which payments of principal and interest by or on behalf of the Issuer in respect of the Securities are made, or by any political subdivision thereof or any authority therein or thereof having power to tax.

"Restricted Subsidiary" means any Subsidiary of the Company and any Subsidiary of such Subsidiary other than an Unrestricted Subsidiary.

"SEC" means the U.S. Securities and Exchange Commission.

"Secured Party" means, individually, and "Secured Parties" means, collectively, the Holders and all other Persons to whom amounts are payable by the Issuer, the Company, any Guarantor, or any Collateral Provider under this Indenture, the Securities, the Guarantee or under any Collateral Agreement (including, without limitation, the Trustee and any Agent).

"Securities" means, collectively, the Initial Securities and any Additional Securities issued pursuant to this Indenture. For the avoidance of doubt, references to the "Securities" shall include any increase in the principal amount of outstanding Securities as a result of payment of PIK Interest.

"Securities Act" means the U.S. Securities Act of 1933, as amended.

"Securities Register" has the meaning set forth in Section 2.03 hereof.

"Significant Subsidiary" means any Restricted Subsidiary of the Company which at the time of determination either (1) had assets which, based on the consolidated balance sheet of the Company for the fiscal quarter most recently ended for which internal financial statements are available, constituted at least 10% of the Company's total assets on a consolidated basis as of

such date or (2) had revenues for the 12-month period which, based on the consolidated income statements of the Company for the fiscal quarter most recently ended for which internal financial statements are available, constituted at least 10% of the Company's total revenues on a consolidated basis for such period, in each case, (a) measured in accordance with IFRS and (b) on a pro forma basis to give effect to any acquisition or disposition of companies, divisions, lines of businesses or operations by the Company and the Restricted Subsidiaries subsequent to such date (or the beginning of such period, as applicable) and on or prior to the date of determination.

"Stated Maturity" means, with respect to any Indebtedness, the date specified in such Indebtedness as the fixed date on which the final payment of principal of such Indebtedness is due and payable, including, with respect to any principal amount which is then due and payable pursuant to any mandatory redemption provision, the date specified for the payment thereof (but excluding any provision providing for the repurchase of any such Indebtedness upon the happening of any contingency unless such contingency has occurred).

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which more than 50% of the outstanding Voting Stock is owned, directly or indirectly, by such Person and one or more Subsidiaries of such Person (or a combination thereof).

"Substituted Debtor" has the meaning set forth in Section 4.06 hereof.

"Successor Company" means, with respect to any consolidation with or merger into, or conveyance, transfer or lease of all or substantially all of the assets of the Company, the resulting, continuing, surviving transferee, assignee or otherwise successor Person, if not the Company.

"Successor Issuer" has the meaning set forth in Section 5.01(1)(a) hereof.

"TIA" means the Trust Indenture Act of 1939 as in force at the date as of which this Indenture was executed; *provided, however*, that in the event the Trust Indenture Act of 1939 is amended after such date, "TIA" means, to the extent required by any such amendment, the Trust Indenture Act of 1939 as so amended.

"Transfer Agent" means any Person authorized by the Issuer at whose office or agency Securities may be presented or surrendered for transfer or for the exchange; *provided* that the Trustee shall initially be appointed as the Transfer Agent.

"Trustee" means the party named as such in this Indenture until a successor replaces it and, thereafter, means the successor.

"Trust Officer" means, when used with respect to the Trustee or the Collateral Agent, any officer within the corporate trust department of the Trustee or the Collateral Agent, having direct responsibility for the administration of this Indenture and to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject.

"United States" means the United States of America.

"Unrestricted Subsidiary" means:

(1) any Subsidiary of the Company that is designated as an Unrestricted Subsidiary by the Issuer in compliance with the terms of this Indenture; and

(2) any Subsidiary of an Unrestricted Subsidiary.

The Issuer may designate any Subsidiary of the Company (including any newly acquired or newly formed Subsidiary or a Person becoming a Subsidiary through merger, consolidation or other business combination transaction, or Investment therein), to be an Unrestricted Subsidiary only if:

(a) such Subsidiary or any of its Subsidiaries does not own any Capital Stock or Indebtedness of, or own or hold any Lien on any property of, the Issuer, the Company or any other Subsidiary of the Issuer or the Company which is not a Subsidiary of the Subsidiary to be so designated or otherwise an Unrestricted Subsidiary; and

(b) such designation and the Investment of the Company in such Subsidiary complies with this Indenture.

As of the Issue Date, all of the Company's Subsidiaries are Restricted Subsidiaries.

"U.S. Bankruptcy Code" means the United States Bankruptcy Reform Act of 1978, as amended, and codified as 11 U.S.C. §§101 et seq.

"U.S. dollar" or "US$" means the lawful currency of the United States.

"U.S. Government Obligations" means direct obligations (or certificates representing an ownership interest in such obligations) of the United States (including any agency or instrumentality thereof) for the payment of which the full faith and credit of the United States is pledged and that are not callable or redeemable at the issuer's option.

"Voting Stock" of a Person means all classes of Capital Stock or other interests (including partnership interests) of such Person then outstanding that are entitled (without regard to the occurrence of any contingency) to vote in the election of the directors of such Person, but excluding such classes of Capital Stock or other interests that are entitled, as a group in a separate cast, to appoint one director of such Person as representative of the minority shareholders.

"Wholly-Owned Subsidiary" means any Restricted Subsidiary of a Person of which at least 95% of the outstanding Capital Stock or other ownership interests (other than directors' qualifying shares) of such entity shall at the time be owned by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

SECTION 1.02 Incorporation by Reference of Trust Indenture Act. The following TIA terms have the following meanings:

"indenture securities" means the Securities; and

"obligor" on the indenture securities means the Issuer, the Guarantor and any other obligor on the indenture securities.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule have the meanings assigned to them by such definitions to the extent such terms are not defined herein.

SECTION 1.03 Rules of Construction. Unless the context otherwise requires:

(1) a term has the meaning assigned to it;

(2) (a) all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with IFRS, (b) except as otherwise herein expressly provided, the term IFRS, with respect to any computation required or permitted hereunder, shall mean IFRS as of the date of such computation, and (c) except as otherwise herein expressly provided, all ratios and computations based on IFRS contained in this Indenture should be computed in conformity with IFRS;

(3) "or" is not exclusive;

(4) "including" and "includes" means including and includes without limitation;

(5) words in the singular include the plural and words in the plural include the singular;

(6) unsecured Indebtedness shall not be deemed to be subordinate or junior to secured Indebtedness merely by virtue of its nature as unsecured Indebtedness;

(7) the principal amount of any non-interest bearing or other discount security at any date shall be the principal amount thereof that would be shown on a balance sheet of the Company dated such date prepared in accordance with IFRS;

(8) the principal amount of any Preferred Stock shall be (a) the maximum liquidation value of such Preferred Stock or (b) the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock, whichever is greater;

(9) references to "principal amount" of Securities include any increase in the principal amount of outstanding Securities as a result of the payment of PIK Interest;

(10) all references to the date the Securities were originally issued shall refer to the Issue Date;

(11) unless context requires otherwise, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Indenture shall refer to this Indenture as a whole and not to any particular provision of this Indenture; and

(12) unless otherwise stated, any agreement, contract or document defined or referred to herein shall mean such agreement, contract or document and all schedules, exhibits and attachments thereto as in effect as of the date hereof, as the same may thereafter be amended, supplemented or otherwise modified from time to time.

## ARTICLE 2

## THE SECURITIES

SECTION 2.01 Form and Dating. Provisions relating to the Securities are set forth in the QIB/Accredited Investor/Regulation S Appendix attached hereto (the "Appendix") which is hereby incorporated in, and expressly made part of, this Indenture. The Securities and the Trustee's certificate of authentication shall be substantially in the form of Exhibit 1 to the Appendix which is hereby incorporated in, and expressly made a part of, this Indenture. The Securities may have notations, legends or endorsements required by law, stock exchange rule, agreements to which the Issuer and the Guarantor are subject, if any, or usage (*provided* that any such notation, legend or endorsement is in a form acceptable to the Issuer). Each Security shall be dated the date of its authentication. The Securities shall be issued in minimum denominations of US$1.00 and integral multiples of US$1.00 in excess thereof in the form of one or more Global Securities. The Securities shall be fully and unconditionally guaranteed by the Guarantor in accordance with Article 10. The terms of the Securities set forth in the Appendix and Exhibit 1 to the Appendix are part of the terms of this Indenture.

(1) The Issuer shall pay interest on the Securities on each Interest Payment Date in accordance with this Indenture and the Securities in cash at the rate of 1.000% per annum. For each of the interest payment periods specified on the Securities, the Issuer may, at its sole option, elect to pay the following interest by capitalizing accrued and unpaid interest on the applicable Interest Payment Date and adding the same to the principal amount of the Securities then outstanding (each, a "PIK Interest") from and including the Issue Date, to and including the Interest Payment Date on the Maturity Date (or earlier redemption or prepayment date), PIK Interest at the rate of 1.000% per annum for each Interest Payment Date during such interest payment period. Following an increase in the principal amount of the outstanding Securities as a result of a payment of PIK Interest on the applicable Interest Payment Date, the Securities will bear interest on such increased principal amount from and after such applicable Interest Payment Date, and the principal amount of the Securities at any time and after such date will include all interest which has been capitalized thereon. For the avoidance of doubt, if the Issuer does not elect to pay PIK Interest, the Issuer shall pay interest on the Securities at the rate of 1.000% per annum.

(2) In the event the Issuer elects to pay PIK Interest for the applicable interest payment period as set forth in the Securities, no later than fifteen (15) days prior to the initial Interest Payment Date, the Issuer shall deliver to the Trustee and the Paying Agents a notice executed by one of its Officers (a) stating that the Issuer has elected to pay PIK Interest on the applicable Interest Payment Date, (b) setting forth the total amount of interest due and payable on the applicable Interest Payment Date, (c) setting forth the amount of PIK Interest to be paid on the applicable Interest Payment Date and

(d) directing the Trustee to increase the aggregate principal amount of the outstanding Securities as of the applicable Interest Payment Date in an amount equal to the PIK Interest payable on such date (a "PIK Notice"), which PIK Notice the Trustee and the Paying Agents shall be entitled to conclusively rely upon. The Trustee shall promptly deliver a copy of the PIK Notice to the Holders of the Securities. In the event the Trustee does not receive the PIK Notice from the Issuer in accordance with the preceding sentence, interest on the Securities for the applicable interest payment period shall automatically be payable in PIK Interest as set forth in the Securities.

SECTION 2.02 Execution and Authentication; Additional Securities.

(1) An Officer of the Issuer shall sign the Securities for the Issuer, and an Officer of the Guarantor shall sign this Indenture and the Notation of the Guarantee. Such signature may be by manual or facsimile signature of such Officer.

(2) If an Officer whose signature is on a Security (or this Indenture or the Notation of Guarantee) no longer holds that office at the time the Trustee authenticates the Security, the Security and the Notation of Guarantee shall be valid nevertheless.

(3) A Security shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Security. The signature shall be conclusive evidence that the Security has been authenticated under this Indenture.

(4) On the Issue Date, the Trustee, upon receipt of a written order from the Issuer, shall authenticate and deliver the Initial Securities and, at any time and from time to time thereafter, the Trustee shall, upon receipt of a written order from the Issuer, authenticate and deliver Additional Securities for original issue (or shall increase the principal amount of Securities as a result of a payment of PIK Interest), in each case upon a written order of the Issuer signed by an Officer of the Issuer. Such written order shall specify the aggregate principal amount of the Securities to be authenticated and the date on which the original issue of Securities is to be authenticated. PIK Interest on the Securities represented by one or more Global Securities is payable by increasing the principal amount of such Global Security as of the Record Date for the initial Interest Payment Date by an amount equal to the PIK Interest for the initial Interest Payment Date, rounded up to the nearest US$1.00, as set forth in the applicable PIK Notice, to the credit of the Holders on such record date, pro rata in accordance with their interests or, if applicable, otherwise in accordance with the procedures of the Depositary. On the initial Interest Payment Date, the Trustee and the Registrar shall adjust their respective books and records with respect to such Security to reflect the payment of such PIK Interest.

(5) The Trustee may appoint an authenticating agent reasonably acceptable to the Issuer to authenticate the Securities. Unless limited by the terms of such appointment, an authenticating agent may authenticate Securities whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as any Registrar, Paying Agent, Transfer Agent or agent for service of notices and demands.

(6) The Issuer may, without the consent of the Holders of the Securities, issue Additional Securities from time to time having terms and conditions set forth in Exhibit 1 to the Appendix that are substantially identical to those of the Initial Securities (except for issue date, issue price and the date from which interest will accrue and, if applicable, the initial Interest Payment Date); *provided* that the Issuer shall have delivered to the Trustee (a) an Officer's Certificate (which satisfies Section 13.04 hereof) certifying that the issuance of such Additional Securities does not contravene any provision of this Indenture and any other information the Issuer may determine to include or the Trustee may reasonably request, and (b) an Opinion of Counsel (subject to customary qualifications) that (i) the form and terms of such Additional Securities have been established in conformity with the provisions of this Indenture and (ii) such Additional Securities, when authenticated and delivered by the Trustee and issued by the Issuer in the manner and subject to any conditions specified in such Opinion of Counsel, will constitute valid and legally binding obligations of the Issuer and the Guarantor, enforceable in accordance with their terms, subject to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting the enforcement of creditors' rights and to general equity principles, and in accordance with Section 13.03 hereof. Such Additional Securities may be issued in one or more series and with the same or different CUSIP numbers, ISINs and/or Common Codes. The Initial Securities and the Additional Securities, if any, will be treated as a single class for all purposes under this Indenture, including waivers, amendments, redemptions and offers to purchase; *provided, however*, that if the Additional Securities are not fungible with the Initial Securities for U.S. federal income tax purposes, such Additional Securities will have a separate CUSIP number, ISIN and Common Code. Holders of Additional Securities will vote together with Holders of Securities issued on the Issue Date as one class under this Indenture, subject to Section 2.08 hereof.

SECTION 2.03 Registrar, Paying Agents and Transfer Agents. The Issuer shall ensure the maintenance of the Registrar, the Paying Agent and the Transfer Agent. The Registrar shall keep a register of the Securities and of their transfer and exchange (the "Securities Register").

The Issuer may have one or more co-registrars and one or more additional Paying Agents and/or Transfer Agents. The term "Paying Agent" includes any additional paying agent, the term "Registrar" includes any additional Registrar or co-registrar and the term "Transfer Agent" includes the Trustee and any additional transfer agents.

The Issuer shall enter into an appropriate agency agreement with any Registrar, Paying Agent, Transfer Agent or co-registrar not a party to this Indenture. Such agreement shall implement the provisions of this Indenture that relate to such agent. The Issuer shall notify the Trustee in writing of the name and address of any such agent. If the Issuer fails to maintain a Registrar, Paying Agent or Transfer Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.06 hereof. The Issuer or any Restricted Subsidiary may act as Paying Agent, Registrar, co-registrar or Transfer Agent.

The Issuer initially appoints (1) the Trustee as Registrar, Transfer Agent and Paying Agent in connection with the Securities, and (2) DTC as Depositary with respect to the Securities.

SECTION 2.04 Paying Agent To Hold Money in Trust. By 12:00 noon (New York City time), no later than one Business Day prior to each Interest Payment Date, redemption date, purchase date or Maturity Date on any Securities, the Issuer shall deposit with a Paying Agent in immediately available funds a sum sufficient to pay such principal and interest when so becoming due on any such Interest Payment Date, redemption date, purchase date or Maturity Date on any Securities. The Issuer shall require each Paying Agent (other than the Trustee) to agree in writing that (1) such Paying Agent shall hold in trust, for the benefit of Holders or the Trustee, all money held by such Paying Agent for the payment of principal and interest on the Securities, (2) such Paying Agent shall give the Trustee written notice of any failure by the Issuer (or by any other obligor on the Securities) to make any payment of the principal of or interest on any Securities, as the case may be and any other payments to be made by or on behalf of the Issuer under this Indenture or the Securities when the same shall be due and payable, and (3) that such Paying Agent will pay any such sums so held in trust by it to the Trustee upon the Trustee's written request at any time during the continuance of the failure referred to in the preceding clause (2). The Paying Agent in New York shall arrange with all other Paying Agents for the payment, from funds furnished by the Issuer to the Paying Agent pursuant to this Indenture, of the principal, premium and interest on the Securities.

The Paying Agent will hold in trust, for the benefit of the Holders or the Trustee, all money held by such Paying Agent for the payment of principal, premium or interest on the Securities. The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by it. Upon complying with this Section 2.04, the Paying Agent shall have no further liability for the money delivered to the Trustee.

The receipt by the Paying Agent or the Trustee from the Issuer of each payment of principal, interest and/or other amounts due in respect of the Securities in accordance with this Indenture and on the date on which such amount of principal, interest and/or other amounts are then due, shall satisfy the obligations of the Issuer herein and under the Securities to make such payment to the Holders on the due date thereof; *provided* that the Trustee or such Paying Agent, as applicable, is not prohibited from paying such money to the Holders in accordance with this Indenture.

So long as any of the Securities remain outstanding, the Issuer shall maintain one or more agents in New York City to whom the Securities may be presented for payment.

Each of the Issuer and the Guarantor agrees, jointly and severally, to indemnify the Holders and the Trustee (which for purposes of this Section 2.04 shall be deemed to include its directors, officers, agents and employees) against any failure on the part of the Paying Agent to pay, in accordance with the terms hereof, any sum due in respect of the Securities on the applicable payment date.

SECTION 2.05 Securityholder Lists. The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Securityholders. If the Trustee is not the Registrar, the Issuer shall furnish to the Trustee, in writing, at least two Business Days before each Interest Payment Date and at such other times as the Trustee may reasonably request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Securityholders.

SECTION 2.06 Transfer and Exchange. The Securities shall be issued in registered form and shall be transferable only as provided in the Appendix to this Indenture. The Issuer may require payment of a sum sufficient to pay all taxes, assessments or other governmental charges in connection with any transfer or exchange pursuant to the terms of this Indenture (other than any such transfer taxes, assessments or similar governmental charge payable upon exchange or transfer pursuant to Section 9.04 hereof). The Issuer shall not be required to make and the Registrar need not register transfers or exchanges of Securities selected and delivered for redemption or any Securities for a period of 15 days before an Interest Payment Date.

Subject to the rights of the relevant Holders as of a Record Date to receive interest as of the related Interest Payment Date, prior to the due presentation for registration of transfer of any Security, the Issuer, the Trustee, any Paying Agent, the Registrar, any Transfer Agent or any co-registrar may conclusively deem and treat the Person in whose name a Security is registered as the absolute owner of such Security for the purpose of receiving payment of principal of and interest on such Security and for all other purposes whatsoever, whether or not presentation of such Security is overdue, and none of the Issuer, the Trustee, any Paying Agent, any Transfer Agent, the Registrar or any co-registrar shall be liable for or affected by notice to the contrary.

All Securities issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Securities surrendered upon such transfer or exchange.

None of the Trustee, the Registrar, the Paying Agent, or any Transfer Agent shall have any obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Security (including any transfers between or among participants in the Depositary or Beneficial Owners of interests in any Global Securities) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

None of the Trustee or any Paying Agent, Registrar or Transfer Agent shall have any responsibility or obligation to any Beneficial Owner of an interest in a Global Security, a member of, or a participant in, the Depositary or any other Person with respect to the accuracy of the records of the Depositary or its nominee or of any participant or member thereof, with respect to any ownership interest in the Securities or with respect to the delivery to any participant, member, Beneficial Owner or other Person (other than the Depositary) of any notice (including any notice of redemption) or the payment of any amount or delivery of any Securities (or other security or property) under or with respect to such Securities. All notices and communications to be given to the Holders and all payments to be made to Holders in respect of the Securities shall be given or made only to or upon the order of the registered Holders (which shall be the Depositary or its nominee in the case of a Global Security). The rights of Beneficial Owners in any Global Security shall be exercised only through the Depositary, subject to the applicable rules and procedures of the Depositary. Each of the Trustee, any Paying Agent, the Registrar and any Transfer Agent may conclusively rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its members, participants and any Beneficial Owners.

SECTION 2.07 Replacement Securities. If (1) any mutilated Security is surrendered to the Issuer, a Registrar, any Transfer Agent or the Trustee, or (2) the Issuer, a Registrar, the Transfer Agent and the Trustee receive evidence to their satisfaction of the destruction, loss or theft of any Security, and, unless otherwise agreed by the Issuer, the Registrar, the Transfer Agent and the Trustee, there is delivered to the Issuer, the Registrar, the Transfer Agent and the Trustee such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Issuer, the Registrar, the Transfer Agent or the Trustee that such Security has been acquired by a Protected Purchaser, the Issuer shall execute and the Trustee, upon receipt of a written order from the Issuer, shall authenticate and deliver, in exchange for any such mutilated Security or in lieu of any such destroyed, lost or stolen Security, a new Security of like tenor and principal amount, bearing a number not contemporaneously outstanding.

In case any such mutilated, destroyed, lost or stolen Security has become due and payable, or has been called for redemption by the Issuer pursuant to Article 3 of this Indenture, the Issuer in its discretion may, instead of issuing a new Security, pay or redeem such Security, as the case may be.

Upon the issuance of any new Security under this Section 2.07, the Issuer may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expense (including the fees and expenses (including, without limitation, attorneys' fees and expenses) of the Trustee, the Registrar or any Transfer Agent) in connection therewith.

Every replacement Security is an additional obligation of the Issuer.

The provisions of this Section 2.07 are exclusive and, to the extent lawful, shall preclude all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities.

SECTION 2.08 Outstanding Securities. Securities outstanding at any time are all Securities authenticated by the Trustee except for those canceled by it pursuant to Section 2.10 hereof, those delivered to the Trustee for cancellation or surrendered for transfer or exchange and those described in this Section 2.08 as not outstanding. Except as set forth below, a Security does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Security.

If a Security is replaced pursuant to Section 2.07 hereof, it ceases to be outstanding unless the Trustee and the Issuer receive proof satisfactory to each of them that the replaced Security is held by a Protected Purchaser.

If any Paying Agent segregates and holds in trust, in accordance with this Indenture, on a redemption date or the Maturity Date money sufficient to pay all principal, premium, and interest payable on that date with respect to the Securities (or portions thereof) to be redeemed or maturing, as the case may be, and such Paying Agent is not prohibited from paying such amounts to the Holders in accordance with this Indenture, then on and after that date, such Securities (or portions thereof) shall cease to be outstanding and interest on them shall cease to accrue.

In determining whether the Holders of the required principal amount of outstanding Securities have concurred in any direction, waiver or consent, Securities owned by the Issuer, or by any Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with the Issuer shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Securities which a Trust Officer of the Trustee actually knows are so owned shall be so disregarded. Also, subject to the foregoing, only Securities outstanding at the time shall be considered in any such determination.

SECTION 2.09 Temporary Securities. Until definitive Securities are ready for delivery, the Issuer may prepare and execute and the Trustee shall, upon receipt of a written order from the Issuer, authenticate temporary Securities. Temporary Securities shall be substantially in the form of definitive Securities but may have variations that the Issuer considers appropriate for temporary Securities. Without unreasonable delay, the Issuer shall prepare and execute and the Trustee shall, upon receipt of a written order from the Issuer, authenticate definitive Securities and deliver them in exchange for temporary Securities.

SECTION 2.10 Cancellation. The Issuer at its option at any time may deliver Securities to the Trustee for cancellation. The Registrar, the Transfer Agent and the Paying Agent shall forward to the Trustee any Securities surrendered to any of them for registration of transfer, exchange or payment. The Trustee and no one else shall cancel and dispose of (subject to the record retention requirements of the Exchange Act) all Securities surrendered for registration of transfer, exchange, payment or cancellation in accordance with its then customary procedures for the disposition of canceled securities and, upon the written request of the Issuer, deliver a certificate of such disposition to the Issuer unless the Issuer directs the Trustee in writing to deliver canceled Securities to the Issuer. The Issuer may not issue new Securities to replace Securities it has redeemed, paid or delivered to the Trustee for cancellation.

SECTION 2.11 CUSIP Numbers, Common Codes and ISINs. The Issuer in issuing the Securities may use "CUSIP" numbers, "ISINs" and "Common Codes" (if then generally in use) or similar numbers and, if so, the Trustee shall use "CUSIP" numbers, "ISINs", "Common Codes" or similar numbers in notices of redemption as a convenience to Holders; *provided, however*, that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Securities or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Securities, and any such redemption shall not be affected by any defect in or omission of such numbers. The Issuer shall promptly notify the Trustee, in writing, of any change in any "CUSIP" numbers, "ISINs" or "Common Codes".

## ARTICLE 3

## REDEMPTION

SECTION 3.01 Notices to Trustee. If the Issuer elects to or is required to redeem the Securities pursuant to Sections 3.04, 3.05, or 3.06 hereof, it shall notify the Trustee in writing of the redemption date and the principal amount of Securities to be redeemed, as hereinafter provided.

The Issuer shall give each notice to the Trustee provided for in this Section 3.01 at least 30 days but not more than 60 days before the redemption date (unless a shorter period shall be acceptable to the Trustee). In the case of a redemption under Sections 3.04, 3.05, or 3.06 hereof, such notice shall be accompanied by an Officer's Certificate and an Opinion of Counsel from the Issuer to the effect that such redemption will comply with the conditions set forth in this Article 3 of this Indenture.

SECTION 3.02 Notice of Redemption. At least 30 days but not more than 60 days before a date for redemption of Securities, the Issuer shall give a notice of redemption to each Holder of a Security to be redeemed in accordance with Section 13.01 hereof.

The notice shall identify the Securities to be redeemed and shall state:

(1) the redemption date;

(2) the redemption price;

(3) that Securities called for redemption must be surrendered to any Paying Agent to collect the redemption price;

(4) that, unless the Issuer defaults in making such redemption payment, interest on Securities called for redemption ceases to accrue on and after the redemption date;

(5) the paragraph of the Securities pursuant to which the Securities called for redemption are being redeemed;

(6) the "CUSIP" number, "ISIN", or "Common Code", if any;

(7) that no representation is made as to the correctness or accuracy of the CUSIP number, ISIN, or Common Code, if any, listed in such notice or printed on the Securities; and

(8) that the Securities called for redemption must be surrendered to the Paying Agent to collect the redemption price.

If any Security is to be redeemed in part only, the notice of redemption that relates to that Security shall state the portion of the principal amount thereof to be redeemed. The Issuer shall issue a new Security in a principal amount equal to the unredeemed portion of the original Security (if any) in the name of the Holder upon cancellation of the original Security (or appropriate adjustments to the amount and beneficial interests in a Global Security shall be made, as appropriate).

In the event that less than all of the Securities are to be redeemed at any time, selection of Securities for redemption shall be made (a) in compliance with the requirements of the principal national securities exchange, if any, on which Securities are listed and any applicable depository procedures, (b) by lot or such other similar method in accordance with the applicable procedures of the Depositary (if the Securities are Global Securities), or (c) if there are no such requirements of such exchange or the Securities are not then listed on a national

securities exchange or the Depositary's procedures do not apply, on a pro rata basis or by such other method the Trustee deems fair and reasonable. No Securities of a principal amount of US$1.00 or less may be redeemed in part, and if Securities are redeemed in part, the remaining outstanding amount must be at least equal to US$1.00 and be an integral multiple of US$1.00 in excess thereof.

At the Issuer's written request, delivered at least 5 days prior to the date such notice of redemption is to be given to the Holder(s) (unless a shorter period shall be acceptable to the Trustee), the Trustee shall give the notice of redemption in the Issuer's name and at the Issuer's expense. In such event, the Issuer shall provide the Trustee with the form of notice of redemption required by this Section 3.02.

SECTION 3.03 Effect of Notice of Redemption. Once notice of redemption is given, Securities called for redemption become irrevocably due and payable on the redemption date and at the redemption price stated in the notice and from and after such redemption date, the Securities called for redemption shall cease to bear interest (unless the Issuer defaults in the making of such redemption price). Upon surrender to a Paying Agent, such Securities shall be paid at the redemption price stated in the notice, plus accrued and unpaid interest to, but not including, the redemption date (subject to the right of Holders of record on the relevant Record Date to receive interest due on the related Interest Payment Date). Failure to give notice or any defect in the notice to any Holder shall not affect the validity of the notice to any other Holder.

SECTION 3.04 Optional Redemption. The Issuer may, at its option, redeem the Securities in whole at any time or in part from time to time at the redemption price of 100.000% (expressed as a percentage of principal amount of the Securities to be redeemed), plus any accrued and unpaid interest on the Securities (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date), if any, to (but excluding) the date of redemption.

SECTION 3.05 Optional Redemption for Equity Offerings. Prior to December 21, 2024, the Issuer may, at its option, on any one or more occasions redeem up to 40% of the aggregate principal amount of the outstanding Securities (calculated after giving effect to any issuance of Additional Securities) with the aggregate Net Proceeds of one or more Equity Offerings, at a redemption price equal to 85.000% of the principal amount thereof, plus any accrued and unpaid interest on the Securities (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date), if any, to (but excluding) the date of redemption; provided that:

(1) after giving effect to any such redemption at least 60% of the original aggregate principal amount of the Securities (calculated after giving effect to any issuance of Additional Securities) remains outstanding after each such redemption; and

(2) such redemption occurs within 90 days after the closing of such Equity Offering.

SECTION 3.06 Tax Redemption. The Issuer may redeem the Securities, in whole but not in part, at a redemption price equal to 100.000% of the principal amount thereof, plus

accrued and unpaid interest on the Securities (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date), if any, to (but excluding) the redemption date, if as a result of:

(1) any amendment to, or change in, the laws or treaties (or any regulations or rulings promulgated thereunder) of a Relevant Jurisdiction; or

(2) any amendment to or change in an official interpretation or application regarding such laws, treaties, regulations or rulings (including a determination by a court of competent jurisdiction),

which amendment or change becomes effective on or after the Issue Date (or, in the case of a jurisdiction that becomes a Relevant Jurisdiction after the Issue Date, on or after the date such jurisdiction becomes a Relevant Jurisdiction), (x) the Issuer has become or would become obligated to pay, on the next date on which any amount would be payable with respect to the Securities and (y) the Issuer determines in good faith that such obligation cannot be avoided by the use of reasonable measures available to the Issuer (including making payment through a Paying Agent located in another jurisdiction, to the extent such measure would be a reasonable measure in light of the circumstances).

Immediately prior to the delivery of any notice of redemption to the Holders pursuant to this provision, the Issuer shall deliver to the Trustee:

(i) an Officer's Certificate (A) stating that the Issuer is entitled to effect such redemption, (B) setting forth a statement of facts showing that the conditions precedent to the right of the Issuer to so redeem have occurred, and (C) stating that all governmental approvals, if any, necessary to effect such redemption have been obtained and are in full force and effect; and

(ii) an opinion of recognized counsel in the Relevant Jurisdiction to the effect that all governmental approvals, if any, necessary to effect such redemption have been obtained and are in full force and effect.

Any notice of redemption pursuant to this Section 3.06 shall be irrevocable.

SECTION 3.07 Deposit of Redemption or Purchase Price.

(1) At or before the close of business one Business Day prior to the redemption date or purchase date, the Issuer shall deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption or purchase price, plus accrued interest and premium, if any, on all Securities to be redeemed or purchased on that date. Upon written request of the Issuer, the Trustee or the Paying Agent shall promptly return to the Issuer, after the applicable redemption date or purchase date, any money deposited with the Trustee or the Paying Agent by the Issuer in excess of the amounts necessary to pay the redemption or purchase price of and accrued interest on, all Securities to be redeemed or purchased.

(2) If the Issuer complies with the provisions of the preceding paragraph, on and after the redemption or purchase date, interest shall cease to accrue on the Securities or the

portions of Securities called for redemption or purchase. If a Security is redeemed or purchased on or after a Record Date but on or prior to the related Interest Payment Date, then any accrued and unpaid interest shall be paid to the Person in whose name such Security was registered at the close of business on such Record Date. If any Security called for redemption or purchase is not so paid upon surrender for redemption or purchase because of the failure of the Issuer to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the redemption date or purchase date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Securities and in Section 4.01 hereof.

SECTION 3.08 Open Market Purchases. The Issuer or any of its Affiliates may at any time purchase Securities at any price or prices in the open market or otherwise.

## ARTICLE 4

## COVENANTS

SECTION 4.01 Performance of Obligations Under the Securities. (1) The Issuer shall duly and punctually pay the principal of and premium, if any, and interest, on the Securities in accordance with the terms of the Securities and this Indenture. The Guarantor shall duly and punctually pay any amounts owed by it under the Guarantee in accordance with the terms of the Guarantee, the Securities and this Indenture. The principal and interest shall be considered paid on each of the dates due if on such date (i) there has been irrevocably deposited with the Trustee or the Paying Agent in accordance with this Indenture money sufficient to pay all principal and interest then due; *provided* that the Paying Agent is not prohibited from paying such money to the Holders in accordance with this Indenture or (ii) in the case of payment of PIK Interest, the Issuer has delivered to the Trustee the documentation necessary to increase the principal balance of the Global Securities to pay PIK Interest.

(2) Any amounts that are payable on the Securities which are not punctually paid or duly provided for (including, without limitation, the principal of, or interest or premium, if any, on the Securities, the redemption price of any Securities to be redeemed) shall accrue interest at the rate of 1.00% per annum in addition to the stated interest rate per annum payable in cash to, but excluding, the date such amounts shall have been paid by or on behalf of the Issuer, to the extent lawful.

SECTION 4.02 Maintenance of Corporate Existence. Subject to Article 5 hereof, each of the Issuer shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence and shall use its reasonable efforts to do or cause to be done all things necessary to preserve and keep in full force and effect its rights (charter and statutory) and franchises; *provided, however*, that the Issuer shall not be required to preserve any such right or franchise if the failure to do so does not, and would not reasonably be expected to, have a Material Adverse Effect.

SECTION 4.03 Appointment of the Trustee or the Collateral Agent. The Issuer, whenever necessary to avoid or fill a vacancy in the office of Trustee or the Collateral Agent, shall promptly appoint in the manner provided in Section 7.07 hereof, a successor Trustee or

Collateral Agent, so that there shall at all times be a Trustee with respect to the Securities and a Collateral Agent with respect to the Collateral.

SECTION 4.04 Ranking. The Issuer shall ensure that the Securities will be senior to all of the Issuer's existing and future subordinated obligations. The Securities shall rank *pari passu* with the Option B Securities.

SECTION 4.05 Further Actions. Upon the request of the Trustee, the Issuer and the Guarantor shall execute such further documents and do all acts and things as may be reasonably necessary in order to give effect to this Indenture, the Securities, the Guarantee and the Collateral Agreement.

SECTION 4.06 Substitution of the Issuer. The Issuer may, without the consent of any Securityholder, be substituted by (1) the Company or (2) any Wholly-Owned Subsidiary of the Company as principal debtor in respect of the Securities (in that capacity, the "Substituted Debtor"); *provided* that the following conditions are satisfied:

(a) such documents shall be executed by the Substituted Debtor, the Issuer, the Company and the Trustee as may be necessary to give full effect to the substitution, including a supplemental indenture under which (i) the Substituted Debtor assumes all of the Issuer's obligations under this Indenture and the Securities; and (ii) the Guarantor (except if the Company is the Substituted Debtor) confirms that the Guarantee remains in full force and effect and applies to the obligations of the Substituted Debtor, and the covenants, Events of Default and other obligations other than the Substituted Debtor's payment obligations continue to apply to the Company and its current and future Restricted Subsidiaries in respect of the Securities to the same extent such provisions applied prior to such substitution as if no such substitution had occurred, it being the intent that the rights of the Holders in respect of the Securities be unaffected by the substitution (the "Issuer Substitution Documents");

(b) if the Substituted Debtor is organized in a jurisdiction other than the Grand Duchy of Luxembourg, the Issuer Substitution Documents shall contain covenants to indemnify and hold harmless each Holder and Beneficial Owner of the Securities against all taxes or duties which arise by reason of a law or regulation in effect or contemplated on the effective date of the substitution, which may be Incurred or levied against such Holder or Beneficial Owner of the Securities as a result of the substitution and which would not have been so Incurred or levied had the substitution not been made;

(c) any credit rating assigned to the Securities shall not be downgraded when the Substituted Debtor replaces and substitutes the Issuer in respect of the Securities; *provided* that, any such downgrade in credit rating is in whole or in part in connection with such substitution;

(d) the Substituted Debtor shall have delivered, or caused the delivery, to the Trustee of opinions from counsel in the jurisdiction of organization of the Substituted Debtor as to the due authorization, execution and delivery of the Issuer Substitution Documents by the Substituted Debtor and the United States as to the validity, legally

binding effect and enforceability of the Issuer Substitution Documents, as well as an Officer's Certificate as to compliance with the provisions described under this Section 4.06;

(e) the Substituted Debtor shall have appointed a process agent in the Borough of Manhattan in The City of New York to receive service of process on its behalf in relation to any legal action or proceedings arising out of or in connection with the Securities, this Indenture and the Issuer Substitution Documents;

(f) no Event of Default has occurred and is continuing; and

(g) the substitution shall comply with all applicable requirements under the laws of the jurisdiction of organization of the Substituted Debtor and New York.

Upon the execution of the Issuer Substitution Documents and the Issuer's delivery of an Officer's Certificate confirming compliance with the other conditions in this Indenture related to the substitution, the Substituted Debtor shall be deemed to be named in the Securities and this Indenture as the principal debtor in place of the Issuer and the Issuer shall be automatically released from all of its obligations under the Securities and this Indenture. For the avoidance of doubt, the Substituted Debtor shall assume all of the Issuer's obligations under this Indenture and the Securities.

Not later than 10 Business Days after the execution of the Issuer Substitution Documents and compliance with the other conditions in this Indenture, the Substituted Debtor shall give notice thereof to the Holders in accordance with the provisions of this Indenture.

## ARTICLE 5

## CONSOLIDATION, MERGER, CONVEYANCE, SALE OR LEASE

SECTION 5.01 Consolidation, Merger, Conveyance, Sale or Lease.

(1) The Issuer shall not, directly or indirectly, consolidate, amalgamate or merge with or into another Person unless:

(a) the resulting Person, surviving Person or transferee (if not the Issuer) is the Company or a Wholly-Owned Subsidiary of the Company (the "Successor Issuer");

(b) the Successor Issuer expressly assumes all the obligations of the Issuer under this Indenture and the Securities pursuant to a supplemental indenture and the Collateral Agreement by amendments or supplements thereto;

(c) immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing; and

(d) the Issuer shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each to the effect that such (i) consolidation, merger or transfer and any supplemental indenture and any other amendments or supplements to the

Collateral Agreement comply with this Indenture and the Collateral Agreement (ii) that such supplemental indenture is the legal, valid and binding obligation of such Successor Issuer and (iii) that all conditions precedent relating to such consolidation, merger or transfer have been satisfied.

## ARTICLE 6

## DEFAULTS AND REMEDIES

SECTION 6.01 Events of Default. An "Event of Default" is defined in this Indenture as a:

(1) default for a period of 30 consecutive days in payment of any interest on the Securities when the same becomes due and payable;

(2) default in payment of principal of or premium, if any, on the Securities when the same becomes due and payable (without necessity of acceleration), upon optional redemption, upon required purchase, upon declaration of acceleration or otherwise;

(3) failure by the Issuer to comply with Article 5;

(4) default in the performance, or breach, of any other covenant or obligation of the Issuer or any Restricted Subsidiary in this Indenture and continuance of such default or breach for a period of 60 consecutive days after written notice specifying such default or breach is given to the Issuer by the Trustee or to the Issuer and the Trustee by the Holders of at least 25% in aggregate principal amount of the outstanding Securities;

(5) any involuntary case, petition, claim or other proceeding is commenced or filed against the Issuer or any Significant Subsidiary under any Bankruptcy Law or any other bankruptcy, insolvency, *falência, recuperação judicial* or *extrajudicial*, or other similar law now or hereafter in effect, including, but not limited to, any proceeding seeking the appointment of a trustee, receiver, *administrador judicial*, liquidator, administrator, custodian, assignee, sequestrator or other similar official of it or any substantial part of its assets, or the liquidation of the Issuer or any Significant Subsidiary, and such involuntary case or other proceeding remains undismissed and unstayed for a period of 60 days; or a non-appealable final order for relief is entered against the Issuer or any Significant Subsidiary under any relevant Bankruptcy Law as now or hereafter in effect; and

(6) the Issuer (a) files a petition or claim and/or commences a voluntary case or other proceeding seeking to be adjudicated bankrupt or insolvent or seeking liquidation, reorganization, *falência, recuperação judicial* or *extrajudicial* or other relief under any applicable Bankruptcy Law or any other bankruptcy, insolvency or other similar law now or hereafter in effect, (b) consents to the institution of bankruptcy, insolvency, liquidation or scheme proceedings against it (including entry of an order against it in an involuntary case), or the filing by it (or against it) of a petition or answer or consent or any other document seeking reorganization or relief under any Bankruptcy Law, (c) consents to the appointment of or taking possession by a receiver, *administrador judicial*, liquidator, administrator, assignee, custodian, trustee, sequestrator or similar official of the Issuer or for all or substantially all of the assets of

the Issuer, (d) effects any general assignment for the benefit of creditors or (e) generally is not paying its debts as they become due.

SECTION 6.02 Notice of Default; Acceleration. The Issuer shall deliver to the Trustee or the Collateral Agent, within 10 Business Days after obtaining actual knowledge thereof, written notice of any Default or Event of Default that has occurred and is still continuing, its status and what action the applicable Person is taking or proposing to take in respect thereof. If an Event of Default (other than an Event of Default specified in Section 6.01(5) or (6) hereof) shall have happened and be continuing, either the Trustee or the Holders of at least 25% in aggregate principal amount of the outstanding Securities, by written notice to the Issuer (and to the Trustee and the Collateral Agent if notice is given by the Holders), may declare the principal amount of (and interest on) all the Securities to be due and payable immediately. If an Event of Default specified in Section 6.01(5) or (6) hereof occurs and is continuing, the principal amount of all the Securities shall be immediately due and payable without notice or any other act on the part of the Trustee or any Securityholder. In this case, the Issuer and the Guarantor shall comply with any and all then applicable regulations of the Central Bank for remittance of funds outside of Brazil. However, if the applicable Person cures all Defaults (except the nonpayment of principal of and accrued and unpaid interest or premium which shall have become due by acceleration) and the Issuer pays or irrevocably deposits with the Trustee a sum sufficient to pay (1) all overdue interest on the outstanding Securities, (2) all unpaid principal of the Securities that has become due otherwise than by such declaration of acceleration, (3) interest on such overdue interest as provided herein and (4) all sums paid or advanced by the Trustee and any Agent hereunder and the compensation, expenses, disbursements and advances of the Trustee, the Agents and their agents and counsel Incurred in connection with such Event of Default, a declaration of acceleration may be rescinded and annulled by the Holders of not less than a majority in aggregate principal amount of the outstanding Securities. In addition, past Defaults with respect to the Securities may be waived by the Holders of not less than a majority in aggregate principal amount of the outstanding Securities except (a) a Default in the payment of principal of (or premium, if any) or interest or premium, if any, on any Security or (b) in respect of a provision of this Indenture which cannot be amended without the consent of the Holder of each outstanding Security affected thereby.

SECTION 6.03 Control by Majority. The Trustee and the Collateral Agent shall be under no obligation to exercise any of its rights or powers under this Indenture at the request or direction of any of the Holders, unless such Holders shall have offered to the Trustee or the Collateral Agent security or indemnity reasonably satisfactory to the Trustee or the Collateral Agent, as applicable. Subject to such provision for indemnification, the Holders of a majority in principal amount of the outstanding Securities shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or the Collateral Agent, as applicable, exercising any trust or power conferred on the Trustee or the Collateral Agent, as applicable, with respect to the Securities (or with respect to the Collateral Agent, the Collateral; *provided* that the Holders may not direct the Collateral Agent to take any action with respect to the Conditional AGE Collateral except and to the extent there are amounts due and payable under the Securities); and *provided further*, *however*, that the Trustee or the Collateral Agent, as applicable, shall have the right to decline to follow any such direction if the action so directed conflicts with any law or the provisions of this Indenture (or with respect to the Collateral Agent, the Collateral Agreement), if the Trustee or the Collateral Agent, as applicable,

shall determine that such action would be prejudicial to Securityholders not taking part in such direction (provided that the Trustee or the Collateral Agent, as applicable, shall have no duty to ascertain whether such actions would be prejudicial to any Holder) or if either of the Trustee or the Collateral Agent, as applicable, determines in good faith that such action would involve the Trustee or the Collateral Agent, as applicable, in personal liability. In the event the Trustee receives inconsistent or conflicting requests and indemnity from two or more groups of Holders of the Notes, each representing less than a majority in aggregate principal amount of the Securities outstanding, the Trustee, may refrain from acting on such direction or requests, and shall Incur no liability to any Person for so refraining.

SECTION 6.04 Limitation on Suits; Rights of Holders to Receive Payments. No Holder shall have any right to institute any proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy thereunder, unless:

(a) such Holder has previously given written notice to the Trustee of a continuing Event of Default with respect to the Securities;

(b) the Holders of not less than 25% in aggregate principal amount of the outstanding Securities shall have made written request to the Trustee to institute proceedings in respect of such Event of Default in its own name as Trustee thereunder;

(c) such Holder or Holders have offered to the Trustee indemnity or security reasonably satisfactory to the Trustee against the costs, expenses (including, without limitation, attorneys' fees and expenses) and liabilities to be Incurred in compliance with such request;

(d) the Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(e) no direction inconsistent with such written request has been given to the Trustee during such 60-day period by the Holders of a majority in aggregate principal amount of the outstanding Securities;

it being understood and intended that no one or more of such Holders shall have any right in any manner whatsoever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other of such Holders, or to obtain or to seek to obtain priority or preference over any other of such Holders or to enforce any right under this Indenture, except in the manner therein provided and for the equal and ratable benefit of all such Holders, it being expressly understood and agreed that the Trustee shall not have an affirmative obligation to ascertain whether such action is prejudicial.

Notwithstanding any other provision of this Indenture, the Holder of any Security shall have the right, which is absolute and unconditional, to receive payment of the principal of (and premium, if any) and interest, if any, on such Security and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

SECTION 6.05 Other Remedies. If an Event of Default occurs and is continuing, the Trustee and the Collateral Agent (solely with respect to its interests in the Collateral) may pursue any available remedy to collect the payment of principal of or interest on the Securities or to enforce the performance of any provision of the Securities or this Indenture or the Collateral Agreement.

The Trustee may maintain a proceeding even if it does not possess any of the Securities or does not produce any of them in the proceeding. A delay or omission by the Trustee of the Collateral Agent or any Securityholder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. No remedy is exclusive of any other remedy. All available remedies are cumulative.

SECTION 6.06 Collection Suit by Trustee. If an Event of Default specified in Section 6.01(1) or (2) hereof occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer for the whole amount then due and owing (together with interest on any unpaid interest to the extent lawful) and the amounts provided for in Section 7.06 hereof.

SECTION 6.07 Trustee or Collateral Agent May File Proofs of Claim. The Trustee or the Collateral Agent, as applicable, may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee or the Collateral Agent, as applicable, and the Securityholders allowed in any judicial proceedings relative to the Issuer its creditors or their property and any Bankruptcy Custodian in any such judicial proceeding is hereby authorized by each Holder to make payments to the Trustee or the Collateral Agent, as applicable, and, in the event that the Trustee or the Collateral Agent, as applicable, shall consent to the making of such payments directly to the Holders, to pay to the Trustee or the Collateral Agent, as applicable, any amount due it for the reasonable compensation, expenses (including, without limitation, attorneys' fees and expenses), disbursements and advances of the Trustee or the Collateral Agent, as applicable, its agents and its counsel, and any other amounts due the Trustee or the Collateral Agent, as applicable, under Section 7.06 hereof.

SECTION 6.08 Priorities. If the Trustee collects any money or property pursuant to this Article 6 or any proceeds are delivered to the Trustee by the Collateral Agent, it shall pay out the money or property in the following order:

FIRST: to the Trustee and the Agents appointed hereunder for amounts due under Section 7.06 hereof;

SECOND: to Securityholders for amounts due and unpaid on the Securities for principal and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Securities for principal and interest, respectively; and

THIRD: to the Issuer.

The Trustee may fix a record date and payment date for any payment to Securityholders pursuant to this Section 6.08 and shall promptly notify the Issuer thereof. At least 15 days before such

record date, the Issuer shall give to each Securityholder and the Trustee a notice that states the record date, the payment date and amount to be paid.

SECTION 6.09 Undertaking for Costs. In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.09 does not apply to a suit by the Trustee, a suit by a Holder pursuant to this Section 6.09 or a suit by Holders of more than 10% in aggregate principal amount of the outstanding Securities.

SECTION 6.10 Waiver of Stay or Extension Laws. The Issuer (to the extent it may lawfully do so) shall not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and the Issuer (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

## ARTICLE 7

## TRUSTEE

SECTION 7.01 Duties of Trustee.

(1) Except during the continuance of an Event of Default:

(a) the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(b) in the absence of negligence or willful misconduct on its part, as determined by a court of competent jurisdiction in a final, non-appealable order, the Trustee may conclusively rely as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. Notwithstanding the foregoing, the Trustee shall examine such certificates and opinions to determine whether or not they conform, on their faces, to the requirements of this Indenture (but need not, and is under no obligation to, confirm or investigate the accuracy of mathematical calculations or other facts stated therein or the validity, accuracy, enforceability or sufficiency of any attachments thereto or documents referenced therein).

(2) Following the occurrence and continuance of an Event of Default, the Trustee shall exercise such of the rights and powers vested in it by this Indenture and use the

same degree of care and skill in their exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs.

(3) The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable order, except that:

(a) this Section 7.01(3) does not limit the effect of Section 7.01(1) hereof;

(b) the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(c) the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.03 hereof.

(4) The Trustee shall not be liable for interest on or the investment of any money received or held by it except as the Trustee may agree in writing with the Issuer.

(5) Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(6) No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise Incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(7) Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 7.01.

SECTION 7.02 Rights of Trustee.

(1) The Trustee may conclusively rely on any document believed by it to be genuine and to have been signed or presented by the proper Person or Persons. The Trustee need not investigate any fact or matter stated in the document but may, in its discretion, make such further inquiry or investigation into such facts or matters as it may see fit and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney at the sole cost of the Issuer and shall Incur no liability or additional liability of any kind by reason of such inquiry or investigation.

(2) Before the Trustee acts or refrains from acting, it may require an Officer's Certificate and/or an Opinion of Counsel. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officer's Certificate or Opinion of Counsel.

(3) The Trustee may act through agents and attorneys and shall not be charged with the supervision of such agents or attorneys, and shall not be responsible for the acts, omissions, misconduct or negligence of any agent appointed with due care.

(4) The Trustee shall not be liable for any action it takes or omits to take in good faith which it reasonably believes to be authorized or within its rights or powers.

(5) The Trustee may consult with counsel of its own selection, the costs and expenses of which shall be borne by the Issuer, and the advice or opinion of counsel of such counsel with respect to legal matters relating to this Indenture and the Securities shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or such opinion of such counsel.

(6) In no event shall the Trustee be responsible or liable for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(7) The Trustee shall not be deemed to have notice of any Default or Event of Default (other than a payment default of principal, premium or interest) unless a Trust Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Securities and this Indenture.

(8) The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each Paying Agent, the Registrar, each Transfer Agent, the Collateral Agent and each other agent, custodian and other Person employed to act hereunder.

(9) The Trustee may request that the Issuer or the Guarantor deliver an Officer's Certificate setting forth the names of individuals and/or titles of Officers authorized at such time to take specified actions pursuant to this Indenture.

(10) In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, pandemics, epidemics, recognized public emergencies, quarantine restrictions, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services, use or infiltration of the Trustee's technological infrastructure exceeding authorized access; it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

(11) Any request, direction, order or demand of the Issuer shall be sufficiently evidenced by an Officer's Certificate of the Issuer (unless other evidence in respect thereof be

herein specifically prescribed); and any resolution of the Board of Directors of the Issuer shall be evidenced by copies thereof certified by the Secretary or an Assistant Secretary (or equivalent Officer) of the Issuer.

(12) The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Indenture at the request, order or direction of any of the Holders pursuant to the provisions of this Indenture, unless such Holders shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses (including, without limitation, attorneys' fees and expenses) and liabilities that might be Incurred thereby.

(13) The permissive rights of the Trustee enumerated herein shall not be construed as duties of the Trustee.

(14) The Trustee shall not have any liability or responsibility with respect to, or obligation or duty to monitor, confirm, determine or inquire as to the Issuer's, the Guarantor's or any Subsidiary's compliance with any covenant under this Indenture (other than payment of the Securities).

(15) To the extent that any consent or instruction from the Holders is required under this Indenture or otherwise with respect to the Collateral and/or the Collateral Agreement, the Trustee, the Paying Agent, the Registrar and the Transfer Agent shall not have any duty or obligation to determine whether such consent or instruction is required nor any duty or obligation to solicit such consent or instructions.

(16) None of the Trustee, any Paying Agent, the Registrar or any Transfer Agent shall at any time be under any duty or responsibility to the Issuer, the Guarantor, any Holders or any other Person to calculate any principal, interest (including, without limitation, PIK Interest), premium or any other amount payable in respect of the Securities whether at Stated Maturity, acceleration, redemption, prepayment or otherwise. Each of the Trustee, the Paying Agent, the Registrar and the Transfer Agent may conclusively rely on the calculations and determinations of the Issuer in respect of any such amount payable with respect to the Securities.

SECTION 7.03 Individual Rights of Trustee. The Trustee in its individual or any other capacity may become the owner or pledgee of Securities and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee. Any Collateral Agent, Paying Agent, Registrar, co-registrar or Transfer Agent may do the same with like rights. However, the Trustee must comply with Sections 7.09 and 7.10 hereof.

SECTION 7.04 Trustee's Disclaimer. The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture, or the Securities; it shall not be accountable for the Issuer's use of the proceeds from the Securities; and it shall not be responsible for any statement of the Issuer or any other Person in this Indenture, or in any other document issued in connection with the sale of the Securities or in the Securities other than the Trustee's certificate of authentication.

SECTION 7.05 Notice of Defaults. If a Default or Event of Default occurs and is continuing and if it is actually known to a Trust Officer in accordance with Section 7.02(7)

hereof, the Trustee shall give to each Securityholder notice of the Default within 10 days after such Trust Officer has actual knowledge thereof. Except in the case of a Default or Event of Default in payment of principal of, or interest or premium, if any, on any Security (including payments pursuant to the mandatory redemption provisions of, or interest, if any, on the Securities), the Trustee may withhold the notice if and so long as the Trustee determines in good faith that withholding the notice is in the interests of Securityholders. The Trustee shall not be charged with knowledge of any Default or Event of Default other than a Default under Section 6.01(1) or 6.01(2) hereof unless a Trust Officer in the Corporate Trust Office of the Trustee shall have received written notice thereof from the Issuer or a Securityholder, expressly referencing this Indenture and the Securities or as otherwise provided in Section 7.02(7) hereof.

SECTION 7.06 Compensation and Indemnity. The Issuer and the Guarantor jointly and severally agree to pay to each of the Trustee, the Collateral Agent, the Paying Agent, the Registrar and the Transfer Agent from time to time such compensation for its services hereunder as the parties may from time to time agree in writing. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. Except as otherwise expressly provided herein, the Issuer and the Guarantor jointly and severally agree to reimburse each of the Trustee, the Collateral Agent, the Paying Agent, the Registrar and the Transfer Agent upon its request for all reasonable expenses (including, without limitation, attorneys' fees and expenses), disbursements and advances Incurred or made by it in accordance with any provision of this Indenture (including the compensation and the expenses and disbursements of its agents and counsel), except any such expense, disbursement or advance as may be attributable to its own willful misconduct or negligence, as determined by a court of competent jurisdiction in a final, non-appealable order. Each of the Issuer and the Guarantor, jointly and severally, shall indemnify each of the Trustee or any predecessor Trustee (which for purposes of this Section 7.06 shall be deemed to include its directors, officers, agents and employees), the Collateral Agent, the Paying Agent, the Registrar, the Transfer Agent, and to hold each of them harmless for, from and against any and all loss, liability damage, cost, claim or expense (including taxes (other than taxes based upon, measured by or determined by the income of the Trustee) and reasonable and documented attorneys' fees and expenses) Incurred by it in connection with the administration of this trust, the performance of its duties hereunder and/or the exercise of its rights hereunder, including the reasonable costs and expenses of defending itself against any claim (whether asserted by the Issuer, the Guarantor, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section 7.06, except to the extent that such loss, damage, claim, liability or expense is due to its own willful misconduct or negligence as determined in a final judgment of a court of competent jurisdiction. The Trustee, the Paying Agent, the Registrar or the Transfer Agent, as applicable, shall notify the Issuer promptly of any claim for which it may seek indemnity. Failure by the Trustee, any Paying Agent, the Registrar or any Transfer Agent to so notify the Issuer and the Guarantor shall not relieve the Issuer and the Guarantor of their obligations hereunder. The Issuer and the Guarantor shall defend the claim and each of the Trustee, any Paying Agent, the Collateral Agent, the Registrar or any Transfer Agent may have separate counsel and the Issuer and the Guarantor shall pay the reasonable and documented fees and expenses of such counsel; *provided* that any of the Trustee, the Paying Agent, the Collateral Agent, the Registrar or the Transfer Agent may only employ separate counsel at the expense of the Issuer if any of the Trustee, the Paying Agent, the Collateral Agent, the Registrar or the Transfer Agent, as applicable, in its sole

judgment, determines (1) a conflict of interest or the potential for a conflict of interest exists by reason of common representation or (2) there are legal defenses available to it that are different from or are in addition to those available to the Issuer and/or the Guarantor or (3) if all parties commonly represented do not agree as to the action (or inaction) of counsel. The Issuer and the Guarantor need not pay for any settlement made without its consent, which consent shall not be unreasonably withheld.

To secure the Issuer's and the Guarantor's obligations in this Section 7.06, the Trustee shall have a Lien prior to the Securities on all money or property held or collected by the Trustee or the Paying Agent other than money or property held in trust to pay principal of and interest, on particular Securities.

The Issuer and the Guarantor agree to pay by wire transfer the fees and expenses (including, without limitation, attorneys' fees and expenses) of each of the Trustee, the Collateral Agent, each Paying Agent, the Registrar and the Transfer Agent and their respective counsel in connection with the negotiation, execution and delivery of this Indenture within three Business Days of receipt of invoices for such fees and expenses.

The Issuer's and the Guarantor's payment obligations pursuant to this Section 7.06 shall survive the discharge of this Indenture, final payment on the Securities and resignation or removal of the Trustee, any Paying Agent, the Registrar or any Transfer Agent. When the Trustee Incurs expenses (including, without limitation, attorneys' fees and expenses) after the occurrence of an Event of Default specified in Section 6.01(5) or (6) hereof with respect to the Issuer or the Guarantor, the expenses are intended to constitute expenses of administration under the U.S. Bankruptcy Code and any other Bankruptcy Law.

SECTION 7.07 Replacement of Trustee. The Trustee may resign at any time by so notifying the Issuer. The Holders of a majority in principal amount of the outstanding Securities may remove the Trustee by so notifying the Trustee and may appoint a successor Trustee. The Issuer shall remove the Trustee if:

(1) the Trustee fails to comply with Section 7.09 hereof;

(2) the Trustee is adjudged bankrupt or insolvent;

(3) a receiver or other public officer takes charge of the Trustee or its property; or

(4) the Trustee otherwise becomes incapable of acting.

Furthermore, so long as no Event of Default has occurred and is continuing, the Issuer may, in its discretion, remove the Trustee at any time.

If the Trustee resigns or is removed by the Issuer or by the Holders of a majority in aggregate principal amount of the Securities and the Issuer or such Holders do not reasonably promptly appoint a successor Trustee, or if a vacancy exists in the office of Trustee for any reason (the Trustee in such event being referred to herein as the "retiring Trustee"), the Issuer

shall promptly appoint a successor Trustee; *provided* that such successor Trustee complies, at the time of such appointment, with Section 7.09 hereof.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer. Thereupon, the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall give a notice of its succession to Securityholders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the Lien provided for in Section 7.06 hereof.

If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Issuer or the Holders of 10% in aggregate principal amount of the outstanding Securities may, at the expense of the Issuer, petition any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee fails to comply with Section 7.09 hereof, any Securityholder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of another successor Trustee.

Notwithstanding the replacement of the Trustee pursuant to this Section 7.07, the Issuer's and the Guarantor's obligations under Section 7.06 hereof shall continue for the benefit of the retiring Trustee.

SECTION 7.08 Successor Trustee by Merger. If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another entity, the resulting, surviving or transferee entity without any further act shall be the successor Trustee.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture any of the Securities shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Securities so authenticated; and in case at that time any of the Securities shall not have been authenticated, any successor to the Trustee by merger, conversion or consolidation may authenticate such Securities either in the name of any predecessor hereunder or in the name of the successor to the Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Securities or in this Indenture provided that the certificate of the Trustee shall have.

SECTION 7.09 Eligibility; Disqualification. The Trustee shall at all times satisfy the requirements of TIA § 310(a). The Trustee shall have a combined capital and surplus of at least US$50,000,000 as set forth in its most recent published annual report of condition. The Trustee shall comply with TIA § 310(b); *provided, however*, that there shall be excluded from the operation of TIA § 310(b)(1) any indenture or indentures under which other securities or certificates of interest or participation in other securities of the Issuer are outstanding if the requirements for such exclusion set forth in TIA § 310(b)(1) are met.

SECTION 7.10 Preferential Collection of Claims Against Issuer. The Trustee shall comply with TIA § 311(a), excluding any creditor relationship listed in TIA § 311(b). A Trustee who has resigned or been removed shall be subject to TIA § 311(a) to the extent indicated.

SECTION 7.11 Appointment of Co-Trustee. Notwithstanding any other provisions of this Indenture, the Trustee shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, and to vest in such Person or Persons, in such capacity and for the benefit of the Securityholders, subject to the other provisions of this Section 7.11, such powers, duties, obligations and rights as the Trustee may consider necessary or desirable. No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 7.09 hereof and no notice to Holders of the appointment of any co-trustee or separate trustee shall be required under Section 7.07 hereof.

(a) Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i) all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the written direction of the Trustee;

(ii) no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

(iii) the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(b) Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article 7. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection or rights (including the rights to compensation, reimbursement and indemnification hereunder) to, the Trustee. Every such instrument shall be filed with the Trustee.

(c) Any separate trustee or co-trustee may at any time constitute the Trustee, its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

## ARTICLE 8

## DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 8.01 Satisfaction and Discharge of Liability on Securities. This Indenture shall be discharged and shall cease to be of further effect as to all Securities issued hereunder, and the Collateral shall be released in accordance with Section 11.04 hereof, when:

(1) (a) all Securities that have been authenticated, except lost, stolen or destroyed Securities that have been replaced or paid and Securities for whose payment money has been deposited in trust and thereafter repaid to the Issuer, have been delivered to the Trustee for cancellation; or

(b) all Securities that have not been delivered to the Trustee for cancellation (i) have become due and payable, (ii) will become due and payable within one year of their Stated Maturity or (iii) are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of a redemption by the Trustee and, in each case, the Issuer, the Guarantor, or any Restricted Subsidiary has irrevocably deposited or caused to be deposited with the Trustee as funds in trust solely for the benefit of the Holders, cash in U.S. dollars in amounts as will be sufficient to pay and discharge the entire Indebtedness on the Securities not delivered to the Trustee for cancellation for principal, and premium, if any, and accrued interest to the date of maturity or redemption;

(2) no Default or Event of Default has occurred and is continuing on the date of the deposit or will occur as a result of the deposit and the deposit will not result in a breach or violation of, or constitute a default under, any other material instrument to which the Issuer is a party or by which the Issuer is bound;

(3) the Issuer, the Guarantor, or any Restricted Subsidiary has paid or caused to be paid all other sums payable by the Issuer or the Guarantor under this Indenture; and

(4) the Issuer has delivered irrevocable instructions to the Trustee under this Indenture to apply the deposited money toward the payment of the Securities at maturity or the redemption date, as the case may be.

In addition, the Issuer must deliver an Officer's Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent relating to satisfaction and discharge have been satisfied.

Notwithstanding this Section 8.01, this Article 8 and the Issuer's and the Guarantor's obligations in Sections 2.03, 2.04, 2.06, 2.07, 7.06 and 7.07 hereof shall survive until the Securities have been paid in full. Thereafter, Section 8.03 hereof and the Issuer's and the Guarantor's obligations in Sections 7.06 and 8.04 hereof shall survive.

SECTION 8.02 Application of Trust Money. The Trustee shall hold in trust U.S. dollars or U.S. Government Obligations deposited with it pursuant to this Article 8. It shall apply the deposited money and the U.S. dollars from U.S. Government Obligations through the Paying Agent and in accordance with this Indenture to the payment of principal of and interest, on the Securities.

SECTION 8.03 Repayment to Issuer. The Trustee and the Paying Agent shall promptly turn over to the Issuer upon written request any excess money or securities held by them at any time.

Subject to any applicable abandoned property law, the Trustee and the Paying Agent shall pay to the Issuer upon written request any money held by them for the payment of principal and interest, that remains unclaimed for two years, and, thereafter, Securityholders entitled to the money must look only to the Issuer and not to the Trustee or any Paying Agent for payment as general creditors.

SECTION 8.04 Reinstatement. If the Trustee or any Paying Agent is unable to apply any U.S. dollars or U.S. Government Obligations in accordance with this Article 8 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's obligations under this Indenture and the Securities shall be revived and reinstated as though no deposit had occurred pursuant to this Article 8 until such time as the Trustee or such Paying Agent is permitted to apply all such U.S. dollars or U.S. Government Obligations in accordance with this Article 8; *provided*, *however*, that, if the Issuer has made any payment of interest on or principal of any Securities because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Securities to receive such payment from the U.S. dollars held by the Trustee or such Paying Agent.

SECTION 8.05 Defeasance. The Issuer, the Guarantor and the Restricted Subsidiaries may, at the Issuer's option, at any time elect to have either Section 8.05(a) or Section 8.05(b) hereof applied to this Indenture, all outstanding Securities and the Guarantee upon compliance with the conditions set forth in this Section 8.05:

(a) Upon the Issuer's election of the "legal defeasance" option applicable to this Section 8.05(a), and subject to the satisfaction of the conditions set forth in Section 8.05(c) hereof, the Issuer and the Guarantor, as applicable, shall be discharged from any and all obligations in respect of this Indenture, the Securities, the Guarantee and the Collateral Agent may release the Collateral in accordance with Section 11.04 hereof (except in each case for certain obligations, including to register the transfer or exchange of Securities, replace stolen, lost or mutilated Securities, maintain paying agencies and hold moneys for payment in trust and the rights, protections, immunities and indemnities of the Trustee and the obligations of the Issuer and the Guarantor with respect thereto).

Subject to compliance with this Section 8.05, the Issuer may exercise its option under this Section 8.05(a) notwithstanding the prior exercise of its option under Section 8.05(b) hereof. If the Issuer exercises the "legal defeasance" option, any payment on the Securities may not be accelerated due to an Event of Default with respect thereto.

(b) Upon the Issuer's election of the "covenant defeasance" option applicable to this Section 8.05(b), and subject to the satisfaction of the conditions set forth in Section 8.05(c) hereof, the Issuer and the Guarantor, as applicable, need not comply with the covenants set forth in Sections 4.02, 4.04, 4.05, and 4.06 and Sections 6.01(3), (4), (5) (solely with respect to any Significant Subsidiary) and (6) (solely with respect to any Significant Subsidiary).

(c) In order to exercise the options set forth in Section 8.05(a) or Section 8.05(b) hereof the Issuer must irrevocably deposit with the Trustee, in trust, (i) money, (ii) U.S. Government Obligations which through the payment of interest and principal in respect thereof in accordance with their terms will provide money in an amount, or (iii) a combination thereof, in each case, in such amounts, as shall be, in the opinion of an internationally recognized firm of independent accountants delivered to the Trustee, sufficient to pay and discharge the principal of each installment of principal and interest, if any, on the outstanding Securities to, but excluding, the dates such payments are due, in accordance with the terms of this Indenture and of the Securities. The defeasance options set forth in Section 8.05(a) or Section 8.05(b) hereof shall become effective only if the Issuer delivers to the Trustee: (A) an opinion of recognized U.S. counsel independent of the Issuer to the effect that the Holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such deposit, defeasance and discharge described in Section 8.05(a) hereof or Section 8.05(b) hereof, as applicable, and shall be subject to U.S. federal income tax on the same amounts and in the same manner and at the same times as if such deposit, defeasance and discharge had not occurred, which in the case of Section 8.05(a) hereof must be based on a change in law or a ruling by the U.S. Internal Revenue Service; and (B) an Opinion of Counsel and an Officer's Certificate as to compliance with all conditions precedent provided for in this Indenture relating to the defeasance of the Securities.

SECTION 8.06 Indemnity for U.S. Government Obligations. The Issuer or the Guarantor shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the U.S. Government Obligations deposited pursuant to this Article 8 or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of outstanding Securities.

## ARTICLE 9

## AMENDMENTS

SECTION 9.01 Without Consent of Holders. Notwithstanding Section 9.02 hereof, the Issuer, the Guarantor, the Trustee and the Collateral Agent may amend this Indenture, the Guarantee or the Securities without notice to or consent of any Securityholder:

(1) to cure any ambiguity, omission, defect or inconsistency;

(2) provide for the assumption by a Successor Issuer, Successor Company or a Substituted Debtor of the obligations of the Issuer or the Guarantor, as applicable, under this Indenture, the Guarantee and/or the Securities;

(3) to add additional Guarantee with respect to the Securities;

(4) to add to the covenants of the Issuer, the Guarantor or the Restricted Subsidiaries for the benefit of the Holders or to surrender any right or power herein conferred upon the Issuer or the Restricted Subsidiaries;

(5) to make any change that does not adversely affect the rights of any Securityholder in any material respect; and

(6) to provide for the appointment of a successor Trustee with respect to the Securities; *provided* that the successor Trustee is otherwise qualified and eligible to act as such under the terms of this Indenture.

The relevant parties to the Collateral Agreement may amend such Collateral Agreement without notice to or consent of any Holder to provide for the succession of any parties to such Collateral Agreement (and other amendments that are administrative or ministerial in nature) in connection with an amendment, renewal, extension, substitution, refinancing, restructuring, replacement, supplementing or other modification from time to time of any agreement that is not prohibited by the Collateral Agreement or this Indenture.

After an amendment under this Section 9.01 becomes effective, the Issuer shall give to Securityholders a notice briefly describing such amendment. The failure to give such notice to all Securityholders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.01.

SECTION 9.02 With Consent of Holders. The Issuer, the Guarantor and the Trustee and the Collateral Agent may amend this Indenture or the rights of the Holders (or waive any Default other than a Default in the payment of principal of, premium, accrued plus unpaid interest, if any, on the Securities) without notice to any Securityholder but with the written consent of the Holders of at least a majority in aggregate in principal amount of the outstanding Securities. However, without the consent of the Holder of each outstanding Security affected thereby, an amendment or waiver may not:

(1) change the Stated Maturity upon which the principal of or the interest on any Security is due and payable;

(2) reduce the principal amount of the Security;

(3) reduce the rate of interest on the Security or any premium payable upon the redemption thereof;

(4) change any place of payment in which any Security or any premium or the interest thereon is payable;

(5) change the currency in which any Security or any premium or the interest thereon is payable;

(6) impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity of the Security (or, in the case of redemption, on or after any redemption date);

(7) reduce the percentages of principal amount of the outstanding Securities, whose Holders' consent is required for any amendment, supplement or waiver of any provision of this Indenture;

(8) waive a Default or Event of Default in the payment of principal of, premium, if any, or interest on the Securities (except (i) a rescission of acceleration of the Securities by the Holders of at least a majority in aggregate principal amount of the then outstanding Securities with respect to a non-payment Default and a waiver of the payment Default that resulted from such acceleration and (ii) a waiver of a Default or Event of Default under Section 6.01(1) of this Indenture, wherein the period set forth therein may be extended by written consent of the Holders of at least a majority in aggregate principal amount of the outstanding Securities);

(9) make any change in this Section 9.02; or

(10) modify or change any provision of this Indenture affecting the ranking of the Securities in a manner adverse to the Securityholders.

Notwithstanding anything herein to the contrary, without the consent of the Holders of at least 75% in principal amount of the Securities then outstanding, no amendment, supplement or waiver may release all or substantially all of the Collateral other than in accordance with the express terms of this Indenture and the Collateral Agreement.

It shall not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent approves the substance thereof.

After an amendment under this Section 9.02 becomes effective, the Issuer shall give to Securityholders a notice briefly describing such amendment. The failure to give such notice to all Securityholders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.02.

SECTION 9.03 Revocation and Effect of Consents and Waivers.

(1) A consent to an amendment or a waiver by a Holder of a Security shall bind the Holder and every subsequent Holder of that Security or portion of the Security that evidences the same debt as the consenting Holder's Security, even if notation of the consent or waiver is not made on the Security. However, any such Holder or subsequent Holder may revoke

the consent or waiver as to such Holder's Security or portion of the Security if the Trustee receives the notice of revocation before the date the amendment or waiver becomes effective. After an amendment or waiver becomes effective, it shall bind every Securityholder. An amendment or waiver becomes effective upon the execution of such amendment or waiver by the Trustee.

(2) The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the Securityholders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture. If a record date is fixed, then notwithstanding Section 9.03(1) hereof, those Persons who were Securityholders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be Holders after such record date. No such consent shall be valid or effective for more than 120 days after such record date.

SECTION 9.04 Notation on or Exchange of Securities. If an amendment changes the terms of a Security, the Trustee may require the Holder of that Security to deliver it to the Trustee. The Trustee may place an appropriate notation on that Security regarding the changed terms and return it to the Holder. Alternatively, if the Issuer or the Trustee so determines, the Issuer in exchange for that Security shall issue and the Trustee shall, upon receipt of a written order of the Issuer, authenticate a new Security that reflects the changed terms. Failure to make the appropriate notation or to issue a new Security shall not affect the validity of such amendment.

SECTION 9.05 Trustee to Sign Amendments. The Trustee shall sign any amendment authorized pursuant to this Article 9 if, in the reasonable discretion of the Trustee, the amendment does not adversely affect the rights, duties, liabilities or immunities of the Trustee. If the Trustee, in its reasonable discretion, determines that any such amendment adversely affects the rights, duties, liabilities or immunities of the Trustee, the Trustee may but need not sign it. In signing such amendment the Trustee shall, upon receipt of a written order of the Issuer, receive indemnity reasonably satisfactory to it and to receive, and (subject to Section 7.01 hereof) shall be fully protected in relying upon, in addition to the documents required by Section 13.03 hereof, an Officer's Certificate and an Opinion of Counsel of the Issuer each stating that such amendment is authorized or permitted by this Indenture, and that the conditions precedent relating to such amendment have been satisfied.

## ARTICLE 10

## GUARANTEE

SECTION 10.01 Guarantee. Subject to the provisions of this Article 10, the Guarantor hereby irrevocably and unconditionally Guarantee to each Securityholder and to the Trustee, on an unsecured basis, the full, due and punctual payment (whether at the Maturity Date, upon redemption, purchase pursuant to an offer to purchase or acceleration or otherwise) of the principal (and premium, if any), interest, Additional Amounts and all other amounts payable by the Issuer under this Indenture and the Securities as they come due. Upon failure by the Issuer to pay punctually any such amount, the Guarantor shall forthwith pay the amount not so paid at the

place and time and in the manner specified in this Indenture. The Guarantee constitute a direct, general and unconditional obligation of the Guarantor which shall at all times rank at least pari passu with all other present and future unsecured obligations of the Guarantor, except for such obligations as may be preferred by mandatory provisions of law.

SECTION 10.02 Guarantee Unconditional. The obligations of the Guarantor under the Guarantee are unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a) any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Issuer under this Indenture, the Securities or any Collateral Agreement, by operation of law or otherwise;

(b) any modification or amendment of or supplement to this Indenture (other than this Article 10), the Securities or any Collateral Agreement;

(c) any change in the corporate existence, structure or ownership of the Issuer, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Issuer or its assets or any resulting release or discharge of any obligation of the Issuer contained in this Indenture, the Securities or any Collateral Agreement;

(d) the existence of any claim, set-off or other rights which the Guarantor may have at any time against the Issuer, the Trustee or any other Person, whether in connection with this Indenture or any unrelated transactions; *provided* that nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim;

(e) any invalidity or unenforceability relating to or against the Issuer for any reason of this Indenture, the Securities or any Collateral Agreement, or any provision of applicable law or regulation purporting to prohibit the payment by the Issuer of the principal of or interest on any Security or any other amount payable by the Issuer under this Indenture;

(f) any other act or omission to act or delay of any kind by the Issuer, the Trustee or any other Person or any other circumstance whatsoever which might, but for the provisions of this Section 10.02, constitute a legal or equitable discharge of or defense to the Guarantor's obligations hereunder; or

(g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate Guarantee or sureties, or which may conflict with the terms of this Indenture.

SECTION 10.03 Discharge and Reinstatement; Guarantor Release.

(1) The Guarantor's obligations hereunder shall remain in full force and effect until the principal of, premium, if any, and interest on the Securities and all other amounts payable by the Issuer under this Indenture have been paid in full. If at any time any payment of the principal of, premium, if any, or interest on any Security or any other amount payable by the Issuer under this Indenture is rescinded or must be otherwise restored or returned upon the

insolvency, bankruptcy or reorganization of the Issuer or otherwise, the Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

(2) AGE shall be released from its obligations under the Guarantee:

(a) upon a sale or disposition (including by way of consolidation or merger) of all or a portion of the Capital Stock of the Guarantor following which the Guarantor is no longer a Subsidiary of the Company;

(b) upon a sale or disposition (including by way of consolidation or merger) of all or substantially all of the assets of the Guarantor to a Person that is not the Company or a Restricted Subsidiary;

(c) upon defeasance or discharge of the Securities in accordance with Sections 8.01 and 8.05 hereof; or

(d) upon the designation of the Guarantor as an Unrestricted Subsidiary;

*provided* that the transaction is carried out pursuant to, and in accordance with, all other applicable provisions of this Indenture, as evidenced by an Officer's Certificate of the Issuer or the Company delivered to the Trustee.

SECTION 10.04 Waiver by the Guarantor.

(1) The Guarantor unconditionally and irrevocably waives acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the Issuer or any other Person. The Guarantee constitute a guarantee of payment and not of collection.

(2) The Guarantor unconditionally and irrevocably waives any and all rights provided under the relevant applicable law of Brazil on prior demand and protest, as well as any and all rights it may have under Articles 333, sole paragraph, 364, 366, 821, 822, 827, 829, 830, 834, 835, 837, 838 and 839 of the Brazilian Civil Code, and Article 794, first paragraph of the Brazilian Code of Civil Procedure.

SECTION 10.05 Subrogation and Contribution. Upon making any payment with respect to any obligation of the Issuer under this Article 10, the Guarantor shall be subrogated to the rights of the payee against the Issuer with respect to such obligation; *provided*, *however*, that the Guarantor shall not be entitled to enforce, or to receive any payments arising out of or based upon, such right of subrogation until the principal of (and premium, if any) interest, and Additional Amounts on all Securities and all other amounts due and owing under this Indenture shall have been paid in full.

SECTION 10.06 Stay of Acceleration. If acceleration of the time for payment of any amount payable by the Issuer under this Indenture or the Securities is stayed upon the insolvency, bankruptcy or reorganization of the Issuer, all such amounts otherwise subject to

acceleration under the terms of this Indenture are nonetheless payable by the Guarantor forthwith on demand by the Trustee.

SECTION 10.07 Execution and Delivery of Guarantee. The execution by the Guarantor of this Indenture or a supplemental indenture hereto evidences the Guarantee of the Guarantor, whether or not the Person signing as an Officer of the Guarantor still holds that office at the time of authentication of any Security. In addition, the Guarantor shall execute a Notation of Guarantee in accordance with Section 2.02 hereof; *provided, however*, that the Guarantor agrees that the Guarantee shall remain in full force and effect notwithstanding any failure to endorse on each Security a Notation of Guarantee. The delivery of any Security by the Trustee after authentication constitutes due delivery of the Guarantee set forth in this Indenture on behalf of the Guarantor.

SECTION 10.08 Purpose of Guarantee. The Guarantor hereby acknowledges that the purpose and intent of the Guarantor in executing this Indenture and providing the Guarantee is to give effect to the agreement of the Guarantor to guarantee the payment of any such amounts due by the Issuer under the Securities and this Indenture, whether such amounts are in respect of principal, interest or any other amounts (including Additional Amounts). Therefore, the Guarantor agrees that if the Issuer shall fail to pay in full when due (whether at Stated Maturity, by acceleration or otherwise) any principal (and premium, if any), interest or any other amounts (including Additional Amounts) with respect to this Indenture and the Securities, the Guarantor shall promptly pay the same, without any demand or notice whatsoever. The Trustee shall promptly deposit in the account designated by the Trustee to receive payments from the Issuer with respect to the Securities for further payment to the Holders any funds it receives from the Guarantor under or pursuant to the Guarantee in respect of the Securities.

## ARTICLE 11

## COLLATERAL

SECTION 11.01 Security Interest. The due and punctual payment of the principal of, premium (if any), and interest on, the Securities when and as the same shall be due and payable, whether on an Interest Payment Date, at maturity, by acceleration, repurchase, redemption or otherwise, and interest on the overdue principal of, premium (if any), and interest on, the Securities and the payment and performance of all other obligations of the Issuer and the Guarantor, according to the terms hereunder and the Guarantee, are secured by the Collateral as provided herein and in the Collateral Agreement. Each Holder, by its acceptance of any Securities, consents and agrees to the terms of the Collateral Agreement (including, in each case, without limitation, the provisions providing for foreclosure and release of Collateral), as the same may be in effect or may be amended from time to time in accordance with their terms, and to the appointment of (1) Wilmington Savings Fund Society, FSB as Trustee under this Indenture and (2) TMF Brasil Administração e Gestão de Ativos Ltda. as Collateral Agent under the Collateral Agreement. Each Holder directs the Collateral Agent to enter into the Collateral Agreement as Collateral Agent for the Secured Parties and to perform its obligations and exercise its rights thereunder in accordance therewith. The Issuer, the Company, the Collateral Provider and the Guarantor consent and agree to be bound by the terms of the Collateral Agreement, as the same may be in effect from time to time, and agree to perform their respective

obligations thereunder in accordance therewith. The Issuer and the Guarantor shall deliver to the Trustee copies of all documents delivered to the Collateral Agent pursuant to the Collateral Agreement, and shall do or cause to be done all such acts and things as may be required by the provisions of the Collateral Agreement to assure and confirm to the Collateral Agent the security interest in the Collateral contemplated by the Collateral Agreement or any part thereof, as from time to time constituted, so as to render the same available for the security and benefit of the Secured Parties. The Issuer and the Guarantor hereby agree that the Collateral Agent shall hold the Collateral in trust for the benefit of all Secured Parties, in each case pursuant to and in accordance with this Indenture and the Collateral Agreement.

SECTION 11.02 The Conditional AGE Collateral. Subject to the terms and conditions set forth in the Collateral Agreement, the conditional fiduciary sale (*alienação fiduciária*) of all AGE Shares held by AGIE and any and all economic rights related thereto (collectively, the "Conditional AGE Collateral") shall secure the Securities, subject to their occasional release from the existing Lien established to secure the Option B Securities (the "Condition Precedent").

SECTION 11.03 Further Assurances.

(1) The Issuer and the Guarantor shall do or cause to be done all acts and things that may be required by applicable law to assure and confirm that, upon satisfaction of the Condition Precedent, the Collateral Agent will hold, for the benefit of the Secured Parties, duly created and enforceable and perfected Liens upon all or a portion of the Collateral (including any property or assets that are acquired or otherwise become, or are required by this Indenture or any Collateral Agreement to become, Collateral after the Issue Date or after satisfaction of the Condition Precedent, as applicable), in each case, as contemplated by, and with the Lien priority required under, the Collateral Agreement. Such security interests and Liens shall be created under the Collateral Agreement and other security agreements and other instruments and documents in form and substance reasonably necessary to, upon satisfaction of the Condition Precedent, grant a security interest and Lien to the Collateral Agent for the benefit of the Secured Parties to secure obligations of the Issuer under this Indenture, the Securities and the Collateral Agreement.

(2) The Issuer and any applicable Guarantor shall promptly execute, acknowledge and deliver such Collateral Agreement, instruments, certificates, notices and other documents, and take such other actions as shall be reasonably required by applicable law, to create, perfect, protect, assure or enforce the Liens and benefits intended to be conferred, in each case as contemplated by this Indenture or Collateral Agreement for the benefit of the Secured Parties.

(3) In addition, the Issuer and such Guarantor shall:

(a) enter into the Collateral Agreement and any amendments or supplements to the Collateral Agreement necessary in order to, upon satisfaction of the Condition Precedent, cause the Collateral Agent (for the benefit of the Secured Parties) to have valid and perfected Liens on the Collateral;

(b) do, execute, acknowledge, deliver, record, file and register, as applicable, any and all acts, deeds, conveyances, security agreements, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as may be required by applicable law so that the Collateral Agent (for the benefit of the Secured Parties) shall have, upon satisfaction of the Condition Precedent, valid and perfected first Liens on the Collateral; and

(c) take such further action and execute and deliver such other documents specified in this Indenture or the Collateral Agreement or as otherwise may be required by applicable law to give effect to the foregoing.

SECTION 11.04 Release of Liens in Respect of Securities.

(1) The Liens on the Collateral that secure the Securities will be released upon the occurrence of any of the following, subject to the terms of this Indenture and the Collateral Agreement:

(a) legal defeasance in accordance with this Indenture;

(b) the satisfaction and discharge of this Indenture as set forth in Article 8 hereof; and

(c) in whole or in part, with the consent of the Holders of at least 75% in principal amount of the Securities then outstanding in accordance with Section 9.02 hereof.

(2) The Collateral Agent shall execute, upon request and at the Issuer's expense, any documents, instruments, agreements or filings reasonably requested by the Issuer to evidence such release of such Collateral, in each case, without representation, warranty or recourse; *provided* that if the Collateral Agent is required to execute any such documents, instruments, agreements or filings, the Collateral Agent shall be fully protected in relying upon an Officer's Certificate and an Opinion of Counsel of the Issuer or the Company in connection with any such release stating that all conditions precedent to such release in this Indenture and the Collateral Agreement have been complied with.

SECTION 11.05 Collateral Agent.

(1) The Collateral Agent shall hold (directly or through co-trustees or agents), and is directed by each Holder to so hold, and shall be entitled to enforce, on behalf of the Holders, all Liens on the Collateral created by the Collateral Agreement for their benefit and the benefit of the other Secured Parties. Neither the Issuer nor any of its Affiliates may serve as Collateral Agent.

(2) The rights and powers granted to the Collateral Agent by the Secured Parties have been granted in order to, among other things, perfect its Lien in the Collateral and to otherwise act as their agent with respect to the matters contemplated hereby and the Collateral Agreement. The Collateral Agent from time to time shall exercise such rights and powers as

contemplated by and subject to the terms and conditions of this Indenture and the Collateral Agreement, and all of the rights, protections, immunities and indemnities applicable to the Collateral Agent set forth in this Indenture shall apply to the Collateral Agent acting pursuant to the Collateral Agreement. The Collateral Agent shall take instructions and directions from the Trustee (acting solely pursuant to the written instructions of the Holders of a majority (or such greater percentage as shall be required by this Indenture) in aggregate principal amount of the outstanding Securities) pursuant to, and solely to the extent set forth in, this Indenture and the Collateral Agreement, and no implied duties and covenants shall be deemed to arise against the Collateral Agent.

(3) The Collateral Agent in its individual capacity shall not be answerable or accountable under any circumstances, except to the extent Incurred as a result of its own willful misconduct or gross negligence (as determined by a court of competent jurisdiction pursuant to a non-appealable final order or judgment) and the Collateral Agent shall not be liable for any action or inaction of the Issuer, the Guarantor, the Collateral Provider or any other parties to the Collateral Agreement. The Collateral Agent shall not have any fiduciary duties or other implied duties, regardless of whether an Event of Default has occurred and is continuing, nor shall it have responsibilities or obligations other than those expressly assumed by it in this Indenture and the Collateral Agreement. The Collateral Agent shall not be required to take any action that is contrary to applicable law or any provision of this Indenture or the Collateral Agreement or, that otherwise subjects it to liability.

(4) The powers conferred on the Collateral Agent under this Indenture with respect to the Collateral are to secure the payment and performance of the Obligations of the Issuer and the Guarantor under this Indenture and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it under this Indenture and/or the Collateral Agreement, the Collateral Agent shall have no duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not any Secured Party has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve or perfect rights against any parties or any other rights pertaining to any such Collateral; *provided* that, if the Collateral Agent receives any written notices with respect to the Collateral, it shall promptly transmit such notices to the Trustee. The Collateral Agent shall have no duty to ascertain or inquire into or verify the performance or observance of any covenants, conditions or agreements on the part of the Issuer, the Guarantor or the Collateral Provider.

(5) It is expressly understood and agreed by all Secured Parties (and, with respect to any Holder of a Security, by holding such Security, such Holder shall be deemed to have agreed) that the Collateral Agent shall not be responsible to any Secured Party for any recital, statement, representation, or warranty (whether written or oral) made by any Person other than the Collateral Agent (without limiting the responsibility, obligations, duties or liabilities of the Person acting as Collateral Agent in another capacity under this Indenture or any Collateral Agreement) in or in connection with this Indenture or the Collateral Agreement or any certificate or other document referred to or provided for in, or received by any of them under, this Indenture or the Collateral Agreement, or for the value, validity, effectiveness, genuineness, enforceability, or sufficiency of this Indenture or the Collateral Agreement, or any other document referred to or

provided for therein or for any failure by the Issuer, any Guarantor, any Collateral Provider or any other Person to perform any of its obligations thereunder.

(6) The Collateral Agent does not make and shall not be deemed to have made any representation or warranty as to the validity, legality or enforceability of this Indenture, the Collateral Agreement or any other document or instrument or as to the correctness of any statement contained in any thereof, or as to the validity or sufficiency of any of the pledge and security interests granted pursuant to any Collateral Agreement.

(7) The Collateral Agent shall Incur no liability to anyone as a result of acting upon any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, bond or other document or paper believed by it to be genuine and believed by it to be signed by the proper party or parties, other than by gross negligence, willful misconduct or bad faith on its part (as determined by a court of competent jurisdiction pursuant to a non-appealable final order or judgment). The Collateral Agent may accept a copy of a resolution of the board or other governing body of any party to this Indenture or the Collateral Agreement, certified by the Secretary or an Assistant Secretary thereof or other duly authorized Person of such party as duly adopted and in full force and effect, as conclusive evidence that such resolution has been duly adopted by said board or other governing body and that the same is in full force and effect. As to any fact or matter the manner of ascertainment of which is not specifically described in this Indenture or the Collateral Agreement, the Collateral Agent shall be entitled to receive and may for all purposes hereof conclusively rely on, and shall be fully protected in acting or refraining from acting upon, a certificate, signed by an officer of any duly authorized Person, as to such fact or matter, and such certificate shall constitute full protection to the Collateral Agent for any action taken or omitted to be taken by it in good faith in reliance thereon. The Collateral Agent shall assume, and shall be fully protected in assuming, that each other party to this Indenture and the Collateral Agreement is authorized by its constitutional documents to enter into this Indenture and to take all action permitted to be taken by it pursuant to the provisions of this Indenture, and shall not have any duty to inquire into the authorization of such party with respect thereto.

(8) The Collateral Agent may execute any of the powers hereunder or perform any duties under this Indenture either directly or by or through agents or sub-agents, including financial advisors, separate trustees or attorneys or a custodian or nominee, and the Collateral Agent shall not be responsible for any misconduct or negligence on the part of, or for the supervision of, any such agent, sub-agent, attorney, custodian or nominee appointed with due care by it hereunder. The rights, privileges, protections, immunities and benefits given to the Collateral Agent, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, each agent, sub-agent or custodian and other Person employed by it to act hereunder.

(9) The Collateral Agent may consult with counsel, independent accountants and other experts, and any opinion of counsel or any advice of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it under this Indenture in good faith and in accordance with such advice or opinion.

(10) The Collateral Agent shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture or the Collateral Agreement, or to institute, conduct or defend any litigation under this Indenture or the Collateral Agreement or in relation hereto or thereto, at the request, order or direction of any of the Secured Parties, pursuant to the provisions of this Indenture or the Collateral Agreement, unless such Secured Party shall have offered to the Collateral Agent security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities which may be Incurred therein or thereby. The Collateral Agent shall not have any duty or responsibility in the event of any default by the Issuer and/or any Guarantor and/or any Collateral Provider or any action or inaction by the Issuer and/or any Guarantor and/or any Collateral Provider in the performance of any of its obligations under this Indenture, the Securities and/or the other Collateral Agreement, as the case may be, and/or any other agreement pertaining to any or all of the foregoing, including but not limited to, any duty or responsibility to initiate or attempt to initiate any proceeding at law or otherwise against the Issuer and/or any Guarantor and/or any Collateral Provider or to make any demand of any kind or nature upon the Issuer and/or any Guarantor and/or any Collateral Provider.

(11) The Collateral Agent shall not be required to expend or risk its own funds or otherwise Incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, and none of the provisions contained in this Indenture or the Collateral Agreement shall in any event require the Collateral Agent to perform, or be responsible or liable for the manner of performance of, any obligations of the Issuer, the Guarantor, the Collateral Provider or any other Person under the Collateral Agreement.

(12) When the Collateral Agent Incurs out-of-pocket expenses or renders services in connection with an exercise of remedies upon the occurrence of an Event of Default, such out-of-pocket expenses (including the fees and expenses of its counsel) and the compensation for such services are intended to constitute expenses of administration under any Bankruptcy Law or law relating to creditors' rights generally. The Collateral Agent shall not be charged with knowledge of any event or information including, but not limited to, an Event of Default unless a Trust Officer of the Collateral Agent obtains actual knowledge of such event or information in the course of performing its obligations hereunder or the Collateral Agent receives written notice of such event or information from any of the Secured Parties, the Issuer, or any Guarantor.

(13) The Collateral Agent shall not be liable for any action it takes or omits to take, in good faith which it reasonably believes to be authorized or within its rights or powers; *provided, however*, that such Collateral Agent's conduct does not constitute willful misconduct or gross negligence.

(14) Any discretionary power or permissive right of the Collateral Agent shall not be deemed to be, or otherwise construed as, an obligation.

(15) The Collateral Agent shall have no duty to monitor the Collateral (including the validity and perfection of the Lien provided pursuant to any Collateral Agreement in respect of such Collateral) or the performance of the Issuer, any Guarantor, any Collateral Provider or any other party to the Collateral Agreement. The Collateral Agent shall have no liability in connection with compliance by the Issuer, any Guarantor, or any Collateral Provider

with statutory or regulatory requirements related to the Collateral. The Collateral Agent shall not make or be deemed to have made any representations or warranties with respect to the Collateral or the validity or sufficiency of any assignment or other disposition of the Collateral.

(16) In no event shall the Collateral Agent be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit), even if any the Collateral Agent shall have been advised of the likelihood of such loss or damage and regardless of the form of action. In no event shall the Collateral Agent Incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of the Collateral Agent (including any act or provision of any present or future law or regulation or governmental authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, or the unavailability of the Brazilian Central Bank wire or facsimile or other wire or communication facility).

(17) The Collateral Agent shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or otherwise, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Issuer to the Collateral, for insuring the Collateral or for payment of taxes, charges, assessment or liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Collateral Agent shall have no responsibility for recording, filing, re-recording or re-filing any financing statement, continuation statement, documents, instrument or other notice in any public office at any time or times or to otherwise take any action to perfect or maintain the perfection of any security interest granted to the Collateral Agent or for otherwise taking any action under or pursuant to the Collateral Agreement. The Collateral Agent shall not be required to make any determination (a) with respect to the Collateral or (b) as to what rights the Holders may have under this Indenture, the Collateral Agreement or any other document in respect of the Collateral.

(18) In each case that the Collateral Agent may, or is required hereunder or under the Collateral Agreement to take any action, including to make any determination, exercise of discretion or judgment, to give consents, to exercise rights, powers or remedies, to release or sell Collateral or otherwise to act hereunder or under the Collateral Agreement, the Collateral Agent may seek direction from the Trustee (who shall only deliver instructions upon receipt of written direction from the Holders of the requisite aggregate principal amount of outstanding Securities). The Collateral Agent shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction from the Trustee (acting solely pursuant to the written instructions of the Holders holding the requisite aggregate principal amount of outstanding Securities). If the Collateral Agent shall request direction from the Trustee with respect to any action, the Collateral Agent shall be entitled to refrain from such action unless and until the Collateral Agent shall have received direction from the Trustee, and the Collateral Agent shall not Incur liability to any Person by reason of so refraining.

SECTION 11.06 Trustee.

(1) Neither the Trustee or any Agent nor any of their respective officers, directors, employees, attorneys or agents shall have any duty with respect to, or be responsible or liable for (a) the existence, genuineness, value or protection of any Collateral, for the legality, enforceability, effectiveness or sufficiency of the Collateral Agreement or any other document or security instrument, for the creation, validity, perfection, priority, sufficiency, protection or enforcement of any Liens or any other security interest in the Collateral or any defect or deficiency as to any such matters; (b) any recording, filing, or depositing of this Indenture, the Collateral Agreement or any other agreement or instrument, (c) monitoring or filing any financing statement, amendments to financing statements, continuation statement or any other document or instrument evidencing a security interest, the maintenance of any such recording, filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, or otherwise creating or monitoring the perfection, continuation of perfection or the sufficiency or validity of any security interest in or related to the Collateral, (d) the acquisition or maintenance of any insurance, (e) the validity of the title of the Company or the Guarantor or any Collateral Provider to the Collateral, (f) the payment or discharge of any tax, assessment, or other governmental charge or any Lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Collateral, or (g) making any investigation into (i) the performance or observance by the Company, the Issuer, any Guarantor, any Collateral Provider or any other Person of any of the covenants, agreements or other terms or conditions set forth in this Indenture, the Securities, the Guarantee, the Collateral Agreement or in any related document, (ii) the satisfaction of any condition set forth in this Indenture, the Securities, the Guarantee, the Collateral Agreement or in any related document.

(2) The Trustee shall not have any duty or responsibility in the event of any default by the Collateral Agent or any action or inaction by the Collateral Agent in the performance of any of its obligations under this Indenture, the Securities and/or the Collateral Agreement, as the case may be, and/or any other agreement pertaining to any or all of the foregoing, included but not limited to any duty or responsibility to initiate or attempt to initiate any proceeding at law or otherwise against the Collateral Agent or to make any demand of any kind or nature upon the Collateral Agent. The Issuer, the Guarantor, the Collateral Provider and the Collateral Agent hereby acknowledge and agree that the Trustee is not a party to the Collateral Agreement or any related document and the Trustee has no independent knowledge of, and is not required to have any independent knowledge of, the terms or provisions of any such agreements or documents. The Trustee shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or otherwise, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Collateral Provider, for insuring the Collateral or for payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Trustee shall have no responsibility for recording, filing, re-recording or re-filing any financing statement, amendments to financing statements, continuation statement, document, instrument or other notice in any public office at any time or times or to otherwise take any action to perfect or maintain the perfection of any security interest granted to the Collateral Agent or for otherwise taking any action under or pursuant to the Collateral Agreement. The Trustee shall not be required to make any determination (a) with respect to the Collateral, the Collateral Agreement, or (b) as to what rights the Holders may have under this Indenture, the Securities, the Guarantee, the Collateral Agreement or any other document in respect of the

Collateral and the Trustee's sole obligation in respect of the Collateral shall be limited to delivery of instructions to the Collateral Agent upon written request of the Holders of the requisite percentage of outstanding Securities as required by this Indenture. Except for delivery of instructions in accordance with the foregoing sentence, the Trustee shall not be required to take any action outside the United States or take any action under any agreement forming part of, or constituting the Collateral, it being understood that the Trustee is authorized to receive any funds for the benefit of the Trustee and the Holders distributed under the Collateral Agreement and to make further distributions of such funds according to the provisions of this Indenture.

## ARTICLE 12

## RESIGNATION AND REMOVAL OF A COLLATERAL AGENT

SECTION 12.01 Resignation or Removal of Collateral Agent. Subject to the appointment of a successor Collateral Agent as provided in Section 12.02 hereof and the acceptance of such appointment by the successor Collateral Agent:

(1) the Collateral Agent may resign at any time by giving not less than 30 days' notice of resignation to the Trustee, the Issuer and the Company; and

(2) the Collateral Agent may be removed at any time, with or without cause, at the written direction of the Trustee (acting at the direction of Holders holding a majority in aggregate principal amount of the Securities then outstanding).

SECTION 12.02 Appointment of Successor Collateral Agent. Upon any such resignation or removal, a successor Collateral Agent may be appointed at the written direction of the Holders of a majority in aggregate principal amount of the Securities then outstanding. If no such successor Collateral Agent has been so appointed and accepted such appointment within 30 days after the predecessor Collateral Agent gave notice of resignation or was removed, the retiring Collateral Agent may (at the expense of the Issuer), at its option, appoint a successor Collateral Agent, as applicable, or petition a court of competent jurisdiction for appointment of a successor Collateral Agent, which must be a bank or trust company:

(1) authorized to exercise corporate trust powers;

(2) having a combined capital and surplus of at least US$50,000,000; and

(3) maintaining an office in Brazil.

The Collateral Agent shall fulfill its obligations hereunder until a successor Collateral Agent meeting the requirements of this Section 12.02 has accepted its appointment as the Collateral Agent and the provisions of Section 12.03 hereof have been satisfied.

Notwithstanding the foregoing and Section 12.01 hereof, if a successor Collateral Agent has not been appointed within one hundred twenty (120) days after the date of its notice of resignation, the Collateral Agent may apply to a court of competent jurisdiction for the appointment of a successor Collateral Agent or for other appropriate relief, and thereafter be relieved of all further duties and obligations as Collateral Agent hereunder and under the

Collateral Agreement. The costs and expenses (including reasonable attorneys' fees and expenses) Incurred by the Collateral Agent in connection with such proceeding shall be paid by, and be deemed an obligation of the Issuer.

SECTION 12.03 Succession. When the Person so appointed as successor Collateral Agent accepts such appointment:

(1) such Person shall succeed to and become vested with all the rights, powers, privileges and duties of the predecessor Collateral Agent, and the predecessor Collateral Agent shall be discharged from its duties and obligations hereunder; and

(2) the predecessor Collateral Agent shall (at the expense of the Company) promptly transfer all Liens and Collateral within its possession or control to the possession or control of the successor Collateral Agent and shall execute instruments and assignments as may be necessary or desirable or reasonably requested by the successor Collateral Agent to transfer to the successor Collateral Agent all Liens, interests, rights, powers and remedies of the predecessor Collateral Agent in respect of the Collateral Agreement.

SECTION 12.04 Merger, Conversion or Consolidation of Collateral Agent. Any Person into which the Collateral Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Collateral Agent shall be a party, or any Person succeeding to the business of the Collateral Agent shall be the successor of the Collateral Agent pursuant to Section 12.02 hereof; *provided* that (a) without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto, except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding, such Person satisfies the eligibility requirements specified in clauses (1) through (3) of Section 12.02 hereof and Section 12.02(2) prior to any such merger, conversion or consolidation, the Collateral Agent shall have notified the Company, the Issuer and the Trustee.

## ARTICLE 13

## MISCELLANEOUS

SECTION 13.01 Notices. Any notice or communication to the Issuer, the Guarantor, the Trustee, the Paying Agent, the Registrar, the Transfer Agent or the Collateral Agent shall be in writing in the English language or a translation, and delivered in person, sent by fax or other electronic method, overnight courier or mailed by first-class mail addressed as follows:

if to the Issuer or the Guarantor:

Andrade Gutierrez Engenharia S.A.
Rua do Passeio, 38, 14th floor – Centro
Rio de Janeiro, RJ, 20021-290
Brazil
Attn: Gustavo Braga Mercher Coutinho

with copies to:

Andrade Gutierrez International S.A.
12C, rue Guillaume Kroll,
L-1882
Luxembourg
Attn: Gustavo Braga Mercher Coutinho

and copies to:

Davis Polk & Wardwell LLP
Av. Presidente Juscelino Kubitschek, 2041
Torre E – CJ 17A, São Paulo, SP 04543-011
Attn: Manuel Garciadiaz
Email: manuel.garciadiaz@davispolk.com

if to the Trustee, Paying Agent, Transfer Agent and Registrar:

Wilmington Savings Fund Society, FSB
500 Delaware Avenue
Wilmington, DE 19801
Attn: WSFS Institutional Services

if to the Collateral Agent:

TMF Brasil Administração e Gestão de Ativos Ltda.
Address: Alameda Caiapós, 243, 2º andar, Conjunto I, Sala CAC, Centro Empresarial Tamboré, Barueri, SP - CEP 06460-110
Attn: Karla Fernandes / Lesli Gonzalez / Leone Azevedo
Phone: +55 11 3509 8470/ +55 11 3509 8196
Email: CTS.Brazil@tmf-group.com

(a) The Trustee may accept and act upon instructions or directions pursuant to this Indenture sent by unsecured email, fax transmission or other similar unsecured electronic methods. If any Person elects to give the Trustee email or fax instructions (or instructions by a similar electronic method) and the Trustee in its discretion elects to act upon such instructions, the Trustee's understanding of such instructions shall be deemed controlling. The Trustee shall not be liable for any losses, costs or expenses (including, without limitation, attorneys' fees and expenses) arising directly or indirectly from the Trustee's reliance upon and compliance with such instructions notwithstanding such instructions conflict or are inconsistent with a subsequent written instruction. The Person providing electronic instructions agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Trustee, including without limitation the risk of the Trustee acting on unauthorized instructions, and the risk or interception and misuse by third parties.

(b) The Trustee may conclusively rely upon and comply with instructions or directions sent via unsecured fax or email transmission and the Trustee shall not be liable for any loss, liability or expense (including, without limitation, attorneys' fees and

expenses) of any kind Incurred by the Issuer, the Guarantor, the Holders or any other Person, due to the Trustee's reliance upon and compliance with instructions or directions given by unsecured fax transmission or email or other electronic transmission.

(c) The Issuer, the Guarantor, the Trustee the Paying Agent, the Registrar or the Transfer Agent or the Collateral Agent by notice to the other may designate additional or different addresses for subsequent notices or communications.

(d) Notwithstanding anything to the contrary contained herein, as long as the Securities are in the form of Global Securities, notice to the Holders may be made electronically in accordance with procedures of the Depositary. Any notice or communication mailed to a Securityholder of a non-Global Security shall be mailed to the Securityholder at the Securityholder's address as it appears on the Securities Register. Any such notice shall be deemed to have been given to a Holder upon the mailing by first-class mail, postage prepaid, of such notice to such Holder at its registered addresses as recorded in the Securities Register not later than the latest date, and not earlier than the earliest date, prescribed in this Indenture for the giving of such notice. If a notice or communication is given in the manner provided above, it is duly given, whether or not the addressee receives it.

(e) Failure to give a notice or communication to a Securityholder or any defect in a notice or communication to a Securityholder shall not affect the sufficiency of such notice or communication with respect to other Securityholders.

SECTION 13.02 Communication by Holders with Other Holders. Securityholders may communicate pursuant to TIA § 312(b) with other Securityholders with respect to their rights under this Indenture or the Securities. The Issuer, the Trustee, the Registrar and anyone else shall have the protection of TIA § 312(c).

SECTION 13.03 Certificate and Opinion as to Conditions Precedent. Upon any request or application by the Issuer or the Guarantor to the Trustee to take or refrain from taking any action under this Indenture, the Issuer or the Guarantor, as the case may be, shall furnish to the Trustee:

(1) an Officer's Certificate in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to taking the proposed action or to refraining from taking the proposed action have been complied with; and

(2) an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

SECTION 13.04 Statements Required in Certificate or Opinion. Each Officer's Certificate or Opinion of Counsel, as the case may be, with respect to compliance with a covenant or condition provided for in this Indenture shall include substantially:

(1) a statement that the individual making such Officer's Certificate or Opinion of Counsel, as the case may be, has read such covenant or condition;

(2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such Officer's Certificate or Opinion of Counsel, as the case may be, are based;

(3) a statement that, in the opinion of such individual, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4) a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with.

SECTION 13.05 Rules by Trustee, Paying Agents and Registrar. The Trustee may make reasonable rules for action by or a meeting of Securityholders. The Registrar, the Transfer Agent and the Paying Agent may make reasonable rules for their functions.

SECTION 13.06 Legal Holidays. If any payment date is not a Business Day, payment shall be made on the next succeeding Business Day, and no interest shall accrue for the intervening period. If a regular Record Date is not a Business Day, the Record Date shall not be affected.

SECTION 13.07 Governing Law. This Indenture, the Securities and the Guarantee shall be construed in accordance with, and this Indenture, the Securities and the Guarantee and all matters arising out of or relating in any way whatsoever to this Indenture, the Securities or the Guarantee (whether in contract, tort or otherwise) shall be governed by, the laws of the State of New York. The Collateral shall be governed by, and construed in accordance with, the laws of Brazil. For the purposes of paragraph 2 of Article 9 of Brazilian decree-law no. 4,657, of September 4, 1942, Wilmington Savings Fund Society, FSB is the proponent of this Indenture. The provisions of articles 470-1 to 470-19 of the Luxembourg law of August 10, 1915 on commercial companies, as amended, are excluded with respect to the Securities.

SECTION 13.08 Successors. All agreements of the Issuer and the Guarantor in this Indenture and the Securities shall bind their successors. All agreements of the Trustee in this Indenture shall bind its successors.

SECTION 13.09 Multiple Originals. The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement. One signed copy is enough to prove this Indenture.

SECTION 13.10 Table of Contents; Headings. The table of contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

SECTION 13.11 Consent to Jurisdiction; Appointment of Agent to Accept Service of Process; Currency Indemnity.

(1) Each of the Issuer and the Guarantor irrevocably consents and agrees, for the benefit of the Holders from time to time of the Securities, the Trustee, the Paying Agent, the Registrar, and the Transfer Agent, that any legal action, suit or proceeding against it with respect to its obligations, liabilities or any other matter arising out of or in connection with this Indenture, the Securities or the Guarantee (whether in contract, tort or otherwise) may be brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York, and hereby irrevocably consents and submits to the nonexclusive jurisdiction of each such court in personam, generally and unconditionally with respect to any action, suit or proceeding for itself and in respect of its properties, assets and revenues.

(2) The Issuer and the Guarantor have validly and effectively appointed CCS Global Solutions, Inc. (together with any of its successors and assigns, the "Process Agent"), with offices on the date hereof at 99 Washington Avenue, Suite 805A, Albany, New York 12210, as its authorized agent upon which process may be served in any action, suit or proceeding referred to in Section 13.11(1) hereof. If for any reason such agent hereunder shall cease to be available to act as such, each of the Issuer and the Guarantor agrees to designate a new agent in the Borough of Manhattan, New York City, New York on the terms and for the purposes of this Section 13.11 reasonably satisfactory to the Trustee. Each of the Issuer and the Guarantor further hereby irrevocably consents and agrees to the service of any and all legal process, summons, notices and documents in any such action, suit or proceeding against the Issuer and the Guarantor by serving a copy thereof upon the Process Agent (whether or not the appointment of such agent shall for any reason prove to be ineffective or such agent shall accept or acknowledge such service) or by mailing copies thereof by registered or certified air mail, postage prepaid, to each of the Issuer at its address specified in or designated in Section 13.01 hereof. Each of the Issuer and the Guarantor agrees that the failure of any such designee, appointee and agent to give any notice of such service to it shall not impair or affect in any way the validity of such service or any judgment rendered in any action or proceeding based thereon. Nothing herein shall in any way be deemed to limit the ability of the Holders, the Trustee, the Paying Agent, the Registrar, and the Transfer Agent to serve any such legal process, summons, notices and documents in any other manner permitted by applicable law or to obtain jurisdiction over the Issuer and the Guarantor or bring actions, suits or proceedings against the Issuer and the Guarantor in such other jurisdictions, and in such manner, as may be permitted by applicable law. Each of the Issuer and the Guarantor irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings arising out of or in connection with this Indenture, the Securities or the Guarantee brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

If for the purpose of obtaining judgment in any court it is necessary to convert a sum due under this Indenture, the Securities or the Guarantee to a Holder or the Trustee from U.S. dollars into another currency, each of the Issuer and the Guarantor agrees, and each Holder by holding such Security and the Trustee by execution of this Indenture shall be deemed to have agreed, to the fullest extent that each of the Issuer, the Guarantor, the Trustee and the Holders

may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures such payee could purchase U.S. dollars with such other currency in New York City, New York on the day two Business Days preceding the day on which final judgment is given.

The obligation of each of the Issuer and the Guarantor in respect of any sum payable by it to any payee shall, notwithstanding any judgment in a currency (the "judgment currency") other than U.S. dollars, be discharged only to the extent that on the Business Day following receipt by such payee of any sum adjudged to be so due in the judgment currency, such payee may, in accordance with normal banking procedures, purchase U.S. dollars with the judgment currency; if the amount of U.S. dollars so purchased is less than the sum originally due to such payee in the judgment currency (determined in the manner set forth in the preceding paragraph), each of the Issuer and the Guarantor agrees, as a separate obligation and notwithstanding any such judgment, to indemnify such payee against such loss, and if the amount of the U.S. dollars so purchased exceeds the sum originally due to such payee, such payee agrees to remit to the Issuer or the Guarantor, as applicable, such excess; *provided* that such payee shall have no obligation to remit any such excess as long as the Issuer or the Guarantor shall have failed to pay such payee any obligations due and payable under this Indenture, any Security or the Guarantee, in which case such excess may be applied to such obligations of the Issuer or the Guarantor under this Indenture, such Security or the Guarantee in accordance with the terms thereof.

(3) The provisions of this 13.11 shall survive any termination of this Indenture, in whole or in part.

SECTION 13.12 Waiver of Jury Trial. EACH OF THE ISSUER, THE GUARANTOR, THE COLLATERAL AGENT AND THE TRUSTEE (SOLELY IN ITS CAPACITY AS TRUSTEE, WHICH, FOR THE AVOIDANCE OF DOUBT, SHALL NOT IN ANY WAY AFFECT ANY RIGHT OF ANY HOLDER) HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE SECURITIES, THE GUARANTEE, THE COLLATERAL OR THE TRANSACTION CONTEMPLATED HEREBY.

SECTION 13.13 Severability. In case any provision in this Indenture or in the Securities shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

SECTION 13.14 Regarding the Paying Agent.

(1) Each payment in full of principal, redemption amount, interest or any other amounts payable under this Indenture in respect of any Securities or the Guarantee made by or on behalf of the Issuer or the Guarantor to or to the order of any Paying Agent in the manner provided herein or in the Securities on the date due shall be valid and effective to satisfy and discharge the obligation of the Issuer to make payment of principal, redemption amount, interest or any other amounts payable under this Indenture and the Securities on such date; *provided*, *however*, that the liability of any Paying Agent hereunder shall not exceed any

amounts paid to it by the Issuer or the Guarantor, or otherwise held by it, on behalf of the Holders hereunder; and *provided*, *further*, that, in the event that there is a default by the Paying Agent in any payment of principal, redemption amount, interest or any other amounts payable in respect of any Security in accordance with the terms hereof, the Issuer and/or the Guarantor shall pay on demand such further amounts as will result in the receipt by the Holders of such amounts as would have been received by them had no such default occurred.

(2) Each of the Issuer and the Guarantor undertakes to, jointly and severally, indemnify the Paying Agent and its Affiliates against all losses, liabilities and expenses (including, without limitation, attorneys' fees and expenses), including any and all tax liabilities (other than taxes based upon, measured by or determined by the income of the Paying Agent or its Affiliates), which, for the avoidance of doubt, shall include Brazilian taxes and associated penalties, costs, claims, actions, damages, expenses or demands which any of them may Incur or which may be made against any of them as a result of or in connection with the appointment of or the exercise of the powers and duties by any Paying Agent or its Affiliates under this Indenture except as may result from its own negligence or willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable order.

(3) Each of the Issuer and the Guarantor acknowledges that the Paying Agent makes no representations as to the interpretation or characterization of the transactions herein undertaken for tax or any other purpose, in any jurisdiction.

(4) The Issuer agrees to pay any and all stamp and other documentary taxes or duties which may be payable in connection with the execution, delivery, performance and enforcement of this Indenture, the Securities and/or the Guarantee by the Paying Agent.

SECTION 13.15 U.S.A. Patriot Act. The parties hereto acknowledge that in order to help the United States government fight the funding of terrorism and money laundering activities, federal regulations that became effective on October 1, 2003 (Section 326 of the U.S.A. Patriot Act) require all financial institutions to obtain, verify, record and update information that identifies each Person establishing a relationship or opening an account. The parties to this Indenture agree that they will provide to the Trustee such information as it may request, from time to time, in order for the Trustee to satisfy the requirements of the U.S.A. Patriot Act, including but not limited to, the name, address, tax identification number and other information that will allow it to identify the individual or entity who is establishing the relationship or opening the account and may also ask for formation documents such as articles of incorporation or other identifying documents to be provided.

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

**ANDRADE GUTIERREZ INTERNATIONAL S.A.**

By: ______________________________
Name: Gustavo Braga Mercher Coutinho
Title: Director

By: ______________________________
Name: Gustavo Benchimol
Title: Director

**ANDRADE GUTIERREZ ENGENHARIA S.A.**
**as Guarantor**

By: ______________________________
Name: Gustavo Braga Mercher Coutinho
Title: Chief Financial Officer

By: ______________________________
Name: Fernando Leyser
Title: Director

**WILMINGTON SAVINGS FUND SOCIETY, FSB,**, as Trustee, Registrar, Transfer Agent and Paying Agent

By: ______________________________
Name: John McNichol
Title: Assistant Vice President

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA, as Collateral Agent**

By: ____________

Name:

Title:

By: [signature]

Name: KARLA FERNANDEZ

Title: MANAGING DIRECTOR

*[Signature Page to the 2040 Notes Indenture]*

QIB/ACCREDITED INVESTOR/REGULATION S APPENDIX

## PROVISIONS RELATING TO THE SECURITIES

1. Definitions

For the purposes of this Appendix, the following terms shall have the meanings indicated below. Other terms used in this Appendix and not defined herein shall have the meanings assigned to them in the Indenture.

"Accredited Investor" means an "accredited investor" within the meaning of Rule 501(a) of Regulation D under the Securities Act.

"Accredited Investor Global Security" means a single, permanent Global Security in definitive, fully registered book-entry form sold to Accredited Investors.

"Certificated Securities" has the meaning set forth in Section 2.1(7) of this Appendix.

"Clearstream" means Clearstream Banking, société anonyme, Luxembourg.

"Distribution Compliance Period" means, in respect of any Regulation S Global Securities, the 40 consecutive days beginning on and including the later of (a) the day on which any Securities represented thereby are offered to Persons other than distributors (as defined in Regulation S under the Securities Act) pursuant to Regulation S and (b) the issue date for such Securities, as notified by the Issuer to the Trustee in writing.

"Euroclear" means Euroclear Bank, S.A./N.V.

"Non-U.S. Person" has the meaning given to it in Regulation S.

"QIB" means a "qualified institutional buyer" as defined in Rule 144A under the Securities Act.

"Regulation S Global Security" means a single, permanent Global Security in definitive, fully registered book-entry form sold outside of the United States in reliance on Regulation S.

"Regulation S Legend" means the Regulation S Legend set forth in Exhibit 1 to this Appendix.

"Restricted Global Security" means a single, permanent Global Security in definitive, fully registered form without interest coupon, constituting a Restricted Security.

"Restricted Securities Legend" means the Restricted Securities Legend set forth in Exhibit 1 to this Appendix.

"Restricted Security" means a Security that constitutes a "restricted security" within the meaning of Rule 144(a)(3) under the Securities Act; *provided*, *however*, that the

Trustee shall be entitled to request and conclusively rely on an Opinion of Counsel with respect to whether any Security constitutes a Restricted Security.

"Securities Custodian" means the custodian with respect to a Global Security, or any successor Person thereto and shall initially be the Trustee.

2. The Securities

2.1 Form and Registration.

(1) Form and Registration. The certificates representing the Securities shall be issued in fully registered form without interest coupons. Each Global Security shall be subject to certain restrictions on transfer, set forth in Section 2.3 and 2.4 of this Appendix.

(2) Regulation S Global Security. Securities offered and sold in reliance on Regulation S under the Securities Act shall initially be represented by one or more Regulation S Global Securities, which shall bear the Regulation S Legend and shall be deposited with the Trustee as Securities Custodian for, and registered in the name of Cede and Co., as nominee of, DTC.

(3) Accredited Investor Global Security. Securities sold to Accredited Investors in reliance on Section 4(a)(2) under the Securities Act shall be represented by one or more Accredited Investor Global Securities, which shall bear the Restricted Securities Legend and shall be deposited with the Trustee as Securities Custodian for, and registered in the name of a nominee of, DTC.

(4) Restricted Global Security. Securities sold in reliance on Rule 144A under the Securities Act shall be represented by one or more Restricted Global Securities, which shall bear the Restricted Securities Legend and shall be deposited with the Trustee as Securities Custodian for, and registered in the name of Cede and Co., as nominee of, DTC.

(5) Ownership. Ownership of beneficial interests in a Global Security shall be limited to Persons who have accounts with DTC ("participants"), or Persons who hold interests through participants in DTC, including Euroclear and Clearstream. Ownership of beneficial interests in a Global Security shall be shown on, and the transfer of that ownership shall be effected only through, records maintained by DTC or its nominee (with respect to interests of participants) and the records of participants (with respect to interests of Persons other than participants). QIBs and Accredited Investors may hold their interests in a Restricted Global Security, or an Accredited Investor Global Security, as applicable, directly through DTC, if they are participants in such system, or indirectly through organizations which are participants in such system.

Non-U.S. Persons may hold their interests in a Regulation S Global Security, directly through Euroclear or Clearstream as indirect participants in DTC, if they are participants in such systems, or indirectly through organizations that are participants in such systems.

So long as DTC or its nominee is the registered owner or Holder of a Global Security, DTC or such nominee, as the case may be, shall be considered the sole owner or Holder

of the Securities represented by such Global Security for all purposes under the Indenture. No Beneficial Owner of an interest in a Global Security shall be able to transfer that interest except in accordance with DTC's applicable procedures, in addition to those provided for under the Indenture. Payments made with respect to a Global Security shall be made to DTC or its nominee, as the registered owner thereof. None of the Issuer, the Trustee or any Paying Agent, the Registrar or any Transfer Agent shall have any responsibility or Incur any liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Global Security or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

The Issuer expects that DTC or its nominee, upon receipt of any payment in respect of a Global Security, shall credit participants' accounts with payments in amounts proportionate to their respective beneficial interests in such Global Security as shown on its records. The Issuer also expects that payments by participants to owners of beneficial interests in such Global Security held through such participants shall be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for such customers. Such payments shall be the responsibility of such participants.

(6) Limitation on Obligations. Although DTC, Euroclear and Clearstream are expected to follow the procedures set forth in this Appendix and the Indenture in order to facilitate transfers of interests in a Global Security among participants of DTC, Euroclear and Clearstream, as the case may be, they are under no obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time. None of the Issuer, the Trustee, any Paying Agent, the Registrar or any Transfer Agent shall have any responsibility or Incur any liability for the performance by DTC, Euroclear or Clearstream or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

(7) Successors; Certificated Securities. If (i) DTC or any successor to DTC is at any time unwilling or unable to continue as a Depositary for the Global Securities and the Issuer fails to appoint a successor Depositary within 90 days, or (ii) any amounts due under the Indenture, the Securities or the Guarantee has become immediately due and payable in accordance with Article 6 of the Indenture after an Event of Default has occurred and is continuing, the Issuer shall issue certificated non-global Securities ("Certificated Securities") which may bear the Restricted Securities Legend or Regulation S Legend, as applicable, set to all Beneficial Owners, in exchange for their beneficial interests in Global Securities. Holders of an interest in a Global Security may receive Certificated Securities, in accordance with DTC's rules and procedures in addition to those provided for under the Indenture; *provided*, *however*, that if the Issuer is issuing Certificated Securities pursuant to Section 2.1(7)(ii) of this Appendix, the Issuer shall only be required to issue Certificated Securities to the Beneficial Owners of the Securities who request Certificated Securities.

(8) Certificated Securities. Except as provided in this Section 2.1, owners of beneficial interests in Global Securities shall not be entitled to receive physical delivery of Certificated Securities. The registered Holder of a Global Security shall be entitled to grant proxies and otherwise authorize any Person, including DTC and Persons that may hold interests

through DTC to take any action which a Holder is entitled to take under the Indenture or the Securities. In the event of transfer of a Global Security to the Beneficial Owners thereof in the form of Certificated Securities, the Issuer shall promptly make available to the Trustee a reasonable supply of Certificated Securities in definitive, fully registered form without interest coupons.

2.2 Global Securities.

(1) Any Global Security (i) shall represent, and shall be denominated in an aggregate amount equal to the aggregate principal amount of, all of the outstanding Securities of such series to be represented by such Global Security, (ii) shall be registered in the name of Cede and Co., as nominee of DTC, (iii) shall be delivered by the Securities Custodian to DTC or pursuant to DTC's instruction and (iv) shall bear a legend substantially to the following effect:

THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY. THIS SECURITY IS EXCHANGEABLE FOR SECURITIES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS SECURITY (OTHER THAN A TRANSFER OF THIS SECURITY AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY) MAY BE REGISTERED EXCEPT IN LIMITED CIRCUMSTANCES.

UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY DEFINITIVE SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

(2) Members of, or participants in, DTC, Euroclear or Clearstream shall have no rights under the Indenture with respect to any Global Security held on their behalf by DTC or the Trustee as its custodian, or under the Global Security, and DTC or its nominee may be treated by the Issuer, the Trustee, the Paying Agent, the Registrar, the Transfer Agent and each of their respective agents as the absolute owner of the Global Security for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Issuer, the Trustee, the Paying Agent, the Registrar, the Transfer Agent or any of their respective agents from giving effect to any written certification, proxy or other authorization furnished by DTC or impair, as

between DTC and its participants, the operation of customary practices governing the exercise of the rights of a Holder of any Global Security.

Transfers between participants in DTC shall be effected in accordance with DTC's procedures, and shall be settled in same-day funds. Transfers between participants in Euroclear and Clearstream shall be effected in accordance with their respective rules and operating procedures. Transactions settled through DTC, Euroclear and Clearstream shall settle on a T+2 basis.

The Issuer expects that DTC shall take any action permitted to be taken by a Holder (including the presentation of Securities for exchange) only at the direction of one or more participants to whose account the interest in a Global Security is credited and only in respect of such portion of the securities as to which such participant or participants has or have given such direction.

Subject to compliance with the transfer restrictions applicable to the Global Securities, cross-market transfers between the participants in DTC, on the one hand, and Euroclear or Clearstream participants, on the other hand, shall be effected through DTC in accordance with DTC's rules on behalf of each of Euroclear or Clearstream by its common depositary; *however*, such cross-market transactions shall require delivery of instructions to Euroclear or Clearstream by the counterparty in such system in accordance with the rules and procedures and within the established deadlines (Brussels, Belgium time) of such system.

Euroclear or Clearstream shall, if the transaction meets its settlement requirements, deliver instructions to its common depositary to take action to effect final settlement on its behalf by delivering or receiving interests in the Global Securities in DTC, and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to DTC. Euroclear participants and Clearstream participants may not deliver instructions directly to the common depositaries for Euroclear or Clearstream.

Because of time zone differences, the securities account of a Euroclear or Clearstream participant purchasing an interest in a Global Security from a participant in DTC shall be credited, and any such crediting shall be reported to the relevant Euroclear or Clearstream participant, during the securities settlement processing day (which must be a business day for Euroclear and Clearstream) immediately following the settlement date of DTC. Cash received in Euroclear or Clearstream as a result of sales of interests in a Global Security by or through a Euroclear or Clearstream participant to a participant in DTC shall be received with value on the settlement date of DTC but shall be available in the relevant Euroclear or Clearstream cash account only as of the business day for Euroclear or Clearstream following DTC's settlement date.

(3) In connection with any transfer or exchange of a portion of the beneficial interest in any Global Security to Beneficial Owners pursuant to Section (7) of this Appendix, the Registrar shall (if one or more Certificated Securities are to be issued) reflect on its books and records the date and a decrease in the principal amount of the Global Security in an amount equal to the principal amount of the beneficial interest in the Global Security to be transferred, and the Issuer shall execute, and the Trustee shall, upon receipt of a written order from the

Issuer, authenticate and deliver, one or more Certificated Securities of like tenor and principal amount of authorized denominations.

(4) Any beneficial interest in one of the Global Securities that is transferred to a Person who takes delivery in the form of an interest in the other corresponding Global Security shall, upon transfer, cease to be an interest in such Global Security and become an interest in the other corresponding Global Security and, accordingly, shall thereafter be subject to all transfer restrictions, if any, and other procedures applicable to beneficial interest in such other corresponding Global Security for as long as it remains such an interest.

(5) In connection with the transfer of Global Securities as an entirety to Beneficial Owners pursuant to Section 2.1(7) of this Appendix, the Global Securities shall be deemed to be surrendered to the Trustee for cancellation, and the Issuer shall execute, and the Trustee shall, upon receipt of a written order from the Issuer, authenticate and deliver, to each Beneficial Owner identified by DTC, in exchange for its beneficial interest in the Global Securities, an equal aggregate principal amount at maturity of Certificated Securities of authorized denominations.

(6) Any Certificated Security constituting a Restricted Security delivered in exchange for an interest in a Global Security pursuant to this Section 2.2 of this Appendix shall bear the applicable Restricted Securities Legend set forth in Exhibit 1 to this Appendix.

(7) The registered Holder of any Global Security may grant proxies and otherwise authorize any Person, including participants in DTC and Persons that may hold interests through participants in DTC to take any action which a Holder is entitled to take under the Indenture or the Securities.

2.3 Special Transfer Provisions.

The following provisions shall apply with respect to the Securities:

(1) Transfers to Non-U.S. Persons. The following provisions shall apply with respect to the registration of any proposed transfer of a Security to any Non-U.S. Person:

(a) the Registrar shall register the transfer of any Security, whether or not such Security bears the Restricted Securities Legend, if the proposed transferor has delivered to the Registrar a certificate substantially in the form of Exhibit 3 to this Appendix;

(b) if the proposed transferee is a participant in DTC and the Securities to be transferred consist of Certificated Securities which after transfer are to be evidenced by an interest in a Regulation S Global Security, upon receipt by the Registrar of (i) written instructions given in accordance with DTC's and the Registrar's procedures and (ii) the certificate required by Section 2.3(1)(a) of this Appendix, the Registrar shall register the transfer and reflect on its books and records the date and an increase in the principal amount of the Regulation S Global Security in an amount equal to the principal amount of Certificated Securities to be transferred, and the Trustee shall cancel the Certificated Securities so transferred;

(c) if the proposed transferor is a participant in DTC seeking to transfer an interest in a Global Security which after transfer is to be evidenced by an interest in a Regulation S Global Security, upon receipt by the Registrar of (i) written instructions given in accordance with DTC's and the Registrar's procedures and (ii) the certificate required by Section 2.3(1)(a) of this Appendix, the Registrar shall register the transfer and reflect on its books and records the date and (x) a decrease in the principal amount of the Global Security from which such interests are to be transferred in an amount equal to the principal amount of the Securities to be transferred and (y) an increase in the principal amount of the Regulation S Global Security in an amount equal to the principal amount of the interest in the Global Security to be transferred.

(2) Transfers to QIBs or Accredited Investors. The following provisions shall apply with respect to the registration of any proposed transfer of a Security to a QIB or an Accredited Investor:

(a) the Registrar shall register the transfer of any Security occurring prior to the Distribution Compliance Period if the proposed transferor has delivered to the Registrar a certificate substantially in the form set forth in Exhibit 4 to this Appendix, in which case any such Security shall be evidenced, after such transfer, by an interest in a Restricted Global Security or an Accredited Investor Global Security, as applicable;

(b) if the proposed transferee is a participant in DTC and the Securities to be transferred consist of Certificated Securities, upon receipt by the Registrar of (i) instructions given in accordance with DTC's and the Registrar's procedures, and (ii) the certificate, if any, required by Section 2.3(2)(a) of this Appendix, the Registrar shall register the transfer and reflect on its books and records the date and an increase in the principal amount of the Restricted Global Security or the Accredited Investor Global Security, as applicable, in an amount equal to the principal amount of the Certificated Securities, to be transferred, and the Trustee shall cancel the Certificated Securities so transferred;

(c) if the proposed transferor is a participant in DTC seeking to transfer an interest in a Global Security which after transfer is to be evidenced by an interest in a Restricted Global Security or an Accredited Investor Global Security, as applicable, upon receipt by the Registrar of (i) written instructions given in accordance with DTC's and the Registrar's procedures, and (ii) the certificate, if any, required by Section 2.3(2)(a) of this Appendix, the Registrar shall register the transfer and reflect on its books and records the date and a decrease in the principal amount of the Global Security from which interests are to be transferred in an amount equal to the principal amount of the Securities to be transferred and an increase in the principal amount of the Restricted Global Security or the Accredited Investor Global Security, as applicable, in an amount equal to the principal amount of the interest in the Global Security to be transferred.

(3) Restricted Securities Legend and Regulation S Legend. Upon the registration of transfer, exchange or replacement of Securities not bearing the Restricted Securities Legend or the Regulation S Legend, as applicable, the Registrar shall deliver

Securities that do not bear the Restricted Securities Legend or the Regulation S Legend, as applicable. Upon the registration of transfer, exchange or replacement of Securities bearing the Restricted Securities Legend or the Regulation S Legend, as applicable, the Registrar shall deliver only Securities that bear the Restricted Securities Legend or the Regulation S Legend, as applicable, unless the Registrar has received an Opinion of Counsel reasonably satisfactory to the Issuer, to the effect that (i) neither such Restricted Securities Legend or the Regulation S Legend, as applicable, nor the related restrictions on transfer are required in order to maintain compliance with the provisions of the Securities Act or (ii) such Security has been sold pursuant to an effective registration statement under the Securities Act.

(4) Securities Purchased by the Issuer. In order to insure the availability of Rule 144(k) under the Securities Act, all Securities which are purchased or otherwise acquired by the Issuer or any of its Affiliates may not be resold or otherwise transferred.

(5) Other Transfers. If a Holder proposes to transfer a Security constituting a Restricted Security pursuant to any exemption from the registration requirements of the Securities Act other than as provided for by Section 2.3(1) of this Appendix, the Registrar shall only register such transfer or exchange if such transferor delivers an Opinion of Counsel reasonably satisfactory to the Issuer, that such transfer is in compliance with the Securities Act and the terms of the Indenture; *provided*, *however*, that the Issuer may, based upon the opinion of its counsel, instruct the Registrar not to register such transfer in any case where the proposed transferee is not a QIB, an Accredited Investor or a Non-U.S. Person.

(6) General. By its acceptance of any Security (or any beneficial interest in any Global Security) bearing the Restricted Securities Legend or the Regulation S Legend, each Holder of such a Security or holder of such beneficial interest acknowledges the restrictions on transfer of such Security set forth in the Indenture, this Appendix, and in the Restricted Securities Legend or the Regulation S Legend, as applicable, and agrees that it will transfer such Security only as provided in this Appendix, the Indenture and in the Restricted Securities Legend or the Regulation S Legend, as applicable. The Registrar shall not register a transfer of any Security unless such transfer complies with the restrictions on transfer of such Security set forth in the Indenture and this Appendix.

The Registrar shall retain copies of all letters, notices and other written communications received pursuant to this Section 2.3 in accordance with its standard retention policies. The Issuer shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable prior written notice to the Registrar.

2.4 Cancellation or Adjustment of Global Security.

At such time as all beneficial interests in a Global Security have either been exchanged for Certificated Securities, redeemed, purchased or canceled, such Global Security shall be returned to DTC for cancellation or retained and canceled by the Trustee. At any time prior to such cancellation, if any beneficial interest in a Global Security is exchanged for certificated Securities, redeemed, purchased or canceled, the principal amount of Securities represented by such Global Security shall be reduced and an adjustment shall be made on the

books and records of the Trustee (if it is then the Securities Custodian for such Global Security) with respect to such Global Security, by the Trustee or the Securities Custodian, to reflect such reduction.

EXHIBIT 1
to
QIB/ACCREDITED INVESTOR/REGULATION S APPENDIX

[FORM OF FACE OF SECURITY]

[Global Securities Legend]

THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY. THIS SECURITY IS EXCHANGEABLE FOR SECURITIES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS SECURITY (OTHER THAN A TRANSFER OF THIS SECURITY AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY) MAY BE REGISTERED EXCEPT IN LIMITED CIRCUMSTANCES.

UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY DEFINITIVE SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS SECURITY WAS ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. UPON REQUEST, THE ISSUER SHALL PROMPTLY MAKE AVAILABLE TO A HOLDER OF THIS SECURITY (1) THE ISSUE PRICE AND ISSUE DATE OF THE SECURITY, (2) THE AMOUNT OF OID ON THE SECURITY, AND (3) THE ORIGINAL YIELD TO MATURITY OF THE SECURITY. SUCH REQUEST SHOULD BE SENT TO THE ISSUER AT ANDRADE GUTIERREZ ENGENHARIA S.A., RUA DO PASSEIO, 38, 14TH FLOOR – CENTRO, RIO DE JANEIRO, RJ, 20021-290, BRAZIL, ATT: GUSTAVO BRAGA MERCHER COUTINHO.

[Restricted Securities Legend]

THIS SECURITY (AND RELATED GUARANTEE) HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE, BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER:

(1) REPRESENTS THAT:

(A) IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) OR AN "ACCREDITED INVESTOR" (WITHIN THE MEANING OF RULE 501(A) OF REGULATION D UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT; OR

(B) IT IS NOT A U.S. PERSON (WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT) AND

(2) AGREES FOR THE BENEFIT OF THE ISSUER THAT IT SHALL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN, EXCEPT IN ACCORDANCE WITH THE SECURITIES ACT AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ONLY:

(A) TO THE ISSUER;

(B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT;

(C) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT OR AN ACCREDITED INVESTOR IN COMPLIANCE WITH RULE 501(A) OF REGULATION D UNDER THE SECURITIES ACT;

(D) IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 OF REGULATION S UNDER THE SECURITIES ACT; OR

(E) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH (2)(E) ABOVE, THE ISSUER RESERVES THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY RULE 144 EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT. THIS LEGEND MAY ONLY BE REMOVED WITH CONSENT OF THE ISSUER.

BY ITS PURCHASE AND HOLDING OF THIS SECURITY (OR ANY INTEREST HEREIN), THE PURCHASER OR HOLDER SHALL BE DEEMED TO HAVE

REPRESENTED AND AGREED THAT EITHER (I) NO ASSETS OF AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN THE U.S. EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA")) SUBJECT TO TITLE I OF ERISA, A PLAN TO WHICH SECTION 4975 OF THE U.S. INTERNAL REVENUE CODE OF 1986, AS AMENDED ("THE CODE"), APPLIES, OR, AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE THE ASSETS OF ANY SUCH PLAN, OR A NON-U.S. PLAN, GOVERNMENTAL PLAN, CHURCH PLAN, OR OTHER PLAN HAVE BEEN USED TO ACQUIRE THIS SECURITY OR ANY INTEREST HEREIN, OR (II) THE ACQUISITION, HOLDING AND DISPOSITION OF THIS SECURITY, OR ANY INTEREST HEREIN, SHALL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE, (OR, IN THE CASE OF A GOVERNMENTAL PLAN, CHURCH PLAN, NON-U.S. OR OTHER PLAN, A VIOLATION OF ANY FEDERAL, NON-U.S., STATE OR LOCAL LAWS, REGULATIONS OR RULES THAT ARE SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE).

[Regulation S Legend]

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION, AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO OR FOR THE ACCOUNT OR BENEFIT OF U.S. PERSONS EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF, THE HOLDER (1) REPRESENTS THAT IT IS NOT A U.S. PERSON, IS NOT ACQUIRING THIS SECURITY FOR THE ACCOUNT OR BENEFIT OF A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION, (2) BY ITS ACCEPTANCE HEREOF, AGREES TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY ONLY (A) TO THE ISSUER OR ANY AFFILIATE THEREOF, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (D) PURSUANT TO OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES IN COMPLIANCE WITH RULE 903 OR 904 UNDER REGULATION S UNDER THE SECURITIES ACT, (E) TO AN "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(A) OF REGULATION D UNDER THE SECURITIES ACT ACQUIRING THE SECURITIES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF SUCH AN ACCREDITED INVESTOR, OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, IN EACH CASE IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND (3) AGREES THAT IT SHALL DELIVER TO EACH PERSON TO WHOM THIS SECURITY IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS RESTRICTIVE

LEGEND. THIS LEGEND SHALL BE REMOVED AFTER 40 CONSECUTIVE DAYS BEGINNING ON AND INCLUDING THE LATER OF (A) THE DAY ON WHICH THE SECURITIES ARE OFFERED TO PERSONS OTHER THAN DISTRIBUTORS (AS DEFINED IN REGULATION S) AND (B) THE DATE OF THE CLOSING OF THE ORIGINAL OFFERING. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANINGS GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT. THIS LEGEND OR ANY PORTION HEREOF MAY BE REMOVED FROM THIS SECURITY SOLELY AT THE DISCRETION AND AT THE DIRECTION OF ANDRADE GUTIERREZ INTERNATIONAL S.A. OR CONSTRUTORA ANDRADE GUTIERREZ S.A.

BY ITS PURCHASE AND HOLDING OF THIS SECURITY (OR ANY INTEREST HEREIN), THE PURCHASER OR HOLDER SHALL BE DEEMED TO HAVE REPRESENTED AND AGREED THAT EITHER (1) NO ASSETS OF AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN THE U.S. EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA")) SUBJECT TO TITLE I OF ERISA, A PLAN TO WHICH SECTION 4975 OF THE U.S. INTERNAL REVENUE CODE OF 1986, AS AMENDED ("THE CODE"), APPLIES, OR, AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE THE ASSETS OF ANY SUCH PLAN, OR A NON-U.S. PLAN, GOVERNMENTAL PLAN, CHURCH PLAN, OR OTHER PLAN HAVE BEEN USED TO ACQUIRE THIS SECURITY OR ANY INTEREST HEREIN, OR (2) THE ACQUISITION, HOLDING AND DISPOSITION OF THIS SECURITY, OR ANY INTEREST HEREIN, SHALL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE, (OR, IN THE CASE OF A GOVERNMENTAL PLAN, CHURCH PLAN, NON-U.S. OR OTHER PLAN, A VIOLATION OF ANY FEDERAL, NON-U.S., STATE OR LOCAL LAWS, REGULATIONS OR RULES THAT ARE SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE).

No. [S][R]

US$ __________
(Comprising:(1) an initial aggregate principal amount on the Issue Date of US$[●] plus (2) the initial PIK Interest payment being made on the Issue Date in the amount of US$[●] for the period from and including December 21, 2022 to and including December 28, 2022)

ANDRADE GUTIERREZ INTERNATIONAL S.A.

1.000% PIK Toggle Notes due 2040

CUSIP No. [Reg. S: L01795 AH3] [144A: 03439T AJ0]
ISIN [Reg. S: USL01795AH34] [144A: US03439TAJ07]

Andrade Gutierrez International S.A., public limited liability company (*société anonyme*) incorporated in the Grand Duchy of Luxembourg, with registered office at 12C, rue Guillaume Kroll, L-1882 Luxembourg and registered with the Luxembourg Register of Commerce and Companies under number B176492, promises to pay to Cede & Co., or its registered assigns, the principal sum in U.S. dollars listed on the Schedule of Increases or Decreases in Global Security attached hereto on December 28, 2040.

Interest Payment Dates: (i) the Issue Date, with interest computed for the period from and including the Issue Date to and including December 28, 2022 (it being understood that such interest payment is being distributed as PIK Interest and is made in advance for interest that would otherwise be paid on December 28, 2022 if December 28, 2022 were an Interest Payment Date, it being further understood that such interest shall be payable to Holders to which the Securities are issued on the Issue Date, notwithstanding any provision of the Indenture or the Securities regarding payment of interest to Holders of record as of any Record Date) and (ii) June 28 and December 28 of each year after 2022, commencing on June 28, 2023 (it being understood that interest payable on June 28, 2023 shall be calculated from and excluding December 28, 2022).

Record Dates: June 15 and December 12.

Additional provisions of this Security are set forth on the other side of this Security.

IN WITNESS WHEREOF, the Issuer has caused this instrument to be duly executed.

**ANDRADE GUTIERREZ INTERNATIONAL S.A.**

By: ______________________________
Name:
Title:

By: ______________________________

Title:

TRUSTEE'S CERTIFICATE OF
AUTHENTICATION

**Wilmington Savings Fund Society, FSB**
as Trustee, certifies that this is
one of the Securities referred
to in the Indenture.

By:

__________________________________
Authorized Signatory

Dated: ________________

[FORM OF REVERSE SIDE OF SECURITY]

**1.000% PIK Toggle Notes due 2040**

1. Interest

Andrade Gutierrez International S.A., public limited liability company (*société anonyme*) incorporated in the Grand Duchy of Luxembourg, with registered office at 12C, rue Guillaume Kroll, L-1882 Luxembourg and registered with the Luxembourg Register of Commerce and Companies under number B-176492, (such company, and its successors and assigns under the Indenture hereinafter referred to as the "Issuer"), promises to pay interest on the principal amount of this Security at the rate per annum shown above.

The Issuer shall pay interest to a Paying Agent, which shall in turn distribute the interest in accordance with the Indenture: (a) on the Issue Date, computed for the period from and including the Issue Date to and including December 28, 2022 (it being understood that such interest payment is being distributed as PIK Interest and is made in advance for interest that would otherwise be paid on December 28, 2022 if December 28, 2022 were an Interest Payment Date, it being further understood that such interest shall be payable to Holders to which the Securities are issued on the Issue Date, notwithstanding any provision of the Indenture or the Securities regarding payment of interest to Holders of record as of any Record Date); and (b) semi-annually on June 28 and December 28 of each year, commencing on June 28, 2023 (it being understood that interest payable on June 28, 2023 shall be calculated from and excluding December 28, 2022). Interest on the Securities shall be computed on the basis of a 360-day year of twelve 30-day months. The Securities shall bear interest at the rate per annum of 1.000% from December 21, 2022, the date of issuance, or from the most recent Interest Payment Date to which interest has been paid or provided for (except for the Interest Payment Date on June 28, 2023, which shall bear interest from and excluding December 28, 2022, as set forth above), to the Maturity Date (or earlier redemption or prepayment date), which interest shall be paid entirely in cash, subject to the following paragraph.

The Issuer shall pay interest on the Securities on each Interest Payment Date in accordance with the Indenture and this Security in cash at the rate of 1.000% per annum. For each of the interest payment periods specified below, the Issuer may, at its sole option, elect to pay the following interest by capitalizing accrued and unpaid interest on the applicable Interest Payment Date and adding the same to the principal amount of the Securities then outstanding (each, a "PIK Interest"): (a) from and including the Issue Date, to and including the Interest Payment Date on the Maturity Date (or earlier redemption or prepayment date), PIK Interest at the rate of 1.000% per annum for each Interest Payment Date during such interest payment period. Following an increase in the principal amount of the outstanding Securities as a result of a payment of PIK Interest on the applicable Interest Payment Date, the Securities will bear interest on such increased principal amount from and after such applicable Interest Payment Date, and the principal amount of the Securities at any time and after such date will include all interest which has been capitalized thereon. For the avoidance of doubt, if the Issuer does not elect to pay PIK Interest, the Issuer shall pay cash interest on the Securities at the rate of 1.000% per annum. In the event the Issuer elects to pay PIK Interest for the applicable interest payment period after the Issue Date, no later than fifteen (15) days prior to the applicable Interest Payment

Date, the Issuer shall deliver to the Trustee and the Paying Agents a notice executed by one of its Officers (i) stating that the Issuer has elected to pay PIK Interest on the applicable Interest Payment Date, (ii) setting forth the total amount of interest due and payable on the applicable Interest Payment Date, (iii) setting forth the amount of PIK Interest to be paid on the applicable Interest Payment Date and (iv) directing the Trustee to increase the aggregate principal amount of the outstanding Securities as of the applicable Interest Payment Date in an amount equal to the PIK Interest payable on such date (a "PIK Notice"), which PIK Notice the Trustee and the Paying Agents shall be entitled to conclusively rely upon. The Trustee shall promptly deliver a copy of the PIK Notice to the Holders of the Securities. In the event the Trustee does not receive the PIK Notice from the Issuer in accordance with the preceding sentence, interest on the Securities for the applicable interest payment period shall automatically be payable in PIK Interest as set forth above.

The Securities shall bear interest on overdue principal, premium, if any, and interest at the rate equal to 1.00% *per annum* in excess of 1.000% to the extent lawful.

2. Method of Payment

Except as otherwise provided in Section 1 in the event the Issuer elects to pay PIK Interest in lieu of cash on the initial Interest Payment Date, the Issuer shall pay interest on the Securities to the Persons who are registered Holders at the close of business on June 15 or December 12 (each a "Record Date" whether or not such date is a Business Day) next preceding the Interest Payment Date even if Securities are canceled after the Record Date and on or before the Interest Payment Date. Holders must surrender Securities to a Paying Agent to collect principal payments. The Issuer shall pay principal, premium, and interest, in money of the United States that at the time of payment is legal tender for payment of public and private debts. Payments in respect of the Securities represented by a Global Security (including principal, premium, and interest) shall be made by wire transfer of immediately available funds to the accounts specified by the Depositary. The Issuer shall make all payments in respect of a Certificated Security (including principal, premium, and interest) at the office or agency of the Paying Agent or the Trustee, unless the Issuer elects to make such payments by mailing a check to the registered address of, or by wire transfer to, a Holder thereof; *provided*, *however*, that payments on a Certificated Security will only be made by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such Holder elects payment by wire transfer by giving written notice to the Trustee or the Paying Agent to such effect designating such account no later than 30 days immediately preceding the relevant due date for payment (or such other date as the Trustee may accept in its discretion). If the Issuer elects to make payments directly to the Holders, payment shall be made by wire transfer or in the form of a check mailed to the address of each such Holder as it appears on the register maintained by the Registrar and Paying Agent. However, the final payment on any Certificated Security shall be made only upon presentation and surrender of such Security at the offices of the Paying Agent on the relevant payment date.

If any payment date (including any redemption date) falls on a day which is not a Business Day, any payment of interest and principal with respect to the Securities shall be made on the next succeeding Business Day with the same force and effect as if made on the due date, and no interest on such payment shall accrue from and after such due date.

3. Registrar, Paying Agent and Transfer Agent

Initially, Wilmington Savings Fund Society, FSB will act as Paying Agent, Registrar and Transfer Agent. The Issuer may appoint and change any Paying Agent, Registrar, Transfer Agent or co-registrar without notice. The Issuer or any Restricted Subsidiary may act as Paying Agent, Registrar, co-registrar or Transfer Agent.

4. Indenture

The Issuer issued the Securities under an Indenture dated as of December 21, 2022 (the "Indenture"), among the Issuer, Andrade Gutierrez Engenharia S.A. (the "Guarantor") and Wilmington Savings Fund Society, FSB, as Trustee, Registrar, Paying Agent and Transfer Agent, and TMF Brasil Administração e Gestão de Ativos Ltda., as the Collateral Agent. Capitalized terms used and not defined herein shall have the same meanings ascribed to such terms in the Indenture.

The Securities are general obligations of the Issuer. The Securities issued on the Issue Date and Securities issued in exchange therefor shall be treated as a single class for all purposes under the Indenture.

To the extent of any conflict between the terms of the Securities and the Indenture, the applicable terms of the Indenture shall govern.

5. Optional Redemption; Notice of Redemption

The Issuer may, at its option, redeem the Securities in whole at any time or in part from time to time at the redemption price of 100.000% (expressed as a percentage of principal amount of the Securities to be redeemed), plus any accrued and unpaid interest on the Securities (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date), if any, to (but excluding) the date of redemption.

6. Optional Redemption for Equity Offerings

Prior to December 21, 2024, the Issuer may, at its option, on any one or more occasions redeem up to 40% of the aggregate principal amount of the Securities (calculated after giving effect to any issuance of Additional Securities) with the aggregate Net Proceeds of one or more Equity Offerings, at a redemption price equal to 85.000% of the principal amount thereof, plus any accrued and unpaid interest on the Securities (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date), if any, to (but excluding) the date of redemption; provided that: (a) after giving effect to any such redemption at least 60% of the original aggregate principal amount of the Securities (calculated after giving effect to any issuance of Additional Securities) remains outstanding after each such redemption; and (b) such redemption occurs within 90 days after the closing of such Equity Offering.

7. Tax Redemption

The Issuer may redeem the Securities, in whole but not in part, at a redemption price equal to 100.000% of the principal amount thereof, plus accrued and unpaid interest on the Securities (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date), if any, to (but excluding) the redemption date, if as a result of:

(a) any amendment to, or change in, the laws or treaties (or any regulations or rulings promulgated thereunder) of a Relevant Jurisdiction; or

(b) any amendment to or change in an official interpretation or application regarding such laws, treaties, regulations or rulings (including a determination by a court of competent jurisdiction),

which amendment or change becomes effective on or after the Issue Date (or, in the case of a jurisdiction that becomes a Relevant Jurisdiction after the Issue Date, on or after the date such jurisdiction becomes a Relevant Jurisdiction), (i) the Issuer has become or would become obligated to pay, on the next date on which any amount would be payable with respect to the Securities, and (ii) the Issuer determines in good faith that such obligation cannot be avoided by the use of reasonable measures available to the Issuer (including making payment through a paying agent located in another jurisdiction, to the extent such measure would be a reasonable measure in light of the circumstances).

Immediately prior to the delivery of any notice of redemption to the Holders pursuant to this provision, the Issuer shall deliver to the Trustee:

(A) an Officer's Certificate (1) stating that the Issuer is entitled to effect such redemption, (2) setting forth a statement of facts showing that the conditions precedent relating to the right of the Issuer to so redeem have occurred, and (3) stating that all governmental approvals, if any, necessary to effect such redemption have been obtained and are in full force and effect; and

(B) an opinion of recognized counsel in the Relevant Jurisdiction to the effect that all governmental approvals, if any, necessary to effect such redemption have been obtained and are in full force and effect.

Any notice of redemption pursuant to this Section 7 shall be irrevocable.

9. Guarantee; Collateral

The payment by the Issuer of the principal of, and premium (if any) and interest on, the Securities shall be fully and unconditionally guaranteed on a joint and several basis by the Guarantor, to the extent set forth in the Indenture. The due and punctual payment of the principal of, premium (if any), and interest on, the Securities and the payment and performance of all other obligations of the Issuer and the Guarantor, according to the terms hereunder and under the Indenture, the Guarantee and under the Collateral Agreement, are secured as provided in the Indenture and in the Collateral Agreement.

10. Denominations; Transfer; Exchange

The Securities shall be issued in registered form in minimum denominations of US$1.00 and any integral multiple of US$1.00 in excess thereof and shall be issued as one or more Global Securities. A Holder may transfer or exchange Securities in accordance with the Indenture. The Securities may be transferred, combined or divided without payment of any charge other than taxes or other governmental charges. The Registrar may require a Holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes and fees required by law or permitted by the Indenture. The Registrar need not register the transfer of or exchange any Securities selected for redemption for 15 days before an Interest Payment Date.

11. Persons Deemed Owners

The registered Holder of this Security may be treated as the owner of it for all purposes; provided that payments of interest shall be made to the Person in whose name a Security is registered at the close of business on the applicable Record Date.

12. Unclaimed Money

If money for the payment of principal, premium or interest remains unclaimed for two years, the Trustee or the relevant Paying Agent shall pay the money back to the Issuer at its written request unless an applicable abandoned property law designates another Person. After any such payment, Holders entitled to the money must look only to the Issuer and not to the Trustee for payment.

13. Discharge; Defeasance

Subject to certain conditions set forth in Article 8 in the Indenture, the Issuer shall be entitled to terminate some or all of its obligations under the Securities and the Indenture if the Issuer deposits with the Trustee cash and/or U.S. Government Obligations for the payment of principal and interest on the Securities upon redemption or maturity, as the case may be.

14. Amendment, Waiver

Subject to certain exceptions set forth in the Indenture, (a) the Indenture and the Securities may be amended without notice to any Holder but with the written consent of the Holders of at least a majority in aggregate principal amount of the outstanding Securities and (b) any default or noncompliance with any provision may be waived with the written consent of the Holders of a majority in aggregate principal amount of the outstanding Securities.

Subject to certain exceptions set forth in the Indenture, without the consent of any Securityholder, the Issuer, the Guarantor and the Trustee and the Collateral Agent may amend the Indenture, the Guarantee or the Securities to cure any ambiguity, omission, defect or inconsistency, or to provide for the assumption by a Successor Issuer, Successor Company or a Substituted Debtor of the obligations of the Issuer or the Guarantor, as applicable, under the Indenture, the Securities and/or the Guarantee; or to add additional Guarantee with respect to the Securities; or to add to the covenants of the Issuer, or the Restricted Subsidiaries for the benefit of the Holders or surrender rights or powers conferred upon the Issuer or the Restricted Subsidiaries; or to make any change that does not adversely affect the rights of the Holders in

any material respect; or to provide for the appointment of a successor Trustee with respect to the Securities; provided that the successor Trustee is otherwise qualified and eligible to act as such under the term of the Indenture.

15. Defaults and Remedies

Under the Indenture, Events of Default include (a) default for 30 days in payment of any interest on the Securities; (b) default in payment of principal of or premium, if any, on the Securities, upon optional redemption, upon required purchase, upon declaration of acceleration, or otherwise; (c) failure by the Issuer to comply with Article 5 of this Indenture; (d) default in the performance, or breach, of any other covenant or obligation of the Issuer, the Guarantor or any Restricted Subsidiary in this Indenture and continuance of such default or breach for a period of 60 consecutive days after written notice specifying such default or breach is given to the Issuer by the Trustee or to the Issuer and the Trustee by the Holders of at least 25% in aggregate principal amount of the outstanding Securities; (e) events of bankruptcy or insolvency with respect to the Issuer or any Significant Subsidiary; or (f) the Guarantee of the Guarantor ceases to be in full force and effect, other than in accordance with the terms of the Indenture, or the Guarantor denies or disaffirms its obligations under the Securities.

If an Event of Default (other than an Event of Default specified in Section 6.01(5) or (6) of the Indenture) occurs and is continuing, either the Trustee or the Holders of at least 25% in aggregate principal amount of the outstanding Securities, by written notice to the Issuer (and to the Trustee if notice is given by the Holders), may declare all the Securities to be due and payable immediately. Certain events of bankruptcy or insolvency are Events of Default which will result in the Securities being due and payable immediately upon the occurrence of such Events of Default.

Securityholders may not enforce this Indenture or the Securities except as provided in this Indenture. The Trustee and the Collateral Agent may refuse to enforce this Indenture or the Securities unless it receives indemnity or security reasonably satisfactory to it. Subject to certain limitations, Holders of a majority in aggregate principal amount of the outstanding Securities may direct the Trustee in its exercise of any trust or power. The Trustee may withhold from Securityholders notice of any continuing Default (except a Default in payment of principal or interest) if it determines that withholding notice is in the interests of the Holders.

16. Trustee Dealings with the Issuer

Subject to certain limitations imposed by the TIA, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Securities and may otherwise deal with and collect obligations owed to it by the Issuer, the Guarantor, or their Affiliates and may otherwise deal with the Issuer, the Guarantor or their Affiliates with the same rights it would have if it were not Trustee.

17. No Recourse Against Others

A director, officer, employee or shareholder, as such, of the Issuer and the Guarantor shall not have any liability for any obligations of the Issuer, the Guarantor or any

Subsidiary of the Issuer or the Guarantor under the Securities or the Indenture or the Guarantee or for any claim based on, in respect of or by reason of such obligations or their creation. By accepting any Security, each Securityholder thereof waives and releases all such liability. The waiver and release are part of the consideration for the issue of the Securities.

18. Authentication

This Security shall not be valid until an authorized signatory of the Trustee (or an authenticating agent) manually signs the certificate of authentication on the other side of this Security.

19. Abbreviations

Customary abbreviations may be used in the name of a Securityholder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act).

20. CUSIP Numbers, Common Codes and ISINs

Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP numbers, Common Codes or ISINs to be printed on the Securities and has directed the Trustee to use CUSIP numbers, Common Codes or ISINs in notices of redemption as a convenience to Securityholders. No representation is made as to the accuracy of such numbers either as printed on the Securities or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

21. Governing Law; Consent to Jurisdiction and Service of Process

THIS SECURITY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

The provisions of articles 470-1 to 470-19 of the Luxembourg law of 10 August 1915 on commercial companies, as amended, are excluded with respect to the Securities.

Each of the Issuer and the Guarantor has consented to the nonexclusive jurisdiction of the courts of the State of New York and the United States courts located in the Borough of Manhattan, New York City, New York with respect to any action that may be brought in connection with the Indenture, the Securities or the Guarantee (whether in contract, tort or otherwise) and has irrevocably appointed CCS Global Solutions, Inc. as agent for service of process.

The Issuer shall furnish to any Securityholder upon written request and without charge to the Securityholder a copy of the Indenture which has in it the text of this Security in larger type. Requests may be made to:

Andrade Gutierrez Engenharia S.A.
Rua do Passeio, 38, 14th floor – Centro
Rio de Janeiro, RJ, 20021-290
Brazil
Attn: Gustavo Braga Mercher Coutinho

with copies to:

Andrade Gutierrez International S.A.
12C, rue Guillaume Kroll,
L-1882
Luxembourg
Attn: Gustavo Braga Mercher Coutinho

**[FORM OF] ASSIGNMENT FORM**

To assign this Security, fill in the form below:

I or we assign and transfer this Security to

______________________________________________________________________

(Insert assignee's soc. sec. or tax I.D. no.)

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

(Print or type assignee's name, address and zip code)

and irrevocably appoint

______________________________________________________

agent to transfer this Security on the books of the Issuer. The agent may substitute another to act for him or her.

Your Signature:

Date: ____________________ ________________________________________

(Sign exactly as your name appears on the other side of this Security)

*Signature guaranteed by:

By: _________________________________

* The signature must be guaranteed by an institution which is a member of one of the following recognized signature guaranty programs: (i) the Securities Transfer Agent Medallion Program (STAMP); (ii) the New York Stock Exchange Medallion Program (MSP); (iii) the Stock Exchange Medallion Program (SEMP); or (iv) such other guaranty program acceptable to the Trustee.

[TO BE ATTACHED TO GLOBAL SECURITIES] SCHEDULE OF INCREASES OR DECREASES IN GLOBAL SECURITY

The initial principal amount of this Global Security is US$[ ]. The following increases or decreases in this Global Security have been made:

| **Date of Increase or Decrease** | **Amount of decrease in principal amount of this Global Security** | **Amount of increase in principal amount of this Global Security** | **Principal amount of this Global Security following such decrease or increase** | **Signature of authorized officer of Trustee or Securities Custodian** |
|---|---|---|---|---|

EXHIBIT 2
to
QIB/ACCREDITED INVESTOR/REGULATION S APPENDIX

FORM OF NOTATION OF GUARANTEE

For value received, Andrade Gutierrez Engenharia S.A. (the "Guarantor") has unconditionally guaranteed, to the extent set forth in the Indenture and subject to the provisions of the Indenture dated as of December 21, 2022 (as amended from time to time, the "Indenture"), among Andrade Gutierrez International S.A. (the "Issuer"), the Guarantor, and Wilmington Savings Fund Society, FSB, as Trustee, Registrar, Transfer Agent and Paying Agent, and TMF Brasil Administração e Gestão de Ativos Ltda., as the Collateral Agent, the full and punctual payment (whether upon redemption, acceleration, or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Security, and the full and punctual payment of all other amounts payable by the Issuer under the Indenture. The obligations of the Guarantor to the Securityholders and to the Trustee pursuant to the Guarantee and the Indenture are expressly set forth in Article 10 of the Indenture and reference is hereby made to the Indenture for the precise terms of the Guarantee. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Indenture.

IN WITNESS WHEREOF, the Guarantor has caused this notation of guarantee to be duly executed.

**Andrade Gutierrez Engenharia S.A., as Guarantor**

By: ________________________________________
Name:
Title:

By: ________________________________________
Name:
Title:

EXHIBIT 3
to
REGULATION S APPENDIX

FORM OF CERTIFICATE TO BE DELIVERED
IN CONNECTION WITH TRANSFERS
PURSUANT TO REGULATION S

[Date]

Andrade Gutierrez International S.A.
12C, rue Guillaume Kroll,
L-1882
Luxembourg
Attn: Gustavo Braga Mercher Coutinho

Wilmington Savings Fund Society, FSB
500 Delaware Avenue
Wilmington, DE 19801
Attn: WSFS Institutional Services

Re: Andrade Gutierrez International S.A. (the "Issuer")
1.000% PIK Toggle Notes due 2040
CUSIP No. [03439T AJ0] [ ]
ISIN: [US03439TAJ07] [ ]

Ladies and Gentlemen:

Reference is hereby made to the Indenture (the "Indenture") dated as of December 21, 2022 by and among Andrade Gutierrez International S.A., as the issuer (the "Issuer"), and Wilmington Savings Fund Society, FSS, as Trustee, Registrar, Transfer Agent and Paying Agent, and TMF Brasil Administração e Gestão de Ativos Ltda., as the collateral agent. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Indenture.

This letter relates to US$ aggregate principal amount of the Issuer's 1.000% PIK Toggle Notes due 2040 (the "Securities") which are held in the form of a beneficial interest in the [Restricted Global Security][Accredited Investor Global Security] (CUSIP: No.: [03439T AJ0] [ ]; ISIN: [US03439TAJ07] [ ]) with the Depositary in the name of the undersigned.

The undersigned has requested transfer of such Securities to a person who will take delivery thereof in the form of a beneficial interest in the Regulation S Global Security (CUSIP No.: L01795 AH3; ISIN: USL01795AH34). In connection with such transfer, the undersigned confirms that such transfer has been effected pursuant to and in accordance with Regulation S under the U.S. Securities Act of 1933, as amended (the "Securities Act"), and, accordingly, the undersigned represents that:

(1) the offer of the Securities was not made to a Person in the United States;

(2) either (a) at the time the buy offer was originated, the transferee was outside the United States or the undersigned and any Person acting on the undersigned's behalf reasonably believed that the transferee was outside the United States, or (b) the transaction was executed in, on or through the facilities of a designated off shore securities market and neither the undersigned nor any Person acting on the undersigned's behalf knows that the transaction has been pre-arranged with a buyer in the United States;

(3) no directed selling efforts have been made in the United States in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S, as applicable;

(4) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act;

(5) the undersigned has advised the transferee of the transfer restrictions applicable to the Securities;

(6) if the circumstances set forth in Rule 904(c) under the Securities Act are applicable, the undersigned has complied with the additional conditions therein, including (if applicable) sending a confirmation or other notice stating that the Securities may be offered and sold during the restricted period specified in Rule 903(c)(2) or (3), as applicable, in accordance with the provisions of Regulation S; pursuant to registration of the Securities under the Securities Act; or pursuant to an available exemption from the registration requirements under the Securities Act; and

(7) if the sale is made during a restricted period and the provisions of Rule 903(c)(3) are applicable thereto, the undersigned confirms that such sale has been made in accordance with such provisions.

You and the Issuer are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.

Very truly yours,

[Name of Transferor]

By: ________________________________
Authorized Signature

Signature Guarantee*: ____________________

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

EXHIBIT 4
to
QIB/ACCREDITED INVESTOR/REGULATION S APPENDIX

FORM OF TRANSFER CERTIFICATE FOR
TRANSFER OF RESTRICTED GLOBAL SECURITY
BEARING A RESTRICTED SECURITIES LEGEND

[Date]

Andrade Gutierrez International S.A.
12C, rue Guillaume Kroll,
L-1882
Luxembourg
Attn: Gustavo Braga Mercher Coutinho

Wilmington Savings Fund Society, FSB
500 Delaware Avenue
Wilmington, DE 19801
Attn: WSFS Institutional Services

Re: Andrade Gutierrez International S.A.
1.000% PIK Toggle Notes due 2040
CUSIP No. L01795 AH3
ISIN: USL01795AH34

Ladies and Gentlemen:

Reference is hereby made to the Indenture (the "Indenture") dated as of December 21, 2022 by and among Andrade Gutierrez International S.A., as the issuer (the "Issuer"), and Wilmington Savings Fund Society, FSS, as Trustee, Registrar, Transfer Agent and Paying Agent, and TMF Brasil Administração e Gestão de Ativos Ltda., as the collateral agent. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Indenture.

This letter relates to US$ aggregate principal amount of the Issuer's 1.000% PIK Toggle Notes due 2040 (the "Securities") which are held in the form of a beneficial interest in the Regulation S Global Security (CUSIP No. L01795 AH3; ISIN: USL01795AH34) with the Depositary in the name of the undersigned.

The undersigned has requested transfer of such Securities to a Person who will take delivery thereof in the form of a beneficial interest in the [Restricted Global Security][Accredited Investor Global Security] (CUSIP No. [03439T AJ0][ ]; ISIN: [US03439TAJ07][ ]). In connection with such transfer, the undersigned does hereby confirm that such transfer has been effected in accordance with the transfer restrictions set forth in the Indenture and on the Securities and pursuant to and in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended, and accordingly, the undersigned represents that:

1. the Securities are being transferred to a transferee that the undersigned reasonably believes is purchasing the Securities for its own account or one or more accounts with respect to which the transferee exercises sole investment discretion; and

2. the undersigned (a) reasonably believes that the transferee and any such account is a qualified institutional buyer or an accredited investor purchasing this security for its own account or for the account of one or more qualified institutional buyers or accredited investors, as applicable, (b) agrees to offer, sell or otherwise transfer the Securities, prior to the date, or the resale restriction termination date, which is one year after the later of the Issue Date and the last date on which the Issuer or any affiliate of the Issuer was the owner of the Securities (or any predecessor of the Securities), only (i) to the Issuer or any Affiliate thereof, (ii) pursuant to a registration statement that has been declared effective under the Securities Act, (iii) for so long as the Securities are eligible for resale pursuant to Rule 144A, to a Person it reasonably believes is a "qualified institutional buyer" purchasing for its own account or for the account of a qualified institutional buyer to whom notice is given that the transfer is being made in reliance on Rule 144A, (iv) pursuant to offers and sales that occur outside the United States in compliance with Rule 903 or 904 under Regulation S under the Securities Act, (v) to an "accredited investor" within the meaning of Rule 501(a) of Regulation D under the Securities Act, (vi) pursuant to another available exemption from the registration requirements of the Securities Act, in each case in accordance with all applicable securities laws of the states of the United States or any other applicable jurisdiction; and (c) agrees that it will deliver to each Person to whom the Securities are being transferred a notice substantially to the effect of this paragraph.

[NAME OF TRANSFEROR]

By: ________________________________
Name:
Title:

Dated: _______________________

Signature Guarantee*: _________________

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

# Exhibit C

## Authorizing Resolutions

**Certified Translation from Portuguese into English**
**Tradução Juramentada**
Original document reference:
Ata AGE
Translated reference:
AGE Minutes
**TRANSLATION No.05 BOOK No.375 PAGE No.108**

I hereby certify and give full faith and credit that on this date a document has been presented to me in Portuguese, to which I translate as follows:

**ANDRADE GUTIERREZ ENGENHARIA S.A.**
CNPJ/MF nº 17.262.213/0001-94
NIRE 3130009183-0

**Minutes of**
**Extraordinary General Meeting**
**held on May 14, 2026**

**Date, Time and Place:** on May 14, 2026, at 11:00 am, at the head office of **ANDRADE GUTIERREZ ENGENHARIA S.A.** ("Company"), located in the City of Belo Horizonte, State of Minas Gerais, at Av. do Contorno 8.123, Bairro Cidade Jardim, Zip Code 30110-937.

**Board of the Meeting**: Pursuant to article 10, § 1, of the Company's Bylaws, the shareholders resolved to appoint Mr. Renato Torres de Faria as Chairman and Mr. Gustavo Braga Mercher Coutinho as Secretary of the Meeting.

**Attending**: The meeting was attended by the Company's shareholders holding shares representing the Company's total capital stock, as evidenced by the records and signatures in the Company's Shareholders' Attendance Book.

**Call**: Formal notice of the meeting is waived pursuant to article 124, paragraph 4, of Law no. 6404/1976 ("Brazilian Corporate Law"), considering the attendance of shareholders representing the Company's total capital stock.

**Convening**: Upon verification of the legal quorum, the Chairman of the Meeting declared the General Meeting convened, with the agenda below.

**José Roberto Vensan Maramaldo**
Tradutor Público e Intérprete Comercial
Matriculado na Jucesp sob o no. 1092 no idioma inglês
Nomeado através da Portaria 68/2000 de 12/07/2000
R.G.: 17.384.458 - SSP SP
C.P.F.: 181224968-30
C.C.M.: 2.845.542-8
WOODS
BRETTON WOODS
Endereço: The Cittyplex Osasco, Avenida Domingos Odália Filho, 301, Sl R 2015, Osasco, SP, CEP 06010-067
Telefone para contato: (11) 98244-2636 com Robert Chanda, e-mail: chanda@bwoods.com.br

**Agenda**: resolve on **(i)** the filing of a request for approval of the extrajudicial reorganization plans signed by the Company, in the capacity of signatory party or intervening party, as applicable ("EJ Plans"); **(ii)** the authorization for the Company's management members to perform all acts necessary to facilitate the filing of the request for approval of the aforementioned EJ Plans; **(iii)** the filing of a recognition proceeding before the U.S. Bankruptcy Court to recognize the extrajudicial reorganization proceeding and implement the EJ Plans in the United States of America; **(iv)** the authorization for the Company's management members to perform all acts necessary to facilitate the filing of the Chapter 15 Proceeding (as defined below); **(v)** the appointment of a foreign representative for the Company to represent the Company before the U.S. Bankruptcy Court; **(vi)** the direction regarding the vote to be cast by the Company at the respective extraordinary general meetings of Zagope SGPS, S.A. ("Zagope") and Andrade Gutierrez Construções S.A. ("AGC") concerning the approval of the aforementioned matters regarding Zagope and Andrade Gutierrez Construções e Serviços S.A. ("AGCS"); and (vii) the ratification of the acts already performed by the Company's management regarding the aforementioned matters.

**Deliberations**: The Company's shareholders approved the drawing up of these minutes in summary form, pursuant to article 130, paragraph 1, of the Brazilian Corporate Law, and also resolved, pursuant to article 8, paragraph 2, of the Company's Bylaws and article 122 of the Brazilian Corporate Law, the following:

**(i)** approve the filing of a request for approval of the EJ Plans, pursuant to articles 161 *et seq*. of Law no. 11,101/2005, to be submitted in the Judicial District of Belo Horizonte, State of Minas Gerais (the "Extrajudicial Reorganization");

**(ii)** in light of the foregoing resolution and the provisions of article 122, item IX, of the Brazilian Corporate Law, approve the performance, by the members of the Company's management, of all acts necessary, useful, or convenient to enable the filing of the request for approval of the aforementioned EJ Plans;

**(iii)** approve the filing of the recognition proceeding (the "Chapter 15 Procedure") before

the U.S. Bankruptcy Court so that the Company **(a)** obtain recognition of the Extrajudicial Reorganization as a foreign main proceeding or, alternatively, as a foreign non-main proceeding, (b) implement the EJ Plans, and (c) give full force and effect to the EJ Plans pursuant to Chapter 15 of Title 11 of the U.S. Bankruptcy Code (the "U.S. Bankruptcy Code");

**(iv)** approve the appointment of Mr. Gustavo Braga Mercher Coutinho, Brazilian, married, holder of Identity Card RG no. 114.197.221 and registered with CPF/ME under no. 091.264.797-37, resident and domiciled in the City and State of São Paulo, with commercial address at Av. das Nações Unidas 12,495, 5th floor, Cidade Monções, Zip Code 04578-911, as the Company's foreign representative, pursuant to Section 101(24) of the U.S. Bankruptcy Code, with specific powers to individually bind and represent the Company before the U.S. Bankruptcy Court or any other proper jurisdictional authority in the United States of America, including powers to seek any injunctive relief or judicial measure available to a foreign representative (as defined in Section 101 of the U.S. Bankruptcy Code) under Chapter 15 of the U.S. Bankruptcy Code or any other applicable laws;

**(v)** authorize Mr. Gustavo Braga Mercher Coutinho to take any actions or measures necessary or appropriate to **(a)** support and promote the recognition and implementation of the Extrajudicial Reorganization in the United States of America and **(b)** file and conduct any proceeding under Chapter 15 of the U.S. Bankruptcy Code;

**(vi)** direct the vote to be cast by the Company at the respective extraordinary general meetings of Zagope and AGC, to the effect of approving the aforementioned matters also with respect to Zagope and AGC, including the appointment of a foreign representative on the same terms as above and the ratification of acts already performed by the management's members of Zagope and AGC (and their respective controlled companies) regarding such matters;

**(vii)** instruct the management of AGC (an investee company of the Company and

shareholder of AGCS) to take all necessary actions to ensure that the guidance described in item "(vi)" above is strictly complied with; and

**(viii)** ratify the acts already performed by the Company's management regarding the matters subject to the above resolutions.

**Closing**: There being no further comments, the Chairman of the Meeting invited anyone wishing to speak to do so, and, as no one came forward, declared the meeting closed and the minutes drawn up, which were read, approved, and signed by all attending members. Board of the Meeting: Chairman Renato Torres de Faria; Secretary: Gustavo Braga Mercher Coutinho. Attending members: **(i)** Board of the Meeting: Renato Torres de Faria, Presidente; and Gustavo Braga Mercher Coutinho, Secretary; **(ii)** Attending Shareholders: p/Andrade Gutierrez Investimentos em Engenharia S.A.: Renato Torres de Faria and Gustavo Braga Mercher Coutinho. p/Telis Participações S.A.: Renato Torres de Faria and André Sant'anna

Valladares de Andrade. These minutes correspond to the original recorded in the appropriate book.

**I certify that this is a true copy of the minutes recorded in the appropriate book, which is kept on file at the Company's headquarter.**

Belo Horizonte, May 14, 2026

Board of the Meeting:

[digitally signed]
Renato Torres de Faria
**Chairman**

[digitally signed]
Gustavo Braga Mercher Coutinho
**Secretary**

## 2026 0514 AGE Ata Aprovacao RE vf_2.pdf

Document number #d917ef25-15dd-49a4-a68c-502e61698b4c

**Original document hash (SHA256):** 06c514b34be182e344ff00bb831991ce05494f8654f127ef4a11 eb01 d0e058ea

**PAdES hash (SHA256):** 4d88066a311 ee7faff3c1b854af243cea734077bbc862bcc081 81 81 d 287füa7b

## Signatures

**Renato Torres de Faria**
CPF: 502.153.966-34

Signed on May 18, 2026 at 17:36:35

Issued by AC SyngularID Multipla- with Digital Certificate ICP-Brasil effective through May 13, 2027

**Gustavo Braga Mercher Coutinho**
CPF: 091.264.797-37

Signed on May 18, 2026 at 18:01:00

Issued by AC SyngularID Multipla- with Digital Certificate ICP-Brasil effective through Dez 18, 2027

## Log

May 18, 2026, 15:55:32

May 18, 2026, 15:56:47

May 18, 2026, 15:56:47

May 18, 2026, 15:56:47

Operator with email barbara.soares@agnet.com.br on Account f580d5d1-0af3-4e9f-816a-959cd1c55b84 created this document, number d917ef25-15dd-49a4-a68c-502e61698b4c. Document signing deadline: June 17, 2026 (15:55). Automatic completion after the last signature: enabled. Language: Brazilian Portuguese.

Operator with email barbara.soares@agnet.com.br on Account f580d5d1-0af3-4e9f-816a-959cd1c55b84 modified the signature process. Deadline for document signature: August 10, 2026 (15:13).

Operator with email barbara.soares@agnet.com.br on Account f580d5d1-0af3-4e9f-816a-959cd1c55b84 added to the Signature List:
renato.faria@agnet.com.br to sign, via E-mail.

Authentication points: digital certificate; full name; CPF; handwritten signature. Data provided by the operator for signatory validation: full name Renato Torres de Faria and CPF 502.153.966-34.

Operator with email barbara.soares@agnet.com.br on account f580d5d1-0af3-4e9f-816a-959cd1c55b84 added to the Signature List:
gustavo.coutinho@agnet.com.br to sign, via E-mail.

Authentication points: digital certificate; full name; CPF; handwritten signature. Data provided by the operator for signatory validation: full name Gustavo Braga Mercher Coutinho and CPF 091.264.797-37.

May 18, 2026, 17:36:35

May 18, 2026, 18:01:DO

May 18, 2026, 18:01:01

Renato Torres de Faria signed. Authentication points: digital certificate, Type A3 e-CPF. CPF provided: 502.153.966-34. Handwritten signature with SHA256 hash prefix 8ab2c3(...), see attachment manuscript_18 mai 2026, 17-31-08.png. IP: 157.167.132.180. Signature component version 1.1443.0 provided at https://app.clicksign.com.

Gustavo Braga Mercher Coutinho signed. Authentication points: digital certificate, Type A3 e-CPF. CPF provided: 091.264.797-37. Handwritten signature with SHA256 hash prefix 094673(...), see attachment manuscript_18 mai 2026, 17-59-48.png. IP: 157.167.132.180. Signature component version 1.1443.0 provided at https://app.clicksign.com.

Signature process automatically completed. Reason: automatic completion after the last enabled signature. Signature process completed for document number d917ef25-15dd-49a4-a68c-502e61698b4c.

**Legally valid signed document.**
To check the validity, access https://www.clicksign.com/validador and use the password generated by the signatory or send this PDF file.
Digital and electronic signatures have legal validity as provided for in Provisional Measure no. 2200-2/2001.

This Log is exclusive and shall be considered part of document no. d917ef25-15dd-49a4-a68c-502e61698b4c, with the effects prescribed in the Clicksign Terms of Use, available at www.clicksign.com.

**Annexes**

**Renato Torres de Faria**

Signed the document on May 18, 2026 at 17:36:35

**HANDWRITTEN SIGNATURE**

Handwritten signature with SHA256 hash prefix 8ab2c3(...)

Renato Torres de Faria

manuscript_18 mai 2026, 17-31-08.png

**Gustavo Braga Mercher Coutinho**

Signed the document on May 18, 2026 at 18:01:00

**HANDWRITTEN SIGNATURE**

Handwritten signature with SHA256 hash prefix 094673(...)

Gustavo Braga Mercher Coutinho

manuscript_18 may 2026, 17-59-48.png

---

This is what was to be translated on the original document, according to my best understanding, which amounted to 7 electronic page equivalents which I have reviewed, found true and correct, and sign below:

Emoluments: R$ 321.37
Receipt Book No.:02 Receipt No.:3764
São Paulo, August 18, 2026

JOSE ROBERTO VENSAN MARAMALDO:18122496830

Digitally signed by JOSE ROBERTO VENSAN MARAMALDO:18122496830
Date: 2026.08.31 11:46:46 -03'00'

José Roberto Vensan Maramaldo

I hereby certify and give full faith and credit that on this date a document has been presented to me in Portuguese, to which I translate as follows:

**ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A.**
CNPJ/MF nº 39.469.291/0001-05
NIRE 3130001999-3

**Minutes of**
**Extraordinary General Meeting**
**held on May 14, 2026**

**Date, Time and Place:** on May 14, 2026, at 11:00 am, at the head office of **ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A.** ("Company"), located at Avenida do Contorno 8,269, Gutierrez, Belo Horizonte/MG, Zip Code 30.110-059.

**Board of the Meeting**: Pursuant to art. 9, of the Company's Bylaws, the shareholders resolved to appoint Mr. Renato Torres de Faria as Chairman and Mr. Paulo Márcio de Oliveira Monteiro as Secretary of the Meeting.

**Attendance**: The meeting was attended by the Company's shareholders holding shares representing the Company's total capital stock, as evidenced by the records and signatures in the Company's Shareholders' Attendance Book.

**Call**: Formal notice of the meeting is waived pursuant to article 124, paragraph 4, of Law no. 6404/1976 ("Corporations Law"), considering the attendance of shareholders representing the Company's total capital stock.

**Convening**: Upon verification of the legal quorum, the Chairman of the Meeting declared the General Meeting convened, with the agenda below.

**Agenda**: resolve on **(i)** the filing of a request for approval of the extrajudicial recovery plans signed by the Company, in the capacity of signatory or intervening party, as applicable ("EJ Plans"); **(ii)** the authorization for the Company's management members to perform all acts necessary to enable the filing of the request for approval of the aforementioned EJ Plans; **(iii)** the filing of a recognition proceeding before the U.S. Bankruptcy Court to recognize the extrajudicial recovery proceeding and enforce the EJ Plans in the United States of America; **(iv)** the authorization for the Company's management members to perform all acts necessary to enable the filing of the Chapter 15 Proceeding (as defined below); **(v)** the appointment of a foreign representative to represent the Company before the U.S. Bankruptcy Court; and **(vi)** the ratification of the acts already performed by the Company's management regarding the aforementioned matters.

**Deliberations**: The Company's shareholders approved the drawing up of these minutes in summary form, pursuant to article 130, paragraph 1, of the Corporations Law, and also resolved, pursuant to articles 8 and 9 of theCompany's Bylaws, and article 122 da Corporations Law:

**(i)** approve the filing of a request for approval of the EJ Plans, pursuant to articles 161 *et seq*. of Law no. 11,101/2005, to be submitted in the Judicial District of Belo Horizonte, State of Minas Gerais (the "Extrajudicial Reorganization");

**(ii)** in light of the foregoing resolution and the provisions of article 122, item IX, of the Corporations Law, approve the undertaking, by the members of the Company's management, of_all acts necessary, useful, or convenient to enable the filing of the request for approval of the aforementioned EJ Plans;

**(iii)** approve the filing of the recognition proceeding (the "Chapter 15 Procedure") before the U.S. Bankruptcy Court in order the Company **(a)** obtains recognition of the Extrajudicial Reorganization as a foreign main proceeding or, alternatively, as a foreign non-main proceeding, **(b)** implements the EJ Plans, and **(c)** gives full force

and effect to the EJ Plans pursuant to Chapter 15 of Title 11 of the U.S. Bankruptcy Code (the "U.S. Bankruptcy Code");

**(iv)** approve the appointment of Mr. Gustavo Braga Mercher Coutinho, a Brazilian citizen, married, holder of Identity Card (RG) no. 114.197.221 and enrolled with the CPF/ME under no. 091.264.797-37, residing and domiciled in the City and State of São Paulo, with a business address at Av. das Nações Unidas 12495, 5° andar, Cidade Monções, CEP 04578-911, as the foreign representative of the Company, pursuant to Section 101(24) of the U.S. Bankruptcy Code, with specific powers to individually bind and represent the Company before the U.S. Bankruptcy Court or any other proper judicial authority in the United States of America, including the power to seek any preliminary injunction or judicial measure available to a foreign representative (as defined in Section 101 of the U.S. Bankruptcy Code), in accordance with Chapter 15 of the U.S. Bankruptcy Code or any other applicable laws;

**(v)** authorize Mr. Gustavo Braga Mercher Coutinho to take any actions or measures necessary or appropriate to **(a)** support and promote the recognition and implementation of the Extrajudicial Reorganization in the United States of America and **(b)** file and conduct any proceeding under Chapter 15 of the U.S. Bankruptcy Code; and

**(vi)** ratify the acts already performed by the Company's management regarding the matters subject to the above resolutions.

**Closing**: There being no further comments, the Chairman of the Meeting invited anyone wishing to speak to do so, and, as no one came forward, declared the meeting closed and the minutes drawn up, which were read, approved, and signed by all attending members. Attending members: **(i)** Board of the Meeting: Renato Torres de Faria, Chairman; e Paulo Márcio de Oliveira Monteiro, Secretary; **(ii)** Attending Shareholders: p/ADPAR – ADMINISTRAÇÃO E PARTICIPAÇÕES LTDA: Paulo Márcio de Oliveira Monteiro e André Sant'anna Valladares de Andrade. p/ANDRADE GUTIERREZ ENGENHARIA S.A.: Renato Torres de Faria e Marco Túlio Pinto. By proxy: CARLOS JOSÉ DE SOUZA. CRISTIANO PIMENTEL CAVALCANTI VIEIRA. JOSE EDUARDO KAUARK LEITE.

MARCUS VINICIUS DUTRA MORESI. RODRIGO VARGAS DE VASCONCELOS CANCADO. RICARDO CURTI. GUSTAVO GONZALEZ CRONEMBERGER PARENTE. RENATO CEZAR LINHARES JUNIOR: **Lucas Rodrigues Oliveira Silva.** These minutes correspond to the original recorded in the appropriate book.

**I certify that this is a true copy of the minutes recorded in the appropriate book, which is kept on file at the Company's headquarter.**

Belo Horizonte, May 14, 2026

[digitally signed]
Renato Torres de Faria
**Chairman**

[digitally signed]
Paulo Márcio de Oliveira Monteiro
**Secretary**

## 2026 0514 AGCS Ata Aprovacao RE vf_1.pdf

Document number #cda9bea2-4ddb-401e-bd08-6ba8d2c4dc13

**Original document hash (SHA256):** e37ee9e6d3d6c730ff011635d134486b3c6b5548d393d4b9096e49f6e2121c12

**PAdES hash (SHA256):** 04d012296080fa3af8c5f845c46d513f5e03019bb713f588461805a6ba03fec0

## Signatures

**Renato Torres de Faria**
CPF: 502.153.966-34

Signed on May 18, 2026 at 17:33:01

Issued by AC SyngularID Multipla with Digital Certificate ICP-Brasil effective through May 13, 2027

**Paulo Márcio de Oliveira Monteiro**
CPF: 269.960.226-49

Signed on May 18, 2026 at 18:03:15

Issued by AC LINK RFB v2- with Digital Certificate ICP-Brasil effective through Dec 05, 2028

## Log

May 18, 2026, 15:41:06

May 18, 2026, 15:43:19

May 18, 2026, 15:43:19

May 18, 2026, 17:33:01

Operator with email email barbara.soares@agnet.com.br on Account f580d5d1-0af3-4e9f-816a-959cd1c55b84 created this document, number cda9bea2-4ddb-401e-bd08-6ba8d2c4dc13. Document signing deadline: June 17, 2026 (15:41). Automatic completion after the last signature: enabled. Language: Brazilian Portuguese.

Operator with email barbara.soares@agnet.com.br on Account f580d5d1-0af3-4e9f-816a-959cd1c55b84 added to the Signature List:
renato.faria@agnet.com.br para assinar, via E-mail.

Authentication points: digital certificate; full name; CPF; handwritten signature. Data provided by the operator for signatory validation: full name Renato Torres de Faria and CPF 502.153.966-34.

Operator with email barbara.soares@agnet.com.br on Account f580d5d1-0af3-4e9f-816a-959cd1c55b84 added to the Signature List:
paulo.monteiro@agnet.com.br para assinar, via E-mail.

Authentication points: digital certificate; full name; CPF; handwritten signature. Data provided by the operator for signatory validation: full name Paulo Márcio de Oliveira Monteiro and CPF 269.960.226-49.

Renato Torres de Faria signed. Authentication points: digital certificate, Type A3 e-CPF. CPF provided: 502.153.966-34. Handwritten signature with SHA256 hash prefix 8ab2c3(...), see attachment manuscript_18 mai 2026, 17-31-08.png. IP: 157.167.132.180. Signature component version 1.1443.0 provided at https://app.clicksign.com.

May 18, 2026, 18:03:15

May 18, 2026, 18:03:17

Paulo Márcio de Oliveira Monteiro signed. Authentication points: digital certificate, Type A3 e-CPF. CPF provided: 269.960.226-49. Handwritten signature with SHA256 hash prefix 3616d6(...), see attachment manuscript_18 mai 2026, 18-01-50.png. IP: 157.167.132.180. Signature component version 1.1443.0 provided at https://app.clicksign.com.

Signature process automatically completed. Reason: automatic completion after the last enabled signature. Signature process completed for document number cda9bea2-4ddb-401e-bd08-6ba8d2c4dc13.

**Legally valid signed document.**
To check the validity, access https://www.clicksign.com/validador and use the password generated by the signatory or send this PDF file.
Digital and electronic signatures have legal validity as provided for in Provisional Measure no. 2200-2/2001.

This Log is exclusive and shall be considered part of document no. cda9bea2-4ddb-401e-bd08-6ba8d2c4dc13, with the effects prescribed in the Clicksign Terms of Use, available at www.clicksign.com.

## Annexes

**Renato Torres de Faria**

Signed the document on May 18, 2026 at 17:33:01

**HANDWRITTEN SIGNATURE**

Handwritten signature with SHA256 hash prefix 8ab2c3(...)

Renato Torres de Faria

manuscript_18 mai 2026, 17-31-08.png

**Paulo Márcio de Oliveira Monteiro**

Signed the document on May 18, 2026 at 18:03:15

**HANDWRITTEN SIGNATURE**

Handwritten signature with SHA256 hash prefix 3616d6(...)

Paulo Márcio de Oliveira Monteiro

manuscript_18 may 2026, 18-01-50.png

---

This is what was to be translated on the original document, according to my best understanding, which amounted to 7 electronic page equivalents which I have reviewed, found true and correct, and sign below:

Emoluments: R$ 321.37
Receipt Book No.:02 Receipt No.:3764
São Paulo, August 18, 2026

JOSE ROBERTO VENSAN MARAMALDO:18122496830 Digitally signed by JOSE ROBERTO VENSAN MARAMALDO:18122496830
Date: 2026.08.31 11:45:53 -03'00'

José Roberto Vensan Maramaldo

**Certified Translation from Portuguese into English**
**Tradução Juramentada**
Original document reference:
Ata AGC
Translated reference:
AGC Minutes
**TRANSLATION No.06 BOOK No.375 PAGE No.115**

I hereby certify and give full faith and credit that on this date a document has been presented to me in Portuguese, to which I translate as follows:

**ANDRADE GUTIERREZ CONSTRUÇÕES S.A.**
**CNPJ/ME nº 61.630.782/0001-37**
**NIRE 31300177050**

**Minutes of**
**Extraordinary General Meeting**
**held on May 14, 2026**

**Date, Time and Place:** on May 14, 2026, at 10:00 am, at the head office of **ANDRADE GUTIERREZ CONSTRUÇÕES S.A.** ("Company"), located in the City of Belo Horizonte, State of Minas Gerais, at Avenida do Contorno 8.269, room 014, Gutierrez, Zip Code 30110-059.

**Board of the Meeting**: Pursuant to article 9º, of the Company's Bylaws, the shareholders resolved to appoint Mr. Renato Torres de Faria as Chairman and Mr. Marco Túlio Pinto as Secretary of the Meeting.

**Attending**: The meeting was attended by the Company's shareholders holding shares representing the Company's total capital stock, as evidenced by the records and signatures in the Company's Shareholders' Attendance Book.

**Call**: Formal notice of the meeting is waived pursuant to article 124, paragraph 4, of Law no. 6404/1976 ("Brazilian Corporation Law"), considering the attendance of shareholders representing the Company's total capital stock.

**Convening**: Upon verification of the legal quorum, the Chairman of the Meeting declared the General Meeting convened, with the agenda below.

**Agenda**: resolve on the voting instructions to be issued by the Company at the extraordinary general meeting of Andrade Gutierrez Construções e Serviços S.A. ("AGCS") regarding **(a)** the filing of a request for approval of the extrajudicial

**José Roberto Vensan Maramaldo**
Tradutor Público e Intérprete Comercial
Matriculado na Jucesp sob o no. 1092 no idioma inglês
Nomeado através da Portaria 68/2000 de 12/07/2000
R.G.: 17.384.458 - SSP SP
C.P.F.: 181224968-30
C.C.M.: 2.845.542-8
WOODS
Endereço: The Cittyplex Osasco, Avenida Domingos Odália Filho, 301, Sl R 2015, Osasco, SP, CEP 06010-067
Telefone para contato: (11) 98244-2636 com Robert Chanda, e-mail: chanda@bwoods.com.br

reorganization plans by AGCS, Andrade Gutierrez International S.A. ("AG International"), Andrade Gutierrez Investimentos em Engenharia S.A. ("AGIE"), Andrade Gutierrez Engenharia S.A. ("AGE"), and Zagope SGPS, S.A. ("Zagope"), in the capacity of signatory parties or intervening parties, as applicable ("EJ Plans"); **(b)** the filing of a recognition proceeding before the U.S. Bankruptcy Court by AGCS, AG International, AGIE, AGE, and Zagope to recognize the extrajudicial reorganization proceeding and enforce the EJ Plans in the United States of America; and **(c)** the subsequent appointment of a foreign representative to represent AGCS before the U.S. Bankruptcy Court.

**Deliberations**: The Company's shareholders approved the drawing up of these minutes in summary form, pursuant to article 130, paragraph 1, of the Brazilian Corporation Law, and also resolved, pursuant to article 9 of the Company's Bylaws and article 122 of the Brazilian Corporation Law:

**(i)** guide the vote to be cast by the Company at the AGCS' extraordinary general meeting, to the effect of:

**(a)** approve the filing by AGCS of a request for approval of the EJ Plans, pursuant to articles 161 et seq. of Law no. 11,101/2005, to be submitted in the City of Belo Horizonte, State of Minas Gerais (the "Extrajudicial Reorganization");

**(b)** in light of the foregoing resolution and the provisions of article 122, item IX, of the Brazilian Corporation Law, approve the performance by the members of AGCS's management of all acts necessary, useful, or convenient to enable the filing of the request for approval of the aforementioned EJ Plans;

**(c)** approve the filing of the recognition proceeding (the "Chapter 15 Procedure") before the U.S. Bankruptcy Court so that AGCS can **(a)** obtain recognition of the Extrajudicial Reorganization as a foreign main proceeding or, alternatively, as a foreign non-main proceeding, **(b)** implement the EJ Plans, and **(c)** give full force and effect to the EJ Plans pursuant to Chapter 15 of Title 11 of the U.S. Bankruptcy Code (the "U.S. Bankruptcy Code");

**(d)** approve the appointment of Mr. Gustavo Braga Mercher Coutinho, a Brazilian citizen, married, holder of Identity Card (RG) no. 114.197.221 221 and enrolled with the CPF/ME under no. 091.264.797-37, residing and domiciled in the City and State of São Paulo, with a business address at Av. das Nações Unidas

12495, 5.o andar, Cidade Monções, CEP 04578-911, as the foreign representative of AGCS, pursuant to Section 101(24) of the U.S. Bankruptcy Code, with specific powers to individually bind and represent Company before the U.S. Bankruptcy Court or any other proper judicial authority in the United States of America, including the power to seek any preliminary injunction or judicial measure available to a foreign representative (as defined in Section 101 of the U.S. Bankruptcy Code), in accordance with Chapter 15 of the U.S. Bankruptcy Code or any other applicable laws;

**(e)** authorize Mr. Gustavo Braga Mercher Coutinho to take any actions or measures necessary or appropriate to (1) support and promote the recognition and implementation of the Extrajudicial Reorganization in the United States of America and (2) file and conduct any proceeding under Chapter 15 of the U.S. Bankruptcy Code; and

**(ii)** ratify the acts already performed by the Company's management regarding the matters subject to the above resolutions.

**Closing**: There being no further comments, the Chairman of the Meeting invited anyone wishing to speak to do so, and, as no one came forward, declared the meeting closed and the minutes drawn up, which were read, approved, and signed by all attending members. Attending members **(i)** Board of the Meeting: Renato Torres de Faria, Chairman; and Marco Túlio Pinto, Secretary; **(ii)** Attending Shareholders: p/**Andrade Gutierrez S.A.:** Renato Torres de Faria e Maria Beatriz Lira Gomes Ferraz. p/**Andrade Gutierrez Engenharia S.A.:** Renato Torres de Faria e Marco Túlio Pinto. These minutes correspond to the original recorded in the appropriate book.

**I certify that this is a true copy of the minutes recorded in the appropriate book, which is kept on file at the Company's headquarter.**

Belo Horizonte, May 14, 2026

**Board of the Meeting**:

[digitally signed]

Renato Torres de Faria
**Chairman**

[digitally signed]

Marco Túlio Pinto
**Secretary**

## 2026 0514 AGC Ata Aprovacao RE vf _1.pdf

Document number #5c7faf74-271 a-4067-b249-0e7c8d877b40

**Original document hash (SHA256):** 20f1 eb8be3c6484a50fc117ad6420c30753651f5f4f a 211Obacbfd423da74140

**PAdES hash (SHA256):** 8712691 a7b6c289c95e0365b980a7e49e91b0d67130d6c7e1180cff18d8c1487

## Signatures

**Renato Torres de Faria**
CPF: 502.153.966-34

Signed on May 18, 2026 at 17:37:58

Issued by AC SyngularID Multipla- with Digital Certificate ICP-Brasil effective through May 13, 2027

**Marco Tulio Pinto**
CPF: 487.484.046-91

Signed on May 18, 2026 at 18:40:41

Issued by AC SyngularID Multipla- with Digital Certificate ICP-Brasil effective through Dec 4, 2027

## Log

18 May 2026, 17:14:41

May 18, 2026, 17:16:03

May 18, 2026, 17:16:03

Original document reference:
Ata AGC
Translated reference:
AGC Minutes

**TRANSLATION No.06 BOOK No.375 PAGE No.120**

May 18, 2026, 17:37:58

Operator with email barbara.soares@agnet.com.br on Account f580d5d1-0af3-4e9f-816a-959cd1c55b84 created this document, number 5c7faf74-271a-4067-b249-0e7c8d877b40. Document signing deadline: June 17, 2026 (17:14). Automatic completion after the last signature: enabled. Language: Brazilian Portuguese.

Operator with email barbara.soares@agnet.com.br on Account f580d5d1-0af3-4e9f-816a-959cd1c55b84 added to the Signature List:
marcotulio@agnet.com.br to sign, via E-mail.

Authentication points: digital certificate; full name; CPF; handwritten signature. Data provided by the operator for signatory validation: full name Marco Tulio Pinto e CPF 487.484.046-91.

Operator with email barbara.soares@agnet.com.br on Account f580d5d1-0af3-4e9f-816a-959cd1c55b84 added to the Signature List:
renato.faria@agnet.com.br to sign, via E-mail.

Authentication points: digital certificate; full name; CPF; handwritten signature. Data provided by the operator for signatory validation: full name Renato Torres de Faria e CPF 502.153.966-34.

Renato Torres de Faria signed. Authentication points: digital certificate, Type A3 e-CPF. CPF provided: 502.153.966-34. Handwritten signature with SHA256 hash prefix 8ab2c3(...), see attachment manuscript_18 mai 2026, 17-31-08.png. IP: 157.167.132.180. Signature component version 1.1443.0 provided at https://app.clicksign.com.

May 18, 2026, 18:40:41

May 18, 2026, 18:40:41

Marco Tulio Pinto signed. Authentication points: digital certificate, Type A3 e-CPF. CPF provided: 487.484.046-91. Handwritten signature with SHA256 hash prefix e2f128(...), see attachment manuscript_18 mai 2026, 18-39-33.png. IP: 187.62.160.1. Signature component version 1.1444.0 provided at https://app.clicksign.com.

Signature process automatically completed. Reason: automatic completion after the last enabled signature. Signature process completed for document number 5c7faf74-271a-4067-b249-0e7c8d877b40.

**Legally valid signed document.**
To check the validity, access https://www.clicksign.com/validador and use the password generated by the signatory or send this PDF file.
Digital and electronic signatures have legal validity as provided for in Provisional Measure no. 2200-2/2001.

This Log is exclusive and shall be considered part of document no.5c7faf74-271a-4067-b249-0e7c8d877b40, with the effects prescribed in the Clicksign Terms of Use, available at www.clicksign.com.

## Annexes

### Renato Torres de Faria

Signed the document on May 18, at 17:37:58

**HANDWRITTEN SIGNATURE**
Handwritten signature with SHA256 hash prefix 8ab2c3(...)

Renato Torres de Faria
manuscript_18 mai 2026, 17-31-08.png

**Marco Tulio Pinto**

Signed the document on May 18, at 18:40:41

**HANDWRITTEN SIGNATURE**
Handwritten signature with SHA256 hash prefix e2f128(...)

Marco Tulio Pinto
manuscript_18 may 2026, 18-39-33.png

---

This is what was to be translated on the original document, according to my best understanding, which amounted to 7 electronic page equivalents which I have reviewed, found true and correct, and sign below:

Emoluments: R$ 321.37
Receipt Book No.:02 Receipt No.:3764
São Paulo, August 18, 2026

JOSE ROBERTO VENSAN MARAMALDO:18122496830
Digitally signed by JOSE ROBERTO VENSAN MARAMALDO:18122496830
Date: 2026.09.02 18:01:39 -03'00'

José Roberto Vensan Maramaldo

**Certified Translation from Portuguese into English**
**Tradução Juramentada**
Original document reference:
Ata AGIE
Translated reference:
AGIE Minutes
**TRANSLATION No.08 BOOK No.375 PAGE No.129**

I hereby certify and give full faith and credit that on this date a document has been presented to me in Portuguese, to which I translate as follows:

**ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A.**
CNPJ/MF No.17.027.611/0001-26 NIRE 3130010231-9

**Minutes of Extraordinary General Meeting held on May 14, 2026**

**Date, Time and Place:** on May 14, 2026, at 10:00 am, at the head office of **ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A.** ("Company"), located in the City of Belo Horizonte, State of Minas Gerais, at Av. do Contorno, 8.269, room 004, District of Gutierrez, Zip Code 30110-059.

**Board of the Meeting**: Pursuant to article 8, §1, of the Company's Bylaws, the shareholders resolved to appoint Mr. Renato Torres de Faria as Chairman and Mrs. Maria Beatriz Lira Gomes Ferraz as Secretary of the Meeting.

**Attendance**: The meeting was attended by the Company's shareholders holding shares representing the Company's total capital stock, as evidenced by the records and signatures in the Company's Shareholders' Attendance Book.

**Call**: Formal notice of the meeting is waived pursuant to article 124, paragraph 4, of Law no. 6404/1976 ("Corporations Law"), considering the attendance of shareholders representing the Company's total capital stock.

**Convening**: Upon verification of the legal quorum, the Chairman of the Meeting declared the General Meeting convened, with the agenda below.

**Agenda**: resolve on **(i)** the filing of a request for approval of the extrajudicial recovery plans signed by the Company, in the capacity of signatory or intervening party, as applicable ("EJ Plans"); **(ii)** the authorization for the Company's management members to perform all acts necessary to enable the filing of the request for approval of the aforementioned EJ Plans; **(iii)** the filing of a recognition proceeding before the U.S. Bankruptcy Court to recognize the extrajudicial recovery proceeding and enforce the EJ Plans in the United States of America; **(iv) the** authorization for the Company's management members to perform all acts necessary to enable the filing of the Chapter 15 Proceeding (as defined below); **(v)** the appointment of a foreign representative to represent the Company before the U.S. Bankruptcy Court; **(vi)** the voting direction to be followed by the Company at the respective extraordinary general meetings of Andrade Gutierrez Engenharia S.A. ("AGE") and Zagope SGPS, S.A. ("Zagope") regarding the approval of the aforementioned matters concerning AGE, Andrade Gutierrez Construções e Serviços S.A. ("AGCS"), and Zagope; and **(vii)** the ratification of the acts already performed by the Company's management regarding the aforementioned matters.

**Deliberations**: The Company's shareholders approved the drawing up of these minutes in summary form, pursuant to article 130, paragraph 1, of the Corporations Law, and also resolved, pursuant to article 8, §2, of the Company's Bylaws and article 122 of the Corporations Law, the following:

**(i)** approve the filing of a request for approval of the EJ Plans, pursuant to articles 161 *et seq*. of Law no. 11,101/2005, to be submitted in the Judicial District of Belo Horizonte, State of Minas Gerais (the "Extrajudicial Reorganization");

**(ii)** in light of the foregoing resolution and the provisions of article 122, item IX, of the Corporations Law, approve the undertaking, by the members of the Company's management, of all acts necessary, useful, or convenient to enable the filing of the request for approval of the aforementioned EJ Plans;

**(iii)** approve the filing of the recognition proceeding (the "Chapter 15 Procedure") before

the U.S. Bankruptcy Court in order the Company (a) obtains recognition of the Extrajudicial Reorganization as a foreign main proceeding or, alternatively, as a foreign non-main proceeding, (b) implements the EJ Plans, and (c) gives full force and effect to the EJ Plans pursuant to Chapter 15 of Title 11 of the U.S. Bankruptcy Code (the "U.S. Bankruptcy Code");

**(iv)** approve the appointment of Mr. Gustavo Braga Mercher Coutinho, a Brazilian citizen, married, holder of Identity Card (RG) no. 114.197.221 and enrolled with the CPF/ME under no. 091.264.797-37, residing and domiciled in the City and State of São Paulo, with a business address at Av. das Nações Unidas, 12495, 5.o andar, Cidade Monções, CEP 04578-911, as the foreign representative of the Company, pursuant to Section 101(24) of the U.S. Bankruptcy Code, with specific powers to individually bind and represent the Company before the U.S. Bankruptcy Court or any other proper judicial authority in the United States of America, including the power to seek any preliminary injunction or judicial measure available to a foreign representative (as defined in Section 101 of the U.S. Bankruptcy Code), in accordance with Chapter 15 of the U.S. Bankruptcy Code or any other applicable laws;

**(v)** authorize Mr. Gustavo Braga Mercher Coutinho to take any actions or measures necessary or appropriate to **(a)** support and promote the recognition and implementation of the Extrajudicial Reorganization in the United States of America and **(b)** file and conduct any proceeding under Chapter 15 of the U.S. Bankruptcy Code;

**(vi)** direct the vote to be cast by the Company at the respective extraordinary general meetings of AGE and Zagope to approve the aforementioned matters with respect to AGE and Zagope as well, including the appointment of a foreign representative on the same terms as above and the ratification of acts already performed by the management members of AGE and Zagope regarding such matters;

**(vii)** direct that the aforementioned matters also be approved at the appropriate corporate

meetings with respect to AGCS, an indirect subsidiary of the Company, with corresponding authorization for the management members of said indirect subsidiaries of the Company to perform all acts necessary to that end, including directing the appointment of a foreign representative on the same terms as above and the ratification of acts already performed by the management members of the Company's indirect subsidiaries regarding the matters subject to the voting instructions hereby conveyed; and

**(viii)** ratify the acts already performed by the Company's management regarding the matters subject to the above resolutions.

**Closing**: There being no further comments, the Chairman of the Meeting invited anyone wishing to speak to do so, and, as no one came forward, declared the meeting closed and the minutes drawn up, which were read, approved, and signed by all attending members. Attending members: **(i)** Board of the Meeting: Renato Torres de Faria, Chairman; and Maria Beatriz Lira Gomes Ferraz, Secretary; **(ii)** Attending Shareholders: p/Andrade Gutierrez S.A.: Renato Torres de Faria and Maria Beatriz Lira Gomes Ferraz.

p/Telis Participações S.A.: Renato Torres de Faria and André Sant'anna Valladares de Andrade. These minutes correspond to the original recorded in the appropriate book.

**I certify that this is a true copy of the minutes recorded in the appropriate book, which is kept on file at the Company's headquarter.**

Belo Horizonte, May 14, 2026

**Board of the Meeting**:

[digitally signed]
Renato Torres de Faria
Chairman

[digitally signed]
Maria Beatriz Lira Gomes Ferraz
Secretary

Original document reference:
Ata AGIE
Translated reference:
AGIE Minutes

**TRANSLATION No.08 BOOK No.375 PAGE No.133**

# 2026 05 14 AGIE Ata Aprovacao RE vf_1.pdf

Document number #8d4c8649-fff9-41cc-8460-7d9277c65ac4
**Original document hash (SHA256):** 243af971 0a726ab4381878065643d 5cdce41 ef886540a0füee47e38808e4cc53
**PAdES hash (SHA256):** c760110372c3a98f2eff243a2e3e6b3eda1ee15098ef5b27a789e289e3c655a8

## Signatures

**Maria Beatriz Lira Gomes Ferraz**
CPF: 272.376.328-50
Signed on May 18, 2026 at 15:55:05
Issued by AC OAB G3- with Digital Certificate ICP-Brasil effective through Jan 19, 2029

**Renato Torres de Faria**
CPF: 502.153.966-34
Signed on May 18, 2026 at 17:35:31
Issued by AC SyngularID Multipla- with Digital Certificate ICP-Brasil effective through May 13, 2027

## Log

May 18, 2026, 15:46:17 Operator with email barbara.soares@agnet.com.br on Account f580d5d1-0af3-4e9f-816a-959cd1 c55b84 created this document, number 8d4c8649-fff9-41cc-8460-7d9277c65ac4. Document signing deadline: June 17, 2026 (15:46). Automatic completion after the last signature: enabled. Language: Brazilian Portuguese.

May 18, 2026, 15:47:20 Operator with email barbara.soares@agnet.com.br on Account f580d5d1-0af3-4e9f-816a-959cd1 c55b84 modified the signature process. Deadline for document signature: June 23, 2026 (15:13).

May 18, 2026, 15:47:20 Operator with email barbara.soares@agnet.com.br on Account f580d5d1-0af3-4e9f-816a-959cd1 c55b84 added to the Signature List: renato.faria@agnet.com.br to sign, via E-mail.

May 18, 2026, 15:47:20 Authentication points: digital certificate; full name; CPF; handwritten signature. Data provided by the operator for signatory validation full name Renato Torres de Faria e CPF 502.153.966-34.
Operator com email barbara.soares@agnet.com.br on Account f580d5d1-0af3-4e9f-816a-959cd1 c55b84 added to the Signature List:
beatriz.gomes@agnet.com.br to sign, via E-mail.

Authentication points: digital certificate; full name; CPF; handwritten signature. Data provided by the operator for signatory validation full name Maria Beatriz Lira Gomes Ferraz e CPF 272.376.328-50.

May 18, 2026, 15:55:05 Maria Beatriz Lira Gomes Ferraz signed. Authentication points: digital certificate, Type A3 e-CPF. CPF provided: 272.376.328-50. Handwritten signature with SHA256 hash prefix 738145(...), see attachment manuscript_18 mai 2026, 15-51-42.png. IP: 187.62.160.1. Signature component version 1.1443.0 provided at https://app.clicksign.com.

May 18, 2026, 17:35:31 Renato Torres de Faria signed. Authentication points: digital certificate, Type A3 e-CPF. CPF provided: 502.153.966-34. Handwritten signature with SHA256 hash prefix 8ab2c3(...), see attachment manuscript_18 mai 2026, 17-31-08.png. IP: 157.167.132.180. Signature component version 1.1443.0 provided at https:/ /app.clicksign.com.

May 18, 2026, 17:35:31 Signature process automatically completed. Reason: automatic completion after the last enabled signature. Signature process completed for document number 8d4c8649-fff9-41cc-8460-7d9277c65ac4.

**Legally valid signed document.**
To check the validity, access https://www.clicksign.com/validador and use the password generated by the signatory or send this PDF file.
Digital and electronic signatures have legal validity as provided for in Provisional Measure no. 2200-2/2001.

This Log is exclusive and shall be considered part of document no.8d4c8649-fff9-41cc-8460-7d9277c65ac4, with the effects prescribed in the Clicksign Terms of Use, available at www.clicksign.com.

## Annexes

### Maria Beatriz Lira Gomes Ferraz
Signed the document on May 18, 2026 at 15:55:05

**HANDWRITTEN SIGNATURE**
Handwritten signature with SHA256 hash prefix 738145(...)

Maria Beatriz Lira Gomes Ferraz
manuscript_18 mai 2026, 15-51-42.png

### Renato Torres de Faria
Signed the document on May 18, 2026 at 17:35:31

**HANDWRITTEN SIGNATURE**
Handwritten signature with SHA256 hash prefix 8ab2c3(...)

Renato Torres de Faria
manuscript_18 may 2026, 17-31-08.png

---

This is what was to be translated on the original document, according to my best understanding, which amounted to 6 electronic page equivalents which I have reviewed, found true and correct, and sign below:

Emoluments: R$ 275.46
Receipt Book No.:02 Receipt No.:3764
São Paulo, August 18, 2026

JOSE ROBERTO VENSAN MARAMALDO:18122496830 Digitally signed by JOSE ROBERTO VENSAN MARAMALDO:18122496830 Date: 2026.08.31 11:46:22 -03'00'

José Roberto Vensan Maramaldo

I hereby certify and give full faith and credit that on this date a document has been presented to me in Portuguese, to which I translate as follows:

**ANDRADE GUTIERREZ S.A.**

CNPJ/MF nº 17.262.197/0001-30

NIRE 3130001481-9

**Minutes of**
**Extraordinary General Meeting**
**held on May 14, 2026**

**Date, Time and Place:** on May 14, 2026, at 09:00 am, at the head office of **ANDRADE GUTIERREZ S.A.** ("Company"), located in the City of Belo Horizonte, State of Minas Gerais, at Av. do Contorno, 8.123, Cidade Jardim, Zip Code 30110-937.

**Board of the Meeting**: Pursuant to article 6, paragraph 1 of the Company's Bylaws, the shareholders resolved to appoint Mr. Renato Torres de Faria as Chairman and Mrs. Maria Beatriz Lira Gomes Ferraz as Secretary of the Meeting.

**Attending**: The meeting was attended by the Company's shareholders holding shares representing the Company's total capital stock, as evidenced by the records and signatures in the Company's Shareholders' Attendance Book.

**Call**: Formal notice of the meeting is waived pursuant to article 124, paragraph 4, of Law no. 6404/1976 ("Corporations Law"), considering the attendance of shareholders representing the Company's total capital stock.

**Convening**: Upon verification of the legal quorum, the Chairman of the Meeting declared the General Meeting convened, with the agenda below.

**Agenda**: resolve on **(i)** the voting direction to be adopted by the Company at the respective extraordinary general meetings of Andrade Gutierrez Investimentos em Engenharia S.A. ("AGIE") and Andrade Gutierrez Construções S.A. ("AGC") regarding **(a)** the filing of a request for approval of the extrajudicial reorganization plans by Andrade Gutierrez International S.A. ("AG International"), AGIE, Andrade Gutierrez Engenharia S.A. ("AGE"), Zagope SGPS, S.A. ("Zagope"), and Andrade Gutierrez Construções e Serviços S.A. ("AGCS"), as signatory parties or intervening parties, as applicable ("EJ Plans"); **(b)** the filing of a recognition proceeding before the U.S. Bankruptcy Court by AGIE, AGE, Zagope, and AGCS to recognize the extrajudicial reorganization proceeding and implement the EJ Plans in the United States of America; and **(c)** the subsequent appointment of a foreign representative to represent AGIE, AGE, Zagope, and AGCS before the U.S. Bankruptcy Court; **(ii)** the authorization for the Company to execute the EJ Plans as an intervening party, including any documents, contracts, and securities arising from or related to the EJ Plans; and **(iii)** the authorization granted to AG International and its management regarding **(a)** the filing of a request for approval of the EJ Plans, **(b)** the filing of a recognition proceeding before the U.S. Bankruptcy Court by AG International to recognize the extrajudicial reorganization proceeding and implement the EJ Plans in the United States of America; and (c) the subsequent appointment of a foreign representative to represent AG International before the U.S. Bankruptcy Court.

**Deliberations**: The Company's shareholders approved the drawing up of these minutes in summary form, pursuant to article 130, paragraph 1, of the Corporations Law, and also resolved, pursuant to article 6, Paragraph 2, of the Company's Bylaws and article 122 of the Corporations Law, the following:

**(i)** guide the vote to be cast by the Company at the extraordinary general meetings of AGIE and AGC, in order to:

**(a)** approve the filing of a request for approval of the EJ Plans, pursuant to articles 161 *et seq*. of Law no. 11,101/2005, to be submitted in the Judicial District of Belo Horizonte, State of Minas Gerais (the "Extrajudicial

Reorganization");

**(b)** in light of the foregoing resolution and the provisions of article 122, item IX, of the Corporations Law, the members of the management of AGIE and AGC are authorized to perform all acts necessary, useful, or convenient to enable the filing of the request for approval of the aforementioned EJ Plans;

**(c)** approve the filing of the recognition proceeding (the "Chapter 15 Procedure") before the U.S. Bankruptcy Court so that AGIE may **(a)** obtain recognition of the Extrajudicial Reorganization as a foreign main proceeding or, alternatively, as a foreign non-main proceeding, **(b)** implement the EJ Plans, and **(c)** give full force and effect to the EJ Plans pursuant to Chapter 15 of Title 11 of the U.S. Bankruptcy Code (the "U.S. Bankruptcy Code");

**(d)** approve the appointment of Mr. Gustavo Braga Mercher Coutinho, a Brazilian citizen, married, holder of Identity Card (RG) no. 114.197.221 and enrolled with the CPF/ME under no. 091.264.797-37, residing and domiciled in the City and State of São Paulo, with a business address at Av. das Nações Unidas, 12495, 5.o andar, Cidade Monções, CEP 04578-911, as the foreign representative of AGIE, pursuant to Section 101(24) of the U.S. Bankruptcy Code, with specific powers to individually bind and represent AGIE before the U.S. Bankruptcy Court or any other proper judicial authority in the United States of America, including the power to seek any preliminary injunction or judicial measure available to a foreign representative (as defined in Section 101 of the U.S. Bankruptcy Code), in accordance with Chapter 15 of the U.S. Bankruptcy Code or any other applicable laws;

**(e)** authorize Mr. Gustavo Braga Mercher Coutinho to take any actions or measures necessary or appropriate to (1) support and promote the recognition and implementation of the Extrajudicial Reorganization in the United States of America and (2) file and conduct any proceeding under Chapter 15 of the U.S. Bankruptcy Code;

**(f)** ensure the aforementioned matters to be approved by the proper corporate bodies of AGE, AGCS, and Zagope, which are the Company's indirect subsidiaries, including the corresponding authorization for the management members of such indirect subsidiaries to perform all necessary acts to that end, and also determine the appointment of a foreign representative under the same terms as referred to above and the ratification of acts already performed by such management members of the Company's indirect subsidiaries regarding the matters subject to the voting instructions hereby conveyed.

**(ii)** authorize the subscription to the EJ Plans by the Company, as an intervening party, including any documents, contracts, and securities arising from the EJ Plans;

**(iii)** authorize the management of AG International to perform all necessary acts with respect to AG International in order to:

**(a)** file the Extrajudicial Reorganization;

**(b)** appoint Mr. Gustavo Braga Mercher Coutinho, Brazilian citizen, married, holder of Identity Card (RG) no. 114.197.221 and enrolled with the CPF/ME under no. 091.264.797-37, resident and domiciled in the City and State of São Paulo, with a business address at Av. das Nações Unidas, 12495, 5.o andar, Cidade Monções, CEP 04578-911, as foreign representative of AG International, pursuant to Section 101(24) of the U.S. Bankruptcy Code, with specific powers to bind and represent AG International individually before the U.S. Bankruptcy Court or any other proper jurisdictional authority in the United States of America, including powers to seek any preliminary injunction or judicial measure available to a foreign representative (as defined in Section 101 of the U.S. Bankruptcy Code), in accordance with Chapter 15 of the U.S. Bankruptcy Code or any other applicable laws; and

**(c)** authorize Mr. Gustavo Braga Mercher Coutinho to take any actions or measures necessary or appropriate to **(1)** support and promote the recognition and

implementation of the Extrajudicial Reorganization in the United States of America and **(2)** file and conduct any proceeding under Chapter 15 of the U.S. Bankruptcy Code; and

**(iv)** ratify the acts already performed by the Company's management regarding the matters subject to the above resolutions.

**Closing**: There being no further comments, the Chairman of the Meeting invited anyone wishing to speak to do so, and, as no one came forward, declared the meeting closed and the minutes drawn up, which were read, approved, and signed by all attending members. Attending members: (i) Board of the Meeting: Renato Torres de Faria, Chairman; and Maria Beatriz Lira Gomes Ferraz, Secretary; (ii) Attending Shareholders: for ADMINISTRADORA SANTO ESTEVÃO S.A.: Gustavo Braga Mercher Coutinho and João José de Araújo Pereira Pavel; for ADMINISTRADORA SANT'ANA LTDA.: Ângela Gutierrez and Cristiana Gutierrez; for ADMINISTRADORA SÃO MIGUEL S.A.: Rafael Andrade da Cunha Pereira and Álvaro Furtado de Andrade. **By proxy:** RICARDO COUTINHO DE SENA, ANUAR BENEDITO CARAM, ANDRE MORAGAS DA COSTA, NEWTON BRANDAO FERRAZ RAMOS, REINALDO IZZO, GUILHERME DE OLIVEIRA ROVERI, DANIELA CAMARA MAURER, JUNIA MARIA CAMPOS DE FREITAS, GLAURO BRAULIO SANTOS, EUDES GLOOR NUNES, DANIELA CARVALHO BUENO, PAULO ROBERTO RECKZIEGEL GUEDES, CLAUDIO JOSE DE CASTRO MISERANI. MARCO TÚLIO PINTO, MARIA BEATRIZ LIRA GOMES FERRAZ. **Board of the Meeting: Chairman**: Renato Torres de Faria; *Secretary*: Maria Beatriz Lira Gomes Ferraz. These minutes correspond to the original recorded in the appropriate book.

**I certify that this is a true copy of the minutes recorded in the appropriate book, which is kept on file at the Company's headquarter.**

Belo Horizonte, May 14, 2026

**Board of the Meeting**:

[digitally signed]
Renato Torres de Faria
**Chairman**

[digitally signed]
Maria Beatriz Lira Gomes Ferraz
**Secretary**

# 2026 0514 AGSA Minutes Approval RE vf_1.pdf

Document number #e8481006-345d-4b9f-b0ea-38275203cc32
**Original document hash (SHA256):** 67aa4da657fc550fe1726d8e2362f2b8480e34eeac95484b5c439d9a1 ab6bd98
**PAdES hash (SHA256):** 995430d Sd d95f25631 0a4cac807d 9b6ba33e2 9c46cb27 a19 beS1b28e9e1492a8

## Signatures

### Renato Torres de Faria

CPF: 502.153.966-34
Signed on May 18, 2026 at 17:34:10
Issued by AC SyngularID Multipla - with Digital Certificate ICP-Brasil effective through May 13, 2027

### Maria Beatriz Lira Gomes Ferraz

CPF: 272.376.328-50
Signed on May 18, 2026 at 15:52:13
Issued by AC OAB G3 – with Digital Certificate ICP-Brasil effective through January 19, 2029

## Log

May 18, 2026, 15:43:42 Operator with email barbara.soares@agnet.com.br on Account f580d5d1-0af3-4e9f-816a-959cd1c55b84 created this document, number e8481006-345d-4b9f-b0ea-38275203cc32. Document signing deadline: June 17, 2026 (15:43). Automatic completion after the last signature: enabled. Language: Brazilian Portuguese.

May 18, 2026, 15:44:35 Operator with email barbara.soares@agnet.com.br on Account f580d5d1-0af3-4e9f-816a-959cd1c55b84 modified the signature process. Deadline for document signature: June 17, 2026 (15:13).

May 18, 2026, 15:44:36 Operator with email barbara.soares@agnet.com.br on Account f580d5d1-0af3-4e9f-816a-959cd1 c55b84 added to the Signature List: renato.faria@agnet.com.br to sign, via E-mail.

Authentication points: digital certificate; full name; CPF; handwritten signature. Data provided by the operator for signatory validation: full name Renato Torres de Faria and CPF 502.153.966-34.

May 18, 2026, 15:44:36 – Operator with email barbara.soares@agnet.com.br, on account f580d5d1-0af3-4e9f-816a-959cd1c55b84, added the following to the signature list: beatriz.gomes@agnet.com.br to sign via email.

Authentication points: digital certificate; full name; CPF; handwritten signature. Data provided by the operator for signatory validation: full name Maria Beatriz Lira Gomes Ferraz and CPF 272.376.328-50.

May 18, 2026, 15:52:13 Maria Beatriz Lira Gomes Ferraz signed. Authentication points: digital certificate, Type A3 e-CPF. CPF provided: 272.376.328-50. Handwritten signature with SHA256 hash prefix 738145(...); see attachment manuscript_18_May_2026_15-51-42.png. IP: 187.62.160.1. Signature component version 1.1443.0 provided at https://app.clicksign.com.
May 18, 2026, 17:34:10 Renato Torres de Faria signed. Authentication points: digital certificate, Type A3 e-CPF. CPF provided: 502.153.966-34. Handwritten signature with SHA256 hash prefix 8ab2c3(...); see attachment manuscript_ 18 May 2026, 17-31-08.png. IP: 157.167.132.180. Signature component version 1.1443.0 provided at https://app.clicksign.com.

18 May 2026, 17:34:11 Signature process automatically completed. Reason: automatic completion after the last enabled signature. Signature process completed for document number e8481006-345d-4b9f-b0ea-38275203cc32.

**Legally valid signed document.**
To check the validity, access https://www.clicksign.com/validador and use the password generated by the signatory or send this PDF file.
Digital and electronic signatures have legal validity as provided for in Provisional Measure no. 2200-2/2001.

This Log is exclusive and shall be considered part of document no. e8481006-345d-4b9f-b0ea-38275203cc32, with the effects prescribed in the Clicksign Terms of Use, available at www.clicksign.com.

## Annexes

**Renato Torres de Faria**
Signed the document on May 18, 2026 at 17:34:10

**HANDWRITTEN SIGNATURE**
Handwritten signature with SHA256 hash prefix 8ab2c3(...)

Renato Torres de Faria
manuscript_May 18, 2026, 17-31-08.png

**Maria Beatriz Lira Gomes Ferraz**
Signed the document on May 81, 2026 at 15:52:13

**HANDWRITTEN SIGNATURE**
Handwritten signature with SHA256 hash prefix 738145(...)

Maria Beatriz Lira Gomes Ferraz
manuscript_May 18, 2026, 15-51-42.png

---

This is what was to be translated on the original document, according to my best understanding, which amounted to 8 electronic page equivalents which I have reviewed, found true and correct, and sign below:

Emoluments: R$ 367.28
Receipt Book No.:02 Receipt No.:3764
São Paulo, August 18, 2026

JOSE ROBERTO VENSAN MARAMALDO:18122496830
Digitally signed by JOSE ROBERTO VENSAN MARAMALDO:18122496830
Date: 2026.09.03 10:48:12 -03'00'

José Roberto Vensan Maramaldo

**Certified Translation from Portuguese into English**
**Tradução Juramentada**
Original document reference:
Ata Inzag
Translated reference:
Inzag Minutes
**TRANSLATION No.11** **BOOK No.375** **PAGE No.144**

I hereby certify and give full faith and credit that on this date a document has been presented to me in Portuguese, to which I translate as follows:

**Resolution of the members**

**INZAG Germany GmbH**

**[Translator's Note: the German portion of the text has been removed]**

**IZG INVEST UNIPESSOAL LDA**, Lagoas Park, Edifício 6, Piso 1, 2740-244 Porto Salvo, Portugal, registered with the Board of Trade of Cascais under No. 516157361 (hereinafter referred to as the "SHAREHOLDER"), is the sole shareholder of **INZAG Germany GmbH** (hereinafter referred to as the "CORPORATION"), registered with the board of trade of the Wiesbaden District Court under No. HRB 32335, with its head office in Wiesbaden. The SHAREHOLDER holds 2,500,000 shares with a nominal value of EUR 1.00 each (representing, in the aggregate, the entire share capital of EUR 2,500,000.00).

Waiving all requirements imposed by law and the Bylaws regarding the convening and holding of a shareholders' meeting, the SHAREHOLDER hereby holds an extraordinary general meeting of the CORPORATION and unanimously resolves as follows:

**Item one:** Resolve to file a request for approval of the extrajudicial recovery plans by the Corporation, which are signed by the Corporation as a signatory or intervening party, as applicable;

**Item two:** Resolve to authorize the members of the Corporation's management to perform all acts necessary to enable the filing of the request for approval of the aforementioned extrajudicial recovery plans;

**Item Three:** Resolve on the filing a recognition proceeding before the U.S. Bankruptcy Court to recognize the extrajudicial reorganization proceeding and enforce the extrajudicial reorganization plans in the United States of America;

**Item Four:** Resolve on the authorization of the members of the Corporation's management to perform all acts necessary to enable the filing of the Chapter 15 Procedure (as defined below);

**Item Five:** Resolve on the appointment of a foreign representative for the Corporation to represent it before the U.S Bankruptcy Court;

**Item Six:** Resove on the authorization for ratification of acts already performed by the Corporation's management regarding the aforementioned matters.

Proceeding immediately to Item One of the Agenda, it was resolved to approve the filing of a request for judicial approval of the extrajudicial recovery plans by the Corporation, which are signed by the Corporation in the capacity of signatory or intervening party, as applicable (the "EJ Plans"), pursuant to articles 161 and

following of Law No. 11.101/2005, to be filed with the Court of Belo Horizonte, in the State of Minas Gerais (the "Extrajudicial Recovery"). In this regard, the SHAREHOLDER noted that the need for the Corporation to sign the EJ Plans is based on the fact that the EJ Plans will enable the restructuring of the 2029 Notes owed by Andrade Gutierrez International. Accordingly, the SHAREHOLDER considers that the signing of the EJ Plans is manifestly in the Corporation's interest, as it will enable the restructuring of the debts of certain entities within the Economic Group of which the Corporation is a part. Therefore, the signing of the EJ Plans, on the terms resolved at this General Meeting, is of significant importance to the Corporation's economic health.

Proceeding immediately to Item Two of the Agenda, it was resolved to approve that the members of the Corporation's management take all actions necessary to enable the filing of the request for approval of the aforementioned EJ Plans.

Proceeding immediately to Item Three of the Agenda, it was resolved to approve the filing of a recognition proceeding (the "Chapter 15 Procedure") before the U.S. Bankruptcy Court so that the Corporation may (a) obtain recognition of the Extrajudicial Recovery as a foreign main proceeding or, alternatively, as a foreign non-main proceeding, (b) implement the EJ Plans, and (c) give full force and effect to the EJ Plans pursuant to Chapter 15 of Title 11 of the U.S. Bankruptcy Code (the "U.S. Bankruptcy Code").

Proceeding immediately to Item Four of the Agenda, it was resolved to approve the appointment of Mr. Gustavo Braga Mercher Coutinho, Brazilian, married, holder of Identity Card (RG) No. 114.197.221 and enrolled with the CPF/ME under No. 091.264.797-37, residing and domiciled in the City and State of São Paulo, with a business address at Av. das Nações Unidas, 12,495, 5th floor, Cidade Monções, Zip Code 04578-911, as the foreign representative of the Corporation, pursuant to Section 101(24) of the U.S. Bankruptcy Code, with specific powers to individually bind and represent the Corporation before the U.S. Bankruptcy Court or any other competent judicial authority in the United States of America, including the power to seek any preliminary injunction or judicial measure available to a foreign representative (as defined in Section 101 of the U.S. Bankruptcy Code), in accordance with Chapter 15 of the U.S. Bankruptcy Code or any other applicable laws.

Proceeding immediately to Item Five of the Agenda, it was resolved to authorize Mr. Gustavo Braga Mercher Coutinho to perform any acts or measures necessary or appropriate to (a) support and promote the recognition and implementation of the Extrajudicial Recovery in the United States of America and (b) file and conduct any proceeding under Chapter 15 of the U.S. Bankruptcy Code.

Proceeding immediately to Item Six of the Agenda, it was resolved to ratify the acts already taken by the Corporation's management regarding the matters subject to the aforementioned resolutions.

The meeting was then closed at 11:00 a.m., and these minutes were drafted; having been read and approved, they are to be signed by the Members.

For the sake of precaution, it is declared that the governing text for this act is the one drafted in Portuguese. Thus,

in the event of a conflict between the interpretation of the German text and the Portuguese text, the Portuguese text shall prevail.

Oeiras, May 7, 2026

IZG INVEST UNIPESSOAL LDA

Acting as Executive Admnistrators

[signed]

Ricardo de Oliveira Sá

[signed]

André Giudice de Oliveira

[signed]

Margarida Damião Ferreira

This is what was to be translated on the original document, according to my best understanding, which amounted to 3 electronic page equivalents which I have reviewed, found true and correct, and sign below:

Emoluments: R$ 137.73
Receipt Book No.:02 Receipt No.:3764
São Paulo, August 18, 2026

JOSE ROBERTO VENSAN MARAMALDO:18122496830

Digitally signed by JOSE ROBERTO VENSAN MARAMALDO:18122496830
Date: 2026.09.02 18:02:10 -03'00'

José Roberto Vensan Maramaldo

**Certified Translation from Portuguese into English**
**Tradução Juramentada**
Original document reference:
Ata Zagope
Translated reference:
Zagope Minutes
**TRANSLATION No.09 BOOK No.375 PAGE No.135**

I hereby certify and give full faith and credit that on this date a document has been presented to me in Portuguese, to which I translate as follows:

Zagope SGPS, S.A.

Lagoas Park, Edifício 6, Piso 1 2740-244 Porto Salvo

NIF: 507403177 CAE: 70100 Matrícula: 507403177

# MINUTES

Page 21

Book number 2

**MINUTE NUMBER NINETY-NINE**

On the seventh day of May, two thousand and twenty-six, at 10:00 a.m., an Extraordinary General Meeting of the company **ZAGOPE SGPS, S.A.** (hereinafter referred to as the "Corporation") was held at its headquarters located at Lagoas Park, Building 6, 1st Floor, in Porto Salvo, with the attendance of the shareholders of ANDRADE GUTIERREZ ENGENHARIA S.A. and ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A., duly represented by Mr. Ricardo de Oliveira Lopes de Sá, with same business address of that of the company, pursuant to the proxies attached to these minutes, in which the shareholders consented to the General Meeting validly deliberating on the Agenda set forth below; consequently, pursuant to Article 54 of the Commercial Companies Code, no formalities prior to the meeting were required, and the General Meeting was deemed duly established.

At the appointed time, Mr. Rodrigo Dubraz Caldeira assumed the role of Chairman of the General Meeting, assisted by Ms. Susana Patrícia Lourenço as Secretary of the General Meeting. She verified the attendance list, confirming that the shareholders were present or duly represented, thereby enabling the General Meeting to convene and validly deliberate. She immediately read the following Agenda:

**Item One:** Resolve on the filing of a request for approval of the extrajudicial recovery plans by the Corporation, which are signed by it in the capacity of signatory or intervening party, as applicable.

**Item Two:** Resolve on the authorization for the members of the Corporation's management to perform all acts necessary to enable the filing of the request for approval of the aforementioned extrajudicial recovery plans;

**Item Three:** Resolve on the filing of a recognition proceeding before the U.S. Bankruptcy Court to recognize the extrajudicial recovery proceeding and enforce the extrajudicial recovery plans in the United States of America;

**Item Four:** Resolve on the authorization for the Corporation's management to perform all acts necessary to enable the filing of the Chapter 15 Proceeding (as defined below);

**Item Five:** Resolve on the appointment of a foreign representative for the Corporation to represent it before the U.S. Bankruptcy Court;

**Item Six:** Resolve on the authorization to ratify acts already performed by the Corporation's management concerning the matters above.

Proceeding immediately to **Item One** of the Agenda, and following due debate and analysis, it was unanimously resolved to approve the filing of a request for approval of the extrajudicial recovery plans by the Corporation, that the Corporation will sign as a signatory or intervening party, as applicable (hereinafter the "EJ Plans"), pursuant to Articles 161 and following of Law No. 11.101/2005, to be filed in the Judicial District of Belo Horizonte, State of Minas Gerais (the "Extrajudicial Recovery"). In this regard, the Shareholders noted that the need for the Corporation to sign the EJ Plans is based on the fact that the EJ Plans will enable the restructuring of the 2029 Notes, which are owed by Andrade Gutierrez International and personally guaranteed by the Corporation; the Corporation will, in fact, be released from the personal guarantee it provided for the 2029 Notes. Accordingly, and for the purposes of Article 6, Paragraph 3 of the Commercial Companies Code, the Shareholders consider that the signing of the EJ Plans is manifestly in the Corporation's interest, as it will release the Corporation from the personal guarantee provided for the 2029 Notes and enable the restructuring of debts owed by certain entities within the Economic Group to which the Corporation belongs, thereby facilitating the Group's financial restructuring to ensure the continued feasibility of the business. Therefore, the subscription to the EJ Plans, on the terms resolved at this General Meeting, is of significant importance to the Corporation's economic health; consequently, the provisions of Article 6.0, Paragraph 3 of the Commercial Companies Code are deemed to have been met.

Proceeding immediately to **Item Two** of the Agenda, and in light of the aforementioned resolution, it was resolved to authorize the members of the Corporation's administration to carry out all acts necessary to enable the filing of the request for approval of the aforementioned EJ Plans.

Proceeding immediately to **Item Three** of the Agenda, it was resolved to approve the filing of a recognition proceeding (the "Chapter 15 Proceeding") before the U.S. Bankruptcy Court so that the Corporation may:

(a) obtain recognition of the Extrajudicial Recovery as a foreign main proceeding or, alternatively, as a foreign non-main proceeding,

(b) implement the EJ Plans, and

(c) give full force and effect to the EJ Plans pursuant to Chapter 15 of Title 11 of the U.S. Bankruptcy

Code (the “U.S. Bankruptcy Code”).

Proceeding immediately to **Item Four** of the Agenda, it was resolved to approve the appointment of Mr. Gustavo Braga Mercher Coutinho, Brazilian, married, holder of Identity Card (RG) No. 114.197.221 and enrolled with the CPF/ME under No. 091.264.797-37, residing and domiciled in the City and State of São Paulo, with a business address at Av. das Nações Unidas 12.495, 5th floor, Cidade Monções, Zip Code 04578-911, as the foreign representative of the Corporation, in accordance with Section 101(24) of the U.S. Bankruptcy Code, with specific powers to individually bind and represent the Corporation before the U.S. Bankruptcy Court or any other competent judicial authority in the United States of America, including the power to seek any preliminary injunction or judicial measure available to a foreign representative (as defined in Section 101 of the U.S. Bankruptcy Code), pursuant to Chapter 15 of the U.S. Bankruptcy Code or any other applicable laws.

Proceeding immediately to **Item Five** of the Agenda, it was resolved to authorize Mr. Gustavo Braga Mercher Coutinho to perform any acts or measures necessary or appropriate to (a) support and promote the recognition and implementation of the extrajudicial recovery in the United States of America and (b) file and conduct any proceedings under Chapter 15 of the U.S. Bankruptcy Code.

Proceeding immediately to **Item Six** of the Agenda, it was resolved to ratify the acts already performed by the Corporation’s management regarding the matters subject to the resolutions above.

The meeting was thus closed at 11:00 a.m., and the minutes were drafted; having been read and approved, they will be signed by the Chairman of the Meeting and the Secretary of the Meeting.

[signed]

[signed]

---

This is what was to be translated on the original document, according to my best understanding, which amounted to 3 electronic page equivalents which I have reviewed, found true and correct, and sign below:

Emoluments: R$ 137.73
Receipt Book No.:02 Receipt No.:3764
São Paulo, August 18, 2026

JOSE ROBERTO VENSAN MARAMALDO:18122496830
Digitally signed by JOSE ROBERTO VENSAN MARAMALDO:18122496830
Date: 2026.08.31 11:47:09 -03'00'

José Roberto Vensan Maramaldo

**José Roberto Vensan Maramaldo**
Tradutor Público e Intérprete Comercial
Matriculado na Jucesp sob o no. 1092 no idioma inglês
Nomeado através da Portaria 68/2000 de 12/07/2000
R.G.: 17.384.458 - SSP SP
C.P.F.: 181224968-30
C.C.M.: 2.845.542-8
Endereço: The Cittyplex Osasco, Avenida Domingos Odália Filho, 301, Sl R 2015, Osasco, SP, CEP 06010-067
Telefone para contato: (11) 98244-2636 com Robert Chanda, e-mail: chanda@bwoods.com.br

# Exhibit D

## EJ Plan 1 and a certified English translation

**Certified Translation from Portuguese into English**
**Tradução Juramentada**
Original document reference:
PRE 1
Translated reference:
ERP 1
**TRANSLATION No.28 BOOK No.374 PAGE No.330**

I hereby certify and give full faith and credit that on this date a document has been presented to me in Portuguese, to which I translate as follows:

Translator's Note: the original document is English-Portuguese bilingual, bi-column. There, the English portion adequately corresponds to the Portuguese portion. Below is the translation including the English portion only.

## Doc. 3:

## Extrajudicial Reorganization Plan of Debtors AGE, AGIE and AGCS, including respective schedules

# EXTRAJUDICIAL REORGANIZATION PLAN

presented by
Andrade Gutierrez Engenharia S.A.
Andrade Gutierrez Construções e Serviços S.A.
Andrade Gutierrez Investimentos em
Engenharia S.A.

as intervening parties,
Andrade Gutierrez International S.A.
Zagope SGPS, S.A.
Inzag Germany GmbH
Andrade Gutierrez S.A.
Andrade Gutierrez Participações S.A.

and with the adhesion and approval of the

Signatory Creditor

(as defined below)

May 18, 2026

# EXTRAJUDICIAL REORGANIZATION PLAN

This Plan, dated May 18, 2026, is submitted for judicial confirmation, jointly, by:

(I) ANDRADE GUTIERREZ ENGENHARIA S.A., a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 17.262.213/0001-94, with its headquarters at Avenida do Contorno, No. 8,123, Cidade Jardim, Belo Horizonte/MG, CEP 30.110-937 ("AGE");

(II) ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A. (formerly known as AG Construções e Serviços S.A.), a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 39.469.291/0001-05, with headquarters at Avenida do Contorno, No. 8.269, Room 300 A1, Gutierrez, Belo Horizonte/MG, CEP 30.110-059 ("AGCS"); and

(III) ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A., a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 17.027.611/0001-26, headquartered at Avenida do Contorno, No. 8.269, Sala 004, Gutierrez, Belo Horizonte/MG, CEP 30.110-059 ("AGIE" and, together with AGE and AGCS, "Debtors").

And it is signed, as consenting intervening parties, by:

(IV) ANDRADE GUTIERREZ INTERNATIONAL S.A., a privately held company, incorporated and organized in accordance with the laws of the Grand Duchy of Luxembourg, registered with the Luxembourg Trade Register under No. B 176492, with address at 65, Boulevard Grande-Duchese Charlotte, L1331, Luxembourg ("AGINT");

(V) ZAGOPE SGPS S.A., a privately held company, incorporated and organized under the laws of the Portuguese Republic, registered under NIF No. 507403177, with headquarters at Lagoas Park, building 6, 1st floor, 2740-244, Porto Salvo, Oeiras, Portugal ("Zagope");

(VI) INZAG GERMANY GMBH, a limited liability company, incorporated and organized under the laws of the Federal Republic of Germany, with headquarters at Taunusstraße 5, 65183, Wiesbaden, Germany ("Inzag");

(VII) ANDRADE GUTIERREZ S.A., a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 17.262.213/0001-94, with headquarters at Avenida do Contorno, No. 8123, Cidade Jardim, Belo Horizonte/MG, CEP 30110-937 ("AGSA"); and

(VIII) ANDRADE GUTIERREZ PARTICIPAÇÕES S.A a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 04.031.960/0001-70, with headquarters at Avenida do Contorno, No. 8123, Cidade Jardim, Belo Horizonte/MG, CEP 30110-937 ("AGPAR" and, together with AGINT, Zagope, Inzag and AGSA, the "Intervening Parties").

Whereas:

(i) the Debtors are part of the branch of the Andrade Gutierrez group that operates in the engineering and civil construction sectors, providing services to public and private clients for almost 80 years;

(ii) given the nature of their business segments, the Debtors raised substantial financial resources, including in the international capital markets, to enable the maintenance and expansion of their activities;

(iii) due to certain macroeconomic adversities, the Debtors, AGINT, and Zagope filed, on September 29, 2022, the request for judicial confirmation of an extrajudicial reorganization plan ("2022 Plan"), which was processed under No. 5209787-06.2022.8.13.0024 before the 1st Business Court of the District of Belo Horizonte/MG (1ª Vara Empresarial da Comarca de Belo Horizonte/MG) ("2022 Extrajudicial Reorganization"), to restructure a relevant portion of their financial indebtedness, in the amount of R$2,358,784,316.04 (two billion, three hundred and fifty-eight million, seven hundred and eighty-four thousand, three hundred and sixteen reais and four centavos), arising from the so-called (a) "11.000% Senior Secured PIK Toggle Notes due 2021", issued on August 20, 2018 ("2021 International Notes"), and (b) "9.500% Senior Secured Notes due 2024", issued on December 9, 2019 ("2024 International Notes");

(iv) on November 29, 2022, the 2022 Plan was confirmed by means of a court order made available in the Electronic Gazette of the Court of Justice of the State of Minas Gerais, having been subsequently the subject of a decision rendered on December 2, 2022 by the United States Bankruptcy Court for the Southern District of New York, granting full effect to the 2022 Plan within the jurisdiction of the United States of America, which resulted in the cancellation and replacement of the 2021 International Notes and the 2024 International Notes by (a) "9.000%/10.500% Senior Secured PIK Toggle Notes due 2029", issued pursuant to the indenture dated December 21, 2022, and amended on August 24, 2023, entered into among AGINT, as issuer and principal debtor, AGE, AGIE, AGCS, Zagope and Inzag, as guarantors, Wilmington Savings Fund Society, FSB ("Wilmington"), as trustee, and TMF Brasil Administração e Gestão de Ativos Ltda. ("TMF"), as local collateral agent ("2029 International Notes"), and (b) "1.000% PIK Toggle Notes due 2040", issued pursuant to the indenture dated December 21, 2022 entered into among AGINT, as issuer and principal debtor, AGE as guarantor, Wilmington, as trustee, and TMF, as local collateral agent ("2040 International Notes" and, together with the 2029 International Notes, the "International Existing Notes");

(v) despite the 2022 Extrajudicial Reorganization having been an important step in reprofiling the Andrade Gutierrez group's capital structure, new hindrances have since arisen, consisting, by way of example, of the (a) the suspension and postponement of relevant projects due to factors beyond the Andrade Gutierrez group's control, affecting approximately 47% of its project portfolio, as of the December/24 reference date, which has substantially impacted the cash flow of the Debtors, Inzag, and Zagope over the past years; (b) the substantive appreciation of the U.S. dollar throughout 2024, which significantly increased the cost of foreign currency indebtedness, resulting in the default, in December 2024, of the interest installment under the 2029 International Notes, in a context of an exchange rates exceeding R$6.00 per dollar; and (c) a steep increase in the Selic rate, which remained, on average, 4.00 percentage points above the projections of the Boletim Focus for the years 2023, 2024 and 2025, leading to a substantial rise in the cost of local currency debt, including those assumed with governmental authorities, whose financial expenses exceed R$ 203,000,000.00 (two hundred and three million reais) and represent a total balance of more than R$ 1.9 billion, which led the Debtors to accumulate significant losses between 2022 and 2025;

(vi) due to this challenging macroeconomic and microeconomic environment, the Debtors were led to default certain obligations, having defaulted on material debts, both those denominated in foreign currency, such as the 2029 International Notes, in the aggregate amount of R$ 2,478,000,246.94 (two billion four hundred and seventy-eight million two hundred and forty-six reais and ninety-four centavos), as determined on the Filing Date, owed by the Debtors together with AGINT, Zagope, and Inzag, as well as other debts denominated in local currency, some of which have already been subject to enforcement proceedings filed against certain Debtors, in significant amounts;

(vii) in this context, the Debtors file the present Extrajudicial Reorganization and submit this Plan with the purpose of restructuring the unsecured claims owed by the Debtors, as defined in this Plan and set forth in Schedule I, thereby enabling the readjustment of their capital structure in order to optimize and foster the development of their operational activities;

(viii) the Debtors file the present Extrajudicial Reorganization in active joinder, pursuant to article 113, I and III of the Brazilian Code of Civil Procedure (as defined below) and 189 of the Brazilian Bankruptcy Act (as defined below) as well as under procedural consolidation, pursuant to articles 69-G to 69-I of the Brazilian Bankruptcy Act, with this single Plan submitted by the Debtors having been approved by the minimum approval quorum required under article 163 of the Brazilian Bankruptcy Act, calculated individually in relation to the creditors of each of the Debtors, pursuant to article 69-I, second and third paragraphs, of the Brazilian Bankruptcy Act, so as to mandatorily bind all Subject Claims (as defined below) to the terms and conditions of this Plan;

(ix) the Debtors and AGINT, Zagope and Inzag (jointly, the "Plan 2 Debtors"), although being independent companies, with separate legal personalities, rights and obligations of their own, and having financial and commercial autonomy to conduct their activities, are part of the same economic group and are partially co-obligated, as applicable, for certain debts to be restructured within the scope of this Extrajudicial Reorganization;

(x) in parallel with the Plan submitted by the Debtors, the Plan 2 Debtors, in active joinder and procedural consolidation with the Debtors, have submitted their own extrajudicial reorganization plan, solely to restructure the International Existing Notes ("Plan 2"), as applicable, considering their respective indebtedness, and therefore file this Extrajudicial Reorganization jointly, with the purpose of enabling the implementation of a structured and coordinated solution for their respective indebtedness.

The Debtors, subject to the terms and conditions set forth below, hereby submit this Plan for judicial confirmation, with the consent and adherence of the SIGNATORY CREDITOR, holder of (i) 71.3% of the Subject Claims owed by AGE; (ii) 73.5% of the Subject Claims owed by AGCS; and (iii) 79.2% of the Subject Claims owed by AGIE, as indicated in Schedule II, so that it may produce effects with respect to the Debtors, AGINT, AGPAR, AGSA, Inzag and Zagope, as applicable, and the Subject Creditors in accordance with the law.

## PART I - INTERPRETATION AND DEFINITIONS

### 1. DEFINITIONS

1.1. Definitions. The defined terms referenced in this Plan, capitalized and listed below, shall be used, as applicable, in their singular or plural form, and in the masculine or feminine gender, without thereby altering the meaning assigned to them.

1.1.1. "AGCS": has the meaning assigned in the Preamble of this Plan.

1.1.2. "AGE": has the meaning assigned in the Preamble of this Plan.

1.1.3. "AGIE": has the meaning assigned in the Preamble of this Plan.

1.1.4. "AGINT": has the meaning assigned in the Preamble of this Plan.

1.1.5. "AGPAR": has the meaning assigned in the Preamble of this Plan.

1.1.6. "AGSA": has the meaning assigned in the Preamble of this Plan.

1.1.7. "Schedules": means the schedules to this Plan.

1.1.8. "Section": means each of the items identified by cardinal numbers in this Plan.

1.1.9. "CNPJ/MF": means the identification number in the National Register of Legal Entities maintained by the Ministry of Finance of Brazil.

1.1.10. "Civil Code": means Law No. 10,406, of January 10, 2002, as amended.

1.1.11. "CPC": means Law No. 13,105, of March 16, 2015, as amended.

1.1.12. "Option A Claim": has the meaning assigned in Section 5.4 of this Plan.

1.1.13. "Option B Claim": has the meaning assigned in Section 6.4 of this Plan.

1.1.14. "Option C Claim": means the Option C Claim – Tranche A and the Option C Claim – Tranche B, jointly.

1.1.15. "Option C Claim – Tranche A": has the meaning set forth in Section 7.4.

1.1.16. "Option C Claim – Tranche B": has the meaning set forth in Section 7.4.

1.1.17. "Subject Claims": means, pursuant to article 163, first paragraph, of the Brazilian Bankruptcy Act, the claims against each of the Debtors that are, cumulatively, (i) encompassed within the unsecured category defined in article 83, VI, "a)" and "b)" of the Brazilian Bankruptcy Act, (ii) owed to individuals or legal entities that are not active suppliers of goods or services to the Debtors, and (iii) materialized, liquid, and certain (including those subject to final court enforcement), whether due or to become due, whether principal or ancillary, including (without limitation) principal amount, accrued interest, default interest, and any other charges, as well as the portion of such claims not covered by the respective collateral and/or fiduciary liens, as determined on the Filing Date and duly listed in Schedule I to this Plan.

1.1.18. "Adhering Creditor": means the Subject Creditor that, although not having signed this Plan on the Signing Date, voluntarily agrees to its terms after the Filing Date and prior to the Plan Confirmation Order, pursuant to Section 4.4 of this Plan.

1.1.19. "Option A Creditor": has the meaning assigned in Section 5.1 of this Plan.

1.1.20. "Option B Creditor": has the meaning assigned in Section 6.1 of this Plan.

1.1.21. "Option C Creditor": has the meaning assigned in Section 7.1 of this Plan.

1.1.22. "Signatory Creditor": means the Subject Creditor listed in Schedule II, who signed the Adhesion Term for Signatory Creditor set forth in Schedule III, through which it adhered to this Plan.

1.1.23. "Subject Creditor": means any creditor holding a Subject Claim.

1.1.24. "Signing Date": means the date of execution of this Plan.

1.1.25. "Judicial Confirmation Date": means the date of publication in the Official Gazette of the Plan Confirmation Order.

1.1.26. "Election Period Commencement Date": has the meaning assigned in Section 8.2 of this Plan.

1.1.27. "Filing Date": means the date on which the request for Extrajudicial Reorganization was filed by the Debtors.

1.1.28. "Chapter 15 Decision": has the meaning assigned in Section 3.5 of this Plan.

1.1.29. "Chapter 15 Enforcement Order": has the meaning assigned in Section 3.5 of this Plan.

1.1.30. "Chapter 15 Recognition Order": has the meaning assigned in Section 3.5 of this Plan.

1.1.31. "Official Gazette": means the National Electronic Judicial Gazette (DJEN), the Electronic Judicial Gazette of the Court of Justice of the State of Minas Gerais (DJE/TJMG), or any other applicable official gazette on the date of publication of the Plan Confirmation Order.

1.1.32. "Calendar Day": means any day of the calendar, it being understood that if a term counted in calendar days expires on a day that is not a Business Day, it shall be automatically extended to the following Business Day.

1.1.33. "Business Day": means any day other than a Saturday, Sunday, or any other day on which banking institutions in the State of Minas Gerais or in the city of Belo Horizonte are not open for business or are authorized to remain closed.

1.1.34. "Dollar" or "US$": means United States dollars.

1.1.35. "DTC": means The Depository Trust Company.

1.1.36. "Payment Option Election": has the meaning assigned in Section 8.1 of this Plan.

1.1.37. "Payment Instruments": means, jointly, the Option A Payment Instruments, the Option B Payment Instruments and the Option C Payment Instruments, as defined below.

1.1.38. "Option A Payment Instruments": means the Option A Payment Instrument – Plan and the Option A Payment Instrument – Notes.

1.1.39. "Option A Payment Instrument – Plan": has the meaning assigned in Section 5.5.1 of this Plan.

1.1.40. "Option A Payment Instrument – Notes": has the meaning assigned in Section 5.5.2 of this Plan.

1.1.41. "Option B Payment Instruments": means the Option B Payment Instrument – Plan and the Option B Payment Instrument – Notes.

1.1.42. "Option B Payment Instrument – Plan": has the meaning assigned in Section 6.5.1 of this Plan.

1.1.43. "Option B Payment Instrument – Notes": has the meaning assigned in Section 6.5.2 of this Plan.

1.1.44. "Option C Payment Instruments": means the Option C Payment Instrument – Plan and the Option C Payment Instruments – Notes.

1.1.45. "Option C Payment Instruments – Plan": has the meaning assigned in Section 7.5.1 of this Plan.

1.1.46. "Option C Payment Instruments – Notes": means the Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes allocated to the Option C Creditors pursuant to Section 7.5.2 of this Plan.

1.1.47. "Intervening Parties": has the meaning assigned in the Preamble of this Plan.

1.1.48. "Inzag": has the meaning assigned in the Preamble of this Plan.

1.1.49. "Extrajudicial Reorganization Court": means the Court of the district of Belo Horizonte, Court of Justice of the State of Minas Gerais, to which the Extrajudicial Reorganization has been assigned.

1.1.50. "Applicable Law": means the Federal Constitution and, as applicable, all law, rule, or legal provision, decree, regulation, ordinance, code or policy, order, decision, or judgment (including arbitral), whether local or foreign, federal, state, or municipal, issued by any governmental authority.

1.1.51. "Brazilian Bankruptcy Act": means Law No. 11,101, of February 9, 2005, as amended.

1.1.52. "Brazilian Corporations Act": means Law No. 6,404, of December 15, 1976, as amended.

1.1.53. "2021 International Notes": has the meaning assigned in recital "(iii)" of this Plan.

1.1.54. "2024 International Notes": has the meaning assigned in recital "(iii)" of this Plan.

1.1.55. "2029 International Notes": has the meaning assigned in recital "(iv)" of this Plan.

1.1.56. "2040 International Notes": has the meaning assigned in recital "(iv)" of this Plan.

1.1.57. "International Existing Notes": has the meaning assigned in recital "(iv)" of this Plan.

1.1.58. "Option A": means the payment option described in Section 5 of this Plan.

1.1.59. "Option B": means the payment option described in Section 6 of this Plan.

1.1.60. "Option C": means the payment option described in Section 7 of this Plan.

1.1.61. "Party": means the Debtors and the Signatory Creditor, referred to collectively or individually, as applicable.

1.1.62. "Parties": means the Debtors and the Signatory Creditor, referred to collectively.

1.1.63. "Election Period": has the meaning assigned in Section 8.2 of this Plan.

1.1.64. "Person": means any person, natural or legal entity, organized under the laws of Brazil or any foreign jurisdiction, including, without limitation, companies in general (corporations, limited liability companies, simple

partnerships, silent partnerships, partnerships, among others), joint venture, trust, investment fund, association, foundation, organization, governmental entity, or any other entity of any type or nature.

1.1.65. "Plan": means this Extrajudicial Reorganization Plan executed between the Debtors and the Signatory Creditor, dated May 18, 2026, and, as applicable, any amendments approved pursuant to the terms of this Extrajudicial Reorganization Plan, all its Schedules being an integral part hereof.

1.1.66. "Plan 2": has the meaning assigned in recital "(x)".

1.1.67. "Chapter 15 Proceedings": means the proceedings to be initiated by the foreign representative(s) of the Debtors under Chapter 15 of the U.S. Bankruptcy Code.

1.1.68. "Payment Option Election Process": means the procedure described in Section 8.2 of this Plan.

1.1.69. "Real" or "R$": means the lawful currency of the Federative Republic of Brazil.

1.1.70. "Extrajudicial Reorganization": means the extrajudicial reorganization proceeding filed by the Debtors before one of the business courts of the District of Belo Horizonte, Court of Justice of the State of Minas Gerais.

1.1.71. "2022 Extrajudicial Reorganization": has the meaning assigned in recital "(iii)" of this Plan.

1.1.72. "Debtors": has the meaning assigned in the Preamble of this Plan.

1.1.73. "Plan 2 Debtors": has the meaning assigned in recital "(ix)" of this Plan.

1.1.74. "Plan Confirmation Order": means the order rendered by the Extrajudicial Reorganization Court, or any other judicial decision issued by another competent court, confirming this Plan.

1.1.75. "DI Rate": means the average one-day (overnight) Interbank Deposit rate, calculated and published daily by B3 S.A. – Brasil, Bolsa, Balcão, based on transactions registered in the B3 Registration System, pursuant to the applicable regulations.

1.1.76. "Adhesion Term for Signatory Creditor" means the adherence instrument set forth in Schedule III, through which the Signatory Creditor have adhered to this Plan.

1.1.77. "Adhesion Term for Adhering Creditor" means the document set forth in Schedule IV.

1.1.78. "Third Party" means any Person other than the Debtors or the Plan 2 Debtors against whom the Subject Creditors hold claims and/or rights in connection with a Subject Claim, whether as main debtor or as co-obligor by virtue of a collateral, corporate, or personal guarantee.

1.1.79. "TMF" means the meaning assigned to it in recital "(iv)" of this Plan.

1.1.80. "Taxes" means any and all compulsory governmental charges established under Applicable Law that do not constitute a sanction for an unlawful act, whether federal, state, municipal, local, or foreign, of any nature or kind, levied on any taxable event or assessment base (including, without limitation, taxes, contributions of any kind, fees, parafiscal charges, compulsory loans, or any charges of a similar nature, and including all interest, charges, monetary correction and/or adjustment, fines, penalties of any kind, and any additional amounts due in connection with the amount of the Tax).

1.1.81. "U.S. Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. paragraphs 101 et seq.

1.1.82. "Zagope" means the meaning assigned to it in the Preamble of this Plan.

**2. RULES OF INTERPRETATION**

2.1. Unless otherwise specified, all Sections and Schedules referred to in this Plan refer to the Schedules and Sections of this Plan itself.

2.2. The titles of the chapters and sections of this Plan have been included solely for reference purposes and shall not affect the content of their provisions.

2.3. Any references to documents or instruments shall be deemed to be as of the date hereof, unless expressly provided otherwise or as otherwise required by the context.

2.4. References to legal provisions and Laws shall be construed as references to such legal

provisions and Laws as in effect on the date hereof or on such other date as may be specifically determined by the context.

2.5. This Plan shall be interpreted in accordance with articles 161 et seq. of the Brazilian Bankruptcy Act.

**PART II – GENERAL CONDITIONS OF THIS PLAN**

**3. PURPOSE, COMPLIANCE WITH LEGAL REQUIREMENTS, AND STRUCTURE OF THIS PLAN**

3.1. Objective. This Plan sets forth the terms and conditions required for the restructuring of the Subject Claims, through the reprofiling of their payment conditions, aligning them with the current and future cash flow of the Debtors and enabling the restructuring of their capital structures.

3.2. Compliance With Legal Requirements. This Plan aims to restructure all Subject Claims, whose total amounts owed individually by each of the Debtors, as of the Filing Date, are described in Schedule II to this Plan.

3.3. This Plan is executed and signed by the Signatory Creditor, pursuant to the adhesion term set forth in Schedule III, which holds (i) 71.3% of all Subject Claims owed by AGE, as indicated in Schedule II, (ii) 73.5% of all Subject Claims owed by AGCS, as indicated in Schedule II, and (iii) 79.2% of all Subject Claims owed by AGIE, as indicated in Schedule II, such that the approval quorum set forth in article 163, caput, of the Brazilian Bankruptcy Act is complied with.

3.4. Reorganization Measures. Upon the Plan Confirmation Order, pursuant to article 163, caput and first paragraph, of the Brazilian Bankruptcy Act, all Subject Claims shall be fully restructured, novated, cancelled and fully satisfied, pursuant to articles 163, caput and first paragraph, and 165, caput, of the Brazilian Bankruptcy Act, and the Subject Creditors shall hold claims governed in accordance with this Plan, which provides terms and conditions consistent with the current and future cash flow of the Debtors.

3.5. Implementation of the Plan Before Foreign Jurisdictions. Following the submission of the Plan before the Extrajudicial Reorganization Court or the entry of the Plan Confirmation Order, the foreign representative(s) of the Debtors, subject to Section 10.6, shall submit the Plan and the Plan Confirmation Order to a United States court of

competent jurisdiction in order to seek an order or orders (i) recognizing the Extrajudicial Reorganization as a foreign main proceeding or non-main foreign proceeding under chapter 15 of the U.S. Bankruptcy Code ("Chapter 15 Recognition Order"), (ii) recognizing and enforcing this Plan and the Plan Confirmation Order within the territorial jurisdiction of the United States of America under chapter 15 of the U.S. Bankruptcy Code ("Chapter 15 Enforcement Order"); and (iii) authorizing and directing the respective parties to that proceeding (including, without limitation, any duly appointed foreign representative) to take any and all actions necessary to give effect to the terms of this Plan and the Plan Confirmation Order (such order or orders, together with the Chapter 15 Recognition Order and the Chapter 15 Enforcement Order, referred to collectively as the "Chapter 15 Decision"). The Debtors may also initiate and/or continue other judicial, out-of-court or administrative proceedings, whether insolvency-related or not, before other jurisdictions, if necessary or advisable for the implementation of the Plan, provided that such ancillary proceedings do not amend the terms and conditions set forth in this Plan.

3.6. Absence of Substantive Consolidation. The Debtors and the Signatory Creditor(s) acknowledge and agree that: (i) the joint submission of this Plan and the filing of the Extrajudicial Reorganization in active joinder result exclusively from procedural consolidation, pursuant to articles 69-G to 69-I of the Brazilian Bankruptcy Act; (ii) neither does there exist, nor is it intended to establish, through this Plan, the Extrajudicial Reorganization or its confirmation, any form of substantive consolidation, commingling of assets, or unification of assets and liabilities among the Debtors; (iii) each Debtor remains legally autonomous, with its own legal personality, estate, assets, liabilities, rights and obligations, and shall be solely liable for its debts, except only in the cases of co-obligation and granting of guarantees expressly provided for in this Plan, in which cases the provisions of Sections 11.5.5, 11.6.1.2 and 11.6.2.1 and articles 346 and 347 of the Brazilian Civil Code shall apply; and (iv) any interpretation of this Plan that results, directly or indirectly, in the application of the legal effects inherent to substantive consolidation is hereby expressly excluded, including the commingling of patrimonial estates or the indistinct treatment of creditors of the different Debtors.

## PART III – SUBJECT CLAIMS

### 4. SCOPE AND BINDING EFFECT OF SUBJECT CLAIMS

4.1. Amount of Subject Claims. The total amount of Subject Claims is (i) R$ 3,400,882,619.38 (three billion four hundred million eight hundred and eighty-two thousand six hundred and nineteen reais and thirty-eight centavos) for AGE, as of the Filing Date, as described in Schedule I to this Plan; (ii) R$ 2,667,042,034.90 (two billion six hundred and sixty-seven million forty-two thousand and thirty-four reais and ninety centavos) for AGCS, as of the Filing Date, as described in Schedule I to this Plan; and (iii) R$ 2,478,000,246.94 (two billion four hundred and seventy-eight million two hundred and forty-six reais and ninety-four centavos.) for AGIE, as of the Filing Date, as described in Schedule I to this Plan.

4.2. Amount of Subject Claims of the Signatory Creditor. The Signatory Creditor is, as of the Filing Date, holder of Subject Claims in the total amount of (i) R$ 2,425,921,625.00 (two billion four hundred and twenty-five million nine hundred and twenty-one thousand six hundred and twenty-five reais) held individually against AGE, as of the Filing Date, as described in Schedule II to this Plan; (ii) R$ 1,961,400,915.00 (one billion nine hundred and sixty-one million four hundred thousand nine hundred and fifteen reais) held individually against AGCS, as of the Filing Date, as described in Schedule II to this Plan; and (iii) R$ 1,961,400,915.00 (one billion nine hundred and sixty-one million four hundred thousand nine hundred and fifteen reais) held individually against AGIE, as of the Filing

Date, as described in Schedule II to this Plan. Accordingly, the Signatory Creditor holds more than 50% (fifty percent) of Subject Claims against each of the Debtors, so that the requirements for the confirmation of the Plan are fully met, pursuant to article 163 of the Brazilian Bankruptcy Act.

4.3. Binding of the Signatory Creditor. The Signatory Creditor expresses its consent to the terms and conditions of the Plan as of the Signing Date, pursuant to article 165, first paragraph, of the Brazilian Bankruptcy Act, provided that the Plan is not terminated pursuant to Section 10.2 and subject to article 165, second paragraph, of the Brazilian Bankruptcy Act.

4.3.1. Pursuant to Section 4.3 above, the Signatory Creditor hereby elects Option C set forth in Section 7 to restructure its respective Subject Claims, which shall, as of the Signing Date, be automatically restructured, novated, fully satisfied, cancelled and replaced by Option C Claims – Tranche A and Option C Claims – Tranche B, and shall therefore be governed pursuant to Sections 7.4.1, 7.4.2, 7.5 and other applicable Sections of this Plan, with all rights and privileges set forth in this Plan, including the corporate guarantees set forth in item "(ix)" of Section 7.4.1 and item "(viii)" of Section 7.4.2. For the avoidance of doubt, the novation set forth in this Section

4.3.1 may be unwound in the event this Plan is terminated pursuant to Section 10.2 and (ii) article 165, second paragraph, of the Brazilian Bankruptcy Act shall be applicable if this Plan is rejected by the Extrajudicial Reorganization Court.

4.4. Adhering Creditors. The Subject Creditors that are not signatories to this Plan on the Signing Date may voluntarily adhere to its terms up to the Judicial Confirmation Date, by completing, signing and delivering to the Debtors the Adhesion Term for Adhering Creditor, in the form attached as Schedule IV to this Plan, duly accompanied by the documents evidencing the authority of the signatory of the Adhesion Term for Adhering Creditor.

4.4.1. In the event that the Subject Creditor holds International Existing Notes, in addition to the documents indicated in the Section above, the Certificate of Holder of International Existing Notes shall also be delivered, in the form set forth in Schedule V to this Plan, duly accompanied by a screenshot of the portal of the custodian of the Subject Creditor, or by a statement issued by the custodian of the Subject Creditor, evidencing ownership of such International Existing Notes.

4.5. Binding Effect on Subject Creditors. Upon the Plan Confirmation Order, all Subject Creditors shall be individually and jointly and severally bound by the terms of this Plan, pursuant to articles 163, caput and first paragraph, and 165, caput, of the Brazilian Bankruptcy Act.

## PART IV – RESTRUCTURING CONDITIONS OF THE SUBJECT CLAIMS

### 5. OPTION A

5.1. Option A. The Subject Creditor that has validly elected Option A, pursuant to Sections 8.1 until 8.3 (the "Option A Creditor"), shall have its respective Subject Claim (i) restructured, novated, fully satisfied, and cancelled with respect to the Debtors, in accordance with this Plan and articles 163, first paragraph, and 165, caput, of the Brazilian Bankruptcy Act, and (ii) replaced by the Option A Claim in the proportions set forth in this Plan, which shall be paid exclusively under the conditions, terms, and payment methods herein established.

5.2. Release. The entry of the Plan Confirmation Order shall result, on the Judicial Confirmation Date, in the full, final, irrevocable, and irreversible release of the respective Subject Claims and of their underlying obligations with respect to the Debtors, and the instruments evidencing the Subject Claims held by the Option A Creditors shall be automatically cancelled and/or extinguished by operation of law, being automatically replaced by the Option A Claims.

5.3. Exchange Ratio. The Option A Creditor shall be entitled to receive the equivalent of thirty-six percent (36%) of the amount of its Subject Claim, under the terms and conditions set forth in Section 5.4 below, and the remaining sixty-four percent (64%) of its respective Subject Claim shall be deemed fully satisfied, as a haircut, for all legal purposes and effects.

5.4. Terms and Conditions of Option A. The Option A Creditors shall be paid in accordance with the terms and conditions described below (the "Option A Claim"), which shall be fully reflected in their respective Option A Payment Instruments:

(i) Principal Amount: 36% (thirty-six percent) of the amount of the Subject Claims held by the Option A Creditors shall be paid under the terms and conditions set forth in Section 5.4, and the remaining 64% (sixty-four percent) shall be subject to the haircut described in Section 5.3 above. For the avoidance of doubt, the amount of the Option A Claim to be received by each Option A Creditor under this Plan and, as applicable, under Plan 2, shall comply with the provisions of Sections 11.5 and following of this Plan, and under no circumstances shall any Option A Creditor receive the amount of its Option A Claim in duplication.

(ii) Interest: the Option A Claims denominated in Dollars shall accrue interest at a rate of six percent (6.00%) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date until December 28, 2040. The Option A Claims denominated in Real shall accrue interest equivalent to 100% (one hundred percent) of the DI Rate per annum (considering, to that end, a year of 252 (two hundred and fifty-two) Business Days), calculated from the Judicial Confirmation Date until December 28, 2040.

(iii) Schedule and Form of Payment of Interest: the interest accrued on the Option A Claims shall be paid as follows: (a) from the Judicial Confirmation Date until December 28, 2030, the interest accrued during such period shall be capitalized into the principal amount; and (b) from December 28, 2030 until December 28, 2040, the interest accrued during such period shall be paid in cash on a semiannual basis, on June 28 and December 28, as applicable, with the first payment date being June 28, 2031.

(iv) Principal Amortization Schedule: the principal amount of the Option A Claims, including the interest capitalized into the principal, shall be amortized in cash in six annual installments, to be paid on December 28, 2035, December 28, 2036, December 28, 2037, December 28, 2038, December 28, 2039, and December 28, 2040, in the amounts corresponding to 16,667%, 20%, 25%, 33,333%, 50% and 100% of the principal outstanding amount on the respective payment dates.

(v) Maturity Date: December 28, 2040.

(vi) Monetary adjustment factor: not applicable.

(vii) Currency: the original currency of the respective Subject Claim held by the Option A Creditor shall not be changed, so that (a) Subject Claims denominated in Real shall remain denominated in Real, and (b) Subject Claims denominated in foreign currency shall remain denominated in its respective foreign currency. The Option A Creditor holding a Subject Claim denominated in foreign currency may, pursuant to article 163, fifth paragraph, of the Brazilian Bankruptcy Act, agree to have its respective Option A Claim denominated in Real, except if such Subject Claim arises from International Existing Notes, in which case the provisions of Section 5.5.2 below shall apply.

(viii) Main Debtor(s): the main debtor(s) of the respective Subject Claim held by the Option A Creditor shall remain, as applicable, the main debtor(s) of the Option A Claim, without prejudice to the corporate guarantees described below.

(ix) Corporate Guarantees. AGE, AGIE, AGCS, AGPAR and AGSA hereby grant a corporate guarantee (fiança) to secure the payment the Option A Claims, irrevocably and irreversibly undertaking, as obligors, jointly and severally with the respective main debtor(s) and among themselves, the obligations arising from this Option A, pursuant to articles 818 et seq. of the Brazilian Civil Code, and expressly waiving the benefits of order and division, as well as any rights or discharge faculties of any nature, set forth in articles 333, sole paragraph, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 and 839, of the Brazilian Civil Code, and in articles 130, 131 and 794 of the Brazilian Code of Civil Procedure. The corporate guarantees granted by AGE, AGCS, AGIE, AGPAR and AGSA, as applicable, shall be equally reflected in the Option A Payment Instrument – Notes (as defined below), and AGE, AGIE, AGCS, AGPAR and AGSA shall be signatories to the indenture of the Option A Payment Instrument – Notes for this purpose, to the same extent described above, in accordance with the laws of the State of New York, United States of America. For the avoidance of doubt, the guarantors shall be subrogated to the rights of the Option A Creditors in the event they honor, in whole or in part, the corporate guarantee, pursuant to the provisions of Sections 11.5 et. seq, it being understood that the corporate guarantors hereby undertake not to collect, receive, or otherwise demand from the issuer of the Option A Payment Instrument – Notes the payment of any amounts paid under the corporate guarantees, whether by subrogation, set-off, or on any other basis , until all guaranteed obligations have been fully satisfied. Should the corporate guarantors, in violation of such provision, receive any proceeds under the indenture of the Option A Payment Instrument – Notes in any other manner, they shall receive such proceeds as trustees, and shall transfer the entirety of such proceeds for the benefit of the Option A Creditors within 2 (two) Business Days of receipt, without any deduction or discount.

5.5. Option A Payment Instruments. As of the Judicial Confirmation Date, the Option A Creditors shall automatically become, as of such date, holders of their respective Option A Claims, with all the characteristics set forth in this Plan, which shall subsequently be evidenced and formalized through the Option A Payment Instruments, in accordance with the criteria set forth below:

5.5.1. Option A Payment Instrument - Plan. Except as provided in Section 5.5.2 below, the Option A Creditors shall have their respective Option A Claims evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (título executivo judicial) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth herein (the “Option A Payment Instrument – Plan”).

5.5.2. Option A Payment Instrument – Notes. The Option A Creditors who, cumulatively, (i) currently hold International Existing Notes; (ii.a) are qualified institutional buyers as defined under Rule 144A promulgated under

the U.S. Securities Act of 1933, as amended, or (ii.b) are not U.S. persons, as defined under Rule 902 of the of U.S. Securities Act, provided that any holder described in this Section 5.5.2, item (ii.b), that is resident of a member state of the European Economic Area must also be a qualified investor under Regulation (EU) 2017/1129, as amended, and under the Luxembourg Law of July 16, 2019 on prospectuses for securities, as amended, or (ii.c) are institutional accredited investors as defined under Rule 501 of the U.S. Securities Act of 1933, shall, subject to the provisions of Section 5.5.2.5 and except as provided in Section 5.5.2.6, have their respective Option A Claims arising from the International Existing Notes evidenced and formalized through new notes to be issued by AGINT in the form of notes, denominated in Dollars, the indenture of which shall be executed in a manner consistent with the Term Sheet set forth in Schedule VI, so as to reflect and represent the terms of Option A as provided in this Plan ("Option A Payment Instrument – Notes").

5.5.2.1. For the avoidance of doubt, the Debtors have not solicited offers to purchase, nor have they offered or sold, and shall not solicit offers to purchase, or offer or sell, any securities in any manner involving a public offering under Section 4(a)(2) of the U.S. Securities Act of 1933.

5.5.2.2. Governing Law. The Option A Payment Instrument – Notes shall be governed by the laws of the State of New York, United States of America.

5.5.2.3. Time of Issuance. The issuance of the Option A Payment Instrument – Notes shall take place following the entry of the Chapter 15 Enforcement Order and the cancellation of the International Existing Notes.

5.5.2.4. Conflict. In the event of any conflict between the indenture governing the Option A Payment Instrument – Notes and any other provision of this Plan, the terms and conditions set forth in this Plan shall prevail.

5.5.2.5. For the avoidance of doubt, between the Judicial Confirmation Date and the issuance date of the Option A Payment Instrument – Notes, the Option A Claims arising from the International Existing Notes shall be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (título executivo judicial) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan, including with respect to the corporate guarantees set forth in Section 5.4 of this Plan.

5.5.2.6. If the Option A Payment Instrument – Notes is not issued for any reason, the Option A Claims arising from the International Existing Notes shall continue to be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (título executivo judicial) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan. The provisions of this Section shall not be construed as a waiver, mitigation, or limitation of the Debtors' obligation to take the reasonably necessary measures to issue the Option A Payment Instrument – Notes, pursuant to the terms of this Plan.

**6. OPTION B**

6.1. Option B. The Subject Creditor that has validly elected Option B, pursuant to Sections 8.1 until 8.3, or that has had its Subject Claim allocated for payment under Option B pursuant to Sections 8.4 or 8.5 (the "Option B Creditor"), shall have its respective Subject Claim (i) restructured, novated, fully satisfied, and cancelled with

respect to the Debtors, in accordance with this Plan and articles 163, first paragraph, and 165, caput, of the Brazilian Bankruptcy Act; and (ii) replaced by the Option B Claim, in the proportions set forth in this Plan, which shall be paid exclusively under the conditions, terms, and payment methods herein established.

6.2. Release. The entry of the Plan Confirmation Order shall result, on the Judicial Confirmation Date, in the full, final, irrevocable, and irreversible release of the respective Subject Claims and of the obligations underlying them with respect to the Debtors, and the instruments evidencing the Subject Claims held by the Option B Creditors shall be automatically cancelled and/or extinguished by operation of law, being automatically replaced by the Option B Claims.

6.3. Exchange Ratio. The Option B Creditor shall be entitled to receive the equivalent of one hundred percent (100%) of the amount of its Subject Claim, under the terms and conditions set forth in Section 6.4 below.

6.4. Terms and Conditions of Option B. The Option B Creditors shall be paid in accordance with the terms and conditions described below (the "Option B Claim"), which shall be fully reflected in their respective Option B Payment Instruments:

(i) Principal Amount: 100% (one hundred percent) of the amount of the Subject Claims held by the Option B Creditors shall be paid under the terms and conditions set forth in Section 6.4. For the avoidance of doubt, the amount of the Option B Claim to be received by each Option B Creditor under this Plan and, as applicable, under Plan 2, shall comply with the provisions of Sections 11.5 and following of this Plan, and under no circumstances shall any Option B Creditor receive payment of its Option B Claim in duplicate.

(ii) Interest: the Option B Claims denominated in Dollars shall accrue interest at a rate of 1% (one per cent) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date and capitalized to the principal amount until the maturity date of the Option B Claims. The Option B Claims denominated in Real shall accrue interest equivalent to 2% (two per cent) per annum (considering, to that end, a year of 252 (two hundred and fifty-two) Business Days), calculated from the Judicial Confirmation Date and capitalized to the principal amount until the maturity date of the Option B Claims.

(iii) Principal Amortization Schedule: the principal amount of the Option B Claims, including the interest accrue and capitalized into the principal, shall be amortized in a single installment on the maturity date of the Option B Claims.

(iv) Monetary adjustment factor: not applicable.

(v) Maturity Date: December 28, 2070.

(vi) Currency: the original currency of the respective Subject Claim held by the Option B Creditor shall not be changed, so that (a) Subject Claims denominated in Real shall remain denominated in Real, and (b) Subject Claims denominated in foreign currency shall remain denominated in its respective foreign currency. The Option B Creditor holding a Subject Claim denominated in foreign currency may, pursuant to article 163, fifth paragraph, of the Brazilian Bankruptcy Act, agree to have its respective Option B Claim denominated in Real, except if such Subject Claim arises from International Existing Notes, in which case the provisions of Section 6.5.2 below shall apply.

(vii) Main Debtor(s): the main debtor(s) of the respective Subject Claim held by the Option B Creditor shall remain, as applicable, the main debtor(s) of the Option B Claim, without prejudice to the corporate guarantees described below.

(viii) Corporate Guarantees: AGE, AGIE, AGCS, AGPAR and AGSA hereby grant a corporate guarantee (fiança) to secure the payment of the Option B Claims, undertaking, irrevocably and irreversibly, as obligors, jointly and severally with the respective main debtor(s) and among themselves, the obligations arising from this Option B, pursuant to articles 818 et seq. of the Brazilian Civil Code, and expressly waiving the benefits of order and division, as well as any rights or discharge faculties of any nature, set forth in articles 333, sole paragraph, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 and 839, of the Brazilian Civil Code, and in articles 130, 131 and 794 of the Brazilian Code of Civil Procedure. The corporate guarantees granted by AGE, AGCS, AGIE, AGPAR and AGSA, as applicable, shall be equally reflected in the Option B Payment Instrument – Notes (as defined below), and AGE, AGIE, AGCS, AGPAR and AGSA shall be signatories to the indenture of the Option B Payment Instrument – Notes for this purpose, to the same extent described above, in accordance with the laws of the State of New York, United States of America. For the avoidance of doubt, the guarantors shall be subrogated to the rights of the Option B Creditors in the event they honor, in whole or in part, the corporate guarantee, pursuant to the provisions of Section 11.5 et. seq, it being understood that the corporate guarantors hereby undertake not to collect, receive, or otherwise demand from the issuer of the Option B Payment Instrument – Notes the payment of any amounts paid under the corporate guarantees, whetherby subrogation, set-off, or on any other basis, until all guaranteed obligations have been fully satisfied. Should the corporate guarantors, in violation of such provision, receive any proceeds under the indenture of the Option B Payment Instrument – Notes in any other manner, they shall receive such proceeds as trustees, and shall transfer the entirety of such proceeds for the benefit of the Option B Creditors within 2 (two) Business Days of receipt, without any deduction or discount.

(ix) Payment or Early Redemption: the Option B Claims may, at any time as of January 1, 2035 and until June 28, 2070, at the sole discretion of the Debtors, AGSA, AGPAR and/or AGINT, be prepaid or redeemed in advance, partially or in full, with the application of a discount equivalent to 90% of the amount of the Option B Claim subject to such prepayment or early redemption, as duly adjusted until the maturity date of the Option B Claims. For the avoidance of doubt, upon payment of an amount equivalent to 10% of the Option B Claim subject to such prepayment or early redemption, as duly adjusted until the maturity date of the Option B Claims, the Option B Claim held by the respective Option B Creditor shall be deemed fully settled and discharged for all legal purposes.

6.5. Option B Payment Instruments. As of the Judicial Confirmation Date, the Option B Creditors shall automatically become, as of such date, holders of their respective Option B Claims, with all the characteristics set forth in this Plan, which shall subsequently be evidenced and formalized through the Option B Payment Instruments, in accordance with the criteria set forth below:

6.5.1. Option B Payment Instrument – Plan. Except in the event described in Section 6.5.2 below, the Option B Creditors shall have their respective Option B Claims evidenced and formalized through this Plan, without the issuance of securities, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (título executivo judicial) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan ("Option B Payment Instrument – Plan").

6.5.2. Option B Payment Instrument – Notes. The Option B Creditors that, cumulatively, (i) currently hold International Existing Notes; (ii.a) are qualified institutional buyers as defined under Rule 144A promulgated under the U.S. Securities Act of 1933, as amended; (ii.b) are not "U.S. persons" as defined under Rule 902 of the U.S. Securities Act, provided that any holder described in this Section 6.5.2, item (ii.b), that is resident of a member state of the European Economic Area must also be a qualified investor under Regulation (EU) 2017/1129, as amended, and under the Luxembourg Law of July 16, 2019 on prospectuses for securities, as amended; or (ii.c) are institutional accredited investors as defined under Rule 501 of the U.S. Securities Act of 1933, shall, subject to the provisions of Section 6.5.2.5 and except as provided in Section 6.5.2.6 of this Plan, have their Option B Claims arising from the International Existing Notes evidenced and formalized through new notes to be issued by AGINT, in the form of notes, denominated in Dollars, the indenture of which shall be executed in a manner consistent with the Term Sheet attached as Schedule VII, so as to reflect and represent the terms of Option B as provided in this Plan (the "Option B Payment Instrument – Notes").

6.5.2.1. For the avoidance of doubt, the Debtors have not solicited offers to buy, or offered or sold, and shall not solicit offers to buy, or offer or sell, any securities in any manner involving a public offering pursuant to Section 4(a)(2) of the U.S. Securities Act of 1933.

6.5.2.2. Governing law. The Option B Payment Instrument – Notes shall be governed by the laws of the State of New York, United States of America.

6.5.2.3. Time of issuance. The issuance of the Option B Payment Instrument – Notes shall occur after the entry of the Chapter 15 Enforcement Order and the cancellation of the International Existing Notes.

6.5.2.4. Conflict. In the event of any conflict between the indenture governing the Option B Payment Instrument – Notes and any other provision of this Plan, the terms and conditions set forth in this Plan shall prevail.

6.5.2.5. For the avoidance of doubt, between the Judicial Confirmation Date and the issuance date of the Option B Payment Instrument – Notes, the Option B Claims arising from the International Existing Notes shall be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (título executivo judicial) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan, including with respect to the corporate guarantees set forth in Section 6.4 of this Plan.

6.5.2.6. If the Option B Payment Instrument – Notes is not issued for any reason, the Option B Claims arising from the International Existing Notes shall continue to be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (título executivo judicial) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan. The provisions of this Section shall not be construed as a waiver, mitigation, or limitation of the Debtors' obligation to take the reasonably necessary measures to issue the Option B Payment Instrument – Notes, pursuant to the terms of this Plan.

**7. OPTION C**

7.1. Option C. The Subject Creditor that has validly elected Option C, in accordance with Sections 8.1 until 8.3 ("Option C Creditor"), shall have its respective Subject Claim (i) restructured, novated, fully satisfied and cancelled,

with respect to the Debtors, pursuant to the terms of this Plan and articles 163, first paragraph, and 165, caput, of the Brazilian Bankruptcy Act; and (ii) replaced by an Option C Claim in the proportions set forth in this Plan, which shall be paid exclusively under the terms, deadlines and payment methods established herein.

7.1.1. For the avoidance of doubt, the election of Option C by the Signatory Creditor was validly and duly made pursuant to Section 4.3.1 of this Plan, and the restructuring, novation, full satisfaction, cancellation and replacement of its respective Subject Claims shall take effect as of the Signing Date, pursuant to article 165, first paragraph, of the Brazilian Bankruptcy Act and Section 4.3.1 of this Plan.

7.2. Release. The entry of the Plan Confirmation Order shall result, on the Judicial Confirmation Date, in the full, complete, irrevocable and irreversible release of the respective Subject Claims and of the obligations underlying them with respect to the Debtors, and the instruments embodying the Subject Claims held by the Option C Creditors shall be automatically cancelled and/or extinguished by operation of law, being shall be automatically replaced by the Option C Claims.

7.2.1. For the avoidance of doubt, the provisions of Section 7.2 shall apply as of the Signing Date to the Subject Claims held by the Signatory Creditor, pursuant to the provisions of Section 4.3.1 of this Plan.

7.3. Exchange Ratio. The Option C Creditor shall be entitled to receive the equivalent of (i) 31% (thirty-one percent) of the amount of its Subject Claim under the terms and conditions set forth in Section 7.4.1, which substantially reflect the terms and conditions applicable to the payment of Option A Claims, as provided in Section 5.4, item "(ii)" onwards; and (ii) 69% (sixty-nine percent) of the amount of its Subject Claim under the terms and conditions set forth in Section 7.4.2, which substantially reflect the terms and conditions applicable to the payment of Option B Claims, as provided in Section 6.4, item (ii) onwards.

7.4. Terms and Conditions of Option C. The Option C Creditors shall be paid, in accordance with the terms and conditions set forth in Sections

7.4.1 ("Option C Claim – Tranche A") and 7.4.2 ("Option C Claim – Tranche B"), which shall be fully reflected in their respective Option C Payment Instruments:

7.4.1. Option C Claims – Tranche A:

(i) Principal Amount: 31% (thirty-one percent) of the amount of the Subject Claims held by the Option C Creditors shall be paid under the terms and conditions set forth in this Section 7.4.1. For the avoidance of doubt, the amount of the Option C Claim – Tranche A to be received by each Option C Creditor, pursuant to this Plan and, as applicable, Plan 2, shall comply with the provisions of Sections 11.5 and following of the Plan, such that, under no circumstances, shall the respective Option C Creditor receive the amount of its Option C Claim – Tranche A in duplicate.

(ii) Interest: the Option C Claims – Tranche A denominated in Dollars shall accrue interest at a rate of 6.00% (six percent) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date until 28 December 2040. The Option C Claims – Tranche A denominated in Real shall accrue interest equivalent to 100% (one hundred percent) of the DI Rate per annum (considering, to that end, a year of 252 (two hundred and fifty-two) Business Days), calculated from the Judicial Confirmation Date until 28 December 2040.

(iii) Schedule and Form of Payment of Interest: the interest accruing on the Option C Claims – Tranche A shall be paid as follows: (a) from the Judicial Confirmation Date until 28 December 2030, the interest accrued during the period shall be capitalized into the principal amount; and (b) from 28 December 2030 until 28 December 2040, the interest accrued during the period shall be paid in cash on a semiannual basis, on 28 June and 28 December, as applicable, with the first payment date being 28 June 2031.

(iv) Principal Payment Schedule: the principal amount of the Option C Claims – Tranche A, including the interest capitalized into the principal amount, shall be amortized, in cash, in six annual installments, to be paid on December 28 of 2035, December 28 of 2036, December 28 of 2037, December 28 of 2038, December 28 of 2039 and December 28 of 2040, in the amounts corresponding to 16.667%, 20%, 25%, 33.333%, 50% and 100% of the outstanding principal balance on the respective payment dates.

(v) Maturity Date: 28 December 2040.

(vi) Monetary adjustment factor: not applicable.

(vii) Currency: the original currency of the respective Subject Claim held by the Option C Creditor shall not be changed, such that (a) Subject Claims denominated in Real shall remain denominated in Real, and (b) Subject Claims denominated in foreign currency shall remain denominated in the respective foreign currency. The Option C Creditor holding a Subject Claim in foreign currency may, pursuant to article 163, fifth paragraph, of the Brazilian Bankruptcy Act, agree to have its respective Option C Claim – Tranche A denominated in Brazilian Reais, except if such Subject Claim arises from International Existing Notes, in which case the provisions of Section 7.5.2 below shall apply.

(viii) Main Debtor(s): the main debtor(s) of the respective Subject Claim held by the Option C Creditor shall remain, as applicable, as the main debtor(s) of the respective Option C Claim – Tranche A, without prejudice to the corporate guarantees described below.

(ix) Corporate Guarantees: AGE, AGIE, AGCS, AGPAR and AGSA hereby grant a corporate guarantee (fiança) to secure the payment of the Option C – Tranche A Claims, irrevocably and irreversibly undertaking, as obligors, jointly and severally with the respective main debtor(s) and among themselves, the obligations arising from this Option C – Tranche A, pursuant to articles 818 et seq. of the Brazilian Civil Code, and expressly waive the benefits of order and division, as well as any rights and faculties of release of any nature, set forth in articles 333, sole paragraph, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 and 839, all of the Brazilian Civil Code, and articles 130, 131 and 794 of the Brazilian Code of Civil Procedure. The corporate guarantees granted by AGE, AGCS, AGIE, AGPAR and AGSA, as applicable, shall be equally reflected in the Option C Payment Instruments – Notes (as defined below), and AGE, AGIE, AGCS, AGPAR and AGSA shall be signatories to the indenture of the Option C Payment Instruments – Notes for this purpose, to the same extent described above, in accordance with the laws of the State of New York, United States of America. For the avoidance of doubt, the guarantors shall be subrogated to the rights of the Option C Creditors in the event they honor, in whole or in part, the corporate guarantee, pursuant to the provisions of Sections 11.5 et. seq., it being understood that the guarantors hereby undertake not to collect, receive, or otherwise demand from the issuer of the Option C Payment Instruments – Notes the payment of any amounts paid under the corporate guarantees, whether by subrogation, set-off, or on any other basis, until all guaranteed obligations have been fully satisfied. Should the corporate guarantors, in violation of such provision, receive any proceeds under the indenture of the Option C

Payment Instruments – Notes in any other manner, they shall receive such proceeds as trustees, and shall transfer the entirety of such proceeds for the benefit of the Option C Creditors within 2 (two) Business Days of receipt, without any deduction or discount.

7.4.2. Option C Claims – Tranche B:

(i) Principal Amount: 69% (sixty-nine percent) of the amount of the Subject Claims held by the Option C Creditors shall be paid under the terms and conditions set forth in this Section 7.4.2. For the avoidance of doubt, the amount of the Option C Claim – Tranche B to be received by each Option C Creditor, pursuant to this Plan and, as applicable, Plan 2, shall comply with the provisions of Sections 11.5 and following of the Plan, such that, under no circumstances, shall the respective Option C Creditor receive the amount of its Option C Claim – Tranche B in duplicate.

(ii) Interest: the Option C – Tranche B Claims denominated in Dollars shall accrue interest at a rate of 1% (one per cent) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date and capitalized into the principal amount until the maturity date of the Option C – Tranche B Claims. The Option C – Tranche B Claims denominated in Real, shall accrue interest equivalent to 2% (two per cent) per annum (considering, to that end, a year of 252 (two hundred and fifty-two) Business Days), calculated from the Judicial Confirmation Date and capitalized to the principal amount until the maturity date of the Option C – Tranche B Claims.

(iii) Principal Payment Schedule: the principal amount of the Option C Claims – Tranche B, including the interest capitalized into the principal amount, shall be amortized in a single installment, on the maturity date of the Option C Claims– Tranche B.

(iv) Monetary adjustment factor: not applicable.

(v) Maturity Date: 28 December 2070.

(vi) Currency: the original currency of the respective Subject Claim held by the Option C Creditor shall not be changed, such that (a) Subject Claims denominated in Real shall remain denominated in Real, and (b) Subject Claims denominated in foreign currency shall remain denominated in the respective foreign currency. The Option C Creditor holding a Subject Claim in foreign currency may, pursuant to article 163, fifth paragraph, of the Brazilian Bankruptcy Act, agree to have its respective Option C Claim – Tranche B denominated in Real, except if such Subject Claim arises from International Existing Notes, in which case the provisions of Section 7.5.2 below shall apply.

(vii) Main Debtor(s): the main debtor(s) of the respective Subject Claim held by the Option C Creditor shall remain, as applicable, as the main debtor(s) of the Option C Claim – Tranche B, without prejudice to the corporate guarantees described below.

(viii) Corporate Guarantees: AGE, AGIE, AGCS, AGPAR and AGSA hereby grant a corporate guarantee (fiança) to secure the payment of the Option C – Tranche B Claims, irrevocably and irreversibly undertaking, as obligors, jointly and severally with the respective main debtor(s) and among themselves, the obligations arising from this Option C – Tranche B, pursuant to articles 818 et seq. of the Brazilian Civil Code, and expressly waive the benefits of order and division, as well as any rights and faculties of release of any nature,

set forth in articles 333, sole paragraph, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 and 839, all of the Brazilian Civil Code, and articles 130, 131 and 794 of the Brazilian Code of Civil Procedure. The corporate guarantees granted by AGE, AGCS, AGIE, AGPAR and AGSA, as applicable, shall be equally reflected in the Option C Payment Instruments – Notes, and AGE, AGIE, AGCS, AGPAR and AGSA shall be signatories to the indenture of the Option C Payment Instruments – Notes for this purpose, to the same extent described above, in accordance with the laws of the State of New York, United States of America. For the avoidance of doubt, the guarantors shall be subrogated to the rights of the Option C Creditors in the event they honor, in whole or in part, the corporate guarantee, pursuant to the provisions of Section 11.5 et. seq., it being understood that the corporate guarantors hereby undertake not to collect, receive, or otherwise demand from the issuer of the Option C Payment Instruments – Notes the payment of any amounts paid under the corporate guarantees, whether by subrogation, set-off, or on any other basis, until all guaranteed obligations have been fully satisfied. Should the corporate guarantors, in violation of such provision, receive any proceeds under the indenture of the Option C Payment Instruments – Notes in any other manner, they shall receive such proceeds as trustees, and shall transfer the entirety of such proceeds for the benefit of the Option C Creditors within 2 (two) Business Days of receipt, without any deduction or discount.

(ix) Early Payment or Redemption. The Option C – Tranche B Claims may, at any time from January 1st, 2035, until June 28, 2070, at the sole discretion of the Debtors, AGSA, AGPAR and/or AGINT, be prepaid or redeemed in advance, partially or in full, with the application of a discount equivalent to 90% of the amount of the Option C – Tranche B Claim subject to such early payment or redemption, as duly adjusted until the maturity date of the Option C – Tranche B Claims. For the avoidance of doubt, upon payment of an amount equivalent to 10% of the Option C – Tranche B Claims subject to the early payment or redemption, as duly updated until the maturity date of the Option C – Tranche B Claims, the entirety of the Option C – Tranche B Claim held by the respective Option C Creditor shall be deemed fully settled and discharged for all legal purposes.

7.5. Option C Payment Instruments. As of the Judicial Confirmation Date, the Option C Creditors shall automatically become, as of such date, holders of their respective Option C Claims, with all the characteristics set forth in this Plan, which shall subsequently be evidenced and formalized through the Option C Payment Instruments, in accordance with the criteria set forth below:

7.5.1 Option C Payment Instrument – Plan. Except for the situation described in Section 7.5.2 below, the Option C Creditors shall have their respective Option C Claims – Tranche A and Option C Claims – Tranche B evidenced and formalized through this Plan, without the issuance of securities, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (título executivo judicial) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan ("Option C Payment Instrument – Plan").

7.5.2 Option C Payment Instruments – Notes. The Option C Creditors who, cumulatively, (i) are currently holders of International Existing Notes; (ii.a) are qualified institutional buyers within the meaning of Rule 144A under the U.S. Securities Act of 1933, as amended, (ii.b) are not "U.S. persons", as defined in Rule 902 under the U.S. Securities Act, provided that any holder described in this Section 7.5.2, item (ii.b.), that is resident of a member state of the European Economic Area must also be a qualified investor under Regulation (EU) 2017/1129, as amended, and the Luxembourg Law of July 16, 2019 on prospectuses for securities, as amended, or (ii.c) are institutional accredited investors as defined in Rule 501 under the U.S. Securities Act of 1933; shall, subject to the

provisions of Section 7.5.2.2 and except as provided in Section 7.5.2.3, have their (i) Option C – Tranche A Claims arising from the International Existing Notes evidenced and formalized through the Option A Payment Instrument – Notes, the indenture of which shall be executed in a manner consistent with the Term Sheet set forth in Schedule VI, so as to reflect and represent the terms of Option C – Tranche A as provided in this Plan, subject to the provisions of item (i) of Section 7.4.1 of this Plan; and (ii) Option C–Tranche B Claims evidenced and formalized through the Option B Payment Instrument – Notes, the indenture of which shall be executed in a manner consistent with the Term Sheet set forth in Schedule VII, so as to reflect and represent the terms of Option C – Tranche B as provided in this Plan, subject to the provisions of Option C – Tranche B as provided in this Plan, pursuant to item (i) of Section 7.4.2 of this Plan.

7.5.2.1 For the avoidance of doubt, the provisions set forth in Sections 5.5.2.1 to 5.5.2.4 and 6.5.2.1 to 6.5.2.4 above shall apply to the Option C Payment Instruments – Notes.

7.5.2.2 For the avoidance of doubt, between the Judicial Confirmation Date (or, in the case of the Signatory Creditor, the Signing Date) and the issuance date of the Option C Payment Instrument – Notes, the Option C – Tranche A Claims and the Option C – Tranche B Claims arising from the International Existing Notes shall be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (título executivo judicial) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan, including with respect to the corporate guarantees set forth in Section 7.4 of this Plan.

7.5.2.3 If the Option C Payment Instrument – Notes is not issued for any reason, the Option C – Tranche A Claims and the Option C – Tranche B Claims arising from the International Existing Notes shall continue to be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall constitute an enforceable court order for all legal purposes, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan. The provisions of this Section shall not be construed as a waiver, mitigation, or limitation of the Debtors' obligation to take all reasonably necessary measures to issue the Option C Payment Instruments – Notes, pursuant to the terms of this Plan.

## 8. ELECTION AND SELECTION OF PAYMENT OPTIONS

8.1. Election of Payment Option. The Subject Creditors may elect to have their Subject Claims restructured and paid under either Option A, Option B or Option C pursuant to Sections 5, 6 and 7 of this Plan, it being understood that each Subject Creditor may elect only one payment option with respect to the entirety of its respective Subject Claim (“Payment Option Election”).

8.2. Payment Option Election Process. The Payment Option Election shall be carried out within the deadline of 30 (thirty) Calendar Days], which shall commence within up to 45 (forty-five) Calendar Days after the Plan Confirmation Order (the “Election Period Commencement Date”), as set forth in Section 8.2.1 below, and each Subject Creditor shall comply with the provisions set forth in the following Sections (the “Payment Option Election Process”), except as provided for in Section 8.2.4 of this Plan. For the avoidance of doubt, the Payment Option Election shall begin on the Election Period Commencement Date and shall end on the thirtieth Calendar Day counted from the Election Period Commencement Date (this interval, the “Election Period”).

8.2.1. Election Period Commencement Date. The Debtors shall disclose, on the website indicated in Section 8.3 below and/or by means of a filing in the records of the Extrajudicial Reorganization, the exact Election Period Commencement Date, which shall be set within up to 45 (forty-five) Calendar Days after the Plan Confirmation Order. In the absence of disclosure by the Debtors in the manner set forth in this Section, the Election Period Commencement Date shall be ipso facto deemed to be the forty-sixth Calendar Day after the Plan Confirmation Order.

8.2.2. Payment Option Election Process for Subject Claims Not Arising from International Existing Notes. The Subject Creditors, with respect to their Subject Claims that do not arise from International Existing Notes, shall, carry out the Payment Option Election by completing and delivering to the Debtors the election form set forth in Schedule VIII, within the Election Period and therefore prior to the end of the Election Period, together with the documents evidencing the powers and authority of the respective signatory.

8.2.3. Payment Option Election Process for Subject Claims Arising from International Existing Notes. The Subject Creditors that are holders of International Existing Notes shall, with respect to their Subject Claims arising from International Existing Notes, carry out the Payment Option Election through DTC's automated tender offer program (ATOP) or the Deposits/Withdrawals at Custodian (DWAC) system. The Subject Creditors that are holders of International Existing Notes shall, within the Election Period and therefore prior to the end of the Election Period, complete and deliver the election form, in the form to be made available on the website referred to in Section 8.3 below, to its respective bank or broker with which their respective International Existing Notes are held in custody. For the avoidance of doubt, if the Subject Creditor holds other Subject Claims that do not arise from International Existing Notes, the Payment Option Election with respect to such Subject Claims not arising from International Existing Notes shall be made in accordance with Section 8.2.2 above.

8.2.4. Signatory Creditor's Election. For the avoidance of doubt, the Signatory Creditor has already validly and duly made the Payment Option Election pursuant to Section 4.3.1 of this Plan. Notwithstanding having validly and duly made the Payment Option Election, the Signatory Creditor undertakes to comply with the provisions of Section 8.2.3 above, in order to enable the identification of its International Existing Notes deposited with the DTC and, thereby, enable their formal cancellation in the event of issuance of the Option C Payment Instruments – Notes.

8.3. All instructions and information relevant and necessary for the participation of the Subject Creditors in the Payment Option Election Process, including any updates, shall be disclosed by the Debtors on the website https://andradegutierrez365.sharepoint.com/:f:/s/R EJ2026andradegutierrez/IgDaz9D-4HAfS5A6mPHcl33BAfEhcicXvDY5d75qzkQm kDg?e=bUYjae after the Plan Confirmation Order.

8.4. The Subject Claim shall be automatically and fully replaced and restructured in accordance with the terms and conditions applicable to Option B set forth in Section 6, if its respective Subject Creditor (i) fails to carry out the Payment Option Election in accordance with the provisions of Sections 8.1 and 8.2; (ii) fails to fully comply with the relevant instructions disclosed on the website indicated in Section 8.3; or (iii) if a holder of International Existing Notes, withdraws its International Existing Notes pursuant to Section 8.5.

8.5. Once the Election Period has ended, Subject Creditors that are holders of International Existing Notes may withdraw their International Existing Notes from the system used in the Payment Option Election Process up to 10 (ten) Business Days prior to the issuance date of the Option A Payment Instrument – Notes, the Option B Payment Instrument – Notes (and, consequently, the Option C Payment Instruments – Notes), it being understood that such

withdrawal may not be subsequently reversed. For the avoidance of doubt, any Subject Creditor that is a holder of International Existing Notes and withdraws its International Existing Notes after the Election Period shall be deemed (i) to have not made a valid election for any of the Payment Options; (ii) to have waived all rights associated with any Payment Option; and, consequently, (iii) to have its respective Subject Claim restructured in accordance with the terms of Option B of this Plan.

**9. RECIPROCAL OBLIGATIONS OF THE DEBTORS, THE SIGNATORY CREDITOR AND THE ADHERING CREDITORS**

9.1. The Signatory Creditor and the Adhering Creditors shall use their best efforts to enable the implementation of this Plan as promptly as possible.

9.2. The Debtors shall:

(i) file the Extrajudicial Reorganization within 5 (five) Business Days from the Signing Date;

(ii) perform all acts, provide all information, and take reasonably necessary measures to implement and comply with the provisions of this Plan, within the time frames and under the conditions established herein, bearing all corresponding expenses, including those reasonably necessary for the issuance of the Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes (and, consequently, the Option C Payment Instruments – Notes);

(iii) comply with all applicable legislation that is substantially relevant to the conduct of their business (including all labor, environmental, tax, and social laws) related to their activities and the maintenance of their assets and properties;

(iv) use their best efforts to enable (a) the confirmation of this Plan by the Court of the Extrajudicial Reorganization, or by any appellate instance, if necessary; (b) the recognition of the Extrajudicial Reorganization and the implementation of the Plan and the Plan Confirmation Order pursuant to the Chapter 15 Decisions;

(v) comply with all relevant obligations set forth in this Plan and its Schedules as from the Signing Date; and

(vi) to file the Chapter 15 Proceedings pursuant to Section 10.6; and

(vii) comply with and observe all deadlines and relevant obligations set forth in this Plan.

9.3. Reciprocal Obligation. The Debtors and the Signatory Creditor, as holder of more than half of the Subject Claims, shall be bound and agree to negotiate in good faith the final drafts of any documents necessary for the implementation of the transactions and commercial agreements described in this Plan.

## PART V – POST-CONFIRMATION

**10. EFFECTS OF THE PLAN**

10.1. Novation. Upon the Plan Confirmation Order, the Subject Claims shall be novated pursuant to articles 163, first paragraph, and 165 of the Brazilian Bankruptcy Act, and shall be paid in the manner established in this Plan. As a result of such novation and unless expressly provided otherwise in this Plan, all obligations, covenants,

financial ratios, events of default, penalties, as well as any other obligations and guarantees of any nature assumed or granted by the Debtors are extinguished and replaced, in all respects, by the provisions of this Plan.

10.2. Resolution of the Plan and the Novation. The Plan shall be automatically terminated, provided that the rights set forth in Section 10.2.1 have not been exercised, and the Subject Claims shall revert to the status quo ante if any of the following events occurs:

(i) the failure to file the Extrajudicial Reorganization within 5 (five) Business Days from the Signing Date

(ii) the issuance of a decision, by the Extrajudicial Reorganization Court or by a competent Appellate Court, rejecting the confirmation of the Plan, which is not reversed or stayed within 240 (two hundred and forty) Calendar Days from the publication of such decision in the Official Gazette;

(iii) issuance of a decision, by the Extrajudicial Reorganization Court or by a competent Appellate Court, substantially modifying the Plan, which is not reversed or stayed within 240 (two hundred and forty) Calendar Days from the publication of such decision in the Official Gazette, unless such modification is expressly accepted by the Debtors and the Subject Creditor(s) holding more than half of the Subject Claims, in which case the Plan shall not be terminated;

(iv) the failure to obtain the Plan Confirmation Order prior to the 2nd (second) anniversary of the Signing Date;

(v) the breach of any materially relevant obligations assumed by the Debtors under this Plan up to the Judicial Confirmation Date, provided that such breach is not remedied within 90 (ninety) Calendar Days from the date of receipt of a notice sent by the Creditor(s) holding more than half of the Subject Claims stating such breach;

(vi) failure to file the Chapter 15 Proceedings in accordance with Section 10.6; or

(vii) the failure to issue the Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes (and, consequently, the Option C Payment Instruments – Notes) within 180 (one hundred and eighty) Calendar Days from the entry of the Chapter 15 Enforcement Order.

10.2.1. The Subject Creditor(s) holding more than half of the Subject Claims may, at their sole discretion, waive termination of the Plan upon the occurrence of any of the events set forth in the Section above, by means of written notice to the Debtors. Such waiver shall only be effective and the Plan shall not be terminated if the Debtors, within 15 (fifteen) Business Days from receipt of such notice, agree to such waiver.

10.2.2. For the avoidance of doubt, subject to the provisions of Section 10.2.2.1 below, any breach of obligations set forth in this Plan and/or in the Option A Payment Instrument – Notes and/or in the Option B Payment Instrument – Notes (and, consequently, in the Option C Payment Instruments – Notes) after the Judicial Confirmation Date shall not result in termination of this Plan, and in such event the Subject Creditors shall continue to hold credit rights as novated by this Plan, it being assured to them the right to adopt any judicial or extrajudicial measures they deem appropriate to ensure compliance with the obligations set forth in this Plan and/or in the Option A Payment Instrument – Notes and/or in the Option B Payment Instrument – Notes (and, consequently, in the Option C Payment Instruments – Notes). For the avoidance of doubt, this Section is not applicable to the events set forth in items "(ii)"and "(iii)" of Section 10.2 above.

10.2.2.1 For the avoidance of doubt, the provisions of Section 10.2.2 above shall not apply and, therefore, the Plan shall be terminated even after the Judicial Confirmation Date, as set forth in items "(vi)" e "(vii)" of Section 10.2 above, in the event the following obligations are defaulted: (i) the Chapter 15 Proceedings are not filed pursuant to Section 10.6 or (ii) the Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes (and, consequently, the Option C Payment Instruments – Notes) are not issued within the term set forth in item (vii) of Section 10.2 and in the manner set forth in this Plan, unless the rights set forth in Section 10.2.1 of this Plan are exercised.

10.3. After the filing of the Plan, the Debtors may, individually or jointly, with the prior written consent of the Subject Creditor(s) holding more than half of the Subject Claims, withdraw from the Extrajudicial Reorganization proceeding or from obtaining the Plan Confirmation Order, at their sole discretion, in which case the Subject Claims owed by the Debtor that exercises the prerogative set forth in this Section shall not be novated and shall remain in full force and effect under their respective originally agreed terms, including the Subject Claims held by the Signatory Creditor.

10.4. Collection of Subject Claims. In accordance with article 163, paragraphs 1 and 8, of the Brazilian Bankruptcy Act, as from the Filing Date and for as long as the Plan remains in force, the Subject Creditors shall not take any judicial or extrajudicial measures, in Brazil or abroad, against the Debtors seeking to enforce, collect, or receive the Subject Claims, whether under their original terms or under this Plan, including, without limitation, (i) filing or pursuing any judicial or arbitral action or proceeding of any kind related to any Subject Claim; (ii) enforcing any judgment, court decision, or arbitral award related to any Subject Claim; (iii) pledging, seizing, attaching, freezing, or otherwise rendering unavailable, in any manner or in any forum, domestic or foreign, any assets of the Debtors to satisfy their Subject Claims, as of the Filing Date, being obliged to cooperate with the release, lifting, and discharge of any liens or judicial restraints over the assets and property of the Debtors; (iv) seeking satisfaction of their Subject Claims by any other means; or (v) asserting any right of setoff against any credit owed to the Debtors with their Subject Claims.

10.5. Termination of Actions and Enforcements. Upon the Plan Confirmation Order, any and all enforcement proceedings, of any nature, or collection actions and similar proceedings related to any Subject Claim against the Debtors, in Brazil or abroad, shall be fully extinguished with respect to the Debtors, it being understood that any liens and attachments over the assets and rights of the Debtors shall be released, as well as any remaining judicially blocked amounts that may have been effected in such judicial proceedings.

10.6. Chapter 15. No later than 45 (forty-five) Calendar Days after the entry of the Plan Confirmation Order, or, at the Debtors' discretion, prior to the entry of the Plan Confirmation Order, the foreign representative(s) of the Debtors shall file the petition for the commencement of the Chapter 15 Proceedings.

10.7. Binding Effect of the Plan. The provisions of the Plan shall bind the Debtors and the Signatory Creditor as of the Signing Date, pursuant to article 165, second paragraph, of the Brazilian Bankruptcy Act, and the provisions of Section 10.2 above, and the Adhering Creditors as of the date on which they execute the Adhesion Term for Adhering Creditors, as well as their respective assignees and successors, and shall bind the Debtors and all Subject Creditors, as well as their respective assignees and successors, as of the Plan Confirmation Order.

10.8. Execution of Documents and Other Measures. The Debtors and the Subject Creditors shall perform all acts and execute all contracts and other documents that are necessary or appropriate to comply with the terms of this Plan.

10.9. Release. Subject to Section 10.2, on the Judicial Confirmation Date, there shall be the automatic, full, general, unrestricted, irrevocable, and irreversible release and discharge of the Debtors from all Subject Claims restructured under this Plan, without limitation, including all and any rights, obligations, actions, indemnifications, appeals, liabilities of any nature, interest, monetary adjustment, penalties, and fines, with the definitive cancellation of all contracts or documents underlying the Subject Claims, including the International Existing Notes, as well as any other agreements arising therefrom.

10.9.1. The release of all Subject Claims shall also occur, pursuant to the terms of this Plan and Plan 2, in relation to Inzag and Zagope, to the extent that the International Existing Notes guaranteed by them shall be definitively cancelled, and both shall be fully released from any and all obligations related to the Subject Claims and the Option A Claims, the Option B Claims and the Option C Claims as established under this Plan and Plan 2.

10.10. As a result of the release arising from the performance of the Plan described above, as of the Judicial Confirmation Date, the claims held by the Subject Creditors shall thereafter be governed exclusively by the terms and conditions set forth in the respective Payment Instruments and related security instruments, pursuant to this Plan.

10.11. Release. The payments made in the manner established in this Plan shall automatically and without any additional formality result in the granting, in favor of the Debtors, of full, clear, irrevocable, and irreversible release of the portion effectively paid of the Option A Claims, Option B Claims and Option C Claims, including with respect to any charges effectively paid, so that the Option A Creditors, Option B Creditors and Option C Creditors shall have no further claims against the Debtors in relation to the portions of their Option A Claims, Option B Claims and Option C Claims effectively paid, at any time, whether in or out of court.

10.12. Amendment of the Plan. Amendments, changes, modifications or waivers to the Plan, as well as to the rights and obligations set forth therein, may be proposed by the Debtors at any time, whether before or after the Plan Confirmation Order, provided that such amendments, changes or modifications are approved by Creditor(s) holding more than half of the Subject Claims, in accordance with the quorum set forth in article 163 of the Brazilian Bankruptcy Act.

10.12.1. Binding Effect of Plan Amendments. Any amendments, changes or modifications to the Plan shall be binding upon the Debtors and the Subject Creditors, as well as their respective assignees and successors, from the date of their approval in accordance with the Brazilian Bankruptcy Act, if they are approved in the manner set forth above.

## PART VI – COMMON PROVISIONS

### 11. GENERAL PROVISIONS

11.1. Schedules. All Schedules to this Plan are incorporated herein and constitute an integral part of this Plan. In the event of any inconsistency between this Plan and any Schedule, this Plan shall prevail, except as otherwise provided herein.

11.2. Deadline extension. Any deadline relating to the performance of any obligation set forth in this Plan shall be deemed extended to the immediately following Business Day if the relevant due date falls on a day that is not a Business Day, provided that, in the case of a pecuniary obligation, no additional amount shall accrue on the amounts payable.

11.3. Assignment and Transfer. Provided that this Plan has not been terminated, the Signatory Creditor may not assign its respective Subject Claims from the Signing Date until the Judicial Confirmation Date, except if: (i) the assignee is an affiliate of the Signatory Creditor, in which case the assigned claims shall be fully and automatically subject to the terms of this Plan; and (ii) in the event of an assignment of a Subject Claim to a Person that is not the Signatory Creditor or an affiliate of the Signatory Creditor, the respective assignee shall fully adhere, in writing, to the terms and conditions of this Plan, prior to the execution of the claim assignment agreement, by completing and delivering the adhesion term set forth in Schedule IV below to the Debtors and complying with the provisions of Section 4.4 above. For the avoidance of doubt, any claim assignments executed by the Signatory Creditor whose respective assignees refuse to adhere to the terms and conditions of this Plan shall be deemed null and void, in which case the original assignor shall continue to be deemed, for all intents and purposes, the legitimate holder of the assigned Subject Claim. The assignment of Subject Claims, after the Filing Date shall not alter their nature, classification, subjection or legal treatment, nor shall it validate rights or prerogatives not originally held by the assignor.

11.4. The payment terms of the Subject Claims novated pursuant to this Plan shall remain unchanged in the event of any assignments or transfers of the Subject Claims to third parties, for any reason whatsoever, including for the purposes of article 83 of the Brazilian Bankruptcy Act.

11.5. Subject Claims with Co-obligation of the Debtors and/or the Plan 2 Debtors. For purposes of the treatment and payment of the Subject Claims under this Plan and/or Plan 2, each Subject Creditor shall be deemed the holder of a single Subject Claim, regardless of the existence of a co-obligation by more than one of the Debtors and/or the Plan 2 Debtors. The financial outcome of the forms and means of payment for the Subject Creditor shall always be equivalent to that set forth in this Plan and in Plan 2 for the total amount of its Subject Claim and may not be increased due to the plurality of co-obligors or guarantees granted by different Debtors and/or Plan 2 Debtors.

11.5.1. The full or partial payment of Subject Claims with a co-obligation of one or more Debtors and/or Plan 2 Debtors shall be deemed, in the same proportion, as having been made by the other Debtors and/or Plan 2 Debtors.

11.5.2. In no event shall the Debtors and/or the Plan 2 Debtors be required to make payments exceeding the amount of the Subject Claim.

11.5.3. If the Subject Claim is paid by any of the Debtors and/or Debtors under the Plan 2, the other Debtors and/or Plan 2 Debtors shall be released, in the same proportion, from making the corresponding payments provided for in the Plan.

11.5.4. If, as a result of any co-obligation, any of the Debtors and/or the Plan 2 Debtors makes a payment that results in the Subject Creditor receiving amounts in violation of the provisions of this Section, such Subject Creditor shall immediately return to the Debtors and/or the Plan 2 Debtors, as applicable, the amounts and/or securities received in excess, including principal, interest, and any other charges accrue until the respective payment.

11.5.5. The Debtor and/or the Plan 2 Debtor that pays the principal obligation of another Debtor and/or Plan 2 Debtor, in accordance with the terms of this Plan and Plan 2, shall be subrogated to the legal position of the respective Subject Creditor, pursuant to articles 346 and 347 of the Brazilian Civil Code, and the credit constituted in its favor as a result of such subrogation shall be paid in accordance with this Plan and with the Plan 2, as applicable.

11.6. Subject Claims with Third-Party Co-Obligation. The Subject Claims owed by Third Parties shall observe the following terms and conditions:

11.6.1. Third party as Main Debtor. The obligations of Third Parties guaranteed by the Debtors shall remain valid, in force, enforceable, and effective in accordance with their respective terms and conditions agreed with such Third Party, whereas the corresponding guarantee obligations assumed by the Debtors shall be novated in accordance with the provisions of this Plan.

11.6.1.1. If the Subject Claims in which any Third Party acts as main debtor are paid by any Person other than the Debtors or the Plan 2 Debtors, the respective obligations of the Debtors, as restructured pursuant to the terms of this Plan, shall be amortized in an amount corresponding to such payment.

11.6.1.2. If the Debtors pay the Subject Claim, as restructured under this Plan, in which the Third Party is the debtor, such Debtors shall be subrogated to the legal positionof the respective Subject Creditor, pursuant to articles 346 et seq. of the Brazilian Civil Code, and may collect from the Third Party in accordance with the rights previously held by such Subject Creditor.

11.6.2. Third Party as Non-Main Debtor. The guarantee obligations provided by Third Parties in favor of Subject Claims owed primarily by the Debtors shall remain valid, in force, enforceable, and effective in accordance with their respective terms and conditions agreed with such Third Party, whereas the corresponding principal obligations of the Debtors shall be novated in accordance with the provisions of this Plan.

11.6.2.1. If any Third Party pays the Subject Claim for which the Debtors are the main debtors, such Third Party shall be subrogated to the legal position of the respective Subject Creditor, pursuant to articles 346 et seq. of the Brazilian Civil Code, becoming the holder of the respective Subject Claim as restructured under this Plan.

11.7. Maintenance of Collateral. Pursuant to article 163, fourth paragraph, of the Brazilian Bankruptcy Act, there shall be no release of any collateral over assets encumbered the Subject Creditors, which, if applicable, shall continue to secure the payment of the Subject Claims held by their respective holders as novated by this Plan and/or by Plan 2.

11.7.1. The Debtors and the Subject Creditors are hereby bound, and any security agents are hereby authorized, if applicable, to execute any and all documents necessary to implement the provisions of Section 11.7 above, including entering into any amendments to the existingsecurity agreements, in order to align them with the provisions of this Plan and its Schedules.

11.7.2. The Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes (and, consequently, the Option C Payment Instruments – Notes) shall be secured by the same assets encumbered to

the 2029 International Notes, observing the provisions set forth in the indentures to be entered into in a manner consistent with the Term Sheets attached as Schedule VI and Schedule VII.

11.8. Taxes. The Taxes shall be the responsibility of the respective Party that is the taxpayer or otherwise liable for the payment of such Tax, in accordance with applicable laws.

11.9. Tolerance. Any tolerance, partial exercise, or concession between the Parties shall always be deemed a mere act of leniency and shall not constitute a waiver or loss of any right, power, privilege, prerogative, or authority granted under this Plan, nor shall it imply novation, alteration, remission, modification, or reduction of the rights and obligations arising from this Plan.

11.10. Severability of the Plan Provisions. If any term or provision of the Plan is deemed invalid, null, or unenforceable, the remaining terms and provisions of the Plan shall remain valid and enforceable, provided that the assumptions underlying them are preserved.

11.11. Conflict. This Plan is executed in English and Portuguese versions. In the event of any conflict between the English and Portuguese versions, the Portuguese version shall prevail.

11.12. Enforceable instrument. This Plan, duly executed by all Parties and Intervening Parties, as well as the Plan Confirmation Order, constitute enforceable judicial instruments under applicable legislation, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, embodying valid, binding, enforceable, and executable obligations for the Debtors, the Intervening Parties, and the Subject Creditors, and may be enforced in their own terms and conditions against the Debtors, the Intervening Parties, and the Subject Creditors, as necessary and applicable, pursuant to articles 513 and 783 et seq. of the Brazilian Code of Civil Procedure.

11.13. Irrevocability and Irreversibility. This Plan is executed by the Parties on an irrevocable and irreversible basis, constituting a valid and binding instrument with respect to the Parties and their respective successors and assignees, for any purpose and effect.

11.14. Entire agreement. This Plan and its Schedules reflect and constitute, in a final, complete, and exclusive manner, all agreements existing among the Parties with respect to the Subject Claims and cancel, supersede, and replace any and all prior proposals, agreements, and understandings, whether oral or written, as well as any and all other communications exchanged among the Parties with respect to the Subject Claims, except as otherwise specified in this Plan.

11.15. Notices. All notices, requests, demands, and other communications to the Debtors, the Intervening Parties, or the representatives of the Signatory Creditor required or permitted under this Plan, to be effective, shall be made in writing and shall be deemed given when sent: (a) by registered mail with return receipt requested, or by courier; or (b) by e-mail when actually delivered, with the delivery receipt serving as proof of delivery and receipt of the message. Communications to the Debtors, the Intervening Parties, and the Signatory Creditor, as applicable, shall be sent to the addresses indicated below, unless a change has been duly communicated to the other Party. Communications addressed to the Adhering Creditors shall be sent to the address indicated in their respective Adhesion Terms.

Debtors and Intervening Parties:

A/C: Gustavo Braga Mercher Coutinho (gustavo.coutinho@agnet.com.br).

Address: Avenida do Contorno, No. 8,279, 3rd floor, Gutierrez, Belo Horizonte/MG, CEP 30110-059.

With a copy to:

Mattar – Sociedade de Advogados

A/C: Eduardo Augusto Mattar (eamattar@mattaradv.com.br);

Cesar Rizzo (crizzo@mattaradv.com.br);

Guilherme Bergamin de Barros (gbarros@mattaradv.com.br);

Victor Dias Vieira Clementino (vclementino@mattaradv.com.br);

Henrique Del VecchioRodrigues (hrodrigues@mattaradv.com.br);

Fernanda Oliveira Alencar (falencar@mattaradv.com.br); and

Ana Katarina Costa Marques (akmarques@mattaradv.com.br).

Address: Av. Pres. JK, nº 2041, Torre B, 5º andar, CEP 04543-011 São Paulo/SP.

Davis Polk & Wardwell LLP

A/C: Manuel Garciadiaz (manuel.garciadiaz@davispolk.com);

Timothy Graulich (timothy.graulich@davispolk.com); and

Joanna McDonald (joanna.mcdonald@davispolk.com).

Address: 450 Lexington Avenue, New York, New York, 10017, United States of America

Foreign and U.S. legal consultants.

Signatory Creditor:

A/C: Luiz Renan Toffanin da Silva (gestaosec.naofin@vert-capital.com).

Address: Rua Cardeal Arcoverde, nº 2.365, 11º Andar, Pinheiros, CEP 05407-020, São Paulo/SP.

**12. GOVERNING LAW AND JURISDICTION.**

12.1. Applicable Law. Except as otherwise provided in the Schedules to this Plan, the rights, duties, and obligations arising from this Plan shall be governed by, interpreted, and enforced in accordance with the laws in force in the Federative Republic of Brazil.

12.2. Jurisdiction. Except as otherwise provided in the Schedules to this Plan, all controversies or disputes arising out of or relating to this Plan, during the period in which the Extrajudicial Reorganization remains pending, shall be resolved by the Court of the Extrajudicial Reorganization until the termination of the Extrajudicial Reorganization. After the termination of the Extrajudicial Reorganization, the Parties elect the courts of the Judicial District of Belo Horizonte, State of Minas Gerais, as the competent forum to resolve all controversies or disputes arising out of or relating to this Plan, waiving any other forum or jurisdiction, no matter how privileged it may be.

And being in full agreement and duly bound, the Parties and the Intervening Parties execute this instrument, for the same purposes, binding themselves and their successors of any kind, for all legal intents and purposes, together with two witnesses.

Belo Horizonte/MG, May 18, 2026.

(Remainder of page intentionally left blank)

(Signatures follow on the next pages).

List of Schedules

Schedule I List of Subject Creditors, indicating the total amount of the Subject Claims owed by each Debtor, duly updated up to the Filing Date.

Schedule II List of the Subject Claims held by the Signatory Creditor against each Debtor, duly updated up to the Filing Date.

Schedule III Adhesion Creditor. Term for Signatory

Schedule IV Adhesion Creditor. Term for Adhering

Schedule V Certificate of Holder of International Existing Notes.

Schedule VI Indicative Term Sheet of the terms and conditions to be set forth in the indenture of the Option A Payment Instrument – Notes.

Schedule VII Indicative Term Sheet of the terms and conditions to be set forth in the indenture of the Option B Payment Instrument – Notes.

Schedule VIII Election Form for Subject Claims not arising from International Existing Notes.

(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.)

ANDRADE GUTIERREZ ENGENHARIA S.A.

[signature]

Name: Renato Torres de Faria

Title: Diretor/Officer

[signature]

Name: Marco Túlio Pinto

Title: Diretor/Officer

(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.)

ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A.

[signature]

Name: José Eduardo Kauark Leite

Title: Diretor/Officer

[signature]

Name: Cristiano Pimentel Cavalcanti Vieira

Title: Diretor/Officer

(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.)

ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A.

[signature]

Name: Renato Torres de Faria

Title: Diretor-Presidente/Chief Executive Officer

[signature]

Name: Gustavo Braga Mercher Coutinho

Title: Diretor

(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.)

As an intervening and consenting party:

ANDRADE GUTIERREZ INTERNATIONAL S.A.

[signature]

Name: Gustavo Braga Mercher Coutinho

Title: Diretor/Officer

[signature]

Nome/Name: Gustavo Benchimol

Title: Diretor/Officer

(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.)

As an intervening and consenting party:

ZAGOPE SGPS S.A.

[signature]

Name: Ricardo de Oliveira Lopes de Sá

Title: Conselheiro

[signature]

Name: Margarida Damião Fernandes F. Lobo

Title: Conselheiro

(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.)

As an intervening and consenting party:

INZAG GERMANY GMBH

[signature]

Name: Leandro Eugenio Fernandez Faria

Title: Diretor/Officer

[signature]

Nome/Name: FabianoNascimento Brandão

Title: Diretor/Officer

(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.)

As an intervening and consenting party:

ANDRADE GUTIERREZ S.A.

[signature]

Name: Renato Torres de Faria

Title: Diretor-Presidente/Chief Executive Officer

[signature]

Name: Maria Beatriz Lira Gomes Ferreira

Title: Diretora/Officer

(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.)

As an intervening and consenting party:

ANDRADE GUTIERREZ PARTICIPAÇÕES S.A.

[signature]

Name: Renato Torres de Faria

Title: Diretor-Presidente/Chief Executive Officer

[signature]

Name: Saulo Alves Pereira Júnior

Title: Diretor/Officer

(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.)

TESTEMUNHAS / WITNESSES

[signature]

Name: Lilian Cristina Pereira de Oliveira

Brazilian Tax Payer Register: 333.114.578-54

[signature]

Name: Barbara Carolina Pires Soares

Brazilian Tax Payer Register: 020.643.106-65

**Schedule I**

**List of Subject Creditors**

[Page left intentionally blank – Schedule I follows on the next page]

LIST OF LIABILITIES OF ANDRADE GUTIERREZ ENGENHARIA S.A.

POSITION AS OF MAY 18, 2026

| Debtor | Creditor | CNPJ/CPF | Classification/Nature | Address | Original Currency | Original Currency Amount | Amount (BRL)² | Origin | Maturity Structure |
|---|---|---|---|---|---|---|---|---|---|
| Andrade Gutierrez Engenharia S.A | Wilmington Savings Fund Society, FSB¹ | N/A | Unsecured | 500 Delaware Avenue, Wilmington, DE 19801 | USD | 65,464,463.81 | 331,603,694.98 | Bonds - 1.000% PIK Toggle Notes due 2040. | Bullet - December 2040 |
| Andrade Gutierrez Engenharia S.A | Wilmington Savings Fund Society, FSB¹ | N/A | Unsecured | 500 Delaware Avenue, Wilmington, DE 19801 | USD | 489,201,296.43 | 2,478,000,246.94 | Bonds - 9.000%/10.500% Senior Secured PIK Toggle Notes due 2029. | Bullet - December 2029 |
| Andrade Gutierrez Engenharia S.A | Vert Private Placements Companhia Securitizadora | 37.368.334/0001-22 | Unsecured | Rua Cardeal Arcoverde, No. 2,365, 11th Floor, Pinheiros, Zip Code | BRL | 180,212,726.51 | 180,212,726.51 | Final Enforcement of Judgment Ratifying Settlement No. 0029727-24.2025.8. | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 05.407-020, São Paulo - SP | | | | 26.0100. N/A | |
| Andrade Gutierrez Engenharia S.A | Vert Private Placements Companhia Securitizadora | 37.368.334/0001-22 | Unsecured | Rua Cardeal Arcoverde, No. 2365, 11th Floor, Pinheiros, Zip Code 05.407-020, São Paulo - SP | EUR | 13,452,000.00 | 79,232,280.00 | "Settlement Agreement," signed on November 29, 2019, as amended. N/A | |
| Andrade Gutierrez Engenharia S.A | Banco Bradesco S/A | 60.746.948/0001-12 | Unsecured | Cidade de Deus - Osasco - SP | BRL | 1,831,213.68 | 1,831,213.68 | CCB 237/2373/2700. Monthly amortization maturing in June 2026 | |
| Andrade Gutierrez Engenharia S.A | Ciranda 4 Energias Renováveis S/A | 37.427.693/0001-03 | Unsecured | Fazenda Boqueirão S/N, Rural Area, Zip Code 56950-000, São José do Belmonte - PE | BRL | 189,041,787.96 | 189,041,787.96 | Judgment enforcement proceeding No. 1029129-87.2024.8.26.0100. N/A | |
| Andrade Gutierrez Engen | Ciranda 5 Energias Renová | 37.427.699/0001-80 | Unsecured | Fazenda Mata do Juazeiro, S/N, Rural Area, | BRL | | | | N/A |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| haria S.A | veis S/A | | | Zip Code 56950-000, São José do Belmonte, PE | | | | | |
| Andrade Gutierrez Engenharia S.A | Ciranda 6 Energias Renováveis S/A | 37.427.691/0001-14 | Unsecured | Fazenda Boa Vista S/N, Rural Area, Zip Code 56950-000, São José do Belmonte - PE | BRL | | | | N/A |
| Andrade Gutierrez Engenharia S.A | Companhia do Metropolitano do Distrito Federal - Metrô DF | 38.070.074/0001-77 | Unsecured | Av. Jequitiba Lote, 155 - Águas Claras - Brasília - DF - Zip Code: 70.310-500 | BRL | 63,246,633.40 | 63,246,633.40 | Judgment enforcement proceeding no. 0003650-78.2013.8.07.0018. N/A | |
| Andrade Gutierrez Engenharia S.A | Companhia do Metropolitano de São Paulo - Metrô SP | 62.070.362/0001-06 | Unsecured | Rua Boa Vista, 175 – Block B – São Paulo - SP | BRL | 20,618,170.10 | 20,618,170.10 | Enforcement of extrajudicial title no. 1065425-94.2020.8.26.0053. N/A | |
| Andrade Gutierrez Engen | Conbec Consórcio Brasileiro de Engenh | 13.185.897/0001-17 | Unsecured | Rua Augusta, 2840, Suite 11, Cerquei | BRL | 2,489,360.22 | 2,489,360.22 | Judgment enforcement proceeding no. 1881207- | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| haria S.A | eiros Consultores | | | ra César, São Paulo/SP, Zip Code 014121-00 | | | | 76.2011.8. 13.0024. N/A | |
| Andra de Gutierrez Engenharia S.A | Vinccler, C.A. Venezolana de Inversiones y Costruciones Clerico, Compañia Anonima | N/A | Unsecured | Prolongación Av. La Salle, Edf. Fiorela, P.B Av. La Salle, Caracas 1050, Distrito Capital, Venezuela | USD | 1,000,000.00 | 5,065,400.00 | "Payment agreement," entered into on September 19, 2019. | Mar. and Sep. 2021, Mar. and Sep. 2022 |
| Andra de Gutierrez Engenharia S.A | Gerenpro, C.A. | N/A | Unsecured | 8050, Puerto Ordaz 8050, Bolívar, Venezuela | USD | 1,000,000.00 | 5,065,400.00 | "Payment agreement," entered into on September 2, 2019. | Mar. and Sep. 2021, Mar. and Sep. 2022 |
| Andra de Gutierrez Engenharia S.A | Dell Acqua, C.A. | N/A | Unsecured | Guayana City 8050, Bolívar, Venezuela | USD | 1,000,000.00 | 5,065,400.00 | "Payment agreement," entered into on September 2, 2019. | Mar. and Sep. 2021, Mar. and Sep. 2022 |
| Andra de Gutierrez Engenharia S.A | Empresa de construcción San Antonio, C.A. N/A | Unsecured | Avenida Principal, Ciudad Guayana 8050, Bolívar, Venezuela | USD | 1,000,000.00 | 5,065,400.00 | "Termination," entered into on September 30, 2019. | Nov. 19, Jan. 20, and Feb. 20 | |

**José Roberto Vensan Maramaldo**
Tradutor Público e Intérprete Comercial
Matriculado na Jucesp sob o no. 1092 no idioma inglês
Nomeado através da Portaria 68/2000 de 12/07/2000
R.G.: 17.384.458 - SSP SP
C.P.F.: 181224968-30
C.C.M.: 2.845.542-8
WOODS
BRETTON WOODS
Endereço: The Cittyplex Osasco, Avenida Domingos Odália Filho, 301, Sl R 2015, Osasco, SP, CEP 06010-067
Telefone para contato: (11) 98244-2636 com Robert Chanda, e-mail: chanda@bwoods.com.br

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Andrade Gutierrez Engenharia S.A | Dunfield Holdings Inc | N/A | Unsecured | 21757 Devonshire St, Ste 1A, Chatsworth, CA 91311, USA | USD | 5,056,599.61 | 25,613,699.66 | "Payment agreement," entered into on September 2, 2019. | Mar. 19, Oct. 19, Mar. 20, Oct. 20, and Mar. 2021 |
| Andrade Gutierrez Engenharia S.A | Bonsimat Desarrollos Globales, S.L. | N/A | Unsecured | Calle Miguel Angel 217 PLANTA. 28010, Madrid | USD | 1,343,552.22 | 6,805,629.42 | "Payment agreement," entered into on October 17, 2018. | Mar. 10 and Jul. 10, 2019; Mar. 10 and Jul. 10, 2020; Mar. 10 and Jul. 10, 2021; Mar. 10 and Jul. 10, 2022; and Mar. 10, 2023 |
| Andrade Gutierrez Engenharia S.A | José Barbosa Filho | 520.574.707-25 | Unsecured | Rua Dário Marques, LT02, QD 12-B - Jardim Metropólis - | BRL | 571,779.97 | 571,779.97 | Enforcement of judgment 0052509-37.1999.8.19.0001. N/A | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | São João de Meriti/ RJ | | | | |
| Andrade Gutierrez Engenharia S.A | Companhia de Saneamento Ambiental do Distrito Federal | 00.082.024/0001-37 | Unsecured | Av. Sibipiruna, 13/21 - Águas Claras - Brasília/ DF | BRL | 343,261.68 | 343,261.68 | Enforcement of judgment 0704095-32.2020.8.07.0011. N/A |
| Andrade Gutierrez Engenharia S.A | Eduardo Henrique da Silva | 130.629.167-45 | Unsecured | Rua Frei Pedro Sinzig, 488 - Honório Gurgel - Rio de Janeiro/ RJ - Zip Code 21511-310 | BRL | 30,705.66 | 30,705.66 | Enforcement of judgment 0001990-70.2018.8.19.0202. N/A |
| Andrade Gutierrez Engenharia S.A | Vallourec Soluções Tub do Brasil S/A | 08.689.024/0002-92 | Unsecured | DT INDUSTRIA S/N - DTO INDUSTRIAL - Jeceaba/ MG - Zip Code: 35.498-000 | BRL | 555,445.24 | 555,445.24 | Enforcement of extrajudicial title 5105225-72.2024.8.13.0024. N/A |
| Andrade Gutierrez Engenharia S.A | Vallum Engenharia Ltda - EPP | 13.344.259/0001-00 | Unsecured | Rua Detetive Moacir Alves Garcia, 86 - Santa Branca - Belo Horizonte/MG - | BRL | 424,383.96 | 424,383.96 | Enforcement of judgment 5118120-70.2021.8.13.0024. N/A |

Zip Code: 31.565-450

| | | |
|---|---|---|
| BRL | 459,365,468.38 | 459,365,468.38 |
| USD | 565,065,912.07 | 2,862,284,871.00 |
| EUR | 13,452,000.00 | 79,232,280.00 |
| TOTAL | | 3,400,882,619.38 |

[1] In the capacity of Trustee, acting as the representative agent for the holders of the Bonds.

[2] Reference exchange rates: BRL/USD = 5.0654 and BRL/EUR = 5.89 (PTAX rate of May 15, 2026, pursuant to Art. 163, § 3, I, of Law No. 11.101/2005).

LIST OF LIABILITIES OF ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A.

POSITION AS OF MAY 18, 2026

| Debtor | Creditor | Classification | CNPJ/CPF | Address | Original Currency | Original Currency Amount | Amount (BRL)[2] | Origin | Maturity Regime |
|---|---|---|---|---|---|---|---|---|---|
| Andrade Gutierrez Construções e Serviços S.A | Wilmington Savings Fund Society, FSB[1] | Unsecured | N/A | 500 Delaware Avenue, Wilmington, DE 19801 | USD | 489,201,296.43 | 2,478,000,246.94 | Bonds - 9.000%/10.500% Senior Secured PIK Toggle Notes due 2029. | Bullet - December 2029 |
| Andrade Gutierrez Construções e Serviços S.A | Ciranda 4 Energias Renováveis S/A | Unsecured | 37.427.693/0001-03 | Fazenda Boqueirão S/N, Rural Area, Zip Code 56950-000, São | BRL | 189,041,787.96 | 189,041,787.96 | Enforcement of judgment no. 1029129-87.2024.8.26.0100. N/A | |
| Andrade Gutierrez Construções e Serviços S.A | Ciranda 5 Energias Renováveis S/A | Unsecured | 37.427.699/0001-80 | Fazenda Mata do Juazeiro, S/N, Rural Area, Zip Code 56950-000, São José do Belmonte, PE | BRL | | | | |
| Andrade | Ciranda 6 | Unsecured | 37.427.691/0001-14 | Fazenda Boa | BRL | | | | |

| | | |
|---|---|---|
| Gutierrez Construções e Serviços S.A | Energias Renováveis S/A | Vista S/N, Rural Area, Zip Code 56950-000, São José do Belmonte - PE |

BRL 189,041,787.96 189,041,787.96

USD 489,201,296.43 2,478,000,246.94

TOTAL 2,667,042,034.90

[1] As Trustee, as representative agent of creditors holding Bonds.

[2] BRL/USD reference exchange rate = 5.0654 (PTAX of 05/15/2026, according to art. 163, § 3, I, of Law No. 11,101/2005).

SCHEDULE OF LIABILITIES OF ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A.

POSITION AS OF MAY 18, 2026

| Debtor | Creditor | CNPJ/CPF | Classification | Address | Original Currency | Original Currency Amount | Amount (BRL)[2] | Origin | Maturity Structure |
|---|---|---|---|---|---|---|---|---|---|
| Andrade Gutierrez Investimentos em Engenharia S.A | Wilmington Savings Fund Society, FSB[1] | N/A | Unsecured | 500 Delaware Avenue, Wilmington, DE 19801 | USD | 489,201,296.43 | 2,478,000,246.94 | Bonds - 9.000%/10.500% Senior Secured PIK Toggle Notes due 2029 | Bullet - December 2029 |

| | | |
|---|---|---|
| USD | 489,201,296.43 | 2,478,000,246.94 |
| TOTAL | 489,201,296.43 | 2,478,000,246.94 |

[1] In the capacity of Trustee, acting as the representative agent for the creditors holding the Bonds.

[2] Reference exchange rate BRL/USD = 5.0654 (PTAX rate of May 15, 2026, pursuant to Art. 163, § 3, I, of Law No. 11.101/2005).

**Schedule II**

**List of the Subject Claims held by the Signatory Creditor**

[Page left intentionally blank – Schedule II follows on the next page]

List of Claims Subject to the Plan Held by Signatory Creditors (Art. 163, § 6, III, LFRE) – List of ANDRADE GUTIERREZ ENGENHARIA S.A.,

POSITION AS OF 05/18/26

| Signatory Creditor | Origin of Claim | Original Currency | Total Value of Signatory Creditors' Claims - Principal + Interest | | % of Total Claims Subject to Proceedings |
|---|---|---|---|---|---|
| | | | Value in BRL1 | Value in original currency2 | |
| VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA | BOND - 1.000% PIK TOGGLE NOTES DUE 2040 | USD | 205,075,703 | 40,485,589 | 71.3% |
| | BOND - 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029 | USD | 1,961,400,915 | 387,215,406 | |
| | Final Enforcement of Judgment No. 0029727-24.2025.8.26.0100 | BRL | 180,212,727 | 180,212,727 | |
| | "Settlement Agreement," signed on November 29, 2019, as amended | EUR | 79,232,280 | 13,452,000 | |
| | Total | | 2.425.921.625 | | 71.3% |

1 Reference exchange rate BRL/USD = 5.0654 and BRL/EUR = 5.89 (PTAX rate of May 15, 2026, pursuant to Art. 163, § 3, I, of Law No. 11.101/2005).

2 Composition of claims held by the signatory creditor arising from: (i) Bond 1.000% PIK TOGGLE NOTES DUE 2040: US$ 40,328,755 in principal and US$ 156,834 in interest; and of the (ii) 9.000%/10.500% Senior Secured PIK Toggle Notes due 2029: US$ 327,219,332 in principal and US$ 59,996,074 in interest.

List of Claims Subject to the Plan Held by Signatory Creditors (Art. 163, § 6, III, LFRE) – List of ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A.,

POSITION AS OF 05/18/26

| Signatory Creditor | Origin of Claim | Original Currency | Total Value of Signatory Creditor's Claims - Principal + Interest | | % of Total Claims Subject to Restructuring |
|---|---|---|---|---|---|
| | | | Value in BRL1 | Value in original currency2 | |
| VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA | BOND - 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029 | USD | 1,961,400,915 | 387,215,406 | 73.5% |
| Total | | | 1,961,400,915 | 387,215,406 | 73.5% |

1 BRL/USD reference exchange rate = 5.0654 (PTAX rate of May 15, 2026, pursuant to Art. 163, § 3, I, of Law No. 11.101/2005).

2 Composition of claims held by the signatory creditor arising from the Bond 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029: US$ 327,219,332 in principal and US$ 59,996,074 in interest.

List of Claims Subject to the Plan Held by Signatory Creditors (Art. 163, § 6, III, LFRE) – List of ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A.,

POSITION AS OF 05/18/26

| Signatory Creditor | Origin of Claim | Original Currency | Total Value of Signatory Creditor's Claims - Principal + Interest | | % of Total Claims Subject to Proceedings |
|---|---|---|---|---|---|
| | | | Value in BRL1 | Value in original currency2 | |
| VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA | BOND - 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029 | USD | 1,961,400,915 | 387,215,406 | 79.2% |
| Total | | | 1,961,400,915 | 387,215,406 | 79.2% |

1 Reference exchange rate BRL/USD = 5.0654 (PTAX rate of May 15, 2026, pursuant to Art. 163, § 3, I, of Law No. 11.101/2005).

2 Composition of claims held by the signatory creditor arising from the Bond 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029: US$ 327,219,332 in principal and US$ 59,996,074 in interest.

**Schedule III**

**Adhesion Term for Signatory Creditor**

[Page left intentionally blank – Schedule II follows on the next page]

Docusign Envelope ID: 069D096B-A20C-83C7-835F-C505DA224169

**ADHESION TERM OF SIGNATORY CREDITOR**

São Paulo, May 18, 2026 À To

Andrade Gutierrez Engenharia S.A.

Andrade Gutierrez Construções e Serviços S.A.

Andrade Gutierrez Investimentos em Engenharia S.A.

With copy to:

Mattar – Sociedade de Advogados

A/C: Eduardo Augusto Mattar (eamattar@mattaradv.com.br)

Guilherme Bergamin de Barros (gbarros@mattaradv.com.br);

Cesar Rizzo (crizzo@mattaradv.com.br); Cesar Rizzo (crizzo@mattaradv.com.br);

Henrique Del Vecchio Rodrigues (hrodrigues@mattaradv.com.br);

Fernanda Oliveira Alencar (falencar@mattaradv.com.br); e

Ana Katarina Costa Marques (akmarques@mattaradv.com.br).

Creditor:

VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA, a corporation organized under Brazilian law, whose corporate purpose is to carry out securitization transactions, with its head office in the City of São Paulo, State of São Paulo, at Rua Cardeal Arcoverde, No. 2,365, 11th Floor, Pinheiros, ZIP Code 05407-020, enrolled with the Brazilian National Register of Legal Entities (CNPJ/MF) under No. 37.368.334/0001-22 ("Signatory Creditor").

Total amount of Subject Claims against AGE: R$ 2,425,921,625.00 (two billion, four hundred and twenty-five million, nine hundred and twenty-one thousand, six hundred and twenty-five reais)

Total amount of Subject Claims against AGCS: R$ 1,961,400,915.00 (one billion, nine hundred and sixty-one million, four hundred thousand, nine hundred and fifteen reais)

Total amount of Subject Claims against AGIE: R$ 1,961,400,915.00 (one billion, nine hundred and sixty-one million, four hundred thousand, nine hundred and fifteen reais)

The Signatory Creditor, identified above, in the capacity of holder of Subject Claims held against AGE, AGCS, and AGIE, by the amount indicated above, hereby represented by its authorized representative, by means of this Adhesion Term, expresses its adhesion to the extrajudicial reorganization plan subscribed by AGE, AGCS and AGIE, in the capacity as parties, and AGINT, Zagope, Inzag, AGPAR and AGSA, in the capacity as intervening parties (the "Plan"), pursuant to, and for all purposes of, Articles 161 et. seq. of Law N° 11. 101, dated as of February 9, 2005, as amended ("LRF"), serving this Term of Adhesion as its acceptance of the terms and conditions of the Plan.

The Signatory Creditor represents that (i) it has received copy of the Plan, its exhbits and all documents attached thereto; (ii) it is aware of and unreservedly agrees to all sections and conditions set forth in the Plan, its exhbits and all documents attached thereto; (iii) this Adhesion Term was signed by a signatory duly authorized and with powers to perform such act, pursuant to the attached documents; and (iv) it is holder of Subject Claims against AGE, AGCS and AGIE, pursuant to the attached documents.

This Adhesion Term is executed on an irrevocable and irreversible basis, pursuant to article 161, paragraph 5, of LRF, subject to the provisions of the Plan.

The terms initiated in capital letters not defined hereto have the meaning ascribed to them in the Plan.

In case of conflict between the Portuguese and English version of this Adhesion Term, the Portuguese version will prevail.

(Remainder of page intentionally left blank)

(Signatures page of the Adhesion Term of Signatory Creditor – Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., AG Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.).

VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA

[digital signature]

Name: Luiz Renan Toffanin

Title: Director

**Schedule IV**

**ADHESION TERM FOR ADHERING CREDITOR**

[Place], [date]

To

Andrade Gutierrez Engenharia S.A.

Andrade Gutierrez Construções e Serviços S.A.

Andrade Gutierrez Investimentos em Engenharia S.A.

With copy to:

Mattar – Sociedade de Advogados

A/C: Eduardo Augusto Mattar (eamattar@mattaradv.com.br)

Guilherme Bergamin de Barros (gbarros@mattaradv.com.br);

Cesar Rizzo (crizzo@mattaradv.com.br);

Henrique Del VecchioRodrigues (hrodrigues@mattaradv.com.br);

Fernanda Oliveira Alencar (falencar@mattaradv.com.br); e

Ana Katarina Costa Marques (akmarques@mattaradv.com.br).

Creditor:

[nome], [state of incorporation]; [address]

(“Adehring Creditor”).

Total amount of Subject Claims against AGE: R$ [=] (=)

Total amount of Subject Claims against AGCS: R$ [=] (=)

Total amount of Subject Claims against AGIE: R$ [=] (=)

The Adhering Creditor, identified above, in the capacity of holder of Subject Claims held against AGE, AGCS, and AGIE, by the amount indicated above, hereby represented by its authorized representative, by means of this Adhesion Term, expresses its adhesion to the extrajudicial reorganization plan subscribed by AGE, AGCS and AGIE, in the capacity as parties, and AGINT, Zagope, Inzag, AGPAR and AGSA, in the capacity as intervening parties (the "Plan"), pursuant to, and for all purposes of, Articles 161 et. seq. of Law Nº 11. 101, dated as of February 9, 2005, as amended ("LRF"), serving this Term of Adhesion as its acceptance of the terms and conditions of the Plan.

The Adhering Creditor represents that (i) it has received copy of the Plan, its exhbits and all documents attached thereto; (ii) it is aware of and unreservedly agrees to all sections and conditions set forth in the Plan, its exhbits and all documents attached thereto; (iii) this Adhesion Term was signed by a signatory duly authorized and with powers to perform such act, pursuant to the attached documents; and (iv) it is holder of Subject Claims against AGE, AGCS and AGIE, pursuant to the attached documents.

This Adhesion Term is executed on an irrevocable and irreversible basis, pursuant to article 161, paragraph 5, of LRF, subject to the provisions of the Plan.

The terms initiated in capital letters not defined hereto have the meaning ascribed to them in the Plan.

In case of conflict between the Portuguese and English version of this Adhesion Term, the Portuguese version will prevail.

(Remainder of page intentionally left blank)

(Signatures page of the Adhesion Term for Adhering Creditor – Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.).

[CREDOR ADERENTE]

Name:

Title:

**Schedule V**

**CERTIFICATE OF HOLDER OF INTERNATIONAL NOTES**

The undersigned hereby represents and warrants, as applicable, that it is (i.a) the holder/beneficial owner of debt securities described below or (i.b) the manager, agent, broker, or advisor for the holder indicated below, which holds the debt securities described below, in accordance with the attached screenshot(s) or broker(s)/custodian(s) certificate(s)/declaration(s), indicating the proof of ownership of said securities, and (ii) duly authorized to deliver this Certificate.

Name of Manager, Agent, Broker or Advisor: [complete if applicable; do not complete if the Certificate is directly signed by the holder/beneficial owner]

Address: [complete if applicable]

E-mail: [complete if applicable]

Name of the Creditor / Beneficial Owner: [complete]

Address: [complete ]

E-mail: [complete]

Total Principal Amount held by Creditor arising from the “9.000%/10.500% Senior Secured PIK Toggle Notes due 2029”, issued by Andrade Gutierrez International S.A. and guaranteed by Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A., Andrade Gutierrez Investimentos em Engenharia S.A., Zagope SGPS, S.A. and Inzag Germany Gmbh, due on 2029 (“2029 Notes”):

US$[complete if applicable]

Name of the custodian(s) of the 2029 Notes held by Creditor: [complete if applicable]

Total Principal Amount held by Creditor arising from the “1.000% PIK Toggle Notes due 2040”, issued by Andrade Gutierrez International S.A. and guaranteed by Andrade Gutierrez Engenharia S.A., due on 2040 (“2040 Notes”):

US$[complete if applicable]

Name of the custodian(s) of the 2040 Notes held by Creditor: [complete if applicable]

Name of Certificate’s signatory: [complete]

Title of Certificate’s signatory: [complete if applicable]

Signature of the Certificate's signatory:

Date: [complete]

## SCHEDULE VI

## OPTION A PAYMENT INSTRUMENT - NOTES TERMS AND CONDITIONS

The capitalized terms used in this schedule that are not expressly defined herein shall be interpreted in accordance with the respective definitions set forth in the Plan.

This schedule is executed in Portuguese and English versions, and, in the event of any conflict, discrepancy, inconsistency or question of interpretation between such versions, the Portuguese version shall prevail for all purposes.

In the event of any conflict, discrepancy, inconsistency or question of interpretation between any provision of this schedule and any provision of the Plan, the provisions of the Plan shall prevail for all purposes.

Issuer Option A Payment Instrument - Notes will be issued by AGINT.

Instrument Option A Payment Instrument - Notes, denominated in Dollar, shall be issued under certain indenture governed by the Laws of the State of New York, United States of America, which shall reflect the terms and conditions set forth in this Schedule VI, as well as in this Plan and Plan 2.

Guarantees Option A Payment Instrument - Notes will be guaranteed by AGE, AGIE, AGCS, AGPAR and AGSA, governed by the Laws of the State of New York, United States of America, and in accordance with the provisions of the Plan.

Collateral Option A Payment Instrument - Notes will be secured by a fiduciary lien, governed by Brazilian law, on the shares issued by AGE and a first lien pledge, governed by German law, on the shares issued by Inzag.

Total Issuance Amount The total issuance amount of the Option A Payment Instrument - Notes shall correspond to (i) thirty-six percent (36%) of the value of the Subject Claims held by the Option A Creditors that comply with Section 5.5.2 of the Plan and Section 5.2.1. of the Plan 2, as well as other applicable provisions, plus applicable interest pursuant to Section 5.4, item "(ii)" of the Plan and Section 5.4, item "(ii)" of the Plan 2 accruing from the Confirmation Date until the issuance date of the Option A Payment Instrument - Notes; in addition to (ii) thirty-one percent (31%) of the value of Subject Claims held by Option C Creditors that comply with Section 7.5.2 of the Plan and Section 7.5.1 of Plan 2, as well as other applicable provisions, plus applicable interest pursuant to Section 7.4.1, item "(ii)" of the Plan and Section 7.4.1, item "(ii)" of the Plan 2 accruing from the Confirmation Date until the issuance date of the Option A Payment Instrument - Notes. For the avoidance of doubt, (a) the amount of Option A Claims to be received by each Option A Creditor, pursuant to this Plan and, as applicable, pursuant to Plan 2, shall be subject to Sections 11.5 et. seq. of the Plan and Plan 2, meaning that, under no circumstances, the respective Option A Creditor shall receive in duplication the amount of its Option A Claim; and (b) the amount of Option C – Tranche A Claims to be received by each Option C Creditor, pursuant to this Plan and the Plan 2, shall

be subject to Sections 11.5 et. seq. of the Plan and Plan 2, meaning that, under no circumstances, the respective Option C Creditor shall receive in duplication the amount of its Option C – Tranche A Claim.

Currency Option A Payment Instrument - Notes will be issued in USD.

Maturity Date Option A Payment Instrument - Notes shall mature on December 28, 2040.

Adjustment and Interest

- Option A Payment Instrument - Notes will not be subject to adjustment for inflation.

- Interest shall accrue on the Option A Payment Instrument - Notes at a rate of six percent (6.00%) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the issuance date of the Option A Payment Instrument - Notes until December 28, 2040.

Interest Payment Date

(a) from the issuance date of the Option A Payment Instrument - Notes until immediately prior to December 28, 2030, the interest accrued during such period shall be capitalized into the principal amount; and

(b) from December 28, 2030 until December 28, 2040, the interest accrued during such period shall be payable in cash on a semiannual basis, on June 28 and December 28 of each year, with the first interest payment date being June 28, 2031.

Amortization The principal amount of the Option A Payment Instrument - Notes, including the interest accrued and capitalized into the principal amount, shall be amortized, in cash, in six annual installments to be paid on December 28, 2035, December 28, 2036, December 28, 2037, December 28, 2038, December 28, 2039, and December 28, 2040, in amounts corresponding to 16.667%, 20%, 25%, 33.333%, 50% and 100% of the principal outstanding balance on each respective payment date.

Securities held by the Issuer, Guarantors or Affiliates The issuer may cancel, partially or in full, at any time and at its sole discretion, the Option A Payment Instrument – Notes held by the issuer, guarantor or any entity controlling, controlled by, or under common control with any issuer and/or guarantor.

Governing Law Option A Payment Instrument - Notes will be governed by the Laws of the State of New York, United States of America.

Distribution and Clearing Issuer will use commercially reasonable efforts to make the Option A Payment Instrument - Notes eligible for deposit on the DTC system from the issue date.

Amendments The Option A Payment Instrument - Notes may be amended with the consent of holders holding the majority of the outstanding aggregate principal amount of the Option A Payment Instrument – Notes and Option B Payment Instrument – Notes (determined on an aggregate basis only). For illustrative purposes, the following matters will be decided through consent of holders holding the majority of the outstanding aggregate principal amount of the Option A Payment Instrument – Notes and Option B Payment Instrument – Notes (determined on an aggregate basis):

- Removal of covenants and events of default;

- Change provisions that would affect the holders' rights in connection with the guarantees and collateral granted to the Option A Payment Instrument – Notes, including to release or extinguish any of these guarantees and collateral

Consent of holders holding 2/3 of the outstanding aggregate principal amount of the Option A Payment Instrument – Notes and Option B Payment Instrument – Notes (determined on an aggregate basis only), shall be required to:

- Change any principal or interest payment date;
- Reduce the interest rate;
- Change the place of payment;
- Change provisions of the indenture affecting the ranking of the Option A Payment Instrument – Notes; and
- Change the required quorum to approve the matters listed above.

The replacement of the trustee of the Option A Payment Instrument – Notes shall require consent of the issuer and guarantors of the Option A Payment Instrument – Notes.

Covenants

- Obligation of the issuer and guarantors to pay, duly and on a timely basis, principal and interest on the Option A Payment Instrument - Notes, according to the Plan, Plan 2 and respective indenture;
- Obligation to preserve corporate existence, subject to eventual exceptions authorized by applicable law and indenture of the Option A Payment Instrument – Notes, including, but not limited to, the possibility of replacing the issuer or conducting corporate reorganizations involving the issuer and guarantors;
- Obligation to appoint a trustee and eventually replace it pursuant to the provisions of the indenture of the Option A Payment Instrument – Notes;
- Obligation to maintain the ranking of the Option A Payment Instrument - Notes, including with respect to all of the issuer's and guarantors' existing and future obligations;
- Obligation to maintain the validity and effectiveness of the indenture of the Option A Payment Instrument - Notes and the guarantees and collateral, subject to eventual exceptions provided for in the Plan, Plan 2 and indenture of the Option A Payment Instrument – Notes;
- Obligation of the issuer and guarantors to comply with laws; and
- Obligation of the issuer and guarantors to maintain accounting and administrative records.

Events of Default

- Failure to pay principal or interest following the expiration of a 60-Calendar Day deadline counted from the date on which the corresponding obligation to pay principal or interest becomes due and payable; being understood that holders holding the majority of the outstanding aggregate principal amount of the Option A Payment Instrument – Notes and Option B Payment Instrument – Notes (determined on an aggregate basis only), may grant cure period of 180 Calendar Days, that may be extended; and

• Default in the performance, or breach, of the indenture covenants, as long as a such default or breach is not cured for a period of 60 consecutive Calendar Days after written notice specifying such default or breach is given to the issuer and

guarantors by the trustee or by holders holding at least the majority of the outstanding aggregate principal amount of the Option A Payment Instrument – Notes and Option B Payment Instrument – Notes (determined on an aggregate basis only).

The Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes may be issued under the same indenture pursuant to supplement indentures and would be referred to as Series A Notes and Series B Notes, respectively.

## SCHEDULE VII

## OPTION B PAYMENT INSTRUMENT - NOTES TERMS AND CONDITIONS

The capitalized terms used in this schedule that are not expressly defined herein shall be interpreted in accordance with the respective definitions set forth in the Plan.

This schedule is executed in Portuguese and English versions, and, in the event of any conflict, discrepancy, inconsistency or question of interpretation between such versions, the Portuguese version shall prevail for all purposes.

In the event of any conflict, discrepancy, inconsistency or question of interpretation between any provision of this schedule and any provision of the Plan, the provisions of the Plan shall prevail for all purposes.

Issuer Option B Payment Instrument - Notes will be issued by AGINT.

Instrument Option B Payment Instrument - Notes, denominated in Dollar, shall be issued under certain indenture governed by the Laws of the State of New York, United States of America, which shall reflect the terms and conditions set forth in this Schedule VII, as well as in this Plan and Plan 2.

Guarantees Option B Payment Instrument - Notes will be guaranteed by AGE, AGIE, AGCS, AGPAR and AGSA, governed by the Laws of the State of New York, United States of America, and in accordance with the provisions of the Plan.

Collateral Option B Payment Instrument - Notes will be secured by a fiduciary lien, governed by Brazilian law, and granted on a conditional basis, over the shares issued by AGE and a second lien pledge, governed by German law, on the shares issued by Inzag.

Total Issuance Amount The total issuance amount of the Option B Payment Instrument - Notes shall correspond to (i) one hundred percent (100%) of the value of the Subject Claims held by the Option B Creditors that comply with Section 6.5.1 of the Plan and Section 6.5.2 of the Plan and Section 6.5.1 of the Plan 2, as well as other applicable provisions, plus the interest applicable pursuant to Section 6.4, item "(ii)" of the Plan and Section 6.4, item "(ii)" of the Plan 2 accruing from the Confirmation Date until the issuance date of the Option B Payment Instrument - Notes; in addition to (ii) sixty-nine percent (69%) of the value of Subject Claims held by Option C Creditors that comply with Section 7.5.2 of the Plan and Section 7.5.1 of the Plan 2, as well as other applicable provisions, plus the interest applicable pursuant to Section 7.4.2, item "(ii)" of the Plan and Section 7.4.2, item "(ii)" of the Plan 2 accruing from the Confirmation Date until the issuance date of the Option B Payment Instrument - Notes. For the avoidance of doubt, (a) the amount of Option B Claims to be received by each Option B Creditor, pursuant to this Plan and, as applicable, pursuant to the Plan 2, shall be subject to Sections 11.5 et. seq. of the Plan and the Plan 2, meaning that, under no circumstances, the respective Option B Creditor shall receive in duplication the amount of its Option B Claim; and (b) the amount of Option C – Tranche B Claims to be received by each

Option C Creditor, pursuant to this Plan and, as applicable, pursuant to the Plan 2, shall be subject to Sections 11.5 et. seq. of the Plan, meaning that, under no circumstances, the respective Option C Creditor shall receive in duplication the amount of its Option C – Tranche B Claim.

Currency Option B Payment Instrument - Notes will be issued in USD.

Maturity Date Option B Payment Instrument - Notes shall mature on December 28, 2070.

Adjustment and Interest

- Option B Payment Instrument - Notes will not be subject to adjustment for inflation.
- Interest shall accrue on the Option B Payment Instrument - Notes at a rate of one percent (1.00%) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the issuance date of the Option B Payment Instrument - Notes until December 28, 2070.

Interest Payment Date The interest of the Option B Payment Instrument - Notes shall be capitalized into the principal and paid in a single installment on December 28, 2070.

Amortization The principal amount on the Option B Payment Instrument – Notes, including the interest accrued and capitalized into the principal, shall be amortized in a single installment on December 28, 2070.

Early Redemption With Discount The Option B Payment Instrument - Notes may, as of January 1st, 2035 and until June 28, 2070, at the sole discretion of the issuer and guarantors, be redeemed in advance, partially or in full, with the application of a discount equivalent to 90% of the value of the Option B Payment Instrument – Notes that is being redeemed, as duly adjusted until the maturity date of the Option B Payment Instrument - Notes. For the avoidance of doubt, upon payment of an amount equivalent to 10% of the Option B Payment Instrument – Notes that is being redeemed, as duly adjusted until the maturity date of the Option B Payment Instrument - Notes, the Option B Payment Instrument - Notes held by the respective Option B Creditors and/or Option C Creditors shall be deemed fully settled and discharged for all legal purposes.

Securities held by the Issuer, Guarantors or Affiliates The issuer may cancel, partially or in full, at any time and at its sole discretion, the Option B Payment Instrument – Notes held by the issuer, guarantor or any entity controlling, controlled by, or under common control with any issuer and/or guarantor.

Governing Law Option B Payment Instrument - Notes will be governed by the Laws of the State of New York, United States of America.

Distribution and Clearing Issuer will use commercially reasonable efforts to make the Option B Payment Instrument - Notes eligible for deposit on the DTC system from the issue date.

Amendments The Option B Payment Instrument - Notes may be amended with the consent of holders holding the majority of the outstanding aggregate principal amount of the Option B Payment Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis only). For illustrative purposes, the following matters will be decided through consent of holders holding the majority of the outstanding aggregate principal amount of the Option B Payment Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis):

- Removal of covenants and events of default;
- Change provisions that would affect the holders' rights in connection with the guarantees and collateral granted to the Option B Payment Instrument – Notes, including to release or extinguish any of these guarantees and collateral

Consent of holders holding 2/3 of the outstanding aggregate principal amount of the Option B Payment Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis only), shall be required to:

- Change any principal or interest payment date;
- Reduce the interest rate;
- Change the place of payment;
- Change provisions of the indenture affecting the ranking of the Option B Payment Instrument – Notes; and
- Change the required quorum to approve the matters listed above.

The replacement of the trustee of the Option B Payment Instrument – Notes shall require consent of the issuer and guarantors of the Option B Payment Instrument – Notes.

Covenants

- Obligation of the issuer and guarantors to pay, duly and on a timely basis, principal and interest on the Option B Payment Instrument - Notes, according to the Plan, Plan 2 and respective indenture;
- Obligation to preserve corporate existence, subject to eventual exceptions authorized by applicable law and indenture of the Option B Payment Instrument – Notes, including, but not limited to, the possibility of replacing the issuer or conducting corporate reorganizations involving the issuer and guarantors;
- Obligation to appoint a trustee and eventually replace it pursuant to the provisions of the indenture of the Option B Payment Instrument – Notes;
- Obligation to maintain the ranking of the Option B Payment Instrument - Notes, including with respect to all of the issuer's and guarantors' existing and future obligations;
- Obligation to maintain the validity and effectiveness of the indenture of the Option B Payment Instrument - Notes and the guarantees and collateral, subject to eventual exceptions provided for in the Plan, Plan 2 and indenture of the Option B Payment Instrument – Notes;
- Obligation of the issuer and guarantors to comply with laws; and
- Obligation of the issuer and guarantors to maintain accounting and administrative records.

Events of Default

- Failure to pay principal or interest following the expiration of a 60-Calendar Day deadline counted from the date on which the corresponding obligation to pay principal or interest becomes due and payable; being understood that holders holding the majority of the outstanding aggregate principal amount of the Option B Payment

Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis only), may grant cure period of 180 Calendar Days, that may be extended; and

- Default in the performance, or breach, of the indenture covenants, as long as a such default or breach is not cured for a period of 60 consecutive Calendar Days after written notice specifying such default or breach is given to the issuer and guarantors by the trustee or by holders holding at least the majority of the outstanding aggregate principal amount of the Option B Payment Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis only).

The Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes may be issued under the same indenture pursuant to supplement indentures and would be referred to as Series A Notes and Series B Notes, respectively.

**SCHEDULE VIII**

**PAYMENT OPTION ELECTION FORM**

[Location], [Date]

To

Andrade Gutierrez Engenharia S.A.

Andrade Gutierrez Construções e Serviços S.A.

Andrade Gutierrez Investimentos em Engenharia S.A.

With a copy to:

Mattar – Sociedade de Advogados

Attn: Eduardo Augusto Mattar (eamattar@mattaradv.com.br);

Guilherme Bergamin de Barros (gbarros@mattaradv.com.br);

Cesar Rizzo (crizzo@mattaradv.com.br);

Henrique Del Vecchio Rodrigues (hrodrigues@mattaradv.com.br);

Fernanda Oliveira Alencar (falencar@mattaradv.com.br); and

Ana Katarina Costa Marques (akmarques@mattaradv.com.br).

**Re.: Election of Payment Option for Subject Creditors (Non-Holders of International Notes)**

Dear Sirs,

[**Name of Subject Creditor**], [full details of Subject Creditor] ("Subject Creditor"), pursuant to the out-of-court reorganization plan executed by Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A., and Andrade Gutierrez Investimentos em Engenharia S.A., as parties, and Andrade Gutierrez S.A., Andrade Gutierrez Participações S.A., Andrade Gutierrez International S.A., Zagope SGPS, S.A., and Inzag Germany GmbH, as consenting intervening parties (the "Plan"), hereby elects, by means of this Election Form, the Payment Option indicated below:

**Payment Option Election – Subject Creditors Who Are Not Holders of Existing International Notes**

( ) Option A

( ) Option B

( ) Option C

Note: Select only one Payment Option for the entirety of the Subject Claim.

The Subject Creditor states that payments arising from the Payment Option selected above shall be made to the following bank account:

Bank: [provide details]

Branch: [provide details]

Checking Account: [provide details]

CNPJ/CPF: [provide details]

The Subject Creditor submits, together with this Election Form, documents evidencing the authority of the signatory of this Election Form, as provided for in the Plan.

Sincerely,

[**SUBJECT CREDITOR**]

Name:

Position:

Name:

Position:

This is what was to be translated on the original document, according to my best understanding, which amounted to 68 electronic page equivalents which I have reviewed, found true and correct, and sign below:

Emoluments: R$ 1560.94
Receipt Book No.:02 Receipt No.:3764
São Paulo, August 18, 2026

JOSE ROBERTO VENSAN MARAMALDO:18122496830
Digitally signed by JOSE ROBERTO VENSAN MARAMALDO:18122496830
Date: 2026.08.27 16:05:21 -03'00'

José Roberto Vensan Maramaldo

| | |
|---|---|
| **PLANO DE RECUPERAÇÃO EXTRAJUDICIAL** | **EXTRAJUDICIAL REORGANIZATION PLAN** |
| apresentado por | presented by |
| **Andrade Gutierrez Engenharia S.A.** | **Andrade Gutierrez Engenharia S.A.** |
| **Andrade Gutierrez Construções e Serviços S.A.** | **Andrade Gutierrez Construções e Serviços S.A.** |
| **Andrade Gutierrez Investimentos em Engenharia S.A.** | **Andrade Gutierrez Investimentos em Engenharia S.A.** |
| tendo como intervenientes anuentes, | as intervening parties, |
| **Andrade Gutierrez International S.A.** | **Andrade Gutierrez International S.A.** |
| **Zagope SGPS, S.A.** | **Zagope SGPS, S.A.** |
| **Inzag Germany GmbH** | **Inzag Germany GmbH** |
| **Andrade Gutierrez S.A.** | **Andrade Gutierrez S.A.** |
| **Andrade Gutierrez Participações S.A.** | **Andrade Gutierrez Participações S.A.** |
| e com a adesão e aprovação do | and with the adhesion and approval of the |
| **Credor Signatário** | **Signatory Creditor** |
| *(conforme definidos a seguir)* | *(as defined below)* |
| **18 de maio de 2026** | **May 18, 2026** |

| **PLANO DE RECUPERAÇÃO EXTRAJUDICIAL** | **EXTRAJUDICIAL REORGANIZATION PLAN** |
|---|---|
| Este Plano, datado de 18 de maio de 2026, é apresentado para homologação judicial, em conjunto, por: | This Plan, dated May 18, 2026, is submitted for judicial confirmation, jointly, by: |
| **(I) ANDRADE GUTIERREZ ENGENHARIA S.A.,** sociedade anônima de capital fechado, constituída e organizada segundo as leis da República Federativa do Brasil, inscrita no CNPJ/MF sob o n.º 17.262.213/0001-94, com sede na Avenida do Contorno, n.º 8.123, Cidade Jardim, Belo Horizonte/MG, CEP 30.110-937 ("AGE"); | **(I) ANDRADE GUTIERREZ ENGENHARIA S.A.**, a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 17.262.213/0001-94, with its headquarters at Avenida do Contorno, No. 8,123, Cidade Jardim, Belo Horizonte/MG, CEP 30.110-937 ("AGE"); |
| **(II) ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A.** (anteriormente denominada AG Construções e Serviços S.A.)**,** sociedade anônima de capital fechado, constituída e organizada segundo as leis da República Federativa do Brasil, inscrita no CNPJ/MF sob o n.º 39.469.291/0001-05, com sede na Avenida do Contorno, n.º 8.269, Sala 300 A1, Gutierrez, Belo Horizonte/MG, CEP 30.110-059 ("AGCS"); e | **(II) ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A.** (formerly known as AG Construções e Serviços S.A.)**,** a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 39.469.291/0001-05, with headquarters at Avenida do Contorno, No. 8.269, Room 300 A1, Gutierrez, Belo Horizonte/MG, CEP 30.110-059 ("AGCS"); and |
| **(III) ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A.**, sociedade anônima de capital fechado, constituída e organizada segundo as leis da República Federativa do Brasil, inscrita no CNPJ/MF sob o n.º 17.027.611/0001-26, com sede na Avenida do Contorno, n.º 8.269, Sala 004, Gutierrez, Belo | **(III) ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A.**, a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 17.027.611/0001-26, headquartered at Avenida do Contorno, No. 8.269, Sala 004, |

| | | |
|---|---|---|
| Horizonte/MG, CEP 30.110-059 ("AGIE" e, em conjunto com AGE e AGCS, "Requerentes"). | | Gutierrez, Belo Horizonte/MG, CEP 30.110-059 ("AGIE" and, together with AGE and AGCS, "Debtors"). |
| E conta com as assinaturas, como intervenientes anuentes, de: | | And it is signed, as consenting intervening parties, by: |
| **(IV) ANDRADE GUTIERREZ INTERNATIONAL S.A.**, sociedade anônima de capital fechado, constituída e organizada de acordo com as leis do Grão-Ducado de Luxemburgo, inscrita no Registro de Comércio de Luxemburgo sob o n.º B 176492, com endereço em Boulevard Grande-Duchese Charlotte, 65, L1331, Luxemburgo ("AGINT"); | | **(IV) ANDRADE GUTIERREZ INTERNATIONAL S.A.**, a privately held company, incorporated and organized in accordance with the laws of the Grand Duchy of Luxembourg, registered with the Luxembourg Trade Register under No. B 176492, with address at 65, Boulevard Grande-Duchese Charlotte, L1331, Luxembourg ("AGINT"); |
| **(V) ZAGOPE SGPS S.A.**, sociedade anônima de capital fechado, constituída e organizada segundo as leis da República Portuguesa, registrada sob o NIF n.º 507403177, com sede no Lagoas Park, edifício 6, piso 1, 2740-244, Porto Salvo, Oeiras, Portugal ("Zagope"); | | **(V) ZAGOPE SGPS S.A.**, a privately held company, incorporated and organized under the laws of the Portuguese Republic, registered under NIF No. 507403177, with headquarters at Lagoas Park, building 6, 1st floor, 2740-244, Porto Salvo, Oeiras, Portugal ("Zagope"); |
| **(VI) INZAG GERMANY GMBH**, sociedade limitada, constituída e organizada segundo as leis da República Federal da Alemanha, com sede em Taunusstraße 5, 65183, Wiesbaden, Alemanha ("Inzag"); | | **(VI) INZAG GERMANY GMBH**, a limited liability company, incorporated and organized under the laws of the Federal Republic of Germany, with headquarters at Taunusstraße 5, 65183, Wiesbaden, Germany ("Inzag"); |

| | | |
|---|---|---|
| **(VII) ANDRADE GUTIERREZ S.A.**, sociedade anônima de capital fechado, constituída e organizada segundo as leis da República Federativa do Brasil, inscrita no CNPJ/MF sob o n.° 17.262.213/0001-94, com sede na Avenida do Contorno, nº 8123, Cidade Jardim, Belo Horizonte/MG, CEP 30110-937 ("AGSA"); e | | **(VII) ANDRADE GUTIERREZ S.A.**, a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 17.262.213/0001-94, with headquarters at Avenida do Contorno, No. 8123, Cidade Jardim, Belo Horizonte/MG, CEP 30110-937 ("AGSA"); and |
| **(VIII) ANDRADE GUTIERREZ PARTICIPAÇÕES S.A.**, sociedade anônima de capital fechado, constituída e organizada segundo as leis da República Federativa do Brasil, inscrita no CNPJ/MF sob o n.° 04.031.960/0001-70, com sede na Avenida do Contorno, nº 8123, Cidade Jardim, Belo Horizonte/MG, CEP 30110-937("AGPAR" e, em conjunto com AGINT, Zagope, Inzag e AGSA, as "Intervenientes Anuentes"). | | **(VIII) ANDRADE GUTIERREZ PARTICIPAÇÕES S.A** a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 04.031.960/0001-70, with headquarters at Avenida do Contorno, No. 8123, Cidade Jardim, Belo Horizonte/MG, CEP 30110-937 ("AGPAR" and, together with AGINT, Zagope, Inzag and AGSA, the "Intervening Parties"). |
| **Considerando que**: | | **Whereas**: |
| **(i)** as Requerentes integram o ramo do grupo Andrade Gutierrez que atua nos setores de engenharia e construção civil, que vem prestando serviços para clientes públicos e privados há quase 80 anos; | | **(i)** the Debtors are part of the branch of the Andrade Gutierrez group that operates in the engineering and civil construction sectors, providing services to public and private clients for almost 80 years; |
| **(ii)** dada a natureza dos segmentos de sua atuação, as Requerentes captaram vultosos recursos financeiros, inclusive no mercado de capitais internacional, com o propósito de viabilizar a manutenção e expansão de suas atividades; | | **(ii)** given the nature of their business segments, the Debtors raised substantial financial resources, including in the international capital markets, to enable the maintenance and expansion of their activities; |

| | |
|---|---|
| **(iii)** em razão de certas adversidades macroeconômicas, as Requerentes, a AGINT e a Zagope apresentaram, em 29 de setembro de 2022, o pedido de homologação de plano de recuperação extrajudicial ("PRE 2022"), que tramitou sob o n.º 5209787-06.2022.8.13.0024, perante a 1ª Vara Empresarial da Comarca de Belo Horizonte/MG ("Recuperação Extrajudicial 2022"), para reestruturar parcela relevante de seu passivo financeiro, no valor de R$2.358.784.316,04 (dois bilhões trezentos e cinquenta e oito milhões setecentos e oitenta e quatro mil trezentos e dezesseis reais e quatro centavos), decorrente das denominadas ***(a)*** "11.000% Senior Secured PIK Toggle Notes due 2021", emitidas em 20 de agosto de 2018 ("Notas Internacionais 2021"), e ***(b)*** "9.500% Senior Secured Notes due 2024", emitidas em 9 dezembro de 2019 ("Notas Internacionais 2024"); | **(iii)** due to certain macroeconomic adversities, the Debtors, AGINT, and Zagope filed, on September 29, 2022, the request for judicial confirmation of an extrajudicial reorganization plan ("2022 Plan"), which was processed under No. 5209787-06.2022.8.13.0024 before the 1st Business Court of the District of Belo Horizonte/MG (*1ª Vara Empresarial da Comarca de Belo Horizonte/MG*) ("2022 Extrajudicial Reorganization"), to restructure a relevant portion of their financial indebtedness, in the amount of R$2,358,784,316.04 (two billion, three hundred and fifty-eight million, seven hundred and eighty-four thousand, three hundred and sixteen reais and four centavos), arising from the so-called ***(a)*** "11.000% Senior Secured PIK Toggle Notes due 2021", issued on August 20, 2018 ("2021 International Notes"), and ***(b)*** "9.500% Senior Secured Notes due 2024", issued on December 9, 2019 ("2024 International Notes"); |
| **(iv)** em 29 de novembro de 2022, o PRE 2022 foi homologado por meio de sentença disponibilizada no Diário do Judiciário Eletrônico do Tribunal de Justiça de Minas Gerais, tendo sido posteriormente objeto de decisão proferida em 2 de dezembro de 2022 pelo juízo do Distrito Sul de Nova Iorque, da Corte de Insolvência dos Estados Unidos da América, concedendo plenos efeitos ao PRE 2022 na jurisdição dos Estados Unidos da América, o que resultou no cancelamento e na substituição das Notas Internacionais 2021 e Notas Internacionais 2024 pelas ***(a)*** "*9.000%/10.500% Senior Secured PIK Toggle Notes due 2029*", emitidas nos termos da escritura de emissão datada | **(iv)** on November 29, 2022, the 2022 Plan was confirmed by means of a court order made available in the Electronic Gazette of the Court of Justice of the State of Minas Gerais, having been subsequently the subject of a decision rendered on December 2, 2022 by the United States Bankruptcy Court for the Southern District of New York, granting full effect to the 2022 Plan within the jurisdiction of the United States of America, which resulted in the cancellation and replacement of the 2021 International Notes and the 2024 International Notes by ***(a)*** "9.000%/10.500% Senior Secured PIK Toggle Notes due 2029", issued pursuant to the indenture dated December |

| | |
|---|---|
| de 21 de dezembro de 2022 e aditada em 24 de agosto de 2023, celebrada entre a AGINT, na qualidade de emissora e devedora principal, a AGE, AGIE, AGCS, Zagope e Inzag, na qualidade de garantidoras, o Wilmington Savings Fund Society, FSB ("Wilmington"), na qualidade de trustee, e TMF Brasil Administração e Gestão de Ativos Ltda. ("TMF"), na qualidade de agente de garantia local ("Notas Internacionais 2029"), e ***(b)*** "*1.000% PIK Toggle Notes due 2040*", emitidas nos termos da escritura de emissão datada de 21 de dezembro de 2022 celebrada entre a AGINT, na qualidade de emissora e devedora principal, a AGE na qualidade de garantidora, o Wilmington, na qualidade de trustee, e TMF, na qualidade de agente de garantia local ("Notas Internacionais 2040" e, em conjunto com as Notas Internacionais 2029, as "Notas Internacionais Existentes"); | 21, 2022, and amended on August 24, 2023, entered into among AGINT, as issuer and principal debtor, AGE, AGIE, AGCS, Zagope and Inzag, as guarantors, Wilmington Savings Fund Society, FSB ("Wilmington"), as trustee, and TMF Brasil Administração e Gestão de Ativos Ltda. ("TMF"), as local collateral agent ("2029 International Notes"), and ***(b)*** "1.000% PIK Toggle Notes due 2040", issued pursuant to the indenture dated December 21, 2022 entered into among AGINT, as issuer and principal debtor, AGE as guarantor, Wilmington, as trustee, and TMF, as local collateral agent ("2040 International Notes" and, together with the 2029 International Notes, the "International Existing Notes"); |
| **(v)** apesar de a Recuperação Extrajudicial 2022 ter sido um passo importante na readequação da estrutura de capital do grupo Andrade Gutierrez, sobrevieram, desde então, novos obstáculos, consistentes, a título exemplificativo, na ***(a)*** paralisação e postergação de obras relevantes, por fatores alheios ao grupo Andrade Gutierrez, abrangendo aproximadamente 47% da carteira de projetos, na data-base de dezembro de 2024, o que impactou de forma substancial o fluxo de caixa das Requerentes, da Inzag e da Zagope ao longo dos últimos anos; ***(b)*** forte valorização acumulada do dólar dos Estados Unidos da América ao longo de 2024, que elevou expressivamente o custo das dívidas em moeda estrangeira, resultando no inadimplemento, em dezembro de 2024, da parcela de juros das Notas Internacionais 2029, em um | **(v)** despite the 2022 Extrajudicial Reorganization having been an important step in reprofiling the Andrade Gutierrez group's capital structure, new hindrances have since arisen, consisting, by way of example, of the ***(a)*** the suspension and postponement of relevant projects due to factors beyond the Andrade Gutierrez group's control, affecting approximately 47% of its project portfolio, as of the December/24 reference date, which has substantially impacted the cash flow of the Debtors, Inzag, and Zagope over the past years; ***(b)*** the substantive appreciation of the U.S. dollar throughout 2024, which significantly increased the cost of foreign currency indebtedness, resulting in the default, in December 2024, of the interest installment under the 2029 International Notes, in a context of an exchange |

| | | |
|---|---|---|
| contexto de câmbio superior a R$6,00 por US$1,00; e ***(c)*** aumento acentuado da taxa Selic, que se manteve, em média, em 4,00 pontos percentuais acima das projeções do Boletim Focus para os anos de 2023, 2024 e 2025, gerando elevação relevante do custo das dívidas em moeda local, inclusive daquelas assumidas perante autoridades governamentais, cujas despesas financeiras excedem R$ 203.000.000,00 (duzentos e três milhões de reais) e representam um saldo total de mais de R$ 1,9 bilhão, o que levou as Requerentes a acumularem prejuízos relevantes entre 2022 e 2025; | | rates exceeding R$6.00 per dollar; and ***(c)*** a steep increase in the Selic rate, which remained, on average, 4.00 percentage points above the projections of the Boletim Focus for the years 2023, 2024 and 2025, leading to a substantial rise in the cost of local currency debt, including those assumed with governmental authorities, whose financial expenses exceed R$ 203,000,000.00 (two hundred and three million reais) and represent a total balance of more than R$ 1.9 billion, which led the Debtors to accumulate significant losses between 2022 and 2025; |
| **(vi)** em razão desse cenário macro e microeconômico desafiador, as Requerentes foram levadas a inadimplir certas dívidas relevantes, tanto denominadas em moeda estrangeira, como as Notas Internacionais 2029, no valor agregado de R$ 2.478.000.246,94 (dois bilhões quatrocentos e setenta e oito milhões duzentos e quarenta e seis reais e noventa e quatro centavos), conforme apurado na Data do Pedido, devidas pelas Requerentes e AGINT, Zagope e Inzag, quanto outras dívidas denominadas em moeda local, algumas delas, inclusive, já objeto de execuções ajuizadas contra algumas das Requerentes, em valores relevantes; | | **(vi)** due to this challenging macroeconomic and microeconomic environment, the Debtors were led to default certain obligations, having defaulted on material debts, both those denominated in foreign currency, such as the 2029 International Notes, in the aggregate amount of R$ 2,478,000,246.94 (two billion four hundred and seventy-eight million two hundred and forty-six reais and ninety-four centavos), as determined on the Filing Date, owed by the Debtors together with AGINT, Zagope, and Inzag, as well as other debts denominated in local currency, some of which have already been subject to enforcement proceedings filed against certain Debtors, in significant amounts; |
| **(vii)** nesse contexto, as Requerentes ajuízam a presente Recuperação Extrajudicial e apresentam este Plano com o objetivo de reestruturar os créditos quirografários devidos pelas Requerentes, conforme definidos neste Plano e indicados no **Anexo I**, permitindo a readequação da sua | | **(vii)** in this context, the Debtors file the present Extrajudicial Reorganization and submit this Plan with the purpose of restructuring the unsecured claims owed by the Debtors, as defined in this Plan and set forth in **Schedule I**, thereby enabling the readjustment of their capital structure in order to |

| | |
|---|---|
| estrutura de capital, de modo a otimizar e impulsionar o desenvolvimento de suas atividades operacionais; | optimize and foster the development of their operational activities; |
| **(viii)** as Requerentes ajuízam a presente Recuperação Extrajudicial em litisconsórcio ativo, nos termos do artigo 113, I e III do CPC (conforme definido abaixo) e 189 da LRF (conforme definido abaixo), bem como em consolidação processual, nos termos dos artigos 69-G a 69-I da LRF, tendo este Plano único apresentado pelas Requerentes sido aprovado pelo quórum mínimo de aprovação exigido pelo artigo 163 da LRF, apurado de forma individual em relação aos credores de cada uma das Requerentes, nos termos do artigo 69-I, §§2º e 3º da LRF, de modo a impositivamente vincular todos os Créditos Sujeitos (conforme definidos abaixo) aos termos e condições deste Plano; | **(viii)** the Debtors file the present Extrajudicial Reorganization in active joinder, pursuant to article 113, I and III of the Brazilian Code of Civil Procedure (as defined below) and 189 of the Brazilian Bankruptcy Act (as defined below) as well as under procedural consolidation, pursuant to articles 69-G to 69-I of the Brazilian Bankruptcy Act, with this single Plan submitted by the Debtors having been approved by the minimum approval quorum required under article 163 of the Brazilian Bankruptcy Act, calculated individually in relation to the creditors of each of the Debtors, pursuant to article 69-I, second and third paragraphs, of the Brazilian Bankruptcy Act, so as to mandatorily bind all Subject Claims (as defined below) to the terms and conditions of this Plan; |
| **(ix)** as Requerentes e AGINT, Zagope e Inzag (em conjunto, as "<u>Requerentes do Plano 2</u>"), apesar de serem sociedades independentes, com personalidades jurídicas, direitos e obrigações próprias, e terem autonomia patrimonial e comercial para conduzir suas atividades, são integrantes de um mesmo grupo econômico e parcialmente coobrigadas, conforme aplicável, por certas dívidas a serem reestruturadas no âmbito desta Recuperação Extrajudicial; | **(ix)** the Debtors and AGINT, Zagope and Inzag (jointly, the "<u>Plan 2 Debtors</u>"), although being independent companies, with separate legal personalities, rights and obligations of their own, and having financial and commercial autonomy to conduct their activities, are part of the same economic group and are partially co-obligated, as applicable, for certain debts to be restructured within the scope of this Extrajudicial Reorganization; |

| | |
|---|---|
| **(x)** paralelamente ao Plano apresentado pelas Requerentes, as Requerentes do Plano 2, em litisconsórcio ativo e consolidação processual com as Requerentes, apresentaram plano de recuperação extrajudicial próprio, para reestruturar, tão somente, as Notas Internacionais Existentes ("Plano 2"), conforme aplicável, considerando as suas respectivas dívidas, motivo pelo qual ajuízam esta Recuperação Extrajudicial em conjunto, com o objetivo de viabilizar a implementação de uma solução estruturada e coordenada para os seus respectivos endividamentos. | **(x)** in parallel with the Plan submitted by the Debtors, the Plan 2 Debtors, in active joinder and procedural consolidation with the Debtors, have submitted their own extrajudicial reorganization plan, solely to restructure the International Existing Notes ("Plan 2"), as applicable, considering their respective indebtedness, and therefore file this Extrajudicial Reorganization jointly, with the purpose of enabling the implementation of a structured and coordinated solution for their respective indebtedness. |
| As Requerentes, observados os termos e condições adiante expostos, submetem o presente Plano à homologação judicial, com o consentimento e adesão do **CREDOR SIGNATÁRIO**, titular de ***(i)*** 71,3% dos Créditos Sujeitos devidos pela AGE; ***(ii)*** 73,5% dos Créditos Sujeitos devidos pela AGCS; e ***(iii)*** 79,2% dos Créditos Sujeitos devidos pela AGIE, conforme indicado no **Anexo II,** para que produza efeitos com relação às Requerentes, à AGINT, AGPAR, AGSA, Inzag e Zagope, conforme aplicável, e aos Credores Sujeitos na forma da lei. | The Debtors, subject to the terms and conditions set forth below, hereby submit this Plan for judicial confirmation, with the consent and adherence of the **SIGNATORY CREDITOR**, holder of ***(i)*** 71.3% of the Subject Claims owed by AGE; ***(ii)*** 73.5% of the Subject Claims owed by AGCS; and ***(iii)*** 79.2% of the Subject Claims owed by AGIE, as indicated in **Schedule II**, so that it may produce effects with respect to the Debtors, AGINT, AGPAR, AGSA, Inzag and Zagope, as applicable, and the Subject Creditors in accordance with the law. |
| **PARTE I – INTERPRETAÇÃO E DEFINIÇÕES** | **PART I - INTERPRETATION AND DEFINITIONS** |
| **1. DEFINIÇÕES** | **1. DEFINITIONS** |

| | |
|---|---|
| **1.1.** Definições. Os termos definidos referenciados neste Plano, iniciados por letra maiúscula e listados abaixo, serão usados, conforme apropriado, na sua forma singular ou plural, no gênero masculino ou feminino, sem que, com isso, percam o significado que lhes é atribuído. | **1.1.** Definitions. The defined terms referenced in this Plan, capitalized and listed below, shall be used, as applicable, in their singular or plural form, and in the masculine or feminine gender, without thereby altering the meaning assigned to them. |
| **1.1.1.** "AGCS": tem o significado atribuído no Preâmbulo deste Plano. | **1.1.1.** "AGCS": has the meaning assigned in the Preamble of this Plan. |
| **1.1.2.** "AGE": tem o significado atribuído no Preâmbulo deste Plano. | **1.1.2.** "AGE": has the meaning assigned in the Preamble of this Plan. |
| **1.1.3.** "AGIE": tem o significado atribuído no Preâmbulo deste Plano. | **1.1.3.** "AGIE": has the meaning assigned in the Preamble of this Plan. |
| **1.1.4.** "AGINT": tem o significado atribuído no Preâmbulo deste Plano. | **1.1.4.** "AGINT": has the meaning assigned in the Preamble of this Plan. |
| **1.1.5.** "AGPAR": tem o significado atribuído no Preâmbulo deste Plano. | **1.1.5.** "AGPAR": has the meaning assigned in the Preamble of this Plan. |
| **1.1.6.** "AGSA": tem o significado atribuído no Preâmbulo deste Plano. | **1.1.6.** "AGSA": has the meaning assigned in the Preamble of this Plan. |
| **1.1.7.** "Anexos": significa os anexos deste Plano. | **1.1.7.** "Schedules": means the schedules to this Plan. |
| **1.1.8.** "Cláusula": significa cada um dos itens identificados por algarismos cardinais neste Plano. | **1.1.8.** "Section": means each of the items identified by cardinal numbers in this Plan. |

| | | |
|---|---|---|
| **1.1.9.** "CNPJ/MF": significa o número de identificação no Cadastro Nacional da Pessoa Jurídica do Ministério da Fazenda do Brasil. | | **1.1.9.** "CNPJ/MF": means the identification number in the National Register of Legal Entities maintained by the Ministry of Finance of Brazil. |
| **1.1.10.** "Código Civil": significa a Lei nº 10.406, de 10 de janeiro de 2002, conforme alterada. | | **1.1.10.** "Civil Code": means Law No. 10,406, of January 10, 2002, as amended. |
| **1.1.11.** "CPC": significa a Lei nº 13.105, de 16 de março de 2015, conforme alterada. | | **1.1.11.** "CPC": means Law No. 13,105, of March 16, 2015, as amended. |
| **1.1.12.** "Crédito Opção A": tem o significado definido na Cláusula 5.4 deste Plano. | | **1.1.12.** "Option A Claim": has the meaning assigned in Section 5.4 of this Plan. |
| **1.1.13.** "Crédito Opção B": tem o significado definido na Cláusula 6.4 deste Plano. | | **1.1.13.** "Option B Claim": has the meaning assigned in Section 6.4 of this Plan. |
| **1.1.14.** "Crédito Opção C": significa o Crédito Opção C – Tranche A e o Crédito Opção C – Tranche B, em conjunto. | | **1.1.14.** "Option C Claim": means the Option C Claim – Tranche A and the Option C Claim – Tranche B, jointly. |
| **1.1.15.** "Crédito Opção C – Tranche A": tem o significado definido na Cláusula 7.4. | | **1.1.15.** "Option C Claim – Tranche A": has the meaning set forth in Section 7.4. |
| **1.1.16.** "Crédito Opção C – Tranche B": tem o significado definido na Cláusula 7.4. | | **1.1.16.** "Option C Claim – Tranche B": has the meaning set forth in Section 7.4. |

| | |
|---|---|
| **1.1.17.** "<u>Créditos Sujeitos</u>": significa, nos termos do art. 163, § 1º, da LRF, os créditos contra cada uma das Requerentes que sejam, cumulativamente, ***(i)*** circunscritos à espécie quirografária definida no artigo 83, VI, "a)" e "b)" da LRF, ***(ii)*** devidos a Pessoas que não sejam fornecedores ativos de bens ou serviços às Requerentes e ***(iii)*** materializados, líquidos, certos (inclusive objeto de cumprimento definitivo de sentença), vencidos ou vincendos, principais ou acessórios, incluindo (sem limitação) o valor principal, juros remuneratórios, juros de mora e quaisquer outros encargos, bem como o saldo de tais créditos não coberto pelas respectivas garantias reais e/ou fiduciárias, conforme apurados na Data do Pedido e devidamente listados no **Anexo I** deste Plano. | **1.1.17. "**<u>Subject Claims</u>**"**: means, pursuant to article 163, first paragraph, of the Brazilian Bankruptcy Act, the claims against each of the Debtors that are, cumulatively, ***(i)*** encompassed within the unsecured category defined in article 83, VI, "a)" and "b)" of the Brazilian Bankruptcy Act, ***(ii)*** owed to individuals or legal entities that are not active suppliers of goods or services to the Debtors, and ***(iii)*** materialized, liquid, and certain (including those subject to final court enforcement), whether due or to become due, whether principal or ancillary, including (without limitation) principal amount, accrued interest, default interest, and any other charges, as well as the portion of such claims not covered by the respective collateral and/or fiduciary liens, as determined on the Filing Date and duly listed in **Schedule I** to this Plan. |
| **1.1.18.** "<u>Credor Aderente</u>": significa o Credor Sujeito que, embora não tenha assinado este Plano na Data de Celebração, venha a anuir voluntariamente aos seus termos após a Data do Pedido e antes da Sentença de Homologação do Plano, na forma da Cláusula 4.4 deste Plano. | **1.1.18.** "<u>Adhering Creditor</u>": means the Subject Creditor that, although not having signed this Plan on the Signing Date, voluntarily agrees to its terms after the Filing Date and prior to the Plan Confirmation Order, pursuant to Section 4.4 of this Plan. |
| **1.1.19.** "<u>Credor Opção A</u>": tem o significado atribuído na Cláusula 5.1 deste Plano. | **1.1.19.** "<u>Option A Creditor</u>": has the meaning assigned in Section 5.1 of this Plan. |
| **1.1.20.** "<u>Credor Opção B</u>": tem o significado atribuído na Cláusula 6.1 deste Plano. | **1.1.20.** "<u>Option B Creditor</u>": has the meaning assigned in Section 6.1 of this Plan. |
| **1.1.21.** "<u>Credor Opção C</u>": tem o significado atribuído na Cláusula 7.1 deste Plano. | **1.1.21.** "<u>Option C Creditor</u>": has the meaning assigned in Section 7.1 of this Plan. |

| | |
|---|---|
| **1.1.22.** "Credor Signatário": significa o Credor Sujeito relacionado no **Anexo II**, que assinou, na Data de Celebração, o Termo de Adesão constante do **Anexo III**, por meio do qual aderiu ao presente Plano. | **1.1.22.** "Signatory Creditor": means the Subject Creditor listed in **Schedule II**, who signed the Adhesion Term for Signatory Creditor set forth in **Schedule III**, through which it adhered to this Plan. |
| **1.1.23.** "Credor Sujeito": significa todo e qualquer credor titular de Crédito Sujeito. | **1.1.23.** "Subject Creditor": means any creditor holding a Subject Claim. |
| **1.1.24.** "Data de Celebração": significa a data de assinatura deste Plano | **1.1.24.** "Signing Date": means the date of execution of this Plan. |
| **1.1.25.** "Data da Homologação": é a data da publicação no Diário Oficial da Sentença de Homologação do Plano. | **1.1.25.** "Judicial Confirmation Date": means the date of publication in the Official Gazette of the Plan Confirmation Order. |
| **1.1.26.** "Data de Início do Período de Eleição": tem o significado atribuído na Cláusula 8.2 deste Plano. | **1.1.26.** "Election Period Commencement Date": has the meaning assigned in Section 8.2 of this Plan. |
| **1.1.27.** "Data do Pedido": significa a data em que o pedido de Recuperação Extrajudicial foi ajuizado pelas Requerentes. | **1.1.27.** "Filing Date": means the date on which the request for Extrajudicial Reorganization was filed by the Debtors. |
| **1.1.28.** "Decisão *Chapter 15*": tem o significado atribuído na Cláusula 3.5 deste Plano. | **1.1.28.** "Chapter 15 Decision": has the meaning assigned in Section 3.5 of this Plan. |
| **1.1.29.** "Decisão de Implementação *Chapter 15*": tem o significado atribuído na Cláusula 3.5 deste Plano. | **1.1.29.** "Chapter 15 Enforcement Order": has the meaning assigned in Section 3.5 of this Plan. |

| | | |
|---|---|---|
| **1.1.30.** "Decisão de Reconhecimento *Chapter 15*": tem o significado atribuído na Cláusula 3.5 deste Plano. | | **1.1.30.** "Chapter 15 Recognition Order": has the meaning assigned in Section 3.5 of this Plan. |
| **1.1.31.** "Diário Oficial": significa o Diário da Justiça Eletrônico Nacional (DJEN), Diário Judiciário Eletrônico do Tribunal de Justiça do Estado de Minas Gerais (DJE/TJMG), ou qualquer outro diário oficial aplicável na data de publicação da Sentença de Homologação do Plano. | | **1.1.31.** "Official Gazette": means the National Electronic Judicial Gazette (DJEN), the Electronic Judicial Gazette of the Court of Justice of the State of Minas Gerais (DJE/TJMG), or any other applicable official gazette on the date of publication of the Plan Confirmation Order. |
| **1.1.32.** "Dia Corrido": significa todo e qualquer dia do calendário, sendo certo que, caso um prazo contado em dias corridos se encerre em dia que não seja Dia Útil, ele será considerado automaticamente prorrogado para o Dia Útil subsequente. | | **1.1.32.** "Calendar Day": means any day of the calendar, it being understood that if a term counted in calendar days expires on a day that is not a Business Day, it shall be automatically extended to the following Business Day. |
| **1.1.33.** "Dia Útil": qualquer dia que não seja sábado, domingo ou qualquer outro dia em que as instituições bancárias no Estado de Minas Gerais ou na cidade de Belo Horizonte não funcionem ou estejam autorizadas a não funcionar. | | **1.1.33.** "Business Day": means any day other than a Saturday, Sunday, or any other day on which banking institutions in the State of Minas Gerais or in the city of Belo Horizonte are not open for business or are authorized to remain closed. |
| **1.1.34.** "Dólar" ou "US$": significa dólares dos Estados Unidos da América. | | **1.1.34.** "Dollar" or "US$": means United States dollars. |
| **1.1.35.** "DTC": significa o *Depository Trust Company*. | | **1.1.35.** "DTC": means The Depository Trust Company. |
| **1.1.36.** "Eleição da Opção de Pagamento": tem o significado definido na Cláusula 8.1 deste Plano. | | **1.1.36.** "Payment Option Election": has the meaning assigned in Section 8.1 of this Plan. |

| | |
|---|---|
| **1.1.37.** "Instrumentos de Pagamento": significa, em conjunto, os Instrumentos de Pagamento da Opção A, os Instrumentos de Pagamento da Opção B e os Instrumentos de Pagamento da Opção C, conforme definido abaixo. | **1.1.37.** "Payment Instruments": means, jointly, the Option A Payment Instruments, the Option B Payment Instruments and the Option C Payment Instruments, as defined below. |
| **1.1.38.** "Instrumentos de Pagamento da Opção A": significa o Instrumento de Pagamento da Opção A – Plano e o Instrumento de Pagamento da Opção A – *Notes*. | **1.1.38.** "Option A Payment Instruments": means the Option A Payment Instrument – Plan and the Option A Payment Instrument – Notes. |
| **1.1.39.** "Instrumento de Pagamento da Opção A – Plano": tem o significado definido na Cláusula 5.5.1 deste Plano. | **1.1.39.** "Option A Payment Instrument – Plan": has the meaning assigned in Section 5.5.1 of this Plan. |
| **1.1.40.** "Instrumento de Pagamento da Opção A – *Notes*": tem o significado definido na Cláusula 5.5.2 deste Plano. | **1.1.40.** "Option A Payment Instrument – Notes": has the meaning assigned in Section 5.5.2 of this Plan. |
| **1.1.41.** "Instrumentos de Pagamento da Opção B": significa o Instrumento de Pagamento da Opção B – Plano e o Instrumento de Pagamento da Opção B – *Notes*. | **1.1.41.** "Option B Payment Instruments": means the Option B Payment Instrument – Plan and the Option B Payment Instrument – Notes. |
| **1.1.42.** "Instrumento de Pagamento da Opção B – Plano": tem o significado definido na Cláusula 6.5.1 deste Plano. | **1.1.42.** "Option B Payment Instrument – Plan": has the meaning assigned in Section 6.5.1 of this Plan. |
| **1.1.43.** "Instrumento de Pagamento da Opção B – *Notes*": tem o significado definido na Cláusula 6.5.2 deste Plano. | **1.1.43.** "Option B Payment Instrument – Notes": has the meaning assigned in Section 6.5.2 of this Plan. |

| | |
|---|---|
| **1.1.44.** "Instrumentos de Pagamento da Opção C": significa o Instrumento de Pagamento da Opção C – Plano e os Instrumentos de Pagamento da Opção C – *Notes*. | **1.1.44.** "Option C Payment Instruments": means the Option C Payment Instrument – Plan and the Option C Payment Instruments – Notes. |
| **1.1.45.** "Instrumentos de Pagamento da Opção C – Plano": tem o significado definido na Cláusula 7.5.1 deste Plano. | **1.1.45.** "Option C Payment Instruments – Plan": has the meaning assigned in Section 7.5.1 of this Plan. |
| **1.1.46.** "Instrumentos de Pagamento da Opção C – *Notes*": significa o Instrumento de Pagamento da Opção A – *Notes* e o Instrumento de Pagamento da Opção B – *Notes* destinados aos Credores Opção C na forma da Cláusula 7.5.2 deste Plano. | **1.1.46.** "Option C Payment Instruments – Notes": means the Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes allocated to the Option C Creditors pursuant to Section 7.5.2 of this Plan. |
| **1.1.47.** "Intervenientes Anuentes": tem o significado atribuído no Preâmbulo deste Plano. | **1.1.47.** "Intervening Parties": has the meaning assigned in the Preamble of this Plan. |
| **1.1.48.** "Inzag": tem o significado atribuído no Preâmbulo deste Plano. | **1.1.48.** "Inzag": has the meaning assigned in the Preamble of this Plan. |
| **1.1.49.** "Juízo da Recuperação Extrajudicial": significa a vara da Comarca de Belo Horizonte, Tribunal de Justiça do Estado de Minas Gerais para a qual tenha sido distribuída a Recuperação Extrajudicial. | **1.1.49.** "Extrajudicial Reorganization Court": means the Court of the district of Belo Horizonte, Court of Justice of the State of Minas Gerais, to which the Extrajudicial Reorganization has been assigned. |
| **1.1.50.** "Lei Aplicável": significa a Constituição Federal e, conforme aplicável, toda e qualquer lei, norma, ou dispositivo legal, decreto, regulamento, portaria, código ou política, ordem, decisão ou sentença (incluindo arbitral), local ou estrangeira, federal, estadual ou municipal, de qualquer autoridade governamental. | **1.1.50.** "Applicable Law": means the Federal Constitution and, as applicable, all law, rule, or legal provision, decree, regulation, ordinance, code or policy, order, decision, or judgment (including arbitral), whether local or foreign, federal, state, or municipal, issued by any governmental authority. |

| | |
|---|---|
| **1.1.51.** "LRF": significa a Lei n.º 11.101, de 9 de fevereiro de 2005, conforme alterada. | **1.1.51.** "Brazilian Bankruptcy Act": means Law No. 11,101, of February 9, 2005, as amended. |
| **1.1.52.** "LSA": significa a Lei nº 6.404, de 15 de dezembro de 1976, conforme alterada. | **1.1.52.** "Brazilian Corporations Act": means Law No. 6,404, of December 15, 1976, as amended. |
| **1.1.53.** "Notas Internacionais 2021": tem o significado atribuído no considerando "(iii)" deste Plano. | **1.1.53.** "2021 International Notes": has the meaning assigned in recital "(iii)" of this Plan. |
| **1.1.54.** "Notas Internacionais 2024": tem o significado atribuído no considerando "(iii)" deste Plano. | **1.1.54.** "2024 International Notes": has the meaning assigned in recital "(iii)" of this Plan. |
| **1.1.55.** "Notas Internacionais 2029": tem o significado atribuído no considerando "(iv)" deste Plano. | **1.1.55.** "2029 International Notes": has the meaning assigned in recital "(iv)" of this Plan. |
| **1.1.56.** "Notas Internacionais 2040": tem o significado atribuído no considerando "(iv)" deste Plano. | **1.1.56.** "2040 International Notes": has the meaning assigned in recital "(iv)" of this Plan. |
| **1.1.57.** "Notas Internacionais Existentes": tem o significado atribuído no considerando "(iv)" deste Plano. | **1.1.57.** "International Existing Notes": has the meaning assigned in recital "(iv)" of this Plan. |
| **1.1.58.** "Opção A": significa a opção de pagamento descrita na Cláusula 5 deste Plano. | **1.1.58.** "Option A": means the payment option described in Section 5 of this Plan. |
| **1.1.59.** "Opção B": significa a opção de pagamento descrita na Cláusula 6 deste Plano. | **1.1.59.** "Option B": means the payment option described in Section 6 of this Plan. |

| | |
|---|---|
| **1.1.60.** "<u>Opção C</u>": significa a opção de pagamento descrita na Cláusula 7 deste Plano. | **1.1.60.** "<u>Option C</u>": means the payment option described in Section 7 of this Plan. |
| **1.1.61.** "<u>Parte</u>": significa as Requerentes e o Credor Signatário, denominados indistintamente e de forma individual. | **1.1.61.** "<u>Party</u>": means the Debtors and the Signatory Creditor, referred to collectively or individually, as applicable. |
| **1.1.62.** "<u>Partes</u>": significa as Requerentes e o Credor Signatário, denominados em conjunto. | **1.1.62.** "<u>Parties</u>": means the Debtors and the Signatory Creditor, referred to collectively. |
| **1.1.63.** "<u>Período de Eleição</u>": tem o significado atribuído na Cláusula 8.2 deste Plano. | **1.1.63.** "<u>Election Period</u>": has the meaning assigned in Section 8.2 of this Plan. |
| **1.1.64.** "<u>Pessoa</u>": significa qualquer pessoa, natural ou jurídica, de direito brasileiro ou estrangeiro, incluindo-se, sem limitação, sociedades em geral (por ações, limitadas, simples, em conta de participação, em parceria, dentre outras), *joint venture*, *trust*, fundo de investimento, associação, fundação, organização, entidade governamental ou outra entidade de qualquer tipo ou natureza. | **1.1.64.** "<u>Person</u>": means any person, natural or legal entity, organized under the laws of Brazil or any foreign jurisdiction, including, without limitation, companies in general (corporations, limited liability companies, simple partnerships, silent partnerships, partnerships, among others), joint venture, trust, investment fund, association, foundation, organization, governmental entity, or any other entity of any type or nature. |
| **1.1.65.** "<u>Plano</u>": significa este plano de recuperação extrajudicial assinado entre as Requerentes e o Credor Signatário, datado de 18 de maio de 2026 e, conforme o caso, eventuais aditamentos aprovados nos termos deste plano de recuperação extrajudicial, sendo que todos os seus Anexos são parte integrante dele. | **1.1.65.** "<u>Plan</u>": means this Extrajudicial Reorganization Plan executed between the Debtors and the Signatory Creditor, dated May 18, 2026, and, as applicable, any amendments approved pursuant to the terms of this Extrajudicial Reorganization Plan, all its Schedules being an integral part hereof. |
| **1.1.66.** "<u>Plano 2</u>": tem o significado atribuído no considerando "(x)". | **1.1.66.** "<u>Plan 2</u>": has the meaning assigned in recital "(x)". |

| | |
|---|---|
| **1.1.67.** "Procedimentos Chapter 15": significa os procedimentos a serem iniciados pelo(s) representante(s) estrangeiro(s) das Requerentes sob o capítulo 15 do *U.S. Bankruptcy Code*. | **1.1.67.** "Chapter 15 Proceedings": means the proceedings to be initiated by the foreign representative(s) of the Debtors under Chapter 15 of the U.S. Bankruptcy Code. |
| **1.1.68.** "Procedimento de Eleição da Opção de Pagamento": significa o procedimento descrito na Cláusula 8.2 deste Plano. | **1.1.68.** "Payment Option Election Process": means the procedure described in Section 8.2 of this Plan. |
| **1.1.69.** "Real" ou "R$": significa a moeda corrente da República Federativa do Brasil. | **1.1.69.** "Real" or "R$": means the lawful currency of the Federative Republic of Brazil. |
| **1.1.70.** "Recuperação Extrajudicial": significa o processo de recuperação extrajudicial ajuizado pelas Requerentes perante uma das varas empresariais da Comarca de Belo Horizonte, Tribunal de Justiça do Estado de Minas Gerais. | **1.1.70.** "Extrajudicial Reorganization": means the extrajudicial reorganization proceeding filed by the Debtors before one of the business courts of the District of Belo Horizonte, Court of Justice of the State of Minas Gerais. |
| **1.1.71.** "Recuperação Extrajudicial 2022": tem o significado atribuído no considerando "(iii)" deste Plano. | **1.1.71.** "2022 Extrajudicial Reorganization": has the meaning assigned in recital "(iii)" of this Plan. |
| **1.1.72.** "Requerentes": tem o significado atribuído no Preâmbulo deste Plano. | **1.1.72.** "Debtors": has the meaning assigned in the Preamble of this Plan. |
| **1.1.73.** "Requerentes do Plano 2": tem o significado atribuído no considerando "(ix)" deste Plano. | **1.1.73.** "Plan 2 Debtors": has the meaning assigned in recital "(ix)" of this Plan. |
| **1.1.74.** "Sentença de Homologação do Plano": significa a sentença proferida pelo Juízo da Recuperação Extrajudicial, ou qualquer outra decisão judicial proferida por outro tribunal competente, que homologue este Plano. | **1.1.74.** "Plan Confirmation Order": means the order rendered by the Extrajudicial Reorganization Court, or any other judicial decision issued by another competent court, confirming this Plan. |

| | |
|---|---|
| **1.1.75.** "Taxa DI": significa a taxa média dos Depósitos Interbancários de um dia (*overnight*), apurada e divulgada diariamente pela B3 S.A. – Brasil, Bolsa, Balcão, com base nas operações registradas no Sistema de Registro da B3, nos termos da regulamentação aplicável. | **1.1.75.** "DI Rate": means the average one-day (overnight) Interbank Deposit rate, calculated and published daily by B3 S.A. – Brasil, Bolsa, Balcão, based on transactions registered in the B3 Registration System, pursuant to the applicable regulations. |
| **1.1.76.** "Termo de Adesão do Credor Signatário": significa o termo de adesão constante do **Anexo III**, pelo qual o Credor Signatário aderiu ao presente Plano. | **1.1.76.** "Adhesion Term for Signatory Creditor" means the adherence instrument set forth in **Schedule III**, through which the Signatory Creditor have adhered to this Plan. |
| **1.1.77.** "Termo de Adesão para Credor Aderente": significa o documento constante do **Anexo IV**. | **1.1.77.** "Adhesion Term for Adhering Creditor" means the document set forth in **Schedule IV**. |
| **1.1.78.** "Terceiro": significa a Pessoa diversa das Requerentes ou das Requerentes do Plano 2 contra a qual os Credores Sujeitos detêm créditos e/ou direitos com relação a um Crédito Sujeito, seja na qualidade de devedor principal, seja na qualidade de coobrigado em virtude de prestação de garantia real, fidejussória ou fiduciária. | **1.1.78.** "Third Party" means any Person other than the Debtors or the Plan 2 Debtors against whom the Subject Creditors hold claims and/or rights in connection with a Subject Claim, whether as main debtor or as co-obligor by virtue of a collateral, corporate, or personal guarantee. |
| **1.1.79.** "TMF": tem o significado atribuído no considerando "(iv)" deste Plano. | **1.1.79.** "TMF" means the meaning assigned to it in recital "(iv)" of this Plan. |
| **1.1.80.** "Tributos": significa todo e qualquer encargo governamental compulsório instituído por Lei Aplicável e que não constitua sanção de ato ilícito, seja ele federal, estadual ou municipal, local ou estrangeiro, de qualquer natureza ou espécie, sobre qualquer fato gerador ou base de cálculo (incluindo, sem se limitar a, impostos, contribuições de qualquer espécie, taxas, encargos | **1.1.80.** "Taxes" means any and all compulsory governmental charges established under Applicable Law that do not constitute a sanction for an unlawful act, whether federal, state, municipal, local, or foreign, of any nature or kind, levied on any taxable event or assessment base (including, without limitation, taxes, contributions of any kind, fees, parafiscal charges, compulsory loans, or any |

| | |
|---|---|
| parafiscais, empréstimos compulsórios ou quaisquer encargos de natureza similar, e incluindo todos os juros, encargos, correção e/ou atualização monetária, multas, penalidades de qualquer natureza e qualquer valor adicional devido com relação ao valor do Tributo). | charges of a similar nature, and including all interest, charges, monetary correction and/or adjustment, fines, penalties of any kind, and any additional amounts due in connection with the amount of the Tax). |
| **1.1.81.** "*U.S. Bankruptcy Code*": significa o Título 11 do *United States Code*, 11 U.S.C. §§ 101 e seguintes. | **1.1.81.** "U.S. Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. paragraphs 101 et seq. |
| **1.1.82.** "Zagope": tem o significado atribuído no Preâmbulo deste Plano. | **1.1.82.** "Zagope" means the meaning assigned to it in the Preamble of this Plan. |
| **2. REGRAS DE INTERPRETAÇÃO** | **2. RULES OF INTERPRETATION** |
| **2.1.** Exceto se especificado de modo diverso, todas as Cláusulas e Anexos mencionados neste Plano referem-se aos Anexos e Cláusulas do próprio Plano. | **2.1.** Unless otherwise specified, all Sections and Schedules referred to in this Plan refer to the Schedules and Sections of this Plan itself. |
| **2.2.** Os títulos dos capítulos e das cláusulas deste Plano foram incluídos exclusivamente para referência e não devem afetar o conteúdo de suas previsões. | **2.2.** The titles of the chapters and sections of this Plan have been included solely for reference purposes and shall not affect the content of their provisions. |
| **2.3.** Quaisquer referências a documentos ou instrumentos devem ser consideradas como escritas na presente data, a menos que de outro modo expressamente previsto ou de outra forma requerida pelo contexto. | **2.3.** Any references to documents or instruments shall be deemed to be as of the date hereof, unless expressly provided otherwise or as otherwise required by the context. |
| **2.4.** As referências a disposições legais e a Leis devem ser interpretadas como referências a essas | **2.4.** References to legal provisions and Laws shall be construed as references to such legal |

| | |
|---|---|
| disposições legais e Leis tais como vigentes nesta data ou em data que seja especificamente determinada pelo contexto. | provisions and Laws as in effect on the date hereof or on such other date as may be specifically determined by the context. |
| **2.5.** Este Plano deve ser interpretado de acordo com os artigos 161 e seguintes da LRF. | **2.5.** This Plan shall be interpreted in accordance with articles 161 et seq. of the Brazilian Bankruptcy Act. |
| **PARTE II – CONDIÇÕES GERAIS DESTE PLANO** | **PART II – GENERAL CONDITIONS OF THIS PLAN** |
| **3. OBJETIVO, CUMPRIMENTO DOS REQUISITOS LEGAIS E ESTRUTURA DESTE PLANO** | **3. PURPOSE, COMPLIANCE WITH LEGAL REQUIREMENTS, AND STRUCTURE OF THIS PLAN** |
| **3.1.** Objetivo. Este Plano estabelece os termos e condições necessários para a reestruturação dos Créditos Sujeitos, mediante o reperfilamento de suas condições de pagamento, adequando-os ao fluxo de caixa atual e futuro das Requerentes e propiciando a readequação de suas estruturas de capital. | **3.1.** Objective. This Plan sets forth the terms and conditions required for the restructuring of the Subject Claims, through the reprofiling of their payment conditions, aligning them with the current and future cash flow of the Debtors and enabling the restructuring of their capital structures. |
| **3.2.** Cumprimento dos Requisitos Legais. Este Plano visa a reestruturar todos os Créditos Sujeitos, cujos montantes totais devidos individualmente por cada uma das Requerentes, na Data do Pedido, encontram-se descritos no **Anexo II** deste Plano. | **3.2.** Compliance With Legal Requirements. This Plan aims to restructure all Subject Claims, whose total amounts owed individually by each of the Debtors, as of the Filing Date, are described in **Schedule II** to this Plan. |
| **3.3.** Este Plano é subscrito e assinado pelo Credor Signatário, conforme termo de adesão constante do **Anexo III**, o qual é titular de ***(i)*** 71,3% de todos os Créditos Sujeitos devidos pela AGE, conforme **Anexo II**, ***(ii)*** 73,5% de todos os Créditos | **3.3.** This Plan is executed and signed by the Signatory Creditor, pursuant to the adhesion term set forth in **Schedule III**, which holds ***(i)*** 71.3% of all Subject Claims owed by AGE, as indicated in **Schedule II**, ***(ii)*** 73.5% of all Subject Claims owed |

| | |
|---|---|
| Sujeitos devidos pela AGCS, conforme **Anexo II**, e ***(iii)*** 79,2% de todos os Créditos Sujeitos devidos pela AGIE, conforme **Anexo II**, de modo que se mostra satisfeito o quórum de aprovação estabelecido no artigo 163, caput, da LRF. | by AGCS, as indicated in **Schedule II**, and ***(iii)*** 79.2% of all Subject Claims owed by AGIE, as indicated in **Schedule II**, such that the approval quorum set forth in article 163, caput, of the Brazilian Bankruptcy Act is complied with. |
| **3.4.** Medidas de reestruturação. Com a Sentença de Homologação do Plano, nos termos do artigo 163, *caput* e § 1º, da LRF, todos os Créditos Sujeitos serão integralmente reestruturados, novados, cancelados e quitados, conforme artigos 163, *caput* e § 1º, e 165, *caput*, da LRF, passando os Credores Sujeitos a serem titulares de direitos creditórios regidos em conformidade com o disposto neste Plano, que prevê termos e condições compatíveis com o fluxo de caixa atual e futuro das Requerentes. | **3.4.** Reorganization Measures. Upon the Plan Confirmation Order, pursuant to article 163, caput and first paragraph, of the Brazilian Bankruptcy Act, all Subject Claims shall be fully restructured, novated, cancelled and fully satisfied, pursuant to articles 163, caput and first paragraph, and 165, caput, of the Brazilian Bankruptcy Act, and the Subject Creditors shall hold claims governed in accordance with this Plan, which provides terms and conditions consistent with the current and future cash flow of the Debtors. |
| **3.5.** Implementação do Plano Perante Jurisdições Estrangeiras. Após a apresentação do Plano perante o Juízo da Recuperação Extrajudicial ou a prolação da Sentença de Homologação do Plano, o(s) representante(s) estrangeiro(s) das Requerentes, observado o disposto na Cláusula 10.6, submeterão o Plano e a Sentença de Homologação do Plano a uma autoridade jurisdicional competente dos Estados Unidos da América para buscar uma decisão ou decisões ***(i)*** reconhecendo a Recuperação Extrajudicial como processo estrangeiro principal ou processo estrangeiro não-principal nos termos do capítulo 15 do *U.S. Bankruptcy Code* ("Decisão de Reconhecimento *Chapter 15*"), ***(ii)*** reconhecendo e implementando este Plano e a Sentença de Homologação dentro da jurisdição territorial dos | **3.5.** Implementation of the Plan Before Foreign Jurisdictions. Following the submission of the Plan before the Extrajudicial Reorganization Court or the entry of the Plan Confirmation Order, the foreign representative(s) of the Debtors, subject to Section 10.6, shall submit the Plan and the Plan Confirmation Order to a United States court of competent jurisdiction in order to seek an order or orders ***(i)*** recognizing the Extrajudicial Reorganization as a foreign main proceeding or non-main foreign proceeding under chapter 15 of the U.S. Bankruptcy Code ("Chapter 15 Recognition Order"), ***(ii)*** recognizing and enforcing this Plan and the Plan Confirmation Order within the territorial jurisdiction of the United States of America under chapter 15 of the U.S. Bankruptcy Code ("Chapter 15 Enforcement |

| | |
|---|---|
| Estados Unidos da América, nos termos do capítulo 15 do *U.S. Bankruptcy Code* ("Decisão de Implementação *Chapter 15*"); e ***(iii)*** autorizando e direcionando as respectivas partes daquele processo (incluindo, sem limitação, qualquer representante estrangeiro devidamente nomeado) a tomarem todas e quaisquer medidas necessárias para dar eficácia aos termos deste Plano e da Sentença de Homologação do Plano (tal decisão ou decisões e, em conjunto com a Decisão de Reconhecimento *Chapter 15* e Decisão de Implementação *Chapter 15*, referidas como "Decisão *Chapter 15*"). As Requerentes também poderão ajuizar e/ou prosseguir com outros procedimentos judiciais, extrajudiciais ou administrativos, relacionados à insolvência ou não, perante outras jurisdições, caso necessário ou aconselhável para a implementação do Plano, desde que esses procedimentos ancilares não alterem os termos e condições previstos neste Plano. | Order"); and ***(iii)*** authorizing and directing the respective parties to that proceeding (including, without limitation, any duly appointed foreign representative) to take any and all actions necessary to give effect to the terms of this Plan and the Plan Confirmation Order (such order or orders, together with the Chapter 15 Recognition Order and the Chapter 15 Enforcement Order, referred to collectively as the "Chapter 15 Decision"). The Debtors may also initiate and/or continue other judicial, out-of-court or administrative proceedings, whether insolvency-related or not, before other jurisdictions, if necessary or advisable for the implementation of the Plan, provided that such ancillary proceedings do not amend the terms and conditions set forth in this Plan. |
| **3.6. Inexistência de consolidação substancial.** As Requerentes e o(s) Credor(es) Signatário(s) reconhecem e acordam que: ***(i)*** a apresentação conjunta deste Plano e o ajuizamento da Recuperação Extrajudicial em litisconsórcio ativo decorrem exclusivamente de consolidação de natureza processual, nos termos dos artigos 69-G a 69-I da LRF; ***(ii)*** não há, nem se pretende instituir, por meio deste Plano, da Recuperação Extrajudicial ou de sua homologação, qualquer forma de consolidação substancial, confusão patrimonial ou unificação de ativos e passivos entre as Requerentes; ***(iii)*** cada Requerente permanece juridicamente autônoma, com personalidade, patrimônio, ativos, passivos, direitos e obrigações | **3.6. Absence of Substantive Consolidation.** The Debtors and the Signatory Creditor(s) acknowledge and agree that: ***(i)*** the joint submission of this Plan and the filing of the Extrajudicial Reorganization in active joinder result exclusively from procedural consolidation, pursuant to articles 69-G to 69-I of the Brazilian Bankruptcy Act; ***(ii)*** neither does there exist, nor is it intended to establish, through this Plan, the Extrajudicial Reorganization or its confirmation, any form of substantive consolidation, commingling of assets, or unification of assets and liabilities among the Debtors; ***(iii)*** each Debtor remains legally autonomous, with its own legal personality, estate, assets, liabilities, rights and |

| | |
|---|---|
| próprios, respondendo exclusivamente por suas dívidas, ressalvadas apenas as hipóteses de coobrigação e de outorga de garantias expressamente previstas neste Plano, sendo que, nestas hipóteses, será observado o disposto nas Cláusulas 11.5.5, 11.6.1.2 e 11.6.2.1 e o disposto nos artigos 346 e 347 do Código Civil; e ***(iv)*** fica expressamente afastada qualquer interpretação deste Plano que resulte, direta ou indiretamente, na aplicação dos efeitos jurídicos próprios da consolidação substancial, inclusive a comunhão de massas patrimoniais ou o tratamento indistinto dos credores das diferentes Requerentes. | obligations, and shall be solely liable for its debts, except only in the cases of co-obligation and granting of guarantees expressly provided for in this Plan, in which cases the provisions of Sections 11.5.5, 11.6.1.2 and 11.6.2.1 and articles 346 and 347 of the Brazilian Civil Code shall apply; and ***(iv)*** any interpretation of this Plan that results, directly or indirectly, in the application of the legal effects inherent to substantive consolidation is hereby expressly excluded, including the commingling of patrimonial estates or the indistinct treatment of creditors of the different Debtors. |
| **PARTE III – DOS CRÉDITOS SUJEITOS** | **PART III – SUBJECT CLAIMS** |
| **4. ABRANGÊNCIA E VINCULAÇÃO DOS CRÉDITOS SUJEITOS** | **4. SCOPE AND BINDING EFFECT OF SUBJECT CLAIMS** |
| **4.1.** Valor dos Créditos Sujeitos. O valor total dos Créditos Sujeitos é de ***(i)*** R$ 3.400.882.619,38 (três bilhões quatrocentos milhões oitocentos e oitenta e dois mil e seiscentos e dezenove reais e trinta e oito centavos) para a AGE, na Data do Pedido, conforme descrito no **Anexo I** deste Plano; ***(ii)*** R$ 2.667.042.034,90 (dois bilhões seiscentos e sessenta e sete milhões quarenta e dois mil e trinta e quatro reais e noventa centavos) para a AGCS, na Data do Pedido, conforme descrito no **Anexo I** deste Plano; e ***(iii)*** R$ 2.478.000.246,94 (dois bilhões quatrocentos e setenta e oito milhões e duzentos e quarenta e seis reais e noventa e quatro centavos) para a AGIE, na Data do Pedido, conforme descrito no **Anexo I** deste Plano. | **4.1.** Amount of Subject Claims. The total amount of Subject Claims is ***(i)*** R$ 3,400,882,619.38 (three billion four hundred million eight hundred and eighty-two thousand six hundred and nineteen reais and thirty-eight centavos) for AGE, as of the Filing Date, as described in **Schedule I** to this Plan; ***(ii)*** R$ 2,667,042,034.90 (two billion six hundred and sixty-seven million forty-two thousand and thirty-four reais and ninety centavos) for AGCS, as of the Filing Date, as described in Schedule **I** to this Plan; and ***(iii)*** R$ 2,478,000,246.94 (two billion four hundred and seventy-eight million two hundred and forty-six reais and ninety-four centavos.) for AGIE, as of the Filing Date, as described in **Schedule I** to this Plan. |

| | |
|---|---|
| **4.2.** Valor dos Créditos Sujeitos do Credor Signatário. O Credor Signatário é, na Data do Pedido, titular de Créditos Sujeitos nos valores totais de ***(i)*** R$ 2.425.921.625,00 (dois bilhões quatrocentos e vinte e cinco milhões novecentos e vinte e um mil seiscentos e vinte e cinco reais) detidos individualmente contra a AGE, na Data do Pedido, conforme descrito no **Anexo II** deste Plano; ***(ii)*** R$ 1.961.400.915,00 (um bilhão novecentos e sessenta e um milhões quatrocentos mil novecentos e quinze reais) detidos individualmente contra a AGCS, na Data do Pedido, conforme descrito no **Anexo II** deste Plano; e ***(iii)*** R$ 1.961.400.915,00 (um bilhão novecentos e sessenta e um milhões quatrocentos mil novecentos e quinze reais) detidos individualmente contra a AGIE, na Data do Pedido, conforme descrito no **Anexo II** deste Plano. Assim, o Credor Signatário é titular de mais de 50% (cinquenta por cento) de Créditos Sujeitos contra cada uma das Requerentes, de modo que estão plenamente satisfeitos os requisitos para a homologação do Plano, nos termos do artigo 163 da LRF. | **4.2.** Amount of Subject Claims of the Signatory Creditor. The Signatory Creditor is, as of the Filing Date, holder of Subject Claims in the total amount of ***(i)*** R$ 2,425,921,625.00 (two billion four hundred and twenty-five million nine hundred and twenty-one thousand six hundred and twenty-five reais) held individually against AGE, as of the Filing Date, as described in **Schedule II** to this Plan; ***(ii)*** R$ 1,961,400,915.00 (one billion nine hundred and sixty-one million four hundred thousand nine hundred and fifteen reais) held individually against AGCS, as of the Filing Date, as described in **Schedule II** to this Plan; and ***(iii)*** R$ 1,961,400,915.00 (one billion nine hundred and sixty-one million four hundred thousand nine hundred and fifteen reais) held individually against AGIE, as of the Filing Date, as described in **Schedule II** to this Plan. Accordingly, the Signatory Creditor holds more than 50% (fifty percent) of Subject Claims against each of the Debtors, so that the requirements for the confirmation of the Plan are fully met, pursuant to article 163 of the Brazilian Bankruptcy Act. |
| **4.3.** Vinculação do Credor Signatário. O Credor Signatário expressa a sua anuência aos termos e condições do Plano a partir da Data de Celebração, nos termos do artigo 165, § 1º, da LRF, desde que o Plano não venha a ser resolvido nos termos da Cláusula 10.2 e observado o artigo 165, § 2º, da LRF. | **4.3.** Binding of the Signatory Creditor. The Signatory Creditor expresses its consent to the terms and conditions of the Plan as of the Signing Date, pursuant to article 165, first paragraph, of the Brazilian Bankruptcy Act, provided that the Plan is not terminated pursuant to Section 10.2 and subject to article 165, second paragraph, of the Brazilian Bankruptcy Act. |

| | |
|---|---|
| **4.3.1.** Em atenção ao disposto na Cláusula 4.3 acima, o Credor Signatário desde já elege a Opção C prevista na Cláusula 7 para reestruturar os seus respectivos Créditos Sujeitos, os quais serão, desde a Data de Celebração, automaticamente reestruturados, novados, quitados, cancelados e substituídos por Créditos Opção C – Tranche A e Créditos Opção C – Tranche B, sendo, portanto, regidos nos termos das Cláusulas 7.4.1, 7.4.2, 7.5 e demais Cláusulas aplicáveis deste Plano, contando com todos os direitos e privilégios previstos neste Plano, inclusive as garantias fidejussórias previstas no item "(ix)" da Cláusula 7.4.1 e item "(viii)" da Cláusula 7.4.2. Para que não restem dúvidas, ***(i)*** a novação de que trata a presente Cláusula 4.3.1 poderá ser revertida caso este Plano venha a ser resolvido nos termos da Cláusula 10.2 e ***(ii)*** o disposto no artigo 165, § 2º, da LRF será aplicável caso este Plano seja rejeitado pelo Juízo da Recuperação Extrajudicial. | **4.3.1.** Pursuant to Section 4.3 above, the Signatory Creditor hereby elects Option C set forth in Section 7 to restructure its respective Subject Claims, which shall, as of the Signing Date, be automatically restructured, novated, fully satisfied, cancelled and replaced by Option C Claims – Tranche A and Option C Claims – Tranche B, and shall therefore be governed pursuant to Sections 7.4.1, 7.4.2, 7.5 and other applicable Sections of this Plan, with all rights and privileges set forth in this Plan, including the corporate guarantees set forth in item "(ix)" of Section 7.4.1 and item "(viii)" of Section 7.4.2. For the avoidance of doubt, the novation set forth in this Section 4.3.1 may be unwound in the event this Plan is terminated pursuant to Section 10.2 and ***(ii)*** article 165, second paragraph, of the Brazilian Bankruptcy Act shall be applicable if this Plan is rejected by the Extrajudicial Reorganization Court. |
| **4.4.** <u>Credores Aderentes</u>. Os Credores Sujeitos que não sejam signatários deste Plano na Data de Celebração poderão, voluntariamente, aderir aos seus termos até a Data da Homologação, por meio do preenchimento, assinatura e entrega às Requerentes do Termo de Adesão para Credor Aderente, conforme minuta constante do **Anexo IV** deste Plano, devidamente acompanhado dos documentos comprobatórios dos poderes do | **4.4.** <u>Adhering Creditors</u>. The Subject Creditors that are not signatories to this Plan on the Signing Date may voluntarily adhere to its terms up to the Judicial Confirmation Date, by completing, signing and delivering to the Debtors the Adhesion Term for Adhering Creditor, in the form attached as **Schedule IV to** this Plan, duly accompanied by the documents evidencing the authority of the signatory of the Adhesion Term for Adhering Creditor. |

| | |
|---|---|
| signatário do Termo de Adesão para Credor Aderente. | |
| **4.4.1.** No caso de o Credor Sujeito ser titular de Notas Internacionais Existentes, além dos documentos indicados na Cláusula acima, também deverá ser entregue o Certificado de Detentor de Notas Internacionais Existentes, conforme minuta constante do **Anexo V** deste Plano, devidamente acompanhado da captura de tela (*screenshot*) do portal do custodiante do Credor Sujeito, ou de declaração emitida pelo custodiante do Credor Sujeito, comprovando a titularidade de tais Notas Internacionais Existentes. | **4.4.1.** In the event that the Subject Creditor holds International Existing Notes, in addition to the documents indicated in the Section above, the Certificate of Holder of International Existing Notes shall also be delivered, in the form set forth in **Schedule V** to this Plan, duly accompanied by a screenshot of the portal of the custodian of the Subject Creditor, or by a statement issued by the custodian of the Subject Creditor, evidencing ownership of such International Existing Notes. |
| **4.5.** Vinculação dos Credores Sujeitos. Com a Sentença de Homologação do Plano, todos os Credores Sujeitos estarão vinculados individual e indistintamente aos termos do Plano, nos termos dos artigos 163, *caput* e § 1º, e 165, *caput*, da LRF. | **4.5.** Binding Effect on Subject Creditors. Upon the Plan Confirmation Order, all Subject Creditors shall be individually and jointly and severally bound by the terms of this Plan, pursuant to articles 163, caput and first paragraph, and 165, caput, of the Brazilian Bankruptcy Act. |
| **PARTE IV – CONDIÇÕES DE REESTRUTURAÇÃO DOS CRÉDITOS SUJEITOS** | **PART IV – RESTRUCTURING CONDITIONS OF THE SUBJECT CLAIMS** |
| **5. OPÇÃO A** | **5. OPTION A** |
| **5.1.** Opção A. O Credor Sujeito que tenha validamente escolhido a Opção A, em atenção ao disposto nas Cláusulas 8.1 a 8.3 ("Credor Opção A"), terá o seu respectivo Crédito Sujeito ***(i)*** reestruturado, novado, quitado e cancelado, com | **5.1.** Option A. The Subject Creditor that has validly elected Option A, pursuant to Sections 8.1 until 8.3 (the "Option A Creditor"), shall have its respective Subject Claim ***(i)*** restructured, novated, fully satisfied, and cancelled with respect to the |

| | | |
|---|---|---|
| relação às Requerentes, nos termos deste Plano e dos artigos 163, § 1º, e 165, *caput*, da LRF, e ***(ii)*** substituído por Crédito Opção A nas proporções previstas neste Plano, o qual será pago exclusivamente nas condições, prazos e formas de pagamento ora estabelecidos. | | Debtors, in accordance with this Plan and articles 163, first paragraph, and 165, caput, of the Brazilian Bankruptcy Act, and ***(ii)*** replaced by the Option A Claim in the proportions set forth in this Plan, which shall be paid exclusively under the conditions, terms, and payment methods herein established. |
| **5.2.** Quitação. A prolação da Sentença de Homologação do Plano acarretará, na Data da Homologação, quitação ampla, plena, irrevogável e irretratável dos respectivos Créditos Sujeitos e das obrigações que os lastreiam com relação às Requerentes, sendo automaticamente cancelados e/ou extintos de pleno direito os instrumentos que consubstanciam os Créditos Sujeitos detidos pelos Credores Opção A, os quais serão automaticamente substituídos por Créditos Opção A. | | **5.2.** Release. The entry of the Plan Confirmation Order shall result, on the Judicial Confirmation Date, in the full, final, irrevocable, and irreversible release of the respective Subject Claims and of their underlying obligations with respect to the Debtors, and the instruments evidencing the Subject Claims held by the Option A Creditors shall be automatically cancelled and/or extinguished by operation of law, being automatically replaced by the Option A Claims. |
| **5.3.** Relação de Troca. O Credor Opção A terá direito a receber o equivalente a 36% (trinta e seis por cento) do valor do seu Crédito Sujeito nos termos e condições descritos na Cláusula 5.4 abaixo, sendo o saldo remanescente de 64% (sessenta e quatro por cento) do seu respectivo Crédito Sujeito considerado quitado, a título de deságio, para todos os fins e efeitos de direito. | | **5.3.** Exchange Ratio. The Option A Creditor shall be entitled to receive the equivalent of thirty-six percent (36%) of the amount of its Subject Claim, under the terms and conditions set forth in Section 5.4 below, and the remaining sixty-four percent (64%) of its respective Subject Claim shall be deemed fully satisfied, as a haircut, for all legal purposes and effects. |
| **5.4.** Termos e Condições da Opção A. Os Credores Opção A serão pagos de acordo com os termos e condições descritos abaixo ("Crédito Opção A"), que serão integralmente refletidos nos seus respectivos Instrumentos de Pagamento da Opção A: | | **5.4.** Terms and Conditions of Option A. The Option A Creditors shall be paid in accordance with the terms and conditions described below (the "Option A Claim"), which shall be fully reflected in their respective Option A Payment Instruments: |

| | |
|---|---|
| **(i)** <u>Valor do Principal</u>: 36% (trinta e seis por cento) do valor dos Créditos Sujeitos detidos pelos Credores Opção A será pago nos termos e condições previstos nesta Cláusula 5.4, e o saldo remanescente de 64% (sessenta e quatro por cento) será objeto do deságio descrito na Cláusula 5.3 acima. Para que não restem dúvidas, o valor em Crédito Opção A a ser recebido por cada Credor Opção A, nos termos deste Plano e, conforme aplicável, do Plano 2, observará o disposto nas Cláusulas 11.5 e seguintes do Plano, de modo que, em nenhuma hipótese, o respectivo Credor Opção A receberá o valor do seu Crédito Opção A em duplicidade. | **(i)** <u>Principal Amount</u>: 36% (thirty-six percent) of the amount of the Subject Claims held by the Option A Creditors shall be paid under the terms and conditions set forth in Section 5.4, and the remaining 64% (sixty-four percent) shall be subject to the haircut described in Section 5.3 above. For the avoidance of doubt, the amount of the Option A Claim to be received by each Option A Creditor under this Plan and, as applicable, under Plan 2, shall comply with the provisions of Sections 11.5 and following of this Plan, and under no circumstances shall any Option A Creditor receive the amount of its Option A Claim in duplication. |
| **(ii)** <u>Juros Remuneratórios</u>: sobre os Créditos Opção A denominados em Dólar incidirão juros remuneratórios de 6,00% (seis por cento) ao ano (considerando-se, para tanto, um ano de 360 (trezentos e sessenta) Dias Corridos), computados a partir da Data da Homologação até 28 de dezembro de 2040. Sobre os Créditos Opção A denominados em Real incidirão juros remuneratórios equivalentes a 100% (cem por cento) da Taxa DI ao ano (considerando-se, para tanto, um ano de 252 (duzentos e cinquenta e dois) Dias Úteis), computados a partir da Data da Homologação até 28 de dezembro de 2040. | **(ii)** <u>Interest</u>: the Option A Claims denominated in Dollars shall accrue interest at a rate of six percent (6.00%) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date until December 28, 2040. The Option A Claims denominated in Real shall accrue interest equivalent to 100% (one hundred percent) of the DI Rate per annum (considering, to that end, a year of 252 (two hundred and fifty-two) Business Days), calculated from the Judicial Confirmation Date until December 28, 2040. |

| | | | |
|---|---|---|---|
| **(iii)** | Cronograma e Forma de Pagamento dos Juros Remuneratórios: os juros remuneratórios que incidirem sobre os Créditos Opção A serão pagos da seguinte forma: **(a)** da Data da Homologação até 28 de dezembro de 2030, os juros remuneratórios incidentes no período serão capitalizados no valor do principal; e **(b)** de 28 de dezembro de 2030 até 28 de dezembro de 2040, os juros remuneratórios incidentes no período serão pagos em dinheiro e em bases semestrais, em 28 de junho e 28 de dezembro, conforme aplicável, sendo a data do primeiro pagamento 28 de junho de 2031. | **(iii)** | Schedule and Form of Payment of Interest: the interest accrued on the Option A Claims shall be paid as follows: **(a)** from the Judicial Confirmation Date until December 28, 2030, the interest accrued during such period shall be capitalized into the principal amount; and **(b)** from December 28, 2030 until December 28, 2040, the interest accrued during such period shall be paid in cash on a semiannual basis, on June 28 and December 28, as applicable, with the first payment date being June 28, 2031. |
| **(iv)** | Cronograma de Pagamento do Principal: o valor do principal dos Créditos Opção A, incluindo os juros capitalizados ao valor do principal, será amortizado, em dinheiro, em seis parcelas anuais, a serem pagas em 28 de dezembro de 2035, 28 de dezembro de 2036, 28 de dezembro de 2037, 28 de dezembro de 2038, 28 de dezembro de 2039 e 28 de dezembro de 2040, no valor correspondente a 16,667%, 20%, 25%, 33,333%, 50% e 100% do valor do saldo do principal existente nas respectivas datas de pagamento. | **(iv)** | Principal Amortization Schedule: the principal amount of the Option A Claims, including the interest capitalized into the principal, shall be amortized in cash in six annual installments, to be paid on December 28, 2035, December 28, 2036, December 28, 2037, December 28, 2038, December 28, 2039, and December 28, 2040, in the amounts corresponding to 16,667%, 20%, 25%, 33,333%, 50% and 100% of the principal outstanding amount on the respective payment dates. |
| **(v)** | Data de Vencimento: 28 de dezembro de 2040. | **(v)** | Maturity Date: December 28, 2040. |

| | | | | |
|---|---|---|---|---|
| **(vi)** | Fator de correção monetária: não aplicável. | | **(vi)** | Monetary adjustment factor: not applicable. |
| **(vii)** | Moeda: não será alterada a moeda original do respectivo Crédito Sujeito detido pelo Credor Opção A, de modo que **(a)** os Créditos Sujeitos denominados em Real continuarão denominados em Real, e **(b)** os Créditos Sujeitos denominados em moeda estrangeira continuarão denominados na respectiva moeda estrangeira. O Credor Opção A titular de Crédito Sujeito em moeda estrangeira poderá, nos termos do artigo 163, § 5º, da LRF, concordar em ter o seu respectivo Crédito Opção A denominado em Real, salvo se tal Crédito Sujeito decorrer de Notas Internacionais Existentes, hipótese em que será observado o disposto na Cláusula 5.5.2 abaixo. | | **(vii)** | Currency: the original currency of the respective Subject Claim held by the Option A Creditor shall not be changed, so that **(a)** Subject Claims denominated in Real shall remain denominated in Real, and **(b)** Subject Claims denominated in foreign currency shall remain denominated in its respective foreign currency. The Option A Creditor holding a Subject Claim denominated in foreign currency may, pursuant to article 163, fifth paragraph, of the Brazilian Bankruptcy Act, agree to have its respective Option A Claim denominated in Real, except if such Subject Claim arises from International Existing Notes, in which case the provisions of Section 5.5.2 below shall apply. |
| **(viii)** | Devedora(s) Principal(is): a(s) devedora(s) principal(is) do respectivo Crédito Sujeito detido pelo Credor Opção A permanecerá(ão), conforme aplicável, como devedora(s) principal(is) do Crédito Opção A, sem prejuízo das garantias fidejussórias descritas abaixo. | | **(viii)** | Main Debtor(s): the main debtor(s) of the respective Subject Claim held by the Option A Creditor shall remain, as applicable, the main debtor(s) of the Option A Claim, without prejudice to the corporate guarantees described below. |
| **(ix)** | Garantias Fidejussórias: AGE, AGIE, AGCS, AGPAR e AGSA prestam, | | **(ix)** | Corporate Guarantees. AGE, AGIE, AGCS, AGPAR and AGSA hereby |

| | |
|---|---|
| neste ato, fiança em garantia do pagamento dos Créditos Opção A, obrigando-se, de forma irrevogável e irretratável, como fiadoras, solidariamente com a(s) respectiva(s) devedora(s) principal(is) e entre si, das obrigações decorrentes desta Opção A, nos termos dos artigos 818 e seguintes do Código Civil, bem como renunciam expressamente aos benefícios de ordem e divisão, assim como aos direitos e faculdades de exoneração de qualquer natureza, previstos nos artigos 333, parágrafo único, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 e 839, todos do Código Civil, e nos artigos 130, 131 e 794 do CPC. As garantias fidejussórias outorgadas por AGE, AGCS AGIE, AGPAR e AGSA, conforme aplicável, serão refletidas igualmente no Instrumento de Pagamento da Opção A – *Notes* (conforme definido abaixo), sendo AGE, AGIE, AGCS, AGPAR e AGSA signatárias da escritura de emissão do Instrumento de Pagamento da Opção A – *Notes*, para este fim, na mesma extensão descrita na frase acima, observando o disposto nas Leis do Estado de Nova Iorque, Estados Unidos da América. Para fins de clareza, as garantidoras fidejussórias sub-rogar-se-ão nos direitos dos Credores Opção A, caso venham a honrar, parcial ou totalmente, a garantia fidejussória, observando o disposto nas Cláusulas | grant a corporate guarantee (*fiança*) to secure the payment the Option A Claims, irrevocably and irreversibly undertaking, as obligors, jointly and severally with the respective main debtor(s) and among themselves, the obligations arising from this Option A, pursuant to articles 818 et seq. of the Brazilian Civil Code, and expressly waiving the benefits of order and division, as well as any rights or discharge faculties of any nature, set forth in articles 333, sole paragraph, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 and 839, of the Brazilian Civil Code, and in articles 130, 131 and 794 of the Brazilian Code of Civil Procedure. The corporate guarantees granted by AGE, AGCS, AGIE, AGPAR and AGSA, as applicable, shall be equally reflected in the Option A Payment Instrument – Notes (as defined below), and AGE, AGIE, AGCS, AGPAR and AGSA shall be signatories to the indenture of the Option A Payment Instrument – Notes for this purpose, to the same extent described above, in accordance with the laws of the State of New York, United States of America. For the avoidance of doubt, the guarantors shall be subrogated to the rights of the Option A Creditors in the event they honor, in whole or in part, the corporate guarantee, pursuant to the provisions of Sections 11.5 et. seq, it |

| | |
|---|---|
| 11.5 e seguintes, sendo que as garantidoras fidejussórias se obrigam desde já a não cobrar, receber ou de qualquer outra forma demandar da emissora do Instrumento de Pagamento da Opção A – *Notes* o pagamento de qualquer valor pago em decorrência das garantias fidejussórias, seja por sub-rogação, compensação ou a qualquer outro título, até que todas as obrigações garantidas tenham sido quitadas. Caso as garantidoras fidejussórias, em violação a tal disposição, venham a receber quaisquer recursos decorrentes da escritura de emissão do Instrumento de Pagamento da Opção A – *Notes* de forma diversa, os receberão na qualidade de fiéis depositárias, devendo providenciar a transferência da totalidade dos referidos recursos em benefício dos Credores Opção A em até 2 (dois) Dias Úteis do seu recebimento, sem qualquer dedução ou desconto. | being understood that the corporate guarantors hereby undertake not to collect, receive, or otherwise demand from the issuer of the Option A Payment Instrument – Notes the payment of any amounts paid under the corporate guarantees, whether by subrogation, set-off, or on any other basis , until all guaranteed obligations have been fully satisfied. Should the corporate guarantors, in violation of such provision, receive any proceeds under the indenture of the Option A Payment Instrument – Notes in any other manner, they shall receive such proceeds as trustees, and shall transfer the entirety of such proceeds for the benefit of the Option A Creditors within 2 (two) Business Days of receipt, without any deduction or discount. |
| **5.5.** <u>Instrumentos de Pagamento da Opção A</u>. A partir da Data da Homologação, os Credores Opção A passarão automaticamente a ser, desde logo, detentores dos seus respectivos Créditos Opção A, com todas as características previstas neste Plano, os quais serão subsequentemente materializados e instrumentalizados por meio dos Instrumentos de Pagamento da Opção A, conforme os critérios estabelecidos abaixo: | **5.5.** <u>Option A Payment Instruments.</u> As of the Judicial Confirmation Date, the Option A Creditors shall automatically become, as of such date, holders of their respective Option A Claims, with all the characteristics set forth in this Plan, which shall subsequently be evidenced and formalized through the Option A Payment Instruments, in accordance with the criteria set forth below: |

| | |
|---|---|
| **5.5.1.** Instrumento de Pagamento da Opção A – Plano. Salvo na hipótese descrita na Cláusula 5.5.2 abaixo, os Credores Opção A terão os seus respectivos Créditos Opção A materializados e instrumentalizados por meio deste Plano, o qual servirá, em conjunto com a Sentença de Homologação do Plano, como título executivo judicial para todos os fins e efeitos de direito, conforme artigo 161, §6º, da LRF, podendo ser executado de acordo com os termos e condições previstos neste Plano ("Instrumento de Pagamento da Opção A – Plano"). | **5.5.1.** Option A Payment Instrument - Plan. Except as provided in Section 5.5.2 below, the Option A Creditors shall have their respective Option A Claims evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (*título executivo judicial*) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth herein (the "Option A Payment Instrument – Plan"). |
| **5.5.2.** Instrumento de Pagamento da Opção A – *Notes*. Os Credores Opção A que, cumulativamente, ***(i)*** sejam atualmente titulares de Notas Internacionais Existentes; e ***(ii.a)*** sejam investidores institucionais qualificados (*qualified institutional buyers*) nos termos da Regra 144A, editada sob o *U.S. Securities Act* de 1933, conforme alterado, ou ***(ii.b)*** não sejam "*pessoas norte-americanas*" (*U.S. persons*), conforme definido na Regra 902 do *U.S Securities Act*, sendo que qualquer credor descrito nessa Cláusula 5.5.2, item (ii.b), que seja residente em um Estado-membro do Espaço Econômico Europeu também deverá ser um investidor qualificado (*qualified investor*), nos termos do Regulamento (UE) 2017/1129, conforme alterado, e da Lei de Luxemburgo de 16 de julho de 2019 sobre prospectos de valores mobiliários, conforme | **5.5.2.** Option A Payment Instrument – Notes. The Option A Creditors who, cumulatively, ***(i)*** currently hold International Existing Notes; ***(ii.a)*** are qualified institutional buyers as defined under Rule 144A promulgated under the U.S. Securities Act of 1933, as amended, or ***(ii.b)*** are not U.S. persons, as defined under Rule 902 of the of U.S. Securities Act, provided that any holder described in this Section 5.5.2, item (ii.b), that is resident of a member state of the European Economic Area must also be a qualified investor under Regulation (EU) 2017/1129, as amended, and under the Luxembourg Law of July 16, 2019 on prospectuses for securities, as amended, or ***(ii.c)*** are institutional accredited investors as defined under Rule 501 of the U.S. Securities Act of 1933, shall, subject to the provisions of Section 5.5.2.5 and except as provided in Section 5.5.2.6, have their |

| | |
|---|---|
| alterada, ou ***(ii.c)*** investidores institucionais credenciados (*institutional accredited investors*) conforme definido na Regra 501 sob o U.S. *Securities Act* de 1933, terão, observado o disposto na Cláusula 5.5.2.5 e salvo na hipótese da Cláusula 5.5.2.6, os seus Créditos Opção A decorrentes das Notas Internacionais Existentes materializados e instrumentalizados por meio de novos títulos a serem emitidos pela AGINT em forma de *notes*, denominadas em Dólares, cuja escritura de emissão será celebrada de forma consistente com o *Term Sheet* constante do **Anexo VI**, de modo a refletir e representar os termos da Opção A conforme o previsto neste Plano ("Instrumento de Pagamento da Opção A – *Notes*"). | respective Option A Claims arising from the International Existing Notes evidenced and formalized through new notes to be issued by AGINT in the form of notes, denominated in Dollars, the indenture of which shall be executed in a manner consistent with the Term Sheet set forth in **Schedule VI**, so as to reflect and represent the terms of Option A as provided in this Plan ("Option A Payment Instrument – Notes"). |
| **5.5.2.1.** Para que não restem dúvidas, as Requerentes não solicitaram ofertas para, ou ofereceram ou venderam, e não solicitarão ofertas, ou oferecerão ou venderão, quaisquer valores mobiliários de qualquer forma envolvendo uma oferta pública nos termos da Seção 4(a)(2) do *U.S. Securities Act* de 1933. | **5.5.2.1.** For the avoidance of doubt, the Debtors have not solicited offers to purchase, nor have they offered or sold, and shall not solicit offers to purchase, or offer or sell, any securities in any manner involving a public offering under Section 4(a)(2) of the U.S. Securities Act of 1933. |
| **5.5.2.2.** Lei de Regência. O Instrumento de Pagamento da Opção A – *Notes* será regido pelas Leis do Estado de Nova Iorque, Estados Unidos da América. | **5.5.2.2.** Governing Law. The Option A Payment Instrument - Notes shall be governed by the laws of the State of New York, United States of America. |

| | |
|---|---|
| **5.5.2.3.** Momento de emissão. A emissão do Instrumento de Pagamento da Opção A – *Notes* será realizada após a Decisão de Implementação *Chapter 15* e o cancelamento das Notas Internacionais Existentes. | **5.5.2.3.** Time of Issuance. The issuance of the Option A Payment Instrument – Notes shall take place following the entry of the Chapter 15 Enforcement Order and the cancellation of the International Existing Notes. |
| **5.5.2.4.** Conflito. Em caso de conflito entre a escritura de emissão do Instrumento de Pagamento da Opção A – *Notes* e qualquer outra disposição deste Plano, prevalecerão os termos e condições estabelecidos neste Plano. | **5.5.2.4.** Conflict. In the event of any conflict between the indenture governing the Option A Payment Instrument – Notes and any other provision of this Plan, the terms and conditions set forth in this Plan shall prevail. |
| **5.5.2.5.** Para que não restem dúvidas, entre a Data da Homologação e a data de emissão do Instrumento de Pagamento Opção A – *Notes*, os Créditos Opção A decorrentes das Notas Internacionais Existentes serão materializados e instrumentalizados por meio deste Plano, o qual servirá, em conjunto com a Sentença de Homologação do Plano, como título executivo judicial para todos os fins e efeitos de direito, conforme artigo 161, § 6º, da LRF, podendo ser executado de acordo com os termos e condições previstos neste Plano, inclusive com relação às garantias fidejussórias previstas na Cláusula 5.4 deste Plano. | **5.5.2.5.** For the avoidance of doubt, between the Judicial Confirmation Date and the issuance date of the Option A Payment Instrument – Notes, the Option A Claims arising from the International Existing Notes shall be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (*título executivo judicial*) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan, including with respect to the corporate guarantees set forth in Section 5.4 of this Plan. |

| | |
|---|---|
| **5.5.2.6.** Caso o Instrumento de Pagamento Opção A – *Notes* não seja emitido por qualquer motivo, os Créditos Opção A decorrentes das Notas Internacionais Existentes continuarão sendo materializados e instrumentalizados por meio deste Plano, o qual servirá, em conjunto com a Sentença de Homologação do Plano, como título executivo judicial para todos os fins e efeitos de direito, conforme artigo 161, § 6º, da LRF, podendo ser executado de acordo com os termos e condições previstos neste Plano. O disposto nesta Cláusula não deve ser interpretado como renúncia, mitigação ou limitação da obrigação das Requerentes de adotar as medidas razoavelmente necessárias para emitir o Instrumento de Pagamento Opção A – *Notes*, nos termos deste Plano. | **5.5.2.6.** If the Option A Payment Instrument – Notes is not issued for any reason, the Option A Claims arising from the International Existing Notes shall continue to be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (*título executivo judicial*) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan. The provisions of this Section shall not be construed as a waiver, mitigation, or limitation of the Debtors' obligation to take the reasonably necessary measures to issue the Option A Payment Instrument – Notes, pursuant to the terms of this Plan. |
| **6. OPÇÃO B** | **6. OPTION B** |
| **6.1.** Opção B. O Credor Sujeito que tenha validamente escolhido a Opção B, em atenção ao disposto nas Cláusulas 8.1 a 8.3, ou que tenha o seu Crédito Sujeito alocado para recebimento de acordo com a Opção B na forma das Cláusula 8.4 ou 8.5 ("Credor Opção B"), terá o seu respectivo Crédito Sujeito ***(i)*** reestruturado, novado, quitado e cancelado, com relação às Requerentes, nos termos deste Plano e dos artigos 163, §1º, e 165, *caput*, da | **6.1.** Option B. The Subject Creditor that has validly elected Option B, pursuant to Sections 8.1 until 8.3, or that has had its Subject Claim allocated for payment under Option B pursuant to Sections 8.4 or 8.5 (the "Option B Creditor"), shall have its respective Subject Claim ***(i)*** restructured, novated, fully satisfied, and cancelled with respect to the Debtors, in accordance with this Plan and articles 163, first paragraph, and 165, caput, of the |

| | |
|---|---|
| LRF; e ***(ii)*** substituído por Crédito Opção B nas proporções previstas neste Plano, o qual será pago exclusivamente nas condições, prazos e formas de pagamento ora estabelecidos. | Brazilian Bankruptcy Act; and ***(ii)*** replaced by the Option B Claim, in the proportions set forth in this Plan, which shall be paid exclusively under the conditions, terms, and payment methods herein established. |
| **6.2.** Quitação. A prolação da Sentença de Homologação do Plano acarretará, na Data da Homologação, quitação ampla, plena, irrevogável e irretratável dos respectivos Créditos Sujeitos e das obrigações que os lastreiam com relação às Requerentes, sendo automaticamente cancelados e/ou extintos de pleno direito os instrumentos que consubstanciam os Créditos Sujeitos detidos pelos Credores Opção B, os quais serão automaticamente substituídos por Créditos Opção B. | **6.2.** Release. The entry of the Plan Confirmation Order shall result, on the Judicial Confirmation Date, in the full, final, irrevocable, and irreversible release of the respective Subject Claims and of the obligations underlying them with respect to the Debtors, and the instruments evidencing the Subject Claims held by the Option B Creditors shall be automatically cancelled and/or extinguished by operation of law, being automatically replaced by the Option B Claims. |
| **6.3.** Relação de Troca. O Credor Opção B terá direito a receber o equivalente a 100% (cem por cento) do valor do seu Crédito Sujeito nos termos e condições descritos na Cláusula 6.4 abaixo. | **6.3.** Exchange Ratio. The Option B Creditor shall be entitled to receive the equivalent of one hundred percent (100%) of the amount of its Subject Claim, under the terms and conditions set forth in Section 6.4 below. |
| **6.4.** Termos e Condições da Opção B. Os Credores Opção B serão pagos de acordo com os termos e condições descritos abaixo ("Crédito Opção B"), que serão integralmente refletidos nos seus respectivos Instrumentos de Pagamento da Opção B: | **6.4.** Terms and Conditions of Option B. The Option B Creditors shall be paid in accordance with the terms and conditions described below (the "Option B Claim"), which shall be fully reflected in their respective Option B Payment Instruments: |
| **(i)** Valor do Principal: 100% (cem por cento) do valor dos Créditos Sujeitos detidos pelos Credores Opção B será pago nos termos e condições previstos nesta Cláusula 6.4. Para que não | **(i)** Principal Amount: 100% (one hundred percent) of the amount of the Subject Claims held by the Option B Creditors shall be paid under the terms and conditions set forth in Section 6.4. For |

| | | | | |
|---|---|---|---|---|
| | restem dúvidas, o valor em Crédito Opção B a ser recebido por cada Credor Opção B, nos termos deste Plano e, conforme aplicável, do Plano 2, observará o disposto nas Cláusulas 11.5 e seguintes do Plano, de modo que, em nenhuma hipótese, o respectivo Credor Opção B receberá o valor do seu Crédito Opção B em duplicidade. | | | the avoidance of doubt, the amount of the Option B Claim to be received by each Option B Creditor under this Plan and, as applicable, under Plan 2, shall comply with the provisions of Sections 11.5 and following of this Plan, and under no circumstances shall any Option B Creditor receive payment of its Option B Claim in duplicate. |
| **(ii)** | Juros Remuneratórios: sobre os Créditos Opção B denominados em Dólar incidirão juros remuneratórios de 1% (um por cento) ao ano (considerando-se, para tanto, um ano de 360 (trezentos e sessenta) Dias Corridos), computados a partir da Data da Homologação e capitalizados ao valor do principal até a data de vencimento dos Créditos Opção B. Sobre os Créditos Opção B denominados em Real incidirão juros remuneratórios equivalentes a 2% (dois por cento) ao ano (considerando-se, para tanto, um ano de 252 (duzentos e cinquenta e dois) Dias Úteis), computados a partir da Data da Homologação e capitalizados ao valor do principal até a data de vencimento dos Créditos Opção B. | | **(ii)** | Interest: the Option B Claims denominated in Dollars shall accrue interest at a rate of 1% (one per cent) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date and capitalized to the principal amount until the maturity date of the Option B Claims. The Option B Claims denominated in Real shall accrue interest equivalent to 2% (two per cent) per annum (considering, to that end, a year of 252 (two hundred and fifty-two) Business Days), calculated from the Judicial Confirmation Date and capitalized to the principal amount until the maturity date of the Option B Claims. |
| **(iii)** | Cronograma de Pagamento do Principal: o valor do principal dos Créditos Opção B, incluindo os juros | | **(iii)** | Principal Amortization Schedule: the principal amount of the Option B Claims, including the interest accrue |

| | | | | |
|---|---|---|---|---|
| | capitalizados no valor do principal, será amortizado em uma única parcela, na data de vencimento dos Créditos Opção B. | | | and capitalized into the principal, shall be amortized in a single installment on the maturity date of the Option B Claims. |
| **(iv)** | Fator de correção monetária: não aplicável. | | **(iv)** | Monetary adjustment factor: not applicable. |
| **(v)** | Data de Vencimento: 28 de dezembro de 2070. | | **(v)** | Maturity Date: December 28, 2070. |
| **(vi)** | Moeda: não será alterada a moeda original do respectivo Crédito Sujeito detido pelo Credor Opção B, de modo que **(a)** os Créditos Sujeitos denominados em Real continuarão denominados em Real, e **(b)** os Créditos Sujeitos denominados em moeda estrangeira continuarão denominados na respectiva moeda estrangeira. O Credor Opção B titular de Crédito Sujeito em moeda estrangeira poderá, nos termos do artigo 163, § 5º, da LRF, concordar em ter o seu respectivo Crédito Opção B denominado em Real, salvo se tal Crédito Sujeito decorrer de Notas Internacionais Existentes, hipótese em que será observado o disposto na Cláusula 6.5.2 abaixo. | | **(vi)** | Currency: the original currency of the respective Subject Claim held by the Option B Creditor shall not be changed, so that **(a)** Subject Claims denominated in Real shall remain denominated in Real, and **(b)** Subject Claims denominated in foreign currency shall remain denominated in its respective foreign currency. The Option B Creditor holding a Subject Claim denominated in foreign currency may, pursuant to article 163, fifth paragraph, of the Brazilian Bankruptcy Act, agree to have its respective Option B Claim denominated in Real, except if such Subject Claim arises from International Existing Notes, in which case the provisions of Section 6.5.2 below shall apply. |
| **(vii)** | Devedora(s) Principal(is): a(s) devedora(s) principal(is) do respectivo Crédito Sujeito detido pelo Credor | | **(vii)** | Main Debtor(s): the main debtor(s) of the respective Subject Claim held by the Option B Creditor shall remain, as |

| | | | |
|---|---|---|---|
| | Opção B permanecerá(ão), conforme aplicável, como devedora(s) principal(is) do Crédito Opção B, sem prejuízo das garantias fidejussórias descritas abaixo. | | applicable, the main debtor(s) of the Option B Claim, without prejudice to the corporate guarantees described below. |
| **(viii)** | Garantias Fidejussórias: AGE, AGIE, AGCS, AGPAR e AGSA prestam, neste ato, fiança em garantia do pagamento dos Créditos Opção B, obrigando-se, de forma irrevogável e irretratável, como fiadoras, solidariamente com a(s) respectiva(s) devedora(s) principal(is) e entre si, das obrigações decorrentes desta Opção B, nos termos dos artigos 818 e seguintes do Código Civil, bem como renunciam expressamente aos benefícios de ordem e divisão, assim como aos direitos e faculdades de exoneração de qualquer natureza, previstos nos artigos 333, parágrafo único, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 e 839, todos do Código Civil, e nos artigos 130, 131 e 794 do CPC. As garantias fidejussórias outorgadas por AGE, AGCS AGIE, AGPAR e AGSA, conforme aplicável, serão refletidas igualmente no Instrumento de Pagamento da Opção B – *Notes* (conforme definido abaixo), sendo AGE, AGIE, AGCS, AGPAR e AGSA signatárias da escritura de emissão do Instrumento de Pagamento da Opção B – Notes, para este fim, na mesma extensão descrita na frase | **(viii)** | Corporate Guarantees: AGE, AGIE, AGCS, AGPAR and AGSA hereby grant a corporate guarantee (*fiança*) to secure the payment of the Option B Claims, undertaking, irrevocably and irreversibly, as obligors, jointly and severally with the respective main debtor(s) and among themselves, the obligations arising from this Option B, pursuant to articles 818 et seq. of the Brazilian Civil Code, and expressly waiving the benefits of order and division, as well as any rights or discharge faculties of any nature, set forth in articles 333, sole paragraph, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 and 839, of the Brazilian Civil Code, and in articles 130, 131 and 794 of the Brazilian Code of Civil Procedure. The corporate guarantees granted by AGE, AGCS, AGIE, AGPAR and AGSA, as applicable, shall be equally reflected in the Option B Payment Instrument – Notes (as defined below), and AGE, AGIE, AGCS, AGPAR and AGSA shall be signatories to the indenture of the Option B Payment Instrument – Notes for this purpose, to the same extent described above, in accordance |

| | | | | |
|---|---|---|---|---|
| | acima, observando o disposto nas Leis do Estado de Nova Iorque, Estados Unidos da América. Para fins de clareza, as garantidoras fidejussórias sub-rogar-se-ão nos direitos dos Credores Opção B, caso venham a honrar, parcial ou totalmente, a garantia fidejussória, observando o disposto nas Cláusulas 11.5 e seguintes, sendo que as garantidoras fidejussórias se obrigam desde já a não cobrar, receber ou de qualquer outra forma demandar da emissora do Instrumento de Pagamento da Opção B – Notes o pagamento de qualquer valor pago em decorrência das garantias fidejussórias, seja por sub-rogação, compensação ou a qualquer outro título, até que todas as obrigações garantidas tenham sido quitadas. Caso as garantidoras fidejussórias, em violação a tal disposição, venham a receber quaisquer recursos decorrentes da escritura de emissão do Instrumento de Pagamento da Opção B – Notes de forma diversa, os receberão na qualidade de fiéis depositárias, devendo providenciar a transferência da totalidade dos referidos recursos em benefício dos Credores Opção B em até 2 (dois) Dias Úteis do seu recebimento, sem qualquer dedução ou desconto. | | | with the laws of the State of New York, United States of America. For the avoidance of doubt, the guarantors shall be subrogated to the rights of the Option B Creditors in the event they honor, in whole or in part, the corporate guarantee, pursuant to the provisions of Section 11.5 et. seq, it being understood that the corporate guarantors hereby undertake not to collect, receive, or otherwise demand from the issuer of the Option B Payment Instrument – Notes the payment of any amounts paid under the corporate guarantees, whether by subrogation, set-off, or on any other basis, until all guaranteed obligations have been fully satisfied. Should the corporate guarantors, in violation of such provision, receive any proceeds under the indenture of the Option B Payment Instrument – Notes in any other manner, they shall receive such proceeds as trustees, and shall transfer the entirety of such proceeds for the benefit of the Option B Creditors within 2 (two) Business Days of receipt, without any deduction or discount. |
| **(ix)** | Pagamento ou Resgate Antecipado: os Créditos Opção B poderão, a qualquer momento a partir de 1º de janeiro de | | **(ix)** | Payment or Early Redemption: the Option B Claims may, at any time as of January 1, 2035 and until June 28, |

| | |
|---|---|
| 2035 e até 28 de junho de 2070, a exclusivo critério das Requerentes, da AGSA, da AGPAR e/ou da AGINT, ser pagos ou resgatados antecipadamente, de forma parcial ou integral, com a aplicação de desconto equivalente a 90% do valor do Crédito Opção B objeto do pagamento ou resgate antecipado, conforme devidamente atualizado até a data de vencimento dos Créditos Opção B. Para que não restem dúvidas, por meio de pagamento de valor equivalente a 10% do Crédito Opção B objeto do pagamento ou resgate antecipado, conforme devidamente atualizado até a data de vencimento dos Créditos Opção B, haverá a quitação da integralidade do Crédito Opção B detido pelo respectivo Credor Opção B para todos os fins e efeitos de direito. | 2070, at the sole discretion of the Debtors, AGSA, AGPAR and/or AGINT, be prepaid or redeemed in advance, partially or in full, with the application of a discount equivalent to 90% of the amount of the Option B Claim subject to such prepayment or early redemption, as duly adjusted until the maturity date of the Option B Claims. For the avoidance of doubt, upon payment of an amount equivalent to 10% of the Option B Claim subject to such prepayment or early redemption, as duly adjusted until the maturity date of the Option B Claims, the Option B Claim held by the respective Option B Creditor shall be deemed fully settled and discharged for all legal purposes. |
| **6.5.** Instrumentos de Pagamento da Opção B. A partir da Data da Homologação, os Credores Opção B passarão automaticamente a ser, desde logo, detentores dos seus respectivos Créditos Opção B, com todas as características previstas neste Plano, os quais serão subsequentemente materializados e instrumentalizados por meio dos Instrumentos de Pagamento da Opção B, conforme os critérios estabelecidos abaixo: | **6.5.** Option B Payment Instruments. As of the Judicial Confirmation Date, the Option B Creditors shall automatically become, as of such date, holders of their respective Option B Claims, with all the characteristics set forth in this Plan, which shall subsequently be evidenced and formalized through the Option B Payment Instruments, in accordance with the criteria set forth below: |
| **6.5.1.** Instrumento de Pagamento da Opção B – Plano. Salvo na hipótese descrita na Cláusula 6.5.2 abaixo, os Credores Opção B | **6.5.1.** Option B Payment Instrument – Plan. Except in the event described in Section 6.5.2 below, the Option B Creditors shall have |

| | |
|---|---|
| terão os seus respectivos Créditos Opção B materializados e instrumentalizados por meio deste Plano, sem a emissão de valores mobiliários, o qual servirá, em conjunto com a Sentença de Homologação do Plano, como título executivo judicial para todos os fins e efeitos de direito, conforme artigo 161, §6º, da LRF, podendo ser executado de acordo com os termos e condições previstos neste Plano ("Instrumento de Pagamento da Opção B – Plano"). | their respective Option B Claims evidenced and formalized through this Plan, without the issuance of securities, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (*título executivo judicial*) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan ("Option B Payment Instrument – Plan"). |
| **6.5.2.** Instrumento de Pagamento da Opção B – *Notes*. Os Credores Opção B que, cumulativamente, ***(i)*** sejam atualmente titulares de Notas Internacionais Existentes; e ***(ii.a)*** sejam investidores institucionais qualificados (*qualified institutional buyers*) nos termos da Regra 144A, editada sob o *U.S. Securities Act* de 1933, conforme alterado, ou ***(ii.b)*** não sejam "*pessoas norte-americanas*" (*U.S. persons*), conforme definido na Regra 902 do *U.S. Securities Act*, sendo que qualquer credor descrito nessa Cláusula 6.5.2, item (ii.b), que seja residente em um Estado-membro do Espaço Econômico Europeu também deverá ser um investidor qualificado (*qualified investor*), nos termos do Regulamento (UE) 2017/1129, conforme alterado, e da Lei de Luxemburgo de 16 de julho de 2019 sobre prospectos de valores mobiliários, conforme alterada, ou ***(ii.c)*** sejam investidores institucionais credenciados (*institutional accredited investors*) conforme definido na Regra 501 sob o *U.S. Securities Act* de 1933, | **6.5.2.** Option B Payment Instrument – Notes. The Option B Creditors that, cumulatively, ***(i)*** currently hold International Existing Notes; ***(ii.a)*** are qualified institutional buyers as defined under Rule 144A promulgated under the U.S. Securities Act of 1933, as amended; ***(ii.b)*** are not "U.S. persons" as defined under Rule 902 of the U.S. Securities Act, provided that any holder described in this Section 6.5.2, item (ii.b), that is resident of a member state of the European Economic Area must also be a qualified investor under Regulation (EU) 2017/1129, as amended, and under the Luxembourg Law of July 16, 2019 on prospectuses for securities, as amended; or ***(ii.c)*** are institutional accredited investors as defined under Rule 501 of the U.S. Securities Act of 1933, shall, subject to the provisions of Section 6.5.2.5 and except as provided in Section 6.5.2.6 of this Plan, have their Option B Claims arising from the International Existing Notes evidenced and formalized through new notes to be issued by AGINT, in the form of notes, denominated in |

| | | |
|---|---|---|
| terão, observado o disposto na Cláusula 6.5.2.5 e salvo na hipótese da Cláusula 6.5.2.6 deste Plano, os seus Créditos Opção B decorrentes das Notas Internacionais Existentes materializados e instrumentalizados por meio de novos títulos a serem emitidos pela AGINT em forma de *notes*, denominadas em Dólares, cuja escritura de emissão será celebrada de forma consistente com o *Term Sheet* constante do **Anexo VII**, de modo a refletir e representar os termos da Opção B conforme o previsto neste Plano ("Instrumento de Pagamento da Opção B – *Notes*"). | | Dollars, the indenture of which shall be executed in a manner consistent with the Term Sheet attached as **Schedule VII,** so as to reflect and represent the terms of Option B as provided in this Plan (the "Option B Payment Instrument – Notes"). |
| **6.5.2.1.** Para que não restem dúvidas, as Requerentes não solicitaram ofertas para, ou ofereceram ou venderam, e não solicitarão ofertas, ou oferecerão ou venderão, quaisquer valores mobiliários de qualquer forma envolvendo uma oferta pública nos termos da Seção 4(a)(2) do *U.S. Securities Act* de 1933. | | **6.5.2.1.** For the avoidance of doubt, the Debtors have not solicited offers to buy, or offered or sold, and shall not solicit offers to buy, or offer or sell, any securities in any manner involving a public offering pursuant to Section 4(a)(2) of the U.S. Securities Act of 1933. |
| **6.5.2.2.** Lei de Regência: O Instrumento de Pagamento da Opção B – *Notes* será regido pelas Leis do Estado de Nova Iorque, Estados Unidos da América. | | **6.5.2.2.** Governing law. The Option B Payment Instrument – Notes shall be governed by the laws of the State of New York, United States of America. |
| **6.5.2.3.** Momento de emissão. A emissão do Instrumento de Pagamento da Opção B – *Notes* será | | **6.5.2.3.** Time of issuance. The issuance of the Option B Payment Instrument – Notes shall occur after the |

| | | |
|---|---|---|
| realizada após a Decisão de Implementação *Chapter 15* e cancelamento das Notas Internacionais Existentes. | | entry of the Chapter 15 Enforcement Order and the cancellation of the International Existing Notes. |
| **6.5.2.4.** Conflito. Em caso de conflito entre a escritura de emissão do Instrumento de Pagamento da Opção B – *Notes* e qualquer outra disposição deste Plano, prevalecerão os termos e condições estabelecidos neste Plano. | | **6.5.2.4.** Conflict. In the event of any conflict between the indenture governing the Option B Payment Instrument – Notes and any other provision of this Plan, the terms and conditions set forth in this Plan shall prevail. |
| **6.5.2.5.** Para que não restem dúvidas, entre a Data da Homologação e a data de emissão do Instrumento de Pagamento Opção B – *Notes*, os Créditos Opção B decorrentes das Notas Internacionais Existentes serão materializados e instrumentalizados por meio deste Plano, o qual servirá, em conjunto com a Sentença de Homologação do Plano, como título executivo judicial para todos os fins e efeitos de direito, conforme artigo 161, § 6º, da LRF, podendo ser executado de acordo com os termos e condições previstos neste Plano, inclusive com relação às garantias fidejussórias previstas na Cláusula 6.4 deste Plano. | | **6.5.2.5.** For the avoidance of doubt, between the Judicial Confirmation Date and the issuance date of the Option B Payment Instrument – Notes, the Option B Claims arising from the International Existing Notes shall be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (*título executivo judicial*) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan, including with respect to the corporate guarantees set forth in Section 6.4 of this Plan. |
| **6.5.2.6.** Caso o Instrumento de Pagamento Opção B – *Notes* não seja | | **6.5.2.6.** If the Option B Payment Instrument – Notes is not issued for any |

| | | |
|---|---|---|
| emitido por qualquer motivo, os Créditos Opção B decorrentes das Notas Internacionais Existentes continuarão sendo materializados e instrumentalizados por meio deste Plano, o qual servirá, em conjunto com a Sentença de Homologação do Plano, como título executivo judicial para todos os fins e efeitos de direito, conforme artigo 161, § 6º, da LRF, podendo ser executado de acordo com os termos e condições previstos neste Plano. O disposto nesta Cláusula não deve ser interpretado como renúncia, mitigação ou limitação da obrigação das Requerentes de adotar as medidas razoavelmente necessárias para emitir o Instrumento de Pagamento Opção B – *Notes*, nos termos deste Plano. | | reason, the Option B Claims arising from the International Existing Notes shall continue to be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (*título executivo judicial*) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan. The provisions of this Section shall not be construed as a waiver, mitigation, or limitation of the Debtors' obligation to take the reasonably necessary measures to issue the Option B Payment Instrument – Notes, pursuant to the terms of this Plan. |
| **7. OPÇÃO C** | | **7. OPTION C** |
| **7.1.** Opção C. O Credor Sujeito que tenha validamente escolhido a Opção C, em atenção ao disposto nas Cláusulas 8.1 a 8.3 ("Credor Opção C"), terá o seu respectivo Crédito Sujeito ***(i)*** reestruturado, novado, quitado e cancelado, com relação às Requerentes, nos termos deste Plano e dos artigos 163, §1º, e 165, *caput*, da LRF; e ***(ii)*** substituído por Crédito Opção C nas proporções previstas neste Plano, o qual será pago exclusivamente nas condições, prazos e formas de pagamento ora estabelecidos. | | **7.1.** Option C. The Subject Creditor that has validly elected Option C, in accordance with Sections 8.1 until 8.3 ("Option C Creditor"), shall have its respective Subject Claim ***(i)*** restructured, novated, fully satisfied and cancelled, with respect to the Debtors, pursuant to the terms of this Plan and articles 163, first paragraph, and 165, caput, of the Brazilian Bankruptcy Act; and ***(ii)*** replaced by an Option C Claim in the proportions set forth in this Plan, which shall be paid exclusively under the |

| | |
|---|---|
| | terms, deadlines and payment methods established herein. |
| **7.1.1.** Para que não restem dúvidas, a escolha da Opção C pelo Credor Signatário foi válida e regularmente feita nos termos da Cláusula 4.3.1 deste Plano, e a reestruturação, novação, quitação, cancelamento e substituição de seus respectivos Créditos Sujeitos dão-se desde a Data da Celebração, nos termos do artigo 165, § 1º, da LRF e da Cláusula 4.3.1 deste Plano. | **7.1.1.** For the avoidance of doubt, the election of Option C by the Signatory Creditor was validly and duly made pursuant to Section 4.3.1 of this Plan, and the restructuring, novation, full satisfaction, cancellation and replacement of its respective Subject Claims shall take effect as of the Signing Date, pursuant to article 165, first paragraph, of the Brazilian Bankruptcy Act and Section 4.3.1 of this Plan. |
| **7.2.** Quitação. A prolação da Sentença de Homologação do Plano acarretará, na Data da Homologação, quitação ampla, plena, irrevogável e irretratável dos respectivos Créditos Sujeitos e das obrigações que os lastreiam com relação às Requerentes, sendo automaticamente cancelados e/ou extintos de pleno direito os instrumentos que consubstanciam os Créditos Sujeitos detidos pelos Credores Opção C, os quais serão automaticamente substituídos pelos Créditos Opção C. | **7.2.** Release. The entry of the Plan Confirmation Order shall result, on the Judicial Confirmation Date, in the full, complete, irrevocable and irreversible release of the respective Subject Claims and of the obligations underlying them with respect to the Debtors, and the instruments embodying the Subject Claims held by the Option C Creditors shall be automatically cancelled and/or extinguished by operation of law, being shall be automatically replaced by the Option C Claims. |
| **7.2.1.** Para que não restem dúvidas, o disposto na Cláusula 7.2 será aplicável desde a Data da Celebração aos Créditos Sujeitos | **7.2.1.** For the avoidance of doubt, the provisions of Section 7.2 shall apply as of the Signing Date to the Subject Claims held by the |

| | |
|---|---|
| detidos pelo Credor Signatário, observado o disposto na Cláusula 4.3.1 deste Plano. | Signatory Creditor, pursuant to the provisions of Section 4.3.1 of this Plan. |
| **7.3.** Relação de Troca. O Credor Opção C terá direito a receber o equivalente a ***(i)*** 31% (trinta e um por cento) do valor do seu Crédito Sujeito nos termos e condições descritos na Cláusula 7.4.1, que refletem substancialmente os termos e condições aplicáveis para o pagamento dos Créditos Opção A, conforme previsto na Cláusula 5.4, item "(ii)" em diante; e ***(ii)*** 69% (sessenta e nove por cento) do valor do seu Crédito Sujeito nos termos e condições descritos na Cláusula 7.4.2, que refletem substancialmente os termos e condições aplicáveis para o pagamento dos Créditos Opção B, conforme previsto na Cláusula 6.4, item (ii) em diante. | **7.3.** Exchange Ratio. The Option C Creditor shall be entitled to receive the equivalent of ***(i)*** 31% (thirty-one percent) of the amount of its Subject Claim under the terms and conditions set forth in Section 7.4.1, which substantially reflect the terms and conditions applicable to the payment of Option A Claims, as provided in Section 5.4, item "(ii)" onwards; and ***(ii)*** 69% (sixty-nine percent) of the amount of its Subject Claim under the terms and conditions set forth in Section 7.4.2, which substantially reflect the terms and conditions applicable to the payment of Option B Claims, as provided in Section 6.4, item (ii) onwards. |
| **7.4.** Termos e Condições da Opção C. Os Credores Opção C serão pagos de acordo com os termos e condições descritos nas Cláusulas 7.4.1 ("Crédito Opção C – Tranche A") e 7.4.2 ("Crédito Opção C – Tranche B"), que serão integralmente refletidos nos seus respectivos Instrumentos de Pagamento da Opção C: | **7.4.** Terms and Conditions of Option C. The Option C Creditors shall be paid, in accordance with the terms and conditions set forth in Sections 7.4.1 ("Option C Claim – Tranche A") and 7.4.2 ("Option C Claim – Tranche B"), which shall be fully reflected in their respective Option C Payment Instruments: |
| **7.4.1.** Créditos Opção C – Tranche A: | **7.4.1.** Option C Claims – Tranche A: |
| **(i)** Valor do Principal: 31% (trinta e um por cento) do valor dos Créditos Sujeitos detidos pelos Credores Opção C será pago nos termos e condições previstos nesta Cláusula 7.4.1. Para que não restem dúvidas, o valor em Crédito Opção C – Tranche A a ser recebido por cada Credor Opção C, nos | **(i)** Principal Amount: 31% (thirty-one percent) of the amount of the Subject Claims held by the Option C Creditors shall be paid under the terms and conditions set forth in this Section 7.4.1. For the avoidance of doubt, the amount of the Option C Claim – Tranche A to be received by each |

| | | | | |
|---|---|---|---|---|
| | termos deste Plano e, conforme aplicável, do Plano 2, observará o disposto nas Cláusulas 11.5 e seguintes do Plano, de modo que, em nenhuma hipótese, o respectivo Credor Opção C receberá o valor do seu Crédito Opção C – Tranche A em duplicidade. | | | Option C Creditor, pursuant to this Plan and, as applicable, Plan 2, shall comply with the provisions of Sections 11.5 and following of the Plan, such that, under no circumstances, shall the respective Option C Creditor receive the amount of its Option C Claim – Tranche A in duplicate. |
| **(ii)** | <u>Juros Remuneratórios</u>: sobre os Créditos Opção C – Tranche A denominados em Dólar incidirão juros remuneratórios de 6,00% (seis por cento) ao ano (considerando-se, para tanto, um ano de 360 (trezentos e sessenta) Dias Corridos), computados a partir da Data da Homologação até 28 de dezembro de 2040. Sobre os Créditos Opção C – Tranche A denominados em Real incidirão juros remuneratórios equivalentes a 100% (cem por cento) da Taxa DI ao ano (considerando-se, para tanto, um ano de 252 (duzentos e cinquenta e dois) Dias Úteis), computados a partir da Data da Homologação até 28 de dezembro de 2040. | | **(ii)** | <u>Interest</u>: the Option C Claims – Tranche A denominated in Dollars shall accrue interest at a rate of 6.00% (six percent) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date until 28 December 2040. The Option C Claims – Tranche A denominated in Real shall accrue interest equivalent to 100% (one hundred percent) of the DI Rate per annum (considering, to that end, a year of 252 (two hundred and fifty-two) Business Days), calculated from the Judicial Confirmation Date until 28 December 2040. |
| **(iii)** | <u>Cronograma e Forma de Pagamento dos Juros Remuneratórios</u>: os juros remuneratórios que incidirem sobre os Créditos Opção C – Tranche A serão pagos da seguinte forma: **(a)** da Data da Homologação até 28 de dezembro de 2030, os juros remuneratórios | | **(iii)** | <u>Schedule and Form of Payment of Interest</u>: the interest accruing on the Option C Claims – Tranche A shall be paid as follows: **(a)** from the Judicial Confirmation Date until 28 December 2030, the interest accrued during the period shall be capitalized into the |

| | | | | |
|---|---|---|---|---|
| | incidentes no período serão capitalizados no valor do principal; e **(b)** de 28 de dezembro de 2030 até 28 de dezembro de 2040, os juros remuneratórios incidentes no período serão pagos em dinheiro e em bases semestrais, em 28 de junho e 28 de dezembro, conforme aplicável, sendo a data do primeiro pagamento 28 de junho de 2031. | | | principal amount; and **(b)** from 28 December 2030 until 28 December 2040, the interest accrued during the period shall be paid in cash on a semiannual basis, on 28 June and 28 December, as applicable, with the first payment date being 28 June 2031. |
| **(iv)** | Cronograma de Pagamento do Principal: o valor do principal dos Créditos Opção C – Tranche A, incluindo os juros capitalizados ao valor do principal, será amortizado, em dinheiro, em seis parcelas anuais, a serem pagas em 28 de dezembro de 2035, 28 de dezembro de 2036, 28 de dezembro de 2037, 28 de dezembro de 2038, 28 de dezembro de 2039 e 28 de dezembro de 2040, no valor correspondente a 16,667%, 20%, 25%, 33,333%, 50% e 100% do valor do saldo do principal existente nas respectivas datas de pagamento. | | **(iv)** | Principal Payment Schedule: the principal amount of the Option C Claims – Tranche A, including the interest capitalized into the principal amount, shall be amortized, in cash, in six annual installments, to be paid on December 28 of 2035, December 28 of 2036, December 28 of 2037, December 28 of 2038, December 28 of 2039 and December 28 of 2040, in the amounts corresponding to 16.667%, 20%, 25%, 33.333%, 50% and 100% of the outstanding principal balance on the respective payment dates. |
| **(v)** | Data de Vencimento: 28 de dezembro de 2040. | | **(v)** | Maturity Date: 28 December 2040. |
| **(vi)** | Fator de correção monetária: não aplicável. | | **(vi)** | Monetary adjustment factor: not applicable. |
| **(vii)** | Moeda: não será alterada a moeda original do respectivo Crédito Sujeito | | **(vii)** | Currency: the original currency of the respective Subject Claim held by the |

| | | | | | |
|---|---|---|---|---|---|
| | detido pelo Credor Opção C, de modo que **(a)** os Créditos Sujeitos denominados em Real continuarão denominados em Real, e **(b)** os Créditos Sujeitos denominados em moeda estrangeira continuarão denominados na respectiva moeda estrangeira. O Credor Opção C titular de Crédito Sujeito em moeda estrangeira poderá, nos termos do artigo 163, § 5º, da LRF, concordar em ter o seu respectivo Crédito Opção C – Tranche A denominado em Real, salvo se tal Crédito Sujeito decorrer de Notas Internacionais Existentes, hipótese em que será observado o disposto na Cláusula 7.5.2 abaixo. | | | Option C Creditor shall not be changed, such that **(a)** Subject Claims denominated in Real shall remain denominated in Real, and **(b)** Subject Claims denominated in foreign currency shall remain denominated in the respective foreign currency. The Option C Creditor holding a Subject Claim in foreign currency may, pursuant to article 163, fifth paragraph, of the Brazilian Bankruptcy Act, agree to have its respective Option C Claim – Tranche A denominated in Brazilian Reais, except if such Subject Claim arises from International Existing Notes, in which case the provisions of Section 7.5.2 below shall apply. |
| **(viii)** | Devedora(s) Principal(is): a(s) devedora(s) principal(is) do respectivo Crédito Sujeito detido pelo Credor Opção C permanecerá(ão), conforme aplicável, como devedora(s) principal(is) do respectivo Crédito Opção C – Tranche A, sem prejuízo das garantias fidejussórias descritas abaixo. | | **(viii)** | Main Debtor(s): the main debtor(s) of the respective Subject Claim held by the Option C Creditor shall remain, as applicable, as the main debtor(s) of the respective Option C Claim – Tranche A, without prejudice to the corporate guarantees described below. |
| **(ix)** | Garantias Fidejussórias: AGE, AGIE, AGCS, AGPAR e AGSA prestam, neste ato, fiança em garantia do pagamento dos Créditos Opção C – Tranche A, obrigando-se, de forma irrevogável e irretratável, como fiadoras, solidariamente com a(s) | | **(ix)** | Corporate Guarantees: AGE, AGIE, AGCS, AGPAR and AGSA hereby grant a corporate guarantee (*fiança*) to secure the payment of the Option C – Tranche A Claims, irrevocably and irreversibly undertaking, as obligors, jointly and severally with the |

| | |
|---|---|
| respectiva(s) devedora(s) principal(is) e entre si, das obrigações decorrentes desta Opção C – Tranche A, nos termos dos artigos 818 e seguintes do Código Civil, bem como renunciam expressamente aos benefícios de ordem e divisão, assim como aos direitos e faculdades de exoneração de qualquer natureza, previstos nos artigos 333, parágrafo único, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 e 839, todos do Código Civil, e nos artigos 130, 131 e 794 do CPC. As garantias fidejussórias outorgadas por AGE, AGCS AGIE, AGPAR e AGSA, conforme aplicável, serão refletidas igualmente nos Instrumentos de Pagamento da Opção C – *Notes*, sendo AGE, AGIE, AGCS, AGPAR e AGSA signatárias da escritura de emissão dos Instrumentos de Pagamento da Opção C – *Notes*, para este fim, na mesma extensão descrita na frase acima, observando o disposto nas Leis do Estado de Nova Iorque, Estados Unidos da América. Para fins de clareza, as garantidoras fidejussórias sub-rogar-se-ão nos direitos dos Credores Opção C, caso venham a honrar, parcial ou totalmente, a garantia fidejussória, observando o disposto nas Cláusulas 11.5 e seguintes, sendo que as garantidoras fidejussórias se obrigam desde já a não cobrar, receber ou de qualquer outra forma demandar da | respective main debtor(s) and among themselves, the obligations arising from this Option C – Tranche A, pursuant to articles 818 et seq. of the Brazilian Civil Code, and expressly waive the benefits of order and division, as well as any rights and faculties of release of any nature, set forth in articles 333, sole paragraph, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 and 839, all of the Brazilian Civil Code, and articles 130, 131 and 794 of the Brazilian Code of Civil Procedure. The corporate guarantees granted by AGE, AGCS, AGIE, AGPAR and AGSA, as applicable, shall be equally reflected in the Option C Payment Instruments – Notes (as defined below), and AGE, AGIE, AGCS, AGPAR and AGSA shall be signatories to the indenture of the Option C Payment Instruments – Notes for this purpose, to the same extent described above, in accordance with the laws of the State of New York, United States of America. For the avoidance of doubt, the guarantors shall be subrogated to the rights of the Option C Creditors in the event they honor, in whole or in part, the corporate guarantee, pursuant to the provisions of Sections 11.5 et. seq., it being understood that the guarantors hereby undertake not to collect, receive, or otherwise demand from the issuer of the Option C Payment |

| | | | |
|---|---|---|---|
| | emissora dos Instrumentos de Pagamento da Opção C – *Notes* o pagamento de qualquer valor pago em decorrência das garantias fidejussórias, seja por sub-rogação, compensação ou a qualquer outro título, até que todas as obrigações garantidas tenham sido quitadas. Caso as garantidoras fidejussórias, em violação a tal disposição, venham a receber quaisquer recursos decorrentes da escritura de emissão dos Instrumentos de Pagamento da Opção C – *Notes* de forma diversa, os receberão na qualidade de fiéis depositárias, devendo providenciar a transferência da totalidade dos referidos recursos em benefício dos Credores Opção C em até 2 (dois) Dias Úteis do seu recebimento, sem qualquer dedução ou desconto. | | Instruments – Notes the payment of any amounts paid under the corporate guarantees, whether by subrogation, set-off, or on any other basis, until all guaranteed obligations have been fully satisfied. Should the corporate guarantors, in violation of such provision, receive any proceeds under the indenture of the Option C Payment Instruments – Notes in any other manner, they shall receive such proceeds as trustees, and shall transfer the entirety of such proceeds for the benefit of the Option C Creditors within 2 (two) Business Days of receipt, without any deduction or discount. |
| **7.4.2.** | Créditos Opção C – Tranche B: | **7.4.2.** | Option C Claims – Tranche B: |
| **(i)** | Valor do Principal: 69% (sessenta e nove por cento) do valor dos Créditos Sujeitos detidos pelos Credores Opção C será pago nos termos e condições previstos nesta Cláusula 7.4.2. Para que não restem dúvidas, o valor em Crédito Opção C – Tranche B a ser recebido por cada Credor Opção C, nos termos deste Plano e, conforme aplicável, do Plano 2, observará o disposto nas Cláusulas 11.5 e seguintes | **(i)** | Principal Amount: 69% (sixty-nine percent) of the amount of the Subject Claims held by the Option C Creditors shall be paid under the terms and conditions set forth in this Section 7.4.2. For the avoidance of doubt, the amount of the Option C Claim – Tranche B to be received by each Option C Creditor, pursuant to this Plan and, as applicable, Plan 2, shall comply with the provisions of Sections |

| | | | | |
|---|---|---|---|---|
| | do Plano, de modo que, em nenhuma hipótese, o respectivo Credor Opção C receberá o valor do seu Crédito Opção C – Tranche B em duplicidade. | | | 11.5 and following of the Plan, such that, under no circumstances, shall the respective Option C Creditor receive the amount of its Option C Claim – Tranche B in duplicate. |
| **(ii)** | <u>Juros Remuneratórios</u>: sobre os Créditos Opção C – Tranche B denominados em Dólar incidirão juros remuneratórios de 1% (um por cento) ao ano (considerando-se, para tanto, um ano de 360 (trezentos e sessenta) Dias Corridos), computados a partir da Data da Homologação e capitalizados no valor do principal até a data de vencimento dos Créditos Opção C – Tranche B. Sobre os Créditos Opção C – Tranche B denominados em Real incidirão juros remuneratórios equivalentes a 2% (dois por cento) ao ano (considerando-se, para tanto, um ano de 252 (duzentos e cinquenta e dois) Dias Úteis), computados a partir da Data da Homologação e capitalizados ao valor do principal até a data de vencimento dos Créditos Opção C – Tranche B. | | **(ii)** | <u>Interest</u>: the Option C – Tranche B Claims denominated in Dollars shall accrue interest at a rate of 1% (one per cent) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date and capitalized into the principal amount until the maturity date of the Option C – Tranche B Claims. The Option C – Tranche B Claims denominated in Real, shall accrue interest equivalent to 2% (two per cent) per annum (considering, to that end, a year of 252 (two hundred and fifty-two) Business Days), calculated from the Judicial Confirmation Date and capitalized to the principal amount until the maturity date of the Option C – Tranche B Claims. |
| **(iii)** | <u>Cronograma de Pagamento do Principal</u>: o valor do principal dos Créditos Opção C – Tranche B, incluindo os juros capitalizados no valor do principal, será amortizado em uma única parcela, na data de | | **(iii)** | <u>Principal Payment Schedule</u>: the principal amount of the Option C Claims – Tranche B, including the interest capitalized into the principal amount, shall be amortized in a single installment, on the maturity date of the Option C Claims– Tranche B. |

| | | | |
|---|---|---|---|
| | vencimento dos Créditos Opção C–Tranche B. | | |
| **(iv)** | <u>Fator de correção monetária</u>: não aplicável. | **(iv)** | <u>Monetary adjustment factor</u>: not applicable. |
| **(v)** | <u>Data de Vencimento</u>: 28 de dezembro de 2070. | **(v)** | <u>Maturity Date</u>: 28 December 2070. |
| **(vi)** | <u>Moeda</u>: não será alterada a moeda original do respectivo Crédito Sujeito detido pelo Credor Opção C, de modo que **(a)** os Créditos Sujeitos denominados em Real continuarão denominados em Real, e **(b)** os Créditos Sujeitos denominados em moeda estrangeira continuarão denominados pela respectiva moeda estrangeira. O Credor Opção C titular de Crédito Sujeito em moeda estrangeira poderá, nos termos do artigo 163, § 5º, da LRF, concordar em ter o seu respectivo Crédito Opção C - Tranche B denominado em Real, salvo se tal Crédito Sujeito decorrer de Notas Internacionais Existentes, hipótese em que será observado o disposto na Cláusula 7.5.2 abaixo. | **(vi)** | <u>Currency</u>: the original currency of the respective Subject Claim held by the Option C Creditor shall not be changed, such that **(a)** Subject Claims denominated in Real shall remain denominated in Real, and **(b)** Subject Claims denominated in foreign currency shall remain denominated in the respective foreign currency. The Option C Creditor holding a Subject Claim in foreign currency may, pursuant to article 163, fifth paragraph, of the Brazilian Bankruptcy Act, agree to have its respective Option C Claim – Tranche B denominated in Real, except if such Subject Claim arises from International Existing Notes, in which case the provisions of Section 7.5.2 below shall apply. |
| **(vii)** | <u>Devedora(s) Principal(is)</u>: a(s) devedora(s) principal(is) do respectivo Crédito Sujeito detido pelo Credor Opção C permanecerá(ão), conforme aplicável, como devedora(s) principal(is) do Crédito Opção C – | **(vii)** | <u>Main Debtor(s)</u>: the main debtor(s) of the respective Subject Claim held by the Option C Creditor shall remain, as applicable, as the main debtor(s) of the Option C Claim – Tranche B, without |

| | | | | |
|---|---|---|---|---|
| | Tranche B, sem prejuízo das garantias fidejussórias descritas abaixo. | | | prejudice to the corporate guarantees described below. |
| **(viii)** | <u>Garantias Fidejussórias</u>: AGE, AGIE, AGCS, AGPAR e AGSA prestam, neste ato, fiança em garantia do pagamento dos Créditos Opção C – Tranche B, obrigando-se, de forma irrevogável e irretratável, como fiadoras, solidariamente com a(s) respectiva(s) devedora(s) principal(is) e entre si, das obrigações decorrentes desta Opção C – Tranche B, nos termos dos artigos 818 e seguintes do Código Civil, bem como renunciam expressamente aos benefícios de ordem e divisão, assim como aos direitos e faculdades de exoneração de qualquer natureza, previstos nos artigos 333, parágrafo único, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 e 839, todos do Código Civil, e nos artigos 130, 131 e 794 do CPC. As garantias fidejussórias outorgadas por AGE, AGCS AGIE, AGPAR e AGSA, conforme aplicável, serão refletidas igualmente nos Instrumentos de Pagamento da Opção C – *Notes*, sendo AGE, AGIE, AGCS, AGPAR e AGSA signatárias da escritura de emissão dos Instrumentos de Pagamento da Opção C – *Notes*, para este fim, na mesma extensão descrita na frase acima, observando o disposto nas Leis do Estado de Nova Iorque, Estados Unidos da América. | | **(viii)** | <u>Corporate Guarantees</u>: AGE, AGIE, AGCS, AGPAR and AGSA hereby grant a corporate guarantee (*fiança*) to secure the payment of the Option C – Tranche B Claims, irrevocably and irreversibly undertaking, as obligors, jointly and severally with the respective main debtor(s) and among themselves, the obligations arising from this Option C – Tranche B, pursuant to articles 818 et seq. of the Brazilian Civil Code, and expressly waive the benefits of order and division, as well as any rights and faculties of release of any nature, set forth in articles 333, sole paragraph, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 and 839, all of the Brazilian Civil Code, and articles 130, 131 and 794 of the Brazilian Code of Civil Procedure. The corporate guarantees granted by AGE, AGCS, AGIE, AGPAR and AGSA, as applicable, shall be equally reflected in the Option C Payment Instruments – Notes, and AGE, AGIE, AGCS, AGPAR and AGSA shall be signatories to the indenture of the Option C Payment Instruments – Notes for this purpose, to the same extent described above, in accordance with the laws of the State of New York, United States of America. For the |

| | | | | |
|---|---|---|---|---|
| | Para fins de clareza, as garantidoras fidejussórias sub-rogar-se-ão nos direitos dos Credores Opção C, caso venham a honrar, parcial ou totalmente, a garantia fidejussória, observando o disposto nas Cláusulas 11.5 e seguintes, sendo que as garantidoras fidejussórias se obrigam desde já a não cobrar, receber ou de qualquer outra forma demandar da emissora dos Instrumentos de Pagamento da Opção C – *Notes* o pagamento de qualquer valor pago em decorrência das garantias fidejussórias, seja por sub-rogação, compensação ou a qualquer outro título, até que todas as obrigações garantidas tenham sido quitadas. Caso as garantidoras fidejussórias, em violação a tal disposição, venham a receber quaisquer recursos decorrentes da escritura de emissão dos Instrumentos de Pagamento da Opção C – *Notes* de forma diversa, os receberão na qualidade de fiéis depositárias, devendo providenciar a transferência da totalidade dos referidos recursos em benefício dos Credores Opção C em até 2 (dois) Dias Úteis do seu recebimento, sem qualquer dedução ou desconto. | | | avoidance of doubt, the guarantors shall be subrogated to the rights of the Option C Creditors in the event they honor, in whole or in part, the corporate guarantee, pursuant to the provisions of Section 11.5 et. seq., it being understood that the corporate guarantors hereby undertake not to collect, receive, or otherwise demand from the issuer of the Option C Payment Instruments – Notes the payment of any amounts paid under the corporate guarantees, whether by subrogation, set-off, or on any other basis, until all guaranteed obligations have been fully satisfied. Should the corporate guarantors, in violation of such provision, receive any proceeds under the indenture of the Option C Payment Instruments – Notes in any other manner, they shall receive such proceeds as trustees, and shall transfer the entirety of such proceeds for the benefit of the Option C Creditors within 2 (two) Business Days of receipt, without any deduction or discount. |
| **(ix)** | <u>Pagamento ou Resgate Antecipado:</u> os Créditos Opção C – Tranche B poderão, a qualquer momento a partir de 1º de janeiro de 2035 e até 28 de | | **(ix)** | <u>Early Payment or Redemption</u>. The Option C – Tranche B Claims may, at any time from January 1st, 2035, until June 28, 2070, at the sole discretion of |

| | | |
|---|---|---|
| junho de 2070, a exclusivo critério das Requerentes, da AGSA, da AGPAR e/ou da AGINT, ser pagos ou resgatados antecipadamente, de forma parcial ou integral, com a aplicação de desconto equivalente a 90% do valor do Crédito Opção C – Tranche B objeto do pagamento ou resgate antecipado, conforme devidamente atualizado até a data de vencimento dos Créditos Opção C – Tranche B. Para que não restem dúvidas, por meio do pagamento de valor equivalente a 10% dos Créditos Opção C – Tranche B objeto do pagamento ou resgate antecipado, conforme devidamente atualizado até a data de vencimento dos Créditos Opção C – Tranche B, haverá a quitação integral da integralidade do Crédito Opção C – Tranche B detido pelo respectivo Credor Opção C para todos os fins e efeitos de direito. | | the Debtors, AGSA, AGPAR and/or AGINT, be prepaid or redeemed in advance, partially or in full, with the application of a discount equivalent to 90% of the amount of the Option C – Tranche B Claim subject to such early payment or redemption, as duly adjusted until the maturity date of the Option C – Tranche B Claims. For the avoidance of doubt, upon payment of an amount equivalent to 10% of the Option C – Tranche B Claims subject to the early payment or redemption, as duly updated until the maturity date of the Option C – Tranche B Claims, the entirety of the Option C – Tranche B Claim held by the respective Option C Creditor shall be deemed fully settled and discharged for all legal purposes. |
| **7.5.** Instrumentos de Pagamento da Opção C. A partir da Data da Homologação, os Credores Opção C passarão automaticamente a ser, desde logo, detentores dos seus respectivos Créditos Opção C, com todas as características previstas neste Plano, os quais serão subsequentemente materializados e instrumentalizados por meio dos Instrumentos de Pagamento da Opção C, conforme os critérios estabelecidos abaixo: | | **7.5.** Option C Payment Instruments. As of the Judicial Confirmation Date, the Option C Creditors shall automatically become, as of such date, holders of their respective Option C Claims, with all the characteristics set forth in this Plan, which shall subsequently be evidenced and formalized through the Option C Payment Instruments, in accordance with the criteria set forth below: |

| | |
|---|---|
| **7.5.1.** Instrumento de Pagamento da Opção C– Plano. Salvo na hipótese descrita na Cláusula 7.5.2 abaixo, os Credores Opção C terão os seus respectivos Créditos Opção C – Tranche A e Créditos Opção C – Tranche B materializados e instrumentalizados por meio deste Plano, sem a emissão de valores mobiliários, o qual servirá, em conjunto com a Sentença de Homologação do Plano, como título executivo judicial para todos os fins e efeitos de direito, conforme artigo 161, §6º, da LRF, podendo ser executado de acordo com os termos e condições previstos neste Plano ("Instrumento de Pagamento da Opção C – Plano"). | **7.5.1** Option C Payment Instrument – Plan. Except for the situation described in Section 7.5.2 below, the Option C Creditors shall have their respective Option C Claims – Tranche A and Option C Claims – Tranche B evidenced and formalized through this Plan, without the issuance of securities, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (*título executivo judicial*) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan ("Option C Payment Instrument – Plan"). |
| **7.5.2.** Instrumentos de Pagamento da Opção C – *Notes*. Os Credores Opção C que, cumulativamente, ***(i)*** sejam atualmente titulares de Notas Internacionais Existentes; e ***(ii.a)*** sejam investidores institucionais qualificados (*qualified institutional buyers*) nos termos da Regra 144A, editada sob o *U.S. Securities Act* de 1933, conforme alterado, ou ***(ii.b)*** não sejam "*pessoas norte-americanas*" (*U.S. persons*), conforme definido na Regra 902 do *U.S. Securities Act*, sendo que qualquer credor descrito nessa Cláusula 7.5.2, item (ii.b), que seja residente em um Estado-membro do Espaço Econômico Europeu também deverá ser um investidor qualificado (*qualified investor*), nos termos do Regulamento (UE) 2017/1129, conforme alterado, e da Lei de | **7.5.2** Option C Payment Instruments – Notes. The Option C Creditors who, cumulatively, ***(i)*** are currently holders of International Existing Notes; ***(ii.a)*** are qualified institutional buyers within the meaning of Rule 144A under the U.S. Securities Act of 1933, as amended, ***(ii.b)*** are not "U.S. persons", as defined in Rule 902 under the U.S. Securities Act, provided that any holder described in this Section 7.5.2, item (ii.b.), that is resident of a member state of the European Economic Area must also be a qualified investor under Regulation (EU) 2017/1129, as amended, and the Luxembourg Law of July 16, 2019 on prospectuses for securities, as amended, or ***(ii.c)*** are institutional accredited investors as defined in Rule 501 under the U.S. Securities |

| | |
|---|---|
| Luxemburgo de 16 de julho de 2019 sobre prospectos de valores mobiliários, conforme alterada, ou ***(ii.c)*** sejam investidores institucionais credenciados (*institutional accredited investors*) conforme definido na Regra 501 sob o *U.S. Securities Act* de 1933; terão, observado o disposto na Cláusula 7.5.2.2 e salvo na hipótese da Cláusula 7.5.2.3, os seus ***(i)*** Créditos Opção C – Tranche A decorrentes das Notas Internacionais Existentes materializados e instrumentalizados por meio dos Instrumento de Pagamento da Opção A – *Notes,* cuja escritura de emissão será celebrada de forma consistente com o *Term Sheet* constante do **Anexo VI**, de modo a refletir e representar os termos da Opção C-Tranche A conforme o previsto neste Plano, observado o disposto no item (i) da Cláusula 7.4.1 deste Plano; e ***(ii)*** Créditos Opção C – Tranche B materializados e instrumentalizados por meio dos Instrumento de Pagamento da Opção B – *Notes,* cuja escritura de emissão será celebrada de forma consistente com o *Term Sheet* constante do **Anexo VII**, de modo a refletir e representar os termos da Opção C-Tranche B conforme o previsto neste Plano, observado o disposto no item (i) da Cláusula 7.4.2 deste Plano. | Act of 1933; shall, subject to the provisions of Section 7.5.2.2 and except as provided in Section 7.5.2.3, have their ***(i)*** Option C – Tranche A Claims arising from the International Existing Notes evidenced and formalized through the Option A Payment Instrument – Notes, the indenture of which shall be executed in a manner consistent with the Term Sheet set forth in **Schedule VI**, so as to reflect and represent the terms of Option C – Tranche A as provided in this Plan, subject to the provisions of item (i) of Section 7.4.1 of this Plan; and ***(ii)*** Option C– Tranche B Claims evidenced and formalized through the Option B Payment Instrument – Notes, the indenture of which shall be executed in a manner consistent with the Term Sheet set forth in **Schedule VII**, so as to reflect and represent the terms of Option C – Tranche B as provided in this Plan, subject to the provisions of Option C – Tranche B as provided in this Plan, pursuant to item (i) of Section 7.4.2 of this Plan. |
| **7.5.2.1** Para que não restem dúvidas, as disposições constantes das Cláusulas 5.5.2.1 a 5.5.2.4 e 6.5.2.1 a 6.5.2.4 acima serão aplicáveis aos | **7.5.2.1** For the avoidance of doubt, the provisions set forth in Sections 5.5.2.1 to 5.5.2.4 and 6.5.2.1 |

| | |
|---|---|
| Instrumentos de Pagamento Opção C - *Notes*. | to 6.5.2.4 above shall apply to the Option C Payment Instruments – Notes. |
| **7.5.2.2** Para que não restem dúvidas, entre a Data da Homologação (ou, no caso do Credor Signatário, a Data da Celebração) e a data de emissão do Instrumento de Pagamento Opção C – *Notes*, os Créditos Opção C – Tranche A e os Créditos Opção C – Tranche B decorrentes das Notas Internacionais Existentes serão materializados e instrumentalizados por meio deste Plano, o qual servirá, em conjunto com a Sentença de Homologação do Plano, como título executivo judicial para todos os fins e efeitos de direito, conforme artigo 161, § 6º, da LRF, podendo ser executado de acordo com os termos e condições previstos neste Plano, inclusive com relação às garantias fidejussórias previstas na Cláusula 7.4 deste Plano. | **7.5.2.2** For the avoidance of doubt, between the Judicial Confirmation Date (or, in the case of the Signatory Creditor, the Signing Date) and the issuance date of the Option C Payment Instrument – Notes, the Option C – Tranche A Claims and the Option C – Tranche B Claims arising from the International Existing Notes shall be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (*título executivo judicial*) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan, including with respect to the corporate guarantees set forth in Section 7.4 of this Plan. |
| **7.5.2.3** Caso o Instrumento de Pagamento Opção C – *Notes* não seja emitido por qualquer motivo, os Créditos Opção C – Tranche A e os Créditos Opção C – Tranche B decorrentes das Notas Internacionais Existentes continuarão sendo materializados e instrumentalizados por meio deste Plano, o qual servirá, | **7.5.2.3** If the Option C Payment Instrument – Notes is not issued for any reason, the Option C – Tranche A Claims and the Option C – Tranche B Claims arising from the International Existing Notes shall continue to be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall constitute an |

| | |
|---|---|
| em conjunto com a Sentença de Homologação do Plano, como título executivo judicial para todos os fins e efeitos de direito, conforme artigo 161, § 6º, da LRF, podendo ser executado de acordo com os termos e condições previstos neste Plano. O disposto nesta Cláusula não deve ser interpretado como renúncia, mitigação ou limitação da obrigação das Requerentes de adotar as medidas razoavelmente necessárias para emitir o Instrumento de Pagamento Opção C – *Notes*, nos termos deste Plano. | enforceable court order for all legal purposes, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan. The provisions of this Section shall not be construed as a waiver, mitigation, or limitation of the Debtors' obligation to take all reasonably necessary measures to issue the Option C Payment Instruments – Notes, pursuant to the terms of this Plan. |
| **8. ELEIÇÃO E ESCOLHA DAS OPÇÕES DE PAGAMENTO** | **8. ELECTION AND SELECTION OF PAYMENT OPTIONS** |
| **8.1.** Eleição da Opção de Pagamento. Os Credores Sujeitos poderão optar pela reestruturação e pagamento de seus Créditos Sujeitos por meio da Opção A, Opção B ou da Opção C, nos termos das Cláusulas 5, 6 e 7 deste Plano, sendo certo que cada Credor Sujeito poderá optar por apenas uma opção de pagamento em relação à totalidade do seu respectivo Crédito Sujeito ("Eleição da Opção de Pagamento"). | **8.1.** Election of Payment Option. The Subject Creditors may elect to have their Subject Claims restructured and paid under either Option A, Option B or Option C pursuant to Sections 5, 6 and 7 of this Plan, it being understood that each Subject Creditor may elect only one payment option with respect to the entirety of its respective Subject Claim ("Payment Option Election"). |
| **8.2.** Procedimento de Eleição de Opção de Pagamento. A Eleição da Opção de Pagamento deverá ser realizada dentro do prazo de 30 (trinta) Dias Corridos, que terá início em até 45 (quarenta e cinco) Dias Corridos após a Sentença de Homologação do Plano ("Data de Início do Período de Eleição"), fixada nos termos da Cláusula 8.2.1 | **8.2.** Payment Option Election Process. The Payment Option Election shall be carried out within the deadline of 30 (thirty) Calendar Days], which shall commence within up to 45 (forty-five) Calendar Days after the Plan Confirmation Order (the "Election Period Commencement Date"), as set forth in Section 8.2.1 below, and each Subject |

| | |
|---|---|
| abaixo, devendo cada Credor Sujeito observar o disposto nas Cláusulas seguintes ("Procedimento de Eleição de Opção de Pagamento"), ressalvado o disposto na Cláusula 8.2.4 do Plano. Para que não restem dúvidas, a Eleição da Opção de Pagamento terá início na Data de Início do Período de Eleição e será encerrada no trigésimo Dia Corrido contado da Data de Início do Período de Eleição (este intervalo, o "Período de Eleição"). | Creditor shall comply with the provisions set forth in the following Sections (the "Payment Option Election Process"), except as provided for in Section 8.2.4 of this Plan. For the avoidance of doubt, the Payment Option Election shall begin on the Election Period Commencement Date and shall end on the thirtieth Calendar Day counted from the Election Period Commencement Date (this interval, the "Election Period"). |
| **8.2.1.** Data de Início do Período de Eleição. As Requerentes divulgarão, no sítio eletrônico indicado na Cláusula 8.3 abaixo e/ou por meio de petição nos autos da Recuperação Extrajudicial, a exata Data de Início do Período de Eleição, que será fixada, pelas Requerentes, em até 45 (quarenta e cinco) Dias Corridos após a Sentença de Homologação do Plano. Na ausência de divulgação pelas Requerentes na forma estabelecida nesta Cláusula, a Data de Início do Período de Eleição será *ipso facto* fixada no quadragésimo sexto Dia Corrido após a Sentença de Homologação. | **8.2.1.** Election Period Commencement Date. The Debtors shall disclose, on the website indicated in Section 8.3 below and/or by means of a filing in the records of the Extrajudicial Reorganization, the exact Election Period Commencement Date, which shall be set within up to 45 (forty-five) Calendar Days after the Plan Confirmation Order. In the absence of disclosure by the Debtors in the manner set forth in this Section, the Election Period Commencement Date shall be *ipso facto* deemed to be the forty-sixth Calendar Day after the Plan Confirmation Order. |
| **8.2.2.** Procedimento de Eleição de Opção de Pagamento para Créditos Sujeitos que não sejam decorrentes de Notas Internacionais Existentes. Os Credores Sujeitos, com relação aos seus Créditos Sujeitos que não sejam decorrentes de Notas Internacionais Existentes, deverão, durante o Período de Eleição e, portanto, antes do fim do Período de Eleição, realizar a Eleição da Opção de Pagamento por meio do | **8.2.2.** Payment Option Election Process for Subject Claims Not Arising from International Existing Notes. The Subject Creditors, with respect to their Subject Claims that do not arise from International Existing Notes, shall, carry out the Payment Option Election by completing and delivering to the Debtors the election form set forth in **Schedule VIII**, within the Election Period and therefore prior to the |

| | |
|---|---|
| preenchimento e entrega às Requerentes do formulário de eleição constante do **Anexo VIII**, em conjunto com os documentos comprobatórios de poderes e representação do respectivo signatário. | end of the Election Period, together with the documents evidencing the powers and authority of the respective signatory. |
| **8.2.3.** Procedimento de Eleição de Opção de Pagamento para Créditos Sujeitos decorrentes de Notas Internacionais Existentes. Os Credores Sujeitos que sejam detentores de Notas Internacionais Existentes deverão, com relação aos seus Créditos Sujeitos decorrentes de Notas Internacionais Existentes, realizar a Eleição de Pagamento por meio do sistema de oferta de compra automatizada do DTC ou pelo sistema de Depósito ou Retirada no Custodiante (DWAC). Os Credores Sujeitos que sejam detentores de Notas Internacionais Existentes deverão, durante o Período de Eleição e, portanto, antes do fim do Período de Eleição, preencher e entregar o formulário de eleição conforme modelo a ser divulgado no sítio eletrônico mencionado na Cláusula 8.3 abaixo, ao seu respectivo banco ou à sua respectiva corretora no qual suas respectivas Notas Internacionais Existentes estão custodiadas. Para que não restem dúvidas, caso o Credor Sujeito seja titular de outros Créditos Sujeitos que não sejam decorrentes de Notas Internacionais Existentes, a Eleição da Opção de Pagamento destes Créditos Sujeitos não decorrentes de Notas | **8.2.3.** Payment Option Election Process for Subject Claims Arising from International Existing Notes. The Subject Creditors that are holders of International Existing Notes shall, with respect to their Subject Claims arising from International Existing Notes, carry out the Payment Option Election through DTC's automated tender offer program (ATOP) or the Deposits/Withdrawals at Custodian (DWAC) system. The Subject Creditors that are holders of International Existing Notes shall, within the Election Period and therefore prior to the end of the Election Period, complete and deliver the election form, in the form to be made available on the website referred to in Section 8.3 below, to its respective bank or broker with which their respective International Existing Notes are held in custody. For the avoidance of doubt, if the Subject Creditor holds other Subject Claims that do not arise from International Existing Notes, the Payment Option Election with respect to such Subject Claims not arising from International Existing Notes shall be made in accordance with Section 8.2.2 above. |

| | |
|---|---|
| Internacionais Existentes deverá ser feita na forma da Cláusula 8.2.2 acima. | |
| **8.2.4.** Eleição do Credor Signatário. Para que não restem dúvidas, o Credor Signatário já efetuou, válida e regularmente, a Eleição da Opção de Pagamento, nos termos da Cláusula 4.3.1 deste Plano. Não obstante tenha efetuado, válida e regularmente, a Eleição da Opção de Pagamento, o Credor Signatário compromete-se a observar o disposto na Cláusula 8.2.3 acima, para possibilitar a identificação de suas Notas Internacionais Existentes depositadas no DTC e, assim, possibilitar que sejam formalmente canceladas na hipótese de emissão dos Instrumentos de Pagamento Opção C – *Notes*. | **8.2.4.** Signatory Creditor's Election. For the avoidance of doubt, the Signatory Creditor has already validly and duly made the Payment Option Election pursuant to Section 4.3.1 of this Plan. Notwithstanding having validly and duly made the Payment Option Election, the Signatory Creditor undertakes to comply with the provisions of Section 8.2.3 above, in order to enable the identification of its International Existing Notes deposited with the DTC and, thereby, enable their formal cancellation in the event of issuance of the Option C Payment Instruments – Notes. |
| **8.3.** Todas as instruções e informações pertinentes e necessárias para participação dos Credores Sujeitos no Procedimento de Eleição da Opção de Pagamento, inclusive eventuais atualizações, serão divulgadas pelas Requerentes no sítio eletrônico https://andradegutierrez365.sharepoint.com/:f:/s/REJ2026andradegutierrez/IgDaz9D-4HAfS5A6mPHcl33BAfEhcicXvDY5d75qzkQmkDg?e=bUYjae após a Sentença de Homologação do Plano. | **8.3.** All instructions and information relevant and necessary for the participation of the Subject Creditors in the Payment Option Election Process, including any updates, shall be disclosed by the Debtors on the website https://andradegutierrez365.sharepoint.com/:f:/s/REJ2026andradegutierrez/IgDaz9D-4HAfS5A6mPHcl33BAfEhcicXvDY5d75qzkQmkDg?e=bUYjae after the Plan Confirmation Order. |
| **8.4.** O Crédito Sujeito será automática e integralmente substituído e reestruturado conforme os termos e condições aplicáveis à Opção B prevista na Cláusula 6, caso o seu respectivo Credor | **8.4.** The Subject Claim shall be automatically and fully replaced and restructured in accordance with the terms and conditions applicable to Option B set forth in Section 6, if its respective Subject |

| | | |
|---|---|---|
| Sujeito ***(i)*** não realize a Eleição da Opção de Pagamento conforme o disposto nas Cláusulas 8.1 e 8.2; ***(ii)*** não observe integralmente as instruções pertinentes divulgadas no sítio eletrônico indicado na Cláusula 8.3; ou ***(iii)*** se detentor de Notas Internacionais Existentes, retire suas Notas Internacionais Existentes nos termos da Cláusula 8.5. | | Creditor ***(i)*** fails to carry out the Payment Option Election in accordance with the provisions of Sections 8.1 and 8.2; ***(ii)*** fails to fully comply with the relevant instructions disclosed on the website indicated in Section 8.3; or ***(iii)*** if a holder of International Existing Notes, withdraws its International Existing Notes pursuant to Section 8.5. |
| **8.5.** Uma vez encerrado o Período de Eleição, os Credores Sujeitos que sejam detentores de Notas Internacionais Existentes poderão retirar suas Notas Internacionais Existentes do sistema utilizado no Procedimento de Eleição da Opção de Pagamento em até 10 (dez) Dias Úteis antes da data de emissão do Instrumento de Pagamento Opção A – *Notes*, do Instrumento de Pagamento Opção B – *Notes* (e, consequentemente, dos Instrumentos de Pagamento da Opção C – *Notes*), sendo certo que tal retirada não poderá ser revertida posteriormente. Para que não restem dúvidas, qualquer Credor Sujeito que seja detentor de Notas Internacionais Existentes e retire suas Notas Internacionais Existentes após o Período de Eleição será considerado ***(i)*** como se não houvesse validamente realizado uma eleição por quaisquer Opções de Pagamento; ***(ii)*** como se houvesse renunciado a todos os direitos associados a qualquer Opção de Pagamento; e, consequentemente; ***(iii)*** terá o seu respectivo Crédito Sujeito reestruturado conforme os termos da Opção B deste Plano. | | **8.5.** Once the Election Period has ended, Subject Creditors that are holders of International Existing Notes may withdraw their International Existing Notes from the system used in the Payment Option Election Process up to 10 (ten) Business Days prior to the issuance date of the Option A Payment Instrument – Notes, the Option B Payment Instrument – Notes (and, consequently, the Option C Payment Instruments – Notes), it being understood that such withdrawal may not be subsequently reversed. For the avoidance of doubt, any Subject Creditor that is a holder of International Existing Notes and withdraws its International Existing Notes after the Election Period shall be deemed ***(i)*** to have not made a valid election for any of the Payment Options; ***(ii)*** to have waived all rights associated with any Payment Option; and, consequently, ***(iii)*** to have its respective Subject Claim restructured in accordance with the terms of Option B of this Plan. |
| **9. OBRIGAÇÕES RECÍPROCAS DAS REQUERENTES, DO CREDOR** | | **9. RECIPROCAL OBLIGATIONS OF THE DEBTORS, THE SIGNATORY** |

| | |
|---|---|
| **SIGNATÁRIO E DOS CREDORES ADERENTES** | **CREDITOR AND THE ADHERING CREDITORS** |
| **9.1.** O Credor Signatário e os Credores Aderentes obrigam-se a envidar os melhores esforços para viabilizar a implementação deste Plano da maneira mais célere possível. | **9.1.** The Signatory Creditor and the Adhering Creditors shall use their best efforts to enable the implementation of this Plan as promptly as possible. |
| **9.2.** As Requerentes obrigam-se a: | **9.2.** The Debtors shall: |
| **(i)** ajuizar a Recuperação Extrajudicial, em até 5 (cinco) Dias Úteis contados da Data de Celebração; | **(i)** file the Extrajudicial Reorganization within 5 (five) Business Days from the Signing Date; |
| **(ii)** praticar atos, fornecer informações e tomar medidas razoavelmente necessárias para implementar e cumprir com as disposições deste Plano, dentro dos prazos e segundo as condições estabelecidas neste Plano, arcando com as despesas correspondentes, incluindo aquelas razoavelmente necessárias para a emissão do Instrumento de Pagamento da Opção A – *Notes* e do Instrumento de Pagamento da Opção B – *Notes* (e, por consequência, dos Instrumentos de Pagamento da Opção C – *Notes*); | **(ii)** perform all acts, provide all information, and take reasonably necessary measures to implement and comply with the provisions of this Plan, within the time frames and under the conditions established herein, bearing all corresponding expenses, including those reasonably necessary for the issuance of the Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes (and, consequently, the Option C Payment Instruments – Notes); |
| **(iii)** cumprir toda a legislação aplicável que seja substancialmente relevante para a condução de seus negócios (incluindo toda e qualquer legislação trabalhista, ambiental, tributária e social), | **(iii)** comply with all applicable legislation that is substantially relevant to the conduct of their business (including all labor, environmental, tax, and social laws) related to their activities and the |

| | | | | |
|---|---|---|---|---|
| | pertinente às suas atividades e à manutenção de seus bens e propriedades; | | | maintenance of their assets and properties; |
| **(iv)** | envidar seus melhores esforços para viabilizar ***(a)*** a homologação deste Plano pelo Juízo da Recuperação Extrajudicial, ou por qualquer outra instância recursal, se necessário; e ***(b)*** o reconhecimento da Recuperação Extrajudicial e a implementação do Plano e da Sentença de Homologação do Plano conforme as Decisões *Chapter 15*; | | **(iv)** | use their best efforts to enable ***(a)*** the confirmation of this Plan by the Court of the Extrajudicial Reorganization, or by any appellate instance, if necessary; ***(b)*** the recognition of the Extrajudicial Reorganization and the implementation of the Plan and the Plan Confirmation Order pursuant to the Chapter 15 Decisions; |
| **(v)** | cumprir todas as obrigações relevantes previstas neste Plano e Anexos, a partir da Data de Celebração; | | **(v)** | comply with all relevant obligations set forth in this Plan and its Schedules as from the Signing Date; and |
| **(vi)** | ajuizar os Procedimentos *Chapter 15* na forma da Cláusula 10.6; e | | **(vi)** | to file the Chapter 15 Proceedings pursuant to Section 10.6; and |
| **(vii)** | cumprir e observar todos os prazos e obrigações relevantes previstas neste Plano. | | **(vii)** | comply with and observe all deadlines and relevant obligations set forth in this Plan. |
| **9.3.** | Obrigação Recíproca. As Requerentes e o Credor Signatário, na qualidade de titular de mais da metade dos Créditos Sujeitos, obrigam-se e concordam em negociar de boa-fé as minutas finais de quaisquer documentos necessários para a implementação das operações e acordos comerciais descritos neste Plano. | | **9.3.** | Reciprocal Obligation. The Debtors and the Signatory Creditor, as holder of more than half of the Subject Claims, shall be bound and agree to negotiate in good faith the final drafts of any documents necessary for the implementation of the transactions and commercial agreements described in this Plan. |

| PARTE V – PÓS-HOMOLOGAÇÃO | PART V – POST-CONFIRMATION |
|---|---|
| **10. EFEITOS DO PLANO** | **10. EFFECTS OF THE PLAN** |
| **10.1.** Novação. Com a Homologação do Plano, os Créditos Sujeitos serão novados na forma dos artigos 163, §1º, e 165 da LRF, devendo ser pagos na forma estabelecida neste Plano. Em razão da referida novação e, salvo se expresso de forma diversa no Plano, todas as obrigações, *covenants*, índices financeiros, hipóteses de vencimento antecipado, multas, bem como outras obrigações e garantias de quaisquer naturezas assumidas ou prestadas pelas Requerentes ficam extintas, sendo substituídas, em todos os seus termos, pelas disposições deste Plano. | **10.1.** Novation. Upon the Plan Confirmation Order, the Subject Claims shall be novated pursuant to articles 163, first paragraph, and 165 of the Brazilian Bankruptcy Act, and shall be paid in the manner established in this Plan. As a result of such novation and unless expressly provided otherwise in this Plan, all obligations, covenants, financial ratios, events of default, penalties, as well as any other obligations and guarantees of any nature assumed or granted by the Debtors are extinguished and replaced, in all respects, by the provisions of this Plan. |
| **10.2.** Resolução do Plano e da Novação. O Plano será resolvido de pleno direito, desde que não exercidas as prerrogativas da Cláusula 10.2.1, e os Créditos Sujeitos retornarão ao *status quo ante* caso verifique-se qualquer um dos seguintes eventos: | **10.2.** Resolution of the Plan and the Novation. The Plan shall be automatically terminated, provided that the rights set forth in Section 10.2.1 have not been exercised, and the Subject Claims shall revert to the *status quo ante* if any of the following events occurs: |
| **(i)** não ajuizamento da Recuperação Extrajudicial em até 5 (cinco) Dias Úteis contados a partir da Data de Celebração; | **(i)** the failure to file the Extrajudicial Reorganization within 5 (five) Business Days from the Signing Date |
| **(ii)** prolação de decisão, pelo Juízo da Recuperação Extrajudicial ou por tribunal competente, rejeitando a homologação do Plano, que não seja revertida ou suspensa no prazo de 240 | **(ii)** the issuance of a decision, by the Extrajudicial Reorganization Court or by a competent Appellate Court, rejecting the confirmation of the Plan, which is not reversed or stayed within |

| | | | | | |
|---|---|---|---|---|---|
| | (duzentos e quarenta) Dias Corridos contados da publicação da referida decisão no Diário Oficial; | | | 240 (two hundred and forty) Calendar Days from the publication of such decision in the Official Gazette; |
| **(iii)** | prolação de decisão, pelo Juízo da Recuperação Extrajudicial ou por tribunal competente, modificando o Plano de forma substancial, que não seja revertida ou suspensa no prazo de 240 (duzentos e quarenta) Dias Corridos contados da publicação da referida decisão no Diário Oficial, salvo se tal modificação for expressamente aceita pelas Requerentes e Credor(es) Sujeito(s) titular(es) de mais da metade dos Créditos Sujeitos, hipótese em que o Plano não será resolvido; | | **(iii)** | issuance of a decision, by the Extrajudicial Reorganization Court or by a competent Appellate Court, substantially modifying the Plan, which is not reversed or stayed within 240 (two hundred and forty) Calendar Days from the publication of such decision in the Official Gazette, unless such modification is expressly accepted by the Debtors and the Subject Creditor(s) holding more than half of the Subject Claims, in which case the Plan shall not be terminated; |
| **(iv)** | a não obtenção da Sentença de Homologação do Plano antes do 2º (segundo) aniversário da Data de Celebração; | | **(iv)** | the failure to obtain the Plan Confirmation Order prior to the 2nd (second) anniversary of the Signing Date; |
| **(v)** | descumprimento de obrigações relevantes assumidas pelas Requerentes no âmbito deste Plano até a Data da Homologação, desde que tal descumprimento não seja sanado no prazo de 90 (noventa) Dias Corridos contados da data do recebimento de notificação encaminhada por Credor(es) titular(es) de mais da | | **(v)** | the breach of any materially relevant obligations assumed by the Debtors under this Plan up to the Judicial Confirmation Date, provided that such breach is not remedied within 90 (ninety) Calendar Days from the date of receipt of a notice sent by the Creditor(s) holding more than half of the Subject Claims stating such breach; |

| | |
|---|---|
| metade dos Créditos Sujeitos enunciando tal descumprimento; | |
| **(vi)** não ajuizamento dos Procedimentos *Chapter 15* na forma da Cláusula 10.6; ou | **(vi)** failure to file the Chapter 15 Proceedings in accordance with Section 10.6; or |
| **(vii)** a não emissão do Instrumento de Pagamento da Opção A – *Notes* e do Instrumento de Pagamento da Opção B – *Notes* (e, consequentemente, dos Instrumentos de Pagamento da Opção C – *Notes*) em até 180 (cento e oitenta) Dias Corridos contados da Decisão de Implementação *Chapter 15*. | **(vii)** the failure to issue the Option A Payment Instrument – *Notes* and the Option B Payment Instrument – *Notes* (and, consequently, the Option C Payment Instruments – *Notes*) within 180 (one hundred and eighty) Calendar Days from the entry of the Chapter 15 Enforcement Order. |
| **10.2.1** O(s) Credor(es) Sujeito(s) titular(es) de mais da metade dos Créditos Sujeitos poderá(ão), a seu exclusivo critério, renunciar à resolução do Plano caso verificada qualquer uma das hipóteses previstas na Cláusula acima, mediante envio de notificação por escrito às Requerentes. Esta renúncia somente terá efeito e o Plano não será resolvido se as Requerentes, em até 15 (quinze) Dias Úteis contados do recebimento de referida notificação, concordarem com tal renúncia. | **10.2.1.** The Subject Creditor(s) holding more than half of the Subject Claims may, at their sole discretion, waive termination of the Plan upon the occurrence of any of the events set forth in the Section above, by means of written notice to the Debtors. Such waiver shall only be effective and the Plan shall not be terminated if the Debtors, within 15 (fifteen) Business Days from receipt of such notice, agree to such waiver. |
| **10.2.2** Para que não restem dúvidas, observado o disposto na Cláusula 10.2.2.1 abaixo, o eventual descumprimento de obrigações previstas neste Plano, e/ou no Instrumento de Pagamento da Opção A – | **10.2.2.** For the avoidance of doubt, subject to the provisions of Section 10.2.2.1 below, any breach of obligations set forth in this Plan and/or in the Option A Payment Instrument – Notes and/or in the Option B Payment |

| | | |
|---|---|---|
| *Notes* e/ou no Instrumento de Pagamento da Opção B – *Notes* (e, consequentemente, nos Instrumentos de Pagamento da Opção C – *Notes*), após a Data da Homologação, não causará a resolução do presente Plano, de modo que, em tal hipótese, os Credores Sujeitos continuarão sendo titulares de direitos creditórios tal como novados por este Plano, sendo-lhes assegurada a prerrogativa de adotarem as medidas judiciais ou extrajudiciais que entenderem cabíveis para assegurar o cumprimento das obrigações previstas neste Plano e/ou no Instrumento de Pagamento da Opção A – *Notes* e/ou no Instrumento de Pagamento da Opção B – *Notes* (e, consequentemente, nos Instrumentos de Pagamento da Opção C – *Notes*). Para fins de esclarecimento, o disposto nesta Cláusula não se aplica aos eventos previstos nos itens “(ii)” e “(iii)” da Cláusula 10.2 acima. | | Instrument – Notes (and, consequently, in the Option C Payment Instruments – Notes) after the Judicial Confirmation Date shall not result in termination of this Plan, and in such event the Subject Creditors shall continue to hold credit rights as novated by this Plan, it being assured to them the right to adopt any judicial or extrajudicial measures they deem appropriate to ensure compliance with the obligations set forth in this Plan and/or in the Option A Payment Instrument – Notes and/or in the Option B Payment Instrument – Notes (and, consequently, in the Option C Payment Instruments – Notes). For the avoidance of doubt, this Section is not applicable to the events set forth in items “(ii)”and “(iii)” of Section 10.2 above. |
| **10.2.2.1** Para fins de clareza, o disposto na Cláusula 10.2.2 acima não será aplicável e, portanto, o Plano será resolvido mesmo após a Data da Homologação, conforme previsto nos itens “(vi)” e “(vii)” da Cláusula 10.2 acima, no caso de descumprimento das seguintes obrigações previstas neste Plano: ***(i)*** os Procedimentos *Chapter 15* não sejam ajuizados na forma da Cláusula 10.6 ou ***(ii)*** não haja a emissão do Instrumento de Pagamento da Opção A – *Notes* e do Instrumento de Pagamento da Opção B – *Notes* (e, consequentemente, dos Instrumentos de Pagamento da Opção | | **10.2.2.1** For the avoidance of doubt, the provisions of Section 10.2.2 above shall not apply and, therefore, the Plan shall be terminated even after the Judicial Confirmation Date, as set forth in items “(vi)” e “(vii)” of Section 10.2 above, in the event the following obligations are defaulted: ***(i)*** the Chapter 15 Proceedings are not filed pursuant to Section 10.6 or ***(ii)*** the Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes (and, consequently, the Option C Payment Instruments – Notes) are not issued within the term set forth in item (vii) |

| | |
|---|---|
| C – *Notes*) no prazo estabelecido no item "(vii)" da Cláusula 10.2 e na forma estabelecida neste Plano, salvo se as prerrogativas da Cláusula 10.2.1 deste Plano forem exercidas. | of Section 10.2 and in the manner set forth in this Plan, unless the rights set forth in Section 10.2.1 of this Plan are exercised. |
| **10.3.** Após o protocolo do Plano, as Requerentes poderão, individual ou conjuntamente, mediante consentimento prévio e por escrito de Credor(es) Sujeito(s) titular(es) de mais da metade dos Créditos Sujeitos, desistir do processo de Recuperação Extrajudicial ou da obtenção da Sentença de Homologação do Plano, a seu exclusivo critério, hipótese em que os Créditos Sujeitos devidos pela Requerente que exerceu a prerrogativa prevista nesta Cláusula não serão novados e permanecerão em vigor e eficazes nos seus respectivos termos originalmente contratados, inclusive os Créditos Sujeitos detidos pelo Credor Signatário. | **10.3.** After the filing of the Plan, the Debtors may, individually or jointly, with the prior written consent of the Subject Creditor(s) holding more than half of the Subject Claims, withdraw from the Extrajudicial Reorganization proceeding or from obtaining the Plan Confirmation Order, at their sole discretion, in which case the Subject Claims owed by the Debtor that exercises the prerogative set forth in this Section shall not be novated and shall remain in full force and effect under their respective originally agreed terms, including the Subject Claims held by the Signatory Creditor. |
| **10.4.** Cobrança dos Créditos Sujeitos. Em conformidade com o artigo 163, §§1º e 8º da LRF, os Credores Sujeitos não poderão, a partir da Data do Pedido e enquanto viger o Plano, adotar qualquer medida, judicial ou extrajudicial, no Brasil ou no exterior, em face das Requerentes, que vise à exigibilidade, cobrança ou ao recebimento dos Créditos Sujeitos, seja nos termos em que foram originalmente constituídos, seja nos termos deste Plano, incluindo, sem limitação, ***(i)*** ajuizar ou prosseguir qualquer ação ou processo judicial ou arbitral de qualquer tipo relacionado a qualquer Crédito Sujeito; ***(ii)*** executar qualquer sentença, decisão judicial ou sentença arbitral relacionada a | **10.4.** Collection of Subject Claims. In accordance with article 163, paragraphs 1 and 8, of the Brazilian Bankruptcy Act, as from the Filing Date and for as long as the Plan remains in force, the Subject Creditors shall not take any judicial or extrajudicial measures, in Brazil or abroad, against the Debtors seeking to enforce, collect, or receive the Subject Claims, whether under their original terms or under this Plan, including, without limitation, ***(i)*** filing or pursuing any judicial or arbitral action or proceeding of any kind related to any Subject Claim; ***(ii)*** enforcing any judgment, court decision, or arbitral award related to any Subject Claim; ***(iii)*** pledging, seizing, attaching, |

| | |
|---|---|
| qualquer Crédito Sujeito; ***(iii)*** penhorar, sequestrar, arrestar, bloquear ou tornar indisponíveis, por qualquer forma, em qualquer foro, nacional ou estrangeiro, quaisquer bens das Requerentes para satisfazer seus Créditos Sujeitos, ficando, desde a Data do Pedido, obrigados a cooperar para a liberação, levantamento e desoneração de quaisquer penhoras ou constrições judiciais sobre bens e ativos das Requerentes; ***(iv)*** buscar a satisfação de seus Créditos Sujeitos por quaisquer outros meios; ou ***(v)*** reclamar qualquer direito de compensação contra qualquer crédito devido às Requerentes com seus Créditos Sujeitos. | freezing, or otherwise rendering unavailable, in any manner or in any forum, domestic or foreign, any assets of the Debtors to satisfy their Subject Claims, as of the Filing Date, being obliged to cooperate with the release, lifting, and discharge of any liens or judicial restraints over the assets and property of the Debtors; ***(iv)*** seeking satisfaction of their Subject Claims by any other means; or ***(v)*** asserting any right of setoff against any credit owed to the Debtors with their Subject Claims. |
| **10.5.** Extinção das Ações e Execuções. Com a Sentença de Homologação do Plano, todo e qualquer processo de execução, de qualquer natureza, ou ação de cobrança e similares, relacionado a qualquer Crédito Sujeito contra as Requerentes, no Brasil ou no exterior, deverá ser extinto completamente com relação às Requerentes, sendo certo que as penhoras e constrições existentes sobre bens e direitos das Requerentes serão liberadas, bem como o saldo de bloqueios judiciais eventualmente efetivados nas referidas ações judiciais. | **10.5.** Termination of Actions and Enforcements. Upon the Plan Confirmation Order, any and all enforcement proceedings, of any nature, or collection actions and similar proceedings related to any Subject Claim against the Debtors, in Brazil or abroad, shall be fully extinguished with respect to the Debtors, it being understood that any liens and attachments over the assets and rights of the Debtors shall be released, as well as any remaining judicially blocked amounts that may have been effected in such judicial proceedings. |
| **10.6.** *Chapter 15*. Em até 45 (quarenta e cinco) Dias Corridos contados da Sentença de Homologação do Plano, ou, a critério das Requerentes, previamente à Sentença de Homologação do Plano, o(s) representante(s) estrangeiro(s) das Requerentes submeterão o pedido de instauração dos Procedimentos *Chapter 15*. | **10.6.** Chapter 15. No later than 45 (forty-five) Calendar Days after the entry of the Plan Confirmation Order, or, at the Debtors' discretion, prior to the entry of the Plan Confirmation Order, the foreign representative(s) of the Debtors shall file the petition for the commencement of the Chapter 15 Proceedings. |

| | | |
|---|---|---|
| **10.7.** <u>Vinculação do Plano</u>. As disposições do Plano vinculam as Requerentes e o Credor Signatário na Data de Celebração, observado o artigo 165, §2º, da LRF, e o disposto na Cláusula 10.2 acima, e os Credores Aderentes na data em que assinarem o Termo de Adesão para Credor Aderente, assim como seus respectivos cessionários e sucessores, e vinculam as Requerentes e todos os Credores Sujeitos, assim como seus respectivos cessionários e sucessores, a partir da Sentença de Homologação do Plano. | | **10.7.** <u>Binding Effect of the Plan</u>. The provisions of the Plan shall bind the Debtors and the Signatory Creditor as of the Signing Date, pursuant to article 165, second paragraph, of the Brazilian Bankruptcy Act, and the provisions of Section 10.2 above, and the Adhering Creditors as of the date on which they execute the Adhesion Term for Adhering Creditors, as well as their respective assignees and successors, and shall bind the Debtors and all Subject Creditors, as well as their respective assignees and successors, as of the Plan Confirmation Order. |
| **10.8.** <u>Formalização de Documentos e Outras Providências</u>. As Requerentes e os Credores Sujeitos deverão realizar todos os atos e firmar todos os contratos e outros documentos que sejam necessários ou adequados para cumprir os termos deste Plano. | | **10.8.** <u>Execution of Documents and Other Measures</u>. The Debtors and the Subject Creditors shall perform all acts and execute all contracts and other documents that are necessary or appropriate to comply with the terms of this Plan. |
| **10.9.** <u>Exoneração</u>. Ressalvado o disposto na Cláusula 10.2, na Data da Homologação, haverá a exoneração e quitação automática, plena, geral, irrestrita, irrevogável e irretratável em relação às Requerentes, com relação a todos os Créditos Sujeitos reestruturados nos termos deste Plano, sem restrição, incluindo todos e quaisquer direitos, obrigações, ações, indenizações, recursos, passivos de qualquer natureza, juros, correção monetária, penalidades, multas, havendo o cancelamento definitivo de todos os contratos ou documentos que lastreiam os Créditos Sujeitos, incluindo as Notas Internacionais Existentes, bem como dos demais contratos delas decorrentes. | | **10.9.** <u>Release</u>. Subject to Section 10.2, on the Judicial Confirmation Date, there shall be the automatic, full, general, unrestricted, irrevocable, and irreversible release and discharge of the Debtors from all Subject Claims restructured under this Plan, without limitation, including all and any rights, obligations, actions, indemnifications, appeals, liabilities of any nature, interest, monetary adjustment, penalties, and fines, with the definitive cancellation of all contracts or documents underlying the Subject Claims, including the International Existing Notes, as well as any other agreements arising therefrom. |

| | |
|---|---|
| **10.9.1.** A exoneração sobre todos os Créditos Sujeitos também ocorre, conforme o disposto nos termos deste Plano e do Plano 2, em relação à Inzag e à Zagope, na medida em que as Notas Internacionais Existentes por elas garantidas serão definitivamente canceladas, sendo ambas integralmente exoneradas de todas e quaisquer obrigações envolvendo os Créditos Sujeitos e os Créditos Opção A, os Créditos Opção B e os Créditos Opção C conforme constituídos nos termos deste Plano e do Plano 2. | **10.9.1.** The release of all Subject Claims shall also occur, pursuant to the terms of this Plan and Plan 2, in relation to Inzag and Zagope, to the extent that the International Existing Notes guaranteed by them shall be definitively cancelled, and both shall be fully released from any and all obligations related to the Subject Claims and the Option A Claims, the Option B Claims and the Option C Claims as established under this Plan and Plan 2. |
| **10.10.** Em razão da exoneração decorrente do cumprimento do Plano descrita acima, a partir da Data da Homologação, os créditos detidos pelos Credores Sujeitos passarão a ser regidos exclusivamente com base nos termos e condições previstos neste Plano e nos respectivos Instrumentos de Pagamento e instrumentos de garantia relacionados, sempre nos termos deste Plano. | **10.10.** As a result of the release arising from the performance of the Plan described above, as of the Judicial Confirmation Date, the claims held by the Subject Creditors shall thereafter be governed exclusively by the terms and conditions set forth in the respective Payment Instruments and related security instruments, pursuant to this Plan. |
| **10.11.** <u>Quitação</u>. Os pagamentos realizados na forma estabelecida neste Plano acarretarão, de forma automática e independentemente de qualquer formalidade adicional, a outorga, em favor das Requerentes, de quitação plena, rasa, irrevogável e irretratável da quota-parte efetivamente paga dos Créditos Opção A, Créditos Opção B e Créditos Opção C, inclusive em relação a encargos efetivamente pagos, de modo que os Credores Opção A, Credores Opção B e Credores Opção C nada mais poderão reclamar contra as Requerentes relativamente às parcelas dos seus | **10.11.** <u>Release</u>. The payments made in the manner established in this Plan shall automatically and without any additional formality result in the granting, in favor of the Debtors, of full, clear, irrevocable, and irreversible release of the portion effectively paid of the Option A Claims, Option B Claims and Option C Claims, including with respect to any charges effectively paid, so that the Option A Creditors, Option B Creditors and Option C Creditors shall have no further claims against the Debtors in relation to the portions of their Option A Claims, Option B Claims and Option C Claims |

| | |
|---|---|
| Créditos Opção A, Créditos Opção B e Créditos Opção C efetivamente pagas, a qualquer tempo, em juízo ou fora dele. | effectively paid, at any time, whether in or out of court. |
| **10.12.** Modificação do Plano. Aditamentos, alterações, modificações ou renúncias (*waivers*) ao Plano, bem como aos direitos e obrigações nele previstos, podem ser propostos pelas Requerentes a qualquer tempo, antes ou após a Sentença de Homologação do Plano, desde que tais aditamentos, alterações ou modificações sejam aprovados por Credor(es) titular(es) de mais da metade dos Créditos Sujeitos, em atenção ao quórum previsto no artigo 163 da LRF. | **10.12.** Amendment of the Plan. Amendments, changes, modifications or waivers to the Plan, as well as to the rights and obligations set forth therein, may be proposed by the Debtors at any time, whether before or after the Plan Confirmation Order, provided that such amendments, changes or modifications are approved by Creditor(s) holding more than half of the Subject Claims, in accordance with the quorum set forth in article 163 of the Brazilian Bankruptcy Act. |
| **10.12.1.** Efeito Vinculativo das Modificações do Plano. Eventuais aditamentos, alterações ou modificações ao Plano vincularão as Requerentes e os Credores Sujeitos, bem como seus respectivos cessionários e sucessores, a partir de sua aprovação na forma da LRF, desde que sejam aprovados na forma acima. | **10.12.1.** Binding Effect of Plan Amendments. Any amendments, changes or modifications to the Plan shall be binding upon the Debtors and the Subject Creditors, as well as their respective assignees and successors, from the date of their approval in accordance with the Brazilian Bankruptcy Act, if they are approved in the manner set forth above. |
| **PARTE VI – DISPOSIÇÕES COMUNS** | **PART VI – COMMON PROVISIONS** |
| **11. DISPOSIÇÕES GERAIS** | **11. GENERAL PROVISIONS** |
| **11.1.** Anexos. Todos os Anexos a este Plano são a ele incorporados e constituem parte integrante deste Plano. Na hipótese de haver qualquer inconsistência entre este Plano e qualquer Anexo, o | **11.1.** Schedules. All Schedules to this Plan are incorporated herein and constitute an integral part of this Plan. In the event of any inconsistency between this Plan and any Schedule, this Plan shall prevail, except as otherwise provided herein. |

| | |
|---|---|
| Plano prevalecerá, exceto se de outra forma disposto neste Plano. | |
| **11.2.** <u>Prorrogação de prazos</u>. Considerar-se-ão prorrogados os prazos referentes ao cumprimento de qualquer obrigação prevista neste Plano, até o Dia Útil imediatamente subsequente, se o respectivo vencimento coincidir com dia que não seja um Dia Útil, observado que, em se tratando de obrigação pecuniária, não haverá qualquer acréscimo aos valores a serem pagos | **11.2.** <u>Deadline extension</u>. Any deadline relating to the performance of any obligation set forth in this Plan shall be deemed extended to the immediately following Business Day if the relevant due date falls on a day that is not a Business Day, provided that, in the case of a pecuniary obligation, no additional amount shall accrue on the amounts payable. |
| **11.3.** <u>Cessão e Transferência.</u> Desde que o presente Plano não tenha sido resolvido, o Credor Signatário não poderá ceder seus respectivos Créditos Sujeitos a partir da Data de Celebração até a Data da Homologação do Plano, exceto se: ***(i)*** o cessionário for uma entidade afiliada do Credor Signatário, hipótese em que haverá adesão integral e automática dos créditos cedidos aos termos deste Plano; e ***(ii)*** na hipótese de cessão de Crédito Sujeito a Pessoa que não seja o Credor Signatário ou entidade afiliada do Credor Signatário, o respectivo cessionário adira integralmente, por escrito, aos termos e condições deste Plano, previamente à formalização do contrato de cessão de crédito, mediante o preenchimento e envio do termo de adesão constante do **Anexo IV** abaixo às Requerentes e cumprimento do disposto na Cláusula 4.4 acima. Para que não restem dúvidas, serão consideradas nulas de pleno direito as cessões de crédito, celebradas pelo Credor Signatário, cujos respectivos cessionários se recusem a aderir aos termos e condições deste Plano, hipótese em que o cedente original continuará sendo considerado, | **11.3.** <u>Assignment and Transfer</u>. Provided that this Plan has not been terminated, the Signatory Creditor may not assign its respective Subject Claims from the Signing Date until the Judicial Confirmation Date, except if: ***(i)*** the assignee is an affiliate of the Signatory Creditor, in which case the assigned claims shall be fully and automatically subject to the terms of this Plan; and ***(ii)*** in the event of an assignment of a Subject Claim to a Person that is not the Signatory Creditor or an affiliate of the Signatory Creditor, the respective assignee shall fully adhere, in writing, to the terms and conditions of this Plan, prior to the execution of the claim assignment agreement, by completing and delivering the adhesion term set forth in **Schedule IV** below to the Debtors and complying with the provisions of Section 4.4 above. For the avoidance of doubt, any claim assignments executed by the Signatory Creditor whose respective assignees refuse to adhere to the terms and conditions of this Plan shall be deemed null and void, in which case the original assignor shall continue to be deemed, for all intents and purposes, the legitimate holder of |

| | |
|---|---|
| para todos os fins e efeitos, como o legítimo titular do Crédito Sujeito cedido. A cessão de Créditos Sujeitos, após a Data do Pedido, não alterará a sua natureza, classificação, sujeição ou regime jurídico, nem convalidará direitos ou prerrogativas não detidos originalmente pelo cedente. | the assigned Subject Claim. The assignment of Subject Claims, after the Filing Date shall not alter their nature, classification, subjection or legal treatment, nor shall it validate rights or prerogatives not originally held by the assignor. |
| **11.4.** As condições de pagamento dos Créditos Sujeitos novados nos termos deste Plano serão mantidas inalteradas em caso de cessões e transferências dos Créditos Sujeitos a terceiros, seja a que título for, inclusive para fins do quanto disposto no artigo 83 da LRF. | **11.4.** The payment terms of the Subject Claims novated pursuant to this Plan shall remain unchanged in the event of any assignments or transfers of the Subject Claims to third parties, for any reason whatsoever, including for the purposes of article 83 of the Brazilian Bankruptcy Act. |
| **11.5.** Créditos Sujeitos com Coobrigação das Requerentes e/ou das Requerentes do Plano 2. Para fins de tratamento e pagamento dos Créditos Sujeitos nos termos deste Plano e/ou do Plano 2, cada Credor Sujeito será considerado titular de um único Crédito Sujeito, independentemente da existência de coobrigação de mais de uma das Requerentes e/ou das Requerentes do Plano 2. O resultado financeiro das formas e meios de pagamento para o Credor Sujeito será sempre equivalente ao previsto neste Plano e no Plano 2 para o valor total do seu Crédito Sujeito, não podendo ser aumentado em razão da pluralidade de coobrigadas ou de garantias prestadas por distintas Requerentes e/ou Requerentes do Plano 2. | **11.5.** Subject Claims with Co-obligation of the Debtors and/or the Plan 2 Debtors. For purposes of the treatment and payment of the Subject Claims under this Plan and/or Plan 2, each Subject Creditor shall be deemed the holder of a single Subject Claim, regardless of the existence of a co-obligation by more than one of the Debtors and/or the Plan 2 Debtors. The financial outcome of the forms and means of payment for the Subject Creditor shall always be equivalent to that set forth in this Plan and in Plan 2 for the total amount of its Subject Claim and may not be increased due to the plurality of co-obligors or guarantees granted by different Debtors and/or Plan 2 Debtors. |
| **11.5.1.** O pagamento, total ou parcial, de Créditos Sujeitos com coobrigação de uma ou mais Requerentes e/ou Requerentes do Plano 2 será considerado, na mesma proporção, como se houvesse sido efetuado | **11.5.1.** The full or partial payment of Subject Claims with a co-obligation of one or more Debtors and/or Plan 2 Debtors shall be deemed, in the same proportion, as having |

| | |
|---|---|
| pelas demais Requerentes e/ou Requerentes do Plano 2. | been made by the other Debtors and/or Plan 2 Debtors. |
| **11.5.2.** Em nenhuma hipótese as Requerentes e/ou as Requerentes do Plano 2 estarão obrigadas a realizar pagamentos que excedam o valor do Crédito Sujeito. | **11.5.2.** In no event shall the Debtors and/or the Plan 2 Debtors be required to make payments exceeding the amount of the Subject Claim. |
| **11.5.3.** Caso o Crédito Sujeito seja pago por qualquer das Requerentes e/ou as Requerentes do Plano 2, as demais Requerentes e/ou as Requerentes do Plano 2 ficarão desobrigadas, na mesma proporção, de realizar os respectivos pagamentos previstos no Plano. | **11.5.3.** If the Subject Claim is paid by any of the Debtors and/or Debtors under the Plan 2, the other Debtors and/or Plan 2 Debtors shall be released, in the same proportion, from making the corresponding payments provided for in the Plan. |
| **11.5.4.** Caso, em razão de eventual coobrigação, qualquer das Requerentes e/ou as Requerentes do Plano 2 efetue pagamento que implique recebimento de valores pelo Credor Sujeito em violação ao descrito nesta Cláusula, o referido Credor Sujeito devolverá imediatamente às Requerentes e/ou às Requerentes do Plano 2, conforme aplicável, os valores e/ou títulos recebidos em excesso, incluindo principal, juros e demais encargos incidentes até o respectivo pagamento. | **11.5.4.** If, as a result of any co-obligation, any of the Debtors and/or the Plan 2 Debtors makes a payment that results in the Subject Creditor receiving amounts in violation of the provisions of this Section, such Subject Creditor shall immediately return to the Debtors and/or the Plan 2 Debtors, as applicable, the amounts and/or securities received in excess, including principal, interest, and any other charges accrue until the respective payment. |
| **11.5.5.** A Requerente e/ou a Requerente do Plano 2 que pagar a obrigação principal de uma outra Requerente e/ou Requerente do Plano 2, em conformidade com os termos deste Plano e do Plano 2, sub-rogar-se-á na posição jurídica do respectivo Credor | **11.5.5.** The Debtor and/or the Plan 2 Debtor that pays the principal obligation of another Debtor and/or Plan 2 Debtor, in accordance with the terms of this Plan and Plan 2, shall be subrogated to the legal position of the respective Subject Creditor, |

| | |
|---|---|
| Sujeito, conforme artigos 346 e 347 do Código Civil, devendo o seu respectivo crédito constituído em razão desta sub-rogação ser pago em conformidade com este Plano e com o Plano 2, conforme aplicável. | pursuant to articles 346 and 347 of the Brazilian Civil Code, and the credit constituted in its favor as a result of such subrogation shall be paid in accordance with this Plan and with the Plan 2, as applicable. |
| **11.6.** Créditos Sujeitos com Coobrigação de Terceiro. Os Créditos Sujeitos devidos por Terceiros observarão os seguintes termos e condições: | **11.6.** Subject Claims with Third-Party Co-Obligation. The Subject Claims owed by Third Parties shall observe the following terms and conditions: |
| **11.6.1.** Terceiro como Devedor Principal. As obrigações de Terceiros garantidas pelas Requerentes manter-se-ão válidas, vigentes, exigíveis e eficazes de acordo com os seus respectivos termos e condições pactuados com o referido Terceiro, ao passo que as respectivas obrigações de garantia assumidas pelas Requerentes serão novadas em conformidade com o disposto neste Plano. | **11.6.1.** Third party as Main Debtor. The obligations of Third Parties guaranteed by the Debtors shall remain valid, in force, enforceable, and effective in accordance with their respective terms and conditions agreed with such Third Party, whereas the corresponding guarantee obligations assumed by the Debtors shall be novated in accordance with the provisions of this Plan. |
| **11.6.1.1.** Caso os Créditos Sujeitos em que qualquer Terceiro figure como devedor principal sejam pagos por qualquer Pessoa que não seja as Requerentes ou Requerentes do Plano 2, as respectivas obrigações das Requerentes, conforme reestruturadas nos termos deste Plano, serão amortizadas em valor correspondente ao referido pagamento. | **11.6.1.1.** If the Subject Claims in which any Third Party acts as main debtor are paid by any Person other than the Debtors or the Plan 2 Debtors, the respective obligations of the Debtors, as restructured pursuant to the terms of this Plan, shall be amortized in an amount corresponding to such payment. |

| | |
|---|---|
| **11.6.1.2.** Caso as Requerentes paguem Créditos Sujeitos, conforme reestruturados por este Plano, em que quaisquer Terceiros figurem como devedores, tais Requerentes sub-rogar-se-ão na posição jurídica do respectivo Credor Sujeito, nos termos dos artigos 346 e seguintes do Código Civil, podendo cobrar o Terceiro em conforme com os direitos até então detidos por tal Credor Sujeito. | **11.6.1.2.** If the Debtors pay the Subject Claim, as restructured under this Plan, in which the Third Party is the debtor, such Debtors shall be subrogated to the legal position of the respective Subject Creditor, pursuant to articles 346 et seq. of the Brazilian Civil Code, and may collect from the Third Party in accordance with the rights previously held by such Subject Creditor. |
| **11.6.2.** Terceiro como Devedor Não-Principal. As obrigações de garantia prestadas por Terceiros em benefício de Créditos Sujeitos devidos em caráter principal pelas Requerentes manter-se-ão válidas, vigentes, exigíveis e eficazes de acordo com os seus respectivos termos e condições pactuados com o referido Terceiro, ao passo que as respectivas obrigações principais das Requerentes serão novadas em conformidade com o disposto neste Plano. | **11.6.2.** Third Party as Non-Main Debtor. The guarantee obligations provided by Third Parties in favor of Subject Claims owed primarily by the Debtors shall remain valid, in force, enforceable, and effective in accordance with their respective terms and conditions agreed with such Third Party, whereas the corresponding principal obligations of the Debtors shall be novated in accordance with the provisions of this Plan. |
| **11.6.2.1.** Caso qualquer Terceiro pague o Crédito Sujeito em que as Requerentes figurem como devedoras principais, tal Terceiro sub-rogar-se-á na posição jurídica do respectivo Credor Sujeito, nos termos dos artigos 346 e seguintes do Código Civil, | **11.6.2.1.** If any Third Party pays the Subject Claim for which the Debtors are the main debtors, such Third Party shall be subrogated to the legal position of the respective Subject Creditor, pursuant to articles 346 et seq. of the Brazilian Civil |

| | |
|---|---|
| passando a ser titular do respectivo Crédito Sujeito conforme reestruturado por este Plano. | Code, becoming the holder of the respective Subject Claim as restructured under this Plan. |
| **11.7.** <u>Manutenção de Garantias</u>. Nos termos do artigo 163, § 4º, da LRF, não haverá a supressão de eventuais garantias sobre bens outorgadas em favor dos Credores Sujeitos, as quais, se aplicável, passarão a assegurar o pagamento dos Créditos Sujeitos detidos pelos seus respectivos titulares conforme novados por esse Plano e/ou pelo Plano 2. | **11.7.** Maintenance of Collateral. Pursuant to article 163, fourth paragraph, of the Brazilian Bankruptcy Act, there shall be no release of any collateral over assets encumbered the Subject Creditors, which, if applicable, shall continue to secure the payment of the Subject Claims held by their respective holders as novated by this Plan and/or by Plan 2. |
| **11.7.1** As Requerentes e os Credores Sujeitos ficam desde já obrigados, e os eventuais agentes de garantia ficam desde já autorizados, se aplicável, a assinar todos e quaisquer documentos necessários para implementar o disposto na Cláusula 11.7 acima, inclusive celebrar eventuais aditamentos aos contratos de garantia existentes, para compatibilizá-los ao disposto neste Plano e em seus Anexos. | **11.7.1.** The Debtors and the Subject Creditors are hereby bound, and any security agents are hereby authorized, if applicable, to execute any and all documents necessary to implement the provisions of Section 11.7 above, including entering into any amendments to the existing security agreements, in order to align them with the provisions of this Plan and its Schedules. |
| **11.7.2** O Instrumento de Pagamento da Opção A – *Notes* e o Instrumento de Pagamento da Opção B – *Notes* (e, consequentemente, os Instrumentos de Pagamento da Opção C – *Notes*) serão garantidos pelos mesmos bens objeto das garantias outorgadas às Notas Internacionais 2029, observando-se o disposto nas escrituras de emissão a serem celebradas de forma consistente com os | **11.7.2.** The Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes (and, consequently, the Option C Payment Instruments – Notes) shall be secured by the same assets encumbered to the 2029 International Notes, observing the provisions set forth in the indentures to be entered into in a manner consistent with the Term Sheets attached as **Schedule VI** and **Schedule VII**. |

| | |
|---|---|
| *Term Sheets* constantes do **Anexo VI** e **Anexo VII**. | |
| **11.8.** Tributos. Os Tributos serão de responsabilidade da respectiva Parte que seja contribuinte ou responsável pelo pagamento deste Tributo, de acordo com as leis aplicáveis. | **11.8.** Taxes. The Taxes shall be the responsibility of the respective Party that is the taxpayer or otherwise liable for the payment of such Tax, in accordance with applicable laws. |
| **11.9.** Tolerância. Qualquer tolerância, exercício parcial ou concessão entre as Partes será sempre considerado mera liberalidade e não configurará renúncia ou perda de qualquer direito, faculdade, privilégio, prerrogativa ou poderes conferidos neste Plano, nem implicará novação, alteração, remissão, modificação ou redução dos direitos e obrigações decorrentes deste Plano. | **11.9.** Tolerance. Any tolerance, partial exercise, or concession between the Parties shall always be deemed a mere act of leniency and shall not constitute a waiver or loss of any right, power, privilege, prerogative, or authority granted under this Plan, nor shall it imply novation, alteration, remission, modification, or reduction of the rights and obligations arising from this Plan. |
| **11.10.** Divisibilidade das Previsões do Plano. Na hipótese de qualquer termo ou disposição do Plano ser considerado inválido, nulo ou ineficaz, os demais termos e disposições do Plano permanecerão válidos e eficazes, desde que as premissas que os embasaram sejam mantidas. | **11.10.** Severability of the Plan Provisions. If any term or provision of the Plan is deemed invalid, null, or unenforceable, the remaining terms and provisions of the Plan shall remain valid and enforceable, provided that the assumptions underlying them are preserved. |
| **11.11.** Conflito. Este Plano é celebrado em versões em inglês e português. Em caso de conflito entre as versões em inglês e em português, prevalecerá a versão em português. | **11.11.** Conflict. This Plan is executed in English and Portuguese versions. In the event of any conflict between the English and Portuguese versions, the Portuguese version shall prevail. |
| **11.12.** Título Executivo. Este Plano devidamente celebrado por todas as Partes e Intervenientes Anuentes, bem como a Sentença de Homologação do Plano constituem títulos executivos judiciais nos termos da legislação aplicável, conforme artigo 161, §6º, da LRF, consubstanciando obrigações | **11.12.** Enforceable instrument. This Plan, duly executed by all Parties and Intervening Parties, as well as the Plan Confirmation Order, constitute enforceable judicial instruments under applicable legislation, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, embodying valid, |

| | |
|---|---|
| válidas, vinculantes, exigíveis e exequíveis para as Requerentes, Intervenientes Anuentes e para os Credores Sujeitos, podendo ser executados nos seu próprios termos e condições contra as Requerentes, Intervenientes Anuentes e contra os Credores Sujeitos, conforme necessário e aplicável, nos termos dos artigos 513 e 783 e seguintes do CPC. | binding, enforceable, and executable obligations for the Debtors, the Intervening Parties, and the Subject Creditors, and may be enforced in their own terms and conditions against the Debtors, the Intervening Parties, and the Subject Creditors, as necessary and applicable, pursuant to articles 513 and 783 et seq. of the Brazilian Code of Civil Procedure. |
| **11.13.** Irrevogabilidade ou Irretratabilidade. Este Plano é celebrado pelas Partes de forma irrevogável e irretratável, consubstanciando instrumento válido e vinculante em relação às Partes e seus respectivos sucessores e cessionários, a qualquer título, e para todos os fins e efeitos. | **11.13.** Irrevocability and Irreversibility. This Plan is executed by the Parties on an irrevocable and irreversible basis, constituting a valid and binding instrument with respect to the Parties and their respective successors and assignees, for any purpose and effect. |
| **11.14.** Acordo Integral. Este Plano e seus Anexos refletem e constituem, de forma final, integral e exclusiva, todas as avenças existentes entre as Partes no que diz respeito aos Créditos Sujeitos e cancelam, superam e substituem quaisquer outras propostas, acordos e entendimentos anteriores, verbais ou escritos, bem como todas e quaisquer outras comunicações mantidas entre as Partes, no que diz respeito aos Créditos Sujeitos, salvo se de outra forma especificado neste Plano. | **11.14.** Entire agreement. This Plan and its Schedules reflect and constitute, in a final, complete, and exclusive manner, all agreements existing among the Parties with respect to the Subject Claims and cancel, supersede, and replace any and all prior proposals, agreements, and understandings, whether oral or written, as well as any and all other communications exchanged among the Parties with respect to the Subject Claims, except as otherwise specified in this Plan. |
| **11.15.** Comunicações. Todas as notificações, requerimentos, pedidos e outras comunicações às Requerentes, Intervenientes Anuentes ou aos representantes do Credor Signatário, requeridas ou permitidas por este Plano, para serem eficazes, devem ser feitas por escrito e serão consideradas realizadas quando enviadas: ***(a)*** por correspondência registrada, com aviso de | **11.15.** Notices. All notices, requests, demands, and other communications to the Debtors, the Intervening Parties, or the representatives of the Signatory Creditor required or permitted under this Plan, to be effective, shall be made in writing and shall be deemed given when sent: ***(a)*** by registered mail with return receipt requested, or by courier; or ***(b)*** by e-mail when actually delivered, with the |

| | |
|---|---|
| recebimento, ou courrier; ou ***(b)*** por *e-mail* quando efetivamente entregues, valendo o aviso de entrega como prova de entrega e recebimento da mensagem. As comunicações às Requerentes, Intervenientes Anuentes e ao Credor Signatário, conforme aplicável, devem ser enviadas aos endereços indicados abaixo, salvo se houver alteração devidamente comunicada à outra Parte. As comunicações endereçadas aos Credores Aderentes serão enviadas para o endereço constante dos respectivos Termos de Adesão. | delivery receipt serving as proof of delivery and receipt of the message. Communications to the Debtors, the Intervening Parties, and the Signatory Creditor, as applicable, shall be sent to the addresses indicated below, unless a change has been duly communicated to the other Party. Communications addressed to the Adhering Creditors shall be sent to the address indicated in their respective Adhesion Terms. |
| **Requerentes e Intervenientes Anuentes:**<br><br>A/C: Gustavo Braga Mercher Coutinho (gustavo.coutinho@agnet.com.br).<br><br>Endereço: Avenida do Contorno, n.º 8.279, 3º andar, Gutierrez, Belo Horizonte/MG, CEP 30110-059. | **Debtors and Intervening Parties:**<br><br>A/C: Gustavo Braga Mercher Coutinho (gustavo.coutinho@agnet.com.br).<br><br>Address: Avenida do Contorno, No. 8,279, 3rd floor, Gutierrez, Belo Horizonte/MG, CEP 30110-059. |
| **Com cópia para**:<br><br>*Mattar – Sociedade de Advogados*<br><br>A/C: Eduardo Augusto Mattar (eamattar@mattaradv.com.br);<br><br>Cesar Rizzo (crizzo@mattaradv.com.br);<br><br>Guilherme Bergamin de Barros (gbarros@mattaradv.com.br);<br><br>Victor Dias Vieira Clementino (vclementino@mattaradv.com.br);<br><br>Henrique Del Vecchio Rodrigues (hrodrigues@mattaradv.com.br);<br><br>Fernanda Oliveira Alencar (falencar@mattaradv.com.br); e | **With a copy to:**<br><br>*Mattar – Sociedade de Advogados*<br><br>A/C: Eduardo Augusto Mattar (eamattar@mattaradv.com.br);<br><br>Cesar Rizzo (crizzo@mattaradv.com.br);<br><br>Guilherme Bergamin de Barros (gbarros@mattaradv.com.br);<br><br>Victor Dias Vieira Clementino (vclementino@mattaradv.com.br);<br><br>Henrique Del Vecchio Rodrigues (hrodrigues@mattaradv.com.br);<br><br>Fernanda Oliveira Alencar (falencar@mattaradv.com.br); and |

| | |
|---|---|
| Ana Katarina Costa Marques (akmarques@mattaradv.com.br).<br><br>Endereço: Av. Pres. JK, nº 2041, Torre B, 5º andar, CEP 04543-011 São Paulo/SP. | Ana Katarina Costa Marques (akmarques@mattaradv.com.br).<br><br>Address: Av. Pres. JK, nº 2041, Torre B, 5º andar, CEP 04543-011 São Paulo/SP. |
| *Davis Polk & Wardwell LLP*<br><br>A/C: Manuel Garciadiaz (manuel.garciadiaz@davispolk.com);<br><br>Timothy Graulich (timothy.graulich@davispolk.com); e<br><br>Joanna McDonald (joanna.mcdonald@davispolk.com).<br><br>Endereço: 450 Lexington Avenue, Nova Iorque, Nova Iorque, 10017, Estados Unidos da América<br><br>Consultores em Direito estrangeiro e estadunidense. | *Davis Polk & Wardwell LLP*<br><br>A/C: Manuel Garciadiaz (manuel.garciadiaz@davispolk.com);<br><br>Timothy Graulich (timothy.graulich@davispolk.com); and<br><br>Joanna McDonald (joanna.mcdonald@davispolk.com).<br><br>Address: 450 Lexington Avenue, New York, New York, 10017, United States of America<br><br>Foreign and U.S. legal consultants. |
| **Credor Signatário**:<br><br>A/C: Luiz Renan Toffanin da Silva (gestaosec.naofin@vert-capital.com).<br><br>Endereço: Rua Cardeal Arcoverde, nº 2.365, 11º Andar, Pinheiros, CEP 05407-020, São Paulo/SP. | **Signatory Creditor**:<br><br>A/C: Luiz Renan Toffanin da Silva (gestaosec.naofin@vert-capital.com).<br><br>Address: Rua Cardeal Arcoverde, nº 2.365, 11º Andar, Pinheiros, CEP 05407-020, São Paulo/SP. |
| **12. LEI E FORO** | **12. GOVERNING LAW AND JURISDICTION.** |
| **12.1.** Lei Aplicável. Exceto quando de outra forma disposto nos Anexos deste Plano, os direitos, deveres e obrigações decorrentes deste Plano deverão ser regidos, interpretados e executados de | **12.1.** Applicable Law. Except as otherwise provided in the Schedules to this Plan, the rights, duties, and obligations arising from this Plan shall be governed by, interpreted, and enforced in |

| | |
|---|---|
| acordo com as leis vigentes na República Federativa do Brasil. | accordance with the laws in force in the Federative Republic of Brazil. |
| **12.2.** Foro. Exceto quando de outra forma disposto nos Anexos deste Plano, todas as controvérsias ou disputas que surgirem ou estiverem relacionadas a este Plano, durante o período em que perdurar a Recuperação Extrajudicial, serão resolvidas pelo Juízo da Recuperação Extrajudicial até o encerramento da Recuperação Extrajudicial. Após o encerramento da Recuperação Extrajudicial, as Partes elegem o foro da Comarca de Belo Horizonte, Estado de Minas Gerais, como competente para resolver todas as controvérsias ou disputas que surgirem ou estiverem relacionadas a este Plano, com renúncia de qualquer outro foro ou jurisdição, por mais privilegiado que seja. | **12.2.** Jurisdiction. Except as otherwise provided in the Schedules to this Plan, all controversies or disputes arising out of or relating to this Plan, during the period in which the Extrajudicial Reorganization remains pending, shall be resolved by the Court of the Extrajudicial Reorganization until the termination of the Extrajudicial Reorganization. After the termination of the Extrajudicial Reorganization, the Parties elect the courts of the Judicial District of Belo Horizonte, State of Minas Gerais, as the competent forum to resolve all controversies or disputes arising out of or relating to this Plan, waiving any other forum or jurisdiction, no matter how privileged it may be. |
| E, por estarem justos e contratados, as Partes e as Intervenientes Anuentes assinam o presente instrumento, a que se obrigam por si e seus sucessores a qualquer tipo, para todos os fins e efeitos de direito, juntamente com duas testemunhas. | And being in full agreement and duly bound, the Parties and the Intervening Parties execute this instrument, for the same purposes, binding themselves and their successors of any kind, for all legal intents and purposes, together with two witnesses. |
| Belo Horizonte/MG, 18 de maio de 2026. | Belo Horizonte/MG, May 18, 2026. |
| *(Restante da página intencionalmente deixado em branco)* | *(Remainder of page intentionally left blank)* |
| (*Assinaturas seguem nas próximas páginas*) | *(Signatures follow on the next pages).* |

| Lista de Anexos | | | List of Schedules | |
|---|---|---|---|---|
| Anexo I | Relação de Credores Sujeitos, com a indicação do valor total dos Créditos Sujeitos devidos por cada Requerente, devidamente atualizados até a Data do Pedido. | | Schedule I | List of Subject Creditors, indicating the total amount of the Subject Claims owed by each Debtor, duly updated up to the Filing Date. |
| Anexo II | Relação dos Créditos Sujeitos detidos pelo Credor Signatário contra cada Requerente, devidamente atualizados até a Data do Pedido. | | Schedule II | List of the Subject Claims held by the Signatory Creditor against each Debtor, duly updated up to the Filing Date. |
| Anexo III | Termo de Adesão do Credor Signatário. | | Schedule III | Adhesion Term for Signatory Creditor. |
| Anexo IV | Termo de Adesão para Credor Aderente. | | Schedule IV | Adhesion Term for Adhering Creditor. |
| Anexo V | Certificado de Detentor de Notas Internacionais Existentes. | | Schedule V | Certificate of Holder of International Existing Notes. |
| Anexo VI | Term Sheet indicativo dos termos e condições que constarão da escritura de emissão do Instrumento de Pagamento da Opção A – Notes. | | Schedule VI | Indicative Term Sheet of the terms and conditions to be set forth in the indenture of the Option A Payment Instrument – Notes. |
| Anexo VII | Term Sheet indicativo dos termos e condições que constarão da escritura de emissão do Instrumento de Pagamento da Opção B – Notes. | | Schedule VII | Indicative Term Sheet of the terms and conditions to be set forth in the indenture of the Option B Payment Instrument – Notes. |
| Anexo VIII | Formulário de Eleição para Créditos Sujeitos não decorrentes de Notas Internacionais Existentes. | | Schedule VIII | Election Form for Subject Claims not arising from International Existing Notes. |

*(Página de assinatura do Plano de Recuperação Extrajudicial de Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. e Andrade Gutierrez Investimentos em Engenharia S.A.*)

*(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.)*

**ANDRADE GUTIERREZ ENGENHARIA S.A.**

Renato Torres de Faria

Nome/Name: Renato Torres de Faria

Cargo/Title: Diretor/Officer

Marco Tulio Pinto

Nome/Name: Marco Túlio Pinto

Cargo/Title: Diretor/Officer

*(Página de assinatura do Plano de Recuperação Extrajudicial de Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. e Andrade Gutierrez Investimentos em Engenharia S.A.)*

*(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.)*

**ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A.**

José Eduardo Kauark Leite

______________________________

Nome/Name: José Eduardo Kauark Leite

Cargo/Title: Diretor/Officer

Cristiano Pimentel Cavalc

______________________________

Nome/Name: Cristiano Pimentel Cavalcanti Vieira

Cargo/Title: Diretor/Officer

*(Página de assinatura do Plano de Recuperação Extrajudicial de Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. e Andrade Gutierrez Investimentos em Engenharia S.A.*)

*(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.)*

**ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A.**

Renato Torres de Faria

__________________________________

Nome/Name: Renato Torres de Faria

Cargo/Title: Diretor-Presidente/Chief Executive Officer

Gustavo Braga Mercher Cou

__________________________________

Nome/Name: Gustavo Braga Mercher Coutinho

Cargo/Title: Diretor

*(Página de assinatura do Plano de Recuperação Extrajudicial de Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. e Andrade Gutierrez Investimentos em Engenharia S.A.)*

*(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.)*

Na qualidade de interveniente anuente:

As an intervening and consenting party:

**ANDRADE GUTIERREZ INTERNATIONAL S.A.**




Nome/Name: Gustavo Braga Mercher Coutinho

Cargo/Title: Diretor/Officer




Nome/Name: Gustavo Benchimol

Cargo/Title: Diretor/Officer

*(Página de assinatura do Plano de Recuperação Extrajudicial de Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. e Andrade Gutierrez Investimentos em Engenharia S.A.)*

*(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.)*

Na qualidade de interveniente anuente:

As an intervening and consenting party:

**ZAGOPE SGPS S.A.**

Nome/Name: Ricardo de Oliveira Lopes de Sá

Cargo/Title: Conselheiro

Nome/Name: Margarida Damião Fernandes F. Lobo

Cargo/Title: Conselheiro

*(Página de assinatura do Plano de Recuperação Extrajudicial de Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. e Andrade Gutierrez Investimentos em Engenharia S.A.*)

*(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.)*

Na qualidade de interveniente anuente:

As an intervening and consenting party:

**INZAG GERMANY GMBH**

Nome/Name: Leandro Eugenio Fernandez Faria

Cargo/Title: Diretor/Officer

Nome/Name: Fabiano Nascimento Brandão

Cargo/Title: Diretor/Officer

*(Página de assinatura do Plano de Recuperação Extrajudicial de Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. e Andrade Gutierrez Investimentos em Engenharia S.A.)*

*(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.)*

Na qualidade de interveniente anuente:

As an intervening and consenting party:

**ANDRADE GUTIERREZ S.A.**

Nome/Name: Renato Torres de Faria

Cargo/Title: Diretor-Presidente/Chief Executive Officer

Nome/Name: Maria Beatriz Lira Gomes Ferreira

Cargo/Title: Diretora/Officer

*(Página de assinatura do Plano de Recuperação Extrajudicial de Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. e Andrade Gutierrez Investimentos em Engenharia S.A.)*

*(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.)*

Na qualidade de interveniente anuente:

As an intervening and consenting party:

**ANDRADE GUTIERREZ PARTICIPAÇÕES S.A.**



Nome/Name: Renato Torres de Faria

Cargo/Title: Diretor-Presidente/Chief Executive Officer



Nome/Name: Saulo Alves Pereira Júnior

Cargo/Title: Diretor/Officer

*(Página de assinatura do Plano de Recuperação Extrajudicial de Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. e Andrade Gutierrez Investimentos em Engenharia S.A.)*

*(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A.)*

**TESTEMUNHAS / WITNESSES**

Lilian Cristina P Oliveir

Nome/Name: Lilian Cristina Pereira de Oliveira

CPF/Brazilian Tax Payer Register: 333.114.578-54

Barbara Carolina Pires

Nome/Name: Barbara Carolina Pires Soares

CPF/Brazilian Tax Payer Register: 020.643.106-65

| Anexo I | Schedule I |
|---|---|
| **Relação de Credores Sujeitos** | **List of Subject Creditors** |

[Página intencionalmente em branco. Anexo I segue na próxima página]

**RELAÇÃO DE PASSIVOS DA ANDRADE GUTIERREZ ENGENHARIA S.A.**

**POSIÇÃO EM 18/05/2026**

| Devedor | Credor | CNPJ/CPF | Classificação/ Natureza | Endereço | Moeda Original | Valor Moeda Original | Valor (BRL)[2] | Origem | Regime de Vencimento |
|---|---|---|---|---|---|---|---|---|---|
| Andrade Gutierrez Engenharia S.A | Wilmington Savings Fund Society, FSB[1] | N/A | Quirografário | 500 Delaware Avenue, Wilmington, DE 19801 | USD | 65.464.463,81 | 331.603.694,98 | Bonds - 1.000% PIK Toggle Notes due 2040. | Bullet - Dezembro de 2040 |
| Andrade Gutierrez Engenharia S.A | Wilmington Savings Fund Society, FSB[1] | N/A | Quirografário | 500 Delaware Avenue, Wilmington, DE 19801 | USD | 489.201.296,43 | 2.478.000.246,94 | Bonds - 9.000%/10.500% Senior Secured PIK Toggle Notes due 2029. | Bullet - Dezembro de 2029 |
| Andrade Gutierrez Engenharia S.A | Vert Private Placements Companhia Securitizadora | 37.368.334/0001-22 | Quirografário | Rua Cardeal Arcoverde, nº 2.365, 11º Andar, Pinheiros, CEP 05.407-020, São Paulo - SP | BRL | 180.212.726,51 | 180.212.726,51 | Cumprimento Definitivo de Sentença Homologatória n.º 0029727-24.2025.8.26.0100. | N/A |
| Andrade Gutierrez Engenharia S.A | Vert Private Placements Companhia Securitizadora | 37.368.334/0001-22 | Quirografário | Rua Cardeal Arcoverde, nº 2.365, 11º Andar, Pinheiros, CEP 05.407-020, São Paulo - SP | EUR | 13.452.000,00 | 79.232.280,00 | "*Settlement Agreement* ", assinado em 29 de novembro de 2019, conforme aditado. | N/A |
| Andrade Gutierrez Engenharia S.A | Banco Bradesco S/A | 60.746.948/0001-12 | Quirografário | Cidade de Deus - Osasco - SP | BRL | 1.831.213,68 | 1.831.213,68 | CCB 237/2373/2700. | Amortização mensal com vencimento em junho/26 |
| Andrade Gutierrez Engenharia S.A | Ciranda 4 Energias Renováveis S/A | 37.427.693/0001-03 | Quirografário | Fazenda Fazenda Boqueirao S/N, Zona Rural, CEP 56950-000, São José do Belmonte - PE | BRL | 189.041.787,96 | 189.041.787,96 | Cumprimento de sentença nº 1029129-87.2024.8.26.0100. | N/A |
| Andrade Gutierrez Engenharia S.A | Ciranda 5 Energias Renováveis S/A | 37.427.699/0001-80 | Quirografário | Fazenda Mata do Juazeiro, S/N, Zona Rural, CEP 56950-000, São José do Belmonte, PE | BRL | | | | N/A |
| Andrade Gutierrez Engenharia S.A | Ciranda 6 Energias Renováveis S/A | 37.427.691/0001-14 | Quirografário | Fazenda Boa Vista S/N, Zona Rural, CEP 56950-000, São José do Belmonte - PE | BRL | | | | N/A |
| Andrade Gutierrez Engenharia S.A | Companhia do Metropolitano do Distrito Federal - Metrô DF | 38.070.074/0001-77 | Quirografário | Av. Jequitiba Lote,155 - Águas Claras - Brasilia - DF - CEP: 70.310-500 | BRL | 63.246.633,40 | 63.246.633,40 | Cumprimento de sentença nº 0003650-78.2013.8.07.0018. | N/A |
| Andrade Gutierrez Engenharia S.A | Companhia do Metropolitano de São Paulo - Metrô SP | 62.070.362/0001-06 | Quirografário | Rua Boa Vista, 175 – Bloco B – São Paulo - SP | BRL | 20.618.170,10 | 20.618.170,10 | Execução de titulo extrajudicial nº 1065425-94.2020.8.26.0053. | N/A |
| Andrade Gutierrez Engenharia S.A | Conbec Consórcio Brasileiro de Engenheiros Consultores | 13.185.897/0001-17 | Quirografário | Rua Augusta, 2840, Conjunto 11, Cerqueira César, São Paulo/SP, CEP 014121-00 | BRL | 2.489.360,22 | 2.489.360,22 | Cumprimento de sentença nº 1881207-76.2011.8.13.0024. | N/A |
| Andrade Gutierrez Engenharia S.A | Vinccler, C.A. Venezolana de Inversiones y Costruciones Clerico, Compañia Anonima | N/A | Quirografário | de, Prolongación Av. La Salle, Edf. Fiorela, P.B Av. La Salle, Caracas 1050, Distrito Capital, Venezuela | USD | 1.000.000,00 | 5.065.400,00 | "*Convenio de pago* ", celebrado em 19 de setembro de 2019. | Mar. e Set. 2021, Mar. e Set. 2022 |
| Andrade Gutierrez Engenharia S.A | Gerenpro, C.A. | N/A | Quirografário | 8050, Puerto Ordaz 8050, Bolívar, Venezuela | USD | 1.000.000,00 | 5.065.400,00 | "*Convenio de pago* ", celebrado em 2 de setembro de 2019. | Mar. e Set. 2021, Mar. e Set. 2022 |
| Andrade Gutierrez Engenharia S.A | Dell Acqua, C.A. | N/A | Quirografário | Guayana City 8050, Bolívar, Venezuela | USD | 1.000.000,00 | 5.065.400,00 | "*Convenio de pago* ", celebrado em 2 de setembro de 2019. | Mar. e Set. 2021, Mar. e Set. 2022 |
| Andrade Gutierrez Engenharia S.A | Empresa de construcción San Antonio, C.A. | N/A | Quirografário | Avenida Principal, Ciudad Guayana 8050, Bolívar, Venezuela | USD | 1.000.000,00 | 5.065.400,00 | "*Terminación* ", celebrada em 30 de setembro de 2019. | Nov. 19, jan. 20 e fev. 20 |
| Andrade Gutierrez Engenharia S.A | Dunfield Holdings Inc | N/A | Quirografário | 21757 Devonshire St, Ste 1A, Chatsworth, CA 91311, EUA | USD | 5.056.599,61 | 25.613.699,66 | "*Convenio de pago* ", celebrado em 2 de setembro de 2019. | Mar. 19, Out. 19, Mar. 20, Out. 20 e Mar. 2021 |
| Andrade Gutierrez Engenharia S.A | Bonsimat Desarrollos Globales, S.L. | N/A | Quirografário | Calle Miguel Angel 217 PLANTA. 28010, Madrid | USD | 1.343.552,22 | 6.805.629,42 | "Convenio de pago", celebrado em 17 de outubro de 2018. | Mar. 10 e Jul. 10 2019, Mar. 10 e Jul 10, 2020, Mar. 10 e Jul 10, 2021, Mar. 10 e Jul 10, 2022 e Mar. 10, 2023 |
| Andrade Gutierrez Engenharia S.A | José Barbosa Filho | 520.574.707-25 | Quirografário | Rua Dário Marques, LT02, QD 12-B - Jardim Metropólis - São João de Meriti/RJ | BRL | 571.779,97 | 571.779,97 | Cumprimento de sentença 0052509-37.1999.8.19.0001. | N/A |
| Andrade Gutierrez Engenharia S.A | Companhia de Saneamento Ambiental do Distrito Federal | 00.082.024/0001-37 | Quirografário | Av. Sibipiruna, 13/21 - Águas Claras - Brasilia/DF | BRL | 343.261,68 | 343.261,68 | Cumprimento de sentença 0704095-32.2020.8.07.0011. | N/A |
| Andrade Gutierrez Engenharia S.A | Eduardo Henrique da Silva | 130.629.167-45 | Quirografário | Rua Frei Pedro Sinzig, 488 - Honório Gurgel - Rio de Janeiro/RJ - CEP 21511-310 | BRL | 30.705,66 | 30.705,66 | Cumprimento de sentença 0001990-70.2018.8.19.0202. | N/A |
| Andrade Gutierrez Engenharia S.A | Vallourec Soluções Tub do Brasil S/A | 08.689.024/0002-92 | Quirografário | DT INDUSTRIA S/N - DTO INDUSTRIAL - JECEABA/MG - CEP: 35.498-000 | BRL | 555.445,24 | 555.445,24 | Execução de título extrajudicial 5105225-72.2024.8.13.0024. | N/A |
| Andrade Gutierrez Engenharia S.A | Vallum Engenharia Ltda - EPP | 13.344.259/0001-00 | Quirografário | Rua Detetive Moacir Alves Garcia, 86 - Santa Branca - Belo Horizonte/MG - CEP: 31.565-450 | BRL | 424.383,96 | 424.383,96 | Cumprimento de sentença 5118120-70.2021.8.13.0024. | N/A |

| | | |
|---|---|---|
| BRL | 459.365.468,38 | 459.365.468,38 |
| USD | 565.065.912,07 | 2.862.284.871,00 |
| EUR | 13.452.000,00 | 79.232.280,00 |
| **TOTAL** | | **3.400.882.619,38** |

[1] Na qualidade de Trustee, como agente representante dos credores titulares de Bonds.

[2] Câmbio de referência BRL/USD = 5,0654 e BRL/EUR =5,89 (PTAX de 15/05/2026, conforme art. 163, § 3º, I, da Lei nº 11.101/2005).

**RELAÇÃO DE PASSIVOS DA ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A.**

**POSIÇÃO EM 18/05/2026**

| Devedor | Credor | Classificação | CNPJ/CPF | Endereço | Moeda Original | Valor Moeda Original | Valor (BRL)[2] | Origem | Regime de Vencimento |
|---|---|---|---|---|---|---|---|---|---|
| Andrade Gutierrez Construções e Serviços S.A | Wilmington Savings Fund Society, FSB[1] | Quirografário | N/A | 500 Delaware Avenue, Wilmington, DE 19801 | USD | 489.201.296,43 | 2.478.000.246,94 | Bonds - 9.000%/10.500% Senior Secured PIK Toggle Notes due 2029. | Bullet - Dezembro de 2029 |
| Andrade Gutierrez Construções e Serviços S.A | Ciranda 4 Energias Renováveis S/A | Quirografário | 37.427.693/0001-03 | Fazenda Fazenda Boqueirao S/N, Zona Rural, CEP 56950-000, São | BRL | 189.041.787,96 | 189.041.787,96 | Cumprimento de sentença nº 1029129-87.2024.8.26.0100. | N/A |
| Andrade Gutierrez Construções e Serviços S.A | Ciranda 5 Energias Renováveis S/A | Quirografário | 37.427.699/0001-80 | Fazenda Mata do Juazeiro, S/N, Zona Rural, CEP 56950-000, São José do Belmonte, PE | BRL | | | | |
| Andrade Gutierrez Construções e Serviços S.A | Ciranda 6 Energias Renováveis S/A | Quirografário | 37.427.691/0001-14 | Fazenda Boa Vista S/N, Zona Rural, CEP 56950-000, São José do Belmonte - PE | BRL | | | | |

| | | |
|---|---|---|
| BRL | 189.041.787,96 | 189.041.787,96 |
| USD | 489.201.296,43 | 2.478.000.246,94 |
| **TOTAL** | | **2.667.042.034,90** |

[1] Na qualidade de Trustee, como agente representante dos credores titulares de Bonds.

[2] Câmbio de referência BRL/USD = 5,0654 (PTAX de 15/05/2026, conforme art. 163, § 3º, I, da Lei nº 11.101/2005).

**RELAÇÃO DE PASSIVOS DA ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A.**

**POSIÇÃO EM 18/05/2026**

| Devedor | Credor | CNPJ/CPF | Classificação | Endereço | Moeda Original | Valor Moeda Original | Valor (BRL)[2] | Origem | Regime de Vencimento |
|---|---|---|---|---|---|---|---|---|---|
| Andrade Gutierrez Investimentos em Engenharia S.A | Wilmington Savings Fund Society, FSB[1] | N/A | Quirografário | 500 Delaware Avenue, Wilmington, DE 19801 | USD | 489.201.296,43 | 2.478.000.246,94 | Bonds - 9.000%/10.500% Senior Secured PIK Toggle Notes due 2029 | Bullet - Dezembro de 2029 |

| | | |
|---|---|---|
| USD | **489.201.296,43** | **2.478.000.246,94** |
| **TOTAL** | **489.201.296,43** | **2.478.000.246,94** |

[1] Na qualidade de Trustee, como agente representante dos credores titulares de Bonds.
[2] Câmbio de referência BRL/USD = 5,0654 (PTAX de 15/05/2026, conforme art. 163, § 3º, I, da Lei nº 11.101/2005).

**Anexo II**

**Relação dos Créditos Sujeitos detidos pelo Credor Signatário**

**Schedule II**

**List of the Subject Claims held by the Signatory Creditor**

[Página intencionalmente em branco. Anexo II segue na próxima página]

**Relação dos Créditos Sujeitos detidos pelos Credores Signatários (Art. 163, § 6º, III, LFRE) - Lista de ANDRADE GUTIERREZ ENGENHARIA S.A.,**

**POSIÇÃO EM: 18/05/26**

| Credor Signatário | Origem do Crédito | Moeda Original | Valor Total dos Créditos dos Credores Signatários - Principal + Juros | | % do Total de Créditos Sujeitos |
|---|---|---|---|---|---|
| | | | Valor em BRL[1] | Valor na moeda original[2] | |
| **VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA** | BOND - 1.000% PIK TOGGLE NOTES DUE 2040 | USD | 205.075.703 | 40.485.589 | **71,3%** |
| | BOND - 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029 | USD | 1.961.400.915 | 387.215.406 | |
| | Cumprimento Definitivo de Sentença Homologatória n.º 0029727-24.2025.8.26.0100 | BRL | 180.212.727 | 180.212.727 | |
| | "*Settlement Agreement*", assinado em 29/11/2019, conforme aditado | EUR | 79.232.280 | 13.452.000 | |
| | **Total** | | **2.425.921.625** | | |
| **Total** | | | **2.425.921.625** | | **71,3%** |

[1] Câmbio de referência BRL/USD = 5,0654 e BRL/EUR = 5,89 (PTAX de 15/05/2026, conforme art. 163, § 3º, I, da Lei nº 11.101/2005).

[2] Composição dos créditos detidos pelo credor signatário decorrentes do: (i) Bond 1.000% PIK TOGGLE NOTES DUE 2040: US$ 40.328.755 de principal e US$ 156.834 de juros; e do (ii) Bond 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029: US$ 327.219.332 de principal e US$ 59.996.074 de juros.

**Relação dos Créditos Sujeitos detidos pelo Credor Signatário (Art. 163, § 6º, III, LFRE) - Lista de ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A.**

**POSIÇÃO EM: 18/05/26**

| Credor Signatário | Origem do Crédito | Moeda Original | Valor Total dos Créditos do Credor Signatário - Principal + Juros | | % do Total de Créditos Sujeitos |
|---|---|---|---|---|---|
| | | | Valor em BRL[1] | Valor na moeda original[2] | |
| **VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA** | BOND - 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029 | USD | 1.961.400.915 | 387.215.406 | **73,5%** |
| **Total** | | | **1.961.400.915** | **387.215.406** | **73,5%** |

[1] Câmbio de referência BRL/USD = 5,0654 (PTAX de 15/05/2026, conforme art. 163, § 3º, I, da Lei nº 11.101/2005).

[2] Composição dos créditos detidos pelo credor signatário decorrentes do Bond 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029: US$ 327.219.332 de principal e US$ 59.996.074 de juros.

**Relação dos Créditos Sujeitos detidos pelo Credor Signatário (Art. 163, § 6º, III, LFRE) - ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A.**

**POSIÇÃO EM: 18/05/26**

| Credor Signatário | Origem do Crédito | Moeda Original | Valor Total dos Créditos do Credor Signatário - Principal + Juros | | % do Total de Créditos Sujeitos |
|---|---|---|---|---|---|
| | | | Valor em BRL[1] | Valor na moeda original[2] | |
| **VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA** | BOND - 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029 | USD | 1.961.400.915 | 387.215.406 | **79,2%** |
| **Total** | | | **1.961.400.915** | **387.215.406** | **79,2%** |

[1] Câmbio de referência BRL/USD = 5,0654 (PTAX de 15/05/2026, conforme art. 163, § 3º, I, da Lei nº 11.101/2005).

[2] Composição dos créditos detidos pelo credor signatário decorrentes do Bond 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029: US$ 327.219.332 de principal e US$ 59.996.074 de juros.

| | |
|---|---|
| **Anexo III** | **Schedule III** |
| **Termo de Adesão do Credor Signatário** | **Adhesion Term for Signatory Creditor** |

[Página intencionalmente em branco. Anexo III segue na próxima página]

**TERMO DE ADESÃO DO CREDOR SIGNATÁRIO**

São Paulo, 18 de maio de 2026

À

Andrade Gutierrez Engenharia S.A.

Andrade Gutierrez Construções e Serviços S.A.

Andrade Gutierrez Investimentos em Engenharia S.A.

Com cópia para:

*Mattar – Sociedade de Advogados*

A/C: Eduardo Augusto Mattar (eamattar@mattaradv.com.br)

Guilherme Bergamin de Barros (gbarros@mattaradv.com.br);

Cesar Rizzo (crizzo@mattaradv.com.br);

Henrique Del Vecchio Rodrigues (hrodrigues@mattaradv.com.br);

Fernanda Oliveira Alencar (falencar@mattaradv.com.br); e

Ana Katarina Costa Marques (akmarques@mattaradv.com.br).

**Credor:**

**VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA**, sociedade por ações com finalidade de realizar operações de securitização, com sede na Cidade de São Paulo, Estado de São Paulo, na Rua Cardeal Arcoverde, nº 2.365, 11º Andar, Pinheiros, CEP 05.407-020, inscrita no CNPJ/MF sob o nº 37.368.334/0001-22 ("Credor Signatário").

**ADHESION TERM OF SIGNATORY CREDITOR**

São Paulo, May 18, 2026

To

Andrade Gutierrez Engenharia S.A.

Andrade Gutierrez Construções e Serviços S.A.

Andrade Gutierrez Investimentos em Engenharia S.A.

With copy to:

*Mattar – Sociedade de Advogados*

A/C: Eduardo Augusto Mattar (eamattar@mattaradv.com.br)

Guilherme Bergamin de Barros (gbarros@mattaradv.com.br);

Cesar Rizzo (crizzo@mattaradv.com.br);

Henrique Del Vecchio Rodrigues (hrodrigues@mattaradv.com.br);

Fernanda Oliveira Alencar (falencar@mattaradv.com.br); e

Ana Katarina Costa Marques (akmarques@mattaradv.com.br).

**Creditor:**

**VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA**, a corporation organized under Brazilian law, whose corporate purpose is to carry out securitization transactions, with its head office in the City of São Paulo, State of São Paulo, at Rua Cardeal Arcoverde, No. 2,365, 11th Floor, Pinheiros, ZIP Code 05407-020, enrolled with the Brazilian National Register

of Legal Entities (CNPJ/MF) under No. 37.368.334/0001-22 ("Signatory Creditor").

**Valor total de Créditos Sujeitos contra a AGE:** R$ 2.425.921.625,00 (dois bilhões, quatrocentos e vinte e cinco milhões, novecentos e vinte e um mil, seiscentos e vinte e cinco reais)

**Total amount of Subject Claims against AGE:** R$ 2,425,921,625.00 (two billion, four hundred and twenty-five million, nine hundred and twenty-one thousand, six hundred and twenty-five reais)

**Valor total de Créditos Sujeitos contra a AGCS:** R$ 1.961.400.915,00 (um bilhão, novecentos e sessenta e um milhões, quatrocentos mil, novecentos e quinze reais)

**Total amount of Subject Claims against AGCS:** R$ 1,961,400,915.00 (one billion, nine hundred and sixty-one million, four hundred thousand, nine hundred and fifteen reais)

**Valor total de Créditos Sujeitos contra a AGIE:** R$ 1.961.400.915,00 (um bilhão, novecentos e sessenta e um milhões, quatrocentos mil, novecentos e quinze reais)

**Total amount of Subject Claims against AGIE:** R$ 1,961,400,915.00 (one billion, nine hundred and sixty-one million, four hundred thousand, nine hundred and fifteen reais)

O Credor Signatário, acima qualificado, na qualidade de titular de Créditos Sujeitos detidos contra a AGE, AGCS e AGIE, pelo valores indicados acima, vem, por seu representante autorizado, por meio do presente Termo de Adesão, manifestar sua expressa adesão ao plano de recuperação extrajudicial subscrito por AGE, AGCS e AGIE, na qualidade de partes, e AGINT, Zagope, Inzag, AGPAR e AGSA, na qualidade de intervenientes anuentes (o "Plano"), nos termos e para todos os fins dos artigos 161 e seguintes da Lei 11.101/2005, conforme alterada ("LRF"), servindo esse Termo de Adesão como manifestação da sua concordância com os termos e condições do Plano.

The Signatory Creditor, identified above, in the capacity of holder of Subject Claims held against AGE, AGCS, and AGIE, by the amount indicated above, hereby represented by its authorized representative, by means of this Adhesion Term, expresses its adhesion to the extrajudicial reorganization plan subscribed by AGE, AGCS and AGIE, in the capacity as parties, and AGINT, Zagope, Inzag, AGPAR and AGSA, in the capacity as intervening parties (the "Plan"), pursuant to, and for all purposes of, Articles 161 *et. seq.* of Law Nº 11. 101, dated as of February 9, 2005, as amended ("LRF"), serving this Term of Adhesion as its acceptance of the terms and conditions of the Plan.

O Credor Signatário declara (i) ter recebido cópia do Plano, seus anexos e de todos os documentos que o acompanham; (ii) ter ciência e concordar irrestritamente com todas as cláusulas e condições previstas no Plano, seus anexos e demais documentos que o acompanham; (iii) que o presente Termo de Adesão foi assinado por subscritor devidamente autorizado e com poderes para tanto, conforme documentação anexa; e (iv) ser titular de Créditos Sujeitos contra a AGE, AGCS e AGIE, conforme documentação anexa.

The Signatory Creditor represents that (i) it has received copy of the Plan, its exhbits and all documents attached thereto; (ii) it is aware of and unreservedly agrees to all sections and conditions set forth in the Plan, its exhbits and all documents attached thereto; (iii) this Adhesion Term was signed by a signatory duly authorized and with powers to perform such act, pursuant to the attached documents; and (iv) it is holder of Subject Claims against AGE, AGCS and AGIE, pursuant to the attached documents.

Este Termo de Adesão é firmado de forma irrevogável e irretratável, conforme o disposto no artigo 161, § 5º, da LRF, observado o disposto no Plano.

This Adhesion Term is executed on an irrevocable and irreversible basis, pursuant to article 161, paragraph 5, of LRF, subject to the provisions of the Plan.

Os termos iniciados em letra maiúscula e não definidos neste Termo de Adesão têm o significado que lhes foi atribuído no Plano.

The terms initiated in capital letters not defined hereto have the meaning ascribed to them in the Plan.

Em caso de conflito entre as versões em português e em inglês deste Termo de Adesão, a versão em português deverá prevalecer.

In case of conflict between the Portuguese and English version of this Adhesion Term, the Portuguese version will prevail.

(*Restante da página intencionalmente deixado em branco*)

*(Remainder of page intentionally left blank)*

*(Página de assinatura do Termo de Adesão de Credor Signatário - Plano de Recuperação Extrajudicial apresentado por Andrade Gutierrez Engenharia S.A., AG Construções e Serviços S.A. e Andrade Gutierrez Investimentos em Engenharia S.A.).*

*(Signatures page of the Adhesion Term of Signatory Creditor – Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., AG Construções e Serviços S.A.* and *Andrade Gutierrez Investimentos em Engenharia S.A.).*

**VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA**

DocuSigned by
Luiz Renan Toffanin da Silva
Assinado por: LUIZ RENAN TOFFANIN DA SILVA:38840942890
CPF: 38840942890
Data/Hora da Assinatura: 18/05/2026 | 19:16:49 PDT
O: ICP-Brasil, OU: VideoConferÃªncia
C: BR
Emissor: AC Certisign RFB G5
2C92117790854F3...

Nome: Luiz Renan Toffanin
Cargo: Diretor

DocuSigned by
Luiz Renan Toffanin da Silva
Assinado por: LUIZ RENAN TOFFANIN DA SILVA:38840942890
CPF: 38840942890
Data/Hora da Assinatura: 18/05/2026 | 19:17:09 PDT
O: ICP-Brasil, OU: VideoConferÃªncia
C: BR
Emissor: AC Certisign RFB G5
2C92117790854F3...

Name: Luiz Renan Toffanin
Title: Director

**Anexo IV**

**TERMO DE ADESÃO**

**PARA CREDOR ADERENTE**

[Local], [data]

À

Andrade Gutierrez Engenharia S.A.

Andrade Gutierrez Construções e Serviços S.A.

Andrade Gutierrez Investimentos em Engenharia S.A.

Com cópia para:

*Mattar – Sociedade de Advogados*

A/C: Eduardo Augusto Mattar (eamattar@mattaradv.com.br)

Guilherme Bergamin de Barros (gbarros@mattaradv.com.br);

Cesar Rizzo (crizzo@mattaradv.com.br);

Henrique Del Vecchio Rodrigues (hrodrigues@mattaradv.com.br);

Fernanda Oliveira Alencar (falencar@mattaradv.com.br); e

**Schedule IV**

**ADHESION TERM FOR ADHERING CREDITOR**

[Local], [data]

To

Andrade Gutierrez Engenharia S.A.

Andrade Gutierrez Construções e Serviços S.A.

Andrade Gutierrez Investimentos em Engenharia S.A.

With copy to:

*Mattar – Sociedade de Advogados*

A/C: Eduardo Augusto Mattar (eamattar@mattaradv.com.br)

Guilherme Bergamin de Barros (gbarros@mattaradv.com.br);

Cesar Rizzo (crizzo@mattaradv.com.br);

Henrique Del Vecchio Rodrigues (hrodrigues@mattaradv.com.br);

Fernanda Oliveira Alencar (falencar@mattaradv.com.br); e

Ana Katarina Costa Marques (akmarques@mattaradv.com.br).

Ana Katarina Costa Marques (akmarques@mattaradv.com.br).

**Credor:**

**Creditor:**

**[nome]**, [qualificação completa] ("Credor Aderente").

**[nome]**, [state of incorporation]; [address] ("Adehring Creditor").

**Valor total de Créditos Sujeitos contra a AGE:** R$ [=] (=)

**Total amount of Subject Claims against AGE:** R$ [=] (=)

**Valor total de Créditos Sujeitos contra a AGCS:** R$ [=] (=)

**Total amount of Subject Claims against AGCS:** R$ [=] (=)

**Valor total de Créditos Sujeitos contra a AGIE:** R$ [=] (=)

**Total amount of Subject Claims against AGIE:** R$ [=] (=)

O Credor Aderente, acima qualificado, na qualidade de titular de Créditos Sujeitos detidos contra a AGE, AGCS e AGIE, pelo valores indicados acima, vem, por seu representante autorizado, por meio do presente Termo de Adesão, manifestar sua expressa adesão ao plano de recuperação extrajudicial subscrito por AGE, AGCS e AGIE, na qualidade de partes, e AGINT, Zagope, Inzag, AGPAR e AGSA, na qualidade de intervenientes anuentes (o "Plano"), nos termos e para todos os fins dos artigos 161 e seguintes da Lei 11.101/2005, conforme alterada ("LRF"), servindo esse Termo de Adesão como manifestação da sua

The Adhering Creditor, identified above, in the capacity of holder of Subject Claims held against AGE, AGCS, and AGIE, by the amount indicated above, hereby represented by its authorized representative, by means of this Adhesion Term, expresses its adhesion to the extrajudicial reorganization plan subscribed by AGE, AGCS and AGIE, in the capacity as parties, and AGINT, Zagope, Inzag, AGPAR and AGSA, in the capacity as intervening parties (the "Plan"), pursuant to, and for all purposes of, Articles 161 *et. seq.* of Law Nº 11. 101, dated as of February 9, 2005, as amended ("LRF"), serving this Term of

concordância com os termos e condições do Plano.

O Credor Aderente declara (i) ter recebido cópia do Plano, seus anexos e de todos os documentos que o acompanham; (ii) ter ciência e concordar irrestritamente com todas as cláusulas e condições previstas no Plano, seus anexos e demais documentos que o acompanham; (iii) que o presente Termo de Adesão foi assinado por subscritor devidamente autorizado e com poderes para tanto, conforme documentação anexa; e (iv) ser titular de Créditos Sujeitos contra a AGE, AGCS e AGIE, conforme documentação anexa.

Este Termo de Adesão é firmado de forma irrevogável e irretratável, conforme o disposto no artigo 161, § 5º, da LRF, observado o disposto no Plano.

Os termos iniciados em letra maiúscula e não definidos neste Termo de Adesão têm o significado que lhes foi atribuído no Plano.

Em caso de conflito entre as versões em português e em inglês deste Termo de Adesão, a versão em português deverá prevalecer.

(*Restante da página intencionalmente deixado em branco*)

Adhesion as its acceptance of the terms and conditions of the Plan.

The Adhering Creditor represents that (i) it has received copy of the Plan, its exhbits and all documents attached thereto; (ii) it is aware of and unreservedly agrees to all sections and conditions set forth in the Plan, its exhbits and all documents attached thereto; (iii) this Adhesion Term was signed by a signatory duly authorized and with powers to perform such act, pursuant to the attached documents; and (iv) it is holder of Subject Claims against AGE, AGCS and AGIE, pursuant to the attached documents.

This Adhesion Term is executed on an irrevocable and irreversible basis, pursuant to article 161, paragraph 5, of LRF, subject to the provisions of the Plan.

The terms initiated in capital letters not defined hereto have the meaning ascribed to them in the Plan.

In case of conflict between the Portuguese and English version of this Adhesion Term, the Portuguese version will prevail.

*(Remainder of page intentionally left blank)*

*(Página de assinatura do Termo de Adesão para Credor Aderente - Plano de Recuperação Extrajudicial apresentado por Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. e Andrade Gutierrez Investimentos em Engenharia S.A.*).

*(Signatures page of the Adhesion Term for Adhering Creditor – Extrajudicial Reorganization Plan of Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A.* and *Andrade Gutierrez Investimentos em Engenharia S.A.).*

[**CREDOR ADERENTE**]

____________________________________

Nome:

Cargo:

____________________________________

Nome:

Cargo:

**Anexo V**

**CERTIFICATE OF HOLDER OF INTERNATIONAL NOTES**

The undersigned hereby represents and warrants, as applicable, that it is **(i.a)** the holder/beneficial owner of debt securities described below or **(i.b)** the manager, agent, broker, or advisor for the holder indicated below, which holds the debt securities described below, in accordance with the attached screenshot(s) or broker(s)/custodian(s) certificate(s)/declaration(s), indicating the proof of ownership of said securities, and **(ii)** duly authorized to deliver this Certificate.

**Name of Manager, Agent, Broker or Advisor**: [complete if applicable; do not complete if the Certificate is directly signed by the holder/beneficial owner]

**Address**: [complete if applicable]

**E-mail**: [complete if applicable]

**Name of the Creditor / Beneficial Owner**: [complete]

**Address**: [complete ]

**E-mail**: [complete]

**Total Principal Amount held by Creditor arising from the "9.000%/10.500% Senior**

**Schedule V**

**CERTIFICADO DE DETENTOR DE NOTAS INTERNACIONAIS**

O subscritor abaixo assinado pelo presente declara e garante, conforme aplicável, que **(i.a)** é proprietário/beneficiário dos títulos de dívida abaixo ou **(i.b)** é administrador, agente, gestor, representante ou consultor do proprietário/beneficiário dos títulos de dívida abaixo indicados, de acordo com os anexos screenshot(s) ou certificado(s)/declarações de custodiante(s), refletindo a propriedade de tais títulos, e **(ii)** está devidamente autorizado a entregar este Certificado.

**Nome do administrador, agente, gestor, representante ou consultor**: [preencher se aplicável; não preencher se o Certificado for assinado diretamente pelo credor]

**Endereço**: [preencher se aplicável]

**E-mail**: [preencher se aplicável]

**Nome do Credor/Proprietário Beneficiário**: [preencher]

**Endereço**: [preencher]

**E-mail**: [preencher]

**Total do Valor do Principal/Histórico detido pelo credor decorrente da**

**Secured PIK Toggle Notes due 2029"**, issued by Andrade Gutierrez International S.A. and guaranteed by Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A., Andrade Gutierrez Investimentos em Engenharia S.A., Zagope SGPS, S.A. and Inzag Germany Gmbh, due on 2029 ("2029 Notes"):

**US$[complete if applicable]**

**Name of the custodian(s) of the 2029 Notes held by Creditor**: [complete if applicable]

**Total Principal Amount held by Creditor arising from the "*1.000% PIK Toggle Notes due 2040*"**, issued by Andrade Gutierrez International S.A. and guaranteed by Andrade Gutierrez Engenharia S.A., due on 2040 ("2040 Notes"):

**US$[complete if applicable]**

**Name of the custodian(s) of the 2040 Notes held by Creditor**: [complete if applicable]

**"*9.000%/10.500% Senior Secured PIK Toggle Notes due 2029*"**, emitidas pela Andrade Gutierrez International S.A. e garantidas pela Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A., Andrade Gutierrez Investimentos em Engenharia S.A., Zagope SGPS, S.A. and Inzag Germany Gmbh, com vencimento em 2029 ("Notas 2029"):

**US$[preencher se aplicável]**

**Nome do(s) custodiante(s) das Notas 2029 detidas pelo Credor**: [preencher se aplicável]

**Total do Valor do Principal/Histórico detido pelo credor decorrente da "*1.000% PIK Toggle Notes due 2040*"**, emitidas pela Andrade Gutierrez International S.A. e garantidas pela Andrade Gutierrez Engenharia S.A., com vencimento em 2040 ("Notas 2040"):

**US$[preencher se aplicável]**

**Nome do(s) custodiante(s) das Notas 2040 detidas pelo Credor**: [preencher se aplicável]

| | |
|---|---|
| Name of Certificate's signatory: [complete] | Nome do signatário do Certificado: [preencher] |
| Title of Certificate's signatory: [complete if applicable] | Cargo do signatário do Certificado: [preencher se aplicável] |
| Signature of the Certificate's signatory:<br><br>____________________________________ | Assinatura do signatário do Certificado:<br><br>____________________________________ |
| Date: [complete] | Data: [preencher] |

**Anexo VI**

| **TERMOS E CONDIÇÕES DO INSTRUMENTO DE PAGAMENTO DA OPÇÃO A - *NOTES*** | |
|---|---|
| As palavras contidas neste anexo iniciadas em letras maiúsculas que não sejam expressamente aqui definidas deverão ser interpretadas de acordo com as respectivas definições do Plano.<br><br>Este anexo é celebrado em versões em português e inglês, sendo que, em caso de conflito, divergência, inconsistência ou dúvida de interpretação entre tais versões, a versão em português prevalecerá para todos os fins.<br><br>Em caso de conflito, divergência, inconsistência ou dúvida de interpretação entre qualquer disposição deste anexo e qualquer disposição do Plano, as disposições do Plano prevalecerão para todos os fins. | |
| Emissora | O Instrumento de Pagamento da Opção A - *Notes* será emitido pela AGINT. |
| Instrumento | O Instrumento de Pagamento da Opção A - *Notes*, denominado em Dólar, será emitido de acordo com certa escritura de emissão regida pelas Leis do Estado de Nova Iorque, Estados Unidos da América, que refletirá os termos e condições previstos neste Anexo VI, bem como neste Plano e no Plano 2. |
| Garantias Fidejussórias | O Instrumento de Pagamento da Opção A - *Notes* contará com garantias fidejussórias da AGE, AGIE, AGCS, AGPAR e AGSA, a serem outorgadas em conformidade com o disposto nas Leis do Estado de Nova Iorque, Estados Unidos da América, e em acordo com as disposições do Plano. |
| Garantias Reais | O Instrumento de Pagamento da Opção A - *Notes* contará com garantia fiduciária, regida por lei brasileira, sobre as ações de emissão da AGE e penhor de 1º grau, regido pelas Leis da República Federal da Alemanha, sobre as ações de emissão da Inzag. |
| Valor Total de Emissão | O valor de emissão total do Instrumento de Pagamento da Opção A - *Notes* corresponderá ao ***(i)*** percentual de 36% (trinta e seis por cento) do valor de Créditos Sujeitos detidos pelos Credores Opção A que atendam ao disposto nas Cláusulas 5.5.2 do Plano e 5.2.1 do Plano 2, bem como nas demais disposições aplicáveis, acrescido dos juros remuneratórios aplicáveis previstos nas Cláusulas 5.4, item "(ii)" do Plano e 5.4., item "(ii)" do Plano 2 que incidirem a partir da Data da Homologação até a data de emissão do Instrumento de Pagamento da Opção A - *Notes*; *acrescido* do ***(ii)*** percentual de 31% (trinta e um por cento) do valor de Créditos Sujeitos detidos pelos Credores Opção C que atendam ao disposto nas Cláusulas 7.5.2 do Plano e 7.5.1 do Plano 2, bem como nas demais disposições aplicáveis, acrescido dos juros remuneratórios aplicáveis previstos nas Cláusulas 7.4.1, item "(ii)" do Plano e 7.4.1, item "(ii)" do Plano 2 que incidirem a partir da Data da Homologação até a data de emissão do Instrumento de Pagamento da Opção A - *Notes*. Para que não restem dúvidas, ***(a)*** o valor em Crédito Opção A a ser recebido por cada Credor Opção A, nos termos deste Plano e, conforme aplicável, do Plano 2, observará o disposto nas Cláusulas 11.5 e seguintes do Plano e do Plano 2, de modo que, em nenhuma hipótese, o respectivo Credor Opção A receberá valor do seu |

| | |
|---|---|
| | Crédito Opção A em duplicidade; e ***(b)*** o valor em Crédito Opção C – Tranche A a ser recebido por cada Credor Opção C, nos termos deste Plano e do Plano 2, observará o disposto nas Cláusulas 11.5 e seguintes do Plano e do Plano 2, de modo que, em nenhuma hipótese, o respectivo Credor Opção C receberá o valor do seu Crédito Opção C – Tranche A em duplicidade. |
| Moeda da Emissão | O Instrumento de Pagamento da Opção A - *Notes* será emitido em Dólar. |
| Vencimento | O Instrumento de Pagamento da Opção A - *Notes* vencerá em 28 de dezembro de 2040. |
| Correção e Juros | • O Instrumento de Pagamento da Opção A - *Notes* não será corrigido monetariamente.<br><br>• Sobre o Instrumento de Pagamento da Opção A - *Notes* incidirá juros remuneratórios de 6,00% (seis por cento) ao ano (considerando-se, para tanto, um ano de 360 (trezentos e sessenta) Dias Corridos), computados a partir da data de emissão do Instrumento de Pagamento da Opção A - *Notes* até 28 de dezembro de 2040. |
| Data de Pagamento de Juros | **(a)** da data de emissão do Instrumento de Pagamento da Opção A - *Notes* até imediatamente antes de 28 de dezembro de 2030, os juros remuneratórios incidentes no período serão capitalizados no valor do principal; e **(b)** de 28 de dezembro de 2030 até 28 de dezembro de 2040, os juros remuneratórios incidentes no período serão pagos em dinheiro e em bases semestrais, em 28 de junho e 28 de dezembro de cada ano, sendo a data do primeiro pagamento em 28 de junho de 2031. |
| Amortização | O valor do principal, incluindo os juros incididos capitalizados ao valor do principal, será amortizado, em dinheiro, em seis parcelas anuais, a serem pagas em 28 de dezembro de 2035, 28 de dezembro de 2036, 28 de dezembro de 2037, 28 de dezembro de 2038, 28 de dezembro de 2039 e 28 de dezembro de 2040, no valor correspondente a 16,667%, 20%, 25%, 33,333%, 50% e 100% do saldo devedor existente nas respectivas datas de pagamento. |
| Valores Mobiliários Detidos pela Emissora, Garantidoras e Afiliadas | A emissora poderá cancelar, parcial ou integralmente, a qualquer tempo e a seu exclusivo critério, o Instrumento de Pagamento da Opção A – *Notes* detido pela emissora, qualquer garantidora ou entidade controladora, controlada ou sob controle comum de qualquer emissora e/ou garantidora. |
| Lei Aplicável | O Instrumento de Pagamento da Opção A - *Notes* será regido pelas Leis do Estado de Nova Iorque, Estados Unidos da América. |
| Distribuição e Negociação | A Emissora envidará os esforços comercialmente razoáveis para possibilitar que o Instrumento de Pagamento da Opção A - *Notes* seja elegível para depósito no sistema do DTC em sua data de emissão. |
| Alterações | O Instrumento de Pagamento da Opção A - *Notes* poderá ser alterado por meio do consentimento de credores titulares de mais da metade do valor principal agregado em circulação do Instrumento de Pagamento da Opção A – *Notes* e do Instrumento de Pagamento da Opção B – *Notes* (apurado apenas de forma consolidada). |

<table>
<tr><td></td><td>A título exemplificativo, as seguintes matérias serão deliberadas por credores titulares de mais da metade do valor principal agregado em circulação do Instrumento de Pagamento da Opção A – Notes e do Instrumento de Pagamento da Opção B – Notes (apurado apenas de forma consolidada):<br><br>• Remoção de covenants e eventos de inadimplemento;<br>• Alteração de disposições que afetem os direitos dos credores relacionados às garantias fidejussórias, reais ou fiduciárias outorgadas ao Instrumento de Pagamento da Opção A – Notes, inclusive para liberar ou extinguir qualquer uma dessas garantias.<br><br>O consentimento de credores titulares de mais de 2/3 do valor principal agregado em circulação do Instrumento de Pagamento da Opção A – Notes e do Instrumento de Pagamento da Opção B – Notes (apurado apenas de forma consolidada) será exigido para:<br><br>• Alterar qualquer data de pagamento de principal ou de juros;<br>• Reduzir a taxa de juros;<br>• Alterar o local de pagamento;<br>• Alterar disposições da escritura de emissão que afete o grau de preferência legal do Instrumento de Pagamento da Opção A – Notes; e<br>• Alterar o quórum necessário para aprovar alterações referentes às matérias listadas acima<br><br>A substituição do trustee do Instrumento de Pagamento da Opção A – Notes dependerá do consentimento expresso da emissora e garantidoras do Instrumento de Pagamento da Opção A – Notes.</td></tr>
<tr><td>Obrigações de fazer/não fazer (covenants)</td><td>• Obrigação da emissora e das garantidoras de pagar, devida e pontualmente, o principal e juros sobre o Instrumento de Pagamento da Opção A - Notes, em conformidade com os termos do Plano, do Plano 2 e da escritura de emissão;<br>• Obrigação da emissora e das garantidoras de manter sua existência corporativa, observando eventuais exceções autorizadas pela lei aplicável e pela escritura de emissão do Instrumento de Pagamento da Opção A – Notes, incluindo, sem limitação, a possibilidade de substituir a emissora ou realizar operações societárias envolvendo a emissora e garantidoras;<br>• Obrigação de nomear um trustee e de eventualmente substituí-lo nos termos da escritura de emissão do Instrumento de Pagamento da Opção A - Notes.<br>• Obrigação de manter o grau de preferência do Instrumento de Pagamento da Opção A - Notes, inclusive em relação a todas as obrigações atuais e futuras da emissora e das garantidoras;</td></tr>
</table>

| | |
|---|---|
| | • Obrigação de manter a validade e a eficácia da escritura de emissão do Instrumento de Pagamento da Opção A – Notes e das respectivas garantias, observando eventuais exceções previstas no Plano, no Plano 2 e na escritura de emissão do Instrumento de Pagamento da Opção A – *Notes*.<br>• Obrigação da emissora e das garantidoras de cumprir as leis aplicáveis; e<br>• Obrigação da emissora e das garantidoras de manter informações contábeis e administrativas. |
| Eventos de Inadimplemento | • Não pagamento do principal ou dos juros após o decurso do prazo de 60 Dias Corridos contado da data em que a respectiva obrigação de pagamento do principal ou dos juros tornou-se devida e exigível; sendo certo que credores titulares de mais da metade do valor principal agregado em circulação do Instrumento de Pagamento da Opção A – *Notes* e do Instrumento de Pagamento da Opção B – *Notes* (apurado apenas de forma consolidada) poderão conceder prazo de cura de 180 (cento e oitenta) Dias Corridos, passível de prorrogação; e<br>• Violação de obrigação de fazer ou não fazer, desde que tal violação não seja sanada em até 60 Dias Corridos contados do envio de notificação escrita à emissora e garantidoras pelo *trustee* ou por credores titulares de mais da metade do valor principal agregado em circulação do Instrumento de Pagamento da Opção A – *Notes* e do Instrumento de Pagamento da Opção B – *Notes* (apurado apenas de forma consolidada). |
| O Instrumento de Pagamento da Opção A – *Notes* e o Instrumento de Pagamento da Opção B – *Notes* poderão ser emitidos sob a mesma escritura nos termos de certo aditamento à escritura de emissão e serão referidos como *Notes* da Série A e *Notes* da Série B, respectivamente. | |

# SCHEDULE VI

| OPTION A PAYMENT INSTRUMENT - NOTES<br>TERMS AND CONDITIONS | |
|---|---|
| The capitalized terms used in this schedule that are not expressly defined herein shall be interpreted in accordance with the respective definitions set forth in the Plan.<br><br>This schedule is executed in Portuguese and English versions, and, in the event of any conflict, discrepancy, inconsistency or question of interpretation between such versions, the Portuguese version shall prevail for all purposes.<br><br>In the event of any conflict, discrepancy, inconsistency or question of interpretation between any provision of this schedule and any provision of the Plan, the provisions of the Plan shall prevail for all purposes. | |
| Issuer | Option A Payment Instrument - Notes will be issued by AGINT. |
| Instrument | Option A Payment Instrument - Notes, denominated in Dollar, shall be issued under certain indenture governed by the Laws of the State of New York, United States of America, which shall reflect the terms and conditions set forth in this Schedule VI, as well as in this Plan and Plan 2. |
| Guarantees | Option A Payment Instrument - Notes will be guaranteed by AGE, AGIE, AGCS, AGPAR and AGSA, governed by the Laws of the State of New York, United States of America, and in accordance with the provisions of the Plan. |
| Collateral | Option A Payment Instrument - Notes will be secured by a fiduciary lien, governed by Brazilian law, on the shares issued by AGE and a first lien pledge, governed by German law, on the shares issued by Inzag. |
| Total Issuance Amount | The total issuance amount of the Option A Payment Instrument - Notes shall correspond to ***(i)*** thirty-six percent (36%) of the value of the Subject Claims held by the Option A Creditors that comply with Section 5.5.2 of the Plan and Section 5.2.1. of the Plan 2, as well as other applicable provisions, plus applicable interest pursuant to Section 5.4, item "(ii)" of the Plan and Section 5.4, item "(ii)" of the Plan 2 accruing from the Confirmation Date until the issuance date of the Option A Payment Instrument - Notes; *in addition* to ***(ii)*** thirty-one percent (31%) of the value of Subject Claims held by Option C Creditors that comply with Section 7.5.2 of the Plan and Section 7.5.1 of Plan 2, as well as other applicable provisions, plus applicable interest pursuant to Section 7.4.1, item "(ii)" of the Plan and Section 7.4.1, item "(ii)" of the Plan 2 accruing from the Confirmation Date until the issuance date of the Option A Payment Instrument - Notes. For the avoidance of doubt, ***(a)*** the amount of Option A Claims to be received by each Option A Creditor, pursuant to this Plan and, as applicable, pursuant to Plan 2, shall be subject to Sections 11.5 et. seq. of the Plan and Plan 2, meaning that, under no circumstances, the respective Option A Creditor shall receive in duplication the amount of its Option A Claim; and ***(b)*** the amount of Option C – Tranche A Claims to be received by each Option C Creditor, pursuant to this Plan and the Plan 2, shall be subject to Sections 11.5 et. seq. of the Plan and Plan 2, meaning that, under no circumstances, the respective Option C Creditor shall receive in duplication the amount of its Option C – Tranche A Claim. |

| | |
|---|---|
| Currency | Option A Payment Instrument - Notes will be issued in USD. |
| Maturity Date | Option A Payment Instrument - Notes shall mature on December 28, 2040. |
| Adjustment and Interest | • Option A Payment Instrument - Notes will not be subject to adjustment for inflation.<br><br>• Interest shall accrue on the Option A Payment Instrument - Notes at a rate of six percent (6.00%) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the issuance date of the Option A Payment Instrument - Notes until December 28, 2040. |
| Interest Payment Date | (a) from the issuance date of the Option A Payment Instrument - Notes until immediately prior to December 28, 2030, the interest accrued during such period shall be capitalized into the principal amount; and (b) from December 28, 2030 until December 28, 2040, the interest accrued during such period shall be payable in cash on a semiannual basis, on June 28 and December 28 of each year, with the first interest payment date being June 28, 2031. |
| Amortization | The principal amount of the Option A Payment Instrument - Notes, including the interest accrued and capitalized into the principal amount, shall be amortized, in cash, in six annual installments to be paid on December 28, 2035, December 28, 2036, December 28, 2037, December 28, 2038, December 28, 2039, and December 28, 2040, in amounts corresponding to 16.667%, 20%, 25%, 33.333%, 50% and 100% of the principal outstanding balance on each respective payment date. |
| Securities held by the Issuer, Guarantors or Affiliates | The issuer may cancel, partially or in full, at any time and at its sole discretion, the Option A Payment Instrument – Notes held by the issuer, guarantor or any entity controlling, controlled by, or under common control with any issuer and/or guarantor. |
| Governing Law | Option A Payment Instrument - Notes will be governed by the Laws of the State of New York, United States of America. |
| Distribution and Clearing | Issuer will use commercially reasonable efforts to make the Option A Payment Instrument - Notes eligible for deposit on the DTC system from the issue date. |
| Amendments | The Option A Payment Instrument - Notes may be amended with the consent of holders holding the majority of the outstanding aggregate principal amount of the Option A Payment Instrument – Notes and Option B Payment Instrument – Notes (determined on an aggregate basis only).<br><br>For illustrative purposes, the following matters will be decided through consent of holders holding the majority of the outstanding aggregate principal amount of the Option A Payment Instrument – Notes and Option B Payment Instrument – Notes (determined on an aggregate basis):<br>• Removal of covenants and events of default;<br>• Change provisions that would affect the holders' rights in connection with the guarantees and collateral granted to the Option A Payment Instrument – Notes, including to release or extinguish any of these guarantees and collateral<br><br>Consent of holders holding 2/3 of the outstanding aggregate principal amount of the Option A Payment Instrument – Notes and Option B |

| | |
|---|---|
| | Payment Instrument – Notes (determined on an aggregate basis only), shall be required to:<br>• Change any principal or interest payment date;<br>• Reduce the interest rate;<br>• Change the place of payment;<br>• Change provisions of the indenture affecting the ranking of the Option A Payment Instrument – Notes; and<br>• Change the required quorum to approve the matters listed above.<br><br>The replacement of the trustee of the Option A Payment Instrument – Notes shall require consent of the issuer and guarantors of the Option A Payment Instrument – Notes. |
| Covenants | • Obligation of the issuer and guarantors to pay, duly and on a timely basis, principal and interest on the Option A Payment Instrument - Notes, according to the Plan, Plan 2 and respective indenture;<br>• Obligation to preserve corporate existence, subject to eventual exceptions authorized by applicable law and indenture of the Option A Payment Instrument – Notes, including, but not limited to, the possibility of replacing the issuer or conducting corporate reorganizations involving the issuer and guarantors;<br>• Obligation to appoint a trustee and eventually replace it pursuant to the provisions of the indenture of the Option A Payment Instrument – Notes;<br>• Obligation to maintain the ranking of the Option A Payment Instrument - Notes, including with respect to all of the issuer's and guarantors' existing and future obligations;<br>• Obligation to maintain the validity and effectiveness of the indenture of the Option A Payment Instrument - Notes and the guarantees and collateral, subject to eventual exceptions provided for in the Plan, Plan 2 and indenture of the Option A Payment Instrument – Notes;<br>• Obligation of the issuer and guarantors to comply with laws; and<br>• Obligation of the issuer and guarantors to maintain accounting and administrative records. |
| Events of Default | • Failure to pay principal or interest following the expiration of a 60-Calendar Day deadline counted from the date on which the corresponding obligation to pay principal or interest becomes due and payable; being understood that holders holding the majority of the outstanding aggregate principal amount of the Option A Payment Instrument – Notes and Option B Payment Instrument – Notes (determined on an aggregate basis only), may grant cure period of 180 Calendar Days, that may be extended; and<br>• Default in the performance, or breach, of the indenture covenants, as long as a such default or breach is not cured for a period of 60 consecutive Calendar Days after written notice specifying such default or breach is given to the issuer and guarantors by the trustee or by holders holding at least the majority of the outstanding aggregate principal amount of the |

| | |
|---|---|
| | Option A Payment Instrument – Notes and Option B Payment Instrument – Notes (determined on an aggregate basis only). |
| The Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes may be issued under the same indenture pursuant to supplement indentures and would be referred to as Series A Notes and Series B Notes, respectively. | |

**Anexo VII**

| **TERMOS E CONDIÇÕES DO INSTRUMENTO DE PAGAMENTO DA OPÇÃO B - *NOTES*** | |
|---|---|
| As palavras contidas neste anexo iniciadas em letras maiúsculas que não sejam expressamente aqui definidas deverão ser interpretadas de acordo com as respectivas definições do Plano.<br><br>Este anexo é celebrado em versões em português e inglês, sendo que, em caso de conflito, divergência, inconsistência ou dúvida de interpretação entre tais versões, a versão em português prevalecerá para todos os fins.<br><br>Em caso de conflito, divergência, inconsistência ou dúvida de interpretação entre qualquer disposição deste anexo e qualquer disposição do Plano, as disposições do Plano prevalecerão para todos os fins. | |
| Emissora | O Instrumento de Pagamento da Opção B – *Notes* será emitido pela AGINT. |
| Instrumento | O Instrumento de Pagamento da Opção B - *Notes*, denominado em Dólar, será emitido de acordo com certa escritura de emissão regida pelas Leis do Estado de Nova Iorque, Estados Unidos da América, que refletirá os termos e condições previstos neste Anexo VII, bem como neste Plano e no Plano 2. |
| Garantias Fidejussórias | O Instrumento de Pagamento da Opção B - *Notes* contará com garantias fidejussórias da AGE, AGIE, AGCS, AGPAR e AGSA, a serem outorgadas em conformidade com o disposto nas Leis do Estado de Nova Iorque, Estados Unidos da América, e em acordo com as disposições do Plano. |
| Garantias Reais | O Instrumento de Pagamento da Opção B - *Notes* contará com garantia fiduciária, regida por lei brasileira, e sob condição suspensiva, sobre as ações de emissão da AGE e penhor em segundo grau, regido pelas Leis da República Federal da Alemanha, sobre as ações de emissão da Inzag. |
| Valor Total de Emissão | O valor de emissão total do Instrumento de Pagamento da Opção B - *Notes* corresponderá ao ***(i)*** percentual de 100% (cem por cento) do valor de Créditos Sujeitos detidos pelos Credores Opção B que atendam ao disposto nas Cláusulas 6.5.2 do Plano e 6.5.1 do Plano 2, bem como nas demais disposições aplicáveis, acrescido dos juros remuneratórios aplicáveis previstos nas Cláusulas 6.4, item "(ii)" do Plano e 6.4, item "(ii)" do Plano 2 que incidirem a partir da Data da Homologação até a data de emissão do Instrumento de Pagamento da Opção B - *Notes*; *acrescido do* ***(ii)*** percentual de 69% (sessenta e nove por cento) do valor de Créditos Sujeitos detidos pelos Credores Opção C que atendam ao disposto nas Cláusulas 7.5.2 do Plano e 7.5.1 do Plano 2, bem como nas demais disposições aplicáveis, acrescido dos juros remuneratórios aplicáveis previstos nas Cláusulas 7.4.2, item "(ii)" do Plano e 7.4.2, item "(ii)" do Plano 2 que incidirem a partir Data da Homologação até a data de emissão do Instrumento de Pagamento da Opção B - *Notes*. Para que não restem dúvidas, ***(a)*** o valor em Crédito Opção B a ser recebido por cada Credor Opção B, nos termos deste Plano e Plano 2, observará o disposto nas Cláusulas 11.5 e seguintes do Plano e do Plano 2, de modo que, em nenhuma hipótese, o respectivo Credor Opção B receberá valor do seu Crédito Opção B em duplicidade; e ***(b)*** o valor em Crédito |

| | |
|---|---|
| | Opção C – Tranche B a ser recebido por cada Credor Opção C, nos termos deste Plano e do Plano 2, observará o disposto nas Cláusulas 11.5 e seguintes do Plano e do Plano 2, de modo que, em nenhuma hipótese, o respectivo Credor Opção C receberá o valor do seu Crédito Opção C – Tranche B em duplicidade. |
| Moeda da Emissão | O Instrumento de Pagamento da Opção B - *Notes* será emitido em Dólar. |
| Vencimento | O Instrumento de Pagamento da Opção B - *Notes* vencerá em 28 de dezembro de 2070. |
| Correção e Juros | • O Instrumento de Pagamento da Opção B - *Notes* não será corrigido monetariamente.<br><br>• Sobre o Instrumento de Pagamento da Opção B - *Notes* incidirá juros remuneratórios de 1% (um por cento) ao ano (considerando-se, para tanto, um ano de 360 (trezentos e sessenta) Dias Corridos), computados a partir da data de emissão do Instrumento de Pagamento da Opção B - *Notes* até 28 de dezembro de 2070. |
| Data de Pagamento de Juros | Os juros do Instrumento de Pagamento da Opção B - *Notes* serão capitalizados no valor do principal e pagos, em uma única parcela, em 28 de dezembro de 2070. |
| Amortização | O valor do principal, incluindo os juros incididos capitalizados ao valor do principal, do Instrumento de Pagamento da Opção B – *Notes* será amortizado, em uma única parcela, em 28 de dezembro de 2070. |
| Resgate de Forma Antecipada com Desconto | O Instrumento de Pagamento da Opção B – *Notes* poderá, a qualquer momento a partir de 1º de janeiro de 2035 e até 28 de junho de 2070, a exclusivo critério da emissora e/ou das garantidoras, ser resgatados antecipadamente, de forma parcial ou integral, conforme aplicável, com a aplicação de desconto equivalente a 90% do valor do Instrumento de Pagamento da Opção B – *Notes* objeto do resgate antecipado, conforme devidamente atualizado até a data de vencimento do Instrumento de Pagamento da Opção B - *Notes*. Para que não restem dúvidas, por meio de pagamento de valor equivalente a 10% do Instrumento de Pagamento da Opção B – *Notes* objeto do resgate antecipado, conforme devidamente atualizado até a data de vencimento do Instrumento de Pagamento da Opção B - *Notes*, haverá a quitação integral da integralidade do Instrumento de Pagamento da Opção B – *Notes* detidos pelos respectivos Credores Opção B e/ou Credores Opção C para todos os fins e efeitos de direito. |
| Valores Mobiliários Detidos pela Emissora, Garantidoras e Afiliadas | A emissora poderá cancelar, parcial ou integralmente, a qualquer tempo e a seu exclusivo critério, o Instrumento de Pagamento da Opção B – *Notes* detido pela emissora, qualquer garantidora ou entidade controladora, controlada ou sob controle comum de qualquer emissora e/ou garantidora. |
| Lei Aplicável | O Instrumento de Pagamento da Opção B - *Notes* será regido pelas Leis do Estado de Nova Iorque, Estados Unidos da América. |
| Distribuição e Negociação | A Emissora envidará os esforços comercialmente razoáveis para possibilitar que o Instrumento de Pagamento da Opção B - *Notes* seja elegível para depósito no sistema do DTC em sua data de emissão. |

| | |
|---|---|
| Alterações | O Instrumento de Pagamento da Opção B - *Notes* poderá ser alterado por meio do consentimento de credores titulares de mais da metade do valor principal agregado em circulação do Instrumento de Pagamento da Opção B – *Notes* e do Instrumento de Pagamento da Opção A – *Notes* (apurado apenas de forma consolidada).<br><br>A título exemplificativo, as seguintes matérias serão deliberadas por credores titulares de mais da metade do valor principal agregado em circulação do Instrumento de Pagamento da Opção B – *Notes* e do Instrumento de Pagamento da Opção A – *Notes* (apurado apenas de forma consolidada):<br><br>• Remoção de *covenants* e eventos de inadimplemento;<br>• Alteração de disposições que afetem os direitos dos credores relacionados às garantias fidejussórias, reais ou fiduciárias outorgadas ao Instrumento de Pagamento da Opção B – Notes, inclusive para liberar ou extinguir qualquer uma dessas garantias.<br><br>O consentimento de credores titulares de mais de 2/3 do valor principal agregado em circulação do Instrumento de Pagamento da Opção B – *Notes* e do Instrumento de Pagamento da Opção A – *Notes* (apurado apenas de forma consolidada) será exigido para:<br><br>• Alterar qualquer data de pagamento de principal ou de juros;<br>• Reduzir a taxa de juros;<br>• Alterar o local de pagamento;<br>• Alterar disposições da escritura de emissão que afete o grau de preferência legal do Instrumento de Pagamento da Opção A – *Notes*; e<br>• Alterar o quórum necessário para aprovar alterações referentes às matérias listadas acima<br><br>A substituição do *trustee* do Instrumento de Pagamento da Opção B – *Notes* dependerá do consentimento expresso da emissora e garantidoras do Instrumento de Pagamento da Opção B – *Notes.* |
| Obrigações de fazer/não fazer (*covenants*) | • Obrigação da emissora e das garantidoras de pagar, devida e pontualmente, o principal e juros sobre o Instrumento de Pagamento da Opção B - *Notes*, em conformidade com os termos do Plano, do Plano 2 e da escritura de emissão;<br>• Obrigação da emissora e das garantidoras de manter sua existência corporativa, observando eventuais exceções autorizadas pela lei aplicável e pela escritura de emissão do Instrumento de Pagamento da Opção B – *Notes*, incluindo, sem limitação, a possibilidade de substituir a emissora ou realizar operações societárias envolvendo a emissora e garantidoras; |

| | |
|---|---|
| | • Obrigação de nomear um *trustee* e de eventualmente substituí-lo nos termos da escritura de emissão do Instrumento de Pagamento da Opção B - *Notes*.<br>• Obrigação de manter o grau de preferência do Instrumento de Pagamento da Opção B - *Notes*, inclusive em relação a todas as obrigações atuais e futuras da emissora e das garantidoras;<br>• Obrigação de manter a validade e a eficácia da escritura de emissão do Instrumento de Pagamento da Opção B – Notes e das respectivas garantias, observando eventuais exceções previstas no Plano, no Plano 2 e na escritura de emissão do Instrumento de Pagamento da Opção B – *Notes*.<br>• Obrigação da emissora e das garantidoras de cumprir as leis aplicáveis; e<br>• Obrigação da emissora e das garantidoras de manter informações contábeis e administrativas. |
| Eventos de Inadimplemento | • Não pagamento do principal ou dos juros após o decurso do prazo de 60 Dias Corridos contado da data em que a respectiva obrigação de pagamento do principal ou dos juros tornou-se devida e exigível; sendo certo que credores titulares de mais da metade do valor principal agregado em circulação do Instrumento de Pagamento da Opção B – *Notes* e do Instrumento de Pagamento da Opção A – *Notes* (apurado apenas de forma consolidada) poderão conceder prazo de cura de 180 (cento e oitenta) Dias Corridos, passível de prorrogação; e<br>• Violação de obrigação de fazer ou não fazer, desde que tal violação não seja sanada em até 60 Dias Corridos contados do envio de notificação escrita à emissora e garantidoras pelo *trustee* ou por credores titulares de mais da metade do valor principal agregado em circulação do Instrumento de Pagamento da Opção B – *Notes* e do Instrumento de Pagamento da Opção A – *Notes* (apurado apenas de forma consolidada). |
| O Instrumento de Pagamento da Opção A – *Notes* e o Instrumento de Pagamento da Opção B – *Notes* poderão ser emitidos sob a mesma escritura nos termos de certo aditamento à escritura de emissão e serão referidos como *Notes* da Série A e *Notes* da Série B, respectivamente. | |

## SCHEDULE VII

| **OPTION B PAYMENT INSTRUMENT - NOTES<br>TERMS AND CONDITIONS** | |
|---|---|
| The capitalized terms used in this schedule that are not expressly defined herein shall be interpreted in accordance with the respective definitions set forth in the Plan.<br><br>This schedule is executed in Portuguese and English versions, and, in the event of any conflict, discrepancy, inconsistency or question of interpretation between such versions, the Portuguese version shall prevail for all purposes.<br><br>In the event of any conflict, discrepancy, inconsistency or question of interpretation between any provision of this schedule and any provision of the Plan, the provisions of the Plan shall prevail for all purposes. | |
| Issuer | Option B Payment Instrument - Notes will be issued by AGINT. |
| Instrument | Option B Payment Instrument - Notes, denominated in Dollar, shall be issued under certain indenture governed by the Laws of the State of New York, United States of America, which shall reflect the terms and conditions set forth in this Schedule VII, as well as in this Plan and Plan 2. |
| Guarantees | Option B Payment Instrument - Notes will be guaranteed by AGE, AGIE, AGCS, AGPAR and AGSA, governed by the Laws of the State of New York, United States of America, and in accordance with the provisions of the Plan. |
| Collateral | Option B Payment Instrument - Notes will be secured by a fiduciary lien, governed by Brazilian law, and granted on a conditional basis, over the shares issued by AGE and a second lien pledge, governed by German law, on the shares issued by Inzag. |
| Total Issuance Amount | The total issuance amount of the Option B Payment Instrument - Notes shall correspond to ***(i)*** one hundred percent (100%) of the value of the Subject Claims held by the Option B Creditors that comply with Section 6.5.1 of the Plan and Section 6.5.2 of the Plan and Section 6.5.1 of the Plan 2, as well as other applicable provisions, plus the interest applicable pursuant to Section 6.4, item "(ii)" of the Plan and Section 6.4, item "(ii)" of the Plan 2 accruing from the Confirmation Date until the issuance date of the Option B Payment Instrument - Notes; *in addition* to ***(ii)*** sixty-nine percent (69%) of the value of Subject Claims held by Option C Creditors that comply with Section 7.5.2 of the Plan and Section 7.5.1 of the Plan 2, as well as other applicable provisions, plus the interest applicable pursuant to Section 7.4.2, item "(ii)" of the Plan and Section 7.4.2, item "(ii)" of the Plan 2 accruing from the Confirmation Date until the issuance date of the Option B Payment Instrument - Notes. For the avoidance of doubt, ***(a)*** the amount of Option B Claims to be received by each Option B Creditor, pursuant to this Plan and, as applicable, pursuant to the Plan 2, shall be subject to Sections 11.5 et. seq. of the Plan and the Plan 2, meaning that, under no circumstances, the respective Option B Creditor shall receive in duplication the amount of its Option B Claim; and ***(b)*** the amount of Option C – Tranche B Claims to be received by each Option C Creditor, pursuant to this Plan and, as applicable, pursuant to the Plan 2, shall be subject to Sections 11.5 et. seq. of the Plan, meaning that, under no circumstances, the respective Option C Creditor shall receive in duplication the amount of its Option C – Tranche B Claim. |

| | |
|---|---|
| Currency | Option B Payment Instrument - Notes will be issued in USD. |
| Maturity Date | Option B Payment Instrument - Notes shall mature on December 28, 2070. |
| Adjustment and Interest | • Option B Payment Instrument - Notes will not be subject to adjustment for inflation.<br><br>• Interest shall accrue on the Option B Payment Instrument - Notes at a rate of one percent (1.00%) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the issuance date of the Option B Payment Instrument - Notes until December 28, 2070. |
| Interest Payment Date | The interest of the Option B Payment Instrument - Notes shall be capitalized into the principal and paid in a single installment on December 28, 2070. |
| Amortization | The principal amount on the Option B Payment Instrument – Notes, including the interest accrued and capitalized into the principal, shall be amortized in a single installment on December 28, 2070. |
| Early Redemption With Discount | The Option B Payment Instrument - Notes may, as of January 1st, 2035 and until June 28, 2070, at the sole discretion of the issuer and guarantors, be redeemed in advance, partially or in full, with the application of a discount equivalent to 90% of the value of the Option B Payment Instrument – Notes that is being redeemed, as duly adjusted until the maturity date of the Option B Payment Instrument - Notes. For the avoidance of doubt, upon payment of an amount equivalent to 10% of the Option B Payment Instrument – Notes that is being redeemed, as duly adjusted until the maturity date of the Option B Payment Instrument - Notes, the Option B Payment Instrument - Notes held by the respective Option B Creditors and/or Option C Creditors shall be deemed fully settled and discharged for all legal purposes. |
| Securities held by the Issuer, Guarantors or Affiliates | The issuer may cancel, partially or in full, at any time and at its sole discretion, the Option B Payment Instrument – Notes held by the issuer, guarantor or any entity controlling, controlled by, or under common control with any issuer and/or guarantor. |
| Governing Law | Option B Payment Instrument - Notes will be governed by the Laws of the State of New York, United States of America. |
| Distribution and Clearing | Issuer will use commercially reasonable efforts to make the Option B Payment Instrument - Notes eligible for deposit on the DTC system from the issue date. |
| Amendments | The Option B Payment Instrument - Notes may be amended with the consent of holders holding the majority of the outstanding aggregate principal amount of the Option B Payment Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis only).<br><br>For illustrative purposes, the following matters will be decided through consent of holders holding the majority of the outstanding aggregate principal amount of the Option B Payment Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis):<br>• Removal of covenants and events of default;<br>• Change provisions that would affect the holders' rights in connection with the guarantees and collateral granted to the |

| | |
|---|---|
| | Option B Payment Instrument – Notes, including to release or extinguish any of these guarantees and collateral<br><br>Consent of holders holding 2/3 of the outstanding aggregate principal amount of the Option B Payment Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis only), shall be required to:<br>• Change any principal or interest payment date;<br>• Reduce the interest rate;<br>• Change the place of payment;<br>• Change provisions of the indenture affecting the ranking of the Option B Payment Instrument – Notes; and<br>• Change the required quorum to approve the matters listed above.<br><br>The replacement of the trustee of the Option B Payment Instrument – Notes shall require consent of the issuer and guarantors of the Option B Payment Instrument – Notes. |
| Covenants | • Obligation of the issuer and guarantors to pay, duly and on a timely basis, principal and interest on the Option B Payment Instrument - Notes, according to the Plan, Plan 2 and respective indenture;<br>• Obligation to preserve corporate existence, subject to eventual exceptions authorized by applicable law and indenture of the Option B Payment Instrument – Notes, including, but not limited to, the possibility of replacing the issuer or conducting corporate reorganizations involving the issuer and guarantors;<br>• Obligation to appoint a trustee and eventually replace it pursuant to the provisions of the indenture of the Option B Payment Instrument – Notes;<br>• Obligation to maintain the ranking of the Option B Payment Instrument - Notes, including with respect to all of the issuer's and guarantors' existing and future obligations;<br>• Obligation to maintain the validity and effectiveness of the indenture of the Option B Payment Instrument - Notes and the guarantees and collateral, subject to eventual exceptions provided for in the Plan, Plan 2 and indenture of the Option B Payment Instrument – Notes;<br>• Obligation of the issuer and guarantors to comply with laws; and<br>• Obligation of the issuer and guarantors to maintain accounting and administrative records. |
| Events of Default | • Failure to pay principal or interest following the expiration of a 60-Calendar Day deadline counted from the date on which the corresponding obligation to pay principal or interest becomes due and payable; being understood that holders holding the majority of the outstanding aggregate principal amount of the Option B Payment Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis only), may grant cure period of 180 Calendar Days, that may be extended; and<br>• Default in the performance, or breach, of the indenture covenants, as long as a such default or breach is not cured for |

| | |
|---|---|
| | a period of 60 consecutive Calendar Days after written notice specifying such default or breach is given to the issuer and guarantors by the trustee or by holders holding at least the majority of the outstanding aggregate principal amount of the Option B Payment Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis only). |
| The Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes may be issued under the same indenture pursuant to supplement indentures and would be referred to as Series A Notes and Series B Notes, respectively. | |

# ANEXO VIII

## FORMULÁRIO DE ELEIÇÃO DE OPÇÃO DE PAGAMENTO

[Local], [data]

À

Andrade Gutierrez Engenharia S.A.

Andrade Gutierrez Construções e Serviços S.A.

Andrade Gutierrez Investimentos em Engenharia S.A.

**Com cópia para:**

*Mattar – Sociedade de Advogados*

A/C: Eduardo Augusto Mattar (eamattar@mattaradv.com.br);

Guilherme Bergamin de Barros (gbarros@mattaradv.com.br);

Cesar Rizzo (crizzo@mattaradv.com.br);

Henrique Del Vecchio Rodrigues (hrodrigues@mattaradv.com.br);

Fernanda Oliveira Alencar (falencar@mattaradv.com.br); e

Ana Katarina Costa Marques (akmarques@mattaradv.com.br).

**Ref.: Eleição de Opção de Pagamento para Credores Sujeitos Não Detentores de Notas Internacionais**

Prezados Senhores,

[**Nome do Credor Sujeito**], [qualificação completa do Credor Sujeito] ("Credor Sujeito"), nos termos do plano de recuperação extrajudicial subscrito por Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. e Andrade Gutierrez Investimentos em Engenharia S.A., na qualidade de partes, e Andrade Gutierrez S.A., Andrade Gutierrez Participações S.A., Andrade Gutierrez International S.A., Zagope SGPS, S.A. e Inzag Germany Gmbh, na qualidade de intervenientes anuentes (o "Plano"), vem, por meio deste Formulário de Eleição, eleger a Opção de Pagamento abaixo assinalada:

**Eleição de Opção de Pagamento - Credores Sujeitos Não Detentores de Notas Internacionais Existentes**

( ) Opção A

( ) Opção B

( ) Opção C

*Obs.: Eleger apenas uma Opção de Pagamento para a totalidade do Crédito Sujeito.*

O Credor Sujeito informa que os pagamentos decorrentes da Opção de Pagamento acima escolhida devem ser realizados na seguinte conta bancária:

Banco: [informar]

Agência: [informar]

Conta Corrente: [informar]

CNPJ/CPF: [informar]

O Credor Sujeito apresenta, em conjunto com este Formulário de Eleição, os documentos comprobatórios dos poderes do signatário deste Formulário de Eleição, conforme previsto no Plano.

Atenciosamente,

[**CREDOR SUJEITO**]

| | |
|---|---|
| ___________________________________ | ___________________________________ |
| Nome: | Nome: |
| Cargo: | Cargo: |

# Exhibit E

## EJ Plan 2 and a certified English translation

I hereby certify and give full faith and credit that on this date a document has been presented to me in Portuguese, to which I translate as follows:

Translator's Note: the original document is English-Portuguese bilingual, bi-column. There, the English portion adequately corresponds to the Portuguese portion. Below is the translation including the English portion only.

## Doc. 4:

Extrajudicial Reorganization Plan of Debtors AGINT, Zagope and Inzag, including respective schedules.

# EXTRAJUDICIAL REORGANIZATION PLAN

presented by
Andrade Gutierrez International S.A.
Zagope SGPS, S.A.
Inzag Germany GmbH

as intervening parties,
Andrade Gutierrez Engenharia S.A.
Andrade Gutierrez Construções e Serviços S.A.
Andrade Gutierrez Investimentos em Engenharia S.A.
Andrade Gutierrez S.A.
Andrade Gutierrez Participações S.A.

and with the adhesion and approval of the

Signatory Creditor

(as defined below)

May 18, 2026

**EXTRAJUDICIAL REORGANIZATION PLAN**

This Plan, dated May 18, 2026, is submitted for judicial confirmation, jointly, by:

(I) ANDRADE GUTIERREZ INTERNATIONAL S.A., a privately held company, incorporated and organized in accordance with the laws of the Grand Duchy of Luxembourg, registered with the Luxembourg Trade Register under No. B 176492, with address at 65, Boulevard Grande-Duchese Charlotte, L1331, Luxembourg (“AGINT”);

(II) ZAGOPE SGPS S.A., a privately held company, incorporated and organized under the laws of the Portuguese Republic, registered under NIF No. 507403177, with headquarters at Lagoas Park, building 6, 1st floor, 2740-244, Porto Salvo, Oeiras, Portugal (“Zagope”); and

(III) INZAG GERMANY GMBH, a limited liability company, incorporated and organized under the laws of the Federal Republic of Germany, with headquarters at Taunusstraße 5, 65183, Wiesbaden, Germany (“Inzag” and, together with AGINT and Zagope, “Debtors”).

And it is signed, as consenting intervening parties, by:

(IV) ANDRADE GUTIERREZ ENGENHARIA S.A., a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 17.262.213/0001-94, with its headquarters at Avenida do Contorno, No. 8,123, Cidade Jardim, Belo Horizonte/MG, CEP 30.110-937 (“AGE”);

(V) ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A. (formerly known as AG Construções e Serviços S.A.), a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 39.469.291/0001-05, with headquarters at Avenida do Contorno, No. 8.269, Room 300 A1, Gutierrez, Belo Horizonte/MG, CEP 30.110-059 (“AGCS”);

(VI) ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A., a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 17.027.611/0001-26, headquartered at Avenida do Contorno, No. 8.269, Sala 004, Belo Horizonte/MG, CEP 30.110-059 (“AGIE”);

(VII) ANDRADE GUTIERREZ S.A., a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 17.262.213/0001-94, with headquarters at Avenida do Contorno, No. 8123, Cidade Jardim, Belo Horizonte/MG, CEP 30110-937 (“AGSA”); and

(VIII) ANDRADE GUTIERREZ PARTICIPAÇÕES S.A a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 04.031.960/0001-70, with headquarters at Avenida do Contorno, No. 8123, Cidade Jardim, Belo Horizonte/MG, CEP 30110-937 (“AGPAR” and, together with AGE, AGIE and AGCS, the “Intervening Parties”).

Whereas:

(i) the Debtors are part of the branch of the Andrade Gutierrez group that operates in the engineering and civil construction sectors, providing services to public and private clients for almost 80 years;

(ii) given the nature of their business segments, the Debtors raised substantial financial resources, including in the international capital markets, to enable the maintenance and expansion of their activities;

(iii) due to certain macroeconomic adversities, the AGINT, Zagope, AGE, AGCS and AGIE filed, on September 29, 2022, the request for judicial confirmation of an extrajudicial reorganization plan ("2022 Plan"), which was processed under No. 5209787-06.2022.8.13.0024 before the 1st Business Court of the District of Belo Horizonte/MG (1ª Vara Empresarial da Comarca de Belo Horizonte/MG) ("2022 Extrajudicial Reorganization"), to restructure a relevant portion of their financial indebtedness, in the amount of R$2,358,784,316.04 (two billion, three hundred and fifty-eight million, seven hundred and eighty-four thousand, three hundred and sixteen reais and four centavos), arising from the so-called (a) "11.000% Senior Secured PIK Toggle Notes due 2021", issued on August 20, 2018 ("2021 International Notes"), and (b) "9.500% Senior Secured Notes due 2024", issued on December 9, 2019 ("2024 International Notes");

(iv) on November 29, 2022, the 2022 Plan was confirmed by means of a court order made available in the Electronic Gazette of the Court of Justice of the State of Minas Gerais, having been subsequently the subject of a decision rendered on December 2, 2022 by the United States Bankruptcy Court for the Southern District of New York, granting full effect to the 2022 Plan within the jurisdiction of the United States of America, which resulted in the cancellation and replacement of the 2021 International Notes and the 2024 International Notes by (a) "9.000%/10.500% Senior Secured PIK Toggle Notes due 2029", issued pursuant to the indenture dated December 21, 2022, and amended on August 24, 2023, entered into among AGINT, as issuer and principal debtor, AGE, AGIE, AGCS, Zagope and Inzag, as guarantors, Wilmington Savings Fund Society, FSB ("Wilmington"), as trustee, and TMF Brasil Administração e Gestão de Ativos Ltda. ("TMF"), as local collateral agent ("2029 International Notes"), and (b) "1.000% PIK Toggle Notes due 2040", issued pursuant to the indenture dated December 21, 2022 entered into among AGINT, as issuer and principal debtor, AGE as guarantor, Wilmington, as trustee, and TMF, as local collateral agent ("2040 International Notes" and, together with the 2029 International Notes, the "International Existing Notes");

(v) despite the 2022 Extrajudicial Reorganization having been an important step in reprofiling the Andrade Gutierrez group's capital structure, new hindrances have since arisen, consisting, by way of example, of the (a) the suspension and postponement of relevant projects due to factors beyond the Andrade Gutierrez group's control, affecting approximately 47% of its project portfolio, as of the December/24 reference date, which has substantially impacted the cash flow of Inzag, Zagope, AGE, AGCS and AGIE over the past years; and (b) the substantive appreciation of the U.S. dollar throughout 2024, which significantly increased the cost of foreign currency indebtedness, resulting in the default, in December 2024, of the interest installment under the 2029 International Notes, in a context of an exchange rates exceeding R$6.00 per dollar;

(vi) due to this challenging macroeconomic and microeconomic environment, the Debtors were led to default certain obligations, having defaulted on material debts, such as the 2029 International Notes, in the aggregate amount of R$ 2,478,000,246.94 (two billion four hundred and seventy-eight million two hundred and forty-six reais and ninety-four centavos), as determined on the Filing Date, owed by the Debtors together with AGE, AGCS and AGIE;

(vii) in this context, the Debtors file the present Extrajudicial Reorganization and submit this Plan with the purpose of restructuring the claims arising from the outstanding balance of the International Existing Notes owed by the

Debtors, as defined in this Plan and set forth in Schedule I, thereby enabling the readjustment of their capital structure in order to optimize and foster the development of their operational activities;

(viii) the Debtors file the present Extrajudicial Reorganization in active joinder, pursuant to article 113, I and III of the Brazilian Code of Civil Procedure (as defined below) and 189 of the Brazilian Bankruptcy Act (as defined below) as well as under procedural consolidation, pursuant to articles 69-G to 69-I of the Brazilian Bankruptcy Act, with this single Plan submitted by the Debtors

having been approved by the minimum approval quorum required under article 163 of the Brazilian Bankruptcy Act, calculated individually in relation to the creditors of each of the Debtors, pursuant to article 69-I, second and third paragraphs, of the Brazilian Bankruptcy Act, so as to mandatorily bind all Subject Claims (as defined below) to the terms and conditions of this Plan;

(ix) the Debtors and AGE, AGCS and AGIE (jointly, the "Plan 1 Debtors"), although being independent companies, with separate legal personalities, rights and obligations of their own, and having financial and commercial autonomy to conduct their activities, are part of the same economic group and are partially co-obligated, as applicable, for certain debts to be restructured within the scope of this Extrajudicial Reorganization;

(x) in parallel with the Plan submitted by the Debtors, the Plan 1 Debtors, in active joinder and procedural consolidation with the Debtors, have submitted their own extrajudicial reorganization plan, to restructure certain unsecured claims ("Plan 1"), as defined under Plan 1, considering their respective indebtedness, and therefore file this Extrajudicial Reorganization jointly, with the purpose of enabling the implementation of a structured and coordinated solution for their respective indebtedness.

The Debtors, subject to the terms and conditions set forth below, hereby submit this Plan for judicial confirmation, with the consent and adherence of the SIGNATORY CREDITOR, holder of (i) 77.1% of the Subject Claims owed by AGINT; (ii) 79.2% of the Subject Claims owed by Zagope; and (iii) 79.2% of the Subject Claims owed by Inzag, as indicated in Schedule II, so that it may produce effects with respect to the Debtors, AGE, AGCS, AGIE, AGPAR and AGSA, as applicable, and the Subject Creditors in accordance with the law.

## PART I - INTERPRETATION AND DEFINITIONS

### 1. DEFINITIONS

1.1. Definitions. The defined terms referenced in this Plan, capitalized and listed below, shall be used, as applicable, in their singular or plural form, and in the masculine or feminine gender, without thereby altering the meaning assigned to them.

1.1.1. "AGCS": has the meaning assigned in the Preamble of this Plan.

1.1.2. "AGE": has the meaning assigned in the Preamble of this Plan.

1.1.3. "AGIE": has the meaning assigned in the Preamble of this Plan.

1.1.4. "AGINT": has the meaning assigned in the Preamble of this Plan.

1.1.5. "AGPAR": has the meaning assigned in the Preamble of this Plan.

1.1.6. "AGSA": has the meaning assigned in the Preamble of this Plan.

1.1.7. "Schedules": means the schedules to this Plan.

1.1.8. "Section": means each of the items identified by cardinal numbers in this Plan.

1.1.9. "CNPJ/MF": means the identification number in the National Register of Legal Entities maintained by the Ministry of Finance of Brazil.

1.1.10. "Civil Code": means Law No. 10,406, of January 10, 2002, as amended.

1.1.11. "CPC": means Law No. 13,105, of March 16, 2015, as amended.

1.1.12. "Option A Claim": has the meaning assigned in Section 5.4 of this Plan.

1.1.13. "Option B Claim": has the meaning assigned in Section 6.4 of this Plan.

1.1.14. "Option C Claim": means the Option C Claim – Tranche A and the Option C Claim – Tranche B, jointly.

1.1.15. "Option C Claim – Tranche A": has the meaning set forth in Section 7.4.

1.1.16. "Option C Claim – Tranche B": has the meaning set forth in Section 7.4.

1.1.17. "Subject Claims": means, pursuant to article 163, first paragraph, of the Brazilian Bankruptcy Act, all claims against the Debtors related to or arising from the International Existing Notes, including (without limitation), principal, interest, default interest, as well as any other charges, obligations or claims derived from or resulting from the issuance, offering and subscription of the International Existing Notes, and any other obligations of the Debtors, governed by, established under, or that may otherwise be directly or indirectly derived from the International Existing Notes, as determined on the Filing Date and duly listed in Schedule I to this Plan.

1.1.18. "Adhering Creditor": means the Subject Creditor that, although not having signed this Plan on the Signing Date, voluntarily agrees to its terms after the Filing Date and prior to the Plan Confirmation Order, pursuant to Section 4.4 of this Plan.

1.1.19. "Option A Creditor": has the meaning assigned in Section 5.1 of this Plan.

1.1.20. "Option B Creditor": has the meaning assigned in Section 6.1 of this Plan.

1.1.21. "Option C Creditor": has the meaning assigned in Section 7.1 of this Plan.

1.1.22. "Signatory Creditor": means the Subject Creditor listed in Schedule II, who signed the Adhesion Term for Signatory Creditor set forth in Schedule III, through which it adhered to this Plan.

1.1.23. "Subject Creditor": means any creditor holding a Subject Claim.

1.1.24. "Signing Date": means the date of execution of this Plan.

1.1.25. "Judicial Confirmation Date": means the date of publication in the Official Gazette of the Plan Confirmation Order.

1.1.26. "Election Period Commencement Date": has the meaning assigned in Section 8.2 of this Plan.

1.1.27. "Filing Date": means the date on which the request for Extrajudicial Reorganization was filed by the Debtors.

1.1.28. "Chapter 15 Decision": has the meaning assigned in Section 3.5 of this Plan.

1.1.29. "Chapter 15 Enforcement Order": has the meaning assigned in Section 3.5 of this Plan.

1.1.30. "Chapter 15 Recognition Order": has the meaning assigned in Section 3.5 of this Plan.

1.1.31. "Official Gazette": means the National Electronic Judicial Gazette (DJEN), the Electronic Judicial Gazette of the Court of Justice of the State of Minas Gerais (DJE/TJMG), or any other applicable official gazette on the date of publication of the Plan Confirmation Order.

1.1.32. "Calendar Day": means any day of the calendar, it being understood that if a term counted in calendar days expires on a day that is not a Business Day, it shall be automatically extended to the following Business Day.

1.1.33. "Business Day": means any day other than a Saturday, Sunday, or any other day on which banking institutions in the State of Minas Gerais or in the city of Belo Horizonte are not open for business or are authorized to remain closed.

1.1.34. "Dollar" or "US$": means United States dollars.

1.1.35. "DTC": means The Depository Trust Company.

1.1.36. "Payment Option Election": has the meaning assigned in Section 8.1 of this Plan.

1.1.37. "Payment Instruments": means, jointly, the Option A Payment Instruments, the Option B Payment Instruments and the Option C Payment Instruments, as defined below.

1.1.38. "Option A Payment Instruments": means the Option A Payment Instrument – Plan and the Option A Payment Instrument – Notes.

1.1.39. "Option A Payment Instrument – Plan": has the meaning assigned in Section 5.5.1.5 of this Plan.

1.1.40. "Option A Payment Instrument – Notes": has the meaning assigned in Section 5.5.1 of this Plan.

1.1.41. "Option B Payment Instruments": means the Option B Payment Instrument – Plan and the Option B Payment Instrument – Notes.

1.1.42. "Option B Payment Instrument – Plan": has the meaning assigned in Section 6.5.1.5 of this Plan.

1.1.43. "Option B Payment Instrument – Notes": has the meaning assigned in Section 6.5.1 of this Plan.

1.1.44. "Option C Payment Instruments": means the Option C Payment Instrument – Plan and the Option C Payment Instruments – Notes.

1.1.45. "Option C Payment Instruments – Plan": has the meaning assigned in Section 7.5.1.2 of this Plan.

1.1.46. "Option C Payment Instruments – Notes": means the Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes allocated to the Option C Creditors pursuant to Sections 7.5.1 of this Plan.

1.1.47. “Intervening Parties”: has the meaning assigned in the Preamble of this Plan.

1.1.48. “Inzag”: has the meaning assigned in the Preamble of this Plan.

1.1.49. “Extrajudicial Reorganization Court”: means the Court of the district of Belo Horizonte, Court of Justice of the State of Minas Gerais, to which the Extrajudicial Reorganization has been assigned.

1.1.50. “Applicable Law”: means the Federal Constitution and, as applicable, all law, rule, or

legal provision, decree, regulation, ordinance, code or policy, order, decision, or judgment (including arbitral), whether local or foreign, federal, state, or municipal, issued by any governmental authority.

1.1.51. “Brazilian Bankruptcy Act”: means Law No. 11,101, of February 9, 2005, as amended.

1.1.52. “Brazilian Corporations Act”: means Law No. 6,404, of December 15, 1976, as amended.

1.1.53. “2021 International Notes”: has the meaning assigned in recital “(iii)” of this Plan.

1.1.54. “2024 International Notes”: has the meaning assigned in recital “(iii)” of this Plan.

1.1.55. “2029 International Notes”: has the meaning assigned in recital “(iv)” of this Plan.

1.1.56. “2040 International Notes”: has the meaning assigned in recital “(iv)” of this Plan.

1.1.57. “International Existing Notes”: has the meaning assigned in recital “(iv)” of this Plan.

1.1.58. “Option A”: means the payment option described in Section 5 of this Plan.

1.1.59. “Option B”: means the payment option described in Section 6 of this Plan.

1.1.60. “Option C”: means the payment option described in Section 7 of this Plan.

1.1.61. “Party”: means the Debtors and the Signatory Creditor, referred to collectively or individually, as applicable.

1.1.62. “Parties”: means the Debtors and the Signatory Creditor, referred to collectively.

1.1.63. “Election Period”: has the meaning assigned in Section 8.2 of this Plan.

1.1.64. “Person”: means any person, natural or legal entity, organized under the laws of Brazil or any foreign jurisdiction, including, without limitation, companies in general (corporations, limited liability companies, simple partnerships, silent partnerships, partnerships, among others), joint venture, trust, investment fund, association, foundation, organization, governmental entity, or any other entity of any type or nature.

1.1.65. “Plan”: means this Extrajudicial Reorganization Plan executed between the Debtors and the Signatory Creditor, dated May 18, 2026, and, as applicable, any amendments approved

pursuant to the terms of this Extrajudicial Reorganization Plan, all its Schedules being an integral part hereof.

1.1.66. “Plan 1”: has the meaning assigned in recital “(x)”.

1.1.67. “Chapter 15 Proceedings”: means the proceedings to be initiated by the foreign representative(s) of the Debtors under Chapter 15 of the U.S. Bankruptcy Code.

1.1.68. "Payment Option Election Process": means the procedure described in Section 8.2 of this Plan.

1.1.69. "Real" or "R$": means the lawful currency of the Federative Republic of Brazil.

1.1.70. "Extrajudicial Reorganization": means the extrajudicial reorganization proceeding filed by the Debtors before one of the business courts of the District of Belo Horizonte, Court of Justice of the State of Minas Gerais.

1.1.71. "2022 Extrajudicial Reorganization": has the meaning assigned in recital "(iii)" of this Plan.

1.1.72. "Debtors": has the meaning assigned in the Preamble of this Plan.

1.1.73. "Plan 1 Debtors": has the meaning assigned in recital "(ix)" of this Plan.

1.1.74. "Plan Confirmation Order": means the order rendered by the Extrajudicial Reorganization Court, or any other judicial decision issued by another competent court, confirming this Plan.

1.1.75. "Adhesion Term for Signatory Creditor" means the adherence instrument set forth in Schedule III, through which the Signatory Creditor have adhered to this Plan.

1.1.76. "Adhesion Term for Adhering Creditor" means the document set forth in Schedule IV.

1.1.77. "TMF" means the meaning assigned to it in recital "(iv)" of this Plan.

1.1.78. "Taxes" means any and all compulsory governmental charges established under Applicable Law that do not constitute a sanction for an unlawful act, whether federal, state, municipal, local, or foreign, of any nature or kind, levied on any taxable event or assessment base (including, without limitation, taxes, contributions of any kind, fees, parafiscal charges, compulsory loans, or any charges of a similar nature, and including all interest, charges, monetary correction and/or adjustment, fines, penalties of any kind, and any

additional amounts due in connection with the amount of the Tax).

1.1.79. "U.S. Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. paragraphs 101 et seq.

1.1.80. "Zagope" means the meaning assigned to it in the Preamble of this Plan.

**2. RULES OF INTERPRETATION**

2.1. Unless otherwise specified, all Sections and Schedules referred to in this Plan refer to the Schedules and Sections of this Plan itself.

2.2. The titles of the chapters and sections of this Plan have been included solely for reference purposes and shall not affect the content of their provisions.

2.3. Any references to documents or instruments shall be deemed to be as of the date hereof, unless expressly provided otherwise or as otherwise required by the context.

2.4. References to legal provisions and Laws shall be construed as references to such legal provisions and Laws as in effect on the date hereof or on such other date as may be specifically determined by the context.

2.5. This Plan shall be interpreted in accordance with articles 161 et seq. of the Brazilian Bankruptcy Act.

## PART II – GENERAL CONDITIONS OF THIS PLAN

### 3. PURPOSE, COMPLIANCE WITH LEGAL REQUIREMENTS, AND STRUCTURE OF THIS PLAN

3.1. Objective. This Plan sets forth the terms and conditions required for the restructuring of the Subject Claims, through the reprofiling of their payment conditions, aligning them with the current and future cash flow of the Debtors and enabling the restructuring of their capital structures.

3.2. Compliance With Legal Requirements. This Plan aims to restructure all Subject Claims, whose total amounts owed individually by each of the Debtors, as of the Filing Date, are described in Schedule II to this Plan.

3.3. This Plan is executed and signed by the Signatory Creditor, pursuant to the adhesion term set forth in Schedule III, which holds (i) 77.1% of all Subject Claims owed by AGINT, as indicated in Schedule II, (ii) 79.2% of all Subject Claims owed by Zagope, as indicated in Schedule II, and (iii) 79.2% of all Subject Claims owed by Inzag, as indicated in Schedule II, such that the approval quorum set forth in article 163, caput, of the Brazilian Bankruptcy Act is complied with.

3.4. Reorganization Measures. Upon the Plan Confirmation Order, pursuant to article 163, caput and first paragraph, of the Brazilian Bankruptcy Act, all Subject Claims shall be fully restructured, novated, cancelled and fully satisfied, pursuant to articles 163, caput and first paragraph, and 165, caput, of the Brazilian Bankruptcy Act, and the Subject Creditors shall hold claims governed in accordance with this Plan, which provides terms and conditions consistent with the current and future cash flow of the Debtors.

3.5. Implementation of the Plan Before Foreign Jurisdictions. Following the submission of the Plan before the Extrajudicial Reorganization Court or the entry of the Plan Confirmation Order, the foreign representative(s) of the Debtors, subject to Section 10.6, shall submit the Plan and the Plan Confirmation Order to a United States court of competent jurisdiction in order to seek an order or orders (i) recognizing the Extrajudicial Reorganization as a foreign main proceeding or non-main foreign proceeding under chapter 15 of the U.S. Bankruptcy Code ("Chapter 15 Recognition Order"), (ii) recognizing and enforcing this Plan and the Plan Confirmation Order within the territorial jurisdiction of the United States of America under chapter 15 of the U.S. Bankruptcy Code ("Chapter 15 Enforcement Order"); and (iii) authorizing and directing the respective parties to that proceeding (including, without limitation, any duly appointed foreign representative) to take any and all actions necessary to give effect to the terms of this Plan and the Plan Confirmation Order (such order or orders, together with the Chapter 15 Recognition Order and the Chapter 15 Enforcement Order, referred to collectively as the "Chapter 15 Decision"). The Debtors may also initiate and/or continue other judicial, out-of-court or administrative proceedings, whether insolvency-related or not, before other jurisdictions, if necessary or advisable for the implementation of the Plan, provided that such ancillary proceedings do not amend the terms and conditions set forth in this Plan.

3.6. Absence of Substantive Consolidation. The Debtors and the Signatory Creditor(s) acknowledge and agree that: (i) the joint submission of this Plan and the filing of the Extrajudicial Reorganization in active joinder result exclusively from procedural consolidation, pursuant to articles 69-G to 69-I of the Brazilian Bankruptcy Act; (ii) neither does there exist, nor is it intended to establish, through this Plan, the Extrajudicial Reorganization or its confirmation, any form of substantive consolidation, commingling of assets, or unification of assets and liabilities among the Debtors; (iii) each Debtor remains legally autonomous, with its own legal personality, estate, assets,

liabilities, rights and obligations, and shall be solely liable for its debts, except only in the cases of co-obligation and granting of guarantees expressly provided for in this Plan, in which cases the provisions of Section

11.5.5 and articles 346 and 347 of the Brazilian Civil Code shall apply; and (iv) any interpretation of this Plan that results, directly or indirectly, in the application of the legal effects inherent to substantive consolidation is hereby expressly excluded, including the commingling of patrimonial estates or the indistinct treatment of creditors of the different Debtors.

## PART III – SUBJECT CLAIMS

### 4. SCOPE AND BINDING EFFECT OF SUBJECT CLAIMS

4.1. Amount of Subject Claims. The total amount of Subject Claims is (i) R$ 2,809,603,941.92 (two billion eight hundred and nine million six hundred and three thousand nine hundred and forty-one reais and ninety-two centavos) for AGINT, as of the Filing Date, as described in Schedule I to this Plan; (ii) R$ 253,270,000.00 (two hundred and fifty-three million two hundred and seventy thousand reais) for Zagope, as of the Filing Date, as described in Schedule I to this Plan; and (iii) R$ 78,853,567.67 (seventy-eight million eight hundred and fifty-three thousand five hundred and sixty-seven reais and sixty-seven centavos) for Inzag, as of the Filing Date, as described in Schedule I to this Plan.

4.2. Amount of Subject Claims of the Signatory Creditor. The Signatory Creditor is, as of the Filing Date, holder of Subject Claims in the total amount of (i) R$ 2,166.476,618.00 (two billion one hundred and sixty-six million four hundred and seventy-six thousand six hundred and eighteen reais) held individually against AGINT, as of the Filing Date, as described in Schedule II to this Plan; (ii) R$ 200,469,718.00 (two hundred million four hundred and sixty-nine thousand seven hundred and eighteen reais) held individually against Zagope, as of the Filing Date, as described in Schedule II to this Plan; and (iii) R$ 62,414,626.00 (sixty-two million four hundred and fourteen thousand six hundred and twenty-six reais) held individually against Inzag, as of the Filing Date, as described in Schedule II to this Plan. Accordingly, the Signatory Creditor holds more than 50% (fifty percent) of Subject Claims against each of the Debtors, so that the requirements for the confirmation of the Plan are fully met, pursuant to article 163 of the Brazilian Bankruptcy Act.

4.3. Binding of the Signatory Creditor. The Signatory Creditor expresses its consent to the terms and conditions of the Plan as of the Signing Date, pursuant to article 165, first paragraph, of the Brazilian Bankruptcy Act, provided that the Plan is not terminated pursuant to Section 10.2 and subject to article 165, second paragraph, of the Brazilian Bankruptcy Act.

4.3.1. Pursuant to Section 4.3 above, the Signatory Creditor hereby elects Option C set forth in Section 7 to restructure its respective Subject Claims, which shall, as of the Signing Date, be automatically restructured, novated, fully satisfied, cancelled and replaced by Option C Claims – Tranche A and Option C Claims – Tranche B, and shall therefore be governed pursuant to Sections 7.4.1, 7.4.2, 7.5 and other applicable Sections of this Plan, with all rights and privileges set forth in this Plan, including the corporate guarantees set forth in item (ix) of Section 7.4.1 and item "(viii)" of Section 7.4.2. For the avoidance of doubt, the novation set forth in this Section 4.3.1 may be unwound in the event this Plan is terminated pursuant to Section 10.2 and (ii) article 165, second paragraph, of the Brazilian Bankruptcy Act shall be applicable if this Plan is rejected by the Extrajudicial Reorganization Court.

4.4. Adhering Creditors. The Subject Creditors that are not signatories to this Plan on the Signing Date may voluntarily adhere to its terms up to the Judicial Confirmation Date, by completing, signing and delivering to the Debtors the Adhesion Term for Adhering Creditor, in the form attached as Schedule IV to this Plan, duly accompanied by the documents evidencing the authority of the signatory of the Adhesion Term for Adhering Creditor.

4.4.1. The Subject Creditor, in addition to the documents indicated in the Section above, the Certificate of Holder of International Existing Notes shall also be delivered, in the form set forth in Schedule V to this Plan, duly accompanied by a screenshot of the portal of the custodian of the Subject Creditor, or by a statement issued by the custodian of the Subject Creditor, evidencing ownership of such International Existing Notes.

4.5. Binding Effect on Subject Creditors. Upon the Plan Confirmation Order, all Subject Creditors shall be individually and jointly and severally bound by the terms of this Plan, pursuant to articles 163, caput and first paragraph, and 165, caput, of the Brazilian Bankruptcy Act.

## PART IV – RESTRUCTURING CONDITIONS OF THE SUBJECT CLAIMS

### 5. OPTION A

5.1. Option A. The Subject Creditor that has validly elected Option A, pursuant to Sections 8.1 until 8.3 (the "Option A Creditor"), shall have its respective Subject Claim (i) restructured, novated, fully satisfied, and cancelled with respect to the Debtors, in accordance with this Plan and articles

163, first paragraph, and 165, caput, of the Brazilian Bankruptcy Act, and (ii) replaced by the Option A Claim in the proportions set forth in this Plan, which shall be paid exclusively under the conditions, terms, and payment methods herein established.

5.2. Release. The entry of the Plan Confirmation Order shall result, on the Judicial Confirmation Date, in the full, final, irrevocable, and irreversible release of the respective Subject Claims and of their underlying obligations with respect to the Debtors, and the instruments evidencing the Subject Claims held by the Option A Creditors shall be automatically cancelled and/or extinguished by operation of law, being automatically replaced by the Option A Claims.

5.3. Exchange Ratio. The Option A Creditor shall be entitled to receive the equivalent of thirty-six percent (36%) of the amount of its Subject Claim, under the terms and conditions set forth in Section 5.4 below, and the remaining sixty-four percent (64%) of its respective Subject Claim shall be deemed fully satisfied, as a haircut, for all legal purposes and effects.

5.4. Terms and Conditions of Option A. The Option A Creditors shall be paid in accordance with the terms and conditions described below (the "Option A Claim"), which shall be fully reflected in their respective Option A Payment Instruments:

(i) Principal Amount: 36% (thirty-six percent) of the amount of the Subject Claims held by the Option A Creditors shall be paid under the terms and conditions set forth in Section 5.4, and the remaining 64% (sixty-four percent) shall be subject to the haircut described in Section 5.3 above. For the avoidance of doubt, the amount of the Option A Claim to be received by each Option A Creditor under this Plan and, as applicable, under Plan 1, shall comply

with the provisions of Sections 11.5 and following of this Plan, and under no circumstances shall any Option A Creditor receive the amount of its Option A Claim in duplication.

(ii) Interest: the Option A Claims shall accrue interest at a rate of six percent (6.00%) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date until December 28, 2040.

(iii) Schedule and Form of Payment of Interest: the interest accrued on the Option A Claims shall be paid as follows: (a) from the Judicial Confirmation Date until December 28, 2030, the interest accrued during such period shall be capitalized into the principal amount; and (b) from December 28, 2030 until December 28, 2040, the interest accrued during such period shall be paid in cash on a semiannual basis, on June 28 and December 28, as applicable, with the first payment date being June 28, 2031.

(iv) Principal Amortization Schedule: the principal amount of the Option A Claims, including the interest capitalized into the principal, shall be amortized in cash in six annual installments, to be paid on December 28, 2035, December 28, 2036, December 28, 2037, December 28], 2038, December 28, 2039, and December 28, 2040, in the amounts corresponding to 16,667%, 20%, 25%, 33,333%, 50% and 100% of the principal outstanding amount on the respective payment dates.

(v) Maturity Date: December 28, 2040.

(vi) Monetary adjustment factor: not applicable.

(vii) Currency: the original currency of the respective Subject Claim held by the Option A Creditor shall not be changed, so that Subject Claims shall remain denominated in its respective foreign currency.

(viii) Main Debtor: AGINT shall remain as main debtor, without prejudice to the corporate guarantees described below.

(ix) Corporate Guarantees. AGE, AGIE, AGCS, AGPAR and AGSA hereby grant a corporate guarantee (fiança) to secure the payment the Option A Claims, irrevocably and irreversibly undertaking, as obligors, jointly and severally with the respective main debtor(s) and among themselves, the obligations arising from this Option A, pursuant to articles 818 et seq. of the Brazilian Civil Code, and expressly waiving the benefits of order and division, as well as any rights or discharge faculties of any nature, set forth in articles 333, sole paragraph, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 and 839, of the Brazilian Civil Code, and in articles 130, 131 and 794 of the Brazilian Code of Civil Procedure. The corporate guarantees granted by AGE, AGCS, AGIE, AGPAR and AGSA, as applicable, shall be equally reflected in the Option A Payment Instrument – Notes (as defined below), and AGE, AGIE, AGCS, AGPAR and AGSA shall be signatories to the indenture of the Option A Payment Instrument – Notes for this purpose, to the same extent described above, in accordance with the laws of the State of New York, United States of America. For the avoidance of doubt, the guarantors shall be subrogated to the rights of the Option A Creditors in the event they honor, in whole or in part, the corporate guarantee, pursuant to the provisions of Sections 11.5 et. seq, it being understood that the corporate guarantors hereby undertake not to collect, receive, or otherwise demand from the issuer of the Option A Payment Instrument – Notes the payment of any amounts paid under the corporate guarantees, whether by subrogation, set-off, or on any other basis , until all guaranteed obligations have been fully satisfied. Should the corporate guarantors, in violation of such provision, receive any proceeds under the indenture of the Option A Payment Instrument –

Notes in any other manner, they shall receive such proceeds as trustees, and shall transfer the entirety of such proceeds for the benefit of the Option A Creditors within 2 (two) Business Days of receipt, without any deduction or discount.

5.5. Option A Payment Instruments. As of the Judicial Confirmation Date, the Option A Creditors shall automatically become, as of such date, holders of their respective Option A Claims, with all the characteristics set forth in this Plan, which shall subsequently be evidenced and formalized through the Option A Payment Instruments, in accordance with the criteria set forth below:

5.5.1. Option A Payment Instrument – Notes. The Option A Creditors who, cumulatively, (i) currently hold International Existing Notes; (ii.a) are qualified institutional buyers as defined under Rule 144A promulgated under the U.S. Securities Act of 1933, as amended, or (ii.b) are not U.S. persons, as defined under Rule 902 of the of U.S. Securities Act, provided that any holder described in this Section 5.5.1, item (ii.b), that is resident of a member state of the European Economic Area must also be a qualified investor under Regulation (EU) 2017/1129, as amended, and under the Luxembourg Law of July 16, 2019 on prospectuses for securities, as amended, or (ii.c) are institutional accredited investors as defined under Rule 501 of the U.S. Securities Act of 1933, shall, subject to the provisions of Section 5.5.1.5 and except as provided in Section 5.5.1.6, have their respective Option A Claims arising from the International Existing Notes evidenced and formalized through new notes to be issued by AGINT in the form of notes, denominated in Dollars, the indenture of which shall be executed in a manner consistent with the Term Sheet set forth in Schedule VI, so as to reflect and represent the terms of Option A as provided in this Plan ("Option A Payment Instrument – Notes").

5.5.1.1. For the avoidance of doubt, the Debtors have not solicited offers to purchase, nor have they offered or sold, and shall not solicit offers to purchase, or offer or sell, any securities in any manner involving a public offering under Section 4(a)(2) of the U.S. Securities Act of 1933.

5.5.1.2. Governing Law. The Option A Payment Instrument – Notes shall be governed by the laws of the State of New York, United States of America.

5.5.1.3. Time of Issuance. The issuance of the Option A Payment Instrument – Notes shall take place following the entry of the Chapter 15 Enforcement Order and the cancellation of the International Existing Notes.

5.5.1.4. Conflict. In the event of any conflict between the indenture governing the Option A Payment Instrument – Notes and any other provision of this Plan, the terms and conditions set forth in this Plan shall prevail.

5.5.1.5. For the avoidance of doubt, between the Judicial Confirmation Date and the issuance date of the Option A Payment Instrument – Notes, the Option A Claims arising from the International Existing Notes shall be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (título executive judicial) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act ("Option A Payment Instrument – Plan"), and may be enforced in accordance with the terms and conditions set forth in this Plan, including with respect to the corporate guarantees set forth in Section 5.4 of this Plan.

5.5.1.6. If the Option A Payment Instrument – Notes is not issued for any reason, the Option A Claims arising from the International Existing Notes shall continue to be evidenced and formalized through this Plan, which, together

with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (título executivo judicial) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan. The provisions of this Section shall not be construed as a waiver, mitigation, or limitation of the Debtors' obligation to take the reasonably necessary measures to issue the Option A Payment Instrument – Notes, pursuant to the terms of this Plan.

**6. OPTION B**

6.1. Option B. The Subject Creditor that has validly elected Option B, pursuant to Sections 8.1 until 8.3, or that has had its Subject Claim allocated for payment under Option B pursuant to Sections 8.4 or 8.5 (the "Option B Creditor"), shall have its respective Subject Claim (i) restructured, novated, fully satisfied, and cancelled with respect to the Debtors, in accordance with this Plan and articles 163, first paragraph, and 165, caput, of the Brazilian Bankruptcy Act; and (ii) replaced by the Option B Claim, in the proportions set forth in this Plan, which shall be paid exclusively under the conditions, terms, and payment methods herein established.

6.2. Release. The entry of the Plan Confirmation Order shall result, on the Judicial Confirmation Date, in the full, final, irrevocable, and irreversible release of the respective Subject Claims and of the obligations underlying them with respect to the Debtors, and the instruments evidencing the Subject Claims held by the Option B Creditors shall be automatically cancelled and/or extinguished by operation of law, being automatically replaced by the Option B Claims.

6.3. Exchange Ratio. The Option B Creditor shall be entitled to receive the equivalent of one hundred percent (100%) of the amount of its Subject Claim, under the terms and conditions set forth in Section 6.4 below.

6.4. Terms and Conditions of Option B. The Option B Creditors shall be paid in accordance with the terms and conditions described below (the "Option B Claim"), which shall be fully reflected in their respective Option B Payment Instruments:

(i) Principal Amount: 100% (one hundred percent) of the amount of the Subject Claims held by the Option B Creditors shall be paid under the terms and conditions set forth in Section 6.4. For the avoidance of doubt, the amount of the Option B Claim to be received by each Option B Creditor under this Plan and, as applicable, under Plan 1, shall comply with the provisions of Sections 11.5 and following of this Plan, and under no circumstances shall any Option B Creditor receive payment of its Option B Claim in duplicate.

(ii) Interest: the Option B Claims shall accrue interest at a rate of 1% (one per cent) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date and capitalized to the principal amount until the maturity date of the Option B Claims.

(iii) Principal Amortization Schedule: the principal amount of the Option B Claims, including the interest accrue and capitalized into the principal, shall be amortized in a single installment on the maturity date of the Option B Claims.

(iv) Monetary adjustment factor: not applicable.

(v) Maturity Date: December 28, 2070.

(vi) Currency: the original currency of the respective Subject Claim held by the Option B Creditor shall not be changed, so that Subject Claims shall remain denominated in its respective foreign currency.

(vii) Main Debtor: AGINT shall remain as main debtor, without prejudice to the corporate guarantees described below.

(viii) Corporate Guarantees: AGE, AGIE, AGCS, AGPAR and AGSA hereby grant a corporate guarantee (fiança) to secure the payment of the Option B Claims, undertaking, irrevocably and irreversibly, as obligors, jointly and severally with the respective main debtor(s) and among themselves, the obligations arising from this Option B, pursuant to articles 818 et seq. of the Brazilian Civil Code, and expressly waiving the benefits of order and division, as well as any rights or discharge faculties of any nature, set forth in articles 333, sole paragraph, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 and 839, of the Brazilian Civil Code, and in articles 130, 131 and 794 of the Brazilian Code of Civil Procedure. The corporate guarantees granted by AGE, AGCS, AGIE, AGPAR and AGSA, as applicable, shall be equally reflected in the Option B Payment Instrument – Notes (as defined below), and AGE, AGIE, AGCS, AGPAR and AGSA shall be signatories to the indenture of the Option B Payment Instrument – Notes for this purpose, to the same extent described above, in accordance with the laws of the State of New York, United States of America. For the avoidance of doubt, the guarantors shall be subrogated to the rights of the Option B Creditors in the event they honor, in whole or in part, the corporate guarantee, pursuant to the provisions of Sections 11.5 et. seq., it being understood that the corporate guarantors hereby undertake not to collect, receive, or otherwise demand from the issuer of the Option B Payment Instrument – Notes the payment of any amounts paid under the corporate guarantees, whether by subrogation, set-off, or on any other basis, until all guaranteed obligations have been fully satisfied. Should the corporate guarantors, in violation of such provision, receive any proceeds under the indenture of the Option B Payment Instrument – Notes in any other manner, they shall receive such proceeds as trustees, and shall transfer the entirety of such proceeds for the benefit of the Option B Creditors within 2 (two) Business Days of receipt, without any deduction or discount.

(ix) Early Redemption: the Option B Claims may, at any time as of January 1, 2035 and until June 28, 2070, at the sole discretion of AGINT, AGE, AGCS, AGIE, AGSA and/or AGPAR, be redeemed in advance, partially or in full, with the application of a discount equivalent to 90% of the amount of the Option B Claim subject to such early redemption, as duly adjusted until the maturity date of the Option B Claims. For the avoidance of doubt, upon payment of an amount equivalent to 10% of the Option B Claim subject to such early redemption, as duly adjusted until the maturity date of the Option B Claims, the Option B Claim held by the respective Option B Creditor shall be deemed fully settled and discharged for all legal purposes.

6.5. Option B Payment Instruments. As of the Judicial Confirmation Date, the Option B Creditors shall automatically become, as of such date, holders of their respective Option B Claims, with all the characteristics set forth in this Plan, which shall subsequently be evidenced and formalized through the Option B Payment Instruments, in accordance with the criteria set forth below:

6.5.1. Option B Payment Instrument – Notes. The Option B Creditors that, cumulatively, (i) currently hold International Existing Notes; (ii.a) are qualified institutional buyers as defined under Rule 144A promulgated under the U.S. Securities Act of 1933, as amended; (ii.b) are not "U.S. persons" as defined under Rule 902 of the U.S. Securities Act, provided that any holder described in this Section 6.5.1, item (ii.b), that is resident of a member state of the European Economic Area must also be a qualified investor under Regulation (EU) 2017/1129, as amended,

and under the Luxembourg Law of July 16, 2019 on prospectuses for securities, as amended; or (ii.c) are institutional accredited investors as defined under Rule 501 of the U.S. Securities Act of 1933, shall, subject to the provisions of Section 6.5.1.5 and except as provided in Section 6.5.1.6 of this Plan, have their Option B Claims arising from the International Existing Notes evidenced and formalized through new notes to be issued by AGINT, in the form of notes, denominated in Dollars, the indenture of which shall be executed in a manner consistent with the Term Sheet attached as Schedule VII, so as to reflect and represent the terms of Option B as provided in this Plan (the "Option B Payment Instrument – Notes").

6.5.1.1. For the avoidance of doubt, the Debtors have not solicited offers to buy, or offered or sold, and shall not solicit offers to buy, or offer or sell, any securities in any manner involving a public offering pursuant to Section 4(a)(2) of the U.S. Securities Act of 1933.

6.5.1.2. Governing law. The Option B Payment Instrument – Notes shall be governed by the laws of the State of New York, United States of America.

6.5.1.3. Time of issuance. The issuance of the Option B Payment Instrument – Notes shall occur after the entry of the Chapter15 EnforcementOrder and the cancellation of the International Existing Notes.

6.5.1.4. Conflict. In the event of any conflict between the indenture governing the Option B Payment Instrument – Notes and any other provision of this Plan, the terms and conditions set forth in this Plan shall prevail.

6.5.1.5. For the avoidance of doubt, between the Judicial Confirmation Date and the issuance date of the Option B Payment Instrument – Notes, the Option B Claims arising from the International Existing Notes shall be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (título executivo judicial) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act ("Option B Payment Instrument – Plan"), and may be enforced in accordance with the terms and conditions set forth in this Plan, including with respect to the corporate guarantees set forth in Section 6.4 of this Plan.

6.5.1.6. If the Option B Payment Instrument – Notes is not issued for any reason, the Option B Claims arising from the International Existing Notes shall continue to be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (título executivo judicial) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan. The provisions of this Section shall not be construed as a waiver, mitigation, or limitation of the Debtors' obligation to take the reasonably necessary measures to issue the Option B Payment Instrument – Notes, pursuant to the terms of this Plan.

## 7. OPTION C

7.1. Option C. The Subject Creditor that has validly elected Option C, in accordance with Sections 8.1 until 8.3 ("Option C Creditor"), shall have its respective Subject Claim (i) restructured, novated, fully satisfied and cancelled, with respect to the Debtors, pursuant to the terms of this Plan and articles 163, first paragraph, and 165, caput, of

the Brazilian Bankruptcy Act; and (ii) replaced by an Option C Claim in the proportions set forth in this Plan, which shall be paid exclusively under the terms, deadlines and payment methods established herein.

7.1.1. For the avoidance of doubt, the election of Option C by the Signatory Creditor was validly and duly made pursuant to Section 4.3.1 of this Plan, and the restructuring, novation, full satisfaction, cancellation and replacement of its respective Subject Claims shall take effect as of the Signing Date, pursuant to article 165, first paragraph, of the Brazilian Bankruptcy Act and Section 4.3.1 of this Plan.

7.2. Release. The entry of the Plan Confirmation Order shall result, on the Judicial Confirmation Date, in the full, complete, irrevocable and irreversible release of the respective Subject Claims and of the obligations underlying them with respect to the Debtors, and the instruments embodying the Subject Claims held by the Option C Creditors shall be automatically cancelled and/or extinguished by operation of law, being shall be automatically replaced by the Option C Claims.

7.2.1. For the avoidance of doubt, the provisions of Section 7.2 shall apply as of the Signing Date to the Subject Claims held by the Signatory Creditor, pursuant to the provisions of Section 4.3.1 of this Plan.

7.3. Exchange Ratio. The Option C Creditor shall be entitled to receive the equivalent of (i) 31% (thirty-one percent) of the amount of its Subject Claim under the terms and conditions set forth in Section 7.4.1, which substantially reflect the terms and conditions applicable to the payment of Option A Claims, as provided in Section 5.4, item "(ii)" onwards; and (ii) 69% (sixty-nine percent) of the amount of its Subject Claim under the terms and conditions set forth in Section 7.4.2, which substantially reflect the terms and conditions applicable to the payment of Option B Claims, as provided in Section 6.4, item (ii) onwards.

7.4. Terms and Conditions of Option C. The Option C Creditors shall be paid, in accordance with the terms and conditions set forth in Sections

7.4.1 ("Option C Claim – Tranche A") and 7.4.2 ("Option C Claim – Tranche B"), which shall be fully reflected in their respective Option C Payment Instruments:

7.4.1. Option C Claims – Tranche A:

(i) Principal Amount: 31% (thirty-one percent) of the amount of the Subject Claims held by the Option C Creditors shall be paid under the terms and conditions set forth in this Section

7.4.1. For the avoidance of doubt, the amount of the Option C Claim – Tranche A to be received by each Option C Creditor, pursuant to this Plan and, as applicable, Plan 1, shall comply with the provisions of Sections 11.5 and following of the Plan, such that, under no circumstances, shall the respective Option C Creditor receive the amount of its Option C Claim – Tranche A in duplicate.

(ii) Interest: the Option C Claims – Tranche A shall accrue interest at a rate of 6.00% (six percent) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date until 28 December 2040.

(iii) Schedule and Form of Payment of Interest: the interest accruing on the Option C Claims – Tranche A shall be paid as follows: (a) from the Judicial Confirmation Date until 28 December 2030, the interest accrued during the period shall be capitalized into the principal amount; and (b) from 28 December 2030 until 28 December 2040, the

interest accrued during the period shall be paid in cash on a semiannual basis, on 28 June and 28 December, as applicable, with the first payment date being 28 June 2031.

(iv) Principal Payment Schedule: the principal amount of the Option C Claims – Tranche A, including the interest capitalized into the principal amount, shall be amortized, in cash, in six annual installments, to be paid on December 28 of 2035, December 28 of 2036, December 28 of 2037, December 28 of 2038, December 28 of 2039 and December 28 of 2040, in the amounts corresponding to 16.667%, 20%, 25%, 33.333%,50% and 100% of the outstanding principal balance on the respective payment dates.

(v) Maturity Date: 28 December 2040.

(vi) Monetary adjustment factor: not applicable.

(vii) Currency: the original currency of the respective Subject Claim held by the Option C Creditor shall not be changed, such that Subject Claims shall remain denominated in the respective foreign currency.

(viii) Main Debtor: AGINT shall remain as the main debtor, without prejudice to the corporate guarantees described below.

(ix) Corporate Guarantees: AGE, AGIE, AGCS, AGPAR and AGSA hereby grant a corporate guarantee (fiança) to secure the payment of the Option C – Tranche A Claims, irrevocably and irreversibly undertaking, as obligors, jointly and severally with the respective main debtor(s) and among themselves, the obligations arising from this Option C – Tranche A, pursuant to articles 818 et seq. of the Brazilian Civil Code, and expressly waive the benefits of order and division, as well as any rights and faculties of release of any nature, set forth in articles 333, sole paragraph, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 and 839, all of the Brazilian Civil Code, and articles 130, 131 and 794 of the Brazilian Code of Civil Procedure. The corporate guarantees granted by AGE, AGCS, AGIE, AGPAR and AGSA, as applicable, shall be equally reflected in the Option C Payment Instruments – Notes (as defined below), and AGE, AGIE, AGCS, AGPAR and AGSA shall be signatories to the indenture of the Option C Payment Instruments – Notes for this purpose, to the same extent described above, in accordance with the laws of the State of New York, United States of America. For the avoidance of doubt, the guarantors shall be subrogated to the rights of the Option C Creditors in the event they honor, in whole or in part, the corporate guarantee, pursuant to the provisions of Sections 11.5 et. seq., it being understood that the guarantors hereby undertake not to collect, receive, or otherwise demand from the issuer of the Option C Payment Instruments – Notes the payment of any amounts paid under the corporate guarantees, whether by subrogation, set-off, or on any other basis, until all guaranteed obligations have been fully satisfied. Should the corporate guarantors, in violation of such provision, receive any proceeds under the indenture of the Option C Payment Instruments – Notes in any other manner, they shall receive such proceeds as trustees, and shall transfer the entirety of such proceeds for the benefit of the Option C Creditors within 2 (two) Business Days of receipt, without any deduction or discount.

7.4.2. Option C Claims – Tranche B:

(i) Principal Amount: 69% (sixty-nine percent) of the amount of the Subject Claims held by the Option C Creditors shall be paid under the terms and conditions set forth in this Section 7.4.2. For the avoidance of doubt, the amount of the Option C Claim – Tranche B to be received by each Option C Creditor, pursuant to this Plan and, as applicable, Plan 1, shall comply with the provisions of Sections 11.5 and following of the Plan, such that, under no

circumstances, shall the respective Option C Creditor receive the amount of its Option C Claim – Tranche B in duplicate.

(ii) Interest: the Option C – Tranche B Claims shall accrue interest at a rate of 1% (one per cent) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date and capitalized into the principal amount until the maturity date of the Option C – Tranche B Claims.

(iii) Principal Payment Schedule: the principal amount of the Option C Claims – Tranche B, including the interest capitalized into the principal amount, shall be amortized in a single installment, on the maturity date of the Option C Claims– Tranche B.

(iv) Monetary adjustment factor: not applicable.

(v) Maturity Date: 28 December 2070.

(vi) Currency: the original currency of the respective Subject Claim held by the Option C Creditor shall not be changed, such that Subject Claims shall remain denominated in the respective foreign currency.

(vii) Main Debtor: AGINT shall remain as the main debtor, without prejudice to the corporate guarantees described below.

(viii) Corporate Guarantees: AGE, AGIE, AGCS, AGPAR and AGSA hereby grant a corporate guarantee (fiança) to secure the payment of the Option C – Tranche B Claims, irrevocably and irreversibly undertaking, as obligors, jointly and severally with the respective main debtor(s) and among themselves, the obligations arising from this Option C – Tranche B, pursuant to articles 818 et seq. of the Brazilian Civil Code, and expressly waive the benefits of order and division, as well as any rights and faculties of release of any nature, set forth in articles 333, sole paragraph, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 and 839, all of the Brazilian Civil Code, and articles 130, 131 and 794 of the Brazilian Code of Civil Procedure. The corporate guarantees granted by AGE, AGCS, AGIE, AGPAR and AGSA, as applicable, shall be equally reflected in the Option C Payment Instruments – Notes, and AGE, AGIE, AGCS, AGPAR and AGSA shall be signatories to the indenture of the Option C Payment Instruments – Notes for this purpose, to the same extent described above, in accordance with the laws of the State of New York, United States of America. For the avoidance of doubt, the guarantors shall be subrogated to the rights of the Option C Creditors in the event they honor, in whole or in part, the corporate guarantee, pursuant to the provisions of Section 11.5 et. seq, it being understood that the corporate guarantors hereby undertake not to collect, receive, or otherwise demand from the issuer of the Option C Payment Instruments – Notes the payment of any amounts paid under the corporate guarantees, whetherby subrogation, set-off, or on any other basis, until all guaranteed obligations have been fully satisfied. Should the corporate guarantors, in violation of such provision, receive any proceeds under the indenture of the Option C Payment Instruments – Notes in any other manner, they shall receive such proceeds as trustees, and shall transfer the entirety of such proceeds for the benefit of the Option C Creditors within 2 (two) Business Days of receipt, without any deduction or discount.

(ix) Early Redemption: the Option C – Tranche B Claims may, at any time from January 1st, 2035, until June 28, 2070, at the sole discretion of AGINT, AGE, AGCS, AGIE, AGSA and/or AGPAR, be redeemed in advance, partially or in full, with the application of a discount equivalent to 90% of the amount of the Option C – Tranche B Claim subject to such redemption, as duly adjusted until the maturity date of the Option C – Tranche B Claims. For

the avoidance of doubt, upon payment of an amount equivalent to 10% of the Option C – Tranche B Claims subject to the early redemption, as duly updated until the maturity date of the Option C – Tranche B Claims, the entirety of the Option C – Tranche B Claim held by the respective Option C Creditor shall be deemed fully settled and discharged for all legal purposes.

7.5. Option C Payment Instruments. As of the Judicial Confirmation Date, the Option C Creditors shall automatically become, as of such date, holders of their respective Option C Claims, with all the characteristics set forth in this Plan, which shall subsequently be evidenced and formalized through the Option C Payment Instruments, in accordance with the criteria set forth below:

7.5.1 Option C Payment Instruments – Notes. The Option C Creditors who, cumulatively, (i) are currently holders of International Existing Notes; (ii.a) are qualified institutional buyers within the meaning of Rule 144A under the U.S. Securities Act of 1933, as amended, (ii.b) are not "U.S. persons", as defined in Rule 902 under the U.S. Securities Act, provided that any holder described in this Section 7.5.1, item (ii.b), that is resident of a member state of the European Economic Area must also be a qualified investor under Regulation (EU) 2017/1129, as amended, and the Luxembourg Law of July 16, 2019 on prospectuses for securities, as amended, or (ii.c) are institutional accredited investors as defined in Rule 501 under the U.S. Securities Act of 1933; shall, subject to the provisions of Section 7.5.1.2 and except as provided in Section 7.5.1.3, have their (i) Option C – Tranche A Claims arising from the International Existing Notes evidenced and formalized through the Option A Payment Instrument – Notes, the indenture of which shall be executed in a manner consistent with the Term Sheet set forth in Schedule VI, so as to reflect and represent the terms of Option C – Tranche A as provided in this Plan, subject to the provisions of item (i) of Section 7.4.1 of this Plan; and (ii) Option C–Tranche B Claims evidenced and formalized through the Option B Payment Instrument – Notes, the indenture of which shall be executed in a manner consistent with the Term Sheet set forth in Schedule VII, so as to reflect and represent the terms of Option C – Tranche B as provided in this Plan, subject to the provisions of Option C – Tranche B as provided in this Plan, pursuant to item (i) of Section 7.4.2 of this Plan.

7.5.1.1 For the avoidance of doubt, the provisions set forth in Sections 5.5.1.1 to 5.5.1.4 and 6.5.1.1 to 6.5.1.4 above shall apply to the Option C Payment Instruments – Notes.

7.5.1.2 For the avoidance of doubt, between the Judicial Confirmation Date (or, in the case of the Signatory Creditor, the Signing Date) and the issuance date of the Option C Payment Instrument – Notes, the Option C – Tranche A Claims and the Option C – Tranche B Claims arising from the International Existing Notes shall be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (título executivo judicial) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act ("Option C Payment Instrument – Plan"), and may be enforced in accordance with the terms and conditions set forth in this Plan, including with respect to the corporate guarantees set forth in Section 7.4 of this Plan.

7.5.1.3 If the Option C Payment Instrument – Notes is not issued for any reason, the Option C – Tranche A Claims and the Option C – Tranche B Claims arising from the International Existing Notes shall continue to be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall constitute an enforceable court order for all legal purposes, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan. The provisions of this Section

shall not be construed as a waiver, mitigation, or limitation of the Debtors' obligation to take all reasonably necessary measures to issue the Option C Payment Instruments – Notes, pursuant to the terms of this Plan.

**8. ELECTION AND SELECTION OF PAYMENT OPTIONS**

8.1. Election of Payment Option. The Subject Creditors may elect ("Payment Option Election") to have their Subject Claims restructured and paid under either Option A, Option B or Option C pursuant to Sections 5, 6 and 7 of this Plan, it being understood that each Subject Creditor may elect only one payment option with respect to the entirety of its respective Subject Claim ("Payment Option Election").

8.2. Payment Option Election Process. The Payment Option Election shall be carried out within the deadline of 30 (thirty) Calendar Days], which shall commence within up to 45 (forty-five) Calendar Days after the Plan Confirmation Order (the "Election Period Commencement Date"), as set forth in Section 8.2.1 below, and each Subject Creditor shall comply with the provisions set forth in the following Sections (the "Payment Option Election Process"), except as provided for in Section 8.2.3 of this Plan. For the avoidance of doubt, the Payment Option Election shall begin on the Election Period Commencement Date and shall end on the thirtieth Calendar Day counted from the Election Period Commencement Date (this interval, the "Election Period").

8.2.1. Election Period Commencement Date. The Debtors shall disclose, on the website indicated in Section 8.3 below and/or by means of a filing in the records of the Extrajudicial Reorganization, the exact Election Period Commencement Date, which shall be set within up to 45 (forty-five) Calendar Days after the Plan Confirmation Order. In the absence of disclosure by the Debtors in the manner set forth in this Section, the Election Period Commencement Date shall be ipso facto deemed to be the forty-sixth Calendar Day after the Plan Confirmation Order.

8.2.2. The Subject Creditors shall, with respect to their Subject Claims arising from International Existing Notes, carry out the Payment Option Election through DTC's automated tender offer program (ATOP) or the Deposits/Withdrawals at Custodian (DWAC) system. The Subject Creditors shall, within the Election Period and therefore prior to the end of the Election Period, complete and deliver the election form, in the form to be made available on the website referred to in Section 8.3 below, to its respective bank or broker with which their respective International Existing Notes are held in custody.

8.2.3. Signatory Creditor's Election. For the avoidance of doubt, the Signatory Creditor has already validly and duly made the Payment Option Election pursuant to Section 4.3.1 of this Plan. Notwithstanding having validly and duly made the Payment Option Election, the Signatory Creditor undertakes to comply with the provisions of Section 8.2.2 above, in order to enable the identification of its International Existing Notes deposited with the DTC and, thereby, enable their formal cancellation in the event of issuance of the Option C Payment Instruments – Notes.

8.3. All instructions and information relevant and necessary for the participation of the Subject Creditors in the Payment Option Election Process, including any updates, shall be disclosed by the Debtors on the website https://andradegutierrez365.sharepoint.com/:f:/s/R EJ2026andradegutierrez/IgDaz9D-4HAfS5A6mPHcl33BAfEhcicXvDY5d75qzkQm kDg?e=bUYjae after the Plan Confirmation Order.

8.4. The Subject Claim shall be automatically and fully replaced and restructured in accordance with the terms and conditions applicable to Option B set forth in Section 6, if its respective Subject Creditor (i) fails to carry out the Payment Option Election in accordance with the provisions of Sections 8.1 and 8.2; (ii) fails to fully comply with

the relevant instructions disclosed on the website indicated in Section 8.3; or (iii) withdraws its International Existing Notes pursuant to Section 8.5.

8.5. Once the Election Period has ended, Subject Creditors may withdraw their International Existing Notes from the system used in the Payment Option Election Process up to 10 (ten) Business Days prior to the issuance date of the Option A Payment Instrument – Notes, the Option B Payment Instrument – Notes (and, consequently, the Option C Payment Instruments – Notes), it being understood that such withdrawal may not be subsequently reversed. For the avoidance of doubt, any Subject Creditor withdraws its International Existing Notes after the Election Period shall be deemed (i) to have not made a valid election for any of the Payment Options; (ii) to have waived all rights associated with any Payment Option; and, consequently, (iii) to have its respective Subject Claim restructured in accordance with the terms of Option B of this Plan.

**9. RECIPROCAL OBLIGATIONS OF THE DEBTORS, THE SIGNATORY CREDITOR AND THE ADHERING CREDITORS**

9.1. The Signatory Creditor and the Adhering Creditors shall use their best efforts to enable the implementation of this Plan as promptly as possible.

9.2. The Debtors shall:

(i) file the Extrajudicial Reorganization within 5 (five) Business Days from the Signing Date;

(ii) perform all acts, provide all information, and take reasonably necessary measures to implement and comply with the provisions of this Plan, within the time frames and under the conditions established herein, bearing all corresponding expenses, including those reasonably necessary for the issuance of the Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes (and, consequently, the Option C Payment Instruments – Notes);

(iii) comply with all applicable legislation that is substantially relevant to the conduct of their business (including all labor, environmental, tax, and social laws) related to their activities and the maintenance of their assets and properties;

(iv) use their best efforts to enable (a) the confirmation of this Plan by the Court of the Extrajudicial Reorganization, or by any appellate instance, if necessary;

(b) the recognition of the Extrajudicial Reorganization and the implementation of the Plan and the Plan Confirmation Order pursuant to the Chapter 15 Decisions;

(v) comply with all relevant obligations set forth in this Plan and its Schedules as from the Signing Date; and

(vi) to file the Chapter 15 Proceedings pursuant to Section 10.6; and

(vii) comply with and observe all deadlines and relevant obligations set forth in this Plan.

9.3. Reciprocal Obligation. The Debtors and the Signatory Creditor, as holder of more than half of the Subject Claims, shall be bound and agree to negotiate in good faith the final drafts of any documents necessary for the implementation of the transactions and commercial agreements described in this Plan.

## PART V – POST-CONFIRMATION

### 10. EFFECTS OF THE PLAN

10.1. Novation. Upon the Plan Confirmation Order, the Subject Claims shall be novated pursuant to articles 163, first paragraph, and 165 of the Brazilian Bankruptcy Act, and shall be paid in the manner established in this Plan. As a result of such novation and unless expressly provided otherwise in this Plan, all obligations, covenants, financial ratios, events of default, penalties, as well as any other obligations and guarantees of any nature assumed or granted by the Debtors are extinguished and replaced, in all respects, by the provisions of this Plan.

10.2. Resolution of the Plan and the Novation. The Plan shall be automatically terminated, provided that the rights set forth in Section 10.2.1 have not been exercised, and the Subject Claims shall revert to the status quo ante if any of the following events occurs:

(i) the failure to file the Extrajudicial Reorganization within 5 (five) Business Days from the Signing Date

(ii) the issuance of a decision, by the Extrajudicial Reorganization Court or by a competent Appellate Court, rejecting the confirmation of the Plan, which is not reversed or stayed within 240 (two hundred and forty) Calendar Days from the publication of such decision in the Official Gazette;

(iii) issuance of a decision, by the Extrajudicial Reorganization Court or by a competent Appellate Court, substantially modifying the Plan, which is not reversed or stayed within 240 (two hundred and forty) Calendar Days from the publication of such decision in the Official Gazette, unless such modification is expressly accepted by the Debtors and the Subject Creditor(s) holding more than half of the Subject Claims, in which case the Plan shall not be terminated;

(iv) the failure to obtain the Plan Confirmation Order prior to the 2nd (second) anniversary of the Signing Date;

(v) the breach of any materially relevant obligations assumed by the Debtors under this Plan up to the Judicial Confirmation Date, provided that such breach is not remedied within 90 (ninety) Calendar Days from the date of receipt of a notice sent by the Creditor(s) holding more than half of the Subject Claims stating such breach;

(vi) failure to file the Chapter 15 Proceedings in accordance with Section 10.6; or

(vii) the failure to issue the Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes (and, consequently, the Option C Payment Instruments – Notes) within 180 (one hundred and eighty) Calendar Days from the entry of the Chapter 15 Enforcement Order.

10.2.1. The Subject Creditor(s) holding more than half of the Subject Claims may, at their sole discretion, waive termination of the Plan upon the occurrence of any of the events set forth in the Section above, by means of written notice to the Debtors. Such waiver shall only be effective and the Plan shall not be terminated if the Debtors, within 15 (fifteen) Business Days from receipt of such notice, agree to such waiver.

10.2.2. For the avoidance of doubt, subject to the provisions of Section 10.2.2.1 below, any breach of obligations set forth in this Plan and/or in the Option A Payment Instrument – Notes and/or in the Option B Payment Instrument – Notes (and, consequently, in the Option C Payment Instruments – Notes) after the Judicial Confirmation Date shall not result in termination of this Plan, and in such event the Subject Creditors shall continue to hold credit

rights as novated by this Plan, it being assured to them the right to adopt any judicial or extrajudicial measures they deem appropriate to ensure compliance with the obligations set forth in this Plan and/or in the Option A Payment Instrument – Notes and/or in the Option B Payment Instrument – Notes (and, consequently, in the Option C Payment Instruments – Notes). For the avoidance of doubt, this Section is not applicable to the events set forth in items "(ii)" e "(iii)" of Section 10.2 above.

10.2.2.1 For the avoidance of doubt, the provisions of Section 10.2.2 above shall not apply and, therefore, the Plan shall be terminated even after the Judicial Confirmation Date, as set forth in items "(vi)" e "(vii)" of Section 10.2 above, in the event the following obligations are defaulted: (i) the Chapter 15 Proceedings are not filed pursuant to Section 10.6 or (ii) the Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes (and, consequently, the Option C Payment Instruments – Notes) are not issued within the term set forth in item (vii) of Section 10.2 and in the manner set forth in this Plan, unless the rights set forth in Section 10.2.1 of this Plan are exercised.

10.3. After the filing of the Plan, the Debtors may, individually or jointly, with the prior written consent of the Subject Creditor(s) holding more than half of the Subject Claims, withdraw from the Extrajudicial Reorganization proceeding or from obtaining the Plan Confirmation Order, at their sole discretion, in which case the Subject Claims owed by the Debtor that exercises the prerogative set forth in this Section shall not be novated and shall remain in full force and effect under their respective originally agreed terms, including the Subject Claims held by the Signatory Creditor.

10.4. Collection of Subject Claims. In accordance with article 163, paragraphs 1 and 8, of the Brazilian Bankruptcy Act, as from the Filing Date and for as long as the Plan remains in force, the Subject Creditors shall not take any judicial or extrajudicial measures, in Brazil or abroad, against the Debtors seeking to enforce, collect, or receive the Subject Claims, whether under their original terms or under this Plan, including, without limitation, (i) filing or pursuing any judicial or arbitral action or proceeding of any kind related to any Subject Claim; (ii) enforcing any judgment, court decision, or arbitral award related to any Subject Claim; (iii) pledging, seizing, attaching, freezing, or otherwise rendering unavailable, in any manner or in any forum, domestic or foreign, any assets of the Debtors to satisfy their Subject Claims, as of the Filing Date, being obliged to cooperate with the release, lifting, and discharge of any liens or judicial restraints over the assets and property of the Debtors; (iv) seeking satisfaction of their Subject Claims by any other means; or (v) asserting any right of setoff against any credit owed to the Debtors with their Subject Claims.

10.5. Termination of Actions and Enforcements. Upon the Plan Confirmation Order, any and all enforcement proceedings, of any nature, or collection actions and similar proceedings related to any Subject Claim against the Debtors, in Brazil or abroad, shall be fully extinguished with respect to the Debtors, it being understood that any liens and attachments over the assets and rights of the Debtors shall be released, as well as any remaining judicially blocked amounts that may have been effected in such judicial proceedings.

10.6. Chapter 15. No later than 45 (forty-five) Calendar Days after the entry of the Plan Confirmation Order, or, at the Debtors' discretion, prior to the entry of the Plan Confirmation Order, the foreign representative(s) of the Debtors shall file the petition for the commencement of the Chapter 15 Proceedings.

10.7. Binding Effect of the Plan. The provisions of the Plan shall bind the Debtors and the Signatory Creditor as of the Signing Date, pursuant to article 165, second paragraph, of the Brazilian Bankruptcy Act, and the provisions of

Section 10.2 above, and the Adhering Creditors as of the date on which they execute the Adhesion Term for Adhering Creditors, as well as their respective assignees and successors, and shall bind the Debtors and all Subject Creditors, as well as their respective assignees and successors, as of the Plan Confirmation Order.

10.8. Execution of Documents and Other Measures. The Debtors and the Subject Creditors shall perform all acts and execute all contracts and other documents that are necessary or appropriate to comply with the terms of this Plan.

10.9. Release. Subject to Section 10.2, on the Judicial Confirmation Date, there shall be the automatic, full, general, unrestricted, irrevocable, and irreversible release and discharge of the Debtors from all Subject Claims restructured under this Plan, without limitation, including all and any rights, obligations, actions, indemnifications, appeals, liabilities of any nature, interest, monetary adjustment, penalties, and fines, with the definitive cancellation of all contracts or documents underlying the Subject Claims, including the International Existing Notes, as well as any other agreements arising therefrom.

10.9.1. The release of all Subject Claims shall also occur, pursuant to the terms of this Plan and Plan 1, in relation to Inzag and Zagope, to the extent that the International Existing Notes guaranteed by them shall be definitively cancelled, and both shall be fully released from any and all obligations related to the Subject Claims and the Option A Claims, the Option B Claims and the Option C Claims as established under this Plan and Plan 1.

10.10. As a result of the release arising from the performance of the Plan described above, as of the Judicial Confirmation Date, the claims held by the Subject Creditors shall thereafter be governed exclusively by the terms and conditions set forth in the respective Payment Instruments and related security instruments, pursuant to this Plan.

10.11. Release. The payments made in the manner established in this Plan shall automatically and without any additional formality result in the granting, in favor of the Debtors, of full, clear, irrevocable, and irreversible release of the portion effectively paid of the Option A Claims, Option B Claims and Option C Claims, including with respect to any charges effectively paid, so that the Option A Creditors, Option B Creditors and Option C Creditors shall have no further claims against the Debtors in relation to the portions of their Option A Claims, Option B Claims and Option C Claims effectively paid, at any time, whether in or out of court.

10.12. Amendment of the Plan. Amendments, changes, modifications or waivers to the Plan, as well as to the rights and obligations set forth therein, may be proposed by the Debtors at any time, whether before or after the Plan Confirmation Order, provided that such amendments, changes or modifications are approved by Creditor(s) holding more than half of the Subject Claims, in accordance with the quorum set forth in article 163 of the Brazilian Bankruptcy Act.

10.12.1. Binding Effect of Plan Amendments. Any amendments, changes or modifications to the Plan shall be binding upon the Debtors and the Subject Creditors, as well as their respective assignees and successors, from the date of their approval in accordance with the Brazilian Bankruptcy Act, if they are approved in the manner set forth above.

## PART VI – COMMON PROVISIONS

### 11. GENERAL PROVISIONS

11.1. Schedules. All Schedules to this Plan are incorporated herein and constitute an integral part of this Plan. In the event of any inconsistency between this Plan and any Schedule, this Plan shall prevail, except as otherwise provided herein.

11.2. Deadline extension. Any deadline relating to the performance of any obligation set forth in this Plan shall be deemed extended to the immediately following Business Day if the relevant due date falls on a day that is not a Business Day, provided that, in the case of a pecuniary obligation, no additional amount shall accrue on the amounts payable.

11.3. Assignment and Transfer. Provided that this Plan has not been terminated, the Signatory Creditor may not assign its respective Subject Claims from the Signing Date until the Judicial Confirmation Date, except if: (i) the assignee is an affiliate of the Signatory Creditor, in which case the assigned claims shall be fully and automatically subject to the terms of this Plan; and (ii) in the event of an assignment of a Subject Claim to a Person that is not the Signatory Creditor or an affiliate of the Signatory Creditor, the respective assignee shall fully adhere, in writing, to the terms and conditions of this Plan, prior to the execution of the claim assignment agreement, by completing and delivering the adhesion term set forth in Schedule IV below to the Debtors and complying with the provisions of Section 4.4 above. For the avoidance of doubt, any claim assignments executed by the Signatory Creditor whose respective assignees refuse to adhere to the terms and conditions of this Plan shall be deemed null and void, in which case the original assignor shall continue to be deemed, for all intents and purposes, the legitimate holder of the assigned Subject Claim. The assignment of Subject Claims, after the Filing Date shall not alter their nature, classification, subjection or legal treatment, nor shall it validate rights or prerogatives not originally held by the assignor.

11.4. The payment terms of the Subject Claims novated pursuant to this Plan shall remain unchanged in the event of any assignments or transfers of the Subject Claims to third parties, for any reason whatsoever, including for the purposes of article 83 of the Brazilian Bankruptcy Act.

11.5. Subject Claims with Co-obligation of the Debtors and/or the Plan 1 Debtors. For purposes of the treatment and payment of the Subject Claims under this Plan and/or Plan 1, each Subject Creditor shall be deemed the holder of a single Subject Claim, regardless of the existence of a co-obligation by more than one of the Debtors and/or the Plan 1 Debtors. The financial outcome of the forms and means of payment for the Subject Creditor shall always be equivalent to that set forth in this Plan and in Plan 1for the total amount of its Subject Claim and may not be increased due to the plurality of co-obligors or guarantees granted by different Debtors and/or Plan 1 Debtors.

11.5.1. The full or partial payment of Subject Claims with a co-obligation of one or more Debtors and/or Plan 1 Debtors shall be deemed, in the same proportion, as having been made by the other Debtors and/or Plan 1 Debtors.

11.5.2. In no event shall the Debtors and/or the Plan 1 Debtors be required to make payments exceeding the amount of the Subject Claim.

11.5.3. If the Subject Claim is paid by any of the Debtors and/or Debtors under the Plan 1, the other Debtors and/or Plan 1 Debtors shall be released, in the same proportion, from making the corresponding payments provided for in the Plan.

11.5.4. If, as a result of any co-obligation, any of the Debtors and/or the Plan 1 Debtors makes a payment that results in the Subject Creditor receiving amounts in violation of the provisions of this Section, such Subject Creditor shall immediately return to the Debtors and/or the Plan 1 Debtors, as applicable, the amounts and/or securities received in excess, including principal, interest, and any other charges accrue until the respective payment.

11.5.5. The Debtor and/or the Plan 1 Debtor that pays the principal obligation of another Debtor and/or Plan 1 Debtor, in accordance with the terms of this Plan and Plan 1, shall be subrogated to the legal position of the respective Subject Creditor, pursuant to articles 346 and 347 of the Brazilian Civil Code, and the credit constituted in its favor as a result of such subrogation shall be paid in accordance with this Plan and with the Plan 1, as applicable.

11.6. Maintenance of Collateral. Pursuant to article 163, fourth paragraph, of the Brazilian Bankruptcy Act, there shall be no release of any collateral over assets encumbered the Subject Creditors, which, if applicable, shall continue to secure the payment of the Subject Claims held by their respective holders as novated by this Plan and/or by Plan 1.

11.6.1. The Debtors and the Subject Creditors are hereby bound, and any security agents are hereby authorized, if applicable, to execute any and all documents necessary to implement the provisions of Section 11.6 above, including entering into any amendments to the existing security agreements, in order to align them with the provisions of this Plan and its Schedules.

11.6.2. The Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes (and, consequently, the Option C Payment Instruments – Notes) shall be secured by the same assets encumbered to the 2029 International Notes, observing the provisions set forth in the indentures to be entered into in a manner consistent with the Term Sheets attached as Schedule VI and Schedule VII.

11.7. Taxes. The Taxes shall be the responsibility of the respective Party that is the taxpayer or otherwise liable for the payment of such Tax, in accordance with applicable laws.

11.8. Tolerance. Any tolerance, partial exercise, or concession between the Parties shall always be deemed a mere act of leniency and shall not constitute a waiver or loss of any right, power, privilege, prerogative, or authority granted under this Plan, nor shall it imply novation, alteration, remission, modification, or reduction of the rights and obligations arising from this Plan.

11.9. Severability of the Plan Provisions. If any term or provision of the Plan is deemed invalid, null, or unenforceable, the remaining terms and provisions of the Plan shall remain valid and enforceable, provided that the assumptions underlying them are preserved.

11.10. Conflict. This Plan is executed in English and Portuguese versions. In the event of any conflict between the English and Portuguese versions, the Portuguese version shall prevail.

11.11. Enforceable instrument. This Plan, duly executed by all Parties and Intervening Parties, as well as the Plan Confirmation Order, constitute enforceable judicial instruments under applicable legislation, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, embodying valid, binding, enforceable, and executable obligations for the Debtors, the Intervening Parties, and the Subject Creditors, and may be enforced in their own terms and conditions against the Debtors, the Intervening Parties, and the Subject Creditors, as necessary and applicable, pursuant to articles 513 and 783 et seq. of the Brazilian Code of Civil Procedure.

11.12. Irrevocability and Irreversibility. This Plan is executed by the Parties on an irrevocable and irreversible basis, constituting a valid and binding instrument with respect to the Parties and their respective successors and assignees, for any purpose and effect.

11.13. Entire agreement. This Plan and its Schedules reflect and constitute, in a final, complete, and exclusive manner, all agreements existing among the Parties with respect to the Subject Claims and cancel, supersede, and replace any and all prior proposals, agreements, and understandings, whether oral or written, as well as any and all other communications exchanged among the Parties with respect to the Subject Claims, except as otherwise specified in this Plan.

11.14. Notices. All notices, requests, demands, and other communications to the Debtors, the Intervening Parties, or the representatives of the Signatory Creditor required or permitted under this Plan, to be effective, shall be made in writing and shall be deemed given when sent: (a) by registered mail with return receipt requested, or by courier; or (b) by e-mail when actually delivered, with the delivery receipt serving as proof of delivery and receipt of the message. Communications to the Debtors, the Intervening Parties, and the Signatory Creditor, as applicable, shall be sent to the addresses indicated below, unless a change has been duly communicated to the other Party. Communications addressed to the Adhering Creditors shall be sent to the address indicated in their respective Adhesion Terms.

Debtors and Intervening Parties:

A/C: Gustavo Braga Mercher Coutinho (gustavo.coutinho@agnet.com.br).

Address: Avenida do Contorno, No. 8,279, 3rd floor, Gutierrez, Belo Horizonte/MG, CEP 30110-059.

With a copy to:

Mattar – Sociedade de Advogados

A/C: Eduardo Augusto Mattar (eamattar@mattaradv.com.br);

Cesar Rizzo (crizzo@mattaradv.com.br);

Guilherme Bergamin de Barros (gbarros@mattaradv.com.br);

Victor Dias Vieira Clementino (vclementino@mattaradv.com.br);

Henrique Del VecchioRodrigues (hrodrigues@mattaradv.com.br);

Fernanda Oliveira Alencar (falencar@mattaradv.com.br); and

Ana Katarina Costa Marques (akmarques@mattaradv.com.br).

Address: Av. Pres. JK, nº 2041, Torre B, 5º andar, CEP 04543-011 São Paulo/SP.

Davis Polk & Wardwell LLP

A/C: Manuel Garciadiaz (manuel.garciadiaz@davispolk.com);

Timothy Graulich (timothy.graulich@davispolk.com); and

Joanna McDonald (joanna.mcdonald@davispolk.com)

Address: 450 Lexington Avenue, New York, New York, 10017, United States of America

Foreign and U.S. legal consultants.

Signatory Creditor:

A/C: Luiz Renan Toffanin da Silva (gestaosec.naofin@vert-capital.com).

Address: Rua Cardeal Arcoverde, nº 2.365, 11º Andar, Pinheiros, CEP 05407-020, São Paulo/SP.

**12. GOVERNING LAW AND JURISDICTION.**

12.1. Applicable Law. Except as otherwise provided in the Schedules to this Plan, the rights, duties, and obligations arising from this Plan shall be governed by, interpreted, and enforced in accordance with the laws in force in the Federative Republic of Brazil.

12.2. Jurisdiction. Except as otherwise provided in the Schedules to this Plan, all controversies or disputes arising out of or relating to this Plan, during the period in which the Extrajudicial Reorganization remains pending, shall be resolved by the Court of the Extrajudicial Reorganization until the termination of the Extrajudicial Reorganization. After the termination of the Extrajudicial Reorganization, the Parties elect the courts of the Judicial District of Belo Horizonte, State of Minas Gerais, as the competent forum to resolve all controversies or disputes arising out of or relating to this Plan, waiving any other forum or jurisdiction, no matter how privileged it may be.

And being in full agreement and duly bound, the Parties and the Intervening Parties execute this instrument, for the same purposes, binding themselves and their successors of any kind, for all legal intents and purposes, together with two witnesses.

Belo Horizonte/MG, May 18, 2026.

(Remainder of page intentionally left blank)

(Signatures follow on the next pages).

List of Schedules

Schedule I List of Subject Creditors, indicating the total amount of the Subject Claims owed by each Debtor, duly updated up to the Filing Date.

Schedule II List of the Subject Claims held by the Signatory Creditor against each Debtor, duly updated up to the Filing Date.

Schedule III Adhesion Creditor. Term for Signatory

Schedule IV Adhesion Creditor. Term for Adhering

Schedule V Certificate of Holder of International Existing Notes.

Schedule VI Indicative Term Sheet of the terms and conditions to be set forth in the indenture of the Option A Payment Instrument – Notes.

Schedule VII Indicative Term Sheet of the terms and conditions to be set forth in the indenture of the Option B Payment Instrument – Notes.

(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS S.A. and Inzag Germany GmbH)

ANDRADE GUTIERREZ INTERNATIONAL S.A.

[signature]

Name: Gustavo Braga Mercher Coutinho

Title: Diretor/Officer

[signature]

Name: Gustavo Benchimol

Title: Diretor/Officer

(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS S.A. and Inzag Germany GmbH)

ZAGOPE SGPS S.A.

[signature]

Name: Ricardo de Oliveira Lopes de Sá

Title: Conselheiro

[signature]

Name: Margarida Damião Fernandes F. Lobo

Title: Conselheiro

(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS S.A. and Inzag Germany GmbH)

INZAG GERMANY GMBH

[signature]

Name: Leandro Eugenio Fernandez Faria

Title: Diretor/Officer

[signature]

Name: FabianoNascimento Brandão

Title: Diretor/Officer

(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS S.A. and Inzag Germany GmbH)

As an intervening and consenting party:

ANDRADE GUTIERREZ ENGENHARIA S.A.

[signature]

Name: Renato Torres de Faria

Title: Diretor/Officer

[signature]

Name: Marco Túlio Pinto

Title: Diretor/Officer

(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS S.A. and Inzag Germany GmbH)

As an intervening and consenting party:

ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A.

[signature]

Name: José Eduardo Kauark Leite

Title: Diretor/Officer

[signature]

Name: Cristiano Pimentel Cavalcanti Vieira

Title: Diretor/Officer

(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS S.A. and Inzag Germany GmbH)

As an intervening and consenting party:

ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A.

[signature]

Name: Renato Torres de Faria

Title: Diretor-Presidente/Chief Executive Officer

[signature]

Name: Gustavo Braga Mercher Coutinho

Title: Officer

(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS S.A. and Inzag Germany GmbH)

As an intervening and consenting party:

ANDRADE GUTIERREZ S.A.

[signature]

Name: Renato Torres de Faria

Title: Diretor-Presidente/Chief Executive Officer

[signature]

Name: Maria Beatriz Lira Gomes Ferreira

Title: Diretora/Officer

(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS S.A. and Inzag Germany GmbH)

As an intervening and consenting party:

ANDRADE GUTIERREZ PARTICIPAÇÕES S.A.

[signature]

Name: Renato Torres de Faria

Title: Diretor-Presidente/Chief Executive Officer

[signature]

Name: Saulo Alves Pereira Júnior

Title: Diretor/Officer

(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS S.A. and Inzag Germany GmbH)

WITNESSES

[signature]

Name: Lilian Cristina Pereira de Oliveira

Brazilian Tax Payer Register: 333.114.578-54

[signature]

Nome/Name: BarbaraCarolina Pires Soares

Brazilian Tax Payer Register: 020.643.106-65

**Schedule I**

**List of Subject Creditors**

[Page left intentionally blank – Schedule I follows on the next page]

SCHEDULE OF LIABILITIES OF ANDRADE GUTIERREZ INTERNATIONAL S.A.

POSITION AS OF MAY 18, 2026

| Debtor | Creditor | CNPJ/CPF | Classification/Nature | Address | Original Currency | Original Currency Amount | Amount (BRL)² | Origin | Maturity Terms |
|---|---|---|---|---|---|---|---|---|---|
| Andrade Gutierrez International | Wilmington Savings Fund Society, FSB¹ | N/A | Bonds - Financial Debt | 500 Delaware Avenue, Wilmington, DE 19801 | USD | 65,464,463.81 | 331,603,694.98 | Bonds - 1.000% PIK Toggle Notes due 2040 | Bullet - December 2040 |
| Andrade Gutierrez International | Wilmington Savings Fund Society, FSB¹ | N/A | Bonds - Financial Debt | 500 Delaware Avenue, Wilmington, DE 19801 | USD | 489,201,296.43 | 2,478,000,246.94 | Bonds - 9.000%/10.500% Senior Secured PIK Toggle Notes due 2029 | Bullet - December 2029 |

USD 554,665,760.24 2,809,603,941.92

TOTAL 554,665,760.24 2,809,603,941.92

¹ Acting as Trustee, as the representative agent for the Bondholders.

[2] Reference exchange rate BRL/USD = 5.0654 (PTAX rate of May 15, 2026, pursuant to Art. 163, § 3, I, of Law No. 11.101/2005).

LIST OF LIABILITIES OF ZAGOPE SGPS S.A.

POSITION AS OF MAY 18, 2026

| Debtor | Creditor | CNPJ/CPF | Classification/Nature | Address | Original Currency Original Currency Amount[2] | Amount (BRL)[3] | Origin | Maturity Terms | |
|---|---|---|---|---|---|---|---|---|---|
| ZAGOPE SGPS, S.A | Wilmington Savings Fund Society, FSB[1] | N/A | Bonds - Financial Debt | 500 Delaware Avenue, Wilmington, DE 19801 | USD | 50,000,000.00 | 253,270,000.00 | Bonds - 9.000%/10.500% Senior Secured PIK Toggle Notes due 2029 | Bullet - December 2029 |

USD 50,000,000.00 253,270,000.00

TOTAL 50,000,000.00 253,270,000.00

[1] Acting as Trustee, as the representative agent for the creditors holding the Bonds.

[2] The personal guarantee provided by Zagope in connection with the 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029 is limited to US$ 50 million.

[3] Reference exchange rate BRL/USD = 5.0654 (PTAX rate of May 15, 2026, pursuant to Art. 163, § 3, I, of Law No. 11.101/2005).

SCHEDULE OF LIABILITIES OF INZAG GERMANY GMBH

POSITION AS OF MAY 18, 2026

| Debtor | Creditor | CNPJ/CPF | Classification/Nature | Address | Original Currency | Original Currency Amount[2] | Amount (BRL)[3] | Origin | Maturity Structure |
|---|---|---|---|---|---|---|---|---|---|
| Inzag Germany GmbH | Wilmington Savings Fund Society, FSB[1] | N/A | Bonds - Financial Debt | 500 Delaware Avenue, Wilmington, DE 19801 | USD | 15,567,095.92 | 78,853,567.67 | Bonds - 9.000%/10.500% Senior Secured PIK Toggle Notes due 2029 | Bullet - December 2029 |

| | | |
|---|---|---|
| USD | 15,567,095.92 | 78,853,567.67 |
| TOTAL | 15,567,095.92 | 78,853,567.67 |

[1] In the capacity of Trustee, acting as the representative agent for the creditors holding the Bonds.

[2] The personal guarantee provided by Inzag in connection with the 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029, calculated pursuant to the indenture, is limited to US$ 15,567,095.92. [3] Reference exchange rate BRL/USD = 5.0654 (PTAX rate of May 15, 2026, pursuant to Art. 163, § 3, I, of Law No. 11.101/2005).

**Schedule II**

**List of the Subject Claims held by the Signatory Creditor**

[Page left intentionally blank – Schedule II follows on the next page]

List of Subject Claims held by the Signatory Creditor (Art. 163, § 6, III, LFRE) – List of ANDRADE GUTIERREZ INTERNATIONAL S.A.

POSITION AS OF: 05/18/26

| Signatory Creditor | Origin of Credit | Original Currency | Total Value of Signatory Creditor's Claims - Principal + Interest | | % of Total Claims Subject to Restructuring |
|---|---|---|---|---|---|
| | | | Value in BRL1 | Value in original currency2 | |
| VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA | BOND - 1.000% PIK TOGGLE NOTES DUE 2040 | USD | 205,075,703 | 40,485,589 | 77.1% |
| BOND - 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029 | | USD | 1,961,400,915 | 387,215,406 | |
| Total | | | 2,166,476,618 | 427,700,995 | 77.1% |

1 Reference exchange rate BRL/USD = 5.0654 (PTAX rate of May 15, 2026, pursuant to Art. 163, § 3, I, of Law No. 11.101/2005).

2 Composition of the claims held by the signatory creditor arising from: (i) Bond 1.000% PIK TOGGLE NOTES DUE 2040: US$ 40,328,755 in principal and US$ 156,834 in interest; and (ii) Bond 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029: US$ 327,219,332 in principal and US$ 59,996,074 in

List of Subject Claims held by the Signatory Creditor (Art. 163, § 6, III, LFRE) – List of ZAGOPE SGPS S.A.

POSITION AS OF: 05/18/26

| Signatory Creditor | Origin of Credit | Original Currency | Total Value of Signatory Creditor's Claims - Principal + Interest | | % of Total Claims Subject to Restructuring |
|---|---|---|---|---|---|
| | | | Value in BRL1 | Value in original currency2 | |
| VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA | BOND - 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029 | USD | 200,469,718 | 39,576,286 | 79.2% |
| Total | | | 200,469,718 | 39,576,286 | 79.2% |

1 Reference BRL/USD exchange rate = 5.0654 (PTAX rate of May 15, 2026, pursuant to Art. 163, § 3, I, of Law No. 11.101/2005).

2 The personal guarantee provided by Zagope in connection with the 9,000%/10,500% Senior Secured PIK Toggle Notes due 2029 is limited to US$ 50 million (the amount attributable to the signatory creditor corresponds to US$ 39,576,286).

List of Subject Claims held by the Signatory Creditor (Art. 163, § 6, III, LFRE) – List of INZAG GERMANY GMBH

POSITION AS OF: 05/18/26

| Signatory Creditor | Origin of Credit | Original Currency | Total Value of Signatory Creditor's Claims - Principal + Interest | | % of Total Claims Subject to Proceedings |
|---|---|---|---|---|---|
| | | | Value in BRL1 | Value in original currency2 | |
| VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA | BOND - 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029 | USD | 62,414,626 | 12,321,757 | 79.2% |
| Total | | | 62,414,626 | 12,321,757 | 79.2% |

1 Reference exchange rate BRL/USD = 5.0654 (PTAX rate of May 15, 2026, pursuant to Art. 163, § 3, I, of Law No. 11.101/2005).

2 The personal guarantee provided by Inzag in connection with the 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029, calculated in accordance with the terms of the indenture, is limited to US$ 15,567,095.92 (the amount attributable to the signatory creditor corresponds to US$ 12,321,757.00).

**Schedule III**

**Adhesion Term for Signatory Creditor**

[Page left intentionally blank – Schedule III follows on the next page]

Docusign Envelope ID: 069D096B-A20C-83C7-835F-C505DA224169

**ADHESION TERM OF SIGNATORY CREDITOR**

São Paulo, May 18, 2026

To

Andrade Gutierrez International S.A.

Zagope SGPS, S.A.

Inzag Germany Gmbh

With copy to:

Mattar – Sociedade de Advogados

A/C: Eduardo Augusto Mattar (eamattar@mattar.com.br)

Guilherme Bergamin de Barros (gbarros@mattar.com.br);

Cesar Rizzo (crizzo@mattar.com.br);

Henrique Del Vecchio Rodrigues (hrodrigues@mattar.com.br);

Fernanda Oliveira Alencar (falencar@mattar.com.br); e

Ana Katarina Costa Marques (akmarques@mattar.com.br).

Creditor:

Original document reference:
PRE 2
Translated reference:
ERP 2
**TRANSLATION No.01 BOOK No.375 PAGE No.43**

VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA, a corporation organized under Brazilian law, whose corporate purpose is to carry out securitization transactions, with its head office in the City of São Paulo, State of São Paulo, at Rua Cardeal Arcoverde, No. 2,365, 11th Floor, Pinheiros, ZIP Code 05407-020, enrolled with the Brazilian National Register of Legal Entities (CNPJ/MF) under No. 37.368.334/0001-22 ("Signatory Creditor").

Total amount of Subject Claims against AGINT: R$ 2,166,476,618.00 (two billion, one hundred and sixty-six million, four hundred and seventy-six thousand, six hundred and eighteen reais)

Total amount of Subject Claims against Zagope: R$ 200,469,718.00 (two hundred million, four hundred and sixty-nine thousand, seven hundred and eighteen reais)

Total amount of Subject Claims against Inzag: R$ 62,414,626.00 (sixty-two million, four hundred and fourteen thousand, six hundred and twenty-six reais)

The Signatory Creditor, identified above, in the capacity of holder of Subject Claims held against AGINT, Zagope, and Inzag, by the amount indicated above, hereby represented by its authorized representative, by means of this Adhesion Term, expresses its adhesion to the extrajudicial reorganization plan subscribed by AGINT, Zagope and Inzag, in the capacity as parties, and AGE, AGCS, AGIE, AGPAR and AGSA, in the capacity as intervening parties (the "Plan"), pursuant to, and for all purposes of, Articles 161 et. seq. of Law Nº 11. 101, dated as of February 9, 2005, as amended ("LRF"), serving this Term of Adhesion as its acceptance of the terms and conditions of the Plan.

The Signatory Creditor represents that (i) it has received copy of the Plan, its exhbits and all documents attached thereto; (ii) it is aware of and unreservedly agrees to all sections and conditions set forth in the Plan, its exhbits and all documents attached thereto; (iii) this Adhesion Term was signed by a signatory duly authorized and with powers to perform such act, pursuant to the attached documents; and (iv) it is holder of Subject Claims against AGINT, Zagope and Inzag, pursuant to the attached documents.

This Adhesion Term is executed on an irrevocable and irreversible basis, pursuant to article 161, paragraph 5, of LRF, subject to the provisions of the Plan.

The terms initiated in capital letters not defined hereto have the meaning ascribed to them in the Plan.

In case of conflict between the Portuguese and English version of this Adhesion Term, the Portuguese version will prevail.

(Remainder of page intentionally left blank)

(Signatures page of the Adhesion Term of Signatory Creditor – Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS, S.A. and Inzag Germany Gmbh).

VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA

[digital signature]

Name: Luiz Renan Toffanin Title: Director

**José Roberto Vensan Maramaldo**
Tradutor Público e Intérprete Comercial
Matriculado na Jucesp sob o no. 1092 no idioma inglês
Nomeado através da Portaria 68/2000 de 12/07/2000
R.G.: 17.384.458 - SSP SP
C.P.F.: 181224968-30
C.C.M.: 2.845.542-8
WOODS
BRETTON WOODS
Endereço: The Cittyplex Osasco, Avenida Domingos Odália Filho, 301, Sl R 2015, Osasco, SP, CEP 06010-067
Telefone para contato: (11) 98244-2636 com Robert Chanda, e-mail: chanda@bwoods.com.br

**Schedule IV**

**ADHESION TERM FOR ADHERING CREDITOR**

[Place], [date]

To

Andrade Gutierrez International S.A.

Zagope SGPS, S.A.

Inzag Germany Gmbh

With copy to:

Mattar – Sociedade de Advogados

A/C: Eduardo Augusto Mattar (eamattar@mattaradv.com.br)

Guilherme Bergamin de Barros (gbarros@mattaradv.com.br);

Cesar Rizzo (crizzo@mattaradv.com.br);

Henrique Del VecchioRodrigues (hrodrigues@mattaradv.com.br);

Fernanda Oliveira Alencar (falencar@mattaradv.com.br); e

Ana Katarina Costa Marques (akmarques@mattaradv.com.br).

Creditor:

[name], [state of incorporation]; [address]

(“Adehring Creditor”).

Total amount of Subject Claims against AGINT: R$ [=] (=)

Total amount of Subject Claims against Zagope: R$ [=] (=)

Total amount of Subject Claims against Inzag: R$ [=] (=)

The Adhering Creditor, identified above, in the capacity of holder of Subject Claims held against AGINT, Zagope, and Inzag, by the amount indicated above, hereby represented by its authorized representative, by means of this Adhesion Term, expresses its adhesion to the extrajudicial reorganization plan subscribed by AGINT, Zagope and Inzag, in the capacity as parties, and AGE, AGCS, AGIE, AGPAR and AGSA, in the capacity as intervening parties (the "Plan"), pursuant to, and for all purposes of, Articles 161 et. seq. of Law Nº 11. 101, dated as of February 9, 2005, as amended ("LRF"), serving this Term of Adhesion as its acceptance of the terms and conditions of the Plan.

The Adhering Creditor represents that (i) it has received copy of the Plan, its exhbits and all documents attached thereto; (ii) it is aware of and unreservedly agrees to all sections and conditions set forth in the Plan, its exhbits and all documents attached thereto; (iii) this Adhesion Term was signed by a signatory duly authorized and with powers to perform such act, pursuant to the attached documents; and (iv) it is holder of Subject Claims against AGINT, Zagope and Inzag, pursuant to the attached documents.

This Adhesion Term is executed on an irrevocable and irreversible basis, pursuant to article 161, paragraph 5, of LRF, subject to the provisions of the Plan.

The terms initiated in capital letters not defined hereto have the meaning ascribed to them in the Plan.

In case of conflict between the Portuguese and English version of this Adhesion Term, the Portuguese version will prevail.

(Remainder of page intentionally left blank)

(Signatures page of the Adhesion Term for Adhering Creditor – Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS, S.A. and Inzag Germany Gmbh).

[ADHERING CREDITOR]

Name:

Title:

**Schedule V**

**CERTIFICATE OF HOLDER OF INTERNATIONAL NOTES**

The undersigned hereby represents and warrants, as applicable, that it is (i.a) the holder/beneficial owner of debt securities described below or (i.b) the manager, agent, broker, or advisor for the holder indicated below, which holds the debt securities described below, in accordance with the attached screenshot(s) or broker(s)/custodian(s) certificate(s)/declaration(s), indicating the proof of ownership of said securities, and (ii) duly authorized to deliver this Certificate.

Name of Manager, Agent, Broker or Advisor: [complete if applicable; do not complete if the Certificate is directly signed by the holder/beneficial owner]

Address: [complete if applicable]

E-mail: [complete if applicable]

Name of the Creditor / Beneficial Owner: [complete]

Address: [complete ]

E-mail: [complete]

Total Principal Amount held by Creditor arising from the "9.000%/10.500% Senior Secured PIK Toggle Notes due 2029", issued by Andrade Gutierrez International S.A. and guaranteed by Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A., Andrade Gutierrez Investimentos em Engenharia S.A., Zagope SGPS, S.A. and Inzag Germany Gmbh, due on 2029 ("2029 Notes"):

US$[complete if applicable]

Name of the custodian(s) of the 2029 Notes held by Creditor: [complete if applicable]

Total Principal Amount held by Creditor arising from the "1.000% PIK Toggle Notes due 2040", issued by Andrade Gutierrez International S.A. and guaranteed by Andrade Gutierrez Engenharia S.A., due on 2040 ("2040 Notes"):

US$[complete if applicable]

Name of the custodian(s) of the 2040 Notes held by Creditor: [complete if applicable]

Name of Certificate's signatory: [complete]

Title of Certificate's signatory: [complete if applicable]

Signature of the Certificate's signatory:

Date: [complete]

**SCHEDULE VI**

**OPTION A PAYMENT INSTRUMENT - NOTES TERMS AND CONDITIONS**

The capitalized terms used in this schedule that are not expressly defined herein shall be interpreted in accordance with the respective definitions set forth in the Plan.

This schedule is executed in Portuguese and English versions, and, in the event of any conflict, discrepancy, inconsistency or question of interpretation between such versions, the Portuguese version shall prevail for all purposes.

In the event of any conflict, discrepancy, inconsistency or question of interpretation between any provision of this schedule and any provision of the Plan, the provisions of the Plan shall prevail for all purposes.

Issuer Option A Payment Instrument - Notes will be issued by AGINT.

Instrument Option A Payment Instrument - Notes, denominated in Dollar, shall be issued under certain indenture governed by the Laws of the State of New York, United States of America, which shall reflect the terms and conditions set forth in this Schedule VI, as well as in this Plan and Plan 1.

Guarantees Option A Payment Instrument - Notes will be guaranteed by AGE, AGIE, AGCS, AGPAR and AGSA, governed by the Laws of the State of New York, United States of America, and in accordance with the provisions of the Plan.

Collateral Option A Payment Instrument - Notes will be secured by a fiduciary lien, governed by Brazilian law, on the shares issued by AGE and a first lien pledge, governed by German law, on the shares issued by Inzag.

Total Issuance Amount The total issuance amount of the Option A Payment Instrument - Notes shall correspond to (i) thirty-six percent (36%) of the value of the Subject Claims held by the Option A Creditors that comply with Section 5.2.1. of the Plan and Section 5.5.2 of the Plan 1, as well as other applicable provisions, plus applicable interest pursuant to Section 5.4, item "(ii)" of the Plan and Section 5.4, item "(ii)" of the Plan 1 accruing from the Confirmation Date until the issuance date of the Option A Payment Instrument - Notes; in addition to (ii) thirty-one percent (31%) of the value of Subject Claims held by Option C Creditors that comply with Section 7.5.1 of the Plan and Section 7.5.2 of the Plan 1, as well as other applicable provisions, plus applicable interest pursuant to Section 7.4.1, item "(ii)" of the Plan and Section 7.4.1, item "(ii)" of the Plan 1 accruing from the Confirmation Date until the issuance date of the Option A Payment Instrument - Notes. For the avoidance of doubt, (a) the amount of Option A Claims to be received by each Option A Creditor, pursuant to this Plan and, as applicable, pursuant to Plan 1, shall be subject to Sections 11.5 et. seq. of the Plan and Plan 1, meaning that, under no circumstances, the respective Option A Creditor shall receive in duplication the amount of its Option A Claim; and (b) the amount of Option C – Tranche A Claims to be received by each Option C Creditor, pursuant to this Plan and the Plan 1, shall be subject to Sections 11.5 et. seq. of the Plan and Plan 1, meaning that, under no circumstances, the respective Option C Creditor shall receive in duplication the amount of its Option C – Tranche A Claim.

Currency Option A Payment Instrument - Notes will be issued in USD.

Maturity Date Option A Payment Instrument - Notes shall mature on December 28, 2040.

Adjustment and Interest

- Option A Payment Instrument - Notes will not be subject to adjustment for inflation.

- Interest shall accrue on the Option A Payment Instrument - Notes at a rate of six percent (6.00%) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the issuance date of the Option A Payment Instrument - Notes until December 28, 2040.

Interest Payment Date (a) from the issuance date of the Option A Payment Instrument - Notes until immediately prior to December 28, 2030, the interest accrued during such period shall be capitalized into the principal amount; and (b) from December 28, 2030 until December 28, 2040, the interest accrued during such period shall be payable in cash on a semiannual basis, on June 28 and December 28 of each year, with the first interest payment date being June 28, 2031.

Amortization The principal amount of the Option A Payment Instrument - Notes, including the interest accrued and capitalized into the principal amount, shall be amortized, in cash, in six annual installments to be paid on December 28, 2035, December 28, 2036, December 28, 2037, December 28, 2038, December 28, 2039, and December 28, 2040, in amounts corresponding to 16.667%, 20%, 25%, 33.333%, 50% and 100% of the principal outstanding balance on each respective payment date.

Securities held by the Issuer, Guarantors or Affiliates The issuer may cancel, partially or in full, at any time and at its sole discretion, the Option A Payment Instrument – Notes held by the issuer, guarantor or any entity controlling, controlled by, or under common control with any issuer and/or guarantor.

Governing Law Option A Payment Instrument - Notes will be governed by the Laws of the State of New York, United States of America.

Distribution and Clearing Issuer will use commercially reasonable efforts to make the Option A

Payment Instrument - Notes eligible for deposit on the DTC system from the issue date.

Amendments The Option A Payment Instrument - Notes may be amended with the consent of holders holding the majority of the outstanding aggregate principal amount of the Option A Payment Instrument – Notes and Option B Payment Instrument – Notes (determined on an aggregate basis only).

For illustrative purposes, the following matters will be decided through consent of holders holding the majority of the outstanding aggregate principal amount of the Option A Payment Instrument – Notes and Option B Payment Instrument – Notes (determined on an aggregate basis):

- Removal of covenants and events of default;

- Change provisions that would affect the holders' rights in connection with the guarantees and collateral granted to the Option A Payment Instrument – Notes, including to release or extinguish any of these guarantees and collateral

Consent of holders holding 2/3 of the outstanding aggregate principal amount of the Option A Payment Instrument – Notes and Option B Payment Instrument – Notes (determined on an aggregate basis only), shall be required to:

- Change any principal or interest payment date;
- Reduce the interest rate;
- Change the place of payment;
- Change provisions of the indenture affecting the ranking of the Option A Payment Instrument – Notes; and
- Change the required quorum to approve the matters listed above.

The replacement of the trustee of the Option A Payment Instrument – Notes shall require consent of the issuer and guarantors of the Option A Payment Instrument – Notes.

Covenants

- Obligation of the issuer and guarantors to pay, duly and on a timely basis, principal and interest on the Option A Payment Instrument - Notes, according to the Plan, Plan 1 and respective indenture;
- Obligation to preserve corporate existence, subject to eventual exceptions authorized by applicable law and indenture of the Option A Payment Instrument – Notes, including, but not limited to, the possibility of replacing the issuer or conducting corporate reorganizations involving the issuer and guarantors;
- Obligation to appoint a trustee and eventually replace it pursuant to the provisions of the indenture of the Option A Payment Instrument – Notes;
- Obligation to maintain the ranking of the Option A Payment Instrument - Notes, including with respect to all of the issuer's and guarantors' existing and future obligations;
- Obligation to maintain the validity and effectiveness of the indenture of the Option A Payment Instrument - Notes and the guarantees and collateral, subject to eventual exceptions provided for in the Plan, Plan 1 and indenture of the Option A Payment Instrument – Notes;
- Obligation of the issuer and guarantors to comply with laws; and
- Obligation of the issuer and guarantors to maintain accounting and administrative records.

Events of Default

- Failure to pay principal or interest following the expiration of a 60-Calendar Day deadline counted from the date on which the corresponding obligation to pay principal or interest becomes due and payable; being understood that holders holding the majority of the outstanding aggregate principal amount of the Option A Payment Instrument – Notes and Option B Payment Instrument – Notes (determined on an aggregate basis only), may grant cure period of 180 Calendar Days, that may be extended; and
- Default in the performance, or breach, of the indenture covenants, as long as a such default or breach is not cured for a period of 60 consecutive Calendar Days after written notice specifying such default or breach is given to the issuer and guarantors by the trustee or by holders holding at least the majority of the outstanding aggregate

principal amount of the Option A Payment Instrument – Notes and Option B Payment Instrument – Notes (determined on an aggregate basis only).

The Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes may be issued under the same indenture pursuant to supplement indentures and would be referred to as Series A Notes and Series B Notes, respectively.

## SCHEDULE VII

## OPTION B PAYMENT INSTRUMENT - NOTES TERMS AND CONDITIONS

The capitalized terms used in this schedule that are not expressly defined herein shall be interpreted in accordance with the respective definitions set forth in the Plan.

This schedule is executed in Portuguese and English versions, and, in the event of any conflict, discrepancy, inconsistency or question of interpretation between such versions, the Portuguese version shall prevail for all purposes.

In the event of any conflict, discrepancy, inconsistency or question of interpretation between any provision of this schedule and any provision of the Plan, the provisions of the Plan shall prevail for all purposes.

Issuer Option B Payment Instrument - Notes will be issued by AGINT.

Instrument Option B Payment Instrument - Notes, denominated in Dollar, shall be issued under certain indenture governed by the Laws of the State of New York, United States of America, which shall reflect the terms and conditions set forth in this Schedule VII, as well as in this Plan and Plan 1.

Guarantees Option B Payment Instrument - Notes will be guaranteed by AGE, AGIE, AGCS, AGPAR and AGSA, governed by the Laws of the State of New York, United States of America, and in accordance with the provisions of the Plan.

Collateral Option B Payment Instrument - Notes will be secured by a fiduciary lien, governed by Brazilian law, and granted on a conditional basis, over the shares issued by AGE and a second lien pledge, governed by German law, on the shares issued by Inzag.

Total Issuance Amount The total issuance amount of the Option B Payment Instrument - Notes shall correspond to (i) one hundred percent (100%) of the value of the Subject Claims held by the Option B Creditors that comply with Section 6.5.1 of the Plan and Section 6.5.2 of the Plan 1, as well as other applicable provisions, plus the interest applicable pursuant to Section 6.4, item "(ii)" of the Plan and Section 6.4, item "(ii)" of the Plan 1 and accruing from the Confirmation Date until the issuance date of the Option B Payment Instrument - Notes; in addition to (ii) sixty-nine percent (69%) of the value of Subject Claims held by Option C Creditors that comply with Section 7.5.1 of the Plan and Section 7.5.2 of the Plan 1, as well as other applicable provisions, plus the interest applicable pursuant to Section 7.4.2, item "(ii)" of the Plan and Section 7.4.2, item "(ii)" of the Plan 1 and accruing from the Confirmation Date until the issuance date of the Option B Payment Instrument - Notes. For the avoidance of doubt, (a) the amount of Option B Claims to be received by each Option B Creditor, pursuant to this Plan and, as applicable, pursuant to the Plan 1, shall be subject to Sections 11.5 et. seq. of the Plan and the Plan 1, meaning that, under no circumstances, the respective Option B Creditor shall receive in duplication the amount of its Option B Claim; and (b) the amount of Option C – Tranche B Claims to be received by each Option C Creditor, pursuant to this Plan and, as applicable, pursuant to the Plan 1, shall be subject to Sections 11.5 et. seq. of the Plan, meaning that, under

no circumstances, the respective Option C Creditor shall receive in duplication the amount of its Option C – Tranche B Claim.

Currency Option B Payment Instrument - Notes will be issued in USD.

Maturity Date Option B Payment Instrument - Notes shall mature on December 28, 2070.

Adjustment and Interest

- Option B Payment Instrument - Notes will not be subject to adjustment for inflation.

- Interest shall accrue on the Option B Payment Instrument - Notes at a rate of one percent (1.00%) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the issuance date of the Option B Payment Instrument - Notes until December 28, 2070.

Interest Payment Date The interest of the Option B Payment Instrument - Notes shall be capitalized into the principal and paid in a single installment on December 28, 2070.

Amortization The principal amount on the Option B Payment Instrument – Notes, including the interest accrued and capitalized into the principal, shall be amortized in a single installment on December 28, 2070.

Early Redemption With Discount The Option B Payment Instrument - Notes may, as of January 1st, 2035 and until June 28, 2070, at the sole discretion of the issuer and guarantors, be redeemed in advance, partially or in full, with the application of a discount equivalent to 90% of the value of the Option B Payment Instrument – Notes that is being redeemed, as duly adjusted until the maturity date of the Option B Payment Instrument - Notes. For the avoidance of doubt, upon payment of an amount equivalent to 10% of the Option B Payment Instrument – Notes that is being redeemed, as duly adjusted until the maturity date of the Option B Payment Instrument - Notes, the Option B Payment Instrument - Notes held by the respective Option B Creditors and/or Option C Creditors shall be deemed fully settled and discharged for all legal purposes.

Securities held by the Issuer, Guarantors or Affiliates The issuer may cancel, partially or in full, at any time and at its sole discretion, the Option B Payment Instrument – Notes held by the issuer, guarantor or any entity controlling, controlled by, or under common control with any issuer and/or guarantor.

Governing Law Option B Payment Instrument - Notes will be governed by the Laws of the State of New York, United States of America.

Distribution and Clearing Issuer will use commercially reasonable efforts to make the Option B Payment Instrument - Notes eligible for deposit on the DTC system from the issue date.

Amendments The Option B Payment Instrument - Notes may be amended with the consent of holders holding the majority of the outstanding aggregate principal amount of the Option B Payment Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis only).

For illustrative purposes, the following matters will be decided through consent of holders holding the majority of the outstanding aggregate principal amount of the Option B Payment Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis):

- Removal of covenants and events of default;
- Change provisions that would affect the holders' rights in connection with the guarantees and collateral granted to the Option B Payment Instrument – Notes, including to release or extinguish any of these guarantees and collateral

Consent of holders holding 2/3 of the outstanding aggregate principal amount of the Option B Payment Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis only), shall be required to:

- Change any principal or interest payment date;
- Reduce the interest rate;
- Change the place of payment;
- Change provisions of the indenture affecting the ranking of the Option B Payment Instrument – Notes; and
- Change the required quorum to approve the matters listed above.

The replacement of the trustee of the Option B Payment Instrument – Notes shall require consent of the issuer and guarantors of the Option B Payment Instrument – Notes.

Covenants

- Obligation of the issuer and guarantors to pay, duly and on a timely basis, principal and interest on the Option B Payment Instrument - Notes, according to the Plan, Plan 1 and respective indenture;
- Obligation to preserve corporate existence, subject to eventual exceptions authorized by applicable law and indenture of the Option B Payment Instrument – Notes, including, but not limited to, the possibility of replacing the issuer or conducting corporate reorganizations involving the issuer and guarantors;
- Obligation to appoint a trustee and eventually replace it pursuant to the provisions of the indenture of the Option B Payment Instrument – Notes;
- Obligation to maintain the ranking of the Option B Payment Instrument - Notes, including with respect to all of the issuer's and guarantors' existing and future obligations;
- Obligation to maintain the validity and effectiveness of the indenture of the Option B Payment Instrument - Notes and the guarantees and collateral, subject to eventual exceptions provided for in the Plan, Plan 1 and indenture of the Option B Payment Instrument – Notes;
- Obligation of the issuer and guarantors to comply with laws; and
- Obligation of the issuer and guarantors to maintain accounting and administrative records.

Events of Default

- Failure to pay principal or interest following the expiration of a 60-Calendar Day deadline counted from the date on which the corresponding obligation to pay principal or interest becomes due and payable; being understood that holders holding the majority of the outstanding aggregate principal amount of the Option B Payment

Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis only), may grant cure period of 180 Calendar Days, that may be extended; and

- Default in the performance, or breach, of the indenture covenants, as long as a such default or breach is not cured for a period of 60 consecutive Calendar Days after written notice specifying such default or breach is given to the issuer and guarantors by the trustee or by holders holding at least the majority of the outstanding aggregate principal amount of the Option B Payment Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis only).

The Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes may be issued under the same indenture pursuant to supplement indentures and would be referred to as Series A Notes and Series B Notes, respectively.

---

This is what was to be translated on the original document, according to my best understanding, which amounted to 55 electronic page equivalents which I have reviewed, found true and correct, and sign below:

Emoluments: R$ 1262.52
Receipt Book No.:02 Receipt No.:3764
São Paulo, August 18, 2026

JOSE ROBERTO VENSAN MARAMALDO:18122496830 Digitally signed by JOSE ROBERTO VENSAN MARAMALDO:18122496830
Date: 2026.08.27 16:05:42 -03'00'

José Roberto Vensan Maramaldo

‘

| | |
|---|---|
| **PLANO DE RECUPERAÇÃO EXTRAJUDICIAL** | **EXTRAJUDICIAL REORGANIZATION PLAN** |
| apresentado por | presented by |
| **Andrade Gutierrez International S.A.** | **Andrade Gutierrez International S.A.** |
| **Zagope SGPS, S.A.** | **Zagope SGPS, S.A.** |
| **Inzag Germany GmbH** | **Inzag Germany GmbH** |
| tendo como intervenientes anuentes, | as intervening parties, |
| **Andrade Gutierrez Engenharia S.A.** | **Andrade Gutierrez Engenharia S.A.** |
| **Andrade Gutierrez Construções e Serviços S.A.** | **Andrade Gutierrez Construções e Serviços S.A.** |
| **Andrade Gutierrez Investimentos em Engenharia S.A.** | **Andrade Gutierrez Investimentos em Engenharia S.A.** |
| **Andrade Gutierrez S.A.** | **Andrade Gutierrez S.A.** |
| **Andrade Gutierrez Participações S.A.** | **Andrade Gutierrez Participações S.A.** |
| e com a adesão e aprovação do | and with the adhesion and approval of the |
| **Credor Signatário** | **Signatory Creditor** |
| *(conforme definidos a seguir)* | *(as defined below)* |
| **18 de maio de 2026** | **May 18, 2026** |

| PLANO DE RECUPERAÇÃO EXTRAJUDICIAL | EXTRAJUDICIAL REORGANIZATION PLAN |
|---|---|
| Este Plano, datado de 18 de maio de 2026, é apresentado para homologação judicial, em conjunto, por: | This Plan, dated May 18, 2026, is submitted for judicial confirmation, jointly, by: |
| **(I) ANDRADE GUTIERREZ INTERNATIONAL S.A.**, sociedade anônima de capital fechado, constituída e organizada de acordo com as leis do Grão-Ducado de Luxemburgo, inscrita no Registro de Comércio de Luxemburgo sob o n.º B 176492, com endereço em Boulevard Grande-Duchese Charlotte, 65, L1331, Luxemburgo ("AGINT"); | **(I) ANDRADE GUTIERREZ INTERNATIONAL S.A.,** a privately held company, incorporated and organized in accordance with the laws of the Grand Duchy of Luxembourg, registered with the Luxembourg Trade Register under No. B 176492, with address at 65, Boulevard Grande-Duchese Charlotte, L1331, Luxembourg ("AGINT"); |
| **(II) ZAGOPE SGPS S.A.**, sociedade anônima de capital fechado, constituída e organizada segundo as leis da República Portuguesa, registrada sob o NIF n.º 507403177, com sede no Lagoas Park, edifício 6, piso 1, 2740-244, Porto Salvo, Oeiras, Portugal ("Zagope"); e | **(II) ZAGOPE SGPS S.A.**, a privately held company, incorporated and organized under the laws of the Portuguese Republic, registered under NIF No. 507403177, with headquarters at Lagoas Park, building 6, 1st floor, 2740-244, Porto Salvo, Oeiras, Portugal ("Zagope"); and |
| **(III) INZAG GERMANY GMBH**, sociedade limitada, constituída e organizada segundo as leis da República Federal da Alemanha, com sede em Taunusstraße 5, 65183, Wiesbaden, Alemanha ("Inzag" e, em conjunto com AGINT e Zagope, "Requerentes"). | **(III) INZAG GERMANY GMBH**, a limited liability company, incorporated and organized under the laws of the Federal Republic of Germany, with headquarters at Taunusstraße 5, 65183, Wiesbaden, Germany ("Inzag" and, together with AGINT and Zagope, "Debtors"). |
| E conta com as assinaturas, como intervenientes anuentes, de: | And it is signed, as consenting intervening parties, by: |

| | |
|---|---|
| **(IV) ANDRADE GUTIERREZ ENGENHARIA S.A.,** sociedade anônima de capital fechado, constituída e organizada segundo as leis da República Federativa do Brasil, inscrita no CNPJ/MF sob o n.º 17.262.213/0001-94, com sede na Avenida do Contorno, n.º 8.123, Cidade Jardim, Belo Horizonte/MG, CEP 30.110-937 ("AGE"); | **(IV) ANDRADE GUTIERREZ ENGENHARIA S.A.**, a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 17.262.213/0001-94, with its headquarters at Avenida do Contorno, No. 8,123, Cidade Jardim, Belo Horizonte/MG, CEP 30.110-937 ("AGE"); |
| **(V) ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A.** (anteriormente denominada AG Construções e Serviços S.A.), sociedade anônima de capital fechado, constituída e organizada segundo as leis da República Federativa do Brasil, inscrita no CNPJ/MF sob o n.º 39.469.291/0001-05, com sede Avenida do Contorno, n.º 8.269, Sala 300 A1, Gutierrez, Belo Horizonte/MG, CEP 30.110-059 ("AGCS"); | **(V) ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A.** (formerly known as AG Construções e Serviços S.A.), a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 39.469.291/0001-05, with headquarters at Avenida do Contorno, No. 8.269, Room 300 A1, Gutierrez, Belo Horizonte/MG, CEP 30.110-059 ("AGCS"); |
| **(VI) ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A.**, sociedade anônima de capital fechado, constituída e organizada segundo as leis da República Federativa do Brasil, inscrita no CNPJ/MF sob o n.º 17.027.611/0001-26, com sede na Avenida do Contorno, n.º 8.269, Sala 004, Gutierrez, Belo Horizonte/MG, CEP 30.110-059 ("AGIE"); | **(VI) ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A.**, a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 17.027.611/0001-26, headquartered at Avenida do Contorno, No. 8.269, Sala 004, Belo Horizonte/MG, CEP 30.110-059 ("AGIE"); |

| | |
|---|---|
| **(VII) ANDRADE GUTIERREZ S.A.**, sociedade anônima de capital fechado, constituída e organizada segundo as leis da República Federativa do Brasil, inscrita no CNPJ/MF sob o n.° 17.262.213/0001-94, com sede na Avenida do Contorno, nº 8123, Cidade Jardim, Belo Horizonte/MG, CEP 30110-937 ("AGSA"); e | **(VII) ANDRADE GUTIERREZ S.A.**, a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 17.262.213/0001-94, with headquarters at Avenida do Contorno, No. 8123, Cidade Jardim, Belo Horizonte/MG, CEP 30110-937 ("AGSA"); and |
| **(VIII) ANDRADE GUTIERREZ PARTICIPAÇÕES S.A.**, sociedade anônima de capital fechado, constituída e organizada segundo as leis da República Federativa do Brasil, inscrita no CNPJ/MF sob o n.° 04.031.960/0001-70, com sede na Avenida do Contorno, nº 8123, Cidade Jardim, Belo Horizonte/MG, CEP 30110-937("AGPAR" e, em conjunto com AGE, AGIE e AGCS, as "Intervenientes Anuentes"). | **(VIII) ANDRADE GUTIERREZ PARTICIPAÇÕES S.A** a privately held company, incorporated and organized under the laws of the Federative Republic of Brazil, enrolled with the CNPJ/MF under No. 04.031.960/0001-70, with headquarters at Avenida do Contorno, No. 8123, Cidade Jardim, Belo Horizonte/MG, CEP 30110-937 ("AGPAR" and, together with AGE, AGIE and AGCS, the "Intervening Parties"). |
| **Considerando que**: | **Whereas**: |
| **(i)** as Requerentes integram o ramo do grupo Andrade Gutierrez que atua nos setores de engenharia e construção civil, que vem prestando serviços para clientes públicos e privados há quase 80 anos; | **(i)** the Debtors are part of the branch of the Andrade Gutierrez group that operates in the engineering and civil construction sectors, providing services to public and private clients for almost 80 years; |
| **(ii)** dada a natureza dos segmentos de sua atuação, as Requerentes captaram vultosos recursos financeiros, inclusive no mercado de capitais internacional, com o propósito de viabilizar a manutenção e expansão de suas atividades; | **(ii)** given the nature of their business segments, the Debtors raised substantial financial resources, including in the international capital markets, to enable the maintenance and expansion of their activities; |

| | | |
|---|---|---|
| **(iii)** em razão de certas adversidades macroeconômicas, a AGINT, a Zagope, a AGE, a AGCS e a AGIE apresentaram, em 29 de setembro de 2022, o pedido de homologação de plano de recuperação extrajudicial ("PRE 2022"), que tramitou sob o n.º 5209787-06.2022.8.13.0024, perante a 1ª Vara Empresarial da Comarca de Belo Horizonte/MG ("Recuperação Extrajudicial 2022"), para reestruturar parcela relevante de seu passivo financeiro, no valor de R$2.358.784.316,04 (dois bilhões trezentos e cinquenta e oito milhões setecentos e oitenta e quatro mil trezentos e dezesseis reais e quatro centavos), decorrente das denominadas ***(a)*** "11.000% Senior Secured PIK Toggle Notes due 2021", emitidas em 20 de agosto de 2018 ("Notas Internacionais 2021"), e ***(b)*** "9.500% Senior Secured Notes due 2024", emitidas em 9 dezembro de 2019 ("Notas Internacionais 2024"); | | **(iii)** due to certain macroeconomic adversities, the AGINT, Zagope, AGE, AGCS and AGIE filed, on September 29, 2022, the request for judicial confirmation of an extrajudicial reorganization plan ("2022 Plan"), which was processed under No. 5209787-06.2022.8.13.0024 before the 1st Business Court of the District of Belo Horizonte/MG (*1ª Vara Empresarial da Comarca de Belo Horizonte/MG*) ("2022 Extrajudicial Reorganization"), to restructure a relevant portion of their financial indebtedness, in the amount of R$2,358,784,316.04 (two billion, three hundred and fifty-eight million, seven hundred and eighty-four thousand, three hundred and sixteen reais and four centavos), arising from the so-called ***(a)*** "11.000% Senior Secured PIK Toggle Notes due 2021", issued on August 20, 2018 ("2021 International Notes"), and ***(b)*** "9.500% Senior Secured Notes due 2024", issued on December 9, 2019 ("2024 International Notes"); |
| **(iv)** em 29 de novembro de 2022, o PRE 2022 foi homologado por meio de sentença disponibilizada no Diário do Judiciário Eletrônico do Tribunal de Justiça de Minas Gerais, tendo sido posteriormente objeto de decisão proferida em 2 de dezembro de 2022 pelo juízo do Distrito Sul de Nova Iorque, da Corte de Insolvência dos Estados Unidos da América, concedendo plenos efeitos ao PRE 2022 na jurisdição dos Estados Unidos da América, o que resultou no cancelamento e na substituição das Notas Internacionais 2021 e Notas Internacionais 2024 pelas ***(a)*** "*9.000%/10.500% Senior Secured PIK Toggle Notes due 2029*", emitidas nos termos da escritura de emissão datada | | **(iv)** on November 29, 2022, the 2022 Plan was confirmed by means of a court order made available in the Electronic Gazette of the Court of Justice of the State of Minas Gerais, having been subsequently the subject of a decision rendered on December 2, 2022 by the United States Bankruptcy Court for the Southern District of New York, granting full effect to the 2022 Plan within the jurisdiction of the United States of America, which resulted in the cancellation and replacement of the 2021 International Notes and the 2024 International Notes by ***(a)*** "9.000%/10.500% Senior Secured PIK Toggle Notes due 2029", issued pursuant to the indenture dated December |

| | |
|---|---|
| de 21 de dezembro de 2022 e aditada em 24 de agosto de 2023, celebrada entre a AGINT, na qualidade de emissora e devedora principal, a AGE, AGIE, AGCS, Zagope e Inzag, na qualidade de garantidoras, o Wilmington Savings Fund Society, FSB ("Wilmington"), na qualidade de trustee, e TMF Brasil Administração e Gestão de Ativos Ltda. ("TMF"), na qualidade de agente de garantia local ("Notas Internacionais 2029"), e ***(b)*** "*1.000% PIK Toggle Notes due 2040*", emitidas nos termos da escritura de emissão datada de 21 de dezembro de 2022 celebrada entre a AGINT, na qualidade de emissora e devedora principal, a AGE na qualidade de garantidora, o Wilmington, na qualidade de trustee, e TMF, na qualidade de agente de garantia local ("Notas Internacionais 2040" e, em conjunto com as Notas Internacionais 2029, as "Notas Internacionais Existentes"); | 21, 2022, and amended on August 24, 2023, entered into among AGINT, as issuer and principal debtor, AGE, AGIE, AGCS, Zagope and Inzag, as guarantors, Wilmington Savings Fund Society, FSB ("Wilmington"), as trustee, and TMF Brasil Administração e Gestão de Ativos Ltda. ("TMF"), as local collateral agent ("2029 International Notes"), and ***(b)*** "1.000% PIK Toggle Notes due 2040", issued pursuant to the indenture dated December 21, 2022 entered into among AGINT, as issuer and principal debtor, AGE as guarantor, Wilmington, as trustee, and TMF, as local collateral agent ("2040 International Notes" and, together with the 2029 International Notes, the "International Existing Notes"); |
| **(v)** apesar de a Recuperação Extrajudicial 2022 ter sido um passo importante na readequação da estrutura de capital do grupo Andrade Gutierrez, sobrevieram, desde então, novos obstáculos, consistentes, a título exemplificativo, na ***(a)*** paralisação e postergação de obras relevantes, por fatores alheios ao grupo Andrade Gutierrez, abrangendo aproximadamente 47% da carteira de projetos, na data-base de dezembro de 2024, o que impactou de forma substancial o fluxo de caixa da Inzag, da Zagope, da AGE, da AGCS e da AGIE ao longo dos últimos anos; e ***(b)*** forte valorização acumulada do dólar dos Estados Unidos da América ao longo de 2024, que elevou expressivamente o custo das dívidas em moeda estrangeira, resultando no inadimplemento, em | **(v)** despite the 2022 Extrajudicial Reorganization having been an important step in reprofiling the Andrade Gutierrez group's capital structure, new hindrances have since arisen, consisting, by way of example, of the ***(a)*** the suspension and postponement of relevant projects due to factors beyond the Andrade Gutierrez group's control, affecting approximately 47% of its project portfolio, as of the December/24 reference date, which has substantially impacted the cash flow of Inzag, Zagope, AGE, AGCS and AGIE over the past years; and ***(b)*** the substantive appreciation of the U.S. dollar throughout 2024, which significantly increased the cost of foreign currency indebtedness, resulting in the default, in December 2024, of the interest installment under |

| | |
|---|---|
| dezembro de 2024, da parcela de juros das Notas Internacionais 2029, em um contexto de câmbio superior a R$6,00 por US$1,00; | the 2029 International Notes, in a context of an exchange rates exceeding R$6.00 per dollar; |
| **(vi)** em razão desse cenário macro e microeconômico desafiador, as Requerentes foram levadas a inadimplir certas dívidas relevantes, como as Notas Internacionais 2029, no valor agregado de R$ 2.478.000.246,94 (dois bilhões quatrocentos e setenta e oito milhões duzentos e quarenta e seis reais e noventa e quatro centavos), conforme apurado na Data do Pedido, devidas pelas Requerentes e AGE, AGCS e AGIE; | **(vi)** due to this challenging macroeconomic and microeconomic environment, the Debtors were led to default certain obligations, having defaulted on material debts, such as the 2029 International Notes, in the aggregate amount of R$ 2,478,000,246.94 (two billion four hundred and seventy-eight million two hundred and forty-six reais and ninety-four centavos), as determined on the Filing Date, owed by the Debtors together with AGE, AGCS and AGIE; |
| **(vii)** nesse contexto, as Requerentes ajuízam a presente Recuperação Extrajudicial e apresentam este Plano com o objetivo de reestruturar os créditos decorrentes do saldo em aberto das Notas Internacionais Existentes devidos pelas Requerentes, conforme definidos neste Plano e indicados no **Anexo I**, permitindo a readequação da sua estrutura de capital, de modo a otimizar e impulsionar o desenvolvimento de suas atividades operacionais; | **(vii)** in this context, the Debtors file the present Extrajudicial Reorganization and submit this Plan with the purpose of restructuring the claims arising from the outstanding balance of the International Existing Notes owed by the Debtors, as defined in this Plan and set forth in **Schedule I**, thereby enabling the readjustment of their capital structure in order to optimize and foster the development of their operational activities; |
| **(viii)** as Requerentes ajuízam a presente Recuperação Extrajudicial em litisconsórcio ativo, nos termos do artigo 113, I e III do CPC (conforme definido abaixo) e 189 da LRF (conforme definido abaixo), bem como em consolidação processual, nos termos dos artigos 69-G a 69-I da LRF, tendo este Plano único apresentado pelas Requerentes sido aprovado pelo quórum mínimo de aprovação | **(viii)** the Debtors file the present Extrajudicial Reorganization in active joinder, pursuant to article 113, I and III of the Brazilian Code of Civil Procedure (as defined below) and 189 of the Brazilian Bankruptcy Act (as defined below) as well as under procedural consolidation, pursuant to articles 69-G to 69-I of the Brazilian Bankruptcy Act, with this single Plan submitted by the Debtors |

| | | |
|---|---|---|
| exigido pelo artigo 163 da LRF, apurado de forma individual em relação aos credores de cada uma das Requerentes, nos termos do artigo 69-I, §§2º e 3º da LRF, de modo a impositivamente vincular todos os Créditos Sujeitos (conforme definidos abaixo) aos termos e condições deste Plano; | | having been approved by the minimum approval quorum required under article 163 of the Brazilian Bankruptcy Act, calculated individually in relation to the creditors of each of the Debtors, pursuant to article 69-I, second and third paragraphs, of the Brazilian Bankruptcy Act, so as to mandatorily bind all Subject Claims (as defined below) to the terms and conditions of this Plan; |
| **(ix)** as Requerentes e a AGE, a AGCS e a AGIE (em conjunto, as "Requerentes do Plano 1"), apesar de serem sociedades independentes, com personalidades jurídicas, direitos e obrigações próprias, e terem autonomia patrimonial e comercial para conduzir suas atividades, são integrantes de um mesmo grupo econômico e parcialmente coobrigadas, conforme aplicável, por certas dívidas a serem reestruturadas no âmbito desta Recuperação Extrajudicial; | | **(ix)** the Debtors and AGE, AGCS and AGIE (jointly, the "Plan 1 Debtors"), although being independent companies, with separate legal personalities, rights and obligations of their own, and having financial and commercial autonomy to conduct their activities, are part of the same economic group and are partially co-obligated, as applicable, for certain debts to be restructured within the scope of this Extrajudicial Reorganization; |
| **(x)** paralelamente ao Plano apresentado pelas Requerentes, as Requerentes do Plano 1, em litisconsórcio ativo e consolidação processual com as Requerentes, apresentaram plano de recuperação extrajudicial próprio, para reestruturar certos créditos quirografários ("Plano 1"), conforme definido nos termos do Plano 1, considerando as suas respectivas dívidas, motivo pelo qual ajuízam esta Recuperação Extrajudicial em conjunto, com o objetivo de viabilizar a implementação de uma solução estruturada e coordenada para os seus respectivos endividamentos. | | **(x)** in parallel with the Plan submitted by the Debtors, the Plan 1 Debtors, in active joinder and procedural consolidation with the Debtors, have submitted their own extrajudicial reorganization plan, to restructure certain unsecured claims ("Plan 1"), as defined under Plan 1, considering their respective indebtedness, and therefore file this Extrajudicial Reorganization jointly, with the purpose of enabling the implementation of a structured and coordinated solution for their respective indebtedness. |

| | |
|---|---|
| As Requerentes, observados os termos e condições adiante expostos, submetem o presente Plano à homologação judicial, com o consentimento e adesão do **CREDOR SIGNATÁRIO**, titular de ***(i)*** 77,1% dos Créditos Sujeitos devidos pela AGINT; ***(ii)*** 79,2% dos Créditos Sujeitos devidos pela Zagope; e ***(iii)*** 79,2% dos Créditos Sujeitos devidos pela Inzag, conforme indicado no **Anexo II,** para que produza efeitos com relação às Requerentes, à AGE, AGCS, AGIE, AGPAR e AGSA, conforme aplicável, e aos Credores Sujeitos na forma da lei. | The Debtors, subject to the terms and conditions set forth below, hereby submit this Plan for judicial confirmation, with the consent and adherence of the **SIGNATORY CREDITOR**, holder of ***(i)*** 77.1% of the Subject Claims owed by AGINT; ***(ii)*** 79.2% of the Subject Claims owed by Zagope; and ***(iii)*** 79.2% of the Subject Claims owed by Inzag, as indicated in **Schedule II**, so that it may produce effects with respect to the Debtors, AGE, AGCS, AGIE, AGPAR and AGSA, as applicable, and the Subject Creditors in accordance with the law. |
| **PARTE I – INTERPRETAÇÃO E DEFINIÇÕES** | **PART I - INTERPRETATION AND DEFINITIONS** |
| **1. DEFINIÇÕES** | **1. DEFINITIONS** |
| **1.1.** Definições. Os termos definidos referenciados neste Plano, iniciados por letra maiúscula e listados abaixo, serão usados, conforme apropriado, na sua forma singular ou plural, no gênero masculino ou feminino, sem que, com isso, percam o significado que lhes é atribuído. | **1.1.** Definitions. The defined terms referenced in this Plan, capitalized and listed below, shall be used, as applicable, in their singular or plural form, and in the masculine or feminine gender, without thereby altering the meaning assigned to them. |
| **1.1.1.** "AGCS": tem o significado atribuído no Preâmbulo deste Plano. | **1.1.1.** "AGCS": has the meaning assigned in the Preamble of this Plan. |
| **1.1.2.** "AGE": tem o significado atribuído no Preâmbulo deste Plano. | **1.1.2.** "AGE": has the meaning assigned in the Preamble of this Plan. |
| **1.1.3.** "AGIE": tem o significado atribuído no Preâmbulo deste Plano. | **1.1.3.** "AGIE": has the meaning assigned in the Preamble of this Plan. |

| | |
|---|---|
| **1.1.4.** "AGINT": tem o significado atribuído no Preâmbulo deste Plano. | **1.1.4.** "AGINT": has the meaning assigned in the Preamble of this Plan. |
| **1.1.5.** "AGPAR": tem o significado atribuído no Preâmbulo deste Plano. | **1.1.5.** "AGPAR": has the meaning assigned in the Preamble of this Plan. |
| **1.1.6.** "AGSA": tem o significado atribuído no Preâmbulo deste Plano. | **1.1.6.** "AGSA": has the meaning assigned in the Preamble of this Plan. |
| **1.1.7.** "Anexos": significa os anexos deste Plano. | **1.1.7.** "Schedules": means the schedules to this Plan. |
| **1.1.8.** "Cláusula": significa cada um dos itens identificados por algarismos cardinais neste Plano. | **1.1.8.** "Section": means each of the items identified by cardinal numbers in this Plan. |
| **1.1.9.** "CNPJ/MF": significa o número de identificação no Cadastro Nacional da Pessoa Jurídica do Ministério da Fazenda do Brasil. | **1.1.9.** "CNPJ/MF": means the identification number in the National Register of Legal Entities maintained by the Ministry of Finance of Brazil. |
| **1.1.10.** "Código Civil": significa a Lei nº 10.406, de 10 de janeiro de 2002, conforme alterada. | **1.1.10.** "Civil Code": means Law No. 10,406, of January 10, 2002, as amended. |
| **1.1.11.** "CPC": significa a Lei nº 13.105, de 16 de março de 2015, conforme alterada. | **1.1.11.** "CPC": means Law No. 13,105, of March 16, 2015, as amended. |
| **1.1.12.** "Crédito Opção A": tem o significado definido na Cláusula 5.4 deste Plano. | **1.1.12.** "Option A Claim": has the meaning assigned in Section 5.4 of this Plan. |
| **1.1.13.** "Crédito Opção B": tem o significado definido na Cláusula 6.4 deste Plano. | **1.1.13.** "Option B Claim": has the meaning assigned in Section 6.4 of this Plan. |

| | |
|---|---|
| **1.1.14.** "Crédito Opção C": significa o Crédito Opção C – Tranche A e o Crédito Opção C – Tranche B, em conjunto. | **1.1.14.** "Option C Claim": means the Option C Claim – Tranche A and the Option C Claim – Tranche B, jointly. |
| **1.1.15.** "Crédito Opção C – Tranche A": tem o significado definido na Cláusula 7.4. | **1.1.15.** "Option C Claim – Tranche A": has the meaning set forth in Section 7.4. |
| **1.1.16.** "Crédito Opção C – Tranche B": tem o significado definido na Cláusula 7.4. | **1.1.16.** "Option C Claim – Tranche B": has the meaning set forth in Section 7.4. |
| **1.1.17.** "Créditos Sujeitos": significa, nos termos do art. 163, § 1º, da LRF, todos os créditos contra as Requerentes relacionados ou resultantes das Notas Internacionais Existentes, incluindo (sem limitação), principal, juros remuneratórios, juros de mora, bem como quaisquer outros encargos, obrigações ou créditos derivados ou resultantes da emissão, oferta e subscrição das Notas Internacionais Existentes, e quaisquer outras obrigações das Requerentes, que sejam regidas, estabelecidas ou que de qualquer outra forma possam ser direta ou indiretamente derivadas das Notas Internacionais Existentes, conforme apurados na Data do Pedido e devidamente listados no **Anexo I** deste Plano. | **1.1.17. "**Subject Claims**"**: means, pursuant to article 163, first paragraph, of the Brazilian Bankruptcy Act, all claims against the Debtors related to or arising from the International Existing Notes, including (without limitation), principal, interest, default interest, as well as any other charges, obligations or claims derived from or resulting from the issuance, offering and subscription of the International Existing Notes, and any other obligations of the Debtors, governed by, established under, or that may otherwise be directly or indirectly derived from the International Existing Notes, as determined on the Filing Date and duly listed in **Schedule I** to this Plan. |
| **1.1.18.** "Credor Aderente": significa o Credor Sujeito que, embora não tenha assinado este Plano na Data de Celebração, venha a anuir voluntariamente aos seus termos após a Data do Pedido e antes da Sentença de Homologação do Plano, na forma da Cláusula 4.4 deste Plano. | **1.1.18.** "Adhering Creditor": means the Subject Creditor that, although not having signed this Plan on the Signing Date, voluntarily agrees to its terms after the Filing Date and prior to the Plan Confirmation Order, pursuant to Section 4.4 of this Plan. |

| | | |
|---|---|---|
| **1.1.19.** "Credor Opção A": tem o significado atribuído na Cláusula 5.1 deste Plano. | | **1.1.19.** "Option A Creditor": has the meaning assigned in Section 5.1 of this Plan. |
| **1.1.20.** "Credor Opção B": tem o significado atribuído na Cláusula 6.1 deste Plano. | | **1.1.20.** "Option B Creditor": has the meaning assigned in Section 6.1 of this Plan. |
| **1.1.21.** "Credor Opção C": tem o significado atribuído na Cláusula 7.1 deste Plano. | | **1.1.21.** "Option C Creditor": has the meaning assigned in Section 7.1 of this Plan. |
| **1.1.22.** "Credor Signatário": significa o Credor Sujeito relacionado no **Anexo II**, que assinou, na Data de Celebração, o Termo de Adesão constante do **Anexo III**, por meio do qual aderiu ao presente Plano. | | **1.1.22.** "Signatory Creditor": means the Subject Creditor listed in **Schedule II**, who signed the Adhesion Term for Signatory Creditor set forth in **Schedule III**, through which it adhered to this Plan. |
| **1.1.23.** "Credor Sujeito": significa todo e qualquer credor titular de Crédito Sujeito. | | **1.1.23.** "Subject Creditor": means any creditor holding a Subject Claim. |
| **1.1.24.** "Data de Celebração": significa a data de assinatura deste Plano | | **1.1.24.** "Signing Date": means the date of execution of this Plan. |
| **1.1.25.** "Data da Homologação": é a data da publicação no Diário Oficial da Sentença de Homologação do Plano. | | **1.1.25.** "Judicial Confirmation Date": means the date of publication in the Official Gazette of the Plan Confirmation Order. |
| **1.1.26.** "Data de Início do Período de Eleição": tem o significado atribuído na Cláusula 8.2 deste Plano. | | **1.1.26.** "Election Period Commencement Date": has the meaning assigned in Section 8.2 of this Plan. |
| **1.1.27.** "Data do Pedido": significa a data em que o pedido de Recuperação Extrajudicial foi ajuizado pelas Requerentes. | | **1.1.27.** "Filing Date": means the date on which the request for Extrajudicial Reorganization was filed by the Debtors. |

| | |
|---|---|
| **1.1.28.** "Decisão *Chapter 15*": tem o significado atribuído na Cláusula 3.5 deste Plano. | **1.1.28.** "Chapter 15 Decision": has the meaning assigned in Section 3.5 of this Plan. |
| **1.1.29.** "Decisão de Implementação *Chapter 15*": tem o significado atribuído na Cláusula 3.5 deste Plano. | **1.1.29.** "Chapter 15 Enforcement Order": has the meaning assigned in Section 3.5 of this Plan. |
| **1.1.30.** "Decisão de Reconhecimento *Chapter 15*": tem o significado atribuído na Cláusula 3.5 deste Plano. | **1.1.30.** "Chapter 15 Recognition Order": has the meaning assigned in Section 3.5 of this Plan. |
| **1.1.31.** "Diário Oficial": significa o Diário da Justiça Eletrônico Nacional (DJEN), Diário Judiciário Eletrônico do Tribunal de Justiça do Estado de Minas Gerais (DJE/TJMG), ou qualquer outro diário oficial aplicável na data de publicação da Sentença de Homologação do Plano. | **1.1.31.** "Official Gazette": means the National Electronic Judicial Gazette (DJEN), the Electronic Judicial Gazette of the Court of Justice of the State of Minas Gerais (DJE/TJMG), or any other applicable official gazette on the date of publication of the Plan Confirmation Order. |
| **1.1.32.** "Dia Corrido": significa todo e qualquer dia do calendário, sendo certo que, caso um prazo contado em dias corridos se encerre em dia que não seja Dia Útil, ele será considerado automaticamente prorrogado para o Dia Útil subsequente. | **1.1.32.** "Calendar Day": means any day of the calendar, it being understood that if a term counted in calendar days expires on a day that is not a Business Day, it shall be automatically extended to the following Business Day. |
| **1.1.33.** "Dia Útil": qualquer dia que não seja sábado, domingo ou qualquer outro dia em que as instituições bancárias no Estado de Minas Gerais ou na cidade de Belo Horizonte não funcionem ou estejam autorizadas a não funcionar. | **1.1.33.** "Business Day": means any day other than a Saturday, Sunday, or any other day on which banking institutions in the State of Minas Gerais or in the city of Belo Horizonte are not open for business or are authorized to remain closed. |
| **1.1.34.** "Dólar" ou "US$": significa dólares dos Estados Unidos da América. | **1.1.34.** "Dollar" or "US$": means United States dollars. |

| | |
|---|---|
| **1.1.35.** "DTC": significa o *Depository Trust Company*. | **1.1.35.** "DTC": means The Depository Trust Company. |
| **1.1.36.** "Eleição da Opção de Pagamento": tem o significado definido na Cláusula 8.1 deste Plano. | **1.1.36.** "Payment Option Election": has the meaning assigned in Section 8.1 of this Plan. |
| **1.1.37.** "Instrumentos de Pagamento": significa, em conjunto, os Instrumentos de Pagamento da Opção A, os Instrumentos de Pagamento da Opção B e os Instrumentos de Pagamento da Opção C, conforme definido abaixo. | **1.1.37.** "Payment Instruments": means, jointly, the Option A Payment Instruments, the Option B Payment Instruments and the Option C Payment Instruments, as defined below. |
| **1.1.38.** "Instrumentos de Pagamento da Opção A": significa o Instrumento de Pagamento da Opção A – Plano e o Instrumento de Pagamento da Opção A – *Notes*. | **1.1.38.** "Option A Payment Instruments": means the Option A Payment Instrument – Plan and the Option A Payment Instrument – Notes. |
| **1.1.39.** "Instrumento de Pagamento da Opção A – Plano": tem o significado definido na Cláusula 5.5.1.5 deste Plano. | **1.1.39.** "Option A Payment Instrument – Plan": has the meaning assigned in Section 5.5.1.5 of this Plan. |
| **1.1.40.** "Instrumento de Pagamento da Opção A – *Notes*": tem o significado definido na Cláusula 5.5.1 deste Plano. | **1.1.40.** "Option A Payment Instrument – Notes": has the meaning assigned in Section 5.5.1 of this Plan. |
| **1.1.41.** "Instrumentos de Pagamento da Opção B": significa o Instrumento de Pagamento da Opção B – Plano e o Instrumento de Pagamento da Opção B – *Notes*. | **1.1.41.** "Option B Payment Instruments": means the Option B Payment Instrument – Plan and the Option B Payment Instrument – Notes. |
| **1.1.42.** "Instrumento de Pagamento da Opção B – Plano": tem o significado definido na Cláusula 6.5.1.5 deste Plano. | **1.1.42.** "Option B Payment Instrument – Plan": has the meaning assigned in Section 6.5.1.5 of this Plan. |

| | | |
|---|---|---|
| **1.1.43.** "Instrumento de Pagamento da Opção B – *Notes*": tem o significado definido na Cláusula 6.5.1 deste Plano. | | **1.1.43.** "Option B Payment Instrument – Notes": has the meaning assigned in Section 6.5.1 of this Plan. |
| **1.1.44.** "Instrumentos de Pagamento da Opção C": significa o Instrumento de Pagamento da Opção C – Plano e os Instrumentos de Pagamento da Opção C – *Notes*. | | **1.1.44.** "Option C Payment Instruments": means the Option C Payment Instrument – Plan and the Option C Payment Instruments – Notes. |
| **1.1.45.** "Instrumentos de Pagamento da Opção C – Plano": tem o significado definido na Cláusula 7.5.1.2 deste Plano. | | **1.1.45.** "Option C Payment Instruments – Plan": has the meaning assigned in Section 7.5.1.2 of this Plan. |
| **1.1.46.** "Instrumentos de Pagamento da Opção C – *Notes*": significa o Instrumento de Pagamento da Opção A – *Notes* e o Instrumento de Pagamento da Opção B – *Notes* destinados aos Credores Opção C na forma da Cláusula 7.5.1 deste Plano. | | **1.1.46.** "Option C Payment Instruments – Notes": means the Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes allocated to the Option C Creditors pursuant to Sections 7.5.1 of this Plan. |
| **1.1.47.** "Intervenientes Anuentes": tem o significado atribuído no Preâmbulo deste Plano. | | **1.1.47.** "Intervening Parties": has the meaning assigned in the Preamble of this Plan. |
| **1.1.48.** "Inzag": tem o significado atribuído no Preâmbulo deste Plano. | | **1.1.48.** "Inzag": has the meaning assigned in the Preamble of this Plan. |
| **1.1.49.** "Juízo da Recuperação Extrajudicial": significa a vara da Comarca de Belo Horizonte, Tribunal de Justiça do Estado de Minas Gerais para a qual tenha sido distribuída a Recuperação Extrajudicial. | | **1.1.49.** "Extrajudicial Reorganization Court": means the Court of the district of Belo Horizonte, Court of Justice of the State of Minas Gerais, to which the Extrajudicial Reorganization has been assigned. |
| **1.1.50.** "Lei Aplicável": significa a Constituição Federal e, conforme aplicável, toda e qualquer lei, | | **1.1.50.** "Applicable Law": means the Federal Constitution and, as applicable, all law, rule, or |

| | |
|---|---|
| norma, ou dispositivo legal, decreto, regulamento, portaria, código ou política, ordem, decisão ou sentença (incluindo arbitral), local ou estrangeira, federal, estadual ou municipal, de qualquer autoridade governamental. | legal provision, decree, regulation, ordinance, code or policy, order, decision, or judgment (including arbitral), whether local or foreign, federal, state, or municipal, issued by any governmental authority. |
| **1.1.51.** "LRF": significa a Lei n.º 11.101, de 9 de fevereiro de 2005, conforme alterada. | **1.1.51.** "Brazilian Bankruptcy Act": means Law No. 11,101, of February 9, 2005, as amended. |
| **1.1.52.** "LSA": significa a Lei nº 6.404, de 15 de dezembro de 1976, conforme alterada. | **1.1.52.** "Brazilian Corporations Act": means Law No. 6,404, of December 15, 1976, as amended. |
| **1.1.53.** "Notas Internacionais 2021": tem o significado atribuído no considerando "(iii)" deste Plano. | **1.1.53.** "2021 International Notes": has the meaning assigned in recital "(iii)" of this Plan. |
| **1.1.54.** "Notas Internacionais 2024": tem o significado atribuído no considerando "(iii)" deste Plano. | **1.1.54.** "2024 International Notes": has the meaning assigned in recital "(iii)" of this Plan. |
| **1.1.55.** "Notas Internacionais 2029": tem o significado atribuído no considerando "(iv)" deste Plano. | **1.1.55.** "2029 International Notes": has the meaning assigned in recital "(iv)" of this Plan. |
| **1.1.56.** "Notas Internacionais 2040": tem o significado atribuído no considerando "(iv)" deste Plano. | **1.1.56.** "2040 International Notes": has the meaning assigned in recital "(iv)" of this Plan. |
| **1.1.57.** "Notas Internacionais Existentes": tem o significado atribuído no considerando "(iv)" deste Plano. | **1.1.57.** "International Existing Notes": has the meaning assigned in recital "(iv)" of this Plan. |

| | |
|---|---|
| **1.1.58.** "Opção A": significa a opção de pagamento descrita na Cláusula 5 deste Plano. | **1.1.58.** "Option A": means the payment option described in Section 5 of this Plan. |
| **1.1.59.** "Opção B": significa a opção de pagamento descrita na Cláusula 6 deste Plano. | **1.1.59.** "Option B": means the payment option described in Section 6 of this Plan. |
| **1.1.60.** "Opção C": significa a opção de pagamento descrita na Cláusula 7 deste Plano. | **1.1.60.** "Option C": means the payment option described in Section 7 of this Plan. |
| **1.1.61.** "Parte": significa as Requerentes e o Credor Signatário, denominados indistintamente e de forma individual. | **1.1.61.** "Party": means the Debtors and the Signatory Creditor, referred to collectively or individually, as applicable. |
| **1.1.62.** "Partes": significa as Requerentes e o Credor Signatário, denominados em conjunto. | **1.1.62.** "Parties": means the Debtors and the Signatory Creditor, referred to collectively. |
| **1.1.63.** "Período de Eleição": tem o significado atribuído na Cláusula 8.2 deste Plano. | **1.1.63.** "Election Period": has the meaning assigned in Section 8.2 of this Plan. |
| **1.1.64.** "Pessoa": significa qualquer pessoa, natural ou jurídica, de direito brasileiro ou estrangeiro, incluindo-se, sem limitação, sociedades em geral (por ações, limitadas, simples, em conta de participação, em parceria, dentre outras), *joint venture*, *trust*, fundo de investimento, associação, fundação, organização, entidade governamental ou outra entidade de qualquer tipo ou natureza. | **1.1.64.** "Person": means any person, natural or legal entity, organized under the laws of Brazil or any foreign jurisdiction, including, without limitation, companies in general (corporations, limited liability companies, simple partnerships, silent partnerships, partnerships, among others), joint venture, trust, investment fund, association, foundation, organization, governmental entity, or any other entity of any type or nature. |
| **1.1.65.** "Plano": significa este plano de recuperação extrajudicial assinado entre as Requerentes e o Credor Signatário, datado de 18 de maio de 2026 e, conforme o caso, eventuais | **1.1.65.** "Plan": means this Extrajudicial Reorganization Plan executed between the Debtors and the Signatory Creditor, dated May 18, 2026, and, as applicable, any amendments approved |

| | | |
|---|---|---|
| aditamentos aprovados nos termos deste plano de recuperação extrajudicial, sendo que todos os seus Anexos são parte integrante dele. | | pursuant to the terms of this Extrajudicial Reorganization Plan, all its Schedules being an integral part hereof. |
| **1.1.66.** "Plano 1": tem o significado atribuído no considerando "(x)". | | **1.1.66.** "Plan 1": has the meaning assigned in recital "(x)". |
| **1.1.67.** "Procedimentos Chapter 15": significa os procedimentos a serem iniciados pelo(s) representante(s) estrangeiro(s) das Requerentes sob o capítulo 15 do *U.S. Bankruptcy Code*. | | **1.1.67.** "Chapter 15 Proceedings": means the proceedings to be initiated by the foreign representative(s) of the Debtors under Chapter 15 of the U.S. Bankruptcy Code. |
| **1.1.68.** "Procedimento de Eleição da Opção de Pagamento": significa o procedimento descrito na Cláusula 8.2 deste Plano. | | **1.1.68.** "Payment Option Election Process": means the procedure described in Section 8.2 of this Plan. |
| **1.1.69.** "Real" ou "R$": significa a moeda corrente da República Federativa do Brasil. | | **1.1.69.** "Real" or "R$": means the lawful currency of the Federative Republic of Brazil. |
| **1.1.70.** "Recuperação Extrajudicial": significa o processo de recuperação extrajudicial ajuizado pelas Requerentes perante uma das varas empresariais da Comarca de Belo Horizonte, Tribunal de Justiça do Estado de Minas Gerais. | | **1.1.70.** "Extrajudicial Reorganization": means the extrajudicial reorganization proceeding filed by the Debtors before one of the business courts of the District of Belo Horizonte, Court of Justice of the State of Minas Gerais. |
| **1.1.71.** "Recuperação Extrajudicial 2022": tem o significado atribuído no considerando "(iii)" deste Plano. | | **1.1.71.** "2022 Extrajudicial Reorganization": has the meaning assigned in recital "(iii)" of this Plan. |
| **1.1.72.** "Requerentes": tem o significado atribuído no Preâmbulo deste Plano. | | **1.1.72.** "Debtors": has the meaning assigned in the Preamble of this Plan. |

| | |
|---|---|
| **1.1.73.** "Requerentes do Plano 1": tem o significado atribuído no considerando "(ix)" deste Plano. | **1.1.73.** "Plan 1 Debtors": has the meaning assigned in recital "(ix)" of this Plan. |
| **1.1.74.** "Sentença de Homologação do Plano": significa a sentença proferida pelo Juízo da Recuperação Extrajudicial, ou qualquer outra decisão judicial proferida por outro tribunal competente, que homologue este Plano. | **1.1.74.** "Plan Confirmation Order": means the order rendered by the Extrajudicial Reorganization Court, or any other judicial decision issued by another competent court, confirming this Plan. |
| **1.1.75.** "Termo de Adesão do Credor Signatário": significa o termo de adesão constante do **Anexo III**, pelo qual o Credor Signatário aderiu ao presente Plano. | **1.1.75.** "Adhesion Term for Signatory Creditor" means the adherence instrument set forth in **Schedule III**, through which the Signatory Creditor have adhered to this Plan. |
| **1.1.76.** "Termo de Adesão para Credor Aderente": significa o documento constante do **Anexo IV**. | **1.1.76.** "Adhesion Term for Adhering Creditor" means the document set forth in **Schedule IV**. |
| **1.1.77.** "TMF": tem o significado atribuído no considerando "(iv)" deste Plano. | **1.1.77.** "TMF" means the meaning assigned to it in recital "(iv)" of this Plan. |
| **1.1.78.** "Tributos": significa todo e qualquer encargo governamental compulsório instituído por Lei Aplicável e que não constitua sanção de ato ilícito, seja ele federal, estadual ou municipal, local ou estrangeiro, de qualquer natureza ou espécie, sobre qualquer fato gerador ou base de cálculo (incluindo, sem se limitar a, impostos, contribuições de qualquer espécie, taxas, encargos parafiscais, empréstimos compulsórios ou quaisquer encargos de natureza similar, e incluindo todos os juros, encargos, correção e/ou atualização monetária, multas, penalidades de qualquer | **1.1.78.** "Taxes" means any and all compulsory governmental charges established under Applicable Law that do not constitute a sanction for an unlawful act, whether federal, state, municipal, local, or foreign, of any nature or kind, levied on any taxable event or assessment base (including, without limitation, taxes, contributions of any kind, fees, parafiscal charges, compulsory loans, or any charges of a similar nature, and including all interest, charges, monetary correction and/or adjustment, fines, penalties of any kind, and any |

| | | |
|---|---|---|
| natureza e qualquer valor adicional devido com relação ao valor do Tributo). | | additional amounts due in connection with the amount of the Tax). |
| **1.1.79.** "*U.S. Bankruptcy Code*": significa o Título 11 do *United States Code*, 11 U.S.C. §§ 101 e seguintes. | | **1.1.79.** "U.S. Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. paragraphs 101 et seq. |
| **1.1.80.** "Zagope": tem o significado atribuído no Preâmbulo deste Plano. | | **1.1.80.** "Zagope" means the meaning assigned to it in the Preamble of this Plan. |
| **2. REGRAS DE INTERPRETAÇÃO** | | **2. RULES OF INTERPRETATION** |
| **2.1.** Exceto se especificado de modo diverso, todas as Cláusulas e Anexos mencionados neste Plano referem-se aos Anexos e Cláusulas do próprio Plano. | | **2.1.** Unless otherwise specified, all Sections and Schedules referred to in this Plan refer to the Schedules and Sections of this Plan itself. |
| **2.2.** Os títulos dos capítulos e das cláusulas deste Plano foram incluídos exclusivamente para referência e não devem afetar o conteúdo de suas previsões. | | **2.2.** The titles of the chapters and sections of this Plan have been included solely for reference purposes and shall not affect the content of their provisions. |
| **2.3.** Quaisquer referências a documentos ou instrumentos devem ser consideradas como escritas na presente data, a menos que de outro modo expressamente previsto ou de outra forma requerida pelo contexto. | | **2.3.** Any references to documents or instruments shall be deemed **to** be as of the date hereof, unless expressly provided otherwise or as otherwise required by the context. |
| **2.4.** As referências a disposições legais e a Leis devem ser interpretadas como referências a essas disposições legais e Leis tais como vigentes nesta data ou em data que seja especificamente determinada pelo contexto. | | **2.4.** References to legal provisions and Laws shall be construed as references to such legal provisions and Laws as in effect on the date hereof or on such other date as may be specifically determined by the context. |

| | |
|---|---|
| **2.5.** Este Plano deve ser interpretado de acordo com os artigos 161 e seguintes da LRF. | **2.5.** This Plan shall be interpreted in accordance with articles 161 et seq. of the Brazilian Bankruptcy Act. |
| **<u>PARTE II – CONDIÇÕES GERAIS DESTE PLANO</u>** | **<u>PART II – GENERAL CONDITIONS OF THIS PLAN</u>** |
| **3. OBJETIVO, CUMPRIMENTO DOS REQUISITOS LEGAIS E ESTRUTURA DESTE PLANO** | **3. PURPOSE, COMPLIANCE WITH LEGAL REQUIREMENTS, AND STRUCTURE OF THIS PLAN** |
| **3.1.** <u>Objetivo</u>. Este Plano estabelece os termos e condições necessários para a reestruturação dos Créditos Sujeitos, mediante o reperfilamento de suas condições de pagamento, adequando-os ao fluxo de caixa atual e futuro das Requerentes e propiciando a readequação de suas estruturas de capital. | **3.1.** <u>Objective</u>. This Plan sets forth the terms and conditions required for the restructuring of the Subject Claims, through the reprofiling of their payment conditions, aligning them with the current and future cash flow of the Debtors and enabling the restructuring of their capital structures. |
| **3.2.** <u>Cumprimento dos Requisitos Legais</u>. Este Plano visa a reestruturar todos os Créditos Sujeitos, cujos montantes totais devidos individualmente por cada uma das Requerentes, na Data do Pedido, encontram-se descritos no **Anexo II** deste Plano. | **3.2.** <u>Compliance With Legal Requirements</u>. This Plan aims to restructure all Subject Claims, whose total amounts owed individually by each of the Debtors, as of the Filing Date, are described in **Schedule II** to this Plan. |
| **3.3.** Este Plano é subscrito e assinado pelo Credor Signatário, conforme termo de adesão constante do **Anexo III**, o qual é titular de ***(i)*** 77,1% de todos os Créditos Sujeitos devidos pela AGINT, conforme **Anexo II**, ***(ii)*** 79,2% de todos os Créditos Sujeitos devidos pela Zagope, conforme **Anexo II**, e ***(iii)*** 79,2% de todos os Créditos Sujeitos devidos pela Inzag, conforme **Anexo II**, de modo que se | **3.3.** This Plan is executed and signed by the Signatory Creditor, pursuant to the adhesion term set forth in **Schedule III**, which holds ***(i)*** 77.1% of all Subject Claims owed by AGINT, as indicated in **Schedule II**, ***(ii)*** 79.2% of all Subject Claims owed by Zagope, as indicated in **Schedule II**, and ***(iii)*** 79.2% of all Subject Claims owed by Inzag, as indicated in **Schedule II**, such that the approval |

| | | |
|---|---|---|
| mostra satisfeito o quórum de aprovação estabelecido no artigo 163, caput, da LRF. | | quorum set forth in article 163, caput, of the Brazilian Bankruptcy Act is complied with. |
| **3.4.** Medidas de reestruturação. Com a Sentença de Homologação do Plano, nos termos do artigo 163, *caput* e § 1º, da LRF, todos os Créditos Sujeitos serão integralmente reestruturados, novados, cancelados e quitados, conforme artigos 163, *caput* e § 1º, e 165, caput, da LRF, passando os Credores Sujeitos a serem titulares de direitos creditórios regidos em conformidade com o disposto neste Plano, que prevê termos e condições compatíveis com o fluxo de caixa atual e futuro das Requerentes. | | **3.4.** Reorganization Measures. Upon the Plan Confirmation Order, pursuant to article 163, caput and first paragraph, of the Brazilian Bankruptcy Act, all Subject Claims shall be fully restructured, novated, cancelled and fully satisfied, pursuant to articles 163, caput and first paragraph, and 165, caput, of the Brazilian Bankruptcy Act, and the Subject Creditors shall hold claims governed in accordance with this Plan, which provides terms and conditions consistent with the current and future cash flow of the Debtors. |
| **3.5.** Implementação do Plano Perante Jurisdições Estrangeiras. Após a apresentação do Plano perante o Juízo da Recuperação Extrajudicial ou a prolação da Sentença de Homologação do Plano, o(s) representante(s) estrangeiro(s) das Requerentes, observado o disposto na Cláusula 10.6, submeterão o Plano e a Sentença de Homologação do Plano a uma autoridade jurisdicional competente dos Estados Unidos da América para buscar uma decisão ou decisões ***(i)*** reconhecendo a Recuperação Extrajudicial como processo estrangeiro principal ou processo estrangeiro não-principal nos termos do capítulo 15 do *U.S. Bankruptcy Code* ("Decisão de Reconhecimento *Chapter 15*"), ***(ii)*** reconhecendo e implementando este Plano e a Sentença de Homologação dentro da jurisdição territorial dos Estados Unidos da América, nos termos do capítulo 15 do *U.S. Bankruptcy Code* ("Decisão de Implementação *Chapter 15*"); e ***(iii)*** autorizando e | | **3.5.** Implementation of the Plan Before Foreign Jurisdictions. Following the submission of the Plan before the Extrajudicial Reorganization Court or the entry of the Plan Confirmation Order, the foreign representative(s) of the Debtors, subject to Section 10.6, shall submit the Plan and the Plan Confirmation Order to a United States court of competent jurisdiction in order to seek an order or orders ***(i)*** recognizing the Extrajudicial Reorganization as a foreign main proceeding or non-main foreign proceeding under chapter 15 of the U.S. Bankruptcy Code ("Chapter 15 Recognition Order"), ***(ii)*** recognizing and enforcing this Plan and the Plan Confirmation Order within the territorial jurisdiction of the United States of America under chapter 15 of the U.S. Bankruptcy Code ("Chapter 15 Enforcement Order"); and ***(iii)*** authorizing and directing the respective parties to that proceeding (including, without limitation, any duly appointed foreign |

| | |
|---|---|
| direcionando as respectivas partes daquele processo (incluindo, sem limitação, qualquer representante estrangeiro devidamente nomeado) a tomarem todas e quaisquer medidas necessárias para dar eficácia aos termos deste Plano e da Sentença de Homologação do Plano (tal decisão ou decisões e, em conjunto com a Decisão de Reconhecimento *Chapter 15* e Decisão de Implementação *Chapter 15*, referidas como "Decisão *Chapter 15*"). As Requerentes também poderão ajuizar e/ou prosseguir com outros procedimentos judiciais, extrajudiciais ou administrativos, relacionados à insolvência ou não, perante outras jurisdições, caso necessário ou aconselhável para a implementação do Plano, desde que esses procedimentos ancilares não alterem os termos e condições previstos neste Plano. | representative) to take any and all actions necessary to give effect to the terms of this Plan and the Plan Confirmation Order (such order or orders, together with the Chapter 15 Recognition Order and the Chapter 15 Enforcement Order, referred to collectively as the "Chapter 15 Decision"). The Debtors may also initiate and/or continue other judicial, out-of-court or administrative proceedings, whether insolvency-related or not, before other jurisdictions, if necessary or advisable for the implementation of the Plan, provided that such ancillary proceedings do not amend the terms and conditions set forth in this Plan. |
| **3.6. Inexistência de consolidação substancial.** As Requerentes e o(s) Credor(es) Signatário(s) reconhecem e acordam que: ***(i)*** a apresentação conjunta deste Plano e o ajuizamento da Recuperação Extrajudicial em litisconsórcio ativo decorrem exclusivamente de consolidação de natureza processual, nos termos dos artigos 69-G a 69-I da LRF; ***(ii)*** não há, nem se pretende instituir, por meio deste Plano, da Recuperação Extrajudicial ou de sua homologação, qualquer forma de consolidação substancial, confusão patrimonial ou unificação de ativos e passivos entre as Requerentes; ***(iii)*** cada Requerente permanece juridicamente autônoma, com personalidade, patrimônio, ativos, passivos, direitos e obrigações próprios, respondendo exclusivamente por suas dívidas, ressalvadas apenas as hipóteses de | **3.6. Absence of Substantive Consolidation.** The Debtors and the Signatory Creditor(s) acknowledge and agree that: ***(i)*** the joint submission of this Plan and the filing of the Extrajudicial Reorganization in active joinder result exclusively from procedural consolidation, pursuant to articles 69-G to 69-I of the Brazilian Bankruptcy Act; ***(ii)*** neither does there exist, nor is it intended to establish, through this Plan, the Extrajudicial Reorganization or its confirmation, any form of substantive consolidation, commingling of assets, or unification of assets and liabilities among the Debtors; ***(iii)*** each Debtor remains legally autonomous, with its own legal personality, estate, assets, liabilities, rights and obligations, and shall be solely liable for its debts, except only in the cases of co-obligation and |

| | | |
|---|---|---|
| coobrigação e de outorga de garantias expressamente previstas neste Plano, sendo que, nestas hipóteses, será observado o disposto na Cláusula 11.5.5 e o disposto nos artigos 346 e 347 do Código Civil; e ***(iv)*** fica expressamente afastada qualquer interpretação deste Plano que resulte, direta ou indiretamente, na aplicação dos efeitos jurídicos próprios da consolidação substancial, inclusive a comunhão de massas patrimoniais ou o tratamento indistinto dos credores das diferentes Requerentes. | | granting of guarantees expressly provided for in this Plan, in which cases the provisions of Section 11.5.5 and articles 346 and 347 of the Brazilian Civil Code shall apply; and ***(iv)*** any interpretation of this Plan that results, directly or indirectly, in the application of the legal effects inherent to substantive consolidation is hereby expressly excluded, including the commingling of patrimonial estates or the indistinct treatment of creditors of the different Debtors. |
| **PARTE III – DOS CRÉDITOS SUJEITOS** | | **PART III – SUBJECT CLAIMS** |
| **4. ABRANGÊNCIA E VINCULAÇÃO DOS CRÉDITOS SUJEITOS** | | **4. SCOPE AND BINDING EFFECT OF SUBJECT CLAIMS** |
| **4.1.** Valor dos Créditos Sujeitos. O valor total dos Créditos Sujeitos é de ***(i)*** R$ 2.809.603.941,92 (dois bilhões oitocentos e nove milhões seiscentos e três mil novecentos e quarenta e um reais e noventa e dois centavos) para a AGINT, na Data do Pedido, conforme descrito no **Anexo I** deste Plano; ***(ii)*** R$ 253.270.000,00 (duzentos e cinquenta e três milhões duzentos e setenta mil reais) para a Zagope, na Data do Pedido, conforme descrito no **Anexo I** deste Plano; e ***(iii)*** R$ 78.853.567,67 (setenta e oito milhões oitocentos e cinquenta e três mil quinhentos e sessenta e sete reais e sessenta e sete centavos) para a Inzag, na Data do Pedido, conforme descrito no **Anexo I** deste Plano. | | **4.1.** Amount of Subject Claims. The total amount of Subject Claims is ***(i)*** R$ 2,809,603,941.92 (two billion eight hundred and nine million six hundred and three thousand nine hundred and forty-one reais and ninety-two centavos) for AGINT, as of the Filing Date, as described in **Schedule I** to this Plan; ***(ii)*** R$ 253,270,000.00 (two hundred and fifty-three million two hundred and seventy thousand reais) for Zagope, as of the Filing Date, as described in Schedule **I** to this Plan; and ***(iii)*** R$ 78,853,567.67 (seventy-eight million eight hundred and fifty-three thousand five hundred and sixty-seven reais and sixty-seven centavos) for Inzag, as of the Filing Date, as described in **Schedule I** to this Plan. |

| | | |
|---|---|---|
| **4.2.** <u>Valor dos Créditos Sujeitos do Credor Signatário</u>. O Credor Signatário é, na Data do Pedido, titular de Créditos Sujeitos nos valores totais de ***(i)*** R$ 2.166.476.618,00 (dois bilhões cento e sessenta e seis milhões quatrocentos e setenta e seis mil seiscentos e dezoito reais) detidos individualmente contra a AGINT, na Data do Pedido, conforme descrito no **Anexo II** deste Plano; ***(ii)*** R$ 200.469.718,00 (duzentos milhões quatrocentos e sessenta e nove mil setecentos e dezoito reais) detidos individualmente contra a Zagope, na Data do Pedido, conforme descrito no **Anexo II** deste Plano; e ***(iii)*** R$ 62.414.626,00 (sessenta e dois milhões quatrocentos e quatorze mil seiscentos e vinte e seis reais) detidos individualmente contra a Inzag, na Data do Pedido, conforme descrito no **Anexo II** deste Plano. Assim, o Credor Signatário é titular de mais de 50% (cinquenta por cento) de Créditos Sujeitos contra cada uma das Requerentes, de modo que estão plenamente satisfeitos os requisitos para a homologação do Plano, nos termos do artigo 163 da LRF. | | **4.2.** <u>Amount of Subject Claims of the Signatory Creditor</u>. The Signatory Creditor is, as of the Filing Date, holder of Subject Claims in the total amount of ***(i)*** R$ 2,166.476,618.00 (two billion one hundred and sixty-six million four hundred and seventy-six thousand six hundred and eighteen reais) held individually against AGINT, as of the Filing Date, as described in **Schedule II** to this Plan; ***(ii)*** R$ 200,469,718.00 (two hundred million four hundred and sixty-nine thousand seven hundred and eighteen reais) held individually against Zagope, as of the Filing Date, as described in **Schedule II** to this Plan; and ***(iii)*** R$ 62,414,626.00 (sixty-two million four hundred and fourteen thousand six hundred and twenty-six reais) held individually against Inzag, as of the Filing Date, as described in **Schedule II** to this Plan. Accordingly, the Signatory Creditor holds more than 50% (fifty percent) of Subject Claims against each of the Debtors, so that the requirements for the confirmation of the Plan are fully met, pursuant to article 163 of the Brazilian Bankruptcy Act. |
| **4.3.** <u>Vinculação do Credor Signatário</u>. O Credor Signatário expressa a sua anuência aos termos e condições do Plano a partir da Data de Celebração, nos termos do artigo 165, § 1º, da LRF, desde que o Plano não venha a ser resolvido nos termos da Cláusula 10.2 e observado o artigo 165, § 2º, da LRF. | | **4.3.** <u>Binding of the Signatory Creditor</u>. The Signatory Creditor expresses its consent to the terms and conditions of the Plan as of the Signing Date, pursuant to article 165, first paragraph, of the Brazilian Bankruptcy Act, provided that the Plan is not terminated pursuant to Section 10.2 and subject to article 165, second paragraph, of the Brazilian Bankruptcy Act. |

| | |
|---|---|
| **4.3.1.** Em atenção ao disposto na Cláusula 4.3 acima, o Credor Signatário desde já elege a Opção C prevista na Cláusula 7 para reestruturar os seus respectivos Créditos Sujeitos, os quais serão, desde a Data de Celebração, automaticamente reestruturados, novados, quitados, cancelados e substituídos por Créditos Opção C – Tranche A e Créditos Opção C – Tranche B, sendo, portanto, regidos nos termos das Cláusulas 7.4.1, 7.4.2, 7.5 e demais Cláusulas aplicáveis deste Plano, contando com todos os direitos e privilégios previstos neste Plano, inclusive as garantias fidejussórias previstas no item (ix) da Cláusula 7.4.1 e item "(viii)" da Cláusula 7.4.2. Para que não restem dúvidas, ***(i)*** a novação de que trata a presente Cláusula 4.3.1 poderá ser revertida caso este Plano venha a ser resolvido nos termos da Cláusula 10.2 e ***(ii)*** o disposto no artigo 165, § 2º, da LRF será aplicável caso este Plano seja rejeitado pelo Juízo da Recuperação Extrajudicial. | **4.3.1.** Pursuant to Section 4.3 above, the Signatory Creditor hereby elects Option C set forth in Section 7 to restructure its respective Subject Claims, which shall, as of the Signing Date, be automatically restructured, novated, fully satisfied, cancelled and replaced by Option C Claims – Tranche A and Option C Claims – Tranche B, and shall therefore be governed pursuant to Sections 7.4.1, 7.4.2, 7.5 and other applicable Sections of this Plan, with all rights and privileges set forth in this Plan, including the corporate guarantees set forth in item (ix) of Section 7.4.1 and item "(viii)" of Section 7.4.2. For the avoidance of doubt, the novation set forth in this Section 4.3.1 may be unwound in the event this Plan is terminated pursuant to Section 10.2 and ***(ii)*** article 165, second paragraph, of the Brazilian Bankruptcy Act shall be applicable if this Plan is rejected by the Extrajudicial Reorganization Court. |
| **4.4.** Credores Aderentes. Os Credores Sujeitos que não sejam signatários deste Plano na Data de Celebração poderão, voluntariamente, aderir aos seus termos até a Data da Homologação, por meio do preenchimento, assinatura e entrega às Requerentes do Termo de Adesão para Credor Aderente, conforme minuta constante do **Anexo IV** deste Plano, devidamente acompanhado dos documentos comprobatórios dos poderes do | **4.4.** Adhering Creditors. The Subject Creditors that are not signatories to this Plan on the Signing Date may voluntarily adhere to its terms up to the Judicial Confirmation Date, by completing, signing and delivering to the Debtors the Adhesion Term for Adhering Creditor, in the form attached as **Schedule IV to** this Plan, duly accompanied by the documents evidencing the authority of the |

| | | |
|---|---|---|
| signatário do Termo de Adesão para Credor Aderente. | | signatory of the Adhesion Term for Adhering Creditor. |
| **4.4.1.** O Credor Sujeito, além dos documentos indicados na Cláusula acima, também deverá ser entregue o Certificado de Detentor de Notas Internacionais Existentes, conforme minuta constante do **Anexo V** deste Plano, devidamente acompanhado da captura de tela (*screenshot*) do portal do custodiante do Credor Sujeito, ou de declaração emitida pelo custodiante do Credor Sujeito, comprovando a titularidade de tais Notas Internacionais Existentes. | | **4.4.1.** The Subject Creditor, in addition to the documents indicated in the Section above, the Certificate of Holder of International Existing Notes shall also be delivered, in the form set forth in **Schedule V** to this Plan, duly accompanied by a screenshot of the portal of the custodian of the Subject Creditor, or by a statement issued by the custodian of the Subject Creditor, evidencing ownership of such International Existing Notes. |
| **4.5.** Vinculação dos Credores Sujeitos. Com a Sentença de Homologação do Plano, todos os Credores Sujeitos estarão vinculados individual e indistintamente aos termos do Plano, nos termos dos artigos 163, *caput* e § 1º, e 165, *caput*, da LRF. | | **4.5.** Binding Effect on Subject Creditors. Upon the Plan Confirmation Order, all Subject Creditors shall be individually and jointly and severally bound by the terms of this Plan, pursuant to articles 163, caput and first paragraph, and 165, caput, of the Brazilian Bankruptcy Act. |
| **PARTE IV – CONDIÇÕES DE REESTRUTURAÇÃO DOS CRÉDITOS SUJEITOS** | | **PART IV – RESTRUCTURING CONDITIONS OF THE SUBJECT CLAIMS** |
| **5. OPÇÃO A** | | **5. OPTION A** |
| **5.1.** Opção A. O Credor Sujeito que tenha validamente escolhido a Opção A, em atenção ao disposto nas Cláusulas 8.1 a 8.3 ("Credor Opção A"), terá o seu respectivo Crédito Sujeito ***(i)*** reestruturado, novado, quitado e cancelado, com relação às Requerentes, nos termos deste Plano e | | **5.1.** Option A. The Subject Creditor that has validly elected Option A, pursuant to Sections 8.1 until 8.3 (the "Option A Creditor"), shall have its respective Subject Claim ***(i)*** restructured, novated, fully satisfied, and cancelled with respect to the Debtors, in accordance with this Plan and articles |

| | |
|---|---|
| dos artigos 163, § 1º, e 165, *caput*, da LRF, e ***(ii)*** substituído por Crédito Opção A nas proporções previstas neste Plano, o qual será pago exclusivamente nas condições, prazos e formas de pagamento ora estabelecidos. | 163, first paragraph, and 165, caput, of the Brazilian Bankruptcy Act, and ***(ii)*** replaced by the Option A Claim in the proportions set forth in this Plan, which shall be paid exclusively under the conditions, terms, and payment methods herein established. |
| **5.2.** Quitação. A prolação da Sentença de Homologação do Plano acarretará, na Data da Homologação, quitação ampla, plena, irrevogável e irretratável dos respectivos Créditos Sujeitos e das obrigações que os lastreiam com relação às Requerentes, sendo automaticamente cancelados e/ou extintos de pleno direito os instrumentos que consubstanciam os Créditos Sujeitos detidos pelos Credores Opção A, os quais serão automaticamente substituídos por Créditos Opção A. | **5.2.** Release. The entry of the Plan Confirmation Order shall result, on the Judicial Confirmation Date, in the full, final, irrevocable, and irreversible release of the respective Subject Claims and of their underlying obligations with respect to the Debtors, and the instruments evidencing the Subject Claims held by the Option A Creditors shall be automatically cancelled and/or extinguished by operation of law, being automatically replaced by the Option A Claims. |
| **5.3.** Relação de Troca. O Credor Opção A terá direito a receber o equivalente a 36% (trinta e seis por cento) do valor do seu Crédito Sujeito nos termos e condições descritos na Cláusula 5.4 abaixo, sendo o saldo remanescente de 64% (sessenta e quatro por cento) do seu respectivo Crédito Sujeito considerado quitado, a título de deságio, para todos os fins e efeitos de direito. | **5.3.** Exchange Ratio. The Option A Creditor shall be entitled to receive the equivalent of thirty-six percent (36%) of the amount of its Subject Claim, under the terms and conditions set forth in Section 5.4 below, and the remaining sixty-four percent (64%) of its respective Subject Claim shall be deemed fully satisfied, as a haircut, for all legal purposes and effects. |
| **5.4.** Termos e Condições da Opção A. Os Credores Opção A serão pagos de acordo com os termos e condições descritos abaixo ("Crédito Opção A"), que serão integralmente refletidos nos seus respectivos Instrumentos de Pagamento da Opção A: | **5.4.** Terms and Conditions of Option A. The Option A Creditors shall be paid in accordance with the terms and conditions described below (the "Option A Claim"), which shall be fully reflected in their respective Option A Payment Instruments: |

| | |
|---|---|
| **(i)** Valor do Principal: 36% (trinta e seis por cento) do valor dos Créditos Sujeitos detidos pelos Credores Opção A será pago nos termos e condições previstos nesta Cláusula 5.4, e o saldo remanescente de 64% (sessenta e quatro por cento) será objeto do deságio descrito na Cláusula 5.3 acima. Para que não restem dúvidas, o valor em Crédito Opção A a ser recebido por cada Credor Opção A, nos termos deste Plano e, conforme aplicável, do Plano 1, observará o disposto nas Cláusulas 11.5 e seguintes do Plano, de modo que, em nenhuma hipótese, o respectivo Credor Opção A receberá o valor do seu Crédito Opção A em duplicidade. | **(i)** Principal Amount: 36% (thirty-six percent) of the amount of the Subject Claims held by the Option A Creditors shall be paid under the terms and conditions set forth in Section 5.4, and the remaining 64% (sixty-four percent) shall be subject to the haircut described in Section 5.3 above. For the avoidance of doubt, the amount of the Option A Claim to be received by each Option A Creditor under this Plan and, as applicable, under Plan 1, shall comply with the provisions of Sections 11.5 and following of this Plan, and under no circumstances shall any Option A Creditor receive the amount of its Option A Claim in duplication. |
| **(ii)** Juros Remuneratórios: sobre os Créditos Opção A incidirão juros remuneratórios de 6,00% (seis por cento) ao ano (considerando-se, para tanto, um ano de 360 (trezentos e sessenta) Dias Corridos), computados a partir da Data da Homologação até 28 de dezembro de 2040. | **(ii)** Interest: the Option A Claims shall accrue interest at a rate of six percent (6.00%) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date until December 28, 2040. |
| **(iii)** Cronograma e Forma de Pagamento dos Juros Remuneratórios: os juros remuneratórios que incidirem sobre os Créditos Opção A serão pagos da seguinte forma: **(a)** da Data da Homologação até 28 de dezembro de 2030, os juros remuneratórios | **(iii)** Schedule and Form of Payment of Interest: the interest accrued on the Option A Claims shall be paid as follows: **(a)** from the Judicial Confirmation Date until December 28, 2030, the interest accrued during such period shall be capitalized into the |

| | | | | |
|---|---|---|---|---|
| | incidentes no período serão capitalizados no valor do principal; e **(b)** de 28 de dezembro de 2030 até 28 de dezembro de 2040, os juros remuneratórios incidentes no período serão pagos em dinheiro e em bases semestrais, em 28 de junho e 28 de dezembro, conforme aplicável, sendo a data do primeiro pagamento 28 de junho de 2031. | | | principal amount; and **(b)** from December 28, 2030 until December 28, 2040, the interest accrued during such period shall be paid in cash on a semiannual basis, on June 28 and December 28, as applicable, with the first payment date being June 28, 2031. |
| **(iv)** | Cronograma de Pagamento do Principal: o valor do principal dos Créditos Opção A, incluindo os juros capitalizados ao valor do principal, será amortizado, em dinheiro, em seis parcelas anuais, a serem pagas em 28 de dezembro de 2035, 28 de dezembro de 2036, 28 de dezembro de 2037, 28 de dezembro de 2038, 28 de dezembro de 2039 e 28 de dezembro de 2040, no valor correspondente a 16,667%, 20%, 25%, 33,333%, 50% e 100% do valor do saldo do principal existente nas respectivas datas de pagamento. | | **(iv)** | Principal Amortization Schedule: the principal amount of the Option A Claims, including the interest capitalized into the principal, shall be amortized in cash in six annual installments, to be paid on December 28, 2035, December 28, 2036, December 28, 2037, December 28], 2038, December 28, 2039, and December 28, 2040, in the amounts corresponding to 16,667%, 20%, 25%, 33,333%, 50% and 100% of the principal outstanding amount on the respective payment dates. |
| **(v)** | Data de Vencimento: 28 de dezembro de 2040. | | **(v)** | Maturity Date: December 28, 2040. |
| **(vi)** | Fator de correção monetária: não aplicável. | | **(vi)** | Monetary adjustment factor: not applicable. |
| **(vii)** | Moeda: não será alterada a moeda original do respectivo Crédito Sujeito | | **(vii)** | Currency: the original currency of the respective Subject Claim held by the |

| | | | | |
|---|---|---|---|---|
| | detido pelo Credor Opção A, de modo que os Créditos Sujeitos continuarão denominados na respectiva moeda estrangeira. | | | Option A Creditor shall not be changed, so that Subject Claims shall remain denominated in its respective foreign currency. |
| **(viii)** | <u>Devedora Principal</u>: AGINT permanecerá devedora principal, sem prejuízo das garantias fidejussórias descritas abaixo. | | **(viii)** | <u>Main Debtor</u>: AGINT shall remain as main debtor, without prejudice to the corporate guarantees described below. |
| **(ix)** | <u>Garantias Fidejussórias</u>: AGE, AGIE, AGCS, AGPAR e AGSA prestam, neste ato, fiança em garantia do pagamento dos Créditos Opção A, obrigando-se, de forma irrevogável e irretratável, como fiadoras, solidariamente com a(s) respectiva(s) devedora(s) principal(is) e entre si, das obrigações decorrentes desta Opção A, nos termos dos artigos 818 e seguintes do Código Civil, bem como renunciam expressamente aos benefícios de ordem e divisão, assim como aos direitos e faculdades de exoneração de qualquer natureza, previstos nos artigos 333, parágrafo único, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 e 839, todos do Código Civil, e nos artigos 130, 131 e 794 do CPC. As garantias fidejussórias outorgadas por AGE, AGCS AGIE, AGPAR e AGSA, conforme aplicável, serão refletidas igualmente no Instrumento de Pagamento da Opção A – *Notes* (conforme definido abaixo), sendo | | **(ix)** | <u>Corporate Guarantees</u>. AGE, AGIE, AGCS, AGPAR and AGSA hereby grant a corporate guarantee (*fiança*) to secure the payment the Option A Claims, irrevocably and irreversibly undertaking, as obligors, jointly and severally with the respective main debtor(s) and among themselves, the obligations arising from this Option A, pursuant to articles 818 et seq. of the Brazilian Civil Code, and expressly waiving the benefits of order and division, as well as any rights or discharge faculties of any nature, set forth in articles 333, sole paragraph, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 and 839, of the Brazilian Civil Code, and in articles 130, 131 and 794 of the Brazilian Code of Civil Procedure. The corporate guarantees granted by AGE, AGCS, AGIE, AGPAR and AGSA, as applicable, shall be equally reflected in the Option A Payment Instrument – Notes (as defined below), and AGE, |

| | | |
|---|---|---|
| AGE, AGIE, AGCS, AGPAR e AGSA signatárias da escritura de emissão do Instrumento de Pagamento da Opção A – *Notes*, para este fim, na mesma extensão descrita na frase acima, observando o disposto nas Leis do Estado de Nova Iorque, Estados Unidos da América. Para fins de clareza, as garantidoras fidejussórias sub-rogar-se-ão nos direitos dos Credores Opção A, caso venham a honrar, parcial ou totalmente, a garantia fidejussória, observando o disposto nas Cláusulas 11.5 e seguintes, sendo que as garantidoras fidejussórias se obrigam desde já a não cobrar, receber ou de qualquer outra forma demandar da emissora do Instrumento de Pagamento da Opção A – *Notes* o pagamento de qualquer valor pago em decorrência das garantias fidejussórias, seja por sub-rogação, compensação ou a qualquer outro título, até que todas as obrigações garantidas tenham sido quitadas. Caso as garantidoras fidejussórias, em violação a tal disposição, venham a receber quaisquer recursos decorrentes da escritura de emissão do Instrumento de Pagamento da Opção A – *Notes* de forma diversa, os receberão na qualidade de fiéis depositárias, devendo providenciar a transferência da totalidade dos referidos recursos em benefício dos Credores Opção A em até | | AGIE, AGCS, AGPAR and AGSA shall be signatories to the indenture of the Option A Payment Instrument – Notes for this purpose, to the same extent described above, in accordance with the laws of the State of New York, United States of America. For the avoidance of doubt, the guarantors shall be subrogated to the rights of the Option A Creditors in the event they honor, in whole or in part, the corporate guarantee, pursuant to the provisions of Sections 11.5 et. seq, it being understood that the corporate guarantors hereby undertake not to collect, receive, or otherwise demand from the issuer of the Option A Payment Instrument – Notes the payment of any amounts paid under the corporate guarantees, whether by subrogation, set-off, or on any other basis , until all guaranteed obligations have been fully satisfied. Should the corporate guarantors, in violation of such provision, receive any proceeds under the indenture of the Option A Payment Instrument – Notes in any other manner, they shall receive such proceeds as trustees, and shall transfer the entirety of such proceeds for the benefit of the Option A Creditors within 2 (two) Business Days of receipt, without any deduction or discount. |

| | |
|---|---|
| 2 (dois) Dias Úteis do seu recebimento, sem qualquer dedução ou desconto. | |
| **5.5.** Instrumentos de Pagamento da Opção A. A partir da Data da Homologação, os Credores Opção A passarão automaticamente a ser, desde logo, detentores dos seus respectivos Créditos Opção A, com todas as características previstas neste Plano, os quais serão subsequentemente materializados e instrumentalizados por meio dos Instrumentos de Pagamento da Opção A, conforme os critérios estabelecidos abaixo: | **5.5.** Option A Payment Instruments. As of the Judicial Confirmation Date, the Option A Creditors shall automatically become, as of such date, holders of their respective Option A Claims, with all the characteristics set forth in this Plan, which shall subsequently be evidenced and formalized through the Option A Payment Instruments, in accordance with the criteria set forth below: |
| **5.5.1.** Instrumento de Pagamento da Opção A – *Notes*. Os Credores Opção A que, cumulativamente, ***(i)*** sejam atualmente titulares de Notas Internacionais Existentes; e ***(ii.a)*** sejam investidores institucionais qualificados (*qualified institutional buyers*) nos termos da Regra 144A, editada sob o *U.S. Securities Act* de 1933, conforme alterado, ou ***(ii.b)*** não sejam "*pessoas norte-americanas*" (*U.S. persons*), conforme definido na Regra 902 do *U.S Securities Act*, sendo que qualquer credor descrito nessa Cláusula 5.5.1, item (ii.b), que seja residente em um Estado-membro do Espaço Econômico Europeu também deverá ser um investidor qualificado(*qualified investor*), nos termos do Regulamento (UE) 2017/1129, conforme alterado, e da Lei de Luxemburgo de 16 de julho de 2019 sobre prospectos de valores mobiliários, conforme alterada, ou ***(ii.c)*** investidores institucionais | **5.5.1.** Option A Payment Instrument – Notes. The Option A Creditors who, cumulatively, ***(i)*** currently hold International Existing Notes; ***(ii.a)*** are qualified institutional buyers as defined under Rule 144A promulgated under the U.S. Securities Act of 1933, as amended, or ***(ii.b)*** are not U.S. persons, as defined under Rule 902 of the of U.S. Securities Act, provided that any holder described in this Section 5.5.1, item (ii.b), that is resident of a member state of the European Economic Area must also be a qualified investor under Regulation (EU) 2017/1129, as amended, and under the Luxembourg Law of July 16, 2019 on prospectuses for securities, as amended, or ***(ii.c)*** are institutional accredited investors as defined under Rule 501 of the U.S. Securities Act of 1933, shall, subject to the provisions of Section 5.5.1.5 and except as provided in Section 5.5.1.6, have their respective Option A Claims arising from the |

| | | |
|---|---|---|
| credenciados (*institutional accredited investors*) conforme definido na Regra 501 sob o U.S. *Securities Act* de 1933, terão, observado o disposto na Cláusula 5.5.1.5 e salvo na hipótese da Cláusula 5.5.1.6, os seus Créditos Opção A decorrentes das Notas Internacionais Existentes materializados e instrumentalizados por meio de novos títulos a serem emitidos pela AGINT em forma de *notes*, denominadas em Dólares, cuja escritura de emissão será celebrada de forma consistente com o *Term Sheet* constante do **Anexo VI**, de modo a refletir e representar os termos da Opção A conforme o previsto neste Plano ("Instrumento de Pagamento da Opção A – *Notes*"). | | International Existing Notes evidenced and formalized through new notes to be issued by AGINT in the form of notes, denominated in Dollars, the indenture of which shall be executed in a manner consistent with the Term Sheet set forth in **Schedule VI**, so as to reflect and represent the terms of Option A as provided in this Plan ("Option A Payment Instrument – Notes"). |
| **5.5.1.1.** Para que não restem dúvidas, as Requerentes não solicitaram ofertas para, ou ofereceram ou venderam, e não solicitarão ofertas, ou oferecerão ou venderão, quaisquer valores mobiliários de qualquer forma envolvendo uma oferta pública nos termos da Seção 4(a)(2) do *U.S. Securities Act* de 1933. | | **5.5.1.1.** For the avoidance of doubt, the Debtors have not solicited offers to purchase, nor have they offered or sold, and shall not solicit offers to purchase, or offer or sell, any securities in any manner involving a public offering under Section 4(a)(2) of the U.S. Securities Act of 1933. |
| **5.5.1.2.** Lei de Regência. O Instrumento de Pagamento da Opção A – *Notes* será regido pelas Leis do Estado de Nova Iorque, Estados Unidos da América. | | **5.5.1.2.** Governing Law. The Option A Payment Instrument - Notes shall be governed by the laws of the State of New York, United States of America. |

| | |
|---|---|
| **5.5.1.3.** Momento de emissão. A emissão do Instrumento de Pagamento da Opção A – *Notes* será realizada após a Decisão de Implementação *Chapter 15* e o cancelamento das Notas Internacionais Existentes. | **5.5.1.3.** Time of Issuance. The issuance of the Option A Payment Instrument – Notes shall take place following the entry of the Chapter 15 Enforcement Order and the cancellation of the International Existing Notes. |
| **5.5.1.4.** Conflito. Em caso de conflito entre a escritura de emissão do Instrumento de Pagamento da Opção A – *Notes* e qualquer outra disposição deste Plano, prevalecerão os termos e condições estabelecidos neste Plano. | **5.5.1.4.** Conflict. In the event of any conflict between the indenture governing the Option A Payment Instrument – Notes and any other provision of this Plan, the terms and conditions set forth in this Plan shall prevail. |
| **5.5.1.5.** Para que não restem dúvidas, entre a Data da Homologação e a data de emissão do Instrumento de Pagamento Opção A – *Notes*, os Créditos Opção A decorrentes das Notas Internacionais Existentes serão materializados e instrumentalizados por meio deste Plano, o qual servirá, em conjunto com a Sentença de Homologação do Plano, como título executivo judicial para todos os fins e efeitos de direito, conforme artigo 161, § 6º, da LRF ("Instrumento de Pagamento da Opção A – Plano"), podendo ser executado de acordo com os termos e condições previstos neste Plano, inclusive com relação às garantias | **5.5.1.5.** For the avoidance of doubt, between the Judicial Confirmation Date and the issuance date of the Option A Payment Instrument – Notes, the Option A Claims arising from the International Existing Notes shall be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (*título executivo judicial*) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act ("Option A Payment Instrument – Plan"), and may be enforced in accordance with the terms and conditions set forth in this Plan, |

| | | |
|---|---|---|
| fidejussórias previstas na Cláusula 5.4 deste Plano. | | including with respect to the corporate guarantees set forth in Section 5.4 of this Plan. |
| **5.5.1.6.** Caso o Instrumento de Pagamento Opção A – *Notes* não seja emitido por qualquer motivo, os Créditos Opção A decorrentes das Notas Internacionais Existentes continuarão sendo materializados e instrumentalizados por meio deste Plano, o qual servirá, em conjunto com a Sentença de Homologação do Plano, como título executivo judicial para todos os fins e efeitos de direito, conforme artigo 161, § 6º, da LRF, podendo ser executado de acordo com os termos e condições previstos neste Plano. O disposto nesta Cláusula não deve ser interpretado como renúncia, mitigação ou limitação da obrigação das Requerentes de adotar as medidas razoavelmente necessárias para emitir o Instrumento de Pagamento Opção A – *Notes*, nos termos deste Plano. | | **5.5.1.6.** If the Option A Payment Instrument – Notes is not issued for any reason, the Option A Claims arising from the International Existing Notes shall continue to be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (*título executivo judicial*) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan. The provisions of this Section shall not be construed as a waiver, mitigation, or limitation of the Debtors' obligation to take the reasonably necessary measures to issue the Option A Payment Instrument – Notes, pursuant to the terms of this Plan. |
| **6. OPÇÃO B** | | **6. OPTION B** |
| **6.1.** Opção B. O Credor Sujeito que tenha validamente escolhido a Opção B, em atenção ao disposto nas Cláusulas 8.1 a 8.3, ou que tenha o seu Crédito Sujeito alocado para recebimento de acordo com a Opção B na forma das Cláusula 8.4 ou 8.5 ("Credor Opção B"), terá o seu respectivo Crédito | | **6.1.** Option B. The Subject Creditor that has validly elected Option B, pursuant to Sections 8.1 until 8.3, or that has had its Subject Claim allocated for payment under Option B pursuant to Sections 8.4 or 8.5 (the "Option B Creditor"), shall have its respective Subject Claim ***(i)*** restructured, novated, |

| | |
|---|---|
| Sujeito ***(i)*** reestruturado, novado, quitado e cancelado, com relação às Requerentes, nos termos deste Plano e dos artigos 163, §1º, e 165, *caput*, da LRF; e ***(ii)*** substituído por Crédito Opção B nas proporções previstas neste Plano, o qual será pago exclusivamente nas condições, prazos e formas de pagamento ora estabelecidos. | fully satisfied, and cancelled with respect to the Debtors, in accordance with this Plan and articles 163, first paragraph, and 165, caput, of the Brazilian Bankruptcy Act; and ***(ii)*** replaced by the Option B Claim, in the proportions set forth in this Plan, which shall be paid exclusively under the conditions, terms, and payment methods herein established. |
| **6.2.** Quitação. A prolação da Sentença de Homologação do Plano acarretará, na Data da Homologação, quitação ampla, plena, irrevogável e irretratável dos respectivos Créditos Sujeitos e das obrigações que os lastreiam com relação às Requerentes, sendo automaticamente cancelados e/ou extintos de pleno direito os instrumentos que consubstanciam os Créditos Sujeitos detidos pelos Credores Opção B, os quais serão automaticamente substituídos por Créditos Opção B. | **6.2.** Release. The entry of the Plan Confirmation Order shall result, on the Judicial Confirmation Date, in the full, final, irrevocable, and irreversible release of the respective Subject Claims and of the obligations underlying them with respect to the Debtors, and the instruments evidencing the Subject Claims held by the Option B Creditors shall be automatically cancelled and/or extinguished by operation of law, being automatically replaced by the Option B Claims. |
| **6.3.** Relação de Troca. O Credor Opção B terá direito a receber o equivalente a 100% (cem por cento) do valor do seu Crédito Sujeito nos termos e condições descritos na Cláusula 6.4 abaixo. | **6.3.** Exchange Ratio. The Option B Creditor shall be entitled to receive the equivalent of one hundred percent (100%) of the amount of its Subject Claim, under the terms and conditions set forth in Section 6.4 below. |
| **6.4.** Termos e Condições da Opção B. Os Credores Opção B serão pagos de acordo com os termos e condições descritos abaixo ("Crédito Opção B"), que serão integralmente refletidos nos seus respectivos Instrumentos de Pagamento da Opção B: | **6.4.** Terms and Conditions of Option B. The Option B Creditors shall be paid in accordance with the terms and conditions described below (the "Option B Claim"), which shall be fully reflected in their respective Option B Payment Instruments: |

| | |
|---|---|
| **(i)** Valor do Principal: 100% (cem por cento) do valor dos Créditos Sujeitos detidos pelos Credores Opção B será pago nos termos e condições previstos nesta Cláusula 6.4. Para que não restem dúvidas, o valor em Crédito Opção B a ser recebido por cada Credor Opção B, nos termos deste Plano e, conforme aplicável, do Plano 1, observará o disposto nas Cláusulas 11.5 e seguintes do Plano, de modo que, em nenhuma hipótese, o respectivo Credor Opção B receberá o valor do seu Crédito Opção B em duplicidade. | **(i)** Principal Amount: 100% (one hundred percent) of the amount of the Subject Claims held by the Option B Creditors shall be paid under the terms and conditions set forth in Section 6.4. For the avoidance of doubt, the amount of the Option B Claim to be received by each Option B Creditor under this Plan and, as applicable, under Plan 1, shall comply with the provisions of Sections 11.5 and following of this Plan, and under no circumstances shall any Option B Creditor receive payment of its Option B Claim in duplicate. |
| **(ii)** Juros Remuneratórios: sobre os Créditos Opção B incidirão juros remuneratórios de 1% (um por cento) ao ano (considerando-se, para tanto, um ano de 360 (trezentos e sessenta) Dias Corridos), computados a partir da Data da Homologação e capitalizados ao valor do principal até a data de vencimento dos Créditos Opção B. | **(ii)** Interest: the Option B Claims shall accrue interest at a rate of 1% (one per cent) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date and capitalized to the principal amount until the maturity date of the Option B Claims. |
| **(iii)** Cronograma de Pagamento do Principal: o valor do principal dos Créditos Opção B, incluindo os juros capitalizados no valor do principal, será amortizado em uma única parcela, na data de vencimento dos Créditos Opção B. | **(iii)** Principal Amortization Schedule: the principal amount of the Option B Claims, including the interest accrue and capitalized into the principal, shall be amortized in a single installment on the maturity date of the Option B Claims. |

| | |
|---|---|
| **(iv)** Fator de correção monetária: não aplicável. | **(iv)** Monetary adjustment factor: not applicable. |
| **(v)** Data de Vencimento: 28 de dezembro de 2070. | **(v)** Maturity Date: December 28, 2070. |
| **(vi)** Moeda: não será alterada a moeda original do respectivo Crédito Sujeito detido pelo Credor Opção B, de modo que os Créditos Sujeitos continuarão denominados na respectiva moeda estrangeira. | **(vi)** Currency: the original currency of the respective Subject Claim held by the Option B Creditor shall not be changed, so that Subject Claims shall remain denominated in its respective foreign currency. |
| **(vii)** Devedora Principal: a AGINT permanecerá como devedora principal, sem prejuízo das garantias fidejussórias descritas abaixo. | **(vii)** Main Debtor: AGINT shall remain as main debtor, without prejudice to the corporate guarantees described below. |
| **(viii)** Garantias Fidejussórias: AGE, AGIE, AGCS, AGPAR e AGSA prestam, neste ato, fiança em garantia do pagamento dos Créditos Opção B, obrigando-se, de forma irrevogável e irretratável, como fiadoras, solidariamente com a(s) respectiva(s) devedora(s) principal(is) e entre si, das obrigações decorrentes desta Opção B, nos termos dos artigos 818 e seguintes do Código Civil, bem como renunciam expressamente aos benefícios de ordem e divisão, assim como aos direitos e faculdades de exoneração de qualquer natureza, previstos nos artigos 333, parágrafo único, 364, 366, | **(viii)** Corporate Guarantees: AGE, AGIE, AGCS, AGPAR and AGSA hereby grant a corporate guarantee (*fiança*) to secure the payment of the Option B Claims, undertaking, irrevocably and irreversibly, as obligors, jointly and severally with the respective main debtor(s) and among themselves, the obligations arising from this Option B, pursuant to articles 818 et seq. of the Brazilian Civil Code, and expressly waiving the benefits of order and division, as well as any rights or discharge faculties of any nature, set forth in articles 333, sole paragraph, 364, 366, 368, 371, 821, 827, 829, 830, |

| | |
|---|---|
| 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 e 839, todos do Código Civil, e nos artigos 130, 131 e 794 do CPC. As garantias fidejussórias outorgadas por AGE, AGCS AGIE, AGPAR e AGSA, conforme aplicável, serão refletidas igualmente no Instrumento de Pagamento da Opção B – *Notes* (conforme definido abaixo), sendo AGE, AGIE, AGCS, AGPAR e AGSA signatárias da escritura de emissão do Instrumento de Pagamento da Opção B – Notes, para este fim, na mesma extensão descrita na frase acima, observando o disposto nas Leis do Estado de Nova Iorque, Estados Unidos da América. Para fins de clareza, as garantidoras fidejussórias sub-rogar-se-ão nos direitos dos Credores Opção B, caso venham a honrar, parcial ou totalmente, a garantia fidejussória, observando o disposto nas Cláusulas 11.5 e seguintes, sendo que as garantidoras fidejussórias se obrigam desde já a não cobrar, receber ou de qualquer outra forma demandar da emissora do Instrumento de Pagamento da Opção B – Notes o pagamento de qualquer valor pago em decorrência das garantias fidejussórias, seja por sub-rogação, compensação ou a qualquer outro título, até que todas as obrigações garantidas tenham sido quitadas. Caso as garantidoras fidejussórias, em | 834, 835, 836, 837, 838 and 839, of the Brazilian Civil Code, and in articles 130, 131 and 794 of the Brazilian Code of Civil Procedure. The corporate guarantees granted by AGE, AGCS, AGIE, AGPAR and AGSA, as applicable, shall be equally reflected in the Option B Payment Instrument – Notes (as defined below), and AGE, AGIE, AGCS, AGPAR and AGSA shall be signatories to the indenture of the Option B Payment Instrument – Notes for this purpose, to the same extent described above, in accordance with the laws of the State of New York, United States of America. For the avoidance of doubt, the guarantors shall be subrogated to the rights of the Option B Creditors in the event they honor, in whole or in part, the corporate guarantee, pursuant to the provisions of Sections 11.5 et. seq., it being understood that the corporate guarantors hereby undertake not to collect, receive, or otherwise demand from the issuer of the Option B Payment Instrument – Notes the payment of any amounts paid under the corporate guarantees, whether by subrogation, set-off, or on any other basis, until all guaranteed obligations have been fully satisfied. Should the corporate guarantors, in violation of such provision, receive any proceeds under the indenture of the Option B |

| | | | | |
|---|---|---|---|---|
| | violação a tal disposição, venham a receber quaisquer recursos decorrentes da escritura de emissão do Instrumento de Pagamento da Opção B – Notes de forma diversa, os receberão na qualidade de fiéis depositárias, devendo providenciar a transferência da totalidade dos referidos recursos em benefício dos Credores Opção B em até 2 (dois) Dias Úteis do seu recebimento, sem qualquer dedução ou desconto. | | | Payment Instrument – Notes in any other manner, they shall receive such proceeds as trustees, and shall transfer the entirety of such proceeds for the benefit of the Option B Creditors within 2 (two) Business Days of receipt, without any deduction or discount. |
| **(ix)** | Resgate Antecipado: os Créditos Opção B poderão, a qualquer momento a partir de 1º de janeiro de 2035 e até 28 de junho de 2070, a exclusivo critério da AGINT, da AGE, da AGCS, da AGIE, da AGSA e/ou da AGPAR, ser resgatados antecipadamente, de forma parcial ou integral, com a aplicação de desconto equivalente a 90% do valor do Crédito Opção B objeto do resgate antecipado, conforme devidamente atualizado até a data de vencimento dos Créditos Opção B. Para que não restem dúvidas, por meio de pagamento de valor equivalente a 10% do Crédito Opção B objeto do resgate antecipado, conforme devidamente atualizado até a data de vencimento dos Créditos Opção B, haverá a quitação da integralidade do Crédito Opção B detido pelo | | **(ix)** | Early Redemption: the Option B Claims may, at any time as of January 1, 2035 and until June 28, 2070, at the sole discretion of AGINT, AGE, AGCS, AGIE, AGSA and/or AGPAR, be redeemed in advance, partially or in full, with the application of a discount equivalent to 90% of the amount of the Option B Claim subject to such early redemption, as duly adjusted until the maturity date of the Option B Claims. For the avoidance of doubt, upon payment of an amount equivalent to 10% of the Option B Claim subject to such early redemption, as duly adjusted until the maturity date of the Option B Claims, the Option B Claim held by the respective Option B Creditor shall be deemed fully settled and discharged for all legal purposes. |

| | |
|---|---|
| respectivo Credor Opção B para todos os fins e efeitos de direito. | |
| **6.5.** <u>Instrumentos de Pagamento da Opção B</u>. A partir da Data da Homologação, os Credores Opção B passarão automaticamente a ser, desde logo, detentores dos seus respectivos Créditos Opção B, com todas as características previstas neste Plano, os quais serão subsequentemente materializados e instrumentalizados por meio dos Instrumentos de Pagamento da Opção B, conforme os critérios estabelecidos abaixo: | **6.5.** <u>Option B Payment Instruments</u>. As of the Judicial Confirmation Date, the Option B Creditors shall automatically become, as of such date, holders of their respective Option B Claims, with all the characteristics set forth in this Plan, which shall subsequently be evidenced and formalized through the Option B Payment Instruments, in accordance with the criteria set forth below: |
| **6.5.1.** <u>Instrumento de Pagamento da Opção B – *Notes*</u>. Os Credores Opção B que, cumulativamente, ***(i)*** sejam atualmente titulares de Notas Internacionais Existentes; e ***(ii.a)*** sejam investidores institucionais qualificados (*qualified institutional buyers*) nos termos da Regra 144A, editada sob o *U.S. Securities Act* de 1933, conforme alterado, ou ***(ii.b)*** não sejam "*pessoas norte-americanas*" (*U.S. persons*), conforme definido na Regra 902 do *U.S. Securities Act*, sendo que qualquer credor descrito nessa Cláusula 6.5.1, item (ii.b), que seja residente em um Estado-membro do Espaço Econômico Europeu também deverá ser um investidor qualificado (*qualified investor*), nos termos do Regulamento (UE) 2017/1129, conforme alterado, e da Lei de Luxemburgo de 16 de julho de 2019 sobre prospectos de valores mobiliários, conforme alterada, ou ***(ii.c)*** sejam investidores institucionais credenciados (*institutional* | **6.5.1.** <u>Option B Payment Instrument – Notes.</u> The Option B Creditors that, cumulatively, ***(i)*** currently hold International Existing Notes; ***(ii.a)*** are qualified institutional buyers as defined under Rule 144A promulgated under the U.S. Securities Act of 1933, as amended; ***(ii.b)*** are not "U.S. persons" as defined under Rule 902 of the U.S. Securities Act, provided that any holder described in this Section 6.5.1, item (ii.b), that is resident of a member state of the European Economic Area must also be a qualified investor under Regulation (EU) 2017/1129, as amended, and under the Luxembourg Law of July 16, 2019 on prospectuses for securities, as amended; or ***(ii.c)*** are institutional accredited investors as defined under Rule 501 of the U.S. Securities Act of 1933, shall, subject to the provisions of Section 6.5.1.5 and except as provided in Section 6.5.1.6 of this Plan, have their Option B Claims arising from the International Existing Notes evidenced and |

| | | |
|---|---|---|
| *accredited investors*) conforme definido na Regra 501 sob o *U.S. Securities Act* de 1933, terão, observado o disposto na Cláusula 6.5.1.5 e salvo na hipótese da Cláusula 6.5.1.6 deste Plano, os seus Créditos Opção B decorrentes das Notas Internacionais Existentes materializados e instrumentalizados por meio de novos títulos a serem emitidos pela AGINT em forma de *notes*, denominadas em Dólares, cuja escritura de emissão será celebrada de forma consistente com o *Term Sheet* constante do **Anexo VII**, de modo a refletir e representar os termos da Opção B conforme o previsto neste Plano ("Instrumento de Pagamento da Opção B – *Notes*"). | | formalized through new notes to be issued by AGINT, in the form of notes, denominated in Dollars, the indenture of which shall be executed in a manner consistent with the Term Sheet attached as **Schedule VII,** so as to reflect and represent the terms of Option B as provided in this Plan (the "Option B Payment Instrument – Notes"). |
| **6.5.1.1.** Para que não restem dúvidas, as Requerentes não solicitaram ofertas para, ou ofereceram ou venderam, e não solicitarão ofertas, ou oferecerão ou venderão, quaisquer valores mobiliários de qualquer forma envolvendo uma oferta pública nos termos da Seção 4(a)(2) do *U.S. Securities Act* de 1933. | | **6.5.1.1.** For the avoidance of doubt, the Debtors have not solicited offers to buy, or offered or sold, and shall not solicit offers to buy, or offer or sell, any securities in any manner involving a public offering pursuant to Section 4(a)(2) of the U.S. Securities Act of 1933. |
| **6.5.1.2.** Lei de Regência: O Instrumento de Pagamento da Opção B – *Notes* será regido pelas Leis do Estado de Nova Iorque, Estados Unidos da América. | | **6.5.1.2.** Governing law. The Option B Payment Instrument – Notes shall be governed by the laws of the State of New York, United States of America. |

| | |
|---|---|
| **6.5.1.3.** Momento de emissão. A emissão do Instrumento de Pagamento da Opção B – *Notes* será realizada após a Decisão de Implementação *Chapter 15* e cancelamento das Notas Internacionais Existentes. | **6.5.1.3.** Time of issuance. The issuance of the Option B Payment Instrument – Notes shall occur after the entry of the Chapter 15 Enforcement Order and the cancellation of the International Existing Notes. |
| **6.5.1.4.** Conflito. Em caso de conflito entre a escritura de emissão do Instrumento de Pagamento da Opção B – *Notes* e qualquer outra disposição deste Plano, prevalecerão os termos e condições estabelecidos neste Plano. | **6.5.1.4.** Conflict. In the event of any conflict between the indenture governing the Option B Payment Instrument – Notes and any other provision of this Plan, the terms and conditions set forth in this Plan shall prevail. |
| **6.5.1.5.** Para que não restem dúvidas, entre a Data da Homologação e a data de emissão do Instrumento de Pagamento Opção B – *Notes*, os Créditos Opção B decorrentes das Notas Internacionais Existentes serão materializados e instrumentalizados por meio deste Plano, o qual servirá, em conjunto com a Sentença de Homologação do Plano, como título executivo judicial para todos os fins e efeitos de direito, conforme artigo 161, § 6º, da LRF ("Instrumento de Pagamento da Opção B – Plano"), podendo ser executado de acordo com os termos e condições previstos neste Plano, inclusive com relação às garantias | **6.5.1.5.** For the avoidance of doubt, between the Judicial Confirmation Date and the issuance date of the Option B Payment Instrument – Notes, the Option B Claims arising from the International Existing Notes shall be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (*título executivo judicial*) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act ("Option B Payment Instrument – Plan"), and may be enforced in accordance with the terms and conditions set forth in |

| | |
|---|---|
| fidejussórias previstas na Cláusula 6.4 deste Plano. | this Plan, including with respect to the corporate guarantees set forth in Section 6.4 of this Plan. |
| **6.5.1.6.** Caso o Instrumento de Pagamento Opção B – *Notes* não seja emitido por qualquer motivo, os Créditos Opção B decorrentes das Notas Internacionais Existentes continuarão sendo materializados e instrumentalizados por meio deste Plano, o qual servirá, em conjunto com a Sentença de Homologação do Plano, como título executivo judicial para todos os fins e efeitos de direito, conforme artigo 161, § 6º, da LRF, podendo ser executado de acordo com os termos e condições previstos neste Plano. O disposto nesta Cláusula não deve ser interpretado como renúncia, mitigação ou limitação da obrigação das Requerentes de adotar as medidas razoavelmente necessárias para emitir o Instrumento de Pagamento Opção B – *Notes*, nos termos deste Plano. | **6.5.1.6.** If the Option B Payment Instrument – Notes is not issued for any reason, the Option B Claims arising from the International Existing Notes shall continue to be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (*título executivo judicial*) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan. The provisions of this Section shall not be construed as a waiver, mitigation, or limitation of the Debtors' obligation to take the reasonably necessary measures to issue the Option B Payment Instrument – Notes, pursuant to the terms of this Plan. |
| **7. OPÇÃO C** | **7. OPTION C** |

| | |
|---|---|
| **7.1.** Opção C. O Credor Sujeito que tenha validamente escolhido a Opção C, em atenção ao disposto nas Cláusulas 8.1 a 8.3 ("Credor Opção C"), terá o seu respectivo Crédito Sujeito ***(i)*** reestruturado, novado, quitado e cancelado, com relação às Requerentes, nos termos deste Plano e dos artigos 163, §1º, e 165, *caput*, da LRF; e ***(ii)*** substituído por Crédito Opção C nas proporções previstas neste Plano, o qual será pago exclusivamente nas condições, prazos e formas de pagamento ora estabelecidos. | **7.1.** Option C. The Subject Creditor that has validly elected Option C, in accordance with Sections 8.1 until 8.3 ("Option C Creditor"), shall have its respective Subject Claim ***(i)*** restructured, novated, fully satisfied and cancelled, with respect to the Debtors, pursuant to the terms of this Plan and articles 163, first paragraph, and 165, caput, of the Brazilian Bankruptcy Act; and ***(ii)*** replaced by an Option C Claim in the proportions set forth in this Plan, which shall be paid exclusively under the terms, deadlines and payment methods established herein. |
| **7.1.1.** Para que não restem dúvidas, a escolha da Opção C pelo Credor Signatário foi válida e regularmente feita nos termos da Cláusula 4.3.1 deste Plano, e a reestruturação, novação, quitação, cancelamento e substituição de seus respectivos Créditos Sujeitos dão-se desde a Data da Celebração, nos termos do artigo 165, § 1º, da LRF e da Cláusula 4.3.1 deste Plano. | **7.1.1.** For the avoidance of doubt, the election of Option C by the Signatory Creditor was validly and duly made pursuant to Section 4.3.1 of this Plan, and the restructuring, novation, full satisfaction, cancellation and replacement of its respective Subject Claims shall take effect as of the Signing Date, pursuant to article 165, first paragraph, of the Brazilian Bankruptcy Act and Section 4.3.1 of this Plan. |
| **7.2.** Quitação. A prolação da Sentença de Homologação do Plano acarretará, na Data da Homologação, quitação ampla, plena, irrevogável e irretratável dos respectivos Créditos Sujeitos e das obrigações que os lastreiam com relação às Requerentes, sendo automaticamente cancelados e/ou extintos de pleno direito os instrumentos que consubstanciam os Créditos Sujeitos detidos pelos Credores Opção C, os quais serão automaticamente substituídos pelos Créditos Opção C. | **7.2.** Release. The entry of the Plan Confirmation Order shall result, on the Judicial Confirmation Date, in the full, complete, irrevocable and irreversible release of the respective Subject Claims and of the obligations underlying them with respect to the Debtors, and the instruments embodying the Subject Claims held by the Option C Creditors shall be automatically cancelled and/or extinguished by operation of law, |

| | |
|---|---|
| | being shall be automatically replaced by the Option C Claims. |
| **7.2.1.** Para que não restem dúvidas, o disposto na Cláusula 7.2 será aplicável desde a Data da Celebração aos Créditos Sujeitos detidos pelo Credor Signatário, observado o disposto na Cláusula 4.3.1 deste Plano. | **7.2.1.** For the avoidance of doubt, the provisions of Section 7.2 shall apply as of the Signing Date to the Subject Claims held by the Signatory Creditor, pursuant to the provisions of Section 4.3.1 of this Plan. |
| **7.3.** Relação de Troca. O Credor Opção C terá direito a receber o equivalente a ***(i)*** 31% (trinta e um por cento) do valor do seu Crédito Sujeito nos termos e condições descritos na Cláusula 7.4.1, que refletem substancialmente os termos e condições aplicáveis para o pagamento dos Créditos Opção A, conforme previsto na Cláusula 5.4, item "(ii)" em diante; e ***(ii)*** 69% (sessenta e nove por cento) do valor do seu Crédito Sujeito nos termos e condições descritos na Cláusula 7.4.2, que refletem substancialmente os termos e condições aplicáveis para o pagamento dos Créditos Opção B, conforme previsto na Cláusula 6.4, item (ii) em diante. | **7.3.** Exchange Ratio. The Option C Creditor shall be entitled to receive the equivalent of ***(i)*** 31% (thirty-one percent) of the amount of its Subject Claim under the terms and conditions set forth in Section 7.4.1, which substantially reflect the terms and conditions applicable to the payment of Option A Claims, as provided in Section 5.4, item "(ii)" onwards; and ***(ii)*** 69% (sixty-nine percent) of the amount of its Subject Claim under the terms and conditions set forth in Section 7.4.2, which substantially reflect the terms and conditions applicable to the payment of Option B Claims, as provided in Section 6.4, item (ii) onwards. |
| **7.4.** Termos e Condições da Opção C. Os Credores Opção C serão pagos de acordo com os termos e condições descritos nas Cláusulas 7.4.1 ("Crédito Opção C – Tranche A") e 7.4.2 ("Crédito Opção C – Tranche B"), que serão integralmente refletidos nos seus respectivos Instrumentos de Pagamento da Opção C: | **7.4.** Terms and Conditions of Option C. The Option C Creditors shall be paid, in accordance with the terms and conditions set forth in Sections 7.4.1 ("Option C Claim – Tranche A") and 7.4.2 ("Option C Claim – Tranche B"), which shall be fully reflected in their respective Option C Payment Instruments: |
| **7.4.1.** Créditos Opção C – Tranche A: | **7.4.1.** Option C Claims – Tranche A: |

| | | | | |
|---|---|---|---|---|
| **(i)** | Valor do Principal: 31% (trinta e um por cento) do valor dos Créditos Sujeitos detidos pelos Credores Opção C será pago nos termos e condições previstos nesta Cláusula 7.4.1. Para que não restem dúvidas, o valor em Crédito Opção C – Tranche A a ser recebido por cada Credor Opção C, nos termos deste Plano e, conforme aplicável, do Plano 1, observará o disposto nas Cláusulas 11.5 e seguintes do Plano, de modo que, em nenhuma hipótese, o respectivo Credor Opção C receberá o valor do seu Crédito Opção C – Tranche A em duplicidade. | | **(i)** | Principal Amount: 31% (thirty-one percent) of the amount of the Subject Claims held by the Option C Creditors shall be paid under the terms and conditions set forth in this Section 7.4.1. For the avoidance of doubt, the amount of the Option C Claim – Tranche A to be received by each Option C Creditor, pursuant to this Plan and, as applicable, Plan 1, shall comply with the provisions of Sections 11.5 and following of the Plan, such that, under no circumstances, shall the respective Option C Creditor receive the amount of its Option C Claim – Tranche A in duplicate. |
| **(ii)** | Juros Remuneratórios: sobre os Créditos Opção C – Tranche A incidirão juros remuneratórios de 6,00% (seis por cento) ao ano (considerando-se, para tanto, um ano de 360 (trezentos e sessenta) Dias Corridos), computados a partir da Data da Homologação até 28 de dezembro de 2040. | | **(ii)** | Interest: the Option C Claims – Tranche A shall accrue interest at a rate of 6.00% (six percent) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date until 28 December 2040. |
| **(iii)** | Cronograma e Forma de Pagamento dos Juros Remuneratórios: os juros remuneratórios que incidirem sobre os Créditos Opção C – Tranche A serão pagos da seguinte forma: **(a)** da Data da Homologação até 28 de dezembro de 2030, os juros remuneratórios | | **(iii)** | Schedule and Form of Payment of Interest: the interest accruing on the Option C Claims – Tranche A shall be paid as follows: **(a)** from the Judicial Confirmation Date until 28 December 2030, the interest accrued during the period shall be capitalized into the |

| | | | | |
|---|---|---|---|---|
| | incidentes no período serão capitalizados no valor do principal; e **(b)** de 28 de dezembro de 2030 até 28 de dezembro de 2040, os juros remuneratórios incidentes no período serão pagos em dinheiro e em bases semestrais, em 28 de junho e 28 de dezembro, conforme aplicável, sendo a data do primeiro pagamento 28 de junho de 2031. | | | principal amount; and **(b)** from 28 December 2030 until 28 December 2040, the interest accrued during the period shall be paid in cash on a semiannual basis, on 28 June and 28 December, as applicable, with the first payment date being 28 June 2031. |
| **(iv)** | <u>Cronograma de Pagamento do Principal</u>: o valor do principal dos Créditos Opção C – Tranche A, incluindo os juros capitalizados ao valor do principal, será amortizado, em dinheiro, em seis parcelas anuais, a serem pagas em 28 de dezembro de 2035, 28 de dezembro de 2036, 28 de dezembro de 2037, 28 de dezembro de 2038, 28 de dezembro de 2039 e 28 de dezembro de 2040, no valor correspondente a 16,667%, 20%, 25%, 33,333%, 50% e 100% do valor do saldo do principal existente nas respectivas datas de pagamento. | | **(iv)** | <u>Principal Payment Schedule</u>: the principal amount of the Option C Claims – Tranche A, including the interest capitalized into the principal amount, shall be amortized, in cash, in six annual installments, to be paid on December 28 of 2035, December 28 of 2036, December 28 of 2037, December 28 of 2038, December 28 of 2039 and December 28 of 2040, in the amounts corresponding to 16.667%, 20%, 25%, 33.333%,50% and 100% of the outstanding principal balance on the respective payment dates. |
| **(v)** | <u>Data de Vencimento</u>: 28 de dezembro de 2040. | | **(v)** | <u>Maturity Date</u>: 28 December 2040. |
| **(vi)** | <u>Fator de correção monetária</u>: não aplicável. | | **(vi)** | <u>Monetary adjustment factor</u>: not applicable. |

| | |
|---|---|
| **(vii)** Moeda: não será alterada a moeda original do respectivo Crédito Sujeito detido pelo Credor Opção C, de modo que os Créditos Sujeitos continuarão denominados na respectiva moeda estrangeira. | **(vii)** Currency: the original currency of the respective Subject Claim held by the Option C Creditor shall not be changed, such that Subject Claims shall remain denominated in the respective foreign currency. |
| **(viii)** Devedora Principal: AGINT permanecerá como a devedora principal, sem prejuízo das garantias fidejussórias descritas abaixo. | **(viii)** Main Debtor: AGINT shall remain as the main debtor, without prejudice to the corporate guarantees described below. |
| **(ix)** Garantias Fidejussórias: AGE, AGIE, AGCS, AGPAR e AGSA prestam, neste ato, fiança em garantia do pagamento dos Créditos Opção C – Tranche A, obrigando-se, de forma irrevogável e irretratável, como fiadoras, solidariamente com a(s) respectiva(s) devedora(s) principal(is) e entre si, das obrigações decorrentes desta Opção C – Tranche A, nos termos dos artigos 818 e seguintes do Código Civil, bem como renunciam expressamente aos benefícios de ordem e divisão, assim como aos direitos e faculdades de exoneração de qualquer natureza, previstos nos artigos 333, parágrafo único, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 e 839, todos do Código Civil, e nos artigos 130, 131 e 794 do CPC. As garantias fidejussórias outorgadas por AGE, AGCS AGIE, | **(ix)** Corporate Guarantees: AGE, AGIE, AGCS, AGPAR and AGSA hereby grant a corporate guarantee (*fiança*) to secure the payment of the Option C – Tranche A Claims, irrevocably and irreversibly undertaking, as obligors, jointly and severally with the respective main debtor(s) and among themselves, the obligations arising from this Option C – Tranche A, pursuant to articles 818 et seq. of the Brazilian Civil Code, and expressly waive the benefits of order and division, as well as any rights and faculties of release of any nature, set forth in articles 333, sole paragraph, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 and 839, all of the Brazilian Civil Code, and articles 130, 131 and 794 of the Brazilian Code of Civil Procedure. The corporate guarantees granted by AGE, AGCS, |

| | | |
|---|---|---|
| AGPAR e AGSA, conforme aplicável, serão refletidas igualmente nos Instrumentos de Pagamento da Opção C – *Notes*, sendo AGE, AGIE, AGCS, AGPAR e AGSA signatárias da escritura de emissão dos Instrumentos de Pagamento da Opção C – *Notes*, para este fim, na mesma extensão descrita na frase acima, observando o disposto nas Leis do Estado de Nova Iorque, Estados Unidos da América. Para fins de clareza, as garantidoras fidejussórias sub-rogar-se-ão nos direitos dos Credores Opção C, caso venham a honrar, parcial ou totalmente, a garantia fidejussória, observando o disposto nas Cláusulas 11.5 e seguintes, sendo que as garantidoras fidejussórias se obrigam desde já a não cobrar, receber ou de qualquer outra forma demandar da emissora dos Instrumentos de Pagamento da Opção C – *Notes* o pagamento de qualquer valor pago em decorrência das garantias fidejussórias, seja por sub-rogação, compensação ou a qualquer outro título, até que todas as obrigações garantidas tenham sido quitadas. Caso as garantidoras fidejussórias, em violação a tal disposição, venham a receber quaisquer recursos decorrentes da escritura de emissão dos Instrumentos de Pagamento da Opção C – *Notes* de forma diversa, os receberão na | | AGIE, AGPAR and AGSA, as applicable, shall be equally reflected in the Option C Payment Instruments – Notes (as defined below), and AGE, AGIE, AGCS, AGPAR and AGSA shall be signatories to the indenture of the Option C Payment Instruments – Notes for this purpose, to the same extent described above, in accordance with the laws of the State of New York, United States of America. For the avoidance of doubt, the guarantors shall be subrogated to the rights of the Option C Creditors in the event they honor, in whole or in part, the corporate guarantee, pursuant to the provisions of Sections 11.5 et. seq., it being understood that the guarantors hereby undertake not to collect, receive, or otherwise demand from the issuer of the Option C Payment Instruments – Notes the payment of any amounts paid under the corporate guarantees, whether by subrogation, set-off, or on any other basis, until all guaranteed obligations have been fully satisfied. Should the corporate guarantors, in violation of such provision, receive any proceeds under the indenture of the Option C Payment Instruments – Notes in any other manner, they shall receive such proceeds as trustees, and shall transfer the entirety of such proceeds for the benefit of the Option C Creditors |

| | | | |
|---|---|---|---|
| | qualidade de fiéis depositárias, devendo providenciar a transferência da totalidade dos referidos recursos em benefício dos Credores Opção C em até 2 (dois) Dias Úteis do seu recebimento, sem qualquer dedução ou desconto. | | within 2 (two) Business Days of receipt, without any deduction or discount. |
| **7.4.2.** | Créditos Opção C – Tranche B: | **7.4.2.** | Option C Claims – Tranche B: |
| **(i)** | Valor do Principal: 69% (sessenta e nove por cento) do valor dos Créditos Sujeitos detidos pelos Credores Opção C será pago nos termos e condições previstos nesta Cláusula 7.4.2. Para que não restem dúvidas, o valor em Crédito Opção C – Tranche B a ser recebido por cada Credor Opção C, nos termos deste Plano e, conforme aplicável, do Plano 1, observará o disposto nas Cláusulas 11.5 e seguintes do Plano, de modo que, em nenhuma hipótese, o respectivo Credor Opção C receberá o valor do seu Crédito Opção C – Tranche B em duplicidade. | **(i)** | Principal Amount: 69% (sixty-nine percent) of the amount of the Subject Claims held by the Option C Creditors shall be paid under the terms and conditions set forth in this Section 7.4.2. For the avoidance of doubt, the amount of the Option C Claim – Tranche B to be received by each Option C Creditor, pursuant to this Plan and, as applicable, Plan 1, shall comply with the provisions of Sections 11.5 and following of the Plan, such that, under no circumstances, shall the respective Option C Creditor receive the amount of its Option C Claim – Tranche B in duplicate. |
| **(ii)** | Juros Remuneratórios: sobre os Créditos Opção C – Tranche B incidirão juros remuneratórios de 1% (um por cento) ao ano (considerando-se, para tanto, um ano de 360 (trezentos e sessenta) Dias Corridos), computados a partir da Data da | **(ii)** | Interest: the Option C – Tranche B Claims shall accrue interest at a rate of 1% (one per cent) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date and capitalized into |

| | | | | |
|---|---|---|---|---|
| | Homologação e capitalizados no valor do principal até a data de vencimento dos Créditos Opção C – Tranche B. | | | the principal amount until the maturity date of the Option C – Tranche B Claims. |
| **(iii)** | Cronograma de Pagamento do Principal: o valor do principal dos Créditos Opção C – Tranche B, incluindo os juros capitalizados no valor do principal, será amortizado em uma única parcela, na data de vencimento dos Créditos Opção C– Tranche B. | | **(iii)** | Principal Payment Schedule: the principal amount of the Option C Claims – Tranche B, including the interest capitalized into the principal amount, shall be amortized in a single installment, on the maturity date of the Option C Claims– Tranche B. |
| **(iv)** | Fator de correção monetária: não aplicável. | | **(iv)** | Monetary adjustment factor: not applicable. |
| **(v)** | Data de Vencimento: 28 de dezembro de 2070. | | **(v)** | Maturity Date: 28 December 2070. |
| **(vi)** | Moeda: não será alterada a moeda original do respectivo Crédito Sujeito detido pelo Credor Opção C, de modo que os Créditos Sujeitos continuarão denominados pela respectiva moeda estrangeira. | | **(vi)** | Currency: the original currency of the respective Subject Claim held by the Option C Creditor shall not be changed, such that Subject Claims shall remain denominated in the respective foreign currency. |
| **(vii)** | Devedora Principal(is): AGINT permanecerá como a devedora principal, sem prejuízo das garantias fidejussórias descritas abaixo. | | **(vii)** | Main Debtor: AGINT shall remain as the main debtor, without prejudice to the corporate guarantees described below. |
| **(viii)** | Garantias Fidejussórias: AGE, AGIE, AGCS, AGPAR e AGSA prestam, neste ato, fiança em garantia do | | **(viii)** | Corporate Guarantees: AGE, AGIE, AGCS, AGPAR and AGSA hereby grant a corporate guarantee (*fiança*) to |

| | | |
|---|---|---|
| pagamento dos Créditos Opção C – Tranche B, obrigando-se, de forma irrevogável e irretratável, como fiadoras, solidariamente com a(s) respectiva(s) devedora(s) principal(is) e entre si, das obrigações decorrentes desta Opção C – Tranche B, nos termos dos artigos 818 e seguintes do Código Civil, bem como renunciam expressamente aos benefícios de ordem e divisão, assim como aos direitos e faculdades de exoneração de qualquer natureza, previstos nos artigos 333, parágrafo único, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 e 839, todos do Código Civil, e nos artigos 130, 131 e 794 do CPC. As garantias fidejussórias outorgadas por AGE, AGCS AGIE, AGPAR e AGSA, conforme aplicável, serão refletidas igualmente nos Instrumentos de Pagamento da Opção C – *Notes*, sendo AGE, AGIE, AGCS, AGPAR e AGSA signatárias da escritura de emissão dos Instrumentos de Pagamento da Opção C – *Notes*, para este fim, na mesma extensão descrita na frase acima, observando o disposto nas Leis do Estado de Nova Iorque, Estados Unidos da América. Para fins de clareza, as garantidoras fidejussórias sub-rogar-se-ão nos direitos dos Credores Opção C, caso venham a honrar, parcial ou totalmente, a garantia fidejussória, | | secure the payment of the Option C – Tranche B Claims, irrevocably and irreversibly undertaking, as obligors, jointly and severally with the respective main debtor(s) and among themselves, the obligations arising from this Option C – Tranche B, pursuant to articles 818 et seq. of the Brazilian Civil Code, and expressly waive the benefits of order and division, as well as any rights and faculties of release of any nature, set forth in articles 333, sole paragraph, 364, 366, 368, 371, 821, 827, 829, 830, 834, 835, 836, 837, 838 and 839, all of the Brazilian Civil Code, and articles 130, 131 and 794 of the Brazilian Code of Civil Procedure. The corporate guarantees granted by AGE, AGCS, AGIE, AGPAR and AGSA, as applicable, shall be equally reflected in the Option C Payment Instruments – Notes, and AGE, AGIE, AGCS, AGPAR and AGSA shall be signatories to the indenture of the Option C Payment Instruments – Notes for this purpose, to the same extent described above, in accordance with the laws of the State of New York, United States of America. For the avoidance of doubt, the guarantors shall be subrogated to the rights of the Option C Creditors in the event they honor, in whole or in part, the corporate guarantee, pursuant to the |

| | | | |
|---|---|---|---|
| | observando o disposto nas Cláusulas 11.5 e seguintes, sendo que as garantidoras fidejussórias se obrigam desde já a não cobrar, receber ou de qualquer outra forma demandar da emissora dos Instrumentos de Pagamento da Opção C – *Notes* o pagamento de qualquer valor pago em decorrência das garantias fidejussórias, seja por sub-rogação, compensação ou a qualquer outro título, até que todas as obrigações garantidas tenham sido quitadas. Caso as garantidoras fidejussórias, em violação a tal disposição, venham a receber quaisquer recursos decorrentes da escritura de emissão dos Instrumentos de Pagamento da Opção C – *Notes* de forma diversa, os receberão na qualidade de fiéis depositárias, devendo providenciar a transferência da totalidade dos referidos recursos em benefício dos Credores Opção C em até 2 (dois) Dias Úteis do seu recebimento, sem qualquer dedução ou desconto. | | provisions of Section 11.5 et. seq, it being understood that the corporate guarantors hereby undertake not to collect, receive, or otherwise demand from the issuer of the Option C Payment Instruments – Notes the payment of any amounts paid under the corporate guarantees, whether by subrogation, set-off, or on any other basis, until all guaranteed obligations have been fully satisfied. Should the corporate guarantors, in violation of such provision, receive any proceeds under the indenture of the Option C Payment Instruments – Notes in any other manner, they shall receive such proceeds as trustees, and shall transfer the entirety of such proceeds for the benefit of the Option C Creditors within 2 (two) Business Days of receipt, without any deduction or discount. |
| **(ix)** | Resgate Antecipado: os Créditos Opção C – Tranche B poderão, a qualquer momento a partir de 1º de janeiro de 2035 e até 28 de junho de 2070, a exclusivo critério da AGINT, da AGE, da AGCS, da AGIE, da AGSA e/ou da AGPAR, ser resgatados antecipadamente, de forma parcial ou | **(ix)** | Early Redemption: the Option C – Tranche B Claims may, at any time from January 1st, 2035, until June 28, 2070, at the sole discretion of AGINT, AGE, AGCS, AGIE, AGSA and/or AGPAR, be redeemed in advance, partially or in full, with the application of a discount equivalent to 90% of the |

| | |
|---|---|
| integral, com a aplicação de desconto equivalente a 90% do valor do Crédito Opção C – Tranche B objeto do resgate antecipado, conforme devidamente atualizado até a data de vencimento dos Créditos Opção C – Tranche B. Para que não restem dúvidas, por meio do pagamento de valor equivalente a 10% dos Créditos Opção C – Tranche B objeto do resgate antecipado, conforme devidamente atualizado até a data de vencimento dos Créditos Opção C – Tranche B, haverá a quitação integral da integralidade do Crédito Opção C – Tranche B detido pelo respectivo Credor Opção C para todos os fins e efeitos de direito. | amount of the Option C – Tranche B Claim subject to such redemption, as duly adjusted until the maturity date of the Option C – Tranche B Claims. For the avoidance of doubt, upon payment of an amount equivalent to 10% of the Option C – Tranche B Claims subject to the early redemption, as duly updated until the maturity date of the Option C – Tranche B Claims, the entirety of the Option C – Tranche B Claim held by the respective Option C Creditor shall be deemed fully settled and discharged for all legal purposes. |
| **7.5.** Instrumentos de Pagamento da Opção C. A partir da Data da Homologação, os Credores Opção C passarão automaticamente a ser, desde logo, detentores dos seus respectivos Créditos Opção C, com todas as características previstas neste Plano, os quais serão subsequentemente materializados e instrumentalizados por meio dos Instrumentos de Pagamento da Opção C, conforme os critérios estabelecidos abaixo: | **7.5.** Option C Payment Instruments. As of the Judicial Confirmation Date, the Option C Creditors shall automatically become, as of such date, holders of their respective Option C Claims, with all the characteristics set forth in this Plan, which shall subsequently be evidenced and formalized through the Option C Payment Instruments, in accordance with the criteria set forth below: |
| **7.5.1.** Instrumentos de Pagamento da Opção C – *Notes*. Os Credores Opção C que, cumulativamente, ***(i)*** sejam atualmente titulares de Notas Internacionais Existentes; e ***(ii.a)*** sejam investidores institucionais qualificados (*qualified institutional buyers*) nos termos da Regra 144A, editada sob o | **7.5.1** Option C Payment Instruments – Notes. The Option C Creditors who, cumulatively, ***(i)*** are currently holders of International Existing Notes; ***(ii.a)*** are qualified institutional buyers within the meaning of Rule 144A under the U.S. Securities Act of 1933, as amended, ***(ii.b)*** are |

| | |
|---|---|
| *U.S. Securities Act* de 1933, conforme alterado, ou ***(ii.b)*** não sejam "*pessoas norte-americanas*" (*U.S. persons*), conforme definido na Regra 902 do *U.S. Securities Act*, sendo que qualquer credor descrito nessa Cláusula 7.5.1, item (ii.b), que seja residente em um Estado-membro do Espaço Econômico Europeu também deverá ser um investidor qualificado (*qualified investor*), nos termos do Regulamento (UE) 2017/1129, conforme alterado, e da Lei de Luxemburgo de 16 de julho de 2019 sobre prospectos de valores mobiliários, conforme alterada, ou ***(ii.c)*** sejam investidores institucionais credenciados (*institutional accredited investors*) conforme definido na Regra 501 sob o *U.S. Securities Act* de 1933; terão, observado o disposto na Cláusula 7.5.1.2 e salvo na hipótese da Cláusula 7.5.1.3, os seus ***(i)*** Créditos Opção C – Tranche A decorrentes das Notas Internacionais Existentes materializados e instrumentalizados por meio dos Instrumento de Pagamento da Opção A – *Notes,* cuja escritura de emissão será celebrada de forma consistente com o *Term Sheet* constante do **Anexo VI**, de modo a refletir e representar os termos da Opção C-Tranche A conforme o previsto neste Plano, observado o disposto no item (i) da Cláusula 7.4.1 deste Plano; e ***(ii)*** Créditos Opção C – Tranche B materializados e instrumentalizados por meio dos Instrumento de Pagamento da Opção B – *Notes,* cuja escritura de emissão será | not "U.S. persons", as defined in Rule 902 under the U.S. Securities Act, provided that any holder described in this Section 7.5.1, item (ii.b), that is resident of a member state of the European Economic Area must also be a qualified investor under Regulation (EU) 2017/1129, as amended, and the Luxembourg Law of July 16, 2019 on prospectuses for securities, as amended, or ***(ii.c)*** are institutional accredited investors as defined in Rule 501 under the U.S. Securities Act of 1933; shall, subject to the provisions of Section 7.5.1.2 and except as provided in Section 7.5.1.3, have their ***(i)*** Option C – Tranche A Claims arising from the International Existing Notes evidenced and formalized through the Option A Payment Instrument – Notes, the indenture of which shall be executed in a manner consistent with the Term Sheet set forth in **Schedule VI**, so as to reflect and represent the terms of Option C – Tranche A as provided in this Plan, subject to the provisions of item (i) of Section 7.4.1 of this Plan; and ***(ii)*** Option C– Tranche B Claims evidenced and formalized through the Option B Payment Instrument – Notes, the indenture of which shall be executed in a manner consistent with the Term Sheet set forth in **Schedule VII**, so as to reflect and represent the terms of Option C – Tranche B as provided in this Plan, subject to the provisions of Option C – Tranche B as provided in this Plan, pursuant to item (i) of Section 7.4.2 of this Plan. |

| | |
|---|---|
| celebrada de forma consistente com o *Term Sheet* constante do **Anexo VII**, de modo a refletir e representar os termos da Opção C-Tranche B conforme o previsto neste Plano, observado o disposto no item (i) da Cláusula 7.4.2 deste Plano. | |
| **7.5.1.1.** Para que não restem dúvidas, as disposições constantes das Cláusulas 5.5.1.1 a 5.5.1.4 e 6.5.1.1 a 6.5.1.4 acima serão aplicáveis aos Instrumentos de Pagamento Opção C - *Notes*. | **7.5.1.1** For the avoidance of doubt, the provisions set forth in Sections 5.5.1.1 to 5.5.1.4 and 6.5.1.1 to 6.5.1.4 above shall apply to the Option C Payment Instruments – Notes. |
| **7.5.1.2.** Para que não restem dúvidas, entre a Data da Homologação (ou, no caso do Credor Signatário, a Data da Celebração) e a data de emissão do Instrumento de Pagamento Opção C – *Notes*, os Créditos Opção C – Tranche A e os Créditos Opção C – Tranche B decorrentes das Notas Internacionais Existentes serão materializados e instrumentalizados por meio deste Plano, o qual servirá, em conjunto com a Sentença de Homologação do Plano, como título executivo judicial para todos os fins e efeitos de direito, conforme artigo 161, § 6º, da LRF ("Instrumento de Pagamento da Opção C – Plano"), podendo ser executado de acordo com os termos e condições previstos neste Plano, inclusive com relação às garantias | **7.5.1.2** For the avoidance of doubt, between the Judicial Confirmation Date (or, in the case of the Signatory Creditor, the Signing Date) and the issuance date of the Option C Payment Instrument – Notes, the Option C – Tranche A Claims and the Option C – Tranche B Claims arising from the International Existing Notes shall be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall serve as a judicial enforceable instrument (*título executivo judicial*) for all legal purposes and effects, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act ("Option C Payment Instrument – Plan"), and may be enforced in accordance with the terms and conditions set forth in this Plan, including with respect to the corporate |

| | |
|---|---|
| fidejussórias previstas na Cláusula 7.4 deste Plano. | guarantees set forth in Section 7.4 of this Plan. |
| **7.5.1.3.** Caso o Instrumento de Pagamento Opção C – *Notes* não seja emitido por qualquer motivo, os Créditos Opção C – Tranche A e os Créditos Opção C – Tranche B decorrentes das Notas Internacionais Existentes continuarão sendo materializados e instrumentalizados por meio deste Plano, o qual servirá, em conjunto com a Sentença de Homologação do Plano, como título executivo judicial para todos os fins e efeitos de direito, conforme artigo 161, § 6º, da LRF, podendo ser executado de acordo com os termos e condições previstos neste Plano. O disposto nesta Cláusula não deve ser interpretado como renúncia, mitigação ou limitação da obrigação das Requerentes de adotar as medidas razoavelmente necessárias para emitir o Instrumento de Pagamento Opção C – *Notes*, nos termos deste Plano. | **7.5.1.3** If the Option C Payment Instrument – Notes is not issued for any reason, the Option C – Tranche A Claims and the Option C – Tranche B Claims arising from the International Existing Notes shall continue to be evidenced and formalized through this Plan, which, together with the Plan Confirmation Order, shall constitute an enforceable court order for all legal purposes, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, and may be enforced in accordance with the terms and conditions set forth in this Plan. The provisions of this Section shall not be construed as a waiver, mitigation, or limitation of the Debtors' obligation to take all reasonably necessary measures to issue the Option C Payment Instruments – Notes, pursuant to the terms of this Plan. |
| **8. ELEIÇÃO E ESCOLHA DAS OPÇÕES DE PAGAMENTO** | **8. ELECTION AND SELECTION OF PAYMENT OPTIONS** |
| **8.1.** <u>Eleição da Opção de Pagamento</u>. Os Credores Sujeitos poderão optar pela reestruturação e pagamento de seus Créditos Sujeitos por meio da Opção A, Opção B ou da Opção C, nos termos das | **8.1.** <u>Election of Payment Option</u>. The Subject Creditors may elect ("<u>Payment Option Election</u>") to have their Subject Claims restructured and paid under either Option A, Option B or Option C |

| | |
|---|---|
| Cláusulas 5, 6 e 7 deste Plano, sendo certo que cada Credor Sujeito poderá optar por apenas uma opção de pagamento em relação à totalidade do seu respectivo Crédito Sujeito ("Eleição da Opção de Pagamento"). | pursuant to Sections 5, 6 and 7 of this Plan, it being understood that each Subject Creditor may elect only one payment option with respect to the entirety of its respective Subject Claim ("Payment Option Election"). |
| **8.2.** Procedimento de Eleição de Opção de Pagamento. A Eleição da Opção de Pagamento deverá ser realizada dentro do prazo de 30 (trinta) Dias Corridos, que terá início em até 45 (quarenta e cinco) Dias Corridos após a Sentença de Homologação do Plano ("Data de Início do Período de Eleição"), fixada nos termos da Cláusula 8.2.1 abaixo, devendo cada Credor Sujeito observar o disposto nas Cláusulas seguintes ("Procedimento de Eleição de Opção de Pagamento"), ressalvado o disposto na Cláusula 8.2.3 do Plano. Para que não restem dúvidas, a Eleição da Opção de Pagamento terá início na Data de Início do Período de Eleição e será encerrada no trigésimo Dia Corrido contado da Data de Início do Período de Eleição (este intervalo, o "Período de Eleição"). | **8.2.** Payment Option Election Process. The Payment Option Election shall be carried out within the deadline of 30 (thirty) Calendar Days], which shall commence within up to 45 (forty-five) Calendar Days after the Plan Confirmation Order (the "Election Period Commencement Date"), as set forth in Section 8.2.1 below, and each Subject Creditor shall comply with the provisions set forth in the following Sections (the "Payment Option Election Process"), except as provided for in Section 8.2.3 of this Plan. For the avoidance of doubt, the Payment Option Election shall begin on the Election Period Commencement Date and shall end on the thirtieth Calendar Day counted from the Election Period Commencement Date (this interval, the "Election Period"). |
| **8.2.1.** Data de Início do Período de Eleição. As Requerentes divulgarão, no sítio eletrônico indicado na Cláusula 8.3 abaixo e/ou por meio de petição nos autos da Recuperação Extrajudicial, a exata Data de Início do Período de Eleição, que será fixada, pelas Requerentes, em até 45 (quarenta e cinco) Dias Corridos após a Sentença de Homologação do Plano. Na ausência de divulgação pelas Requerentes na forma estabelecida nesta Cláusula, a Data de Início do Período de Eleição será *ipso facto* | **8.2.1.** Election Period Commencement Date. The Debtors shall disclose, on the website indicated in Section 8.3 below and/or by means of a filing in the records of the Extrajudicial Reorganization, the exact Election Period Commencement Date, which shall be set within up to 45 (forty-five) Calendar Days after the Plan Confirmation Order. In the absence of disclosure by the Debtors in the manner set forth in this Section, the Election Period Commencement Date shall be *ipso facto* deemed to be the |

| | |
|---|---|
| fixada no quadragésimo sexto Dia Corrido após a Sentença de Homologação. | forty-sixth Calendar Day after the Plan Confirmation Order. |
| **8.2.2.** Os Credores Sujeitos deverão, com relação aos seus Créditos Sujeitos decorrentes de Notas Internacionais Existentes, realizar a Eleição de Pagamento por meio do sistema de oferta de compra automatizada do DTC ou pelo sistema de Depósito ou Retirada no Custodiante (DWAC). Os Credores Sujeitos deverão, durante o Período de Eleição e, portanto, antes do fim do Período de Eleição, preencher e entregar o formulário de eleição conforme modelo a ser divulgado no sítio eletrônico mencionado na Cláusula 8.3 abaixo, ao seu respectivo banco ou à sua respectiva corretora no qual suas respectivas Notas Internacionais Existentes estão custodiadas. | **8.2.2.** The Subject Creditors shall, with respect to their Subject Claims arising from International Existing Notes, carry out the Payment Option Election through DTC's automated tender offer program (ATOP) or the Deposits/Withdrawals at Custodian (DWAC) system. The Subject Creditors shall, within the Election Period and therefore prior to the end of the Election Period, complete and deliver the election form, in the form to be made available on the website referred to in Section 8.3 below, to its respective bank or broker with which their respective International Existing Notes are held in custody. |
| **8.2.3.** <u>Eleição do Credor Signatário</u>. Para que não restem dúvidas, o Credor Signatário já efetuou, válida e regularmente, a Eleição da Opção de Pagamento, nos termos Cláusula 4.3.1 deste Plano. Não obstante tenha efetuado, válida e regularmente, a Eleição da Opção de Pagamento, o Credor Signatário compromete-se a observar o disposto na Cláusula 8.2.2 acima, para possibilitar a identificação de suas Notas Internacionais Existentes depositadas no DTC e, assim, possibilitar que sejam formalmente canceladas na hipótese de | **8.2.3.** <u>Signatory Creditor's Election</u>. For the avoidance of doubt, the Signatory Creditor has already validly and duly made the Payment Option Election pursuant to Section 4.3.1 of this Plan. Notwithstanding having validly and duly made the Payment Option Election, the Signatory Creditor undertakes to comply with the provisions of Section 8.2.2 above, in order to enable the identification of its International Existing Notes deposited with the DTC and, thereby, enable their formal |

| | |
|---|---|
| emissão dos Instrumentos de Pagamento Opção C – *Notes*. | cancellation in the event of issuance of the Option C Payment Instruments – Notes. |
| **8.3.** Todas as instruções e informações pertinentes e necessárias para participação dos Credores Sujeitos no Procedimento de Eleição da Opção de Pagamento, inclusive eventuais atualizações, serão divulgadas pelas Requerentes no sítio eletrônico https://andradegutierrez365.sharepoint.com/:f:/s/REJ2026andradegutierrez/IgDaz9D-4HAfS5A6mPHcl33BAfEhcicXvDY5d75qzkQmkDg?e=bUYjae após a Sentença de Homologação do Plano. | **8.3.** All instructions and information relevant and necessary for the participation of the Subject Creditors in the Payment Option Election Process, including any updates, shall be disclosed by the Debtors on the website https://andradegutierrez365.sharepoint.com/:f:/s/REJ2026andradegutierrez/IgDaz9D-4HAfS5A6mPHcl33BAfEhcicXvDY5d75qzkQmkDg?e=bUYjae after the Plan Confirmation Order. |
| **8.4.** O Crédito Sujeito será automática e integralmente substituído e reestruturado conforme os termos e condições aplicáveis à Opção B prevista na Cláusula 6, caso o seu respectivo Credor Sujeito ***(i)*** não realize a Eleição da Opção de Pagamento conforme o disposto nas Cláusulas 8.1 e 8.2; ***(ii)*** não observe integralmente as instruções pertinentes divulgadas no sítio eletrônico indicado na Cláusula 8.3; ou ***(iii)*** retire suas Notas Internacionais Existentes nos termos da Cláusula 8.5. | **8.4.** The Subject Claim shall be automatically and fully replaced and restructured in accordance with the terms and conditions applicable to Option B set forth in Section 6, if its respective Subject Creditor ***(i)*** fails to carry out the Payment Option Election in accordance with the provisions of Sections 8.1 and 8.2; ***(ii)*** fails to fully comply with the relevant instructions disclosed on the website indicated in Section 8.3; or ***(iii)*** withdraws its International Existing Notes pursuant to Section 8.5. |
| **8.5.** Uma vez encerrado o Período de Eleição, os Credores Sujeitos poderão retirar suas Notas Internacionais Existentes do sistema utilizado no Procedimento de Eleição da Opção de Pagamento em até 10 (dez) Dias Úteis antes da data de emissão do Instrumento de Pagamento Opção A – *Notes*, do | **8.5.** Once the Election Period has ended, Subject Creditors may withdraw their International Existing Notes from the system used in the Payment Option Election Process up to 10 (ten) Business Days prior to the issuance date of the Option A Payment Instrument – Notes, the Option |

| | | |
|---|---|---|
| Instrumento de Pagamento Opção B – *Notes* (e, consequentemente, dos Instrumentos de Pagamento da Opção C – *Notes*), sendo certo que tal retirada não poderá ser revertida posteriormente. Para que não restem dúvidas, qualquer Credor Sujeito que retire suas Notas Internacionais Existentes após o Período de Eleição será considerado ***(i)*** como se não houvesse validamente realizado uma eleição por quaisquer Opções de Pagamento; ***(ii)*** como se houvesse renunciado a todos os direitos associados a qualquer Opção de Pagamento; e, consequentemente; ***(iii)*** terá o seu respectivo Crédito Sujeito reestruturado conforme os termos da Opção B deste Plano. | | B Payment Instrument – Notes (and, consequently, the Option C Payment Instruments – Notes), it being understood that such withdrawal may not be subsequently reversed. For the avoidance of doubt, any Subject Creditor withdraws its International Existing Notes after the Election Period shall be deemed ***(i)*** to have not made a valid election for any of the Payment Options; ***(ii)*** to have waived all rights associated with any Payment Option; and, consequently, ***(iii)*** to have its respective Subject Claim restructured in accordance with the terms of Option B of this Plan. |
| **9. OBRIGAÇÕES RECÍPROCAS DAS REQUERENTES, DO CREDOR SIGNATÁRIO E DOS CREDORES ADERENTES** | | **9. RECIPROCAL OBLIGATIONS OF THE DEBTORS, THE SIGNATORY CREDITOR AND THE ADHERING CREDITORS** |
| **9.1.** O Credor Signatário e os Credores Aderentes obrigam-se a envidar os melhores esforços para viabilizar a implementação deste Plano da maneira mais célere possível. | | **9.1.** The Signatory Creditor and the Adhering Creditors shall use their best efforts to enable the implementation of this Plan as promptly as possible. |
| **9.2.** As Requerentes obrigam-se a: | | **9.2.** The Debtors shall: |
| **(i)** ajuizar a Recuperação Extrajudicial, em até 5 (cinco) Dias Úteis contados da Data de Celebração; | | **(i)** file the Extrajudicial Reorganization within 5 (five) Business Days from the Signing Date; |
| **(ii)** praticar atos, fornecer informações e tomar medidas razoavelmente necessárias para implementar e | | **(ii)** perform all acts, provide all information, and take reasonably necessary measures to implement and |

| | | | | |
|---|---|---|---|---|
| | cumprir com as disposições deste Plano, dentro dos prazos e segundo as condições estabelecidas neste Plano, arcando com as despesas correspondentes, incluindo aquelas razoavelmente necessárias para a emissão do Instrumento de Pagamento da Opção A – *Notes* e do Instrumento de Pagamento da Opção B – *Notes* (e, por consequência, dos Instrumentos de Pagamento da Opção C – *Notes*); | | comply with the provisions of this Plan, within the time frames and under the conditions established herein, bearing all corresponding expenses, including those reasonably necessary for the issuance of the Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes (and, consequently, the Option C Payment Instruments – Notes); |
| **(iii)** | cumprir toda a legislação aplicável que seja substancialmente relevante para a condução de seus negócios (incluindo toda e qualquer legislação trabalhista, ambiental, tributária e social), pertinente às suas atividades e à manutenção de seus bens e propriedades; | **(iii)** | comply with all applicable legislation that is substantially relevant to the conduct of their business (including all labor, environmental, tax, and social laws) related to their activities and the maintenance of their assets and properties; |
| **(iv)** | envidar seus melhores esforços para viabilizar ***(a)*** a homologação deste Plano pelo Juízo da Recuperação Extrajudicial, ou por qualquer outra instância recursal, se necessário; e ***(b)*** o reconhecimento da Recuperação Extrajudicial e a implementação do Plano e da Sentença de Homologação do Plano conforme as Decisões *Chapter 15*; | **(iv)** | use their best efforts to enable ***(a)*** the confirmation of this Plan by the Court of the Extrajudicial Reorganization, or by any appellate instance, if necessary; ***(b)*** the recognition of the Extrajudicial Reorganization and the implementation of the Plan and the Plan Confirmation Order pursuant to the Chapter 15 Decisions; |

| | |
|---|---|
| **(v)** cumprir todas as obrigações relevantes previstas neste Plano e Anexos, a partir da Data de Celebração; | **(v)** comply with all relevant obligations set forth in this Plan and its Schedules as from the Signing Date; and |
| **(vi)** ajuizar os Procedimentos *Chapter 15* na forma da Cláusula 10.6; e | **(vi)** to file the Chapter 15 Proceedings pursuant to Section 10.6; and |
| **(vii)** cumprir e observar todos os prazos e obrigações relevantes previstas neste Plano. | **(vii)** comply with and observe all deadlines and relevant obligations set forth in this Plan. |
| **9.3.** Obrigação Recíproca. As Requerentes e o Credor Signatário, na qualidade de titular de mais da metade dos Créditos Sujeitos, obrigam-se e concordam em negociar de boa-fé as minutas finais de quaisquer documentos necessários para a implementação das operações e acordos comerciais descritos neste Plano. | **9.3.** Reciprocal Obligation. The Debtors and the Signatory Creditor, as holder of more than half of the Subject Claims, shall be bound and agree to negotiate in good faith the final drafts of any documents necessary for the implementation of the transactions and commercial agreements described in this Plan. |
| **PARTE V – PÓS-HOMOLOGAÇÃO** | **PART V – POST-CONFIRMATION** |
| **10. EFEITOS DO PLANO** | **10. EFFECTS OF THE PLAN** |
| **10.1.** Novação. Com a Homologação do Plano, os Créditos Sujeitos serão novados na forma dos artigos 163, § 1º, e 165 da LRF, devendo ser pagos na forma estabelecida neste Plano. Em razão da referida novação e, salvo se expresso de forma diversa no Plano, todas as obrigações, *covenants*, índices financeiros, hipóteses de vencimento antecipado, multas, bem como outras obrigações e garantias de quaisquer naturezas assumidas ou prestadas pelas Requerentes ficam extintas, sendo | **10.1.** Novation. Upon the Plan Confirmation Order, the Subject Claims shall be novated pursuant to articles 163, first paragraph, and 165 of the Brazilian Bankruptcy Act, and shall be paid in the manner established in this Plan. As a result of such novation and unless expressly provided otherwise in this Plan, all obligations, covenants, financial ratios, events of default, penalties, as well as any other obligations and guarantees of any nature assumed or granted by the Debtors are extinguished |

| | | |
|---|---|---|
| substituídas, em todos os seus termos, pelas disposições deste Plano. | | and replaced, in all respects, by the provisions of this Plan. |
| **10.2.** <u>Resolução do Plano e da Novação</u>. O Plano será resolvido de pleno direito, desde que não exercidas as prerrogativas da Cláusula 10.2.1, e os Créditos Sujeitos retornarão ao *status quo ante* caso verifique-se qualquer um dos seguintes eventos: | | **10.2.** <u>Resolution of the Plan and the Novation</u>. The Plan shall be automatically terminated, provided that the rights set forth in Section 10.2.1 have not been exercised, and the Subject Claims shall revert to the *status quo ante* if any of the following events occurs: |
| **(i)** não ajuizamento da Recuperação Extrajudicial em até 5 (cinco) Dias Úteis contados a partir da Data de Celebração; | | **(i)** the failure to file the Extrajudicial Reorganization within 5 (five) Business Days from the Signing Date |
| **(ii)** prolação de decisão, pelo Juízo da Recuperação Extrajudicial ou por tribunal competente, rejeitando a homologação do Plano, que não seja revertida ou suspensa no prazo de 240 (duzentos e quarenta) Dias Corridos contados da publicação da referida decisão no Diário Oficial; | | **(ii)** the issuance of a decision, by the Extrajudicial Reorganization Court or by a competent Appellate Court, rejecting the confirmation of the Plan, which is not reversed or stayed within 240 (two hundred and forty) Calendar Days from the publication of such decision in the Official Gazette; |
| **(iii)** prolação de decisão, pelo Juízo da Recuperação Extrajudicial ou por tribunal competente, modificando o Plano de forma substancial, que não seja revertida ou suspensa no prazo de 240 (duzentos e quarenta) Dias Corridos contados da publicação da referida decisão no Diário Oficial, salvo se tal modificação for expressamente aceita pelas | | **(iii)** issuance of a decision, by the Extrajudicial Reorganization Court or by a competent Appellate Court, substantially modifying the Plan, which is not reversed or stayed within 240 (two hundred and forty) Calendar Days from the publication of such decision in the Official Gazette, unless such modification is expressly accepted by the Debtors and the |

| | | | | |
|---|---|---|---|---|
| | Requerentes e Credor(es) Sujeito(s) titular(es) de mais da metade dos Créditos Sujeitos, hipótese em que o Plano não será resolvido; | | | Subject Creditor(s) holding more than half of the Subject Claims, in which case the Plan shall not be terminated; |
| **(iv)** | a não obtenção da Sentença de Homologação do Plano antes do 2º (segundo) aniversário da Data de Celebração; | | **(iv)** | the failure to obtain the Plan Confirmation Order prior to the 2nd (second) anniversary of the Signing Date; |
| **(v)** | descumprimento de obrigações relevantes assumidas pelas Requerentes no âmbito deste Plano até a Data da Homologação, desde que tal descumprimento não seja sanado no prazo de 90 (noventa) Dias Corridos contados da data do recebimento de notificação encaminhada por Credor(es) titular(es) de mais da metade dos Créditos Sujeitos enunciando tal descumprimento; | | **(v)** | the breach of any materially relevant obligations assumed by the Debtors under this Plan up to the Judicial Confirmation Date, provided that such breach is not remedied within 90 (ninety) Calendar Days from the date of receipt of a notice sent by the Creditor(s) holding more than half of the Subject Claims stating such breach; |
| **(vi)** | não ajuizamento dos Procedimentos *Chapter 15* na forma da Cláusula 10.6; ou | | **(vi)** | failure to file the Chapter 15 Proceedings in accordance with Section 10.6; or |
| **(vii)** | a não emissão do Instrumento de Pagamento da Opção A – *Notes* e do Instrumento de Pagamento da Opção B – *Notes* (e, consequentemente, dos Instrumentos de Pagamento da Opção C – *Notes*) em até 180 (cento e oitenta) | | **(vii)** | the failure to issue the Option A Payment Instrument – *Notes* and the Option B Payment Instrument – *Notes* (and, consequently, the Option C Payment Instruments – *Notes*) within 180 (one hundred and eighty) Calendar |

| | |
|---|---|
| Dias Corridos contados da Decisão de Implementação *Chapter 15*. | Days from the entry of the Chapter 15 Enforcement Order. |
| **10.2.1** O(s) Credor(es) Sujeito(s) titular(es) de mais da metade dos Créditos Sujeitos poderá(ão), a seu exclusivo critério, renunciar à resolução do Plano caso verificada qualquer uma das hipóteses previstas na Cláusula acima, mediante envio de notificação por escrito às Requerentes. Esta renúncia somente terá efeito e o Plano não será resolvido se as Requerentes, em até 15 (quinze) Dias Úteis contados do recebimento de referida notificação, concordarem com tal renúncia. | **10.2.1.** The Subject Creditor(s) holding more than half of the Subject Claims may, at their sole discretion, waive termination of the Plan upon the occurrence of any of the events set forth in the Section above, by means of written notice to the Debtors. Such waiver shall only be effective and the Plan shall not be terminated if the Debtors, within 15 (fifteen) Business Days from receipt of such notice, agree to such waiver. |
| **10.2.2** Para que não restem dúvidas, observado o disposto na Cláusula 10.2.2.1 abaixo, o eventual descumprimento de obrigações previstas neste Plano, e/ou no Instrumento de Pagamento da Opção A – *Notes* e/ou no Instrumento de Pagamento da Opção B – *Notes* (e, consequentemente, nos Instrumentos de Pagamento da Opção C – *Notes*), após a Data da Homologação, não causará a resolução do presente Plano, de modo que, em tal hipótese, os Credores Sujeitos continuarão sendo titulares de direitos creditórios tal como novados por este Plano, sendo-lhes assegurada a prerrogativa de adotarem as medidas judiciais ou extrajudiciais que entenderem cabíveis para assegurar o cumprimento das obrigações previstas neste Plano e/ou no | **10.2.2.** For the avoidance of doubt, subject to the provisions of Section 10.2.2.1 below, any breach of obligations set forth in this Plan and/or in the Option A Payment Instrument – Notes and/or in the Option B Payment Instrument – Notes (and, consequently, in the Option C Payment Instruments – Notes) after the Judicial Confirmation Date shall not result in termination of this Plan, and in such event the Subject Creditors shall continue to hold credit rights as novated by this Plan, it being assured to them the right to adopt any judicial or extrajudicial measures they deem appropriate to ensure compliance with the obligations set forth in this Plan and/or in the Option A Payment Instrument – Notes and/or in the Option B Payment Instrument – Notes (and, consequently, in the Option C Payment |

| | | |
|---|---|---|
| Instrumento de Pagamento da Opção A – *Notes* e/ou no Instrumento de Pagamento da Opção B – *Notes* (e, consequentemente, nos Instrumentos de Pagamento da Opção C – *Notes*). Para fins de esclarecimentos, o disposto nesta Cláusula não se aplica aos eventos previstos nos itens "(ii)" e "(iii)" da Cláusula 10.2 acima. | | Instruments – Notes). For the avoidance of doubt, this Section is not applicable to the events set forth in items "(ii)" e "(iii)" of Section 10.2 above. |
| **10.2.2.1** Para fins de clareza, o disposto na Cláusula 10.2.2 acima não será aplicável e, portanto, o Plano será resolvido mesmo após a Data da Homologação, conforme previsto nos itens "(vi)" e "(vii)" da Cláusula 10.2 acima, no caso de descumprimento das seguintes obrigações previstas neste Plano: ***(i)*** os Procedimentos *Chapter 15* não sejam ajuizados na forma da Cláusula 10.6 ou ***(ii)*** não haja a emissão do Instrumento de Pagamento da Opção A – *Notes* e do Instrumento de Pagamento da Opção B – *Notes* (e, consequentemente, dos Instrumentos de Pagamento da Opção C – *Notes*) no prazo estabelecido no item "(vii)" da Cláusula 10.2 e na forma estabelecida neste Plano, salvo se as prerrogativas da Cláusula 10.2.1 deste Plano forem exercidas. | | **10.2.2.1** For the avoidance of doubt, the provisions of Section 10.2.2 above shall not apply and, therefore, the Plan shall be terminated even after the Judicial Confirmation Date, as set forth in items "(vi)" e "(vii)" of Section 10.2 above, in the event the following obligations are defaulted: ***(i)*** the Chapter 15 Proceedings are not filed pursuant to Section 10.6 or ***(ii)*** the Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes (and, consequently, the Option C Payment Instruments – Notes) are not issued within the term set forth in item (vii) of Section 10.2 and in the manner set forth in this Plan, unless the rights set forth in Section 10.2.1 of this Plan are exercised. |
| **10.3.** Após o protocolo do Plano, as Requerentes poderão, individual ou conjuntamente, mediante consentimento prévio e por escrito de Credor(es) Sujeito(s) titular(es) de mais da metade dos Créditos Sujeitos, desistir do processo de Recuperação Extrajudicial ou da obtenção da | | **10.3.** After the filing of the Plan, the Debtors may, individually or jointly, with the prior written consent of the Subject Creditor(s) holding more than half of the Subject Claims, withdraw from the Extrajudicial Reorganization proceeding or from obtaining the Plan Confirmation Order, at their sole |

| | |
|---|---|
| Sentença de Homologação do Plano, a seu exclusivo critério, hipótese em que os Créditos Sujeitos devidos pela Requerente que exerceu a prerrogativa prevista nesta Cláusula não serão novados e permanecerão em vigor e eficazes nos seus respectivos termos originalmente contratados, inclusive os Créditos Sujeitos detidos pelo Credor Signatário. | discretion, in which case the Subject Claims owed by the Debtor that exercises the prerogative set forth in this Section shall not be novated and shall remain in full force and effect under their respective originally agreed terms, including the Subject Claims held by the Signatory Creditor. |
| **10.4.** Cobrança dos Créditos Sujeitos. Em conformidade com o artigo 163, §§1º e 8º da LRF, os Credores Sujeitos não poderão, a partir da Data do Pedido e enquanto viger o Plano, adotar qualquer medida, judicial ou extrajudicial, no Brasil ou no exterior, em face das Requerentes, que vise à exigibilidade, cobrança ou ao recebimento dos Créditos Sujeitos, seja nos termos em que foram originalmente constituídos, seja nos termos deste Plano, incluindo, sem limitação, ***(i)*** ajuizar ou prosseguir qualquer ação ou processo judicial ou arbitral de qualquer tipo relacionado a qualquer Crédito Sujeito; ***(ii)*** executar qualquer sentença, decisão judicial ou sentença arbitral relacionada a qualquer Crédito Sujeito; ***(iii)*** penhorar, sequestrar, arrestar, bloquear ou tornar indisponíveis, por qualquer forma, em qualquer foro, nacional ou estrangeiro, quaisquer bens das Requerentes para satisfazer seus Créditos Sujeitos, ficando, desde a Data do Pedido, obrigados a cooperar para a liberação, levantamento e desoneração de quaisquer penhoras ou constrições judiciais sobre bens e ativos das Requerentes; ***(iv)*** buscar a satisfação de seus Créditos Sujeitos por quaisquer outros meios; ou ***(v)*** reclamar qualquer direito de | **10.4.** Collection of Subject Claims. In accordance with article 163, paragraphs 1 and 8, of the Brazilian Bankruptcy Act, as from the Filing Date and for as long as the Plan remains in force, the Subject Creditors shall not take any judicial or extrajudicial measures, in Brazil or abroad, against the Debtors seeking to enforce, collect, or receive the Subject Claims, whether under their original terms or under this Plan, including, without limitation, ***(i)*** filing or pursuing any judicial or arbitral action or proceeding of any kind related to any Subject Claim; ***(ii)*** enforcing any judgment, court decision, or arbitral award related to any Subject Claim; ***(iii)*** pledging, seizing, attaching, freezing, or otherwise rendering unavailable, in any manner or in any forum, domestic or foreign, any assets of the Debtors to satisfy their Subject Claims, as of the Filing Date, being obliged to cooperate with the release, lifting, and discharge of any liens or judicial restraints over the assets and property of the Debtors; ***(iv)*** seeking satisfaction of their Subject Claims by any other means; or ***(v)*** asserting any right of setoff against any credit owed to the Debtors with their Subject Claims. |

| | |
|---|---|
| compensação contra qualquer crédito devido às Requerentes com seus Créditos Sujeitos. | |
| **10.5.** Extinção das Ações e Execuções. Com a Sentença de Homologação do Plano, todo e qualquer processo de execução, de qualquer natureza, ou ação de cobrança e similares, relacionado a qualquer Crédito Sujeito contra as Requerentes, no Brasil ou no exterior, deverá ser extinto completamente com relação às Requerentes, sendo certo que as penhoras e constrições existentes sobre bens e direitos das Requerentes serão liberadas, bem como o saldo de bloqueios judiciais eventualmente efetivados nas referidas ações judiciais. | **10.5.** Termination of Actions and Enforcements. Upon the Plan Confirmation Order, any and all enforcement proceedings, of any nature, or collection actions and similar proceedings related to any Subject Claim against the Debtors, in Brazil or abroad, shall be fully extinguished with respect to the Debtors, it being understood that any liens and attachments over the assets and rights of the Debtors shall be released, as well as any remaining judicially blocked amounts that may have been effected in such judicial proceedings. |
| **10.6.** *Chapter 15*. Em até 45 (quarenta e cinco) Dias Corridos contados da Sentença de Homologação do Plano, ou, a critério das Requerentes, previamente à Sentença de Homologação do Plano, o(s) representante(s) estrangeiro(s) das Requerentes submeterão o pedido de instauração dos Procedimentos *Chapter 15*. | **10.6.** Chapter 15. No later than 45 (forty-five) Calendar Days after the entry of the Plan Confirmation Order, or, at the Debtors' discretion, prior to the entry of the Plan Confirmation Order, the foreign representative(s) of the Debtors shall file the petition for the commencement of the Chapter 15 Proceedings. |
| **10.7.** Vinculação do Plano. As disposições do Plano vinculam as Requerentes e o Credor Signatário na Data de Celebração, observado o artigo 165, §2º, da LRF, e o disposto na Cláusula 10.2 acima, e os Credores Aderentes na data em que assinarem o Termo de Adesão para Credor Aderente, assim como seus respectivos cessionários e sucessores, e vinculam as Requerentes e todos os Credores Sujeitos, assim | **10.7.** Binding Effect of the Plan. The provisions of the Plan shall bind the Debtors and the Signatory Creditor as of the Signing Date, pursuant to article 165, second paragraph, of the Brazilian Bankruptcy Act, and the provisions of Section 10.2 above, and the Adhering Creditors as of the date on which they execute the Adhesion Term for Adhering Creditors, as well as their respective assignees and successors, and shall bind the Debtors and all Subject Creditors, as well as their |

| | |
|---|---|
| como seus respectivos cessionários e sucessores, a partir da Sentença de Homologação do Plano. | respective assignees and successors, as of the Plan Confirmation Order. |
| **10.8.** Formalização de Documentos e Outras Providências. As Requerentes e os Credores Sujeitos deverão realizar todos os atos e firmar todos os contratos e outros documentos que sejam necessários ou adequados para cumprir os termos deste Plano. | **10.8.** Execution of Documents and Other Measures. The Debtors and the Subject Creditors shall perform all acts and execute all contracts and other documents that are necessary or appropriate to comply with the terms of this Plan. |
| **10.9.** Exoneração. Ressalvado o disposto na Cláusula 10.2, na Data da Homologação, haverá a exoneração e quitação automática, plena, geral, irrestrita, irrevogável e irretratável em relação às Requerentes, com relação a todos os Créditos Sujeitos reestruturados nos termos deste Plano, sem restrição, incluindo todos e quaisquer direitos, obrigações, ações, indenizações, recursos, passivos de qualquer natureza, juros, correção monetária, penalidades, multas, havendo o cancelamento definitivo de todos os contratos ou documentos que lastreiam os Créditos Sujeitos, incluindo as Notas Internacionais Existentes, bem como dos demais contratos delas decorrentes. | **10.9.** Release. Subject to Section 10.2, on the Judicial Confirmation Date, there shall be the automatic, full, general, unrestricted, irrevocable, and irreversible release and discharge of the Debtors from all Subject Claims restructured under this Plan, without limitation, including all and any rights, obligations, actions, indemnifications, appeals, liabilities of any nature, interest, monetary adjustment, penalties, and fines, with the definitive cancellation of all contracts or documents underlying the Subject Claims, including the International Existing Notes, as well as any other agreements arising therefrom. |
| **10.9.1.** A exoneração sobre todos os Créditos Sujeitos também ocorre, conforme o disposto nos termos deste Plano e do Plano 1, em relação à Inzag e à Zagope, na medida em que as Notas Internacionais Existentes por elas garantidas serão definitivamente canceladas, sendo ambas integralmente exoneradas de todas e quaisquer obrigações envolvendo os Créditos Sujeitos e os Créditos Opção A, os Créditos Opção B e os Créditos Opção C conforme | **10.9.1.** The release of all Subject Claims shall also occur, pursuant to the terms of this Plan and Plan 1, in relation to Inzag and Zagope, to the extent that the International Existing Notes guaranteed by them shall be definitively cancelled, and both shall be fully released from any and all obligations related to the Subject Claims and the Option A Claims, |

| | | |
|---|---|---|
| constituídos nos termos deste Plano e do Plano 1. | | the Option B Claims and the Option C Claims as established under this Plan and Plan 1. |
| **10.10.** Em razão da exoneração decorrente do cumprimento do Plano descrita acima, a partir da Data da Homologação, os créditos detidos pelos Credores Sujeitos passarão a ser regidos exclusivamente com base nos termos e condições previstos neste Plano e nos respectivos Instrumentos de Pagamento e instrumentos de garantia relacionados, sempre nos termos deste Plano. | | **10.10.** As a result of the release arising from the performance of the Plan described above, as of the Judicial Confirmation Date, the claims held by the Subject Creditors shall thereafter be governed exclusively by the terms and conditions set forth in the respective Payment Instruments and related security instruments, pursuant to this Plan. |
| **10.11.** Quitação. Os pagamentos realizados na forma estabelecida neste Plano acarretarão, de forma automática e independentemente de qualquer formalidade adicional, a outorga, em favor das Requerentes, de quitação plena, rasa, irrevogável e irretratável da quota-parte efetivamente paga dos Créditos Opção A, Créditos Opção B e Créditos Opção C, inclusive em relação a encargos efetivamente pagos, de modo que os Credores Opção A, Credores Opção B e Credores Opção C nada mais poderão reclamar contra as Requerentes relativamente às parcelas dos seus Créditos Opção A, Créditos Opção B e Créditos Opção C efetivamente pagas, a qualquer tempo, em juízo ou fora dele. | | **10.11.** Release. The payments made in the manner established in this Plan shall automatically and without any additional formality result in the granting, in favor of the Debtors, of full, clear, irrevocable, and irreversible release of the portion effectively paid of the Option A Claims, Option B Claims and Option C Claims, including with respect to any charges effectively paid, so that the Option A Creditors, Option B Creditors and Option C Creditors shall have no further claims against the Debtors in relation to the portions of their Option A Claims, Option B Claims and Option C Claims effectively paid, at any time, whether in or out of court. |
| **10.12.** Modificação do Plano. Aditamentos, alterações, modificações ou renúncias (*waivers*) ao Plano, bem como aos direitos e obrigações nele previstos, podem ser propostos pelas Requerentes a qualquer tempo, antes ou após a Sentença de Homologação do Plano, desde que tais | | **10.12.** Amendment of the Plan. Amendments, changes, modifications or waivers to the Plan, as well as to the rights and obligations set forth therein, may be proposed by the Debtors at any time, whether before or after the Plan Confirmation Order, provided that such amendments, changes or |

| | |
|---|---|
| aditamentos, alterações ou modificações sejam aprovados por Credor(es) titular(es) de mais da metade dos Créditos Sujeitos, em atenção ao quórum previsto no artigo 163 da LRF. | modifications are approved by Creditor(s) holding more than half of the Subject Claims, in accordance with the quorum set forth in article 163 of the Brazilian Bankruptcy Act. |
| **10.12.1.** Efeito Vinculativo das Modificações do Plano. Eventuais aditamentos, alterações ou modificações ao Plano vincularão as Requerentes e os Credores Sujeitos, bem como seus respectivos cessionários e sucessores, a partir de sua aprovação na forma da LRF, desde que sejam aprovados na forma acima. | **10.12.1.** Binding Effect of Plan Amendments. Any amendments, changes or modifications to the Plan shall be binding upon the Debtors and the Subject Creditors, as well as their respective assignees and successors, from the date of their approval in accordance with the Brazilian Bankruptcy Act, if they are approved in the manner set forth above. |
| **PARTE VI – DISPOSIÇÕES COMUNS** | **PART VI – COMMON PROVISIONS** |
| **11. DISPOSIÇÕES GERAIS** | **11. GENERAL PROVISIONS** |
| **11.1.** Anexos. Todos os Anexos a este Plano são a ele incorporados e constituem parte integrante deste Plano. Na hipótese de haver qualquer inconsistência entre este Plano e qualquer Anexo, o Plano prevalecerá, exceto se de outra forma disposto neste Plano. | **11.1.** Schedules. All Schedules to this Plan are incorporated herein and constitute an integral part of this Plan. In the event of any inconsistency between this Plan and any Schedule, this Plan shall prevail, except as otherwise provided herein. |
| **11.2.** Prorrogação de prazos. Considerar-se-ão prorrogados os prazos referentes ao cumprimento de qualquer obrigação prevista neste Plano, até o Dia Útil imediatamente subsequente, se o respectivo vencimento coincidir com dia que não seja um Dia Útil, observado que, em se tratando de obrigação pecuniária, não haverá qualquer acréscimo aos valores a serem pagos | **11.2.** Deadline extension. Any deadline relating to the performance of any obligation set forth in this Plan shall be deemed extended to the immediately following Business Day if the relevant due date falls on a day that is not a Business Day, provided that, in the case of a pecuniary obligation, no additional amount shall accrue on the amounts payable. |

| | | |
|---|---|---|
| **11.3.** <u>Cessão e Transferência.</u> Desde que o presente Plano não tenha sido resolvido, o Credor Signatário não poderá ceder seus respectivos Créditos Sujeitos a partir da Data de Celebração até a Data da Homologação do Plano, exceto se: ***(i)*** o cessionário for uma entidade afiliada do Credor Signatário, hipótese em que haverá adesão integral e automática dos créditos cedidos aos termos deste Plano; e ***(ii)*** na hipótese de cessão de Crédito Sujeito a Pessoa que não seja o Credor Signatário ou entidade afiliada do Credor Signatário, o respectivo cessionário adira integralmente, por escrito, aos termos e condições deste Plano, previamente à formalização do contrato de cessão de crédito, mediante o preenchimento e envio do termo de adesão constante do **Anexo IV** abaixo às Requerentes e cumprimento do disposto na Cláusula 4.4 acima. Para que não restem dúvidas, serão consideradas nulas de pleno direito as cessões de crédito, celebradas pelo Credor Signatário, cujos respectivos cessionários se recusem a aderir aos termos e condições deste Plano, hipótese em que o cedente original continuará sendo considerado, para todos os fins e efeitos, como o legítimo titular do Crédito Sujeito cedido. A cessão de Créditos Sujeitos, após a Data do Pedido, não alterará a sua natureza, classificação, sujeição ou regime jurídico, nem convalidará direitos ou prerrogativas não detidos originalmente pelo cedente. | | **11.3.** <u>Assignment and Transfer</u>. Provided that this Plan has not been terminated, the Signatory Creditor may not assign its respective Subject Claims from the Signing Date until the Judicial Confirmation Date, except if: ***(i)*** the assignee is an affiliate of the Signatory Creditor, in which case the assigned claims shall be fully and automatically subject to the terms of this Plan; and ***(ii)*** in the event of an assignment of a Subject Claim to a Person that is not the Signatory Creditor or an affiliate of the Signatory Creditor, the respective assignee shall fully adhere, in writing, to the terms and conditions of this Plan, prior to the execution of the claim assignment agreement, by completing and delivering the adhesion term set forth in **Schedule IV** below to the Debtors and complying with the provisions of Section 4.4 above. For the avoidance of doubt, any claim assignments executed by the Signatory Creditor whose respective assignees refuse to adhere to the terms and conditions of this Plan shall be deemed null and void, in which case the original assignor shall continue to be deemed, for all intents and purposes, the legitimate holder of the assigned Subject Claim. The assignment of Subject Claims, after the Filing Date shall not alter their nature, classification, subjection or legal treatment, nor shall it validate rights or prerogatives not originally held by the assignor. |
| **11.4.** As condições de pagamento dos Créditos Sujeitos novados nos termos deste Plano serão mantidas inalteradas em caso de cessões e transferências dos Créditos Sujeitos a terceiros, seja | | **11.4.** The payment terms of the Subject Claims novated pursuant to this Plan shall remain unchanged in the event of any assignments or transfers of the Subject Claims to third parties, for |

| | |
|---|---|
| a que título for, inclusive para fins do quanto disposto no artigo 83 da LRF. | any reason whatsoever, including for the purposes of article 83 of the Brazilian Bankruptcy Act. |
| **11.5.** Créditos Sujeitos com Coobrigação das Requerentes e/ou das Requerentes do Plano 1. Para fins de tratamento e pagamento dos Créditos Sujeitos nos termos deste Plano e/ou do Plano 1, cada Credor Sujeito será considerado titular de um único Crédito Sujeito, independentemente da existência de coobrigação de mais de uma das Requerentes e/ou das Requerentes do Plano 1. O resultado financeiro das formas e meios de pagamento para o Credor Sujeito será sempre equivalente ao previsto neste Plano e no Plano 1 para o valor total do seu Crédito Sujeito, não podendo ser aumentado em razão da pluralidade de coobrigadas ou de garantias prestadas por distintas Requerentes e/ou Requerentes do Plano 1. | **11.5.** Subject Claims with Co-obligation of the Debtors and/or the Plan 1 Debtors. For purposes of the treatment and payment of the Subject Claims under this Plan and/or Plan 1, each Subject Creditor shall be deemed the holder of a single Subject Claim, regardless of the existence of a co-obligation by more than one of the Debtors and/or the Plan 1 Debtors. The financial outcome of the forms and means of payment for the Subject Creditor shall always be equivalent to that set forth in this Plan and in Plan 1for the total amount of its Subject Claim and may not be increased due to the plurality of co-obligors or guarantees granted by different Debtors and/or Plan 1 Debtors. |
| **11.5.1.** O pagamento, total ou parcial, de Créditos Sujeitos com coobrigação de uma ou mais Requerentes e/ou Requerentes do Plano 1 será considerado, na mesma proporção, como se houvesse sido efetuado pelas demais Requerentes e/ou Requerentes do Plano 1. | **11.5.1.** The full or partial payment of Subject Claims with a co-obligation of one or more Debtors and/or Plan 1 Debtors shall be deemed, in the same proportion, as having been made by the other Debtors and/or Plan 1 Debtors. |
| **11.5.2.** Em nenhuma hipótese as Requerentes e/ou as Requerentes do Plano 1 estarão obrigadas a realizar pagamentos que excedam o valor do Crédito Sujeito. | **11.5.2.** In no event shall the Debtors and/or the Plan 1 Debtors be required to make payments exceeding the amount of the Subject Claim. |
| **11.5.3.** Caso o Crédito Sujeito seja pago por qualquer das Requerentes e/ou as | **11.5.3.** If the Subject Claim is paid by any of the Debtors and/or Debtors under the Plan |

| | | |
|---|---|---|
| Requerentes do Plano 1, as demais Requerentes e/ou as Requerentes do Plano 1 ficarão desobrigadas, na mesma proporção, de realizar os respectivos pagamentos previstos no Plano. | | 1, the other Debtors and/or Plan 1 Debtors shall be released, in the same proportion, from making the corresponding payments provided for in the Plan. |
| **11.5.4.** Caso, em razão de eventual coobrigação, qualquer das Requerentes e/ou as Requerentes do Plano 1 efetue pagamento que implique recebimento de valores pelo Credor Sujeito em violação ao descrito nesta Cláusula, o referido Credor Sujeito devolverá imediatamente às Requerentes e/ou às Requerentes do Plano 1, conforme aplicável, os valores e/ou títulos recebidos em excesso, incluindo principal, juros e demais encargos incidentes até o respectivo pagamento. | | **11.5.4.** If, as a result of any co-obligation, any of the Debtors and/or the Plan 1 Debtors makes a payment that results in the Subject Creditor receiving amounts in violation of the provisions of this Section, such Subject Creditor shall immediately return to the Debtors and/or the Plan 1 Debtors, as applicable, the amounts and/or securities received in excess, including principal, interest, and any other charges accrue until the respective payment. |
| **11.5.5.** A Requerente e/ou a Requerente do Plano 1 que pagar a obrigação principal de uma outra Requerente e/ou Requerente do Plano 1, em conformidade com os termos deste Plano e do Plano 1, sub-rogar-se-á na posição jurídica do respectivo Credor Sujeito, conforme artigos 346 e 347 do Código Civil, devendo o seu respectivo crédito constituído em razão desta sub-rogação ser pago em conformidade com este Plano e com o Plano 1, conforme aplicável. | | **11.5.5.** The Debtor and/or the Plan 1 Debtor that pays the principal obligation of another Debtor and/or Plan 1 Debtor, in accordance with the terms of this Plan and Plan 1, shall be subrogated to the legal position of the respective Subject Creditor, pursuant to articles 346 and 347 of the Brazilian Civil Code, and the credit constituted in its favor as a result of such subrogation shall be paid in accordance with this Plan and with the Plan 1, as applicable. |
| **11.6.** Manutenção de Garantias. Nos termos do artigo 163, § 4º, da LRF, não haverá a supressão de eventuais garantias sobre bens outorgadas em favor dos Credores Sujeitos, as quais, se aplicável, | | **11.6.** Maintenance of Collateral. Pursuant to article 163, fourth paragraph, of the Brazilian Bankruptcy Act, there shall be no release of any collateral over assets encumbered the Subject |

| | |
|---|---|
| passarão a assegurar o pagamento dos Créditos Sujeitos detidos pelos seus respectivos titulares conforme novados por esse Plano e/ou pelo Plano 1. | Creditors, which, if applicable, shall continue to secure the payment of the Subject Claims held by their respective holders as novated by this Plan and/or by Plan 1. |
| **11.6.1.** As Requerentes e os Credores Sujeitos ficam desde já obrigados, e os eventuais agentes de garantia ficam desde já autorizados, se aplicável, a assinar todos e quaisquer documentos necessários para implementar o disposto na Cláusula 11.6 acima, inclusive celebrar eventuais aditamentos aos contratos de garantia existentes, para compatibilizá-los ao disposto neste Plano e em seus Anexos. | **11.6.1.** The Debtors and the Subject Creditors are hereby bound, and any security agents are hereby authorized, if applicable, to execute any and all documents necessary to implement the provisions of Section 11.6 above, including entering into any amendments to the existing security agreements, in order to align them with the provisions of this Plan and its Schedules. |
| **11.6.2.** O Instrumento de Pagamento da Opção A – *Notes* e o Instrumento de Pagamento da Opção B – *Notes* (e, consequentemente, os Instrumentos de Pagamento da Opção C – *Notes*) serão garantidos pelos mesmos bens objeto das garantias outorgadas às Notas Internacionais 2029, observando-se o disposto nas escrituras de emissão a serem celebradas de forma consistente com os *Term Sheets* constantes do **Anexo VI** e **Anexo VII**. | **11.6.2.** The Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes (and, consequently, the Option C Payment Instruments – Notes) shall be secured by the same assets encumbered to the 2029 International Notes, observing the provisions set forth in the indentures to be entered into in a manner consistent with the Term Sheets attached as **Schedule VI** and **Schedule VII**. |
| **11.7.** Tributos. Os Tributos serão de responsabilidade da respectiva Parte que seja contribuinte ou responsável pelo pagamento deste Tributo, de acordo com as leis aplicáveis. | **11.7.** Taxes. The Taxes shall be the responsibility of the respective Party that is the taxpayer or otherwise liable for the payment of such Tax, in accordance with applicable laws. |

| | |
|---|---|
| **11.8.** Tolerância. Qualquer tolerância, exercício parcial ou concessão entre as Partes será sempre considerado mera liberalidade e não configurará renúncia ou perda de qualquer direito, faculdade, privilégio, prerrogativa ou poderes conferidos neste Plano, nem implicará novação, alteração, remissão, modificação ou redução dos direitos e obrigações decorrentes deste Plano. | **11.8.** Tolerance. Any tolerance, partial exercise, or concession between the Parties shall always be deemed a mere act of leniency and shall not constitute a waiver or loss of any right, power, privilege, prerogative, or authority granted under this Plan, nor shall it imply novation, alteration, remission, modification, or reduction of the rights and obligations arising from this Plan. |
| **11.9.** Divisibilidade das Previsões do Plano. Na hipótese de qualquer termo ou disposição do Plano ser considerado inválido, nulo ou ineficaz, os demais termos e disposições do Plano permanecerão válidos e eficazes, desde que as premissas que os embasaram sejam mantidas. | **11.9.** Severability of the Plan Provisions. If any term or provision of the Plan is deemed invalid, null, or unenforceable, the remaining terms and provisions of the Plan shall remain valid and enforceable, provided that the assumptions underlying them are preserved. |
| **11.10.** Conflito. Este Plano é celebrado em versões em inglês e português. Em caso de conflito entre as versões em inglês e em português, prevalecerá a versão em português. | **11.10.** Conflict. This Plan is executed in English and Portuguese versions. In the event of any conflict between the English and Portuguese versions, the Portuguese version shall prevail. |
| **11.11.** Título Executivo. Este Plano devidamente celebrado por todas as Partes e Intervenientes Anuentes, bem como a Sentença de Homologação do Plano constituem títulos executivos judiciais nos termos da legislação aplicável, conforme artigo 161, §6º, da LRF, consubstanciando obrigações válidas, vinculantes, exigíveis e exequíveis para as Requerentes, Intervenientes Anuentes e para os Credores Sujeitos, podendo ser executados nos seu próprios termos e condições contra as Requerentes, Intervenientes Anuentes e contra os Credores Sujeitos, conforme necessário e aplicável, nos termos dos artigos 513 e 783 e seguintes do CPC. | **11.11.** Enforceable instrument. This Plan, duly executed by all Parties and Intervening Parties, as well as the Plan Confirmation Order, constitute enforceable judicial instruments under applicable legislation, pursuant to article 161, sixth paragraph, of the Brazilian Bankruptcy Act, embodying valid, binding, enforceable, and executable obligations for the Debtors, the Intervening Parties, and the Subject Creditors, and may be enforced in their own terms and conditions against the Debtors, the Intervening Parties, and the Subject Creditors, as necessary and applicable, pursuant to articles 513 |

| | | |
|---|---|---|
| | | and 783 et seq. of the Brazilian Code of Civil Procedure. |
| **11.12.** <u>Irrevogabilidade ou Irretratabilidade</u>. Este Plano é celebrado pelas Partes de forma irrevogável e irretratável, consubstanciando instrumento válido e vinculante em relação às Partes e seus respectivos sucessores e cessionários, a qualquer título, e para todos os fins e efeitos. | | **11.12.** <u>Irrevocability and Irreversibility</u>. This Plan is executed by the Parties on an irrevocable and irreversible basis, constituting a valid and binding instrument with respect to the Parties and their respective successors and assignees, for any purpose and effect. |
| **11.13.** <u>Acordo Integral</u>. Este Plano e seus Anexos refletem e constituem, de forma final, integral e exclusiva, todas as avenças existentes entre as Partes no que diz respeito aos Créditos Sujeitos e cancelam, superam e substituem quaisquer outras propostas, acordos e entendimentos anteriores, verbais ou escritos, bem como todas e quaisquer outras comunicações mantidas entre as Partes, no que diz respeito aos Créditos Sujeitos, salvo se de outra forma especificado neste Plano. | | **11.13.** <u>Entire agreement</u>. This Plan and its Schedules reflect and constitute, in a final, complete, and exclusive manner, all agreements existing among the Parties with respect to the Subject Claims and cancel, supersede, and replace any and all prior proposals, agreements, and understandings, whether oral or written, as well as any and all other communications exchanged among the Parties with respect to the Subject Claims, except as otherwise specified in this Plan. |
| **11.14.** <u>Comunicações</u>. Todas as notificações, requerimentos, pedidos e outras comunicações às Requerentes, Intervenientes Anuentes ou aos representantes do Credor Signatário, requeridas ou permitidas por este Plano, para serem eficazes, devem ser feitas por escrito e serão consideradas realizadas quando enviadas: ***(a)*** por correspondência registrada, com aviso de recebimento, ou courrier; ou ***(b)*** por *e-mail* quando efetivamente entregues, valendo o aviso de entrega como prova de entrega e recebimento da mensagem. As comunicações às Requerentes, Intervenientes Anuentes e ao Credor Signatário, conforme aplicável, devem ser enviadas aos | | **11.14.** <u>Notices</u>. All notices, requests, demands, and other communications to the Debtors, the Intervening Parties, or the representatives of the Signatory Creditor required or permitted under this Plan, to be effective, shall be made in writing and shall be deemed given when sent: ***(a)*** by registered mail with return receipt requested, or by courier; or ***(b)*** by e-mail when actually delivered, with the delivery receipt serving as proof of delivery and receipt of the message. Communications to the Debtors, the Intervening Parties, and the Signatory Creditor, as applicable, shall be sent to the addresses indicated below, unless a change has been duly communicated to the other Party. |

| | |
|---|---|
| endereços indicados abaixo, salvo se houver alteração devidamente comunicada à outra Parte. As comunicações endereçadas aos Credores Aderentes serão enviadas para o endereço constante dos respectivos Termos de Adesão. | Communications addressed to the Adhering Creditors shall be sent to the address indicated in their respective Adhesion Terms. |
| **Requerentes e Intervenientes Anuentes:**<br><br>A/C: Gustavo Braga Mercher Coutinho (gustavo.coutinho@agnet.com.br).<br><br>Endereço: Avenida do Contorno, n.º 8.279, 3º andar, Gutierrez, Belo Horizonte/MG, CEP 30110-059. | **Debtors and Intervening Parties:**<br><br>A/C: Gustavo Braga Mercher Coutinho (gustavo.coutinho@agnet.com.br).<br><br>Address: Avenida do Contorno, No. 8,279, 3rd floor, Gutierrez, Belo Horizonte/MG, CEP 30110-059. |
| **Com cópia para**:<br><br>*Mattar – Sociedade de Advogados*<br><br>A/C: Eduardo Augusto Mattar (eamattar@mattaradv.com.br);<br><br>Cesar Rizzo (crizzo@mattaradv.com.br);<br><br>Guilherme Bergamin de Barros (gbarros@mattaradv.com.br);<br><br>Victor Dias Vieira Clementino (vclementino@mattaradv.com.br);<br><br>Henrique Del Vecchio Rodrigues (hrodrigues@mattaradv.com.br);<br><br>Fernanda Oliveira Alencar (falencar@mattaradv.com.br); e<br><br>Ana Katarina Costa Marques (akmarques@mattaradv.com.br).<br><br>Endereço: Av. Pres. JK, nº 2041, Torre B, 5º andar, CEP 04543-011 São Paulo/SP. | **With a copy to:**<br><br>*Mattar – Sociedade de Advogados*<br><br>A/C: Eduardo Augusto Mattar (eamattar@mattaradv.com.br);<br><br>Cesar Rizzo (crizzo@mattaradv.com.br);<br><br>Guilherme Bergamin de Barros (gbarros@mattaradv.com.br);<br><br>Victor Dias Vieira Clementino (vclementino@mattaradv.com.br);<br><br>Henrique Del Vecchio Rodrigues (hrodrigues@mattaradv.com.br);<br><br>Fernanda Oliveira Alencar (falencar@mattaradv.com.br); and<br><br>Ana Katarina Costa Marques (akmarques@mattaradv.com.br).<br><br>Address: Av. Pres. JK, nº 2041, Torre B, 5º andar, CEP 04543-011 São Paulo/SP. |

| | |
|---|---|
| *Davis Polk & Wardwell LLP*<br><br>A/C: Manuel Garciadiaz (manuel.garciadiaz@davispolk.com);<br><br>Timothy Graulich (timothy.graulich@davispolk.com); e<br><br>Joanna McDonald (joanna.mcdonald@davispolk.com).<br><br>Endereço: 450 Lexington Avenue, Nova Iorque, Nova Iorque, 10017, Estados Unidos da América<br><br>Consultores em Direito estrangeiro e estadunidense. | *Davis Polk & Wardwell LLP*<br><br>A/C: Manuel Garciadiaz (manuel.garciadiaz@davispolk.com);<br><br>Timothy Graulich (timothy.graulich@davispolk.com); and<br><br>Joanna McDonald (joanna.mcdonald@davispolk.com)<br><br>Address: 450 Lexington Avenue, New York, New York, 10017, United States of America<br><br>Foreign and U.S. legal consultants. |
| **Credor Signatário**:<br><br>A/C: Luiz Renan Toffanin da Silva (gestaosec.naofin@vert-capital.com).<br><br>Endereço: Rua Cardeal Arcoverde, nº 2.365, 11º Andar, Pinheiros, CEP 05407-020, São Paulo/SP. | **Signatory Creditor**:<br><br>A/C: Luiz Renan Toffanin da Silva (gestaosec.naofin@vert-capital.com).<br><br>Address: Rua Cardeal Arcoverde, nº 2.365, 11º Andar, Pinheiros, CEP 05407-020, São Paulo/SP. |
| **12. LEI E FORO** | **12. GOVERNING LAW AND JURISDICTION.** |
| **12.1.** Lei Aplicável. Exceto quando de outra forma disposto nos Anexos deste Plano, os direitos, deveres e obrigações decorrentes deste Plano deverão ser regidos, interpretados e executados de acordo com as leis vigentes na República Federativa do Brasil. | **12.1.** Applicable Law. Except as otherwise provided in the Schedules to this Plan, the rights, duties, and obligations arising from this Plan shall be governed by, interpreted, and enforced in accordance with the laws in force in the Federative Republic of Brazil. |
| **12.2.** Foro. Exceto quando de outra forma disposto nos Anexos deste Plano, todas as | **12.2.** Jurisdiction. Except as otherwise provided in the Schedules to this Plan, all controversies or |

| | | |
|---|---|---|
| controvérsias ou disputas que surgirem ou estiverem relacionadas a este Plano, durante o período em que perdurar a Recuperação Extrajudicial, serão resolvidas pelo Juízo da Recuperação Extrajudicial até o encerramento da Recuperação Extrajudicial. Após o encerramento da Recuperação Extrajudicial, as Partes elegem o foro da Comarca de Belo Horizonte, Estado de Minas Gerais, como competente para resolver todas as controvérsias ou disputas que surgirem ou estiverem relacionadas a este Plano, com renúncia de qualquer outro foro ou jurisdição, por mais privilegiado que seja. | | disputes arising out of or relating to this Plan, during the period in which the Extrajudicial Reorganization remains pending, shall be resolved by the Court of the Extrajudicial Reorganization until the termination of the Extrajudicial Reorganization. After the termination of the Extrajudicial Reorganization, the Parties elect the courts of the Judicial District of Belo Horizonte, State of Minas Gerais, as the competent forum to resolve all controversies or disputes arising out of or relating to this Plan, waiving any other forum or jurisdiction, no matter how privileged it may be. |
| E, por estarem justos e contratados, as Partes e as Intervenientes Anuentes assinam o presente instrumento, a que se obrigam por si e seus sucessores a qualquer tipo, para todos os fins e efeitos de direito, juntamente com duas testemunhas. | | And being in full agreement and duly bound, the Parties and the Intervening Parties execute this instrument, for the same purposes, binding themselves and their successors of any kind, for all legal intents and purposes, together with two witnesses. |
| Belo Horizonte/MG, 18 de maio de 2026. | | Belo Horizonte/MG, May 18, 2026. |
| *(Restante da página intencionalmente deixado em branco)* | | *(Remainder of page intentionally left blank)* |
| (*Assinaturas seguem nas próximas páginas*) | | *(Signatures follow on the next pages).* |

| Lista de Anexos | | | List of Schedules | |
|---|---|---|---|---|
| Anexo I | Relação de Credores Sujeitos, com a indicação do valor total dos Créditos Sujeitos devidos por cada Requerente, devidamente atualizados até a Data do Pedido. | | Schedule I | List of Subject Creditors, indicating the total amount of the Subject Claims owed by each Debtor, duly updated up to the Filing Date. |
| Anexo II | Relação dos Créditos Sujeitos detidos pelo Credor Signatário contra cada Requerente, devidamente atualizados até a Data do Pedido. | | Schedule II | List of the Subject Claims held by the Signatory Creditor against each Debtor, duly updated up to the Filing Date. |
| Anexo III | Termo de Adesão do Credor Signatário. | | Schedule III | Adhesion Term for Signatory Creditor. |
| Anexo IV | Termo de Adesão para Credor Aderente. | | Schedule IV | Adhesion Term for Adhering Creditor. |
| Anexo V | Certificado de Detentor de Notas Internacionais Existentes. | | Schedule V | Certificate of Holder of International Existing Notes. |
| Anexo VI | Term Sheet indicativo dos termos e condições que constarão da escritura de emissão do Instrumento de Pagamento da Opção A – Notes. | | Schedule VI | Indicative Term Sheet of the terms and conditions to be set forth in the indenture of the Option A Payment Instrument – Notes. |
| Anexo VII | Term Sheet indicativo dos termos e condições que constarão da escritura de emissão do Instrumento de Pagamento da Opção B – Notes. | | Schedule VII | Indicative Term Sheet of the terms and conditions to be set forth in the indenture of the Option B Payment Instrument – Notes. |

*(Página de assinatura do Plano de Recuperação Extrajudicial de Andrade Gutierrez International S.A., Zagope SGPS S.A. e Inzag Germany GmbH)*

*(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS S.A. and Inzag Germany GmbH)*

**ANDRADE GUTIERREZ INTERNATIONAL S.A.**

______________________________

Nome/Name: Gustavo Braga Mercher Coutinho

Cargo/Title: Diretor/Officer

______________________________

Nome/Name: Gustavo Benchimol

Cargo/Title: Diretor/Officer

*(Página de assinatura do Plano de Recuperação Extrajudicial de Andrade Gutierrez International S.A., Zagope SGPS S.A. e Inzag Germany GmbH*)

*(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS S.A. and Inzag Germany GmbH*)

**ZAGOPE SGPS S.A.**

____________________________________

Nome/Name: Ricardo de Oliveira Lopes de Sá

Cargo/Title: Conselheiro

____________________________________

Nome/Name: Margarida Damião Fernandes F. Lobo

Cargo/Title: Conselheiro

*(Página de assinatura do Plano de Recuperação Extrajudicial de Andrade Gutierrez International S.A., Zagope SGPS S.A. e Inzag Germany GmbH)*

*(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS S.A. and Inzag Germany GmbH)*

**INZAG GERMANY GMBH**



Nome/Name: Leandro Eugenio Fernandez Faria

Cargo/Title: Diretor/Officer



Nome/Name: Fabiano Nascimento Brandão

Cargo/Title: Diretor/Officer

*(Página de assinatura do Plano de Recuperação Extrajudicial de Andrade Gutierrez International S.A., Zagope SGPS S.A. e Inzag Germany GmbH*)

*(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS S.A. and Inzag Germany GmbH*)

Na qualidade de interveniente anuente:

As an intervening and consenting party:

**ANDRADE GUTIERREZ ENGENHARIA S.A.**

Renato Torres de Faria

________________________________

Nome/Name: Renato Torres de Faria

Cargo/Title: Diretor/Officer

Marco Tulio Pinto

________________________________

Nome/Name: Marco Túlio Pinto

Cargo/Title: Diretor/Officer

*(Página de assinatura do Plano de Recuperação Extrajudicial de Andrade Gutierrez International S.A., Zagope SGPS S.A. e Inzag Germany GmbH)*

*(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS S.A. and Inzag Germany GmbH)*

Na qualidade de interveniente anuente:

As an intervening and consenting party:

**ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A.**

José Eduardo Kauark Leite

__________________________________

Nome/Name: José Eduardo Kauark Leite

Cargo/Title: Diretor/Officer

Cristiano Pimentel Cavalc

__________________________________

Nome/Name: Cristiano Pimentel Cavalcanti Vieira

Cargo/Title: Diretor/Officer

*(Página de assinatura do Plano de Recuperação Extrajudicial de Andrade Gutierrez International S.A., Zagope SGPS S.A. e Inzag Germany GmbH)*

*(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS S.A. and Inzag Germany GmbH)*

Na qualidade de interveniente anuente:

As an intervening and consenting party:

**ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A.**

Renato Torres de Faria

________________________________

Nome/Name: Renato Torres de Faria

Cargo/Title: Diretor-Presidente/Chief Executive Officer

Gustavo Braga Mercher Cou

________________________________

Nome/Name: Gustavo Braga Mercher Coutinho

Cargo/Title: Diretor

*(Página de assinatura do Plano de Recuperação Extrajudicial de Andrade Gutierrez International S.A., Zagope SGPS S.A. e Inzag Germany GmbH)*

*(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS S.A. and Inzag Germany GmbH)*

Na qualidade de interveniente anuente:

As an intervening and consenting party:

**ANDRADE GUTIERREZ S.A.**

Renato Torres de Faria

____________________________________

Nome/Name: Renato Torres de Faria

Cargo/Title: Diretor-Presidente/Chief Executive Officer

____________________________________

Nome/Name: Maria Beatriz Lira Gomes Ferreira

Cargo/Title: Diretora/Officer

*(Página de assinatura do Plano de Recuperação Extrajudicial de Andrade Gutierrez International S.A., Zagope SGPS S.A. e Inzag Germany GmbH)*

*(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS S.A. and Inzag Germany GmbH)*

Na qualidade de interveniente anuente:

As an intervening and consenting party:

**ANDRADE GUTIERREZ PARTICIPAÇÕES S.A.**

Renato Torres de Faria

______________________________

Nome/Name: Renato Torres de Faria

Cargo/Title: Diretor-Presidente/Chief Executive Officer

Saulo Alves Pereira Junio

______________________________

Nome/Name: Saulo Alves Pereira Júnior

Cargo/Title: Diretor/Officer

*(Página de assinatura do Plano de Recuperação Extrajudicial de Andrade Gutierrez International S.A., Zagope SGPS S.A. e Inzag Germany GmbH)*

*(Signatures page of the Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS S.A. and Inzag Germany GmbH)*

**TESTEMUNHAS / WITNESSES**

__________________________________

Nome/Name: Lilian Cristina Pereira de Oliveira

CPF/Brazilian Tax Payer Register: 333.114.578-54

__________________________________

Nome/Name: Barbara Carolina Pires Soares

CPF/Brazilian Tax Payer Register: 020.643.106-65

| Anexo I | Schedule I |
|---|---|
| **Relação de Credores Sujeitos** | **List of Subject Creditors** |

[Página intencionalmente em branco. Anexo I segue na próxima página]

**RELAÇÃO DE PASSIVOS DA ANDRADE GUTIERREZ INTERNATIONAL S.A.**

**POSIÇÃO EM 18/05/2026**

| Devedor | Credor | CNPJ/CPF | Classificação/ Natureza | Endereço | Moeda Original | Valor Moeda Original | Valor (BRL)[2] | Origem | Regime de Vencimento |
|---|---|---|---|---|---|---|---|---|---|
| Andrade Gutierrez International | Wilmington Savings Fund Society, FSB[1] | N/A | Bonds - Dívida Financeira | 500 Delaware Avenue, Wilmington, DE 19801 | USD | 65.464.463,81 | 331.603.694,98 | Bonds - 1.000% PIK Toggle Notes due 2040 | Bullet - Dezembro de 2040 |
| Andrade Gutierrez International | Wilmington Savings Fund Society, FSB[1] | N/A | Bonds - Dívida Financeira | 500 Delaware Avenue, Wilmington, DE 19801 | USD | 489.201.296,43 | 2.478.000.246,94 | Bonds - 9.000%/10.500% Senior Secured PIK Toggle Notes due 2029 | Bullet - Dezembro de 2029 |

| | | |
|---|---|---|
| USD | **554.665.760,24** | **2.809.603.941,92** |
| **TOTAL** | **554.665.760,24** | **2.809.603.941,92** |

[1] Na qualidade de Trustee, como agente representante dos credores titulares de Bonds.
[2] Câmbio de referência BRL/USD = 5,0654 (PTAX de 15/05/2026, conforme art. 163, § 3º, I, da Lei nº 11.101/2005).

**RELAÇÃO DE PASSIVOS DA ZAGOPE SGPS S.A.**

**POSIÇÃO EM 18/05/2026**

| Devedor | Credor | CNPJ/CPF | Classificação/ Natureza | Endereço | Moeda Original | Valor Moeda Original[2] | Valor (BRL)[3] | Origem | Regime de Vencimento |
|---|---|---|---|---|---|---|---|---|---|
| ZAGOPE SGPS, S.A | Wilmington Savings Fund Society, FSB[1] | N/A | Bonds - Dívida Financeira | 500 Delaware Avenue, Wilmington, DE 19801 | USD | 50.000.000,00 | 253.270.000,00 | Bonds - 9.000%/10.500% Senior Secured PIK Toggle Notes due 2029 | Bullet - Dezembro de 2029 |

| | | |
|---|---|---|
| USD | **50.000.000,00** | **253.270.000,00** |
| **TOTAL** | **50.000.000,00** | **253.270.000,00** |

[1] Na qualidade de Trustee, como agente representante dos credores titulares de Bonds.
[2] A garantia pessoal prestada pela Zagope no âmbito das 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029 é limitada a US$ 50 milhões.
[3] Câmbio de referência BRL/USD = 5,0654 (PTAX de 15/05/2026, conforme art. 163, § 3º, I, da Lei nº 11.101/2005).

**RELAÇÃO DE PASSIVOS DA INZAG GERMANY GMBH**

**POSIÇÃO EM 18/05/2026**

| Devedor | Credor | CNPJ/CPF | Classificação/ Natureza | Endereço | Moeda Original | Valor Moeda Original[2] | Valor (BRL)[3] | Origem | Regime de Vencimento |
|---|---|---|---|---|---|---|---|---|---|
| Inzag Germany GmbH | Wilmington Savings Fund Society, FSB[1] | N/A | Bonds - Dívida Financeira | 500 Delaware Avenue, Wilmington, DE 19801 | USD | 15.567.095,92 | 78.853.567,67 | Bonds - 9.000%/10.500% Senior Secured PIK Toggle Notes due 2029 | Bullet - Dezembro de 2029 |

| | | |
|---|---|---|
| USD | **15.567.095,92** | **78.853.567,67** |
| **TOTAL** | **15.567.095,92** | **78.853.567,67** |

[1] Na qualidade de Trustee, como agente representante dos credores titulares de Bonds.
[2] A garantia pessoal prestada pela Inzag no âmbito das 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029, calculada nos termos da escritura de emissão, é limitada a US$ 15.567.095,92.
[3] Câmbio de referência BRL/USD = 5,0654 (PTAX de 15/05/2026, conforme art. 163, § 3º, I, da Lei nº 11.101/2005).

**Anexo II**

**Relação dos Créditos Sujeitos detidos pelo Credor Signatário**

**Schedule II**

**List of the Subject Claims held by the Signatory Creditor**

[Página intencionalmente em branco. Anexo II segue na próxima página]

**Relação dos Créditos Sujeitos detidos pelo Credor Signatário (Art. 163, § 6º, III, LFRE) - Lista de ANDRADE GUTIERREZ INTERNATIONAL S.A.**

**POSIÇÃO EM: 18/05/26**

| Credor Signatário | Origem do Crédito | Moeda Original | Valor Total dos Créditos do Credor Signatário - Principal + Juros | | % do Total de Créditos Sujeitos |
|---|---|---|---|---|---|
| | | | Valor em BRL[1] | Valor na moeda original[2] | |
| **VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA** | BOND - 1.000% PIK TOGGLE NOTES DUE 2040 | USD | 205.075.703 | 40.485.589 | **77,1%** |
| | BOND - 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029 | USD | 1.961.400.915 | 387.215.406 | |
| **Total** | | | **2.166.476.618** | **427.700.995** | **77,1%** |

[1] Câmbio de referência BRL/USD = 5,0654 (PTAX de 15/05/2026, conforme art. 163, § 3º, I, da Lei nº 11.101/2005).

[2] Composição dos créditos detidos pelo credor signatário decorrentes do: (i) Bond 1.000% PIK TOGGLE NOTES DUE 2040: US$ 40.328.755 de principal e US$ 156.834 de juros; e do (ii) Bond 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029: US$ 327.219.332 de principal e US$ 59.996.074 de

**Relação dos Créditos Sujeitos detidos pelo Credor Signatário (Art. 163, § 6º, III, LFRE) - Lista de ZAGOPE SGPS S.A.**

**POSIÇÃO EM: 18/05/26**

| Credor Signatário | Origem do Crédito | Moeda Original | Valor Total dos Créditos do Credor Signatário - Principal + Juros | | % do Total de Créditos Sujeitos |
|---|---|---|---|---|---|
| | | | Valor em BRL[1] | Valor na moeda original[2] | |
| **VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA** | BOND - 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029 | USD | 200.469.718 | 39.576.286 | **79,2%** |
| **Total** | | | **200.469.718** | **39.576.286** | **79,2%** |

[1] Câmbio de referência BRL/USD = 5,0654 (PTAX de 15/05/2026, conforme art. 163, § 3º, I, da Lei nº 11.101/2005).

[2] A garantia pessoal prestada pela Zagope no âmbito das 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029 é limitada a US$ 50 milhões (valor atribuível ao credor signatário corresponde a US$ 39.576.286)

**Relação dos Créditos Sujeitos detidos pelo Credor Signatário (Art. 163, § 6º, III, LFRE) - Lista de INZAG GERMANY GMBH**

**POSIÇÃO EM: 18/05/26**

| Credor Signatário | Origem do Crédito | Moeda Original | Valor Total dos Créditos do Credor Signatário - Principal + Juros | | % do Total de Créditos Sujeitos |
|---|---|---|---|---|---|
| | | | Valor em BRL[1] | Valor na moeda original[2] | |
| **VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA** | BOND - 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029 | USD | 62.414.626 | 12.321.757 | **79,2%** |
| **Total** | | | **62.414.626** | **12.321.757** | **79,2%** |

[1] Câmbio de referência BRL/USD = 5,0654 (PTAX de 15/05/2026, conforme art. 163, § 3º, I, da Lei nº 11.101/2005).

[2] A garantia pessoal prestada pela Inzag no âmbito das 9.000%/10.500% SENIOR SECURED PIK TOGGLE NOTES DUE 2029, calculada nos termos da escritura de emissão, é limitada a US$ 15.567.095,92 (valor atribuível ao credor signatário corresponde a US$ 12.321.757,00)

**Anexo III**

**Termo de Adesão do Credor Signatário**

**Schedule III**

**Adhesion Term for Signatory Creditor**

[Página intencionalmente em branco. Anexo III segue na próxima página]

**TERMO DE ADESÃO**

**DE CREDOR SIGNATÁRIO**

São Paulo, 18 de maio de 2026

À

Andrade Gutierrez International S.A.

Zagope SGPS, S.A.

Inzag Germany Gmbh

Com cópia para:

*Mattar – Sociedade de Advogados*

A/C: Eduardo Augusto Mattar (eamattar@mattar.com.br)

Guilherme Bergamin de Barros (gbarros@mattar.com.br);

Cesar Rizzo (crizzo@mattar.com.br);

Henrique Del Vecchio Rodrigues (hrodrigues@mattar.com.br);

Fernanda Oliveira Alencar (falencar@mattar.com.br); e

Ana Katarina Costa Marques (akmarques@mattar.com.br).

**Credor:**

**VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA**, sociedade por ações com finalidade de realizar operações de securitização, com sede na Cidade de São Paulo, Estado de São Paulo, na Rua Cardeal Arcoverde, nº 2.365, 11º Andar, Pinheiros, CEP 05.407-020, inscrita no CNPJ/MF sob o nº 37.368.334/0001-22 ("Credor Signatário").

**ADHESION TERM OF**

**SIGNATORY CREDITOR**

São Paulo, May 18, 2026

To

Andrade Gutierrez International S.A.

Zagope SGPS, S.A.

Inzag Germany Gmbh

With copy to:

*Mattar – Sociedade de Advogados*

A/C: Eduardo Augusto Mattar (eamattar@mattar.com.br)

Guilherme Bergamin de Barros (gbarros@mattar.com.br);

Cesar Rizzo (crizzo@mattar.com.br);

Henrique Del Vecchio Rodrigues (hrodrigues@mattar.com.br);

Fernanda Oliveira Alencar (falencar@mattar.com.br); e

Ana Katarina Costa Marques (akmarques@mattar.com.br).

**Creditor:**

**VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA**, a corporation organized under Brazilian law, whose corporate purpose is to carry out securitization transactions, with its head office in the City of São Paulo, State of São Paulo, at Rua Cardeal Arcoverde, No. 2,365, 11th Floor, Pinheiros, ZIP Code 05407-020, enrolled with the Brazilian National Register of Legal Entities (CNPJ/MF) under No. 37.368.334/0001-22 ("Signatory Creditor").

**Valor total de Créditos Sujeitos contra a AGINT:** R$ 2.166.476.618,00 (dois bilhões, cento e sessenta e seis milhões, quatrocentos e setenta e seis mil, seiscentos e dezoito reais)

**Total amount of Subject Claims against AGINT:** R$ 2,166,476,618.00 (two billion, one hundred and sixty-six million, four hundred and seventy-six thousand, six hundred and eighteen reais)

**Valor total de Créditos Sujeitos contra a Zagope:** R$ 200.469.718,00 (duzentos milhões, quatrocentos e sessenta e nove mil, setecentos e dezoito reais)

**Total amount of Subject Claims against Zagope:** R$ 200,469,718.00 (two hundred million, four hundred and sixty-nine thousand, seven hundred and eighteen reais)

**Valor total de Créditos Sujeitos contra a Inzag:** R$ 62.414.626,00 (sessenta e dois milhões, quatrocentos e quatorze mil, seiscentos e vinte e seis reais)

**Total amount of Subject Claims against Inzag:** R$ 62,414,626.00 (sixty-two million, four hundred and fourteen thousand, six hundred and twenty-six reais)

O Credor Signatário, acima qualificado, na qualidade de titular de Créditos Sujeitos detidos contra a AGINT, Zagope e Inzag, pelo valores indicados acima, vem, por seu representante autorizado, por meio do presente Termo de Adesão, manifestar sua expressa adesão ao plano de recuperação extrajudicial subscrito por AGINT, Zagope e Inzag, na qualidade de partes, e AGE, AGCS, AGIE, AGPAR e AGSA, na qualidade de intervenientes anuentes (o "Plano"), nos termos e para todos os fins dos artigos 161 e seguintes da Lei 11.101/2005, conforme alterada ("LRF"), servindo esse Termo de Adesão como manifestação da sua concordância com os termos e condições do Plano.

The Signatory Creditor, identified above, in the capacity of holder of Subject Claims held against AGINT, Zagope, and Inzag, by the amount indicated above, hereby represented by its authorized representative, by means of this Adhesion Term, expresses its adhesion to the extrajudicial reorganization plan subscribed by AGINT, Zagope and Inzag, in the capacity as parties, and AGE, AGCS, AGIE, AGPAR and AGSA, in the capacity as intervening parties (the "Plan"), pursuant to, and for all purposes of, Articles 161 *et. seq.* of Law Nº 11. 101, dated as of February 9, 2005, as amended ("LRF"), serving this Term of Adhesion as its acceptance of the terms and conditions of the Plan.

O Credor Signatário declara (i) ter recebido cópia do Plano, seus anexos e de todos os documentos que o acompanham; (ii) ter ciência

The Signatory Creditor represents that (i) it has received copy of the Plan, its exhbits and all documents attached thereto; (ii) it is aware

e concordar irrestritamente com todas as cláusulas e condições previstas no Plano, seus anexos e demais documentos que o acompanham; (iii) que o presente Termo de Adesão foi assinado por subscritor devidamente autorizado e com poderes para tanto, conforme documentação anexa; e (iv) ser titular de Créditos Sujeitos contra a AGINT, Zagope e Inzag, conforme documentação anexa.

of and unreservedly agrees to all sections and conditions set forth in the Plan, its exhbits and all documents attached thereto; (iii) this Adhesion Term was signed by a signatory duly authorized and with powers to perform such act, pursuant to the attached documents; and (iv) it is holder of Subject Claims against AGINT, Zagope and Inzag, pursuant to the attached documents.

Este Termo de Adesão é firmado de forma irrevogável e irretratável, conforme o disposto no artigo 161, § 5º, da LRF, observado o disposto no Plano.

This Adhesion Term is executed on an irrevocable and irreversible basis, pursuant to article 161, paragraph 5, of LRF, subject to the provisions of the Plan.

Os termos iniciados em letra maiúscula e não definidos neste Termo de Adesão têm o significado que lhes foi atribuído no Plano.

The terms initiated in capital letters not defined hereto have the meaning ascribed to them in the Plan.

Em caso de conflito entre as versões em português e em inglês deste Termo de Adesão, a versão em português deverá prevalecer.

In case of conflict between the Portuguese and English version of this Adhesion Term, the Portuguese version will prevail.

(*Restante da página intencionalmente deixado em branco*)

*(Remainder of page intentionally left blank)*

*(Página de assinatura do Termo de Adesão de Credor Signatário - Plano de Recuperação Extrajudicial apresentado por Andrade Gutierrez International S.A., Zagope SGPS, S.A. e Inzag Germany Gmbh).*

*(Signatures page of the Adhesion Term of Signatory Creditor – Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS, S.A. and Inzag Germany Gmbh).*

**VERT PRIVATE PLACEMENTS COMPANHIA SECURITIZADORA**

DocuSigned by
Luiz Renan Toffanin da Silva
Assinado por: LUIZ RENAN TOFFANIN DA SILVA:38840942890
CPF: 38840942890
Data/Hora da Assinatura: 18/05/2026 | 19:16:49 PDT
O: ICP-Brasil, OU: VideoConferÃªncia
C: BR
Emissor: AC Certisign RFB G5
2C92117790854F3...

ome: Luiz Renan Toffanin
Cargo: Diretor

DocuSigned by
Luiz Renan Toffanin da Silva
Assinado por: LUIZ RENAN TOFFANIN DA SILVA:38840942890
CPF: 38840942890
Data/Hora da Assinatura: 18/05/2026 | 19:17:10 PDT
O: ICP-Brasil, OU: VideoConferÃªncia
C: BR
Emissor: AC Certisign RFB G5
2C92117790854F3...

Name: Luiz Renan Toffanin
Title: Director

**Anexo IV**

**TERMO DE ADESÃO**

**PARA CREDOR ADERENTE**

[Local], [data]

À

Andrade Gutierrez International S.A.

Zagope SGPS, S.A.

Inzag Germany Gmbh

Com cópia para:

*Mattar – Sociedade de Advogados*

A/C: Eduardo Augusto Mattar (eamattar@mattaradv.com.br)

Guilherme Bergamin de Barros (gbarros@mattaradv.com.br);

Cesar Rizzo (crizzo@mattaradv.com.br);

Henrique Del Vecchio Rodrigues (hrodrigues@mattaradv.com.br);

Fernanda Oliveira Alencar (falencar@mattaradv.com.br); e

Ana Katarina Costa Marques (akmarques@mattaradv.com.br).

**Schedule IV**

**ADHESION TERM FOR ADHERING CREDITOR**

[Local], [data]

To

Andrade Gutierrez International S.A.

Zagope SGPS, S.A.

Inzag Germany Gmbh

With copy to:

*Mattar – Sociedade de Advogados*

A/C: Eduardo Augusto Mattar (eamattar@mattaradv.com.br)

Guilherme Bergamin de Barros (gbarros@mattaradv.com.br);

Cesar Rizzo (crizzo@mattaradv.com.br);

Henrique Del Vecchio Rodrigues (hrodrigues@mattaradv.com.br);

Fernanda Oliveira Alencar (falencar@mattaradv.com.br); e

Ana Katarina Costa Marques (akmarques@mattaradv.com.br).

**Credor:**

**[nome]**, [qualificação completa] ("Credor Aderente").

**Valor total de Créditos Sujeitos contra a AGINT:** R$ [=] (=)

**Valor total de Créditos Sujeitos contra a Zagope:** R$ [=] (=)

**Valor total de Créditos Sujeitos contra a Inzag:** R$ [=] (=)

O Credor Aderente, acima qualificado, na qualidade de titular de Créditos Sujeitos detidos contra a AGINT, Zagope e Inzag, pelo valores indicados acima, vem, por seu representante autorizado, por meio do presente Termo de Adesão, manifestar sua expressa adesão ao plano de recuperação extrajudicial subscrito por AGINT, Zagope e Inzag, na qualidade de partes, e AGE, AGCS, AGIE, AGPAR e AGSA, na qualidade de intervenientes anuentes (o "Plano"), nos termos e para todos os fins dos artigos 161 e seguintes da Lei 11.101/2005, conforme alterada ("LRF"), servindo esse Termo de Adesão como manifestação da sua concordância com os termos e condições do Plano.

**Creditor:**

**[nome]**, [state of incorporation]; [address] ("Adehring Creditor").

**Total amount of Subject Claims against AGINT:** R$ [=] (=)

**Total amount of Subject Claims against Zagope:** R$ [=] (=)

**Total amount of Subject Claims against Inzag:** R$ [=] (=)

The Adhering Creditor, identified above, in the capacity of holder of Subject Claims held against AGINT, Zagope, and Inzag, by the amount indicated above, hereby represented by its authorized representative, by means of this Adhesion Term, expresses its adhesion to the extrajudicial reorganization plan subscribed by AGINT, Zagope and Inzag, in the capacity as parties, and AGE, AGCS, AGIE, AGPAR and AGSA, in the capacity as intervening parties (the "Plan"), pursuant to, and for all purposes of, Articles 161 *et. seq.* of Law Nº 11. 101, dated as of February 9, 2005, as amended ("LRF"), serving this Term of Adhesion as its acceptance of the terms and conditions of the Plan.

O Credor Aderente declara (i) ter recebido cópia do Plano, seus anexos e de todos os documentos que o acompanham; (ii) ter ciência e concordar irrestritamente com todas as cláusulas e condições previstas no Plano, seus anexos e demais documentos que o acompanham; (iii) que o presente Termo de Adesão foi assinado por subscritor devidamente autorizado e com poderes para tanto, conforme documentação anexa; e (iv) ser titular de Créditos Sujeitos contra a AGINT, Zagope e Inzag, conforme documentação anexa.

The Adhering Creditor represents that (i) it has received copy of the Plan, its exhbits and all documents attached thereto; (ii) it is aware of and unreservedly agrees to all sections and conditions set forth in the Plan, its exhbits and all documents attached thereto; (iii) this Adhesion Term was signed by a signatory duly authorized and with powers to perform such act, pursuant to the attached documents; and (iv) it is holder of Subject Claims against AGINT, Zagope and Inzag, pursuant to the attached documents.

Este Termo de Adesão é firmado de forma irrevogável e irretratável, conforme o disposto no artigo 161, § 5º, da LRF, observado o disposto no Plano.

This Adhesion Term is executed on an irrevocable and irreversible basis, pursuant to article 161, paragraph 5, of LRF, subject to the provisions of the Plan.

Os termos iniciados em letra maiúscula e não definidos neste Termo de Adesão têm o significado que lhes foi atribuído no Plano.

The terms initiated in capital letters not defined hereto have the meaning ascribed to them in the Plan.

Em caso de conflito entre as versões em português e em inglês deste Termo de Adesão, a versão em português deverá prevalecer.

In case of conflict between the Portuguese and English version of this Adhesion Term, the Portuguese version will prevail.

(*Restante da página intencionalmente deixado em branco*)

*(Remainder of page intentionally left blank)*

*(Página de assinatura do Termo de Adesão para Credor Aderente - Plano de Recuperação Extrajudicial apresentado por Andrade Gutierrez International S.A., Zagope SGPS, S.A. e Inzag Germany Gmbh).*

*(Signatures page of the Adhesion Term for Adhering Creditor – Extrajudicial Reorganization Plan of Andrade Gutierrez International S.A., Zagope SGPS, S.A. and Inzag Germany Gmbh).*

[**CREDOR ADERENTE**]

| | |
|---|---|
| ______________________________ | ______________________________ |
| Nome: | Nome: |
| Cargo: | Cargo: |

**Anexo V**

**CERTIFICATE OF HOLDER OF INTERNATIONAL NOTES**

The undersigned hereby represents and warrants, as applicable, that it is **(i.a)** the holder/beneficial owner of debt securities described below or **(i.b)** the manager, agent, broker, or advisor for the holder indicated below, which holds the debt securities described below, in accordance with the attached screenshot(s) or broker(s)/custodian(s) certificate(s)/declaration(s), indicating the proof of ownership of said securities, and **(ii)** duly authorized to deliver this Certificate.

**Name of Manager, Agent, Broker or Advisor**: [complete if applicable; do not complete if the Certificate is directly signed by the holder/beneficial owner]

**Address**: [complete if applicable]

**E-mail**: [complete if applicable]

**Name of the Creditor / Beneficial Owner**: [complete]

**Address**: [complete ]

**E-mail**: [complete]

**Schedule V**

**CERTIFICADO DE DETENTOR DE NOTAS INTERNACIONAIS**

O subscritor abaixo assinado pelo presente declara e garante, conforme aplicável, que **(i.a)** é proprietário/beneficiário dos títulos de dívida abaixo ou **(i.b)** é administrador, agente, gestor, representante ou consultor do proprietário/beneficiário dos títulos de dívida abaixo indicados, de acordo com os anexos screenshot(s) ou certificado(s)/declarações de custodiante(s), refletindo a propriedade de tais títulos, e **(ii)** está devidamente autorizado a entregar este Certificado.

**Nome do administrador, agente, gestor, representante ou consultor**: [preencher se aplicável; não preencher se o Certificado for assinado diretamente pelo credor]

**Endereço**: [preencher se aplicável]

**E-mail**: [preencher se aplicável]

**Nome do Credor/Proprietário Beneficiário**: [preencher]

**Endereço**: [preencher]

**E-mail**: [preencher]

**Total Principal Amount held by Creditor arising from the "9.000%/10.500% Senior Secured PIK Toggle Notes due 2029"**, issued by Andrade Gutierrez International S.A. and guaranteed by Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A., Andrade Gutierrez Investimentos em Engenharia S.A., Zagope SGPS, S.A. and Inzag Germany Gmbh, due on 2029 ("2029 Notes"):

**US$[complete if applicable]**

**Total do Valor do Principal/Histórico detido pelo credor decorrente da "*9.000%/10.500% Senior Secured PIK Toggle Notes due 2029*"**, emitidas pela Andrade Gutierrez International S.A. e garantidas pela Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A., Andrade Gutierrez Investimentos em Engenharia S.A., Zagope SGPS, S.A. and Inzag Germany Gmbh, com vencimento em 2029 ("Notas 2029"):

**US$[preencher se aplicável]**

**Name of the custodian(s) of the 2029 Notes held by Creditor**: [complete if applicable]

**Nome do(s) custodiante(s) das Notas 2029 detidas pelo Credor**: [preencher se aplicável]

**Total Principal Amount held by Creditor arising from the "*1.000% PIK Toggle Notes due 2040*"**, issued by Andrade Gutierrez International S.A. and guaranteed by Andrade Gutierrez Engenharia S.A., due on 2040 ("2040 Notes"):

**US$[complete if applicable]**

**Total do Valor do Principal/Histórico detido pelo credor decorrente da "*1.000% PIK Toggle Notes due 2040*"**, emitidas pela Andrade Gutierrez International S.A. e garantidas pela Andrade Gutierrez Engenharia S.A., com vencimento em 2040 ("Notas 2040"):

**US$[preencher se aplicável]**

**Name of the custodian(s) of the 2040 Notes held by Creditor**: [complete if applicable]

**Nome do(s) custodiante(s) das Notas 2040 detidas pelo Credor**: [preencher se aplicável]

| | |
|---|---|
| Name of Certificate's signatory: [complete] | Nome do signatário do Certificado: [preencher] |
| Title of Certificate's signatory: [complete if applicable] | Cargo do signatário do Certificado: [preencher se aplicável] |
| Signature of the Certificate's signatory:<br><br>___________________________________ | Assinatura do signatário do Certificado:<br><br>___________________________________ |
| Date: [complete] | Data: [preencher] |

**Anexo VI**

| **TERMOS E CONDIÇÕES DO INSTRUMENTO DE PAGAMENTO DA OPÇÃO A - *NOTES*** | |
|---|---|
| As palavras contidas neste anexo iniciadas em letras maiúsculas que não sejam expressamente aqui definidas deverão ser interpretadas de acordo com as respectivas definições do Plano.<br><br>Este anexo é celebrado em versões em português e inglês, sendo que, em caso de conflito, divergência, inconsistência ou dúvida de interpretação entre tais versões, a versão em português prevalecerá para todos os fins.<br><br>Em caso de conflito, divergência, inconsistência ou dúvida de interpretação entre qualquer disposição deste anexo e qualquer disposição do Plano, as disposições do Plano prevalecerão para todos os fins. | |
| Emissora | O Instrumento de Pagamento da Opção A - *Notes* será emitido pela AGINT. |
| Instrumento | O Instrumento de Pagamento da Opção A - *Notes*, denominado em Dólar, será emitido de acordo com certa escritura de emissão regida pelas Leis do Estado de Nova Iorque, Estados Unidos da América, que refletirá os termos e condições previstos neste Anexo VI, bem como neste Plano e no Plano 1. |
| Garantias Fidejussórias | O Instrumento de Pagamento da Opção A - *Notes* contará com garantias fidejussórias da AGE, AGIE, AGCS, AGPAR e AGSA, a serem outorgadas em conformidade com o disposto nas Leis do Estado de Nova Iorque, Estados Unidos da América, e em acordo com as disposições do Plano. |
| Garantias Reais | O Instrumento de Pagamento da Opção A - *Notes* contará com garantia fiduciária, regida por lei brasileira, sobre as ações de emissão da AGE e penhor de 1º grau, regido pelas Leis da República Federal da Alemanha, sobre as ações de emissão da Inzag. |
| Valor Total de Emissão | O valor de emissão total do Instrumento de Pagamento da Opção A - *Notes* corresponderá ao ***(i)*** percentual de 36% (trinta e seis por cento) do valor de Créditos Sujeitos detidos pelos Credores Opção A que atendam ao disposto nas Cláusulas 5.2.1 do Plano e 5.5.2 do Plano 1, bem como nas demais disposições aplicáveis, acrescido dos juros remuneratórios aplicáveis previstos nas Cláusulas 5.4., item "(ii)" do Plano e 5.4, item "(ii)" do Plano 1 que incidirem a partir da Data da Homologação até a data de emissão do Instrumento de Pagamento da Opção A - *Notes*; *acrescido* do ***(ii)*** percentual de 31% (trinta e um por cento) do valor de Créditos Sujeitos detidos pelos Credores Opção C que atendam ao disposto nas Cláusulas 7.5.1 do Plano e 7.5.2 do Plano 1 e, bem como nas demais disposições aplicáveis, acrescido dos juros remuneratórios aplicáveis previstos nas Cláusulas 7.4.1, item "(ii)" do Plano e 7.4.1, item "(ii)" do Plano 1 que incidirem a partir da Data da Homologação até a data de emissão do Instrumento de Pagamento da Opção A - *Notes*. Para que não restem dúvidas, ***(a)*** o valor em Crédito Opção A a ser recebido por cada Credor Opção A, nos termos deste Plano e, conforme aplicável, do Plano 1, observará o disposto nas Cláusulas 11.5 e seguintes do Plano e do Plano 1, de modo que, |

| | |
|---|---|
| | em nenhuma hipótese, o respectivo Credor Opção A receberá valor do seu Crédito Opção A em duplicidade; e ***(b)*** o valor em Crédito Opção C – Tranche A a ser recebido por cada Credor Opção C, nos termos deste Plano e do Plano 1, observará o disposto nas Cláusulas 11.5 e seguintes do Plano e do Plano 1, de modo que, em nenhuma hipótese, o respectivo Credor Opção C receberá o valor do seu Crédito Opção C – Tranche A em duplicidade. |
| Moeda da Emissão | O Instrumento de Pagamento da Opção A - *Notes* será emitido em Dólar. |
| Vencimento | O Instrumento de Pagamento da Opção A - *Notes* vencerá em 28 de dezembro de 2040. |
| Correção e Juros | • O Instrumento de Pagamento da Opção A - *Notes* não será corrigido monetariamente.<br><br>• Sobre o Instrumento de Pagamento da Opção A - *Notes* incidirá juros remuneratórios de 6,00% (seis por cento) ao ano (considerando-se, para tanto, um ano de 360 (trezentos e sessenta) Dias Corridos), computados a partir da data de emissão do Instrumento de Pagamento da Opção A - *Notes* até 28 de dezembro de 2040. |
| Data de Pagamento de Juros | **(a)** da data de emissão do Instrumento de Pagamento da Opção A - *Notes* até imediatamente antes de 28 de dezembro de 2030, os juros remuneratórios incidentes no período serão capitalizados no valor do principal; e **(b)** de 28 de dezembro de 2030 até 28 de dezembro de 2040, os juros remuneratórios incidentes no período serão pagos em dinheiro e em bases semestrais, em 28 de junho e 28 de dezembro de cada ano, sendo a data do primeiro pagamento em 28 de junho de 2031. |
| Amortização | O valor do principal, incluindo os juros incididos capitalizados ao valor do principal, será amortizado, em dinheiro, em seis parcelas anuais, a serem pagas em 28 de dezembro de 2035, 28 de dezembro de 2036, 28 de dezembro de 2037, 28 de dezembro de 2038, 28 de dezembro de 2039 e 28 de dezembro de 2040, no valor correspondente a 16,667%, 20%, 25%, 33,333%, 50% e 100% do saldo devedor existente nas respectivas datas de pagamento. |
| Valores Mobiliários Detidos pela Emissora, Garantidoras e Afiliadas | A emissora poderá cancelar, parcial ou integralmente, a qualquer tempo e a seu exclusivo critério, o Instrumento de Pagamento da Opção A – *Notes* detido pela emissora, qualquer garantidora ou entidade controladora, controlada ou sob controle comum de qualquer emissora e/ou garantidora. |
| Lei Aplicável | O Instrumento de Pagamento da Opção A - *Notes* será regido pelas Leis do Estado de Nova Iorque, Estados Unidos da América. |
| Distribuição e Negociação | A Emissora envidará os esforços comercialmente razoáveis para possibilitar que o Instrumento de Pagamento da Opção A - *Notes* seja elegível para depósito no sistema do DTC em sua data de emissão. |
| Alterações | O Instrumento de Pagamento da Opção A - *Notes* poderá ser alterado por meio do consentimento de credores titulares de mais da metade do valor principal agregado em circulação do |

<table>
<tr><td></td><td>Instrumento de Pagamento da Opção A – Notes e do Instrumento de Pagamento da Opção B – Notes (apurado apenas de forma consolidada).<br><br>A título exemplificativo, as seguintes matérias serão deliberadas por credores titulares de mais da metade do valor principal agregado em circulação do Instrumento de Pagamento da Opção A – Notes e do Instrumento de Pagamento da Opção B – Notes (apurado apenas de forma consolidada):<br><br>• Remoção de covenants e eventos de inadimplemento;<br>• Alteração de disposições que afetem os direitos dos credores relacionados às garantias fidejussórias, reais ou fiduciárias outorgadas ao Instrumento de Pagamento da Opção A – Notes, inclusive para liberar ou extinguir qualquer uma dessas garantias.<br><br>O consentimento de credores titulares de mais de 2/3 do valor principal agregado em circulação do Instrumento de Pagamento da Opção A – Notes e do Instrumento de Pagamento da Opção B – Notes (apurado apenas de forma consolidada) será exigido para:<br><br>• Alterar qualquer data de pagamento de principal ou de juros;<br>• Reduzir a taxa de juros;<br>• Alterar o local de pagamento;<br>• Alterar disposições da escritura de emissão que afete o grau de preferência legal do Instrumento de Pagamento da Opção A – Notes; e<br>• Alterar o quórum necessário para aprovar alterações referentes às matérias listadas acima<br><br>A substituição do trustee do Instrumento de Pagamento da Opção A – Notes dependerá do consentimento expresso da emissora e garantidoras do Instrumento de Pagamento da Opção A – Notes.</td></tr>
<tr><td>Obrigações de fazer/não fazer (covenants)</td><td>• Obrigação da emissora e das garantidoras de pagar, devida e pontualmente, o principal e juros sobre o Instrumento de Pagamento da Opção A - Notes, em conformidade com os termos do Plano, do Plano 1 e da escritura de emissão;<br>• Obrigação da emissora e das garantidoras de manter sua existência corporativa, observando eventuais exceções autorizadas pela lei aplicável e pela escritura de emissão do Instrumento de Pagamento da Opção A – Notes, incluindo, sem limitação, a possibilidade de substituir a emissora ou realizar operações societárias envolvendo a emissora e garantidoras;</td></tr>
</table>

| | |
|---|---|
| | • Obrigação de nomear um *trustee* e de eventualmente substituí-lo nos termos da escritura de emissão do Instrumento de Pagamento da Opção A - *Notes*.<br>• Obrigação de manter o grau de preferência do Instrumento de Pagamento da Opção A - *Notes*, inclusive em relação a todas as obrigações atuais e futuras da emissora e das garantidoras;<br>• Obrigação de manter a validade e a eficácia da escritura de emissão do Instrumento de Pagamento da Opção A – Notes e das respectivas garantias, observando eventuais exceções previstas no Plano, no Plano 1 e na escritura de emissão do Instrumento de Pagamento da Opção A – *Notes*.<br>• Obrigação da emissora e das garantidoras de cumprir as leis aplicáveis; e<br>• Obrigação da emissora e das garantidoras de manter informações contábeis e administrativas. |
| Eventos de Inadimplemento | • Não pagamento do principal ou dos juros após o decurso do prazo de 60 Dias Corridos contado da data em que a respectiva obrigação de pagamento do principal ou dos juros tornou-se devida e exigível; sendo certo que credores titulares de mais da metade do valor principal agregado em circulação do Instrumento de Pagamento da Opção A – *Notes* e do Instrumento de Pagamento da Opção B – *Notes* (apurado apenas de forma consolidada) poderão conceder prazo de cura de 180 (cento e oitenta) Dias Corridos, passível de prorrogação; e<br>• Violação de obrigação de fazer ou não fazer, desde que tal violação não seja sanada em até 60 Dias Corridos contados do envio de notificação escrita à emissora e garantidoras pelo *trustee* ou por credores titulares de mais da metade do valor principal agregado em circulação do Instrumento de Pagamento da Opção A – *Notes* e do Instrumento de Pagamento da Opção B – *Notes* (apurado apenas de forma consolidada). |
| O Instrumento de Pagamento da Opção A – *Notes* e o Instrumento de Pagamento da Opção B – *Notes* poderão ser emitidos sob a mesma escritura nos termos de certo aditamento à escritura de emissão e serão referidos como *Notes* da Série A e *Notes* da Série B, respectivamente. | |

**SCHEDULE VI**

| **OPTION A PAYMENT INSTRUMENT - NOTES<br>TERMS AND CONDITIONS** | |
|---|---|
| The capitalized terms used in this schedule that are not expressly defined herein shall be interpreted in accordance with the respective definitions set forth in the Plan.<br><br>This schedule is executed in Portuguese and English versions, and, in the event of any conflict, discrepancy, inconsistency or question of interpretation between such versions, the Portuguese version shall prevail for all purposes.<br><br>In the event of any conflict, discrepancy, inconsistency or question of interpretation between any provision of this schedule and any provision of the Plan, the provisions of the Plan shall prevail for all purposes. | |
| Issuer | Option A Payment Instrument - Notes will be issued by AGINT. |
| Instrument | Option A Payment Instrument - Notes, denominated in Dollar, shall be issued under certain indenture governed by the Laws of the State of New York, United States of America, which shall reflect the terms and conditions set forth in this Schedule VI, as well as in this Plan and Plan 1. |
| Guarantees | Option A Payment Instrument - Notes will be guaranteed by AGE, AGIE, AGCS, AGPAR and AGSA, governed by the Laws of the State of New York, United States of America, and in accordance with the provisions of the Plan. |
| Collateral | Option A Payment Instrument - Notes will be secured by a fiduciary lien, governed by Brazilian law, on the shares issued by AGE and a first lien pledge, governed by German law, on the shares issued by Inzag. |
| Total Issuance Amount | The total issuance amount of the Option A Payment Instrument - Notes shall correspond to ***(i)*** thirty-six percent (36%) of the value of the Subject Claims held by the Option A Creditors that comply with Section 5.2.1. of the Plan and Section 5.5.2 of the Plan 1, as well as other applicable provisions, plus applicable interest pursuant to Section 5.4, item "(ii)" of the Plan and Section 5.4, item "(ii)" of the Plan 1 accruing from the Confirmation Date until the issuance date of the Option A Payment Instrument - Notes; *in addition* to ***(ii)*** thirty-one percent (31%) of the value of Subject Claims held by Option C Creditors that comply with Section 7.5.1 of the Plan and Section 7.5.2 of the Plan 1, as well as other applicable provisions, plus applicable interest pursuant to Section 7.4.1, item "(ii)" of the Plan and Section 7.4.1, item "(ii)" of the Plan 1 accruing from the Confirmation Date until the issuance date of the Option A Payment Instrument - Notes. For the avoidance of doubt, ***(a)*** the amount of Option A Claims to be received by each Option A Creditor, pursuant to this Plan and, as applicable, pursuant to Plan 1, shall be subject to Sections 11.5 et. seq. of the Plan and Plan 1, meaning that, under no circumstances, the respective Option A Creditor shall receive in duplication the amount of its Option A Claim; and ***(b)*** the amount of Option C – Tranche A Claims to be received by each Option C Creditor, pursuant to this Plan and the Plan 1, shall be subject to Sections 11.5 et. seq. of the Plan and Plan 1, meaning that, under no circumstances, the respective Option C |

| | |
|---|---|
| | Creditor shall receive in duplication the amount of its Option C – Tranche A Claim. |
| Currency | Option A Payment Instrument - Notes will be issued in USD. |
| Maturity Date | Option A Payment Instrument - Notes shall mature on December 28, 2040. |
| Adjustment and Interest | • Option A Payment Instrument - Notes will not be subject to adjustment for inflation.<br><br>• Interest shall accrue on the Option A Payment Instrument - Notes at a rate of six percent (6.00%) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the issuance date of the Option A Payment Instrument - Notes until December 28, 2040. |
| Interest Payment Date | (a) from the issuance date of the Option A Payment Instrument - Notes until immediately prior to December 28, 2030, the interest accrued during such period shall be capitalized into the principal amount; and (b) from December 28, 2030 until December 28, 2040, the interest accrued during such period shall be payable in cash on a semiannual basis, on June 28 and December 28 of each year, with the first interest payment date being June 28, 2031. |
| Amortization | The principal amount of the Option A Payment Instrument - Notes, including the interest accrued and capitalized into the principal amount, shall be amortized, in cash, in six annual installments to be paid on December 28, 2035, December 28, 2036, December 28, 2037, December 28, 2038, December 28, 2039, and December 28, 2040, in amounts corresponding to 16.667%, 20%, 25%, 33.333%, 50% and 100% of the principal outstanding balance on each respective payment date. |
| Securities held by the Issuer, Guarantors or Affiliates | The issuer may cancel, partially or in full, at any time and at its sole discretion, the Option A Payment Instrument – Notes held by the issuer, guarantor or any entity controlling, controlled by, or under common control with any issuer and/or guarantor. |
| Governing Law | Option A Payment Instrument - Notes will be governed by the Laws of the State of New York, United States of America. |
| Distribution and Clearing | Issuer will use commercially reasonable efforts to make the Option A Payment Instrument - Notes eligible for deposit on the DTC system from the issue date. |
| Amendments | The Option A Payment Instrument - Notes may be amended with the consent of holders holding the majority of the outstanding aggregate principal amount of the Option A Payment Instrument – Notes and Option B Payment Instrument – Notes (determined on an aggregate basis only).<br><br>For illustrative purposes, the following matters will be decided through consent of holders holding the majority of the outstanding aggregate principal amount of the Option A Payment Instrument – Notes and Option B Payment Instrument – Notes (determined on an aggregate basis):<br>• Removal of covenants and events of default;<br>• Change provisions that would affect the holders' rights in connection with the guarantees and collateral granted to the |

| | |
|---|---|
| | Option A Payment Instrument – Notes, including to release or extinguish any of these guarantees and collateral<br><br>Consent of holders holding 2/3 of the outstanding aggregate principal amount of the Option A Payment Instrument – Notes and Option B Payment Instrument – Notes (determined on an aggregate basis only), shall be required to:<br>• Change any principal or interest payment date;<br>• Reduce the interest rate;<br>• Change the place of payment;<br>• Change provisions of the indenture affecting the ranking of the Option A Payment Instrument – Notes; and<br>• Change the required quorum to approve the matters listed above.<br><br>The replacement of the trustee of the Option A Payment Instrument – Notes shall require consent of the issuer and guarantors of the Option A Payment Instrument – Notes. |
| Covenants | • Obligation of the issuer and guarantors to pay, duly and on a timely basis, principal and interest on the Option A Payment Instrument - Notes, according to the Plan, Plan 1 and respective indenture;<br>• Obligation to preserve corporate existence, subject to eventual exceptions authorized by applicable law and indenture of the Option A Payment Instrument – Notes, including, but not limited to, the possibility of replacing the issuer or conducting corporate reorganizations involving the issuer and guarantors;<br>• Obligation to appoint a trustee and eventually replace it pursuant to the provisions of the indenture of the Option A Payment Instrument – Notes;<br>• Obligation to maintain the ranking of the Option A Payment Instrument - Notes, including with respect to all of the issuer's and guarantors' existing and future obligations;<br>• Obligation to maintain the validity and effectiveness of the indenture of the Option A Payment Instrument - Notes and the guarantees and collateral, subject to eventual exceptions provided for in the Plan, Plan 1 and indenture of the Option A Payment Instrument – Notes;<br>• Obligation of the issuer and guarantors to comply with laws; and<br>• Obligation of the issuer and guarantors to maintain accounting and administrative records. |
| Events of Default | • Failure to pay principal or interest following the expiration of a 60-Calendar Day deadline counted from the date on which the corresponding obligation to pay principal or interest becomes due and payable; being understood that holders holding the majority of the outstanding aggregate principal amount of the Option A Payment Instrument – Notes and Option B Payment Instrument – Notes (determined on an aggregate basis only), may grant cure period of 180 Calendar Days, that may be extended; and |

| | |
|---|---|
| | • Default in the performance, or breach, of the indenture covenants, as long as a such default or breach is not cured for a period of 60 consecutive Calendar Days after written notice specifying such default or breach is given to the issuer and guarantors by the trustee or by holders holding at least the majority of the outstanding aggregate principal amount of the Option A Payment Instrument – Notes and Option B Payment Instrument – Notes (determined on an aggregate basis only). |
| The Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes may be issued under the same indenture pursuant to supplement indentures and would be referred to as Series A Notes and Series B Notes, respectively. | |

**Anexo VII**

| **TERMOS E CONDIÇÕES DO INSTRUMENTO DE PAGAMENTO DA OPÇÃO B - *NOTES*** | |
|---|---|
| As palavras contidas neste anexo iniciadas em letras maiúsculas que não sejam expressamente aqui definidas deverão ser interpretadas de acordo com as respectivas definições do Plano.<br><br>Este anexo é celebrado em versões em português e inglês, sendo que, em caso de conflito, divergência, inconsistência ou dúvida de interpretação entre tais versões, a versão em português prevalecerá para todos os fins.<br><br>Em caso de conflito, divergência, inconsistência ou dúvida de interpretação entre qualquer disposição deste anexo e qualquer disposição do Plano, as disposições do Plano prevalecerão para todos os fins. | |
| Emissora | O Instrumento de Pagamento da Opção B – *Notes* será emitido pela AGINT. |
| Instrumento | O Instrumento de Pagamento da Opção B - *Notes*, denominado em Dólar, será emitido de acordo com certa escritura de emissão regida pelas Leis do Estado de Nova Iorque, Estados Unidos da América, que refletirá os termos e condições previstos neste Anexo VII, bem como neste Plano e no Plano 1. |
| Garantias Fidejussórias | O Instrumento de Pagamento da Opção B - *Notes* contará com garantias fidejussórias da AGE, AGIE, AGCS, AGPAR e AGSA, a serem outorgadas em conformidade com o disposto nas Leis do Estado de Nova Iorque, Estados Unidos da América, e em acordo com as disposições do Plano. |
| Garantias Reais | O Instrumento de Pagamento da Opção B - *Notes* contará com garantia fiduciária, regida por lei brasileira, e sob condição suspensiva, sobre as ações de emissão da AGE e penhor em segundo grau, regido pelas Leis da República Federal da Alemanha, sobre as ações de emissão da Inzag. |
| Valor Total de Emissão | O valor de emissão total do Instrumento de Pagamento da Opção B - *Notes* corresponderá ao ***(i)*** percentual de 100% (cem por cento) do valor de Créditos Sujeitos detidos pelos Credores Opção B que atendam ao disposto nas Cláusulas 6.5.1 do Plano e 6.5.2 do Plano 1, bem como nas demais disposições aplicáveis, acrescido dos juros remuneratórios aplicáveis previstos nas Cláusulas 6.4, item "(ii)" do Plano e 6.4, item "(ii)" do Plano 1 que incidirem a partir da Data da Homologação até a data de emissão do Instrumento de Pagamento da Opção B - *Notes*; *acrescido do **(ii)*** percentual de 69% (sessenta e nove por cento) do valor de Créditos Sujeitos detidos pelos Credores Opção C que atendam ao disposto nas Cláusulas 7.5.1 do Plano e 7.5.2 do Plano 1, bem como nas demais disposições aplicáveis, acrescido dos juros remuneratórios aplicáveis previstos nas Cláusulas 7.4.2, item "(ii)" do Plano e 7.4.2, item "(ii)" do Plano 1 que incidirem a partir Data da Homologação até a data de emissão do Instrumento de Pagamento da Opção B - *Notes*. Para que não restem dúvidas, ***(a)*** o valor em Crédito Opção B a ser recebido por cada Credor Opção B, nos termos deste Plano e Plano 1, observará o disposto nas Cláusulas 11.5 e seguintes do Plano e do Plano 1, de modo que, em nenhuma hipótese, o respectivo Credor Opção B receberá valor do seu Crédito Opção |

| | |
|---|---|
| | B em duplicidade; e ***(b)*** o valor em Crédito Opção C – Tranche B a ser recebido por cada Credor Opção C, nos termos deste Plano e do Plano 1, observará o disposto nas Cláusulas 11.5 e seguintes do Plano e do Plano 1, de modo que, em nenhuma hipótese, o respectivo Credor Opção C receberá o valor do seu Crédito Opção C – Tranche B em duplicidade. |
| Moeda da Emissão | O Instrumento de Pagamento da Opção B - *Notes* será emitido em Dólar. |
| Vencimento | O Instrumento de Pagamento da Opção B - *Notes* vencerá em 28 de dezembro de 2070. |
| Correção e Juros | • O Instrumento de Pagamento da Opção B - *Notes* não será corrigido monetariamente.<br><br>• Sobre o Instrumento de Pagamento da Opção B - *Notes* incidirá juros remuneratórios de 1% (um por cento) ao ano (considerando-se, para tanto, um ano de 360 (trezentos e sessenta) Dias Corridos), computados a partir da data de emissão do Instrumento de Pagamento da Opção B - *Notes* até 28 de dezembro de 2070. |
| Data de Pagamento de Juros | Os juros do Instrumento de Pagamento da Opção B - *Notes* serão capitalizados no valor do principal e pagos, em uma única parcela, em 28 de dezembro de 2070. |
| Amortização | O valor do principal, incluindo os juros incididos capitalizados ao valor do principal, do Instrumento de Pagamento da Opção B – *Notes* será amortizado, em uma única parcela, em 28 de dezembro de 2070. |
| Resgate de Forma Antecipada com Desconto | O Instrumento de Pagamento da Opção B – *Notes* poderá, a qualquer momento a partir de 1º de janeiro de 2035 e até 28 de junho de 2070, a exclusivo critério da emissora e/ou das garantidoras, ser resgatados antecipadamente, de forma parcial ou integral, conforme aplicável, com a aplicação de desconto equivalente a 90% do valor do Instrumento de Pagamento da Opção B – *Notes* objeto do resgate antecipado, conforme devidamente atualizado até a data de vencimento do Instrumento de Pagamento da Opção B - *Notes*. Para que não restem dúvidas, por meio de pagamento de valor equivalente a 10% do Instrumento de Pagamento da Opção B – *Notes* objeto do resgate antecipado, conforme devidamente atualizado até a data de vencimento do Instrumento de Pagamento da Opção B - *Notes*, haverá a quitação integral da integralidade do Instrumento de Pagamento da Opção B – *Notes* detidos pelos respectivos Credores Opção B e/ou Credores Opção C para todos os fins e efeitos de direito. |
| Valores Mobiliários Detidos pela Emissora, Garantidoras e Afiliadas | A emissora poderá cancelar, parcial ou integralmente, a qualquer tempo e a seu exclusivo critério, o Instrumento de Pagamento da Opção B – *Notes* detido pela emissora, qualquer garantidora ou entidade controladora, controlada ou sob controle comum de qualquer emissora e/ou garantidora. |
| Lei Aplicável | O Instrumento de Pagamento da Opção B - *Notes* será regido pelas Leis do Estado de Nova Iorque, Estados Unidos da América. |
| Distribuição e Negociação | A Emissora envidará os esforços comercialmente razoáveis para possibilitar que o Instrumento de Pagamento da Opção B - *Notes* |

| | |
|---|---|
| | seja elegível para depósito no sistema do DTC em sua data de emissão. |
| Alterações | O Instrumento de Pagamento da Opção B - *Notes* poderá ser alterado por meio do consentimento de credores titulares de mais da metade do valor principal agregado em circulação do Instrumento de Pagamento da Opção B – *Notes* e do Instrumento de Pagamento da Opção A – *Notes* (apurado apenas de forma consolidada).<br><br>A título exemplificativo, as seguintes matérias serão deliberadas por credores titulares de mais da metade do valor principal agregado em circulação do Instrumento de Pagamento da Opção B – *Notes* e do Instrumento de Pagamento da Opção A – *Notes* (apurado apenas de forma consolidada):<br><br>• Remoção de *covenants* e eventos de inadimplemento;<br>• Alteração de disposições que afetem os direitos dos credores relacionados às garantias fidejussórias, reais ou fiduciárias outorgadas ao Instrumento de Pagamento da Opção B – Notes, inclusive para liberar ou extinguir qualquer uma dessas garantias.<br><br>O consentimento de credores titulares de mais de 2/3 do valor principal agregado em circulação do Instrumento de Pagamento da Opção B – *Notes* e do Instrumento de Pagamento da Opção A – *Notes* (apurado apenas de forma consolidada) será exigido para:<br><br>• Alterar qualquer data de pagamento de principal ou de juros;<br>• Reduzir a taxa de juros;<br>• Alterar o local de pagamento;<br>• Alterar disposições da escritura de emissão que afete o grau de preferência legal do Instrumento de Pagamento da Opção A – *Notes*; e<br>• Alterar o quórum necessário para aprovar alterações referentes às matérias listadas acima<br><br>A substituição do *trustee* do Instrumento de Pagamento da Opção B – *Notes* dependerá do consentimento expresso da emissora e garantidoras do Instrumento de Pagamento da Opção B – *Notes*. |
| Obrigações de fazer/não fazer (*covenants*) | • Obrigação da emissora e das garantidoras de pagar, devida e pontualmente, o principal e juros sobre o Instrumento de Pagamento da Opção B - *Notes*, em conformidade com os termos do Plano, do Plano 1 e da escritura de emissão;<br>• Obrigação da emissora e das garantidoras de manter sua existência corporativa, observando eventuais exceções autorizadas pela lei aplicável e pela escritura de emissão do Instrumento de Pagamento da Opção B – *Notes*, |

| | |
|---|---|
| | incluindo, sem limitação, a possibilidade de substituir a emissora ou realizar operações societárias envolvendo a emissora e garantidoras;<br>• Obrigação de nomear um *trustee* e de eventualmente substituí-lo nos termos da escritura de emissão do Instrumento de Pagamento da Opção B - *Notes*.<br>• Obrigação de manter o grau de preferência do Instrumento de Pagamento da Opção B - *Notes*, inclusive em relação a todas as obrigações atuais e futuras da emissora e das garantidoras;<br>• Obrigação de manter a validade e a eficácia da escritura de emissão do Instrumento de Pagamento da Opção B – Notes e das respectivas garantias, observando eventuais exceções previstas no Plano, no Plano 1 e na escritura de emissão do Instrumento de Pagamento da Opção B – *Notes*.<br>• Obrigação da emissora e das garantidoras de cumprir as leis aplicáveis; e<br>• Obrigação da emissora e das garantidoras de manter informações contábeis e administrativas. |
| Eventos de Inadimplemento | • Não pagamento do principal ou dos juros após o decurso do prazo de 60 Dias Corridos contado da data em que a respectiva obrigação de pagamento do principal ou dos juros tornou-se devida e exigível; sendo certo que credores titulares de mais da metade do valor principal agregado em circulação do Instrumento de Pagamento da Opção B – *Notes* e do Instrumento de Pagamento da Opção A – *Notes* (apurado apenas de forma consolidada) poderão conceder prazo de cura de 180 (cento e oitenta) Dias Corridos, passível de prorrogação; e<br>• Violação de obrigação de fazer ou não fazer, desde que tal violação não seja sanada em até 60 Dias Corridos contados do envio de notificação escrita à emissora e garantidoras pelo *trustee* ou por credores titulares de mais da metade do valor principal agregado em circulação do Instrumento de Pagamento da Opção B – *Notes* e do Instrumento de Pagamento da Opção A – *Notes* (apurado apenas de forma consolidada). |
| O Instrumento de Pagamento da Opção A – *Notes* e o Instrumento de Pagamento da Opção B – *Notes* poderão ser emitidos sob a mesma escritura nos termos de certo aditamento à escritura de emissão e serão referidos como *Notes* da Série A e *Notes* da Série B, respectivamente. | |

## SCHEDULE VII

| **OPTION B PAYMENT INSTRUMENT - NOTES<br>TERMS AND CONDITIONS** | |
|---|---|
| The capitalized terms used in this schedule that are not expressly defined herein shall be interpreted in accordance with the respective definitions set forth in the Plan.<br><br>This schedule is executed in Portuguese and English versions, and, in the event of any conflict, discrepancy, inconsistency or question of interpretation between such versions, the Portuguese version shall prevail for all purposes.<br><br>In the event of any conflict, discrepancy, inconsistency or question of interpretation between any provision of this schedule and any provision of the Plan, the provisions of the Plan shall prevail for all purposes. | |
| Issuer | Option B Payment Instrument - Notes will be issued by AGINT. |
| Instrument | Option B Payment Instrument - Notes, denominated in Dollar, shall be issued under certain indenture governed by the Laws of the State of New York, United States of America, which shall reflect the terms and conditions set forth in this Schedule VII, as well as in this Plan and Plan 1. |
| Guarantees | Option B Payment Instrument - Notes will be guaranteed by AGE, AGIE, AGCS, AGPAR and AGSA, governed by the Laws of the State of New York, United States of America, and in accordance with the provisions of the Plan. |
| Collateral | Option B Payment Instrument - Notes will be secured by a fiduciary lien, governed by Brazilian law, and granted on a conditional basis, over the shares issued by AGE and a second lien pledge, governed by German law, on the shares issued by Inzag. |
| Total Issuance Amount | The total issuance amount of the Option B Payment Instrument - Notes shall correspond to ***(i)*** one hundred percent (100%) of the value of the Subject Claims held by the Option B Creditors that comply with Section 6.5.1 of the Plan and Section 6.5.2 of the Plan 1, as well as other applicable provisions, plus the interest applicable pursuant to Section 6.4, item "(ii)" of the Plan and Section 6.4, item "(ii)" of the Plan 1 and accruing from the Confirmation Date until the issuance date of the Option B Payment Instrument - Notes; *in addition* to ***(ii)*** sixty-nine percent (69%) of the value of Subject Claims held by Option C Creditors that comply with Section 7.5.1 of the Plan and Section 7.5.2 of the Plan 1, as well as other applicable provisions, plus the interest applicable pursuant to Section 7.4.2, item "(ii)" of the Plan and Section 7.4.2, item "(ii)" of the Plan 1 and accruing from the Confirmation Date until the issuance date of the Option B Payment Instrument - Notes. For the avoidance of doubt, ***(a)*** the amount of Option B Claims to be received by each Option B Creditor, pursuant to this Plan and, as applicable, pursuant to the Plan 1, shall be subject to Sections 11.5 et. seq. of the Plan and the Plan 1, meaning that, under no circumstances, the respective Option B Creditor shall receive in duplication the amount of its Option B Claim; and ***(b)*** the amount of Option C – Tranche B Claims to be received by each Option C Creditor, pursuant to this Plan and, as applicable, pursuant to the Plan 1, shall be subject to Sections 11.5 et. seq. of the Plan, meaning that, under no circumstances, the respective Option C Creditor shall receive in duplication the amount of its Option C – Tranche B Claim. |

| | |
|---|---|
| Currency | Option B Payment Instrument - Notes will be issued in USD. |
| Maturity Date | Option B Payment Instrument - Notes shall mature on December 28, 2070. |
| Adjustment and Interest | • Option B Payment Instrument - Notes will not be subject to adjustment for inflation.<br><br>• Interest shall accrue on the Option B Payment Instrument - Notes at a rate of one percent (1.00%) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the issuance date of the Option B Payment Instrument - Notes until December 28, 2070. |
| Interest Payment Date | The interest of the Option B Payment Instrument - Notes shall be capitalized into the principal and paid in a single installment on December 28, 2070. |
| Amortization | The principal amount on the Option B Payment Instrument – Notes, including the interest accrued and capitalized into the principal, shall be amortized in a single installment on December 28, 2070. |
| Early Redemption With Discount | The Option B Payment Instrument - Notes may, as of January 1st, 2035 and until June 28, 2070, at the sole discretion of the issuer and guarantors, be redeemed in advance, partially or in full, with the application of a discount equivalent to 90% of the value of the Option B Payment Instrument – Notes that is being redeemed, as duly adjusted until the maturity date of the Option B Payment Instrument - Notes. For the avoidance of doubt, upon payment of an amount equivalent to 10% of the Option B Payment Instrument – Notes that is being redeemed, as duly adjusted until the maturity date of the Option B Payment Instrument - Notes, the Option B Payment Instrument - Notes held by the respective Option B Creditors and/or Option C Creditors shall be deemed fully settled and discharged for all legal purposes. |
| Securities held by the Issuer, Guarantors or Affiliates | The issuer may cancel, partially or in full, at any time and at its sole discretion, the Option B Payment Instrument – Notes held by the issuer, guarantor or any entity controlling, controlled by, or under common control with any issuer and/or guarantor. |
| Governing Law | Option B Payment Instrument - Notes will be governed by the Laws of the State of New York, United States of America. |
| Distribution and Clearing | Issuer will use commercially reasonable efforts to make the Option B Payment Instrument - Notes eligible for deposit on the DTC system from the issue date. |
| Amendments | The Option B Payment Instrument - Notes may be amended with the consent of holders holding the majority of the outstanding aggregate principal amount of the Option B Payment Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis only).<br><br>For illustrative purposes, the following matters will be decided through consent of holders holding the majority of the outstanding aggregate principal amount of the Option B Payment Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis):<br>• Removal of covenants and events of default;<br>• Change provisions that would affect the holders' rights in connection with the guarantees and collateral granted to the |

| | |
|---|---|
| | Option B Payment Instrument – Notes, including to release or extinguish any of these guarantees and collateral<br><br>Consent of holders holding 2/3 of the outstanding aggregate principal amount of the Option B Payment Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis only), shall be required to:<br>• Change any principal or interest payment date;<br>• Reduce the interest rate;<br>• Change the place of payment;<br>• Change provisions of the indenture affecting the ranking of the Option B Payment Instrument – Notes; and<br>• Change the required quorum to approve the matters listed above.<br><br>The replacement of the trustee of the Option B Payment Instrument – Notes shall require consent of the issuer and guarantors of the Option B Payment Instrument – Notes. |
| Covenants | • Obligation of the issuer and guarantors to pay, duly and on a timely basis, principal and interest on the Option B Payment Instrument - Notes, according to the Plan, Plan 1 and respective indenture;<br>• Obligation to preserve corporate existence, subject to eventual exceptions authorized by applicable law and indenture of the Option B Payment Instrument – Notes, including, but not limited to, the possibility of replacing the issuer or conducting corporate reorganizations involving the issuer and guarantors;<br>• Obligation to appoint a trustee and eventually replace it pursuant to the provisions of the indenture of the Option B Payment Instrument – Notes;<br>• Obligation to maintain the ranking of the Option B Payment Instrument - Notes, including with respect to all of the issuer's and guarantors' existing and future obligations;<br>• Obligation to maintain the validity and effectiveness of the indenture of the Option B Payment Instrument - Notes and the guarantees and collateral, subject to eventual exceptions provided for in the Plan, Plan 1 and indenture of the Option B Payment Instrument – Notes;<br>• Obligation of the issuer and guarantors to comply with laws; and<br>• Obligation of the issuer and guarantors to maintain accounting and administrative records. |
| Events of Default | • Failure to pay principal or interest following the expiration of a 60-Calendar Day deadline counted from the date on which the corresponding obligation to pay principal or interest becomes due and payable; being understood that holders holding the majority of the outstanding aggregate principal amount of the Option B Payment Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis only), may grant cure period of 180 Calendar Days, that may be extended; and |

| | |
|---|---|
| | • Default in the performance, or breach, of the indenture covenants, as long as a such default or breach is not cured for a period of 60 consecutive Calendar Days after written notice specifying such default or breach is given to the issuer and guarantors by the trustee or by holders holding at least the majority of the outstanding aggregate principal amount of the Option B Payment Instrument – Notes and Option A Payment Instrument – Notes (determined on an aggregate basis only). |
| The Option A Payment Instrument – Notes and the Option B Payment Instrument – Notes may be issued under the same indenture pursuant to supplement indentures and would be referred to as Series A Notes and Series B Notes, respectively. | |

# Exhibit F

## Initial Court Order and a certified English translation

**Certified Translation from Portuguese into English**
**Tradução Juramentada**
Original document reference:
Decisão RE AG
Translated reference:
Decision EJ AG
**TRANSLATION No.03 BOOK No.375 PAGE No.95**

I hereby certify and give full faith and credit that on this date a document has been presented to me in Portuguese, to which I translate as follows:

**Judiciary Branch**

**Court of Justice of the State of Minas Gerais**

**1st Business Court of the Judicial District of Belo Horizonte**

Avenida Raja Gabaglia, 1753 - Bairro: Luxemburgo - CEP: 30380900 - Fone: (31) 3299-4400 - Email: vempresarial1@tjmg.jus.br

**EXTRAJUDICIAL REORGANIZATION Nº 1087093-64.2026.8.13.0024/MG**

APPLICANT: ZAGOPE SGPS S.A.

APPLICANT: INZAG GERMANY GMBH

APPLICANT: ANDRADE GUTIERREZ INTERNATIONAL S.A.

APPLICANT: ANDRADE GUTIERREZ ENGENHARIA S/A

APPLICANT: ANDRADE GUTIERREZ CONSTRUCOES E SERVICOS S.A

APPLICANT: ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S/A

**DECISION**

Having examined the matter, etc.

ZAGOPE SGPS S.A., INZAG GERMANY GMBH, ANDRADE GUTIERREZ INTERNATIONAL S.A., ANDRADE GUTIERREZ ENGENHARIA S/A, ANDRADE GUTIERREZ CONSTRUCOES E SERVICOS S.A., and ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S/A filed this extrajudicial reorganization proceeding pursuant to articles 161 et seq. of Law no. 11.101/2005.

The Applicants state that they are part of one of the country's most traditional engineering groups, with nearly 80 years of experience and involvement in infrastructure projects deemed essential to national and international development.

The Applicants state that, following a successful restructuring in 2022 (Extrajudicial Reorganization no. 5209787-06.2022.8.13.0024), the Group faced new and unforeseen macroeconomic issues, such as the suspension of major projects in Ghana and the Dominican Republic, significant currency devaluation, and the maintenance of interest rates (Selic) at high levels. These factors significantly impacted the Group's cash flow, leading to a default on financial obligations exceeding BRL 2 billion.

They uphold the feasibility of the companies and the need for a coordinated restructuring of liabilities to preserve business operations, productive enterprise, and jobs, in accordance with the principle of the company's corporate function (Article 47 of the LRF).

They report that creditors representing between 71% and 79% of the covered class of unsecured creditors (excluding operational suppliers) supported the plan they have submitted, thereby exceeding the absolute majority quorum required under article 163, caput, of the Brazilian Bankruptcy and Reorganization Law ("LRF").

The Applicants pled in a Request for Urgent Relief: (i) the ratification of the stay period and a prohibition on enforcement measures (article 163, paragraph 8, in conjunction with article 6, II and III of the LRF); (ii) the verification of levy of execution on receivables from contracts with SABESP; (iii) the waiver of the requirement to submit clearance certificates and authorization to participate in public bidding procedures; and (iv) the suspension of the effectiveness of ipso facto clauses (automatic termination upon the filing for reorganization).

The "Ciranda" creditor group filed a submission, in connection with Event 10, PEDHABILITACAO1, objecting to the plan and the suspension of enforcement proceedings, alleging a lack of homogeneity within the class and an abuse of power by the majority creditor.

The Applicants filed a rejoinder in Event 11, PET1, arguing that the objection was untimely and that the grouping was lawful.

**This is the report on the essential matters. Now I shall decide.**

The Extrajudicial reorganization is governed by Articles 161 to 167 of Law no. 11101/2005.

The ratification of the Extrajudicial Reorganization Plan was requested pursuant to article 163, paragraph 7, of Law no. 11.101/2005, which provides:

> *"Article 163. The debtor may also request judicial ratification of an extrajudicial reorganization plan that binds all creditors covered thereby, provided the creditors representing more than half of the claims ("créditos") of each class covered by the extrajudicial reorganization plan execute the request. (Wording provided by Law no. 14.112 of 2020) (Effective date)"*
>
> *(...)*

*7th Paragraph. The relevant party may file the request provided for in the caput of this article with proof of the consent of creditors representing at least 1/3 (one-third) of all claims of each class covered thereby and with a commitment to reach, within a non-extendable period of ninety (90) days counting from the date of the request, the quorum provided for in the caput of this article through express adhesion, with the option for the debtor to request the conversion of the proceeding into a judicial reorganization proceeding. (Included by Law no. 14.112 of 2020) (Effective date)"*

The review of the case records and the documents accompanying the Complaint confirms that the Applicants have met the requirements outlined in articles 48 and 161 of the LRF: the Applicants have been conducting business for over two years, are not bankrupt, their administrators have no criminal convictions, and they have observed the two-year waiting period since the last court approval of a reorganization plan (which occurred on November 29, 2022).

Regarding the approval quorum, Article 163 of the LRF requires the consent of the creditors representing more than 50% of the claims of each covered class.

In this regard, the Applicants submitted the plan with the support of holders of more than 70% of the claims in the selected unsecured category, thereby authorizing not only the processing of the case but also the immediate application of the legal protective effects.

Regarding the suspension under article 163, paragraph 8:

*"8th Paragraph. The suspension referred to in article 6 of this Law applies to extrajudicial reorganization proceedings from the time the respective request is filed, exclusively regarding the types of claims covered thereby; such suspension shall be ratified by the judge only if the initial quorum required by § 7 of this article is proven. (Included by Law no. 14.112 of 2020) (Effective date)"*

Once the Applicants demonstrated an adhesion rate exceeding 50%, ratification is mandatory.

Regarding the objections raised by the "Ciranda" creditors, I note that, pursuant to article 164, paragraph 2 of the LRF, objections can only be filed after the publication of the Public Notice for Filing Objections. Therefore, arguments concerning class heterogeneity and the creation of subclasses will be addressed at the proper time, ensuring the right to adversary proceeding, without, however, preventing the receipt of the plan or the granting of urgent relief measures necessary to preserve the companies.

Regarding the levy of execution of 30% of the receivables from SABESP contracts, mentioned in Event 10, Doc. 1, and Event 11, Doc. 1, the established caselaw of the Superior Court of Justice determines that the allocation of levied funds, even before the filing for reorganization, shall be determined by the Court where the reorganization proceedings are pending decision. This is necessary to ensure the alignment between creditors and the company's reorganization. Maintaining such a restriction, levied on the gross revenue from ongoing projects, would render continued operations infeasible.

Regarding participation in public tenders, the prevailing view among the Superior Courts is that the requirement for clearance certificates or a court-ratified reorganization plan should be considered in the company's best interests, provided its economic feasibility is demonstrated. Preventing the Applicants from carrying out their core business activity (public works) while the proceedings are pending before the Court would defeat the very purpose of the governing law.

Finally, regarding ipso facto clauses, prevailing legal doctrine and case law consider them abusive in the context of reorganization proceedings, as a mere state of financial distress should not automatically terminate essential contracts.

In view of the foregoing, I ORDER:

1. THE ISSUANCE of the public notice provided for in article 164 of Law no. 11.101/2005, so that creditors may submit their objections within a period of thirty (30) days. The debtor companies should provide proof of publication in a wide-circulation newspaper.

2. THE SUSPENSION, for a period of one hundred and eighty (180) days, of all lawsuits and enforcement proceedings filed against the debtors ANDRADE GUTIERREZ ENGENHARIA S.A., ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A., and ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A., exclusively regarding claims subject to the submitted plans, pursuant to article 163, paragraph 8, and article 6 of the LRF.

3. PROHIBITION against any form of retention, attachment, levy of execution, sequestration, search and seizure, or judicial or extrajudicial encumbrance upon the Applicants' assets arising from claims subject to these proceedings, including deposits made by SABESP in the case file of lawsuit No. 1029129-87.2024.8.26.0100 (2nd Business Court of São Paulo). I hereby grant this decision with the force of a formal court order to be delivered by the Applicants to the aforementioned Court, so that the funds held therein, and not yet withdrawn, may be made available to the companies.

4. THE WAIVER, in ongoing or future procurement processes, of the requirement to present a clearance certificate regarding extrajudicial reorganization or a previously ratified extrajudicial reorganization plan, in which case the Applicants shall demonstrate economic feasibility in accordance with the terms required by the bidding procedures.

5. THE SUSPENSION OF THE EFFECTIVENESS of express termination clauses (ipso facto) providing for the termination of contracts solely as a result of the filing of this request for extrajudicial reorganization.

6. THE NOTIFICATION of the Public Prosecutor's Office to monitor the proceedings.

Let notice be served and let it be complied with.

Document electronically signed by CLAUDIA HELENA BATISTA, Presiding Judge, on May 28, 2026, at 11:52:15, pursuant to article 1, III, "b", of Law no. 11.419/2006. The authenticity of the document may be verified at www.tjmg.jus.br > eproc > Autenticação de documentos by entering verification code 4030367v6 and CRC code 77e5d172.

1087093-64.2026.8.13.0024 4030367 .V6

---

This is what was to be translated on the original document, according to my best understanding, which amounted to 5 electronic page equivalents which I have reviewed, found true and correct, and sign below:

Emoluments: R$ 229.55
Receipt Book No.:02 Receipt No.:3764
São Paulo, August 18, 2026

JOSE ROBERTO VENSAN MARAMALDO:18122496830
Digitally signed by JOSE ROBERTO VENSAN MARAMALDO:18122496830
Date: 2026.09.01 16:51:24 -03'00'

José Roberto Vensan Maramaldo

**Poder Judiciário**
**Tribunal de Justiça do Estado de Minas Gerais**
**1ª Vara Empresarial da Comarca de Belo Horizonte**

Avenida Raja Gabaglia, 1753 - Bairro: Luxemburgo - CEP: 30380900 - Fone: (31) 3299-4400 - Email: vempresarial1@tjmg.jus.br

**RECUPERAÇÃO EXTRAJUDICIAL Nº 1087093-64.2026.8.13.0024/MG**

**REQUERENTE**: ZAGOPE SGPS S.A.

**REQUERENTE**: INZAG GERMANY GMBH

**REQUERENTE**: ANDRADE GUTIERREZ INTERNATIONAL S.A.

**REQUERENTE**: ANDRADE GUTIERREZ ENGENHARIA S/A

**REQUERENTE**: ANDRADE GUTIERREZ CONSTRUCOES E SERVICOS S.A

**REQUERENTE**: ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S/A

# DECISÃO

**Vistos, etc.**

**ZAGOPE SGPS S.A., INZAG GERMANY GMBH, ANDRADE GUTIERREZ INTERNATIONAL S.A., ANDRADE GUTIERREZ ENGENHARIA S/A, ANDRADE GUTIERREZ CONSTRUCOES E SERVICOS S.A e ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S/A** ajuizaram a presente **RECUPERAÇÃO EXTRAJUDICIAL**, com fulcro nos artigos 161 e seguintes da Lei nº 11.101/2005.

As Requerentes relatam ser integrantes de um dos mais tradicionais conglomerados de engenharia do país, com quase 80 anos de história e participação em obras de infraestrutura vitais para o desenvolvimento nacional e internacional.

Narram que, após uma reestruturação bem-sucedida em 2022 (Recuperação Extrajudicial nº 5209787-06.2022.8.13.0024), enfrentaram novos e imprevisíveis reveses macroeconômicos, tais como a interrupção de projetos relevantes em Gana e na República Dominicana, a forte desvalorização cambial e a manutenção da taxa de juros (Selic) em patamares elevados. Tais fatores impactaram severamente o fluxo de caixa do Grupo, levando ao inadimplemento de obrigações financeiras que ultrapassam R$ 2 bilhões.

Sustentam a viabilidade das empresas e a necessidade de reestruturação coordenada do passivo para a preservação da atividade, da fonte produtora e dos postos de trabalho, em observância ao princípio da função social da empresa (art. 47 da LRF).

Informam que o plano apresentado obteve a adesão de credores que representam entre 71% e 79% da classe de credores quirografários abrangida (excluindo-se fornecedores operacionais), superando o quórum de maioria absoluta exigido pelo art. 163, *caput*, da LRF.

Requereram, em sede de tutela de urgência: (i) a ratificação do *stay period* e a proibição de medidas constritivas (art. 163, §8º c/c art. 6º, II e III da LRF); (ii) o levantamento de penhoras incidentes sobre recebíveis de contratos com a SABESP; (iii) a

**Poder Judiciário**
**Tribunal de Justiça do Estado de Minas Gerais**
**1ª Vara Empresarial da Comarca de Belo Horizonte**

dispensa de apresentação de certidões negativas e a autorização para participação em processos licitatórios; e (iv) a suspensão da eficácia de cláusulas *ipso facto* (rescisão automática por ajuizamento de recuperação).

O grupo de credores "Ciranda" manifestou-se no evento 10, PEDHABILITACAO1, insurgindo-se contra o plano e a suspensão das execuções, alegando falta de homogeneidade na classe e abuso de poder pelo credor majoritário.

As Requerentes replicaram no evento 11, PET1, arguindo a intempestividade da impugnação e a legalidade do agrupamento.

**É o relatório do necessário. Decido.**

A Recuperação Extrajudicial é disciplinada pelos artigos 161 a 167 da Lei nº 11.101/2005.

Foi requerida a homologação do Plano de Recuperação Extrajudicial nos termos do § 7º do artigo 163 da Lei 11.101/2005, que prevê:

> *"Art. 163. O devedor poderá também requerer a homologação de plano de recuperação extrajudicial que obriga todos os credores por ele abrangidos, desde que assinado por credores que representem mais da metade dos créditos de cada espécie abrangidos pelo plano de recuperação extrajudicial. (Redação dada pela Lei nº 14.112, de 2020) (Vigência)*
>
> *(...)*
>
> *§ 7º O pedido previsto no **caput** deste artigo poderá ser apresentado com comprovação da anuência de credores que representem pelo menos 1/3 (um terço) de todos os créditos de cada espécie por ele abrangidos e com o compromisso de, no prazo improrrogável de 90 (noventa) dias, contado da data do pedido, atingir o quórum previsto no **caput** deste artigo, por meio de adesão expressa, facultada a conversão do procedimento em recuperação judicial a pedido do devedor. (Incluído pela Lei nº 14.112, de 2020) (Vigência)"*

Da análise dos autos e dos documentos que instruem a inicial, verifica-se que as Requerentes atenderam aos requisitos dos arts. 48 e 161 da LRF: exercem atividades há mais de dois anos, não são falidas, os administradores não possuem condenações criminais e respeitaram o prazo de dois anos desde a última homologação de plano de recuperação (ocorrida em 29/11/2022).

Quanto ao *quórum* de aprovação, o art. 163 da LRF exige a concordância de credores que representem mais de 50% dos créditos de cada espécie abrangida.

No caso, as Requerentes apresentaram o plano com a adesão de mais de 70% dos créditos da espécie quirografária selecionada, o que autoriza não apenas o processamento do feito, mas a incidência imediata dos efeitos protetivos da lei.

**Poder Judiciário**
**Tribunal de Justiça do Estado de Minas Gerais**
**1ª Vara Empresarial da Comarca de Belo Horizonte**

Quanto à suspensão prevista do §8º do art. 163 temos:

> *"§ 8º Aplica-se à recuperação extrajudicial, desde o respectivo pedido, a suspensão de que trata o art. 6º desta Lei, exclusivamente em relação às espécies de crédito por ele abrangidas, e somente deverá ser ratificada pelo juiz se comprovado o quórum inicial exigido pelo § 7º deste artigo. (Incluído pela Lei nº 14.112, de 2020) (Vigência)"*

Tendo as Requerentes comprovado adesão superior a 50%, a ratificação é medida impositiva.

Relativamente à insurgência dos credores "Ciranda", observo que, nos termos do art. 164, §2º da LRF, o momento processual adequado para a apresentação de impugnações é após a publicação do edital de convocação. Assim, as alegações de heterogeneidade da classe e criação de subclasses serão apreciadas em momento oportuno, garantindo-se o contraditório, não obstando, contudo, o recebimento do plano e a concessão das tutelas de urgência necessárias à preservação das empresas.

Sobre a penhora de 30% dos recebíveis dos contratos da SABESP, mencionada no evento 10, DOC1 e evento 11, DOC1, a jurisprudência consolidada do Superior Tribunal de Justiça estabelece que a destinação de valores penhorados, mesmo antes do pedido de recuperação, deve ser deliberada pelo juízo recuperacional, a fim de garantir a paridade entre credores e o soerguimento da empresa. Manter tal constrição, que incide sobre faturamento bruto de obras em andamento, inviabilizaria a continuidade operacional.

Quanto à participação em licitações, o entendimento dos Tribunais Superiores caminha no sentido de que a exigência de certidões negativas ou de plano já homologado deve ser relativizada em prol da preservação da empresa, desde que demonstrada a viabilidade econômica. Impedir o exercício da atividade principal das Requerentes (obras públicas) durante o trâmite processual esvaziaria o propósito da própria lei de regência.

Por fim, no que toca às cláusulas *ipso facto*, a doutrina e a jurisprudência majoritárias as consideram abusivas no contexto da recuperação, pois a mera situação de crise não deve implicar na extinção automática de contratos essenciais.

Pelo exposto, **DETERMINO**:

1. **A EXPEDIÇÃO** do edital previsto no art. 164 da Lei 11.101/2005, para que os credores, no prazo de 30 (trinta) dias, apresentem suas impugnações. Caberá às devedoras a comprovação da publicação em jornal de grande circulação.

2. **A SUSPENSÃO**, pelo prazo de 180 (cento e oitenta) dias, de todas as ações e execuções ajuizadas em face das devedoras **ANDRADE GUTIERREZ ENGENHARIA S.A., ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A.** e **ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A.**, exclusivamente no que se refere aos créditos sujeitos aos planos apresentados, na forma do art. 163, §8º e art. 6º da LRF.

**Poder Judiciário**
**Tribunal de Justiça do Estado de Minas Gerais**
**1ª Vara Empresarial da Comarca de Belo Horizonte**

**3. A PROIBIÇÃO** de qualquer forma de retenção, arresto, penhora, sequestro, busca e apreensão e constrição judicial ou extrajudicial sobre os bens das Requerentes oriunda de créditos sujeitos, inclusive os depósitos efetuados pela SABESP nos autos do processo nº 1029129-87.2024.8.26.0100 (2ª Vara Empresarial de SP). Confiro a esta decisão força de ofício a ser entregue pelas autoras ao referido Juízo para que os valores ali retidos e ainda não levantados sejam colocados à disposição das emrpesas.

**4. A DISPENSA**, nas licitações em curso ou futuras, da apresentação de certidão negativa de recuperação extrajudicial ou da apresentação de plano de recuperação extrajudicial já homologado, bastando às Requerentes demonstrar a viabilidade econômica nos termos exigidos pelo certame.

**5. A SUSPENSÃO DA EFICÁCIA** de cláusulas resolutivas expressas (*ipso facto*) que prevejam a rescisão de contratos em decorrência exclusiva do ajuizamento deste pedido de recuperação extrajudicial.

**6. A INTIMAÇÃO** do Ministério Público para acompanhar o feito.

Intimar. Cumprir.

---

Documento assinado eletronicamente por **CLAUDIA HELENA BATISTA, Juíza na Titularidade Plena**, em 28/05/2026, às 11:52:15, conforme art. 1º, III, "b", da Lei 11.419/2006. A autenticidade do documento pode ser conferida no site www.tjmg.jus.br > eproc > Autenticação de documentos, informando o código verificador **4030367v6** e o código CRC **77e5d172**.

---

**1087093-64.2026.8.13.0024** **4030367 .V6**

# Exhibit G

## Public Notice and a certified English translation

**Certified Translation from Portuguese into English**

**Tradução Juramentada**

Original document reference:
Edital AG
Translated reference:
AG Notice

**TRANSLATION No.37 BOOK No.376 PAGE No.359**

I hereby certify and give full faith and credit that on this date a document has been presented to me in Portuguese, to which I translate as follows:

August 27, 2026, 11:59 :: 4157779 - eproc - ::

Available in the Official Gazette of the State (DE): June 02 2026. Notice Term: July 17 2026

**[Coat of Arms]**

**Judiciary Branch**
**Court of Justice of the State of Minas Gerais**
**1st Business Court of the Judicial District of Belo Horizonte**

Avenida Raja Gabaglia, 1753 - Bairro: Luxemburgo - CEP: 30380900 – Phone Number: (31) 3299-4400 - Email: vempresarial1@tjmg.jus.br

**EXTRAJUDICIAL REORGANIZATION No. 1087093-64.2026.8.13.0024/MG**

**APPLICANT**: ZAGOPE SGPS S.A.

**APPLICANT**: INZAG GERMANY GMBH

**APPLICANT**: ANDRADE GUTIERREZ INTERNATIONAL S.A.

**APPLICANT**: ANDRADE GUTIERREZ ENGENHARIA S/A

**APPLICANT**: ANDRADE GUTIERREZ CONSTRUCOES E SERVIÇOS S.A

**APPLICANT**: ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S/A

## NOTICE

1st BUSINESS COURT. JUDICIAL DISTRICT OF BELO HORIZONTE/MG. CASE No. 1087093-64.2026.8.13.0024.

NOTICE FOR PUBLIC INFORMATION OF THE INTERESTED PARTIES AND CREDITORS. EXTRAJUDICIAL REORGANIZATION PLANS of ANDRADE GUTIERREZ ENGENHARIA S.A. (cnpj 17.262.213/0001-94); ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A. (cnpj 39.469.291/0001-05); ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S/A (CNPJ – 17.027.611/0001-26); ANDRADE GUTIERREZ INTERNATIONAL S.A. (enrolled with the Luxembourg Trade Companies Register under number B 176492); ZAGOPE SGPS S.A. (organized and existent under the laws of the Republic of Portugal, NIF registration number 507403177) and INZAG GERMANY

Original document reference:
Edital AG
Translated reference:
AG Notice

**TRANSLATION No.37 BOOK No.376 PAGE No.360**

GMBH (organized and existent under the laws of the Federative Republic of Germany, headquartered at Taunusstraße 5, 65183, Wiesbaden, Germany). Claudia Helena Batista, State Judge of the 1st Business Court, acting in her capacity, in accordance with the law, etc., hereby NOTIFIES the creditors that this Court has already received the Extrajudicial Reorganization Plans of the aforementioned companies. The plans were entered into the case file in Event 1 (documents titled OUTDOC4 and OUTDOC5) in their entirety. Creditors are hereby warned that they have 30 (thirty) days from the date of publication of this notice to submit any objections to the plan, attaching proof of their claims in accordance with article 164, paragraphs 2 and 3 of Law 11.101/2005. This document is issued so that it may come to the knowledge of all. Belo Horizonte/MG, June 01 2026. (signed) Brígida Nascimento Souza de Oliveira – Court Clerk (signed.) Cláudia Helena Batista – State Judge.

This document was signed electronically by **LUCAS GERALDO GUEDES** on June 1, 2026, at 5:06:22 PM, in accordance with article 1, III, b, of Law 11.419/2006. The authenticity of the document can be verified at www.tjmg.jus.br > eproc > Autenticação de documentos, by entering the verification code **4157779v5** and the CRC code **6cfb61fd**.

**1087093-64.2026.8.13.0024**
**4157779 .V5**

https://eproc1g.tjmg.jus.br/eproc/controlador.php?acao=minuta_imprimir&acao_origem=acessar_documento&hash=96432ee3d9b79e298c1e98f1...

1/1

---

This is what was to be translated on the original document, according to my best understanding, which amounted to 2 electronic page equivalents which I have reviewed, found true and correct, and sign below:

Emoluments: R$ 91.82
Receipt Book No.:02 Receipt No.:3781
São Paulo, August 28, 2026

JOSE ROBERTO VENSAN MARAMALDO:18122496830 Digitally signed by JOSE ROBERTO VENSAN MARAMALDO:18122496830 Date: 2026.08.31 11:49:10 -03'00'

José Roberto Vensan Maramaldo

**Disponibilizado no D.E.: 02/06/2026**
**Prazo do edital: 17/07/2026**

# Poder Judiciário
# Tribunal de Justiça do Estado de Minas Gerais
# 1ª Vara Empresarial da Comarca de Belo Horizonte

Avenida Raja Gabaglia, 1753 - Bairro: Luxemburgo - CEP: 30380900 - Fone: (31) 3299-4400 - Email: vempresarial1@tjmg.jus.br

**RECUPERAÇÃO EXTRAJUDICIAL Nº 1087093-64.2026.8.13.0024/MG**

**REQUERENTE**: ZAGOPE SGPS S.A.

**REQUERENTE**: INZAG GERMANY GMBH

**REQUERENTE**: ANDRADE GUTIERREZ INTERNATIONAL S.A.

**REQUERENTE**: ANDRADE GUTIERREZ ENGENHARIA S/A

**REQUERENTE**: ANDRADE GUTIERREZ CONSTRUCOES E SERVICOS S.A

**REQUERENTE**: ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S/A

# EDITAL

1ª VARA EMPRESARIAL. COMARCA DE BELO HORIZONTE/MG. AUTOS 1087093-64.2026.8.13.0024. EDITAL PARA CONHECIMENTO DOS INTERESSADOS E CREDORES. PLANOS DE RECUPERAÇÃO EXTRAJUDICIAL de ANDRADE GUTIERREZ ENGENHARIA S.A. (cnpj 17.262.213/0001-94); ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A. (cnpj 39.469.291/0001-05); ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S/A (CNPJ – 17.027.611/0001-26); ANDRADE GUTIERREZ INTERNATIONAL S.A. (inscrita no Registro de Comércio de Luxemburgo sob o n.º B 176492); ZAGOPE SGPS S.A. (constituída e organizada segundo as leis da República Portuguesa, registrada sob o NIF n.º 507403177) e INZAG GERMANY GMBH (constituída e organizada segundo as leis da República Federativa da Alemanha, com sede em Taunusstraße 5, 65183, Wiesbaden, Alemanha). A Drª Claudia Helena Batista, MMª Juíza de Direito, da 1ª Vara Empresarial, em exercício de seu cargo, na forma da lei, etc. AVISA aos credores que foram recebidos Planos de Recuperação Extrajudicial das empresas em epígrafe, juntados aos autos no evento 1 (documentos nomeados OUTDOC4 e OUTDOC5), o seu inteiro teor. Ficam os credores advertidos de que têm o prazo de 30 (trinta) dias, a partir da publicação do presente edital para apresentação de eventuais impugnações ao plano, juntando a prova de seu crédito na forma do artigo 164 § 2º e § 3º, da lei 11.101/2005. E, para que chegue ao conhecimento de todos, é expedido o presente. Belo Horizonte/MG, 01/06/2026. (as.) Brígida Nascimento Souza de Oliveira - Escrivã Judicial. (as.) Drª Cláudia Helena Batista - Juíza de Direito.

---

Documento assinado eletronicamente por **LUCAS GERALDO GUEDES**, em 01/06/2026, às 17:06:22, conforme art. 1º, III, "b", da Lei 11.419/2006. A autenticidade do documento pode ser conferida no site www.tjmg.jus.br > eproc > Autenticação de documentos, informando o código verificador **4157779v5** e o código CRC **6cfb61fd**.

---

# Exhibit H

## Published Public Notice and a certified translation

**Certified Translation from Portuguese into English**

**Tradução Juramentada**

Original document reference:
31_OUTDOC2
Translated reference:
31_OUTDOC2

**TRANSLATION No.18 BOOK No.378 PAGE No.152**

I hereby certify and give full faith and credit that on this date a document has been presented to me in Portuguese, to which I translate as follows:

**Doc. 1 - Proof of publication of the public notice in a widely recognized newspaper**

**VIC ENGENHARIA S.A. CNPJ n.° 12.086.678/0001-18 NIRE n.° 31300153118**

**MINUTES OF THE EXTRAORDINARY GENERAL MEETING HELD ON MAY 29, 2026**

1. DATE, TIME, AND LOCATION: Held on May 29, 2026, at 8:00 a.m., at the headquarter of VIC Engenharia S.A. (the "Company"), in the City of Belo Horizonte, State of Minas Gerais, at Avenida Álvares Cabral, 1777, sala 1702, Santo Agostinho, CEP 30170-008. 2. CALL NOTICE AND ATTENDANCE: Publication of a call notice was waived, pursuant to article 124, paragraph 4, of Law no. 6,404, of December 15, 1976, as amended (the "Brazilian Corporation Law"), considering the attendance of shareholders representing the Company's total share capital, as set forth in the attendance list contained in Annex I to these Minutes of the Extraordinary General Meeting of Shareholders. 3. MEETING BOARD: The shareholders elected Mr. Alexandre Augusto Leite Toledo as Chairman of the Meeting Board, a Brazilian citizen, married under the partial community of property regime, business administrator, holder of Identity Card no. MG 2.328.234 SSP/MG and Individual Taxpayer Registry (CPF) no. 520.006.996-34, residing and domiciled in Belo Horizonte, State of Minas Gerais, at Rua Maestro Arthur Bosmans, 40, apto. 1100, bairro Belvedere, CEP 30320-680, who invited Mr. Randy Luiz Lanza Chaves Junior to serve as Secretary of the Meeting Board, a Brazilian citizen, married under the partial community of property regime, civil engineer, holder of Identity Card no. MG-11.995.815 SSP/MG, CREA/MG registration no. 162939D, and Individual Taxpayer Registry (CPF) no. 079.095.556-36, residing and domiciled in Belo Horizonte, State of Minas Gerais, at Rua General Andrade Neves, 318, apto. 601, bairro Gutierrez, CEP 30.430-070. 4. AGENDA: In connection with the public distribution of Real Estate Receivables Certificates ("CRI") of the Single Series of the 86th Issuance of LEVERAGE COMPANHIA. SECURITIZADORA, a joint-stock company registered as a securitization company with the Brazilian Securities and Exchange Commission ("CVM") under no. 949, category "S1", headquartered in the City of São Paulo, State of São Paulo, at Avenida Paulista, 1912, 13.o andar, sala 132, Bela Vista, CEP 01310-924, enrolled with the CNPJ under no. 48.415.978/0001-40 ("Securitization Company"), in accordance with Law no. 14,430, of August 3, 2022 ("Law 14,430/22") and CVM Resolution no. 160, of July 13, 2022 ("Offering" and "Securitization Operation", respectively), the Company's shareholders met to consider, discuss, and resolve upon: (a) the approval of the issuance, by the Company, of forty thousand (40,000) simple debentures, not convertible into shares, in a single series, secured by real guarantees and additional personal

guarantees, for private placement, with a unit par value of one thousand reais (R$1,000.00), totaling an aggregate issuance value of forty million reais (R$40,000,000.00), under the terms and conditions of the "Private Deed of the 5th (Fifth) Issuance of Simple Debentures, Not Convertible into Shares, in a Single Series, Secured by Real Guarantees and Additional Personal Guarantees, for Private Placement, by VIC Engenharia S.A.", to be executed by the Company, as issuer, and by EMB ENGENHARIA S.A., a joint-stock company not registered as a publicly held company with the CVM, headquartered in the City of Belo Horizonte, state of Minas Gerais, at Avenida Barão Homem de Melo, 4494, sala 1112, bairro Estoril, CEP 30494-270, enrolled with the CNPJ under no. 09.252.516/0001-06 ("EMB Engenharia") and by ALEXANDRE AUGUSTO LEITE TOLEDO, a Brazilian citizen, businessman, married under the partial community of property regime to GISELE FERREIRA ALVIM TOLEDO, enrolled in the Ministry of Finance's Individual Taxpayer Registry ("CPF") under no. 520.006.996-34, holder of Identity Card no. 23.282.34 SSP/MG, residing and domiciled in the City of Belo Horizonte, State of Minas Gerais, at Rua Maestro Arthur Bosmans, 40, apto. 1100, bairro Belvedere, CEP 30320-680 ("Alexandre Toledo," in conjunction with EMB Engenharia, referred to simply as the "Guarantors"), in the capacity of guarantors, and by the Securitization Company, in the capacity of debenture holder ("Issuance," "Debenture Issuance Deed," and "Debentures," respectively), considering that the Securitization Company shall be entitled to the entirety of the receivables owed by the Company within the scope of the Debenture Issuance ("Real Estate Receivables"). The Debentures shall have the following characteristics: (i) Total Issuance Amount: forty million reais (R$40,000,000.00); (ii) Issuance Number: the Issuance refers to the 5th (fifth) issuance of Debentures by the Company; (iii) Series: the Issuance shall be carried out in a single series; (iv) Placement Procedure: the Debentures shall be subject to private placement without the intermediation of financial institutions belonging to the distribution system; therefore, are not subject to article 19 of Law no. 6,385, of December 7, 1976, and CVM Resolution no. 160; (v) Quantity and Unit Par Value: forty thousand (40,000) Debentures shall be issued, with a unit par value of one thousand reais (R$1,000.00) on the Issuance Date; (vi) Issuance Date: for all legal purposes, the issuance date of the Debentures shall be the date indicated in the Debenture Issuance Deed ("Issuance Date"); (vii) Term and Maturity Date: subject to the provisions of the Debenture Issuance Deed, the Debentures shall have the term indicated in the Debenture Issuance Deed, maturing on May 22, 2031 (the "Maturity Date"), except in cases of Optional Early Amortization, Optional Early Redemption of the Debentures, Automatic Early Maturity, and Non-Automatic Early Maturity (as defined below); (viii) Type: the Debentures shall be secured by real guarantees, with additional fiduciary guarantees, pursuant to the terms below; (ix) Form and Convertibility: the Debentures shall be issued in registered form, without the issuance of certificates, and shall not be convertible into shares; (x) Price and Method of Subscription and Payment: the Debentures shall be subscribed and paid for in tranches, provided that the respective Conditions Precedent (as set forth in Clause 4.14 of the Debenture Issuance Deed) have been satisfied: (i) at their Unit Par Value, on the Date of the First Payment of the CRIs; or (ii) in the event of payments for the Debentures on subsequent Payment Dates, at their Unit Par Value plus Remuneration, calculated on a *pro rata temporis* from the Date of the First Payment until the date of their actual payment, provided that the payment

amount for the Debentures shall correspond exactly to the payment amount for the CRIs. (xi) Real Guarantees: to secure the faithful, full, and timely performance of all principal or ancillary obligations, whether present or future, assumed or to be assumed by the Company and the Guarantors, relating to the Debentures and other obligations under the Transaction Documents, including payment of the Total Issuance Amount, subject to the possibility of partial placement of the Debentures, as well as Remuneration Interest, any Default Charges, default penalties, insurance, premiums, expenses, costs, and fees due for debt collection, expenses related to the enforcement of guarantees, legal fees, and any pecuniary obligation incurred to ensure the full satisfaction and receipt by the Securitization Company of the amounts due to it under the terms of the Debenture Issuance Deed and the other Transaction Documents, collectively the "Secured Obligations"), the following shall be constituted in favor of the Securitization Company, in addition to the Reserve Fund and the Expense Fund: a. Fiduciary Assignment of Quotas. To secure the Secured Obligations, a fiduciary assignment of all quotas issued by the SPEs AFQ (as defined below) shall be constituted directly in favor of the Securitization Company, pursuant to the "Private Instrument of Fiduciary Assignment of Quotas as Security and Other Covenants" entered into by and between the Company and VIC PARTICIPAÇÕES LTDA., a limited liability company headquartered in the City of Belo Horizonte, State of Minas Gerais, at Avenida Álvares Cabral, 1777, sala 1702, bairro Santo Agostinho, CEP 30170-008, enrolled with the CNPJ under no. 60.427.045/0001-79, with its corporate documents filed with JUCEMG under NIRE 31216408049 ("VIC Participações"), in the capacity of fiduciary assignors, and the Securitization Company, in the capacity of fiduciary assignee, with the intervening participation and consent of the SPEs AFQ (as defined below) (the "Fiduciary Assignment of Quotas Agreement" and the "Fiduciary Assignment of Quotas," respectively). b. Fiduciary Disposal of Real Estate: as security for the Secured Obligations, RESERVA VIC COSTA AZUL EMPREENDIMENTOS IMOBILIÁRIOS LTDA., a limited liability company headquartered in the City of Belo Horizonte, State of Minas Gerais, at Avenida Álvares Cabral, 1777, sala 1,710, bairro Santo Agostinho, CEP 30170-008, enrolled with the CNPJ under no. 44.220.378/0001-76, with its corporate documents filed with JUCEMG under NIRE 31212662029 ("SPE Costa Azul"), shall establish a fiduciary disposal of the real estate subject to Property Registration no. 48,810 at the Real Estate Registry Office of Porto Seguro/BA ("Fiduciarily Disposed Property"), pursuant to the "Private Instrument of Fiduciary Disposal of Real Estate as Security and Other Covenants," to be executed, substantially in accordance with the terms of Annex VII to the Debenture Issuance Deed, between SPE Costa Azul and the Securitization Company, with the intervention and consent of the Company (the "Real Estate Fiduciary Disposal Agreement" and "Fiduciary Disposal of Real Estate," respectively). c. Fiduciary Assignment. As security for the Secured Obligations, the SPEs CF (as defined below) shall establish a fiduciary assignment and a promise of fiduciary assignment regarding the credit rights held by them arising from the sale of units comprising the Collateral Developments (as defined below) under the terms of the respective purchase and sale agreements ("Real Estate Agreements"), as well as the credit rights held by them arising from the execution of instruments acknowledging debt regarding outstanding balances owed by purchasers of units in the Collateral Developments (as defined below), even after the SPEs (as defined

below) have issued a release regarding the respective purchase and sale agreements upon the purchasers obtaining financing from financial institutions ("Debt Acknowledgement Instruments" and "Fiducially Assigned Credits," respectively). This arrangement shall be established pursuant to the "Private Instrument of Fiduciary Assignment and Promise of Fiduciary Assignment of Credit Rights as Collateral and Other Covenants" to be entered into between the SPEs CF (as defined below) and the Securitization Company, with the intervention and consent of the Company ("Fiduciary Assignment Agreement" and "Fiduciary Assignment," respectively). d. For the purposes of these minutes, the following definitions shall apply: (i) "SPEs": shall mean, collectively, the following special purpose entities, all of which are grantors of guarantees in connection with the Issuance: (a) SPE Costa Azul; (b) GRAN VIC JUNDIAÍ CONDOMÍNIO ZURIQUE EMPREENDIMENTOS IMOBILIÁRIOS SPE LTDA., a limited liability company headquartered in the City of Belo Horizonte, State of Minas Gerais, at Avenida Álvares Cabral, 1777, sala 1706, bairro Santo Agostinho, CEP 30170-008, enrolled with the CNPJ under no. 41.365.304/0001-30, with its corporate documents filed with JUCEMG under NIRE 31212183431 ("SPE Zurique"); (c) GRAN VIC JUNDIAÍ CONDOMÍNIO COPENHAGEN EMPREENDIMENTOS IMOBILIÁRIOS SPE LTDA., a limited liability company headquartered in the City of Belo Horizonte, State of Minas Gerais, at Avenida Álvares Cabral, 1777, sala 1706, bairro Santo Agostinho, CEP 30170-008, enrolled with the CNPJ under no. 41.365.268/0001-04, with its corporate documents filed with JUCEMG under NIRE 31212183392 ("SPE Copenhagen"); (d) GRAN VIC JUNDIAÍ CONDOMÍNIO FRIBURGO EMPREENDIMENTOS IMOBILIÁRIOS SPE LTDA., a limited liability company headquartered in the City of Belo Horizonte, State of Minas Gerais, at Avenida Álvares Cabral, 1777, sala 1706, bairro Santo Agostinho, CEP 30170-008, enrolled with the CNPJ under no. 41.365.711/0001-47, with its corporate documents filed with JUCEMG under NIRE 31212183597 ("SPE Friburgo"); (e) GRAN VIC CRISTAL EMPREENDIMENTOS IMOBILIÁRIOS SPE LTDA., a limited liability company headquartered in the City of Belo Horizonte, State of Minas Gerais, at Avenida Álvares Cabral, 1777, sala 1710, bairro Santo Agostinho, CEP 30170-008, enrolled with the CNPJ under no. 54.484.000/0001-33, with its corporate documents filed with JUCEMG under NIRE 31215010421 ("SPE Cristal"); and (f) GRAN VIC SAFIRA EMPREENDIMENTOS IMOBILIÁRIOS SPE LTDA., a limited liability company headquartered in the City of Belo Horizonte, State of Minas Gerais, at Avenida Álvares Cabral, 1777, sala 1710, bairro Santo Agostinho, CEP 30170-008, enrolled with the CNPJ under no. 54.593.160/0001-10, with its corporate documents filed with JUCEMG under NIRE 31215033430 ("SPE Safira"); (ii) "SPEs AFQ" or "SPEs CF": shall mean the SPEs, excluding SPE Costa Azul; (iii) "Developments": shall mean, collectively, the real estate developments owned by the SPEs (excluding SPE Costa Azul) described in the Fiduciary Assignment Agreement; (iv) "Legal Organization Guarantors": shall mean, collectively, the SPEs, VIC Participações, and the Legal Organization Guarantor; and (v) "Guarantors": shall mean, collectively, the Legal Organization Guarantors and Alexandre Toledo. (xii) Suretyship Guarantee: as security for the Secured Obligations, the Guarantors, irrevocably and irreversibly, in the capacity of guarantors and principal obligors, provide a guarantee in favor of the Securitization Company, assuming joint and several responsibility with the Company for the

faithful and exact performance of all Secured Obligations; (xiii) Monetary Adjustment: the Unit Par Value of the Debentures or the outstanding balance of the Unit Par Value of the Debentures, however the case may be, shall not be subject to monetary adjustment. (xiv) Remuneratory Interest: the Unit Par Value of the Debentures, or the outstanding balance thereof, shall accrue remuneratory interest corresponding to one hundred percent (100%) of the accumulated variation of the average daily rates for one-day Interbank Deposit (DI) rates, "over extra-group", expressed as an annual percentage based on two hundred and fifty-two (252) Business Days, calculated and published daily by B3 in the daily bulletin available on its website (http://www.b3.com.br) (the "DI Rate"), plus a surcharge of three point seven five zero zero percent (3.7500%) per annum, based on two hundred and fifty-two (252) Business Days (the "Surcharge," and, in conjunction with the DI Rate, the "Remuneration" or "Remuneratory Interest"), calculated on an exponential and cumulative basis, on a *pro rata temporis*, according to the Business Days elapsed, from the initial Subscription and Payment Date of the CRIs or the most recent Remuneratory Interest Payment Date, however the case may be, until the date of actual payment. (xv) Scheduled Amortization: without prejudice to the payments arising from Early Maturity Events (as defined below), Mandatory Early Amortization (as defined below), Optional Early Amortization, Mandatory Early Redemption (as defined below), and/or Optional Early Redemption (as defined below), pursuant to the Debenture Issuance Deed, the Unit Par Value shall be amortized monthly, as provided in Annex I to the Debenture Issuance Deed, subject to the grace period, and calculated in accordance with the formula set forth in the Debenture Issuance Deed, the result of which shall be determined by the Securitization Company; (xvi) Remuneratory Interest Payment Date: without prejudice to payments arising from Early Maturity Events (as defined below), Mandatory Early Amortization (as defined below), Optional Early Amortization (as defined below), Mandatory Early Redemption (as defined below), and/or Optional Early Redemption (as defined below), pursuant to the Debenture Issuance Deed, the Remuneration shall be paid monthly, in accordance with the payment schedule set forth in Annex I to the Debenture Issuance Deed; (xvii) Optional Early Amortization and Optional Early Redemption of the Debentures: as of the First Subscription and Payment Date (inclusive), the Company may, at its sole discretion, effect the early amortization of the Debentures, limited to ninety-eight percent (98%) of their respective Unit Par Value or the outstanding balance thereof (“Optional Early Amortization”), or alternatively, the total optional early redemption of the Debentures (“Total Optional Early Redemption”), upon payment of (a) the Unit Par Value or the outstanding balance thereof, in whole or in part, as applicable, plus (b) the Remuneration, calculated on a *pro rata temporis*, from the First Subscription and Payment Date or the immediately preceding Remuneration payment date, however the case may be, through the date of actual payment, (c) Default Charges (as defined below), if applicable, and (d) a premium applicable to the amount subject to Optional Early Amortization or to the outstanding balance of the Unit Par Value in the case of Total Optional Early Redemption (“Premium”), in accordance with the table below: Period (counted from the Issuance Date). Premium: from the initial payment date up to and including the twelfth (12th) month, i.e., May 2027, two point fifty percent (2.50%); from after the twelfth (12th) month, i.e., May 2027, up to and including the twenty-fourth (24th) month, i.e., May 2028, two percent (2.00%); from after the twenty-

fourth (24th) month, i.e., May 2028, up to and including the thirty-sixth (36th) month, i.e., May 2029, one point fifty percent (1.50%); from after the thirty-sixth (36th) month, i.e., May 2029, until the Maturity Date, one percent (1.00%). (xviii) Compulsory Early Amortization and Compulsory Total Redemption: from the date hereof until the full settlement of the CRIs, the Debentures shall be subject to compulsory extraordinary amortization, limited to ninety-eight percent (98%) of the Unit Par Value, or compulsory total early redemption, as applicable, with the consequent early amortization or early redemption of the CRIs, respectively, on a monthly basis, in the following events ("Compulsory Early Amortization" or "Compulsory Early Redemption," respectively): (i) if, on a specific Verification Date, the Securitization Company verifies non-compliance with the Minimum Collateral Ratio. In this case, should there be remaining funds in the Centralizing Account and/or the Collection Accounts following the fulfillment of the Payment Order (the "Surplus"), the Securitization Company shall direct the Surplus toward the Mandatory Early Amortization of the Debentures and/or the Mandatory Early Redemption of the Debentures in an amount sufficient to restore the breached Minimum Collateral Ratio; provided that, if the Surplus for such month is insufficient for such purpose, the Company shall, upon notification by the Securitization Company, contribute funds in an amount sufficient to complete the recovery of the Minimum Collateral Ratio; and/or (ii) in the event of the unavailability of the DI Rate described in Clause 4.16.2 of the Debenture Issuance Deed, should there be no agreement regarding the new index, or in the absence of a quorum for the convening and/or deliberation of the Special Meeting of CRI Investors called for this purpose, the Company shall carry out the Mandatory Early Redemption of the Debentures, resulting in the total early redemption of the CRIs, within thirty (30) days following the date on which the impossibility of reaching an agreement is established, or the date on which such meeting was scheduled to take place, or on the Maturity Date of the Debentures. (xix) Default Charges: in the event of a delay in the payment of any amount due to the Securitization Company, including, but not limited to, the payment of Remuneration Interest and/or the redemption and/or early maturity of the Debentures and/or payment of the Unit Par Value, default charges shall apply immediately and without the need for any notice. These charges shall accrue for the period from the date the default actually occurs until the debt is effectively settled and shall be calculated cumulatively as follows, without prejudice to the Remuneration: (i) default interest of one percent (1%) per month, or fraction thereof, calculated on a *pro rata temporis* from the date of default until the date of actual payment, applied to the overdue amount; and (ii) a fine of two percent (2%) on the total overdue and unpaid balance; and (xx) Use of Proceeds: the net proceeds raised by the Company through the issuance of the Debentures, that is, excluding those related to Expenses and the Initial Value of the Reserve Fund, shall be allocated in full and exclusively by the Company and/or by special purpose entities controlled by the Company, as indicated in Table 1 of Annex II to the Debenture Issuance Deed ("Destination SPEs"), to cover future real estate-related expenses directly and indirectly linked to the construction, development, renovation, and/or maintenance of the real estate projects owned by them, as described in Table 1 of Annex II to the Debenture Issuance Deed ("Target Developments"), in accordance with the indicative schedule set forth in Table 2 of Annex II to the Debenture Issuance Deed (the "Indicative Schedule" and "Future Allocation," respectively); (xxi) Automatic Early Maturity:

regardless of notice, formal demand, extrajudicial notification, or a Special Meeting of CRI Investors, all obligations set forth in the Debenture Issuance Deed shall be declared due and payable in advance, subject to the respective cure periods, should any of the events listed in Clause 6.1 of the Debenture Issuance Deed occur; (xxii) Non-Automatic Early Maturity: without prejudice to the provisions of Clause 6.1 of the Debenture Issuance Deed, the Securitization Company shall, subject to the respective cure periods, convene a Special Meeting of CRI Investors to deliberate on declaring the early maturity of the Debentures in the events listed in Clause 6.2 of the Debenture Issuance Deed; and (xxiii) Other Conditions: the other characteristics of the Issuance shall be those specified in the Debenture Issuance Deed; (b) authorization to establish the fiduciary assignment of quotas; (c) authorization for the Company's officers or any of its legitimate representatives/attorneys-in-fact to perform any and all acts relating to the Securitization Transaction or any other document involving the Securitization Transaction, the Offering, and/or the CRIs, including (1) negotiating and signing any and all documents necessary for the implementation and formalization of the aforementioned resolutions, as well as providing and/or granting to the Securitization Company the declarations, powers of attorney, and notices set forth in such documents and any amendments thereto; and (2) the engagement of service providers in connection with the Securitization Transaction, including, but not limited to, the measurement agent, fiduciary agent, registrar, custodian, settlement bank, independent auditors, and legal counsel; and (d) the ratification of any and all acts already performed by the Company's officers or any of its legitimate representatives/attorneys-in-fact to carry out the Issuance and Offering. 5. RESOLUTIONS: Having examined and discussed the matters on the agenda, the Company's shareholders unanimously and unreservedly resolved to approve all items set forth in the Agenda above. 6. CLOSING, DRAFTING, APPROVAL, AND SIGNING OF THE MINUTES: The Chairman opened the floor for comments, and as no one wished to speak, he declared the session closed and requested that I, the Secretary, draft these Minutes, which, after being read, reviewed, and approved, were signed by the Chairman and the Secretary. Belo Horizonte, MG, May 29, 2026. Alexandre Augusto Leite Toledo, Chairman of the Meeting; Randy Luiz Lanza Chaves Junior, Secretary. ANNEX I TO THE MINUTES OF THE EXTRAORDINARY GENERAL MEETING OF VIC ENGENHARIA S.A. HELD ON MAY 29, 2026. Shareholders / Signature(s): ACE ASSESSORIA E CONSULTORIA ESPECIALIZADA LTDA. (Alexandre Augusto Leite Toledo); EMB ENGENHARIA S.A. (Samuel Rodrigues Costa, Randy Luiz Lanza Chaves Junior).

KONA PARTNERSHIP S.A.

CNPJ 58.526.038/0001-82

Minutes of the Extraordinary General Meeting

1. Date, Time, and Location: meeting held on April 30, 2026, at 11:30 a.m., at the Company's headquarter located at Rua Desembargador Jorge Fontana, 498, sala 801, bairro Belvedere, Belo Horizonte/MG, CEP 30.320-670. 2. Meeting Board: Henrique Ayres Jameli (Chair of the Meeting, e-mail

henrique.jameli@3ariva.com.br) and Thiago Nogueira Penna (Secretary of the Meeting, e-mail thiago@3ainvestimentos.com.br). 3. Attendance: all Company's shareholders attended; therefore, the publication of a call notice was waived (Law no. 6,404/76, article 124, paragraph 4). 4. Agenda: (i) the reduction of the Company's share capital due to excess capital; (ii) the method of refunding the amount corresponding to the reduced capital to the shareholders; (iii) the consequent amendment to Article 5 of the Company's Bylaws; (iv) the authorization for the officers to perform all acts necessary to implement the resolutions; and (v) the ratification of the acts already performed by the management. 5. Resolutions: after analyzing the items on the Agenda, the sole shareholder resolved as follows: 5.1. Reduce the Company's Share Capital due to Excess. Approve the reduction of the Company's share capital by the amount of three million, six hundred and thirty-four thousand, eight hundred and seventy-eight reais and sixty cents (R$3,634,878.60), deeming it excessive in relation to the Company's operational and investment needs, pursuant to article 173 of Law no. 6,404/76, whereby the Company's share capital changes from eight million, four hundred and ninety-seven thousand, four hundred and twenty-four reais and nine cents (R$8,497,424.09), fully subscribed and paid-in, to four million, eight hundred and sixty-two thousand, five hundred and forty-five reais and forty-nine cents (R$4,862,545.49), fully subscribed and paid-in, through a reduction of the value assigned to each of the seven hundred and ninety thousand, one hundred and ninety-one (790,191) common shares comprising the Company's share capital by four reais and sixty cents (R$4.60) per share, with the total number of shares and the proportional shareholding of each shareholder remaining unchanged. 5.2. Approve that the reimbursement of the amount corresponding to the capital reduction shall be made in cash, in proportion to each shareholder's equity interest in the Company. 5.3. Approve that, pursuant to article 174 of Law no. 6,404/76, the Capital Reduction shall become effective following the expiration of a 60-day period counted from the publication of these minutes as prescribed by law, considering that any variations in the value of the Company's accounting equity verified between the date hereof and the effective date of the Capital Reduction shall not change the amounts adopted in this resolution. 5.4. Approve the amendment of Article 5 of the Company's Bylaws, which shall be read as follows: "Article 5 - The Company's share capital is four million, eight hundred and sixty-two thousand, five hundred and forty-five reais and forty-nine cents (R$4,862,545.49), divided into seven hundred and ninety thousand, one hundred and ninety-one (790,191) common, registered, indivisible shares with no par value." 5.5. Authorization to Officers. Authorize the Company's officers to perform all acts necessary to implement the resolutions adopted herein, including, but not limited to, signing documents, filing these minutes with the Board of Trade of the State of Minas Gerais (JUCEMG), arranging for the appropriate statutory publications, and making payments to shareholders following the expiration of the statutory period. 5.6. Ratification. Ratify all acts performed by the Company's management in accordance with the resolutions adopted herein. 6. Adjournment and Drafting of Minutes. There being no further business to discuss, the Chairman declared the General Meeting adjourned. The signatories declare that these Minutes are approved in their entirety and are digitally signed, pursuant to article 10, paragraph 2, of Provisional Measure no. 2.200-2/2001, by the members of the Meeting Board and the Shareholders. I certify that these Minutes are a true copy recorded

in the appropriate register. Belo Horizonte, April 30, 2026. Members of the Meeting Board: Henrique Ayres Jameli – Chairman; Thiago Nogueira Penna – Secretary. Shareholders: Guilherme Boechat Muniz Lara, Lucas Freitas Da Cruz, Pedro Henrique Costa Cunha, Julia Guimarães Paes, Heitor Teixeira de Macedo Ferreira, Lucas Guilherme Gomes Costa, Lucas Urgel Aliani Silva, Gustavo Silva Campos Moreira, Igor Carvalho Rodrigues de Sousa, Leonardo de Almeida Fonseca, Viviane Ferreira Abreu, Adaias Batista Da Silva Junior, Márcio Peixoto De Almeida Junior, Marcelo Fonseca Gonçalves, Italo Magno Simões Delgado Santos, Gabriel Santana Branco, Ana Catharina Lopes Daldegan Cardoso, Gustavo Rodrigues de Oliveira, Luis Felipe Dos Santos Diniz, Acácio Ferreira da Silva, Igor Ferreira Magalhães, Rui Lybaert Fontoura, Tairine Mariane De Almeida Bolina, Franco Henrique Cassini Labbate, Pedro Ernesto Ribeiro De Azambuja, Rodrigo Gontijo Donnard, Breno Figueiredo Campos, Paulo Victor Ferreira Ribeiro, Keven Wender Mendes Vilela, Claudia Giselle Nogueira, Samuel Coelho Leite, Bernardo Pereira Ottoni, Henrique Galvão Telles, Gustavo Jordan, Ana Paula Balsamão Vaz, Augusto César Carsalade Vieira, Glaucia Passos Marcandier Bambirra, Fernando Luiz Damasceno, Rafael Rezende Nascimento Fernandes, Leonardo Brum Cardoso, Lucas Prado Marques, Carlos Henrique Chaves Pessoa, Gabriel Fernandes de Andrade Ayres, Flávio Pacelli Ziviani de Oliveira, Thiago Nogueira Penna, Marconi Elmais Dutra, Marco Túlio Jota de Oliveira, Eduardo Maurício de Oliveira, Henrique Ayres Jameli, Douglas Gontijo de Sousa, Thais Andrade Aparecido, Fabiana Fracalossi Serafim, Gabriel Cançado Peixoto Albino, Izabela Ribas Matoso, Fernando Soares Guimarães, Patrícia De Almeida Fonseca Guerra, Alberto Maia Valério, Rafaella Duarte Miranda, Tide Ferrão de Barros Soares, Paulo Caus Mesquita, Fernanda Cançado Della Monica, Liliane Castro Lacerda, Samuel Sampaio Chagas, André Rodrigues Lage, Matheus Vinicius Souza Mattos, Kleber de Aragão Rebouças, Bárbara Costa Silva Matos, Lennon Galantini Menegati Nascimento, Mateus Ribeiro Galhardo, Jaqueline Cardoso Santana Roder, Flávio Lúcio Moreira Bicalho Filho, Bruno Rodrigues Lara Leite, Daniela Vasconcellos de Oliveira, Juan Vicente Miranda Bellusci, Caio Colares de Souza Lima, Victor Arcuri Lemos, Debora Luiza Exposito Gonçalves, Júlia de Carvalho Ferri, Renato Gomide De Sousa, Gabriel Victor de Oliveira. Attorney's Signature: Name: Ana Catharina Lopes Daldegan Cardoso - OAB/MG: 233.444.

SOCIEDADE INDEPENDÊNCIA IMÓVEIS S.A.

CNPJ/MF no. 05.217.061/0001-29 - NIRE 31.3.0002215-3

CALL NOTICE FOR ORDINARY AND EXTRAORDINARY GENERAL MEETING

The shareholders of Independência Imóveis S.A. (“Company”) are hereby convened to meet at an Ordinary General Meeting (“AGOE”) to be held on June 25, 2026, at 2:00 p.m., on first call, and at 2:30 p.m., on second call, at the Company’s headquarter located at Avenida Presidente Itamar Franco, 3600, bairro São Mateus, Juiz de Fora, Minas Gerais, CEP 36025-290, to deliberate on the following ordinary matters: (i) Reviewing the management accounts, and examining, discussing, and voting on the Company’s Financial Statements for the fiscal year ended December 31, 2025, and the distribution of

dividends; (ii) Re-election of the members of the Company's Executive Board; and on the following extraordinary matter: (iii) Removal of CNAE code 68.21-8-02 – Real estate rental brokerage; (iv) Change of address within the same municipality. Chairperson: Ms. Daniella de Souza Guanabara Santos, Brazilian citizen, single, economist, holder of Identity Card no. XX844007-X, issued by Detran/RJ, and enrolled with the CPF/ME under no. XXX.618.677-XX. Secretary: Mr. José Vicente Coelho Duprat Avellar, Brazilian citizen, married, business administrator, holder of Identity Card no. XX.828.410-X, issued by IFP/RJ, and enrolled with the CPF/MF under no. XXX.301.687-XX. To be admitted to the AGOE, shareholders shall present documents proving their identity and, in the case of corporate shareholders, their legal representation. Subject to legal restrictions, shareholders may be represented at the AGOE by a proxy; in such cases, the power of attorney and proof of the proxy's identity shall also be presented. Juiz de Fora/MG, June 1, 2026.

Daniella de Souza Guanabara Santos – Director

NOTICE

1st BUSINESS COURT. JUDICIAL DISTRICT OF BELO HORIZONTE/MG. CASE No. 1087093-64.2026.8.13.0024. NOTICE FOR PUBLIC INFORMATION OF THE INTERESTED PARTIES AND CREDITORS. EXTRAJUDICIAL REORGANIZATION PLANS of ANDRADE GUTIERREZ ENGENHARIA S.A. (CNPJ 17.262.213/0001-94); ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A. (CNPJ 39.469.291/0001-05); ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S/A (CNPJ – 17.027.611/0001-26); ANDRADE GUTIERREZ INTERNATIONAL S.A. (enrolled with the Luxembourg Trade Companies Register under number B 176492); ZAGOPE SGPS S.A. (organized and existent under the laws of the Republic of Portugal, NIF registration number 507403177) and INZAG GERMANY GMBH (organized and existent under the laws of the Federative Republic of Germany, headquartered at Taunusstraße 5, 65183, Wiesbaden, Germany). Claudia Helena Batista, State Judge of the 1st Business Court, acting in her capacity, in accordance with the law, etc., hereby NOTIFIES the creditors that this Court has already received the Extrajudicial Reorganization Plans of the aforementioned companies. The plans were entered into the case file in Event 1 (documents titled OUTDOC4 and OUTDOC5) in their entirety. Creditors are hereby warned that they have 30 (thirty) days from the date of publication of this notice to submit any objections to the plan, attaching proof of their claims in accordance with article 164, paragraphs 2 and 3 of Law 11.101/2005. This document is issued so that it may come to the knowledge of all. Belo Horizonte/MG, June 01 2026. (signed) Brígida Nascimento Souza de Oliveira – Court Clerk (signed.) Cláudia Helena Batista – State Judge.

CIMCOP S/A - ENGENHARIA E CONSTRUÇÕES

CNPJ/MF 17.161.464/0001-82 - NIRE 3130004265-1

Extraordinary General Meeting - Call Notice

The shareholders of CIMCOP S/A - ENGENHARIA E CONSTRUÇÕES are hereby convened to an Extraordinary General Meeting to be held on June 11, 2026, at 9:00 a.m., on first call, or at 9:30 a.m., on second call, at the Company's headquarter located at Rua Walfrido Mendes, 400, bairro Califórnia, in this City, to deliberate on the following agenda: AGENDA FOR THE EXTRAORDINARY MEETING: a) Ratification of the capital stock increase through the subscription of new shares, as approved at the Extraordinary General Meeting held on April 14, 2026.

Belo Horizonte, June 1, 2026

Roberta Miraglia de Souza Martins – Chair of the Board of Directors

GERDAU AÇOMINAS S.A.

CNPJ No. 17.227.422/0001-05 - NIRE 31300036677

Certificate

We hereby certify that the Minutes of the Ordinary and Extraordinary General Meetings held on April 29, 2026, at 3:00 p.m., published in the newspaper Diário do Comércio - MG on May 5, 2026, were duly registered with the Board of Trade of the State of Minas Gerais. I certify the registration under no. 13918772 on June 1, 2026. Protocol no. 263315347 – May 8, 2026. Marinely de Paula Bomfim – Secretary General.

DOMINGOS COSTA INDÚSTRIAS

ALIMENTÍCIAS S.A.

CNPJ 17.159.518/0001-75

CALL NOTICE

The shareholders of Domingos Costa Indústrias Alimentícias S/A are hereby convened, pursuant to articles 123 and 124 of Federal Law no. 6,404/76, to meet in an Ordinary and Extraordinary General Meeting, in accordance with the sole paragraph of article 131 of such Law. The Meetings shall be held on June 24, 2026, at 9:30 a.m., on first call, and at 9:45 a.m., on second call, at the Company's headquarter located at Praça Louis Ensch, 160, Cidade Industrial, Contagem, Minas Gerais, to address the following agenda: I - Approval of the Management Report and Financial Statements for the 2025 fiscal year; II - Resolution on the allocation of net income for the fiscal year and the distribution of dividends; III - Other matters of interest to the Company.

NOTICE TO SHAREHOLDERS

The documents referred to in article 133 of Law no. 6,404/76, relating to the fiscal year ended December 31, 2025, are available to shareholders at the Company's headquarter, located at Praça Louis Ensch, 160, Cidade Industrial, Contagem, Minas Gerais. Contagem, June 1, 2026. PATRICIA MACEDO COSTA – CEO.

VIAÇÃO SERTANEJA S/A.

- Under Court-Supervised Reorganization

CNPJ no. 16.505.190/0001-39

NIRE 3120072173-4

CALL NOTICE

EXTRAORDINARY GENERAL MEETING

The shareholders of Viação Sertaneja S/A are hereby convened to an Extraordinary General Meeting to be held on June 13, 2026, at the Company's headquarter located at Rua Frei Orlando, 439, Centro, Abaeté. The meeting shall commence at 2:00 p.m., on first call, subject to the legally required minimum attendance, and at 2:30 p.m., on second call, regardless of the number of attendees, to deliberate on the following agenda: Amendment of the Company's Bylaws to eliminate the position/role of Legal Director from the Company's administrative structure; administrative reorganization and related adjustments resulting from the bylaw amendment; and general matters and other topics of interest to the Company. Shareholder's attendance is of fundamental importance to the deliberations to be undertaken.

Abaeté, May 29, 2026

Lídia Mendes Vargas de Vargas

Chairman of the Board of Directors

Advertise in Diário do Comércio

The hub for analysis and discussion on the economy in Minas Gerais

Food, Energy, and Travel Drive up Inflation in the State Capital

% IPCA-BH The indicator increased 0.28% in May, according to the Ipead Foundation; the accumulated figure for the last 12 months showed an increase of 3.66%

Inflation in Belo Horizonte accelerated in May. According to the Institute for Economic, Administrative, and Accounting Research of Minas Gerais (Ipead), the Broad Consumer Price Index (IPCA-BH) for the state capital rose by 0.28%. Food, energy, and travel costs drove the figure up.

The result represents an acceleration compared to the previous four-week period (0.15%) and stability relative to April (0.28%). Over the last 12 months, the indicator increased by 3.66%.

One of the main drivers of rising inflation in Belo Horizonte in May 2026 was the cost of food. Prices in the food category increased by 0.69%. Produce (fruits and vegetables), with a 2.87% increase, and processed foods, with a 1.07% rise, drove prices up, contributing 0.11 percentage points (p.p.) to the overall index.

Other contributors to the rise in the IPCA-BH were travel and energy tariffs, with increases of 4.66% and 2.55%, respectively. Travel accounted for 0.12 percentage points of the impact on the inflation index, while energy accounted for 0.08 percentage points. Conversely, gasoline and ethanol prices decreased by 14.28% and 7.28%, respectively.

Eduardo Antunes, research manager at the Ipead Foundation, states that the inflation result, showing an acceleration during the period, comes as no surprise, considering the natural upward pressure food prices exercise at this time of year. "Given the characteristics of the current situation, inflation is at a reasonable level, mainly when looking at the last 12 months, where it remains below 4%, at 3.66%," he says.

Yesterday, the Ipead Foundation released the basic food basket survey, which increased by 3.77% in May 2026 in the State Capital. The value reached R$796.58, which accounted for 49.14% of the minimum wage in Belo Horizonte. In the same period of 2025, this proportion was 49.78%, and the basket was R$40.90 cheaper than currently. In other words, although the nominal value of the basket has increased, it now represents a slightly smaller portion of the minimum wage.

“Considering the characteristics of the current moment, inflation is at a reasonable level, mainly when looking at the last 12 months, where it remains below 4%, at 3.66%.” — Eduardo Antunes

PRINT EDITION PRODUCED

BY THE *DIÁRIO DO COMÉRCIO* NEWSPAPER

Daily circulation via newsstands and subscriptions. Digital versions and the full text of the Legal Notices found on this page are available at: diariodocomercio.com.br/publicidade-legal. You can also access them via the QR code alongside.

UNION OF COMMERCE IN GOODS, SERVICES, AND TOURISM OF CONTAGEM AND IBIRITÉ – CALL OF NOTICE FOR THE EXTRAORDINARY GENERAL MEETING – The President of the UNION OF COMMERCE IN GOODS, SERVICES, AND TOURISM OF CONTAGEM AND IBIRITÉ, enrolled with the CNPJ/MF under no. 01.985.938/0001-70, exercising the powers conferred upon him by

the Bylaws and applicable legislation, hereby summons companies, micro-enterprises, and similar entities, including branches, operating in the retail, wholesale, and warehousing trade sectors within the municipality of Contagem, excluding only those operating mainly in the wholesale food trade and the retail trade of construction materials, paints, hardware, and machinery, provided they are up-to-date with employer union obligations and eligible to vote, to attend the Extraordinary General Meeting to be held on June 18, 2026 (Thursday). The meeting shall convene at 8:30 a.m., on first call; should a sufficient quorum not be reached at the designated time, the meeting shall proceed under a second call at 9:00 a.m. at Rua Treze de Junho, 74, bairro Três Barras, Contagem, MG. The purpose is to deliberate on the following agenda item: discuss and submit for majority approval the new proposals for the 2026/2027 Collective Labor Agreement with the labor union, SINTRACC, regarding the municipality of Contagem. Contagem, June 3, 2026. President Frank Sinatra dos Santos Chaves (CPF 232.343.776-34).

SOCIEDADE INDEPENDÊNCIA IMÓVEIS S.A.

CNPJ/MF no. 05.217.061/0001-29 - NIRE 31.3.0002215-3

CALL NOTICE FOR ORDINARY AND EXTRAORDINARY GENERAL MEETING

The shareholders of Independência Imóveis S.A. (“Company”) are hereby convened to meet at an Ordinary General Meeting (“AGOE”) to be held on June 25, 2026, at 2:00 p.m., on first call, and at 2:30 p.m., on second call, at the Company’s headquarter located at Avenida Presidente Itamar Franco, 3600, bairro São Mateus, Juiz de Fora, Minas Gerais, CEP 36025-290, to deliberate on the following ordinary matters: (i) Review of the management accounts, and examining, discussing, and voting on the Company’s Financial Statements for the fiscal year ended December 31, 2025, and the distribution of dividends; (ii) Re-election of the members of the Company’s Executive Board; and on the following extraordinary matter: (iii) Removal of CNAE code 68.21-8-02 – Real estate rental brokerage; (iv) Change of address within the same municipality.

President: Mrs. Daniella de Souza Guanabara Santos, Brazilian citizen, single, economist, holder of Identity Card no. XX844007-X, issued by Detran/RJ, enrolled with the CPF/ME under no. XXX.618.677-XX. Secretary: Mr. José Vicente Coelho Duprat Avellar, Brazilian citizen, married, business administrator, holder of Identity Card no. XX.828.410-X, issued by IFP/RJ, and enrolled with the CPF/MF under no. XXX.301.687-XX. To be admitted to the AGOE, shareholders shall present documents proving their identity and, in the case of a legal organization shareholder, their legal representation. Subject to legal restrictions, shareholders may be represented at the AGOE by an agent, in which case the power of attorney and proof of identity of the agent shall also be presented. Juiz de Fora/MG, June 1, 2026.

Daniella de Souza Guanabara Santos – Director

GERDAU AÇOMINAS S.A.

CNPJ n° 17.227.422/0001-05 - NIRE 31300036677

Certificate

We hereby certify that the Minutes of the Ordinary and Extraordinary General Meetings held on April 29, 2026, at 3:00 p.m., published in the newspaper Diário do Comércio - MG on May 5, 2026, were duly registered with the Board of Trade of the State of Minas Gerais. I certify the registration under no. 13918772 on June 1, 2026. Protocol no. 263315347 – May 8, 2026. Marinely de Paula Bomfim – General Secretary.

MELHORAMENTOS DOM BOSCO SOCIEDADE ANÔNIMA

CNPJ 16.906.935/0001-71 - NIRE 31300059723

CALL NOTICE FOR THE ORDINARY GENERAL MEETING

Shareholders are hereby invited to meet at the Ordinary General Meeting, which shall be held on first call at the Company's headquarter, located at: Praça Coronel Adolfo, 68 - Centro, in the City of Araxá - MG, on 06/12/2026 at 10:30 a.m., as well as by digital means, in accordance with article 124, paragraph 2°-A, of Law no. 6,404/1976 and DREI Normative Instruction no. 81/2020, in order to: (i) decide on the rendering of accounts, analysis, discussion and voting on the Financial Statements for the fiscal years ending on 12/31/2024 and 12/31/2025; (ii) other corporate matters. Notice: all documents relating to the agenda are available to shareholders at the Company's headquarter.

Araxá (MG), March 27, 2026. Adhemar Rodrigues Valle Neto – Director.

CIMCOP S/A - ENGENHARIA E CONSTRUÇÕES

CNPJ/MF 17.161.464/0001-82 - NIRE 3130004265-1

Extraordinary General Meeting – Call Notice

The shareholders of CIMCOP S/A - ENGENHARIA E CONSTRUÇÕES are hereby summoned to the Extraordinary General Meeting to be held on June 11, 2026, at 9:00 a.m., on first call, or at 9:30 a.m., on second call, at its registered office at Rua Walfrido Mendes, 400 - Bairro California, in this State Capital, in order to deliberate on the following agendas: AGENDA OF THE EXTRAORDINARY MEETING: a) approval of the increase in share capital through the subscription of new shares approved at the Extraordinary General Meeting held in April 14, 2026.

Belo Horizonte, June 1, 2026

Roberta Miraglia de Souza Martins – Chairman of the Board of Directors

INDEPENDENT WATER AND SEWAGE SERVICE SAAE DE BOCAIÚVA/MG NOTICE OF SUSPENSION OF BIDDING - ELECTRONIC AUCTION P.E. 009/2026 – THE INDEPENDENT WATER AND SEWAGE SERVICE SAAE DE BOCAIÚVA through its Auctioneer makes public the SUSPENSION of the P.L. 017/2026 - P.E. 009/2026. Subject: LEASE OF DISTRIBUTED GENERATION SYSTEM (SGD) TO MEET THE NEEDS OF SAAE DE BOCAIUVA-MG, which would take place on 06/08/2026 at 9:00 a.m., due to the approval of the objection submitted, the new notice shall be rectified and published with a new session date through the same Portals: saaebocaiuva.com.br/licitacoes, portaldecompraspublicas.com.br and pncp.gov.br. Marlon Alexsander Siqueira. Auctioneer.

NOTICE. 1st. Business Court. Judicial district of Belo Horizonte/MG. Case No. 1087093-64.2026.8.13.0024. Notice for public information of the interested parties and creditors. Extrajudicial reorganization plans of ANDRADE GUTIERREZ ENGENHARIA S.A. (CNPJ 17.262.213/0001-94); ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A. (CNPJ 39.469.291/0001-05); ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S/A (CNPJ – 17.027.611/0001-26); ANDRADE GUTIERREZ INTERNATIONAL S.A. (enrolled with the Luxembourg Trade Companies Register under number B 176492); ZAGOPE SGPS S.A. (organized and existent under the laws of the Republic of Portugal, NIF registration number 507403177) and INZAG GERMANY GMBH (organized and existent under the laws of the Federative Republic of Germany, headquartered at Taunusstraße 5, 65183, Wiesbaden, Germany).

Dr. Claudia Helena Batista, State Judge of the 1st. Business Court, acting in her capacity, in accordance with the law, etc., hereby NOTIFIES the creditors that this Court has already received the Extrajudicial Reorganization Plans of the aforementioned companies. The plans were entered into the case file in Event 1 (documents titled OUTDOC4 and OUTDOC5) in their entirety. Creditors are hereby warned that they have 30 (thirty) days from the date of publication of this notice to submit any objections to the plan, attaching proof of their claims in accordance with article 164, paragraphs 2 and 3 of Law 11.101/2005. This document is issued so that it may come to the knowledge of all. Belo Horizonte/MG, June 01 2026. (signed) Brígida Nascimento Souza de Oliveira – Court Clerk (signed.) Cláudia Helena Batista – State Judge.

MUNICIPAL GOVERNMENT OF CATAGUASES/MG

ABSTRACT OF PUBLIC NOTICES

BIDDING PROCESS NO. 039/2026 – ELECTRONIC REVERSE AUCTION No. 015/2026

PRICE REGISTRATION No. 015/2026 - UASG 984305 - PE 90015

Type: largest discount per lot. Subject: price registration for the future and potential contracting of a company specializing in preventive and corrective electrical and mechanical maintenance services for heavy vehicles, including the supply of electrical and mechanical parts based on the Audatex Price List for the specific vehicle brand, to meet the demands of the Department of Education of the Municipality of Cataguases, MG. Date of event: June 22, 2026, at 9:00 a.m. Estimated value: R$600,000.00. Legal basis: Law no. 14,133 of April 1, 2021. Availability of the Public Notices: pregaocataguases@gmail.com, on the Cataguases City Hall website: www.cataguases.mg.gov.br, and via the Federal Government procurement portal: www.comprasgovernamentais.gov.br. Clarifications available by phone at (32) 3429-2500 or via email at pregaocataguases@gmail.com. Cataguases, June 2, 2026.

José Henriques - Mayor of Cataguases

NOTICE OF FIDUCIARY TRANSFER AUCTION – IN-PERSON AND ONLINE

1st AUCTION: June 17, 2026, at 3:00 p.m.

2nd AUCTION: June 19, 2026, at 3:00 p.m. (Brasília time)

FRAZÃO

CALL NOTICE

By this notice, I inform that on July 22, 2026, from 8:00 a.m. to 2:00 p.m., at the headquarter of FIEMG, at Av. do Contorno, 4520, 10.o andar, bairro Funcionários, in the City of Belo Horizonte - MG, an election shall be held for the composition of the Board of Directors, Deputy Directors, Fiscal Council, Representative Delegates with the Council of the Federation of Industries of the State of Minas Gerais to which this Organization is affiliated, as well as their respective substitutes, leaving a period of twenty (20) days open for registration of plates, which shall occur from the date of publication of this Notice. The application for registration of plates shall be addressed to the President of the Organization, signed by one of its members and shall contain the disposition of positions in accordance with the provisions of the Union Statute, accompanied by all required documents, in accordance with Article 8 of the Electoral Regulations.

The Organization's Administrative Office shall operate during the period designated for the registration of plates, from 8:00 a.m. to 5:00 p.m., excluding weekends and holidays; during this time, a qualified staff member shall be available to assist interested parties, provide information, and issue the corresponding receipt. Challenges to candidates shall be filed within five (5) days of the publication of the list of registered plates, in accordance with Article 12 of the Election Regulations.

The election shall be held under a single call to order, lasting a minimum of six (6) hours, with no minimum quorum requirement. In the event of a single plate, representatives of Regular Member Companies eligible to vote need only sign the General Meeting attendance list. This document shall constitute approval of the presented plate. In the event of a tie between the leading plates, a new election shall be held within fifteen (15) days, with eligibility limited to the candidates already registered on such plates.

Belo Horizonte, June 3, 2026

GUILHERME SILVA COSTA ABRANTES - CHAIRMAN

CPF: 809.122.816-34

IDORGANIZATION CARD: MG 3436600

Minas Gerais State Secretariat of Public Security

Ana Claudia Carolina Campos Frazão, Official Auctioneer, JUCESP no. 836, with offices at Rua Herval, 1052, Belenzinho, São Paulo/SP, CEP 03062-000, HEREBY ANNOUNCES to all who see or become aware of this PUBLIC NOTICE that she shall conduct a PUBLIC AUCTION, held both IN-PERSON AND ONLINE, pursuant to article 27 and its paragraphs of Law no. 9,514/97. This auction is authorized by the Fiduciary Creditor, BANCO SANTANDER (BRASIL) S/A - CNPJ no. 90.400.888/0001-42, under the terms of the private instrument with the force of a public deed no. 0010370603, executed on April 28, 2023, with the Fiduciary Debtor(s), BRUNO DA SILVA AZEVEDO, enrolled under the CPF/MF no. 064.927.956-52). The FIRST AUCTION shall take place on June 17, 2026, with a minimum bid equal to or greater than three hundred and thirty-two thousand, three hundred and forty-six reais and nineteen cents (R$332,346.19).

The property registered under no. 47,260 at the 2nd Real Estate Registry Office of Juiz de Fora/MG, consisting of “Apartment 710 in the development named Residencial Madrid, located at Rua Barão de Santa Helena, 620, bairro Granbery, with a main private area of 57.10 m², a total private area of 67.90 m², a common use area of 18.60 m², a total actual area of 86.50 m², one private covered parking space no. 79 located on the 3rd floor, and a corresponding fractional share of 9.03/1000 of the land, which measures 45.00 m of frontage on Rua Barão de Santa Helena, 55.00 m on the left side from the perspective of an observer looking at the property from the public street, bordering lot 27; 55.00 m on the right side, bordering house 596, the Mariam Mickail Mokdeci Building, and Catarina Cortes Coelho Ramos, and 45.00 m at the rear, also bordering Catarina Cortes Coelho Ramos.” Municipal Registration: 042.097/059. Sale on an “ad corpus” basis and in its current condition. R.04 records a fiduciary disposal in favor of Banco Santander (Brasil) S/A. Property is occupied.

Should there be no bidders at the first auction, June 19, 2026 is hereby designated as the date, at the same location, for the SECOND AUCTION, with a minimum bid equal to or greater than two hundred and

ninety-eight thousand, nine hundred and eighty-four reais and forty-seven cents (R$298,984.47), pursuant to article 27, paragraph 2 of Law no. 9,514/97. The in-person auction shall take place at the Auctioneer's office. Parties interested in participating in the auction online shall register at www.FrazaoLeiloes.com.br and submit the necessary documentation for registration approval 24 hours prior to the start of the auction. Further information is available on the Auctioneer's website: www.FrazaoLeiloes.com.br. Information may be obtained by calling 11-3550-4066 (02.26949_RB_3621-04).

NOTICE OF FIDUCIARY TRANSFER AUCTION

1st Auction: June 16, 2026, at 10:00 a.m.

2nd Auction: June 18, 2026, at 10:00 a.m. (Brasília time)

FERNANDO JOSE CERELLO GONÇALVES PEREIRA, Official Auctioneer, JUCESP no. 844, with an office at Alameda Santos, 787 - Conjunto 132, bairro Jardim Paulista - São Paulo/SP, HEREBY GIVES NOTICE to all who see or become aware of this PUBLIC NOTICE that he shall offer for PUBLIC AUCTION, in person and online, pursuant to Law no. 9,514/97, article 27 and its paragraphs, and authorized by the Fiduciary Creditor BANCO SANTANDER (BRASIL) S/A - CNPJ No. 90.400.888/0001-42, under the terms of the private instrument with the legal force of a public deed no. 0010514469, executed on May 19, 2025, with the Fiduciary Debtor(s) Rodrigo Lourenço Ribeiro Cunha and Júlia Gonçalves Forti Cosenza Cunha, of legal age, holding CPF nos. 083.332.876-03 and 075.296.466-64), on June 16, 2026, at 10:00 a.m., in a FIRST AUCTION, with a minimum bid equal to or greater than seven hundred and twenty-nine thousand, four hundred and ninety-two reais and twenty-seven cents (R$729,492.27), the property registered under no. 153,791 at the 1st Real Estate Registry Office of Divinópolis/MG, consisting of "Residential Apartment no. 303 - 5th Floor, with a main private area of 92.75 m² and an accessory private area of 20.70 m² corresponding to two (2) covered parking spaces for two (2) vehicles - Spaces no. 18/19 - basement, total private area of 113.45 m², common use area of 40.37 m² (comprising 0.22 m² uncovered and 40.15 m² covered), total actual area of 153.82 m², fractional share of 0.03317, total built area of 153.60 m², located at Rua Frei Carlos, lot 213, block 050, zone 020, bairro Santa Clara, Divinópolis/MG".

Municipal Registration: 227627. Sale on an "ad corpus" basis and in the property's current state of repair. R. 13 records a fiduciary disposal in favor of Banco Santander (Brasil) S/A. Property is occupied. Eviction is the responsibility of the purchaser, pursuant to article 30 of Law 9,514/97. Note: (i) any costs associated with cancelling the asset segregation regime recorded in Av. 05 of the aforementioned property title shall be borne by the winning bidder/purchaser, with no right to reimbursement; (ii) there is a pending lawsuit regarding an extrajudicial title (condominium fees), Case no. 1002749-72.2025.8.13.0223 in progress before the Unified Jurisdictional Unit of the Special Civil Court - 2nd Judicial District of Divinópolis/MG.

Should there be no bidders at the first auction, the SECOND AUCTION is hereby scheduled for June 18, 2026, at 10:00 a.m., at the same location, with a minimum bid equal to or greater than six hundred and eighty-nine thousand, two hundred and forty-four reais and forty cents (R$689,244.40), pursuant to article 27, paragraph 2, of Law no. 9,514/97. The in-person auction shall take place at the Auctioneer's office. Parties interested in participating in the auction online shall register on the website www.megaleiloes.com.br one (1) hour prior to the start of the auction. Further information is available on the Auctioneer's website: www.megaleiloes.com.br or by calling (11) 3149-4600 (02.26952).

ELECTRONIC REVERSE AUCTION (PRICE REGISTRATION SYSTEM) No. 90614/2026

UASG 158137 - IFSULDEMINAS

Case no.: 23346.001104.2026-73. Subject: possible future hiring of a specialized company to provide services in the maintenance of agricultural greenhouses, according to the notice and annexes. Call Notice, in the official electronic environment: https://www.gov.br/compras/pt-br. Call Notice, on the IFSULDEMINAS website: https://www.muz. ifsuldeminas.edu.br/2026. Registration of Proposals: from 06/03/2026 until 08:59 a.m. on 06/23/2026, in the official environment. Public Session at 09:00 a.m. on 06/23/2026. Further information can be found in the call notice and annexes.

Lucas Deleon Ramirio

Procurement Officer

TENDER NOTICES

Case no. 25/2024 – Electronic Reverse Auction no. 90.005/2026

SRP n° 90.003/2026

Subject: Price Registration for the acquisition of movable goods. Total items: 04. Availability of the Tender Notice and submission of proposals starting June 3, 2026, at 8:00 a.m.. Bidding session: June 23, 2026, at 10:00 a.m. Location: www.compras.gov.br. UASG: 926188. Brasília-DF time. Jânio P. da Silva, Auctioneer.

Case no. 39/2024 – Electronic Reverse Auction no. 90.006/2026

SRP no. 90.004/2026

Subject: RP for acquisition of pantry and kitchen materials. Total groups: 03/ items:16. Availability of Tender Notice and delivery of proposals from 06/03/2026 at 08:00 a.m.. Dispute session: 06/18/2026 at

10:00 a.m. Location: www.compras.gov.br. UASG: 926188. Brasília-DF time. Gabriela B. Agostinho, Auctioneer.

TENDER NOTICE

Reverse Auction (Price Registration System) no. 90001/2026 – UASG 160109

Case no.: 64378.000104/2026-66. Subject: Electronic Reverse Auction – Contracting of engineering services for the renovation of the bathroom in the Corporals' and Privates' barracks at the 4th Cia Com L Mth, in Belo Horizonte - MG. Total Offered Items: 1. Tender Notice: available from June 3, 2026, between 8:00 a.m. and 12:00 p.m. and between 1:30 p.m. and 4:30 p.m. Address: Av. Perimetral Sul, 1200 – Bairro São Francisco – Belo Horizonte - MG, or at www.comprasgovernamentais.gov.br. Submission of Proposals: starting June 3, 2026, at 8:00 a.m. via the website www.comprasnet.gov.br.

Opening of Proposals: June 19, 2026, at 9:00 a.m. on the website www.comprasnet.gov.br.

FELLIPE CORREIA MACIEL - Captain

Expenditure Authorizer of the 4th Cia Com L Mth

CALL NOTICE

By means of this public notice, I hereby announce that on July 22, 2026, between 8:00 a.m. and 2:00 p.m., an election shall be held at the FIEMG headquarter, located at Av. do Contorno, 4520, 10.o andar, bairro Funcionários, in the City of Belo Horizonte, MG, to select the Board of Directors, Deputy Directors, Supervisory Board, and Delegate Representatives to the Council of the Federation of Industries of the State of Minas Gerais to which this Organization is affiliated, as well as their respective alternates; a 20-day period for the registration of candidate plates is hereby opened, commencing on the date of publication of this Call Notice.

The application for the registration of plates shall be addressed to the President of the Organization and signed by one of the plate members. It shall specify the distribution of offices in accordance with the Union's Bylaws and be accompanied by all required documents, pursuant to Article 8 of the Election Regulations. During the plate registration period, the Organization's administrative office shall operate from 8:00 a.m. to 5:00 p.m., excluding weekends and holidays, with qualified personnel available to assist interested parties, provide information, and issue the corresponding receipt.

Any challenge to candidates shall be filed within five (5) days of the publication of the list of registered plates, in accordance with Article 12 of the Election Regulations. The election shall be held under a single call, lasting a minimum of six (6) hours, with no minimum quorum requirement. In the event of a single plate, representatives of Regular Member Companies eligible to vote need only sign the General Meeting attendance list; this signature shall constitute approval of the presented plate. In the event of a tie between the top-voted plates, a new election shall be held within fifteen (15) days, with eligibility limited to the candidates already registered on such plates.

Belo Horizonte, June 3, 2026

GUILHERME SILVA COSTA ABRANTES – PRESIDENT

CPF: 809.122.816-34

IDENTITY CARD: MG 3436600 -

Minas Gerais State Secretariat of Public Security

CALL NOTICE

EXTRAORDINARY GENERAL MEETINGS

The President of the UNION OF WORKERS IN THE INDUSTRIES OF MINERAL EXTRACTION AND THE EXPLORATION, PROSPECTING, EXTRACTION, AND PROCESSING OF IRON, BASE METALS, AND OTHER METALLIC AND NON-METALLIC MINERALS OF ITABIRA AND THE SURROUNDING REGION, in the exercise of his statutory and legal powers, hereby summons all workers of BEMISA S/A based within the Union's territorial jurisdiction to attend the Extraordinary General Meetings. These meetings shall be held on June 8, 9, and 11, 2026 (with a voting station also available on June 9, 2026, as described below), convening first with the statutory quorum and subsequently with any number of attendees present, in accordance with the dates, times, and location specified below:

Table (first line cannot be read)

Date / First call / Second Call / Shift/Letter

Monday / Tuesday / Thursday

A (entry) / C (entry) / B (entry) / D (entry)

to deliberate on the following AGENDA:

1) Reading of the Call Notice; 2) Consideration and voting on the proposal presented by BEMISA S.A. during this second Meeting, following the conclusion of the six-month trial period resolved upon in the first Meeting, regarding whether or not to continue the 12-hour shift model (4x4 rotation schedule); 3) Authorization to initiate collective labor dispute proceedings and/or take measures to facilitate the negotiation of a Collective Bargaining Agreement should negotiation attempts fail, in whole or in part, including the authorization to call a strike, in accordance with the Bylaws; 4) Authorization to collect attorney's fees for representation in proceedings and the Negotiating Assistance Fee, in accordance with the Addendum to TAC no. 56.2013 entered into with the Labor Prosecution Service, the STF ruling on Subject 935, and the terms established in a general meeting previously convened and held for such purposes, including regarding the exercise of the right to object to the Negotiating Assistance Fee within a period of five consecutive days, counting from the date of determination; 5) Only workers currently on the 4x4 rotating shift trial, whose names appear on the official voting lists, are authorized to vote. Presenting an official photo ID or an employee ID Badge is mandatory at the time of voting. Workers on the administrative (ADM) schedule are not permitted to vote; 6) A ballot box shall be available at the Metasita's headquarters (Union of Metalworkers of Timóteo and Coronel Fabriciano) (Av. Monsenhor Rafael, 155 – Timirim – Timóteo/MG) on June 9, 2026, during business hours (10:00 a.m. to 4:00 p.m.), for workers who are on leave, off-duty, or on vacation. Presenting an official photo ID and an employee ID Badge is mandatory at the time of voting;

Itabira, June 2, 2026

KONA PARTNERSHIP S.A.

CNPJ 58.526.038/0001-82

Minutes of the Extraordinary General Meeting

1. Date, Time, and Location: meeting held on April 30, 2026, at 11:30 a.m., at the Company's headquarter located at Rua Desembargador Jorge Fontana, 498, sala 801, bairro Belvedere, Belo Horizonte/MG, CEP 30320-670. 2. Meeting Board: Henrique Ayres Jameli (Chair of the Meeting, e-mail: henrique.jameli@3ariva.com.br) and Thiago Nogueira Penna (Secretary of the Meeting, e-mail: thiago@3ainvestimentos.com.br). 3. Attendance: all shareholders of the Company attended; therefore, the publication of a call notice was waived (Law no. 6,404/76, article 124, paragraph 4). 4. Agenda: (i) the reduction of the Company's share capital due to excess capital; (ii) the method of refunding the amount corresponding to the reduced capital to the shareholders; (iii) the consequent amendment to Article 5 of the Company's Bylaws; (iv) the authorization for the officers to perform all acts necessary to implement the resolutions; and (v) the ratification of acts already performed by the management. 5. Resolutions: after reviewing the items on the Agenda, the sole shareholder resolved as follows: 5.1. Reduction of the Company's Share Capital due to Excess Capital. Approve the reduction of the Company's share capital

by the amount of three million, six hundred and thirty-four thousand, eight hundred and seventy-eight reais and sixty cents (R$3,634,878.60), deeming it excessive in relation to the Company's operational and investment needs, pursuant to article 173 of Law no. 6,404/76, whereby the Company's share capital changes from eight million, four hundred and ninety-seven thousand, four hundred and twenty-four reais and nine cents (R$8,497,424.09), fully subscribed and paid-in, to R$ 4,862,545.49 four million, eight hundred and sixty-two thousand, five hundred and forty-five reais and forty-nine cents), fully subscribed and paid-in, through a reduction of four reais and sixty cents (R$4.60) per share in the value attributed to each of the seven hundred and ninety thousand, one hundred and ninety-one (790,191) common shares comprising the Company's share capital, with the total number of shares and the proportional shareholding of each shareholder remaining unchanged. 5.2. Approve that the reimbursement of the amount corresponding to the capital reduction shall be made in cash, in proportion to each shareholder's interest in the Company's share capital. 5.3. Approve that, pursuant to article 174 of Law no. 6.404/76, the Capital Reduction shall become effective following the expiration of a 60-day period counted from the publication of these minutes in accordance with the law, considering that any variations in the value of the Company's accounting equity verified between the date hereof and the effective date of the Capital Reduction shall not change the values adopted in this resolution. 5.4. Approve the amendment of Article 5 of the Company's Bylaws, which shall be read as follows: "Article 5 - The Company's share capital is four million, eight hundred and sixty-two thousand, five hundred and forty-five reais and forty-nine cents (R$4,862,545.49), divided into seven hundred and ninety thousand, one hundred and ninety-one (790,191) common, registered, indivisible shares with no par value." 5.5. Authorization to Officers. Authorize the Company's officers to perform all acts necessary for the implementation of the resolutions adopted herein, including, but not limited to, signing documents, filing these minutes with the Board of Trade of the State of Minas Gerais (JUCEMG), arranging for the appropriate legal publications, and making payments to shareholders after the expiration of the statutory period. 5.6. Ratification. Ratify all acts performed by the Company's management in accordance with the resolutions adopted herein. 6. Adjournment and Drafting of Minutes. There being no further business to discuss, the Chairman declared the General Meeting adjourned.

The signatories declare that these Minutes are approved in their entirety and are digitally signed, pursuant to article 10, paragraph 2, of Provisional Measure no. 2.200-2/2001, by the members of the Meeting Board and the Shareholders. I certify that these Minutes are a true copy recorded in the appropriate register. Belo Horizonte, April 30, 2026. Members of the Presiding Board: Henrique Ayres Jameli – Chairman; Thiago Nogueira Penna – Secretary. Shareholders: Guilherme Boechat Muniz Lara, Lucas Freitas Da Cruz, Pedro Henrique Costa Cunha, Julia Guimarães Paes, Heitor Teixeira de Macedo Ferreira, Lucas Guilherme Gomes Costa, Lucas Urgel Aliani Silva, Gustavo Silva Campos Moreira, Igor Carvalho Rodrigues de Sousa, Leonardo de Almeida Fonseca, Viviane Ferreira Abreu, Adaias Batista Da Silva Junior, Márcio Peixoto De Almeida Junior, Marcelo Fonseca Gonçalves, Italo Magno Simões Delgado Santos, Gabriel Santana Branco, Ana Catharina Lopes Daldegan Cardoso, Gustavo Rodrigues de Oliveira, Luis Felipe Dos Santos Diniz, Acácio Ferreira da Silva, Igor Ferreira Magalhães, Rui Lybaert Fontoura, Tairine

Mariane De Almeida Bolina, Franco Henrique Cassini Labbate, Pedro Ernesto Ribeiro De Azambuja, Rodrigo Gontijo Donnard, Breno Figueiredo Campos, Paulo Victor Ferreira Ribeiro, Keven Wender Mendes Vilela, Claudia Giselle Nogueira, Samuel Coelho Leite, Bernardo Pereira Ottoni, Henrique Galvão Telles, Gustavo Jordan, Ana Paula Balsamão Vaz, Augusto César Carsalade Vieira, Glaucia Passos Marcandier Bambirra, Fernando Luiz Damasceno, Rafael Rezende Nascimento Fernandes, Leonardo Brum Cardoso, Lucas Prado Marques, Carlos Henrique Chaves Pessoa, Gabriel Fernandes de Andrade Ayres, Flávio Pacelli Ziviani de Oliveira, Thiago Nogueira Penna, Marconi Elmais Dutra, Marco Túlio Jota de Oliveira, Eduardo Maurício de Oliveira, Henrique Ayres Jameli, Douglas Gontijo de Sousa, Thais Andrade Aparecido, Fabiana Fracalossi Serafim, Gabriel Cançado Peixoto Albino, Izabela Ribas Matoso, Fernando Soares Guimarães, Patrícia De Almeida Fonseca Guerra, Alberto Maia Valério, Rafaella Duarte Miranda, Tide Ferrão de Barros Soares, Paulo Caus Mesquita, Fernanda Cançado Della Monica, Liliane Castro Lacerda, Samuel Sampaio Chagas, André Rodrigues Lage, Matheus Vinicius Souza Mattos, Kleber de Aragão Rebouças, Bárbara Costa Silva Matos, Lennon Galantini Menegati Nascimento, Mateus Ribeiro Galhardo, Jaqueline Cardoso Santana Roder, Flávio Lúcio Moreira Bicalho Filho, Bruno Rodrigues Lara Leite, Daniela Vasconcellos de Oliveira, Juan Vicente Miranda Bellusci, Caio Colares de Souza Lima, Victor Arcuri Lemos, Debora Luiza Exposito Gonçalves, Júlia de Carvalho Ferri, Renato Gomide De Sousa, Gabriel Victor de Oliveira. Attorney's signature: Name: Ana Catharina Lopes Daldegan Cardoso - OAB/MG: 233.444.

---

This is what was to be translated on the original document, according to my best understanding, which amounted to 25 electronic page equivalents which I have reviewed, found true and correct, and sign below:

Emoluments: R$ 765.16
Receipt Book No.:02 Receipt No.:3707
São Paulo, September 15, 2026

José Roberto Vensan Maramaldo

**VIC ENGENHARIA S.A. CNPJ n.º 12.086.678/0001-18 NIRE n.º 31300153118**

**ATA DE ASSEMBLEIA GERAL EXTRAORDINÁRIA REALIZADA EM 29 DE MAIO DE 2026**

**1. DATA, HORÁRIO E LOCAL:** Realizada no dia 29 de maio de 2026, às 08:00, na sede da VIC Engenharia S.A. ("Sociedade"), na cidade de Belo Horizonte, estado de Minas Gerais, na Avenida Álvares Cabral, nº 1.777, sala 1.702, Santo Agostinho, CEP 30170-008. **2. CONVOCAÇÃO E PRESENÇA:** Dispensada a publicação de anúncio de convocação, nos termos do § 4º do art. 124 da Lei nº 6.404, de 15 de dezembro de 1976, conforme alterada ("Lei das Sociedades por Ações"), tendo em vista a presença dos acionistas representando a totalidade do capital social da Sociedade, conforme disposto na lista de presença constante do Anexo I a esta Ata de Assembleia Geral Extraordinária de Acionistas. **3. MESA:** Os acionistas elegeram para presidente da Mesa, o Sr. **Alexandre Augusto Leite Toledo**, brasileiro, casado em regime de comunhão parcial de bens, administrador de empresas, portador da Carteira de Identidade nº MG 2.328.234 SSP/MG e inscrito no CPF sob o nº 520.006.996-34, residente e domiciliado em Belo Horizonte/MG, Rua Maestro Arthur Bosmans, nº 40, apto 1.100, Bairro Belvedere, CEP: 30.320-680, que convidou como Secretário da Mesa o Sr. **Randy Luiz Lanza Chaves Junior**, brasileiro, casado em regime de comunhão parcial de bens, engenheiro civil, portador da carteira de identidade MG-11.995.815 - SSP/MG, CREA/MG 162939D e do inscrito no CPF sob o nº 079.095.556-36, residente e domiciliado em Belo Horizonte/MG, na Rua General Andrade Neves, 318, Apto 601, Bairro Gutierrez, CEP 30.430-070. **4. ORDEM DO DIA:** No âmbito da distribuição pública dos Certificados de Recebíveis Imobiliários ("CRI") da Série Única da 86ª Emissão da **LEVERAGE COMPANHIA SECURITIZADORA**, sociedade por ações com registro de companhia securitizadora perante a Comissão de Valores Mobiliários ("CVM") sob o nº 949, na categoria "S1", com sede na cidade de São Paulo, estado de São Paulo, na Avenida Paulista, nº 1912, 13º andar, sala 132, Bela Vista, CEP 01310-924, inscrita no CNPJ sob o nº 48.415.978/0001-40 ("Securitizadora"), de acordo com a Lei nº 14.430, de 3 de agosto de 2022 ("Lei 14.430/22") e a Resolução da CVM nº 160, de 13 de julho de 2022 ("Oferta" e "Operação de Securitização", respectivamente), os acionistas da Sociedade se reuniram para apreciar, discutir e deliberar sobre: (a) a aprovação da emissão, pela Sociedade, de 40.000 (quarenta mil) debêntures simples, não conversíveis em ações, em série única, da espécie com garantia real, com garantia adicional fidejussória, para colocação privada, com valor nominal unitário de R$ 1.000,00 (um mil reais), totalizando o valor total de emissão R$ 40.000.000,00 (quarenta milhões de reais), nos termos e condições da "Escritura Particular da 5ª (Quinta) Emissão de Debêntures Simples, Não Conversíveis em Ações, em Séries Única, da Espécie com Garantias Real, com Garantia Adicional Fidejussória, para Colocação Privada, da VIC Engenharia S.A.", a ser celebrada pela Sociedade, na qualidade de emissora, pela **EMB ENGENHARIA S.A.**, sociedade por ações sem registro de companhia aberta perante a CVM, com sede na cidade de Belo Horizonte, estado de Minas Gerais, na Avenida Barão Homem de Melo, nº 4.494, sala, 1.112, bairro de Estoril, CEP 30.494-270, inscrita no CNPJ sob o nº 09.252.516/0001-06 ("EMB Engenharia") e por **ALEXANDRE AUGUSTO LEITE TOLEDO**, brasileiro, empresário, casado em comunhão parcial de bens com **GISELE FERREIRA ALVIM TOLEDO**, inscrito no Cadastro Nacional da Pessoa Física do Ministério da Fazenda ("CPF") sob o nº 520.006.996-34, portador da carteira de identidade nº 23.282.34 SSP/MG, residente e domiciliado na cidade de Belo Horizonte, no estado de Minas Gerais, na Rua Maestro Arthur Bosmans, nº 40, apt. 1.100, bairro de Belvedere, CEP 30.320-680 ("Alexandre Toledo", em conjunto com EMB Engenharia, simplesmente "Fiadores"), na qualidade de fiadores e pela Securitizadora, na qualidade de debenturista ("Emissão", "Escritura de Emissão de Debêntures" e "Debêntures", respectivamente), sendo certo que a Securitizadora terá direito à totalidade dos créditos devidos pela Sociedade no âmbito da emissão das Debêntures ("Créditos Imobiliários"). As Debêntures contarão com as seguintes características: **(i) Valor Total da Emissão:** R$ 40.000.000,00 (quarenta milhões de reais); **(ii) Número da Emissão:** a Emissão constitui a 5ª (quinta) emissão de Debêntures da Sociedade; **(iii) Séries:** a Emissão será realizada em uma única série; **(iv) Procedimento de Colocação:** as Debêntures serão objeto de colocação privada e sem a intermediação de instituições financeiras integrantes do sistema de distribuição, de forma que não estão sujeitas ao artigo 19 da Lei nº 6.385, de 07 de dezembro de 1976 e da Resolução CVM nº 160; **(v) Quantidade e Valor Nominal Unitário:** serão emitidas 40.000 (quarenta mil) Debêntures, com valor nominal unitário de R$ 1.000,00 (um mil reais), na Data de Emissão; **(vi) Data de Emissão:** Para todos os efeitos legais, a data de emissão das Debêntures será aquela indicada na Escritura de Emissão de Debêntures ("Data de Emissão"); **(vii) Prazo e Data de Vencimento:** Observado o disposto na Escritura de Emissão de Debêntures, as Debêntures terão prazo indicadto na Escritura de Emissão de Debêntures, vencendo-se, portanto, em 22 de maio de 2031 ("Data de Vencimento"), ressalvadas as hipóteses de Amortização Antecipada Facultativa, Resgate Antecipado Facultativo das Debêntures, Vencimento Antecipado Automático e Vencimento Antecipado Não Automático (conforme definidos abaixo); **(viii) Espécie:** as Debêntures serão da espécie com garantia real, com garantia adicional fidejussória, nos termos abaixo; **(ix) Forma e Conversibilidade:** as Debêntures serão emitidas sob a forma nominativa, sem a emissão de certificados, e não serão conversíveis em ações; **(x) Preço e Forma de Subscrição e Integralização:** as Debêntures serão subscritas e integralizadas em tranches, desde que verificado o atendimento das respectivas Condições Precedentes (conforme disposto na Cláusula 4.14 da Escritura de Emissão de Debêntures) (i) pelo seu Valor Nominal Unitário, na Data da Primeira Integralização dos CRI; ou (ii) em caso de integralizações das Debêntures em Datas de Integralizações posteriores, pelo seu Valor Nominal Unitário, acrescido de Remuneração, calculada pro rata temporis, desde a Data da Primeira Integralização, até a data de sua efetiva integralização, observado que o valor de integralização das Debêntures corresponderá ao exato valor de integralização dos CRI. **(xi) Garantias Reais:** em garantia do fiel, integral e pontual cumprimento de todas as obrigações principais ou acessórias, presentes ou futuras, assumidas ou que venham a ser assumidas pela Sociedade e pelos Fiadores relativas às Debêntures e demais obrigações nos termos dos Documentos da Operação, o que inclui o pagamento do Valor Total da Emissão, observada a possibilidade de colocação parcial das Debêntures, assim como os Juros Remuneratórios, os eventuais Encargos Moratórios, penalidades moratórias, seguros, prêmios, despesas, custas e emolumentos devidos pela cobrança da dívida, despesas com a excussão de garantias, honorários advocatícios, e qualquer obrigação pecuniária incorrida para a plena satisfação e recebimento, pela Securitizadora, dos valores a ela devidos nas condições constantes na Escritura de Emissão de Debêntures e dos demais Documentos da Operação ("Obrigações Garantidas"), serão constituídas além do Fundo de Reserva e do Fundo de Despesas, em favor da Securitizadora: a. Alienação Fiduciária de Quotas. Em garantia das Obrigações Garantidas, será constituída, diretamente em favor da Securitizadora, a alienação fiduciária da totalidade das quotas de emissão das SPEs AFQ (conforme abaixo definido), nos termos do "Instrumento Particular de Alienação Fiduciária de Quotas em Garantia e Outras Avenças" celebrado entre a Sociedade e a **VIC PARTICIPAÇÕES LTDA.**, sociedade limitada, com sede na cidade de Belo Horizonte, no estado de Minas Gerais, na Avenida Álvares Cabral, n° 1.777, Sala 1.702, bairro de Santo Agostinho, CEP 30.170-008, inscrita no CNPJ sob o nº 60.427.045/0001-79, com seus atos constitutivos arquivados na JUCEMG sob o NIRE 31216408049 ("VIC Participações"), na qualidade de fiduciantes, e a Securitizadora, na qualidade de fiduciária, com a interveniência e a anuência das SPEs AFQ (conforme abaixo definido) ("Contrato de Alienação Fiduciária de Quotas" e "Alienação Fiduciária de Quotas", respectivamente). b. Alienação Fiduciária de Imóvel: Em garantia das Obrigações Garantidas, a **RESERVA VIC COSTA AZUL EMPREENDIMENTOS IMOBILIÁRIOS LTDA.**, sociedade limitada, com sede na cidade de Belo Horizonte, estado de Minas Gerais, na Avenida Álvares Cabral, nº 1.777, sala 1.710, bairro Santo Agostinho, CEP 30.170-008, inscrita no CNPJ sob o nº 44.220.378/0001-76, com seus atos constitutivos arquivados na JUCEMG sob o NIRE 31212662029 ("SPE Costa Azul") constituirá a alienação fiduciária do imóvel objeto da matrícula nº 48.810 do RGI de Porto Seguro/BA ("Imóvel Alienado Fiduciariamente"), nos termos do "Instrumento Particular de Alienação Fiduciária de Imóvel em Garantia e Outras Avenças", a ser celebrado, substancialmente, nos termos do Anexo VII à Escritura de Emissão de Debêntures, entre a SPE Costa Azul e a Securitizadora, com a interveniência e a anuência da Sociedade ("Contrato de Alienação Fiduciária de Imóvel" e "Alienação Fiduciária de Imóvel", respectivamente). c. Cessão Fiduciária. Em garantia das Obrigações Garantidas, as SPEs CF (conforme abaixo definido) constituirão a cessão fiduciária e a promessa de cessão fiduciária dos direitos creditórios de sua titularidade, decorrentes da comercialização das unidades integrantes dos Empreendimentos Garantia (conforme abaixo definido) nos termos dos respectivos compromissos de compra e venda ("Contratos Imobiliários"), bem como os direitos creditórios de sua titularidade decorrentes da formalização de instrumentos de confissão de dívida tendo por objeto saldo em aberto devido pelos adquirentes de unidades dos Empreendimentos Garantia (conforme abaixo definido) mesmo após as SPEs (conforme abaixo definido) concederem a quitação dos respectivos compromissos de compra e venda por ocasião de obtenção de financiamento pelos adquirentes junto a instituições financeiras ("Termos de Confissão de Dívida" e "Créditos Cedidos Fiduciariamente", respectivamente), a ser constituída nos termos do "Instrumento Particular de Contrato de Cessão Fiduciária e de Promessa de Cessão Fiduciária de Direitos Creditórios em Garantia e Outras Avenças", a ser celebrado entre as SPEs CF (conforme abaixo definido) e a Securitizadora, com a interveniência e a anuência da Sociedade ("Contrato de Cessão Fiduciária" e "Cessão Fiduciária", respectivamente). d. Para fins desta ata, serão consideradas as seguintes definições: (i) "SPEs": entender-se-á, quando em conjunto, as seguintes sociedades de propósito específico, todas outorgantes de garantias no âmbito da Emissão: (a) SPE Costa Azul; (b) **GRAN VIC JUNDIAÍ CONDOMÍNIO ZURIQUE EMPREENDIMENTOS IMOBILIÁRIOS SPE LTDA.**, sociedade limitada, com sede na cidade de Belo Horizonte, estado de Minas Gerais, na Avenida Álvares Cabral, nº 1.777, Sala 1.706, bairro Santo Agostinho, CEP 30.170-008, inscrita no CNPJ sob o nº 41.365.304/0001-30, com seus atos constitutivos arquivados na JUCEMG sob o NIRE 31212183431 ("SPE Zurique"); (c) **GRAN VIC JUNDIAÍ CONDOMÍNIO COPENHAGEN EMPREENDIMENTOS IMOBILIÁRIOS SPE LTDA.**, sociedade limitada, com sede na cidade de Belo Horizonte, estado de Minas Gerais, na Avenida Álvares Cabral, nº 1.777, Sala 1.706, bairro Santo Agostinho, CEP 30.170-008, inscrita no CNPJ sob o nº 41.365.268/0001-04, com seus atos constitutivos arquivados na JUCEMG sob o NIRE 31212183392 ("SPE Copenhagen"); (d) **GRAN VIC JUNDIAÍ CONDOMÍNIO FRIBURGO EMPREENDIMENTOS IMOBILIÁRIOS SPE LTDA.**, sociedade limitada, com sede na cidade de Belo Horizonte, estado de Minas Gerais, na Avenida Álvares Cabral, nº 1.777, Sala 1.706, bairro Santo Agostinho, CEP 30.170-008, inscrita no CNPJ sob o nº 41.365.711/0001-47, com seus atos constitutivos arquivados na JUCEMG sob o NIRE 31212183597 ("SPE Friburgo"); (e) **GRAN VIC CRISTAL EMPREENDIMENTOS IMOBILIÁRIOS SPE LTDA.**, sociedade limitada, com sede na cidade de Belo Horizonte, estado de Minas Gerais, na Avenida Álvares Cabral, nº 1.777, Sala 1.710, bairro Santo Agostinho, CEP 30.170-008, inscrita no CNPJ sob o nº 54.484.000/0001-33, com seus atos constitutivos arquivados na JUCEMG sob o NIRE 31215010421 ("SPE Cristal"); e (f) **GRAN VIC SAFIRA EMPREENDIMENTOS IMOBILIÁRIOS SPE LTDA.,** sociedade limitada, com sede na cidade de Belo Horizonte, no estado de Minas Gerais, na Avenida Álvares Cabral, n° 1.777, Sala 1.710, bairro de Santo Agostinho, CEP 30.170-008, inscrita no CNPJ sob o nº 54.593.160/0001-10, com seus atos constitutivos arquivados na JUCEMG sob o NIRE 31215033430 ("SPE Safira"); (ii) "SPEs AFQ" ou "SPEs CF": entender-se-á as SPEs, exceto pela SPE Costa Azul; (iii) "Empreendimentos": entender-se-á, quando em conjunto, os empreendimentos imobiliários de titularidade das SPEs (exceto pela SPE Costa Azul), descritos no Contrato de Cessão Fiduciária; (iv) "Garantidores PJ", entender-se-á, quando em conjunto, as SPEs, a VIC Participações e o Fiador PJ; e (v) "Garantidores", entender-se-á, quando em conjunto, os Garantidores PJ e Alexandre Toledo. **(xii) Garantia Fidejussória:** em garantia das Obrigações Garantidas, os Fiadores, de forma irrevogável e irretratável, na qualidade de fiadores e principais pagadores, prestam fiança em favor da Securitizadora, responsabilizando-se, solidariamente com a Sociedade, pelo fiel e exato cumprimento de todas as Obrigações Garantidas; **(xiii) Atualização Monetária:** O Valor Nominal Unitário das Debêntures ou o saldo do Valor Nominal Unitário das Debêntures, conforme o caso, não será atualizado monetariamente. **(xiv) Juros Remuneratórios:** Sobre o Valor Nominal Unitário das Debêntures, ou o seu saldo, incidirão juros remuneratórios correspondentes a 100% (cem por cento) da variação acumulada das taxas médias diárias dos DI - Depósitos Interfinanceiros de um dia, "over extra-grupo", expressas na forma percentual ao ano, base 252 (duzentos e cinquenta e dois) Dias Úteis, calculadas e divulgadas diariamente pela B3, no informativo diário disponível em sua página na Internet (http://www.b3.com.br) ("Taxa DI"), acrescida de sobretaxa de 3,7500% (três inteiros e sete mil e quinhentos décimos de milésimo por cento) ao ano, base 252 (duzentos e cinquenta e dois) Dias Úteis ("Sobretaxa", e, em conjunto com a Taxa DI, "Remuneração" ou "Juros Remuneratórios"), calculados de forma exponencial e cumulativa pro rata temporis por Dias Úteis decorridos, desde a primeira Data de Integralização dos CRI ou da última Data de Pagamento dos Juros Remuneratórios, conforme o caso, até a data do efetivo pagamento. **(xv) Amortização Programada:** sem prejuízo dos pagamentos em decorrência das Hipóteses de Vencimento Antecipado (conforme abaixo definido), de Amortização Antecipada Compulsória (conforme abaixo definido), de Amortização Antecipada Facultativa, de Resgate Antecipado Compulsório (conforme abaixo definido) e/ou de Resgate Antecipado Facultativo (conforme abaixo definido), nos termos da Escritura de Emissão de Debêntures, o Valor Nominal Unitário será amortizado mensalmente, conforme previsto no Anexo I da Escritura de Emissão de Debêntures, observado o período de carência, a ser calculada nos termos da fórmula prevista na Escritura de Emissão de Debêntures, cujo resultado será apurado pela Securitizadora; **(xvi) Data de Pagamento dos Juros Remuneratórios:** Sem prejuízo dos pagamentos em decorrência das Hipóteses de Vencimento Antecipado (conforme abaixo definido), de Amortização Antecipada Compulsória (conforme abaixo definido), de Amortização Antecipada Facultativa (conforme abaixo definido), de Resgate Antecipado Compulsório (conforme abaixo definido) e/ou de Resgate Antecipado Facultativo (conforme abaixo definido), nos termos da Escritura de Emissão de Debêntures, a Remuneração será paga mensalmente, conforme cronograma de pagamentos previsto no Anexo I à Escritura de Emissão de Debêntures; **(xvii) Amortização Antecipada Facultativa e Resgate Antecipado Facultativo das Debêntures:** A partir da data da Primeira Integralização (inclusive), a Sociedade poderá, a seu exclusivo critério, realizar a amortização antecipada das Debêntures, limitada a 98% (noventa e oito por cento) de seu respectivo Valor Nominal Unitário, ou de seu saldo ("Amortização Antecipada Facultativa"), ou ainda, o resgate antecipado facultativo total das Debêntures ("Resgate Antecipado Facultativo Total"), mediante o pagamento (a) parcial ou integral, conforme aplicável, do Valor Nominal Unitário, ou do seu saldo, acrescido (b) da Remuneração, calculada pro rata temporis desde a primeira Data de Integralização ou a data de pagamento de Remuneração imediatamente anterior, conforme o caso, até a data do efetivo pagamento, (c) dos Encargos Moratórios (conforme abaixo definido), caso aplicável, e (d) de prêmio incidente sobre o valor a ser objeto de Amortização Antecipada Facultativa ou sobre o saldo do Valor Nominal Unitário, no caso de Resgate Antecipado Facultativo Total ("Prêmio"), conforme a tabela abaixo: **Período (contado da Data de Emissão). Prêmio;** A partir da primeira data de integralização, até o 12º (décimo segundo) mês, ou seja, maio de 2027 (inclusive), 2,50% (dois inteiros e cinquenta centésimos por cento); A partir do 12º (décimo segundo) mês, ou seja, maio de 2027 (exclusive), até o 24º (vigésimo quarto) mês, ou seja, maio de 2028 (inclusive); 2,00% (dois por cento); A partir do 24º (vigésimo quarto) mês, ou seja, maio de 2028 (exclusive), até o 36º (trigésimo sexto) mês, ou seja, maio de 2029 (inclusive), 1,50% (um inteiro e cinquenta centésimos por cento) A partir do 36º (trigésimo sexto) mês, ou seja, maio de 2029 (exclusive), até a Data de Vencimento; 1,00% (um por cento). **(xviii) Amortização Antecipada Compulsória e Resgate Total Compulsório:** A partir da presente data e até a integral liquidação dos CRI, as Debêntures deverão ser amortizadas extraordinariamente, de forma compulsória, limitada a 98% (noventa e oito por cento) do Valor Nominal Unitário, ou resgatadas antecipadamente, de forma total e compulsória, conforme o caso, com a consequente amortização antecipada dos CRI ou resgate antecipado dos CRI, respectivamente, mensalmente, nas seguintes hipóteses ("Amortização Antecipada Compulsória" ou "Resgate Antecipado Compulsório", respectivamente): (i) se, em determinada Data de Verificação, for verificado, pela Securitizadora, o descumprimento da Razão Mínima de Garantia. Neste caso, caso haja recursos remanescentes na Conta Centralizadora e/ou nas Contas Arrecadadoras após o cumprimento da Ordem de Pagamentos ("Excedente"), a Securitizadora deverá direcionar o Excedente à Amortização Antecipada Compulsória das Debêntures e/ou ao Resgate Antecipado Compulsório das Debêntures em montante suficiente ao restabelecimento da Razão Mínima de Garantia descumprida, observado que, caso o Excedente do mês em questão seja insuficiente para tanto, a Sociedade deverá, mediante notificação da Securitizadora, aportar recursos em montante suficiente para concluir o restabelecimento da Razão Mínima de Garantia; e/ou (ii) na hipótese de indisponibilidade da Taxa DI descrita na Cláusula 4.16.2 da Escritura de Emissão de Debêntures, caso não haja acordo sobre o novo índice ou em caso de ausência de quórum de instalação e/ou deliberação na Assembleia Especial de Investidores dos CRI convocada com esse fim, a Sociedade deverá realizar o Resgate Antecipado Compulsório das Debêntures, com o consequente resgate antecipado total dos CRI, no prazo de 30 (trinta) dias após a data em que se verificar a impossibilidade de um acordo ou na data em que a referida assembleia deveria ter ocorrido, ou na Data de Vencimento das Debêntures. **(xix) Encargos Moratórios:** Ocorrendo atraso no pagamento de qualquer quantia devida à Securitizadora, incluindo, sem limitação, o pagamento dos Juros Remuneratórios e/ou do resgate e/ou do vencimento antecipado das Debêntures e/ou pagamento do Valor Nominal Unitário, de forma imediata e independentemente de qualquer notificação, pelo período que decorrer da data da efetiva da mora até a efetiva liquidação da dívida, calculados, cumulativamente, da seguinte forma, sem prejuízo da Remuneração: (i) juros moratórios de 1% (um por cento) ao mês, ou fração, calculados pro rata temporis, desde a data de inadimplemento até a data do efetivo pagamento, incidente sobre o valor em atraso; e (ii) multa de 2% (dois por cento) sobre o saldo total vencido e não pago; e **(xx) Destinação de Recursos:** os recursos líquidos captados pela Sociedade através da emissão das Debêntures ou seja, excluídos aqueles referentes às Despesas, ao Valor Inicial do Fundo de Reserva, serão integralmente e exclusivamente destinados, pela Sociedade e/ou por sociedades de propósito específico controladas pela Sociedade, indicadas na Tabela 1 do Anexo II à Escritura de Emissão de Debêntures ("SPEs Destinação") para o custeio de despesas de natureza imobiliária futuras vinculadas e atinentes direta e indiretamente à construção, desenvolvimento, reforma e/ou manutenção dos empreendimentos imobiliários de que são proprietárias, conforme descritos na Tabela 1 do Anexo II à Escritura de Emissão de Debêntures ("Empreendimentos Alvo"), conforme cronograma indicativo, previsto na Tabela 2 do Anexo II à Escritura de Emissão de Debêntures ("Cronograma Indicativo" e "Destinação Futura", respectivamente); **(xxi) Vencimento Antecipado Automático:** independentemente de aviso, interpelação, notificação extrajudicial ou de Assembleia Especial de Investidores dos CRI, todas as obrigações constantes da Escritura de Emissão de Debêntures serão declaradas antecipadamente vencidas, observado os respectivos prazos de cura, caso seja verificada a ocorrência de alguma das hipóteses listadas na Cláusula 6.1 da Escritura de Emissão de Debêntures; **(xxii) Vencimento Antecipado Não Automático:** sem prejuízo do disposto na Cláusula 6.1 da Escritura de Emissão de Debêntures, a Securitizadora deverá convocar, os respectivos prazos de cura, Assembleia Especial de Investidores dos CRI, visando a deliberar sobre a declaração de vencimento antecipado das Debêntures, nas hipóteses listadas na Cláusula 6.2 da Escritura de Emissão de Debêntures; e **(xxiii) Demais Condições:** as demais características da Emissão serão aquelas especificadas na Escritura de Emissão das Debêntures. (b) a autorização para constituição da Alienação Fiduciária de Quotas; (c) a autorização aos administradores da Sociedade ou quaisquer dos seus legítimos representantes/procuradores para praticarem todos e quaisquer atos relativos à Operação de Securitização ou qualquer outro documento envolvendo a Operação de Securitização, Oferta e/ou os CRI, incluindo (1) a negociação e assinatura de todos e quaisquer documentos necessários à implementação e formalização das deliberações acima referidas, bem como para prestar e/ou outorgar à Securitizadora, as declarações, procurações e notificações previstas nos referidos documentos e eventuais aditamentos; e (2) a contratação de prestadores de serviços no âmbito da Operação de Securitização, incluindo, mas não se limitando, ao agente de medição, agente fiduciário, escriturador, instituição custodiante, banco liquidante, auditores independentes e assessores legais; e (d) a ratificação de todos e quaisquer atos já praticados pelos administradores da Sociedade ou quaisquer dos seus legítimos representantes/procuradores para a realização da Emissão e Oferta. **5. DELIBERAÇÕES:** Examinadas e debatidas as matérias constantes da ordem do dia, os Acionistas da Sociedade decidiram, unanimemente e sem quaisquer restrições, aprovar a totalidade dos itens previstos na Ordem do Dia acima. **6. ENCERRAMENTO, LAVRATURA, APROVAÇÃO E ASSINATURA DA ATA:** O Sr. Presidente concedeu a palavra a quem dela quisesse fazer uso e, como ninguém se manifestou, deu por encerrada a sessão, solicitando a mim, Secretário, que lavrasse a presente Ata, a qual, após lida, conferida e aprovada, foi assinada pelo Presidente e pelo Secretário. Belo Horizonte/MG, 29 de maio de 2026. **Alexandre Augusto Leite Toledo** Presidente da Mesa **Randy Luiz Lanza Chaves Junior** Secretário. **ANEXO I À ATA DE ASSEMBLEIA GERAL EXTRAORDINÁRIA DA VIC ENGENHARIA S.A. REALIZADA EM 29 DE MAIO DE 2026 Acionistas Assinatura(s) ACE ASSESSORIA E CONSULTORIA ESPECIALIZADA LTDA.** Alexandre Augusto Leite Toledo **EMB ENGENHARIA S.A.** Samuel Rodrigues Costa, Randy Luiz Lanza Chaves Junior.

---

**KONA PARTNERSHIP S.A.**

CNPJ 58.526.038/0001-82

**Ata de Assembleia Geral Extraordinária**

**1. Data, Hora e Local:** Assembleia realizada no dia 30 de abril de 2026, às 11:30 horas, na sede da Companhia, localizada na Rua Desembargador Jorge Fontana, nº 498, sala 801, bairro Belvedere, Belo Horizonte/MG, CEP 30.320-670. **2. Mesa:** Henrique Ayres Jameli (Presidente da Mesa, e-mail henrique.jameli@3ariva.com.br) e Thiago Nogueira Penna (Secretário da Mesa, e-mail thiago@3ainvestimentos.com.br). **3. Presença:** Presente a totalidade dos acionistas da Companhia, sendo dispensada, portanto, a publicação de edital de convocação (Lei 6.404/76, art. 124, §4º). **4. Ordem do Dia:** (i) a redução do capital social da Companhia por excessividade; (ii) a forma de restituição aos acionistas do valor correspondente ao capital reduzido; (iii) a consequente alteração do Artigo 5º do Estatuto Social da Companhia; (iv) autorização aos administradores para praticar todos os atos necessários à consecução das deliberações; e (v) a ratificação dos atos já praticados pela administração. **5. Deliberações:** Após análise dos temas constantes da Ordem do Dia, a única acionista deliberou o quanto segue: **5.1. Redução do Capital Social da Companhia por Excessividade.** Aprovar a redução do capital social da Companhia no valor de R$ 3.634.878,60 (três milhões, seiscentos e trinta e quatro mil, oitocentos e setenta e oito reais e sessenta centavos), por julgá-lo excessivo em relação às necessidades operacionais e de investimento da Companhia, nos termos do art. 173 da Lei nº 6.404/76, passando o capital social da Companhia de R$ 8.497.424,09 (oito milhões, quatrocentos e noventa e sete mil, quatrocentos e vinte e quatro reais e nove centavos), totalmente subscrito e integralizado, para R$ 4.862.545,49 (quatro milhões, oitocentos e sessenta e dois mil, quinhentos e quarenta e cinco reais e quarenta e nove centavos), totalmente subscrito e integralizado, mediante a redução do valor atribuído a cada uma das 790.191 (setecentas e noventa mil, cento e noventa e uma) ações ordinárias do capital social da Companhia em R$ 4,60 (quatro reais e sessenta centavos) por ação, permanecendo inalterada a quantidade total de ações e a participação proporcional de cada acionista. **5.2.** Aprovar que a restituição do valor correspondente à redução de capital seja realizada em dinheiro, proporcionalmente à participação de cada acionista no capital social da Companhia. **5.3.** Aprovar que em razão do disposto no art. 174 da Lei nº 6.404/76, a Redução de Capital se tornará eficaz após o decurso do prazo de 60 (sessenta) dias contados da publicação desta ata na forma da lei, sem que eventuais credores quirografários por títulos anteriores à data da publicação desta ata na forma da lei, sem que eventuais credores tenham se oposto, o que deverá ser verificado pela administração da Companhia entre a presente data e a data de eficácia da Redução de Capital, não alterando os valores adotados nesta deliberação. **5.4.** Aprovar a alteração do Artigo 5º do Estatuto Social da Companhia, que passa a vigorar com a seguinte redação: *"Artigo 5º – O Capital social da sociedade é de R$ 4.862.545,49 (quatro milhões, oitocentos e sessenta e dois mil, quinhentos e quarenta e cinco reais e quarenta e nove centavos), dividido em 790.191 (setecentas e noventa mil, cento e noventa e uma) ações ordinárias, nominativas, indivisíveis e sem valor nominal."* **5.5. Autorização aos Administradores.** Autorizar os administradores da Companhia a praticar todos os atos necessários à implementação das deliberações ora tomadas, incluindo, mas não se limitando a, assinar documentos, registrar a presente ata perante a Junta Comercial do Estado de Minas Gerais - JUCEMG, promover as publicações legais cabíveis e efetuar o pagamento aos acionistas após o decurso do prazo legal. **5.6. Ratificação.** Ratificar todos os atos praticados pela administração da Companhia em consonância com as deliberações ora tomadas. **6. Encerramento e Lavratura da Ata.** Nada mais havendo a ser tratado, deu o Sr. Presidente por encerrada a Assembleia Geral. Os signatários declaram que a presente Ata é aprovada em todos os seus termos, sendo assinada digitalmente, nos termos do parágrafo 2º, do artigo 10, da Medida Provisória nº 2.200-2/2001, pelos membros da mesa e pelos Acionistas. *Certifico que a Ata é cópia fiel lavrada em livro próprio.* Belo Horizonte, 30 de abril de 2026. **Membros da Mesa: Henrique Ayres Jameli** - *Presidente da Mesa;* **Thiago Nogueira Penna** - *Secretário da Mesa.* **Acionistas: Guilherme Boechat Muniz Lara, Lucas Freitas Da Cruz, Pedro Henrique Costa Cunha, Julia Guimarães Paes, Heitor Teixeira de Macedo Ferreira, Lucas Guilherme Gomes Costa, Lucas Urgel Aliani Silva, Gustavo Silva Campos Moreira, Igor Carvalho Rodrigues de Sousa, Leonardo de Almeida Fonseca, Viviane Ferreira Abreu, Adaias Batista Da Silva Junior, Márcio Peixoto De Almeida Junior, Marcelo Fonseca Gonçalves, Italo Magno Simões Delgado Santos, Gabriel Santana Branco, Ana Catharina Lopes Daldegan Cardoso, Gustavo Rodrigues de Oliveira, Luis Felipe Dos Santos Diniz, Acácio Ferreira da Silva, Igor Ferreira Magalhães, Rui Lybaert Fontoura, Tairine Mariane De Almeida Bolina, Franco Henrique Cassini Labbate, Pedro Ernesto Ribeiro De Azambuja, Rodrigo Gontijo Donnard, Breno Figueiredo Campos, Paulo Victor Ferreira Ribeiro, Kevin Wender Mendes Vilela, Claudia Gisele Nogueira, Samuel Coelho Leite, Bernardo Pereira Ottoni, Henrique Galvão Telles, Gustavo Jordan, Ana Paula Balsamão Vaz, Augusto César Carsalade Vieira, Glaucia Passos Marcandier Bambirra, Fernando Luiz Damasceno, Rafael Rezende Nascimento Fernandes, Leonardo Brum Cardoso, Lucas Prado Marques, Carlos Henrique Chaves Pessoa, Gabriel Fernandes de Andrade Ayres, Flávio Pacelli Ziviani de Oliveira, Thiago Nogueira Penna, Marconi Elmais Dutra, Marco Túlio Jota de Oliveira, Eduardo Maurício de Oliveira, Henrique Ayres Jameli, Douglas Gontijo de Sousa, Thais Andrade Aparecido, Fabiana Fracalossi Serafim, Gabriel Cançado Peixoto Albino, Izabela Ribas Matoso, Fernando Soares Guimarães, Patricia De Almeida Fonseca Guerra, Alberto Maia Valério, Rafaella Duarte Miranda, Tide Ferrão de Barros Soares, Paulo Caus Mesquita, Fernanda Cançado Della Monica, Liliane Castro Lacerda, Samuel Sampaio Chagas, André Rodrigues Lage, Matheus Vinícius Souza Mattos, Kleber de Aragão Rebouças, Bárbara Costa Silva Matos, Lennon Galantini Menegati Nascimento, Mateus Ribeiro Galhardo, Jaqueline Cardoso Santana Roder, Flávio Lúcio Moreira Bicalho Filho, Bruno Rodrigues Lara Leite, Daniela Vasconcellos de Oliveira, Juan Vicente Miranda Bellucci, Caio Colares de Souza Lima, Victor Arcuri Lemos, Debora Luiza Exposito Gonçalves, Júlia de Carvalho Ferri, Renato Gomide De Sousa, Gabriel Victor de Oliveira. Visto do Advogado: Nome:** Ana Catharina Lopes Daldegan Cardoso - **OAB/MG:** 233.444.

---

**SOCIEDADE INDEPENDÊNCIA IMÓVEIS S.A.**

CNPJ/MF nº 05.217.061/0001-29 - NIRE 31.3.0002215-3

**EDITAL DE CONVOCAÇÃO DE ASSEMBLEIA GERAL ORDINÁRIA E EXTRAORDINÁRIA**

Ficam convocados os Srs. acionistas da **Sociedade Independência Imóveis S.A.** ("Companhia") a se reunirem em Assembleia Geral Ordinária ("AGOE"), a ser realizada no dia 25 de junho de 2026, às 14:00 horas em primeira convocação e às 14:30 horas em segunda convocação, no edifício da sede da Companhia, localizada na Avenida Presidente Itamar Franco, nº 3600, Bairro São Mateus, Juiz de Fora, Minas Gerais, CEP: 36.025-290, para deliberar ordinariamente acerca das seguintes matérias: (i) Tomar as contas dos administradores, examinar, discutir e votar as Demonstrações Financeiras da Companhia relativas aos exercícios sociais encerrados em 31/12/2025 e a distribuição de dividendos. (ii) Reeleição dos membros da Diretoria da Companhia; extraordinariamente acerca do seguinte tema: (iii) Exclusão do CNAE 68.21-8-02 - Corretagem no aluguel de imóveis; (iv) Alteração de endereço dentro do mesmo município. **Presidente:** Sra. **Daniella de Souza Guanabara Santos**, brasileira, solteira, economista, portadora da carteira de identidade nº XX844007-X, expedida pelo Detran/RJ, inscrita no CPF/ME sob o nº XXX.618.677-XX. **Secretário:** Sr. **José Vicente Coelho Duprat Avellar**, brasileiro, casado, administrador de empresas, titular do documento de identidade nº XX.828.410-X, expedido pelo IFP/RJ, e inscrito no CPF/MF sob o nº XXX.301.687-XX. Para que sejam admitidos à AGOE, os acionistas deverão apresentar documentos que comprovem sua identidade e, no caso de acionista pessoa jurídica, sua representação legal. Observadas as restrições legais, os acionistas poderão ser representados na AGOE por mandatário, devendo, neste caso, ser apresentados ainda o instrumento de mandato e o comprovante de identidade do mandatário. Juiz de Fora/MG, 01 de junho de 2026.

**Daniella de Souza Guanabara Santos** - Diretora

---

EDITAL. 1ª VARA EMPRESARIAL. COMARCA DE BELO HORIZONTE/MG. AUTOS 1087093-64.2026.8.13.0024. EDITAL PARA CONHECIMENTO DOS INTERESSADOS E CREDORES. PLANOS DE RECUPERAÇÃO EXTRAJUDICIAL de **ANDRADE GUTIERREZ ENGENHARIA S.A.** (cnpj 17.262.213/0001-94); **ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A.** (cnpj 39.469.291/0001-05); **ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S/A** (CNPJ – 17.027.611/0001-26); **ANDRADE GUTIERREZ INTERNATIONAL S.A.** (inscrita no Registro de Comércio de Luxemburgo sob o nº B 176492); ZAGOPE SGPS S.A. (constituída e organizada segundo as leis da República Portuguesa, registrada sob o NIF n.º 507403177) e INZAG GERMANY GMBH (constituída e organizada segundo as leis da República Federativa da Alemanha, com sede em Taunusstraße 5, 65183, Wiesbaden, Alemanha). A Drª Claudia Helena Batista, MMª Juíza de Direito, da 1ª Vara Empresarial, em exercício de seu cargo, na forma da lei, etc. AVISA aos credores que foram recebidos Planos de Recuperação Extrajudicial das empresas em epígrafe, juntados aos autos no evento 1 (documentos nomeados OUTDOC4 e OUTDOC5), o seu inteiro teor. Ficam os credores advertidos de que têm o prazo de 30 (trinta) dias, a partir da publicação do presente edital para apresentação de eventuais impugnações ao plano, juntando a prova de seu crédito na forma do artigo 164 § 2º e § 3º, da lei 11.101/2005. E, para que chegue ao conhecimento de todos, é expedido o presente. Belo Horizonte/MG, 01/06/2026. (as.) Brigida Nascimento Souza de Oliveira - Escrivã Judicial. (as.) Drª Cláudia Helena Batista - Juíza de Direito.*

---

**DOMINGOS COSTA INDÚSTRIAS ALIMENTICIAS S/A**

CNPJ 17.159.518/0001-75

**EDITAL DE CONVOCAÇÃO**

Ficam os senhores acionistas da Domingos Costa Indústrias Alimentícias S/A convocados na forma dos arts. 123/124, da Lei Federal 6.404/76, para se reunirem em Assembleia Geral Ordinária e Extraordinária, a teor do parágrafo único do art. 131 da mesma Lei. As Assembleias serão realizadas às 9:30 horas do dia 24 de junho de 2026 em primeira convocação, e às 9:45 horas em segunda convocação, na sede da Empresa, a Praça Louis Ensch, 160, Cidade Industrial, Contagem, Minas Gerais, com a seguinte ordem do dia: I - Aprovação do relatório da Administração e das Demonstrações Financeiras do exercício de 2025; II - Deliberar sobre a destinação do lucro líquido do exercício e a distribuição de dividendos; III - Outros assuntos de interesse da Sociedade.

**AVISO AOS ACIONISTAS**

Acham-se à disposição dos senhores acionistas, na sede da sociedade, situada à Praça Louis Ensch, nº 160, Cidade Industrial, Contagem, Minas Gerais, os documentos a que se refere o artigo 133 da Lei 6.404/76, relativos ao exercício social findo em 31 de dezembro de 2025. Contagem, 01 de junho de 2026. PATRICIA MACEDO COSTA - Diretora Presidente.

---

**VIAÇÃO SERTANEJA S/A.**

**– Em Recuperação Judicial**

CNPJ nº 16.505.190/0001-39

NIRE 3120072173-4

**EDITAL DE CONVOCAÇÃO**

**ASSEMBLEIA GERAL EXTRAORDINÁRIA**

Ficam convocados os Senhores Sócios/Acionistas da Viação Sertaneja S/A para se reunirem em Assembleia Geral Extraordinária, a realizar-se no dia 13 de junho de 2026, na sede da empresa, situada à Rua Frei Orlando, nº 439, Centro, em Abaeté, às 14h00, em primeira convocação, com a presença mínima legal exigida, e às 14h30, em segunda convocação, com qualquer número de presentes, a fim de deliberarem sobre a seguinte ordem do dia: Alteração do Estatuto Social da empresa para exclusão da função/cargo de Diretor Jurídico da estrutura administrativa da companhia; Reorganização administrativa e adequações correlatas decorrentes da alteração estatutária; Assuntos gerais e outros temas de interesse da empresa. A participação dos sócios/acionistas é de fundamental importância para as deliberações a serem tomadas.

Abaeté, 29 de maio de 2026.

**Lídia Mendes Vargas de Vargas**

Presidente do Conselho de Administração.

---

**CIMCOP S/A - ENGENHARIA E CONSTRUÇÕES**

CNPJ/MF 17.161.464/0001-82 - NIRE 3130004265-1

**Assembleia Geral Extraordinária - Edital de Convocação**

Pelo presente ficam os senhores acionistas da **CIMCOP S/A – ENGENHARIA E CONSTRUÇÕES** convocados para a Assembléia Geral Extraordinária a ser realizada no dia 11 de Junho de 2026, às 09 h. (nove horas) em primeira convocação, ou às 09h30min (nove horas e trinta minutos) em segunda convocação, em sua sede social à Rua Walfrido Mendes, nº 400 – Bairro Califórnia, nesta Capital, a fim de deliberarem sobre os seguintes pautas: **PAUTA DA ASSEMBLÉIA EXTRAORDINÁRIA: a) Homologação do aumento do capital social mediante subscrição de novas ações aprovado na Assembleia Geral Extraordinária realizada em 14 de abril de 2026.**

Belo Horizonte, 01 de Junho de 2026.

Roberta Miraglia de Souza Martins - Presidente do Conselho de Administração

---

**GERDAU AÇOMINAS S.A.**

CNPJ nº 17.227.422/0001-05 - NIRE 31300036677

**Certidão**

Certificamos que a Ata das Assembleias Gerais Ordinária e Extraordinária realizadas em 29 de abril de 2026, às 15h, publicada no jornal Diário do Comércio - MG, no dia 05/05/2026, foi devidamente registrada na Junta Comercial do Estado de Minas Gerais - Certifico o registro sob o nº 13918772 em 01/06/2026. Protocolo 263315347 - 08/05/2026. Marinely de Paula Bomfim - Secretária-Geral.

---

ANUNCIE NO
Diário do Comércio
O ponto de encontro, análise e debate sobre a economia em Minas Gerais.
31 9 9959-2706 / 3469-2007
comercial@diariodocomercio.com.br
diariodocomercio.com.br
Diário do Comércio
diáriodocomercio

# Alimentos, energia e viagens elevam a inflação na Capital

**IPCA-BH Indicador registrou alta de 0,28% em maio, segundo a Fundação Ipead; no acumulado dos últimos 12 meses, o resultado foi de elevação de 3,66%**

ANDERSON GONÇALVES

A inflação em Belo Horizonte acelerou no mês de maio. De acordo com a Fundação Instituto de Pesquisas Econômicas, Administrativas e Contábeis de Minas Gerais (Ipead), o Índice de Preços ao Consumidor Amplo (IPCA-BH) da capital mineira subiu 0,28%. Alimentos, energia e viagens puxaram o resultado para cima.

O resultado representa aceleração em relação à quadrissemana anterior (0,15%) e estabilidade na comparação com abril (0,28%). No acumulado dos últimos 12 meses, o indicador cresceu 3,66%.

Um dos principais motivos para o incremento da inflação em Belo Horizonte no quinto mês de 2026 foi o custo dos alimentos. Os preços do grupo alimentação subiram 0,69%. Vegetais (frutas, legumes e verduras), com alta de 2,87%, e produtos industrializados, com elevação de 1,07%, puxaram os preços para cima, gerando impacto de 0,11 ponto percentual (p.p.) no índice geral.

Outras contribuições para a alta do IPCA-BH foram as viagens e as tarifas de energia, com altas de 4,66% e 2,55%, respectivamente. O impacto no índice inflacionário foi de 0,12 p.p. das viagens e 0,08 p.p. da energia. Já gasolina e etanol tiveram queda de 14,28% e 7,28%, respectivamente.

O gerente de pesquisas da Fundação Ipead, Eduardo Antunes, afirma que o resultado da inflação, com aceleração no período, não surpreende, pois há uma pressão natural dos alimentos sobre os preços nesta época do ano. "Dadas as características desse momento que vivemos, a inflação está em um patamar razoável, principalmente quando olhamos para os últimos 12 meses, que ainda está abaixo de 4%, em 3,66%", diz.

Ontem, a Fundação Ipead divulgou a pesquisa da cesta básica, que teve alta de 3,77% em maio de 2026 na Capital. O valor chegou a R$ 796,58, o que representou 49,14% do salário mínimo em Belo Horizonte. No mesmo período de 2025, essa proporção era de 49,78%, e a cesta estava R$ 40,90 mais barata do que atualmente. Ou seja, embora o valor nominal da cesta tenha aumentado, ela passou a representar uma parcela ligeiramente menor do salário mínimo.

> **"Dadas as características desse momento que vivemos, a inflação está em um patamar razoável, principalmente quando olhamos para os últimos 12 meses, que ainda está abaixo de 4%, em 3,66%"**
> Eduardo Antunes

**EDIÇÃO IMPRESSA PRODUZIDA PELO JORNAL DIÁRIO DO COMÉRCIO.**
**Circulação diária em bancas e assinantes. As versões digitais e as integras das Publicações Legais contidas nessa página, encontram-se disponíveis no site: diariodocomercio.com.br/publicidade-legal**
**Acesse também através do QR CODE ao lado.**

---

**SINDICATO DO COMÉRCIO DE BENS, SERVIÇOS E TURISMO DE CONTAGEM E IBIRITÉ – EDITAL DE CONVOCAÇÃO DA ASSEMBLEIA GERAL EXTRAORDINÁRIA** – O Presidente do SINDICATO DO COMÉRCIO DE BENS, SERVIÇOS E TURISMO DE CONTAGEM E IBIRITÉ, inscrito no CNPJ/MF sob o nº 01.985.938/0001-70, no uso das atribuições que lhe confere o Estatuto e a Legislação em vigor, convoca as empresas, micro empresas e seus similares, incluídos filiais, que atuam no segmento do comércio atacadista e/ou varejista de comércio atacadista e varejista no município de Contagem, excluídas apenas aquelas que operam predominantemente no segmento de comércio atacadista de gêneros alimentícios e no segmento do comércio varejista de material de construção, tintas, ferragens e maquinismos, com abrangência territorial em Contagem/MG, quites com as obrigações sindicais patronais e em condições de votar, para participarem da Assembleia Geral Extraordinária a se realizar no dia 18 de junho 2026 (quinta-feira), às 08h30min, em primeira convocação e não havendo quórum suficiente no horário acima designado, a Assembleia será realizada em segunda convocação, às 09h00min na Rua Treze de Junho, nº 74, Bairro Três Barras, Contagem MG, para deliberar sobre o seguinte assunto constante da ordem do dia: Discutir e submeter à aprovação da maioria as novas propostas para a Convenção Coletiva de Trabalho 2026/2027 com o Sindicato laboral, SINTRACC, atinente ao município de Contagem. Contagem, 03 de junho de 2026. Presidente Frank Sinatra dos Santos Chaves CPF 232.343.776-34.

---

**SOCIEDADE INDEPENDÊNCIA IMÓVEIS S.A.**
CNPJ/MF nº 05.217.061/0001-29 - NIRE 31.3.0002215-3
**EDITAL DE CONVOCAÇÃO DE ASSEMBLEIA GERAL ORDINÁRIA E EXTRAORDINÁRIA**
Ficam convocados os Srs. acionistas da **Sociedade Independência Imóveis S.A.** ("Companhia") a se reunirem em Assembleia Geral Ordinária ("AGOE"), a ser realizada no dia 25 de junho de 2026, às 14:00 horas em primeira convocação e às 14:30 horas em segunda convocação, no edifício da sede da Companhia, localizada na Avenida Presidente Itamar Franco, nº 3600, Bairro São Mateus, Juiz de Fora, Minas Gerais, CEP: 36.025-290, para deliberar ordinariamente acerca das seguintes matérias: (i) Tomar as contas dos administradores, examinar, discutir e votar as Demonstrações Financeiras da Companhia relativas aos exercícios sociais encerrados em 31/12/2025 e a distribuição de dividendos. (ii) Reeleição dos membros da Diretoria da Companhia; extraordinariamente acerca do seguinte tema: (iii) Exclusão do CNAE 68.21-8-02 - Corretagem no aluguel de imóveis; (iv) Alteração de endereço dentro do mesmo município. **Presidente:** Sra. **Daniella de Souza Guanabara Santos**, brasileira, solteira, economista, portadora da carteira de identidade nº XX844007-X, expedida pelo Detran/RJ, inscrita no CPF/ME sob o nº XXX.618.677-XX. **Secretário:** Sr. **José Vicente Coelho Duprat Avellar**, brasileiro, casado, administrador de empresas, titular do documento de identidade nº XX.828.410-X, expedido pelo IFP/RJ, e inscrito no CPF/MF sob o nº XXX.301.687-XX. Para que sejam admitidos à AGOE, os acionistas deverão apresentar documentos que comprovem sua identidade e, no caso de acionista pessoa jurídica, sua representação legal. Observadas as restrições legais, os acionistas poderão ser representados na AGOE por mandatário, devendo, neste caso, ser apresentados ainda o instrumento de mandato e o comprovante de identidade do mandatário. Juiz de Fora/MG, 01 de junho de 2026.
**Daniella de Souza Guanabara Santos - Diretora**

---

**GERDAU AÇOMINAS S.A.**
CNPJ nº 17.227.422/0001-05 - NIRE 31300036677
**Certidão**
Certificamos que a Ata das Assembleias Gerais Ordinária e Extraordinária realizadas em 29 de abril de 2026, às 15h, publicada no jornal Diário do Comércio - MG, no dia 05/05/2026, foi devidamente registrada na Junta Comercial do Estado de Minas Gerais - Certifico o registro sob o nº 13918772 em 01/06/2026. Protocolo 263315347 - 08/05/2026. Marinely de Paula Bomfim - Secretária-Geral.

---

**MELHORAMENTOS DOM BOSCO SOCIEDADE ANÔNIMA**
*CNPJ 16.906.935/0001-71 - NIRE 31300059723*
**EDITAL DE CONVOCAÇÃO PARA ASSEMBLEIA GERAL ORDINÁRIA.**
Ficam convocados os senhores acionistas a se reunirem em Assembleia Geral Ordinária, que se realizará em primeira convocação na sede da Companhia, situada no endereço: Praça Coronel Adolfo, Nº 68 – Centro, na cidade de Araxá - MG, no dia **12/06/2026** às **10:30 horas**, bem como por meio digital, nos termos do art. 124, §2º-A, da Lei nº 6.404/1976 e da Instrução Normativa DREI nº 81/2020, a fim de: (i) Deliberar sobre a prestação de contas, exame, discussão e votação das Demonstrações Financeiras referentes aos exercícios sociais findos em **31/12/2024 e 31/12/2025**; (ii) Outros assuntos de interesse social. **Aviso**: todos os documentos relativos à ordem do dia encontram-se à disposição dos acionistas na sede da Companhia.
Araxá (MG), 27 de março de 2026. Adhemar Rodrigues Valle Neto - Diretor.

---

**CIMCOP S/A - ENGENHARIA E CONSTRUÇÕES**
CNPJ/MF 17.161.464/0001-82 - NIRE 3130004265-1
**Assembleia Geral Extraordinária - Edital de Convocação**
Pelo presente ficam os senhores acionistas da **CIMCOP S/A – ENGENHARIA E CONSTRUÇÕES** convocados para a Assembleia Geral Extraordinária a ser realizada no dia 11 de Junho de 2026, às 09 h. (nove horas) em primeira convocação, ou às 09h30min (nove horas e trinta minutos) em segunda convocação, em sua sede social à Rua Walfrido Mendes, nº 400 – Bairro Califórnia, nesta Capital, a fim de deliberarem sobre as seguintes pautas: **PAUTA DA ASSEMBLÉIA EXTRAORDINÁRIA: a) Homologação do aumento do capital social mediante subscrição de novas ações aprovado na Assembleia Geral Extraordinária realizada em 14 de abril de 2026.**
Belo Horizonte, 01 de Junho de 2026.
Roberta Miraglia de Souza Martins - Presidente do Conselho de Administração

---

**SERVIÇO AUTÔNOMO DE ÁGUA E ESGOTO SAAE DE BOCAIÚVA/MG**
**AVISO DE SUSPENSÃO DE LICITAÇÃO - PREGÃO ELETRÔNICO P.E. 009/2026** - O SERVIÇO AUTÔNOMO DE ÁGUA E ESGOTO SAAE DE BOCAIÚVA através de seu Pregoeiro torna público a SUSPENSÃO do P.L. 017/2026 – P.E. 009/2026. Obj.: LOCAÇÃO DE SISTEMA DE GERAÇÃO DISTRIBUÍDA ( SGD) PARA ATENDER AS NECESSIDADES DO SAAE DE BOCAIUVA-MG, que aconteceria 08/06/2026 as 09:00h, devido ao deferimento de impugnação encaminhada, o novo edital será retificado e publicado com nova data de sessão através dos mesmos Portais: saaebocaiuva.com.br/licitacoes, portaldecompraspublicas.com.br e no pncp.gov.br. Marlon Alexsander Siqueira. Pregoeiro.

---

**MetabaseItabira**
SINDICATO DOS TRABALHADORES NAS INDÚSTRIAS DE EXTRAÇÃO MINERAL E DE PESQUISA, PROSPECÇÃO, EXTRAÇÃO E BENEFICIAMENTO DO FERRO METAIS BÁSICOS E DEMAIS MINERAIS METÁLICOS E NÃO METÁLICOS DE ITABIRA E REGIÃO.
CNPJ 20.959.524/0001-11

**EDITAL DE CONVOCAÇÃO**
**ASSEMBLEIAS GERAIS EXTRAORDINÁRIAS**

O Presidente do **SINDICATO DOS TRABALHADORES NAS INDÚSTRIAS DE EXTRAÇÃO MINERAL E DE PESQUISA, PROSPECÇÃO, EXTRAÇÃO E BENEFICIAMENTO DO FERRO E METAIS BÁSICOS E DEMAIS MINERAIS METÁLICOS E NÃO METÁLICOS DE ITABIRA E REGIÃO**, no uso de suas atribuições estatutárias e legais, convoca a todos os trabalhadores da BEMISA S/A, lotados em sua base territorial, para participarem das **Assembleias Gerais Extraordinárias, que serão realizadas nos dias 08, 09 e 11 de junho de 2026 (com ponto de votação, também no dia 09/06/2026, conforme descrito abaixo)**, em primeira convocação, com o quórum estatutário, e em segunda convocação, com qualquer número de presentes, conforme dias, horários e local abaixo especificado:

**DATAS E HORÁRIOS DAS ASSEMBLEIAS**
**CONTINUIDADE OU NÃO DO TURNO 12 HORAS (Escala 4X4 de Revezamento)**
**Local: Local:** Portaria da Mina Baratinha, localizada na Est. Acesso a São Joaquim da Barra, S/Nº, Fazenda Horto Baratinha, Antônio Dias/MG

| DATA | 1ª CONVOCAÇÃO | 2ª CONVOCAÇÃO | TURNO / LETRA |
|---|---|---|---|
| 08/06 segunda-feira | 19h00 | 19h20 | A (entrada) |
| | 07h00 | 07h20 | C (entrada) |
| 09/06 terça-feira | 19h00 | 19h20 | B (entrada) |
| 11/06 quinta-feira | 07h00 | 07h20 | D (entrada) |

para deliberarem sobre a seguinte **ORDEM DO DIA:**
**1)** Leitura do Edital; **2)** Apreciação e votação da proposta apresentada pela BEMISA S/A. em segunda Assembleia, uma vez encerrada a fase de teste de seis meses deliberada na primeira Assembleia, com vistas à definição da continuidade ou não do modelo de Turno de 12 horas (Escala 4X4 de Revezamento); **3)** Autorização para suscitar Dissídio Coletivo e/ou tomar medidas que viabilizem a negociação do Acordo Coletivo, no caso de frustração das tentativas de negociação, no todo ou em parte, inclusive deflagrar greve, nos termos do Estatuto; **4)** Autorização para cobrança de Honorários Advocatícios em razão da atuação em processos judiciais e da Taxa Assistencial Negocial, nos termos do Aditivo do TAC de nº 56.2013, celebrado com o Ministério Público do Trabalho, do julgamento do tema 935, pelo STF, bem como nos termos fixados em assembleia geral anteriormente convocada e realizada para citadas finalidades, inclusive quanto ao exercício do direito de oposição referente a taxa Assistencial Negocial no prazo de 5 dias corridos, a contar da apuração; **5)** Somente os trabalhadores que laboram no Turno de Revezamento Escala 4x4 em teste, devidamente com os nomes nas Listas Nominadas têm a autorização para votar. É obrigatório no ato da votação a apresentação do documento oficial (com foto) ou o Crachá Funcional. Não é permitido a votação dos trabalhadores do horário ADM (Administrativo); **6)** A urna de votação estará disponível na Sede do Metasita (Sindicato dos Trabalhadores Metalúrgicos de Timóteo e Coronel Fabriciano) (Av. Monsenhor Rafael, nº 155 – Timirim – Timóteo/MG), para votação dos trabalhadores afastados, folga ou férias, no dia 09/06/2026, no horário de funcionamento das 10h00 às 16h00min. É obrigatório no ato da votação a apresentação do documento oficial (com foto) e Crachá Funcional.
Itabira, 02 de junho de 2026.

**ANDRÉ VIANA MADEIRA**
**PRESIDENTE**

**ADRIANO RODRIGUES SILVA DO CARMO**
**DIRETOR SECRETÁRIO GERAL**

---

**KONA PARTNERSHIP S.A.**
CNPJ 58.526.038/0001-82
**Ata de Assembleia Geral Extraordinária**
**1. Data, Hora e Local:** Assembleia realizada no dia 30 de abril de 2026, às 11:30 horas, na sede da Companhia, localizada na Rua Desembargador Jorge Fontana, nº 498, sala 801, bairro Belvedere, Belo Horizonte/MG, CEP 30.320-670. **2. Mesa:** Henrique Ayres Jameli (Presidente da Mesa, e-mail henrique.jameli@3ariva.com.br) e Thiago Nogueira Penna (Secretário da Mesa, e-mail thiago@3ainvestimentos.com.br). **3. Presença:** Presente a totalidade dos acionistas da Companhia, sendo dispensada, portanto, a publicação de edital de convocação (Lei 6.404/76, art. 124, §4º). **4. Ordem do Dia:** (i) a redução do capital social da Companhia por excessividade; (ii) a forma de restituição aos acionistas do valor correspondente ao capital reduzido; (iii) a consequente alteração do Artigo 5º do Estatuto Social da Companhia; (iv) a autorização aos administradores para praticar todos os atos necessários à consecução das deliberações; e (v) a ratificação dos atos já praticados pela administração. **5. Deliberações:** Após análise dos itens constantes da Ordem do Dia, a única acionista deliberou o quanto segue: **5.1. Redução do Capital Social da Companhia por Excessividade.** Aprovar a redução do capital social da Companhia no valor de R$ 3.634.878,60 (três milhões, seiscentos e trinta e quatro mil, oitocentos e setenta e oito reais e sessenta centavos), por julgá-lo excessivo em relação às necessidades operacionais e de investimento da Companhia, nos termos do art. 173 da Lei nº 6.404/76, passando o capital social da Companhia de R$ 8.497.424,09 (oito milhões, quatrocentos e noventa e sete mil, quatrocentos e vinte e quatro reais e nove centavos), totalmente subscrito e integralizado, para R$ 4.862.545,49 (quatro milhões, oitocentos e sessenta e dois mil, quinhentos e quarenta e cinco reais e quarenta e nove centavos), totalmente subscrito e integralizado, mediante a redução do valor atribuído a cada uma das 790.191 (setecentas e noventa mil, cento e noventa e uma) ações ordinárias do capital social da Companhia em R$ 4,60 (quatro reais e sessenta centavos) por ação, permanecendo inalterada a quantidade total de ações e a participação proporcional de cada acionista. **5.2.** Aprovar que a restituição do valor correspondente à redução de capital será realizada em dinheiro, proporcionalmente à participação de cada acionista no capital social da Companhia. **5.3.** Aprovar que em razão do disposto no art. 174 da Lei nº 6.404/76, a Redução de Capital se tornará eficaz após o decurso do prazo de 60 (sessenta) dias contados da publicação desta ata na forma da lei, sendo certo que eventuais variações no valor do patrimônio contábil da Companhia verificadas entre a presente data e a data de eficácia da Redução de Capital, não alterarão os valores adotados nesta deliberação. **5.4.** Aprovar a alteração do Artigo 5º do Estatuto Social da Companhia, que passa a vigorar com a seguinte redação: *"Artigo 5º - O Capital social da sociedade é de R$ 4.862.545,49 (quatro milhões, oitocentos e sessenta e dois mil, quinhentos e quarenta e cinco reais e quarenta e nove centavos), dividido em 790.191 (setecentas e noventa mil, cento e noventa e uma) ações ordinárias, nominativas, indivisíveis e sem valor nominal."* **5.5. Autorização aos Administradores.** Autorizar os administradores da Companhia a praticar todos os atos necessários à implementação das deliberações ora tomadas, incluindo, mas não se limitando a, assinar documentos, registrar a presente ata perante a Junta Comercial do Estado de Minas Gerais - JUCEMG, promover as publicações legais cabíveis e efetuar o pagamento aos acionistas após o decurso do prazo legal. **5.6. Ratificação.** Ratificar todos os atos praticados pela administração da Companhia em consonância com as deliberações ora tomadas. **6. Encerramento e Lavratura da Ata.** Nada mais havendo a se tratado, deu o Sr. Presidente por encerrada a Assembleia Geral. Os signatários declaram que a presente Ata é aprovada em todos os seus termos, sendo assinada digitalmente, nos termos do parágrafo 2º, do artigo 10, da Medida Provisória nº 2.200-2/2001, pelos membros da mesa e pelos Acionistas. *Certifico que a Ata é cópia fiel lavrada em livro próprio.* Belo Horizonte, 30 de abril de 2026. **Membros da Mesa: Henrique Ayres Jameli** - *Presidente da Mesa*; **Thiago Nogueira Penna** - *Secretário da Mesa*. **Acionistas: Guilherme Boechat Muniz Lara, Lucas Freitas Da Cruz, Pedro Henrique Costa Cunha, Julia Guimarães Paes, Heitor Teixeira de Macedo Ferreira, Lucas Guilherme Gomes Costa, Lucas Urgel Allani Silva, Gustavo Silva Campos Moreira, Igor Carvalho Rodrigues de Sousa, Leonardo de Almeida Fonseca, Viviane Ferreira Abreu, Adaías Batista Da Silva Junior, Márcio Peixoto De Almeida Junior, Marcelo Fonseca Gonçalves, Italo Magno Simões Delgado Santos, Gabriel Santana Branco, Ana Catharina Lopes Daldegan Cardoso, Gustavo Rodrigues de Oliveira, Luis Felipe Dos Santos Diniz, Acácio Ferreira da Silva, Igor Ferreira Magalhães, Rui Lybaert Fontoura, Tairine Mariane De Almeida Bolina, Franco Henrique Cassini Labbate, Pedro Ernesto Ribeiro De Azambuja, Rodrigo Gontijo Donnard, Breno Figueiredo Campos, Paulo Victor Ferreira Ribeiro, Kevin Wender Mendes Vilela, Claudia Giselle Nogueira, Samuel Coelho Leite, Bernardo Pimenta Teixeira, Henrique Galvão Telles, Gustavo Jordan, Ana Paula Balsamão Vaz, Augusto César Carsalade Vieira, Glaucia Passos Marcandier Bambirra, Fernando Luiz Damasceno, Rafael Rezende Nascimento Fernandes, Leonardo Brum Cardoso, Lucas Prado Marques, Carlos Henrique Chaves Pessoa, Gabriel Fernandes de Andrade Ayres, Flávio Parcelli Zivlani de Oliveira, Thiago Nogueira Penna, Marconi Elmais Dutra, Marco Túlio Jota de Oliveira, Eduardo Mauricio de Oliveira, Henrique Ayres Jameli, Douglas Gontijo de Sousa, Thaís Andrade Aparecido, Fabiana Fracalossi Serafim, Gabriel Cançado Peixoto Albino, Izabela Ribas Matoso, Fernando Soares Guimarães, Patrícia De Almeida Fonseca Guerra, Alberto Maia Valério, Rafaela Duarte Miranda, Tide Ferrão de Barros Soares, Paulo Caus Mesquita, Fernanda Cançado Della Monica, Liliane Castro Lacerda, Samuel Sampaio Chagas, André Rodrigues Lage, Matheus Vinicius Souza Mattos, Kleber de Aragão Rebouças, Bárbara Costa Silva Matos, Lennon Galantini Menegati Nascimento, Mateus Ribeiro Galhardo, Jaqueline Cardoso Santana Roder, Flávio Lúcio Moreira Bicalho Filho, Bruno Rodrigues Lara Leite, Daniela Vasconcellos de Oliveira, Juan Vicente Miranda Bellucci, Caio Colares de Souza Lima, Victor Arcuri Lemos, Debora Luiza Exposito Gonçalves, Júlia de Carvalho Ferri, Renato Gomide De Sousa, Gabriel Victor de Oliveira. Visto do Advogado: Nome:** Ana Catharina Lopes Daldegan Cardoso - **OAB/MG:** 233.444.

---

INSTITUTO FEDERAL DE EDUCAÇÃO, CIÊNCIA E TECNOLOGIA SUL DE MINAS GERAIS — MINISTÉRIO DA EDUCAÇÃO — GOVERNO DO BRASIL — DO LADO DO POVO BRASILEIRO

**PREGÃO ELETRÔNICO SRP Nº 90614/2026**
**UASG 158137 – IFSULDEMINAS**
Nº do Processo: 23346.001104.2026-73. Objeto: Eventual Contratação Futura de Empresa Especializada para Prestação de Serviços em Manutenção de Estufas Agrícolas, conforme edital e anexos. Edital, no ambiente eletrônico oficial: https://www.gov.br/compras/pt-br. Edital, no site do IFSULDEMINAS: https://www.muz.ifsuldeminas.edu.br/2026. Cadastramento das Propostas: a partir de 03/06/2026 até as 08:59 h do dia 23/06/2026, no ambiente oficial. Sessão Pública às 09:00h do dia 23/06/2026. Demais informações encontram-se no edital e anexos.
**Lucas Deleon Ramirio**
**Agente de Contratação**

---

Coren CONSELHO REGIONAL DE ENFERMAGEM DE MINAS GERAIS — GOVERNO DO BRASIL — DO LADO DO POVO BRASILEIRO

**AVISOS DE LICITAÇÕES**
**Proc. nº 25/2024 - Pregão Eletrônico nº 90.005/2026**
**SRP nº 90.003/2026**
Objeto: RP para Aquisição de bens móveis. Total de itens: 04. Disponibilidade de Edital e entrega das propostas a partir de 03/06/2026 às 08h00. Sessão de disputa: 23/06/2026 às 10h00. Local: www.compras.gov.br.UASG:926188. Hora de Brasília-DF. Jânio P. da Silva, Pregoeiro.
**Proc. nº 39/2024 - Pregão Eletrônico nº 90.006/2026**
**SRP nº 90.004/2026**
Objeto: RP para Aquisição de materiais de copa e cozinha. Total de grupos: 03/ itens:16. Disponibilidade de Edital e entrega das propostas a partir de 03/06/2026 às 08h00. Sessão de disputa: 18/06/2026 às 10h00. Local: www.compras.gov.br. UASG:926188. Hora de Brasília-DF. Gabriela B. Agostinho, Pregoeira.

---

4ª COMPANHIA DE COMUNICAÇÕES LEVE DE MONTANHA — MINISTÉRIO DA DEFESA — GOVERNO DO BRASIL — DO LADO DO POVO BRASILEIRO

**AVISO DE LICITAÇÃO**
**Pregão SRP Nº 90001/2026 - UASG 160109**
Nº Processo: 64378.000104/2026-66. Objeto: Pregão Eletrônico - Contratação de serviços de engenharia de Adequação do banheiro do alojamento de Cabos e Soldados da 4ª Cia Com L Mth, em Belo Horizonte-MG. Total de Itens Licitados: 1. Edital: 03/06/2026 de 08h às 12h e de 13h30 às 16h30. Endereço: Av. Perimetral Sul Nr 1.200 – Bairro São Francisco – BELO HORIZONTE – MG ou www.comprasgovernamentais.gov.br. Entrega das Propostas: a partir de 03/06/2026 às 08h no site www.comprasnet.gov.br.
Abertura das Propostas: 19/06/2026 às 09h00 site www.comprasnet.gov.br.
**FELLIPE CORREIA MACIEL - Capitão**
**Ordenador de Despesas da 4ª Cia Com L Mth**

---

silemg — Sindicato das Indústrias de Laticínios e Produtos Derivados no Estado de Minas Gerais - SILEMG

**EDITAL DE CONVOCAÇÃO**
Pelo presente edital, faço saber que no dia **22 (vinte e dois) de Julho de 2.026**, no período de **08:00 às 14:00 horas**, na sede da FIEMG, na **Av. do Contorno, 4.520, 10º andar, bairro Funcionários**, no município de Belo Horizonte - MG, será realizada **eleição** para composição da **Diretoria, Diretores Adjuntos, Conselho Fiscal, Delegados Representantes junto ao Conselho da Federação das Indústrias do Estado de Minas Gerais** a que está filiada esta Entidade, bem como os respectivos suplentes, ficando aberto o **prazo de 20 (vinte) dias** para o registro de chapas, que ocorrerá a partir da data da publicação deste Edital. O requerimento para registro das chapas deverá ser dirigido ao Presidente da Entidade, sendo assinado por um de seus integrantes e deverá conter a disposição dos cargos de acordo com o previsto no Estatuto do Sindicato, acompanhado de todos os documentos exigidos, em conformidade com o Artigo 8º do Regulamento Eleitoral. **A Secretaria da Entidade funcionará no período destinado ao registro de chapas, no horário de 8:00 às 17:00 horas**, exceto nos fins de semana e feriados, onde se encontrará à disposição dos interessados, pessoa habilitada para o atendimento, prestação de informações e fornecimento do correspondente recibo. **A impugnação de candidaturas deverá ser feita no prazo de 05 (cinco) dias, a contar da divulgação da relação das chapas registradas, conforme Artigo 12º do Regulamento Eleitoral.** A eleição será realizada em convocação única, tendo duração mínima de 06 (seis) horas, não havendo exigência de quorum mínimo. Havendo chapa única, os representantes das Empresas Associadas Regulares e em condições de votar, deverão apenas assinar a lista de presença da Assembleia Geral, constituindo este documento a aprovação da chapa apresentada. Em caso de empate entre as chapas mais votadas, realizar-se-á nova eleição num prazo de 15 (quinze) dias, sendo limitada a elegibilidade aos candidatos já inscritos das referidas chapas.
Belo Horizonte, 03 de junho de 2.026.
**GUILHERME SILVA COSTA ABRANTES - PRESIDENTE**
CPF: 809.122.816-34
CARTEIRA DE IDENTIDADE: MG 3436600 -
Secretaria de Segurança Pública do Estado de Minas Gerais

---

EDITAL. 1ª VARA EMPRESARIAL. COMARCA DE BELO HORIZONTE/MG. AUTOS 1087093-64.2026.8.13.0024. EDITAL PARA CONHECIMENTO DOS INTERESSADOS E CREDORES. PLANOS DE RECUPERAÇÃO EXTRAJUDICIAL DE **ANDRADE GUTIERREZ ENGENHARIA S.A.** (cnpj 17.262.213/0001-94); **ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A.** (cnpj 39.469.291/0001-05); **ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S/A** (CNPJ – 17.027.611/0001-26); **ANDRADE GUTIERREZ INTERNATIONAL S.A.** (inscrita no Registro de Comércio de Luxemburgo sob o n.º B 176492); ZAGOPE SGPS S.A. (constituída e organizada segundo as leis da República Portuguesa, registrada sob o NIF n.º 507403177) e INZAG GERMANY GMBH (constituída e organizada segundo as leis da República Federativa da Alemanha, com sede em Taunusstraße 5, 65183, Wiesbaden, Alemanha). A Drª Claudia Helena Batista, MMª Juíza de Direito, da 1ª Vara Empresarial, em exercício de seu cargo, na forma da lei, etc. AVISA aos credores que foram recebidos Planos de Recuperação Extrajudicial das empresas em epígrafe, juntados aos autos no evento 1 (documentos nomeados OUTDOC4 e OUTDOC5), o seu inteiro teor. Ficam os credores advertidos de que têm o prazo de 30 (trinta) dias, a partir da publicação do presente edital para apresentação de eventuais impugnações ao plano, juntando a prova de seu crédito na forma do artigo 164 § 2º e § 3º, da lei 11.101/2005. E, para que chegue ao conhecimento de todos, é expedido o presente. Belo Horizonte/MG, 01/06/2026. (as.) Brígida Nascimento Souza de Oliveira - Escrivã Judicial. (as.) Drª Cláudia Helena Batista - Juíza de Direito.

---

**PREFEITURA MUNICIPAL DE CATAGUASES/MG**
**EXTRATO DE EDITAIS**
**PROCESSO LICITATÓRIO Nº 039/2026 - PREGÃO ELETRÔNICO Nº 015/2026**
**REGISTRO DE PREÇOS Nº 015/2026 - UASG 984305 - PE 90015**
Tipo: Maior desconto por lote. Objeto: Registrar preços para futura e eventual contratação de empresa especializada na prestação de serviços de manutenção elétrica e mecânica preventiva e corretiva de veículos pesados incluindo o fornecimento de peças elétricas e mecânicas sobre a Tabela de Preços Audatex da marca do veículo em atendimento às demandas da Secretaria de Educação da Prefeitura Municipal de Cataguases/MG. Data de realização: 22/06/2026 às 09h. Valor estimado: R$ 600.000,00. Fundamentação Legal: 14.133 de 01 de abril de 2021. Disponibilidade do Edital: pregaocataguases@gmail.com, no site da Prefeitura de Cataguases: www.cataguases.mg.gov.br e pelo portal de compras do Governo Federal: www.comprasgovernamentais.gov.br. Esclarecimentos pelo tel: (32) 3429-2500 ou através do e-mail: pregaocataguases@gmail.com. Cataguases, 02 de junho de 2026.
José Henriques - Prefeito de Cataguases

---

**EDITAL DE LEILÃO DE ALIENAÇÃO FIDUCIÁRIA – PRESENCIAL E ONLINE**
**1º LEILÃO: 17 de junho de 2026, às 15h00min *.**
**2º LEILÃO: 19 de junho de 2026, às 15h00min *. (*horário de Brasília)**
Santander — FRAZÃO Leilões

Ana Claudia Carolina Campos Frazão, Leiloeiro(a) Oficial, JUCESP nº 836, com escritório na Rua Herval, nº 1052, Belenzinho, São Paulo/SP, CEP: 03062-000, FAZ SABER a todos quanto o presente EDITAL virem ou dele conhecimento tiver, que levará a **LEILÃO PÚBLICO** de modo **PRESENCIAL E ON-LINE**, nos termos da Lei nº 9.514/97, artigo 27 e parágrafos, autorizado pelo **Credor Fiduciário BANCO SANTANDER (BRASIL) S/A** - CNPJ nº 90.400.888/0001-42, nos termos do Instrumento particular com força de escritura pública nº 0010370603, firmado em 28/04/2023, com o(s) **Fiduciante(s) BRUNO DA SILVA AZEVEDO**, inscrito no CPF/MF nº 064.927.956-52, no dia **17/06/2026** em **PRIMEIRO LEILÃO**, com lance mínimo igual ou superior a **R$ 332.346,19** (trezentos e trinta e dois mil trezentos e quarenta e seis reais e dezenove centavos), o imóvel matriculado sob **nº 47.260 do Cartório do 2º Ofício de Registro de Imóveis de Juiz de Fora/MG**, constituído por "Apartamento 710, no empreendimento denominado Residencial Madrid, situado na Rua Barão de Santa Helena, 620, no Bairro Granbery, com área privativa principal de 57,10m², área privativa total de 67,90m², área de uso comum de 18,60m², área real total de 86,50m², dotado de 01 vaga coberta de nº 79, privativa, situada no 3º pavimento, e respectiva fração ideal de 9,03/1000 do terreno que mede 45,00m de frente para a Rua Barão de Santa Helena, 55,00m do lado esquerdo do observador que da via pública olhar para o imóvel, confrontando com o lote 27; 55,00m do lado direito, confrontando com a casa 596, com o Espólio Mariam Mickail Mokdeci e com Catarina Cortes Coelho Ramos, e 45,00m nos fundos, confrontando ainda com Catarina Cortes Coelho Ramos". **Cadastro Municipal**: 042.097/059. Venda em caráter "ad corpus" e no estado de conservação que se encontra. Consta conforme R.04 a alienação fiduciária em favor do Banco Santander (Brasil) S/A. **Imóvel Ocupado**. Caso não haja licitante em primeiro leilão, fica desde já designado o dia **19/06/2026**, no mesmo local, para realização do **SEGUNDO LEILÃO**, com lance mínimo igual ou superior a **R$ 298.984,47 (duzentos e noventa e oito mil novecentos e oitenta e quatro reais e quarenta e sete centavos), nos termos do art. 27, §2º da Lei 9.514/97. O leilão presencial ocorrerá no escritório do Leiloeiro(a). Os interessados em participar do leilão de modo on-line**, deverão se cadastrar no site www.FrazaoLeiloes.com.br, **encaminhar a documentação necessária para liberação do cadastro 24 horas do início do leilão. Outras informações no site do Leiloeiro(a): www.FrazaoLeiloes.com.br**. Informações pelo tel. 11-3550-4066 (02.26949_RB_3621-04).

---

**EDITAL DE LEILÃO DE ALIENAÇÃO FIDUCIÁRIA**
**1º LEILÃO: 16/06/2026 às 10h;**
**2º LEILÃO: 18/06/2026 às 10h. (*horário de Brasília)**
Santander — megaleilões

**FERNANDO JOSE CERELLO GONÇALVES PEREIRA**, Leiloeiro(a) Oficial, JUCESP nº 844, com escritório na Alameda Santos, nº 787 – Conjunto 132, Bairro Jardim Paulista – São Paulo/SP, FAZ SABER a todos quanto o presente **EDITAL** virem ou dele conhecimento tiver, que levará a **PÚBLICO LEILÃO** de modo presencial e online, nos termos da Lei nº 9.514/97, artigo 27 e parágrafos, autorizada pelo Credor Fiduciário **BANCO SANTANDER (BRASIL) S/A** - CNPJ n° 90.400.888/0001-42, nos termos do Instrumento particular com eficácia de escritura pública nº 0010514469, firmado em 19/05/2025, com o(s) Fiduciante(s) **Rodrigo Lourenço Ribeiro Cunha** e Júlia Gonçalves Forti Cosenza Cunha, maior, inscrito no CPF n° 083.332.876-03 e 075.296.466-64, no dia **16/06/2026 às 10h em PRIMEIRO LEILÃO**, com lance mínimo igual ou superior a R$ 729.492,27 (setecentos e vinte e nove mil, quatrocentos e noventa e dois reais e vinte e sete centavos), o imóvel **matriculado sob nº 153.791 do 1º Oficial de Registro de Imóveis de Divinópolis/MG**, constituído por "Apartamento residencial nº 303 - 5º Pavimento, com área privativa principal de 92,75m², área privativa acessória de 20,70m² correspondente a 02 (duas) vagas de garagem coberta para 02 (dois) veículos - Vagas nº 18/19 - subsolo, área privativa total de 113,45m², área de uso comum de 40,37m² (sendo 0,22m² descoberta e 40,15m² cobertas), área real total de 153,82m², fração ideal de 0,03317, área construída total de 153,60m², situado na Rua Frei Carlos, lote 213, quadra 050, zona 020, Bairro Santa Clara, Divinópolis/MG". Cadastro Municipal: 227627. Venda em caráter "ad corpus" e no estado de conservação que se encontra. Consta conforme R. 13 a alienação fiduciária em favor do Banco Santander (Brasil) S/A. Imóvel Ocupado. Desocupação por conta do adquirente, nos termos do art. 30 da lei 9.514/97. Obs.: (i) Eventual necessidade de baixa do regime de afetação constante da Av. 05 da citada matrícula, correrá as expensas do arrematante/comprador sem direito a reembolso; (ii) Consta Ação de Título Extrajudicial (taxa Condominial), processo nº 1002749-72.2025.8.13.0223 em trâmite perante a Unidade Jurisdicional Única do Juizado Especial - 2º JD da Comarca de Divinópolis/MG. Caso não haja licitante em primeiro leilão, fica desde já designado o dia **18/06/2026 às 10h, no mesmo local, para realização do SEGUNDO LEILÃO**, com lance mínimo igual ou superior a R$ R$ 689.244,40 (seiscentos e oitenta e nove mil, duzentos e quarenta e quatro reais e quarenta centavos), nos termos do art. 27, §2º da Lei 9.514/97). O leilão presencial ocorrerá no escritório do Leiloeiro(a). Os interessados em participar do leilão de modo on-line, deverão se cadastrar no site **www.megaleiloes.com.br**, 1 (uma) horas do início do leilão. Outras informações no site do leiloeiro(a): **www.megaleiloes.com.br** ou telefone (11) 3149-4600 (02.26952).

Este documento foi assinado digitalmente pelo(s) signatário(s) na lista de protocolo de assinatura(s). Para validar as assinaturas acesse: https://sdocs.safeweb.com.br/portal/Validador?publicID=3c14afa7-b472-4ab3-8e13-02edf4b5c3ca

# Exhibit I

# EJ Plan 1 Notice

Belo Horizonte, 8 de junho de 2026

De:

**Andrade Gutierrez Engenharia S.A.**
Avenida do Contorno, n.º 8.123, Belo Horizonte/MG, CEP 30.110-937, Brasil ("AGE");

**Andrade Gutierrez Investimentos em Engenharia S.A.**
Avenida do Contorno, n.º 8.269, Sala 300 C1, Belo Horizonte/MG, CEP 30.110-059, Brasil ("AGIE");

**Andrade Gutierrez Construções e Serviços S.A.**
Avenida do Contorno, n.º 8.269, Sala 300 A1, Belo Horizonte/MG, CEP 30.110-059, Brasil ("AGCS" e, em conjunto com AGE e AGIE, "Partes Notificantes" ou "Requerentes").

Aos:
Credores Sujeitos da AGE, AGIE e AGCS

Ref.: Carta aos Credores Sujeitos, conforme o art. 164, § 1º, da Lei nº 11.101/2005.

Por meio da presente carta, as Partes Notificantes vêm comunicar a V.Sas que, em 19 de maio de 2026, ajuizaram pedido

Belo Horizonte, June 8, 2026

From:

**Andrade Gutierrez Engenharia S.A.**
Avenida do Contorno, No. 8.123, Belo Horizonte/MG, CEP 30.110-937, Brazil ("AGE");

**Andrade Gutierrez Investimentos em Engenharia S.A.**
Avenida do Contorno, No. 8.269, Room 300 C1, Belo Horizonte/MG, CEP 30.110-059, Brazil ("AGIE");

**Andrade Gutierrez Construções e Serviços S.A.**
Avenida do Contorno, No. 8.269, Room 300 A1, Belo Horizonte/MG, CEP 30.110-059, Brazil ("AGCS" and, together with AGE and AGIE, the "Notifying Parties" or the "Debtors").

To:
AGE, AGIE and AGCS Subject Creditors

Re.: Letter to the Subject Creditors, pursuant to article 164, first paragraph, of Law No. 11,101/2005.

Through this letter, the Notifying Parties hereby inform you that on May 19, 2026, the Notifying Parties filed a

de homologação de seu plano de recuperação extrajudicial ("Plano"), autuado sob o nº. 1087093-64.2026.8.13.0024 ("Recuperação Extrajudicial") e distribuído à 1ª Vara Empresarial da Comarca de Belo Horizonte.

request for judicial confirmation of their extrajudicial reorganization plan ("Plan"), registered under No. 1087093-64.2026.8.13.0024 ("Extrajudicial Reorganization") and directed to the 1st Business Court of the District of Belo Horizonte.

A íntegra dos autos da Recuperação Extrajudicial pode ser acessada no sítio eletrônico vinculado ao Tribunal de Justiça do Estado de Minas Gerais (https://eproc1g.tjmg.jus.br/eproc/). O Plano e demais informações que possam ser relevantes aos Credores Sujeitos também podem ser consultados no sítio eletrônico https://andradegutierrez365.sharepoint.com/:f:/s/R.

The full dockets of the Extrajudicial Reorganization can be accessed through the website related to the Minas Gerais State Court (https://eproc1g.tjmg.jus.br/eproc/). The Plan and other information that may be relevant to Subject Creditors are also available on the Notifying Parties' case website https://andradegutierrez365.sharepoint.com/:f:/s/R.

Os termos e expressões utilizados nesta carta, salvo se de outra forma aqui definidos, terão os significados a eles atribuídos no Plano.

The terms and expressions used in this letter, unless otherwise defined herein, shall have the meanings assigned to them in Plan.

O resumo do Plano e de suas condições de pagamento abaixo apresentado não dispensa a leitura atenta e integral do Plano pelos respectivos Credores Sujeitos, incluindo os seus anexos, para que possam validamente exercer a eleição da opção

The summary of the Plan and its payment terms set forth below does not dispense with the need for the applicable Subject Creditors to carefully review the Plan in its entirety, including its schedules, in order to validly exercise their payment election, the criteria,

de pagamento, cujos critérios, prazos e requisitos formais estão previstos nos Planos. Caso haja eventual conflito entre o resumo das condições de pagamento constante desta notificação e o Plano, prevalecerá o disposto nos Plano.

deadlines and formal requirements for which are set forth in the Plan. In the event of any inconsistency between the summary of the payment terms contained in this notice and the Plan, the terms of the Plan shall prevail.

O Plano visa a reestruturar, nos termos do art. 163, § 1º, da LRF, os créditos contra cada uma das Notificantes que sejam, cumulativamente, (i) circunscritos à espécie quirografária definida no artigo 83, VI, "a)" e "b)" da LRF, (ii) devidos a Pessoas que não sejam fornecedores ativos de bens ou serviços às Requerentes e (iii) materializados, líquidos, certos (inclusive objeto de cumprimento definitivo de sentença), vencidos ou vincendos, principais ou acessórios, incluindo (sem limitação) o valor principal, juros remuneratórios, juros de mora e quaisquer outros encargos, bem como o saldo de tais créditos não coberto pelas respectivas garantias reais e/ou fiduciárias, conforme apurados na Data do Pedido e devidamente listados no Anexo I do Plano.

The Plan aims to restructure, pursuant to article 163, first paragraph, of the Brazilian Bankruptcy Act, the claims against each of the Debtors that are, cumulatively, (i) encompassed within the unsecured category defined in article 83, VI, "a)" and "b)" of the Brazilian Bankruptcy Act, (ii) owed to individuals or legal entities that are not active suppliers of goods or services to the Debtors, and (iii) materialized, liquid, and certain (including those subject to final court enforcement), whether due or to become due, whether principal or ancillary, including (without limitation) principal amount, accrued interest, default interest, and any other charges, as well as the portion of such claims not covered by the respective collateral and/or fiduciary liens, as determined on the Filing Date and duly listed in Schedule I to the Plan.

O Plano já conta com a aprovação expressiva de credor titular de créditos

The Plan has already been approved by creditor holding claims

que representam **(i)** 71,3% de todos os Créditos Sujeitos devidos pela AGE, **(ii)** 73,5% de todos os Créditos Sujeitos devidos pela AGCS e **(iii)** 79,2% de todos os Créditos Sujeitos devidos pela AGIE, conforme o disposto no art. 163 e ss. da LRF, de modo que se mostra satisfeito o quórum de aprovação estabelecido a lei.

representing **(i)** 71.3% of all Subject Claims owed by AGE, **(ii)** 73.5% of all Subject Claims owed by AGCS, and **(iii)** 79.2% of all Subject Claims owed by AGIE, in accordance with the provisions of article 163 et seq. of the Brazilian Bankruptcy Act, such that the approval quorum established in the law has already been complied with.

Os Credores Sujeitos poderão optar, nos termos do Procedimento de Eleição da Opção de Pagamento, por reestruturar os seus Créditos Sujeitos por meio da Opção A, Opção B ou Opção C. Todos os Credores Sujeitos que desejarem realizar a Eleição da Opção de Pagamento deverão fazê-la dentro do prazo disposto no Procedimento de Eleição da Opção de Pagamento, conforme as instruções a serem divulgadas pelas Notificantes. Caso o Credor Sujeito não realize a Eleição da Opção de Pagamento ou não observe as instruções pertinentes mencionadas no Plano, o Crédito Sujeito do respectivo Credor Sujeito será automática e integralmente alocado na Opção B.

The Subject Creditors may choose to, pursuant to the Payment Option Election, to restructure their Subject Claims through Option A, Option B or Option C. All Subject Creditors who wish to make a Payment Option Election must do so by the deadline provided for in the Payment Option Election, pursuant to the instructions to be made available by the Notifying Parties. If the Subject Creditor does not make the Payment Option Election or does not comply with all instructions provided for in the Plan, the Subject Claims held by such Subject Creditor shall be automatically and fully allocated to Option B.

Os termos e condições da Opção A podem ser sumarizados da seguinte forma:

The terms and conditions of Option A may be summarized as follows:

| | |
|---|---|
| **(i)** Valor do principal: 36% (trinta e seis por cento) do valor dos créditos sujeitos detidos pelos Credores Opção A será pago nos termos e condições da Cláusula 5.4. do Plano, observados nos itens "ii" e "ix" abaixo, e o saldo remanescente de 64% (sessenta e quatro por cento) será objeto de deságio. Para que não restem dúvidas, em nenhuma hipótese o respectivo Credor Opção A receberá o valor do seu Crédito Opção A em duplicidade, conforme previsto no Plano. | **(i)** Principal Amount: 36% (thirty-six percent) of the amount of the Subject Claims held by Option A Creditors shall be paid pursuant to the terms and conditions of Section 5.4. of the Plan, as set forth in items "ii" through "ix" below, and the remaining balance of 64% (sixty-four percent) shall be subject to a haircut. For the avoidance of doubt, under no circumstances shall any Option A Creditor receive the amount of its Option A Claim in duplication, as set forth in the Plan. |
| **(ii)** Juros Remuneratórios: sobre os Créditos Opção A denominados em Dólar incidirão juros remuneratórios de 6,00% (seis por cento) ao ano (considerando-se, para tanto, um ano de 360 (trezentos e sessenta) Dias Corridos), computados a partir da Data da | **(ii)** Interest: the Option A Claims denominated in Dollars shall accrue interest at a rate of six percent (6.00%) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date until December 28, 2040. |

ANDRADE GUTIERREZ

Homologação até 28 de dezembro de 2040. Sobre os Créditos Opção A denominados em Real incidirão juros remuneratórios equivalentes a 100% (cem por cento) da Taxa DI ao ano (considerando-se, para tanto, um ano de 252 (duzentos e cinquenta e dois) Dias Úteis), computados a partir da Data da Homologação até 28 de dezembro de 2040.

The Option A Claims denominated in Real shall accrue interest equivalent to 100% (one hundred percent) of the DI Rate per annum (considering, to that end, a year of 252 (two hundred and fifty-two) Business Days), calculated from the Judicial Confirmation Date until December 28, 2040.

**(iii)** Cronograma e Forma de Pagamento dos Juros Remuneratórios: os juros remuneratórios que incidirem sobre os Créditos Opção A serão pagos da seguinte forma: **(a)** da Data da Homologação até 28 de dezembro de 2030, os juros remuneratórios incidentes no período serão capitalizados no valor do principal; e **(b)** de 28 de dezembro de 2030 até 28 de dezembro de 2040, os juros remuneratórios

**(iii)** Schedule and Form of Payment of Interest: the interest accrued on the Option A Claims shall be paid as follows: **(a)** from the Judicial Confirmation Date until December 28, 2030, the interest accrued during such period shall be capitalized into the principal amount; and **(b)** from December 28, 2030 until December 28, 2040, the interest accrued during such period shall be paid in cash on a semiannual basis,

incidentes no período serão pagos em dinheiro e em bases semestrais, em 28 de junho e 28 de dezembro, conforme aplicável, sendo a data do primeiro pagamento 28 de junho de 2031.

on June 28 and December 28, as applicable, with the first payment date being June 28, 2031.

**(iv)** Cronograma de Pagamento do Principal: o valor do principal dos Créditos Opção A, incluindo os juros capitalizados ao valor do principal, será amortizado, em dinheiro, em seis parcelas anuais, a serem pagas em 28 de dezembro de 2035, 28 de dezembro de 2036, 28 de dezembro de 2037, 28 de dezembro de 2038, 28 de dezembro de 2039 e 28 de dezembro de 2040, no valor correspondente a 16,667%, 20%, 25%, 33,333%, 50% e 100% do valor do saldo do principal existente nas respectivas datas de pagamento.

**(iv)** Principal Amortization Schedule: the principal amount of the Option A Claims, including the interest capitalized into the principal, shall be amortized in cash in six annual installments, to be paid on December 28, 2035, December 28, 2036, December 28, 2037, December 28, 2038, December 28, 2039, and December 28, 2040, in the amounts corresponding to 16,667%, 20%, 25%, 33,333%, 50% and 100% of the principal outstanding amount on the respective payment dates.

| | |
|---|---|
| **(v)** Data de Vencimento: 28 de dezembro de 2040. | **(v)** Maturity Date: December 28, 2040. |
| **(vi)** Fator de correção monetária: não aplicável. | **(vi)** Monetary adjustment factor: not applicable. |
| **(vii)** Moeda: não será alterada a moeda original do respectivo Crédito Sujeito detido pelo Credor Opção A, de modo que **(a)** os Créditos Sujeitos denominados em Real continuarão denominados em Real, e **(b)** os Créditos Sujeitos denominados em moeda estrangeira continuarão denominados na respectiva moeda estrangeira. O Credor Opção A titular de Crédito Sujeito em moeda estrangeira poderá, nos termos do artigo 163, § 5º, da LRF, concordar em ter o seu respectivo Crédito Opção A denominado em Real, salvo se tal Crédito Sujeito decorrer de Notas Internacionais Existentes, hipótese em que será | **(vii)** Currency: the original currency of the respective Subject Claim held by the Option A Creditor shall not be changed, so that **(a)** Subject Claims denominated in Real shall remain denominated in Real, and **(b)** Subject Claims denominated in foreign currency shall remain denominated in its respective foreign currency. The Option A Creditor holding a Subject Claim denominated in foreign currency may, pursuant to article 163, fifth paragraph, of the Brazilian Bankruptcy Act, agree to have its respective Option A Claim denominated in Real, except if such Subject Claim arises from International Existing |

observado o disposto na Cláusula 5.5.2 do Plano.

Notes, in which case the provisions of Section 5.5.2 of the Plan shall apply.

**(viii)** Devedora(s) Principal(is): a(s) devedora(s) principal(is) do respectivo Crédito Sujeito detido pelo Credor Opção A permanecerá(ão), conforme aplicável, como devedora(s) principal(is) do Crédito Opção A, sem prejuízo das garantias fidejussórias descritas abaixo.

**(viii)** Main Debtor(s): the main debtor(s) of the respective Subject Claim held by the Option A Creditor shall remain, as applicable, the main debtor(s) of the Option A Claim, without prejudice to the corporate guarantees described below.

**(ix)** Garantias fidejussórias: prestadas por AGE, AGIE, AGCS, AGPAR e AGSA, conforme aplicável, observado o disposto no Plano.

**(ix)** Corporate Guarantees: granted by AGE, AGIE, AGCS, AGPAR and AGSA, as applicable, subject to the terms of the Plan.

Os termos e condições da Opção B podem ser sumarizados da seguinte forma:

The terms and conditions of Option B may be summarized as follows:

**(i)** Valor do principal: 100% (cem por cento) do valor dos créditos sujeitos detidos pelos Credores Opção B será pago nos

**(i)** Principal Amount: 100% (one hundred percent) of the amount of the Subject Claims held by Option B Creditors shall be paid

termos e condições previstos na Cláusula 6.4 do Plano, os quais seguem resumidos nos itens "ii" a "ix" abaixo. Para que não restem dúvidas, em nenhuma hipótese o respectivo Credor Opção B receberá o valor do seu Crédito Opção B em duplicidade, conforme previsto no Plano.

pursuant to the terms and conditions of Section 6.4. of the Plan, as set forth in items "ii" through "ix" below. For the avoidance of doubt, under no circumstances shall any Option B Creditor receive the amount of its Option B Claim in duplication, as provided for in the Plan.

**(ii)** Juros Remuneratórios: sobre os Créditos Opção B denominados em Dólar incidirão juros remuneratórios de 1% (um por cento) ao ano (considerando-se, para tanto, um ano de 360 (trezentos e sessenta) Dias Corridos), computados a partir da Data da Homologação e capitalizados ao valor do principal até a data de vencimento dos Créditos Opção B. Sobre os Créditos Opção B denominados em Real incidirão juros

**(ii)** Interest: the Option B Claims denominated in Dollars shall accrue interest at a rate of 1% (one per cent) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date and capitalized to the principal amount until the maturity date of the Option B Claims. The Option B Claims denominated in Real shall accrue interest equivalent to 2% (two per cent) per annum (considering, to that end, a

| | | | |
|---|---|---|---|
| | remuneratórios equivalentes a 2% (dois por cento) ao ano (considerando-se, para tanto, um ano de 252 (duzentos e cinquenta e dois) Dias Úteis), computados a partir da Data da Homologação e capitalizados ao valor do principal até a data de vencimento dos Créditos Opção B. | | year of 252 (two hundred and fifty-two) Business Days), calculated from the Judicial Confirmation Date and capitalized to the principal amount until the maturity date of the Option B Claims. |
| **(iii)** | Cronograma de Pagamento do Principal: o valor do principal dos Créditos Opção B, incluindo os juros capitalizados no valor do principal, será amortizado em uma única parcela, na data de vencimento dos Créditos Opção B. | **(iii)** | Principal Amortization Schedule: the principal amount of the Option B Claims, including the interest accrue and capitalized into the principal, shall be amortized in a single installment on the maturity date of the Option B Claims. |
| **(iv)** | Fator de correção monetária: não aplicável. | **(iv)** | Monetary adjustment factor: not applicable. |
| **(v)** | Data de Vencimento: 28 de dezembro de 2070. | **(v)** | Maturity Date: December 28, 2070. |

**(vi)** Moeda: não será alterada a moeda original do respectivo Crédito Sujeito detido pelo Credor Opção B, de modo que **(a)** os Créditos Sujeitos denominados em Real continuarão denominados em Real, e **(b)** os Créditos Sujeitos denominados em moeda estrangeira continuarão denominados na respectiva moeda estrangeira. O Credor Opção B titular de Crédito Sujeito em moeda estrangeira poderá, nos termos do artigo 163, § 5º, da LRF, concordar em ter o seu respectivo Crédito Opção B denominado em Real, salvo se tal Crédito Sujeito decorrer de Notas Internacionais Existentes, hipótese em que será observado o disposto na Cláusula 6.5.2 do Plano.

**(vi)** Currency: the original currency of the respective Subject Claim held by the Option B Creditor shall not be changed, so that **(a)** Subject Claims denominated in Real shall remain denominated in Real, and **(b)** Subject Claims denominated in foreign currency shall remain denominated in its respective foreign currency. The Option B Creditor holding a Subject Claim denominated in foreign currency may, pursuant to article 163, fifth paragraph, of the Brazilian Bankruptcy Act, agree to have its respective Option B Claim denominated in Real, except if such Subject Claim arises from International Existing Notes, in which case the provisions of Section 6.5.2 of the Plan shall apply.

**(vii)** Devedora(s) Principal(is): a(s) devedora(s)

**(vii)** Main Debtor(s): the main debtor(s) of the respective

principal(is) do respectivo Crédito Sujeito detido pelo Credor Opção B permanecerá(ão), conforme aplicável, como devedora(s) principal(is) do Crédito Opção B, sem prejuízo das garantias fidejussórias descritas abaixo.

**(viii)** Garantias fidejussórias: prestadas por AGE, AGIE, AGCS, AGPAR e AGSA, conforme aplicável, observado o disposto no Plano.

**(ix)** Pagamento ou Resgate Antecipado: os Créditos Opção B poderão, a qualquer momento a partir de 1º de janeiro de 2035 e até 28 de junho de 2070, a exclusivo critério das Requerentes, da AGSA, da AGPAR e/ou da AGINT, ser pagos ou resgatados antecipadamente, de forma parcial ou integral, com a aplicação de desconto equivalente a 90% do valor

Subject Claim held by the Option B Creditor shall remain, as applicable, the main debtor(s) of the Option B Claim, without prejudice to the corporate guarantees described below.

**(viii)** Corporate Guarantees: granted by AGE, AGIE, AGCS, AGPAR and AGSA, as applicable, subject to the terms of the Plan.

**(ix)** Payment or Early Redemption: the Option B Claims may, at any time as of January 1, 2035 and until June 28, 2070, at the sole discretion of the Debtors, AGSA, AGPAR and/or AGINT, be prepaid or redeemed in advance, partially or in full, with the application of a discount equivalent to 90% of the amount of the Option B Claim subject to such

do Crédito Opção B objeto do pagamento ou resgate antecipado, conforme devidamente atualizado até a data de vencimento dos Créditos Opção B. Para que não restem dúvidas, por meio de pagamento de valor equivalente a 10% do Crédito Opção B objeto do pagamento ou resgate antecipado, conforme devidamente atualizado até a data de vencimento dos Créditos Opção B, haverá a quitação da integralidade do Crédito Opção B detido pelo respectivo Credor Opção B para todos os fins e efeitos de direito

prepayment or early redemption, as duly adjusted until the maturity date of the Option B Claims. For the avoidance of doubt, upon payment of an amount equivalent to 10% of the Option B Claim subject to such prepayment or early redemption, as duly adjusted until the maturity date of the Option B Claims, the Option B Claim held by the respective Option B Creditor shall be deemed fully settled and discharged for all legal purposes.

Os termos e condições da Opção C – Tranche A podem ser sumarizados da seguinte forma:

The terms and conditions of Option C – Tranche A may be summarized as follows:

**(i)** Valor do principal: 31% (trinta e um por cento) do valor dos créditos sujeitos detidos pelos Credores Opção C será pago nos termos e condições previstos na Cláusula 7.4.1 do Plano, os quais seguem

**(i)** Principal Amount: 31% (thirty-one percent) of the amount of the Subject Claims held by Option C Creditors shall be paid under the terms and conditions of Section 7.4.1 of the Plan, as set forth in

resumidos nos itens "ii" a "ix" abaixo. Para que não restem dúvidas, em nenhuma hipótese o respectivo Credor Opção C receberá o valor do seu Crédito Opção C – Tranche A em duplicidade, conforme previsto no Plano.

items "ii" through "ix" below. For the avoidance of doubt, under no circumstances shall any Option C Creditor receive the amount of its Option C Claim – Tranche A in duplication, as provided for in the Plan.

**(ii)** Juros Remuneratórios: sobre os Créditos Opção C – Tranche A denominados em Dólar incidirão juros remuneratórios de 6,00% (seis por cento) ao ano (considerando-se, para tanto, um ano de 360 (trezentos e sessenta) Dias Corridos), computados a partir da Data da Homologação até 28 de dezembro de 2040. Sobre os Créditos Opção C – Tranche A denominados em Real incidirão juros remuneratórios equivalentes a 100% (cem por cento) da Taxa DI ao ano (considerando-se, para tanto, um ano de 252

**(ii)** Interest: the Option C Claims – Tranche A denominated in Dollars shall accrue interest at a rate of 6.00% (six percent) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date until 28 December 2040. The Option C Claims – Tranche A denominated in Real shall accrue interest equivalent to 100% (one hundred percent) of the DI Rate per annum (considering, to that end, a year of 252 (two hundred and fifty-two) Business

(duzentos e cinquenta e dois) Dias Úteis), computados a partir da Data da Homologação até 28 de dezembro de 2040.

**(iii)** Cronograma e Forma de Pagamento dos Juros Remuneratórios: os juros remuneratórios que incidirem sobre os Créditos Opção C – Tranche A serão pagos da seguinte forma: **(a)** da Data da Homologação até 28 de dezembro de 2030, os juros remuneratórios incidentes no período serão capitalizados no valor do principal; e **(b)** de 28 de dezembro de 2030 até 28 de dezembro de 2040, os juros remuneratórios incidentes no período serão pagos em dinheiro e em bases semestrais, em 28 de junho e 28 de dezembro, conforme aplicável, sendo a data do primeiro pagamento 28 de junho de 2031.

Days), calculated from the Judicial Confirmation Date until 28 December 2040.

**(iii)** Schedule and Form of Payment of Interest: the interest accruing on the Option C Claims – Tranche A shall be paid as follows: (a) from the Judicial Confirmation Date until 28 December 2030, the interest accrued during the period shall be capitalized into the principal amount; and (b) from 28 December 2030 until 28 December 2040, the interest accrued during the period shall be paid in cash on a semiannual basis, on 28 June and 28 December, as applicable, with the first payment date being 28 June 2031.

**(iv)** Cronograma de Pagamento do Principal: o valor do principal dos Créditos Opção C – Tranche A, incluindo os juros capitalizados ao valor do principal, será amortizado, em dinheiro, em seis parcelas anuais, a serem pagas em 28 de dezembro de 2035, 28 de dezembro de 2036, 28 de dezembro de 2037, 28 de dezembro de 2038, 28 de dezembro de 2039 e 28 de dezembro de 2040, no valor correspondente a 16,667%, 20%, 25%, 33,333%, 50% e 100% do valor do saldo do principal existente nas respectivas datas de pagamento.

**(iv)** Principal Payment Schedule: the principal amount of the Option C Claims – Tranche A, including the interest capitalized into the principal amount, shall be amortized, in cash, in six annual installments, to be paid on December 28 of 2035, December 28 of 2036, December 28 of 2037, December 28 of 2038, December 28 of 2039 and December 28 of 2040, in the amounts corresponding to 16.667%, 20%, 25%, 33.333%, 50% and 100% of the outstanding principal balance on the respective payment dates.

**(v)** Data de Vencimento: 28 de dezembro de 2040.

**(v)** Maturity Date: 28 December 2040.

**(vi)** Fator de correção monetária: não aplicável.

**(vi)** Monetary adjustment factor: not applicable.

**(vii)** Moeda: não será alterada a moeda original do

**(vii)** Currency: the original currency of the respective

respectivo Crédito Sujeito detido pelo Credor Opção C, de modo que **(a)** os Créditos Sujeitos denominados em Real continuarão denominados em Real, e **(b)** os Créditos Sujeitos denominados em moeda estrangeira continuarão denominados na respectiva moeda estrangeira. O Credor Opção C titular de Crédito Sujeito em moeda estrangeira poderá, nos termos do artigo 163, § 5º, da LRF, concordar em ter o seu respectivo Crédito Opção C – Tranche A denominado em Real, salvo se tal Crédito Sujeito decorrer de Notas Internacionais Existentes, hipótese em que será observado o disposto na Cláusula 7.5.2 do Plano.

Subject Claim held by the Option C Creditor shall not be changed, such that **(a)** Subject Claims denominated in Real shall remain denominated in Real, and **(b)** Subject Claims denominated in foreign currency shall remain denominated in the respective foreign currency. The Option C Creditor holding a Subject Claim in foreign currency may, pursuant to article 163, fifth paragraph, of the Brazilian Bankruptcy Act, agree to have its respective Option C Claim – Tranche A denominated in Brazilian Reais, except if such Subject Claim arises from International Existing Notes, in which case the provisions of Section 7.5.2 of the Plan shall apply.

**(viii)** Devedora(s) Principal(is): a(s) devedora(s) principal(is) do respectivo Crédito Sujeito detido pelo Credor Opção C

**(viii)** Main Debtor(s): the main debtor(s) of the respective Subject Claim held by the Option C Creditor shall remain, as applicable, as

permanecerá(ão), conforme aplicável, como devedora(s) principal(is) do respectivo Crédito Opção C – Tranche A, sem prejuízo das garantias fidejussórias descritas abaixo.

the main debtor(s) of the respective Option C Claim – Tranche A, without prejudice to the corporate guarantees described below.

**(ix)** Garantias fidejussórias: prestadas por AGE, AGIE, AGCS, AGPAR e AGSA, conforme aplicável, observado o disposto no plano.

**(ix)** Corporate Guarantees: granted by AGE, AGIE, AGCS, AGPAR and AGSA, as applicable, subject to the terms of the Plan.

Os termos e condições da Opção C – Tranche B podem ser sumarizados da seguinte forma:

The terms and conditions of Option C – Tranche B may be summarized as follows:

**(i)** Valor do Principal: 69% (sessenta e nove por cento) do valor dos créditos sujeitos detidos pelos Credores Opção C será pago nos termos e condições previstos na Cláusula 7.4.2 do Plano os quais seguem resumidos nos itens "ii" a "ix" abaixo. Para que não restem dúvidas, em nenhuma hipótese o respectivo

**(i)** Principal Amount: 69% (sixty-nine percent) of the amount of the Subject Claims held by Option C Creditors shall be paid under the terms and conditions of Section 7.4.2 of the Plan, as set forth in items "ii" through "ix" below. For the avoidance of doubt, under no circumstances shall any Option C Creditor receive

Credor Opção C receberá o valor do seu Crédito Opção C – Tranche B em duplicidade, conforme previsto no Plano.

the amount of its Option C – Tranche B Claim in duplication, as provided for in the Plan.

**(ii)** <u>Juros Remuneratórios</u>: sobre os Créditos Opção C – Tranche B denominados em Dólar incidirão juros remuneratórios de 1% (um por cento) ao ano (considerando-se, para tanto, um ano de 360 (trezentos e sessenta) Dias Corridos), computados a partir da Data da Homologação e capitalizados no valor do principal até a data de vencimento dos Créditos Opção C – Tranche B. Sobre os Créditos Opção C – Tranche B denominados em Real incidirão juros remuneratórios equivalentes a 2% (dois por cento) ao ano (considerando-se, para tanto, um ano de 252 (duzentos e cinquenta e dois) Dias Úteis),

**(ii)** <u>Interest</u>: the Option C – Tranche B Claims denominated in Dollars shall accrue interest at a rate of 1% (one per cent) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date and capitalized into the principal amount until the maturity date of the Option C – Tranche B Claims. The Option C – Tranche B Claims denominated in Real, shall accrue interest equivalent to 2% (two per cent) per annum (considering, to that end, a year of 252 (two hundred and fifty-two) Business Days), calculated from the Judicial Confirmation Date and capitalized to the

computados a partir da Data da Homologação e capitalizados ao valor do principal até a data de vencimento dos Créditos Opção C – Tranche B.

principal amount until the maturity date of the Option C – Tranche B Claims.

**(iii)** Cronograma de Pagamento do Principal: o valor do principal dos Créditos Opção C – Tranche B, incluindo os juros capitalizados no valor do principal, será amortizado em uma única parcela, na data de vencimento dos Créditos Opção C– Tranche B.

**(iii)** Principal Payment Schedule: the principal amount of the Option C Claims – Tranche B, including the interest capitalized into the principal amount, shall be amortized in a single installment, on the maturity date of the Option C Claims– Tranche B.

**(iv)** Fator de correção monetária: não aplicável.

**(iv)** Monetary adjustment factor: not applicable.

**(v)** Data de Vencimento: 28 de dezembro de 2070.

**(v)** Maturity Date: 28 December 2070.

**(vi)** Moeda: não será alterada a moeda original do respectivo Crédito Sujeito detido pelo Credor Opção C, de modo que **(a)** os Créditos Sujeitos denominados em Real

**(vi)** Currency: the original currency of the respective Subject Claim held by the Option C Creditor shall not be changed, such that **(a)** Subject Claims denominated in Real shall

continuarão denominados em Real, e **(b)** os Créditos Sujeitos denominados em moeda estrangeira continuarão denominados pela respectiva moeda estrangeira. O Credor Opção C titular de Crédito Sujeito em moeda estrangeira poderá, nos termos do artigo 163, § 5º, da LRF, concordar em ter o seu respectivo Crédito Opção C - Tranche B denominado em Real, salvo se tal Crédito Sujeito decorrer de Notas Internacionais Existentes, hipótese em que será observado o disposto na Cláusula 7.5.2 do Plano.

remain denominated in Real, and **(b)** Subject Claims denominated in foreign currency shall remain denominated in the respective foreign currency. The Option C Creditor holding a Subject Claim in foreign currency may, pursuant to article 163, fifth paragraph, of the Brazilian Bankruptcy Act, agree to have its respective Option C Claim – Tranche B denominated in Real, except if such Subject Claim arises from International Existing Notes, in which case the provisions of Section 7.5.2 of the Plan shall apply.

**(vii)** Devedora(s) Principal(is): a(s) devedora(s) principal(is) do respectivo Crédito Sujeito detido pelo Credor Opção C permanecerá(ão), conforme aplicável, como devedora(s) principal(is) do Crédito Opção C – Tranche B, sem prejuízo

**(vii)** Main Debtor(s): the main debtor(s) of the respective Subject Claim held by the Option C Creditor shall remain, as applicable, as the main debtor(s) of the Option C Claim – Tranche B, without prejudice to the corporate guarantees described below.

das garantias fidejussórias descritas abaixo.

**(viii)** Garantias fidejussórias: prestadas por AGE, AGIE, AGCS, AGPAR e AGSA, conforme aplicável, observado o disposto no Plano.

**(ix)** Pagamento ou Resgate Antecipado: os Créditos Opção C – Tranche B poderão, a qualquer momento a partir de 1º de janeiro de 2035 e até 28 de junho de 2070, a exclusivo critério das Requerentes, da AGSA, da AGPAR e/ou da AGINT, ser pagos ou resgatados antecipadamente, de forma parcial ou integral, com a aplicação de desconto equivalente a 90% do valor do Crédito Opção C – Tranche B objeto do pagamento ou resgate antecipado, conforme devidamente atualizado até a data de vencimento dos Créditos Opção C –

**(viii)** Corporate Guarantees: granted by AGE, AGIE, AGCS, AGPAR and AGSA, as applicable, subject to the terms of the Plan.

**(ix)** Early Payment or Redemption. The Option C – Tranche B Claims may, at any time from January 1st, 2035, until June 28, 2070, at the sole discretion of the Debtors, AGSA, AGPAR and/or AGINT, be prepaid or redeemed in advance, partially or in full, with the application of a discount equivalent to 90% of the amount of the Option C – Tranche B Claim subject to such early payment or redemption, as duly adjusted until the maturity date of the Option C – Tranche B Claims. For the avoidance of doubt, upon payment of an amount equivalent to 10% of the

Tranche B. Para que não restem dúvidas, por meio do pagamento de valor equivalente a 10% dos Créditos Opção C – Tranche B objeto do pagamento ou resgate antecipado, conforme devidamente atualizado até a data de vencimento dos Créditos Opção C – Tranche B, haverá a quitação integral da integralidade do Crédito Opção C – Tranche B detido pelo respectivo Credor Opção C para todos os fins e efeitos de direito.

Option C – Tranche B Claims subject to the early payment or redemption, as duly updated until the maturity date of the Option C – Tranche B Claims, the entirety of the Option C – Tranche B Claim held by the respective Option C Creditor shall be deemed fully settled and discharged for all legal purposes.

A partir da Data da Homologação, os credores de cada opção passam imediatamente a ser detentores dos seus créditos com todas as características previstas no Plano, os quais serão posteriormente materializados por meio dos respectivos Instrumentos de Pagamento, conforme critérios estabelecidos no Plano.

As of the Judicial Confirmation Date, creditors under each option shall immediately become holders of their respective claims with all the characteristics set forth in the Plan, which shall subsequently be materialized by means of the respective Payment Instruments, pursuant to the criteria established in the Plan.

Por fim, conforme previsto no § 1º do art. 164 da LRF, as Partes Notificantes informam que o edital

Finally, as provided for in the first paragraph of article 164 of the Brazilian Bankruptcy Act, the Notifying Parties

ANDRADE GUTIERREZ

previsto no caput do art. 164 da LRF foi disponibilizado em 2 de junho de 2026 no Diário de Justiça Eletrônico Nacional, por meio da Plataforma Nacional de Editais, sendo considerado publicado, portanto, no dia 3 de junho de 2026. Em atenção ao disposto no § 2º do art. 164 da LRF, os Credores Sujeitos dispõem do prazo de 30 (trinta) dias corridos, contados da publicação do referido edital, para apresentarem suas respectivas impugnações ao Plano, devendo juntar a prova de seu respectivo Crédito Sujeito. Portanto, considerando que o edital foi publicado no dia 3 de junho de 2026, os Credores Sujeitos têm até o dia 3 de julho de 2026 para apresentarem suas impugnações ao Plano.

inform that the public notice provided in the head provision of article 164 of the Brazilian Bankruptcy Act was made available in the National Official Gazette, through the National Platform of Public Notices, on June 2nd, 2026, thus being considered published on June 3rd, 2026. In compliance with the provisions of paragraph second of article 164 of the Brazilian Bankruptcy Act, the Subject Creditors have a period of 30 (thirty) calendar days, counted from the publication of the aforementioned notice, to present their respective objections to the Plan, and any such objection must include proof of their respective Subject Claim. Therefore, considering that the notice was published on June 3rd, 206, Subject Creditors have until July 3rd, 2026, to file their objections to the Plan.

As Partes Notificantes também informam que permanecem inteiramente à disposição dos Credores Sujeitos para elucidar eventuais dúvidas que tenham quanto aos assuntos pertinentes à Recuperação Extrajudicial, podendo ser diretamente contatadas no correio eletrônico ri@agnet.com.br ou por meio dos seguintes correios eletrônicos de seus assessores jurídicos, Mattar —

The Notifying Parties also inform you that they remain entirely at the disposal of the Subject Creditors to clarify any doubts they may have regarding matters pertaining to the Extrajudicial Reorganization, and may be contacted directly via email ri@agnet.com.br or through the following emails from their legal advisors, Mattar – Sociedade de Advogados

ANDRADE GUTIERREZ

Sociedade de Advogados (mattar.ag@mattaradv.com.br) e Davis Polk & Wardwell LLP (manuel.garciadiaz@davispolk.com, (timothy.graulich@davispolk.com e joanna.mcdonald@davispolk.com).

(mattar.ag@mattaradv.com.br) and Davis Polk & Wardwell LLP (manuel.garciadiaz@davispolk.com, (timothy.graulich@davispolk.com and joanna.mcdonald@davispolk.com).

Atenciosamente,

Sincerely,

**Andrade Gutierrez Engenharia S.A.**

**Andrade Gutierrez Construções e Serviços S.A.**

**Andrade Gutierrez Investimentos em Engenharia S.A.**

# Exhibit J

## EJ Plan 2 Notice

AG ANDRADE GUTIERREZ

Belo Horizonte, 8 de junho de 2026

De:

**Andrade Gutierrez International S.A.** Boulevard Grande-Duchese Charlotte, 65, L1331, Luxemburgo ("AGINT");

**Zagope SGPS S.A.**
Lagoas Park, edifício 6, piso 1, 2740-244, Porto Salvo, Oeiras, Portugal ("Zagope");

**Inzag Germany GmbH**
Taunusstraße 5, 65183, Wiesbaden, Alemanha ("Inzag" e, em conjunto com AGINT e Zagope, "Partes Notificantes" ou "Requerentes").

Ao:

**Wilmington Savings Fund Society, FSB**

500 Delaware Avenue, Wilmington, DE 19801, Estados Unidos da América.

Ref.: Carta aos Credores Sujeitos, conforme o art. 164, § 1º, da Lei nº 11.101/2005.

Por meio da presente carta, as Partes Notificantes vêm comunicar a V.Sas que,

Belo Horizonte, June 8, 2026

From:

**Andrade Gutierrez International S.A.**, Boulevard Grande-Duchese Charlotte, 65, L1331, Luxembourg ("AGINT");

**Zagope SGPS S.A.**
Lagoas Park, building 6, 1st floor, 2740-244, Porto Salvo, Oeiras, Portugal ("Zagope"); and

**Inzag Germany GmbH**
Taunusstraße 5, 65183, Wiesbaden, Germany ("Inzag" and, together with AGINT and Zagope, "Notifying Parties" or "Debtors").

To:

**Wilmington Savings Fund Society, FSB**

500 Delaware Avenue, Wilmington, DE 19801, United States of América.

Re.: Letter to the Subject Creditors, pursuant to article 164, first paragraph, of Law No. 11,101/2005.

Through this letter, the Notifying Parties hereby inform you that on May

ANDRADE GUTIERREZ

em 19 de maio de 2026, ajuizaram pedido de homologação de seu plano de recuperação extrajudicial ("Plano"), autuado sob o nº. 1087093-64.2026.8.13.0024 ("Recuperação Extrajudicial") e distribuído à 1ª Vara Empresarial da Comarca de Belo Horizonte.

A íntegra dos autos da Recuperação Extrajudicial pode ser acessada no sítio eletrônico vinculado ao Tribunal de Justiça do Estado de Minas Gerais (https://eproc1g.tjmg.jus.br/eproc/). O Plano e demais informações que possam ser relevantes aos Credores Sujeitos também podem ser consultados no sítio eletrônico https://andradegutierrez365.sharepoint.com/:f:/s/R.

Os termos e expressões utilizados nesta carta, salvo se de outra forma aqui definidos, terão os significados a eles atribuídos no Plano.

O resumo do Plano e de suas condições de pagamento abaixo apresentado não dispensa a leitura atenta e integral do Plano pelos respectivos Credores Sujeitos, incluindo os seus anexos, para que possam

19, 2026, the Notifying Parties filed a request for judicial confirmation of their extrajudicial reorganization plan ("Plan"), registered under No. 1087093-64.2026.8.13.0024 ("Extrajudicial Reorganization") and directed to the 1st Business Court of the District of Belo Horizonte.

The full dockets of the Extrajudicial Reorganization can be accessed through the website related to the Minas Gerais State Court (https://eproc1g.tjmg.jus.br/eproc/). The Plan and other information that may be relevant to Subject Creditors are also available on the Notifying Parties' case website https://andradegutierrez365.sharepoint.com/:f:/s/R.

The terms and expressions used in this letter, unless otherwise defined herein, shall have the meanings assigned to them in Plan.

The summary of the Plan and its payment terms set forth below does not dispense with the need for the applicable Subject Creditors to carefully review the Plan in its entirety, including its schedules, in order to

validamente exercer a eleição da opção de pagamento, cujos critérios, prazos e requisitos formais estão previstos nos Planos. Caso haja eventual conflito entre o resumo das condições de pagamento constante desta notificação e o Plano, prevalecerá o disposto nos Plano.

validly exercise their payment election, the criteria, deadlines and formal requirements for which are set forth in the Plan. In the event of any inconsistency between the summary of the payment terms contained in this notice and the Plan, the terms of the Plan shall prevail.

O Plano visa a reestruturar, nos termos do art. 163, § 1º, da LRF, todos os créditos contra as Requerentes relacionados ou resultantes das Notas Internacionais Existentes, incluindo (sem limitação), principal, juros remuneratórios, juros de mora, bem como quaisquer outros encargos, obrigações ou créditos derivados ou resultantes da emissão, oferta e subscrição das Notas Internacionais Existentes, e quaisquer outras obrigações das Requerentes, que sejam regidas, estabelecidas ou que de qualquer outra forma possam ser direta ou indiretamente derivadas das Notas Internacionais Existentes, conforme apurados na Data do Pedido e devidamente listados no Anexo I do Plano.

The Plan aims to restructure, pursuant to article 163, first paragraph, of the Brazilian Bankruptcy Act, all claims against the Debtors related to or arising from the International Existing Notes, including (without limitation), principal, interest, default interest, as well as any other charges, obligations or claims derived from or resulting from the issuance, offering and subscription of the International Existing Notes, and any other obligations of the Debtors, governed by, established under, or that may otherwise be directly or indirectly derived from the International Existing Notes, as determined on the Filing Date and duly listed in Schedule I to the Plan.

O Plano já conta com a aprovação expressiva de credor titular de créditos

The Plan has already been approved by a creditor holding claims

que representam **(i)** 77,1% de todos os Créditos Sujeitos devidos pela AGINT, **(ii)** 79,2% de todos os Créditos Sujeitos devidos pela Zagope e **(iii)** 79,2% de todos os Créditos Sujeitos devidos pela Inzag, conforme o disposto no art. 163 e ss. da LRF, de modo que se mostra satisfeito o quórum de aprovação estabelecido a lei.

representing **(i)** 77.1% of all Subject Claims owed by AGINT, as indicated in Schedule II, **(ii)** 79.2% of all Subject Claims owed by Zagope, as indicated in Schedule II, and **(iii)** 79.2% of all Subject Claims owed by Inzag, in accordance with the provisions of article 163 et seq. of the Brazilian Bankruptcy Act, such that the approval quorum established in the law has already been complied with.

Os Credores Sujeitos poderão optar, nos termos do Procedimento de Eleição da Opção de Pagamento, por reestruturar os seus Créditos Sujeitos por meio da Opção A, Opção B ou Opção C. Todos os Credores Sujeitos que desejarem realizar a Eleição da Opção de Pagamento deverão fazê-la dentro do prazo disposto no Procedimento de Eleição da Opção de Pagamento, conforme as instruções a serem divulgadas pelas Notificantes. Caso o Credor Sujeito não realize a Eleição da Opção de Pagamento ou não observe as instruções pertinentes mencionadas no Plano, o Crédito Sujeito do respectivo Credor Sujeito será automática e integralmente alocado na Opção B.

The Subject Creditors may choose to, pursuant to the Payment Option Election, to restructure their Subject Claims through Option A, Option B or Option C. All Subject Creditors who wish to make a Payment Option Election must do so by the deadline provided for in the Payment Option Election, pursuant to the instructions to be made available by the Notifying Parties. If the Subject Creditor does not make the Payment Option Election or does not comply with all instructions provided for in the Plan, the Subject Claims held by such Subject Creditor shall be automatically and fully allocated to Option B.

Os termos e condições da Opção A podem ser sumarizados da seguinte forma:

**(i)** Valor do principal: 36% (trinta e seis por cento) do valor dos créditos sujeitos detidos pelos Credores Opção A será pago nos termos e condições da Cláusula 5.4 do Plano, observados nos itens “ii” e “ix” abaixo, e o saldo remanescente de 64% (sessenta e quatro por cento) será objeto de deságio. Para que não restem dúvidas, em nenhuma hipótese o respectivo Credor Opção A receberá o valor do seu Crédito Opção A em duplicidade, conforme previsto no Plano.

**(ii)** Juros Remuneratórios: sobre os Créditos Opção A incidirão juros remuneratórios de 6,00% (seis por cento) ao ano (considerando-se, para tanto, um ano de 360

The terms and conditions of Option A may be summarized as follows:

**(i)** Principal Amount: 36% (thirty-six percent) of the amount of the Subject Claims held by Option A Creditors shall be paid pursuant to the terms and conditions of Section 5.4 of the Plan, as set forth in items "ii" through "ix" below, and the remaining balance of 64% (sixty-four percent) shall be subject to a haircut. For the avoidance of doubt, under no circumstances shall any Option A Creditor receive the amount of its Option A Claim in duplication, as set forth in the Plan.

**(ii)** Interest: the Option A Claims shall accrue interest at a rate of six percent (6.00%) per annum (considering, to that end, a year of 360 (three hundred and sixty)

ANDRADE GUTIERREZ

(trezentos e sessenta) Dias Corridos), computados a partir da Data da Homologação até 28 de dezembro de 2040.

**(iii)** Cronograma e Forma de Pagamento dos Juros Remuneratórios: os juros remuneratórios que incidirem sobre os Créditos Opção A serão pagos da seguinte forma: **(a)** da Data da Homologação até 28 de dezembro de 2030, os juros remuneratórios incidentes no período serão capitalizados no valor do principal; e **(b)** de 28 de dezembro de 2030 até 28 de dezembro de 2040, os juros remuneratórios incidentes no período serão pagos em dinheiro e em bases semestrais, em 28 de junho e 28 de dezembro, conforme aplicável, sendo a data do primeiro pagamento 28 de junho de 2031.

Calendar Days), calculated from the Judicial Confirmation Date until December 28, 2040.

**(iii)** Schedule and Form of Payment of Interest: the interest accrued on the Option A Claims shall be paid as follows: **(a)** from the Judicial Confirmation Date until December 28, 2030, the interest accrued during such period shall be capitalized into the principal amount; and **(b)** from December 28, 2030 until December 28, 2040, the interest accrued during such period shall be paid in cash on a semiannual basis, on June 28 and December 28, as applicable, with the first payment date being June 28, 2031.

ANDRADE GUTIERREZ

| | | | |
|---|---|---|---|
| **(iv)** | Cronograma de Pagamento do Principal: o valor do principal dos Créditos Opção A, incluindo os juros capitalizados ao valor do principal, será amortizado, em dinheiro, em seis parcelas anuais, a serem pagas em 28 de dezembro de 2035, 28 de dezembro de 2036, 28 de dezembro de 2037, 28 de dezembro de 2038, 28 de dezembro de 2039 e 28 de dezembro de 2040, no valor correspondente a 16,667%, 20%, 25%, 33,333%, 50% e 100% do valor do saldo do principal existente nas respectivas datas de pagamento. | **(iv)** | Principal Amortization Schedule: the principal amount of the Option A Claims, including the interest capitalized into the principal, shall be amortized in cash in six annual installments, to be paid on December 28, 2035, December 28, 2036, December 28, 2037, December 28], 2038, December 28, 2039, and December 28, 2040, in the amounts corresponding to 16,667%, 20%, 25%, 33,333%, 50% and 100% of the principal outstanding amount on the respective payment dates. |
| **(v)** | Data de Vencimento: 28 de dezembro de 2040. | **(v)** | Maturity Date: December 28, 2040. |
| **(vi)** | Fator de correção monetária: não aplicável. | **(vi)** | Monetary adjustment factor: not applicable. |
| **(vii)** | Moeda: não será alterada a moeda original do respectivo Crédito Sujeito | **(vii)** | Currency: the original currency of the respective Subject Claim held by the |

detido pelo Credor Opção A, de modo que os Créditos Sujeitos continuarão denominados na respectiva moeda estrangeira.

**(viii)** Devedora Principal: AGINT permanecerá devedora principal, sem prejuízo das garantias fidejussórias descritas abaixo.

**(ix)** Garantias fidejussórias: prestadas por AGE, AGIE, AGCS, AGPAR e AGSA, conforme aplicável, observado o disposto no Plano.

Os termos e condições da Opção B podem ser sumarizados da seguinte forma:

**(i)** Valor do principal: 100% (cem por cento) do valor dos créditos sujeitos detidos pelos Credores Opção B será pago nos termos e condições previstos na Cláusula 6.4

Option A Creditor shall not be changed, so that Subject Claims shall remain denominated in its respective foreign currency.

**(viii)** Main Debtor: AGINT shall remain as main debtor, without prejudice to the corporate guarantees described below.

**(ix)** Corporate Guarantees: granted by AGE, AGIE, AGCS, AGPAR and AGSA, as applicable, subject to the terms of the Plan.

The terms and conditions of Option B may be summarized as follows:

**(i)** Principal Amount: 100% (one hundred percent) of the amount of the Subject Claims held by Option B Creditors shall be paid pursuant to the terms and conditions of Section 6.4

do Plano, os quais seguem resumidos nos itens “ii” a “ix” abaixo. Para que não restem dúvidas, em nenhuma hipótese o respectivo Credor Opção B receberá o valor do seu Crédito Opção B em duplicidade, conforme previsto no Plano.

of the Plan, as set forth in items "ii" through "ix" below. For the avoidance of doubt, under no circumstances shall any Option B Creditor receive the amount of its Option B Claim in duplication, as provided for in the Plan.

**(ii)** <u>Juros Remuneratórios</u>: sobre os Créditos Opção B incidirão juros remuneratórios de 1% (um por cento) ao ano (considerando-se, para tanto, um ano de 360 (trezentos e sessenta) Dias Corridos), computados a partir da Data da Homologação e capitalizados ao valor do principal até a data de vencimento dos Créditos Opção B.

**(ii)** <u>Interest</u>: the Option B Claims shall accrue interest at a rate of 1% (one per cent) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date and capitalized to the principal amount until the maturity date of the Option B Claims.

**(iii)** <u>Cronograma de Pagamento do Principal</u>: o valor do principal dos Créditos Opção B, incluindo os juros capitalizados no valor

**(iii)** <u>Principal Amortization Schedule:</u> the principal amount of the Option B Claims, including the interest accrue and

do principal, será amortizado em uma única parcela, na data de vencimento dos Créditos Opção B.

capitalized into the principal, shall be amortized in a single installment on the maturity date of the Option B Claims.

**(iv)** Fator de correção monetária: não aplicável.

**(iv)** Monetary adjustment factor: not applicable.

**(v)** Data de Vencimento: 28 de dezembro de 2070.

**(v)** Maturity Date: December 28, 2070.

**(vi)** Moeda: não será alterada a moeda original do respectivo Crédito Sujeito detido pelo Credor Opção B, de modo que os Créditos Sujeitos continuarão denominados na respectiva moeda estrangeira.

**(vi)** Currency: the original currency of the respective Subject Claim held by the Option B Creditor shall not be changed, so that Subject Claims shall remain denominated in its respective foreign currency.

**(vii)** Devedora Principal: a AGINT permanecerá como devedora principal, sem prejuízo das garantias fidejussórias descritas abaixo.

**(vii)** Main Debtor: AGINT shall remain as main debtor, without prejudice to the corporate guarantees described below.

**(viii)** Garantias fidejussórias: prestadas por AGE, AGIE,

**(viii)** Corporate Guarantees: granted by AGE, AGIE,

AGCS, AGPAR e AGSA, conforme aplicável, observado o disposto no Plano.

**(ix)** Resgate Antecipado: os Créditos Opção B poderão, a qualquer momento a partir de 1º de janeiro de 2035 e até 28 de junho de 2070, a exclusivo critério da AGINT, da AGE, da AGCS, da AGIE, da AGSA e/ou da AGPAR, ser resgatados antecipadamente, de forma parcial ou integral, com a aplicação de desconto equivalente a 90% do valor do Crédito Opção B objeto do resgate antecipado, conforme devidamente atualizado até a data de vencimento dos Créditos Opção B. Para que não restem dúvidas, por meio de pagamento de valor equivalente a 10% do Crédito Opção B objeto do resgate antecipado, conforme devidamente atualizado até a data de

AGCS, AGPAR and AGSA, as applicable, subject to the terms of the Plan.

**(ix)** Early Redemption: the Option B Claims may, at any time as of January 1, 2035 and until June 28, 2070, at the sole discretion of AGINT, AGE, AGCS, AGIE, AGSA and/or AGPAR, be redeemed in advance, partially or in full, with the application of a discount equivalent to 90% of the amount of the Option B Claim subject to such early redemption, as duly adjusted until the maturity date of the Option B Claims. For the avoidance of doubt, upon payment of an amount equivalent to 10% of the Option B Claim subject to such early redemption, as duly adjusted until the maturity date of the Option B Claims, the Option B Claim held by the respective Option B

vencimento dos Créditos Opção B, haverá a quitação da integralidade do Crédito Opção B detido pelo respectivo Credor Opção B para todos os fins e efeitos de direito.

Creditor shall be deemed fully settled and discharged for all legal purposes

Os termos e condições da Opção C – Tranche A podem ser sumarizados da seguinte forma:

The terms and conditions of Option C – Tranche A may be summarized as follows:

**(i)** Valor do principal: 31% (trinta e um por cento) do valor dos créditos sujeitos detidos pelos Credores Opção C será pago nos termos e condições previstos na Cláusula 7.4.1 do Plano, os quais seguem resumidos nos itens "ii" a "ix" abaixo. Para que não restem dúvidas, em nenhuma hipótese o respectivo Credor Opção C receberá o valor do seu Crédito Opção C – Tranche A em duplicidade, conforme previsto no Plano.

**(i)** Principal Amount: 31% (thirty-one percent) of the amount of the Subject Claims held by Option C Creditors shall be paid under the terms and conditions of Section 7.4.1 of the Plan, as set forth in items "ii" through "ix" below. For the avoidance of doubt, under no circumstances shall any Option C Creditor receive the amount of its Option C Claim – Tranche A in duplication, as provided for in the Plan.

**(ii)** Juros Remuneratórios: sobre os Créditos Opção C

**(ii)** Interest: the Option C Claims – Tranche A shall

– Tranche A incidirão juros remuneratórios de 6,00% (seis por cento) ao ano (considerando-se, para tanto, um ano de 360 (trezentos e sessenta) Dias Corridos), computados a partir da Data da Homologação até 28 de dezembro de 2040.

**(iii)** Cronograma e Forma de Pagamento dos Juros Remuneratórios: os juros remuneratórios que incidirem sobre os Créditos Opção C – Tranche A serão pagos da seguinte forma: **(a)** da Data da Homologação até 28 de dezembro de 2030, os juros remuneratórios incidentes no período serão capitalizados no valor do principal; e **(b)** de 28 de dezembro de 2030 até 28 de dezembro de 2040, os juros remuneratórios incidentes no período serão pagos em dinheiro e em bases semestrais, em 28 de junho e 28 de dezembro,

accrue interest at a rate of 6.00% (six percent) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date until 28 December 2040.

**(iii)** Schedule and Form of Payment of Interest: the interest accruing on the Option C Claims – Tranche A shall be paid as follows: (a) from the Judicial Confirmation Date until 28 December 2030, the interest accrued during the period shall be capitalized into the principal amount; and (b) from 28 December 2030 until 28 December 2040, the interest accrued during the period shall be paid in cash on a semiannual basis, on 28 June and 28 December, as applicable, with the first payment date being 28 June 2031.

conforme aplicável, sendo a data do primeiro pagamento 28 de junho de 2031.

**(iv)** Cronograma de Pagamento do Principal: o valor do principal dos Créditos Opção C – Tranche A, incluindo os juros capitalizados ao valor do principal, será amortizado, em dinheiro, em seis parcelas anuais, a serem pagas em 28 de dezembro de 2035, 28 de dezembro de 2036, 28 de dezembro de 2037, 28 de dezembro de 2038, 28 de dezembro de 2039 e 28 de dezembro de 2040, no valor correspondente a 16,667%, 20%, 25%, 33,333%, 50% e 100% do valor do saldo do principal existente nas respectivas datas de pagamento.

**(iv)** Principal Payment Schedule: the principal amount of the Option C Claims – Tranche A, including the interest capitalized into the principal amount, shall be amortized, in cash, in six annual installments, to be paid on December 28 of 2035, December 28 of 2036, December 28 of 2037, December 28 of 2038, December 28 of 2039 and December 28 of 2040, in the amounts corresponding to 16.667%, 20%, 25%, 33.333%,50% and 100% of the outstanding principal balance on the respective payment dates.

**(v)** Data de Vencimento: 28 de dezembro de 2040.

**(v)** Maturity Date: 28 December 2040.

| | |
|---|---|
| **(vi)** Fator de correção monetária: não aplicável. | **(vi)** Monetary adjustment factor: not applicable. |
| **(vii)** Moeda: não será alterada a moeda original do respectivo Crédito Sujeito detido pelo Credor Opção C, de modo que os Créditos Sujeitos continuarão denominados na respectiva moeda estrangeira. | **(vii)** Currency: the original currency of the respective Subject Claim held by the Option C Creditor shall not be changed, such that Subject Claims shall remain denominated in the respective foreign currency. |
| **(viii)** Devedora Principal: AGINT permanecerá como a devedora principal, sem prejuízo das garantias fidejussórias descritas abaixo. | **(viii)** Main Debtor: AGINT shall remain as the main debtor, without prejudice to the corporate guarantees described below. |
| **(ix)** Garantias fidejussórias: prestadas por AGE, AGIE, AGCS, AGPAR e AGSA, conforme aplicável, observado o disposto no Plano. | **(ix)** Corporate Guarantees: granted by AGE, AGIE, AGCS, AGPAR and AGSA, as applicable, subject to the terms of the Plan. |
| Os termos e condições da Opção C – Tranche B podem ser sumarizados da seguinte forma: | The terms and conditions of Option C – Tranche B may be summarized as follows: |

ANDRADE GUTIERREZ

**(i)** Valor do Principal: 69% (sessenta e nove por cento) do valor dos créditos sujeitos detidos pelos Credores Opção C será pago nos termos e condições previstos na Cláusula 7.4.2 do Plano os quais seguem resumidos nos itens "ii" a "ix" abaixo. Para que não restem dúvidas, em nenhuma hipótese o respectivo Credor Opção C receberá o valor do seu Crédito Opção C – Tranche B em duplicidade, conforme previsto no Plano.

**(i)** Principal Amount: 69% (sixty-nine percent) of the amount of the Subject Claims held by Option C Creditors shall be paid under the terms and conditions of Section 7.4.2 of the Plan, as set forth in items "ii" through "ix" below. For the avoidance of doubt, under no circumstances shall any Option C Creditor receive the amount of its Option C – Tranche B Claim in duplication, as provided for in the Plan.

**(ii)** Juros Remuneratórios: sobre os Créditos Opção C – Tranche B incidirão juros remuneratórios de 1% (um por cento) ao ano (considerando-se, para tanto, um ano de 360 (trezentos e sessenta) Dias Corridos), computados a partir da Data da Homologação e capitalizados no valor do principal até a data de

**(ii)** Interest: the Option C – Tranche B Claims shall accrue interest at a rate of 1% (one per cent) per annum (considering, to that end, a year of 360 (three hundred and sixty) Calendar Days), calculated from the Judicial Confirmation Date and capitalized into the principal amount until the maturity date of the

vencimento dos Créditos Opção C – Tranche B.

Option C – Tranche B Claims.

**(iii)** Cronograma de Pagamento do Principal: o valor do principal dos Créditos Opção C – Tranche B, incluindo os juros capitalizados no valor do principal, será amortizado em uma única parcela, na data de vencimento dos Créditos Opção C– Tranche B.

**(iii)** Principal Payment Schedule: the principal amount of the Option C Claims – Tranche B, including the interest capitalized into the principal amount, shall be amortized in a single installment, on the maturity date of the Option C Claims– Tranche B.

**(iv)** Fator de correção monetária: não aplicável.

**(iv)** Monetary adjustment factor: not applicable.

**(v)** Data de Vencimento: 28 de dezembro de 2070.

**(v)** Maturity Date: 28 December 2070.

**(vi)** Moeda: não será alterada a moeda original do respectivo Crédito Sujeito detido pelo Credor Opção C, de modo que os Créditos Sujeitos continuarão denominados pela respectiva moeda estrangeira.

**(vi)** Currency: the original currency of the respective Subject Claim held by the Option C Creditor shall not be changed, such that Subject Claims shall remain denominated in the respective foreign currency.

| | |
|---|---|
| **(vii)** Devedora Principal(is): AGINT permanecerá como a devedora principal, sem prejuízo das garantias fidejussórias descritas abaixo. | **(vii)** Main Debtor: AGINT shall remain as the main debtor, without prejudice to the corporate guarantees described below. |
| **(viii)** Garantias fidejussórias: prestadas por AGE, AGIE, AGCS, AGPAR e AGSA, conforme aplicável, observado o disposto no Plano. | **(viii)** Corporate Guarantees: granted by AGE, AGIE, AGCS, AGPAR and AGSA, as applicable, subject to the terms of the Plan. |
| **(ix)** Pagamento ou Resgate Antecipado: os Créditos Opção C – Tranche B poderão, a qualquer momento a partir de 1º de janeiro de 2035 e até 28 de junho de 2070, a exclusivo critério da AGINT, da AGE, da AGCS, da AGIE, da AGSA e/ou da AGPAR, ser resgatados antecipadamente, de forma parcial ou integral, com a aplicação de desconto equivalente a 90% do valor do Crédito Opção C – Tranche B objeto do resgate antecipado, | **(ix)** Early Redemption: the Option C – Tranche B Claims may, at any time from January 1st, 2035, until June 28, 2070, at the sole discretion of AGINT, AGE, AGCS, AGIE, AGSA and/or AGPAR, be redeemed in advance, partially or in full, with the application of a discount equivalent to 90% of the amount of the Option C – Tranche B Claim subject to such redemption, as duly adjusted until the maturity date of the Option C – Tranche B |

conforme devidamente atualizado até a data de vencimento dos Créditos Opção C – Tranche B. Para que não restem dúvidas, por meio do pagamento de valor equivalente a 10% dos Créditos Opção C – Tranche B objeto do resgate antecipado, conforme devidamente atualizado até a data de vencimento dos Créditos Opção C – Tranche B, haverá a quitação integral da integralidade do Crédito Opção C – Tranche B detido pelo respectivo Credor Opção C para todos os fins e efeitos de direito.

Claims. For the avoidance of doubt, upon payment of an amount equivalent to 10% of the Option C – Tranche B Claims subject to the early redemption, as duly updated until the maturity date of the Option C – Tranche B Claims, the entirety of the Option C – Tranche B Claim held by the respective___Option C Creditor shall be deemed fully settled and discharged for all legal purposes.

A partir da Data da Homologação, os credores de cada opção passam imediatamente a ser detentores dos seus créditos com todas as características previstas no Plano, os quais serão posteriormente materializados por meio dos respectivos Instrumentos de Pagamento, conforme critérios estabelecidos no Plano.

As of the Judicial Confirmation Date, creditors under each option shall immediately become holders of their respective claims with all the characteristics set forth in the Plan, which shall subsequently be materialized by means of the respective Payment Instruments, pursuant to the criteria established in the Plan.

ANDRADE GUTIERREZ

Por fim, conforme previsto no § 1º do art. 164 da LRF, as Partes Notificantes informam que o edital previsto no caput do art. 164 da LRF foi disponibilizado em 2 de junho de 2026 no Diário de Justiça Eletrônico Nacional, por meio da Plataforma Nacional de Editais, sendo considerado publicado, portanto, no dia 3 de junho de 2026. Em atenção ao disposto no § 2º do art. 164 da LRF, os Credores Sujeitos dispõem do prazo de 30 (trinta) dias corridos, contados da publicação do referido edital, para apresentarem suas respectivas impugnações ao Plano, devendo juntar a prova de seu respectivo Crédito Sujeito. Portanto, considerando que o edital foi publicado no dia 3 de junho de 2026, os Credores Sujeitos têm até o dia 3 de julho de 2026 para apresentarem suas impugnações ao Plano.

Finally, as provided for in the first paragraph of article 164 of the Brazilian Bankruptcy Act, the Notifying Parties inform that the public notice provided in the head provision of article 164 of the Brazilian Bankruptcy Act was made available in the National Official Gazette, through the National Platform of Public Notices, on June 2nd, 2026, thus being considered published on June 3rd, 2026. In compliance with the provisions of paragraph second of article 164 of the Brazilian Bankruptcy Act, the Subject Creditors have a period of 30 (thirty) calendar days, counted from the publication of the aforementioned notice, to present their respective objections to the Plan, and any such objection must include proof of their respective Subject Claim. Therefore, considering that the notice was published on June 3rd, 206, Subject Creditors have until July 3rd, 2026, to file their objections to the Plan.

As Partes Notificantes também informam que permanecem inteiramente à disposição dos Credores Sujeitos para elucidar eventuais dúvidas que tenham quanto aos assuntos pertinentes à Recuperação Extrajudicial, podendo ser diretamente

The Notifying Parties also inform you that they remain entirely at the disposal of the Subject Creditors to clarify any doubts they may have regarding matters pertaining to the Extrajudicial Reorganization, and may be contacted directly via email

contatadas no correio eletrônico ri@agnet.com.br ou por meio dos seguintes correios eletrônicos de seus assessores jurídicos, Mattar — Sociedade de Advogados (mattar.ag@mattaradv.com.br) e Davis Polk & Wardwell LLP (manuel.garciadiaz@davispolk.com, (timothy.graulich@davispolk.com e joanna.mcdonald@davispolk.com).

ri@agnet.com.br or through the following emails from their legal advisors, Mattar – Sociedade de Advogados (mattar.ag@mattaradv.com.br) and Davis Polk & Wardwell LLP (manuel.garciadiaz@davispolk.com, (timothy.graulich@davispolk.com and joanna.mcdonald@davispolk.com).

Atenciosamente,

Sincerely,

**Andrade Gutierrez International S.A.**

**Inzag Germany GmbH**

**Zagope SGPS, S.A.**

# Exhibit K

## Brazilian Confirmation Order and a certified English translation

**Certified Translation from Portuguese into English**
**Tradução Juramentada**
Original document reference:
2026.09.17 - RE AG Decisão de homologação
Translated reference:
2026.09.17 - AG ER Confirmation Decision
**TRANSLATION No.28** **BOOK No.378** **PAGE No.230**

I hereby certify and give full faith and credit that on this date a document has been presented to me in Portuguese, to which I translate as follows:

17/09/2026, 21:31
62 - SENT1

**JUDICIARY BRANCH**
**Court of Justice of the State of Minas Gerais**
**1st Business Court of the District of Belo Horizonte**

Avenida Raja Gabaglia, 1753 - District: Luxemburgo – CEP (ZIP CODE): 30380900 - Phone: (31) 3299-4400 - Email: vempresarial1@tjmg.jus.br

**EXTRAJUDICIAL REORGANIZATION No. 1087093-64.2026.8.13.0024/MG**

**APPLICANT**: ZAGOPE SGPS S.A.

**APPLICANT**: INZAG GERMANY GMBH

**APPLICANT**: ANDRADE GUTIERREZ INTERNATIONAL S.A.

**APPLICANT**: ANDRADE GUTIERREZ ENGENHARIA S.A.

**APPLICANT**: ANDRADE GUTIERREZ CONSTRUCOES E SERVICOS S.A.

**APPLICANT**: ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S/A

# DECISION

CASE NUMBER:

CLASS:

SUBJECT:

**Case Records seen, etc.**

**I – REPORT**

1. This refers to a Request for Confirmation of the **EXTRAJUDICIAL REORGANIZATION PLAN**

filed by ANDRADE GUTIERREZ ENGENHARIA S.A. – AGE, ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A. – AGIE, ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A. – AGCS, ANDRADE GUTIERREZ INTERNATIONAL S.A. – AGINT, INZAG GERMANY GMBH – INZAG e ZAGOPE SGPS S.A. – ZAGOPE.

2. Applicants stated that they are part of the Andrade Gutierrez Group, which operates in the engineering and infrastructure industries, and that this Court has jurisdiction because the group's center of management and the headquarters of the Brazilian companies are located in Belo Horizonte/MG. They also report that AGE, AGCS, AGIE, AGINT, and Zagope were previously subject to an Extrajudicial Reorganization, the plan of which was confirmed in case number 5209787-06.2022.8.13.0024 on November 29, 2022. They reported that, following the restructuring carried out in 2022, they experienced economic and financial difficulties again. They attribute those difficulties to the reduction and interruption of international projects, exchange rate fluctuations, increased financial burdens, and the impact of these factors on liquidity and cash flow, among other factors. They nevertheless maintained the continuity and feasibility of business activities, as well as the need for further reorganization of a portion of the liabilities. They set the value of the dispute at BRL 3,400,882,619.38. They requested that the six companies be listed in the joint proceedings for procedural consolidation, without substantial consolidation of their respective assets.

3. Applicants submitted two plans, namely: Plan 1, which was entered into the case file as **event 1, DOC4**, is subscribed by AGE, AGIE, and AGCS and covers claims that meet the objective criteria established therein, particularly unsecured claims, excluding active suppliers of goods or services, as defined in the document. Plan 2, which was entered into the case file as **event 1, DOC5**, is subscribed by AGINT, Inzag and Zagope and includes the claims arising from the international financial obligations specified in the document, including those related to notes with final due dates scheduled for 2029 and 2040, subject to the limits of the

guarantees provided by each company.

4. Applicants submitted, in **event 1, DOC6**, individualized lists of the claims affected by each company and, in **event 1, DOC7**, the claims attributed to the signatory creditor. They also attached the joinder agreement, representation documents, and documentation intended to evidence the existence and ownership of the claims considered for the establishment of the quorums, especially in **event 1, DOC8** and **event 1, DOC9**.

5. According to the initial documentation, Plan 1 was presented with adherence ratios of 71.3% for AGE-affected claims, 73.5% for AGCS-affected claims, and 79.2% for AGIE-affected claims. Regarding Plan 2, it accounted for 77.1% adherence ratio of the affected claims from AGINT and 79.2% from Zagope and Inzag, respectively. The percentages were calculated separately for each company, without substantial consolidation of their respective liabilities.

6. The Plans establish three restructuring modalities. In summary, Option A provides for payment of 36% of the affected claim, according to the charges and amortization schedule established in the document; Option B provides for payment of the principal over a longer period, with final maturity scheduled for 2070 and specific remuneration and redemption rules; and Option C subdivides the claim into two installments, corresponding to 31% and 69%, subject to the specific conditions provided for in the Plans. Applicants informed that the signatory creditor chose Option C.

7. As a matter of urgency, they requested the endorsement of the suspension of actions and executions related to the affected claims and the prohibition of enforcement measures; measures regarding the amounts retained in executions involving receivables from SABESP; specific treatment of the requirements related to Extrajudicial Reorganization in bidding procedures; and the suspension of the effectiveness of contractual clauses that provided for automatic termination solely due to the filing of Extrajudicial Reorganization proceedings.

8. At the end, they requested judicial confirmation of both plans, with the extension of their effects to the creditors affected therein, including dissenting creditors, pursuant to Article 163 of Law No. 11.101/2005.

9. Before the Judge reviewed the motion for expedited treatment of the case, CIRANDA 4 ENERGIAS RENOVÁVEIS SA, CIRANDA 5 ENERGIAS RENOVÁVEIS S.A. and CIRANDA 6 ENERGIAS RENOVÁVEIS S.A. appeared in Court spontaneously in **event 10, PEDHABILITACAO1**, requesting authorization for joining the proceedings and questioning the composition of the creditors used for the establishment of the quorums and the suspension of the enforcement measures.

10. Applicants replied in **event 11, PET1**, arguing, in short, the premature nature of that objection, the regularity of the objective criteria for delimiting the claims affected, the fulfillment of the quorum set by law and the need for the protection measures requested.

11. According to the decision under **event 12, DEC1**, the Judge ordered that the proceedings should continue and that the notice under article 164 of Law No. 11.101/2005 be issued. The judge ordered the suspension of actions and executions related to claims subject to the Plans against AGE, AGIE, and AGCS, and prohibited withholding, attachment, or other enforcement restraints arising from those claims for 180 days. The Judge also ordered that the amounts from SABESP that were withheld and not yet collected in Case no. 1029129-

87.2024.8.26.0100 should be made available to Applicants; waived the presentation of Clearance Certificate of Extrajudicial Reorganization or of a plan already confirmed in bidding procedures, without prejudice to the evidence of economic feasibility required in the respective bidding procedure; and the suspension of effectiveness of termination clauses based exclusively on the filing of this request.

12. The notice was duly issued under **event 24, EDITAL1** and forwarded for publication under **event 25, EDITAL1**. In event 31, Applicants presented proof of publication in a widely circulated newspaper and the forwarding of notices sent to the creditors.

13. The Public Prosecution's Office expressed its opinion, under event 31, PET1, that there was no legal basis to justify its mandatory intervention in the proceedings. Said understanding was subsequently confirmed in event **54, PET1.**

14. In **event 36, PET1**, CIRANDA 4 ENERGIAS RENOVÁVEIS SA, CIRANDA 5 ENERGIAS RENOVÁVEIS S.A. and CIRANDA 6 ENERGIAS RENOVÁVEIS S.A. filed an objection to the confirmation. In summary, they argued that their claims stem from an arbitration award and are subject to enforcement proceedings. In contrast, a substantial portion of the claims considered for the quorum arises from structured financial debt with future maturities. They argued that the differences in origin, enforceability, economic value, and impact on the respective creditors would prevent all claims from being treated together under a single category for voting purposes. They claimed the need to establish subclasses or groupings and to reassess the quorums outlined in Article 163 of Law No. 11.101/2005. They further argued that concentrating a significant portion of the affected claims in a single signatory creditor would have allowed the enforcement of the Plan's conditions on the other creditors, and they claimed this was an abuse resulting from the majority status. Based on this argument, they requested that the Judge reassess the previously awarded suspension, arguing that the minimum quorum required for the *stay period* should also be assessed separately according to the subclasses they deem appropriate. Alternatively, the suspension should be canceled, specifically regarding the enforcement of the judgments they requested. Subsequently, they requested the maintenance of the deposits corresponding to 30% of the receivables from the contracts with SABESP, alleging that the judicial attachment had been established before the request for Extrajudicial Reorganization and would cover successive obligations. They also cited economic circumstances related to the renewable energy generation industry and the importance of claims for their activities.

15. The COMPANHIA DO METROPOLITANO DE SÃO PAULO – METRÔ filed an objection under **event 37, PET1** questioning, initially, the sufficiency of the documentation intended to evidence the existence, ownership, classification, and value of the claims used to establish the confirmation quorum. They further argued that the claim they hold, arising from Case No. 1065425-94.2020.8.26.0053, was listed as BRL 20,618,170.10, although it actually corresponded to BRL 21,372,840.36, on the reference date of May 1, 2026. They requested the corresponding correction. They separately indicated legal fees of BRL 2,137,284.04, which, according to them, was due to Associação dos Advogados do Metrô de São Paulo – Metrojur (São Paulo Metro Lawyers Association). They argued that this sum would be independent of the principal debt and could not, in their name, be considered an unsecured debt affected by the Plan. Therefore, they requested their exclusion from the calculation base or, otherwise, a specific classification. Consequently, they requested that the list of creditors be corrected and the quorums recalculated. Ultimately, they requested the Judge to order the Applicants to pay legal fees in case of full or partial acceptance of the objection and, alternatively to the rejection of their objections to the confirmation, they expressed their preference for Option A. However, they expressly stated that their

statement regarding their preference would not constitute voluntary adherence to the Plan, agreement with its other provisions, or a waiver of the objections raised.

16. In event 38, DESP1, this Judge upheld the decision previously rendered in the reconsideration hearing, noting the denial of the request for a stay of appeal filed in the Interlocutory Appeal No. 2800965-63.2026.8.13.0000. The registration of Metrô's attorneys was certified under event 39, CERTIDAO1.

17. Applicants filed their reply to the objection of the Ciranda companies in **event 58, PET1**. They alleged that Law No. 11.101/2005 authorizes the objective delimitation of the types and groups of affected claims and that there was no legal requirement to subdivide by the origin, maturity date, or economic value of each claim. They objected to the allegation of abuse by the majority creditor, pleaded for the maintenance of protective measures, and requested that the objection be rejected and the Plans confirmed. They entered documents into the case file.

18. In **event 59, PET1**, the Applicants replied to Metrô's objection. They stated that the documents relating to the ownership of the claims used to determine the quorum were already included in the Evidentiary stage and argued that the indiscriminate presentation of all additional documents requested by the objecting party was unnecessary. Regarding the claim, they expressly stated that they did not object to its monetary adjustment to BRL 21,372,840.36, in accordance with the amount presented by the creditor itself. They further requested that the portion relating to attorneys' fees incurred in the loss of the suit be excluded from the list of affected claims and that any choice of payment method comply with the procedure set out in the Plans. They pledged to provide Metrô with the necessary assistance in choosing Option A at the appropriate time.

19. In event 60, Applicants voluntarily submitted documentation regarding the tax compliance of AGE, AGIE, and AGCS.

20. These are the facts. Now I shall decide the case.

## II – GROUNDS FOR THE DECISION

21. Under paragraph 5 of article 164, this Judge must review any objections and confirm the plan presented by a ruling "if the Judge considers that the plan does not indicate the performance of acts foreseen in article 130 of this Law and that there are no other irregularities that recommend its rejection."

22. The Extrajudicial Reorganization procedure is provided in articles 161 to 167 of Law No. 11.101/2005.

**23. Legal requirements for confirmation:**

24. The request was accompanied by the Applicants' corporate, accounting, equity, and representation documents. The previous Extrajudicial Reorganization was confirmed on November 29, 2022. Therefore, on the date of filing this procedure, the deadline outlined in Article 161, Paragraph 3, of Law No. 11.101/2005 expired.

25. The provisions of Article 164 of Law No. 11.101/2005 were also observed. The notice was

issued and published, and the Applicants proved that they had sent notices to the affected creditors.

26. The Extrajudicial Reorganization provided for in Article 163 of Law No. 11.101/2005 allows the plan to take effect with respect to all claims of the type or group affected by it when the creditors representing more than half of these claims adhere to it, subject to legal verification and judicial control of its regularity.

27. The Court's confirmation neither implies an examination of the economic feasibility of freely structured options, nor authorizes the Court to replace the negotiated conditions with others deemed more advantageous to a particular creditor. However, the Court must review the legality of the delimitation of the universe of subject claims, the quorum, the regularity of the adherences, and the clauses whose effectiveness depends on requirements imposed by Law No. 11.101/2005.

**28. The objection presented by CIRANDA 4 ENERGIAS RENOVÁVEIS S.A., CIRANDA 5 ENERGIAS RENOVÁVEIS S.A. and CIRANDA 6 ENERGIAS RENOVÁVEIS S.A.:**

29. The objections filed by the CIRANDA companies are based on the premise that unsecured claims of different origins, due dates, and economic values could not be grouped for Article 163 of Law No. 11.101/2005.

30. Article 163, paragraph 1, of Law No. 11.101/2005 authorizes the plan to affect all or part of one or more types of claims or a specific group of creditors of the same nature and subject to similar payment conditions. The legal provision does not require that every difference of obligation cause, due date, or amount determine the establishment of an autonomous subgroup with its own quorum.

31. Plan 1, which was entered into the case file as **event 1, DOC4**, previously delimited the affected parties based on objective criteria, related to the unsecured nature of the claims and the non-existence of an active supply of goods or services to Applicants. The exclusion of active suppliers is objectively consistent with the continuity of business activity and is applied according to a previously defined criterion, not specifically created to exclude the objecting parties.

32. The fact that the CIRANDA companies' claim stems from an arbitration award and is already at the enforcement phase does not, in itself, withdraw its unsecured nature. Similarly, the fact that other debts have a future maturity date does not require their exclusion from the scope of consideration, since the existence of the debt, and not exclusively the occurrence of its maturity date, is relevant for the application of the reorganization regime.

33. Also, there is no evidence that the payment alternatives foreseen in the Plan are reserved for the signatory creditor or unavailable to the other affected creditors under the same legally applicable conditions.

34. Regarding the allegation of abuse of majority position, the concentration of a substantial portion of the affected claims in a single creditor does not, in itself, constitute an abuse of rights. Article 163 of the Brazilian Judicial Reorganization and Bankruptcy Law (LRF) establishes a resolution criterion based on the value of the claims and does not set a minimum number of creditors who must adhere to it.

35. Rejecting a particular adherence to the plan would require concrete evidence of a defect, a simulation, a legal impediment, unlawful discriminatory treatment, or an abusive exercise of a legal position to the detriment of all creditors. The mere difference between the amount of the claims, their origin, or their respective due dates is not sufficient to reach said conclusion.

36. The total value of certain financial obligations from the value actually held by the signatory creditor must be defined and included in the calculation of each debtor's quorum. The lists under **event 1, DOC6** and **event 1, DOC7** individualize, for each company, the affected liabilities and the claims attributed to the signatory, which is why it is not possible to indiscriminately equate the full value of an issue or a specific liability with the numerator used to determine the majority.

37. Since no irregularity has been evidenced in the objective delimitation of the group, nor any concrete flaw in the adherence, there is no basis for judicially establishing the intended subclasses or disregarding the claims calculated solely based on their origin or due date.

38. Therefore, I REJECT the objection filed by CIRANDA 4 ENERGIAS RENOVÁVEIS S.A., CIRANDA 5 ENERGIAS RENOVÁVEIS S.A. and CIRANDA 6 ENERGIAS RENOVÁVEIS S.A. in **event 36, PET1**.

39. Considering the nature and complexity of the controversy, the work performed, and the absence of an evidentiary stage, I set the attorney's fees at BRL 15,000.00, as a single amount related to the joint objection, to be paid by CIRANDA 4 ENERGIAS RENOVÁVEIS S.A., CIRANDA 5 ENERGIAS RENOVÁVEIS S.A. and CIRANDA 6 ENERGIAS RENOVÁVEIS S.A., in equal parts, in favor of the Applicants' lawyers.

**39. Objection filed by COMPANHIA DO METROPOLITANO DE SÃO PAULO – METRÔ:**

40. Metrô questioned the sufficiency of the documentation used to prove the claims considered in establishing the quorum and requested the full presentation of the respective articles of association, calculation sheets, and other supporting documents.

41. The request cannot be accepted. The preliminary evidentiary stage is not limited to the Applicants' spreadsheets. The individualized lists of claims are included in **event 1, DOC6** and **event 1, DOC7**, the joinder agreement and representation documents are filed under **event 1, DOC8**, and the documentation relating to the existence, assignment, and ownership of the signatory's claims is filed under **event 1, DOC9**. These documents identify the debtor, creditor, nature of claim, currency, value, origin, and maturity schedule of the obligations.

42. The Objecting Party did not identify any specific claim of the signatory that was nonexistent, or that had already been paid, held by a third party, counted twice, or subject to a guarantee capable of concretely altering the quorum. The discrepancy identified regarding their own claim does not invalidate the other claims considered, even though it should be corrected.

43. Therefore, the entry of all intended contracts, statements, and historical documents is unnecessary. Article 163, paragraph 6, of Law No. 11.101/2005 requires only sufficient documentation to verify

compliance with legal requirements, as is the case here.

44. Regarding the correction, Metrô's claim was originally listed by AGE as BRL 20,618,170.10. The Objecting Party requested its adjustment to BRL 21,372,840.36, on the reference date of May 1, 2026. Applicants expressly agreed with said sum as provided in **event 59, PET1**.

45. The adjustment, however, does not compromise the legal quorum. The affected liabilities according to AGE are adjusted from BRL 3,400,882,619.38 to BRL 3,401,637,289.64. At the same time, the signatory claim of BRL 2,425,921,625.00 remains unchanged, corresponding to approximately 71.32% of the liabilities, a percentage higher than that required by Article 163 of Law No. 11.101/2005.

46. Regarding the other Applicants, the percentages also remain above the legal majority: 73.5% for AGCS, 79.2% for AGIE, 77.1% for AGINT, and 79.2% for Zagope and Inzag, when considering each company's liabilities separately.

47. Regarding attorney's fees, Metrô also indicated an amount of BRL 2,137,284.04, attributed to Metrojur, arguing that it is an independent claim not subject to the Plan.

48. The amount now recognized in favor of Metrô, of BRL 21,372,840.36, does not include this portion, and the Applicants stated that the attorney's fees were not included in the scope of the Plans. Therefore, no amount is to be excluded from the list of claims.

49. Regarding Metrô's subsidiary manifestation of Option A, the election must observe the procedure foreseen in clause 8 of Plan 1 (**event 1, DOC4**), including the required forms and documents, with the Applicants providing the necessary information for the proper ratification of the option.

50. Therefore, I PARTIALLY ACCEPT the objection of COMPANHIA DO METROPOLITANO DE SÃO PAULO – METRÔ, under **event 37, PET1**, exclusively to determine that its claim before AGE be considered for BRL 21,372,840.36, on the reference date of May 1, 2026, for the proceedings;

51. I REJECT Metrô's other requests for supplementary documentation, refusal of confirmation, and recalculation of quorums due to insufficient evidence, acknowledging that the amendment of its claim does not compromise the majority requirement under Article 163 of Law No. 11.101/2005;

52. I acknowledge Metrô's subsidiary statement in favor of Option A, without hereby attributing to it the effect of voluntary adherence or waiver of the objections raised. The election must comply with the procedure set out in clause 8 of Plan 1.

53. Given the nature of the claims examined, the work performed, and the impossibility of objectively measuring the economic benefit, I set attorney's fees at BRL 10,000.00 in favor of the Applicants' attorneys, to be paid by Metrô, and BRL 10,000.00 in favor of Metrô's attorneys, for which AGE will be liable, with no compensation allowed pursuant to articles 85 and 86 of the CPC.

**53. Verification of Legality:**

54. After discussing the challenges regarding group composition and quorums, I will now examine the scope of certain provisions whose effectiveness must be reconciled with the legislation.

55. Clause 10.4 of the Plans establishes a broad prohibition on the adoption of judicial and extrajudicial measures related to the affected claims while the Plans are in effect.

> *10.4. Collection of Affected Claims. In accordance with Article 163, Paragraph1st and 8th of the LRF, the Affected Creditors may not, from the Date of the Request and while the Plan is in effect, take any judicial or extrajudicial measure, in Brazil or abroad, against the Applicants, aimed at the enforceability, collection or receipt of the Affected Claims, whether under the terms in which they were originally constituted or under the terms of this Plan, including, without limitation, (i) file or continue any judicial or arbitration action or proceeding of any kind related to any Affected Credit; (ii) enforce any judgment, court decision or arbitration award related to any Affected Credit; (iii) seize, attach, bind, block or make unavailable, in any way, in any national or foreign sphere, any assets of the Applicants to satisfy its Affected Claims, and, from the Date of the Claim, they are obliged to cooperate in the release, lifting and discharge of any judicial liens or attachments on Applicants' assets and properties; (iv) pursue payment of its Affected Claims by any other means; or (v) claim any right of set-off against any claim due to the Applicants using its Affected Claims.*

56. The provision is valid concerning the collection of the restructured original obligations. Still, it cannot be interpreted as preventing the exercise of appropriate measures to enforce the obligations themselves under the Plans, should they be in default. The confirmation does not release Applicants from complying with the restructured obligations, the enforceability of which remains in effect under the terms of the Plan itself and applicable law.

57. Therefore, the interpretation of clause 10.4 of the Plans should be clarified to state that the prohibition on collecting the Affected Claims does not preclude the adoption of appropriate judicial or extrajudicial measures to enforce compliance with the restructured obligations in the event of default.

**58. The requests related to the stay period and receivables from SABESP**

59. The companies CIRANDA 4 ENERGIAS RENOVÁVEIS S.A., CIRANDA 5 ENERGIAS RENOVÁVEIS S.A. and CIRANDA 6 ENERGIAS RENOVÁVEIS S.A. requested the revocation of the stay period or the removal of its effects in relation to the enforcement of the judgment promoted by them, alleging the need to form subclasses and the prior nature of the attachments carried out, among other arguments.

60. The requests cannot be accepted, since the regular composition of the group of affected creditors has been recognized and the compliance with the legal quorum has been demonstrated. Inclusively, after the amendment of Metrô's claim, there is no basis to disregard the effects of the decision under **event 12, DEC1,** in relation to the creditors. The prior existence of the attachment, in itself, does not exclude a claim duly submitted to the Plan from the Extrajudicial Reorganization.

61. After confirmation, however, the suspension measures granted during the proceedings

cease to constitute an independent basis for regulating the claims, which become subject to the conditions of the confirmed Plan and the effects provided for in Law No. 11.101/2005.

62. Therefore, I dismiss the requests to revoke the stay period and to grant an individual exemption from its effects. And upon confirmation, the affected claims become subject to the conditions of the confirmed Plans and the effects of Law No. 11.101/2005.

63. Regarding SABESP's receivables, the effects of the order in **event 12, DEC1** remain in effect with respect to the amounts reached by the measure. The relevant procedural steps should be taken in the proceedings in which the enforcement was carried out.

64. **Measures related to bidding procedures and *ipso facto* clauses:**

65. The injunction previously granted regarding the termination clauses should also be confirmed only insofar as it is based exclusively on the filing of the Extrajudicial Reorganization proceedings. The injunction does not prevent contract termination based on independent default, whether prior or subsequent, or on another legally legitimate contractual basis.

**III – THE APPLICABLE LEGAL PROVISION**

66. In light of the foregoing, pursuant to Articles 161, 163, 164, and 165 of Law No. 11.101/2005 and Article 487, I, of the Code of Civil Procedure:

67. I REJECT the objection filed by CIRANDA 4 ENERGIAS RENOVÁVEIS S.A., CIRANDA 5 ENERGIAS RENOVÁVEIS S.A. and CIRANDA 6 ENERGIAS RENOVÁVEIS S.A., under **event 36, PET1**.

68. I order CIRANDA 4 ENERGIAS RENOVÁVEIS S.A., CIRANDA 5 ENERGIAS RENOVÁVEIS S.A. and CIRANDA 6 ENERGIAS RENOVÁVEIS S.A, to pay attorneys' fees in the total amount of BRL 15,000.00, in favor of the Applicants' attorneys. This sum will be divided equally among the parties.

69. I PARTIALLY ACCEPT the objection filed by COMPANHIA DO METROPOLITANO DE SÃO PAULO – METRÔ, in **event 37, PET1**, exclusively to order that its affected claim before ANDRADE GUTIERREZ ENGENHARIA S.A. – AGE be considered, for the purposes hereof, as BRL 21,372,840.36, on the reference date of May 1, 2026. I reject the other requests.

70. Given the reciprocal defeat in the objection presented by Metrô, I ORDER METRÔ to pay attorney's fees of BRL 10,000.00 in favor of the Applicants' attorneys. I ORDER AGE to pay attorney's fees of BRL 10,000.00 in favor of Metrô's attorneys, with no compensation allowed.

**71. I CONFIRM the EXTRAJUDICIAL REORGANIZATION PLAN 1, filed in Event 1, DOC4, by ANDRADE GUTIERREZ ENGENHARIA S.A. – AGE, ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A. – AGIE and ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A. – AGCS, so that it may produce its legal effects in relation to the**

**claims it affects.**

**72. I CONFIRM THE EXTRAJUDICIAL REORGANIZATION PLAN 2, presented in event 1, DOC5, by ANDRADE GUTIERREZ INTERNATIONAL S.A. – AGINT, INZAG GERMANY GMBH – INZAG and ZAGOPE SGPS S.A. – ZAGOPE, so that it may produce its legal effects in relation to the claims affected by it.**

73. In terms of legal verification, clause 10.4 of the Plans should be interpreted to mean that the prohibition on collecting Affected Claims does not extend to judicial or extrajudicial measures to enforce restructured obligations in the event of default.

74. I DENY the requests filed by the Ciranda companies to revoke the stay period and waive its effects individually. However, with this Plan confirmation, the stay period of actions and executions is terminated, and the affected claims will now be subject to the conditions established in the confirmed Plans.

75. With respect to the receivables of SABESP affected by the decision in event 12, I uphold the measures determined therein, and the relevant procedural acts should be adopted in the proceedings where the enforcement was ordered.

76. I confirm, within the limits of the reasoning, the injunction previously granted regarding the termination clauses based exclusively on the filing of the Extrajudicial Reorganization proceedings, without prejudice to the termination of the contract based on independent default or other legally legitimate grounds.

77. I acknowledge Metrô's subsidiary statement in favor of Option A, and any eventual selection must follow the procedure outlined in clause 8 of Plan 1;

78. Law No. 11.101/2005 does not establish a period of judicial oversight of compliance with the Plans after its confirmation in Extrajudicial Reorganization proceedings.

79. Thus, once the Plans are confirmed, any default on the restructured obligations may be claimed by the respective creditors through the appropriate channels, subject to the Plans' conditions, since the confirmation judgment is valid as an enforceable judicial title.

80. The Rapporteur of the Interlocutory Appeal No. 2800965-63.2026.8.13.0000 is hereby notified of the issuance of this judgment.

81. I hereby order this decision to be valid as an official document to be forwarded by the Applicants for the necessary actions resulting from the Plan confirmation, in accordance with what was decided in this judgment.

82. Applicants are liable for the final costs.

83. After the judgment becomes final and all necessary procedures have been completed, I order the archiving and closing of the case.

84. I hereby order that this decision be published, recorded, and that the notification of the

parties hereto be given.

---

Document electronically signed by **MURILO SILVIO DE ABREU, Deputy Judge**, on 09/17/2026, at 8:46:21 PM, pursuant to art. 1, III, b, of Law 11.419/2006. The genuineness of the document can be verified on the website www.tjmg.jus.br > eproc > Autenticação de documenmtos, by entering the verification code **8864863v41** and the CRC code **90c7d7ee**.

---

**1087093-64.2026.8.13.0024**

**8864863 .V41**

https://eproc1g.tjmg.jus.br/eproc/controlador.php?acao=acessar_documento&doc=117896826446170000924704
13282&evento=11789682644617000092470505352&key=63401b35412f1f58d4b91ac66bcafba48657…

---

This is what was to be translated on the original document, according to my best understanding, which amounted to 12 electronic page equivalents which I have reviewed, found true and correct, and sign below:

Emoluments: R$ 367.28
Receipt Book No.:02 Receipt No.:3714
São Paulo, September 21, 2026

JOSE ROBERTO VENSAN MARAMALDO:18122496830
Digitally signed by JOSE ROBERTO VENSAN MARAMALDO:18122496830
Date: 2026.09.28 16:10:32 -03'00'

José Roberto Vensan Maramaldo

**Poder Judiciário**
**Tribunal de Justiça do Estado de Minas Gerais**
**1ª Vara Empresarial da Comarca de Belo Horizonte**

Avenida Raja Gabaglia, 1753 - Bairro: Luxemburgo - CEP: 30380900 - Fone: (31) 3299-4400 - Email: vempresarial1@tjmg.jus.br

**RECUPERAÇÃO EXTRAJUDICIAL Nº 1087093-64.2026.8.13.0024/MG**

**REQUERENTE**: ZAGOPE SGPS S.A.

**REQUERENTE**: INZAG GERMANY GMBH

**REQUERENTE**: ANDRADE GUTIERREZ INTERNATIONAL S.A.

**REQUERENTE**: ANDRADE GUTIERREZ ENGENHARIA S/A

**REQUERENTE**: ANDRADE GUTIERREZ CONSTRUCOES E SERVICOS S.A

**REQUERENTE**: ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S/A

# SENTENÇA

PROCESSO Nº:

CLASSE:

ASSUNTO:

**Vistos, etc.**

**I – RELATÓRIO**

1. Trata-se de pedido de **HOMOLOGAÇÃO DE PLANOS DE RECUPERAÇÃO EXTRAJUDICIAL** apresentados por ANDRADE GUTIERREZ ENGENHARIA S.A. – AGE, ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A. – AGIE, ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A. – AGCS, ANDRADE GUTIERREZ INTERNATIONAL S.A. – AGINT, INZAG GERMANY GMBH – INZAG e ZAGOPE SGPS S.A. – ZAGOPE.

2. As Requerentes afirmaram integrar o Grupo Andrade Gutierrez, com atuação nos setores de engenharia e infraestrutura, e sustentaram a competência deste Juízo em razão da localização, em Belo Horizonte/MG, do centro de direção das atividades do grupo e das sedes das sociedades brasileiras. Informam, ainda, que AGE, AGCS, AGIE, AGINT e Zagope foram submetidas a anterior recuperação extrajudicial, cujo plano foi homologado no processo nº 5209787-06.2022.8.13.0024, em 29/11/2022. Relataram que, após a reestruturação realizada em 2022, sobrevieram novas dificuldades econômico-financeiras, que atribuem, entre outros fatores, à redução e interrupção de projetos internacionais, à variação cambial, à elevação dos encargos financeiros e ao impacto desses fatores sobre a liquidez e o fluxo de caixa. Sustentaram, não obstante, a continuidade e a viabilidade das atividades empresariais e a necessidade de nova reorganização de parcela do passivo. Atribuíram à causa o valor de R$ 3.400.882.619,38 e requereram o processamento conjunto das seis sociedades em consolidação processual, sem consolidação substancial dos respectivos patrimônios.

3. Foram apresentados dois planos distintos. O Plano 1, juntado **evento 1, DOC4**, é subscrito por AGE, AGIE e AGCS e alcança os créditos que atendam aos critérios objetivos nele estabelecidos, notadamente créditos de natureza quirografária, excluídos os fornecedores ativos de bens ou serviços, nos termos definidos no próprio instrumento. O Plano 2, apresentado no **evento 1, DOC5**, é subscrito por AGINT, Inzag e Zagope e compreende os créditos decorrentes das obrigações financeiras internacionais especificadas no instrumento, inclusive os relacionados às notas com vencimentos finais previstos para 2029 e 2040, observados os limites das garantias prestadas por cada sociedade.

4. As Requerentes apresentaram, no **evento 1, DOC6**, relações individualizadas dos créditos abrangidos por cada sociedade e, no **evento 1, DOC7**, os créditos atribuídos ao credor signatário. Juntaram, ainda, os termos de adesão, documentos de representação e documentação destinada a demonstrar a existência e a titularidade dos créditos computados para a formação dos quóruns, especialmente nos **evento 1, DOC8** e **evento 1, DOC9**.

5. Segundo a documentação inicial, o Plano 1 foi apresentado com adesões correspondentes a 71,3% dos créditos abrangidos da AGE, 73,5% dos créditos abrangidos da AGCS e 79,2% dos créditos abrangidos da AGIE. Quanto ao Plano 2, foram informadas adesões equivalentes a 77,1% dos créditos abrangidos da AGINT e 79,2% dos créditos abrangidos de Zagope e Inzag, respectivamente. Os percentuais foram apurados separadamente em relação a cada uma das sociedades, sem consolidação substancial dos respectivos passivos.

6. Os Planos estabelecem três modalidades de reestruturação. Em síntese, a Opção A prevê pagamento de 36% do crédito sujeito, segundo os encargos e o cronograma de amortização estabelecidos no instrumento; a Opção B prevê pagamento do principal em prazo mais alongado, com vencimento final previsto para 2070 e disciplina específica de remuneração e resgate; e a Opção C subdivide o crédito em duas parcelas, correspondentes a 31% e 69%, submetidas às condições próprias previstas nos Planos. As Requerentes informaram que o credor signatário elegeu a Opção C.

7. Em caráter urgente, requereram a ratificação da suspensão das ações e execuções relacionadas aos créditos abrangidos e a proibição de atos constritivos; providências quanto aos valores retidos em execuções envolvendo recebíveis da SABESP; tratamento específico das exigências relacionadas à recuperação extrajudicial em procedimentos licitatórios; e a suspensão da eficácia de cláusulas contratuais que previssem resolução automática exclusivamente em razão do ajuizamento da recuperação extrajudicial.

8. Ao final, pugnaram pela homologação judicial dos dois planos, com extensão de seus efeitos aos credores abrangidos, inclusive dissidentes, na forma do art. 163 da Lei nº 11.101/2005.

9. Antes da apreciação do pedido de urgência, CIRANDA 4 ENERGIAS RENOVÁVEIS S.A., CIRANDA 5 ENERGIAS RENOVÁVEIS S.A. e CIRANDA 6 ENERGIAS RENOVÁVEIS S.A. compareceram espontaneamente no **evento 10, PEDHABILITACAO1**, requerendo seu ingresso no feito e questionando a composição do universo de credores utilizado para a formação dos quóruns e a suspensão das medidas executivas.

10. As Requerentes manifestaram-se no **evento 11, PET1**, sustentando, em síntese, a prematuridade daquela insurgência, a regularidade dos critérios objetivos de delimitação dos créditos abrangidos, o preenchimento do quórum previsto em lei e a necessidade das medidas de proteção postuladas.

11. Pela decisão do **evento 12, DEC1**, foi determinado o prosseguimento do procedimento e a expedição do edital previsto no art. 164 da Lei nº 11.101/2005. Foi estabelecida, por 180 dias, a suspensão das ações e execuções relativas aos créditos sujeitos aos Planos em face de AGE, AGIE e AGCS, bem como vedadas medidas de retenção e constrição decorrentes daqueles créditos. Foi determinada, ainda, a disponibilização às Requerentes dos valores provenientes da SABESP que se encontrassem retidos e ainda não levantados no processo nº 1029129-87.2024.8.26.0100; dispensadas, nas licitações, a apresentação de certidão negativa de recuperação extrajudicial ou de plano já homologado, sem afastamento da demonstração da viabilidade econômica exigida no respectivo certame; e suspensa a eficácia de cláusulas resolutivas fundadas exclusivamente no ajuizamento do presente pedido.

12. O edital foi devidamente expedido no **evento 24, EDITAL1** e encaminhado para publicação no **evento 25, EDITAL1**. No evento 31 as Requerentes apresentaram comprovantes da publicação em jornal de grande circulação e das comunicações encaminhadas aos credores abrangidos.

13. O Ministério Público, no **evento 31, PET1**, manifestou pela inexistência de hipótese legal que justificasse sua intervenção obrigatória no procedimento, entendimento posteriormente reiterado no evento **evento 54, PET1**.

14. No **evento 36, PET1**, CIRANDA 4 ENERGIAS RENOVÁVEIS S.A., CIRANDA 5 ENERGIAS RENOVÁVEIS S.A. e CIRANDA 6 ENERGIAS RENOVÁVEIS S.A. apresentaram impugnação à homologação. Sustentaram, em síntese, que seus créditos decorrem de condenação arbitral e são objeto de cumprimento de sentença, enquanto parcela substancial dos créditos computados para a formação do quórum decorre de dívida financeira estruturada, com vencimentos futuros. Alegaram que as diferenças de origem, exigibilidade, expressão econômica e repercussão sobre os respectivos credores impediriam o tratamento conjunto de todos os créditos sob uma única espécie para fins de votação. Defenderam a necessidade de formação de subclasses ou agrupamentos distintos, com reapuração dos quóruns previstos no art. 163 da Lei nº 11.101/2005. Argumentaram, ainda, que a concentração de parcela expressiva dos créditos abrangidos em um único credor signatário teria permitido a imposição das condições do Plano aos demais credores e invocam abuso da posição majoritária. A partir disso, requereram a reconsideração da suspensão anteriormente reconhecida, por entenderem que também o quórum mínimo necessário ao *stay period* deveria ser aferido separadamente segundo as subclasses que reputam adequadas. Subsidiariamente, o afastamento da suspensão especificamente quanto ao cumprimento de sentença por elas ajuizado. Sucessivamente, pugnaram pela manutenção dos depósitos correspondentes a 30% dos recebíveis provenientes dos contratos com a SABESP, sustentando que a constrição teria sido constituída anteriormente ao pedido de recuperação extrajudicial e alcançaria prestações sucessivas. Invocaram, também, circunstâncias econômicas relacionadas ao setor de geração de energia renovável e a relevância do crédito para suas atividades.

15. A COMPANHIA DO METROPOLITANO DE SÃO PAULO – METRÔ apresentou impugnação no **evento 37, PET1** questionando, inicialmente, a suficiência da documentação destinada a demonstrar a existência, titularidade, classificação e valor dos créditos utilizados na formação do quórum de aprovação. Sustentou, ainda, que o crédito de sua titularidade, decorrente do processo nº 1065425-94.2020.8.26.0053, foi relacionado por R$ 20.618.170,10, embora correspondesse a R$ 21.372.840,36, na data-base de 01/05/2026, requerendo a respectiva retificação. Indicou, separadamente, honorários advocatícios no valor de R$ 2.137.284,04, cuja titularidade atribui à Associação dos Advogados do Metrô de São Paulo – Metrojur. Aduziu que essa verba possuiria autonomia em relação ao crédito principal e não poderia ser considerada, em seu nome, como crédito quirografário abrangido pelo Plano, requerendo sua exclusão da base de cálculo ou, subsidiariamente, classificação específica. Requereu, em consequência, a retificação da relação de credores e a reapuração dos quóruns. Ao final, pugnou pela condenação das Requerentes em honorários sucumbenciais em caso de acolhimento total ou parcial da

impugnação e, subsidiariamente à rejeição de suas objeções à homologação, manifestou preferência pela Opção A, ressalvando expressamente que a manifestação não constituiria adesão voluntária ao Plano, concordância com suas demais disposições ou renúncia às impugnações formuladas.

16. No evento 38, DESP1, este Juízo manteve a decisão anteriormente proferida em juízo de retratação, registrando o indeferimento do pedido de efeito suspensivo formulado no Agravo de Instrumento nº 2800965-63.2026.8.13.0000. O cadastramento dos procuradores do Metrô foi certificado no evento 39, CERTIDAO1.

17. As Requerentes apresentaram resposta à impugnação das sociedades Ciranda no **evento 58, PET1**. Sustentaram que a Lei nº 11.101/2005 autoriza a delimitação objetiva das espécies e grupos de créditos abrangidos e que não existe imposição legal de subdivisão decorrente da origem, vencimento ou expressão econômica de cada crédito. Impugnaram a alegação de abuso do credor majoritário, defendem a manutenção das medidas protetivas e requerem a rejeição da impugnação e a homologação dos Planos. Juntaram documentos.

18. No **evento 59, PET1**, as Requerentes responderam à impugnação do Metrô. Afirmaram que os documentos relativos à titularidade dos créditos computados para a formação do quórum já integravam a instrução inicial e sustentaram não ser exigível a apresentação indistinta de todos os documentos adicionais postulados pela impugnante. Quanto ao crédito, manifestaram expressamente não se opor à sua retificação para R$ 21.372.840,36, conforme o valor apresentado pela própria credora. Sustentaram, ainda, que a parcela relativa aos honorários sucumbenciais não foi incluída na relação dos créditos sujeitos e que eventual opção por modalidade de pagamento deverá observar o procedimento previsto nos Planos. Comprometeram-se a prestar o auxílio necessário ao Metrô para a escolha da Opção A no momento adequado.

19. No evento 60, as Requerentes apresentaram espontaneamente documentação referente à regularidade fiscal de AGE, AGIE e AGCS.

20. É o relatório. Decido.

## II – FUNDAMENTAÇÃO

21. Como previsto no §5º do art. 164, cabe ao juízo apreciar eventuais impugnações e homologar o plano apresentado por sentença, "*se entender que não implica prática de atos previstos no art. 130 desta Lei e que não há outras irregularidades que recomendem sua rejeição.*"

22. O procedimento de Recuperação Extrajudicial está previsto nos artigos 161 a 167 da Lei 11.101/2005.

### 23. Dos requisitos legais para a homologação:

24. O pedido foi instruído com os documentos societários, contábeis, patrimoniais e de representação das sociedades autoras. A anterior Recuperação Extrajudicial foi homologada em 29/11/2022, de modo que, na data do ajuizamento deste procedimento, estava superado o prazo previsto no art. 161, § 3º, da Lei nº 11.101/2005.

25. Também foram observadas as providências do art. 164 da Lei nº 11.101/2005. O edital foi expedido e publicado, as Requerentes comprovaram a realização das comunicações aos credores abrangidos.

26. A Recuperação Extrajudicial prevista no art. 163 da Lei nº 11.101/2005 admite que o plano produza efeitos em relação à totalidade dos créditos da espécie ou do grupo por ele abrangidos quando obtida a adesão de credores representativos de mais da metade desses créditos, observada a aferição legal e o controle judicial de regularidade.

27. A homologação judicial não implica exame da conveniência econômica das opções livremente estruturadas, nem autoriza que o Juízo substitua as condições negociais por outras reputadas mais vantajosas a determinado credor. Compete ao Poder Judiciário, contudo, exercer controle de legalidade sobre a delimitação do universo de créditos sujeitos, o quórum, a regularidade das adesões e as cláusulas cuja eficácia dependa de requisitos impostos pela Lei nº 11.101/2005.

### 28. Da impugnação apresentada por CIRANDA 4 ENERGIAS RENOVÁVEIS S.A., CIRANDA 5 ENERGIAS RENOVÁVEIS S.A. e CIRANDA 6 ENERGIAS RENOVÁVEIS S.A.:

29. A impugnação das sociedades Ciranda parte da premissa de que créditos quirografários de origens, vencimentos e expressões econômicas distintas não poderiam ser reunidos no mesmo grupo para fins do art. 163 da Lei nº 11.101/2005.

30. O art. 163, § 1º, da Lei nº 11.101/2005 autoriza que o plano abranja a totalidade de uma ou mais espécies de créditos ou determinado grupo de credores de mesma natureza e sujeito a semelhantes condições de pagamento. A norma não exige que toda diferença de causa obrigacional, vencimento ou valor determine a instituição de subgrupo autônomo com quórum próprio.

31. O Plano 1, juntado no **evento 1, DOC4**, delimitou previamente o universo atingido mediante critérios objetivos, relacionados à natureza quirografária dos créditos e à inexistência de fornecimento ativo de bens ou serviços às Requerentes. A exclusão dos fornecedores ativos guarda pertinência objetiva com a

continuidade da atividade empresarial e se aplica segundo critério previamente definido, não especificamente criado para afastar as impugnantes.

32. O fato de o crédito das sociedades CIRANDA decorrer de sentença arbitral e já se encontrar em fase de cumprimento não lhe retira, por si só, a natureza quirografária. Do mesmo modo, a circunstância de outros créditos possuírem vencimento futuro não impõe sua exclusão do universo considerado, pois a existência do crédito, e não exclusivamente a ocorrência de seu vencimento, é relevante para a incidência do regime recuperacional.

33. Tampouco se demonstrou que as alternativas de pagamento previstas no Plano estejam reservadas ao credor signatário ou sejam indisponíveis, nas mesmas condições juridicamente aplicáveis, aos demais credores abrangidos.

34. Quanto à alegação de abuso da posição majoritária, a concentração de parcela expressiva dos créditos sujeitos em um único titular não configura, isoladamente, abuso de direito. O próprio art. 163 da LRF adota critério de deliberação calculado segundo o valor dos créditos e não estabelece número mínimo de credores aderentes.

35. O afastamento de determinada adesão exigiria demonstração concreta de vício, simulação, impedimento legal, tratamento discriminatório ilícito ou exercício abusivo da posição jurídica em prejuízo do conjunto de credores. A mera diferença entre o montante dos créditos, sua origem ou seus respectivos vencimentos não é suficiente para essa conclusão.

36. Também deve ser distinguido o valor global de determinadas obrigações financeiras do valor efetivamente titularizado pelo credor signatário e computado na formação do quórum de cada devedora. As relações de **evento 1, DOC6** e **evento 1, DOC7** individualizam, para cada sociedade, o passivo abrangido e os créditos atribuídos ao signatário, razão pela qual não é possível equiparar indistintamente o valor integral de uma emissão ou de determinado passivo ao numerador utilizado para aferição da maioria.

37. Não demonstrada irregularidade na delimitação objetiva do grupo nem vício concreto na adesão, não há fundamento para instituir judicialmente as subclasses pretendidas ou desconsiderar os créditos computados apenas em razão de sua origem ou de seu vencimento.

38. Assim, REJEITO a impugnação formulada por CIRANDA 4 ENERGIAS RENOVÁVEIS S.A., CIRANDA 5 ENERGIAS RENOVÁVEIS S.A. e CIRANDA 6 ENERGIAS RENOVÁVEIS S.A. no **evento 36, PET1**.

39. Considerados a natureza e a complexidade da controvérsia, o trabalho desenvolvido e a ausência de instrução probatória, fixo os honorários advocatícios em R$ 15.000,00, como verba única relativa à impugnação conjunta, a cargo de CIRANDA 4 ENERGIAS RENOVÁVEIS S.A., CIRANDA 5 ENERGIAS RENOVÁVEIS S.A. e CIRANDA 6 ENERGIAS RENOVÁVEIS S.A., em partes iguais, em favor dos patronos das Requerentes.

**39. Da impugnação da COMPANHIA DO METROPOLITANO DE SÃO PAULO – METRÔ:**

40. O Metrô questionou a suficiência da documentação utilizada para comprovar os créditos considerados na formação do quórum e requereu a apresentação integral dos respectivos instrumentos constitutivos, memórias de cálculo e demais documentos de suporte.

41. O pedido não comporta acolhimento. A instrução inicial não se limita a planilhas unilaterais das Requerentes. As relações individualizadas dos créditos constam do **evento 1, DOC6** e **evento 1, DOC7** os termos de adesão e documentos de representação do **evento 1, DOC8**, e a documentação relativa à existência, cessão e titularidade dos créditos do signatário do **evento 1, DOC9**. Esses documentos identificam devedor, credor, natureza, moeda, valor, origem e regime de vencimento das obrigações.

42. A impugnante não individualizou crédito específico do signatário que fosse inexistente, já satisfeito, titularizado por terceiro, computado em duplicidade ou submetido a garantia capaz de alterar concretamente o quórum. A divergência identificada quanto ao seu próprio crédito, embora deva ser corrigida, não invalida os demais créditos considerados.

43. Não é necessária, portanto, a juntada genérica de todos os contratos, extratos e documentos históricos pretendidos. O art. 163, § 6º, da Lei nº 11.101/2005 exige documentação suficiente ao controle dos requisitos legais, o que se verifica no caso.

44. Quanto à retificação, o crédito do Metrô foi originalmente relacionado pela AGE em R$ 20.618.170,10. A impugnante requereu sua retificação para R$ 21.372.840,36, na data-base de 01/05/2026, valor com o qual as Requerentes expressamente concordaram no evento **evento 59, PET1**.

45. A retificação, contudo, não compromete o quórum legal. O passivo sujeito da AGE passa de R$ 3.400.882.619,38 para R$ 3.401.637.289,64, permanecendo inalterado o crédito signatário de R$ 2.425.921.625,00, correspondente a aproximadamente 71,32% do passivo, percentual superior ao exigido pelo art. 163 da Lei nº 11.101/2005.

46. Quanto às demais Requerentes, os percentuais também permanecem superiores à maioria legal: 73,5% para a AGCS, 79,2% para a AGIE, 77,1% para a AGINT e 79,2% para Zagope e Inzag, considerados separadamente os passivos de cada sociedade.

47. Em relação aos honorários advocatícios, o Metrô indicou, ainda, verba de R$ 2.137.284,04, atribuída à Metrojur, sustentando tratar-se de crédito autônomo não sujeito ao Plano.

48. O valor ora reconhecido em favor do Metrô, de R$ 21.372.840,36, não inclui essa parcela, e as Requerentes afirmaram que os honorários sucumbenciais não foram inseridos no perímetro dos Planos. Não há, portanto, quantia a ser excluída da relação de créditos.

b49 Quanto à manifestação subsidiária do Metrô pela Opção A, a escolha deverá observar o procedimento previsto na cláusula 8 do Plano 1 (**evento 1, DOC4**), inclusive quanto aos formulários e documentos exigidos, cabendo às Requerentes prestar as informações necessárias à regular formalização da opção.

50. Portanto, ACOLHO PARCIALMENTE a impugnação da COMPANHIA DO METROPOLITANO DE SÃO PAULO – METRÔ, de **evento 37, PET1**, exclusivamente para determinar que seu crédito sujeito perante a AGE seja considerado no valor de R$ 21.372.840,36, na data-base de 01/05/2026, para os fins deste procedimento;

51. REJEITO os demais pedidos do Metrô de complementação documental, recusa da homologação e reapuração dos quóruns por insuficiência de comprovação, reconhecendo que a retificação de seu crédito não compromete a maioria exigida pelo art. 163 da Lei nº 11.101/2005;

52. Registro a manifestação subsidiária do Metrô pela Opção A, sem atribuir-lhe, por esse ato, efeito de adesão voluntária ou de renúncia às impugnações formuladas, devendo a eleição observar o procedimento disciplinado pela cláusula 8 do Plano 1.

68. Diante da natureza das pretensões examinadas, do trabalho desenvolvido e da impossibilidade de mensuração objetiva do proveito econômico, fixo honorários advocatícios em R$ 10.000,00 em favor dos patronos das Requerentes, a cargo do Metrô, e em R$ 10.000,00 em favor dos patronos do Metrô, a cargo da AGE, vedada a compensação, nos termos dos arts. 85 e 86 do CPC.

**53. Do controle de legalidade:**

54. Superadas as impugnações quanto à composição dos grupos e aos quóruns, cabe examinar o alcance de determinadas disposições cuja eficácia deve ser compatibilizada com a legislação.

55. A cláusula 10.4 dos Planos estabelece ampla vedação à adoção de medidas judiciais e extrajudiciais relacionadas aos créditos sujeitos enquanto vigentes os instrumentos.

> *10.4. Cobrança dos Créditos Sujeitos. Em conformidade com o artigo 163, §§1º e 8º da LRF, os Credores Sujeitos não poderão, a partir da Data do Pedido e enquanto viger o Plano, adotar qualquer medida, judicial ou extrajudicial, no Brasil ou no exterior, em face das Requerentes, que vise à exigibilidade, cobrança ou ao recebimento dos Créditos Sujeitos, seja nos termos em que foram originalmente constituídos, seja nos termos deste Plano, incluindo, sem limitação, (i) ajuizar ou prosseguir qualquer ação ou processo judicial ou arbitral de qualquer tipo relacionado a qualquer Crédito Sujeito; (ii) executar qualquer sentença, decisão judicial ou sentença arbitral relacionada a qualquer Crédito Sujeito; (iii) penhorar, sequestrar, arrestar, bloquear ou tornar indisponíveis, por qualquer forma, em qualquer foro, nacional ou estrangeiro, quaisquer bens das Requerentes para satisfazer seus Créditos Sujeitos, ficando, desde a Data do Pedido, obrigados a cooperar para a liberação, levantamento e desoneração de quaisquer penhoras ou constrições judiciais sobre bens e ativos das Requerentes; (iv) buscar a satisfação de seus Créditos Sujeitos por quaisquer outros meios; ou (v) reclamar qualquer direito de compensação contra qualquer crédito devido às Requerentes com seus Créditos Sujeitos.*

56. A previsão é válida quanto à cobrança das obrigações originárias reestruturadas, mas não pode ser interpretada como impedimento ao exercício das medidas cabíveis para exigir as próprias obrigações previstas nos Planos, caso venham a ser inadimplidas. A homologação não confere às Requerentes imunidade em relação ao cumprimento das obrigações reestruturadas, cuja exigibilidade subsiste nos termos do próprio Plano e da legislação aplicável.

57. Assim, deve ser ressalvada a interpretação da cláusula 10.4 dos Planos, para consignar que a vedação à cobrança dos Créditos Sujeitos não impede a adoção das medidas judiciais ou extrajudiciais cabíveis para exigir o cumprimento das obrigações reestruturadas em caso de inadimplemento.

**58. Dos pedidos relativos ao *stay period* e aos recebíveis da SABESP**

59. As empresas CIRANDA 4 ENERGIAS RENOVÁVEIS S.A., CIRANDA 5 ENERGIAS RENOVÁVEIS S.A. e CIRANDA 6 ENERGIAS RENOVÁVEIS S.A. requereram a revogação do *stay period* ou, subsidiariamente, o afastamento de seus efeitos em relação ao cumprimento de sentença por elas promovido, sustentando, entre outros argumentos, a necessidade de formação de subclasses e a anterioridade das constrições realizadas.

60. Os pedidos não comportam acolhimento, pois reconhecida a regular composição do grupo de credores abrangidos e demonstrado o atendimento ao quórum legal, inclusive após a retificação do crédito do Metrô, não se verifica fundamento para afastar os efeitos da decisão do **evento 12, DEC1** em relação às credoras.

A anterioridade da constrição, por si só, não exclui da recuperação extrajudicial crédito regularmente submetido ao Plano.

61. Com a homologação, contudo, as medidas de suspensão deferidas no curso do procedimento deixam de constituir o fundamento autônomo da disciplina dos créditos, que passam a se submeter às condições do Plano homologado e aos efeitos previstos na Lei nº 11.101/2005.

62. Logo, os pedidos de revogação do *stay period* e de afastamento individual de seus efeitos restam indeferidos e, com a homologação, os créditos sujeitos passam a observar as condições dos Planos homologados e os efeitos previstos na Lei nº 11.101/2005.

63. Quanto aos recebíveis da SABESP, ficam mantidos os efeitos da determinação do **evento 12, DEC1** relativamente aos valores alcançados pela medida, devendo as providências processuais pertinentes ser adotadas no processo em que realizada a constrição.

**64. Das medidas relacionadas às licitações e às cláusulas *ipso facto:***

65. A tutela anteriormente deferida quanto às cláusulas resolutivas deve igualmente ser confirmada apenas nos limites em que fundada exclusivamente no ajuizamento da recuperação extrajudicial. A proteção não impede a resolução contratual fundada em inadimplemento autônomo, anterior ou superveniente, ou em outro fundamento contratual juridicamente legítimo.

**III – DISPOSITIVO**

66. Diante do exposto, com fundamento nos arts. 161, 163, 164 e 165 da Lei nº 11.101/2005 e no art. 487, I, do Código de Processo Civil:

67. REJEITO a impugnação apresentada por CIRANDA 4 ENERGIAS RENOVÁVEIS S.A., CIRANDA 5 ENERGIAS RENOVÁVEIS S.A. e CIRANDA 6 ENERGIAS RENOVÁVEIS S.A., no evento 36, PET1.

68. Condeno CIRANDA 4 ENERGIAS RENOVÁVEIS S.A., CIRANDA 5 ENERGIAS RENOVÁVEIS S.A. e CIRANDA 6 ENERGIAS RENOVÁVEIS S.A., em partes iguais, no pagamento de honorários advocatícios no valor total de R$ 15.000,00, em favor dos patronos das Requerentes.

69. ACOLHO PARCIALMENTE a impugnação apresentada pela COMPANHIA DO METROPOLITANO DE SÃO PAULO – METRÔ, no evento 37, PET1, exclusivamente para determinar que seu crédito sujeito perante a ANDRADE GUTIERREZ ENGENHARIA S.A. – AGE seja considerado, para os fins deste procedimento, no valor de R$ 21.372.840,36, na data-base de 01/05/2026, rejeitados os demais pedidos.

70. Diante da sucumbência recíproca na impugnação apresentada pelo Metrô, CONDENO-O ao pagamento de honorários advocatícios de R$ 10.000,00 em favor dos patronos das Requerentes e CONDENO a AGE no pagamento de honorários advocatícios de R$ 10.000,00 em favor dos patronos do Metrô, vedada a compensação.

**71. HOMOLOGO o PLANO DE RECUPERAÇÃO EXTRAJUDICIAL 1, apresentado no evento evento 1, DOC4, por ANDRADE GUTIERREZ ENGENHARIA S.A. – AGE, ANDRADE GUTIERREZ INVESTIMENTOS EM ENGENHARIA S.A. – AGIE e ANDRADE GUTIERREZ CONSTRUÇÕES E SERVIÇOS S.A. – AGCS, para que produza seus jurídicos e legais efeitos em relação aos créditos por ele abrangidos.**

**72. HOMOLOGO O PLANO DE RECUPERAÇÃO EXTRAJUDICIAL 2, apresentado no evento 1, DOC5, por ANDRADE GUTIERREZ INTERNATIONAL S.A. – AGINT, INZAG GERMANY GMBH – INZAG e ZAGOPE SGPS S.A. – ZAGOPE, para que produza seus jurídicos e legais efeitos em relação aos créditos por ele abrangidos.**

73. Em controle de legalidade, a cláusula 10.4 dos Planos deve ser interpretada no sentido de que a vedação à cobrança dos Créditos Sujeitos não alcança as medidas judiciais ou extrajudiciais destinadas à exigência das obrigações reestruturadas em caso de inadimplemento.

74. INDEFIRO os pedidos das sociedades Ciranda de revogação do *stay period* e de afastamento individual de seus efeitos, ficando, contudo, encerrado, com a presente homologação, o período de suspensão das ações e execuções, passando os créditos sujeitos a observar as condições estabelecidas nos Planos homologados.

75. Mantenho, quanto aos recebíveis da SABESP alcançados pela decisão do evento 12, as providências nela determinadas, devendo os atos processuais pertinentes ser adotados no processo em que realizada a constrição.

76. Confirmo, nos limites da fundamentação, a tutela anteriormente deferida quanto às cláusulas resolutivas fundadas exclusivamente no ajuizamento da recuperação extrajudicial, sem prejuízo da resolução contratual fundada em inadimplemento autônomo ou em outro fundamento juridicamente legítimo.

77. Registro a manifestação subsidiária do Metrô pela Opção A, devendo eventual eleição observar o procedimento previsto na cláusula 8 do Plano 1;

78. No procedimento de recuperação extrajudicial, a Lei nº 11.101/2005 não estabelece período de fiscalização judicial do cumprimento dos Planos após a homologação.

79. Assim, uma vez homologados os Planos, eventual inadimplemento das obrigações reestruturadas poderá ser perseguido pelos respectivos credores pelas vias próprias, observadas as condições dos Planos, uma vez que a sentença homologatória constitui título executivo judicial.

80. Comunique-se ao Relator do Agravo de Instrumento nº 2800965-63.2026.8.13.0000 a prolação desta sentença.

81. Confiro a esta decisão força de ofício a ser remetida pelas Requerentes para as providências decorrentes da homologação, observado o que foi decidido nesta sentença.

82. Custas finais pelas Requerentes.

83. Após o trânsito em julgado e cumpridas as providências cabíveis, arquivar com baixa.

84. Publicar. Registrar. Intimar.

---

Documento assinado eletronicamente por **MURILO SILVIO DE ABREU, Juiz Substituto**, em 17/09/2026, às 20:46:21, conforme art. 1º, III, "b", da Lei 11.419/2006. A autenticidade do documento pode ser conferida no site www.tjmg.jus.br > eproc > Autenticação de documentos, informando o código verificador **8864863v41** e o código CRC **90c7d7ee**.

---

**1087093-64.2026.8.13.0024** **8864863 .V41**

# Exhibit L

## Noteholder Election Notice

**Andrade Gutierrez International S.A. ("AGINT"), Andrade Gutierrez Investimentos em Engenharia S.A. ("AGIE"), Andrade Gutierrez Engenharia S.A. ("AGE"), Zagope SGPS, S.A. ("Zagope"), Andrade Gutierrez Construções e Serviços S.A. ("AGCS") and INZAG Germany GmbH ("INZAG")**

**9.000%/10.500% Senior Secured PIK Toggle Notes due 2029 (the "2029 Notes")**[1]
(CUSIP No. L01795 AG5 / ISIN USL01795AG50 and
CUSIP No. 03439T AH4 / ISIN US03439TAH41)

**1.000% PIK Toggle Notes due 2040 (the "2040 Notes")**[2]
(CUSIP No. L01795 AH3 / ISIN USL01795AH34 and
CUSIP No. 03439T AJ0 / ISIN US03439TAJ07)

## NOTICE OF RESTRUCTURING AND ELECTION PROCESS ("ELECTION NOTICE")

**For Holders of 2029 Notes and 2040 Notes**

On May 19, 2026, (i) debtors Andrade Gutierrez Engenharia S.A., Andrade Gutierrez Construções e Serviços S.A. and Andrade Gutierrez Investimentos em Engenharia S.A. (collectively, the "EJ Plan 1 Debtors") filed a request for confirmation of their extrajudicial reorganization plan ("EJ Plan 1") and (ii) Andrade Gutierrez International S.A., Zagope Sgps, S.A., and INZAG Germany GmbH (collectively, the "EJ Plan 2 Debtors" and together with the EJ Plan 1 Debtors, the "Debtors") filed a request for confirmation of their extrajudicial reorganization plan ("EJ Plan 2" and together with EJ Plan 1, the "EJ Plans"), each before the 1st Commercial Court of the District of Belo Horizonte (the "Brazilian Court").[3] On May 28, 2026, the Brazilian Court entered an interlocutory order that, among other things, accepted the processing of the case.

The terms of the EJ Plans were approved, as applicable, by a Creditor holding more than (i) 71.3% of claims owed by AGE, (ii) 79.2% of claims owed by AGIE, (iii) 73.5% of claims owed by AGCS, (iv) 77.1% of claims owed by AGINT, (v) 79.2% of claims owed by Zagope, and (vi) 79.2% of claims owed by INZAG.

Pursuant to (i) EJ Plan 1, the 2029 Notes and the 2040 Notes (together, the "Existing Notes") will be exchanged for certain consideration (the "EJ Plan 1 Consideration"), and (ii) EJ Plan 2, the Existing Notes will be exchanged for certain consideration (the "EJ Plan 2 Consideration" and together with the EJ Plan 1 Consideration, the "EJ Plan Consideration"), in each case, as described

[1] The 2029 Notes were issued by AGINT and guaranteed by AGE, AGIE, AGCS, Zagope, and INZAG.

[2] The 2040 Notes were issued by AGINT and guaranteed by AGE.

[3] Except as otherwise specified, capitalized terms used but not defined herein shall have the meaning given to such terms in the EJ Plans and the *Declaration of Gustavo Coutinho in Support of the Motion for (I) Recognition of Foreign Proceeding, (II) Recognition of Foreign Representative, (III) Recognition and Enforcement of Brazilian Confirmation Order and Related EJ Plans and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code and Additional First Day Filings*.

in clauses 5, 6 and 7 of each of the EJ Plans, each depending on whether a Subject Creditor (or, a "Creditor") makes one of the following elections, as fully described in the EJ Plans and summarized below. A Creditor who is a holder of Existing Notes is referred to herein as a "Noteholder", with respect to its Subject Claims arising from the Existing Notes. Each Option under EJ Plan 1 has the same economic terms as the corresponding Option under EJ Plan 2. Under no circumstance will a Creditor receive the EJ Plan Consideration in duplication under both EJ Plan 1 and EJ Plan 2 (*i.e.,* Noteholders will receive the same EJ Plan Consideration under both EJ Plan 1 and EJ Plan 2, considering the aggregate amount each one holds under the Existing Notes, without duplication). A Creditor who makes a valid election before the Election Deadline (as defined below) is referred to herein as an "Electing Creditor." A Creditor who (i) does not make a valid election before the Election Deadline or, if applicable, (ii) withdraws its Existing Notes from ATOP (as defined below) is referred to herein as a "Non-Electing Creditor". Non-Electing Creditors shall be deemed to have selected Option B (as described below) for purposes of receiving their EJ Plan Consideration. As further detailed below, as consideration for their claims, Noteholders shall receive, with respect to their claims arising from the Existing Notes, new notes corresponding to the Option selected. **Each Creditor may only select one of the following election options for all of its Existing Notes. For the avoidance of doubt, in the event of any conflict between this Election Notice or the Noteholder Election Form and the EJ Plans, the EJ Plans shall prevail. Creditors should refer to the EJ Plans, available on the Case Website (as defined below).**

**Option A Election**: ***Under Option A, Creditors may elect a 36% recovery with a maturity of 2040 as follows:*** Creditors who elect option A (the "Option A Creditors" and the claims held by the Option A Creditors, the "Option A Claims") are entitled to receive as consideration (the "Option A Consideration") the equivalent of 36% of the amount of the subject claim, and the remaining 64% shall be deemed discharged. Creditors of Option A claims arising from the Existing Notes shall receive their Option A Consideration in the form of new notes, which are expected to be made eligible on the DTC platform (the "New Notes A"), issued by AGINT and guaranteed by Debtors AGE, AGIE and AGCS and non-Debtors Andrade Gutierrez Participações S.A. ("AGPAR") and Andrade Gutierrez S.A. ("AGSA"). The New Notes A will be secured by a first priority, Brazilian law governed fiduciary lien over the equity in AGE, and a first lien, German law governed pledge over the equity in INZAG. The New Notes A shall accrue interest at a rate of 6.00% per annum. Interest accrued from the date of the Brazilian Confirmation Order to December 28, 2030 shall be capitalized into principal of the New Notes A. Interest accrued from December 28, 2030 to December 28, 2040 shall be paid in cash on a semiannual basis on June 28 and December 28, as applicable, with the first payment being due June 28, 2031. The principal amount of the New Notes A shall be paid in six annual installments beginning December 28, 2035, with a maturity date of December 28, 2040.

**Option B Election**: ***Under Option B, Creditors may elect preservation of 100% of the claim principal with minimal interest through 2070, bullet maturity and optional debtor prepayment right at a 90% discount as follows:*** Creditors who elect option B (the "Option B Creditors" and the claims held by the Option B Creditors, the "Option B Claims") are entitled to receive as consideration (the "Option B Consideration") the equivalent of 100% of the amount of the subject claim. Creditors of Option B claims arising from the Existing Notes shall receive their Option B Consideration in the form of new notes, which are expected to be made eligible on the DTC platform (the "New Notes B"), issued by AGINT and guaranteed by Debtors AGE, AGIE, AGCS and non-Debtors AGPAR and AGSA. The New Notes B will be secured by a second priority Brazilian law governed fiduciary lien over the equity in AGE (granted on a conditional basis), and a second lien, German law governed pledge over the equity in INZAG. The New Notes B shall accrue interest at a rate of 1.00% per annum. Interest accrued from the date of the Brazilian Confirmation Order shall be capitalized into principal of the New Notes B. The principal amount of the New Notes B and interest shall be paid in one single installment due on the maturity date: December 28, 2070. The New Notes B may be redeemed in advance, partially or in full, at the sole discretion of AGINT, AGE, AGCS, AGIE, AGSA and/or AGPAR at any time from January 1, 2035 until June 28, 2070, at a 90% discount. ***Option B is also the default EJ Plan treatment for Creditors that do not duly make an election.***

**Option C Election**: ***Under Option C, Creditors may elect a combination of Option A and Option B treatments as follows:*** Creditors who elect option C (the "Option C Creditors" and the claims held by the Option C Creditors, the "Option C Claims") are entitled to receive as consideration 31% of the amount of their subject claims in the form of Option A Consideration and 69% of their subject claims in the form of Option B Consideration. Option C Claims arising from the Existing Notes shall be exchanged for a combination of New Notes A and New Notes B, as applicable.

**Distributions under the EJ Plans**

**Upon the Confirmation Order, the Existing Notes have been restructured under the terms of the EJ Plans. Creditors will be able to elect their EJ Plan Consideration by making a valid election. The issuance of the New Notes A and New Notes B, for the subject claims arising from the Existing Notes, should occur no later than 180 Calendar Days from entry of the Chapter 15 Enforcement Order. If the New Notes A and the New Notes B are not issued for any reason, the subject claims arising from the Existing Notes shall continue to be evidenced and formalized through the EJ Plans and Confirmation Order as an enforceable instrument.**

**How to Make an Election**

Creditors who wish to make an election with respect to their Existing Notes as set forth herein must provide instructions to their bank or broker holding such Noteholder's Existing Notes (the "DTC Participant"), and request that such DTC Participant submit their Existing Notes via DTC's Automated Tender Offer Program ("ATOP") before the Election Deadline, which is **October 30, 2026 at 5:00 p.m. prevailing Eastern Time** (the "Election Deadline"). **Please see the Noteholder Election Form sent concurrently with this Election Notice** (the "Election Form") **for additional information**.

***By submitting its Existing Notes into ATOP, each Electing Noteholder will be deemed to acknowledge, ratify and confirm (a) consent to, authorize and direct its DTC Participant, the Trustees and Collateral Agents under the Existing Notes[4] the Debtors and their affiliates and each of their respective agents and advisors and other representatives to do all things necessary or desirable to effectuate the terms of the EJ Plans applicable to such Noteholder as an Electing Noteholder and (b) that such Electing Noteholder is making the same election for all of its Existing Notes.***

Each DTC Participant will determine the deadline by which it must receive election instructions. Upon submission through ATOP, the Existing Notes may not be transferred unless validly withdrawn. No later than 180 Calendar Days from entry of the Chapter 15 Enforcement Order, the Existing Notes will be exchanged for the applicable EJ Plan Consideration in the form of New Notes. The resulting New Notes A and New Notes B are expected to be transferable upon issuance.

**Withdrawal rights**. Following the Election Deadline and up to ten (10) business days prior to the anticipated date on which the New Notes are expected to be issued, the Existing Notes may be withdrawn from ATOP; *provided, however,* that following any such withdrawal, the Existing Notes may **not** be resubmitted. Any Creditor that withdraws Existing Notes following the Election Deadline shall, with respect to such Existing Notes, (i) be deemed **not** to have made an election, (ii) have relinquished all rights associated with any previously-made election associated with such

[4] Wilmington Savings Fund Society, FSB, is the indenture trustee and TMF Group New York, LLC, is the collateral agent, under the Existing Notes (in such capacities, the "Trustees" and the "Collateral Agents," respectively).

Existing Notes, and, as a result, (iii) shall be deemed to have selected Option B hereunder for purposes of receiving its EJ Plan Consideration.

**Further Information**

The EJ Plan and the Noteholder Election Form are available at https://dm.epiq11.com/andrade (the "Case Website").

For further information on this Election Notice or the elections described above, please contact the Debtors' information and distribution agent, Epiq Corporate Restructuring LLC. (the "Agent"), via email at registration@epiqglobal.com (with a reference to "Andrade" in the subject line).

# Exhibit M

# Noteholder Election Form

**Andrade Gutierrez International S.A. ("AGINT"), Andrade Gutierrez Investimentos em Engenharia S.A. ("AGIE"), Andrade Gutierrez Engenharia S.A. ("AGE"), Zagope SGPS, S.A. ("Zagope"), Andrade Gutierrez Construções e Serviços S.A. ("AGCS") and INZAG Germany GmbH ("INZAG") (the "Debtors")**

**9.000%/10.500% Senior Secured PIK Toggle Notes due 2029 (the "2029 Notes")[1]**
(CUSIP No. L01795 AG5 / ISIN USL01795AG50 and
CUSIP No. 03439T AH4 / ISIN US03439TAH41)

**1.000% PIK Toggle Notes due 2040 (the "2040 Notes")[2]**
(CUSIP No. L01795 AH3 / ISIN USL01795AH34 and
CUSIP No. 03439T AJ0 / ISIN US03439TAJ07)

## NOTEHOLDER ELECTION FORM ("ELECTION FORM")

Please see the accompanying *Notice of Restructuring and Election Process* (the "Election Notice") for additional information. Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Election Notice or the Debtors' extrajudicial reorganization plans (the "EJ Plans"), as applicable.

The Election Notice and the EJ Plans are also available at https://dm.epiq11.com/andrade (the "Case Website"). All Noteholders are encouraged to duly make an election. As detailed in the Election Notice, the deadline to duly make an election is **October 30, 2026 at 5:00 p.m. prevailing Eastern Time** (the "Election Deadline").

Pursuant to (i) EJ Plan 1, the 2029 Notes and the 2040 Notes (together, the "Existing Notes") will be exchanged for certain consideration (the "EJ Plan 1 Consideration"), and (ii) EJ Plan 2, the Existing Notes will be exchanged for certain consideration (the "EJ Plan 2 Consideration" and together with the EJ Plan 1 Consideration, the "EJ Plan Consideration"), in each case, as described in clauses 5, 6 and 7 of each of the EJ Plans, each depending on whether a Subject Creditor (or, a "Creditor") makes one of the following elections, as fully described in the EJ Plans, the Election Notice, and summarized below. A Creditor who is a holder of Existing Notes is referred to herein as a "Noteholder", with respect to its Subject Claims arising from the Existing Notes. Each Option under EJ Plan 1 has the same economic terms as the corresponding Option under EJ Plan 2. Under no circumstance will a Creditor receive the EJ Plan Consideration in duplication under both EJ Plan 1 and EJ Plan 2 (*i.e.,* Noteholders will receive the same EJ Plan Consideration under both EJ Plan 1 and EJ Plan 2, considering the aggregate amount each one holds under the Existing Notes, without duplication). A Creditor who makes a valid election before the Election Deadline (as defined below) is referred to herein as an "Electing Creditor." A Creditor who (i) does not make a valid election before the Election Deadline or, if applicable, (ii) withdraws its Existing Notes from ATOP (as defined below) is referred to herein as a "Non-Electing Creditor". Non-Electing Creditors shall be deemed to have selected Option B (as described below) for purposes of receiving their EJ Plan Consideration. As further detailed below, as consideration for their claims, Noteholders shall receive, with respect to their claims arising from the Existing Notes, new notes corresponding to the Option selected. **Each Creditor may only select one of the following election options for all of its Existing Notes.**

[1] The 2029 Notes were issued by AGINT and guaranteed by AGE, AGIE, AGCS, Zagope, and INZAG.

[2] The 2040 Notes were issued by AGINT and guaranteed by AGE.

**For the avoidance of doubt, in the event of any conflict between this Election Notice or the Noteholder Election Form and the EJ Plans, the EJ Plans shall prevail. Creditors should refer to the EJ Plans, available on the Case Website (as defined above)**.

**Withdrawal rights**. Following the Election Deadline and up to ten (10) business days prior to the anticipated date on which the New Notes are expected to be issued, the Existing Notes may be withdrawn from ATOP; provided, however, that following any such withdrawal, the Existing Notes may not be resubmitted. Any Creditor that withdraws Existing Notes following the Election Deadline shall, with respect to such Existing Notes, (i) be deemed not to have made an election, (ii) have relinquished all rights associated with any previously-made election associated with such Existing Notes, and, as a result, (iii) shall be deemed to have selected Option B hereunder for purposes of receiving its EJ Plan Consideration.

**Election Instructions to DTC Participant**

**Item 1: Existing Notes**

| 2029 Notes CUSIP/ ISIN | Principal Amount Held |
|---|---|
| (CUSIP No. L01795 AG5 / ISIN USL01795AG50) | |
| (CUSIP No. 03439T AH4 / ISIN US03439TAH41) | |

| 2040 Notes CUSIP/ ISIN | Principal Amount Held |
|---|---|
| (CUSIP No. L01795 AH3 / ISIN USL01795AH34) | |
| (CUSIP No. 03439T AJ0 / ISIN US03439TAJ07) | |

**Item 2: Noteholder Election** (***Noteholders may only select ONE of the three options below***):

☐ **Option A Election**: ***Under Option A, Creditors may elect a 36% recovery with a maturity of 2040 as follows:*** Creditors who elect option A (the "Option A Creditors" and the claims held by the Option A Creditors, the "Option A Claims") are entitled to receive as consideration (the "Option A Consideration") the equivalent of 36% of the amount of the subject claim, and the remaining 64% shall be deemed discharged. Creditors of Option A claims arising from the Existing Notes shall receive their Option A Consideration in the form of new notes, which are expected to be made eligible on the DTC platform (the "New Notes A"), issued by AGINT and guaranteed by Debtors AGE, AGIE and AGCS and non-Debtors Andrade Gutierrez Participações S.A. ("AGPAR") and Andrade Gutierrez S.A. ("AGSA"). The New Notes A will be secured by a first priority, Brazilian law governed fiduciary lien over the equity in AGE, and a first lien, German law governed pledge over the equity in INZAG. The New Notes A shall accrue interest at a rate of 6.00% per annum. Interest accrued from the date of the Brazilian Confirmation Order to December 28, 2030 shall be capitalized into principal of the New Notes A. Interest accrued from December 28, 2030 to December 28, 2040 shall be paid in cash on a semiannual basis on June 28 and December 28, as applicable, with the first payment being due June 28, 2031. The principal amount of the New Notes A shall be paid in six annual installments beginning December 28, 2035, with a maturity date of December 28, 2040.

☐ **Option B Election**: ***Under Option B, Creditors may elect preservation of 100% of the claim principal with minimal interest through 2070, bullet maturity and optional debtor prepayment right at a 90% discount as follows:*** Creditors who elect option B (the "Option B Creditors" and the claims held by the Option B Creditors, the "Option B Claims") are entitled to receive as consideration (the "Option B Consideration") the equivalent of 100% of the amount of the subject claim. Creditors of Option B claims arising from the Existing Notes shall receive their Option B Consideration in the form of new notes, which are expected to be made eligible on the DTC platform (the "New Notes B"), issued by AGINT and guaranteed by Debtors AGE, AGIE, AGCS and non-Debtors AGPAR and AGSA. The New Notes B will be secured by a second priority Brazilian law governed fiduciary lien over the equity in AGE (granted on a conditional basis), and a second lien, German law governed pledge over the equity in INZAG. The New Notes B shall accrue interest at a rate of 1.00% per annum. Interest accrued from the date of the Brazilian Confirmation Order shall be capitalized into principal of the New Notes B. The principal amount of the New Notes B and interest shall be paid in one single installment due on the maturity date: December 28, 2070. The New Notes B may be redeemed in advance, partially or in full, at the sole discretion of AGINT, AGE, AGCS, AGIE, AGSA and/or AGPAR at any time from January 1, 2035 until June 28, 2070, at a 90% discount. ***Option B is also the default EJ Plan treatment for Creditors that do not duly make an election***.

☐ **Option C Election**: ***Under Option C, Creditors may elect a combination of Option A and Option B treatments as follows:*** Creditors who elect option C (the "Option C Creditors" and the claims held by the Option C Creditors, the "Option C Claims") are entitled to receive as consideration 31% of the amount of their subject claims in the form of Option A Consideration and 69% of their subject claims in the form of Option B Consideration. Option C Claims arising from the Existing Notes shall be exchanged for a combination of New Notes A and New Notes B, as applicable.

**Item 3: Certification**

By returning this form or related instruction to its bank or broker (the "DTC Participant"), the Noteholder is instructing its DTC Participant to submit its Existing Notes pursuant to the election option indicated; and, in making any election, is automatically certifying that (i) if submitting a Rule 144A CUSIP, it is a "qualified institutional buyer" as defined in Rule 144A under the Securities Act of 1933, as amended (the "Securities Act") or (ii) if submitting a Regulation S CUSIP, is not a "U.S. person" and is located outside of the United States as defined in Regulation S under the Securities Act; and is hereby providing its consent to authorize and direct its DTC Participant, the Trustees and Collateral Agents under the Existing Notes, the Debtors and their affiliates and each of their respective agents and advisors and other representatives to do all things necessary or desirable to effectuate the terms of the EJ Plans applicable to the Noteholder as an Electing Noteholder, and (c) is making the same election for all of its Existing Notes. No EJ Plan Consideration will be delivered except in compliance with the Securities Act and the rules and regulations thereunder.

Date: ______________________________________________________________

Holder Name: ________________________________________________________

Authorized signature: __________________________________________________

Name of Signatory: ____________________________________________________

Title: ______________________________________________________________

Address: ______________________________________________________________

Telephone Number: _____________________________________________________

Email: ________________________________________________________________